ORIGINAL COPY
(FILED UNDER SEAL)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No. _____ |
| Plaintiff, | |
| v. | |
| **RAGINGBULL.COM, LLC**, et al., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER WITH ASSET FREEZE, APPOINTMENT OF A TEMPORARY RECEIVER, OTHER RELIEF, AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................................ii

TABLE OF EXHIBITS.....................................................................................................iv

I.   INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS ........................................................................................... 2

   A.  Raging Bull's Deceptive Business Practices.................................................... 2

       1.  Defendants' Deceptive Claims Regarding Trading Successes and
Income Potential ...................................................................................... 4

          a.   Advertising Claims Regarding Instructors' Wealth and Wins ............................ 4

          b.   Advertising Claims Regarding Instructors' Market Beating Strategies............ 10

          c.   Advertising Claims Regarding Instructors' Real Time Trade Alerts ................ 14

          d.   Advertising Claims Regarding Who Can Successfully Use Their Services...... 19

          e.   Advertising Claims Involving Unsubstantiated Consumer Testimonials .......... 21

       2.  Defendants' Disclaimers Confirm Their Earnings Claims Lack Substantiation...... 23

       3.  Defendants' Practices Regarding Cancellation ....................................................... 25

       4.  Defendants' Aggressive Response to Refund Requests, Consumer
Complaints, and Chargebacks................................................................ 28

   B.  Defendants ...................................................................................................... 30

       1.  Corporate Defendants .............................................................................. 30

       2.  Individual Defendants .............................................................................. 32

   C.  Consumer Injury ............................................................................................ 36

III.  ARGUMENT .............................................................................................................. 37

   A.  The FTC Act Authorizes the Requested Relief.............................................. 37

   B.  The Evidence Justifies Granting the FTC's Requested TRO ......................... 38

       1.  The FTC Is Likely to Succeed on the Merits........................................... 38

          a.  Section 5 of the FTC Act.................................................................. 38

          b.  Defendants' Deceptive Earnings Claims Violate Section 5 .............................. 40

          c.  Defendants' Additional Deceptive Claims Violate Section 5........................... 42

          d.  Defendants Are Violating ROSCA................................................... 43

       2.  The Equities Weigh in Favor of Granting the FTC's Requested Relief.................. 44

       3.  The Corporate Defendants Are Subject to Joint and
Several Liability as a Common  Enterprise ............................................. 45

       4.  The Individual Defendants are Personally Liable..................................... 47

   C.  The Proposed TRO Is Necessary and Appropriate to Preserve the Possibility of
Effective Final Relief.................................................................................... 50

       1.  An Asset Freeze Is Necessary and Warranted......................................... 50

       2.  Appointment of a Receiver Is Necessary and Warranted ....................... 53

       3.  Access to Defendants' Business Premises and Limited Expedited Discovery Is
Necessary and Proper............................................................................. 54

IV.  CONCLUSION.......................................................................................................... 55

## **TABLE OF AUTHORITIES**

## **Cases**

*Asseo v. Pan Am. Grain Co.*, 805 F.2d 23 (1st Cir. 1986)..................................................... iv

*Deckert v. Indep. Shares Corp.*, 311 U.S. 282 (1940)....................................................... 52

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999)............................................. 44-45

*FTC v. Agora Fin.,* 447 F. Supp. 3d 350 (D. Md. 2020) ................................................ 38

*FTC v. AmeriDebt*, 373 F. Supp.2d 558 (D. Md. 2005)................................... 37, 38, 50, 51

*FTC v. Beatrice Foods Co.*, 587 F.2d 1225 (D.C. Cir. 1979) ....................................... 38

*FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016) ..................................... 45

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006)................................. 39, 40

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ............................... 39, 41

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014)................................... 39-40

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993)....................................................... 39, 40

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ................... 39, 42

*FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976) .................................. 38

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005)................................. 40

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) ......................................... 50

*FTC v. Grant Connect LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011)............................ 45

*FTC v. Grant Connect, LLC,* 763 F.3d 1094 (9th Cir. 2014) ..................................... 45

*FTC v. Hardwire Interactive, Inc.*, No. 18-56161, 2019 WL 1514546
 (9th Cir. Mar. 19, 2019) ......................................................................................... 46

*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014) ............................... 40

*FTC v. IAB Mktg. Assocs.*, LP, 972 F. Supp.2d 1307 (S.D. Fla. 2013) ....................... 51

*FTC v. Innovative Mktg.*, 654 F. Supp.2d 378 (D. Md. 2009) ................................... 48

*FTC v. J.K. Publications, Inc.*, No. 99-0044, 2000 WL 35594143
 (C.D. Cal. Aug. 9, 2000) ........................................................................................ 36

*FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282 (D. Minn. 1985) ........................... 42

*FTC v. Lights of America, Inc.*, No. 8:10-CV-1333, 2013 WL 5230681
 (C.D. Cal. Sept. 17, 2013)............................................................................ 39, 40, 43

*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998) ............................... 39

*FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008)............ 45

*FTC v. Network Servs. Depot,Inc.*, 617 F.3d 1127 (9th Cir. 2010) ........................... 45

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994).................................... 39, 40, 43

*FTC v. Ross*, 743 F.3d 886 (4th Cir. 2014)....................................... 37, 47-48, 50, 53

*FTC v. Ross*, 897 F. Supp. 2d 369 (D. Md. 2012)....................................... 39, 48, 49

*FTC v. Sage Seminars*, No. 4:95-CV-2854, 1995 WL 798938 (N.D. Cal. Nov. 2, 1995)............ 42

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ........................................................ 39

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) ...................................................... 39

*FTC v. Thomsen-King & Co.*, 109 F.2d 516 (7th Cir. 1940) ...................................... 45

*FTC v. Transnet Wireless*, 506 F. Supp.2d 1247 (S.D. Fla. Mar. 20, 2007) ............ 42

*FTC v. Triangle Media Corp.*, No.18-CV-1388-MMA (NLS), 2018 WL 4051701
  (S.D. Cal. Aug. 24, 2018) ........................................................................................ 46

*FTC v. U.S. Oil & Gas*, 748 F.2d 1431 (11th Cir. 1984) ...................................... 53, 54

*FTC v. USA Beverages, Inc.*, No. 05-61682, 2005 WL 5654219
  (S.D. Fla. Dec. 6, 2005) ..................................................................................... 51, 54

*FTC v. Vemma Nutrition Co.*, No. 2:15-CV-1578, 2015 WL 11118111
  (D. Ariz. Sept. 18, 2015) .................................................................................... 39, 42

*FTC v. World Patent Mktg.*, No. 17-CV-20848, 2017 WL 3508639 (S.D. Fla. Aug. 16, 2017) ... 51

*FTC v. World Wide Factors*, 882 F.2d 344 (9th Cir. 1989) ....................................... 44

*In re Sanctuary Belize*, 409 F. Supp.3d 380 (D. Md. 2019) ......................... 44, 50-51, 52

*In the Matter of Cliffdale Assocs.*, 103 F.T.C. 110, 1984 WL 565319 (F.T.C. 1984) .................. 40

*In the Matter of Southwest Sunsites, Inc.*, 105 F.T.C. 7, 1985 WL 668880 (F.T.C. 1985), *aff'd*
  785 F.2d 1431 (9th Cir. 1986) .................................................................................. 40

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995) ........................... iv

*P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 266 (6th Cir. 1970) ........................... 45

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) ................................................. 37

*Schwartz v. Wellin*, No. 2:13-cv-3595, 2014 WL 51212 (D.S.C. Jan. 7, 2014) ........... 38

*SEC v. First Fin. Group.*, 645 F.2d 429 (5th Cir. 1981) ............................................. 54

*SEC v. Manor Nursing Ctrs. Inc.*, 458 F.2d 1082 (2nd Cir. 1972) ............................ 51

*SEC v. R.J. Allen & Assoc.*, 386 F. Supp. 866 (S.D. Fla. 1974) ............................ 53-54

*United States v. First Nat'l City Bank*, 379 U.S. 378 (1965) .................................... 52

*Virginia v. Kelly*, 29 F.3d 145 (4th Cir. 1994) ........................................................ 38

*Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206 (S.D. Fla. 2014) ........................... iv

**Statutes & Rules**

15 U.S.C. § 45(a) ..................................................................................................... 38

15 U.S.C. § 53(b) ................................................................................................. 37, 50

15 U.S.C. § 57b ................................................................................................... 37, 50

15 U.S.C. § 8403 ................................................................................................ 37, 43

16 C.F.R. § 310.2(w) ................................................................................................ 43

## TABLE OF EXHIBITS

| Exhibit | Description | PX _, [Page Range] |
|---------|-------------|--------------------|
| PX 1 | Declaration of Abagail Zeviar (consumer) | 1 - 55 |
| PX 2 | Declaration of Alan Adelson (consumer) | 56 - 147 |
| PX 3 | Declaration of Bradley Panek (consumer) | 148 - 152 |
| PX 4 | Declaration of Bruno Roy (witness) | 153 - 288 |
| PX 5 | Declaration of Charles Buckley (consumer) | 289 - 293 |
| PX 6 | Declaration of Danielle Felts (consumer) | 294 - 307 |
| PX 7 | Declaration of Ugo Diribe (consumer) | 308 - 495 |
| PX 8 | Declaration of Dustyann Tyukody (consumer) | 496 - 652 |
| PX 9 | Declaration of George Fotion (consumer) | 653 - 655 |
| PX 10 | Declaration of Hussein Abtidon (consumer) | 656 - 666 |
| PX 11 | Declaration of Joseph Palamara (consumer) | 667 - 783 |
| PX 12 | Declaration of Joseph Webster (consumer) | 784 - 800 |
| PX 13 | Declaration of Jyothish Kaimal (consumer) | 801 - 908 |
| PX 14 | Declaration of Marie Roy (consumer) | 909 - 1224 |
| PX 15 | Declaration of Matthew Arvin (consumer) | 1225 - 1227 |
| PX 16 | Declaration of Michael Oniya (consumer) | 1228 - 1318 |
| PX 17 | Declaration of Nova Holness (consumer) | 1319 - 1346 |
| PX 18 | Declaration of Ronald Martin (consumer) | 1347 - 1351 |
| PX 19 | Declaration of Sydney Budina (consumer) | 1352 - 1457 |
| PX 20 | Declaration of Tracy Forth (consumer) | 1458 - 1461 |
| PX 21 | Declaration of Trina Larson (consumer) | 1462 – 1492 |
| PX 22 | Declaration of Robert Shompe (New Hampshire BBB) | 1493 – 1586 |
| PX 23 | Declaration of Michelle Tavares (FTC Investigator) | 1587 – 1652 |
| PX 24 | Declaration of Emil George (FTC Forensic Accountant) | 1653 – 1683 |
| PX 25 | Declaration of Olivia Pennoyer (FTC Paralegal) | 1684 – 1731 |
| PX 26 | Expert Report of Prof. Russell R. Wermers | 1732 – 1805 |
| PX 27 | Declaration of Reeve Tyndall (FTC Investigator) | 1806 – 3061 |

**Notes on exhibits:** The FTC submits 27 exhibits—each a declaration, many with attachments—in support of this Motion. All exhibits cited in the Memorandum are referenced as "PX [exhibit number]." References include citations to relevant paragraphs by number, and to relevant attachments by page number. The pages of the 27 exhibits are consecutively numbered.

In considering an application for a TRO or preliminary injunction, the Court may rely on affidavits and hearsay materials. *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986) ("Affidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding.")); *see also Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1212 (S.D. Fla. 2014).

I.     **INTRODUCTION**

The Federal Trade Commission ("FTC") respectfully requests that the Court immediately halt Defendants' deceptive stock market investing scheme that has bilked consumers out of over $137 million in just the past three years.  Doing business as RagingBull.com LLC ("Raging Bull"), Defendants prey on consumers, including older individuals, with false and unsubstantiated claims that Defendants' services will enable consumers to generate substantial income.  Defendants claim to have purportedly simple and proven trading strategies that anyone can follow and to offer real-time trade alerts that let consumers copy the trades of Raging Bull's purportedly successful instructors.  They promise wealth to consumers even if they are inexperienced, have little time, or have little money to invest.

Defendants pay millions of dollars to promote their image of success as financial "gurus" and to advertise their earnings claims to lure unsuspecting consumers into their scheme.   Yet Defendants' earnings claims are not substantiated.  Defendants admit in buried disclaimers that they have not made "any attempt to determine whether any testimonials," of which they use many, "are representative of the experiences of all persons" using their services, showing they in fact have no data on which to base any of their claims about the results consumers can expect. Defendants also admit that the instructor results they use in advertising are "very atypical."  They further fail to mention that the founders of Raging Bull have lost a substantial amount of money in their stock and options trading.

Indeed, consumers who purchase Defendants' services, paying from $49 up to $3000 per subscription, do not make the kinds of income advertised; a number of them lose money instead, sometimes tens of thousands of dollars.  Consumers find there is little if any substance and no implementable strategy in Defendants' materials.  The FTC's expert further confirms that consumers who use these services are unlikely to make the kind of money advertised because no clear and viable trading strategy is presented to these consumers.

Defendants' reckless earnings claims continue and have not been tempered by the uncertainties in the stock market due to the COVID-19 pandemic.  Amid the current economic

crisis, Defendants claim to have found a "goldmine" and tout the "success" of their COVID-19 and pandemic "plays" in a market that Defendants claim is "creating more money making opportunities than we've seen in over a decade."  Once consumers realize they have been tricked, they often try to cancel the services they have purchased to prevent them from auto-renewing.  Defendants do not consistently provide a simple mechanism to cancel their subscriptions and make it difficult for consumers to avoid recurring subscription charges.

Because Defendants' conduct has already injured tens of thousands of consumers across the country and abroad, and continues to harm additional consumers on a daily basis, Plaintiffs seek a temporary restraining order ("TRO") that will stop Defendants' deceptive business practices and preserve assets for potential redress to consumers.

## II.    STATEMENT OF FACTS

### A.    Raging Bull's Deceptive Business Practices

Since at least 2014, Defendants have duped consumers into spending their hard-earned money, including government payments issued as a result of the Covid-19 pandemic,[1] for their stock and options trading services.  Defendants use false and unsubstantiated income claims to convince consumers they can generate substantial income by following the strategies and trades of Raging Bull's instructors.

Raging Bull offers or has offered more than thirty stock and options trading services, with at least eight trading instructors running those services.[2]  Jeff Bishop ("Bishop") and Jason Bond ("Bond") are the founders and front-men for Raging Bull.[3]  Kyle Dennis ("Dennis") is one of Raging Bull's most active instructors, aside from Bishop and Bond themselves.  These three

---

[1] Individual Defendant Jeff Bishop states in a promotional video for a Raging Bull service called Portfolio Accelerator, "I want you to join me on this journey of building your portfolio…It's less than 1,000 dollars, okay.  It's not a –I mean for some people it might be a lot, but you know what, the Government just gave you $1200 bucks, why don't you just make an investment in yourself right now, make the investment, it's 1,000 dollars…" PX 27, ¶ 24, Att. II, p. 2054.

[2] PX 27, ¶ 21.  Defendants have terminated services without warning, even for consumers who paid for "lifetime" subscriptions, and offer new services to replace them rather than offering a refund. PX 2, ¶ 39; PX 3, ¶¶ 9-10; PX 8, ¶ 24.

[3] PX 27, ¶¶ 21.

operate the vast majority of the services.[4]  Raging Bull advertises that consumers who sign up for their programs will learn from Bishop, Bond, Dennis, and the company's other instructors' simple-to-follow strategies for beating the market or will be able to copy these purported millionaire investors' specific trades using real-time alerts.[5]

Defendants spend millions of dollars to advertise their services to consumers worldwide through search engine ads, social media ads, and online videos.[6]  They use affiliate marketers and endorsers, including Jordan Belfort ("The Wolf of Wall Street"), to direct potential customers to their sites.[7]  They also use aggressive email marketing techniques[8] to capture consumers' attention and further spread their deceptive claims through emails and free promotional videos peddling each service.[9]

Since approximately March 2020, during the COVID-19 pandemic, Defendants have employed additional marketing tactics based on the nationwide economic uncertainty.  For example, marketing emails in April 2020 claimed Dennis "was able to rack up nearly $500K in profits by trading stocks related to the COVID-19 pandemic" and had found a "hidden bull market."[10]  In May 2020, Defendants advertised a webinar for a service called Trade with Kyle in which Kyle Dennis purported to explain the effects of the pandemic on the stock market and why

---

[4] PX 27, ¶ 23.

[5] PX 27, ¶ 23.

[6] PX 24, ¶ 27; PX 27, ¶ 89.

[7] PX 27, ¶ 93.

[8] The FTC investigators purchased Defendants' services and soon after they signed up, Raging Bull flooded their undercover accounts with dozens of daily emails.  Between March and November 2020, one undercover account received 4,738 emails.  These included not only promised email alerts from the service, but also marketing emails from other instructors for Raging Bull's slew of products.  PX 23, ¶ 7; PX 27, ¶¶ 31, 36.  This is consistent with consumers' experiences.  PX 1, ¶ 4; PX 2, ¶ 40; PX 5, ¶ 4; PX 6, ¶ 5; PX 7, ¶ 8; PX 8, ¶ 6; PX 9, ¶ 3; PX 10, ¶ 6; PX 12, ¶ 5; PX 13, ¶ 6; PX 17, ¶ 5; PX 19, ¶ 5; PX 21, ¶ 11.

[9] PX 27, ¶¶ 24, 36.

[10] PX 27, ¶ 36, Att. PPP, pp. 2306-2307; *See also*, PX 8, ¶¶ 31-42 (Bond, Bishop and Dennis sent consumer emails promoting their services and capitalizing on the pandemic.  For example, Bishop stated in one email, "there are hundreds of opportunities *every single day* to execute on high conviction patterns, and rake in thousands or even tens of thousands in profits in an extremely short period of time (emphasis in original)."

he believes that "even though the market is going down…there's so much opportunity to be made in the short-term."[11]  Raging Bull and its instructors have sent a constant stream of emails touting their ability to make consistent profits from the stock market during the pandemic.[12]

The unswerving focus of Raging Bull's advertisements, regardless of medium, is that Raging Bull's services are likely to lead to better financial results for consumers, including claims that consumers will generate substantial income through trading in the financial markets. Defendants convince consumers of this by: (1) falsely claiming they are millionaire traders who have simple strategies consumers can copy to make market-beating profits; (2) falsely claiming anyone can successfully use their services despite having little experience, time or money; and (3) prominently displaying positive, but unsubstantiated, consumer testimonials.

Once consumers subscribe to Defendants' services, Defendants do not provide a simple mechanism for consumers to cancel, and they aggressively oppose chargebacks and refunds.

### 1.      Defendants' Deceptive Claims Regarding Trading Successes and Income Potential

#### a.      Advertising Claims Regarding Instructors' Wealth and Wins

Raging Bull's image is built around the supposed trading success of its founders, Bishop and Bond.  They go out of their way to falsely create larger-than-life personas as highly sought-after trading geniuses who are living the high life off their trading prowess.[13]  Defendants even falsely advertised on their social media pages and website that Jason Bond had been invited by Harvard Business School to speak before its faculty and students.[14]  Defendants leverage this

---

[11] PX 27, ¶24, Att. LL, p. 2090.

[12] PX 27, ¶¶ 36, 48, 55; PX 8, ¶¶ 31-42.

[13] In marketing videos promoting their services, Bishop and Bond show themselves on the floor of the New York Stock Exchange ("NYSE"), ringing the bell at NASDAQ, flying on a private jet, carrying wads of cash, and strutting through casinos.  However, they fail to disclose that they asked a financial news service to interview them at NYSE and that neither owns a private jet. Bond also told consumers his picture was displayed in Times Square as recognition of his trading skills.  This too was false.  Bond paid a promoter for this marketing ploy. PX 27, ¶ 97.

[14] For example, Raging Bull and Bond sent numerous emails to their subscribers and posted announcements on Twitter and Facebook in 2017, claiming that Bond was being "honored" and invited to speak at the Harvard Business School.  PX 4, ¶¶ 15-17.  This was false.  Bond paid a third-party promoter to stage the event at the Harvard Faculty Club using a fake Harvard

(*continued*)

4

manufactured credibility to sell their services while touting their own wealth and cherry-picked wins to convince consumers they are purchasing services from "millionaire traders" who have a proven track record.[15]

Defendants make such claims across all of their services.  For example, Bond boasts about his wealth in the free video promoting his original service, Jason Bond Picks (captured March 12, 2020), by stating:[16]

- "[J]ust in the last few weeks, I made $170,000 trading stocks."
- "Just in the last few years, $758,000 in trading profits…I think I am going to make a half million dollars this year."

Similarly, in his promotional video for a service called Weekly Windfalls (captured June 15, 2020) Bond says:[17]

- "As you know, I've been trading stocks, specifically momentum, that entire time and have made millions of dollars trading and teaching other people how to do the same."
- "So now I'm going to be making more than double the amount of money for not only myself, but my clients.  So, yeah, I've been crushing it with stocks."

Bond also cherry-picks specific successful trades and brags about his winning percentages.  In the Weekly Windfalls video, for instance, he says:[18]

---

insignia.  PX 4, ¶ 18.  Harvard Business School has confirmed that it had no affiliation with Bond.  PX 4, ¶ 18.

[15] *See, e.g.*, PX 27, Att. J, pp. 1863, 1866, Att. BB, p. 1971, Att. GG, p. 2025.  Bond has been making deceptive claims of his trading wealth since 2011, when he first started working for Bishop as a consultant.  On his Jason Bond Picks website from December 24, 2011, Bond states, "I made my mark (and my fortune) on Wall Street by spotting opportunities, pouncing and locking in those profits fast...All my trades are 100% verified by a independent trading service, and I'm consistently one of the top performers-in any market."  PX 27, ¶ 64, Att. ZZZ, p. 2388.  Yet, the truth, as Bond admitted in sworn testimony, is that he left his job as a gym teacher in 2011 and started with a $5000 E-trade account.  Bishop told him no one would take him seriously, so Bishop allowed him to trade with $250,000 in Bishop's account, but Bond never kept the profits from that.  PX 27, ¶ 88, Att. NNNN, pp. 2931, 2933.

[16] PX 27 ¶ 24, Att. GG, pp. 2023, 2025.

[17] PX 27 ¶ 24, Att. OO, p. 2147.

[18] *Id*. at 2151, 2152

- "And I told you I had that 19-win streak.  That's not uncommon…I won 19 in a row.  This isn't smoke and mirrors.  I made $41,000 and change in as little as three weeks with 19 straight wins."

- "I don't want to get anybody's hopes up, but the compounding effect when you're getting 30, 40, 50 percent wins over and over and over is magnificent."

- "Probability of winning 60% of the time, but with expertise like mine, 70, 80, 90 percent of the time.  Going to have runs where I don't lose for a month."[19]

- "Projecting… half a million dollars on average for me with the strategy."

Along the same lines, in his promotional video for his service Monday Movers (captured August 24, 2020), Bond talks about trades he placed on Fridays that he made profits on by Mondays.[20]  These highlighted trades had 15% to 675% moves and he claims he made thousands of dollars. Bond states, "[s]o placing a trade on a Friday afternoon and getting out sometime on Monday takes me all of five to 10 minutes to execute and I can walk away with 500, a thousand or even, as you saw, upwards of $27,000."[21]

Jeff Bishop makes similar claims.  He tells consumers he is a MENSA-certified genius trader who has made millions of dollars trading.  During Bishop's video promoting High Octane (captured June 11, 2020), his options trading service, he says:[22]

- "Now I'm hunting the big whales out there.  I'm going after the big money.  I'm looking for six figure days.  I'm pretty confident I'm going to have a seven figure day pretty soon, yeah.  I think I'll make a million bucks in a day pretty soon, using the same system."

- "Some of these have delivered well over 100% in just a few days.  If I had to update this now, I'm sure some of these are up over 1,000%."

- "So check this out, today, like I said, those two trades alone, well, well over 100,000 dollars."

---

[19] Once consumers purchase a Raging Bull subscription, they have access to Defendants' suite of training videos (*see infra* note 56).  Bond, Bishop, and Dennis narrate the vast majority of those videos. Despite making claims of a consumer's probability of winning with his service in his promotional video, Bond tells his subscribers in a *post purchase* video, "Anybody who gives you a guarantee on their trading performance is lying. You can't guarantee trading performance..." PX 25, ¶ 58.

[20] PX 27 ¶ 24, Att. HH, pp. 2035-2038.

[21] PX 27 ¶ 24, Att. HH, p. 2037.

[22] PX 27 ¶ 24, Att. FF, pp. 2011-2012.

Bishop boasts about his profits in his videos and email marketing.  In a promotional video for a service called Bullseye Trades (July 13, 2020), Bishop states:[23]

- "I'm aiming to make over 100% profit each and every week with these ideas and I'm really good at it.  I have made literally hundreds of trades where I'v made well over 100% on it.  Some of these I used to think were unreal profits, I mean I'm talking $50,000, 60, even $100,000 in a matter of days."

Bishop also cherry-picks specific wins to highlight to consumers.  The product webpage for Bullseye Trades, as displayed in October 2020, tells consumers to check out some of Jeff's "Real Bullseye Trades That Were Sent" and then says, "Less than 24 hours after his trade alert, Jeff's DIS trade earned him a quick 70% gain for almost $10,000."[24]

Similarly, an email dated July 6, 2020 to the account the FTC investigator used to purchase Jason Bond Picks says Jeff's "last High Conviction $20,000 trade on AVLR returned 150% overnight and 376% in just 5 trading days."[25]  In an email advertising Weekly Money Multiplier on January 31, 2019, Bishop says in the subject line, "Year's Salary in 1 Trade" and shows a screenshot of a trading screen from a phone showing he made $91,000 on a trade.[26]  Another email, from January 30, 2019, says, "$9k in extra income" and "all that's required from you is a paragraph of reading and to press a few buttons.  Seems easy, right?"[27]

Defendants make the success of instructors other than Bond or Bishop central to their advertising as well.  Raging Bull advertises some instructors, including Defendant Dennis, as former students of Bond and Bishop who made their own millions trading stocks and then joined Raging Bull as instructors to teach their winning strategies.[28]  Defendants similarly tout cherry picked wins for these instructors.

---

[23] PX 27, ¶ 24, Att. BB, p.1971.

[24] PX 27, ¶ 23, Att. J, p. 1864.

[25] PX 27, ¶ 36, Att. PPP, p. 2309.

[26] PX 2, ¶ 14, Att. G, pp. 86-87.

[27] PX 2, ¶ 13, Att. F, p. 84.

[28] *See, e.g.*, PX 27, ¶ 24, Att. GG, pp. 2022-2023.

Defendants' marketing materials also include these instructors highlighting selected winning trades that earned huge percentages, often over 100% per trade and as high as 1600%.[29] A video ad for services offered by Kyle Dennis feature, for example, Dennis saying he made "about $9,100 per day trading stocks" in 2019.[30] Nathan Bear, a Raging Bull instructor, sent the FTC investigator an email on July 13, 2020 after he purchased Jason Bond Picks. The email advertised his service called Weekly Money Multiplier and stated:[31]

- "I've hit over 100 100%+ movers. Think about that for just a second. I'm going to rephrase. More than 100 times in the last 6 months, I have taken the amount of money I invested and doubled it. $500 to $1,000. $1,000 to $2,000. Again and again and again. OVER 100 TIMES!"

Many consumers purchase Defendants' services because they believe the instructors are successful traders.[32] In reality, these claims are false, misleading or unsubstantiated.

First, trading account statements for Bishop and Bond, as well as the Raging Bull corporate brokerage account formerly used by Bond,[33] show they actually lost millions of dollars in their trading activities during the years 2014 through 2018.[34] Analysis by an outside financial markets expert, Professor Russ Wermers,[35] retained by the FTC to evaluate Raging Bull's

---

[29] PX 27 ¶ 24, Att. NN, pp. 2136, 2139.

[30] PX 27, ¶ 24, Att. EE, p. 1997.

[31] PX 27, ¶ 36, Att. PPP, p. 2313.

[32] PX 2, ¶¶ 11, 15; PX 7, ¶¶ 3, 6; PX 8, ¶ 2; PX 15, ¶¶ 3-4; PX 17, ¶¶ 3-4; PX 18, ¶¶ 2, 4.

[33] Bond admits that he has done most of his trading over the years from Raging Bull's corporate brokerage account, but in 2019 was trading from his personal account. PX 27, ¶ 88, Att. NNNN, p. 2938.

[34] PX 26, ¶ 87 and Table 1. Bond makes several misrepresentations about his performance in 2015. In one *post purchase* video he says, ""The S&P closes red for the year (referring to 2015). I made 188% return...just shy of $200,000 profit." PX 25, ¶ 46. In another he says he had a 90% win rate in 2015 and was up 170%. PX 25, ¶ 44. In fact, in 2015, his 1099-B tax records show losses exceeding $800,000. PX 26, ¶ 87 and Table 1.

[35] Dr. Wermers is the Chairman of the Department of Finance and holds the Dean's Chair in Finance at University of Maryland Smith School of Business. Dr. Wermers is widely published in the area of investment fund performance evaluation and quantitative equity strategies. In addition to his academic experience, Dr. Wermers has also consulted for Goldman Sachs and other well-known financial institutions, working with GSAM trading professionals in devising investment strategies. He also currently sits on the Asset Management Advisory Committee of the U.S. Securities and Exchange Commission, comprised of a select group of top industry and academic experts in the field. PX 26, ¶¶ 1-4, 8.

purported trading strategies and performance, found these "losses are not only substantial, but also persistent over the years examined" and occurred during periods of stock market upturns.[36]

Second, according to the FTC's expert, Defendants' advertisements that make specific claims regarding percentage of trading returns are "cherry-picked" and "unlikely to be achievable in practice."[37] Indeed, even a trading return that exceeds 50% is quite rare and it would be highly unlikely for most individual traders to achieve.[38]

Third, while continuing to represent to consumers in their advertising that they achieve trading returns and results superior to Wall Street hedge funds and other financial institutions,[39] Defendants admit their win rates are not typical in their disclaimers.[40] At times, they also admit to massive losses in the training videos made available to consumers only after they have purchased the services.[41] In one video, Bond also admitted that he knew he had losses and purposefully did not disclose them to consumers by stating, "[i]n the old days, 5K loss. Me? Publicly? Never gonna happen. I'm not gonna do it. It'll end my business. If somebody hears that I lost 5000, why would they ever want to learn from me."[42]

---

[36] PX 26, ¶ 87. Dr. Wermers noted the Russell 2000 Index gained 22% in 2016 and 12% in 2017, two years during which Raging Bull trainers incurred substantial losses. *Id*.

[37] PX 26, ¶ 91.

[38] *Id*. ¶ 93. Dr. Wermers analyzed Bond and Bishop's advertising that made specific claims about percentages of trading returns. He found that the claimed returns equated to annual returns ranging from 108% to 330% per year. These are not consistent with the 1099-Bs he analyzed where Bond and Bishop failed to generate profits and incurred substantial losses over several years. *Id*. at ¶ 92.

[39] *Id*. ¶ 24.

[40] *See infra* Section II.A.2.

[41] *See supra* note 19. In his 2020 Masterclass video Bond stated, "**It's not uncommon for me to make hundreds of thousands of dollars quickly or to lose hundreds of thousands of dollars quickly**... Most years, I finish profitable…" *Id*. at 56. He also stated, "That is what I've learned by reading Mastering the Trade and **that is what I've learned by going through the pandemic and losing half a million dollars, at one point closer to $800,000 in the matter of a few months…**(emphasis added)." PX 25, ¶ 83.

[42] PX 25, ¶ 49.

> **b.**     **Advertising Claims Regarding Instructors' Market Beating Strategies**

Defendants also advertise their services with claims that their strategies can beat the market and generate substantial income for subscribers.  For example, Bond markets his trading service "Jason Bond Picks" with statements like "Don't Just Beat the Market…Crush It" and he brags about having a winning strategy in his promotional video (captured March 12, 2020) for the service by saying:[43]

- "I've helped 3 students in a very short period of time make over a million dollars."

- "My strategy is so simple, if you can…see a fishhook on a chart, if you can see a pennant on a chart and a rocket on a chart, you will know the three things that I've used to create millions of dollars."

- "Those are my three trading patterns.  They changed my life forever.  The only question I have for you is, could they change yours…you've learned my favorite money-making techniques…it's that simple." [44]

Similarly, in his promotional video for the trading service Unchained (captured March 25, 2020) Bond says:[45]

- "When things get crazy, I generally go back to my number one strategy…that's two patterns that helps [sic] me identify big, huge movers in any market condition…for me it's momentum and specifically the two patterns that I'm going to teach you tonight."

- "And what I'm going to teach you tonight, I actually used in the last week to make about $75,000."

- "My strategies work.  I just proved it over the course of the last week.  And in general, I dominate."

Defendants also describe the trading service, Total Alpha, as teaching consumers "the options trading strategies that Jeff Bishop has used to make a fortune in the stock market."[46]

---

[43] PX 27 ¶ 24, Att. TT, p. 2183, Att. GG, p. 2023-2024, 2031.

[44] Bond tells subscribers *post purchase*, "Most day traders lose a lot of money very quickly and never graduate to profit-making status and the SEC even warns on that." PX 25, ¶ 60.

[45] PX 27 ¶ 24, Att. MM, pp. 2104-2105, 2110.

[46] PX 27, ¶ 118(b), Att. GGGGG, p. 3048

Bishop shares his purported strategies for Total Alpha by stating in the promotional video (captured May 27, 2020):[47]

- "There are three distinct phases that I've used to generate huge returns like these over and over again.  And now you can, too…As traders, the most important thing to focus on is simplicity because with simplicity comes a lot of money.  I mean, a lot of money once you master it.  You want to keep things simple and you want to make more money, right?"

- "So what I developed is a methodical system that takes the crystal ball out of the process and narrows it down to focus on three constantly repeating phases of a stock's life…very few [people] actually know how to profit from it. But I made it my mission to profit from this. And now you can, too."

- "I am not just here to show you how to find them.  I'm here to show you how you can make a killing, a literal killing by making it simple and dialing in on only three phases and never veering off course."

- "It's a proven method and it's what I've been teaching people for years."

- "This is all you need and it's made me an insane amount of money in a short period of time."

Bishop also runs a service, Bullseye Trades, that offers consumers access to purported educational materials plus alerts for "one trade," "once a week," with "one hundred percent profit targets."[48]  Advertising materials for Bullseye Trades state "I'm aiming to make over 100% profit each and every week with these ideas and I'm really good at it."[49]

Defendants market Sniper Report as a newsletter by Kyle Dennis "strategically developed to only deliver high probable [sic] trades with the power to make 100%, 200%, 300% return [sic] on each trade."[50]  Dennis also tells consumers interested in his options service, Dollar Ace, that he has a proprietary scanner that finds insider information.  In his promotional video (June 8, 2020) he says that his scanner hunts down sub-dollar options based off indicators hiding in plain sight and this allows him to profit alongside inside traders.  He says,[51]

---

[47] PX 27 ¶ 24, Att. KK, pp. 2076-2077, 2079.

[48] PX 27, ¶ 23, Att. PP, p. 2155.

[49] PX 27 ¶ 24, Att. BB, p. 1971.

[50] PX 27, ¶ 118(a), Att. FFFFF, p. 3045.

[51] PX 27, ¶ 24, Att. DD, p. 1993-1994.

- "I have the ability to see exactly where the money is going and can trade off of it to make boatloads of cash."

- "you can just turn on your smartphone and turn that into a little ATM in your pocket.  I'm making this as easy as possible for you."

In his Fast Five Trading promotional video (September 2, 2020), Dennis tells consumers, "I stick to a set of simple trading patterns that have allowed me to pull in profits daily."[52]

Raging Bull advertises that its subscriptions come with materials that set forth the various purported strategies, including "playbooks," ebooks, videos, and access to chat rooms where consumers can interact with the instructors.[53]  Once consumers purchase, they typically receive access to a membership site or "dashboard" where they can see all of their subscriptions and access their online materials.[54]  The playbooks include high-level overviews of common trading concepts and broad suggestions like "don't get too emotional."[55]  The videos also touch on generic trading concepts and a number of them are recordings of old webinars, some as old as 2012, which appear to be divided up into parts and styled as lessons.[56]

Some consumers stated they could not follow the materials at all.[57]  Others, who typically had more finance or trading background, said that while they understood the technical terms used, they could not discern a strategy that they could use in their own trading and that the

---

[52] PX 27 ¶ 24, Att. EE, p. 1998.

[53] PX 3, ¶¶ 3-4; PX 5, ¶ 3; PX 7, ¶ 4; PX 8, ¶ 4; PX 10, ¶ 3; PX 11, ¶ 3; PX 18, ¶ 5; PX 21, ¶ 6; PX 27, ¶ 35, Att. OOO, pp. 2297-2299; PX 26, ¶ 27.

[54] PX 2, Att. K, p. 101 ("if you have a current active subscription…you will need to go to your subscriptions list inside the RagingBull Dashboard"); PX 12, ¶ 11; PX 27, ¶ 38.

[55] PX 26, ¶ 30.

[56] PX 25, ¶¶ 9, 22; PX 26, ¶ 30.  After purchasing several services in 2020, the FTC investigator received access to 236 videos (totaling 102.9 hours).  The videos were narrated by Bishop, Bond, or Dennis and created between 2012 and 2020 (more than half were created between 2012 and 2016). PX 25, ¶¶ 7-9.

[57] PX 17, ¶ 7; PX 20, ¶ 7.

videos were basic with very little substance.[58]  Many consumers who tried to follow Raging Bull's strategies lost money.[59]

According to the FTC's expert, Defendants' purported trading strategies are unlikely to generate consistent profits, let alone the kind of market-beating returns or substantial income that Defendants convey in their advertisements.  First, Defendants claim that their so-called trading strategies rely on technical trading indicators and identifying historical patterns in stock charts to predict future stock price movements.[60]  Trading strategies designed around technical trading indicators are often complicated and require significant resources, rigor, and precision in their application which makes these strategies highly risky for retail traders.[61]  Contrary to Defendants' claims, it is extremely unlikely that technical trading indicators can consistently work in the sectors of the market in which Defendants promote their use, i.e., small capitalization and penny stocks; in fact, they are likely to generate consistent losses.[62]

Second, there is no evidence that Defendants' training materials actually teach a market-beating trading strategy.  The general trading concepts Defendants purport to teach lack the structure, concreteness, consistency, and clarity required for Raging Bull's subscribers to apply

---

[58] PX 3, ¶ 12; PX 4, ¶ 33; PX 5, ¶ 5; PX 7, ¶ 5; PX 8, ¶ 7; PX 10, ¶ 11; PX 12, ¶ 9; PX 13, ¶ 26; PX 19, ¶ 34.

[59] PX 2, ¶ 42 ($4,000 subscription fees, $75,000 trading losses); PX 3, ¶ 16 ($14,000 subscription fees, $19,000 trading losses); PX 5, ¶ 19 ($9994 subscription fees, $7,000 trading losses); PX 6, ¶ 13 ($5,000 subscription fees, $50,000 trading losses); PX 7, ¶ 32 ($24,000 trading losses); PX 8, ¶ 51 ($10,000 subscription fees, $15,000 trading losses); PX 14, ¶ 57 ($96,000 trading losses); PX 15, ¶ 7 ($1500 subscription fee); PX 18, ¶ 9 ($12,000 trading losses); PX 19, ¶ 53 ($4,000 subscription fees, $26,000 trading losses); PX 20, ¶ 10 ($10,000 trading losses); PX 21, ¶ 12 ($1500 subscription fees, $10,000-$15,000 trading losses).

[60] PX 26, ¶ 42.

[61] PX 26, ¶ 43.

[62] PX 26, ¶¶ 43-44. The market sectors Defendants promote, which include small-capitalization and "penny" stocks, can be characterized as securities with much lower trading volume on average.  With only "thin trading" in these sectors, quoted prices can be an unreliable technical indicator; in addition, even if a technical indicator can be trusted, it is not likely an investor can implement such a trade without incurring a large trading cost. PX 26, ¶¶ 16-17.

them on their own in a timely manner.[63]  Specifically, they fail to reveal any strategy with a clear set of instructions that enables subscribers to properly set up, execute, and exit their trades.[64]

> ### c.  Advertising Claims Regarding Instructors' Real Time Trade Alerts

Defendants also offer consumers real-time trade alerts about a trade just made, including date, time, and price.[65]  The alerts are designed so consumers can copy the trades and make money like the instructor claims he makes.  A number of consumers explained this was a primary reason they bought the service,[66] and many of Raging Bull's services emphasize their alert offerings in promotional materials.[67]

The Raging Bull website in November 2016 stated, "Now you can follow these **MILLIONAIRE TRADERS** as they alert each move they make in real-time.  Real money.  Real traders.  Real results.  You deserve the BEST! (emphasis in the original)."[68]

In his video promoting Weekly Windfalls (captured June 15, 2020), Bond tells consumers:[69]

- "[Y]ou can literally look over my shoulder and pay you back [sic][piggyback] on the trades with doing nothing more than picking up that spoon and taking a bite of that sweet honey."

- "You're going to get a trade alert and there's going to be a 30-second video with that trade alert.  It's set it and forget it….we're going to put the trade on and we're going to collect that windfall on Friday…You can literally look over my shoulder and watch me do this because I'm going to stream the portfolio live…So in

---

[63] PX 26, ¶¶ 15, 20.

[64] PX 26, ¶ 15.

[65] PX 27, ¶ 23.  Defendants offer trade alerts in 16 out of 18 services and they have been a staple of Raging Bull's offerings since the beginning.  In fact, Bond also offered live alerts in December 2011 with Jason Bond Picks before Raging Bull was formed.  *See, e.g.*, PX 27, ¶ 23, Att. ZZZ, p. 2387.

[66] PX 1, ¶ 10; PX 5, ¶ 2; PX 7, ¶ 6; PX 9, ¶ 4; PX 10, ¶ 2; PX 12, ¶ 4; PX 15, ¶ 4; PX 21, ¶ 5.

[67] PX 27, ¶ 23.

[68] PX 27, ¶ 64, Att. BBBB, p. 2430.

[69] PX 27, ¶ 24, Att. OO, 2150.

addition to getting the 30-second video that shows the order being put into play, you can watch the portfolio live. You can piggyback on the strategy."[70]

In his promotional video for Jason Bond Picks (captured March 12, 2020), Bond says that he expects his clients to read the daily watch list, a "two-minute primer," and then look for "real-time trade alerts by text and email during the day."[71]

- "Three to five of those a week. If the market is hot, it's going to be more than three to five, all right? Researched by me, snapshot comes out to you in the morning, and then the alerts come out to you during the day. I mean, that's what it looks like on your phone. Those are the actual alerts I send clients at the actual time on the actual date."[72]

- "Trade alerts, real-time access to all of my content, portfolio, the huge wins that I'm making, I'm texting, I'm emailing out to my clients. Simple, powerful, profitable."

Bishop also offers real time trade alerts with his subscriptions and tells consumers when promoting Bullseye Trades, "You can follow right along with me.  I tell you exactly what trade it is, what the exact price is and what I'm looking to get out of it.  And I'm not looking for a little bit of profit, I'm looking for 100 percent or more each and every week" and "This is what you

---

[70] In contrast, in one of Bond's training videos consumers can watch *post-purchase*, Bond says, "All of Wall Street is one big pump…I have no problem with stock promotion or bias in any form whatsoever so long as it's legal.  If it's legal and I can make money off of it, I will participate in it... where it becomes an issue is the uneducated person who signs up for this list and thinks all they have to do is buy the next pick and leave their money in and they will get rich and gets burned. And I don't even feel bad for that person." PX 25, ¶ 40.

[71] PX 27, ¶ 24, Att. GG 2025, 2032.

[72] Bond sells his subscriptions to consumers highlighting his alerts, but then *post-purchase* says in a Jason Bond Picks video from 2020, "As long as you're disciplined in your trading like this, you're going to be able to stay in the game. You'll be able to capture big wins… You can't mirror this stuff…  **If you want to mirror anything that I do, if you want to piggyback on me, momentum penny stocks is not the place**…  **Do not try to buy after I buy**…(emphasis added)."  PX 25, ¶ 49.

need to make consistent profits week after week."[73]  On the Bullseye Trades order page, it states, "ONE TRADE ONCE A WEEK ONE HUNDRED PERCENT PROFIT TARGETS."[74]

Dennis tells consumers he will send "alerts delivered right to your phone and right to your email.  So imagine this, you're walking along, right, on the street, you get a text message from me right to your phone.  It will tell you exactly what I'm buying."[75]  Jeff Williams, another Raging Bull instructor who runs Profit Prism, tells consumers, "[o]ver $20,000 profit or a 275% return on my very first run.  And I'm sharing this with traders just like yourself, real-time alerts, emails…and they are seeing success like they never thought was possible" and "I send you the exact text alert of what I'm looking for, what I'm trading, when I buy it and, of course, when I sell it."[76]

Consumers routinely complain about Defendants' alerts.  For one, they report that they often do not receive both alerts—to buy and to sell—or that alerts come too late.[77]  Consequently, consumers do not always know when to get in or out of the trades, or prices have

---

[73] PX 27, ¶ 24, Att. BB, p. 1974.  In contrast, Bishop states in a training video seen by consumers *post purchase*, "**I do so many trades on options, it's not feasible to put out alerts all the time...** the other thing is I'm not really encouraging people to make the trades I make... I'm doing things that are pretty advanced… **You have a whole different risk profile than I do. I don't want you copying my trades** (emphasis added)."  PX 25, ¶ 95.

[74] PX 27, ¶ 25, Att. PP, p. 2155.

[75] PX 27, ¶ 24, Att. DD, p. 1995.  Dennis states in a *post purchase* video, "Cause the goal here is, like I've been saying from the get go, is not to sit here and mirror anyone's trades. That's very hard… Anyone can mirror trades… It's not very successful if you sit there mirroring trades."  PX 25, ¶ 119.

[76] PX 27, ¶ 25, Att. JJ, p. 2066-2067.  Defendants, in their disclaimer buried in a link at the bottom of their product page, state that "An individual should never invest in the securities of any of the companies' mentioned based solely on information contained on our website. **Individuals should assume that all information provided regarding companies is not trustworthy unless verified by their own independent research.**" (emphasis added).  PX 27, Att. HHH, p. 2265.  Following these disclaimers to the letter would make it impossible for consumers to use Defendant's trade alerts because of the time it would take to research each trade before executing it.

[77] PX 1, ¶ 12; PX 3, ¶ 7; PX 8, ¶ 20; PX 12, ¶ 8; PX 13, ¶ 13; PX 16, ¶ 12, 23; PX 17, ¶ 7; PX 20, ¶ 8; PX 21, ¶ 9.  Bond admits this happens.  *See* PX 25, ¶ 58 ("Lot of times it's just some tech issue… Our team is there to help you with that… It's possible the text alert on Tesla didn't go out. I don't know which trade it was today but one trade the email alert went out but not text… I'm pushing so many buttons throughout the day.  Sometimes I mess up.").

changed by the time they get an alert, negatively affecting their chances of capturing the same profits as the instructor.[78]  In addition, consumers state that because Defendants make their own trades and *then* send the alert to their thousands of subscribers (a practice they admit to),[79] this appears to drive the prices up or down such that consumers must purchase at a higher cost for the same trades or sell at a lower price.[80]  Often when Defendants send out the sell alerts, they inform subscribers they have sold for huge profits, while their subscribers often are left with huge losses because they could not purchase or sell at the same price as the instructor.[81]

Defendants are aware of this, yet continue to advertise services that include real-time alerts.[82]  Bond recorded a video in 2017 offered to consumers *post-purchase* where he stated, "Nothing in my service is designed for mirroring... Focus on the pattern not on just buying when I buy and selling when I sell. I don't know a single client in my service and I have over 7000 paying clients now that has ever written me and said every single day I make a killing mirroring your trades..."[83]

---

[78] PX 1, ¶ 11; PX 10, ¶ 4; PX 11, ¶¶ 21-22;  PX ¶ 22, Att. C, p. 1548; PX,16, ¶¶ 11, 25; PX 20, ¶ 9; *see also,* PX 19, ¶ 27 ("I ended up being glued to my computer all day on those days I was trading and even had two monitors dedicated to my trading so that I could react to these alerts immediately," but "[d]espite all this, the biotech stocks that Kyle alerted were volatile and the price moved so quickly that I was too late getting in and getting out of these trades.").

[79] PX 27, Att. NNNN, p. 77-81.

[80] PX 2, ¶ 27; PX 7, ¶¶ 7, 23; PX 15, ¶ 5; PX 16, ¶ 23; PX 21, ¶ 10.

[81] *E.g.,* PX 1, ¶ 11; PX 2, ¶ 23; PX 16, ¶ 23; PX 20, ¶ 8.

[82] PX 27, ¶ 23.  Consumers complained about this to Defendants. *E.g.,* PX 2, ¶ 28 (consumer emailed customer service stating, "Noticing post the calls, with everyone chasing the bids or offers their paying up to 15 to 20%.  The sheep are left with the crumbs?"); PX 7, ¶ 24; PX 11, ¶ 23; PX 19, ¶ 16.  In a training video *post-purchase*, Dennis says: "I do not want to see people doing what happened here today which is the second I buy it, a bunch of folks here cause 127,000 shares to be traded and it went up to the area of my sell zone. Now, I didn't sell it for the reason being that I'm fully aware that a lot of you guys chased it...."  PX 25, ¶ 155.

[83] PX 25, ¶ 65.  Bond also stated in his training video from 2015 that consumers can watch *post purchase*, "**Get the idea of mirroring my trades out of your head.** That's not why I built this service. I built this service because I know how to trade, and I can teach you to do it too without me... **People always complain "Oh Jay buys the stock and you, know, I can't get the same price" Welcome to Wall Street...** That isn't what this service is about. The service is about why did this happen and how can you spot it before it happens next time and how can you quickly find it so you don't have to spend 10 hours a day doing it... **If I would've bought that stock, somebody would've complained that it moved too fast. Maybe even multiple people** (emphasis added)." PX 25, ¶ 63; *see also, id*. ¶¶ 29, 37, 49, 65, 71, 119, 154, 155; PX 22, Att. C,

(*continued*)

17

The FTC's expert confirmed consumers' experiences that the alerts provide little information on the appropriate buy or sell price subscribers should aim for as well as how long the alert should be actionable.[84]  This lack of clarity makes the subscribers vulnerable to potentially large losses.[85]  In addition, the expert confirmed that because the instructors typically alert consumers to the trades *after* they have already executed their own trades on often thinly traded stocks and options, it is unlikely that most subscribers can act in a timely manner to capture the price of the trade alerts.[86]

The expert further explains that "[m]irroring an already-executed trade … is not straightforward" when investing in the style of Defendants and that subscribers are "likely to be at a disadvantage" when trying to do so.[87]  Indeed, "[t]he longer the time delay between when a trade alert is sent out and when subscribers are able to react to the alert, the greater the risk that the price has moved in a direction unfavorable to the subscribers."[88]  More importantly, a collective attempt by the thousands of Raging Bull subscribers to mirror a trade can have a large price impact on the stock's price and cause consumers to lose money while lining the pockets of the instructors.[89]

---

p. 1547 (customer service responding that "[W]e do not guarantee profits on our trades, nor do we ever recommend mirroring trades.  Our trades are for observational purposes across the board for all of our services.")

[84] PX 26, ¶¶ 15, 19-20, 46, 80-81.

[85] PX 26, ¶¶ 20-22, 46, 85.

[86] PX 26, ¶¶ 21, 79-81, 85.

[87] PX 26, ¶ 79.

[88] PX 26, ¶ 79-80.

[89] PX 26, ¶¶ 23, 77, 80-85.  Defendants acknowledge this.  Bond says in a training video, "Penny stocks attract a lot of beginners, because it's a get rich mentality….  Herd mentality drives huge penny stock gains….  What drives penny stocks? It can be a bunch of people on a forum talking about it. It can be major media touting it…Remember, Apple is a huge company, so if people believe that the next iPhone is going to be made with a lot of Liquidmetal, that's going to excite a lot of people who don't know how to trade and then there's people who do know how to trade and all the masses come together and the supply just isn't there, and the demand outweighs the supply and the price just skyrockets, so from where we alerted it, it went up 200%." PX 25, ¶ 69. *See also*, *id.* ¶¶ 154-55.

Finally, the 1099-B records for Raging Bull, Bishop and Bond show that, even in a perfect world where Defendants' subscribers could mimic or mirror those trainers' trades without any time lag or price impact, they would have still suffered substantial losses.[90]

> **d.    Advertising Claims Regarding Who Can Successfully Use Their Services**

Aware that the complexity of the financial markets may prove daunting to some consumers, Defendants stress that anyone can successfully use their services regardless of how much time, money or experience the consumer may have, and their simple strategies will mechanically yield profits. For example, in Bond's free video promoting his options service called Weekly Windfalls, he tells consumers that this service is great for small accounts, is the best options strategy for beginners, and that the strategy is designed for busy professionals. Specifically, he says:[91]

- "So a $2,000 margin account.  No crazy software or anything like that…you could start with as little as $1000, and if you are hitting 50% returns, it wouldn't take many trades to get to that coveted $25,000 day trading account."

- "This is, in my opinion, the best option strategy for a beginner.  Anyone who's looking to get into options should start here for the sole reason that the odds are already stacked in your favor."

- "I don't think anything more than the video and looking over my shoulder is necessary for clients.  And I want that for them, Jeff.  They're busy.  They've got jobs, careers, kids, families. I mean, everybody's schedule is packed.  This strategy is designed for the busy professional…You can literally look over my shoulder and pay you back [sic][piggyback] on the trades with doing nothing more than picking up that spoon and taking a bite of that sweet honey."[92]

---

[90] PX 26, ¶ 86-88.

[91] PX 27, ¶ 24, Att. OO, pp. 2150-2151, 2153.

[92] Bond admits if consumers work full time they may have difficulty mirroring his trades. Bond stated in a training video *post purchase*, "If you're going to mirror, if you're at work, you don't have to wait for me to sell, you know what I'm looking for, so you can put your sales in at any number you want…You're going to have to go study conditional orders. I'm not going to talk you/walk you through how to place these conditional orders.  Because to be quite frank I don't know.  But I do know this much, it can be done. And all you have to do is watch a five minute video on E-Trade Pro [site] and you're good to go…I'm not going to go into it because I don't need to do it, but if I worked full time and I couldn't watch trades, you better believe I would understand how to use conditional orders." PX 25, ¶ 41.

Bishop, in his Total Alpha options trading promotional video claims:[93]

- "It's ok to start small.  Everyone does…I actually prefer that you start small…You can start with any account size you wish."

- "Actually, now that I think of it, it's even better if you're brand new because there's no bad habits to break.  You're starting from scratch with the one service that simplifies the market and it is proven to make people boatloads of cash…So, yes, if you're new to options, perfect."[94]

- "But I want to show you how in just ten minutes per day you can make some additional income.  Most of my members have full-time jobs.  Maybe you do, too. Great, this is perfect for you.  You cannot get any better than this."

- "If you give Total Alpha just one hour a week, that's all you need so you can supplement your income.  I'm telling you just ten minutes a day can transform your account considerably.  You can do this at any level you want.  It doesn't matter where you're starting."

Dennis, in his Dollar Ace promotional video tells consumers:[95]

- "[T]his is a perfect strategy for someone with a small account or a large account."

- "Even if you've never, ever traded options before, this is perfect.  Because I'm going to streamline this for you."

- "See, the beauty of this system is that it's easy to follow. It requires a little bit of time to implement, just minutes per day."

For Dennis' Sniper Report program, he states on the order page (captured in October 2020), "**Kyle's No Work Promise:** Say 'SO LONG!' to the days of tedious trading, slaving over stock charts or spending thousands on a degree in finance…Kyle does ALL the work and research.  All you have to do is read his alerts and reap the benefits."[96]

In reality, many consumers are not able to use the programs despite these claims.  Some consumers' lack of experience hindered their ability to use the program.[97]  Consumers'

---

[93] PX 27, ¶ 24, Att. KK, pp. 2085-2086.

[94] When applying for a merchant account with Nuvei, Bishop provided a product matrix for Raging Bull's services in which states that Total Alpha is the most advanced options trading service Raging Bull offers. PX 27, ¶ 78, Att. IIII, p. 2595.

[95] PX 27, ¶ 24, Att. DD, pp. 1992, 1994-1995.

[96] PX 27, ¶ 23, Att. SS, p. 2180.

[97] PX 17, ¶¶, 3, 6; PX 20, ¶¶ 6-10.

experiences contradict Raging Bull's claims that little time need be devoted in order to succeed.[98] Finally, some consumers find they cannot use this strategy to make money if they have only a small amount of money to start with.[99]

The FTC's expert opined that because there is no concrete or viable strategy and because mirroring Raging Bull's own trades is unlikely to yield market-beating returns, consumers who are inexperienced at trading, or who have limited capital and time, are extremely unlikely to achieve consistent profits and market-beating returns through their subscriptions to Raging Bull's services.[100]

### e.   Advertising Claims Involving Unsubstantiated Consumer Testimonials

Defendants' marketing, whether it is a webpage, order page, promotional video or email marketing, is replete with customers' testimonials used to entice consumers to purchase their services.[101] These customers talk about specific successes, overall gains, and overall satisfaction with Raging Bull's services.

Most of the testimonials refer to specific trades or periods of time where a consumer did well, which, like the instructors' cherry picked wins, are not representative of a typical consumer's overall results.  On the order page for Jason Bond Picks (captured April 2020), customer testimonials state:[102]

- "Jason Bond is REAL! I've been following some of Jason's trades…The teaching method and instruction is impeccable and easy to follow.  I am thankful to have discovered Jason's excellent program!" – Jeff W.

- "4 out of my last 5 trades have made me $$$.  Was skeptical at first but I have fully recovered my membership fee after 3 trades.  Highly recommend!"- Ian A.

---

[98] PX 1, ¶ 12; PX 5, ¶ 17.

[99] PX 2, ¶ 35; PX 10, ¶ 4.

[100] PX 26, ¶ 25.

[101] PX 27, ¶¶ 23-25.

[102] PX 27, ¶ 23, Att.TT, p. 2185.

Bishop's Bullseye Trading options service also contains customer testimonials on its sales page (captured October 2020):[103]

- "Jeff, Got in IWM at $1.30. Just sold at $2.80. First triple digit profit at 115%!!!!!  Gain of $6,000. Thank you, Thank you, thank you." – Bruce Marling

- "Same story $500 in about 15 min. May buy back in if it consolidates but can't be made with that profit!" – Michael Staats

- "Thanks Jeff!! Got half position on at $2.80 and out at $4.55, 63% return is great!! Made over 900%+" – Vincenzo Curella

On the Bullseye Trading order page (captured October 2020), these testimonials are posted:[104]

- "Well, just doubled on WDAY, thank you Jeff. My goal is to retire and trade as I need to. I want time with grandchildren, so let's keep this going please." - Louise Petersen

- "Got in at 3.20 and just sold at 7.90. Snagged a 147% gain in a matter of 2 days. Jeff…You're the real deal my friend! Thanks!" - Heath Robinson."[105]

Advertisements for Bullseye Trades also feature quotes from purported customers, asserting wins of 25%, 70%, or 115%, or claiming, "all of the Bullseye Trades have been profitable for me."[106]

In Bishop's Total Alpha video (captured May 27, 2020), he shows purported subscribers' testimonials on the screen saying "I am up $10,000 on the trade so far and sold some already! $36,000 on the day. Thanks!" and "Its [sic] crazy how good of a feel Jeff B has on the market! I also bought XLE and ROKU with him, up $14k on those 2 combined." Total Alpha ads feature testimonials from purported customers claiming to have made "[$]6500.00 in 20 MINUTES," "$500 in 15 min[utes]," "roughly 90% in 24 hours," and "92%" wins.[107]

---

[103] PX 27, ¶ 23, Att. J, p. 1869.

[104] PX 27, ¶ 25, Att. PP, p. 2163.

[105] This same consumer testimonial also is shown on the video for Bishop's Total Alpha options service. PX 27, ¶ 118(d).

[106] PX 27, ¶ 24, Att. BB, p. 1972.

[107] PX 27, ¶ 118(b), Att. KK, p. 2078, Att. GGGGG, p. 3050.

In Dennis' Dollar Ace promotional video (captured June 8, 2020), Dennis includes short video testimonials from customers. One said that the customer was able to turn $4,700 into $80,000 in just a few months. Another customer said that he was able to turn $9,000 into $162,000 in trading profits. One customer said that he lost $40,000, bounced back with Dennis' service, and is now a profitable trader traveling the world.[108]

Dennis' Sniper Report sales page (captured in October 2020), contains testimonials like, "I started with $4,700 and have turned it into $80,000 in just about 2 months working with Kyle," and "INPX up $2500 Kyle you are a stock GOD," "+$890 CGC & +1210 NBEV over the weekend."[109]

Defendants admit in their disclaimers that their testimonials are unsubstantiated and are not representative of typical results.[110] In sworn testimony, Bond admitted Defendants do not verify customer testimonials,[111] and, as described below, the disclaimer pages for each of Raging Bull's services confirm this.

### 2. Defendants' Disclaimers Confirm Their Earnings Claims Lack Substantiation

Defendants post various disclaimers that contradict their marketing claims and admit the misleading nature of their ubiquitous income claims, including those from consumers and themselves.

---

[108] PX 27, ¶ 24, Att. DD, p. 1991.

[109] PX 27, ¶ 23, Att. M, p. 1884.

[110] PX 27, ¶¶ 26, 36. Defendants were also accused of paying for fake testimonials in a defamation lawsuit brought originally by Raging Bull (*see infra* note 172). Bond and Bishop denied they do so in sworn affidavits, stating they hired a company called TrustPilot to gather and authenticate reviews from consumers. PX 27, ¶ 88, Att. SSSS, pp. 3000, 3003. An FTC investigator found TrustPilot took down a review approximately two weeks after the account was opened because it found the review came from the same computer used to open Raging Bull's account. PX 27, ¶ 86(b). Raging Bull also appears to flag virtually all negative reviews consumers file on TrustPilot as violating TrustPilot's policies. When a review is flagged, it is moved offline until TrustPilot investigates and then it is reinstated or removed, depending on the outcome. PX 27, ¶ 86(c). One consumer reported that her review was flagged for containing language that was "accusatory or defamatory" and all she did was state "they have charged me $998.00 in ADVANCE and are refusing to refund my money." PX 21, ¶ 26.

[111] PX 27, ¶ 88, Att. NNNN, p. 2952-2954. Bond told the New Hampshire Securities Bureau ("NHSB") that Defendants do not verify typical customer testimonials on social media.

As noted above, Defendants rely heavily on consumers' testimonials throughout their marketing.  Defendants' order pages typically include a pair of links at the bottom, titled "Disclaimer" and "Terms and Conditions."[112]  Within their disclaimers, they state that "[t]estimonials are believed to be true based on the representations of the persons providing the testimonials **but facts stated in testimonials have not been independently audited or verified**. **Nor has there been any attempt to determine whether any testimonials are representative of the experiences of all persons using the methods described herein** (emphasis added)."[113] With these statements, Defendants baldly admit that they have no substantiation for the testimonials they use to sell their trading services.

In addition, Defendants' disclaimers state, "**[n]o person was compensated for providing a testimonial** (emphasis added)."  Yet, Defendants have compensated at least two well-known sports figures for their testimonials.[114]

The website disclaimers also contradict Defendants' advertising that consumers can make substantial income by following the instructors' trades and allowing Defendants to do all the "hard work."  For example, while Bullseye Trades is marketed with statements such as "I do all the homework and research during the week ahead and you get to piggyback off my single best idea for the week," the disclaimers on other pages of the website or in the small text box below

---

[112] PX 27, ¶¶ 26, Att. PP-GGG.  There is no requirement to click on these hyperlinks to view the content on the website or to purchase the services.  The Disclaimer and Terms and Conditions contain a notice regarding consumer testimonials.  However, the consumer testimonials themselves do not provide a link to any of these disclaimer notices.  PX 27, ¶ 26.  There is also no requirement to scroll through the text box on the order page before ordering a service.  *Id.* ¶ 27.

[113] PX 27, Att. HHH, p. 2263.

[114] PX 27, ¶¶ 94-95, Att. HHH, p. 2263.  In 2017, it appears Defendants paid Jose Canseco, a former professional baseball player, to endorse Jason Bond's Millionaire Roadmap Service. Canseco claimed that he was a new member of the service and that he believed Jason Bond had experience, incredible profits (400%), and was worth checking out.  *Id.* Att. PPPP, p. 2978. According to bank records, Raging Bull paid Jose Canseco $18,000 over a three-month period in 2017.  PX 24, ¶ 28, Att. E, p. 1681.  In 2020, Defendants paid Mike Alstott, a former professional NFL player, $20,000.  *Id.*  He spoke on a podcast with Jeff Williams, a Raging Bull instructor, and said that he was using his service, Profit Prism, and that people should try the program.  PX 27, Att. QQQQ, p. 2982.  Neither testimonial disclosed these payments.  PX 27, ¶¶ 94-95.

24

the purchase button contradict that.  In a complete about-face, the disclaimers say instead "[a]n individual should never invest in the securities of any of the companies'[sic] mentioned based solely on information contained on our website" and "individuals should assume that all information provided regarding companies is not trustworthy unless verified by their own independent research."[115]

As noted above, Defendants rely heavily on their own income claims as well as consumer testimonials to sell their services.[116]  Starting in March 2020, the FTC investigator began to receive emails sent to an undercover account after purchasing Raging Bull's services.  Since July 2020, these emails, which include buy and sell alerts, watch lists, solicitations for additional services, and announcements, include a disclaimer that states in part, "**RESULTS PRESENTED NOT TYPICAL OR VERIFIED**" and "**subscribers' trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL** (emphasis in the original)."[117]

These disclaimers admit that Defendants have consistently lacked substantiation regarding whether the earnings claims they make, the example trades they tout, and the consumer testimonials they use are truthful and not misleading.

### 3.   Defendants' Practices Regarding Cancellation

In general, Raging Bull's services renew automatically, either quarterly or annually.[118] While Defendants disclose this before consumers pay, they make it difficult for consumers to

---

[115] PX 27, ¶ 26(b), Att. III, p. 2267.

[116] Defendants rely on these heavily in their promotional videos marketing their services. Defendants sometimes include disclaimers at the beginning of these videos, often claiming they are obligated to do so.  Despite the actual disclaimer displaying for only a brief period of time in fine print while the instructor speaks, the instructor ad libs the disclaimer typically only highlighting that trading is risky.  However, the actual disclaimer states in small print in a large block of text that "results are very atypical and you should not expect to replicate them." *See, e.g.*, PX 27, ¶¶ 23-24, Att. LL, p. 2089.

[117] PX 27, ¶ 36, Att. PPP, 2300-2316.

[118] *See, e.g.*, PX 27, ¶ 78, Att. IIII, pp. 2593-2603.

cancel many of their subscriptions before Defendants charge them again.[119]  Consumers complain that, although they typically sign up online, they are not always able to cancel online.[120]  Consumers then must email or call the company.  Many consumers who call the company are disconnected, receive no answer, have long hold times, leave unreturned messages, or receive voicemails telling them to send an email.[121]  When consumers try to cancel or request refunds by email, they are told they must speak with a live Raging Bull representative by phone.[122]  Often weeks go by before a persistent consumer finally reaches a live Raging Bull representative.[123]  Consumers report that these delay tactics and obstructions have resulted in charges on their credit cards for unwanted subscription renewals.[124]  In some instances, Defendants continued to bill consumers after consumers told Raging Bull and its representatives (before the auto-renewal date) to cancel their services, and then refused to refund or reverse the unauthorized charges.[125]  Defendants have also configured the online customer account pages so that, while consumers can add a new credit card to their accounts online, they are unable to remove their credit cards from their accounts.[126]

---

[119] PX 6, ¶¶ 9-10; PX 7, ¶¶ 25-27; PX 9, ¶¶ 6-7; PX 10, ¶ 12; PX 12, ¶¶ 11-13; PX 13, ¶¶ 18-21; PX 14, ¶¶ 23, 34, 47-48; PX 16, ¶¶ 27-31; PX 19, ¶¶ 37-41; PX 20, ¶¶ 12-13; PX 21, ¶¶ 17-20; PX 23, ¶¶ 18-23; PX 27, ¶¶ 38-40.  Out of approximately 247 complaints, the FTC has received approximately 77 in which consumers complained that they were unable to cancel or had difficulty cancelling their subscriptions.  *Id*. at ¶ 68.

[120] PX 6, ¶ 10; PX 7, ¶ 25; PX 9, ¶ 6; PX 13, ¶ 18; PX 16, ¶ 27; PX 19, ¶¶ 37-38.

[121] PX5, ¶ 16; PX 6, ¶ 10; PX 7, ¶ 25; PX 10, ¶ 12; PX 12, ¶ 13; PX 13, ¶ 20; PX 16, ¶ 29.

[122] PX 12, ¶ 11; PX 13, ¶ 19 ("As far as cancellations and refunds we do not handle this via email for your personal account security"); PX 16, ¶ 29 ("Adam responded to tell me Raging Bull does not issue refunds over email and that I needed to call their 'VIP team' during trading hours or to leave a voicemail").

[123] PX 6, ¶ 11; PX 7, ¶ 26; PX 10, ¶ 14; PX 12, ¶ 13; PX 16, ¶ 30.

[124] PX 12, ¶¶ 11-13; PX 14, ¶¶ 47-48; PX 16, ¶ 30-31; PX 20, ¶¶ 12-14; PX 21, ¶¶ 16-17.

[125] *See, e.g.*, PX 14, ¶¶ 34, 47-48, PX 19, ¶¶ 37-38, 45 & Att. O, p. 1445 ("You renewed my subscription to Jason Bond Picks after I explicitly sent you 3 different emails instructing you NOT TO RENEW MY SUBSCRIPTION!!!!!"); PX 21, ¶¶ 16-20 ("Raging Bull customer service cursed at me and said I agreed to the auto renew when I signed up initially").

[126] *See, e.g.*, PX 7, ¶ 25 ("Raging Bull kept the credit card I paid with on file and I could not delete it from their website"); PX 19, Att. O, p. 1445 ("You don't let user's [sic] remove their card details so they cannot be used for renewal").

The FTC investigators' experiences confirm these delay tactics.  During their investigation, the FTC investigators purchased five different services offered by Raging Bull. For three of the purchases, FTC investigators were not able to cancel online even though they followed the instructions for the two ways to purportedly cancel online as described on the Raging Bull "FAQ" webpage.[127]  For one service, the FTC investigator emailed and called Raging Bull's customer service line three separate times, each with 30-minute hold times, before she left a message and hung up.[128]  After nine days, the FTC investigator called again and was finally able to get in touch with a live Raging Bull representative when she dialed the sales line rather than the customer service line.[129]  When trying to cancel another subscription, the FTC investigator was stuck in a circuitous loop between the subscription page and notifications page, neither of which allowed him to cancel despite the instructions in the "FAQ" webpage.[130]

Defendants are aware that Raging Bull has obstructed and made it difficult for consumers to cancel their subscriptions, and that this is a major source of consumer complaints.[131]  In early

---

[127] FTC investigators were able to find a cancellation link for two of the five subscriptions, but after clicking on the link, they have not received confirmation from Raging Bull that the cancellation on these two subscriptions went through.  PX 23, ¶ 23; PX 27, ¶¶ 47, 58.  One consumer who also thought he had effectively canceled online by clicking a button later discovered that Raging Bull disregarded his attempt to cancel and charged his credit card again. PX 19, ¶¶ 37-38.

[128] PX 23, ¶¶ 20-22.  The FTC investigator had initially tried to cancel this subscription through Raging Bull's "Contact Us" form, but received an email from a Raging Bull representative who said she could only cancel by talking to one of their "dedicated Client Concierge agents" over the phone.  PX 23, ¶ 19.

[129] PX 23, ¶¶ 20-23.  During the call, the Raging Bull representative assured the FTC investigator that she had canceled the subscription, although she has not received a written confirmation of the cancellation.  *Id*. ¶ 23.

[130] One of these subscriptions offered a 30-day money back guarantee.  The FTC investigator has tried calling for nearly two months to ask for the refund, but has been unable to reach anyone by phone.  PX 27, ¶¶ 56-59.

[131] PX 7, ¶ 26 ("He told me I would forfeit my subscription fee if I decided to quit Option Rocket even though it had only been approximately two months since I signed up"); PX 19, ¶ 39 ("I caught Kyle Dennis in the chatroom and sent him a private message to complain about the improper auto-renewal charge"); PX 11, ¶ 32 ("He kept repeating that Raging Bull does not give refunds and to 'enjoy the remaining time on your subscription'"); PX 14, ¶ 56 ("In January 2020, Raging Bull contacted me to let me know that they had agreed to refund me for the 'unwanted renewal'"); PX 21, ¶ 17 ("I received an email back from someone named Nathan who told me that I agreed to the auto renewal and they do not issue refunds for late cancellations").

2019, Raging Bull even assured its payment processor that it would rectify these problems by "sending customers Renewal Reminders" and "making it easier for their customers to cancel their account."[132]  The sheer number of complaints in 2020 regarding the billing practices and cancellation challenges confronted by Raging Bull's customers demonstrate that Defendants have yet to make it easy or simple for consumers to cancel their auto-renewing subscriptions.[133]

### 4.  Defendants' Aggressive Response to Refund Requests, Consumer Complaints, and Chargebacks

Defendants resort to various tactics to stymie consumers' efforts to recover their losses and refunds.  For example, when consumers seek a refund—either because they come to realize they were deceived by Defendants' earnings misrepresentations or because they are unable to timely cancel their subscriptions and prevent the recurring charges—Raging Bull's initial response invariably is to find cover behind its lengthy "terms and conditions" webpage.  Here, Raging Bull's representatives would argue that, according to these terms and conditions, the company has a strict "no refund" policy, even for unwanted recurring charges on subscriptions that consumers were unable to timely cancel.[134]  In this way, Raging Bull denies most consumers' refund requests in the first instance.

When dissatisfied consumers escalate their dispute by initiating a chargeback with their credit card companies, Raging Bull typically disputes these consumer-initiated chargebacks by, among other things, falsely stating to credit card companies that these consumers are still "using" Defendants' services.[135]  As "proof" for this specious claim, Defendants have tracked and

---

[132] PX 27, ¶ 79, Att. JJJJ, p. 2802.

[133] PX 27, ¶¶ 68-69 (77 consumers reported issues cancelling Raging Bull services and 193 consumers reported issues obtaining a refund).

[134] PX 5, ¶ 16; PX 11, ¶ 12; PX 13, ¶¶ 19-20; PX 14, ¶ 47; PX 16, ¶ 31; PX 19, ¶ 40; PX 21, ¶ 17.

[135] *See, e.g.*, PX 1, ¶ 19 ("Raging Bull disputed the decision to grant me the chargeback and told Bank of America that I was currently using the subscription"); PX 11, ¶ 32 ("Through correspondence with my bank, I learned that Raging Bull told them I was still using their service" and "still receiving emails from the company and failed to unsubscribe"); PX 14, ¶ 54 ("Raging Bull also showed my credit card company my website login history and said this was 'Proof of Delivery'"); PX 20, ¶ 14 ("Raging Bull disputed the chargeback and claimed I had agreed to their terms of service, which they said did not allow any refunds").

attached copies of consumers' login information, including the IP addresses and the number of times the consumer "logged in" to their Raging Bull members' dashboard.[136]  In some cases, Raging Bull would require new customers to sign an online agreement (after credit card billing information is provided but before consumers can access the services they paid for) containing fine print language that purports to waive certain rights of the consumer, including the right to terminate the service and claim refunds.[137]  Defendants would provide copies of these agreements to credit card companies as further "proof" that consumers had consented to the recurring charges.  Raging Bull has effectively reversed consumer-initiated chargebacks through these tactics.[138]

Some consumers who are denied refunds have also submitted complaints to the Better Business Bureau ("BBB").[139]  In fact, through the BBB, Defendants have received hundreds of complaints from subscribers harmed by Defendants' deceptive earnings claims and illegal billing practices.[140]  From December 2017—when Raging Bull's file was transferred to the New Hampshire BBB from Texas—to October 2020, Raging Bull carried an "F" rating from the BBB for 27 of those 34 months, due to the large number of unanswered consumer complaints.[141]

---

[136] *See, e.g.*, PX 14, ¶ 54; PX 17, ¶¶ 12-13.  Contrary to Defendants' claims, consumers may need to access the online dashboard for tasks having nothing to do with using the services, including researching how to cancel their account, reviewing their account information, updating payment information, accessing the FAQ page, or searching for Raging Bull's customer service contact information.  PX 27, ¶¶ 38-40, 57-59.

[137] PX 14, Att. JJ, p. 1215 ("Neither this Agreement nor the License may be terminated even if the User no longer accesses or has access to the Site," "License will automatically renew," and "User acknowledges that the User is being given access to our proprietary information and techniques and once the User has been granted access, we cannot issue refunds"); PX 2, Att. M, p. 121 (non-refundable).

[138] PX 1, ¶19; PX 11, ¶ 32; PX 14, ¶ 54; PX 15, ¶ 7; PX 16, ¶ 33; PX 20, ¶ 14.

[139] PX 1, ¶16; PX 2, ¶ 37; PX 3, ¶ 15; PX 5, ¶ 16; PX 7, ¶ 28; PX 8, ¶¶ 16, 47; PX 9, ¶ 8; PX 10, ¶ 13; PX 14, ¶ 56; PX 15, ¶ 8; PX 16, ¶ 37; PX 17, ¶ 14; PX 18, ¶ 7; PX 19, ¶ 42; PX 20, ¶ 15; PX 21, ¶ 28.

[140] PX 22, ¶¶ 6-9; PX 27, ¶¶ 66-71.

[141] PX 22, ¶ 10.  To try to improve its BBB rating, Raging Bull appears to have offered refunds to some consumers, although these refund offers have been sporadic and temporary and appear to have been undertaken to appease one payment processor's concerns about Raging Bull's high chargeback rates.  *Id.* ¶¶ 10-11; PX 27, ¶ 79, Att. JJJJ, p. 2802 (the payment processor received

(*continued*)

Raging Bull has also conditioned the issuance of refunds on consumers first agreeing to withdraw their BBB complaints or mark them as resolved, despite BBB's policy to the contrary.[142]

Defendants' ongoing deception and harmful tactics have also prompted at least two payment processors to terminate Defendants' merchant accounts within the past two years.  In July 2019, after warning Defendants on repeated occasions about excessive monthly chargeback rates, one payment processor (First Data Merchant Services) finally terminated Defendants' merchant accounts.[143]  The next payment processor that on-boarded Raging Bull (Stripe) issued a termination notice in September 2020, shortly after receiving notice that Raging Bull had hit MasterCard's excessive chargeback program for the prior month.[144]

### B.    Defendants

#### 1.    Corporate Defendants

**RagingBull.com, LLC**, formerly known as Lighthouse Media, LLC,[145] ("Raging Bull") is a Delaware limited liability corporation located in Lee, New Hampshire and incorporated in

---

assurances from Raging Bull in early 2019 that it would be "automatically submitting and [d]iscover refunds that come back" and "trying to increase their BBB rating").

[142] PX 7, ¶ 30; PX 9, ¶ 9; PX 10, ¶ 14; PX 16, ¶ 37; PX 19, ¶ 43; PX 22, ¶, pp. 1517-1518.  The BBB has also warned Defendants that these conditional refunds violated BBB's policy.  PX 22, ¶ 14.  The BBB has also rejected Defendants' repeated attempts to obtain accreditation.  *Id*. ¶¶ 12-13 ("BBB Accreditation is a symbol of trust and ethics in the marketplace" and "BBB NH has explained to Raging Bull LLC on at least 5 separate occasions that their company is not eligible for BBB Accreditation as they do not meet BBB's Standards for Accreditation").

[143] PX 27, ¶ 79, Att. JJJJ, p. 2810.  In September 2018, this payment processor observed that Raging Bull "remains an ongoing concern due to the potential for reputational risk from the high [chargebacks]…."  *Id*. Att. JJJJ, p. 2826.  In February 2019, Discover notified this payment processor to remove several of Raging Bull's merchant accounts from its network.  *Id*. at 2831-2835.  In June 2019, after re-assessing Defendants' business model, one risk manager noted: "If we lose any money here it is because we didn't do appropriate due diligence.  There is so much negative on this guy [i.e., Jason Bond], I wonder how we ever approved him.  Is this Small Business AA?"  *Id*. at 2840-2841.

[144] PX 27, ¶ 81, Att. LLLL, pp. 2891-2893.  Mastercard's chargeback program identifies merchant accounts with excessive monthly chargeback activity using pre-determined acceptable thresholds.  *Id*.

[145] Raging Bull was formed under the name Lighthouse Media LLC on January 3, 2014.  The name was formally changed to Raging Bull on December 8, 2016.  Both companies share the same tax identification number.  PX 27, ¶ 3, Att. A, pp. 1843-1844.

2014.[146]  Raging Bull is owned by Sherwood Ventures LLC (65%), Jason Bond[147] (25%), and MFA Holdings Corp. (10%).[148]

**Sherwood Ventures, LLC** ("Sherwood Ventures") is a Texas limited liability corporation with its principal place of business at 62 Calef Highway in Lee, New Hampshire.[149]  Sherwood Ventures is owned by Jeff Bishop and is 65% owner of Raging Bull.[150]  Since 2017, Sherwood Ventures has received approximately $20.8 million from Raging Bull.[151]  Raging Bull's domain, ragingbull.com, was originally registered under Sherwood Venture's name and the registration was changed to list Ragingbull.com, LLC in January 2017.[152]

**Jason Bond LLC** ("Bond LLC") is a Delaware limited liability corporation with its registered address at 1209 N. Orange St. Wilmington, Delaware.[153]  Jason Bond LLC is owned by Jason Bond and is a 25% owner of Raging Bull.

**MFA Holdings Corp.** ("MFA") is a Florida corporation formed in February 2014.  MFA is owned solely by Allan Marshall and has no other directors or officers.  Its principal place of business is listed as Allan Marshall's personal residence.[154]  In the very same month and year that MFA was created, MFA entered into an operating agreement with Sherwood Ventures and Jason Bond for the operation of Lighthouse Media, LLC (now known as Raging Bull).  MFA is a 10%

---

[146] Its principal place of business is listed at 62 Calef Highway, Lee, New Hampshire, which is a PO Box.  However, it has a physical office located at 11311 McCormick Road, Hunt Valley, MD 21031. PX 27, ¶¶ 17-18.

[147] Defendant Jason Bond variously reports his ownership share as being in his own name or in the name of his two holding companies, Jason Bond, LLC and Jason Bond, Inc.  PX 27, ¶ 8, Att. E, pp. 1850-1853.

[148] PX 27, ¶¶ 4, 78.

[149] PX 27, ¶ 5, Att. C, pp. 1847-1848.

[150] PX 27, ¶¶ 5, 73(c).

[151] PX 24, ¶ 12.

[152] PX 27, ¶ 85.

[153] Jason Bond LLC was formed for tax purposes.  PX 27, ¶ 88, Att. NNNN, pp. 2964-2965.

[154] PX 27, ¶¶ 10-11, Att. F, pp. 1854-1856.

owner of Raging Bull.[155]  From April 2017 to July 2020, Raging Bull paid MFA nearly $4 million in distributions.  Between 2019 and 2020, MFA also assisted in financing Raging Bull's operations by sending over $135,000 to Raging Bull from MFA's bank account.  Through MFA, Allan Marshall has signed bank documents authorizing opening a bank account under Raging Bull's name, which Defendants have used to collect consumer payments.[156]

**Winston Research, Inc.** ("Winston Research") is a Delaware corporation with its principal place of business at Kyle Dennis' home address in Kingsport, Tennessee.[157]  Kyle Dennis is the signatory on the corporate bank account for Winston.[158]  The account has received approximately $4.2 million from Raging Bull since 2017.[159]

**Winston Corp.** was a California corporation with its principal place of business located at Kyle Dennis' prior home address in California.[160]  Kyle Dennis has a contract with Raging Bull under Winston Corp. and he is the signatory on the corporate bank account that received approximately $4 million from Raging Bull since 2017.[161]

### 2.  Individual Defendants

**Jeff Bishop** ("Bishop") is CEO and co-founder of Raging Bull and one of its lead instructors.[162]  Bishop is the sole owner of Sherwood Ventures, which owns 65% of Raging Bull.[163]  Bishop is the signatory on Raging Bull's corporate accounts[164] and he opened the

---

[155] PX 27, ¶ 78, Att. IIII, pp. 2590-2592 (Lighthouse Media operating agreement signed by Allan Marshall on behalf of MFA Holdings in February 2014).

[156] PX 24, ¶ 12; PX 27, ¶ 74, Att. EEEE, pp. 2484-2489.

[157] PX 27, ¶¶ 12-14, Att. H, p. 1858.

[158] PX 27, ¶ 75, Att. FFFF, pp. 2499-2504.

[159] PX 24, ¶ 12.

[160] PX 27, ¶ 75, Att. I. pp. 1859-1860.  Winston Corp. was dissolved on September 19, 2017.  *Id.* at 1862.

[161] PX 24, Att. A, p. 1662.

[162] PX 27, ¶ 21.

[163] PX 27, ¶¶ 5, 73(c), 78(c).

[164] PX 27, ¶¶ 73-74.  This includes the accounts for Raging Bull's predecessor, Lighthouse Media.

corporate merchant processing accounts.  As signatory on merchant accounts, Bishop is aware that two separate payment processors terminated Raging Bull's merchant accounts; one for high chargebacks.[165]  Bishop also paid for many of Raging Bull's domains, including ragingbull.com, jasonbondpicks.com, sherwoodventures.com, biotechbreakouts.com, millionaireroadmap.com, weeklymoneymultiplier.com, and sniperreport.com.[166]  He also paid for privacy protection for several Raging Bull domains.[167]

Bishop runs several of Raging Bull's options trading services.[168]  He narrates the promotional videos for these services and promotes his products through webpages, videos and marketing emails; all of which makes widespread use of earnings claims.[169]  In particular, he describes himself as a millionaire trader and uses his purported success to market his services despite substantial trading losses reported between 2014-2018.[170]  Bishop also is aware of consumer complaints, including complaints about Raging Bull's deceptive advertising and illegal billing practices.  Bishop was involved in responding to the BBB about consumer complaints and in trying to improve their rating.[171]  In 2019, RagingBull.com LLC, Jason Bond and Jeff Bishop sued an alleged competitor for defamation.[172]  In the suit, Bishop and his company Raging Bull were confronted with evidence of consumer complaints as to the company's fraudulent practices and use of fake testimonials and he responded by filing his own affidavit denying the

---

[165] PX 27, ¶¶ 77-78.

[166] PX 27, ¶ 83.

[167] PX 27, ¶ 84.  Privacy protection services mask the identity of the domain owner from consumers and law enforcement.  These domains included sherwoodventures, millionaireroadmap.com, jasonbondpicks.com, biotechbreakouts.com, weeklymoneymultiplier.com, and thedollarace.com.  *Id.* ¶ 84.

[168] PX 27, ¶ 23.

[169] PX 27, ¶¶ 23-25 and accompanying attachments.

[170] *See*, *e.g.*, PX 27, ¶ 24, Att. J, p. 1863 ("Learn how you can get one high conviction trade (weekly) from millionaire options trading guru Jeff Bishop"); PX 26, ¶ 87 (Table 1).

[171] PX 22, Att. C, pp. 1538-1542.

[172] PX 27, ¶ 104, Att. SSSS, pp. 2990-3014; *See Ragingbull.com, LLC, et. al.*, No. 19-003110-CA-30 (11th Cir. Ct. Fl. Jan. 30, 2019).

allegations.[173]  Bishop is aware that his representations to consumers to advertise his services are false.  He admitted in a training video consumers see *post-purchase* that consumers should not follow his real-time trade alerts even though that is what he heavily pitches.[174]  Despite advertising that anyone can use his service, he says, "[y]ou have a whole different risk profile than I do.  I don't want you copying my trades."[175]

**Jason Bond** ("Bond"), formerly known as Jason P. Kowalik, is the President and co-founder of Raging Bull.[176]  Bond is sole owner of Jason Bond LLC, which owns 25% of Raging Bull.[177]  He is the signatory on Raging Bull's corporate accounts and opened the merchant processing accounts with Bishop.[178]  As signatory on the accounts, Bond is aware that two separate payment processors terminated Raging Bull's merchant accounts; one for high chargebacks.[179]  Bond is the instructor for at least three of Raging Bull's services and is the face of much of the company's advertising.[180]  Just like Bishop, he promotes his products through webpages, videos and email marketing; all of which contain earnings claims, and he promotes himself as a millionaire trader despite reporting substantial trading losses to the IRS between 2014 and 2018.[181]

Bond is aware of consumer complaints and Raging Bull's deceptive acts.  He was also a plaintiff in the defamation lawsuit described above and submitted an affidavit denying that he

---

[173] PX 27, ¶ 104, Att. SSSS, pp. 3002-3004.

[174] *See supra* note 73.

[175] *Id*.

[176] PX 27, ¶ 23.

[177] PX 27, ¶¶ 8, 78(c).

[178] PX 27, ¶¶ 74, 78, 80.

[179] PX 27, ¶¶ 77, 81.

[180] PX 27, ¶¶ 23-25, 99.

[181] PX 27, ¶¶ 23-25 and accompanying attachments.  *Id*. Att. GG, pp. 2022, 2024 ("I used to be a broke schoolteacher and I transitioned to Wall Street and made a killing trading stocks…Now I'm a multi-millionaire"); PX 26, ¶ 87 (Table 1).

has defrauded consumers.[182]  In 2019, Bond also offered the subscribers of some of Raging Bull's most expensive products 6 months free due to complaints about various services being discontinued or materially changed.[183]  Bond is also aware that his representations to consumers in his advertising are false.  He has admitted in training videos consumers see *post-purchase* that consumers should not follow his real-time trade alerts even though that is what he heavily pitches.[184]  For example, he says that when "uneducated" consumers who purchase solely to mirror his trades get "burned," he does not "even feel bad for that person."[185]

**Kyle Dennis** ("Dennis") is a trading instructor who has offered at least five widely advertised services through Raging Bull.[186]  Defendants promote Dennis' services by claiming he is one of Bond's most successful students and a self-made millionaire, who made his fortune trading in the stock market like Bond.[187]  Dennis has received commissions from Raging Bull through his solely-owned companies Winston Research, Inc. and Winston Corp.[188]

Dennis markets his products through promotional videos, email marketing and product webpages replete with deceptive earnings claims.[189]  Like the other Raging Bull instructors, Dennis claims to have developed a trading strategy that enables him to predict market price movements and find profitable trades, especially by focusing on companies in the biotech sector, and claims that consumers who join his services can make consistent profits following his trade alerts.[190]  Dennis received complaints from consumers who lost substantial sums of money

---

[182] PX 27 ¶ 104, Att. SSSS, pp. 2999-3001.  In the affidavit he submitted in the defamation lawsuit, dated March 2019, Bond also described himself as successful stock trader despite his massive losses described above. *Id*. at 2999.

[183] PX 2, ¶ 39.

[184] *See supra* notes 70 and 72.

[185] PX 25, ¶ 40.

[186] PX 27, ¶ 23.  Some of these services like Biotech Breakouts, Option Rocket, and Biotech Nucleus, have been discontinued or re-named. PX 27, ¶ 64.

[187] PX 27, ¶ 24, Att. GG, p. 2022.

[188] PX 24, ¶ 14.

[189] PX 27; ¶¶ 23-25 and accompanying attachments.

[190] PX 10, ¶ 2; PX 14, ¶¶ 13-16; PX 19, ¶¶ 18-19; PX 21, ¶ 4.

following Dennis' trade alerts about their losses and unauthorized billing.[191]  Despite his claimed

expertise in researching, scanning and identifying "breakout" stocks and his purported "insight"

into the biotech sector, Dennis states in his post-purchase "training" videos that he often relies on

guesswork and imperfect information.[192]

### C.   Consumer Injury

By using the tactics described above, Defendants have taken in over $137 million since

2017.[193]  The total consumer injury is likely much greater since Defendants started Raging Bull

in 2014.[194]  Twenty Raging Bull consumers have submitted declarations telling the stories of

their interactions with Raging Bull and attesting to its deceptive conduct.  In addition to paying

thousands of dollars in annual, auto-renewing subscription fees, these twenty consumers have

incurred net trading losses of over $350,000 following Raging Bull's training and alerts.[195]  At

least 220 other consumers victimized by Raging Bull have filed complaints with the BBB, the

FTC and Attorney Generals' offices.[196]  Many of the consumers who filed these complaints have

reported individual losses of several thousand dollars or more from subscription fees.[197]

---

[191] PX 7, ¶ 24; PX 21, ¶ 18.  When one consumer complained publicly about Raging Bull's
unauthorized auto renewal in a chatroom where Dennis was moderating, Raging Bull proceeded
to block that consumer's access and deactivated his ability to post additional messages in the
chatroom.  PX 19, ¶ 39.

[192] PX 25, ¶ 124 ("Do I know where it's gonna base out?  Absolutely not … Anybody that tells
you they do know exactly where it's going to go is lying to you"); *Id*. ¶ 131 ("When to sell?
Boy, is that a hard question to answer"); *Id*. ¶ 134 ("In general, earnings don't mean too much for
biotechs…which is why in most cases, unless you have a particular insight into a stock, it's not a
good idea to really play them…in general, it's very hard to predict if the company you're looking
at is going to beat expectations…").

[193] PX 24, ¶ 10.

[194] PX 27, ¶ 3.

[195] *See supra* note 59.

[196] PX 27, ¶ 67.  These complaints are also likely just the tip of the iceberg.  *FTC v. J.K.
Publications, Inc.*, No. 99-0044, 2000 WL 35594143, *15 (C.D. Cal. Aug. 9, 2000) ("[T]here
undoubtedly injured [consumers] who will never file a complaint…").  In the FTC's experience,
the raw number of complaints actually reported to government and consumer protection agencies
represents only a fraction of consumer harm.  *See* K. Anderson, *Consumer Fraud in the United
States:  An FTC Survey 80* (Aug. 2004), at
https://www.ftc.gov/sites/default/files/documents/reports/consumer-fraud-united-states-ftc-
survey/040805confraudrpt.pdf (FTC Bureau of Economics report noting that only 8.4% of

(*continued*)

36

## III.   **ARGUMENT**

### A.      **The FTC Act Authorizes the Requested Relief**

To prevent further harm to consumers and preserve Defendants' assets, this Court should issue the proposed TRO.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b),[198] gives the Court authority to issue permanent injunctive relief to enjoin practices that violate any law enforced by the FTC and to award "complete relief."  *FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014);[199] *FTC v. AmeriDebt*, 373 F. Supp.2d 558, 562 (D. Md. 2005) (court has authority to grant "any ancillary relief necessary to accomplish complete justice").  This ancillary relief may encompass "the full range of equitable remedies," including a TRO, a preliminary injunction, an asset freeze, appointment of a receiver, and any other measures that the Court deems necessary to protect consumers and preserve the possibility for complete and permanent relief.  *AmeriDebt*, 373 F. Supp. 2d at 562.  Indeed, when the public interest is involved, the court's equitable powers "assume an even broader and more flexible character."  *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).  The District of Maryland and other district courts in the 4th Circuit have granted the type of preliminary relief the FTC seeks here.[200]

---

consumer fraud victims complain to an "official source" such as the federal government or the BBB).

[197] PX 27, ¶ 67; *See supra* note 59.

[198] The FTC also brings this action pursuant to Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 4 of the ROSCA, 15 U.S.C. § 8403, which authorize the Court to grant such relief as the court finds necessary to redress injury to consumer resulting from Defendants' violation of ROSCA, "including the rescission and reformation of contracts, and the refund of money."

[199] In *Ross*, the 4th Circuit held that "by authorizing the district court to issue a permanent injunction in the Federal Trade Commission Act…Congress presumably authorized the district court to exercise the full measure of its equitable jurisdiction" and "the court had sufficient statutory power to award "complete relief," including monetary consumer redress, which is a form of equitable relief."  *Ross*, 743 F.3d 886 at 891.

[200] Orders from the District of Maryland include, *FTC v. Ecological Fox, LLC et al.*, No. 1:18-cv-003309 (D. Md. Oct. 31, 2018) (ordering TRO with asset freeze, appointment of a temporary receiver, immediate access to premises, asset repatriation, and expedited discovery); *FTC v. American Industrial Enter., LLC*, No. 1:16-cv-0281 (D. Md. Feb. 2, 2016) (ordering TRO with asset freeze, appointment of a temporary receiver, immediate access to premises, expedited discovery, and asset repatriation); *FTC v. Midway Industries LLC, et. al.*, No. 1:14-cv-02312 (D. Md. July 21, 2014) (ordering TRO with asset freeze., appointment of a temporary receiver, immediate access to premises, and asset repatriation); *FTC v. Loma Int'l Bus. Group, Inc.*, No. 1:11-cv-01483 (D. Md. June 2, 2011) (ordering TRO with asset freeze, appointment of a temporary monitor, immediate access to premises, expedited discovery, and asset repatriation);

(*continued*)

## B.    The Evidence Justifies Granting the FTC's Requested TRO

To enter a preliminary injunction under Section 13(b), the Court "must (i) consider the FTC's likelihood of success on the merits and (ii) whether the equities weigh in favor of a preliminary injunction."[201] *AmeriDebt*, 373 F. Supp. 2d at 563; *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976).  Significantly, "[t]his test is different from that used for private litigants, who must also prove irreparable injury, because in an FTC action harm to the public interest is presumed." *AmeriDebt*, 373 F. Supp. 2d at 563.

Regarding the likelihood of success factor, "[t]he burden for prevailing on a motion for a preliminary injunction under Section 13(b) is far more lenient" than the summary judgment standard.  *Id*.  The FTC prevails "'if it shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits.'" *Id*. (*quoting FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1979)).

Regarding the balance of equities factor, "the public interest should receive greater weight in [13(b)] proceedings."  The Fourth Circuit "has gone so far as to say that private injuries [to the defendants from the injunction] 'are not proper considerations for granting or withholding injunctive relief under Section 13(b).'" *FTC v. Agora Fin.,* 447 F. Supp. 3d 350, 367 (D. Md. 2020) (*quoting Food Town*, 539 F.2d at 1346).

### 1.    The FTC Is Likely to Succeed on the Merits

#### a.    Section 5 of the FTC Act

Section 5 of the FTC Act empowers the FTC to prevent "deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  In order for the FTC to prevail on its claim that Defendants engaged in deceptive acts or practices in violation of Section 5(a) of the FTC Act, the

---

*FTC v. Holiday Vacations Mktg. Corp.*, No. 8:11-cv-01319 (D. Md. May 16, 2011) (ordering TRO with asset freeze, expedited discovery, and asset repatriation); *FTC v. Residential Relief Found.*, No. 10-CV-3214 (D. Md. Nov. 15, 2010) (ordering TRO with asset freeze, immediate access to premises, appointment of a temporary receiver, expedited discovery, and asset repatriation).  *See* Appendix A for a complete list of the 15 court orders from district courts in the Fourth Circuit that have granted TROs with asset freeze, appointment of a receiver, and other equitable relief.

[201] A TRO is evaluated "under the same rubric" as a request for a PI.  *See*, *e.g. Schwartz v. Wellin*, No. 2:13-cv-3595, 2014 WL 51212, *2 (D.S.C. Jan. 7, 2014) (*citing Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994)).

FTC must show (1) there was a representation, (2) the representation was likely to mislead consumers; and (3) the representation was material.  *FTC v. Ross*, 897 F. Supp. 2d 369, 381 (D. Md. 2012) (*citing FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)).

A misrepresentation may be either express or implied. *FTC v. Figgie Int'l*, 994 F.2d 595, 604 (9th Cir. 1993) (noting there is "nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole").

A representation is likely to mislead consumers if (1) the express or implied message conveyed is false, or (2) the maker of the representation lacked a reasonable basis for asserting that the message was true.  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994); *see also FTC v. Lights of America, Inc.*, No. 8:10-CV-1333, 2013 WL 5230681, at *40 (C.D. Cal. Sept. 17, 2013) (holding defendants liable for claims made without adequate substantiation).  Where the maker lacks adequate substantiation evidence, the maker necessarily lacks any reasonable basis for its claims.  *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010).

Further, in determining whether a representation is likely to mislead consumers, courts consider the overall "net impression" it creates.  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009).[202]  Claims of "potential" earnings imply that such earnings are representative of what the typical consumer achieves.  *See FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000).  The "common-sense net impression" of representation controls.  *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262 (E.D.N.Y. 1998).  Representations also may be misleading despite the use of a disclaimer such as "results may vary" if consumers reasonably believe that a statement of unusual earning potential represents typical earnings.  *FTC v. Vemma Nutrition Co.*, No. 2:15-CV-1578, 2015 WL 11118111, *6 (D. Ariz. Sept. 18, 2015).  Further, "[w]hile proof of actual deception is unnecessary to establish a violation of Section 5, such proof is highly probative to show that a practice is likely to mislead consumers acting reasonably under

---

[202] "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures." *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).

the circumstances." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 633 (6th Cir. 2014) (citation omitted).

Finally, a representation, omission, or practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Cyberspace.com*, 453 F.3d at 1201 (quoting *In the Matter of Cliffdale Assocs.*, 103 F.T.C. 110, 1984 WL 565319 (F.T.C. 1984)).  If consumers are likely to have chosen differently but for the deception, then a misrepresentation is material.  *In the Matter of Southwest Sunsites, Inc.*, 105 F.T.C. 7, 1985 WL 668880, at *109 (1985), *aff'd*, 785 F.2d 1431 (9th Cir. 1986).

Express claims are presumed to be material, as are claims that go to the central characteristics of a product or service.  *Pantron I Corp.*, 33 F.3d at 1095-96; *Lights of Am.*, 2013 WL 5230681, at *41.  Consumer reliance is also presumed if defendants made material misrepresentations that were widely disseminated and consumers purchased the defendant's product.  *Figgie Int'l*, 994 F.2d at 605-6.

For purposes of determining liability under Section 5, it is irrelevant whether the product or service sold provided value to the consumer. "[T]he salient issue in fraudulent-misrepresentation cases 'is whether the seller's misrepresentations tainted the customer's purchasing decisions,' not the value (if any) of the items sold." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1235 (11th Cir. 2014); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1207 (10th Cir. 2005); *Figgie Int'l*, 994 F.2d at 606 ("The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each [product] that is not useful to them").

### b.      Defendants' Deceptive Earnings Claims Violate Section 5

The FTC is likely to prevail on Count I of the Complaint, which alleges Defendants are violating Section 5 by misrepresenting the amount of income consumers are likely to earn with Defendants' programs. Defendants represent that consumers are likely to make substantial income through Defendants' special trading strategies and through the trade recommendations Defendants provide by way of trade alerts or livestreamed trades.  *See supra* Section II.A.1.

Defendants convince consumers this is true through claims about their own income and trades, their prolific use of consumer testimonials, and claims about beating the market or making consistent money.

Defendants lack substantiation for their claims.[203]  Defendants admit they do not track or verify purchasers' trading performance, and, as a result, have no data with which to support their income claims.[204]  Further, they admit that their own trades are "not typical."[205]

Defendants' claims are also false.  While Defendants tell consumers that they can expect to generate substantial income from trading after purchasing Defendants' services, in reality, many purchasers do not make substantial income from trading, and many make nothing at all or lose money.[206]  This is consistent with Bond and Bishop's own trading data, which shows massive trading losses consistently over a four-year period.[207]  Further, the FTC's expert found that contrary to Defendants' widespread claims, they present no implementable strategy consumers can use to make money, and Defendants use of "technical analysis" is especially unlikely to work in the market sectors where Defendants' instructors direct consumers to invest.[208]  The FTC's expert also found that consumers are particularly unlikely to make money using Defendants' trade recommendations because mirroring trades makes consumers vulnerable to potentially large losses.[209]

Defendants' representations are likely to mislead consumers acting reasonably under the circumstances.  As illustrated by the complaints and declarations from defrauded consumers, Defendants' misrepresentations give consumers the impression that they too can make substantial income using Defendants' services.  Such false and unsubstantiated earnings claims are also

---

[203] *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010) (lack of substantiation violates Section 5).

[204] PX 27, Att. HHH, p. 2263.

[205] *See*, *e.g.*, PX 27, Att. PPP, p. 2315.

[206] *See supra* note 59; PX 27, ¶ 67.

[207] PX 26, ¶ 87.

[208] PX 26, ¶ 39.

[209] PX 26, ¶ 81.

material.  Courts "consistently conclude that misrepresentations regarding income potential are material and violate the FTC Act." *FTC v. Vemma Nutrition Co*., No. 2:15-CV-1578, 2015 WL 11118111 at *5) (*citing Five-Star Auto*, 97 F. Supp. 2d at 528-29).[210]  Moreover, many of Defendants' claims are presumed to be material because they are express claims.  *FTC v. Transnet Wireless*, 506 F. Supp.2d 1247, 1267 (S.D. Fla. Mar. 20, 2007).

### c.     Defendants' Additional Deceptive Claims Violate Section 5

The FTC is also likely to prevail on Count II of the complaint, which alleges that Defendants made related misrepresentations about consumers' ability to deploy Defendants' strategies for making money.  As shown above, Defendants tell consumers that any consumer can learn and use Raging Bull's strategies to earn income despite lack of experience, and that consumers can do so without significant investable capital or significant free time.[211]

Consumer experience shows these claims are not true.[212]  The FTC's expert likewise concluded that consumers who are inexperienced at trading,[213] or who have limited capital[214] or

---

[210] *See also FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1292 (D. Minn. 1985) ("Defendants' exaggerated profit and earning prediction cut to the core of the customer's decision to invest"); *FTC v. Sage Seminars*, No. 4:95-CV-2854, 1995 WL 798938, *4 (N.D. Cal. Nov. 2, 1995) (testimony revealed express earnings claims that were false and court inferred the representations were material and that consumer reliance was reasonable).

[211] *See, e.g.*, PX 1, ¶¶ 8; 12 ("In Kyle's video presentation, he said over and over again that you only need 10 minutes per day and anyone with a small account could use the service.  But, this was not true…I sat in front of my computer…and I could still not make the same trades."); PX 17, ¶ 3 ("Jason…emphasized that this was a great program for someone inexperienced and new to trading); PX 20, ¶ 3 ("the ads made it sound like anyone could learn this stuff").

[212] PX 1, ¶¶ 12-13 ("I told the customer service representative I cannot sit and watch his stock scanner all day because I have a full time job, and that is not what he told us in the video presentation."); PX 2, ¶ 35 ("Jeff Bishop…claimed that you did not have to have a lot of money or time to be successful…I noticed from Jeff Bishop's live screen that he purchased 100 option contracts at one time for about $40,000…I definitely could not follow all of this trades and had to allocate in much smaller amounts."); PX 10, ¶ 5 ("I also realized after I signed up that Kyle was investing large sums of money to make the profits he was talking about…Kyle did not tell us that he was trading with such large amounts of money in his presentation"); PX 17, ¶ 6 (Although Bond emphasized this program was great for someone inexperienced and new to trading, "I participated in one of the webinar training sessions. I realized that this training was completely over my head…I saw other people chatting on the side box of the webinar saying the same thing"); PX 20, ¶ 5 ("I would not have signed up if I did not believe the program could work for me with my limited experience and time"), *Id*. ¶7 (she found the training materials to be difficult to understand).

time[215] are extremely unlikely to achieve consistent profits and market-beating returns through their subscriptions to Raging Bull's services.[216]

These representations are all likely to mislead consumers acting reasonably under the circumstances. As illustrated by the complaints and declarations from defrauded consumers, Defendants' misrepresentations give consumers the impression that they too can make substantial income using Defendants' services, despite any limitations. Many of Defendants' false or misleading claims are presumed to be material because they are express and go to the central characteristics of the product. *See Pantron I Corp.*, 33 F.3d at 1095-96; *Lights of Am.*, 2013 WL 5230681, at *41.

### d.      Defendants Are Violating ROSCA

Section 4 of ROSCA, 15 U.S.C. § 8403 prohibits charging consumers for goods or services sold in transactions effected on the Internet through a "negative option" feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller: (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains the consumer's express informed consent before making the charge; and (3) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403. The TSR, in turn, defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

---

[213] Inexperienced traders are at an extreme disadvantage competing with well-resourced institutional investors and face numerous challenges just to "break-even." PX 26, ¶ 94.

[214] Retail traders with limited capital are much more likely to exhaust their capital before they can generate trading profits. Each trading position held by a consumer with limited means presents a significant threat to the loss of all the consumer's capital. PX 26, ¶ 95.

[215] Trying to follow Raging Bull's purported strategies takes a significant time commitment because they lack clear exit strategies in volatile sectors of the market. Not paying attention, even for a few minutes, could result in losses. PX 26, ¶ 96

[216] PX 26, ¶ 97.

Raging Bull's recurring subscription services, which are typically billed quarterly or annually, are negative option features.  But, Raging Bull fails to provide an effective or "simple mechanism" to cancel and stop the recurring charges on many of their subscriptions.  Instead, Defendants design their cancellation procedures in such a way that makes it extremely difficult for consumers to cancel their services and prevent their accounts from automatically renewing. As discussed above, consumer complaints and declarations show that consumers are unable to cancel without multiple attempts, methods (online, email, and telephone), and contacts with the company spanning several weeks.  Consumers at times face conflicting instructions that lead them in circles.[217]  This is confirmed by the FTC's own attempts at cancellation and request for a refund.[218]  Some consumers even resorted to closing their credit card accounts to ensure they would not be subject to additional charges.[219]  In sum, Defendants have violated and are continuing to violate ROSCA by, among other things, selling negative option subscription offers without a simple mechanism to stop recurring charges.

## 2.    The Equities Weigh in Favor of Granting the FTC's Requested Relief

Not only has the FTC demonstrated a likelihood of success on the merits, but the balance of the equities also weighs in favor of granting the requested relief. When "balancing the public and private equities associated with deciding to impose a preliminary injunction" in FTC cases, "the public interest is given greater weight." *In re Sanctuary Belize*, 409 F. Supp.3d 380, 396 (D. Md. 2019).  No individual has a legitimate interest in continuing to operate an unlawful scheme; thus, "there is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation, or preserve their assets from dissipation or concealment." *FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989). Where the danger of asset dissipation exists, "the public interest in preserving the illicit proceeds of the [ ]

---

[217] *See supra*, Section II.A.3.

[218] PX 23, ¶¶ 18-23; PX 27, ¶¶ 38-40, 57-59.

[219] PX 7, ¶ 31 ("I specifically cancelled the card to stop Raging Bull from taking money from my account"); PX 12, ¶ 16 ("I had to cancel the credit card I used to purchase the services to ensure that Raging Bull could not charge me again").

scheme… is great." *FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999).  Indeed, "a court of equity … has no duty...to protect illegitimate profits or advance business which is conducted by [unlawful] business methods." *FTC v. Thomsen-King & Co.*, 109 F.2d 516, 519 (7th Cir. 1940).

### 3.    The Corporate Defendants Are Subject to Joint and Several Liability as a Common Enterprise

The Defendants have operated as a common enterprise while engaging in the deceptive acts or practices alleged in the Complaint.  They should be held jointly and severally liable for the unlawful acts of the common enterprise.[220]

Courts generally respect the corporate form but will disregard it under appropriate circumstances, such as when it is used to skirt the law.  *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 266 (6th Cir. 1970).  Accordingly, when two or more corporations act as a single enterprise in furtherance of a fraudulent scheme, courts have disregarded their corporate identities and treated them as a common enterprise. *FTC v. Grant Connect LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) (*citing FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)), *aff'd in part, rev'd in part on other grounds*, 763 F.3d 1094 (9th Cir. 2014).  The members of a common enterprise may be held liable for each other's deceptive acts or practices. *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014); *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010).

To determine if a common enterprise exists, courts evaluate "'the pattern and frame-work of the whole enterprise.'" *Grant Connect*, 827 F. Supp. 2d at 1216 (quoting *Nat'l Urological*, 645 F. Supp. 2d at 1182).  Courts consider a nonexclusive list of factors, including: (1) common control and ownership; (2) the sharing of resources, staff, phone numbers, and email systems; (3) whether the enterprise conducted business through a maze of interrelated companies; (4) unified marketing; and (5) joint participation in a common venture in which the participants benefitted

---

[220] A common enterprise finding is not a prerequisite to the relief sought in the FTC's Motion for a Temporarily Restraining Order, including joint and several liability. *See*, *e.g.*, *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 600-01(9th Cir. 2016) (holding that joint and several liability is available in equitable actions, including those brought under the FTC Act).

from a shared scheme.  *See FTC v. Triangle Media Corp.*, No.18-CV-1388-MMA (NLS), 2018

WL 4051701, at *11 (S.D. Cal. Aug. 24, 2018), *aff'd by FTC v. Hardwire Interactive, Inc.*, No.

18-56161, 2019 WL 1514546 (9th Cir. Mar. 19, 2019).

      The evidence shows that the Corporate Defendants have operated as a common enterprise

at the direction and for the benefit of their owners, officers, or control persons.  Raging Bull is

owned by Sherwood Ventures, Bond LLC, and MFA.[221]  Bishop owns and controls Sherwood

Ventures, and Bond owns and controls Bond LLC.  Dennis, who owns and controls Winston

Research and Winston Corp, joined Raging Bull in 2016, signing a contract between Winston

Corp and Lighthouse Media, LLC (former name of Raging Bull).[222]  These corporate entities do

not appear to have any other officers or employees.[223]  Raging Bull and Sherwood Ventures share

the same address and share Bishop as an officer and employee.[224]  Raging Bull likewise shares

Bond as an officer and employee with Jason Bond, LLC.[225]  Each of the Individual Defendants

does their work for Raging Bull from the same address where their respective company

operates.[226] Each of these corporate entities has been in active concert and participation with the

others to manage, market, and profit from Raging Bull's deception of consumers.

      Once a consumer purchases a Raging Bull service, all of their subscriptions, including

those offered by Bishop, Bond and Dennis, appear on a single, unified, Raging Bull dashboard

that includes common FAQs, common contact information, and common account information.[227]

When a consumer contacts Raging Bull customer support, that support is for all of Raging Bull's

services, regardless of the instructor.  Raging Bull's services, including those run by Bond,

Bishop, and Dennis, are purchased on the same website,

---

[221] PX 27, ¶¶ 4, 78(c).

[222] PX 27, ¶92.

[223] PX 27, ¶¶ 7-8, 15-16.

[224] PX 27, ¶¶ 4-5.  Also, the ragingbull.com domain was originally owned by Sherwood
Ventures, but was changed to Raging Bull on January 26, 2017. PX 27, ¶85.

[225] PX 27, ¶¶ 4, 8.

[226] PX 27, ¶ 20 (the Individual Defendants work out of their own homes).

[227] PX 27, ¶¶ 38-40, 59.

app.ragingbull.com/checkout/package/[name of service].[228]  Raging Bull has used at least two payment processors that processed merchant accounts for all of Raging Bull's services including those offered by Bishop, Bond and Dennis.[229]  Bishop and Dennis receive their portion of the proceeds from the sale of these services through their respective Corporate Defendant from the Raging Bull corporate accounts.[230]

MFA, Sherwood Ventures and Bond LLC opened a Raging Bull business depository account used to collect consumers' payments for Raging Bull's services.[231]  In the past year, MFA has sent over $135,000 to Raging Bull to finance its operations.[232]  Apart from Allan Marshall, MFA does not appear to have any employees, officers, offices or even websites.  In fact, MFA was formed in the same month and year it signed the amended operating agreement with Sherwood Ventures and Jason Bond.[233]

All of these activities have been in pursuit of a shared and fraudulent business venture that Bond, Bishop and Dennis co-manage and use to enrich themselves to the detriment of deceived consumers.  The Corporate Defendants serve as the conduit and framework for the fraud.  The facts show common control of Raging Bull by sharing of revenues, merchant accounts, contact persons, emails and phone numbers.  They should be recognized as a common enterprise and be held jointly and severally liable for the consumer harm they have caused.

### 4.    The Individual Defendants are Personally Liable

If a corporation is liable under Section 5—as Raging Bull is—individual defendants are liable for injunctive relief under the FTC Act if they participated directly in the deceptive

---

[228] PX 27, ¶ 25.

[229] PX 27, ¶¶ 77-78, 81.

[230] PX 24, ¶ 12.  Between April 2017 and June 2020, Raging Bull paid Sherwood Ventures over $20 million and Sherwood paid Raging Bull over $400,000 between 2017 and 2019.  Raging Bull paid Winston Research and Winston Corp. over $4.2 million between 2017 and 2018.  Raging Bull paid MFA nearly $4 million between 2017 and 2020.  *Id.*

[231] PX 27, ¶ 74, Att. EEEE, pp. 2484-2489.

[232] PX 24, ¶ 12.

[233] *See supra* notes 154-155.

practices or had authority to control those practices.  *Ross*, 743 F.3d at 892.  "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."  *FTC v. Innovative Mktg.*, 654 F. Supp.2d 378, 385-86 (D. Md. 2009).  Direct participation can be demonstrated through evidence that the defendant developed or created, reviewed, altered, and disseminated the deceptive marketing materials.  *Ross*, 897 F. Supp. at 382.

Individual defendants are liable for monetary relief for unlawful corporate acts or practices under the FTC Act if they "had or should have had knowledge of the deceptive practices."  *Ross*, 743 F.3d at 892.  This element may be established by showing that the "individual had actual knowledge of the deceptive conduct, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning the truth."  *Id*. at 892.[234]

Here, Bishop and Bond are officers of Raging Bull.[235]  Bishop owns and directs Sherwood Ventures, which owns 65% of Raging Bull.[236]  Bond owns and directs Jason Bond, LLC, which owns 25% of Raging Bull.[237]  Both are also signatories on corporate bank accounts and merchant accounts for Raging Bull.[238]  Bishop purchased the domains associated with Raging Bull and its services.[239]  As such, both have authority to control the misconduct at issue.

Bishop, Bond and Dennis also have directly participated in Raging Bull's deceptive acts and practices.  They are intimately involved in Raging Bull's advertising and lead the majority of

---

[234] "When an individual (1) had some level of participation in the development, review, creation or editing of the deceptive marketing scheme, (2) disseminated the deceptive advertisements, and (3) was aware of complaints or problems surrounding the marketed product or the advertisements, while he or she may not necessarily have actual knowledge of the unlawful acts, this individual is at best recklessly indifferent to the truth or intentionally avoids it."  *Ross*, 897 F. Supp.2d at 385.

[235] PX 27, ¶¶ 4, 23, 74(a).

[236] PX 27, ¶ 78(c).

[237] PX 27, ¶¶ 8, 78(c).

[238] PX 27, ¶¶ 73(a), 74(a), 78

[239] PX 27, ¶¶ 83-84.

the company's trading programs.[240]  All three personally narrate the promotional videos for their particular services and appear on their products' websites.[241]  They have all made deceptive claims in advertising for their services and those of other instructors.[242]

As described above, Bishop, Bond and Dennis are aware of consumers' complaints against the corporate entities.[243]  All three have knowledge, through their own admissions often buried in the fine print, that the testimonials they use to promote Raging Bulls' services are not substantiated, and that they lack substantiation for the income claims they make.[244]  Further, each is aware that the successful trades of their own that they use in advertising are not typical and do not represent the individuals' overall or average trading results.[245]  Bishop and Bond are acutely aware of their own misrepresentations to consumers about their purported success as millionaire traders using their purported strategies.[246]

The Individual Defendants all have the requisite control or participation and the requisite knowledge of the unlawful conduct and are jointly and severally liable for the acts and practices of the common enterprise.  *Ross*, 897 F. Supp. at 387 ("It is well established that once a defendant is found to be individually liable for a corporate defendant's deceptive acts, he or she is jointly and severally liable for the total amount of consumer redress.")

---

[240] PX 27, ¶ 23.

[241] PX 27, ¶ 24.

[242] *See supra* Sections II.A.1.b-d.

[243] PX 27, ¶ 104, Att. SSSS, pp. 3005-3014; PX 22, Att. C, pp. 1538-1542.

[244] *See supra* Section II.A.2.

[245] *See, e.g.*, PX 27, Att. PPP, p. 2310.

[246] PX 26, ¶ 87.  Dennis is also aware that his trading strategies and trade alerts present significant risk of loss for many consumers attempting to follow them.  *See, e.g.,* PX 25, 134 ("In general earnings don't mean too much for biotechs…Not only do you have to compete with institutions and other people playing these earnings, but there's 13 different analysts with different opinions…which is why in most cases, unless you have particular insight into a stock, it's not a good idea to really play them…in general, it's very hard to predict if the company you're looking at is going to beat expectation").  Moreover, the FTC's expert has evaluated Dennis' purported "training" materials and trade-related emails and, like Bond and Bishop, found that Dennis lacks any concrete or implementable trading strategy, much less any strategy that is likely to generate substantial trading profits for consumers.  PX 26, ¶ 15.

### C.   The Proposed TRO Is Necessary and Appropriate to Preserve the Possibility of Effective Final Relief

The proposed TRO orders Defendants to put an immediate stop to the unlawful practices challenged in the Complaint.  This relief would serve the public interest by preventing further harm to consumers.[247]  The FTC also asks this Court for an immediate freeze on all assets of the common enterprise, an interim asset preservation order against the Individual Defendants, the appointment of a temporary receiver over the Corporate Defendants, limited expedited discovery and access to Defendants' business premises and records.  Absent such relief, there is substantial risk that Defendants will continue to operate their fraudulent scheme, dissipate assets, and destroy documents to preclude the satisfaction of effective final relief.  Courts in this district and in the Fourth Circuit have regularly granted the preliminary relief requested here.[248]

### 1.   An Asset Freeze Is Necessary and Warranted

A district court's authority to freeze a defendant's assets in a law enforcement action brought by the FTC is ancillary to the agency's authority to order consumer redress.[249]  "To insure that any final relief is complete and meaningful, the court may … order any necessary temporary or preliminary relief, such as an asset freeze."  *Ameridebt*, 373 F. Supp. 2d at 562 (*citing FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996)); *In re Sanctuary Belize*, 409 F. Supp.3d at 419 (imposing an asset freeze to preserve as many assets as possible for final

---

[247] Specifically, the proposed order prohibits Defendants from making deceptive earnings claims and from promoting or enrolling consumers in any negative option offers without providing a simple method to cancel and prevent recurring charges.  The proposed TRO also temporarily enjoins Defendants from exploiting consumers by transferring or selling their financial information to others.

[248] *See* Appendix A (citing 15 separate orders from district courts in the Fourth Circuit appointing temporary receivers, imposing an asset freeze, authorizing immediate access to defendants' business records and limited expedited discovery, and other relief, including recent orders issued during the COVID-19 pandemic).

[249] Section 13(b) of the FTC Act confers full equitable powers on this Court, including the power to award restitution, disgorgement of ill-gotten gains, and rescission of contracts.  15 U.S.C. § 53(b); *Ross*, 743 F.3d at 890 (finding that Section 13(b) confers "sufficient statutory power to award 'complete relief,' including monetary consumer redress, which is a form of equitable relief")).  Section 19 of the FTC Act also empowers the Court to grant such relief as "necessary to redress injury to consumers," including but not limited to "the refund of money or return of property."  15 U.S.C. § 57b.

resolution of the case).  Where "the law presumes irreparable harm, as in an FTC enforcement action, the FTC need only establish 'a possibility of dissipation of assets'" to obtain an asset freeze.  *Id.*, at 419 (*citing FTC v. IAB Mktg. Assocs.*, LP, 972 F. Supp.2d 1307, 1313, n.3 (S.D. Fla. 2013), *aff'd* 746 F.3d 1228 (11th Cir. 2014)); *Ameridebt*, 373 F. Supp.2d at 562.  Moreover, "[d]issipation does not necessarily mean that assets will be spirited away in secret; rather, it means that less money will be available for consumer redress." *FTC v. World Patent Mktg.*, No. 17-CV-20848, 2017 WL 3508639, *17 (S.D. Fla. Aug. 16, 2017).[250]

As noted above, Defendants have bilked consumers out of more than $137 million in only the last three years.  Meanwhile, Individual Defendants have drawn massive sums of money out of the Raging Bull common enterprise, paying themselves generously while leaving the Corporate Defendants severely undercapitalized.[251]  Where consumer injury is so substantial, the need to immediately identify and secure all possible assets to redress this loss is vital.  Moreover, the Court may infer from Defendants' course of fraudulent conduct that they are likely to waste or conceal assets prior to resolution of this action.  *See SEC v. Manor Nursing Ctrs. Inc.*, 458 F.2d 1082, 1106 (2nd Cir. 1972).  This inference is heightened where, as here, the "scope of monetary liability for Defendants' unlawful conduct is enormous and provides considerable motivation for defendants to place their assets beyond the Court's reach." *FTC v. USA Beverages, Inc.*, No. 05-61682, 2005 WL 5654219, *9 (S.D. Fla. Dec. 6, 2005).

There is also strong evidence of diversion and dissipation of funds by the Defendants. For example, Defendants have diverted corporate funds to pay for expensive cars (over $750,000), privately chartered flights (over $1 million), and home improvement and construction

---

[250] In keeping with this precedent, at least one court has held that payment for "legal fees and living expenses constitutes a dissipation of assets, as these expenditures would deplete the assets available for consumer redress." *World Patent Marketing*, 2017 WL 3508639, at *17.

[251] An FTC forensic accountant has analyzed the bank records of Corporate Defendants from April 2017 to July 2020.  PX 24, ¶ 4.  According to these records, Bishop and his LLC, Sherwood Ventures, have withdrawn about $23.5 million from Raging Bull's various bank accounts, Bond has received over $10 million, and Dennis (through his corporate shells) has received over $4.4 million from the scheme during those three years.  *Id.* ¶¶ 12-14.  Moreover, the monthly activity summaries from the Corporate Defendants' bank accounts show substantial sums are withdrawn almost as soon as the funds arrive in those accounts.  *Id.* Att. B.

(over $1.2 million), among other things.[252]  Defendants have also bankrolled their own frenetic, high-risk trading activities using ill-gotten consumer funds, resulting in further loss and waste.[253] Without an asset freeze, Defendants will continue to dissipate, divert and misuse any remaining corporate assets and the thousands of consumers victimized by their scheme face a substantial risk that insufficient funds will remain for redress.[254]

This Court has authority to extend the asset freeze to all Individual Defendants with equal force, since the Individual Defendants are personally liable for the harm caused by the Raging Bull common enterprise.  At this time, Plaintiff requests an asset preservation order (with a one-time allowance of $25,000 for living expenses) over the personal assets of the Individual Defendants, unless review of the Individuals Defendants' financial information demonstrates the need to extend the asset freeze to all Defendants.[255]  A strong asset preservation order against the Individual Defendants is necessary because the available funds in the Corporate Defendants' accounts are grossly insufficient to satisfy the FTC's potential monetary judgment against Defendants.

---

[252] *Id.* ¶¶ 20-22.  Bank records also appear to show substantial and regular payments from Raging Bull's corporate accounts to settle credit card bills incurred by Jeff Bishop and his spouse (totaling about $39.6 million).  There are also numerous cash withdrawals by Jeff Bishop (about $120,110), as well as bank transfers to unknown or unspecified accounts from a Corporate Defendant account controlled by Jeff Bishop (over $3.5 million).  *Id.* ¶¶ 31-32.

[253] As noted above, Raging Bull and its co-founders (Bishop and Bond) have incurred substantial trading losses every year from 2014 thru 2018.  PX 26, ¶¶ 87-88.  Bond testified that Raging Bull's brokerage account is funded by the partners (Bishop, Bond and Allan Marshall), whose incomes in turn are derived from subscription fees paid by Raging Bull consumers.  PX 27, ¶ 104, Att. NNNN, p. 2924, 2959.  Defendants' bank records also show over $5.4 million being transferred from the Corporate Defendants' depository accounts to Defendants' various brokerage accounts.  PX 24, ¶ 23.

[254] The Court has authority to direct third parties to preserve defendants' assets in order to effectuate the purpose of the TRO and may order the freezing of assets located outside the United States.  *See, e.g., Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (courts have power to direct third parties to preserve assets); *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965) (court has authority to freeze "property under its control, whether the property be within or without the United States").  An immediate freeze of the Corporate Defendants' assets will permit Plaintiff and a court-appointed Receiver to direct persons and financial institutions currently holding Corporate Defendants' assets to preserve and prevent those assets from being dissipated.

[255] The FTC need not show that the funds to be frozen are "traceable to proceeds or profits and income from the proceeds."  *In re Sanctuary Belize*, 409 F. Supp.3d at 419.

### 2.   Appointment of a Receiver Is Necessary and Warranted

The appointment of a receiver is also critical.  The Raging Bull enterprise is permeated

with fraud and Individual Defendants cannot be trusted to operate the business lawfully.  Under

Defendants' control, the Raging Bull enterprise has engaged in years of deception causing

millions of dollars in consumer harm.  To sustain this illegal operation, Defendants have poured

millions of dollars each year into their deceptive marketing campaigns, filled with false earnings

claims and targeting scores of new consumer victims.[256]  Defendants not only misrepresent their

trading performance and illusory success through their own advertising, but also pay affiliates

(posing as consumers) and "celebrities" to perpetuate the deception.[257]  Defendants have

persisted in their illegal conduct despite receiving hundreds of complaints from consumers[258] and

payment processors terminating their merchant accounts in the past two years.[259]

The appointment of a temporary receiver is a sound remedy in cases involving deception

and is necessary here to prevent further dissipation.  *See FTC v. U.S. Oil & Gas*, 748 F.2d 1431,

1432 (11th Cir. 1984); *FTC v. Ross*, 743 F.3d 886, 890 (4th Cir. 2014) (a district court "possesses

broad equitable powers which it must particularly exercise to protect the public interest"); *SEC v.

R.J. Allen & Assoc.*, 386 F. Supp. 866, 878 (S.D. Fla. 1974) ("the appointment of a receiver is

necessary to prevent diversion or waste of assets to the detriment of those for whose benefit, in

---

[256] PX 24, ¶ 27 & Att. D, pp. 1678-1680. (showing over $10 million spent on advertising and marketing vendors between 2017 to 2020).  This figure is likely understated, since Raging Bull's tax return for 2018 shows that it spent about $8.6 million—approximately 39% of all expenses—on advertising that year.  PX 27, ¶ 78, Att. IIII, p. 2620.

[257] To cite just a few examples, Defendants have paid sports figures like Jose Canseco to proclaim that Jason Bond generates 400% returns a year through his trading, as well as "affiliates" like Russell Barbour (posing as a satisfied customer) to tout Defendants' services over the internet.  PX 24, ¶¶ 28-29 & Att. E, p. 1681 (payments totaling $18,000 to Canseco and payments totaling $155,719 to Barbour); PX 27, ¶ 120, Att. JJJJJ, pp. 3057-3061.

[258] In addition to the hundreds of consumers who have complained about Defendants' false advertising and illegal cancellation practices, the FTC has also received at least eleven complaints accusing Defendants of stock price manipulation or investor fraud in connection with their trade alerts. PX 27, ¶ 71.

[259] PX 27, ¶¶ 77(d), 81(c), Att. HHHH, pp. 2582-2583, Att. LLLL.  Records from payment processors show that Defendants were warned about their high monthly chargeback rates.  *Id.* Att. LLLL, p. 2893; Att. JJJJ, p. 2780 ("As of 1/2019, chargebacks jumped to 7% for the month…. We had a call with the merchant who sympathized with our concerns").

some measure, the injunction action is brought"); *SEC v. First Fin. Group.*, 645 F.2d 429, 438 (5th Cir. 1981) (where defendants have engaged in deception, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of" consumers victimized by the fraud).

A court-appointed receiver can also review the evidence and determine whether Defendants' business can be operated lawfully and profitably. Raging Bull may not be a viable business if potential purchasers no longer hear Defendants' gross earnings misrepresentations and its customers are afforded a simple mechanism to cancel their subscriptions and prevent unwanted charges. A receiver can also secure business locations, take possession and custody of computers, documents, and other evidence from Defendants' scheme, help identify injured consumers and the extent of consumer harm, and make an accounting that will assist in identifying and securing additional assets of Defendants. *See U.S. Oil & Gas,* 748 F.2d at 1432*; USA Beverages*, 2005 WL 5654219, at *9 ("an asset freeze coupled with the appointment of a receiver gives the Receiver, and the FTC, a tool for searching for additional assets"). Without a receiver, Defendants are likely to hide or dissipate assets, destroy evidence, and engage in other acts that subvert the Court's ability to award effective final relief.[260]

### 3. Access to Defendants' Business Premises and Limited Expedited Discovery Is Necessary and Proper

To facilitate the FTC's and the receiver's efforts to locate and secure relevant documents and assets wrongfully obtained from Defendants' unlawful activities, the FTC seeks leave of Court for limited expedited discovery to locate and identify documents and assets and to allow the FTC and the receiver to access Defendants' business premises. During its investigation, the FTC has learned that Defendants have been renting a physical office in Hunt Valley, Maryland since 2019, where Raging Bull's customer service and marketing personnel are based.[261]

---

[260] In similar actions involving fraudulent conduct, courts in this district and in the Fourth Circuit have regularly exercised their equitable power to appoint a temporary receiver to prevent further diversion of funds that may otherwise be used for consumer redress. *See* Appendix A.

[261] PX 27, ¶ 18. This location is not disclosed to consumers. On its websites and the BBB directory, Raging Bull lists its corporate headquarters as "62 Calef Hwy, Lee, New Hampshire," which is a mail drop. PX 27, ¶ 17. Raging Bull's prior corporate headquarters, listed as "835 E.

(*continued*)

District courts are authorized to depart from normal discovery procedures and fashion a discovery schedule that meets the needs of a particular case.  Federal Rules of Civil Procedure 26(d), 33(a), and 34(b) authorize the Court to alter the standard provisions, including applicable time-frames, that govern depositions and production of documents.  This type of discovery order reflects the Court's broad and flexible authority in equity to grant preliminary emergency relief in cases involving the public interest.

Defendants' words and actions betray a deep disregard for the law.  The substantial risk of asset dissipation and document destruction in this case, coupled with Defendants' ongoing and deliberate statutory violations, justifies emergency relief.  Accordingly, it is in the interest of justice to provide the requested emergency relief to maintain the status quo and preserve this Court's ability to award full and effective final relief.[262]

## IV.  **<u>CONCLUSION</u>**

The FTC respectfully requests that the Court grant this emergency Motion and issue the proposed temporary restraining order with an asset freeze, the appointment of a temporary receiver over Corporate Defendants, and other equitable relief, and order Defendants to show cause why a preliminary injunction should not issue.

---

Lamar Blvd., #222, Arlington, Texas," was also a mail drop.  *Id.*  In fact, prior to Raging Bull, Jeff Bishop previously operated at least five other defunct companies ostensibly involved in stock promotion and trading services (*e.g.,* BlueWave Advisors LLC, Patriot Publishing LLC, Stock Hideout LLC, Beacon Equity Research LLC, and Twin Media LLC), whose headquarters were also located at mail drops.  *Id.* ¶¶ 105-111.

[262] While the FTC has notified Defendants prior to filing this action and this emergency application for a TRO, the FTC submits that the facts here would also support entry of the TRO *ex parte*.  The FTC is filing herewith a Rule 65 Certification of Counsel demonstrating that immediate and irreparable injury, loss or damage will result from a delay in entry of the proposed TRO.

Respectfully submitted,

Alden F. Abbott
General Counsel

Dated: December 7, 2020

Colleen Robbins (Md. Temp. Bar No. 92567)
Sung W. Kim (D. Md. Temp Bar No. 814609)
Gordon Sommers (D. Md. Temp. Bar No. 814431)
Thomas Biesty (D. Md. Temp. Bar No. 814459)
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-2548; crobbins@ftc.gov
(202) 326-2211; skim6@ftc.gov
(202) 326-2504; gsommers@ftc.gov
(202) 326-3043; tbiesty@ftc.gov
(202) 326-3395 (Facsimile)
*Attorneys for Plaintiff*
*Federal Trade Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2020, I electronically filed the foregoing with the Clerk of the Court using CM/ECF and provided notice and copies of the foregoing Memorandum in Support of Plaintiff's Emergency Motion for a Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, Other Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue, accompanying papers and exhibits, to each of the defendants specified below via email.  I further certify that on December 7, 2020, a copy of the foregoing papers was provided to a process server for hand delivery, along with the Complaint, to each of the defendants below:

     RagingBull.com, LLC
     Jeffrey M. Bishop
     Jason Bond f/k/a Jason P. Kowalik
     Kyle W. Dennis
     Sherwood Ventures, LLC
     Jason Bond, LLC
     Winston Research Inc.
     Winston Corp.
     MFA Holdings Corp.


                                           _____
                                             Colleen Robbins

## APPENDIX A
### Entry of TROs by District Courts from Fourth Circuit
### (copies of orders will be made available upon request)

1.   *FTC v. Ecological Fox, LLC*, Case No. 1:18-CV-03309-PJM (D. Md. Nov. 5, 2018) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, immediate access to business premises, and limited expedited discovery);

2.   *FTC v. Am. Indus. Enter., LLC*, Case No. 1:16-CV-0281-GLR (D. Md. Feb. 2, 2016) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, immediate access to business premises, and limited expedited discovery);

3.   *FTC v. Midway Indus. LLC*, Case No. 1:14-CV-02312-JFM (D. Md. Jul. 21, 2014) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, and immediate access to business premises);

4.   *FTC v. Loma Int'l Bus. Grp., Inc.,* Case No. 1:11-CV-01483-MJG (D. Md. Jun. 2, 2011) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, immediate access to business premises, and limited expedited discovery);

5.   *FTC v. Holiday Vacations Mktg. Corp.*, Case No. 8:11-CV-01319-JFM (D. Md. May 16, 2011) (*ex parte* TRO with asset freeze, financial accounting, and limited expedited discovery);

6.   *FTC v. Residential Relief Found., Inc.*, Case. No. 1:10-CV- 03214-JFM (D. Md. Nov. 15, 2010) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, access to business premises, and limited expedited discovery);

7.   *FTC v. Innovative Marketing, Inc.*, Case No. 1:08-CV-03233-RDB (D. Md. Dec. 3, 2008) (ex parte TRO with asset freeze, financial accounting, access to business premises, and limited expedited discovery);

8.   *FTC v. National Landmark Logistics, LLC*, Case No. 0:20-CV-02592-JMC (D.S.C. July 17, 2020) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, immediate access to business premises, and limited expedited discovery);

9.   *FTC v. Absolute Financial Services, LLC*, Case No. 0:20-CV-02596-JMC (D.S.C. July 17, 2020) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, immediate access to business premises, and limited expedited discovery);

10.   *FTC v. Taft*, Case No. 4:97-CV-00532-CWH (D.S.C. Mar. 7, 1997) (ECF No. 11) (*ex parte* TRO with asset freeze, temporary receiver, immediate access to business premises, and limited expedited discovery);

11.   *FTC v. Glob. Asset Fin. Servs. Grp., LLC*, Case No. 3:19-CV-00055-GCM (W.D.N.C. Feb. 4, 2019) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, immediate access to business premises, and limited expedited discovery);

12.   *FTC v. Lombardo, Daniels & Moss*, LLC, No. 3:17-CV-503-RJC-DCK (W.D.N.C. Aug. 21, 2017) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, immediate access to business premises, and limited expedited discovery);

13.  *FTC v. Int'l Prod. Design, Inc.*, Case. No. 1:97-CV- 01114-GBL-TCB (E.D. Va. Jan. 9, 2007) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, access to business premises, and limited expedited discovery);

14.  *FTC v. One or More Unknown Parties Deceiving Consumers While Doing Business as or Using Premier-Escrow.com*, Case No. 1:03-CV-00488-JCC (E.D. Va. Apr. 21, 2003) (*ex parte* TRO with asset freeze and limited expedited discovery);

15.  *FTC et al. v. The Tungsten Grp., Inc.*, Case No. 2:01-CV-00773-RAJ (E.D. Va. Oct. 15, 2001) (*ex parte* TRO with asset freeze, temporary receiver, financial accounting, immediate access to business premises, and limited expedited discovery).