**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-03538 - GLR |
| | ) | |
| RAGINGBULL.COM, LLC f/k/a | ) | |
| LIGHTHOUSE MEDIA LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION TO STAY ENFORCEMENT OR MODIFY TEMPORARY RESTRAINING ORDER

Defendants RagingBull.com, LLC ("Raging Bull"), Jeffrey M. Bishop, Jason Bond, Sherwood Ventures, LLC, Jason Bond, LLC, Winston Research Inc., and Winston Corp. (collectively, "Defendants"),[1] by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 65(b)(4), hereby file this motion requesting the Court to stay or otherwise modify the Temporary Restraining Order ("TRO") entered on December 8, 2020, and in support state as follows:

## I.      INTRODUCTION

The TRO, which was entered without a hearing and without the benefit of a response and objections by the Defendants, is an immediate and irreparable threat to Raging Bull and poses extraordinarily burdensome restrictions that will make it impossible for the business to continue.

Notably, as both this Court and the FTC have recognized, and contrary to the FTC's own expectation when it filed this action, the TRO was entered without any opportunity afforded to Raging Bull to be heard in any manner before it was entered. In addition, the TRO was entered

---

[1] The undersigned counsel do not represent defendants Kyle W. Dennis or MFA Holdings Corp.

under the significant cloud of the FTC's legal authority under FTC Act 13(b) to obtain the type of restitution relief that the FTC seeks here. The issue of whether the FTC can obtain an asset freeze and the appointment of a Receiver under FTCA 13(b) is the subject of determination by the U.S. Supreme Court in a pending case in its current term and which has resulted in at least two other enforcement actions brought by the FTC of a similar nature being stayed by federal district courts pending that determination. Thus, respectfully, the FTC is not reasonably likely to succeed on the "process" portions of the TRO – the asset freeze and the need for a Receiver. In addition, as will be discussed below, the FTC is not reasonably likely to succeed on the merits of their claim – that the entire business is "permeated" with fraud and all of their customers were "duped."

Despite Defendants' submission that the TRO should not have been entered, and despite the strong likelihood that the alleged legal basis to seek an asset freeze is invalid, the Defendants are nevertheless sensitive to the Court's concerns about preserving assets. To that end, Defendants will propose reasonable measures to ensure no wasting of assets and are willing to enter into a reasonable bond to protect against asset dissipation if the asset freeze is lifted. The catch 22 is that the Defendants cannot post a bond with such a pervasive asset freeze pending.

The complete freeze of the company's assets and operations means it cannot even begin to meet its obligations to its current subscribers or pay its approximately 160 employees, let alone continue its operations, even with *full* compliance with the substantive provisions of the TRO (*e.g.*, Sections I, II, and III, pp. 7-9). (*See* Declaration of Jeffrey M. Bishop ("Bishop Decl.") at ¶¶ 12-13.) Its program leaders, called "gurus," will be unable to trade, as their brokerage accounts are closed. (*Id.* at ¶ 13(a).) Without the ability to trade, Raging Bull cannot provide its services to its tens of thousands of active subscribers. (*Id.* at ¶¶ 5, 13(a).) The company will incur substantial new liabilities, as it will be unable to pay its bills and subscribers will cancel and demand refunds.

(*Id.* at ¶¶ 13, 16.) Not only will the TRO in its current form cripple a legitimate business (contrary to the FTC hyperbole), it will inflict increased damages by directly causing the inability of existing contracts that thousands of subscribers still want. (*Id.*)

Furthermore, the temporary Receiver appointed by the Court has made clear in conference with the Defendants' counsel on December 9, 2020, that he views the Court's TRO mandate markedly different from what Defendants understand to be the Court's purpose in entering the TRO's provisions as a whole. Specifically, the Receiver indicated that his intention is to fully halt the company's operations while assessing whether to keep the business going. (*Id.* at ¶ 15.) This includes shutting down Raging Bull's email capabilities, which will make it impossible for defense counsel to effectively communicate with their clients and defend themselves. (*Id.*) Further, under these intended actions, the business cannot survive even a short period of time – days. Even if the Receiver concludes, after a short time, that the company has and can operate legally and profitably, there will be no company left to operate. As a result of the conversation with the Receiver, both the Receiver and Defendants believe additional guidance and clarification is needed, and Defendants submit that additional modifications to the TRO are critical to accomplish the goals here, which should be to insure that a legitimate business complies with its legal obligations; not to kill a decade-old business that provides a valued and desired service to tens of thousands subscribers.

To that end, Defendants propose that they will stipulate to comply with the substantive requirements of the TRO, including the provisions in Sections I, II, and III. Defendants will further agree to strict limitations prohibiting the disbursement or distribution of any assets to any defendant, or related person, or any other third party that is not business-critical. Allowing the

business to operate will do far more to preserve the company's assets than the draconian asset freeze and receivership it presently faces under the TRO.

We ask that the TRO be modified to allow the company to continue to operate pending a decision on the preliminary injunction motion currently scheduled for December 18, 2020. The asset freeze should be removed and the Receiver should not be appointed at this time, or at most, appointed only for the limited purpose consistent with the appropriate objectives of this TRO – the preservation of assets and operations and not the cessation of Raging Bull's lawful activities. Alternatively, the TRO should be modified to clarify that the Receiver is not authorized, without prior Court approval, to take actions to shut the company down.

## I.     BACKGROUND

### A.     Raging Bull's Services

Raging Bull is a subscription-based publisher that provides subscribers with training and educational materials to learn trading strategies for their own investing activity. (Bishop Decl. at ¶ 3.) Raging Bull has been in business for a decade, teaching its subscribers how to trade stocks through the publication of training materials, analysis and commentary, and real-time trading examples. (*Id.* at ¶¶ 4-5.)

Raging Bull currently employs approximately 160 employees, most of whom are currently working from home during the COVID-19 pandemic. (*Id.* at ¶ 6.)

Raging Bull offers publication materials for multiple trading strategies, which are developed and taught by Raging Bull's gurus through a mix of instructional videos, daily stock watch lists, and exemplar trading activity in real time. (*Id.* at ¶ 4.) Subscriptions correspond to different trading strategies, and the services provided varies across trading strategies and gurus. (*Id.*)

4

Raging Bull directs new subscribers of a service to its publication of training videos on the trading strategy for that service. (*Id.* at ¶ 9(a).) For example, JasonBondPicks subscribers are directed to watch multiple core instructional videos, which provide an overview of how to implement the strategy of creating profits through the execution of small cap swing trades. (*See id.*) Swing trades typically involve identifying stocks, through a technical analysis of statistical trends in trading activity, which are poised to move up or down. Once identified, the strategy involves determining a position at which to buy and/or sell within a period of a few days to capture a portion of the stock's upswing.

The instructional videos provide trading strategy basics, but to really learn a trading strategy requires executing the strategy in real time. (*Id.* at ¶ 4.) Raging Bull's gurus offer real-time trading examples to "teach by doing" with corresponding stock watch lists and alerts for trades. (*Id.*)

For services providing daily watch lists, the watchlists highlight the stocks the guru is watching for potential trades. (*Id.* at ¶ 9(b).) The watchlists generally provide detail regarding why the guru is watching the stocks, how the stocks' recent activity fits within the trading strategy, and what expected action (buy or sell at a particular price) the guru is planning with respect to those stocks. (*Id.*) Depending on the strategy, trading on highlighted stocks may carry through to subsequent days as the conditions necessary to execute trades in a particular strategy may not occur the same day the watchlist is published. The watchlists allow the subscriber to view a demonstration of the trading strategy in real time, which is a helpful educational tool in learning to implement the strategy.

Most of Raging Bull's gurus provide training to subscribers through their real money trading of securities. (*Id.* at ¶ 9(c).) Trading real money provides the realistic proving ground for

a guru's strategies, requiring the gurus to demonstrate the efficacy of their strategies in the face of real market conditions with real investor emotions and fears on the line. (*Id.*) Real money trading also has a level of precision lacking from trading paper money. For example, a trader may be watching a security with the intention of purchasing at, say, $3.23 a share. However, even if the stock price reaches that amount, the trader may not be able to fill an order at that price, which would necessarily impact – for better or worse – any eventual profit or loss when the stock is sold. Real money trading factors this market risk in, where paper money trading does not.

To further illustrate their trading strategies in real-time, Raging Bull gurus publish trade alerts via text message and/or email to subscribers. (*Id.* at ¶ 9(d).) The gurus send out trade alerts noting the price at which the guru bought or sold the position. Real-time trade alerts demonstrate in real time how the guru is executing the strategy and teaches subscribers how to successfully repeat the strategy. (*Id.*)

Several gurus, including Jason Bond, have live streamed their brokerage account portfolios so subscribers can see all trading activity within the accounts on a real-time, and fully transparent basis. (*Id.* at ¶ 9(e).) Livestreaming the account portfolios gives subscribers the ability to verify all trading activity by the guru, including the activity reported in trade alerts. This also allows subscribers to immediately observe trading activity and would be able to see any instances of scalping, short sales or other activity that might suggest the guru is profiting off the activity of subscribers rather than market activity.

Raging Bull has also offered live chat rooms for certain subscribers. (*Id.* at ¶ 9(f).) These chat rooms provide subscribers with the opportunity to ask questions of a guru (although not all subscriber questions can be addressed in a chat room) and communicate with other subscribers in real time during market hours. (*Id.*) The chat room offers a general discussion about the guru's

trading strategies in real-time, rather than post-hoc activity summaries with the benefit of hindsight. (*Id.*)

**B.      Raging Bull's Subscribers**

Over the course of a decade, Raging Bull has built a successful business with a track record of satisfied subscribers. Currently, the company has approximately 70,000 subscribers. (*Id.* at ¶ 5.) Over the course of its decade-long history, the company has had more than 200,000 subscribers. (*Id.*)

In recent years, Raging Bull has received hundreds of unsolicited comments from its subscribers praising the company's gurus, teaching, and services. (*Id.* at ¶ 7.) In the 48 hours since learning of the FTC's Complaint, the company has reached out to ask many of its subscribers if they would be willing to re-confirm their comments about the company by signing a supporting statement. Over 140 subscribers have submitted signed re-confirmation statements. Examples of over 200 subscriber statements, including 142 signed re-confirmation statements provided this week, have been attached as Exhibit A to Jeffrey Bishop's Declaration.

## II.      ARGUMENT

**A.      The Court Should Stay the Asset Preservation Portions of the TRO Pending the U.S. Supreme Court's Ruling on the Legality of the FTC's Expansion of FTC Act Section 13(b) to Recover Monetary Damages.**

While Defendants deny wrongdoing and any need for injunctive relief, Defendants are not currently seeking to stay the "substantive" portions of the TRO's Order in Sections I through III, which are designed to mitigate the risk of customers' future injury. Defendants respectfully move to stay the TRO's Sections IV through VI imposing a preservation of assets, receivership, and an asset freeze mandate—pending the U.S. Supreme Court's decision in *AMG Capital Mgmt., LLC*

*v. FTC*, No. 19-508 (cert. granted July 9, 2020).[2] In that case, for which oral arguments are scheduled to take place on January 13, 2021,[3] the U.S. Supreme Court will decide a threshold legal issue that is central to this dispute: whether Section 13(b) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 53(b), authorizes the FTC to demand monetary relief in addition to purely "injunctive" relief. The TRO's "process" provisions are purportedly designed to preserve assets to pay monetary damages in the unlikely event violations are ultimately found. But should the Supreme Court determine that monetary remedies are unavailable or limited, the freezes and the like contained in the TRO that threaten Raging Bull's very existence would be totally unnecessary.

### 1.     The Text of Section 13(b) Authorizes Injunctions – Not Monetary Relief

FTCA Section 13(b) gives the FTC authority to seek judicial relief to prevent acts that violate the FTCA or rules promulgated thereunder. 15 U.S.C. § 53(b). Section 13(b) provides that, where the FTC "has reason to believe" a person "is violating, or is about to violate" a law enforced by the FTC, and that "enjoining" such act "pending the issuance" and resolution "of a complaint by the Commission" is in the public interest, it may seek "a temporary restraining order or a preliminary injunction" in district court. *Id.* Critically, however, the text of Section 13(b) mentions only injunctive relief. Unlike FTCA Section 19, 15 U.S.C. § 57(b), which establishes a far more rigorous standard, Section 13(b) does not expressly authorize monetary remedies.[4]

---

[2] *See AMG Capital Management, LLC v. Federal Trade Commission*, No. 19-508 (cert. granted July 9, 2020) ("*AMG Capital Mgmt.*").

[3] *See* Oral Arguments, Supreme Court of the United States, October Term 2020, *available at* https://www.supremecourt.gov/oral_arguments/calendars/MonthlyArgumentCalJanuary2021.html (last visited Dec. 9, 2020).

[4] In addition, in a separate but related federal agency context, the U.S. Supreme Court held in *Kokesh v. SEC*, that "disgorgement imposed as a sanction for violating a federal securities law" is a "penalty" for statute-of-limitations purposes. 137 S. Ct. 1635, 1639 (2017).

2.    **Staying the TRO Is Appropriate Pending the U.S. Supreme Court's Forthcoming Decision and Is In Line With at Least Two Other Federal District Courts**

Given that the very grounds the FTC relies upon for its authority and rationale for seeking the TRO's asset freeze and receivership is in legal doubt, Defendants respectfully ask that the Court stay the TRO until a decision is reached in *AMG Capital Mgmt.*[5] At least two district courts have stayed cases in which the FTC is a plaintiff and seeks monetary relief pending the decision in *FTC v. Credit Bureau Center, LLC*, the case with which *AMG Capital Mgmt.* was previously consolidated before the U.S. Supreme Court. *See Fed. Trade Comm'n v. Lending Club Corp.*, No. 18-CV-02454-JSC, 2020 WL 4898136, at *4 (N.D. Cal. Aug. 20, 2020) (staying all proceedings); *Federal Trade Commission v. Match Grp. Inc.*, No. 3:19-cv-02281-K (N.D. Tex. Oct. 9, 2020) (Order, Dkt. No. 54) (staying action pending resolution of *FTC v. Credit Bureau Center, LLC*).

3.    **Granting a Stay of the TRO Pending the U.S. Supreme Court's Forthcoming Decision Is in the Interests of Justice**

The FTC's request for a preservation of assets, receivership, and asset freeze invokes Section 13(b) of the FTC Act – titled "Temporary Restraining Orders; Preliminary Injunctions" – to seek equitable monetary relief from Raging Bull for allegedly wrongful past conduct that Raging Bull disputes.[6] That the FTC's request is predicated on avoiding the dissipation of funds by the Defendants so they may be used to pay consumer's money damages objectively means that a

---

[5] *See* Plaintiff's Memorandum In Support Of Plaintiff's Emergency Motion For A Temporary Restraining Order With Asset Freeze, Appointment Of A Temporary Receiver, Other Relief, And Order To Show Cause Why A Preliminary Injunction Should Not Issue at 50 (stating "A district court's authority to freeze a defendant's assets in a law enforcement action brought by the FTC is ancillary to the agency's authority to order consumer redress.") & n. 249 ("Section 13(b) of the FTC Act confers full equitable powers on this Court, including the power to award restitution, disgorgement of ill-gotten gains, and rescission of contracts. 15 U.S.C. § 53(b)").
[6] *See* Sections I-III of the Temporary Restraining Order.

determination of whether the FTC has this ultimate power in the first place is central to the FTC's case.

Under these circumstances, a grant of the requested stay would be in the interests of justice. First, the pending Supreme Court case and the stayed district court actions throw into substantial doubt whether the FTC can meet its burden of a substantial likelihood of success on the merits of this requested relief. Second, to allow the TRO to remain in full force would undeniably cause irreparable harm and kill the Defendants' business. if Defendants are correct about how the Supreme Court will decide the case, unless the TRO is stayed or modified, Defendants' victory will be an empty one. Third, a stay would promote judicial efficiency because the U.S. Supreme Court decision in *AMG Capital Mgmt.* will decide the law surrounding a core dispute in this case. It would likewise streamline this litigation and could potentially greatly reduce the scope of the FTC's powers directly at issue in this matter.

In this District, a stay is appropriate "where the Supreme Court may shortly provide definitive guidance on key legal questions that could impact the viability of some or all of the claims asserted by Plaintiffs … ." *Int'l Refugee Assistance Project v. Trump*, 323 F. Supp. 3d 726, 734 (D. Md. 2018) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936)); *see also Preston v. United States*, No. CIV.A. ELH-14-01920, 2015 WL 221633, at *9 (D. Md. Jan. 15, 2015) (staying action pending Supreme Court's resolution of case with similar issue) (citing *Amdur v. Lizars,* 372 F.2d 103, 106 (4th Cir. 1967) (holding that a District Court has "discretion to stay proceedings on its docket pending the outcome of a similar suit.")). The FTC's legal authority under Section 13(b) to obtain consumer restitution as an appropriate remedy in this case is the very linchpin of any basis to obtain the asset freeze and related asset preservation rights for the Receiver. As such, based on clear precedent both within as well as outside the Fourth Circuit, at a minimum those aspects

of the TRO should be stayed by the Court pending the Supreme Court's determination of that important legal issue in the Supreme Court's current term.

Separately, without a stay, Defendants will continue to be prejudiced and would suffer irreparable harm through all or virtually all of its legitimate business operations ceasing the day after being served the Complaint, such that Defendant Raging Bull would accrue massive—but entirely avoidable—liabilities and harm including to innocent members of the Defendant's workforce during a global pandemic. This should be considered along with the fact that the Defendants had no notice of this matter or its underlying investigation and, significantly, did not have an opportunity to be heard prior to the entry of the TRO the day after the Complaint was filed. Lastly, the FTC would not be prejudiced by a stay, because in terms of the risk of ongoing customer injury the "substantive" portions of the FTC order will remain in full. Accordingly, Defendants respectfully ask for a stay of the TRO, as described above.

**B.      The FTC Fails to Show a Likelihood of Ultimate Success on the Merits.**

**1.      The FTC's Biased and Unfair Portrait of Raging Bull's Subscribers is Belied by Real Subscribers Offering Positive Reviews of the Company**

The FTC has presented a one-sided, cherry-picked view of Raging Bull's purported dissatisfied subscribers. There is no doubt now that the FTC's clandestine investigation of Raging Bull has been ongoing for many months. Nor is there any doubt that the FTC has expended substantial resources and effort in taking an "absolutely no stone unturned" approach in building its case.

And yet, the FTC has come up with only 21 subscribers with complaints about Raging Bull's services. Raging Bull has had more 200,000 subscribers over the years. (Bishop Decl. at ¶ 5.) In other words, the FTC bases its claim that Raging Bull "tricks" its subscribers, injuring "tens of thousands of consumers" on a biased survey of ***0.0105 percent*** of Raging Bulls actual

subscribers. Even the FTC's reliance on 220 "complaints" (FTC, BBB and "form" consumer complaints routinely received by State Attorney General offices, many of which are undoubtedly "carbon copy" duplicates and therefore either double or triple-counted), is a complaint level far below the expected 8.4% "consumer fraud" complaint level that the FTC cites in its brief (*see* FTC Memo in Support fn. 196, at 32). Far from supporting an inference of consumer fraud as the FTC would have this Court do, the complaint numbers cited by the FTC in fact suggest the very absence of consumer fraud. As to the 21 consumer declarations submitted by the FTC, these declarations have undoubtedly been prepared with substantial involvement – perhaps guidance – by FTC lawyers, which is common practice at the FTC when dealing with third-party complainants and will be the subject of discovery in this litigation. The point is that the small number of complaints and the nature of the consumer declarations must be viewed in the totality of this case and cannot be the overwhelming – even sole – basis for concluding, which the FTC would have this Court believe, that consumer injury has occurred and, even if it has, is sufficiently widespread to warrant entry of the FTC's TRO.

While not preparing for litigation (as the FTC has been doing), Raging Bull has collected hundreds of unsolicited subscriber comments in the last few years. These comments are from subscribers who are satisfied with Raging Bull's services. They praise as Raging Bull and its services as helpful, educational, honest, transparent and effective. Raging Bull did not send a team of lawyers out to gather and assist in drafting these comments – many of these reviews pre-date the filing of the FTC's Complaint by many months or years and were not solicited, let alone for the purpose of defending Raging Bull in this case. These are real reviews from real subscribers describing their real experiences using the Raging Bull services. In the 48 hours after receiving the

FTC's papers, Raging Bull was able to reach some of these subscribers to re-confirm under signature their comments about the company – which they did.

And, despite having no advance notice of the FTC's action, which was filed only days ago, Raging Bull submits more than 200 positive subscriber statements – ***ten times as many*** as the FTC has been able to generate in their many months of investigation.

Raging Bull understands that a small few of its subscribers have been unhappy with the services they received. Every business in the United States, no matter what its products or services, undoubtedly has some number of consumers who are either unhappy or feel that they have cause for recompense from the company they have patronized, some justified and some not – this is part of doing business in a business-to-consumer trade, and practically nothing that any company can do will change that fact. It is certainly disappointing to Raging Bull that not all of its subscribers have been satisfied. But the FTC is simply wrong to suggest, based on scant evidence and a relatively few number of complaints and fabricated consumer declarations, that Raging Bull has a legion of dissatisfied customers who felt duped. These complaints – both their nature as well as their numbers – need to be examined critically before jumping to the conclusion that because of them the business is engaged in widespread consumer fraud and, in effect, the business should be shut down.

2.      **Raging Bull Disputes the FTC's Mischaracterization of its Past Practices, But Will Stipulate to Abide by the TRO's Substantive Restrictions Concerning its Marketing and Trading Activities**

Despite what the FTC hopes to suggest with its cherry-picked and often mischaracterized examples, Raging Bull has not engaged in a common practice of misleading marketing or improper trading activities. For example, the FTC's claim that Raging Bull's real-time trading method of teaching is deceptive is belied by the FTC's acknowledgment that Raging Bull gurus are transparent in their real-time trading. Raging Bull's teaching programs include videos, daily watch

lists, and alerts by gurus who make real-money trades, informing subscribers of what securities they are reviewing and why and under what conditions they might purchase or sell those positions. The gurus also often livestream their trading account portfolios, providing a real-time and accurate account of exactly how the guru is trading and when. There was no deception, no false statement, and no taking advantage of subscribers. In fact, the subscribers are getting exactly what was advertised – "real-money" traders trading in real-time.[7]

But the merits of the FTC's substantive allegations are not at issue in this Motion. Raging Bull will stipulate to all of the substantive aspects of the TRO, which order Raging Bull to conduct its business in compliance with the FTC's requirements. As noted below, Raging Bull believes its current operations are in compliance, and Raging Bull will ensure that it fully complies with Sections I, II, and III of the TRO pending the preliminary injunction hearing.

### 3. The FTC Ignores Raging Bull's Diligent Efforts to Improve Its Operations and Compliance

Raging Bull is not the company the FTC portrays in its Complaint. Many of the purported "deceptive" marketing examples offered by the FTC are outdated – not just because the examples are from a few years ago, but because Raging Bull has undertaken substantial efforts over the last year and more to improve its operations and compliance.

The FTC dismisses or outright omits the critical fact that Raging Bull has been taking significant steps in the last year to improve its operations and compliance policies and procedures.

---

[7] Indeed, the FTC acknowledges many instances in which Raging Bull **very clearly** cautions subscribers that they cannot expect to get the same results as the gurus by simply attempting to duplicate their trades. *See, e.g.*, Mot. at 15, n.72 ("You can't mirror this stuff… If you want to mirror anything that I do, if you want to piggyback on me, momentum penny stocks is not the place… Do not try to buy after I buy…"). The FTC attempts to dismiss such statements because what they have chosen to highlight are statements made to subscribers, rather than prospective subscribers. But many of the statements the FTC says are "deceptive" are made to subscribers as well. The FTC wants it both ways – Raging Bull is damned if it does and damned if it doesn't when communicating with its subscribers.

This has included addressing many of the issues which the FTC has identified (though drastically and unfairly overstated) in its Motion, and which are addressed in the TRO – specifically, claims regarding its gurus' success and strategies; earnings claims; and subscriber cancellation and refund requests. Raging Bull has taken these steps of its own accord, without any prompting by the FTC. These efforts continued after the FTC's actions in the recent OTA settlement, despite having no knowledge that the FTC was investigating Raging Bull.

Indeed, in late 2019, Raging Bull developed and began to implement a comprehensive Compliance Manual. As reflected in the Compliance Manual, Raging Bull strives to provide complete transparency with its subscribers whenever a guru trades real money in connection with the guru's training services. Because a component of Raging Bull's services involves teaching subscribers through the guru's own real money trading, subscribers expect, and Raging Bull provides, full and contemporaneous transparency in the guru's trading activity.

Generally, as stated in the Compliance Manual, neither Raging Bull nor its personnel are permitted to or may profit or seek to profit based upon the knowledge of what trades or transactions another person at Raging Bull is planning to make, or to collude or act in concert with any other person to, without limitation, manipulate stock prices, engage in signaling or otherwise seek to profit based upon such knowledge. Raging Bull specifically prohibits employees from engaging in any unlawful trading activity, pump and dump schemes, scalping, or touting. (Bishop Decl. at ¶ 10.)

Moreover, Raging Bull has developed new and updated policies and held multiple comprehensive training sessions to make its marketing and communications compliance more robust. (*Id.* at ¶ 11.) These policies and trainings have been rolled out to all Raging Bull employees

involved in providing services to subscribers or communicating with and marketing to subscribers and non-subscribers. Indeed, the FTC has seen some of the fruit of these improvements.[8]

Raging Bull has grown very fast and is working hard to ensure that its business develops and incorporates substantial safeguards and internal controls to fit the company's business and subscribers. This has been a process and the company understands it is not and has not always been perfect. But the company is working hard toward that goal. The TRO was obtained without any acknowledgement of this fact or any attempts by the FTC through its standard pre-complaint investigation process to learn about this company.

## C.    The Equities Do Not Favor the FTC's – and the Receiver's – Efforts to Kill the Company to Preserve Assets.

The FTC shrugs off the importance in weighing the equities in considering the appropriateness of a TRO. In effect, the FTC contends that any negative impact on the company, its 160 employees, and its many thousands of satisfied subscribers, is irrelevant because the public interest is given greater weight.

Nevertheless, the FTC identifies only a single indicia of public interest in considering the equities – "the danger of asset dissipation." Mot. at 44. By racing for a TRO on a purported emergency and as it played out on an ex parte basis, the FTC chose the ***most destructive path*** it could to serve that public interest.

The FTC demanded, and received, a TRO with two devastating components.

First, the complete asset freeze has rendered Raging Bull completely inert. (Bishop Decl. at ¶ 12.) It cannot do business with its assets frozen. (*Id.*) All of the activities necessary to the

---

[8] *See, e.g.*, Mot. at 25 (acknowledging a July 2020 change in Raging Bull's disclaimers to note: "'RESULTS PRESENTED NOT TYPICAL OR VERIFIED' and 'subscribers' trading results have NOT been tracked or verified and past performance is not necessarily indicative of future results, and the results presented in this communication are NOT TYPICAL.'").

operation of the business will stop, including:

- Guru brokerage accounts will be closed. Because most company gurus promise to and do teach using real-time trading, this will end their ability to provide services to their subscribers.

- The company will be cut off from the credit card companies, losing the ability to receive payments from subscribers.

- The company will be unable to pay its vendors, contract partners and service providers, resulting in, among other losses, the closure of email and other modes of communications with its subscribers and loss of access to and control of its business-critical and subscriber data.

- The company will not be able to pay for its rent and other facilities.

- The company will also not be able to make payroll – with its 160 employees missing their first paychecks tomorrow.

(*Id.* at ¶ 13.)

Second, and perhaps unknown to the Court, the Receiver has informed the company that it is his intention to shut down the company, terminate its email system and modes of communication, put an end to all of the company's current services, sever all efforts to meet any of the company's obligations to its subscribers, and not pay the 160 employees another dime. (*Id.* at ¶15.) The plain terms of the TRO contemplate that the business should continue its operations in compliance with the substance provisions in Sections I and II, except in the event the Receiver, in his exercise of *judgment*, concludes the operations of the company cannot continue legally and profitably. But the Receiver has made clear his intention to moth ball the company while endeavoring to make his determination. Even should he ultimately determine as he should that the Company has and can operate legally and profitably, it simply will be too late. The Receiver's approach seems to be to kill the allegedly ill patient, examine the patient's body and cause of death in an autopsy, and then sometime later report back to the authorities (including this Court), that the patient is gone and cannot be revived. Respectfully, that cannot be this Court's intent in

entering the FTC's TRO.

If the Receiver takes these actions, there will not be a "***danger*** of asset dissipation" – there will be a ***very real*** dissipation. The company's revenue stream from current customers – not even new customers through advertising and marketing in full compliance with Sections I and II of the FTC's TRO – will be immediately shut off. (*Id.* at ¶ 16.) Moreover, the company's liabilities will skyrocket, as subscribers, vendors and others will seek recompense for the Receiver's shuttering of the company. (*Id.* at ¶¶ 15-16.) These harms cannot be overstated. The company cannot survive with the complete asset freeze laid out in Section V of the TRO, and the Receiver has indicated he has no intention for the company to survive – an outcome that appears to be welcomed by the FTC.

Without the asset freeze, and without ceding complete control to a Receiver intending to shut the business down immediately, the company can continue to operate. The defendants are prepared to stipulate to strict limitations prohibiting the disbursement or distribution of any assets to any individual defendant, or related person, or any other third party not business-critical. The company can pay its employees (not including individual defendants), pay its necessary vendors and service providers, and meets its obligations to its subscribers while following the substantive requirements in Sections I, II, and III of the TRO. There will be more assets, not fewer, being preserved. The public interest will be better served, while better serving the interests of the company's employers and subscribers.

### III.     RELIEF SOUGHT

Raging Bull respectfully requests the following relief:

1.     Except as stated herein, Raging Bull will stipulate that it will fully comply with the TRO, including compliance with Sections I, II and III, while the TRO remains in effect.

2.     Raging Bull requests the TRO be modified to strike or otherwise omit Section V

(asset freeze over corporate defendants), and to make any and all other such modifications necessary to effectuate the striking or omission of Section V.

3.      Raging Bull requests Section XIII of the TRO be modified to strike or otherwise omit Section XIII (temporary receiver), such that no temporary Receiver is appointed or authorized pending a decision on the preliminary injunction motion currently scheduled to be heard on December 18, 2020 and to make any and all other such modifications necessary to effectuate the striking or omission of Section XIII.

4.      In the event the Court declines to grant the relief in Paragraph 3 above, Raging Bull requests Section XIV of the TRO be modified to clarify that pending a decision on the preliminary injunction motion currently scheduled to be heard on December 18, 2020, the Receiver is not authorized to assume control over Raging Bull's physical premises, take control over the management of the company, terminate, shut down or otherwise cease or modify any material aspect of Raging Bull's business operations without prior Court approval, and to modify all such other Sections of the TRO as necessary to effectuate this stated modification. By way of example, subject to complying with other provisions of the TRO including in Sections 1, II and III, and the limitations set forth below, the Receiver will allow Raging Bull to continue to fulfill its contracts with current subscribers (including communicating with subscribers by email, text, chat rooms, video conferences), access its brokerage accounts, pay its business critical suppliers, pay its employees, and take other business critical actions to keep the company operating pending a decision on the preliminary injunction motion currently scheduled to be heard on December 18, 2020.

5.      Upon the Court's granting of the relief sought in (2) and (3) of this requested relief, pending a decision on the preliminary injunction motion currently scheduled to be heard on

December 18, 2020, Raging Bull will agree not to make any distributions or payments of any kind to any Defendant in this case and to only use assets as necessary to conduct its general business in the normal course. The other Defendants will abide by the terms of the TRO in Section IV.

### IV.    CONCLUSION

For the reasons stated herein, Raging Bull respectfully requests the Court grant this Motion and issue the relief sought herein, and any further relief as appropriate. Should the Court wish to have a hearing on Defendant's Motion, Counsel will make ourselves available.

Dated: December 10, 2020

Respectfully submitted,

RagingBull.com, LLC, Jeffrey M. Bishop, Jason Bond, Sherwood Ventures, LLC, Jason Bond, LLC, Winston Research Inc., and Winston Corp.

By: /s/ *David G. Barger*
David G. Barger (DCB# 469095)
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749-1300
Email: bargerd@gtlaw.com

Andrew G. Berg
2101 L Street, N.W.
Suite 1000
Washington DC 20037
Tel: (202) 331- 3100
Email: berga@gtlaw.com
*Pro Hac Vice Pending*

Miriam G. Bahcall
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: (312) 476-5135
Email: bahcallm@gtlaw.com
*Pro Hac Vice Pending*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of December 2020 a true and accurate copy

foregoing DEFENDANTS' MOTION TO STAY ENFORCEMENT OR MODIFY

TEMPORARY RESTRAINING ORDER was properly served on all parties through the ECF

system.

/s/ *David Barger*
David G. Barger (DCB# 469095)
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749-1300
Email: bargerd@gtlaw.com

*Counsel for Defendants*

21