UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**,<br><br>    Plaintiff,<br><br>v.<br><br>**RAGINGBULL.COM, LLC**, et al.,<br><br>    Defendants. | Case No. 1:20-cv-3538 |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STAY
ENFORCEMENT OR MODIFY TEMPORARY RESTRATING ORDER

SUMMARY

Defendants[1] ask this Court to stay parts of the Temporary Restraining Order ("TRO") entered against them on December 9th, based on three main arguments: (1) the Supreme Court *might* decide an issue that *might* affect the scope of relief available under § 13(b) of the FTC Act; (2) they have not violated the law—even though they have provided no substantiation and indeed they *continue* to violate the law; and (3) they make spurious and unsupported claims about the effects of the TRO on Defendants while ignoring the effect on consumers. Lifting the asset freeze and receivership portions of the TRO, as Defendants request, would allow for the immediate dissipation of hundreds of thousands of dollars needed for consumer redress.

---

[1] The Motion to Stay was filed by Defendants RagingBull.com, LLC, Jeffrey M. Bishop, Jason Bond, Sherwood Ventures, LLC, and Jason Bond, LLC. On December 11, 2020, at 12:54pm, counsel for Defendants Kyle W. Dennis, Winston Research Inc., and Winston Corp. entered an appearance and at 1:18 PM filed a motion to join the Motion to Stay on behalf of their clients. ECF Nos. 34, 35.

1

Defendants do not hide the ball – they seek a stay so they can continue spending money and running a company that has defrauded hundreds of thousands of consumers. And, they have continued to disseminate deceptive earnings claims in violation of the TRO since its entry.[2] Nowhere in Defendants' motion do they contest FTC's allegations that they lack substantiation for their advertising; nor do they contest that Bishop and Bond have substantial and persistent trading losses and derive their income primarily from Raging Bull's customers.

The TRO, including its asset freeze and receivership provisions, is indispensable to protect the possibility of consumer redress. For the reasons described below, Plaintiff asks this Court to deny Defendants' motion.

## RELEVANT PROCEDURAL HISTORY

On December 7, 2020, the FTC filed a Complaint in this Court alleging Defendants, a group of six corporate defendants and three individual defendants, defrauded consumers of more than $137 million by misrepresenting how much money consumers are likely to make using Defendants' online services related to stock and options trading. ECF No. 1. Concurrently, the FTC sought a Temporary Restraining Order ("TRO") against Defendants for their deceptive and unlawful conduct in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and the Restore Online Shoppers Confidence Act ("ROSCA"), 15 U.S.C. § 8404. ECF No. 2. The FTC gave advance notice of its action and its Motion for a TRO to Defendants at 7:05 AM on December 7, 2020.[3]

After reviewing the papers filed by the FTC, this Court entered a TRO against Defendants on December 8. ECF No. 21. The TRO prohibits Defendants from continuing to

---

[2] PX 28 (Second Declaration of Reeve Tyndall), ¶¶ 4-10
[3] PX 28, ¶ 3; *see also* ECF No. 2-3 ¶ 3.

engage in fraudulent behavior, including misrepresenting the earnings potential of their products to consumers and failing to provide a simple mechanism by which to cancel recurring subscriptions. ECF No. 21 pt. I, II. The TRO also prohibits release of consumer information. *Id.* Pt. III. Further, to protect the possibility of consumer redress, the TRO orders the assets of the individual Defendants preserved, *id.* Pt. IV, orders frozen all of Defendants' corporate assets, *id.* pt. V, and orders the appointment of a temporary Receiver, *id.* pt. XIV, who has the power to assume full control of the Receivership entities and their assets and documents. *Id*. pt. XIV.

On December 10, at 2:14 PM, Defendants filed a motion seeking to modify the TRO. Mot for Stay, ECF No. 28. Defendants ask the Court to terminate the asset freeze provisions in the TRO and to terminate the receivership or limit the Receivers' powers. Mot for Stay at 18-19. The same day, the FTC filed a notice with this Court indicating its intent to respond to Defendants' motion. ECF No. 29. Defendants later that day filed a notice asking that FTC's response be filed by noon today, Dec. 11 at the same deadline set for a joint status report by the parties. ECF No. 30. FTC has made efforts to prepare this response as expeditiously as possible. Today, counsel for Dennis and two corporations moved for leave to join the motion to stay.

## ARGUMENT

**I.    A STAY OF THE TRO PENDING THE SUPREME COURT'S DECISION IN *FTC V. AMG CAPITAL MANAGEMENT* IS NOT APPROPRIATE**

The law is clear in the Fourth Circuit that Section 13(b) of the FTC Act authorizes the Court to award complete relief, including monetary relief. *FTC v. Ross*, 743 F.3d 886, 890 (4th Cir. 2014). Without mentioning or citing to *Ross*, Defendants ask this Court to ignore binding precedent in the Fourth Circuit and instead assume the Supreme Court will rule, sometime next year, that this Court lacks power to order an asset freeze and receivership here. Mot. to Stay at 8-11; *see generally AMG Capital Mgmt., LLC v. FTC*, 207 L.Ed.2d 1118, 1118 (U.S. 2020)

(granting *certiorari* in appeal of *FTC v. AMG Capital Mgmt. LLC*, 910 F.3d 417 (9th Cir. 2018)). It has long been settled that "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." *Landis v. North Am. Water Waters & Elec. Co.*, 299 U.S. 248 (1936). The burden of showing the necessity for a stay rests with the moving party and is heightened when a stay will "work damage" to another party. *Int'l Refugee Assistance Project v. Trump*, 323 F. Supp. 3d 726, 731 (D. Md. 2018) (quoting *Landis*, 299 U.S. at 255). Courts considering motions to stay a matter based on a potential decision by the Supreme Court typically rely on factors articulated in *Landis*, namely "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *United States ex rel. Tusco, Inc. v. Clark Constr. Grp., LLC*, 235 F. Supp. 3d 745, 755 (D. Md. 2016) (quotation omitted). The Defendants' motion should be denied because the Supreme Court's ruling in AMG will not necessarily affect this litigation and Defendants have failed to establish meaningful harm, while the consumers (and thus the public interest) will be harmed by a delay of this Court's TRO.

    First, the legal argument Defendants hope the Supreme Court will one day adopt is that the text of § 13(b) authorizes injunctions but not monetary relief. Mot. to Stay at 8. That argument was squarely rejected by the Fourth Circuit in *FTC v. Ross*.[4] *Ross*, 743 F.3d at 890 ("Congress' invocation of the federal district court's equitable jurisdiction brings with it the full 'power to decide all relevant matters in dispute and to award complete relief even though the decree includes that which might be conferred by a court of law.'" (quoting *Porter v. Warner*

---

[4] The Fourth Circuit explicitly noted, "[w]e adopt the reasoning of those courts and reject Ross' attempt to obliterate a significant part of the Commission's remedial arsenal." *Ross*, 743 F.3d at 892.

*Holding Co.*, 328 U.S. 395, 399 (1946)); *see also* Mem. In Supp. of TRO ("TRO Memo") at 37 & n.200 (noting this Court and others in the Fourth Circuit have issued TROs like this one), ECF No. 2-1.  It is pure speculation to assume the Supreme Court will overturn the case on which *Ross* is based, *Porter v. Warner Holding Co.,* 328 U.S. 395 (1946),[5] which has been on the books and favorably cited by the Supreme Court for more than six decades.[6]

Further, Defendants' argument that *AMG* could affect this case in a way that justifies staying parts of the TRO is specious, because the FTC also seeks relief under § 19 of the FTC Act, 15 U.S.C. § 57b.  Even if the scope of relief available under § 13(b) were limited by the Supreme Court's decision (a pure hypothetical at this point), the FTC would still be able to seek redress for victims of the Defendants' fraud under § 19.  *See* TRO Memo at 37 n.198.  Section 19 authorizes the Court to grant such relief as the court finds necessary to redress injury to consumer resulting from Defendants' violation of ROSCA, "including the rescission and reformation of contracts, and the refund of money."  15 U.S.C. § 8404.  Thus, Defendants will be subject to monetary relief for their violations of ROSCA no matter how the Supreme Court rules.

Numerous other FTC cases have proceeded during this same time period without Courts granting stays.  *E.g., In re Sanctuary Belize Litigation*, No. 1:18-cv-03309-PJM, ECF No. 1018 (D. Md. Aug. 25, 2020) (denying motion to stay proceedings based on *AMG* and its companion

---

[5] The Fourth Circuit stated that "powerful Supreme Court authority" supported equitable monetary relief under Section 13(b).  Ross, 743 F.3d at 892.
[6] Not counting the Ninth Circuit's decision in *AMG,* six other Circuits have taken the same position as the Fourth Circuit did in Ross. *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 15 (1st Cir. 2010); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314- 1315 (8th Cir. 1991); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 n.6 (10th Cir. 2005); *FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1432-1434 (11th Cir. 1984) (per curium).

case pending before the Supreme Court).⁷  The Fourth Circuit, on an appeal of a stay denial petition, stated "(l)astly we conclude that petitioners are not entitled to mandamus relief in the form of a stay of the district court proceedings pending the Supreme Court's disposition of petitions for certiorari calling the Court to reconsider the FTC's ability to seek restitution under Section 13(b) of the FTCA." *See In re Pukke*, 790 Fed. Appx. 513 (4th Cir, 2020)).⁸  Basing a stay on armchair speculation about a future Supreme Court's decision, particularly where that future decision is not determinative of the outcome of this case, in no way serves judicial economy, which is the first prong of the *Landis* test.

Second, any harm to Defendants from being subject to the provisions of the TRO for one more week as they prepare for the Preliminary Injunction hearing this Court has expeditiously scheduled is far outweighed by the harm to victims of the Defendants' fraud that would result from lifting parts of the TRO.  As discussed more below, Defendants misrepresent the Receiver's actions thus far, Defendants' have continued with their deceptive marketing despite this Court's TRO and New Hampshire's Cease and Desist Order filed on December 7, 2020,⁹ and hundreds

---

⁷ The two cases from *this Circuit* that Defendants cite, which granted stays based on *other* Supreme Court cases, similarly represent the exception, not the rule, and dealt with unique situations readily distinguishable from Defendants' request to continue operating a company that has defrauded thousands of consumers.  Mot to Stay at 10; *see Int'l Refugee Assistance Project v. Trump*, 323 F. Supp. 3d 726, 733 (D. Md. 2018) (in a case involving the President's travel ban, the question presented was not framed as Plaintiff's likelihood of success, but rather as specific legal questions to be resolved by the Supreme Court); *Preston v. United States*, No. CIV.A. ELH-14-01920, 2015 WL 221633, at *1, 9 (D. Md. Jan. 15, 2015) (individual plaintiff filed an administrative claim under the Federal Torts Claim Act and a Supreme Court holding would resolve the question of whether equitable tolling applies to the Act).

⁸ Defendants point to two out-of-circuit cases in which Courts have granted stays pending the AMG case.  These cases did not involve TROs.  *See* Mot to Stay at 9, citing *Fed. Trade Comm'n v. Lending Club Corp.*, No. 18-CV-02454-JSC, 2020 WL 4898136, at *4 (N.D. Cal. Aug. 20, 2020) (staying all proceedings) and *Federal Trade Commission v. Match Grp. Inc.*, No. 3:19-cv-02281-K (N.D. Tex. Oct. 9, 2020) (Order, Dkt. No. 54).

⁹ PX 28, ¶ 15.

of thousands of dollars that could otherwise be used for consumer redress will likely be immediately dissipated if these portions of the stay are lifted.

Finally, and as detailed below, Plaintiff, acting in the public interest, would be harmed because lifting the TRO would allow Defendants to dissipate hundreds of thousands of dollars while awaiting the Preliminary Injunction hearing, making it far harder for the FTC to redress victims of their fraud.  This Court has already entered an expedited schedule to allow rapid briefing and resolution of the TRO, with a Preliminary Injunction hearing scheduled for December 18th.  Defendants will have been under the TRO for only ten days by the time they have an opportunity for a hearing and a chance to contest the merits of the FTC's case.

## II.     DEFENDANTS DO NOT MEET THEIR BURDEN TO DISSOLVE PARTS OF THE TRO.

Based on the FTC's voluminous evidentiary submission, this Court found that the FTC is likely to succeed on the merits in this action.  ECF No. 21 at 2-3.  The Court based its finding on evidence that: (i) Defendants' deceptive earnings claims violate the FTC Act; (ii) Defendants' additional statements concerning consumers' ability to deploy the Defendants' strategies for making money also violate the FTC Act; and (iii) Defendants' are violating ROSCA.  *See* ECF No. 2-1 at 38-44.  Defendants' motion fails to call into doubt the Court's finding that a TRO was appropriate.

Defendants' studiously avoid addressing the merits of the FTC's allegations.  Indeed, Defendants all but concede that they have violated the law as they state they are willing to

consent to the TRO's prohibitions on conduct that violates the FTC Act and ROSCA.[10] Mot. for Stay at 2. They also fail to disclose that they also continuing to violate the law and the TRO.[11]

Rather, Defendants serve up a disjointed argument why the FTC is unlikely to succeed on the merits. First, they argue consumers are satisfied with their products; second, that the FTC's allegations concern practices that are ancient history; and, third, that Defendants are making "diligent efforts to improve [their] operations and compliance." Mot. for Stay at 11-14. These arguments are unavailing and certainly do not negate the Court's findings that a TRO is justified.

### A. Defendants' Unlawful Conduct Has Been Ongoing and Rampant

Defendants' assert that their violations of the FTC Act and ROSCA are "past practices" and resigned to history. ECF No. 28 at 13-14. The foundation for their request to modify the TRO is that "Raging Bull believes its current operations are in compliance," and they assure the court that this purported compliance will continue pending the PI hearing. ECF No. 28 at 14. Yet, nothing could be further from the truth. The FTC's complaint contains vivid and recent examples of Defendants' earning claims. ECF No. 1 at ¶¶ 29-76. So does the FTC's memorandum in support of its TRO Motion. ECF No. 2-1 at 4-21. Even this week, while Defendants allegedly came into compliance with the TRO, they were continuing to make unlawful earnings claims.[12] For example, on December 8, 2020 at 6:18pm, the FTC investigator received an email from Kyle Dennis stating in part, "5 minutes option strategy poised to **double your money** week after week (emphasis in original)."[13] On December 9, the FTC investigator found a Facebook advertisement for Jeff Bishop's Bullseye Trades that linked to a sales page

---

[10] While Defendants present their offer to stipulate to these parts of the TRO as an olive branch, their offer amounts only to a concession they must follow the law. *See* ECF No. 21 at pts. I-III (prohibiting violations of the law).
[11] PX 28, ¶¶ 4-10.
[12] *Id.*
[13] PX 28, ¶ 4(c).

that said in part, "Watch and learn as millionaire guru Jeff Bishop trades his real money with his Bullseye Trades strategy."[14]  On December 10 the FTC investigator logged into the Raging Bull members' site and Defendants had not changed the cancellation process outlined in his first declaration.[15]  Defendants' breezy assertions that their misconduct is a thing of the past do nothing to disturb this Court's findings that Defendants have engaged in unlawful conduct and will continue to do so.  ECF No. 21 at 2.

**B.     Defendants' Ongoing Unlawful Conduct Undermines Their Purported Compliance Claims**

Defendants assert that they are engaged in extensive efforts to improve their "operations and compliance."  ECF No. 28 at 14-16.  Yet, Defendants' papers make only vague statements as to revised policies and practices and a "comprehensive" compliance manual, *id.* at 15, and the statement that they specifically prohibit their employees from committing securities fraud.  *Id.*  This purported newfound commitment to legal compliance does not withstand scrutiny when compared with the factual record.

As abundantly shown in the FTC's TRO submission, the Defendants have not ceased their unlawful conduct and were not likely to do so absent this Court's entering a TRO.  Indeed, while castigating the FTC's action as unwarranted, Defendants' avoid any mention of *this week's* order to cease and desist issued by the New Hampshire Department of State's Bureau of Securities Regulation.[16]  This action for alleged violations of New Hampshire law contains numerous instances of alleged wrongdoing by a number of the Defendants in 2020, despite Defendants supposed efforts to clean up their act.[17]

---

[14] PX 28, ¶ 7.
[15] PX 28, ¶ 10.
[16] PX 28, ¶15.
[17] *Id.*

### C. Defendants' Showing of Minimal Consumer Satisfaction Does Not Refute the FTC's Allegations

Defendants' argue that the FTC's voluminous body of evidence is cherry-picked, Mot. for Stay at 11, 13, and that the extensive and well-documented consumer declarations submitted by the FTC are somehow "fabricated" and showcase only a disgruntled minority of consumers, *Id.* at 13. Defendants trumpet some 200 unsolicited comments by "satisfied" subscribers, *id.* at 7, but Defendants' submission is underwhelming at best.

First, as a matter of law, and as the Court properly noted earlier this week, evidence about satisfied consumers does not constitute evidence of substantiation for earnings claims. Courts routinely hold that reasonable consumers were misled in cases where some consumers may claim satisfaction with a service or only few consumers actually complained. *See, e.g., FTC v. Johnson*, 96 F.Supp.3d 1110, 1119 (D. Nev. 2015) ("The FTC is not required to show that all consumers were deceived, and the existence of satisfied consumers does not constitute a defense").

Second, Defendants' only claim to extensive consumer satisfaction is some 200 hundred general statements of consumers. But Defendants do not and cannot assert that these are representative of typical consumer experiences because they have made no effort to substantiate their advertising claims. Offering 200 statements of satisfaction out of their claimed consumer base of 200,000 clients is not impressive. Moreover, these "satisfaction" statements contain no documentation that attest to these consumers' trading performance and thereby provide no substantiation for Defendants' unlawful claims about how much money consumers can earn using Defendants' services. Finally, the claim that these statements are "unsolicited" is belied by

10

the fact that Defendants Bond and Bishop have in fact hired a third-party company to actively garner positive reviews for Raging Bull.[18]

Finally, Defendants' also scoff at the approximately 240 complaints received by the FTC, BBB, and State Attorneys General office. ECF No. 28 at 12. Defendants, however, remain painfully silent as to the outrageous number of credit card chargebacks that have led not one but two payment processors to terminate their services to Defendants. ECF No. 2-1 at 30. A smattering of general unverified statements of consumer satisfaction does not affect the Court's finding of the FTC's likelihood of success on the merits.

### III. THE ASSET FREEZE AND APPOINTMENT OF A TEMPORARY RECEIVER ARE BOTH NECESSARY AND WARRANTED AS TO ALL CORPORATE DEFENDANTS

#### A. Defendants' Arguments for Lifting the Asset Freeze Provisions of the TRO Are Meritless

Defendants' motion argues that there are several "activities necessary to the operation of the business" that the asset freeze would stop. For example, Defendants argue that the asset freeze has "rendered Raging Bull completely inert" and that the company will not be able to pay its 160 employees and its vendors or make rent. ECF No. 28 at 16-17. First, Defendants fail to mention that the TRO already authorizes the Receiver to make any payments and disbursements from the receivership estate, where deemed necessary, including payment of any debt or obligations incurred prior to the TRO entry, as well as rental payments. ECF No. 21 at Section XIV(G). Defendants' motion also does not dispute that, prior to the TRO, Defendants routinely diverted massive amounts of ill-gotten consumer funds from the corporate accounts into their personal coffers and used additional corporate funds to pay for expensive cars, private jet travel, and home improvement construction. ECF No. 2-1 at 51-52. Now that Defendants are faced

---

[18] ECF No. 2-1 at 23, n. 110.

11

with the realities of the Court's TRO preventing such dissipation and waste, Defendants pledge that they will no longer raid the corporate treasury and that their intentions are strictly to pay employees and vendors with the company's assets.

Moreover, the TRO only prohibits Defendants from using the proceeds generated from their prior illegal venture to finance future business activities. If Defendants intend to operate a lawful enterprise, and need to pay some vendors and employees during this interim period, Defendants can seek a bridge loan,[19] borrow from family and friends, or allocate the $25,000 each from their personal accounts that the TRO has already authorized for release to Defendants.[20] Indeed, Defendants' motion ignores the fact that the TRO does not impose a complete asset freeze over the personal accounts of Individual Defendants.

Defendants' request for a lifting of the asset freeze so that Defendants can cover their operating expenses is also premature, as Defendants have not provided any accounting for expenses incurred on actual full-time employees over the past year. The FTC has not received the Defendants' financial statements to get a fuller picture of Defendants' total assets and liabilities.[21]

Defendants also argue that the asset freeze will cause the brokerage accounts of Raging Bull's "gurus" to be closed, which will hinder their ability to "teach using real-time trading" and "end their ability to provide services to their subscribers." ECF No. 28 at 17. Defendants'

---

[19] During the pandemic, Defendants applied for and was approved for a $1.1 million loan from the Paycheck Protection Program (PPE) in April 2020. Defendants represented on the loan application that there were only 66 employees to be covered by the loan at that time. PX 28, ¶ 11.
[20] Defendants can also make a specific application to the Court if there is a compelling need to draw additional funds from their personal account.
[21] The Raging Bull Defendants have asked for an extension until December 16 to produce these disclosures and the FTC has stated it does not oppose such an extension.

motion does not explain why the gurus' personal brokerage accounts would be affected, given that their personal assets have not been frozen and many gurus are not named Defendants. Defendants' motion also fails to mention that Bishop and Bond's "real money trading" has mostly resulted in net losses and that continued trading by these Defendants may result in further loss of consumer money. ECF No. 2-1 at 52. Staving off this kind of dissipation and loss of Defendants' assets is precisely why the asset freeze is needed.

Third, Defendants contend that the asset freeze will cut Raging Bull off from "credit card companies, losing the ability to receive payments from subscribers." ECF No. 28 at 17. However, to the extent those monies were paid based upon Defendants' deception, those monies do not belong to Defendants.[22]

As an alternative to an asset freeze, Defendants' motion suggests that they could propose a "reasonable bond." ECF No. at 2. Defendants have not specified what that amount would be, where it could come from, or whether it would be sufficient to ensure that any final relief is complete and meaningful, given they have caused over $137 million in consumer injury in just the last three years.

Since the entry of the TRO, the FTC has also learned that Defendants wired $2 million to Defendants' counsel, some hours after receiving notice FTC's motion for the TRO.[23] If Defendants' request to lift the asset freeze is granted, all of this money and more would likely be dissipated, transferred, or disbursed to Defendants' lawyers, creditors and vendors, leaving

---

[22] Defendants fail to mention that, even prior to the entry of the TRO, two payment processors already terminated Defendants' merchant accounts due to high chargebacks and concerns about their business practices. ECF No. 2-1 at 30. As one of those payment processors observed: "If we [i.e., the payment processor] lose any money here it is because we didn't do appropriate due diligence. There is so much negative on this guy [i.e., Jason Bond], I wonder how we ever approved him." PX 27, at 2840-41.
[23] The FTC has been informed by the Receiver that the money is now in escrow.

essentially nothing for consumer redress.  *See, e.g., FTC v. World Patent Marketing*, No. 17-CV-20848, 2017 WL 3508639, *17 (S.D. Fla. Aug. 16, 2017).  In short, the asset freeze is necessary and appropriate to preserve the possibility of final monetary relief available to the FTC under both Section 13(b) and Section 19 of the FTC Act, and Defendants have made no showing for why it should be lifted or modified.

    **B. Defendants' Arguments Against the Appointment of the Temporary Receiver Are Equally Baseless**

Defendants also fail to rebut any of the FTC's arguments about why the temporary receiver is critical.  If their prior track record is any indication, Defendants cannot be trusted to operate this business lawfully or to prevent waste or mismanagement of the company's assets.  ECF No. 2-1 at 53-54; *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981) (where defendants have engaged in deception, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment" of consumer victims).

Defendants' business model depends on deceiving both new and existing subscribers to their various subscription services.  In addition to this action, another law enforcement agency – the New Hampshire Bureau of Securities Regulation - recently filed a cease and desist against these Defendants this week.[24]  The FTC has also learned that after Raging Bull's merchant accounts were terminated by Stripe in September 2020, Defendants opened five more merchant account relationships, in part by pledging corporate assets, to continue to bilk more money from consumers.[25]

---

[24] PX 28, Att. F.
[25] *Id*., ¶ 12.

Further, Defendants misstate the Receiver's intentions and role at this time, which is governed by the TRO itself.  The Receiver has stated that he would first need to conduct due diligence and assess whether this business can be run legally and profitably.  *See* ECF No. 32.  As part of this effort, the Receiver must make a financial accounting of the company's assets and financial condition of the company.  Defendants have yet to provide financial statements of the companies but are already crying foul that the receiver has pre-determined the company's fate.  It has been less than four days since the receiver was appointed.  The receiver has not obtained any financial statements or accounting and has interviewed only a handful of employees made available by Defendants at their business premise.  Without any evidence except the double hearsay declaration of Jeff Bishop, Defendants' motion simply concludes that the company will be shut down and all of its employees let go in the first instance.  Again, Defendants' attempt to remove the Receiver based on this scant showing is nothing more than an attempt to reassert its control over the Raging Bull operation and continue to harm consumers.  In sum, it is premature to terminate the Receivership.  The Receiver needs additional time to conduct his evaluation of Defendants' business and determine if it can be run lawfully and profitably.  Until that time, Defendants must wait because the overwhelming evidence submitted by FTC shows a significant risk of asset waste, dissipation, and continued harm to consumers if they are allowed to operate before that time.

### IV.     CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to stay or modify this Court's Temporary Restraining Order entered on December 8, 2020.

                              Respectfully submitted,

                              Alden F. Abbott
                              General Counsel

Dated: December 11, 2020         */s/ Gordon E. Sommers*
                              Colleen Robbins (D. Md. Temp Bar No. 92567)
                              Sung W. Kim (D. Md. Temp Bar No. 814609)
                              Gordon E. Sommers (D. Md. Temp. Bar No. 814431)
                              Thomas Biesty (D. Md. Temp. Bar No. 814459)
                              Federal Trade Commission
                              600 Pennsylvania Ave., NW
                              Mailstop CC-8528
                              Washington, DC 20580
                              (202) 326-2548; crobbins@ftc.gov
                              (202) 326-2211; skim6@ftc.gov
                              (202) 326-2504; gsommers@ftc.gov
                              (202) 326-3043; tbiesty@ftc.gov
                              (202) 326-3395 (Facsimile)

                              *Attorneys for Plaintiff*
                              *Federal Trade Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2020, I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to counsel of record identified on the service list below and via email to the unrepresented Defendants listed below:

David G. Barger
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
(703) 749-1300
bargerd@gtlaw.com

Andrew G. Berg
Greenberg Traurig LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100
berga@gtlaw.com

Miriam G. Bahcall
Greenberg Traurig LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
(312) 476-5135
bahcallm@gtlaw.com

*Attorneys for RagingBull.com, LLC, Jeffrey M. Bishop, Jason Bond f/k/a Jason P. Kowalik, Sherwood Ventures, LLC, Jason Bond, LLC*

Jonathan Shaw
Boies Schiller Flexner LLP
1401 New York Ave, NW
Washington, DC 20005
(202)237-2727
jshaw@bsfllp.com

*Attorney for Kyle W. Dennis, Winston Research Inc., Winston Corp*

Mark S. Saudek
Gallagher Evelius & Jones LLP
218 North Charles Street, Suite 400
Baltimore MD 21201
phone (410) 727-7702
fax (410) 468-2786
msaudek@gejlaw.com

*Counsel to Receiver Peter E. Keith*

Kyle W. Dennis
kyle@ragingbull.com;
kylewdennis@gmail.com

MFA Holdings Corp.
marshall.allan@yahoo.com


  */s/ Gordon E. Sommers*
   Gordon E. Sommers