**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | * | |
| *Plaintiff*, | * | |
| v. | * | **Case No. 1:20-cv-03538-GLR** |
| **RAGINGBULL.COM, LLC,** | * | |
| **f/k/a LIGHTHOUSE MEDIA LLC,** *et al.*, | * | |
| *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANT MFA HOLDINGS CORP.'S RESPONSE TO ORDER TO SHOW CAUSE
WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................ 1

II.     FACTS ............................................................................................................... 3

III.    LEGAL STANDARD........................................................................................ 7

IV.     ARGUMENT .................................................................................................... 8

        A.  The FTC Cannot Succeed on the Merits of Its Claims against MFA ................................. 9

            1.  The FTC Has Not Shown that It Is Entitled to the Relief It Seeks As a Matter
                of Law ............................................................................................... 9

            2.  The FTC Has Not Shown That It is Likely to Succeed on the Merits Because
                It Has Not Alleged or Demonstrated that MFA Engaged in Any of the
                Unlawful Activity Challenged in the Complaint. ........................................... 12

                a.  The FTC's Complaint and Motion Do Not Demonstrate Likelihood of
                    Success on the Merits concerning Common Interest or Joint and
                    Several Liability................................................................................. 16

                b.  MFA Had Minimal Involvement with the Other Defendants' Business
                    Activities, and No Involvement with the Wrongdoing Alleged in the
                    Complaint........................................................................................... 19

        B.  The FTC's Proposed Injunction is Prohibitively Overbroad ........................................... 23

        C.  The Balance of Equities Favors Denying the Relief Sought by the FTC ........................ 27

        D.  Issuing the Preliminary Injunction Would Harm The Public Interest ............................. 29

V.      CONCLUSION................................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*CFPB v. Universal Debt & Payment Sols., LLC*,
No. 1:15-cv-0859, 2019 WL 1295004 (N.D. Ga. Mar. 21, 2019) ....................................20, 21

*Cunningham v. Channer, LLC*,
No. 17-cv-1305, 2018 WL 4620391 (W.D.N.Y. Sept. 26, 2018)...........................................13

*FTC v. AbbVie Inc*,
976 F.3d 327 (3d Cir. 2020)...................................................................................................10

*FTC v. Agora Fin., LLC*,
447 F. Supp. 3d 350 (D. Md. 2020)..............................................................................24, 25, 27

*FTC v. Am. Home Servicing Ctr., LLC*,
No. 18-cv-00597, 2019 WL 7171733 (C.D. Cal. Dec. 5, 2019)................................13, 14, 23

*FTC v. Ameridebt, Inc.*,
373 F. Supp. 2d 558 (D. Md. 2005)........................................................................................27

*FTC v. AMG Services, Inc.*,
No. 2:12-cv-536, 2016 WL 1275612, (D. Nev. Mar. 31, 2016), *aff'd sub nom.*,
720 F. App'x 380 (9th Cir. 2017) ...........................................................................................21

*FTC v. Commerce Planet*,
815 F.3d 593 (9th Cir. 2016) ..................................................................................................15

*FTC v. COORGA Nutraceuticals Corp.*,
201 F. Supp. 3d 1300 (D. Wyo. 2016).....................................................................................24

*FTC v. Credit Bureau Ctr., LLC*,
937 F.3d 764 (7th Cir. 2019) ..................................................................................................10

*FTC v. Elec. Payment Sols. of Am. Inc.*,
No. 17-cv-02535, 2020 WL 6199414 (D. Ariz. Aug. 31, 2020) .............................................15

*FTC v. EMA Nationwide, Inc.*,
No. 12-cv-2394, 2013 WL 4545143 (N.D. Ohio Aug. 27, 2013)...........................................22

*FTC v. Evans Prods. Co.*,
775 F.2d 1084 (9th Cir. 1985) ................................................................................................29

*FTC v. Food Town Stores, Inc.*,
539 F.2d 1339 (4th Cir. 1976) ...........................................................................................7, 27

*FTC v. John Beck Amazing Profits*,
No. 2:09-cv-4719, 2009 WL 7844076 (C.D. Cal. Nov. 17, 2009) ...........................................8

*FTC v. John Beck Amazing Profits*,
888 F. Supp. 2d 1006 (C.D. Cal. 2012) ................................................................24

*FTC v. Kuykendall*,
371 F.3d 745 (10th Cir. 2004) ................................................................14, 16, 17

*FTC v. Lakhany*,
No. 12-cv-003337, 2012 WL 12860115 (C.D. Cal. May 2, 2012)........................................28

*FTC v. Merch. Servs. Direct, LLC*,
No. 13-cv-0279, 2013 WL 4094394 (E.D. Wash. Aug. 13, 2013).........................................27

*FTC v. Nat'l Urological Grp., Inc.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) ............................................................13, 26

*FTC v. Onlineyellowpagestoday.com, Inc.*,
No. 14-cv-838, 2014 WL 2694243 (W.D. Wash. June 10, 2014) .........................................24

*FTC v. PayDay Fin. LLC*,
989 F. Supp. 2d 799 (D.S.D. 2013) ................................................................21

*FTC v. Pointbreak Media, LLC*,
376 F. Supp. 3d 1257 (S.D. Fla. 2019) ................................................................13

*FTC v. Quincy Bioscience and Beaman*,
Case 1:17-cv-00124 (S.D.N.Y. Jul. 24, 2019).............................................................22,23

*FTC v. Sterling Precious Metals*,
894 F. Supp. 2d 1378 (S.D. Fla. 2012) ................................................................7

*FTC v. Swish Mktg.*,
Case No. 09-cv-03814, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010) ....................................22

*FTC v. Thomas Jefferson Univ.*,
No. 20-cv-01113, 2020 WL 7227250 (E.D. Pa. Dec. 8, 2020)...........................................7, 10

*FTC v. Vacation Prop. Servs.*,
No. 11-cv-00595, 2012 WL 1854251 (M.D. Fla. May 21, 2012) ..............................14, 15, 17

*FTC v. Vantage Point Servs., LLC*,
266 F. Supp. 3d 648 (W.D.N.Y. 2017)................................................................21

*FTC v. Wash. Data Res.*,
No. 8:09-cv-2309, 2012 WL 2075827 (M.D. Fla. June 8, 2012) ...........................................24

*Hayes v. N. State Law Enforcement Officers Ass'n*,
  10 F.3d 207 (4th Cir. 1993) ..........................................................................8

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds by Winter v.
  NRDC*, 555 U.S. 7 (2008) ..........................................................................30

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ........................................................................7

*Munaf v. Geren*,
  553 U.S. 674 (2008)......................................................................................7

*Normandie Oz, LLC v. Interra-Sky Normandie, LLC*,
  No. 20-cv-1069, 2020 WL 6784233 (S.D. Tex. Nov. 18, 2020) ...........................30

*Oakley v. Devos*,
  No. 20-cv-03215, 2020 WL 3268661 (N.D. Cal. June 17, 2020)...........................30

*Perez v. Ohio Bell Tel. Co.*,
  655 F. App'x 404 (6th Cir. 2016) ..................................................................24

*Profiles, Inc. v. Bank of Am. Corp.*,
  453 F. Supp. 3d 742 (D. Md. 2020) ...............................................................30

*U.S. ex rel Rahman v. Oncology Assoc.*,
  198 F.3d 489 (4th Cir. 1999) .........................................................................9

*Red Canyon Sheep Co. v. Ickes*,
  98 F.2d 308 (D.D.C. 1938) ..........................................................................28

*In re Sanctuary Belize Litig.*,
  409 F. Supp. 3d 380 (D. Md. 2019) ....................................................... *passim*

*In re Sanctuary Belize Litig.*,
  No. 18-cv-3309, 2020 WL 5095531 (D. Md. Aug. 28, 2020) ...............................15

*Smart & Co., Inc. v. Food Sys. Global Co. Ltd.*,
  No. 08-cv-5079, 2008 WL 4381679 (D. Minn. Sept. 26, 2008)............................30

*In re Stage Presence, Inc.*,
  No. 12-cv-10525, 2019 WL 2004030 (S.D.N.Y. May 7, 2019) .............................22

*Trump v. Int'l Refugee Assistance Project*,
  137 S. Ct. 2080 (2017)............................................................................8, 24

*United States v. Engels*,
No. 98-cv-2096, 2001 WL 1346652 (N.D. Iowa Sept. 24, 2001), *amended in part*, 2001 WL 1782887 (N.D. Iowa Oct. 24, 2001) ........................................................21, 22

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................................................7

**Statutes**

15 U.S.C. § 53(b) ...............................................................................................9, 10, 11

15 U.S.C § 57b ........................................................................................................11, 12

## I.    <u>INTRODUCTION</u>

The Federal Trade Commission failed to allege in its complaint anything beyond defendant MFA Holding Corp.'s ten percent ownership interest in Raging Bull while also failing in its motion for temporary restraining order to include any facts that could possibly support finding MFA liable for the conduct alleged in its filings.  Nonetheless, the FTC seeks a prohibitively overbroad and sweeping order that would continue to halt MFA's business, freeze all of its assets, and prevent it from funding completely unrelated and lawfully operating companies in which it holds ownership interests.  For these and other reasons set forth herein, all of the factors courts consider when deciding whether to grant a preliminary injunction weigh heavily and convincingly against ordering any of the relief the FTC seeks as to MFA:  (1) the FTC failed to and cannot show that it is likely to succeed on the merits of any of its claims against MFA; (2) the proposed preliminary injunction is prohibitively overly broad and would restrain lawful business activity that is completely unrelated to any of the conduct alleged by the FTC; (3) the requested injunctive relief would result in undue and unfair hardships to MFA; and (4) issuing the preliminary injunction would harm the public.

Foremost, the FTC failed to and cannot show that it is likely to succeed on the merits of any of its claims against MFA because neither of MFA's two employees – Allan Marshall and his wife (whose name appears nowhere in any of the thousands of pages of documents that the FTC filed ) – engaged in any of the misconduct alleged in the Federal Trade Commission's complaint. Indeed, neither of them ever:

- Created, edited, approved, or disseminated to consumers any Raging Bull advertising, marketing, or promotional materials;

- Created, approved or published or disseminated any Raging Bull billing disclosures;

- Created, approved or published or disseminated any Raging Bull customer service or product return protocols;

- Visited any Raging Bull office;

- Participated in any of Raging Bull's operations;

- Was employed by, shared offices or office space with, or provided personnel to Raging Bull; or

- Engaged in other conduct that could result in a finding of liability as set forth below.

Indeed, nothing in the thousands of pages of documents that the FTC lodged in support of its motion for temporary restraining order comes anywhere close to showing that MFA did any of these things or engaged in other activity that could hold it liable. And, the reason is simple: MFA did not do any of these things and is not liable for the misconduct alleged in the complaint.

Rather, MFA is a mere ten percent owner of the company that also holds ownership interests in several other companies, including in an IT service company and health products manufacturing company that have nothing to do with any of the other defendants in the litigation. Yet, the FTC seeks to freeze all of MFA's assets and operations without any proof that MFA engaged in any unlawful activity, instead alleging acts that cannot and do not establish any legal violation as a matter of law.

First, owning ten percent of a company is not unlawful, and mere ownership does not establish that the owner engaged in any unlawful activity conducted by that company. Second, MFA's appearance on bank account certificates is not unlawful, and the very documents on which the FTC relies to impute liability to MFA show that MFA did not deposit any funds to, withdraw funds from, or otherwise use or control the account the FTC challenges. Third, the $135,000 transfer that the FTC challenges did not fund any of Raging Bull's operations. Rather, the challenged transfer reflected a refund to Raging Bull after it inadvertently paid for MFA's portion of a membership fee. Fourth, receiving distributions as an investor from a company is not

unlawful.  The Court's inquiry should end here, as there is not a single fact showing that MFA could be liable for any of the misconduct alleged by the FTC.

The proposed preliminary injunction is prohibitively overbroad in all events, and would impose undue and unfair burdens by restraining lawful business activity having no connection to anything related to Raging Bull.  Among other things, the preliminary injunction would prohibit MFA from assisting one of its portfolio companies acquire manufacturing equipment for health products wholly unrelated to Raging Bull.  Enjoining this and other similar conduct will not further any of the goals that the purpose of a preliminary injunction is intended to achieve; nothing in the FTC's papers warrant such a drastic remedy; and the balance of the harms and the public's interest in the continued operations of lawful business weigh squarely in favor of denying the preliminary injunction.

## II.    FACTS

MFA was formed as an investment holding company. (Declaration of A. Marshall, Ex. A ¶ 7.)  MFA has one shareholder (Allan Marshall) and two employees (Mr. Marshall and his wife). (*Id.* ¶¶ 2-3.)

At the time the FTC obtained the temporary restraining order, MFA had invested in multiple companies, including an information technologies infrastructure company, cannabis advertising company, and a consumer health products manufacturing company. (Ex. A ¶ 31.) Although it invests in companies selling consumer products and services, MFA does not offer or sell any products or services to consumers. (*Id.*)

In or around 2014, MFA paid Mr. Bishop, Mr. Bond, or their companies approximately $1,400,000 in exchange for a combined total 25% ownership interest in Lighthouse Media, LLC, which is now known as RagingBull.com, LLC or Raging Bull. (*Id.* ¶ 6.)  MFA subsequently sold 15% of the 25% it acquired. (*Id.*)  MFA now owns 10% of Raging Bull. (*Id.*)

3

MFA was not involved in any of the day-to-day activities of Raging Bull; did not create, modify, or approve Raging Bull's advertising or marketing materials or billing practices; never visited Raging Bull's offices; and otherwise had no involvement in Raging Bull's operations. (*See id.* ¶¶ 11, 12, 14, 22, 23, 25; PX 27, at 2924 (describing Marshall as a "passive partner" in Raging Bull).)

Instead, MFA is a holding company that invests in a portfolio of companies and operates independently from Raging Bull. (Declaration of A. Marshall, Ex. A ¶ 7.)  MFA invests in many companies, not only Raging Bull, including companies that provide informational technology infrastructure services, a marketing technology company for the cannabis industry, and a company that manufactures consumer health products. (*Id.* ¶ 31.)  MFA does not share any employee, officer, or director with Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or Winston Research, Inc. (*Id.* ¶ 24.)  MFA does not have any control over the day-to-day operations of Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or Winston Research, Inc. (*Id.* ¶¶ 11, 12.)  Further, no MFA employee, officer, or director has ever approved, created, or modified advertisements, or marketing or promotional materials; or customer service, return, or billing practices of Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or Winston Research, Inc. (*Id.* ¶ 22.)  Neither MFA nor Allan Marshall started any new business school with Bishop or Bond, or assisted Kyle Dennis with stock trading or building a newsletter, contrary to the statements in the Jason Bond Daily Watch List Newsletter.  (*Id.* ¶ 28 (citing ECF No. 9-4 at 68-71).)

MFA and the other defendants have different office locations, and no MFA director or employee has ever held an office in, or otherwise visited the offices of the other defendants. (*See* Ex. A ¶¶ 14, 15.)  MFA does not share employees with Raging Bull, Sherwood Ventures, Jason

Bond, LLC, Winston Corp., or Winston Research, Inc. (*Id.* ¶ 24.)  And, contrary to the declaration of the FTC's expert, Russell Wermers, Marshall was never an employee of Raging Bull. (*Id.* ¶ 8.) Although MFA provided Mr. Marshall with a Raging Bull email account, he rarely used it, and he was never provided a company phone or credit card by Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or Winston Research, Inc. (*Id.* ¶ 17.)  Likewise, MFA has not provided a company phone, credit card, or email address to any employee, officer, or director of Raging Bull or any of the other defendants. (*Id.* ¶ 18.)

No MFA employee, officer, or director has ever had any control over the day-to-day operations of Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or Winston Research, Inc. (Ex. A ¶ 12.)  Similarly, Bishop, Bond, and Dennis do not formulate, direct, control, or have the authority to control MFA; and they have never had, any role in the operations of MFA. (*Id.* ¶ 13.)   No MFA employee, officer, or director has ever approved, created, or modified advertisements or marketing, or customer service, return, or billing practices for any of the other defendants. (*Id*. ¶ 22.)

Outside of the initial investment and profit payouts in accordance with its arms-length transaction with Raging Bull, MFA does not otherwise receive funds from Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., Winston Research, Inc., Bishop, Bond, or Dennis. (Ex. A ¶ 19.)  Similarly, Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., Winston Research, Inc., Bishop, Bond, and Dennis are not authorized to deposit or withdraw funds to or from any MFA bank account. (*Id*. ¶ 21.)  While MFA appears on a business depository certificate for a Raging Bull bank account, neither MFA nor any of its employees were authorized to, or did in practice, deposit funds to, withdraw funds from, or otherwise control the account. (*See* ECF 14-2, 44-50; *see also* Ex. A ¶ 27.)

Although MFA transferred $135,000 to a Raging Bull account in 2019, the funds were not provided for the operation of Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., Winston Research, Inc., or any other entity. (Ex. A ¶ 26.)  Instead, the funds constituted partial payment for a membership MFA shared with Raging Bull in FlexJet, a program allowing members to pay for limited shared use of a plane. (*Id.*)  In 2019, Raging Bull inadvertently paid the entire cost of the membership fee to FlexJet, instead of splitting the cost of the membership fees with MFA. (*Id.*)  After learning that Raging Bull had paid for MFA's portion of the membership fee, MFA transferred its portion of the membership fee, $135,000, to Raging Bull as reimbursement for MFA's portion of the membership fee. (*Id.*)  Mr. Marshall subsequently instructed Raging Bull to refrain from paying for his portion of the FlexJet membership because he did not use it for Raging Bull purposes, and to keep these funds separate. (*Id.*)

MFA also has outstanding financial commitments to other companies in which it has invested.  For example, prior to the entry of the temporary restraining order, MFA agreed to provide funding to one of these companies for the purchase of equipment to manufacture consumer products. (Ex. A ¶ 33.)  If the preliminary injunction the FTC seeks were entered against MFA, it would be unable to meet this commitment and engage in other lawful transactions.

The preliminary injunction would impose other sweeping obligations on the company, including by prohibiting MFA from engaging in its normal lawful business activities (*see* Temporary Restraining Order, § XIV (Duties and Authority of Receiver)); requiring it to disclose to the receiver all business activity it engages in (*id.* § XII (Report of New Business Activity)); requiring it to relinquish complete control over the company to the receiver (*id.* § XIV (Duties and Authority of Receiver)); and forcing it to transfer all of its assets to the receiver. (*Id.* § XV (Transfer of Receivership Property to Receiver).)  These extensive obligations would affect several unrelated

companies, shut down MFA, and would require Mr. Marshall and his wife to work around the clock to comply, preventing them from attending to other businesses and fulfilling their obligations to these entities. The FTC failed to provide a single ground warranting any of the injunctive relief it obtained and seeks to continue.

### III.   <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary remedy, never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (citations omitted); *Munaf v. Geren,* 553 U.S. 674, 689-90 (2008) (citation omitted); *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 250 (4th Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)); *FTC v. Sterling Precious Metals,* 894 F. Supp. 2d 1378, 1382-83 (S.D. Fla. 2012). Accordingly, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 129 S. Ct. 365, 376 (quoting *Amoco Production Co.,* 480 U.S. 531, 542 (1987)).

The FTC bears the burden to show that the injunction would be in the public interest, considering (1) the FTC's likelihood of success on the merits; and (2) whether the equities weigh in favor of a preliminary injunction. *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976). To meet the first element, likelihood of success on the merits, the FTC must show "preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits." *In re Sanctuary Belize Litig*., 409 F. Supp. 3d 380, 396 (D. Md. 2019). *See also FTC v. Thomas Jefferson Univ.*, No. 20-cv-01113, 2020 WL 7227250, at *28 (E.D. Pa. Dec. 8, 2020) (denying FTC request for preliminary injunction where it failed to show likelihood of success on the merits).

Finally, like any other type of injunctive relief, a preliminary injunction under Section 13(b) "must be narrowly tailored . . . to remedy the specific harm shown by the plaintiff[]

rather than 'to enjoin all possible breaches of the law.'" *FTC v. John Beck Amazing Profits,* No. 2:09-cv-4719, 2009 WL 7844076, at *4 (C.D. Cal. Nov. 17, 2009) (citation omitted); *Hayes v. N. State Law Enforcement Officers Ass'n,* 10 F.3d 207, 217 (4th Cir. 1993) (vacating injunction as overbroad).  Thus, "[c]rafting a preliminary injunction is an exercise in discretion and judgment," and the Court "'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of a particular case.'" *Trump v. Int'l Refugee Assistance Project,* 137 S. Ct. 2080, 2087 (2017) (quoting 11A C. Wright & A. Miller, Federal Practice & Procedure § 2947, at 115).

## IV.   **ARGUMENT**

MFA did not engage in any of the conduct, either own its own or in combination with others, that the FTC alleges violated the FTC Act or the Restore Online Shoppers' Confidence Act ("ROSCA"), or any other law or regulation, and therefore cannot respond to the merits of these allegations.  Thus, the FTC has not met its burden of showing that a preliminary injunction should issue against MFA – or any other defendant for the reasons set forth by those defendants.

First, the FTC failed to show that it is likely to prevail on the merits of its claims legally or factually.  The FTC failed to and cannot show that it is likely to prevail on its claims for restitution under Section 13(b) of the Federal Trade Commission Act (the only statute pursuant to which the FTC filed its motion for temporary restraining order) as a matter of law because the Supreme Court currently is deciding that issue given that some courts have ruled that the FTC cannot seek such relief.  Likewise, the FTC failed to and cannot show that it is likely to prevail in the merits of its claims factually because nothing in the complaint or motion for temporary restraining order shows that MFA engaged in any conduct that could support a finding of liability.

Further, the balance of the equities weighs squarely in favor of denying the injunction because it would cripple MFA's ability to provide necessary funding to multiple unrelated,

legitimate businesses during the ongoing pandemic when jobs are needed the most. These businesses employ a number of individuals and provide products and services, such as technology and consumer health products, that further consumer interests. Accordingly, it also is in the public interests to deny the injunction.

    **A.**   <u>**The FTC Cannot Succeed on the Merits of Its Claims against MFA**</u>

        1.   <u>The FTC Has Not Shown that It Is Entitled to the Relief It Seeks As a Matter of Law</u>

In a preliminary injunction, the FTC can only obtain the relief to which it would be entitled if it prevailed after trial on the merits. *U.S. ex rel Rahman v. Oncology Assoc.*, 198 F.3d 489, 497 (4th Cir. 1999) (quoting *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) ("A preliminary injunction is always appropriate to grant intermediate relief *of the same character* as that which may be granted finally.") (emphasis added)). Thus, to obtain the asset freeze it seeks, the FTC must show as a threshold matter that it is entitled to monetary relief under Section 13(b) of the Federal Trade Commission Act. The FTC has not demonstrated that it has the statutory authority to seek, or that the Court has the authority to enter, the preliminary injunction and asset freeze it seeks under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), the sole basis upon which the motion is brought. *See* FTC Motion for Temporary Restraining Order and Asset Freeze, ECF 2-1 ("Motion"), at 37 (citing 15 U.S.C. § 53(b) as basis for the relief sought.); *see also* Proposed Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why A Preliminary Injunction Should Not Issue, ECF 2-2, at 4 (proposing a finding of jurisdiction that this Court has authority to issue this Order pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b)).

While Section 13(b) allows the entry of an injunction to restrain unlawful conduct, no statutory authority exists to enter an injunction to freeze money for use in a money judgment because Section 13(b) does not permit the recovery of money.  Rather, the text of Section 13(b) states that "[w]henever the Commission has reason to believe--that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission . . . the Commission . . . may bring suit . . . *to enjoin* any such act or practice." 15 U.S.C. § 53(b) (emphasis added).  Accordingly, while Section 13(b) authorizes the FTC to seek an injunction, nothing in the statutory text of 13(b) authorizes any monetary relief.

Despite the FTC's authority going unchallenged for years, two Circuits have recently held that district courts lack the power to order monetary relief under Section 13(b). *FTC v. AbbVie Inc*, 976 F.3d 327, 379 (3d Cir. 2020); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019).  While the Ninth Circuit found that Section 13(b) authorized the FTC to obtain equitable monetary relief in *FTC v. AMG Capital Mgmt., LLC*, the defendant in that case appealed, and the U.S. Supreme Court granted certiorari, to decide the issue. 910 F.3d 417 (9th Cir. 2018), *cert granted*, No. 19-508 (cert. granted July 9, 2020).  The Supreme Court will hear arguments next month, and the decision will directly bear on this case because a Supreme Court decision that Section 13(b) does not authorize monetary relief, such as restitution, will preclude the FTC from obtaining the $137 million it seeks here.  Thus, assuming that binding authority exists within the Fourth Circuit finding that Section 13(b) authorizes monetary relief, this does not create a likelihood of success on the merits of this question because the FTC cannot show now, beyond mere speculation, that the Supreme Court will hold that the FTC is entitled to obtain the monetary relief it seeks here.  At best, the FTC can show that it might prevail – not that it is likely to prevail as required to obtain a preliminary injunction. *FTC v. Thomas Jefferson Univ.*, No. 20-cv-01113,

2020 WL 7227250, at *28 (E.D. Pa. Dec. 8, 2020) (denying FTC request for preliminary injunction where it failed to show likelihood of success on the merits).  Consequently, the Court should deny the FTC's request to obtain redress in a preliminary injunction that it could not receive after trial on the merits.

The Court should likewise reject the FTC's assertion that "[e]ven if the scope of relief available under § 13(b) were limited by the Supreme Court's decision (a pure hypothetical at this point), the FTC would still be able to seek redress for victims of the Defendants' fraud under § 19." (FTC Response in Opposition to Motion to Stay Enforcement or Modify Temporary Restraining Order ("Response"), at 5 (citing 15 U.S.C. § 57b).)  Foremost, the FTC has moved for a temporary restraining order and preliminary injunction via Section 13(b)—not Section 19.  In fact, the Court's temporary restraining order finds that this Court has authority to issue this Order pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), not Section 19. (ECF No. 21, at Findings H.) Indeed, the temporary restraining order contrasts Section 13(b) from Section 19 by stating that the Court has jurisdiction to enter the temporary restraining order under Section 13(b) while noting that the FTC brought suit pursuant to Section 19 (but not that the temporary restraining order was entered pursuant to Section 19).  Accordingly, any arguments about the relief that is or is not authorized under Section 19 are improperly raised at this juncture and the FTC must meet its burden of proving that it is likely to succeed in obtaining redress under Section 13(b).

Additionally, Section 19 only offers the FTC an avenue of monetary redress for allegations related to its subscription cancellation policies under ROSCA; it does not provide for monetary redress arising from the brunt of the FTC's allegations, which relate to challenged advertising claims.  This is because any relief available under Section 19 would be limited to "redress. . . ***resulting from*** the rule violation or the unfair or deceptive act or practice" under which the Section

19 action is authorized. 15 U.S.C § 57b(b) (emphasis added).  Nowhere does the FTC assert that the "$137 million in consumer injury" relate to the specific violations of ROSCA it alleges, the "fail[ure] to provide simple mechanisms for consumers to stop recurring charges from being placed on their credit card, debit card, bank account, or other financial account." (Compl. ¶ 116.)  Rather, it broadly claims that "Defendants have taken in over $137 million since 2017" resulting from all of the conduct it challenges, including alleged unsubstantiated earnings claims and misrepresentations regarding Raging Bull's services. (Motion, at 36.)  The FTC has therefore failed to tie the $137 million it seeks to any specific harm resulting from Raging Bull's subscription cancellation mechanism.  Thus, the FTC cannot show that granting the sweeping injunction and asset freeze is warranted with respect to the alleged ROSCA violations because it has failed to show what amount of the $137 million it seeks pertains to the alleged Section 19 violations – alleged violations in which MFA had no role in all events.

      2.   The FTC Has Not Shown That It is Likely to Succeed on the Merits Because It Has Not Alleged or Demonstrated that MFA Engaged in Any of the Unlawful Activity Challenged in the Complaint.

Even if the FTC has the statutory authority to obtain the relief requested in the injunction, it has failed to show a single ground that the injunction sought is appropriate as to MFA.  The complaint does not allege that MFA engaged in any wrongdoing or that it violated any law.  Indeed, MFA is referenced in only two of the FTC's 120-paragraph complaint, and the FTC's allegations rest nearly exclusively on MFA's 10% ownership share in Raging Bull. (Compl. ¶ 17.)

To support its theory that MFA should be liable for the other corporate defendants' actions, the FTC asserts that MFA was part of a common enterprise with the other defendants.  Here, the

12

FTC cannot demonstrate a likelihood of success on its claims against MFA on a theory of common enterprise, joint and several liability.

A common enterprise "exhibit[s] either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Am. Home Servicing Ctr., LLC*, No. 18-cv-00597, 2019 WL 7171733, at *9 (C.D. Cal. Dec. 5, 2019) (citing *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010)). To determine whether a group of defendants operated as a common enterprise, courts "look to a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate Defendants." *In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380, 397 (D. Md. 2019). These are fact-specific inquiries which require well-pled allegations as to the "patterns and framework of the whole enterprise." *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1283 (S.D. Fla. 2019) (noting that "no one factor is determinative" in finding common enterprise); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) ("When determining whether a common enterprise exists, the pattern and frame-work of the whole enterprise must be taken into consideration.") (internal citation omitted); *Cunningham v. Channer, LLC*, No. 17-cv-1305, 2018 WL 4620391, at *4 (W.D.N.Y. Sept. 26, 2018) (finding no common enterprise where plaintiff "offers no well-pleaded facts to support" his assertion that a common enterprise exists).

Courts have found a common enterprise where all entity defendants operate from the same physical address; all entity defendants share common control, commingle funds, exchange extensive communications with each other, and share employees; all entity defendants transfer

funds freely among themselves, deposit checks made out to other defendant entities; and where it "was in fact very difficult to tell which entity" an employee worked for, given the muddled paperwork. *In re Sanctuary Beliz Litig.*, 409 F. Supp. 3d at 414-15.  Courts have also found a common enterprise existed where defendants "commingled bank accounts, shared office space and employees, paid rent for the other common-enterprise companies, and conducted the same underlying business effort to market and sell [allegedly unlawful] loan modification services." *FTC v. Am. Home Servicing Ctr., LLC*, No. 18-cv-00597, 2019 WL 7171733, at *10 (C.D. Cal. Dec. 5, 2019).

On the other hand, courts decline to find common enterprise liability where the FTC fails to provide evidence that a corporate defendant engaged in the complained of misconduct.  Thus, in *FTC v. Kuykendall*, the Tenth Circuit reversed the District Court's finding that a corporate defendant was part of a common enterprise due to the FTC's failure "to provide [the court] with any reason to believe other corporate defendants could control [the primary defendant], or that the corporate structure was nothing more than an effort to conceal the assets of [the primary defendant] and not a legitimate liability-limiting arrangement." 371 F.3d 745, 758-59 (10th Cir. 2004). Instead, the corporate defendant's "only apparent relationship to the activities [of the primary defendant] appears to have been in receiving payment for ancillary services, such as equipment leasing, billing, and collecting provided to [the primary defendant], and sharing some common ownership interests with [the primary defendant]." *Id.*

In *FTC v. Vacation Prop. Servs.*, the court found that the evidence was insufficient to find a common enterprise where "each company appears to have dealt independently with its own customers," and "the record does not establish that the entities commingled corporate funds," even

though one of the corporate defendants "made periodic payments to [the other corporate defendant]." No. 8:11-cv-00595, 2012 WL 1854251, at *5 (M.D. Fla. May 21, 2012).

The FTC also asserts that a finding of common enterprise is not needed to establish joint and several liability. (*See* Motion, at 45 n.220 (citing *FTC v. Commerce Planet*, 815 F.3d 593, 598-99 (9th Cir. 2016)). However, *Commerce Planet* did not find that joint and several liability could be imposed without a showing of requisite involvement by the defendant. Indeed, the defendant in that case "exercised operational control over the company" and "oversaw and directed the [challenged] marketing . . . which included reviewing and approving the manner in which the negative option was disclosed to consumers." *Id.* at 598. Cases in the wake of *Commerce Planet* make clear that, for liability to attach, the FTC must demonstrate that the defendant sought to be held liable was engaged in the alleged wrongdoing. *FTC v. Elec. Payment Sols. of Am. Inc.*, No. 17-cv-02535, 2020 WL 6199414, at *6 (D. Ariz. Aug. 31, 2020); *see also In re Sanctuary Belize Litig.*, No. 18-cv-3309, 2020 WL 5095531, at *42 (D. Md. Aug. 28, 2020) ("Given the massive evidence of Pukke's control over SBE, his direction of its marketing and sales strategies, and the deceptions he and others perpetrated on consumers, not least the concealment of his active and controlling involvement in the enterprise," the court found the defendant jointly and severally liable with the other defendants.). The FTC's allegations in this case come nowhere close to alleging that MFA was part of a common enterprise, or had any other involvement in the conduct challenged in the complaint such that it should be held liable for the misconduct of any other defendant.

       *a.   The FTC's Complaint and Motion Do Not Demonstrate Likelihood of*

         *Success on the Merits concerning Common Interest or Joint and Several*

         *Liability*

In this case, the complaint spends short shrift on MFA's involvement in the challenged conduct, stating that MFA owns 10% of Raging Bull (Compl. ¶ 17); and "Defendants Raging Bull, Sherwood Ventures, Jason Bond, LLC, MFA Holdings, Winston Corp., and Winston Research, Inc. (collectively, 'Corporate Defendants') have operated as a common enterprise while engaging in the deceptive acts and practices alleged below. . . Working together, Corporate Defendants have conducted the business practices described below through an interrelated network of companies, which share owners, officers, managers, employees, and office locations. Consumer money comes into Raging Bull as a result of Defendants' deceptive acts and is quickly transferred out to the other corporate entities, sometimes multiple times per month, as profit distributions, commissions, or wages. Because Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below." (Compl. ¶ 20.)  The FTC provides three bases to support its assertion that MFA entered a common enterprise with the other defendants, none of which suffice individually or collectively to find MFA jointly and severally liable for violations of the FTC Act and ROSCA.

First, the FTC asserts that MFA's ownership stake and the payments of profits from Raging Bull to MFA support a finding of a "common enterprise." (Compl ¶ 17.)  However, an entity's ownership stake in another company and payments from that company do not create a "common enterprise" between the entities, and this is a far cry from the "highly unusual circumstances" courts require to dispense with the corporate form. *N.M. ex rel. Balderas*, 401 F. Supp. 3d 1229, 1308 (D.N.M. 2019).  To that end, in *FTC v. Kuykendall*, the Tenth Circuit refused to find that a

corporate defendant was part of a common enterprise, despite allegations that the corporate defendant engaged in the challenged conduct. 371 F.3d 745, 758-59 (10th Cir. 2004). Instead, the court held that the targeted corporation's "only apparent relationship to the activities [challenged] appears to have been in receiving payment for ancillary services, such as equipment leasing, billing, and collecting provided to [the other defendant], and sharing some common ownership interests with [the other defendant]." *Id*. Further, in *FTC v. Vacation Prop. Servs*, the court found the evidence was insufficient to find a common enterprise where "each company appears to have dealt independently with its own customers," and "the record does not establish that the entities commingled corporate funds" even though one of the corporate defendants "made periodic payments to [the other corporate defendant]." 2012 WL 1854251, at *5 (M.D. Fla. May 21, 2012). Were allegations of minority ownership enough, any company that held a minority share of another company would be acting in common enterprise. The law simply does not support this absurd result, and, MFA's ownership interest and Raging Bull's periodic payments to MFA cannot give rise to liability here.

Second, the FTC asserts in its motion for temporary restraining order that a common enterprise existed between MFA and the other defendants because "MFA, Sherwood Ventures and Bond LLC opened a Raging Bull business depository account used to collect consumers' payments for Raging Bull's services." (Motion, at 47.) The documents provided by the FTC do not demonstrate that MFA actively opened (other than possibly through an unidentified proxy), or knew the purpose of, the challenged account. Further, the document does not list MFA or any of its employees, officers or directors as having "Deposit or Withdrawal Authorization" on the account. Rather, only Jordan Reyna, Jeffrey Bishop, and Jason Bond had such authority. (ECF 14-2, at 48.) Indeed, as a matter of fact, MFA did not deposit funds to, withdraw funds from, or

otherwise control that account. (Ex. A ¶ 27.)   Moreover, appearing on a business depository certificate does not demonstrate that MFA engaged in or even knew about any of the unlawful conduct challenged in the complaint at the time the account was opened in 2019, let alone at the time the FTC filed this lawsuit on December 7, 2020.

The Court should likewise reject the FTC's assertions the absence of offices and online presence indicate wrongdoing.   MFA is solely owned by Allan Marshall, and MFA has only two employees:   Mr. Marshall and his wife.   MFA exists to invest in and provide consulting services to companies, and its success never required and does not now require any online presence. Indeed, in a case that the FTC brought that is all about online advertising, the fact that MFA has no online presence further validates that it had no involvement in any of the alleged misconduct.

Finally, the FTC's argument that a $135,000 payment by MFA to Raging Bull supports a finding of a common enterprise is wrong.   MFA refunded $135,000 to Raging Bull in 2019 after Raging Bull paid a membership fee owed by MFA.   Specifically, the $135,000 constituted partial payment for a membership MFA shared with Raging Bull in FlexJet, a program allowing members to pay for limited shared use of a jet. (*Id.* ¶ 26.)   Raging Bull inadvertently paid the entire cost of the membership fee to FlexJet, instead of splitting the cost of the membership fees with MFA. (*Id.*) After learning that Raging Bull had paid for MFA's portion of the membership fee, MFA transferred its portion of the membership fee, $135,000, to Raging Bull as reimbursement for MFA's portion of the membership fee. (*Id.*)   Mr. Marshall then instructed Raging Bull to refrain from paying for his use of FlexJet. (*Id.*)   Far from demonstrating interconnectedness, MFA's payment to Raging Bull for the membership further emphasizes the distinction between the entities.

> b. *MFA Had Minimal Involvement with the Other Defendants' Business*
> *Activities, and No Involvement with the Wrongdoing Alleged in the*
> *Complaint*

Bare as they are, the FTC's allegations substantially overstate MFA's involvement with the other corporate entities. MFA is a holding company that invests in various entities and provides consulting services. (Declaration of A. Marshall, Ex. A ¶ 31.) It operates its own business activities, independently and apart from Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., and Winston Research, Inc. (*Id.* ¶ 7.) MFA invests in many companies, not only Raging Bull, including a company that provides technology services to major corporations, an advertising and marketing company for the cannabis industry, and a health products manufacturing company. (*Id.* ¶ 31).

As set forth in Mr. Marshall's declaration, no facts exist that support a finding of common enterprise. Other than MFA's 10% ownership interest in Raging Bull, the entities do not share common control, nor do they share any employees, officers, or directors. (Ex. A ¶ 9 ("No MFA employee, officer, or director is, or has ever been, a board member, employee, officer, or director of Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or Winston Research, Inc."); *id.* ¶ 10 ("No employee, officer, or director of Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or Winston Research, Inc. is, or has ever been, a board member, employee, officer, or director of MFA. Bishop, Bond, and Kyle Dennis are not, and have never been, a board member, employee, officer, or director of MFA"); *id.* ¶ 24 (MFA does not share any employees, officers, or office space with Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or Winston Research, Inc).) Similarly, the companies do not share offices, and no

MFA director or employee has ever held an office in, or otherwise visited the offices of the other

defendants. (*Id.* ¶¶ 14, 16.)

Moreover, no MFA employee, officer, or director has ever had any control over the day-

to-day operations of Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., or

Winston Research, Inc. (Ex. A ¶ 12.)  Similarly, Bishop, Bond, and Dennis do not formulate,

direct, control, or have the authority to control MFA; and they have never had, any role in the

operations of MFA. (*Id.* ¶ 13.)  MFA's name appears in none of the advertising or marketing

materials provided by the FTC, and the two instances in which Allan Marshall's name appeared

in advertising were not authorized by him. (*Id.* ¶ 30.)  Indeed, he never saw those two instances

until December 12, 2020, when reviewing the FTC's filings. (*Id.* ¶¶ 28, 29.)  Further, no MFA

employee, officer, or director has ever approved, created or modified advertisements or marketing,

or customer service, return, or billing practices of Raging Bull, Sherwood Ventures, Jason Bond,

LLC, Winston Corp., or Winston Research, Inc. (*Id.* ¶ 22.)

Likewise, there is no commingling of funds between MFA and the other defendants. (Ex.

A ¶¶ 20, 21; *id.* ¶ 21 (Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., Winston

Research, Inc., Bishop, Bond, and Dennis are not signatories on any bank accounts used for MFA;

and they are not authorized to access, deposit, or withdraw any funds from any MFA bank

accounts).)  Finally, MFA receives a report approximately once a month concerning MFA's return

on investment in Raging Bull and receives occasional company summaries.  MFA has no input on

the contents of any of the reports or summaries it has received and receives. (*Id.* ¶ 25.)

To be sure, the payout of profits to a business investor cannot suffice to form the basis of

a common enterprise or joint and several liability. *CFPB v. Universal Debt & Payment Sols., LLC*,

No. 1:15-cv-0859, 2019 WL 1295004, at *14 n.12 (N.D. Ga. Mar. 21, 2019) (noting that "evidence

that [owner and officer of LLC Defendants] received $76,500 in checks written from S Payment's account. . . is not sufficient to prove commingling of funds among S Payment and the other LLC Defendants, much less establish S Payment's involvement in a common enterprise"); *see also FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 657 (W.D.N.Y. 2017) (denying FTC's motion for summary judgment on issue of common enterprise because "although Defendants transferred money to each other, they argue that these transfers were made pursuant to contract and for services rendered").   Even in a situation where the court noted "the hallmarks of some 'common enterprise'" (corporate funds being passed from defendant entities to non-defendant entities controlled by an individual defendant), this is not enough for a court to "declare all of the Defendants to constitute a 'common enterprise.'" *FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 810 (D.S.D. 2013).

Instead, to find a common enterprise based on commingled funds, the law requires far more than is present here.   In *FTC v. AMG Services, Inc.*, the court found evidence of commingling funds where the company was "wholly owned by Kim Tucker and nominal owner of an $8 million mansion in Aspen, Colorado, also received payments arranged by Scott Tucker for the property's purchase, mortgage, property taxes, furnishing, maintenance, and housekeeping." No. 2:12-cv-536, 2016 WL 1275612, at *4 (D. Nev. Mar. 31, 2016), *aff'd sub nom.*, 720 F. App'x 380 (9th Cir. 2017); *United States v. Engels*, No. 98-cv-2096, 2001 WL 1346652, at *10 (N.D. Iowa Sept. 24, 2001), *amended in part*, 2001 WL 1782887 (N.D. Iowa Oct. 24, 2001) (finding commingling of funds where "[t]he record is replete with evidence demonstrating that the Engels made no practical distinction between the Trust property and their personal property.   Among many other personal expenses paid from Trust bank accounts were life insurance policies for several of the Engels' children, a wedding dress and other wedding expenses for the Engels' daughter, veterinarian

21

services for the family dog, purchase of a hearing aid and service plan for John Engels, donations to the Engels' church and other religious organizations, family groceries, shoes and hosiery."). Unlike in this case, where distributions were made pursuant to an operating agreement for minority ownership and funds inadvertently paid to third parties were subsequently repaid, courts find common enterprise where bank records show that all members of the alleged common enterprise transferred money frequently among themselves, paid each other's employees, and generally disregarded corporate formalities when dealing with third parties. *FTC v. EMA Nationwide, Inc.*, No. 12-cv-2394, 2013 WL 4545143, at *7 (N.D. Ohio Aug. 27, 2013). This is separate and distinct from the receipt of profits on a routine basis. *See, e.g., In re Stage Presence, Inc.*, No. 12-cv-10525, 2019 WL 2004030, at *4 (S.D.N.Y. May 7, 2019) (declining to find alter ego based on commingling of funds where the corporation "made some distributions to" defendant, "just as any corporation does if it has excess funds"). Thus, any payments to MFA arising from its 10% ownership in Raging Bull do not and cannot establish liability in this case.

To the contrary, the facts overwhelmingly show the separation between MFA and the other defendants in this case, and that MFA had minimal involvement in the operations and activities of any of the other defendants, and no involvement in the unlawful conduct alleged in the complaint. And, while the FTC attempts to lump together MFA with the other corporate defendants, this type of pleading is impermissible, as the FTC cannot establish a factual nexus between MFA and the alleged wrongful conduct of the remaining Individual and Corporate Defendants in the case. *FTC v. Swish Mktg.,* Case No. 09-cv-03814, 2010 WL 653486, at *11 (N.D. Cal. Feb. 22, 2010); *FTC v. Quincy Bioscience and Beaman*, Case 1:17-cv-00124, Dkt. No. 72 (S.D.N.Y. Jul. 24, 2019) (dismissing an individual 22% shareholder of the company because the FTC's Complaint "does

not adequately allege that [individual defendant] participated in the alleged deceptive acts or had knowledge of them.").

The FTC's complaint and motion cannot show that MFA is liable for any alleged statutory violations, and this case is unlike those where courts have found a common enterprise, which involve situations where "[a]ll [] entity Defendants have operated from the same address…, [a]ll share common control, commingle funds, exchange extensive communications with one another, all share employees," "[p]ayments made to one company have been deposited in the bank accounts of others," "the entities transferred funds freely among themselves, maintained bank accounts for other member entities, and deposited checks made out to other member entities," *In re Sanctuary Belize*, 409 F. Supp. 3d at 414-415, or "commingled bank accounts, shared office space and employees, paid rent for the other common-enterprise companies, and conducted the same underlying business effort to market and sell [allegedly unlawful] services." *FTC v. Am. Home Servicing Ctr., LLC*, No. 18-cv-00597, 2019 WL 7171733, at *10 (C.D. Cal. Dec. 5, 2019). Thus, the FTC does not allege, and will be unable to provide, any facts showing that MFA will or should be liable for any of the unlawful conduct alleged in the complaint, or that the FTC can receive any redress from MFA as a result of the allegedly unlawful activities of the other defendants. Accordingly, the FTC cannot meet its burden of showing likelihood of success on the merits of its claims against MFA. The Court should deny the entry of preliminary injunction on this ground alone.

**B.  The FTC's Proposed Injunction is Prohibitively Overbroad**

As currently fashioned, the preliminary injunction sought is not narrowly tailored to the violations alleged in the complaint. Thus, the injunction is overbroad because it seeks to enjoin conduct that the FTC has not challenged and would shut down MFA's business without requiring

the FTC to provide anything demonstrating MFA's participation in the alleged misconduct. *FTC v. Onlineyellowpagestoday.com, Inc.*, No. 14-cv-838, 2014 WL 2694243, at *4 (W.D. Wash. June 10, 2014) ("[t]his overly broad TRO . . . would effectively shut down all aspects of defendants' business without requiring plaintiff to meet any standard of proof."). *See also FTC v. Agora Fin., LLC*, 447 F. Supp. 3d 350, 370-71 (D. Md. 2020) (finding the FTC's requested relief overbroad) (citing *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087, 198 L.Ed.2d 643 (2017) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents"); *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1012 (C.D. Cal. 2012) ("The framing of the scope of the injunction depends upon the circumstances of each case")); *c.f. Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404, 413 (6th Cir. 2016) (rejecting Occupational Safety and Health Administration's request for a broad injunction prohibiting defendant from any future violations of the law because it "provided no evidence supporting his claim for such a sweeping injunctive order").

And, although the FTC is occasionally permitted to "'fence in' offenders by enjoining more than the specific misconduct previously engaged in," such an injunction nevertheless "must bear a reasonable relation to the unlawful practices found to exist." *FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1314 (D. Wyo. 2016) (citation omitted); *FTC v. Wash. Data Res.*, No. 8:09-cv-2309, 2012 WL 2075827, at *5 (M.D. Fla. June 8, 2012) (noting that Rule 65 and binding precedent "permit a moderate and precise injunction limiting the prohibited misrepresentation to a particular 'line of business'" and modifying a proposed FTC injunction because it included a "global prohibition against misrepresentation in general" which was broader than necessary to prohibit misrepresentations about the challenged debt-relief services). Thus,

another court in this District recently narrowed an injunction sought by the Federal Trade Commission because it found that it was "too broad to speculate that Defendants are engaged in deceptive marketing as to each of their [products], without specific information to support that claim." *FTC v. Agora Fin., LLC*, 447 F. Supp. 3d 350, 371 (D. Md. 2020).

Here, the FTC has not shown a "reasonable relationship" between its claims and the broad preliminary injunctive relief it seeks against MFA. The complaint exclusively challenges the advertising for RagingBull.com and Raging Bull's billing practices. It is silent as to any wrongdoing by MFA or how its operations violated any law but seeks to hold it just as liable as the other defendants and subject to the same restrictions. The proposed injunction, however, spans far beyond the allegations in the complaint. It would prohibit MFA from engaging in its normal lawful business activities with unrelated legitimate companies (*See* Temporary Restraining Order, § XIV (Duties and Authority of Receiver)); require it to disclose to the receiver all business activity it engages in (*id*. § XII (Report of New Business Activity)); require it to relinquish complete control over the company to the receiver (*id.* § XIV (Duties and Authority of Receiver)); and force it to transfer all of its assets to the receiver. (*Id*. § XV (Transfer of Receivership Property to Receiver).) In doing so, the injunction would halt MFA's operations and freeze assets far beyond any activities surrounding the allegedly unlawful practices, a result that exceeds the permissible bounds of an injunction. *See FTC v. Agora Fin., LLC*, 447 F. Supp. 3d 350, 371 (D. Md. 2020) (narrowing the relief in the FTC's proposed preliminary injunction to encompass only the entities involved in the advertising and the marketing of the newsletters challenged in the complaint).

Further, while courts have enjoined multiple corporate entities where the "corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with 'a clear mechanism for avoiding the terms of the order," this concern is not present here. *FTC*

*v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (quoting *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming an FTC order holding a company liable because it was part of a "maze of interrelated companies" through which "the same individuals were transacting an integrated business")).  In this case, MFA is separate and distinct from the other defendants, and there is no overlap between its operations, activities, and employees and those of the other defendants.  It does not engage in any of the activities alleged in the complaint or in any consumer-facing businesses whatsoever, nor does it have any infrastructure or instrumentalities by which it could engage, or assist any third party in engaging, in any of the allegedly unlawful conduct.  Stated differently, if the preliminary injunction were denied as to MFA, this would not allow the remaining defendants any mechanism for avoiding the terms of the preliminary order, directly or indirectly.

What is more, the preliminary injunction would impose duties on MFA with respect to multiple companies engaged in activities wholly unrelated to the activities in the complaint.  For example, it requires MFA to provide financial disclosures and report to the receiver regarding other companies in which it has invested, including an information technologies infrastructure company and a company that manufactures consumer health products.  This result is impermissibly overbroad, and the Court should reject the proposed injunction against MFA for this reason, too.  *FTC v. Agora Fin., LLC*, 447 F. Supp. 3d 350, 371 (D. Md. 2020) (limiting the companies covered by the FTC's proposed preliminary injunction to "address the [] overbreadth in the FTC's proposed order").

The FTC's request to freeze MFA's assets also overreaches.  Putting aside that Section 13(b) does not empower the FTC to obtain monetary relief or an asset freeze, the FTC also has not made any showing that this drastic remedy is warranted here.  Indeed, it implicitly

acknowledges that it cannot demonstrate a likelihood of dissipation, arguing that an asset freeze is warranted here because the FTC need only establish 'a *possibility* of dissipation of assets'" to obtain an asset freeze. *See* Motion, at 51 (emphasis added) (citing *FTC v. IAB Mktg. Assocs., LP*, 972 F. Supp.2d 1307, 1313, n.3 (S.D. Fla. 2013), *aff'd* 746 F.3d 1228 (11th Cir. 2014); *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 562 (D. Md. 2005)).  And, while the FTC lumps all of defendants together, arguing they have "dissipate[d], diver[ed], and misuse[d]" corporate assets, the FTC does not allege or show that *MFA* specifically dissipated any assets or that there is a likelihood or possibility of MFA doing so.  Thus, the FTC has not provided specific evidence to support its allegations, and "without specific information to support that claim," it is simply "too broad to speculate" that MFA has engaged in any wrongful activity or that assets would be dissipated absent an injunction. *FTC v. Agora Fin., LLC*, 447 F. Supp. 3d 350, 371 (D. Md. 2020). Accordingly, the preliminary injunction is overbroad, and the Court should reject the FTC's attempt to impose a sweeping injunction on MFA for this additional reason.

### C.  <u>The Balance of Equities Favors Denying the Relief Sought by the FTC</u>

The balance of equities also warrants denying a preliminary injunction encompassing MFA. *FTC v. Merch. Servs. Direct, LLC*, No. 13-cv-0279, 2013 WL 4094394, at *4 (E.D. Wash. Aug. 13, 2013) (denying temporary restraining order and noting "a balancing of the equities weighs in Defendants' favor").  To obtain the preliminary injunction it seeks, the FTC must show that the equities weigh in favor of issuing the injunction. It has failed to do so here. *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976).

In weighing the equities, the Court balances both the defendant's private interest and the public interest, though the public interest is given greater weight. *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 564 (D. Md. 2005) (citing *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d

1020, 1030 (7th Cir. 1988)). In this case, both the private *and* the public interest would be harmed by granting the injunctive relief, tipping the equities in favor of denial.

MFA would be harmed should injunctive relief be granted.  While the FTC argues that "[n]o individual has a legitimate interest in continuing to operate an unlawful scheme" and therefore "there is no oppressive hardship to defendants in requiring them to […] preserve their assets from dissipation or concealment" (Motion, at 44), MFA has demonstrated that it is not part of any alleged common enterprise or any allegedly unlawful scheme.  Instead, it operates entirely separate and apart from the other named defendants and pursues its own lawful business activities. As explained above, the FTC fails to adequately allege either that MFA is engaging in the type of wrongful conduct at issue in the complaint or that a failure to enjoin MFA would result in an irretrievable loss of assets, tipping the equities in MFA's favor such that injunctive relief should be denied. *FTC v. Lakhany*, No. 12-cv-003337, 2012 WL 12860115, *1 (C.D. Cal. May 2, 2012) (denying injunctive relief with respect to the defendant where FTC failed to demonstrate that the defendant engaged in the wrongful conduct at issue or that failure to enjoin would cause an irretrievable loss of assets, tipping the equities in defendant's favor).

Similarly, while "a court of equity . . . has no duty . . . to protect illegitimate profits or advance business which is conducted by [unlawful] business methods" (Motion, at 44-45 (citing *FTC v. Thomsen-King & Co.*, 109 F.2d 516, 519 (7th Cir. 1940)), the corollary must be that the Court has an interest in protecting legitimate profits and lawful businesses from being unfairly restrained through injunctive relief. *See, e.g., Red Canyon Sheep Co. v. Ickes*, 98 F.2d 308, 317 (D.D.C. 1938) (finding it proper for a court of equity to protect a lawful business from the proposed illegal act by the government).  Here, MFA will be harmed if all of its assets are frozen and untouchable except through petition to the receiver.  This, in turn, would hamstring MFA in its

lawful business operations, resulting in substantial financial harm. This likelihood of financial harm to MFA weighs heavily against issuing injunctive relief. *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1089 (9th Cir. 1985) (denying injunctive relief where balance of hardships favored defendant because ancillary relief of an asset freeze would cause serious harm to defendant's financial position).

In contrast, in the absence of injunctive relief, the public will not be harmed because MFA has not deceived or otherwise misled consumers, or engaged in any activities that would harm the public or consumers.  The FTC alleges that the public interest would be served by entry of the preliminary injunction due to the *possibility* of asset dissipation (indeed, the FTC acknowledges that there is a "possibility" but not "likelihood" of asset dissipation). *See* Motion, at 50-51.  Further, the FTC provides nothing establishing the harm of removing MFA from a preliminary injunction as all of the allegations of harm relate to defendants that engaged in or controlled the unlawful activities, not MFA.  The court-appointed receiver also has not found any unlawful activity with respect to MFA.  Thus, despite filing thousands of pages of exhibits concerning the defendants' alleged wrongdoing and the possibility of harm if an injunction does not issue, the FTC does not explain why failing to include MFA on any preliminary injunction would result in *any* harm.  Thus, the FTC has not demonstrated that absent an injunction against MFA, consumers will suffer any harm, let alone the harms it asserts arising out of the other defendants' allegedly deceptive earnings claims and negative option offers given that MFA had no role in those activities.  Balancing the equities therefore supports denying the preliminary injunction.

### D.  Issuing the Preliminary Injunction Would Harm The Public Interest

Entering injunctive relief against MFA would actively harm the public interest because the proposed injunction would prevent MFA from investing in and supporting legitimate companies.

*In re Sanctuary Belize Litig.,* 409 F. Supp. 3d 380, 396 (D. Md. 2019) (noting the public interest is given greater weight than private interest).  Courts across the country this year have found that promoting lawful economic activity and keeping people employed during the COVID-19 pandemic is in the public interest. *See, e.g., Oakley v. Devos*, No. 20-cv-03215, 2020 WL 3268661, at *18 n.34 (N.D. Cal. June 17, 2020) (finding the public interest would be harmed in the absence of maintaining workers who in turn spend money in the local economy and "sustain[] the economy through this public health emergency"); *Normandie Oz, LLC v. Interra-Sky Normandie, LLC*, No. 20-cv-1069, 2020 WL 6784233, at *5 (S.D. Tex. Nov. 18, 2020) (finding the public interest would be harmed by an injunction which would hinder the sale and development of a hotel "in light of the economic conditions in Puerto Rico caused by […] the coronavirus pandemic");  *Profiles, Inc. v. Bank of Am. Corp.,* 453 F. Supp. 3d 742, 756 (D. Md. 2020) ("[T]he Court is certainly sympathetic to the economic harm that Plaintiffs' respective small businesses are enduring. COVID-19 has wreaked havoc on this country, and the global economy…").

 If entered, the injunction would prohibit MFA from assisting lawful businesses during this time of economic uncertainty.  It also would prevent MFA from honoring its present commitments for outstanding requests by lawful companies in which it has ownership interests, including helping a company acquire machinery for continued operations.  (Ex. A ¶ 33.)  These are harms above and beyond to just MFA itself and would extend to the public.  *See Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008), *overruled in part on other grounds by Winter v. NRDC*, 555 U.S. 7 (2008) (considering public interest factors as including "aiding the struggling local economy and preventing job loss"); *Smart & Co., Inc. v. Food Sys. Global Co. Ltd.*, No. 08-cv-5079, 2008 WL 4381679, at *7 (D. Minn. Sept. 26, 2008) (finding obvious the public interest in "economic growth and job creation" as well as "upholding valid contracts").

Consequently, denying injunctive relief as to MFA would promote the public interest by aiding business growth, preventing job loss, and upholding valid contracts.  As a result, the public interest warrants denying the FTC's request for injunctive relief against MFA, and the FTC fails to demonstrate otherwise.

### V.   <u>CONCLUSION</u>

For the reasons set forth above, the Court should not enter the Preliminary Injunction or, alternatively, modify the FTC's proposed injunction as set forth herein.

Dated:  December 13, 2020                Respectfully Submitted,


                                         /s/  Ari N. Rothman                
                                         Ari N. Rothman (Fed. Bar No. 17560)
                                         VENABLE LLP
                                         600 Massachusetts Avenue, N.W.
                                         Washington, D.C.  20001
                                         T: 202-344-4000
                                         F: 202-344-8300
                                         anrothman@venable.com
                                         *Counsel for Defendant*
                                         *MFA Holdings Corporation*

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 13th day of December, 2020, a copy of the foregoing

was served on all counsel of record through the Court's CM/ECF system.

/s/  Ari N. Rothman
Ari N. Rothman