IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | : |
| Plaintiff, | : |
| v. | :   Civil Action No. GLR-20-3538 |
| RAGINGBULL.COM, LLC, et al., | : |
| Defendants. | : |

## ORDER

THIS MATTER is before the Court on Defendants RagingBull.com, LLC ("Raging Bull"), Jeffrey M. Bishop, Jason Bond, Sherwood Ventures, LLC, and Jason Bond, LLC's (collectively, "Raging Bull") Motion to Stay Enforcement or Modify Temporary Restraining Order (ECF No. 28). Defendants Kyle W. Dennis, Winston Research Inc., and Winston Corp. (collectively, "Dennis Defendants"), as well as Defendant MFA Holdings Corp. ("MFA"), join Raging Bull's Motion. (See ECF Nos. 35, 43).[1] The Motion is ripe for review, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will deny the Motion.

---

[1] On December 13, 2020, Defendant MFA filed its Response to Order to Show Cause Why a Preliminary Injunction Should Not Issue. (ECF No. 45). MFA's Response sets forth several reasons why the requested injunctive relief is overly broad as to MFA; in particular, that MFA did not engage in the conduct at issue in the Complaint, and MFA otherwise has little involvement with Raging Bull's operations.

In light of these arguments, the Court directed the FTC to file a Reply to MFA's Response by noon on December 15, 2020. At the time of the entry of this Order, MFA is subject to the existing TRO. Separately, however, the Court will consider whether the TRO should be lifted or modified as to MFA. For this reason, the Court will grant MFA's Motion for Relief from Section VII of the Temporary Restraining Order (ECF No. 54).

## I.   BACKGROUND

On December 7, 2020, the Federal Trade Commission ("FTC") filed the above-captioned Complaint alleging that Raging Bull, a provider of subscription-based investment training, as well as five corporate defendants and three individual defendants connected to Raging Bull, defrauded consumers of more than $137 million by misrepresenting how much money Raging Bull's subscribers could make using its online services related to stock and options trading. (ECF No. 1). The FTC's three-count Complaint alleges: false or unsubstantiated earnings claims and other misrepresentations regarding Raging Bull's services in violation of section 5(a) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a) (Counts I & II); and failure to provide a simple cancellation method in violation of section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 et seq., which is treated as a violation of a rule promulgated under section 18 of the FTCA (Count III). (Compl. ¶¶ 105–17, ECF No. 1). Concurrent with its Complaint, the FTC filed an Emergency Motion for a Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, Other Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue, accompanied by several exhibits. (ECF Nos. 2, 9–10, 12–18). The FTC gave Defendants advance notice of this action and its Emergency Motion at 7:05 a.m. on December 7, 2020. (Kim Aff. ¶ 3, ECF No. 2-3).

On December 8, 2020, approximately twenty-four hours after receiving the FTC's Emergency Motion, the Court entered a Temporary Restraining Order ("TRO") ex parte.

(ECF No. 21). On December 10, 2020, Raging Bull filed its Motion to Stay Enforcement or Modify Temporary Restraining Order. (ECF No. 28). The FTC filed its Opposition on December 11, 2020, followed by Raging Bull's Reply on December 13, 2020. (ECF Nos. 38, 46).

## II.   ANALYSIS

Raging Bull advances three arguments for staying or modifying the TRO: (1) the FTC's authority to freeze assets under section 13(b) of the FTCA is up for dispute in a case currently pending before the United States Supreme Court; (2) the FTC fails to show a likelihood of success on the merits; and (3) the equities disfavor FTC's efforts to preserve assets. The Court addresses each argument in turn.

Raging Bull first argues that the Court should stay sections IV through VI of the TRO—which impose preservation of assets, receivership, and an asset freeze—pending the Supreme Court's forthcoming decision in <u>AMG Capital Management, LLC v. Federal Trade Commission</u>, No. 19-508 (cert. granted July 9, 2020). <u>AMG Capital</u> involves a challenge to the FTC's long-standing authority to seek monetary relief in addition to injunctive relief under section 13(b) of the FTCA. Raging Bull contends that, because the ruling in <u>AMG Capital</u> will bear directly on the FTC's ability to collect consumer restitution—and, in turn, to obtain an asset freeze and receivership—it is appropriate to stay the TRO until the Supreme Court provides definitive guidance on the issue.

At bottom, the Court declines to set aside or modify the TRO based on a mere speculation that the Supreme Court may, at some point next year, invalidate the FTC's

authority to collect monetary damages under section 13(b). As it stands, this Court is bound by the United States Court of Appeals for the Fourth Circuit's decision in FTC v. Ross, 743 F.3d 886 (4th Cir. 2014), which affirmed the FTC's ability to seek monetary relief as part of its "remedial arsenal." Id. at 892. And importantly, Ross is consistent with the precedent in five other federal circuits. See FTC v. Direct Mktg. Concepts, Inc., 624 F.3d 1, 15 (1st Cir. 2010); FTC v. Bronson Partners, LLC, 654 F.3d 359, 365 (2d Cir. 2011); FTC v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1314–15 (8th Cir. 1991); FTC v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1202 n.6 (10th Cir. 2005); FTC v. United States Oil & Gas Corp., 748 F.2d 1431, 1432–34 (11th Cir. 1984) (per curiam).

Raging Bull cites two cases in support of its proposition that a stay is appropriate: FTC v. Lending Club Corp., No. 18-CV-02454-JSC, 2020 WL 4898136 (N.D.Cal. Aug. 20, 2020) and FTC v. Match Group Inc., No. 3:19-cv-02281-K (N.D.Tex. Oct. 9, 2020). These cases are not binding on the Court and, in any event, are distinguishable from the case at hand because they did not involve a requested stay of a TRO or other injunctive relief. See Lending Club, 2020 WL 4898136, at *4 (staying all proceedings just prior to trial where, in addition to the pending Supreme Court decision, it was unclear whether the court could "require a party to virtually try a case" during the COVID-19 pandemic); Match Group, No. 3:19-cv-02281-K (Order, Dkt. No. 54) (staying all proceedings prior to discovery). By contrast, at least one other judge in this district has denied a request to stay ongoing injunctive relief despite the Supreme Court's consideration of AMG Capital. See

In re Sanctuary Belize Litigation, No. 1:18-cv-03309-PJM, ECF No. 1018 (D.Md. Aug. 25, 2020). As such, the authority Raging Bull cites on this issue is not persuasive.

Raging Bull correctly observes that it is sometimes appropriate to impose a stay "where the Supreme Court may shortly provide definitive guidance on key legal questions that could impact the viability of some or all of the claims." Int'l Refugee Assistance Project v. Trump, 323 F.Supp.3d 726, 734 (D.Md. 2018). The Court is also guided, however, by the well-established principle that "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." Landis v. N. Am. Co., 299 U.S. 248, 255 (1936). As such, courts considering motions to stay based on a potential decision by the Supreme Court typically consider: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." United States ex rel. Tusco, Inc. v. Clark Constr. Grp., LLC, 235 F.Supp.3d 745, 755 (D.Md. 2016) (internal quotation marks omitted). Here, although staying the TRO would certainly alleviate the hardship to Raging Bull for the time being, doing so may fatally undermine the FTC's authority to collect monetary relief—an authority which, at present, is well-settled in the Fourth Circuit, and may ultimately be upheld by the Supreme Court. Thus, in the Court's judgment, this is not one of the rare circumstances that warrants a stay.

Raging Bull next urges the Court to stay the TRO because the FTC is unlikely to succeed on the merits. Raging Bull argues that the FTC's case is based upon only twenty-

5

one "cherry-picked" negative reviews that were generated with "substantial involvement" or "guidance" from FTC lawyers or were otherwise "fabricated." (Mot. Stay TRO at 11–12, ECF No. 28). Raging Bull also suggests that many of the complaints to the FTC, Better Business Bureau ("BBB"), and state Attorneys General on which the FTC relies—nearly 240 in total—are "carbon copy" duplicates of one another, meaning that the 8.4% consumer fraud level the FTC cites in its brief is significantly inflated. (Id. at 12). Raging Bull notes that, in contrast to the FTC's purported evidence, Raging Bull has amassed 200,000 subscribers over the years and collected more than 200 unsolicited subscriber reviews describing Raging Bull's services as "helpful, educational, honest, transparent and effective." (Id. at 12–13).

The Court does not doubt that Raging Bull has a number of satisfied customers. The Court also acknowledges that virtually every business in the United States will have some number of consumers who are unhappy despite the company's best efforts. At this time, however, Raging Bull's showing of satisfied customers does not negate the FTC's evidence that a certain number of Raging Bull's subscribers were misled or deceived. Indeed, reasonable consumers may be misled even where some consumers claim to be satisfied with a service or only a few consumers actually complained. See, e.g., FTC v. Johnson, 96 F.Supp.3d 1110, 1119 (D.Nev. 2015) ("The FTC is not required to show that all consumers were deceived, and the existence of satisfied consumers does not constitute a defense."). Moreover, because these consumer statements do not include any documentation about the consumers' actual trading performance, the statements do not disprove the FTC's

6

allegation that Raging Bull makes unlawful claims about how much money consumers can earn using its services. Thus, without more, Raging Bull's customer statements do not disturb this Court's previous finding that the FTC is likely to succeed on the merits of its claims.

Raging Bull also contends that the FTC grossly mischaracterizes its trading activities and ignores the company's compliance efforts. Specifically, Raging Bull states that the FTC's examples of Raging Bull's allegedly deceptive marketing are moot in light the company's comprehensive compliance manual, which it implemented in late 2019. The compliance manual counsels, among other things, that gurus should provide "complete transparency" with subscribers. (Mot. Stay TRO at 15). According to Raging Bull, its "gurus" are transparent in their real-time trading because they "inform subscribers of what securities they are reviewing and why and under what conditions they might purchase or sell those positions." (Id. at 14). The gurus also provide real-time alerts and livestream their trading account portfolios. Therefore, as Raging Bull tells it, subscribers are getting exactly what is advertised—"real-money" traders trading in real-time. (Id.).

This explanation overlooks the fact that the crux of FTC's Complaint is not that Raging Bull fails to provide the real-time trading services it advertises, but that Raging Bull overstates the ability of prospective subscribers to earn substantial income by using its mirror-trading services, only to inform them after they subscribe that users should not mimic the gurus' trades, all while failing to provide those subscribers with a simple method of cancellation. And although Raging Bull briefly asserts that it cautions both prospective

7

subscribers and existing subscribers that they cannot expect to get the same results as the gurus by attempting to duplicate their trades, (see Mot. Stay TRO at 14 n.7), Raging Bull fails to provide a single example of such a warning directed toward prospective subscribers. Up against the FTC's substantial evidence of deceptive and misleading conduct, Raging Bull's description of its compliance program and self-proclaimed transparent operations are insufficient at this time to convince the Court that the FTC is unlikely to succeed on the merits.[2]

Raging Bull next contends that the balance of the equities weighs against the TRO in light of the harm to Raging Bull, its 160 employees, and thousands of its satisfied subscribers. Raging Bull states that the TRO's asset freeze provision has completely halted its ability to do business, including its ability to provide services to and collect payments from subscribers; pay its vendors, contract and service partners, and rent; and make payroll. Raging Bull asserts it "cannot survive" the asset freeze and, indeed, that its liabilities will skyrocket as a result. (Mot. Stay TRO at 18).

The Court is mindful of the hardships the TRO imposes on Raging Bull and its employees. At the same time, the Court must weigh these hardships against the need to protect the interests of the public. Lifting or modifying the TRO at this time would allow

---

[2] Raging Bull states in its Reply that it "did not put the merits at issue in [its] Motion" in order to focus on the more pressing issues at hand—that is, the effect of the asset freeze and receivership on Raging Bull's continued existence. (Reply at 15, ECF No. 46). Unfortunately, Raging Bull's approach misses the mark, as the TRO was based, in large part, on the Court's preliminary finding that the FTC was likely to succeed on the merits. Without evidence to the contrary, the Court is simply not in a position to set aside the TRO at this stage.

Defendants to dissipate hundreds of thousands of dollars—either through continued operation of Raging Bull or through improper means[3]—in the time leading up to the preliminary injunction hearing. As noted above, this would severely limit the FTC's ability to secure redress for the victims of Raging Bull's alleged conduct. Moreover, the Court is not swayed by Raging Bull's argument that the TRO unfairly hinders its ability to provide its services and collect subscription fees because, as the FTC argues quite persuasively, it is these very services that form the basis of the FTC's Complaint, and any subscription fees collected as the result of Defendants' deception would constitute ill-gotten gains. In light of these risks, the Court finds that consideration of the equities counsels in favor of leaving the TRO in place.

The Court is also satisfied that, contrary to the assertions in Raging Bull's Motion, the Receiver is not dead set on shuttering the company. At the time of its Reply, Raging Bull conveyed that "Defendants have been attempting to work with the Receiver, who has expressed at least a willingness to keep the company running." (Reply at 15–16, ECF No. 46). Indeed, the Receiver avers that he does not presently intend to shut down the company, terminate its email system, end its services, interfere with its efforts to meet obligations to its subscribers, or withhold paychecks from its employees. (Keith Aff. ¶¶ 7, 13, ECF No.

---

[3] The Court does not mean to suggest that Defendants here are likely to take improper action in the absence of an asset freeze. The Court is cognizant, however, of the numerous examples of cases in which a TRO was the only backstop against attempts by defendants to dissipate or conceal assets and destroy evidence. (See Kim Aff. ¶ 6 (listing cases in which the immediate entry of a TRO successfully thwarted defendants' attempts to conceal or dissipate assets)).

32-1). Instead, the Receiver must first determine whether Raging Bull can be run legally and profitably, which requires, in part, a financial accounting of the company's assets. Thus, at this stage, stripping the Receiver of his authority would be premature. The Court also notes that there is some flexibility for Raging Bull to work with the Receiver within the boundaries of the TRO, which presently authorizes the Receiver to make any payments and disbursements from the receivership estate, where necessary, including payment of any debt or obligations incurred prior to the entry of the TRO. (TRO at § XIV(G), ECF No. 21).

In addition to cooperating with the Receiver, there appear to be several avenues available to Raging Bull to keep its business afloat. As the FTC points out, to the extent Defendants must pay vendors and employees during this time, Defendants may seek a bridge loan, borrow from family and friends, or allocate the $25,000 from each of their personal accounts that the TRO has already authorized for release. Defendants may also make a specific application to the Court if there is a compelling need to draw additional funds from their personal accounts. The Court has also proposed—and the parties have apparently discussed in general terms—that Defendants could post a bond as an alternative to the asset freeze.

Moving forward, the Court encourages the parties to work collaboratively to reach a resolution to this matter with the understanding that many employees who may not be involved in the alleged unlawful business practices will be adversely impacted.

## III.   CONCLUSION

At this stage, the Court finds that Raging Bull has not presented sufficient evidence to justify setting aside or modifying the TRO, nor has Raging Bull convinced the Court that the TRO was entered in error. As such, Raging Bull's Motion to Stay the TRO will be denied. The existing TRO will remain in place until the preliminary injunction hearing, at which time Defendants will have the chance to present a more fulsome argument in opposition to the FTC's requested injunctive relief.

Accordingly, is it this 15th day of December, 2020, hereby ORDERED that:

1.   Defendants' Motion to Stay Enforcement or Modify Temporary Restraining Order (ECF No. 28) is DENIED; and

2.   The existing Temporary Restraining Order is EXTENDED until the preliminary injunction hearing, which is currently set for Wednesday, January 13, 2021 at 9:30 a.m.; and

3.   MFA's Motion for Relief from Section VII of the Temporary Restraining Order (ECF No. 54) is GRANTED. MFA's deadline to complete the financial disclosures is EXTENDED to December 30, 2020.

/s/
_____
George L. Russell, III
United States District Judge