UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**,<br><br>Plaintiff,<br><br>v.<br><br>**RAGINGBULL.COM, LLC**, et al.,<br><br>Defendants. | Case No. 1:20-cv-03538-GLR |

**FEDERAL TRADE COMMISSION'S REPLY MEMORANDUM IN SUPPORT OF
A PRELIMINARY INJUNCTION AGAINST MFA HOLDINGS CORP.**

**I.      Introduction**

The evidence shows that MFA is a shell company opened and operating for the benefit of Raging Bull. As such, MFA should be considered part of the Corporate Defendant common enterprise. However, given the claims Mr. Marshall raises in his declaration about legitimate companies he funds through MFA, the FTC requests this court modify the temporary restraining order ("TRO") as to MFA only to remove it from the asset freeze and receivership entities. As explained below, the FTC will use the provisions of the TRO to investigate MFA's claims prior to the preliminary injunction hearing.[1]

**II.     MFA is Part of a Common Enterprise**

MFA, through its sole shareholder Allan Marshall, argues that MFA should be excused from this lawsuit and the temporary restraining order ("TRO") and preliminary injunction ("PI") order because the FTC has not alleged or demonstrated any instances of misconduct specifically by MFA. To the contrary, the FTC has alleged and set forth evidence that MFA is part of the

---

[1] Given that the FTC is making this request, we have not addressed MFA's statutory arguments, but refer the Court to the FTC's analysis in its opposition to Defendants' motion to stay the TRO. ECF No. 38.

1

Raging Bull common enterprise that has bilked consumers of more than $137 million in the last three years. ECF No. 2-1 at 45-46. Thus, MFA should be held responsible along with the other corporate shell entities involved in the Raging Bull common enterprise. *FTC v. Ameridebt, Inc.*, 343 F. Supp. 2d 451, 463 (D. Md. 2019) ("insofar as the Complaint fairly alleges a common enterprise among Defendants to mislead and defraud consumers, all Defendants may very well be liable for the conduct, including misrepresentations, of other participants in the scheme").

Courts generally respect the corporate form but will disregard it under appropriate circumstances, such as when it is used to skirt the law. *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 266 (6th Cir. 1970). To determine if a common enterprise exists, courts evaluate "'the pattern and frame-work of the whole enterprise.'" *Grant Connect*, 827 F. Supp. 2d at 1216 (quoting *Nat'l Urological*, 645 F. Supp. 2d at 1182). While courts often consider factors such as common control, office space, employees, and commingling of funds in determining whether a common enterprise exists, "no one factor is controlling. In fact, federal courts routinely consider a variety of factors." *FTC v. Zurixx LLC*, No. 19-cv-713, 2020 WL 6898341, *2 (D. Utah Nov. 24, 2020) (*citing FTC v. Wyndham Worldwide Corp.*, No. 13-1887-ES, 2014 WL 2812049, at *7 (D.N.J. June 23, 2014)). In *FTC v. Nudge, LLC*, the court found that common enterprise liability had been sufficiently pled where the complaint alleged that defendants shared common control and ownership structure and transferred millions of dollars between bank accounts belonging to defendants. *FTC v. Nudge*, 430 F. Supp. 3d 1230, 1240 (D. Utah 2019).

MFA focuses this Court's attention on factors the FTC has not cited, such as common employees and common office space. These elements are not required, as "shell companies can participate in a common enterprise." *Zurixx*, 2020 WL 6898341, at * 3. In fact, shell companies cannot "avoid common enterprise liability on the ground that they had no employees at all or no true business location." *Id.*, at *7.

Neither MFA's opposition nor its founder Allan Marshall's supporting declaration disputes that MFA has enjoyed the ill-gotten fruits of the Raging Bull scheme, receiving nearly $4 million between April 2017 to July 2020. Nor do they dispute that MFA is one of only three

owners of a closely held LLC (*i.e.*, Raging Bull f/k/a Lighthouse Media), that MFA was formed in February 2014 and entered into an agreement with Bishop and Bond to operate Raging Bull that same month, [2] and that MFA has signed account opening documents (in September 2019) enabling Raging Bull to process and collect consumer payments. ECF No. 2-1 at 47. Marshall's declaration notes that he provided Bishop and Bond with $1.4 million in investment capital for the operation of the Raging Bull enterprise. ECF No. 45-1 at ¶ 6. The payment records from Raging Bull's bank accounts note that several of the payments it has made to MFA between April 2017 to October 2020 were for "vendor pmt."[3]

Significant other evidence indicates that MFA is primarily a shell company and not an investment vehicle engaged with other legitimate businesses. MFA is currently listed as an "inactive" entity according to Florida Secretary of State registration records, has not filed an annual report in 2020, and has been in an administratively dissolved state since September 2020.[4] According to Florida law, this means that it "may not carry on any business except that necessary to wind up and liquidate its affairs … and notify claimants…."[5] MFA's opposition confirms that the company has no functional business location (apart from Marshall's residence), no other officers or directors (except for Marshall who is the sole owner) or employees (apart from Marshall and his wife), and no websites.[6]

Further, Marshall's declaration does not address Jason Bond's testimony that the owners of Raging Bull (i.e., Marshall acting through MFA) inject money into the Raging Bull trading

---

[2] PX 27, Att. IIII at 2590-92.

[3] PX 29, ¶ 10. Marshall's declaration states that the FTC misconstrued "a $135,000 payment" from MFA to Raging Bull, and that this was only reimbursement to Raging Bull which in 2019 had "inadvertently paid the entire cost of a membership fee for Flexjet (a private jet service) instead of splitting the cost of the membership fees with MFA." Contrary to Marshall's statement, there was not one but three separate wire transfers (on September 17, 2019, February 4, 2020, and June 25, 2020) of varying amounts from MFA to Raging Bull, only one of which is indicated as payment for FlexJet. PX 29, ¶ 11 (JPMorgan records).

[4] PX 29, ¶8.

[5] Fla. Stat. 607.1421 states that a "corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs under s. 607.1405 and notify claimants under s. 607.1406."

[6] ECF No. 45-1, ¶¶ 2-3.

accounts, which Raging Bull "gurus" use to display their "real money" trades to consumers:[7]

> Q: So what money funds the Raging Bull account in E-Trade, is that from subscriptions?
>
> A: Jeff, Allen [sic], myself fund that account. So we will – I don't know where the money comes from, it comes from our bank account. The money that comes into our bank account is from subscriptions so… Jeff, Allan and I fund that account.

Statements in Marshall's declaration that seek to distance MFA from any involvement with Raging Bull raise more questions than answers. For example, Marshall disclaims any affiliation with a Raging Bull subscription service called "Angel Investing Insider" and states "I did not authorize the use of my name in any of the advertising or other materials set forth in the preceding two paragraphs." However, the declaration neglects to explain why not only his name, but his profile and photo are featured prominently in various advertisements for the "Boardroom," another Raging Bull service.[8] Similarly, Marshall's declaration does not explain how he appeared in a "free video training" with Jeff Bishop, where Raging Bull subscribers would learn the "7 principles and strategies [Bishop and Marshall] used to go from a couple of working class dudes… (really both of us started out flat-broke)… To independently wealthy Angel Investors!"[9]

Marshall's declaration states that MFA "operates its own business, independent of Raging Bull, that invests in a portfolio of various companies, not only Raging Bull." In support of this contention, Marshall's declaration states that MFA previously agreed to provide "$250,000 in funding to a company in which it invested to purchase manufacturing equipment" and that a preliminary injunction would "prevent the companies MFA owns from receiving capital that they can use to continue and grow their operations at a time when job growth could not be more critical." But MFA has not produced any financial accounting to verify any such investments or

---

[7] PX 27, Att. NNNN, p. 2959.
[8] PX 29, ¶¶ 3-5.
[9] Id., ¶ 7 (April 21, 2020 email from Angel Investing Insider to FTC investigator).

financial transactions independent of Raging Bull, and its contention that the preliminary injunction should not apply to it is based solely on the single declaration of its sole owner.

At this juncture the evidence indicates, on balance, that MFA is a shell company used to benefit Raging Bull, and MFA ultimately will be proven to be part of the common enterprise. Nonetheless, the FTC believes that it is important to examine MFA's claims that it operates as sort of investment business wholly separate from Raging Bull and is a mere investor in Raging Bull. The TRO's limited expedited discovery provisions are critical here as they require MFA to submit financial disclosures and permit an asset deposition of MFA and Allan Marshall. These provisions will enable the FTC to properly evaluate MFA's assertion that it is not merely a shell company for Raging Bull.

### III. The Equities Strongly Favor a Preliminary Injunction Against MFA, But the FTC Submits that a Modification of the TRO is Appropriate at this Time

While devoting many pages to the private interest it contends will be affected by the injunction, MFA concedes "the public interest is given greater weight than private interests." ECF No. 45 at 28. Nowhere in its arguments on the equities does MFA actually contest that the conduct charged against Defendants was illegal or that consumers suffered over $137 million in injury. MFA contends that both its private financial interest and the public interest would be harmed by an injunction. But neither MFA's opposition nor Marshall's declaration explains what public interest is being furthered by enabling MFA to use the proceeds of Raging Bull's fraudulent scheme to further MFA's private investment interests. MFA's brief and the attached declaration also fall short on details about these supposedly lawful businesses and the impact an injunction against MFA Holdings (not the "lawful" businesses) would have upon those other businesses. ECF No. 45 at 28.

The possibility that there could be some, unquantified economic impact from subjecting MFA to a preliminary injunction is far outweighed by the public interest in preventing fraud and restoring consumers' lost assets. Those consumers should be made whole. However, given Marshall's representations that he funds legitimate businesses that are entirely unrelated to

Raging Bull through MFA, the FTC believes it would be appropriate to modify the TRO as to MFA only by lifting the asset freeze and receiver provisions.[10]

Because the FTC is seeking to modify the TRO at this time and lift the asset freeze and receivership provisions from MFA, we do not think it is necessary to address MFA's statutory arguments regarding the Commission's ability to obtain consumer redress. We refer the Court to our arguments on this issue in the FTC's opposition to the Defendants' motion to stay or modify the TRO.

## IV.  Conclusion

Based on the foregoing, the FTC respectfully requests the Court issue the proposed TRO attached to this motion, which removes MFA from the asset freeze and receivership provisions. The proposed TRO also incorporates the Court's scheduling order for the preliminary injunction briefing and hearing entered yesterday (ECF No. 50) and reflects the Court's extension of the expiration of the TRO until the PI hearing.

Respectfully submitted,

Dated: December 15, 2020

/s/  Sung W. Kim
Colleen Robbins (D. Md. Temp Bar No. 92567)
Sung W. Kim (D. Md. Temp Bar No. 814609)
Gordon E. Sommers (D. Md. Temp. Bar No. 814431)
Thomas Biesty (D. Md. Temp. Bar No. 814459)
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-2548; crobbins@ftc.gov
(202) 326-2211; skim6@ftc.gov
(202) 326-2504; gsommers@ftc.gov
(202) 326-3043; tbiesty@ftc.gov
(202) 326-3395 (Facsimile)

*Attorneys for Plaintiff*
*Federal Trade Commission*

---

[10] The FTC is providing a modified proposed TRO that incorporates these changes concurrently with this reply. A redline comparison to the proposed TRO previously submitted by the FTC on December 7, 2020 is also attached and will be emailed to all parties and the Court.

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2020, I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to counsel of record identified on the service list below:

David G. Barger
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
(703) 749-1300
bargerd@gtlaw.com

Andrew G. Berg
Greenberg Traurig LLP
2101 L Street, NW
Suite 1000
Washington, DC 20037
(202) 331-3100
berga@gtlaw.com

Miriam G. Bahcall
Greenberg Traurig LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
(312) 476-5135
bahcallm@gtlaw.com

*Attorneys for RagingBull.com, LLC, Jeffrey M. Bishop, Jason Bond f/k/a Jason P. Kowalik, Sherwood Ventures, LLC, Jason Bond, LLC*

Jonathan Shaw
Boies Schiller Flexner LLP
1401 New York Ave, NW
Washington, DC 20005
(202)237-2727
jshaw@bsfllp.com

*Attorney for Kyle W. Dennis, Winston Research Inc., Winston Corp*

Ari N. Rothman
VENABLE LLP
600 Massachusetts Avenue N.W.
Washington, DC 20001
(202) 344-4000
anrothman@venable.com

*Attorney for MFA Holdings Corp.*

Mark S. Saudek
Gallagher Evelius & Jones LLP
218 North Charles Street, Suite 400
Baltimore MD 21201
phone (410) 727-7702
fax (410) 468-2786
msaudek@gejlaw.com

*Counsel to Receiver Peter E. Keith*

                       /s/ Sung W. Kim
                       Sung W. Kim