IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:20-cv-03538 - GLR ) |
| RAGINGBULL.COM, LLC f/k/a LIGHTHOUSE MEDIA LLC, et al., | ) EMERGENCY MOTION ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS RAGINGBULL.COM, LLC, JEFFREY M. BISHOP AND JASON BOND'S EMERGENCY MOTION FOR CLARIFICATION OF THE TEMPORARY RESTRAINING ORDER, OR IN THE ALTERNATIVE TO INCREASE FUNDS AVAILABLE TO INDIVIDUAL DEFENDANTS TO PAY DEFENSE COSTS**

Defendant RagingBull.com, LLC ("Raging Bull" or the "company") and Individual Defendants Jeffrey M. Bishop and Jason Bond (the "Individual Defendants" and collectively with Raging Bull, the "Defendants"), by and through undersigned counsel, submit this Emergency Motion for Clarification of the Temporary Restraining Order ("Motion"), and in support state as follows:

**I.     Introduction**

Defendants bring this Motion to ask the Court to clarify Receiver's authority and obligation under the TRO[1] to preserve the company's assets and limit its liabilities by allocating some company funds to the company's legal defense of the pending enforcement actions by the Federal Trade Commission ("FTC") and the New Hampshire Bureau of Securities Regulation ("New Hampshire Bureau"). The Temporary Receiver has told Defendants that he does not believe he has

---

[1] The Modified Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue entered on December 17, 2020 shall be referred to herein as the "TRO."

the authority or obligation to make such payments, nor has he made allowance for any such expenses to date despite Defendants' repeated requests. Defendants disagree with the Temporary Receiver's position. The preliminary injunction hearing is scheduled for February 5, 2021, with Defendants' submissions due on January 13, 2021. Because the Temporary Receiver's inaction is causing significant harm and prejudice to Defendants, it is imperative that the Temporary Receiver's authority and obligations under the TRO be clarified as soon as possible.

Under the TRO, "the Receiver is ***directed*** and ***authorized***" to "[m]ake payments and disbursements from the receivership estate that are necessary or advisable" to "[c]onserve, hold, manage, and prevent the loss of all Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those Assets." TRO, Section XIV(D) and (G). The Temporary Receiver has refused to release any company funds so the company can defend against allegations asserted by the FTC in the present matter (the "FTC Action") and by the New Hampshire Bureau in a related enforcement matter pending before the New Hampshire Department of State ("New Hampshire Action").[2] Based on the FTC's incomplete, inaccurate and significantly biased view of Raging Bull's conduct, the FTC seeks $137 million in damages and an effective shuttering of the business. The New Hampshire Bureau has issued an Order to Cease and Desist based on a mistaken application of the law and an erroneous view of Raging Bull's operations. The New Hampshire Bureau, which closely coordinated with the FTC and also names the Defendants as respondents, also seeks unprecedented and unlawful damages from Raging Bull. If Raging Bull is unable to mount an effective defense against both Actions, then the FTC and New Hampshire Bureau may be able to obtain unjust outcomes – without a meaningful opportunity

---

[2] Recognizing the financial toll litigation can take on a company, the TRO includes a stay of civil actions. TRO at Section XIX. However, litigation brought by regulators, such as the FTC and New Hampshire Actions, continues and must be defended. *Id*.

2

afforded to Raging Bull to defend its conduct – that massively increase the company's liabilities and dissipate its assets.

In the alternative, if the Court declines to clarify the TRO as requested herein, the Individual Defendants ask the Court to approve, under Section XIV of the TRO, an increase in amount of individual funds on which they can draw to pay the Defense Costs (as defined in Section III below). The Temporary Receiver has in fact invited the Individual Defendants to "move the court for leave to apply [their individual] assets for legal defense or employment of any individuals." *See* S. Trahan Decl. (attached as Ex. 1) at ¶ 19. This is exactly what the Individual Defendants are seeking in the alternative in this Motion.

## II.     Background

The correct construction and interpretation of some provisions of the TRO is the subject of this Motion. Defendants have been concerned with a lack of clarity regarding the Temporary Receiver's role since first appointed by the Court. In Defendants' Motion to Stay Enforcement or Modify the Temporary Restraining Order ("Motion to Modify the TRO"), Defendants informed the Court of their concern that the Temporary Receiver intended to close down the company's operations. *See* 12/10/20 Mot. (Dkt. 28) at 17. In part based on these concerns, Defendant sought a modification of the TRO to rescind the asset freeze and appointment of the Temporary Receiver in order to allow the company to continue business operations and pay its employees. *Id*. The Temporary Receiver informed the Court that he had no present intention to shut down Raging Bull's operations or withhold any future paychecks from Raging Bull's employees. *See* Receiver's 12/11/20 Resp. (Dkt. 32) at 3. The Court denied Defendants' motion, and instead asked the parties "to work collaboratively to reach a resolution to this matter with the understanding that many employees who may not be involved in the alleged unlawful business practices will be adversely impacted." 12/15/20 Order (Dkt. 56) at 10.

Raging Bull has to date cooperated with the Temporary Receiver every step of the way, providing access to its data and systems, providing its computers for copying and making its employees available to interview and assist the Temporary Receiver throughout the process. Trahan Decl. at ¶ 6. Within hours of the Court's entry of the original TRO on December 8, 2020, Raging Bull began preparing a list of business-critical systems and expenses, including company payroll, that would allow critical operations to continue pending the preliminary injunction hearing. *Id*. at ¶ 7. Raging Bull spoke with the Temporary Receiver and his counsel on December 14, where they discussed critical systems and the importance of payroll. *Id*. at ¶ 8. The Temporary Receiver asked Raging Bull to compile a list of core workplace employees needed to keep the company running and to provide information to the Receiver and the company pending the preliminary injunction hearing, which Raging Bull did. *Id*. at ¶ 9. Because it could not pay non-core employees, Raging Bull had to furlough these employees on December 15, 2020. *Id*. at ¶ 10.

Raging Bull spoke with the Temporary Receiver and his counsel on December 16, during which time Raging Bull presented its list of 33 critical employees who were necessary to the continued, scaled-back operation of the business, which was to include fulfillment of its service obligations to its current subscribers, to provide customer service to current subscribers calling in to the company, to assist the Temporary Receiver, and to support the company's defense by collecting of information and documents needed in the litigation. *Id*. at ¶ 11. Much of the factual information, data and documents that are relevant to the FTC's misstated allegations – and which are needed to rebut the FTC's case – are contained in the Company's electronic records which are mostly accessible only by those Raging Bull employees. *Id*.

At this December 16 meeting, the Temporary Receiver also told Raging Bull that the FTC wants to shut the business down. *Id*. at ¶ 12. Although the Temporary Receiver indicated he was

considering allowing operations to continue, he indicated he could not release company funds to pay any of the critical employees or support operations without the FTC's approval. *Id*. at ¶ 13. As a result, Raging Bull was left with no choice but to pause its operations for 30 days, beginning December 21, 2020. *Id*. at ¶ 14.

Upon being told that 33 critical employees is too many, on December 22, Raging Bull presented the Temporary Receiver with a reduced list of 17 employees listed as critical personnel needed to provide limited operations support, cooperate with the Temporary Receiver and support the company in gathering the data and information to defend itself. *Id*. at ¶ 15.

In a December 23 email, counsel for the Temporary Receiver requested the removal of 4 employees from Raging Bull's list of 17 employees provided the day before, stating that the "sole purposes of continuing any employees' employment are (i) to ensure the preservation of information and systems; (ii) to provide access by the temporary receiver to information and materials; and (iii) to ensure that the business can remain operational (with no outward-facing operations)" until the preliminary injunction hearing. *Id*. at ¶ 16. Counsel for the Temporary Receiver noted that the 13 remaining employees listed as critical "appear to fit into one or more of these three categories." *Id*.

On December 24, the Temporary Receiver's counsel circulated to Raging Bull a draft consent motion for leave to pay expenses, which included paying the 13 employees. *Id*. at ¶ 17. The Temporary Receiver's counsel explained this to be a "reasonable request of the Court" and that the FTC had indicated its "tentative consent" to the list. *Id*. The Temporary Receiver's draft consent motion included payment of expenses and compensation to the 13 employees for two distinct purposes. The first was to assist the Temporary Receiver in his investigation of the company. Second, company funds were to be used to provide the minimum support necessary for

Raging Bull to continue its existence as a potentially viable ongoing business, which was to be the specific subject of the Temporary Receiver's report by direction of this Court under the TRO. *Id*. The Temporary Receiver's draft acknowledged that Section XIV.D of the TRO "directs the Temporary Receiver to prevent the loss of all assets of the Receivership Entities, and the continued corporate existence of RagingBull.com, LLC is itself an asset that may warrant preservation." *Id*. Further, the Temporary Receiver stated: "In Mr. Keith's view, making the requested payments to ensure the continued existence of the company is necessary to effectuate the terms of the Temporary Restraining Order." *Id*.

Despite these representations, on December 28 the Temporary Receiver informed Raging Bull that the FTC would not consent to the motion. *Id*. at ¶ 18. The Temporary Receiver's counsel explained that the "FTC presently is not in a position to consent to the full amount of the requested expenses," and that "[a]s to employees, the FTC notes that every employee has an obligation to cooperate fully with the temporary receiver, regardless of employment status." *Id*. But there is no basis in the TRO for the Temporary Receiver to refuse its direction to make the payments necessary to preserve the assets of the company and limit its liabilities whether or not the FTC agrees. In fact, the FTC's "expressed concerns that the proposed expenses are not necessary for preserving information or providing the temporary receiver access to information" (*id*.) is directly contrary to the Temporary Receiver's previously stated, but subsequently withdrawn, view that the TRO required using company funds to ensure the continued existence of the company: "In Mr. Keith's view, making the requested payments ***to ensure the continued existence of the company is necessary to effectuate the terms of the Temporary Restraining Order***" (*id*. at ¶ 17 (emphasis added)).

On December 30, the Temporary Receiver's counsel sent a revised list of critical expenses and employees, now listing only six employees who would receive some compensation from the company's assets for the *sole* purpose of assisting the Temporary Receiver. Trahan Decl. at ¶ 19. As for defense costs, the Temporary Receiver noted that based on his "[r]eview of defendants' financial disclosures and the company's finances," the Individual Defendants should move the Court for leave to pay defense costs from their individual funds. *Id*.

Defendants had no choice but to agree to the more limited consent motion; otherwise, not a single employee would be paid despite many helping the Temporary Receiver without pay for the better part of a month. The motion was filed with the parties' consent after close of business on December 31, 2020.[3] Yesterday, January 4, 2021, the Court granted the motion. *See* 1/4/21 Order, Dkt. 106.

This stripped-down list of six employees – reduced from the original list of 33 Raging Bull needed – will not allow for the retention of any additional employees to aid in the company's defense of the FTC or New Hampshire Actions. Raging Bull's inability to secure the timely release of any funds to pay for employees or expenses that would allow the company to continue any level of operations before the preliminary injunction hearing has forced the company to shut down. This is exactly what Defendants feared would happen when it filed its Motion to Modify the TRO. Now, the only path left to Defendants to save the company, preserve its assets and limit its liabilities before the preliminary injunction hearing is to defend itself in the FTC Action and the related New Hampshire Action.

---

[3] While consenting the Defendants made clear that their consent should not be deemed a waiver of their right and they specifically reserved their right to seek the approval of additional expense.

**III.     Relief Requested – Defense Costs**

Defendants seek an order from the Court clarifying that the TRO authorizes and directs the Temporary Receiver to use Raging Bull funds to pay the following defense costs ("Defense Costs") leading up to the preliminary injunction hearing, or, in the alternative, to allow the Individual Defendants to pay these Defense Costs from their individual assets.

The Defense Costs are as follows:

- Payment of salary, totaling $136,686.66 to employ six Raging Bull employees from December 1, 2020 through February 5, 2021 who are critical to assist the company in preparing its defense of the FTC Action and the New Hampshire Action. These employees have been identified in good faith as critical to identify and collect company information from its data repositories that is required to respond to the allegations of unlawful conduct by the FTC and the New Hampshire Bureau. *See* Trahan Decl. at ¶ 20.

- Payment of $300,000 in attorneys' fees accrued from December 7, 2020 through February 5, 2021 to defend the FTC Action, including preparing for and participating in the preliminary injunction hearing. Defendants, or in the alternative the Individual Defendants, request $300,000 to use toward such attorneys' fees. Defendants expect the total to be substantially greater than this requested amount, and reserve the right to seek any additional amounts. However, because of the extreme need for funds to pay attorneys' fees to defend itself, Defendants, or in the alternative the Individual Defendants, request only $300,000 for attorneys' fees at this time.

- Payment of up to $125,000 for retention of two experts to address allegations raised in the FTC Action, including in response to the FTC's purported expert, Russell Wermers, who over many months prepared and submitted a 72-page "expert report." Wermers charges $750 per hour for his work on this matter. *See* PX26 at 1737. Wermers also utilized a staff of economists and consultants with The Brattle Group to assist him, although the number of economists and consultant, and their respective rates, has not been disclosed. *Id*. Defendants' retained experts, and any supporting staff or consultants, will be paid from these funds at an hourly rate at or lower than Wermers' rate, with the combined total payments to the experts not to exceed $125,000 without further approval from the Court.

- Payment of up to $100,000 in attorneys' fees to defend the New Hampshire Action. On January 6, 2021, Defendants will request a hearing on the New Hampshire Bureau's Order to Cease and Desist. Under applicable rules, a hearing date will be set within 15 days of Defendants' request. Defendants will ask to continue the hearing date until a date after February 5, 2021 to allow for discovery and time to prepare for the hearing. In the event the request is denied, substantial attorneys' fees will be incurred to prepare and participate in the hearing. As such, Defendants, or in the alternative the Individual Defendants, require and request up to $100,000 be made available to use toward such attorneys' fees, to be used only as needed, and reserve the right to seek any additional amounts.

**IV.     The Court Should Clarify that the TRO Directs the Temporary Receiver to Use Company Assets to Pay Necessary Defense Costs**

A clarification of the TRO is necessary because a disagreement exists between Defendants and the Receiver regarding the scope of the Receiver's authority and obligations under the TRO to make payments from the company's assets for necessary Defense Costs to avoid increasing the company's liabilities. Although the Receiver and FTC finally agreed to a very narrow consent motion, which the Court granted yesterday (*see* 1/4/21 Order, Dkt. 106) to allow the payment of only six company employees for the sole purpose of assisting the Receiver's work, Raging Bull's requests for Defense Costs have been rejected because the Receiver does not believe he has the authority or obligation to meet those requests.

Defendants believe the TRO provides the Receiver with the authority and, indeed, the obligation to pay Raging Bull's Defense Costs. Specifically, under the TRO, "the Receiver is ***directed*** and ***authorized*** to" take certain actions, including:

- "Conserve, hold, manage, and prevent the loss of all Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those Assets."

- "Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver."

TRO, Section XIV(D) and (G).

In other words, the Receiver is "directed and authorized" under the TRO to "perform all acts necessary or advisable to preserve the value" of the company's assets, which necessitates making "payments and disbursements" from the company's assets to "[c]onserve, hold [] and prevent the loss" of company assets.

Raging Bull requests the Receiver make company funds available for defense against the FTC and New Hampshire Actions. This defense is essential to avoid unnecessary and unjust

9

liabilities and depletion of assets. Indeed, the TRO contemplates the need to defend against actions that may threaten the preservation of company assets. *See id.* at Section XIV(M) ("direct[ing] and authoriz[ing]" the Receiver to defend "any legal action in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order…"). It also contains a stay of civil actions, though it carves out actions brought by regulators. *See* TRO at Section XIX. Here, the company must defend itself in the FTC and New Hampshire Actions to work toward fair outcomes that preserve the assets of the company and does not subject to the company to unnecessary and unjust liabilities.

In addition, courts have found the payment of such defense costs from company assets to be appropriate. *See FTC v. Next-gen, Inc.*, No. 4:18-CV-00128-DGK, 2018 WL 8754140, at *1 (W.D. Mo. Aug. 3, 2018) (unfreezing approximately $400,000 in defendant company's funds to pay attorneys' fees incurred prior to and after the entry of a TRO, and allowing defendant to detail additional attorneys' fees and expert fees in response to court's show cause order).

As there is a clear dispute between Defendants and the Receiver as to the meaning of the TRO, Defendants respectfully ask the Court to provide clarification. Specifically, Defendants request the Court clarify that the TRO authorizes and ***directs*** the Receiver to make "payments and disbursements" from company assets to pay for the Defense Costs defined in Section I.

**V.   In the Alternative, the Court Should Approve the Use of Individual Assets so the Individual Defendants Can Pay the Defense Costs**

In the Court's Order denying Defendants' Motion to Modify the TRO, the Court noted that the Individual Defendants "may also make a specific application to the Court if there is a compelling need to draw additional funds from their personal accounts." 12/15/20 Order at 10. Similarly, after review of the Individual Defendants' financial disclosures, the Receiver suggested

that "[t]he individual defendants may, of course, move the Court for leave to apply [their individual] assets for legal defense or the employment of any individuals." Trahan Decl. at ¶ 19. If the Court declines to clarify that the TRO authorizes and requires the Receiver to pay the Defense Costs from the company's assets, the Individual Defendants request approval from the Court to draw on their individual assets to pay the Defense Costs.

Section IV of the TRO limits the Individual Defendants to the use of a cumulative amount of $25,000 of their individual assets, and prohibits the use of any additional individual assets "without prior approval of the Court." Those funds (some significant portion of which were needed to pay past liabilities, such as existing credit card balances and other household expenses, owing as of the date of the entry of the TRO, let alone basic future living expenses) are inadequate to fund a defense of the New Hampshire and FTC Actions. As such, the Individual Defendants request an increase in the amount of funds from their individual assets that they may draw from to allow for the payment of the Defense Costs. This is within the Court's discretion under Section IV of the TRO, and it is appropriate to allow the use of individual assets to provide for legal defense. *See FTC v. IAB Mktg. Assocs., LP*, No. 12-61830-CIV, 2013 WL 2433214, at *3 (S.D. Fla. June 4, 2013) (release of individual funds for attorneys' fees is appropriate because "the preliminary-injunction hearing and the legal work leading up to it is a chance for a defendant to show that the FTC is not likely to prevail on the merits. So although the merits of an action are not finally resolved when a preliminary injunction is entered, a highly relevant finding concerning the merits is made at that point."); *F.T.C. v. Think Achievement Corp.*, 312 F.3d 259, 262 (7th Cir. 2002) (stating that it is appropriate for a court to unfreeze individual funds for payment of attorneys' fees prior to court's determination as to which of defendant's assets were legitimate or a product of fraud). Indeed, the FTC has stipulated to preliminary injunction orders that allowed for the use of

individual defendant assets for the payment of attorney's fees. *See, e.g.*, *FTC v. Big Dog Solutions, LLC*, No. 16-cv-6607 (Dkt. 53), Stipulated Preliminary Injunction, at Section 3(E) (N.D. Ill. July 28, 2016) (despite asset freeze, allowing individual defendants subject to prior written agreement with plaintiff to "pay from their individual personal funds reasonable, usual, ordinary, and necessary living expenses and attorneys' fees").

If the Court denies this Motion in its entirety, and no funds are made available to pay Defense Costs from the company or individual assets, the Defendants will be effectively prevented from defending against serious allegations of defrauding consumers and conducting unlawful business operations. This defense is of particular importance in this case because the FTC has stated its intention on numerous occasions to permanently put Raging Bull out of business. Moreover, the FTC seeks to impose significant individual liability on the Individual Defendants, and may pursue lifetime bans from employment in their chosen industry despite the FTC neither having the authorization to do so nor seeking such relief in its complaint. This would be unjust and unfair, and would undermine the lawfulness of the proceedings in this Court and in New Hampshire. *See FTC v. Next-gen, Inc.*, No. 4:18-CV-00128-DGK, 2018 WL 8754140, at *2 (W.D. Mo. Aug. 3, 2018) ("[T]he Court here 'does not believe that it could achieve a fair result at the preliminary injunction hearing were it to deny defendants the ability to retain counsel. This is a complex legal matter, and lawyers are essential to the presentation of issues related to it.'") (quoting *S.E.C. v. Dowdell*, 175 F. Supp. 2d 850, 856 (W.D. Va. 2001) (ordering submission of "reasonable estimates of fees necessary to take [defendants] through the hearing on the preliminary injunction").

The FTC – which conducted a secret investigation over many months and with access to unlimited and unrestricted government funds before bringing an ambush lawsuit and obtaining an

*ex parte* TRO – would no doubt prefer an anemic defense, devoid of zealous legal counsel or expert testimony on the company's behalf and severely handicapping Defendants' ability to address the FTC's misdirected factual and legal allegations. Indeed, the FTC has made Raging Bull the "poster child" for its "illusory income" crackdown (*see* https://www.ftc.gov/news-events/blogs/business-blog/2020/12/operation-income-illusion-cracks-down-illusory-income-claims), effectively announcing Raging Bull and the Individual Defendants' culpability without so much as even informing Defendants that it was under investigation. The FTC's position is based solely on their <u>allegations</u> that Defendants defrauded consumers. But these are nothing more than mere allegations – false allegations which Defendants vigorously oppose. *See FTC v. 4 Star Resolution, LLC*, No. 15-CR-112S, 2015 WL 4276273, at *1 (W.D.N.Y. July 14, 2015) ("[I]t cannot be ignored that this suit was brought to establish the [D]efendants' wrongdoing; the [C]ourt cannot assume the wrongdoing before judgment in order to remove the [D]efendants' ability to defend themselves.'") (quoting *Fed. Sav. & Loan Ins. Corp. v. Dixon,* 835 F.2d 554, 565 (5th Cir. 1987).

**VI.   Conclusion**

WHEREFORE, Defendants RagingBull.com, LLC, Jeffrey M. Bishop and Jason Bond respectfully requests the Court allow for the payment of Defense Costs as more fully detailed in Section III herein and in the Proposed Order, attached hereto as Exhibit 2, and all further relief that the Court deems just and equitable.

Dated: January 5, 2021                        Respectfully submitted,

RagingBull.com, LLC, Jeffrey M. Bishop
and Jason Bond

By: /s/ *David G. Barger*
David G. Barger (DCB# 469095)
Greenberg Traurig LLP

        1750 Tysons Blvd.
        Suite 1200
        McLean, VA 22102
        Tel: (703) 749-1300
        Email: bargerd@gtlaw.com

        Andrew G. Berg (*admitted pro hac vice*)
        2101 L Street, N.W.
        Suite 1000
        Washington DC 20037
        Tel: (202) 331- 3100
        Email: berga@gtlaw.com

        Miriam G. Bahcall (*admitted pro hac vice*)
        Greenberg Traurig, LLP
        77 West Wacker Drive
        Suite 3100
        Chicago, IL 60601
        Tel: (312) 476-5135
        Email: bahcallm@gtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of January 2021 a true and accurate copy foregoing Defendants RagingBull.com, LLC, Jeffrey M. Bishop and Jason Bond's Emergency Motion for Clarification of the Temporary Restraining Order, or in the Alternative to Increase Funds Available to Individual Defendants to Pay Defense Costs, was properly served on all parties through the ECF system.

/s/ *David Barger*
David G. Barger (DCB# 469095)
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749-1300
Email: bargerd@gtlaw.com
