**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br> v. <br><br> **RAGINGBULL.COM, LLC**, et al., <br><br> Defendants. | Case No. 1:20-cv-3538 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS RAGINGBULL.COM, LLC, WINSTON CORP., AND WINSTON RESEARCH INC., JEFFREY M. BISHOP, JASON BOND AND KYLE W. DENNIS'S EMERGENCY MOTIONS FOR DEFENSE COSTS AND LIVING EXPENSES (ECF NOS. 107, 110, AND 112)**

Plaintiff Federal Trade Commission ("FTC") opposes Defendants RagingBull.com, LLC, Jeffrey M. Bishop, and Jason Bond's (collectively, "GT Defendants"[1]) requests to expend frozen or preserved funds on employee salaries, attorneys' and experts' fees, and living expenses (ECF Nos. 107, 110), as well as Defendants Winston Corp., Winston Research Inc., and Kyle W. Dennis's (collectively, "BSF Defendants";[2] collectively with the GT Defendants, "Defendants") request to expend preserved funds on attorneys' fees (ECF No. 112).

GT Defendants seek **$661,686** for employee salaries, attorneys' and experts' fees to defend against this action and another by the New Hampshire Department of State's Bureau of Securities Regulation. BSF Defendants seek to expend an unspecified amount on attorneys' fees. Defendants Bond and Bishop seek an additional **$80,000** in personal expenses, including

---

[1] Plaintiff refers to these Defendants as the GT Defendants because they are represented by Greenberg Traurig LLP.

[2] Plaintiff refers to these Defendants as the BSF Defendants because they are represented by Boies Schiller Flexner LLP.

1

**$30,000** for a patio renovation and furniture. These exorbitant and unsubstantiated expenses would deprive consumers of the limited funds available for relief. Furthermore, the GT Defendants ▇▇▇▇▇▇ have no basis for their requests, as they seek equitable relief with unclean hands.

## I.   BACKGROUND

This Court granted the FTC's emergency motion for a temporary restraining order ("TRO") in this matter on December 8, 2020. *See* ECF Nos. 21; 64. In granting the TRO, the Court reasoned that there is good cause to believe that: (1) Defendants were engaged in and likely to engage in violations of Section 5(a) of the FTC Act, 15 U.S.C. § 455(a) and Section 4 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403; (2) the FTC is likely to prevail in this action; and (3) absent an asset freeze and preservation order, Defendants would spend their ill-gotten gains, preventing effective final relief for consumers who were victimized by Defendants' scheme. ECF No. 64 at 2-3. The TRO thus placed a freeze on the corporate defendants' assets and required individual defendants to preserve their assets. *Id.* at 9-11.[3] The TRO permitted Jeffrey M. Bishop, Jason Bond and Kyle W. Dennis ("Individual Defendants") to spend up to $25,000 of their personal funds for any purpose. *Id.* at 9-10.

The GT Defendants now argue in a series of emergency motions—in which they are joined by the BSF Defendants with respect to attorneys' fees—that they should be allowed to further deplete assets available for consumer relief to pay their extravagant living expenses, employee salaries, and expensive lawyers and experts. The GT Defendants assert, without any basis, that the FTC's case rests on an "incomplete, inaccurate, and significantly biased view of Raging Bull's conduct" and that it is "essential" to spend hundreds of thousands of dollars in a

---

[3] The TRO was later modified to permit the receiver to pay certain administrative costs and employee wages in order to preserve information and materials of defendants. ECF No. 106.

short time period to "avoid unnecessary and unjust liabilities and depletion of assets."  ECF No. 107 at 2, 9-10.  The GT Defendants continue to level conclusory arguments that the entry of the TRO—which the Court has found good cause to grant based on more than 3,000 pages of evidence submitted in support of the FTC's application—was somehow unjust or improper.  But in support of their position, they offer not a single argument or defense relevant to the merits of the case.

Moreover, since the entry of the TRO, the Receiver has secured and the FTC has been able to access some of Defendants' internal communications and other records that corroborate the already extensive evidence of Defendants' illegal conduct.  For example: the FTC discovered in Defendants' files a letter the Better Business Bureau ("BBB") sent Defendant Bond on September 8, 2017, detailing a number of earnings claims made on jasonbondpicks.com and ragingbull.com, including "$500 in profits a day keeps the JOB away."  Fourth Declaration of Reeve Tyndall, PX 30, Att. A.  The BBB sought substantiation for such claims.  *Id*.  The BBB also identified a "pattern" of Raging Bull consumers complaining that the company continued to charge them after they had cancelled the company's services.  *Id*.  Despite requesting one, the BBB never received a response to its letter.  PX 22, Att. C, p. 1553.

The FTC also located an email in Defendants' files ███████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████

3

Defendants' requests range from vague (such as the GT Defendants' request to pay a prestigious law firm $300,000 for two months of work without describing counsel's work or billing arrangement) to absurd (such as Defendant Bond's request that the Court release $30,000 funds to cover furniture and his patio renovation). ECF Nos. 107, 110-1. Along the way, Defendants seek to flip the TRO on its head, requesting that the Court clarify that the TRO—which froze or ordered Defendants to preserve assets in order to protect "the Court's ability to grant effective final relief to consumers" (ECF 64, Finding E)—"directs the Temporary Receiver to use Raging Bull funds" to cover Defendants' defense costs (ECF 107 at 8). Further, despite requesting that the Court allocate frozen or preserved assets to cover their expenses, Defendants fail to show that they lack other means to fund their defense costs and living expenses.

## II.  GRANTING BISHOP AND BOND'S REQUEST FOR PERSONAL EXPENSES WOULD BE UNWARRANTED AND INEQUITABLE

Bishop and Bond request that the Court allow them to spend a combined **$80,000** of their personal funds on living expenses, in addition to the $50,000 in spending they were already permitted by the TRO. In support of these requests, Bishop and Bond cite to a single case[4], and provide conclusory and vague declarations. Bishop and Bond seek release of preserved assets to maintain or subsidize their luxurious lifestyles, at the expense of the consumers they deceived. The Court should deny these requests.

### A.  Equity Requires That Already Limited Funds Be Preserved For Consumer Relief

Bishop and Bond are not entitled to use preserved funds for their living expenses, as the equities weigh strongly in favor of the public's interest in preserving funds for injured consumers

---

[4] That case, *SEC v. Dowdell*, is inapposite, as the Securities and Exchange Commission—plaintiff in the matter--consented to the release of funds for such expenses. 175 F. Supp. 2d 850, 854-55 (W.D. Va. 2001). The court also reasoned that the *Dowdell* defendants were not seeking funds for luxuries. *Id*. That is not the case here, as discussed in more detail in Section II.C.

and strongly against Bishop and Bond's private interest in paying for their lavish lifestyle using funds obtained through a deceptive scheme. This Court may deny entirely, or severely limit, the payment of expenses in order to preserve frozen funds for consumer redress and disgorgement. *See CFTC v. Noble Metals, Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995); *FTC v. USA Financial, LLC*, No. 08-cv-899, 2008 WL 3165930, at *3 (M.D. Fla. Aug. 6, 2008), aff'd, No. 10-12152, Fed. Appx. 970 (11th Cir. Feb. 25, 2011). On a motion to release funds, "the defendant's interest in having access to funds needed to pay ordinary and necessary living expenses . . . must be balanced against the government's interest in preventing the depletion of potentially forfeitable assets." *United States v. Thier*, 801 F.2d 1463, 1474 (5th Cir. 1986), overruled on other grounds; *United States v. Holy Land Foundation*, 493 F.3d 469 (5th Cir. 2007).

The overarching goal of the Court should be the preservation of assets for ultimate return to consumers. *See FSLIC v. Ferm*, 909 F.2d 372, 374 (9th Cir. 1990) (discussing decisions that "recognized the importance of preserving the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another."). Courts have imposed constructive trusts to preserve assets for future redress to consumers when those assets were obtained by fraud. *See, e.g.*, *FTC v. Network Services Depot, Inc.,* 617 F.3d 1127, 1143 (9th Cir. 2010); *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 565 (D. Md. 2005) ("any proceeds of wrongdoing may be properly ordered held in trust for the victims of the wrongdoing").

When a district court determines that the FTC is likely to prevail in a final determination on the merits, as it has here, it has "a duty to ensure that . . . assets . . . [are] available to make restitution to the injured customers." *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1031 (7th Cir. 1988); *see also FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996); *FTC v. Ross*, 897 F. Supp. 2d 369, 386 (D. Md. 2012), citing *Ameridebt, Inc.*, 373 F. Supp. 2d at 562.

Indeed, private injuries "are not proper considerations for granting or withholding injunctive relief under Section 13(b)." *Ameridebt, Inc.*, 373 F. Supp. 2d at 564-65 (concluding that "in balancing the equities, the public interest predominates and will be best served by the appointment of a receiver, an asset freeze, an accounting, and a repatriation of Defendants' assets") (citing *FTC v. Food Town Stores*, 539 F.2d 1339, 1346 (4th Cir. 1976)).

Courts have also routinely denied requests for living expenses and attorneys' fees where, as here, the amount frozen is less than the amount needed to compensate injured consumers. *See Noble Metals*, 67 F.3d at 775 (affirming district court's denial of attorneys' fees where "the frozen assets fell far short of the amount needed to compensate [defendant's] customers"). Here, the assets currently frozen constitute a small fraction of the more than $137 million in harm caused by Defendants' conduct that would be required for consumer redress. *See* PX 24, ¶ 10 (establishing consumer harm at more than $137 million); Declaration of Roshni C. Agarwal, PX 31, ¶ 8 ($10,930,176.14 frozen). This reason alone is sufficient to deny Defendants' motions. *See World Travel Vacation Brokers, Inc.*, 861 F.2d at 1031 (court should "ensure that the assets . . . [remain] available to make restitution to the injured customers").

**B.   Bishop and Bond Have Not Demonstrated That They Lack Other Assets or Sources of Income**

The TRO entered in this matter does not prohibit the Individual Defendants from engaging in lawful, gainful employment, asking for financial assistance or obtaining a loan from a family member or friend, or incurring credit card debt. This Court expressly directed Defendants to look to these alternate sources of income when it denied their motion to stay the entry of the TRO. ECF No. 56 at 10 (noting that "Defendants may seek a bridge loan, [or] borrow from family and friends" in order to obtain funds while the TRO is in effect).

Despite this clear direction from the Court, neither Bishop nor Bond has made any showing that they have sought other employment, or sought funds from family members, friends, or from a credit line in order to provide for their living expenses.  Nor have they demonstrated any efforts to borrow from business partners or connections who are not subject to the TRO.  Indeed, courts in the Fourth Circuit have recognized that defendants' failure to make efforts to obtain funds is fatal.  *See SEC v. North Star Fin., LLC*, 2017 U.S. Dist. LEXIS 15870, at *5-6 (D. Md. Feb. 3, 2017) (release of additional frozen assets for personal expenses denied because defendant "should be actively pursuing financial self-sufficiency"); *United States v. Jamie*, No. 2:10-CV-00498, 2011 WL 145196, at *3 (S.D.W. Va. Jan. 18, 2011) (denying release of living expenses in part because defendant failed to show "efforts to attain alternate sources of income").

    **C.**    **Bond and Bishop Seek Expenses That Clearly Do Not Qualify as Necessary Living Expenses**

If a court releases funds for expenses under these circumstances, the expenses must be limited to amounts that are both reasonable and necessary.  *See, e.g.*, *Noble Metals*, 67 F.3d at 775, n.8; *SEC v. Private Equity Mgmt. Grp., Inc.*, No. CV 09-2901, 2009 WL 2058247, at *4 (C.D. Cal. July 9, 2009).  While Bishop and Bond are vague as to what the requested funds will pay for, to the extent they do provide specifics, they seek the release of assets to maintain or subsidize their luxurious lifestyles.  Defendant Bond asks this Court to release **$30,000** in funds subject to the TRO's asset preservation requirement for the following extravagant home improvement expenses:  (1) **$9,674.00** for a sectional couch and coordinating loveseats[5]; (2) **$1,803.78** for architecture services; (3) **$6,632** to pay a landscape architecture firm to design and

---

[5] Defendant Bond states in his declaration that he has no credit cards.  ECF No. 110-1, ¶12.  But the furniture invoice he attaches to his declaration shows that he paid a deposit of nearly $3,000 on a credit card, suggesting that he does in fact have access to a credit card for living expenses.  *Id*. at 10.

7

build a pavilion and boathouse; and (4) **$35,885** to install a stonework patio or similar outdoor structure.  Typically a court will deny such a request where the defendant requests "funds for luxuries rather than necessities" or where the defendant has "other sources of income."  *Private Equity Mgmt. Grp., Inc.*, 2009 WL 2058247, at *3; *see also SEC v. Coates*; No. 94 Civ. 5361, 1994 WL 455558, at *2 (S.D.N.Y. Aug. 23, 1994) (rejecting a request for funds to pay for "lawn service").  Such is the case here.

Bond and Bishop also seek an unspecified amount of funds for "connectivity technology," and Bishop seeks an unspecified amount of funds to pay his credit card bills, although he fails to explain what living expenses he incurred on his credit card.  *See* ECF No. 110-1, ¶ 14; ECF No. 110-2, ¶ 13.  Courts have previously concluded that these types of expenses cannot be considered reasonable or necessary.  *See, e.g.*, *SEC v. Forte*, 598 F. Supp. 2d 689, 694 (E.D. Pa. 2009) (premium television services, cellular telephones, home phone, high-speed internet, and credit card debt are not "necessary" living expenses).

In denying the Defendants' motion to stay entry of the TRO, this Court noted that Defendants may apply for a release of personal funds if they have a "compelling need," but Defendants have made no such showing here.  *See* ECF No. 56 at 10.

### III.     THE COURT SHOULD DENY DEFENDANTS' REQUEST FOR EXORBITANT "DEFENSE COSTS"

GT Defendants seek in excess of **$661,000** for costs they will incur or have incurred defending themselves in this action and another civil law enforcement action brought by the New Hampshire Department of State's Bureau of Securities Regulation.  Specifically GT Defendants seek to spend the following:

1. **$300,000** to pay counsel from Greenberg Traurig LLP for work performed and to be performed between December 7, 2020, and February 5, 2021;

8

2. **$125,000** for unidentified experts to perform unidentified work over an unidentified period;

3. **$136,686.66** to employ six Raging Bull employees from December 1, 2020 through February 5, 2021; and

4. **$100,000** in attorneys' fees to defend the New Hampshire action.[6]

Besides the $100,000 for the New Hampshire action, all these proposed costs are to prepare for the February 5, 2021 preliminary injunction hearing. These costs are both excessive and unsubstantiated. The BSF Defendants make an even more extraordinary request—that they be permitted to expend an unspecified amount of funds currently preserved for consumer relief defending this action. ECF No. 112.

Without showing that their attorneys' fees are reasonable or establishing that they are necessary, Defendants request that the Court release funds so that they can pay hundreds of thousands of dollars to two nationwide law firms.[7] Further, in requesting access to funds subject to the TRO, Defendants' counsel is competing with injured consumers for the funds generated by Defendants' misconduct. Equity favors preserving these funds, which do not properly belong to Defendants, for the benefit of injured consumers rather than diverting them to expensive

---

[6] ECF No. 107 at 8.

[7] Defendants wrongly characterize their request for defense costs as a motion to clarify the TRO. In order to protect assets subject to the TRO, the Court "directed and authorized" the Temporary Receiver to "[m]ake payments and disbursements from the receivership estate that are necessary or advisable" to "[c]onserve, hold, manage, and prevent the loss of all Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those Assets." ECF No. 64, Sections XIV(D), (G). Defendants argue these provisions obligate the Temporary Receiver to pay their personal and corporate defense costs, as though the receivership were a trust established for their benefit. In reality, Defendants are subject to a TRO, with their assets frozen or preserved, because the Court found there is good cause to believe that Defendants violated the law and would dissipate or conceal their assets absent Court order. ECF No. 64, Findings C and E. The Court should reject Defendants' effort to modify the TRO and treat Defendants' request for defense costs as a request that the Court exercise its discretion to make certain funds available to Defendants.

counsel—not least because each Individual Defendant can seek lawful employment and may have other resources available to him. Each of these arguments is detailed below.

### A. Equity Favors Preserving Assets for Consumers Rather Than Paying Defense Costs

Courts routinely deny or severely limit requests to use frozen or preserved funds for attorneys' fees where such payment would reduce the frozen assets available to compensate injured consumers at the end of the case. *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989); *Noble Metals*, 67 F.3d at 775; *SEC. v. Current Fin. Servs.*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999) (denying a request for attorneys' fees because "[t]he frozen assets clearly do not exceed plaintiff's approximation of liability"). The victims in this case have paid far more than remains for consumer relief. PX 31, ¶ 8. For this reason alone, the request should be denied.[8]

Defendants argue that courts have allowed the release of frozen funds for attorneys' fees prior to the preliminary injunction hearing, but courts have also rejected requests for attorneys' fees before a preliminary injunction is in place. *See, e.g.*, *FTC v. Elite IT Partners, Inc.*, No. 2:19-CV-125, 2019 WL 1568400, at *1-*2 (D. Utah Apr. 5, 2019) (rejecting a defendant's request to release funds subject to receivership under a TRO because although the defendant claimed the funds were "necessary to pay for a full and proper defense at the forthcoming preliminary injunction hearing," he failed to show that equity favored releasing the funds); *see also FTC v. 4 Star Resolution, LLC*, No. 15-CR-112S, 2015 WL 4276273, at *1-*2 (W.D.N.Y. July 14, 2015) (denying a release of funds frozen by a TRO for defendants' attorneys' fees).

---

[8] Likewise, equity does not allow the GT Defendants to expend further frozen or preserved funds to defend against other serious law violations they have committed along the way, including dedicating these funds to enable GT Defendants' lawyers to defend the New Hampshire Department of State's Bureau of Securities Regulation's action.

### B. Defendants Have Not Demonstrated That They Lack Other Assets or Sources of Income

In addition, Defendants' request should be denied because they have failed to show that they lack access to other assets that could be used to pay their attorneys' fees. *See, e.g.*, *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 565 (5th Cir. 1987) (the burden is on defendant "to show that he cannot pay them from new or exempt assets" and "to satisfy the court that he can secure the services of an attorney only if assets subject to the freeze order are released"); *Elite IT Partners, Inc.*, 2019 WL 1568400, at *2 (D. Utah Apr. 5, 2019) (denying motion for release of attorney's fees from asset freeze where defendant "supplies no testimony or evidence describing any efforts to finance his legal expenses through new employment, available lines of credit, loans, or any other potential sources of funds"); *FTC v. Digital Altitude*, No. LA CV18-00729 JAK (MRWx), 2018 WL 4944419, at *9 (C.D. Cal. July 26, 2018) (denying fee request where defendants "had been able to obtain approximately $35,000 and used it to pay their legal fees," and failed to provide evidence that defendants had "actually taken steps to seek employment" or establish whether defendant's "spouse has been, or could become, employed").[9]

As described above in Section II.B., Defendants Bishop's and Bond's declarations provide no evidence that they made any efforts to obtain funds from gainful employment or other sources. And Defendant Dennis submitted no declaration or other evidence regarding his financial status to support his claim for legal fees.[10]

---

[9] In one case Defendants cite, *FTC v. 4 Star Resolution, LLC*, the court similarly concluded that the burden falls on defendants and that absent an accounting of defendants' financial state, a release of fees would be unwise. 2015 WL 4276273, at *1-*2.

[10] Dennis also contends that because he is not an "officer, director or owner" of Raging Bull, he is required to personally finance the costs of his defense and that it would be inappropriate to hold him liable for Raging Bull's conduct. ECF No. 112 at 1-2. Dennis' belated attempt to inoculate himself from Raging Bull's fraudulent practices is unavailing, when in fact he was a critical actor in the illicit scheme. The FTC's moving brief details extensive evidence of Dennis's direct participation in Raging Bull's deceptive marketing since at least 2016. ECF No. 2, pp. 32-36.

Defendants have not demonstrated that they lack access to assets or income sources that may be used to pay their legal fees pursuant to the TRO. Nor have they established a "compelling need" for this Court to grant their request to expend personal funds for their defense, and therefore their requests should be denied. *See* ECF No. 56 at 10.

### C. The Proposed Defense Costs Are Vague, Unsubstantiated, and Extravagant

GT Defendants seek $300,000 to pay counsel from Greenberg Traurig LLP for work performed and to be performed between December 7, 2020, and February 5, 2021 and $125,000 for unidentified experts to perform unidentified work over an unidentified period. GT Defendants provide only a generic description of counsel's work: "to defend the FTC Action, including preparing for and participating in the preliminary injunction hearing." ECF No. 107 at 8. BSF Defendants provide even less detail; they simply seek carte blanche to use personal assets to pay counsel from Boies Schiller Flexner LLP. None of the Defendants provides the Court sufficient information to evaluate the request, such as specific tasks contemplated, hours allotted to them, or information about payments already made to counsel.

Consider, for reference, the lodestar analysis this circuit conducts to calculate the fee award for prevailing parties, which is based on identifying "the number of reasonable hours expended" and a reasonable rate for counsel's work. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). Courts consider twelve factors in determining reasonable hours and rates,[11] and the applicant must submit "contemporaneous time records that reveal all hours

---

[11] The factors are "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the

12

for which compensation is requested and how those hours were allotted to specific tasks." *CoStar Grp., Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000).[12] The applicant must document, "for each attorney, the date, the hours expended and the nature of the work done," and the court can reduce the fee award if the documentation is vague or incomplete. *Id.* Defendants in this case are not prevailing parties. They are asking the Court to release funds subject to a TRO but have provided the Court little or no information in support of the requested attorneys' fees.

Based on what little information Defendants have provided, their fees appear to be extravagant. GT Defendants' counsel seeks $300,000 for roughly two months of work. Approximately half of this period—which included two federal holidays—has already passed. For reference, three attorneys working five hours per day over 20 work days (approximately one month) would need to bill an average of $500 per hour to cost $150,000 in that span. Given that counsel has not yet answered Plaintiff's Complaint (ECF No. 1), raised substantive defenses, issued or responded to discovery, or attended a deposition, the GT Defendants' request for fees is excessive.

For similar reasons, the Court should deny GT Defendants' request for $125,000 to pay two experts. GT Defendants do not identify the experts they seek to pay or even hint at a defense they hope to assert. They do not state why they seek no less than two experts or identify the

---

experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *CoStar Grp., Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 787 (D. Md. 2000).

[12] Similarly, Local Rule 109.1.b requires prevailing parties that seek attorneys' fees to provide "a detailed description of the work performed broken down by hours or fractions thereof expended on each task, the attorney's customary fee for such like work, the customary fee for like work prevailing in the attorney's community, a listing of any expenditures for which reimbursement is sought, any additional factors which are required by the case law, and any additional factors that the attorney wishes to bring to the Court's attention."

experts' respective areas of expertise. They do not state the experts' billing rates. They do not state how long they expect these funds to last. Neither do they cite case law supporting their request. GT Defendants fail to substantiate their need for expert costs or demonstrate that releasing $125,000 of funds currently being preserved for consumer victims would be equitable.

> D. **The Court Should Not Grant GT Defendants' Extraordinary Request to Fund Six Additional Employee Salaries With Funds Preserved For Consumer Relief**

Defendants assert that they need to pay the salaries of no less than six unidentified employees to assist in their defense, in addition to the six the Temporary Receiver has already obtained this Court's permission to pay. *See* ECF No. 106. As GT Defendants acknowledge in their first emergency motion (ECF No. 107), this is not the first time GT Defendants have sought to use receivership funds to pay RagingBull.com LLC ("Raging Bull") employees. In denying Defendants' Motion to Stay Enforcement or Modify Temporary Restraining Order, the Court "encourage[d] the parties to work collaboratively to reach a resolution to this matter with the understanding that many employees who may not be involved in the alleged unlawful business practices will be adversely impacted." ECF No. 56 at 10. This has already happened. Raging Bull and the Temporary Receiver negotiated a list of six employees whose wages and benefits the Temporary Receiver would pay through January 15, 2021.[13] The Temporary Receiver filed a motion for leave to pay these expenses on December 31, 2020, (ECF No. 105), which the Court granted on January 4, 2021 (ECF No. 106). GT Defendants did not object to this motion; in fact, they waited until after the Court granted it to raise the purported need to pay six additional employees.

---

[13] These six employees are not the ones the GT Defendants now seek to pay with funds preserved for consumer relief. *See* ECF No. 107-1, ¶20.

The Court should deny this request for several reasons. First, Defendants should not be allowed to extract what they can from negotiations with the Temporary Receiver, consent to motions resulting from such negotiations, wait until the Court orders the requested relief, and immediately ask the Court to fund additional employee's salaries. This new request is an inefficient use of the Court's resources, and it undermines the parties' ability to negotiate without involving the Court.

Further, as GT Defendants note, the Temporary Receiver informed them that the only acceptable reasons for continued employment would be "(i) to ensure the preservation of information and systems; (ii) to provide access by the temporary receiver to information and materials; and (iii) to ensure that the business can remain operational (with no outward-facing operations)' until the preliminary injunction hearing." ECF No. 107; ECF No. 107-1 at 12. But by GT Defendants' own terms, they seek to pay these additional six employees as "Defense Costs" to contribute to their defense against "the allegations of unlawful conduct by the FTC and the New Hampshire Bureau." ECF No. 107 at 8; ECF No. 107-1 ¶ 20. Similarly, Raging Bull told the Temporary Receiver that it sought funds for employees in order to "support litigation/discovery." ECF No. 107-1 at 9. In fact, the Temporary Receiver's counsel told Raging Bull that the Temporary Receiver refused to employ four "Marketing Evidence Support" employees because they did not serve an appropriate purpose. ECF No. 107-1 at 12. Indeed, to the extent Defendants are now asking that frozen or preserved funds be expended to enable them to gather substantiation for their marketing claims, that's too late: they were required to have the substantiation *before* making the claims. *See FTC v. Lights of Am., Inc.*, No. SACV10-01333 JVS, 2013 WL 5230681, at *48 (C.D. Cal. Sept. 17, 2013). Nevertheless, three of the employees GT Defendants ask the Court to order the Temporary Receiver to fund are in the "Marketing

15

Evidence Support" department, which accounts for more than $90,000 of the requested $136,686.66. GT Defendants offer the Court no reason to override the Temporary Receiver, cite no case law supporting their argument, and fail to demonstrate the need to employ the six individuals at issue.

     **E.**    **Defendants' Counsel Assumed The Risk of Nonpayment And Should Continue To Bear This Risk Rather Than Draw Funds From Consumers' Losses**

Courts routinely deny requests to release funds to pay counsel engaged after an asset freeze was in place. *See, e.g.*, *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 80 (3d Cir. 1993) ("Lastly, Maxwell's current attorneys entered their appearance after Maxwell's assets were already frozen and thus should have recognized that there might be some delay in obtaining reimbursement for services rendered.").[14] The FTC informed Defendants' counsel that it would seek an asset freeze and preservation order when it notified counsel of its intent to bring this case—*i.e.*, before counsel were actually engaged to represent Defendants in the case. Indeed, Defendants' counsel entered appearances in this case after the Court issued the TRO. ECF Nos. 21 (TRO), 22 (Entry of Appearance by David G. Barger), 24 (Motion to Appear Pro Hac Vice for Andrew Geoff Berg), 25 (Motion to Appear Pro Hac Vice for Miriam Goldman Bahcall), and 34 (Entry of Appearance by Jonathan Shaw). Counsel therefore understood and accepted the risk of delayed payment.

Moreover, Defendants' counsel is seeking to be paid, in part, for work performed between December 7, 2020, and the date Defendants filed their emergency motions seeking defense costs.

---

[14] *See also FTC v. Sharp*, No. CV-S89-870 RDF (RJJ), 1991 WL 214076, at *4 (D. Nev. July 23, 1991) (where an attorney knows about an asset freeze prior to representing a client, the victims "have a stronger claim to the frozen assets" than the attorney); *FTC v. LoPinto*, No. CV-S-93-0561, 1994 U.S. Dist. LEXIS 21695, at *3 (D. Nev. Feb. 1, 1994) ("Defendants' counsel [] was aware [that assets were frozen because they appeared to have been fraudulently obtained from innocent consumers] yet he chose to work for defendants anyway. [Counsel] assumed the right of non-payment or at least delayed payment.").

16

It is not clear why Defendants claim it is an emergency that counsel be paid for work counsel performed knowing its clients' assets were subject to a TRO.  Instead of waiting one month to seek legal fees, allowing fees to accrue while delaying case deadlines, counsel could have filed an emergency motion to clarify whether they could be paid using funds covered by the TRO when they entered appearances in this case.  Rather than seek immediate clarity about the availability of funds, Defendants' counsel waited nearly one month, which further demonstrates that they accepted the risk of nonpayment or delayed payment.  *See LoPinto*, 1994 U.S. Dist. LEXIS 21695, at *3 ("[Defendants'] assets have been frozen because they appear to have been fraudulently obtained by defendants from innocent consumers.  Defendants' counsel [] was aware of this fact yet he chose to work for defendants anyway. [Counsel] assumed the risk of non-payment or at least delayed payment.").  The Court should decline Defendants' request to dissipate receivership assets—already less than the amount Defendants' victims lost— to insure costly counsel against a known risk.

### IV. GT DEFENDANTS' ███████████████ UNCLEAN HANDS BAR THEIR CLAIMS FOR EQUITABLE RELIEF

The Court should bar the GT Defendants' ███████████ requests because they made bad-faith asset transfers after learning that the FTC would seek a TRO.  "'[H]e who comes into equity must come with clean hands.'"  *Miller v. Hooks*, 749 F. App'x 154, 161 (4th Cir. 2018) (quoting *Precision Instrument Mfg, v. Automotive Maintenance Machinery*, 324 U.S. 806, 814 (1945)).  The unclean hands doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Id.*  For example, in *SEC v. Illarramendi*, the court held that equity required it to bar a moving party's request for legal fees because the party had transferred funds "with knowledge that an asset freeze was imminent."  No. 3:11CV78 JBA, 2014 WL 8019048, at *11 (D. Conn. Mar. 27, 2014).

Here, the same facts compel the same result. On December 7, 2020 at 7:05am Eastern Time, the FTC emailed Jeff Bishop, Jason Bond, Kyle Dennis, and Allan Marshall the FTC's pleadings, including the Complaint and the proposed TRO containing asset freeze and asset preservation provisions. *See* PX 28, ¶ 3. ▮

▮ Also on December 7, 2020, RagingBull.com LLC wired $2 million to Greenberg Traurig, which now represents the GT Defendants in this action. PX 28, ¶ 11.[15] ▮

## V. CONCLUSION

Defendants took over $137 million from consumers through deception. They now want the Court to release frozen or preserved moneys to fund their team of expensive lawyers, employees of the scheme, and unidentified expert witnesses. Defendants Bishop and Bond also ask this Court to subsidize their expensive lifestyles. The amount that is frozen for potential redress is a small fraction of the enormous injury Defendants caused. Defendants provide no evidence that they do not have access to alternative funds to pay the claimed expenses, and they make no showing that the expenses they seek to pay are necessary or reasonable. Finally, the GT Defendants ▮ have unclean hands with respect to their conduct leading up to

---

[15] After communications with FTC counsel regarding this transfer, Greenberg Traurig provided a sworn affidavit stating that the $2,000,000 is being held in the firm's trust account.

the issuance of the TRO, and cannot seek equitable relief now.  The FTC respectfully requests that the Court deny Defendants' requests in their entirety.

                                        Respectfully submitted,

                                        Alden F. Abbott
                                        General Counsel

Dated: January 11, 2021                    /s/ Colleen Robbins
                                        Colleen Robbins (D. Md. Temp Bar No. 92567)
                                        Sung W. Kim (D. Md. Temp Bar No. 814609)
                                        Gordon E. Sommers (D. Md. Temp. Bar No. 814431)
                                        Thomas Biesty (D. Md. Temp. Bar No. 814459)
                                        Federal Trade Commission
                                        600 Pennsylvania Ave., NW
                                        Mailstop CC-8528
                                        Washington, DC 20580
                                        (202) 326-2548; crobbins@ftc.gov
                                        (202) 326-2211; skim6@ftc.gov
                                        (202) 326-2504; gsommers@ftc.gov
                                        (202) 326-3043; tbiesty@ftc.gov
                                        (202) 326-3395 (Facsimile)

                                        *Attorneys for Plaintiff*
                                        *Federal Trade Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2021, I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to counsel of record for Defendants.

                                                      */s/* Colleen Robbins
                                                      Colleen Robbins