**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-03538 - GLR |
| | ) | |
| RAGINGBULL.COM, LLC f/k/a | ) | |
| LIGHTHOUSE MEDIA LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' CONSOLIDATED RESPONSE TO ORDER TO SHOW CAUSE
<u>WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE</u>**

## TABLE OF CONTENTS

RAGING BULL DEFENDANTS' RESPONSE.................................................................1

INTRODUCTION...........................................................................................1

BACKGROUND ............................................................................................3

    I.     Jason Bond Picks and the Creation of Raging Bull .................................3

    II.    Raging Bull's Services ..............................................................5

    III.   Raging Bull's Efforts to Strengthen and Improve Compliance and Customer Service.......................................................................8

    IV.   Raging Bull's Subscribers ..........................................................9

    V.    Harm Caused by the TRO ..........................................................9

LEGAL STANDARD ....................................................................................11

ARGUMENT ..............................................................................................13

    I.     Raging Bull's Experts Demonstrate the FTC's Fatal Errors....................13

         A.    The FTC Obtained an *Ex Parte* TRO and Now Seeks a Preliminary Injunction Based on Wermers' Grossly Flawed Assessment of Defendants' Trading..................................................13

         B.    The FTC's Allegations of Deceptive Advertising are Unfounded and Not Supported by Empirical Evidence ............................17

              1.    The FTC's Implicit Assumptions Are Inherently Flawed...................17

              2.    The Company's Target Audience—the "Reasonable Consumer" for FTC Deception Analysis Purposes—Is Neither Elderly Nor Likely To Be Deceived.........................................20

              3.    Given Raging Bull's Market Competition, There Is a Higher Likelihood that Consumers are Familiar with Industry Terms and Conditions ..................................................21

              4.    Because Raging Bull's Services Are High Involvement Products—Not Purchased on Impulse—Consumers Are Not Likely To Rely Only On Advertising and Sales Initiatives.................22

              5.    Raging Bull's Business Model, Sales Compensation System, and Choice Architecture Are Not Consistent With That of a Company That *Can* Benefit from Consumer Deception.......................22

6.     The FTC's Arguments About Raging Bull's Advertisements and Income Potential Claims Do Not Demonstrate a Case of Deception ............................................................................................24

7.     The Remaining Evidence Offered by the FTC to Make Its Deception Case is Inconsistent with Required, Sound, Scientific Methods ............................................................................................24

II.     The FTC Does Not Have a Likelihood of Success on the Merits ............................25

    A.     The FTC Has Neither Met Its Burden for Prevailing on a Preliminary Injunction Request Nor Satisfied the Legal Standard for Proving Deception. .........................................................................................25

        1.     FTC Act Section 5 and the FTC's Deception Standards ....................25

        2.     The FTC Must Demonstrate the "Net Impression" of Defendants' Statements Were in Fact Misrepresentations .........................................27

    B.     Defendants Have Substantiation or a Reasonable Basis for Statements Concerning Trading Profits, and Does Not Cherry-Pick Wins ....................28

    C.     Defendants Provide a Good Product of Value to Subscribers .......................31

    D.     Defendants Do Not Deceive or Mislead Consumers about the Likelihood of Success Using Raging Bull's Services ..................................33

    E.     Defendants Do Not Deceive or Mislead Consumers as to the Level of Skill Required for Trading ..............................................................35

    F.     Defendants' Use of Unpaid Consumer Testimonials with Disclaimers Is Not Deceptive or Misleading ...................................................................36

        1.     The FTC Disregards Defendants' Robust and Conspicuous Testimonial Disclaimer ....................................................................36

        2.     The FTC Improperly Disregards the Use of Disclaimers, Failing to Meet Its Preliminary Injunction Burden ..........................................40

    G.     Defendants Have Addressed the Issues with Refunds, Cancellations and Chargebacks ..............................................................................................42

III.     The Balance of Equities Favors Defendants as the Public Interest Will Not be Served by the FTC's Requested Relief ..............................................................45

    A.     No Substantive Restrictions or Obligations Sought by the FTC are in Dispute, as Defendants will Stipulate to Comply with Section I and II of the TRO to the Date of Trial ...................................................................46

B.      There is No Basis for the Requested Asset Freeze, Which is Inequitable and Would Deplete Assets ............................................................................. 46

C.      The Appointment of a Receiver is Unnecessary ............................................. 49

**KYLE DENNIS AND THE WINSTON ENTITIES' RESPONSE** ........................................ **51**

RELEVANT FACTS ........................................................................................................ 53

ARGUMENT ................................................................................................................... 56

I.      The FTC Cannot Demonstrate that Mr. Dennis is Individually Liable for the Alleged Deceptive Practices Under the FTC Act ................................................ 56

A.      Mr. Dennis Did Not Participate In Any Deceptive Practice or Have the Authority to Control Any Deceptive Practice .................................................. 57

1.      Mr. Dennis Does Not Directly Participate In or Have the Authority to Control Raging Bull's Allegedly Deceptive Advertising. ....................................................................................... 58

2.      Raging Bull's Biotech Breakouts Brand's Paid Content is Not Deceptive in Any Way. ........................................................................ 65

B.      Mr. Dennis Did Not Have Knowledge of Any Deceptive Practice. ............... 69

II.      The FTC Cannot Demonstrate that The Winston Entities Participated in a Common Enterprise .......................................................................................... 71

III.      The FTC Does Not Attempt To Demonstrate That Mr. Dennis or the Winston Entities Are Liable Under Its ROSCA Claims. ................................................... 73

IV.      The Equities Weigh Strongly Against Enjoining Mr. Dennis or the Winston Entities. ......................................................................................................... 73

V.      Even If the Court Concludes that An Injunction Is Appropriate, the FTC Will Be Unable to Hold Mr. Dennis Jointly And Severally Liable. ........................ 76

**MFA HOLDINGS CORPORATION'S RESPONSE** ....................................................... **80**

INTRODUCTION ............................................................................................................. 80

ARGUMENT ................................................................................................................... 82

I.      The Injunctive Relief is Moot as to MFA and is Overbroad ..................................... 82

II.      The FTC Failed to Demonstrate That It Is Likely to Prevail on the Merits ............. 84

A.     The FTC's Reply Demonstrates that Mr. Marshall and MFA Were Not Involved in Creating the Challenged Advertising Materials. .........................84

B.     The FTC Failed to Show that MFA Was Part of Any "Common Enterprise" with the Other Defendants. ........................................................88

C.     The Balance of the Equities Weigh Against Entering the Injunction, Even as Modified, and The Public Interest Would Not Be Advanced by Entering Injunctive Relief As to MFA ......................................................92

CONCLUSION.......................................................................................................................93

Defendants, by and through undersigned counsel, submit this response to the Federal Trade Commission's ("FTC" or "Plaintiff") motion for an order to show cause why a preliminary injunction should not issue ("Motion"), and in support state as follows.   Defendants RagingBull.com, LLC ("Raging Bull"), Jeffrey M. Bishop, Jason Bond, Sherwood Ventures, LLC, and Jason Bond, LLC (collectively, "Raging Bull Defendants") set forth their response on pages 1 to 50; defendants Kyle Dennis, Winston Corp., and Winston Research Inc. set forth their response on pages 51 to 79; and defendant MFA Corporation sets forth its response on pages 80 to 93.[1]

## RAGING BULL DEFENDANTS' RESPONSE

### INTRODUCTION

The FTC seeks its preliminary injunction based on claims of false advertising. Rather than focus on specific representations in advertising it believes to have been deceptive, the FTC claims that any and all advertisement are false because the company is "permeated with fraud." In an effort to paint RagingBull.com, LLC ("Raging Bull") as a fraudulent company," the FTC has provided inaccurate and misleading evidentiary claims and thereby misled the Court and the public.  As a primary example, the FTC's purported expert, Russell Wermers, opines that Raging Bull and its co-founders had trading losses of over $56 million from 2014 to 2018, and the trading accounts used by Raging Bull's lead guru Jason Bond had $7.5 million in trading losses in that same time period

---

[1]      Defendants are also filing the following exhibits in support of this response:  Expert Report of Bates Group and Greg Kyle (Exhibit 1); Expert Report of Dr. Yoram Wind (Exhibit 2); Declaration of Jason Bond (Exhibit 3); Second Declaration of Jeffrey M. Bishop (Exhibit 4); First Declaration of Stephen Prior (Exhibit 5); Declaration of Kyle W. Dennis (Exhibit 6); and Second Declaration of Allan Marshall (Exhibit 7).
       As used in the Raging Bull Defendants' Response, "Defendants" refers to the Raging Bull Defendants, and "Individual Defendants" refers to Defendants Jeffrey M. Bishop and Jason Bond.

Wermers' analysis is deeply flawed and does not reflect the trading activity of the accounts he reviewed. The impact of Wermers' errors is massive. The purported $56 million trading loss never happened. And Jason Bond did not have $7.5 million in trading losses from 2014 to 2018. Rather, as Defendants' expert demonstrates,[2] Jason Bond had a realized trading profit of over $500,000 in the accounts Wermers reviewed during that time period.

Based on Wermers' flawed analysis, the FTC attacks Jason Bond's earnings claims and the very efficacy of the trading strategies he and Raging Bull's other gurus teach. For instance, the FTC contends that Jason Bond misrepresented that his trading was up 170% in 2015 because, according to Wermers, he actually had "losses exceeding $800,000" in 2015. Wermers is wrong. As Defendants' expert shows, Jason Bond had an internal rate of return of 168 percent in 2015, and that he made about $140,000 in trading profits.

Because Wermers mistakenly or negligently opines that Jason Bond is a terrible trader who has lost $7.5 million between 2014 and 2018, it is unsurprising that Wermers also concludes that these "sizeable and consistent losses over many years, including periods of rising stock markets … are consistent with the general lack of efficacy" of the trading strategies and methodologies that Jason Bond teaches subscribers. The entire foundation of Wermers' opinions, and the FTC's reliance on Wermers, collapses under his flawed trading analysis. Plus, perhaps unknown to Wermers given that he is not a trader and contrary to Wermers' unfounded opinion, there are many others in the marketplace who are successfully teaching and using trading methods similar to those employed by Jason Bond and others at Raging Bull.[3]

---

[2] *See* Initial Expert Report of Bates Group LLC and Greg A. Kyle ("Bates") (**Exhibit 1**).

[3] *See* Report of Dr. Yoram Wind, Assessing the Validity of the Allegations in the FTC Complaint and Request for a Preliminary Injunction in FEDERAL TRADE COMMISSION v. RAGINGBULL.COM, LLC, et al., Case 1:20-cv-03538-GLR ("Wind Report") (**Exhibit 2**), at ¶

The FTC obtained an *ex parte* TRO, and now asks the Court to enter an oppressive and unnecessary preliminary injunction designed to completely shut Raging Bull down, based in part on this false picture of Raging Bull as trading phonies. But in the FTC's rush to convince the Court and the public that Raging Bull is "permeated with fraud," the FTC commits another fatal error. It fails to consider any of the existing empirical evidence necessary to determine the validity of its claims and assumptions underlying them. Instead, the FTC bases its conclusions on a few anecdotal (and unvalidated) stories and cherry-picked ads.

Unlike the FTC – which despite conducting its secret investigation for many months – Raging Bull employed Dr. Yoram Wind, a Professor of Marketing at the Wharton School, to conduct this analysis. Had the FTC conducted the proper analysis, the FTC would have concluded, as did Dr. Wind, that the empirical evidence suggests that subscribers received value and that the reasonable consumer in the target audience of 18-45 year-olds simply was not deceived.

For these reasons, the FTC has not met its burden and it should be denied the over-reaching injunctive relieve it seeks against Defendants.

## BACKGROUND

### I.     Jason Bond Picks and the Creation of Raging Bull

Jason Bond[4] was a school teacher for approximately ten years starting in 2001 in the Webster Central School District in upstate New York, near where he grew up. J. Bond Declaration ("Bond Decl.") (**Exhibit 3**) at ¶ 5. He has a bachelor's degree in education from SUNY Brockport and a master's in education from Walden University.

---

26, Exhibit 10 (providing a list of ten of Raging Bull's competitors offering similar products with similar pricing).

[4] Jason Bond was born Jason Kowalik. Jason's father was born Donald Bond, but changed it to Kowalik when his mother (Jason's grandmother) remarried. That second marriage did not last, and Donald's adoptive father left and lost touch with the family. As an adult, Jason decided to change his name to Bond to honor his father's family name. Bond Decl. at ¶ 3.

Jason Bond and his wife Pam, also a school teacher, worked hard as teachers but found themselves over $200,000 in debt. In looking for ways to make additional money, while teaching, Bond opened a small account and started trading stocks. Bond Decl. at ¶ 5-6. He joined a few subscription services, studying their materials and lessons as well as learning through his own trading experiences. Bond Decl. at ¶ 6. As Bond learned more, he began to think about using his experience in education to teach stock trading. Bond Decl. at ¶ 6. In around 2008, Bond met Jeff Bishop through the online trading community. Bond Decl. at ¶ 6.

Bishop, who has a master's degree in economics, had worked for several years in the online financial marketing industry. J. Bishop Declaration ("Bishop Decl.") (**Exhibit 4**) at ¶ 8. Bishop had gained experience with charting and stock patterns that were most persistent in stocks trading under $10 which could be used to predict a security's price movement. Bishop Decl. at ¶ 7. Bond had approached Bishop to purchase a website he had built, which Bishop did. Bishop Decl. at ¶ 8. Bond then began writing educational pieces for Bishop's sites, and Bishop taught Bond about stock patterns for successful trading. Bishop Decl. at ¶ 9; Bond Decl. ¶ 6. Bond built on what he learned from Bishop and developed his own trading strategies. Bond Decl. at ¶ 6.

In 2011, Jason Bond left his 10-year career as a school teacher to pursue a new path in stocks and teaching trading with Bishop. Bond Decl. at ¶ 7. Bishop hired Bond to teach on an online newsletter site he owned, which would later become JasonBondPicks.com. Bishop Decl. at ¶ 9. Bond built a following of subscribers due to his skill and talent as a stock trader and teacher. Bishop Decl. at ¶ 9; Bond Decl. at ¶ 7. Bond focused his teaching on small- and mid-cap stocks and the service was renamed Jason Bond Picks (JasonBondPicks.com). With the service's continued success, Bond and Bishop formed Lighthouse Media LLC in 2014 to grow Jason Bond Picks.  Bond Decl. at ¶ 9. At the time Lighthouse Media LLC was formed, Jason Bond Picks was

4

the only service of the company at that time. In 2016, the company name was changed to RagingBull.com, LLC. Bond Decl. at ¶ 9.

## II.     Raging Bull's Services

Raging Bull is a subscription-based publisher that provides subscribers with training and educational materials to learn trading strategies for their own investing activity. Bishop Decl. at ¶ 14.

Raging Bull's trading strategies are developed and taught to subscribers by Raging Bull's "gurus" through a mix of instructional videos, daily stock watch lists, email and other communications, exemplar trading activity in real time, and live chat rooms. Bishop Decl. at ¶ 15. Kyle Dennis Declaration ("Dennis Decl.") (attached as Exhibit 6) at ¶ 23.  Raging Bull offers a variety of services corresponding to different trading strategies and the services provided vary across trading strategies and gurus. Raging Bull directs new subscribers of a service to its publication of training videos on the trading strategy for that service. Bishop Decl. at ¶ 16. The instructional videos provide trading strategy basics, but to really learn a trading strategy requires executing the strategy in real time. Bishop Decl. at ¶ 16. Thus, Raging Bull's gurus educate subscribers through a "teach by doing" method, providing real-time trading examples with corresponding stock watch lists and alerts for trades, including sharing with subscribers their own personal experiences employing such trading strategies developed over many years of their professional activities. Bishop Decl. at ¶ 15.  Dennis Decl. at ¶ 23.  Most of Raging Bull's gurus provide training to subscribers through their real money trading of securities. Trading real money provides the realistic proving ground for a guru's strategies, requiring the gurus to demonstrate the efficacy of their strategies in the face of real market conditions with real investor emotions and fears on the line. Bishop Decl. at ¶ 16.  Real money trading also has a level of precision lacking from trading paper money. For example, a trader may be watching a security with the intention of

purchasing at, say, $3.23 a share. However, even if the stock price reaches that amount, the trader may not be able to fill an order at that price, which would necessarily impact – for better or worse – any eventual profit or loss when the stock is sold. Real money trading factors this market risk in, where paper money trading does not.

To further illustrate their trading strategies, several of Raging Bull's gurus publish trade alerts via text message and/or email to subscribers. Bishop Decl. at ¶ 16. The gurus send out trade alerts noting the price at which the guru bought or sold the position. Real-time trade alerts demonstrate in real time how the guru is executing the strategy so subscribers may learn. Bishop Decl. at ¶ 16.  Dennis Decl. at ¶ 23.

Several gurus, including Jason Bond, have live streamed their brokerage account portfolios so subscribers can see all trading activity within the accounts on a real-time, and fully transparent basis. Bishop Decl. at ¶ 16. Livestreaming the account portfolios gives subscribers the ability to verify all trading activity by the guru, including the activity reported in trade alerts. This also allows subscribers to immediately observe trading activity and would be able to see any instances of scalping, short sales or other activity that might suggest the guru is profiting off the activity of subscribers rather than market activity.

Raging Bull has also offered live chat rooms for certain subscribers. Bishop Decl. at ¶ 16. These chat rooms provide subscribers with the opportunity to ask questions of a guru (although not all subscriber questions can be answered) and communicate with other subscribers in real time during market hours. Bishop Decl. at ¶ 16. The chat room offers a general discussion about the guru's trading strategies in real-time, rather than post-hoc activity summaries with the benefit of hindsight. Bishop Decl. at ¶ 16.

For several years, Jason Bond Picks was the only trading service offered by Raging Bull, and Bond was the only guru. Jason Bond Picks has been Bond's primary newsletter service since it was formed. Bond teaches stock trading with an emphasis on trading small-cap stocks (stocks with a market capitalization under $2 billion and generally trading under $10) and mid-cap stocks (stocks with market capitalization between $2 billion and $10 billion with stock prices that may be over $10). Bond Decl. at ¶ 11. These stocks generally trade on the NASDAQ; Bond generally does not target OTC or low-volume stocks. Bond Decl. at ¶ 11.

Bond's strategy involves swing trading, which is typically a buy and hold for one to four days. Bond Decl. at ¶ 12. There are thousands of small- and mid-cap stock opportunities, so Bond teaches stock setups and how to scan for stocks to focus on. Bond Decl. at ¶ 12. Bond looks for patterns as part of a technical analysis, but also looks for momentum or catalysts behind the stock, such as SEC filings or company news. Bond Decl. at ¶ 12. This teaching also gets into various technical trading concepts, such as Fibonacci retracement, Japanese candlesticks, and others. Bond Decl. at ¶ 12.

Bond's publications and curriculum have evolved over time. It has included video lessons, daily stock watch lists, trade alerts, participation in chat rooms, livestreaming his trading portfolios, live video streams, posts and articles on the company website, and regular email and other electronic communications discussing, often in great detail, Bond's daily and anticipated trading activity. Bond Decl. at ¶ 13. The emphasis has always been on transparency and learning. Bond Decl. at ¶ 13.

Bond like Raging Bull's other guru's generally trades real money. Bond Decl. at ¶ 14. His typical practice has been to publish a daily watchlist either the night before or early morning, listing a few stocks he would be watching for the day or over the next few days. Bond Decl. at ¶

15. This daily watchlist is not simply a list of stocks, but includes discussions about why he is watching these stocks, what setups he is looking at, what patterns he is playing and where he will be looking to buy or sell. Bond Decl. at ¶ 15. Bond publishes consistent and substantive discussion nearly every day of his trading, not just instructional videos and trade alerts. Bond Decl. at ¶ 15.

In addition to Bond's services, Raging Bull's most popular trading service is offered by Kyle Dennis, who runs and teaches the service Biotech Breakouts. Bishop Decl. at ¶ 11; Dennis Decl. at ¶ 8. Together, Bond's services and the Biotech Breakouts services generate more than half of the company's revenue. Bishop Decl. at ¶ 11.

Jeff Bishop did not provide any trading services for Raging Bull before March 2018. Bishop Decl. at ¶ 24. In 2018, Bishop began a small options trading service called Weekly Money Multiplier, which accounted for only about 15% of Raging Bull's 2018 revenue. Bishop Decl. at ¶ 24.

### III.   Raging Bull's Efforts to Strengthen and Improve Compliance and Customer Service

Raging Bull has grown very fast, particularly in the last couple of years. The growth of the business in some respects outpaced the company's ability to keep up with the implementation of processes and controls for compliance and customer service. Defendants have been working very hard to improve and had taken many steps on its own initiative before the FTC brought its complaint following its secret investigation.

In late 2019, Raging Bull hired Susan Trahan as its General Counsel and Chief Compliance Officer. From the start of Ms. Trahan's involvement, the company's Compliance & Legal team became more structured and proactive. In 2019, the company completed a robust organization-wide Compliance Manual, which includes strict rules around formalizing the company's existing practice of not publishing statements that are false or misleading, and avoiding the use of

unsupportable claims in publications and advertisements. The Compliance Manual also includes a separate "Customer Communications & Advertising Policy," sets forth a review and approval process for marketing materials, and stresses the reinforcement of transparency.  During Ms. Trahan's tenure, the company has also held internal trainings on the topic of advertising best practices and telesales; performed phone call audits of telesales employee compliance matters; and more actively enforced the application of publication standards.  The Wind Report at ¶ 38, Exhibit 22, includes a table showing the dates of recent compliance training for Raging Bull personnel regarding, among other topics, marketing, customer support and telesales.  The company's tightening of compliance oversight and its establishment of renewed standards and procedures in relation to advertising materials moots past alleged violations and makes the likelihood of their recurrence much lower.

## IV.    Raging Bull's Subscribers

Raging Bull has had more than 200,000 subscribers to its services since the company's inception. Before the FTC filed its complaint, Raging Bull had approximately 80,000 subscribers.

In its Complaint, the FTC suggests Raging Bull targets "older adults, retirees, and/or immigrants." Compl. at ¶ 23. The FTC does not even attempt to support this claim. In fact, Raging Bull does not target these groups. Raging Bull does not conduct direct marketing to media channels designed to target seniors or "immigrants." Bishop Decl. at ¶ 22-23.

## V.    Harm Caused by the TRO

Before the FTC filed its complaint, Raging Bull employed approximately 160 people through the country and internationally, most of whom were working from home during the COVID-19 pandemic. Bishop Decl. at ¶ 38. Since the Court entered the TRO *ex parte* on December 8, 2020, all but 6 employees have been let go or furloughed. Bishop Decl. at ¶ 38. Some of these employees continued to work for several weeks after the TRO was entered without ever

being paid, providing assistance requested by the Temporary Receiver, taking steps to comply with the TRO including data preservation, fulfilling subscriber services and responding to customer queries, and providing information and documents to the company to defend itself in this matter. Bishop Decl. at ¶ 38.

Most important, the TRO and what followed made it impossible for it to deliver the contracted for services to the thousands of subscribers who had paid for and wanted the services they were receiving from Raging Bull and its gurus. The real harm is to those consumers who are not receiving the training and experience they wanted and signed up for. This is confirmed by the outpouring of support that Raging Bull received from its subscribers in the days after the FTC's actions and even after the FTC published its sensational and unfounded allegations of fraud. [cite]

As detailed in the Raging Bull Defendants' Emergency Motion for Clarification of the Temporary Restraining Order (Dkt. 107), the asset freeze and appointment of the Temporary Receiver effectively forced the company to pause all operations as of December 21, 2020. Bishop Decl. at ¶ 39. While the Raging Bull Defendants have been fighting desperately to keep the company on life support up to the preliminary injunction hearing, the FTC stated that its true intention, going beyond the relief actually sought by the FTC with a preliminary injunction, is to close down Raging Bull permanently. Bishop Decl. at ¶ 39. Although the substantive restrictions and obligation sought by the FTC in Sections I and II of the TRO would be acceptable to the Raging Bull Defendants, the FTC's intention is to keep the asset freeze in place and appoint a permanent Receiver so the company can be killed off to the detriment of not only Raging Bull but also its thousands of subscribers who paid for and were satisfied with the service they were receiving.

**LEGAL STANDARD**

The FTC sues for violations of Section 5(a) of FTC Act, which prohibits "unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45. "To succeed under section 5(a), the FTC must prove (1) that there was a representation; (2) that the representation was likely to mislead consumers; and (3) that the misleading representation was material." *FTC v. Ross*, 897 F. Supp. 2d 369, 381 (D. Md. 2012) (quoting *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)), aff'd, 743 F.3d 886 (4th Cir. 2014). Based on these purported violations of Section 5(a) of the FTC Act, the FTC seeks a wide-ranging preliminary injunction that would effectively shut down the operations of the company, preventing the company from servicing its over 80,000 subscribers who have paid for services and putting hundreds of persons out of work in the middle of a pandemic, and a freeze all of its assets and the assets of the Defendants.

To obtain preliminary injunctive relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(a), for a violation of Section 5, the FTC bears the burden of showing a likelihood of success on the merits of its claims and that, on balance, the equities weigh in favor of granting the injunction. FTC v. Infinity Grp. Servs., No. 09-cv-977, 2009 WL 10670551, at *3 (C.D. Cal. Oct. 1, 2009); see also, *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976)( FTC bears burden to show injunction would be in the public interest, considering FTC's likelihood of success on merit and that equities weigh in favor of a preliminary injunction) This means the FTC must show "preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits." *In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380, 396 (D. Md. 2019). *See also FTC v. Thomas Jefferson Univ.*, No. 20-cv-01113, 2020 WL 7227250, at *28 (E.D. Pa. Dec. 8, 2020) (denying FTC request for preliminary injunction where it failed to show likelihood of success on the merits).

A preliminary injunction under Section 13(b) "must be narrowly tailored . . . to remedy the specific harm shown by the plaintiff[] rather than 'to enjoin all possible breaches of the law.'" *FTC v. John Beck Amazing Profits,* No. 2:09-cv-4719, 2009 WL 7844076, at *4 (C.D. Cal. Nov. 17, 2009) (citation omitted); *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) (vacating injunction as overbroad). Thus, "[c]rafting a preliminary injunction is an exercise in discretion and judgment," and the Court "'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of a particular case.'" *Trump v. Int'l Refugee Assistance Project,* 137 S. Ct. 2080, 2087 (2017) (quoting 11A C. Wright & A. Miller, Federal Practice & Procedure § 2947, at 115).

Moreover, a preliminary injunction is an "extraordinary and drastic remedy," which is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted). *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy, never awarded as of right." citations omitted); *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 250 (4th Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)).

Finally, like here when the injunctive relief sought includes an asset freeze, the FTC "must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV- 4719, 2009 WL 7844076, at *15 (C.D. Cal. Nov. 17, 2009) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)); *see also FTC v. Millennium Telecard, Inc.,* No. 11-CV-2479, 2011 WL 2745963, at *11 (D.N.J. July 12, 2011) (same).

As demonstrated below, the FTC simply cannot meet its burden and is not entitled to the drastic and far-reaching injunction that it seeks.

**ARGUMENT**

**I.**     <u>**Raging Bull's Experts Demonstrate the FTC's Fatal Errors**</u>

**A.**     **The FTC Obtained an *Ex Parte* TRO and Now Seeks a Preliminary Injunction Based on Wermers' Grossly Flawed Assessment of Defendants' Trading**

According to the FTC's expert, Russell Wermers, Jason Bond and Jeff Bishop are extremely ineffective traders, who realized tens of millions of dollars in losses. Wermers opines that Jason Bond and Jeff Bishop had over $56 million in trading losses as part of their Raging Bull services between 2014 to 2018. And, according to Wermers, the accounts he analyzes that were traded by Jason Bond from 2014 to 2018 had a $7.5 million loss.

This lies at the heart of Wermers' opinion that Raging Bull deceives consumers through earning claims that ***must*** be false because they experienced huge losses, and because Raging Bull sold consumers on bogus teaching strategies from failed traders whose trading strategies resulted in "persistent and substantial losses."

However, as Defendants' experts Bates Group LLC and Greg Kyle ("Bates") conclude, Wermers' opinions are grossly flawed and in several ways.

<u>**First**</u>, Wermers relies on a flawed methodology to assess trading performance. According to Wermers, he analyzed what he describes as trading activity as shown on 1099-B records. Based on these 1099-B records, Wermers states that his "Table 1 summarizes the gains and losses of the different accounts held by Raging Bull and Raging Bull's instructors for the period from 2014 to 2018." PX 26, 1777. However, Table 1 of Wermers' report does not, in fact, analyze actual trading data and does not show the net gain or losses for the selected accounts. As Bates illustrates, Wermers uses a unique and flawed methodology that is defective. Bates Report at 9–17.

Wermers' methodology is flawed because he relies on data from selected 1099-B tax records that the brokerage firms provided to the IRS, and not comprehensive net gains or losses as

13

derived from the brokerage firm account statements. Bates Report at 9-10. The 1099-B tax records provide an incomplete record of trading activity as not all trading activity or data is required to be reported to the IRS. *Id.* Wermers did not review the trading account statements as he should have. PX 26, 1802-05 (listing materials considered and not listing account statements). This is surprising because the FTC has the relevant account statements, or certainly had very easy access to them, because Defendants produced the account statements in August 2018 to the SEC and in October 2019 to the New Hampshire Bureau.[5]

In reviewing the 1099-B forms, Wermers includes an artificial adjustment, known as "wash sale loss disallowed," in calculating the purported "actual trading performance." Wash sale losses disallowed is an IRS tax accounting rule under Section 1091 of the Internal Revenue Code that "prevents investors from recognizing ***artificial losses*** by selling a stock for a loss and then repurchasing the stock within a short period of time." *Id.* (citing TD Ameritrade 1099 Information Guide, at 35 (emphasis added)).  A wash sale occurs when, among other things, an investor sells or trades stock or securities at a loss and within 30 days before or after the sale buys substantially similar stock.  The disallowed wash sale loss may be added to the cost basis of the subsequently acquired shares for tax purposes, adding to their cost basis and therefore reducing the reported profit or increasing the loss when those shares are liquidated.  The disallowed wash sale losses are not actual, trading losses.  It is those specific types of "artificial" (tax entry) losses that form the basis for Wermers' flawed opinions on trading performance.

---

[5] Both the SEC and the New Hampshire Bureau assisted the FTC in its secret investigation of Defendants. *See* "As Scammers Leverage Pandemic Fears, FTC and Law Enforcement Partners Crack Down on Deceptive Income Schemes Nationwide," 12/14/20, https://www.ftc.gov/news-events/press-releases/2020/12/scammers-leverage-pandemic-fears-ftc-law-enforcement-partners (last visited January 10, 2021) ("The FTC thanks the New Hampshire Bureau of Securities Regulation and the U.S. Securities and Exchange Commission for their assistance in this matter.").

The impact of Wermers' error is massive. Wermers' analysis of the accounts from 2014 to 2018 which he (inaccurately) believes were part of Raging Bull's services showed a loss of **$56,426,361**. PX 26, 1779, Table 1. But, as Bates demonstrates, the actual realized amount was a $2,308,158 loss, largely comprising accounts *not* part of any Raging Bull service. *See* Bates Report at 3 and Exhibit 3. Wermers therefore overstates the realized net loss by *over 2400 percent*, or by *over $54 million*. Indeed, the average equity value across the accounts Wermers reviewed was only $1.98 million. *Id*. at 3. Simply put, it was not possible for Raging Bull and its co-founders to lose $56 million with an average equity or aggregate account values of less than $2 million. *Id*.

Furthermore, based on his review of the accounts Jason Bond traded in from 2014 to 2018,[6] Wermers' concludes that these accounts had a *loss* of **$7,417,379**. But in fact, Bond had actually had a realized trading *profit* of **$528,344** in the accounts Wermers reviewed – <u>an $8 million swing</u>.[7]

The impact of Wermers' error is felt on a year to year basis. For example, Wermers opines that Jason Bond (trading in Account 4059) had a trading *loss* of $2,479,067 in 2016 and a trading *loss* of $1,331,936 in 2017. When in fact, as Bates demonstrates, in Account 4059 Jason Bond had a realized trading *profit* of $316,032 (and a net out of pocket profit of $318,966) in 2016 and a realized trading *profit* of $314,172 (and a net out of pocket profit of $300,697) in 2017. Bates Report at Exhibit 7.

---

[6] Bond traded in the following accounts from 2014 to 2018 as part of his Raging Bull services: Account 8701 (1/2014 to 3/2014; 2017-2018), Account 4059 (2014-2018), Account 1637 (2015), Account 6387 (2018)). Bond Decl. ¶ 39-38. Wermers analyzed all of these account except for Account 8701 from 2014. Bond also traded in Account 8701 in 2013 and has the account statements and 1099-B form for that account and year. Wermers did not analyze Bond's trading from 2013.

[7] As noted, Wermers did not review Bond's trading in Account 8701 from January 2014 to March 2014, which Bates concludes had a realized gain of $84,537. Bond's performance from 2014 to 2018 on a net out of pocket basis was a trading profit of $482,121, after adjusting to remove the unrealize long positions in LQMT that was not part of Bond's teaching strategy. See Bates Report at Exhibit 7; Bond Decl. at ¶ 29-38.

Wermers' error is so large because the very kind of transactions implicated by the wash sale rule – short-term transactions including swing trades – are what Raging Bull teaches. Wermers so grossly overstates the actual trading losses because he uses the cost basis column from the 1099-B that includes the "artificial losses" from the wash sales. *Id*. The wash sale rule is for tax reporting purposes only and does not reflect the "actual trading performance" in the accounts. Wermers misses that.

**<u>Second</u>**, Wermers analyzes certain accounts and time periods that are not relevant to the trading patterns and strategies Bond and Bishop taught Raging Bull subscribers. Specifically, Account 9075, held by Happy Mountain Holdings LLC, was not used in connection with any Raging Bull service from 2014 to 2017 and does not include any trading activity that forms the basis for any statements made by Defendants or anyone else with Raging Bull. Bishop Decl. at ¶ 30. These accounts are irrelevant. And yet, Wermers concludes there were $41,587,736 in trading losses in Account 9075 from 2014 to 2017. The only account Wermers reviewed which included any trading by Jeff Bishop related to any of his Raging Bull services was in Account 9075 during 2018. Bishop Decl. at ¶ 30. Moreover, not all of the trading in this account in 2018 was related to his teaching. Bishop Decl. at ¶ 30.

The FTC convinced the Court to grant an *ex parte* TRO, and now seek entry of an overbroad and unnecessary preliminary injunction, based largely on Wermers' opinions. Wermers, however, grossly misstates the actual trading performance of the accounts he reviews. Jason Bond did not lose $7.5 million from 2014 to 2018, he had a realized profit of over $500,000. And the FTC's repeated reliance on Defendants' "substantial trading losses" to bolster its claim to the Court that Raging Bull is "permeated with fraud" collapses.

**B.**     **The FTC's Allegations of Deceptive Advertising are Unfounded and Not Supported by Empirical Evidence**

A close reading of the FTC's Complaint and supporting materials demonstrates that the Commission's case, at heart, rests wholly on anecdotal evidence and unproven generalizations. Because of this, Defendant retained Dr. Yoram Wind, Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania, to use his expertise in marketing and determine based on empirical evidence whether in fact consumers were deceived and, as a result, suffered injury compensable under FTC Act Section 5.[8]  Tellingly, in Dr. Wind's words, the FTC's Complaint "was not based on a conceptually sound understanding of consumer behavior and marketing nor on any generalizable empirical data on the perceptions and behavior of the Raging Bull consumers and, the FTC Complaint, in fact, ignored most of the available data that contradicts its speculative and unsupported allegations."  Wind Report at ¶ 3.  Dr. Wind's examination, in sum, found that "the FTC's allegations are not supported by any data" and, as such, Dr. Wind stated that "with great scientific confidence I conclude that the FTC's allegations are invalid."  Wind Report at ¶ 5.

Among other critical takeaways, Dr. Wind's report determines that the "FTC's conclusions are based mostly on speculation, through a few affidavits from customers, and from selective reference to a few ads and marketing materials (without regard to whether they are fairly representative of Raging Bull's overall program or how much of the alleged consumer injury is

---

[8] Dr. Wind's qualifications may be found in more detail in Section III of his report.  In brief, he joined the Wharton Staff in 1967, upon receipt of his doctorate from Stanford University, and took Emeritus status in 2017.  He has published 25 books and more than 300 papers and articles in the marketing field, and he has served as editor-in-chief of the *Journal of Marketing*.  Dr. Wind has received the four major marketing awards, The Charles Coolidge Parlin Award (1985), the AMA/Irwin Distinguished Educator Award (1993), the Paul D. Converse Award (1996), and MIT's Buck Weaver Award (2007), and he was inducted into the Marketing Hall of Fame in 2017.  Notably, Wermers has no expertise in marketing or deceptive advertising.

attributable to these specific ads)." *Id.* at ¶ 25. As for the FTC's 21 consumer affidavits offered in support of its preliminary injunction motion, Dr. Wind confirms that "no information is provided as to how the affidavits or ads were selected.  Without knowing the sampling approach, one cannot generalize the data to the entire Raging Bull customer base."  *Id.* at ¶ 63.

Moreover, as Dr. Wind's report and supporting materials articulate, Raging Bull's target audience and customer base is not naïve, gullible and vulnerable, but rather a relatively sophisticated group interested in trading and financial news.  In fact, according to Dr. Wind, Raging Bull's advertisements target first-time investors—who want to learn the fundamentals— and sophisticated investors—who are interested in advancing their investment competencies— with products appropriate for each group.  Wind Report ¶ 25, Exhibit 3. The Raging Bull website attracts visitors who are primarily college- or graduate-school educated and have an income of $100,000 —far from the FTC's blind supposition that the company targets elderly individuals or "immigrants."  Wind Report at ¶ 25, Exhibits 8 & 9.

This is critical because using the required reasonable consumer acting reasonably legal standard set forth in FTC deception case law, as applied to Raging Bull's more sophisticated and knowledgeable customers seeking to learn from stock trading expertise, Dr. Wind concludes that even if some of Raging Bull's historical statements were arguably deceptive or misrepresentations (a point the Raging Bull Defendants do not concede), the company's advertising target audience and existing customer base would not materially rely upon such misrepresentations in purchasing or upgrading Raging Bull subscriptions.  This is especially true given the buying journey undertaken by consumers in Raging Bull's competitive market for its "high involvement" products.

In its Complaint and pleadings, the FTC did not present empirical evidence of consumer net impressions establishing Raging Bull's claims as misrepresentations relied upon when purchasing the company's subscriptions, as the FTC only presented a small number of consumer affidavits not wholly representative of the company's targeted audience—a group whose positive endorsements and voluntary, uncompensated testimonials speak to the appreciation they have for Raging Bull's legitimate business as an informational publisher.  Lastly, Dr. Wind's report shows that if consumers actually were deceived and relied on Raging Bull misrepresentations and were harmed, the usual indicia of fraud are absent in practice and in the FTC's materials.  He notes, "[t]he data shows clearly that the Raging Bull customers were not deceived and thus did not suffer any harm as a result of any such alleged deception."  Wind Report at ¶ 5. On this basis, Dr. Wind concludes that it is unlikely that consumers were either deceived or injured by Raging Bull's alleged misrepresentations, and based on scientific analysis, that it is also unlikely that the FTC will be able to establish that Raging Bull customers were in fact deceived and injured.

1.      The FTC's Implicit Assumptions Are Inherently Flawed

The FTC's case is based in large part on several critical implicit assumptions.  These may be summarized as follows:

    a.   Raging Bull targeted an audience that was especially gullible or vulnerable to believing the company's allegedly false and deceptive representations;

    b.   Raging Bull subscribers did not understand what they were purchasing, or thought they were purchasing something materially different from what was described to them by the company;

    c.   Raging Bull subscribers decided to subscribe based only on the company's advertising, marketing and sales activities;

>     d.   Raging Bull's alleged false and deceptive representations were material to their
>          decision to purchase the company's service; and
>
>     e.   Raging Bull customers suffered compensable harm as a result.

Despite its strongly asserted claims, the FTC makes no showing supporting these assumptions empirically. Instead, it wishes the Court to rely on its conclusions alone and the short, anecdotal takes of approximately 20 past customers unrepresentative of the company's 80,000 person active user base—which were derived over at least nine months of secret investigation of the company. The FTC presents to the Court selective reference to a sampling of historical ads—without regard to whether they are fairly representative of Raging Bull's overall business or how much of the alleged consumer injury might be attributable to these specific ads. Dr. Wind's evaluation of the assumptions and evidence presented by the FTC concludes that the allegations do not stand up to reality. He found that, "[g]iven these basic contextual facts, it is highly unlikely that the Raging Bull customers have been deceived by the Raging Bull advertising, marketing and sales material." Wind Report at ¶ 35.

> 2.   The Company's Target Audience—the "Reasonable Consumer" for FTC
>      Deception Analysis Purposes—Is Neither Elderly Nor Likely To Be Deceived

While the FTC surmises that Raging Bull's target audience and customer base is naïve, gullible or vulnerable, this is in fact not the case. The evidence of this is clear. Dr. Wind's examination determined that from June 2012 to December 2020, only 12.1% of the company's Facebook advertising was targeted at consumers over 65 years of age. In contrast, Raging Bull's primary target market was 35-54 years old, receiving 45.2% of the advertising budget. Wind Report at ¶ 25, Exhibit 1. Raging Bull's Google advertising spend was similarly targeted at 35-54 year-olds and customers interested in financial services. *Id.* at ¶ 25, Exhibit 2. Ads were overwhelmingly placed in English language channels appealing to investors, which directly

undermines the FTC's unfounded implication that the company somehow targets "immigrants." Moreover, the company's programmatic media buys are focused on targeted investor segments. *Id*. And, individuals with college and graduate school degrees and household incomes of over $100,000 have a high affinity (likelihood) to visit the Raging Bull website. *Id*. at ¶ 25, Exhibits 8 & 9. Dr. Wind found that the content of Raging Bull's advertising, email and marketing programs "was clearly targeted at two groups – first-time investors who wanted to learn the fundamentals and sophisticated investors interested in advancing their investment competencies." *Id*. at ¶ 25, Exhibit 3.

These facts directly undermine the FTC's various assertions as to the easily impressionable nature of Raging Bull's audience based on where its advertisements are shown and the level of sophistication of its site visitors and customers. This is very significant, given that for deception cases, the FTC "examine[s] the practice from the perspective of a consumer acting reasonably in the circumstances. If the representation or practice affects or is directed primarily to a particular group, the Commission examines reasonableness from the perspective of that group."[9] FTC Deception Policy Statement. Accordingly, given the factual circumstances that surround Raging Bull's target audience, as supported by expert analysis, to prevail on its case the FTC must use a sophisticated, investor-focused consumer as its "reasonable consumer" in proving its deception case. The FTC cannot do so, and so instead erroneously bases its arguments on an unrepresentative, naïve audience.

3.   <u>Given Raging Bull's Market Competition, There Is a Higher Likelihood that Consumers are Familiar with Industry Terms and Conditions</u>

The market for Raging Bull's services is very competitive and includes numerous

---

[9] *See* FTC.gov, "FTC Policy Statement on Deception," appended to *Cliffdale Associates, Inc.*., 103 F.T.C. 110, 174 (1984), *available at*: http://www.ftc.gov/system/files/documents/ public_statements/410531/831014deceptionstmt.pdf ("FTC Deception Policy Statement").

Competitors, which has implications on a customer's buying journey and process. According to Dr. Wind, this means that "consumers are likely to develop a consideration set of a number of companies and evaluate this before deciding on a product purchase." Wind Report at ¶ 27 & at Exhibit 11. The presence of robust competition within a market, in turn, increases the likelihood that a consumer will be familiar with the terms and conditions used throughout the industry. Wind Report at ¶ 28. Given the competition and likely exposure to other entities in this space, the FTC's implicit assumption that consumers did not understand what they were purchasing, or thought they were purchasing something materially different from what was described to them by Raging Bull is far less likely to be true.

4.  Because Raging Bull's Services Are High Involvement Products—Not Purchased on Impulse—Consumers Are Not Likely To Rely Only On Advertising and Sales Initiatives

The FTC's presentation of Raging Bull's customers and target audience as prospective customers susceptible to purchasing at the drop of a hat after seeing an advertisement, the so-called "stimulus response," is not supported by the facts. As Dr. Wind outlines in his report, Raging Bull's services are "high involvement products" that are not bought on impulse but rather involve a complex buying journal involving many sources of information. Wind Report at ¶ 30-33. Moreover, Dr. Wind concludes "The implications of the journey are that most consumers in deciding whether to buy the Raging Bull products are not likely to rely only on the company's adverting, sales, website and other marketing initiatives." Wind Report at ¶ 33.

5.  Raging Bull's Business Model, Sales Compensation System, and Choice Architecture Are Not Consistent With That of a Company That *Can* Benefit from Consumer Deception

The FTC's case presents as fact that Raging Bull supposedly "prey[s] on consumers," and has swindled them out of an FTC-divined amount of $137 million dollars. This confuses a sound business comprised of consumers that find value and invest in a company's offerings with

a fraudulent "churn and burn" type business that bears no resemblance to Raging Bull. Key to the FTC's view is that the company is "permeated with fraud" and is reviled by consumers who are fooled into spending money and then immediately leave never to return. This is not supported by the facts discussed above or the empirical evidence.

In fact, Raging Bull's entire business model is inconsistent with that of a company that can benefit from deceiving its customers. The company's business and revenue models are based on having satisfied customers who will subscribe to their services and continue to renew and upgrade the level of subscription to more expensive products. A breakdown of Raging Bull's total revenues by product for 2018 through September 2020 demonstrates that an overwhelming majority of the company's revenue comes not from entry level products under $199, but higher priced, backend products. For instance, in 2019, 75.4% of total revenues was derived from backend products costing $800 or more. As demonstrated with visuals in Dr. Wind's report, "the objective of the firm is to upgrade the customers from the free (webinars, videos and other offerings) and cheap products to the more sophisticated and expensive products. This clearly cannot be done by deceiving the customers." Wind Report at ¶ 36. Moreover, from January 2020 through September 2020, Raging Bull's monthly average customer retention rate was 93%. *See* Wind Report at ¶ 46, Exhibit 28.

It is also the case that the cost of client acquisition is high for Raging Bull. Dr. Wind concludes that acquiring clients by deceiving them does not make business sense since the company will lose money on every acquired client who feels deceived and then leaves. Wind Report at ¶ 36(b).

Notably, too, the most critical component of the sales architecture is the compensation system which in the case of Raging Bull's gurus, content providers and editorial staff who wrote the

purportedly objectionable content is based on *net after any refunds* and starts 30 days *after* the sale—the usual period for free refunds.  It is thus clear that such a compensation system provides no incentive to deceive would be subscribers, as the FTC would have the Court believe.  See also, Wind Report at ¶ 39-41(finding all other evidence was "inconsistent with a process that encourages deception).

6.      The FTC's Arguments About Raging Bull's Advertisements and Income Potential
         Claims Do Not Demonstrate a Case of Deception

The FTC selectively submits—more accurately, "cherry picks"—historical and more recent Raging Bull advertisements to argue that part of the company being "permeated with fraud" is as a result of its universally deceptive ads.  This argument fails. As confirmed by Dr. Wind, "ads identified by the FTC as implying deception are not representative of the range of ads used by Raging Bull and ignore the facts that at most, they led consumers to ask for free educational material."  Wind Report at ¶ 42.  And, the income potential claims are validated, as demonstrated in Dr. Wind's report. *Id* at ¶ 43 at Exhibit 26.  As Dr. Wind concludes, "While there is no practical way in which any firm can validate the income claims of volunteer testimonials especially when there is no incentive offered to provide the testimonials, the voluntary customers testimonials, reviews and social media post contradict the FTC unsupported assumption that the income potential clams are deceptive."  *Id.*

7.      The Remaining Evidence Offered by the FTC to Make Its Deception Case is
         Inconsistent with Required, Sound, Scientific Methods

Dr. Wind's report finds significant flaws with the "evidence' provided by the FTC, in that it is "inconsistent with required, sound scientific methods for several reasons that apply to both the affidavits and the ads and marketing material.  This ranges from not providing information about how the affidavits or ads were selected, to the small sample size, to the "evidence" being

contradictory to a wide array of favorable testimonials and reviews received by Raging Bull, and

more.  Wind Report at ¶ 63 & 64. Analyzing the above, Dr. Wind concludes that:

> the nonscientific data offered by the affidavits cannot be relied on to
> establish whether there is a likelihood that consumers were deceived and
> injured as a result of Raging Bull's conduct as alleged by the FTC. These
> 21 affidavits provide little or no scientifically valid evidence that Raging
> Bull customers generally have been defrauded and injured as a result of
> Raging Bull's business practices under examination by the court. In my
> opinion the FTC's reliance on the consumer anecdotal experience of 21
> affiants, and the suggestion that this Court should do likewise, has no
> scientific merit.

*Id.* at ¶ 65.

## II.    The FTC Does Not Have a Likelihood of Success on the Merits

### A.  The FTC Has Neither Met Its Burden for Prevailing on a Preliminary Injunction Request Nor Satisfied the Legal Standard for Proving Deception.

#### 1.  FTC Act Section 5 and the FTC's Deception Standards

The FTC curates a laundry list of items in its Complaint and pleadings as to allegations of

deceptive business practices that purportedly qualify Raging Bull as a fraudulent business.  The

FTC wrongly and without the requisite empirical support argues that Defendants' advertising

claims were deceptive with respect to their guru's trading successes and wealth; the existence of

actual defined trading strategies; the ability to use their materials without previous experience if

time and effort is expended; the incorporation of disclaimed consumer testimonials in marketing

materials; and the company's widespread use of prominent disclaimers.

It is also the case that, given the focus and progress made with respect to the company's

investments and emphasis on its compliance program efforts over the last year or so, many of the

alleged violative practices the FTC references have already been addressed and are moot.  This

means that the likelihood of recurrence—necessitating a preliminary injunction—is very low and

unlikely to happen. The burden of proof is on the FTC to prove its deception claims, and as

described below, the FTC fails to meet this standard. As further demonstrated below and Dr. Wind's report concludes, "the allegations and the "evidence" provided by the FTC appear not to be valid as a factual matter under well-established marketing theory and practice, and therefore would not support a conclusion that the FTC is likely to prevail on the merits of its Complaint/allegations." Wind Report at 6.

The FTC's demand for injunctive relief depends on its proving that defendants violated Section 5(a) of FTC Act, which prohibits "unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45. "To succeed under section 5(a), the FTC must prove (1) that there was a representation; (2) that the representation was likely to mislead consumers; and (3) that the misleading representation was material." *FTC v. Ross*, 897 F. Supp. 2d 369, 381 (D. Md. 2012) (quoting *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)), aff'd, 743 F.3d 886 (4th Cir. 2014). This is also set forth in the FTC Policy Statement on Deception, which explains that three primary elements undergird all deception cases. Furthermore, whether a representation, omission or practice is likely to mislead consumers must be considered from the perspective of the reasonable consumer—and, notably, if the representation or practice affects or is directed primarily to a particular group, the FTC examines reasonableness from the perspective of that group.

Moreover, the FTC has the burden to prove each of these elements. At a minimum, the FTC must show that Defendants' representations regarding its products and services were false, or that Defendants lacked a reasonable basis for asserting that the representations were true. *FTC v. Pantron Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994). Significantly, the FTC must follow its own rules in doing so and in this case reasonableness must be judged from the perspective of Raging

Bull's target audience and customers to whom the company's marketing "affects or is directed primarily." FTC Policy Statement on Deception at 1-2.

Moreover, "For an advertiser to have had a 'reasonable basis' for a representation, it must have had some recognizable substantiation for the representation prior to making it in an advertisement." *FTC v. John Beck Amazing Profits, LLC,* 865 F.Supp.2d 1052, 1068 (N.D. Cal. 2012) (citing *FTC v. Direct Mktg. Concepts, Inc.,* 569 F.Supp.2d 285, 298 (D.Mass.2008)). But, "The FTC has the burden of proving that Defendants' purported substantiation is inadequate..." *John Beck,* 865 F.Supp.2d at 1068 (citing *FTC v. QT, Inc.,* 448 F.Supp.2d 908, 959 (N.D. Ill. 2006)).

It is also the case that puffery, or exaggerations about a product or service are not actionable under Section 5 of the FTC Act. "The term "Puffing" refers generally to an expression of opinion not made as a representation of fact. As the FTC has said, "There is a category of advertising themes, in the nature of puffing or other hyperbole, which do not amount to the type of affirmative product claims for which either the Commission or the consumer would expect documentation." *Id.* at 13 (citing *Pfizer, Inc.*, 81 F.T.C. 23, 64 (1972)). These statements of "opinion", "hyperbole" or "possibilities" are nonactionable "puffery."

2.   The FTC Must Demonstrate the "Net Impression" of Defendants' Statements Were in Fact Misrepresentations

When analyzing the representations in an advertisement, including when there is more than one possible reasonable interpretation, courts evaluate the "net impression" created by the challenged materials as a whole. As the FTC said in its guiding policy statement on deception standards, "the net impression of the advertisement, evaluated from the perspective of the audience to whom the advertisement is directed, is controlling." FTC Policy Statement on Deception at 11, fn 32 (citing 81 F.T.C. 23, 58 (1972)). *FTC v. Agora Fin.,* LLC, 447 Supp. 3d 350, 368 (D. Md.

2020) (citing *Fanning v.* FTC, 821 F.3d 164, 170 (1st Cir. 2016) (noting that the FTC "looks at the 'overall net impression' left with consumers acting reasonably under the circumstances). *See also FTC v. DIRECTV, Inc.*, No. 15-cv-01129, 2018 WL 3911196, at *5 (N.D. Cal. Aug. 16, 2018). "[T]he tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context." *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976) (citations omitted); cf. *Johns v. Bayer Corp.,* No. 09-cv-1935, 2013 WL 1498965, at *22 (S.D. Cal. Apr. 10, 2013) (in a private false advertising case, the court analyzes "the 'overall message conveyed' and not parsed out segments of that message, which have been selected by a party based on a desire to substantiate a particular argument.").

The FTC also must prove that the net impression was false, misleading, or unsubstantiated. *DIRECTV*, 2018 WL 3911196, *5 ("the FTC failed to establish that there was any misleading "net impression") (emphasis added). The FTC has not met this standard.  As Dr. Wind notes in his expert report, "[i]n summary, the nonscientific data offered by the affidavits cannot be relied on to establish whether there is a likelihood that consumers were deceived and injured as a result of Raging Bull's conduct as alleged by the FTC."  Wind Report at ¶ 65.

**B.**     **Defendants Have Substantiation or a Reasonable Basis for Statements Concerning Trading Profits, and Does Not Cherry-Pick Wins**

The FTC argues that Raging Bull makes earnings claims about its wins which are not substantiated and not true. The FTC provides no evidence that these earning claims lack substantiation or reasonable basis. Instead, the FTC believes – relying, once again, on Wermers' faulty opinions – that the statements simply cannot be true because Raging Bull's gurus are terrible traders.

To illustrate its position, the FTC states:

> Dr. Wermers analyzed Bond and Bishop's advertising that made specific
> claims about percentages of trading returns. He found that the claimed

> returns equated to annual returns ranging from 108% to 330% per year. ***These are not consistent with the 1099-Bs he analyzed where Bond and Bishop failed to generate profits and incurred substantial losses over several years.***

Mot. at 9, n.38 (emphasis added) (citing to ¶¶ 92 and 93 of Wermers' report). As previously discussed Wermers' analysis is off by millions of dollars. To the FTC's point above, once a proper analysis of Bond's trading activity is conducted (which is what is being referring to in the FTC's example), as Bates has done, we see that Bond's earnings claims are in fact substantiated and materially true. Bates Report at 21, Exhibit 10 (finding Bond's internal rate of return for 2017 to be 366 percent).

In another example offered by the FTC, Bond states in a March 23, 2017 email to subscribers that he made "$22,000 profit" on SNAP "on Wednesday." *See* Compl. at ¶ 62. Once again, Jason Bond's statement is substantiated and materially true. Bates Report at 21, Exhibit 11 (finding Bond made $21,199.92 closing the trade on SNAP on Wednesday, March 22, 2017).

More broadly, the FTC relies on Wermers to try to discredit the fact that Jason Bond has made a million dollars in trading profits. The FTC contends that Bond "promotes himself as a millionaire trader despite reporting substantial trading losses to the IRS between 2014 and 2018." Mot. at 34 (citing Wermers' report). In fact, a proper analysis of Bond's trading records demonstrates that Bond in fact was up over a million in cumulative trading profits by late 2017. *See* Bates Report at 17.

Not only are these statements substantiated and true, but Defendants are open about their losses and trading mistakes when they happen. Talking about both the wins and losses of trading is core to how Raging Bull's gurus teach. Dennis Decl. at ¶ 28. For instance, in a video lesson from

November 20, 2020, Jason Bond explains a day he earned nearly $200,000 in profits, only to immediately experience losses of $300,000.[10]

Jeff Bishop uses his losses as teaching moments. Bishop Decl. at 24. For example, Bishop tells subscribers:

> [R]ather than second-guessing myself, I want to dissect this trade. You see, trading comes with losses. That's inevitable. What we control is how we analyze the setup and execute the trade. The rest is up to the market. So the question is did I make any bad decisions? And what could I do differently that would deliver better results. Let's dive in!"[11]

Elsewhere, Mr. Bishop states:

> The market is mean and unpredictable, and there is **always** the possibility that a trade won't work out. No matter how solid the setup or how big the edge. **On any given trade, I only risk what I am willing to lose.** One or two massive losing trades can not only blow up your account, but it can wreck your confidence and your ability to trade with your mind instead of your emotions. […] A prerequisite for thinking in probabilities is that you accept the risk. **Even with my highest conviction trade, I accept the possibility that it could end up a loser.** The truth is the typical trader wants to be right on every single trade so much so that they desperately try to create certainty where it just doesn't exist. **There is no such thing as certainty when it comes to the markets. Trust me…I learned the hard way!**[12]

These are just a handful of the routine instances of Defendants discuss losses, and not, as the FTC suggests, simply cherry-picking wins. Discussing the high and lows of trading is part of how Raging Bull teaches.

---

[10] *See* Jason Bond Monday Movers, "Facebook Live," Nov. 20, 2020, at 2:20, *available at*: https://www.facebook.com/JasonBondPicks/videos/658675828348986/.

[11] *See* Total Alpha, "Learning From My TAN Bullseye Trade Loss," Nov. 7, 2020, *available at*: https://totalalphatrading.com/2020/11/07/learning-from-my-tan-bullseye-trade-loss/.

[12] *See* Declaration of Stephen Prior (**Exhibit 5**), at Attachment A (hereinafter "Prior Decl."). Raging Bull, "Bullseye Tip of the Week!," Jan. 9, 2020.

### C.      Defendants Provide a Good Product of Value to Subscribers

As discussed above, Raging Bull provides a wide array of publication materials providing information and education to its subscribers. In his report, Wermers fails to consider much of the actual teaching and education materials that Raging Bull provides its subscribers.

As an initial matter, Wermers builds on his failed analysis of Mr. Bond's trading activity by further opining that it is "extremely unlikely" that the strategies used by Mr. Bond "can consistently work in the sectors of the market in which Raging Bull promotes their use; in contrast, such simple strategies are likely to generate consistent losses." PX 26, 1739. Wermers goes even further:

> Indeed, the actual trading results of Raging Bull and its co-founders show sizeable and consistent losses over many years, including periods of rising stock markets. These results are consistent with the general lack of efficacy of technical trading strategies implemented by retail traders in the illiquid market sectors promoted by Raging Bull.

PX 26, 1741.

Just looking at Mr. Bond's trading results from 2014 to 2018, Wermers' opinion is off by approximately $8 million dollars, so it is no surprise that Wermers has the related, and equally wrong, opinion that Mr. Bond's trading strategies will also fail.

Bolstered by his mistaken view of Bond's trading results, Wermers claims that "[g]enerating market-beating returns over time in small-capitalization stocks is extremely difficult and rare, even among professional investors." PX26, 1754. He further opines that "I have found no evidence in my review of Raging Bull's training materials or other communications with its subscribers that suggests that Raging Bull and its trading 'gurus' deploy a market-beating trading strategy." PX26, 1754. But Jason Bond (and other gurus) has in fact been a profitable swing trader who teaches the trading strategies, focused on small- and mid-capitalized stocks, that he uses as profitable trader.

Furthermore, Wermers' view that "momentum trading" or "swing trading" cannot be profitable unless done via algorithmic trading (PX 26, 1754) is belied by the popularity of services that have successfully taught it for years and numerous authorities who claim it has merit. And forms of "technical trading" including "momentum trading" is taught by most of Raging Bull's competitors who have been allowed to operate and teach these methods for years. Bishop Decl. at 25. In particular, Jason Bond's service focuses on "swing trading." Per Investopedia, "Swing trading is one of the most popular forms of active trading, where traders look for intermediate-term opportunities using various forms of technical analysis." Investopedia, https://www.investopedia.com/terms/s/swingtrading.asp (last visited January 12, 2021); *see also* E. Boehmer et al., *Tracking Retail Investor Activity*, Journal of Finance, Aug. 31, 2020, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2822105 (finding that individual stocks with net buying by retail investors outperform stocks with negative imbalances by approximately 10 basis points over the following week). This demonstrates empirical research to support the notion that short-term momentum trading can have net profitable outcomes for traders.

Wermers also makes no attempt to review the experience and results of anyone who has actually learned to trade from Jason Bond. For example, the FTC and Wermers could have, but chose not to, consider the success of Bond's trading education with Kyle Dennis, Nathan Bear and Taylor Conway.

Kyle Dennis has been a very successful trader by learning from Jason Bond. Bond Decl. at ¶ 22; Dennis Decl. at ¶ 3. He was a subscriber of Bond's services Jason Bond Picks and Millionaire Roadmap. Bond Decl. at ¶ 22. By using the techniques taught by Bond, Dennis has made trading profits of $36,901 in 2013, $55,468 in 2014, $847,417 in 2015 and $1,130,566 in 2016. Bond Decl. at ¶ 22; Dennis Decl. at ¶ 4.  As part of a Raging Bull contest when Dennis was still a subscriber,

Raging Bull's accountants audited Dennis' brokerage accounts and taxes and verified that he made over $1 million in trading profits as a subscriber to Bond's services. Bond Decl. at ¶ 22. Since that time, Dennis has continued to make large trading profits. Dennis Decl at ¶ 4.

Nathan Bear is another former subscriber to Jason Bond's services who has made over a million dollars in trading profits by learning to trade from Bond. Raging Bull reviewed his brokerage statements and confirmed his trading profits while a subscriber to Bond's services.

Another similar example is Taylor Conway, who also made over a million dollars in trading profits by learning to trade from Bond. As with Bear, Raging Bull verified that he made those trading profits as a subscriber to Bond's services, starting with only approximately $10,000 in his trading account.

Wermers did nothing to examine the trading activity of Dennis, Bear or Conway. Nor did Wermers consider that each of them learned from Jason Bond. Instead, Wermers did a limited and inadequate review of a few training videos and a small number of alerts and watchlists. It is unclear – other than to preserve the secrecy of the FTC's investigation – why neither the FTC nor Wermers took any steps to review the performance of Jason Bond's actual subscribers, including those subscribers who have had trading profits which, according to Wermers' flawed analysis, should not even be possible.

**D.      Defendants Do Not Deceive or Mislead Consumers about the Likelihood of Success Using Raging Bull's Services**

The FTC contends that "Defendants represent, directly or indirectly, expressly or by implication, that consumers who purchase Raging Bull's services **will earn or are likely to earn** substantial income." Compl. at ¶ 105 (emphasis added).  This is simply not the case. In fact, as Dr. Wind's report shows, Raging Bull's business funnel demonstrates that the company has no incentive to deceive its customers.  Wind Report at ¶ 36, Exhibit 16.

33

The FTC conflates statements about subjective target goals or substantiated past successes with promises or guarantees made to lure in impressionable consumers. But Raging Bull does not tell or imply to consumers that using Raging Bull's service means they *will* or *likely will* make profits on a given trade. Raging Bull's service, on the contrary, is intended to arm traders with knowledge to make their own informed trading decisions.

In addition, the FTC ignores the safeguards Raging Bull builds into its communications that reinforce this point. Raging Bull's gurus embed clear and conspicuous qualifiers within the content of their marketing communications, to ensure expectations are correct about what the service is and what it is not. This has the effect of rendering the "net impression" of the materials to be non-deceptive. Indeed, Raging Bull's marketing materials routinely make statements to this effect. For example, Jason Bond tells subscribers to the front-end *Monday Movers* service:

> **The goal of this service is to EDUCATE you on my personal trading tactics by showing you which stocks *I'm* stalking and why, so you can hopefully apply those principles in your own trading.**
>
> First and foremost, if you're new to trading (or if swing trading momentum stocks is a new strategy for you), consume all the education that is now at your fingertips, and **paper trade until you feel more comfortable.** Don't risk capital unless you're confident in what you're doing.
>
> Remember, my approach might not align with your risk tolerance, so it's important to **have your own plan** in place to manage your trades with your own profit and loss zones.
>
> I'm a teacher above all other things, so again, the ultimate goal of *Monday Movers* is to **teach you how to fish,** so to speak. I want you to absorb as much education as you can, and then apply my principles to enhance your own trading.
>
> Plus, there are **plenty of times when a *Monday Movers* watchlist stock will do absolutely nothing on Monday,** and that's okay!

How long you hold *your* trades is up to you, but if the setup looks right, **sometimes patience is key.**[13]

Similarly, Kyle Dennis tells *Fast 5 Trades* subscribers: "**The goal of this service is to EDUCATE you on my personal trading tactics by showing you which stocks *I'm* stalking and why, so you can hopefully apply those principles in your own trading.** Remember, my approach might not align with your risk tolerance, so it's important to **have your own plan** in place to manage your trades with your own buy profit and stop zones."[14]

All in, the net impression to Raging Bull's target audience is not deceptive, and this reality plays out in the fact that numerous subscribers who work with Raging Bull for years at a time and upgrade their offerings to more intense but more expensive backend products.

### E.     Defendants Do Not Deceive or Mislead Consumers as to the Level of Skill Required for Trading

The FTC states that Defendants "stress that anyone can successfully use their services regardless of how much time, money or experience the consumer may have, and their simple strategies will mechanically yield profits." Mot. at 19-20. The FTC seeks to bolster this point by listing examples of Raging Bull describing the benefits of starting with a small account for options trading. The FTC claims, despite these comments, that "[i]n reality, many consumers are not able to use to the programs despite these claims.  Some consumers' lack of experience hindered their ability to use the program." Mot. at 20.

The FTC seems to base its speculative conclusions on a handful of cherry-picked, anecdotal consumer declarations, as it offers no empirical evidence for this. The FTC's declarations are irrelevant, and Defendants have gathered many times more statements from subscribers directly

---

[13] *See* Prior Decl., Attachment A.  Raging Bull, "Welcome to Monday Movers!".
[14] *See* Prior Decl., Attachment A.  Raging Bull, "Welcome to Fast 5!".

contradicting the FTC's conclusion that this is all too hard to do. Indeed, in the short time since the FTC brought its lawsuit alleging that Raging Bull is "permeated with fraud," Defendants have received far more subscriber reviews lauding the company, its gurus, and the publication materials. All of this cuts against the FTC's weak assertion that some consumers felt their lack of experience held them back, as this will be the case in any group of a significant size.

The FTC also overlooks the myriad instances of Defendants stressing the skill and practice that goes into developing familiarity and experience with trading strategies. A regular example is something like a *Weekly Money Multiplier* email noting that it is an "education service [...] and the goal here is to help teach you how to trade, which takes time."[15]  Contrary to the FTC's claims, Raging Bull and its instructors are forthright that nothing comes easy, nothing is guaranteed, and that although the strategies are intended to be digestible and able to be studied and reinforced, practice is required to develop skill over months and years.

### F.     Defendants' Use of Unpaid Consumer Testimonials with Disclaimers Is Not Deceptive or Misleading

#### 1.    The FTC Disregards Defendants' Robust and Conspicuous Testimonial Disclaimer

The FTC's endorsement rules state that if an "advertiser does not have substantiation that the endorser's experience is representative of what consumers will generally achieve, the advertisement should clearly and conspicuously disclose the generally expected performance in the depicted circumstances, and the advertiser must possess and rely on adequate substantiation for that representation." 16 C.F.R. § 255.2(b).[16] In a footnote to that statement, the FTC states that

---

[15] *See* Prior Decl., Attachment A.  Raging Bull, "WMM Day 1:  Welcome to Weekly Money Multiplier".

[16] *See* FTC.gov, *Guides Concerning the Use of Endorsements and Testimonials in Advertising*, codified at 16 C.F.R. Part 255, *available at*:  https://www.ftc.gov/sites/default/files/attachments/ press-releases/ftc-publishes-final-guides-governing-endorsements-testimonials/091005revisedendorsementguides.pdf.

it tested the communication of advertisements containing testimonials that clearly and prominently disclosed "Results not typical" or more pointed language, and that it believes similar disclaimers are unlikely to be effective. *Id.* at n.1. Significantly, however, these same federal rules note: "Nonetheless, the Commission cannot rule out the possibility that a strong disclaimer of typicality could be effective in the context of a particular advertisement." It also notes that the FTC has the burden of proof in a law enforcement action.

In this case, the FTC correctly notes that starting in 2020, on its own initiative as part of its renewed and refocused compliance efforts, Raging Bull began incorporating an even more conspicuous and unequivocal disclaimer in its various publications and communications. As noted in the TRO Memo at page 25, the disclaimer states in part, **"RESULTS PRESENTED NOT TYPICAL OR VERIFIED"** and **"subscribers' trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL."** (emphasis in original). Separately, as another representative example, immediately below Jason Bond's signature on the *Monday Movers* email received by all subscribers upon registration, referenced *supra*, in a font size that is the same as the main body text and is italicized for emphasis next to an asterisk, the following disclaimer is included: "*RagingBull does NOT track or verify subscribers' individual trading results and these individual experiences should NOT be understood as typical as or representative. Results presented are not typical and may vary from person to person. Please see our full disclaimer here: ragingbull.com/disclaimer.*"

It is noteworthy that, although like its competitors Raging Bull does not verify the income claims of its subscribers, Raging Bull has received thousands of unsolicited customer testimonials and reviews through customer review websites, emails, and social media posts. Subscribers

consistently post in social media that they have made profits by employing Raging Bull's education and strategies. To provide an illustration, for Jason Bond's products alone, Raging Bull has received over 900 unsolicited positive testimonials, customer reviews, and social media posts, which Dr. Wind determined contradict the FTC's claim that income potential claims are not valid. Wind Report at ¶ 43, Exhibit 27.

In repurposing in promotional materials customers' voluntarily provided endorsements, Defendants do not hold out these endorsements as "representative of what consumers will generally achieve with the advertised product or service in actual, albeit variable, conditions of use," 16 C.F.R. § 252(b), and do not create a net impression that is deceptive. Starting in 2020, Defendants also more aggressively incorporated disclaimers directly into the main body of marketing communications, or through the use of asterisks directing attention to testimonial disclaimers. This type of proactive action is not widely seen across Defendants' competitors or even in other industries. This is illustrated, for example, on the *Profit Prism* check-out page:

# Check out these Results From Existing Members:



---

17 *See* Prior Decl., Attachment A.  Raging Bull, "Profit Prism Platinum," check-out page.

Taken as a whole, the "net impression" of the use of the uncompensated, voluntarily provided consumer testimonials in Raging Bull advertising would not deceive consumers into thinking that the results those consumers experienced were typical or that new subscribers would achieve like results.

> 2.   The FTC Improperly Disregards the Use of Disclaimers, Failing to Meet Its Preliminary Injunction Burden

Beyond consumer testimonials, Raging Bull has used disclaimers in its marketing copy for years. In recent months, Raging Bull has taken additional steps to improve its disclaimers and ensure they are utilized in accordance with applicable guidelines. Indeed, the FTC recognizes that a disclaimer is sufficient if it is clearly and conspicuously disclosed. *See* FTC's *Advertising FAQ's: A Guide for Small Business,* FTC.gov, https://www.ftc.gov/tips-advice/business-center/guidance/advertising-faqs-guide-small-business (last visited January 11, 2021).[18]  Various visual examples of Raging Bull conspicuously displaying disclaimers and disclosures, including throughout the critical points of the purchase process, may be found in the Wind Report at paragraph 39, Exhibit 23.

As noted above, the FTC acknowledges that Raging Bull utilizes disclaimers, and that the disclaimers have recently improved and been more prominent. But the FTC brushes off disclaimers as wholesale inadequate. This is incorrect. It also goes to the FTC not meeting its requirement of showing a likelihood of occurrence, further demonstrating that a preliminary injunction is not necessary.

---

[18] *See also POM Wonderful LLC,* No. 9344 2013 FTC Lexis 6 at *1-2 *(F.T.C.* Jan. 10, 2013); *POM Wonderful LLC v. FTC,* 777 F.3d 478, 493 (D.C. Cir. 2015) ("an effective disclaimer" can be a cure); *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.* 832 F.2d 1311, 1315 (2d Cir. 1987) ("the use of disclaimers [is] an adequate remedy when they are sufficient to avoid substantially the risk of consumer confusion.").

Contrary to the FTC's unsupported charge that Raging Bull's disclaimers are inadequate, there is substantial support that such disclaimers are sufficient. In *National Grange of the Order of Husbandry v. California State Grange,* 2016 WL 8730678 (E.D. Ca. 2016), the Court recognized disclaimers are indeed an appropriate and long recognized method to avoid consumer confusion and misimpression, and cited cases from the Ninth and Second Circuits in reaching such conclusion. *See California State Grange,* 2016 WL 8730678, *10 (citing *Consumers Union of U.S., Inc. v. Gen. Signal Corp.,* 724 F.2d 1044, 1053 (2d Cir. 1983) ("Disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship. Absolute prohibitions of speech as provided for in the instant preliminary injunction are improper where there is any possibility that an explanation or disclaimer will suffice." (internal citations omitted)); *see also Mattel, Inc. v. MCA Records, Inc.,* 28 F. Supp. 2d 1120, 1143 (C.D. Cal. 1998) (citing *Consumers Union* favorably), *affd,* 296 F .3d 894 (9th Cir. 2002); *Playboy Enters., Inc. v. Welles,* 7 F. Supp. 2d 1098, 1104 (S.D. Cal. 1998) (citing *Consumers Union* favorably), *affd,* 162 F.3d 1169 (9th Cir. 1998).

Where the disclosures, warnings and disclaimers address the supposed misimpression, a "preliminary injunction [is] improper where there is *any* possibility that an explanation or disclaimer will suffice." *Id.* (bold/italics added); *see also Consumers Union,* 724 F.2d at 1052 (disclaimers are a favored way of alleviating consumer confusion as to source or sponsorship citing *Champion Spark Plug Co. v. Sanders,* 331 U.S. 125, 130 (1947)).

In Raging Bull's case, a link to its "Disclaimer," https://ragingbull.com/disclaimer/, is included in the website's universal footer. And, Raging Bull's Compliance and Legal strive to ensure that prominent disclaimers are included within each email, video presentation, e-book, and other publication that the company puts out. Going above and beyond what many competitors do,

Raging Bull not only includes disclaimers at the end of materials, the company also frequently includes relevant disclaimers at the beginning of or infused into spoken and written materials. Again, the company is upfront with consumers about what its services are and are not, and the net impression is not deceptive.

### G.     Defendants Have Addressed the Issues with Refunds, Cancellations and Chargebacks

The FTC tries to paint Raging Bull as "permeated with fraud" in its handling of customer refunds, cancellations and chargebacks. What the FTC ignores are the efforts Raging Bull has made to improve customer service, the exigent circumstances behind the bulk of the complaints the FTC cherry-picks in its Motion, and the fact that most of the issues have been fixed or substantially improved.

Moreover, the FTC goes to great lengths to suggest the company is draconian or underhanded with its refund policy.  This is simply not the case.  As Dr. Wind's report describes in more detail, Raging Bull grants refunds in many situations showing that the customer is not trapped after a purchase.  Wind Report at ¶ 36, Exhibit 18.  The reason for the company's default policy of not providing refunds to subscribers is that Raging Bull believes that a subscriber has received significant value upon accessing the documents and that value cannot be returned to the company upon cancellation of the service. However, Raging Bull routinely provides refunds in a variety of situations, including for cancellation within 48 hours of purchase, unwanted renewals, money-back guarantees, and after completion of a Learning Management System.  *Id.*

Raging Bull is a business that is and always has been centered on its relationship with its subscribers. It is also a business that grew extremely fast in recent years. Raging Bull chose to staff its customer service team by hiring quality people in the U.S. who would provide a better

experience for its customers, rather than outsourcing customer service offshore to save money. Bishop Decl. at ¶ 19.

When COVID-19 hit the U.S. in March 2020, Raging Bull was blindsided. In fact, Raging Bull's executive team met early on to discuss ways to cut expenses because they anticipated and planned for a significant ***drop*** in business and possibly a recession toward the summer. Bishop Decl. at ¶ 20. The opposite happened, and the company was not adequately prepared.

Unexpectedly, Raging Bull's subscriber base grew substantially very fast right at the time the company was bracing for a significant downturn. Bishop Decl. at ¶ 21. At this same time, Raging Bull was forced to close its offices and abruptly transition its employees to work from home. Bishop Decl. at ¶ 21.

This turn of events created two acute problems for customer service. First, Raging Bull's customer support agents were less productive at home; and second, the company had more support tickets come in at record rates from new subscribers. Bishop Decl. at ¶ 21. Because of these factors, Raging Bull acknowledges that it did not provide the level of customers service it had provided in the past, or that its subscribers deserved. Bishop Decl. at ¶ 21. This impacted handling rebate requests, responding to customer complaints, and addressing chargebacks. Bishop Decl. at ¶ 21. As a result, customer complaints increased to previously unseen levels. Bishop Decl. at ¶ 21. In realizing the scale of the issue, the company spent a tremendous amount of money to quickly hire more (U.S.-based) customer service employees through an outsourcing firm. Bishop Decl. at ¶ 21. This nearly doubled Raging Bull's customer support staff and helped them to catch up on outstanding support issues. Bishop Decl. at ¶ 21.

This is plainly reflected in the data reported by the Better Business Bureau ("BBB"), as cited in the FTC's Motion. Raging Bull had very few complaints with the BBB before 2018. In

fact, the company had only 15 total complaints up through 2017. *See* PX 22, 1494. Two-thirds of complaints made to the BBB about Raging Bull over the last XX years occurred in 2020 during the pandemic. *Id*. This COVID-related influx of complaints, and Raging Bull's dedication and efforts to address their customer relation issues, is reflected in the roller-coaster ride Raging Bull's BBB rating took in 2020. Raging Bull's BBB rating was a "B" in November 2019.[19] *Id*. at 1496. In March of 2020, Raging Bull's rating precipitously dropped from a "B-" to a "D". *Id*. And, as COVID roiled the company and subscribers, the rating dropped to an "F" on April 6, 2020 due to "unanswered complaints." *Id*. On October 5, 2020, after Raging Bull had implemented the changes noted above and caught up on its customer complaint backlog, Raging Bull's BBB rating changed from an "F" to "NR" "because the business responded to 19 complaints that had been previously closed as unanswered and/or unresolved." *Id*. at 14978. The rating then was increased to "B-" on October 21, 2020. This happened before Defendants had any knowledge the FTC was conducting a secret investigation and contacting potential disgruntled subscribers – finding only 21 out of the 200,000 historical subscribers of the company.[20]

Defendants believe they have addressed the customer service issues it has faced recently. For purposes of the FTC's request for a preliminary injunction, the salient point is that Defendants are entirely committed to taking any additional steps are necessary to ensure it complies the obligations and restriction listed in Section II of the TRO.

---

[19] Before November 2019, the BBB had mis-categorized Raging Bull, which artificially and inaccurately assigned an "F" score to the company. When that categorization error was fixed, the score immediately increased to a "B". *See* PX 22, 1496.

[20] The FTC tries to suggest that Raging Bull has never been able to reach "accreditation" by the BBB, that is irrelevant. Indeed, the BBB's "accreditation" program is generally thought to be a revenue-generating tool for the BBB, rather than a legitimate indicator of a business's dedication to customer service. *See* https://money.cnn.com/2015/09/30/news/better-business-bureau-millions/index.html (last visited January 11, 2021). Andy many reputable companies have received failing grades by the BBB. For example, E*Trade has an F score.

### III.   The Balance of Equities Favors Defendants as the Public Interest Will Not be Served by the FTC's Requested Relief

The FTC requests an asset freeze on Defendants' assets and a receivership that would result in the permanent termination of all business operations, regardless of the outcome at trial, and would in fact all but rig the trial in the FTC's favor by depriving Defendants from the ability to defend themselves. This extreme relief is all the more shocking because, as demonstrated above, the FTC's entire case is premised on a deception of the Court and the public.

First, the preliminary injunction sought by the FTC moot because the substantive provisions of the proposed preliminary injunction – Sections I and II of the TRO – are not in dispute. The Raging Bull Defendants will stipulate those obligations and restrictions until trial. Second, the FTC has not met its burden to show a need for the complete asset freeze against Raging Bull and the Individual Defendants. It is unnecessary to preserve assets and, in fact, serves only to deplete assets and rob Defendants of their right to defend themselves against the FTC's allegations.[21] There has been no allegation let alone showing that Defendants have transferred assets overseas or outside of the reach of this Court.  Third, the continued appointment of a receiver is also not needed and will make it effectively impossible for the company to operate as contemplated by Sections I and II of the propose preliminary injunction. In fact, it already has. This is to the detriment of Raging Bull's more than 80,000 subscribers.

An asset freeze and appointment of a receiver would inure no benefit to the public. And because a preliminary injunction is not needed to ensure Defendants follow the restrictions and obligation of Sections I and II of the preliminary injunction, there would be no benefit to the public

---

[21] Defendants reserve the right to seek to further relief in connection with the FTC's requested asset freeze based on the U.S. Supreme Court's upcoming ruling in *AMG Capital Management, LLC v. Federal Trade Commission*, No. 19-508 (cert. granted July 9, 2020). Oral argument was presented in AMG today, January 13, 2021.

by the entry of the requested preliminary injunction. Therefore, the equities do not weigh in favor of a preliminary injunction. *See Food Town Stores*, 539 F.2d at 1343.

> **A.     No Substantive Restrictions or Obligations Sought by the FTC are in Dispute, as Defendants will Stipulate to Comply with Section I and II of the TRO to the Date of Trial**

The issue for the Court is whether a preliminary injunction should issue and, if so, what should be incorporated into such a preliminary injunction. There is no dispute about the substantive provisions sought by the FTC – Sections I and II of the TRO. The Raging Bull Defendants are prepared to stipulate going forward to Sections I and II. The remaining injunctive relief sought by the FTC must therefore be denied, as Section 13(b) of the FTC Act only empowers the FTC to address "ongoing or impending illegal conduct." *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 155-56 (3d Cir. 2019) ("Section 13(b) requires that the FTC have reason to believe a wrongdoer "is violating" or "is about to violate" the law.").

> **B.     There is No Basis for the Requested Asset Freeze, Which is Inequitable and Would Deplete Assets**

An asset freeze is an "extraordinary and dramatic provisional remedy" that is only granted sparingly. *In re Adelphia Commc'ns Corp.*, No. 04-CV-2817, 2004 WL 2186582, at *8 (S.D.N.Y. Sept. 27, 2004); *see also Kemp v. Peterson*, 940 F.2d 110, 114 (4th Cir. 1991) (freezing assets is an extraordinary remedy). Nevertheless, the FTC argues that an asset freeze is required because the potential monetary liability is so great. Mot. at 51. The FTC bases this assertion on the flawed premise that every consumer who subscribed to a Raging Bull service was defrauded and should get their money back. As demonstrated above, the great majority of subscribers are satisfied with the services they received and no damages can be awarded for such subscribers even if the FTC prevailed on the merits (which they will not).

To obtain an asset freeze, the FTC must present evidence to "show a likelihood of dissipation of the claimed assets." *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719, 2009 WL 7844076, at *15 (C.D. Cal. Nov. 17, 2009). The "likelihood of dissipation" requirement is a high bar. Indeed, courts have found the FTC failed to meet this standard even where they succeeded – unlike here – in demonstrating some financial impropriety by defendants. For example, in *FTC v. Millennium Telecard, Inc.*, the court modified its prior order imposing a temporary asset freeze, observing that the FTC's limited "proofs of Defendants' financial impropriety," which included three bounced checks and a disregard for the corporate form, did not "rise to the level of those instances where courts have found a likelihood of dissipation of assets." No. 11-CV-2479, 2011 WL 2745963, at *13 (D.N.J. July 12, 2011). Instead, courts granting such asset freezes have done so only when "presented with allegations and evidence showing that the defendants were concealing assets, were transferring them so as to place them out of the reach of post-judgment collection, or were dissipating the assets." *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 707 (S.D. Tex. 2002); *see also John Beck*, 2009 WL 7844076, at *15 (denying FTC's request for asset freeze in part because there was no evidence defendants "previously attempted to intentionally dissipate, hide or otherwise shelter corporate or personal assets from an effort to collect a debt or judgment against [d]efendants").

Here, the FTC has offered **no evidence** of a likelihood of dissipation. The FTC merely contends there is "a ***possibility*** of dissipation of assets." Mot. at 51 (emphasis added). That is not enough. The FTC points to their allegation that Defendants "bilked consumers out of more than $137 million" through deceptive marketing. *Id*. But mere allegations regarding a defendant's alleged misleading marketing practices is insufficient to support an asset freeze. In *FTC v. John Beck Amazing Profits, LLC*, for example, the FTC sought an asset freeze against corporate and

individual defendants. 888 F. Supp. 2d 1006, 1012 (C.D. Cal. 2012). The court found that "the only evidence in support of an asset freeze is Defendants' misleading marketing practices," but "[i]f this were sufficient to support an asset freeze, one would issue in every deceptive advertising case." *Id*. The court rejected such a low threshold, concluding that "an asset freeze is not supported by the FTC's evidence." *Id.*

The FTC offers little more than the allegation of misleading marketing practices – which was exactly the *John Beck* court's concern. To be sure, the FTC tries to dress things up to suggest there is more than mere allegations of misleading marketing. The FTC says the alleged damages are "substantial" (Mot. at 51), but that does nothing to make dissipation more likely. The FTC also suggests that the company paying distributions to its owners over the last few years is, *ipso facto*, a sign of "dissipation." *Id*. But the FTC provides no support for the position that the payment of distributions or compensation increases the likelihood of assets being dissipated. Instead, the FTC says these distributions left the Corporate Defendants "severely undercapitalized." *Id*. The FTC cites to the declaration of their forensic accountant, but nowhere in that declaration does the accountant claim the business is under-capitalized. *See* PX 24. Indeed, the company is not "under-capitalized."

If the company's assets are frozen, it will be unable to operate consistent with Sections I and II of the proposed preliminary injunction. The FTC seeks a *de facto* shut down of the business by choking off its funds. This is, unfortunately, exactly what the FTC intends to do. In fact, it has already done so by refusing to allow the Temporary Receiver to pay operational expenses or the payroll for personnel necessary to service subscribers. But, given the failure of the FTC's allegations as illustrated above, it would be an unjust outcome

Furthermore, to avoid a complete asset freeze and allow the company to operate consistent with Sections I and II of the proposed preliminary injunction, Defendants would agree to the following limitation on the use of assets up to the time of trial:

- Raging Bull will not pay any disbursements or distributions to its owners including Individual Defendants Bond and Bishop;

- Raging Bull may pay all ordinary business expenses, including payroll, consistent with the operation of the company no otherwise inconsistent with Sections I and II of the proposed preliminary injunction; and

- Raging Bull may use all other assets as deemed reasonable and necessary upon application to the Court.

## C.      The Appointment of a Receiver is Unnecessary

Under Sections XIII and XIV.T of the TRO, the Temporary Receiver was appointed on a temporary basis to report to the Court before the hearing on preliminary injunction regarding whether he believes the business can operate legally and profitably. In other words, the Temporary Receiver is to make a determination as to whether Defendants could operate a successful business in compliance with Section 5(a) of the FTC Act. Because the evidence shows that there is demand for the services Raging Bull provides and it can operate profitably (as evidenced by the fact it has many competitors in the space and its own satisfied customers), the Temporary Receiver should conclude that Raging Bull can operate in compliance with the FTC Act and profitably. As a result, there is no need to suspend operations under Section XIV.T or for the continued appointment of a receiver. The Court should therefore reject the FTC's request for appointment of a receiver as unnecessary. *See Compass Bank v. Baraka Holdings, LLC*, No. 17-CV-06563, 2017 WL 10378348, at *3 (C.D. Cal. Oct. 26, 2017) ("Appointing a receiver is an extraordinary equitable remedy, which should be applied with caution.") (quoting *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009)).

The basis for the FTC's request that a receiver be appointed is that "Defendants cannot be trusted to operate the business lawfully." Mot. at 53. Defendants have demonstrated this to be false and that the business was not "permeated with fraud." Moreover, because Defendants will agree to operate its business consistent with Sections I and II of the proposed preliminary injunction, and will also agree to the limitations (but not freeze) on the use of their assets stated above, a receiver will not serve any role in ensuring the lawful and profitable operation of the business or the preservation of assets. Indeed, the continued appointment of a receiver could make it impossible to operate the business as it already has. Respectfully, a receiver cannot reasonably be expected to run the operations of the company. The company depends on the active involvement of the Individual Defendants, whose experience and relationship with subscribers is the predominant asset of the company. *See FTC v. Verity Int'l, Ltd.*, 124 F. Supp. 2d 193, 204 (S.D.N.Y. 2000) (noting that because "preliminary injunction rulings are based on incomplete records and therefore arguably have a higher probability of error than rulings after trial or on summary judgment," the court should be "reluctant to impose what might be a commercial death sentence at an interlocutory stage if there is some reasonable alternative").

To the extent the Court deems it necessary and appropriate, Defendants would be amendable to the appointment of an independent compliance monitor to ensure Raging Bull operates in compliance with its agreement to abide by Sections I and II of the proposed preliminary injunction. *See FTC v. OTA Franchise Corp.*, Case No. 20-cv-00287 JVS (KESx) (Dkt. 130) 4/20/20 Preliminary Injunction (ordering use of an independent monitor, rather than the appointment of a receiver, to ensure defendant's compliance with preliminary injunction).

## KYLE DENNIS AND THE WINSTON ENTITIES' RESPONSE

The FTC seeks to hold Kyle Dennis, a Raging Bull employee with no equity or managerial role in the company, and two entities that had no role in the allegedly deceptive conduct at issue, Winston Research Inc. and Winston Corp. (the "Winston Entities"), jointly and severally liable with Raging Bull for $137 million.  Neither the law nor the facts support such an outcome, yet the FTC seeks a preliminary injunction that imposes a blanket asset freeze on all of Mr. Dennis's personal assets, in addition to the assets of the Winston Entities. Such a preliminary injunction is improper.

First, the FTC will not succeed on the merits of its claims against Mr. Dennis or the Winston Entities.  Regardless of whether *Raging Bull* may have engaged in questionable advertising practices, *Mr. Dennis* does not directly participate in any of Raging Bull's advertising practices, and his job duties are limited to providing content to paying subscribers to products under Raging Bull's Biotech Breakouts brand.  Mr. Dennis does not write, approve, or even see marketing emails – even if they purport to be from him – that are sent to consumers before they are distributed.  The FTC therefore cannot point to a single deceptive, false, or misleading statement that Mr. Dennis has made to any consumer.  When looking at the content that Mr. Dennis actually provides to consumers – paid educational content – Mr. Dennis is transparent with consumers, explaining that sometimes his strategies work and sometimes they don't work, and reminding them that they cannot expect to simply mirror his trades and be profitable traders.  Nor does Mr. Dennis control any of the alleged deceptive practices: he is a non-executive, non-managerial employee who has no control over Raging Bull's marketing department, customer service representatives, billing policies, or cancellation policies.  Yet the FTC seeks to hold him accountable for all of it.

As to the Winston Entities, the FTC's evidence cannot and will not support holding them liable under a theory of common enterprise liability. As an initial matter, the FTC's complaint should be dismissed against them because it contains literally no non-conclusory allegations about them other than their corporate existence. [Compl. ¶¶ 14, 18, 19.] And in support of an injunction, the FTC cites no evidence connecting the Winston Entities to the allegedly deceptive practices whatsoever aside from the fact that they received money from Raging Bull for contractually provided services. Merely receiving such money does not give rise to common enterprise liability under well-established precedent, making a preliminary injunction against the Winston Entities improper. Thus, the FTC is unlikely to succeed on the merits of its case against Mr. Dennis and the Winston Entities.

Second, the equities weigh against preliminary injunctive relief. Here, the FTC asks this Court to impose a blanket asset freeze on all of Mr. Dennis and the Winston Entities' assets in order to preserve $137 million for consumers. But the FTC ignores Mr. Dennis's role as a mere employee of Raging Bull, and the Winston Entities' lack of any role whatsoever in the allegedly deceptive conduct at issue. The FTC attempts to lump all of the defendants together using group pleading and hyperbolic language unsupported by any evidence, but the reality is that imposing an asset freeze on everything that Mr. Dennis owns is unjust and inequitable considering that Mr. Dennis is one of 160 employees at Raging Bull, and one of many "gurus" at Raging Bull whose job duties are exactly the same as Mr. Dennis's. Further, in addition to his work for Raging Bull, Mr. Dennis also works as an independent trader and much of his personal assets were earned from work entirely separate from Raging Bull – precisely because Mr. Dennis is in fact a highly succesful and profitable trader. The scope of the relief sought by the FTC is overbroad and would freeze all of the assets, regardless of whether the assets came from Raging Bull.

Finally, the asset freeze that the FTC seeks over Mr. Dennis's personal assets is overbroad, unnecessary, and not supported by law. Recent Supreme Court precedent limits the FTC's potential recovery against Mr. Dennis and the Winston Entities to their own net profits. Yet the asset freeze that the FTC proposes would freeze *all* of Mr. Dennis's assets. Such an asset freeze would have devastating consequences on Mr. Dennis. The FTC has failed to demonstrate why an asset freeze is necessary to ensure that permanent relief is available. The FTC cannot meet its burden of justifying a preliminary injunction, an extraordinary and drastic remedy, against Mr. Dennis and the Winston Entities.

## RELEVANT FACTS

Alone amongst the defendants, Mr. Dennis has no ownership in or control over Raging Bull's corporate practices and policies. Rather, he was at all relevant times either an independent contractor (through the Winston Entities) or an employee of Raging Bull whose job it was to generate content for paid subscribers to Raging Bull's "Biotech Breakouts" brand. The content generated by Mr. Dennis was at all times accurate, honest, and reflective of his own personal trading.

Mr. Dennis began his trading career as Jason Bond's student. He saw an advertisement for Jason Bond's swing trading program – before Raging Bull existed – and subscribed, learned from Mr. Bond, and developed the skills necessary to become a successful full-time trader. [Exhibit 6, Declaration of Kyle W. Dennis ("Dennis Decl.") ¶¶ 3–4.] Eventually, Mr. Dennis asked Mr. Bond if he could pass on the skills that he had learned to others through a newsletter. [*Id.* ¶ 5.] Mr. Bond agreed, and in 2016, Lighthouse Media, LLC (the former name of Raging Bull) and Winston Corp., a corporation owned by Mr. Dennis, entered into an agreement under which Winston Corp. (and later Winston Research Inc.) was to provide newsletter content to Lighthouse Media. [Dennis

Decl. ¶¶ 5–6 & Ex. A.] Effective January 1, 2019, Mr. Dennis became a full time, at-will employee of Raging Bull, with the title of "Biotech Breakouts Guru." [Dennis Decl. ¶ 7 & Ex. B.] Mr. Dennis is not an executive of Raging Bull, does not own (and never has owned) any equity in Raging Bull, and does not have any right to participate in the profits of Raging Bull. [Dennis Decl. ¶¶ 9–10.]

As a Biotech Breakouts Guru, Mr. Dennis provides content to paid subscribers to Raging Bull's products under the "Biotech Breakouts" brand, which currently include Fast 5 Trades, Dollar Ace, Sniper Report, Trade With Kyle, and Mobile Closer. [*Id.* ¶¶ 8, 12.] The purpose of those products is to educate Raging Bull subscribers by (1) providing them with educational content, including videos and ebooks, that walk subscribers through basic trading principles and strategies, and (2) providing subscribers with examples of how to apply those principles and strategies from Mr. Dennis's own trading – or "teaching by doing." [*Id.* ¶¶ 13–18.] Mr. Dennis explains to subscribers that the purpose of the products is educational. For example, when users sign up for Fast 5 Trades, they receive a welcome email stating, "**The goal of this service is to EDUCATE you on my personal trading tactics by showing you which stocks *I'm* stalking and why, so you can hopefully apply those principles in your own trading**." [PX27 Att. VVV, p.2377–78 (emphases in original).]

The primary ways in which the Biotech Breakouts products teach by doing is through watch lists and trade alerts. Watch lists provide subscribers with a list of securities that Mr. Dennis is monitoring and an explanation, sometimes in the form of an accompanying video, as to why he is including certain securities on the watch list. [Dennis Decl. ¶ 19.] The watch lists also typically provide a "buy zone" (which tells subscribers at what price Mr. Dennis would consider purchasing shares), a "profit zone" (which tells subscribers where Mr. Dennis thinks the stock price might

move), and a "stop zone" (which tells subscribers at what price Mr. Dennis would consider acting to limit losses if the trade moves against him). [*Id.* ¶¶ 20–21 & Exs. G, H.]

Trade alerts tell subscribers when Mr. Dennis makes a trade that was listed on a watch list, and they are not meant to be mirrored. [Dennis Decl. ¶ 23.] Mr. Dennis makes this clear to subscribers, and emphasizes that subscribers should use the trade alerts as examples of how to execute that strategy, and to make their own trades rather than copying what Mr. Dennis does. [*Id.*] For example, the FAQs page for Fast 5 Trades clearly states: "The goal should be to use the education and ideas to form your own trade plans, rather than waiting to follow along with Kyle's (which will be impossible to match, given how fast the market moves)." [Dennis Decl. Ex. J.]

Mr. Dennis also updates subscribers as to the outcome of his trades, letting them know both when his trades are successful and when he was wrong. [Dennis Decl. ¶ 28.] Further, all of Mr. Dennis's emails to subscribers – including emails containing watch lists and trade alerts – contain a disclaimer, which were subject to Raging Bull's compliance policies, explaining that the information Mr. Dennis provides is "solely for informational purposes," is "not intended to be used as a personalized investment recommendation" and that subscribers "bear responsibility for his/her own investment research and decisions." [*Id.* ¶ 25.]

As a non-executive employee with no ownership stake in Raging Bull, Mr. Dennis's role is limited. While he writes almost all of the content that goes to *paid* subscribers to the Biotech Breakouts product himself, he does not have any control over or input into content that any other Raging Bull gurus, including but not limited to Jason Bond and Jeffrey Bishop, provide to paid subscribers. [*Id.* ¶¶ 30, 31.] Further, Mr. Dennis does not write or create *any* free content, including free articles on the Raging Bull website and free Raging Bull emails, even if they purport to be "signed" by Mr. Dennis, contain his picture, or come from kyle@biotechbreakouts.com. [*Id.*

¶ 32.]  And Mr. Dennis does not create the advertising or marketing materials for any of Raging Bull's products, including those under the Biotech Breakouts brand.  [*Id.* ¶¶ 34–36.]  Sometimes, as part of his job duties, Raging Bull has Mr. Dennis appear in video sales letters ("VSLs") to promote a Biotech Breakouts product, but those VSLs are scripted by Raging Bull's marketing department and Mr. Dennis understood them to be approved by Raging Bull's compliance department post-production; Mr. Dennis is effectively an actor reading lines.  [*Id.* ¶ 39.]  Finally, Mr. Dennis has no role in handling subscribers' requests to cancel subscriptions to Raging Bull's products, requests for refunds or credit card chargebacks, billing policies, or automatic subscription renewal policies.  [*Id.* ¶¶ 43–45.]  Mr. Dennis is not involved in corporate policymaking at all.  [*Id.* ¶ 11.]

Winston Corp. and Winston Research Inc. are both S corporations of which Mr. Dennis is the only shareholder and employee.  [*Id.* ¶¶ 46–47.]  Winston Corp. contracted with Raging Bull to provide it with services prior to Mr. Dennis becoming an employee of Raging Bull, but never had any other operations.  [*Id.* ¶¶ 5, 46.]  Winston Corp. was dissolved in 2017, and Mr. Dennis became an independent contractor with Raging Bull through Winston Research Inc.  [*Id.* ¶ 6.]  Both Winston Entities are assetless and have no operations.  [*Id.* ¶¶ 46–47.]

## ARGUMENT

### I.  The FTC Cannot Demonstrate that Mr. Dennis is Individually Liable for the Alleged Deceptive Practices Under the FTC Act.

Mr. Dennis and the Winston Entities join in the Raging Bull Defendants' arguments to the extent applicable to them.  But even assuming for the sake of argument that the Court believes that Raging Bull's practices were deceptive, the FTC will be unable to meet its burden of proving that Mr. Dennis – an employee with limited job duties that do not encompass the alleged conduct at issue – is personally liable for those practices.

An individual may be found liable under Section 5 of the FTC Act only if he: "(1) participated directly in the deceptive practices or had authority to control those practices, *and* (2) had or should have had knowledge of the deceptive practices." *F.T.C. v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014) (emphasis added).[22]  Mr. Dennis did not directly participate in any deceptive practice – he is not involved in the Raging Bull advertising at the center of the FTC's Complaint and the paid Raging Bull content that Mr. Dennis authored is not deceptive.  Nor does Mr. Dennis have the authority to control any of the allegedly deceptive practices because, as a non-executive employee of Raging Bull, he has no ultimate authority over how Raging Bull markets its products, Raging Bull's auto-renewal policies, or Raging Bull's cancellation policies.  Presumably for this reason, the FTC did not sue any other Raging Bull employees, including the other "gurus" who likewise authored content to Raging Bull subscribers and had the same exact role and responsibilities as Mr. Dennis.[23]

Thus, the FTC will be unable to prove that Mr. Dennis participated directly in any deceptive practices, had the authority to control any deceptive practices, or even knew about any deceptive practices.

A.     **Mr. Dennis Did Not Participate In Any Deceptive Practice or Have the Authority to Control Any Deceptive Practice.**

Mr. Dennis did not participate directly (or indirectly) in the deceptive practices alleged in the FTC's Complaint, and the FTC has not pointed to any evidence demonstrating otherwise. Instead, the FTC argues, without the benefit of evidence or explanation, that Mr. Dennis was

---

[22]     The FTC misleadingly suggests that knowledge of a corporate entity's deceptive conduct can give rise to individual liability.  [FTC Br. at 48.]  That is incorrect – the FTC must show *both* (1) participation in or authority to control the deceptive practices *and* (2) knowledge of the deceptive practices.  *See Ross*, 743 F.3d at 892.

[23]     It is a mystery why the FTC chose to sue only Mr. Dennis amongst all of Raging Bull's employees, except perhaps that as an unquestionably successful trader, the FTC sees Mr. Dennis as a "deep pocket."

"intimately involved in Raging Bull's advertising and lead the majority of the company's trading programs." [FTC Br. at 48–49.] This argument fails for two reasons: (1) the evidence demonstrates the contrary, namely, that Mr. Dennis is *not* intimately involved in Raging Bull's advertising and is, in fact, not involved in Raging Bull's advertising at all and (2) nothing about Mr. Dennis's actual conduct – which includes authoring educational material for paid Raging Bull subscribers – is deceptive.

1. <u>Mr. Dennis Does Not Directly Participate In or Have the Authority to Control Raging Bull's Allegedly Deceptive Advertising.</u>

Mr. Dennis has one job at Raging Bull: to create content for paid subscribers using products under the Biotech Breakouts brand (and *only* products under that brand). [Dennis Decl. ¶ 8.] The FTC incorrectly contends that Mr. Dennis was "intimately involved in Raging Bull's advertising," relying on evidence that is easily rebutted and that cannot support its burden of proving individual liability. That evidence falls into three categories: (1) Raging Bull marketing emails that were not distributed or written by Mr. Dennis; (2) Raging Bull product sales pages that were not written or designed by Mr. Dennis; and (3) Raging Bull VSLs that are scripted by Raging Bull's marketing department and approved by Raging Bull's compliance department. [*See* FTC Br. at 35 ("Dennis markets his products through promotional videos, email marketing and product webpages replete with deceptive earnings claims.").]

a. Mr. Dennis is Not Liable for Raging Bull's Marketing Emails.

First, in contending that Mr. Dennis was "intimately involved" in advertising, the FTC incorrectly attributes all marketing emails for products under the Biotech Breakouts brand directly to Mr. Dennis, as if he himself personally wrote or approved them. [*See e.g.*, PX14 ¶ 52 ("On April 29, 2019, I received a solicitation email from Kyle Dennis."); PX28 ¶ 4 ("On December 8, 2020 at 6:18pm ET, I received an email from Kyle Dennis at Kyle@biotechbreakouts.com. The

email included a hyperlink to a sales page for Dollar Ace.").] But the FTC points to *no evidence* supporting its conclusion that Mr. Dennis was "intimately involved" in writing, distributing, or approving any marketing emails. Instead, without any evidence, the FTC makes the leap that because some marketing emails and sales pages depict Mr. Dennis's name or picture or one of the Biotech Breakouts products, the statements in those materials must be attributable to Mr. Dennis.

The reason that the FTC cannot cite any such evidence is that Mr. Dennis, in fact, does not write marketing materials for *any* products advertised to consumers, including the Biotech Breakouts products. [Dennis Decl. ¶ 34.] Mr. Dennis does not write any emails advertising Raging Bull products under that brand, including those that are sent from kyle@biotechbreakouts.com, those that purport to be "signed" by Mr. Dennis, or those that contain Mr. Dennis's picture. [*Id.* ¶¶ 35–36.] Those advertising emails are written and distributed by Raging Bull's marketing department, and Mr. Dennis does not even see them before they are distributed. [*Id.*] Simply put, Mr. Dennis's job is limited to providing paid content to his subscribers. Although the Biotech Breakouts products have Mr. Dennis's face and name on them, Mr. Dennis is just an employee; they are ultimately Raging Bull's products, and Raging Bull has ultimate authority over how those products are marketed and presented to consumers. And, in any event, the marketing emails are not false or deceptive in any way. [*See supra* Part II of Raging Bull Defendants' Response.]

> b.     Mr. Dennis is Not Liable for Raging Bull's Product Webpages.

Second, and similarly, the FTC contends that Mr. Dennis is responsible for all of the sales pages on the Raging Bull website that relate to Biotech Breakouts products. [*See, e.g.*, FTC Br. at 20 ("For Dennis' Sniper Report program, *he states* on the order page . . . ." (citing PX 27, ¶ 23, Att. SS, p. 2180) (emphasis added)).] But Mr. Dennis does not write the statements on various sales pages on Raging Bull's website and does not design the sales pages, including the location and appearance of the disclaimers on them. [*Id.* ¶ 41.] Nor does he choose which customer

testimonials appear on sales pages, or have any role verifying testimonials.  [*Id.* ¶ 40.]  Again, his role as an employee at Raging Bull encompasses trading and providing paid content to subscribers about that trading, not advertising products.

And even if Mr. Dennis could be said to have "participated" in making statements on webpages that he did not write or design, the webpages are pointed examples of inactionable statements that the FTC will ultimately be unable to demonstrate are false or misleading.  For example, the FTC points to the following statements on Raging Bull product webpages, and attempts to shoehorn them into a broad category of deceptive earnings statements and statements about who can successfully use the products:

- The Sniper Report product page on biotechbreakouts.com stating that Sniper Report is "strategically developed to only deliver high probable [sic] trades with the power to make 100%, 200%, 300% return [sic] on each trade."  [FTC Br. at 11 (citing PX 27, Att. FFFFF, p.3045).]

- The order page for Sniper Report on ragingbull.com stating that: "Kyle's No Work Promise: Say 'SO LONG!' to the days of tedious trading, slaving over stock charts or spending thousands on a degree in finance . . . Kyle does ALL the work and research. All you have to do is read his alerts and reap the benefits."  [FTC Br. at 20 (citing PX 27, Att. SS, p.2180).]

As to these statements, the "express or implied message conveyed" is not false, as the FTC must prove in order to demonstrate that the representations were likely to mislead consumers.  [*See* FTC Br. at 39 (citing *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994)).]   In the first statement, the very words used make clear that there is only a *potential* to make certain trades using his program and that those trades only have "the power to" result in high returns.  That statement conveys no express claims, guarantees, or promises, and the FTC in fact points to no evidence that the statement about what Sniper Report was "strategically developed" to do is false. [*See supra* Parts II.D & II.E. of Raging Bull Defendants' Response.]   Such statements about potential returns are also illustrative examples of puffery.  *See, e.g.*, *In re Sanctuary Belize Litig.*,

No. CV PJM 18-3309, 2020 WL 5095531, at *29 (D. Md. Aug. 28, 2020) (property developer's representations to prospective lot purchasers that lot values would greatly appreciate was puffery and did not violate FTC Act); *Carlucci v. Han*, 886 F. Supp. 2d 497, 524 (E.D. Va. 2012) (alleged misrepresentations regarding potential investment return "that Envion would provide Carlucci with the best return he had ever received, possibly up to 50 times his investment" "are the quintessential examples of non-actionable puffery").

The second statement is taken out of context. As explained on the sales page the FTC cites and in other materials, Sniper Report is a "set it and forget it strategy" that provides Mr. Dennis's monthly trade ideas for long-term trades that he may buy and hold for many months. [PX27, Att. SS, 2177 ("Each month you will receive Kyle's personal selection of his favorite "set it and forget it" stock ideas."); Dennis Decl. ¶ 22 & Ex. I ("Remember, the outlook on these are generally 9+ months forward looking, so my view here is more of a longer term trade rather than a short term swing trade.").] Thus, when the Sniper Report sales page says things like "[so long] to the days of tedious trading," such representations are comparing long-term trading to short-term trading, which by nature require more time and attention to the market on a day-to-day basis than long-term "set it and forget it" trades. Further, the FTC's brief omits other statements on the sales page clarifying that subscribers will need to educate themselves in order to benefit from Sniper Report. For example, the sales page explains that a subscription to Sniper Report comes with "100+ total lessons with 50+ hours of material on investing . . . . Start from square 1 and move through the 50+ hours of lessons at your own pace, or lock-in on lessons where you know you need the most improvement." [PX27, Att. SS, p. 2179.] Thus, not only is Mr. Dennis not liable for what Raging Bull says about products on its websites, but the statements as to the Biotech Breakouts products are not false or misleading in any way.

c.      Mr. Dennis is Not Liable for Raging Bull's VSLs.

Third, the FTC attempts to argue that statements in VSLs that market Raging Bull products are attributable to Mr. Dennis.  [FTC Br. at 11–12, 20, 23 (citing PX 27 Atts. DD & EE).]  But VSLs read by Mr. Dennis are scripted by Raging Bull's marketing department, and Mr. Dennis does not write those scripts, aside from providing Raging Bull with real life trade examples to include.  [Dennis Decl. ¶ 39.]  Further, Mr. Dennis's understanding is that the VSLs are approved by Raging Bull's compliance department post-production.  [*Id.*]  Thus the VSLs are not Mr. Dennis's, but rather Raging Bull's – Mr. Dennis, as a Raging Bull employee who works pursuant to an administrative structure put in place by his corporate employer, does not choose how to market Raging Bull's products and is not at all involved in corporate policymaking about such marketing. He is merely reading lines.

Even if Mr. Dennis could somehow be held personally liable for VSLs scripted by Raging Bull's marketing department and approved by Raging Bull's compliance department, the VSLs that the FTC attempt to attribute to Mr. Dennis are not deceptive.  The FTC selectively points to statements in VSLs about Raging Bull programs under the Biotech Breakouts brand being "perfect" and "easy to follow" [FTC Br. at 20 (citing PX 27 Att. DD, pp. 1992, 1994-1995)], but conveniently omits the portions of the VSLs in which Mr. Dennis reads portions of the scripts explaining that he lost money when he first started trading because trading is difficult.  [*See, e.g.*, PX27 Att. DD, p. 1991 (Dollar Ace VSL explaining that Mr. Dennis "sucked" when he first started trading and "lost half of [his] account" because he "didn't understand how the market really worked"); PX27 Att. EE, pp. 1997–98 (Fast 5 Trades VSL, stating "Now trading wasn't a walk in the park at the beginning. I actually lost 7,000 dollars and almost took myself out of the game, but I didn't quit."); *see also supra* Parts II.D & II.E. of Raging Bull Defendants' Response.]  Not only does the FTC omit important context from the VSLs that negate their allegations that they are

deceptive, but even the statements it does point to about the programs being "easy to use" and "perfect" are additional examples of inactionable puffery. *See, e.g.*, *Kiddie Acad. Domestic Franchising, LLC v. Wonder World Learning, LLC*, No. CV ELH-17-3420, 2020 WL 4338891, at *21 (D. Md. July 27, 2020) (representations that "owner operators of its franchises did not need any training or experience as [franchisor] provided all training" and that franchisor had a "platform which would guide [franchisee] to success" were mere puffery); *Baney Corp. v. Agilysys NV, LLC*, 773 F. Supp. 2d 593, 609 (D. Md. 2011) (statement that a program would be "easy to use and perfect for a multi-property environment" was "mere puffery," "is too much like an opinion to constitute a misstatement of fact, and it is too vague to justify reliance").

The FTC also highlights statements in the VSLs about Mr. Dennis's own trading success, but points to no evidence demonstrating or even suggesting that those statements are false or deceptive in any way.  [FTC Br. at 8, 12 (citing PX27 Att. EE, pp. 1997–98).]  In fact, the FTC does not challenge Mr. Dennis's success as a trader *at all*.  Even the FTC's expert, Russell Wermer, whose report includes a deeply flawed analysis of the trading performance of Raging Bull's owners – Jeff Bishop and Jason Bond – does not even bother to address Mr. Dennis's own trading performance.  [PX26 ¶¶ 86–88, pp. 1777–79.]  This is likely because Mr. Dennis has been unquestionably successful, using the skills he learned when he was a student of Jason Bond's to become a profitable trader.  [Dennis Decl. ¶ 3.]  Mr. Dennis earned over $1 million in short-term capital gains from trading in 2019, and over $5 million in short-term capital gains from trading in 2020.  [*Id.* ¶ 4; *see also* Bond Decl. ¶ 22 (detailing Mr. Dennis's verified success as a trader and student of Mr. Bond).]

Finally, the FTC points to a webinar promoting Trade With Kyle, a Raging Bull product under the Biotech Breakouts brand, for which the Raging Bull marketing department provided Mr.

Dennis with a PowerPoint slide deck to present (which he understood that the compliance department approved). [Dennis Decl. ¶ 39; PX27 Att. LL, p.2088.]  This is the only marketing video including Mr. Dennis that the FTC cites that was *not* scripted and it contains a clear disclaimer about trading's inherent risks. [PX27 Att. LL, p.2089 ("[T]his is really super super-duper important. Disclaimer here, right.  Trading is risky. . . . [Y]ou're the one taking responsibility for your wins and your losses. I always like to hear about both because I have wins and losses as well and I take responsibility for my decisions, as you should take that, those responsibilities as well.").]  Accordingly, even if the FTC can demonstrate that Mr. Dennis participated in Raging Bull's advertising practices by appearing in promotional videos, the FTC will be unlikely to demonstrate that the few videos in which Mr. Dennis appeared are deceptive in any way.

Without evidence demonstrating that Mr. Dennis himself personally engaged in any deceptive conduct, the FTC cannot hold him personally liable for Raging Bull's conduct even if the Court determines that some of that conduct was deceptive.  Mr. Dennis's role stands in stark contrast to other cases in which courts have found individuals liable for false or misleading advertisements.  For example, in a case in this district, the court held that an individual directly participated in a deceptive marketing scheme where she "controlled the contents and appearance of the ads," "reprimanded and disciplined departments when the work did not coincide with her standards," "supervised the ad developers, [and] made changes and gave orders concerning the ads." *F.T.C. v. Ross*, 897 F. Supp. 2d 369, 384 (D. Md. 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014). In stark contrast to *Ross*, Mr. Dennis is a mere employee whose job is to provide paid content to Raging Bull subscribers that the FTC does not allege was deceptive.  Mr. Dennis's conduct bears no relation to conduct in other cases where individual employee liability has been established.

          d.     Mr. Dennis Does Not Have Authority to Control Raging Bull's Advertising.

Similarly, Mr. Dennis does not have authority to control the allegedly deceptive advertising practices at issue. As the FTC explains, "[a]uthority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." [FTC Br. at 48 (quoting *FTC v. Innovative Mktg.*, 654 F. Supp.2d 378, 385–86 (D. Md. 2009)).] Mr. Dennis is a non-executive employee who has no managerial responsibilities over anyone in Raging Bull's marketing department, is not an officer, and who has had no role in making corporate policy. [Dennis Decl. ¶¶ 9, 11.] Mr. Dennis does not even see marketing emails that promote Biotech Breakouts products before they are distributed to consumers. [*Id.* ¶¶ 34–36.] The FTC has not pointed to a single case in which a non-executive, non-equity employee of a corporate defendant whose job duties do not encompass advertising, and who has no control over the employees whose job duties do encompass advertising or the policies that guide those employees, was held liable for deceptive advertising. [FTC Br. at 48–49.]

    2.    <u>Raging Bull's Biotech Breakouts Brand's Paid Content is Not Deceptive in Any Way.</u>

With respect to Mr. Dennis's actual job at Raging Bull – providing content to paid subscribers under the Biotech Breakouts brand – the FTC has pointed to no false or misleading earnings claims or statements about the amount of experience, effort, and money required to trade successfully that Mr. Dennis made in performing those duties. In fact, Raging Bull's products under the Biotech Breakouts brand are extremely transparent.

First, all of the products are meant to teach subscribers trading strategies by using Mr. Dennis's own trades as real life examples of how to apply those strategies. [Dennis Decl. ¶ 18.] Second, Mr. Dennis updates subscribers on the results of his trades, even when he incurs losses. [*Id.* ¶ 28 & Ex. N.] Third, Mr. Dennis reminds subscribers that trading is inherently risky and that

no one can guarantee where the price of a certain security will go.  [*See, e.g.*, PX25, ¶ 130 ("Do I know where it's gonna base out? Absolutely not … Anybody that tells you they do know exactly where it's going to go is lying to you."); Dennis Decl. ¶ 28 & Ex. N at 10 ("Of course, there will always be unexpected gaps down. . . .").]

Fourth, Mr. Dennis's statements to his subscribers include disclaimers, many of which were approved by Raging Bull's counsel, making clear that he is not giving investment advice. [*See, e.g.*, PX13 Att. I, p.868 (trade alert with disclaimer); ECF No. 28-2 at 136 (subscriber review stating "[w]ithout fail, they give the disclaimer that they cannot give advice to people who ask for it. I wish I had a dollar for every time I've heard Kyle [Dennis] say that in Mobile Closer"); PX27 Att. VVV, p.2377–78 ("It's also important to note that I am NOT a financial advisor or broker, and I do NOT make stock recommendations." (emphasis in original)).]  Fifth, Mr. Dennis often reminds subscribers that they should use his services to educate themselves on his trading strategies, and that successful trading takes time and effort.  [*See, e.g.*, Dennis Decl. Ex. F at 1 (encouraging subscribers to watch an educational video "so you understand my thought process and learn").].   Mr. Dennis is explicit with subscribers that they are not supposed to try to mirror his trades.  [Dennis Decl. ¶ 23 & Exs. J at 1, K at 1.]  Rather, he explains to subscribers that the goal of the Biotech Breakouts products is to educate them, using his own trades only as examples of how to apply the trading strategies that they are meant to teach. [*Id.* ¶¶ 16, 23; PX27 Att. VVV, pp.2377–78.]

The FTC largely bases its argument, however, on a handful of complaints that subscribers are unable to successfully mirror Mr. Dennis's trades when they receive trade alerts.[24]  [*See, e.g.*,

---

[24]      Trade alerts are hardly novel.  Countless paid subscription services on the market offer trading education and ideas through trade alerts and other similar real-time trading features.  For example, TheStreet offers "notifications on every trade Jim Cramer [host of Mad Money on

FTC Br. at 16–17.]  Even if true, this cannot possibly make Mr. Dennis's conduct deceptive because he repeatedly and explicitly tells his subscribers that they should not use trade alerts to copy his trades.  This is not a point buried in the fine print:  Mr. Dennis says it in plain – sometimes boldfaced – language when a subscriber first begins receiving Biotech Breakout content, (PX27 Att. VVV, p.2377–78 (Fast 5 Trades Welcome email stating:  "**The goal of this service is to EDUCATE you on my personal trading tactics by showing you which stocks *I'm* stalking and why, so you can hopefully apply those principles in your own trading**."  (capitalization, boldface, and italics in original));  *see also* Dennis Decl. Ex. E (Dollar Ace Welcome email containing substantially similar language)), and reiterates the point over and over again, including in products' Frequently Asked Questions, (*see, e.g.*, Dennis Decl. ¶ 23 & Ex. J ("The goal should be to use the education and ideas to form your own trade plans, rather than waiting to follow along with Kyle's (which will be impossible to match, given how fast the market moves).");  PX25 ¶ 119 ("Cause the goal here is, like I've been saying from the get go, is not to sit here and mirror anyone's trades.");  Dennis Decl. Ex. K (example of Mobile Closer trade alert stating "Remember, be responsible for where YOU want to buy and sell. I'll be holding overnight, but you can always sell whenever you want - even before the day's close if you see a gain you like.")).

   The FTC attempts to argue that Mr. Dennis's post-purchase statements to his subscribers about not copying his trades demonstrate that the pre-purchase advertising of the trade alerts is

---

CNBC] and his team make."  *See* https://subscription.thestreet.com/action-alerts-plus/.  Sky View Trading offers alerts in which subscribers are "immediately notified" when its traders place trades. *See*  https://skyviewtrading.com/alerts/.  Shaeffer's Investment Research offers a variety of "Advanced Trading Alerts" which are "real-time alerts delivered during market hours for investors looking to take their option trading to the next level and to optimize their trading decisions."  *See* https://store.schaeffersresearch.com/product-details/advanced-trading-services.  These are only a few examples of the many trade alert services available to consumers for a fee.  *See* Money Crashers, 7 Best Stock Picking Services of 2020 (Nov. 1, 2020), *available at* https://www.moneycrashers.com/best-stock-picking-services/.

deceptive, and that he must be held liable for such alleged deception.  [FTC Br. at 16–17.]  This argument fails as to Mr. Dennis for two reasons.  First, as explained above, Mr. Dennis does not market his trade alerts, and thus cannot possibly be held responsible for how they are marketed.  Second, Mr. Dennis's trade alerts are *not* in fact marketed in a way to suggest that they "are designed so consumers can copy the trades and make money like the instructor claims he makes" as the FTC contends.  [FTC Br. at 14.]  The FTC does not point to a single advertisement that states that the purpose of Mr. Dennis's trade alerts is for consumers to make the very trades that he makes when he makes them.  Rather, the FTC cites a VSL in which Raging Bull's script (not Mr. Dennis) states that "alerts [will be] delivered right to your phone and right to your email" and that the alerts will tell them exactly what Mr. Dennis is buying. [FTC Br. at 16 (citing PX 27 ¶ 24, Att. DD at 1995).].  That statement is entirely consistent with the service that the trade alerts actually provide – a message telling consumers what Mr. Dennis is buying – and nothing about that statement says that consumers can or should copy Mr. Dennis's exact trades.  In fact, many consumers apparently understood the purpose of the trade alerts *before* purchasing Raging Bull products under the Biotech Breakouts brand.  [*See, e.g.*, ECF No. 28-2 at 143 ("I knew that what I was paying for was not trade alerts or some kind of service where you blindly follow a trade and expect to make money."); *id.* at 159 ("Now something to understand here is that these trades are just what the Gurus are taking and never an advice for us to take.").]²⁵

---

²⁵    The FTC also contends that the trade alerts do not provide information on the appropriate buy or sell price for the corresponding security based on its expert's report.  [FTC Br. at 18.]  This is wrong.  The FTC's expert, Russell Wermers, provided a single example of a trade alert that Mr. Dennis sent out and opined that the alert was not clear about when subscribers should buy or sell.  [PX26 ¶ 81 & Fig. 4.]  First of all, the trade alert clearly explains what *Mr. Dennis* did with a stock, and not what subscribers should do.  [*Id.* Fig. 4 ("I added 2,500 more share of EARS at .73 . . . .).]  Second, Wermers takes the trade alert completely out of context and ignores the other information that Mr. Dennis provides subscribers.  Earlier the same day, Mr. Dennis provided subscribers with a watch list containing a buy zone, profit zone, and sell zone for the very same security mentioned

It simply cannot be deceptive that subscribers are unable to match Mr. Dennis's trades when he literally tells them that his trades are "impossible to match."   [Dennis Decl. Ex. J.]  The fact that some subscribers were allegedly unhappy with Mr. Dennis's products, did not find them useful, or ignored Mr. Dennis's clear directives *not* to mirror his trades cannot give rise to personal liability, and certainly does not justify holding Mr. Dennis jointly and severally liable for $137 million of Raging Bull's total revenues over three years.

### B.    Mr. Dennis Did Not Have Knowledge of Any Deceptive Practice.

Even if the FTC could demonstrate that Mr. Dennis participated in or had the authority to control the practices that the FTC complains about, the FTC would also need to demonstrate that Mr. Dennis knew or should have known that the conduct was deceptive.  *See Ross*, 743 F.3d at 892.  The evidence is overwhelming that Mr. Dennis had no such knowledge.

The FTC's knowledge argument is based on its allegation that Mr. Dennis received consumer complaints about Raging Bull's products and policies.  [FTC Br. at 49.]  Specifically, the FTC points to three (and only three) consumer complaints of which it alleges Mr. Dennis was aware:  one that a subscriber sent about not being able to mirror trade alerts via Facebook Messenger (PX7 ¶ 24 & Att. O), one that a subscriber sent about an auto-renewal charge to kyle@biotechbreakouts.com (PX21 ¶ 18), and another that a subscriber sent about an auto-renewal charge to Mr. Dennis in a chatroom (PX19 ¶ 39).

The email and Facebook complaints do not evidence Mr. Dennis's knowledge for the simple reason that he never saw them.  Messages to kyle@biotechbreakouts.com and to Mr.

---

in the trade alert that Wermers says does not tell subscribers when they should buy or sell.  [Dennis Decl. ¶ 24 and Ex. L.]  Thus, his contention that Mr. Dennis's trade alerts do not provide subscribers with enough information is tainted by his failure to consider all of the information that Mr. Dennis provides subscribers, rather than looking at the trade alerts in isolation.

Dennis via Facebook Messenger go directly to Raging Bull's customer service team, not to Mr. Dennis.  [Dennis Decl. ¶¶ 37–38.]

The only complaint Mr. Dennis may have actually received was the one from a chatroom, in which a single subscriber complains about his subscription being automatically renewed.  [PX19 ¶ 39.]  This evidence is highly suspect and has no probative value.  To begin with, unlike the voluminous other correspondence attached to that consumer's declaration, including e-mail complaints to the other individual defendants,[26] the chatroom conversation is not attached and relayed only in hearsay form in the body of the witness's declaration.  Thus, it is far from clear that this subscriber ever actually communicated with Mr. Dennis, or complained to him.  But even taking the subscriber's declaration at face value, Mr. Dennis's response was that "he could not do anything to help me," and that "[the subscriber] needed to talk to Raging Bull's management." [*Id.*]

According to the FTC's own witness, then, Mr. Dennis was not responsible for Raging Bull's corporate policies and appropriately directed this subscriber to management.  Yet the FTC contends that it is likely to prove that Mr. Dennis is jointly and severally liable for *all* of the deceptive conduct alleged in the Complaint, including deceptive advertising and insufficient cancellation mechanisms, and for the *entirety* of Raging Bull's $137 million in revenues over a three-year period.  The FTC's reliance on a single complaint that may or may not have ever been made, and may or may not have actually been read by Mr. Dennis, and which (if he saw it at all) Mr. Dennis appropriately referred to management is telling of its lack of evidence against him,

---

[26]   One of the attachments to the subscriber's declaration is a letter from "counsel for RagingBull.com, Jason Bond, and Jeff Bishop" demanding that the subscriber "cease and desist your defamatory conduct."  [PX19 Att. Q].  The letter does not purport to be on Mr. Dennis's behalf, further evidencing that he is simply not responsible for or involved in Raging Bull's corporate policy.

especially in light of Mr. Dennis's total lack of control over Raging Bull's billing policies. The FTC will not be able to prove that Mr. Dennis knew or should have known that he was somehow engaging in deceptive conduct, let alone that he knew about all of the deceptive practices for which the FTC seeks to hold him jointly and severally liable.[27]

## II.    The FTC Cannot Demonstrate that The Winston Entities Participated in a Common Enterprise.

There is no evidence on which to hold the Winston Entities liable, either. As an initial matter, the FTC's Complaint should be dismissed against the Winston Entities because it contains *literally* no allegations about them other than their corporate existence (Compl. ¶¶ 14, 18, 19) and the entirely conclusory allegation that all of the Corporate Defendants have "operated as a common enterprise," (*id.* ¶ 20). But even looking past that, the FTC's evidence does not remotely suffice to hold the Winston Entities liable.

"To determine whether a group of [corporate] defendants operated as a common enterprise, courts look to a variety of factors, including: common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which reveals that no real distinction existed between the Corporate

---

[27]    There is also a mismatch in the FTC's evidence, even crediting the FTC's arguments. The consumer complaint the FTC relies on has to do with the purported inability of a subscriber to cancel his auto-renewal. But the FTC does not claim that Mr. Dennis participated directly in Raging Bull's auto-renewal, cancellation, or refund policies, nor does it claim he had the ability to control them. He therefore cannot be personally liable, because personal liability requires direct participation or control over specific conduct *and* knowledge that *that* conduct is deceptive. It is not sufficient to show that a defendant did one thing, and knew that another thing was deceptive, especially when that defendant is an employee with limited job duties and is not actively involved in the company's business affairs. *Cf. Ross*, 743 F.3d at 892 (knowledge "may be established by showing that the individual had actual knowledge *of the deceptive conduct*, was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth" (emphasis added)).

Defendants." *In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380, 397 (D. Md. 2019) (internal quotation marks omitted).  Here, the FTC offers zero evidence supporting *any* of the common enterprise factors as to the Winston Entities.  The Winston Entities and Raging Bull do not share common control or officers – Mr. Dennis is the sole owner of Winston Research and was the sole owner of Winston Corp. before it was dissolved, but is not an owner, officer, or executive of Raging Bull.  [Dennis Decl. ¶ 46–47; Compl. ¶¶ 18, 19; Dennis Decl. ¶ 10.]  The Winston Entities and Raging Bull do not share office space – Winston Corp. is dissolved with no office space, and Winston Research's principal place of business is in Kingsport, Tennessee, where Raging Bull does not have any offices.  [Compl. ¶¶ 11, 18, 19; Dennis Decl. ¶ 46–47.]  Nor has the FTC shown any commingling of corporate funds, only payments from Raging Bull to the Winston Entities for contractually negotiated services.  [Dennis Decl. ¶¶ 5–6; PX27 ¶ 92.]  The Winston Entities never had any other operations, and had no involvement whatsoever in the allegedly deceptive scheme at issue.  [Dennis Decl. ¶¶ 46–47.]

The FTC's *only* justification for trying to hold the Winston Entities jointly and severally liable for $137 million of Raging Bull's revenues is the allegation that they received approximately $4 million each from Raging Bull pursuant to an arms-length contract.  [FTC Br. at 32; PX24 ¶ 12 & Att. A at p.1662; PX27 ¶ 92.]  That alleged fact is deficient as a matter of law to establish common enterprise liability, especially when compared to other cases in this district in which the court held that the FTC was likely to succeed in proving common enterprise liability.  *See, e.g.*, *In re Sanctuary Belize*, 409 F. Supp. 3d at 414–15 (holding that FTC was likely demonstrate common enterprise liability where all entity defendants "operated from the same address," "share common control, commingle funds, exchange extensive communications with one another, [and] share employees," and "[p]ayments made to one company have been deposited in the bank accounts of

others").  The FTC has wholly failed to justify the extraordinary remedy of a preliminary injunction and receivership as to the Winston Entities, as after months of investigating this case, the FTC has nothing else to show for its theory that the Winston Entities should be held jointly and severally liable for Raging Bull's alleged deceptive practices.

**III.**      **The FTC Does Not Attempt To Demonstrate That Mr. Dennis or the Winston Entities Are Liable Under Its ROSCA Claims.**

Count III of the FTC's Complaint asserts a claim under the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 *et seq.*, relating to Raging Bull's alleged failure to have a simple mechanism for consumers to stop recurring charges.  Despite asserting that claim against "Defendants," the FTC does not appear to contend that Mr. Dennis or the Winston Entities are liable under ROSCA.  The FTC makes no argument that Mr. Dennis participated in or had the authority to control Raging Bull's cancellation polices, automatic subscription renewals, consumer refunds, or any other allegedly illegal conduct under ROSCA.  Nor could it – Mr. Dennis did not participate in or have any control of billing, cancellation, refunds, chargebacks, or auto-renewal; he is not an owner or officer of Raging Bull; he does not participate in making or approving corporate policy; and he has no managerial responsibilities over Raging Bull's customer service employees.  [Dennis Decl. ¶¶ 9, 43–46.]  To the extent that by naming "Defendants" the Complaint charges Mr. Dennis and the Winston Entities with an alleged ROSCA violation, it should be dismissed.  Certainly, the FTC has not shown, or even tried to show, a likelihood of success on the merits.

**IV.**      **The Equities Weigh Strongly Against Enjoining Mr. Dennis or the Winston Entities.**

"In considering the second requirement for an injunction, whether the equities weigh in favor of preliminary relief, the Court balances Defendants' private interests against the interest of the public."  *FTC v. Agora Fin., LLC*, 447 F. Supp. 3d 350, 359 (D. Md. 2020).  "[I]njunctive relief

should be no more burdensome to the defendant[s] than necessary." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  The FTC seeks an overbroad injunction against Mr. Dennis and the Winston Entities without showing how an injunction would promote the public interest or grappling with the crippling effects of the injunction on Mr. Dennis.  Instead, the FTC makes conclusory arguments that the equities favor an injunction to preserve assets and to prevent further injury to consumers.  These reasons are neither supported by evidence nor sufficient to tip the equities in favor of a far-reaching preliminary injunction.

As explained above, Mr. Dennis is an employee of Raging Bull, not an owner and manager, and is just one of many employees whose education and trading strategies Raging Bull sells. [Dennis Decl. ¶ 9.]  Notably, the FTC has not sued any other employee of Raging Bull, even though there are numerous other gurus whose job responsibilities are *exactly* the same as Mr. Dennis's – to provide content to paid subscribers.  Even if the FTC could prove that Mr. Dennis is individually liable for deceiving consumers through the limited set of statements that he distributes as part of his job duties, Mr. Dennis relied on Raging Bull's compliance department's approval of the disclaimers in his messages and of the few promotional videos in which he was featured.  Mr. Dennis's good faith reliance on compliance personnel, as an employee merely performing his job duties, weighs heavily against the broad injunctive relief the FTC seeks here.  *See, e.g., SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992) ("Good faith reliance on the advice of counsel is . . . a factor in determining the propriety of injunctive relief.").

Despite Mr. Dennis's limited non-executive, non-managerial, and non-ownership role as a Raging Bull employee, and despite his reliance on counsel, the FTC seeks to hold Mr. Dennis jointly and severally liable for the *entire amount* of monetary relief to which it says it is entitled (three years of Raging Bull's total revenues) and to freeze *all* of his personal assets accordingly.

This is despite the fact that the FTC itself alleges that Mr. Dennis, through the Winston Entities, has received only a small percentage of the $137 million to which the FTC says it is entitled from the same time period. [FTC Br. at 51 (citing PX 24 ¶¶ 12–14).] It would be inequitable, even if the FTC could prevail on the merits, to hold Mr. Dennis – an employee – liable as if he were synonymous with Raging Bull.

Further, the proposed restriction on Mr. Dennis's assets prevents him from performing work that he does independently of his employment for Raging Bull: stock trading. In addition to his work for Raging Bull, Mr. Dennis also works as an independent trader, which generates a major source of his income. Much of Mr. Dennis's personal assets are from work entirely outside of Raging Bull. The scope of the relief sought by the FTC – a blanket personal asset freeze over everything Mr. Dennis owns – is overbroad and would essentially preclude Mr. Dennis from participating in activities that have nothing to do with Raging Bull even though he is only an employee with no control over, or ownership of, the business.

Against the distressing effects on Mr. Dennis, and his role as a mere employee-instructor at Raging Bull, the FTC offers scant support for the claim that an injunction offers any contribution to the public interest. The FTC argues that it seeks injunctive relief to prevent further injury to consumers, but there is no evidence or reason to believe that Mr. Dennis will deplete assets the Court may award as restitution or disgorgement. In fact, the evidence the FTC cites for the proposition that "[t]here is also strong evidence of diversion and dissipation of funds by the Defendants" does not relate to Mr. Dennis himself (or the Winston Entities) at all. [FTC Br. at 51 n.252 (citing PX24 ¶¶ 20–22, 31–32).] In the end, the FTC has failed to support any of its claims that the equities weigh in favor of entering the preliminary injunction against Mr. Dennis and the Winston Entities.

**V.      Even If the Court Concludes that An Injunction Is Appropriate, the FTC Will
Be Unable to Hold Mr. Dennis Jointly And Severally Liable.**

The FTC argues that the Defendants' revenue from the alleged scheme, minus chargebacks,
is $137 million, and that Defendants are jointly and severally liable for that amount.  [PX24 ¶ 10;
FTC Br. at 36.]  But, in accordance with the Supreme Court's recent decision in *Liu v. SEC*, the
FTC will not be able to hold Mr. Dennis liable for that amount for three reasons, making a blanket
asset freeze wholly unnecessary and inequitable.

First, in holding that "courts must deduct legitimate expenses before ordering
disgorgement," *Liu* limits asset freezes to net profits, not revenues.  *Liu v. SEC*, 140 S. Ct. 1936,
1950 (2020); *see also id.* at 1950–51 ("Courts may not enter disgorgement awards that exceed the
gains 'made upon any business or investment, when both the receipts and payments are taken into
the account.'" (quoting *Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 804 (1869)).  "A rule
to the contrary that 'make[s] no allowance for the cost and expense of conducting [a] business'
would be 'inconsistent with the ordinary principles and practice of courts of chancery.'"  *Id.*
(quoting *Tilghman v. Proctor*, 125 U.S. 136, 145 (1888)).  Here, the FTC seeks to disgorge the
total revenues of the allegedly deceptive practices, that is, profits before the deduction of expenses.
Doing so would be improper, thus rendering its proposed asset freeze both overbroad and wholly
unsupported by any evidence of Raging Bull's net profits for the time period in question.

Second, and critically as to Mr. Dennis, *Liu* confirmed that joint-and-several liability is "at
odds with the common-law rule requiring individual liability for wrongful profits."  *Id.* at 1949.
The Supreme Court warned that the "practice could transform any equitable profits-focused
remedy into a penalty," because it "runs against the rule to not impose joint liability in favor of
holding defendants 'liable to account for such profits only as have accrued to themselves . . . and
not for those which have accrued to another."  *Id.* (quoting *Belknap v. Schild*, 161 U.S. 10, 25–26

(1896)).  Accordingly, the FTC's theory of liability allowing for an asset freeze of all of the Defendants' assets up to the total amount of gross revenue from the allegedly deceptive practices falls apart because, under *Liu*, the asset freeze may only reach each defendant's *own* net profits. *See id.* at 1949–50.  At least one other district court has found that this holding controls in FTC Act cases.  *See, e.g.*, *FTC v. Elec. Payment Sols. of Am. Inc*., No. CV-17-02535-PHX-SMM, 2020 WL 6199414, at \*4 (D. Ariz. Aug. 31, 2020) ("The Court further finds that disgorgement must be limited to an individual defendant's net profits to be an equitable form of relief pursuant to *Liu*.").

Although the FTC makes no attempt to differentiate Mr. Dennis's net profits from Raging Bull from his revenues, the FTC could not conceivably obtain more than his own revenues, rendering a blanket asset freeze entirely overbroad and unlawful.  At worst, any asset freeze against Mr. Dennis must be limited to the net amount that the FTC can demonstrate that Mr. Dennis received from Raging Bull – $13.6 million since 2016, according to the Temporary Receiver's recent submission.  [*See* Jan 11, 2021 Sealed Response of Temporary Receiver to Raging Bull's Emergency Motions at 5.]  Thus, as both an equitable and legal matter, Mr. Dennis cannot be held liable for the entire $137 million in Raging Bull revenues.

Third, not only is it clear that the FTC will be unable to hold Mr. Dennis and the Winston Entities jointly and severally liable for $137 million, but the FTC is likely not entitled to monetary relief *at all*.  The plain language of Section 13(b) provides only for a temporary restraining order or a preliminary injunction, not monetary remedies.  Specifically, section 13(b) provides that, where the FTC "has reason to believe" a person "is violating, or is about to violate" a law enforced by the FTC, the FTC it may seek "a temporary restraining order or a preliminary injunction" if "enjoining" such act "pending the issuance" and resolution "of a complaint by the Commission"

is in the public interest.  15 U.S.C. § 53(b). Thus, section 13(b) does not expressly authorize monetary remedies.

The Supreme Court has rejected implied remedies and limited statutes to the relief Congress specifically authorized.  *See Meghrig v. KFC Western, Inc.*, 516 U.S. 487–88 (1996).  In a recent decision, the Seventh Circuit applied *Meghrig* to the FTC Act and Section 13(b), recognizing that "the Supreme Court has clarified that courts must consider whether an implied equitable remedy is compatible with a statute's express remedial scheme.  And it has specifically instructed us not to assume that a statute with 'elaborate enforcement provisions' implicitly authorizes other remedies." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019) (*citing Meghrig*, 516 U.S. at 487–88).  The Seventh Circuit reasoned that "[m]ost notably, the FTCA has two detailed remedial provisions that expressly authorize restitution if the Commission follows certain procedures [and] [o]ur current reading of section 13(b) allows the Commission to circumvent these elaborate enforcement provisions and seek restitution directly through an implied remedy." *Id.*  The court therefore held "that section 13(b) does not authorize restitutionary relief." *Id.* at 786.  And other courts have followed suit.  *See, e.g.*, *FTC v. AbbVie Inc,*, 976 F.3d 327, 379 (3d Cir. 2020); *see also FTC v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018) (O'Scannlain, *J.*, concurring) (suggesting that FTC's interpretation of section 13(b) is "no longer tenable").

The Supreme Court's rejection of implied statutory remedies was confirmed in *Liu*, which limited the relief available to the SEC under a statute providing for "any equitable relief that may be appropriate or necessary for the benefit of investors."  140 S. Ct. at 1946.  The Court held that the statute's text excludes punitive monetary sanctions and only authorizes disgorgement of "a defendant's net profits from wrongdoing."  *Id.*  *Liu* also listed the various names for equitable

monetary remedies, such as restitution, disgorgement, and accounting—none of which appear in Section 13(b). *Id.* at 1937. *Liu* thus confirms that Section 13(b) authorizes neither monetary remedies nor asset freezes.

After *Liu* was decided, the Court granted certiorari on a Ninth Circuit case raising the issue of whether Section 13(b) allows the FTC to recover monetary relief, *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 194 (2020). The Supreme Court's reason for granting cert in *AMG* is clear: the opinion in *Liu*, which construed the applicable statute narrowly, sets the stage for reading the even narrower language of Section 13(b) – which authorizes only "injunctions," not "any equitable relief" as in *Liu* – by its plain terms. (Argument in *AMG* was heard earlier today, January 13, 2021.)

The potential for collecting monetary relief from the Defendants is the FTC's sole justification for an asset freeze in this case. The high likelihood that the FTC's power to collect any such monetary relief will be undercut in *AMG* between now and the resolution of this case only makes the blanket, crippling, personal asset freeze on Mr. Dennis all the more inequitable and draconian. For this reason and all of the additional reasons articulated above, the Court should not enter the FTC's proposed preliminary injunction against Mr. Dennis and the Winston Entities.

## MFA HOLDINGS CORPORATION'S RESPONSE

### INTRODUCTION

Nothing warrants entering a preliminary injunction against MFA Holdings Corporation. Foremost, nothing will be left to enjoin as to MFA by the time the Court hears the FTC's motion because MFA is not subject to any of the TRO's asset freeze or receivership provisions, and because its only remaining obligation under the TRO is to appear for a deposition on January 21, 2021, which MFA has agreed to do. Likewise, MFA has complied with all of the TRO's other provisions by providing its sworn financial disclosures and responding to the FTC's expedited discovery requests. And, MFA does not engage in any consumer-facing marketing or practices. Thus, the TRO's conduct prohibitions never applied to it and do not apply to it now.

The FTC is not entitled to a preliminary injunction in all events because it cannot show that it is likely to succeed on the merits of its claims against MFA or satisfy any of the other requirements needed for a preliminary injunction to issue. Despite filing thousands of pages of exhibits to allege wrongdoing against Raging Bull and the other defendants, and despite conducting a covert but thorough investigation that spanned many months and that the FTC continues to this day, the FTC filed only a nine-page declaration to support its contention that MFA should be liable for all the allegations of wrongdoing in its complaint and the $137 million it seeks for alleged consumer injury. The FTC filed that declaration at ECF No. 58-1, hereinafter the "Tyndall Declaration," in its filing that proposed to remove MFA from the TRO's asset freeze and receivership provisions (ECF No. 58 ("Reply")) after receiving MFA's initial response to the Order to Show Cause Why A Preliminary Injunction Should Not Issue.

However, nothing in the Tyndall Declaration or any of the FTC's voluminous filings contain any evidence showing that MFA engaged in any conduct that mandates any preliminary injunctive relief against MFA. Foremost, Allan Marshall, MFA's sole shareholder, did not author

or approve the "Angel Investing Insider" email cut-and-pasted into the Tyndall Declaration that the FTC suggests he wrote and the email itself proves as much: Mr. Marshall's name is misspelled and a simple comparison between his real signature and the signature in the email shows that the signature in the advertising email is not his. Indeed, Mr. Marshall had not heard about the "Angel Investing Insider" promotion or seen any of the other advertising materials in the Tyndall Declaration until after the FTC filed suit in December.

Thus, despite investigating the claims for months and having received access to Raging Bull's computers and offices, the FTC failed to show that MFA created, reviewed, revised, or approved the challenged advertising materials and practices; that Mr. Marshall – who never was subject to the TRO – approved using his name, image, biography, or statements for use in the challenged advertising; or that Mr. Marshall or MFA had any involvement in any of the activity challenged by the FTC. As set forth herein, multiple courts have found that liability does not attach under these circumstances, including where an individual's image, video, and signature are used in advertising that the individual never saw or approved. The Court should follow these authorities and conclude that the FTC failed to and cannot show that MFA is or could be liable for the advertising and related practices it challenges.

Likewise, MFA demonstrated that it is not "a company opened and operated for the benefit of Raging Bull" or part of any "common enterprise" with it because MFA holds an interest in multiple unrelated companies. Similarly, the FTC's bare assertion that MFA operates as a "shell company and not as an investment [vehicle] engaged with other legitimate businesses" (Reply, at 3) is untrue, rebutted by the financial disclosures that MFA produced and the bank records that the FTC presumably obtained, and insufficient to meet the FTC's burden of showing that the preliminary injunction it seeks should issue. And, the only remaining basis for the FTC's claims

against MFA – routine profit distributions pursuant to an arms-length operating agreement – is insufficient to find that MFA comprised part of a common enterprise.[28]

For any or all of these reasons, the Court should decline to enter any preliminary injunctive relief as to MFA.

## ARGUMENT

### I.     The Injunctive Relief is Moot as to MFA and is Overbroad

Preliminary injunctive relief "must bear a reasonable relation to the unlawful practices found to exist." *FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1314 (D. Wyo. 2016) (citation omitted).  Further, a preliminary injunction is not appropriate where "there is no additional relief that the court can grant." *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 41 (D.D.C. 2020) (where "there is no additional relief that the court can grant, . . . there is no need for injunctive relief"); *NY State Rifle & Pistol Ass'n, Inc. v. City of New York, NY*, 140 S. Ct. 1525, 1526 (2020) (after "the precise relief that petitioners requested in the prayer for relief in their complaint" was provided, their claim for injunctive relief was moot); *Hui Malama I Kohola v. Nat'l Marine Fisheries Serv.*, 156 F. App'x 16, 17 (9th Cir. 2005); *Davidson v. Bureau of Prisons*, No. 11-cv-309, 2012 WL 5421161, at *2 (E.D. Ky. Nov. 6, 2012).

Here, no injunction is warranted because the FTC "already obtained all the relief that [it] sought." *Bernhardt*, 468 F. Supp. 3d at 41.  First, the FTC requested, and the Court entered an order, releasing MFA from the TRO's asset freeze and receivership provisions.  Second, the FTC stated in its Reply that MFA needed to remain as a party to the TRO so that the FTC could obtain

---

[28]     Pursuant to Fed. R. Civ. P. 10(c), MFA incorporates by reference the arguments made in its Response to Order to Show Cause, Joinder, and Reply (ECF 43, 45, 64). *See Doyle v. Hogan*, No. 19-cv-0190, 2019 WL 3500924, at *6 (D. Md. Aug. 1, 2019); *NVR, Inc. v. Harry A. Poole, Sr. Contractor, Inc.,* No. 14-cv-241, 2015 WL 1137739, at *2 n.5 (D. Md. Mar. 13, 2015); *Levy v. Wexford Health Sources, Inc.,* No. 14-cv-3678, 2016 WL 865364, at *6 (D. Md. Mar. 7, 2016).

financial disclosures and expedited discovery. (ECF No. 58 at 5.)  MFA has since provided its sworn financial disclosures, responded to the FTC's expedited discovery requests and produced documents, and agreed to appear for its Rule 30(b)(6) deposition on January 21, 2021.  Third, MFA has never engaged in any consumer-facing marketing or other practices. (Ex. 7 ("Second Marshall Decl.") ¶ 15.)  Thus, there is nothing left for the Court to enjoin, and the motion is moot as to MFA.

Further, even as modified, the relief sought by the FTC remains overbroad because it would impose restrictions that do not bear a "reasonable relation to the unlawful practices found to exist" with respect to MFA. *FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1314 (D. Wyo. 2016) (citation omitted).  The FTC does not allege or provide evidence showing that MFA engaged in any of the challenged conduct although it attempts to do so with the Tyndall Declaration.  But, the Tyndall Declaration includes only advertising that MFA and did not see until after the FTC filed suit; it does not contain any advertising that MFA or Mr. Marshall created, approved, or transmitted. (Tyndall Decl. ¶¶ 3-7; Ex. 7, Second Marshall Decl. ¶¶ 7, 11, 12.) Likewise, the FTC failed to refute that MFA is merely an investment holding company that does not engage in any consumer-facing marketing or practices. (ECF No. 45-1, First Marshall Decl. ¶ 31.)  The injunction the FTC seeks is therefore overbroad because it purports to enjoin MFA from engaging in advertising and billing practices wholly unrelated to its business. *FTC v. Agora*, 447 F. Supp. 3d 350, 371 (D. Md. 2020) (limiting an injunction that purported to enjoin conduct related to any "dietary supplement, food, drug, or other product" sold by defendants because "[d]efendants are publishing companies, and their products, as far as the Court can tell from the existing record, are limited to written publications.").

Because the FTC has already obtained all the relief it sought from MFA and because the other requested relief does not and cannot apply to MFA, the FTC's motion is moot as to MFA and the injunction is overbroad in all events, thereby warranting denial of the FTC's motion as to MFA.

II.     **The FTC Failed to Demonstrate That It Is Likely to Prevail on the Merits**

    A.     **The FTC's Reply Demonstrates that Mr. Marshall and MFA Were Not Involved in Creating the Challenged Advertising Materials.**

The FTC failed to demonstrate that it is likely to succeed on the merits as to MFA because it did not allege any facts showing that MFA engaged in the conduct challenged in the complaint or any unlawful activity.

*First*, the FTC in its Reply cites a handful of Raging Bull advertising containing Mr. Marshall's name and image. (Reply, at 4.)  However, Mr. Marshall did not create, approve, or disseminate any of that advertising.  For example, the only email that the FTC asserts that Mr. Marshall wrote, an April 21, 2020, "Angel Investing Insider" email, misspells his name as "Allen" instead of "Allan." (*See* Tyndall Decl. at p. 4.)  However, Mr. Marshall does not spell his name "Allen," did not draft or approve the email, and had not even seen the email until after the FTC filed its Reply on December 15, 2020. (Ex. 7, Second Marshall Decl. ¶ 11.)  Additionally, the "signature" in that email (Tyndall Decl. at p.5) is not Mr. Marshall's signature, and Mr. Marshall did not sign the email or authorize the use of his signature for any email or other promotional material for Raging Bull. (Ex. 7, Second Marshall Decl. ¶ 11 and Attachment 1 thereto (providing true and accurate copy of Mr. Marshall's signature).)

*Second,* contrary to the FTC's assertion, Mr. Marshall was not one of the "founders" of the Boardroom Event, and he did not create or authorize his appearance in any video or any other promotional material for Raging Bull in connection with that event. (Ex. 7, Second Marshall Decl.

¶ 5.)  Instead, Mr. Bishop asked Mr. Marshall to meet with various individuals in Las Vegas in November 2019 for the Boardroom Event during which Mr. Marshall and others listened to sales pitches from small companies with an eye toward potentially investing in the companies. (*Id.* ¶ 4.) During the event, Mr. Marshall did not interact with any consumers, and to his knowledge, the purpose of the Boardroom Event was to identify potential business investments. (*Id.* ¶ 5.)

As the Boardroom Event occurred in November 2019, Mr. Marshall did not "discuss trading during the Covid-19 pandemic" during it as the FTC alleges because he was unaware that COVID-19 existed at that time. (*Id.* ¶ 6.)  Mr. Marshall also did not authorize the use of his name, video, image, or biographical information in connection with the Boardroom Event as a "founder" or "co-founder," or for use in any Raging Bull advertising. (*Id.* ¶ 5.)  He also was unaware that he had ever been "nickname[d] the [IPO Godfather]" until after the FTC filed suit. (*Id.* ¶ 8.)

Critically, the FTC has not alleged that the Boardroom Event violated the FTC Act, the Restore Online Shoppers' Confidence Act, or any other law.  Nor can it.  The Boardroom Event reflects a single instance where Mr. Marshall watched investor presentations in 2019 as opposed to showing any involvement in any consumer-facing promotional materials for Raging Bull. Mr. Marshall's attendance at the Boardroom Event does not demonstrate that MFA participated in any of the challenged conduct.

*Third,* none of the other materials provided by the FTC show that Mr. Marshall was involved in any of the activities challenged in the complaint.  While the FTC asserts that Mr. Marshall appeared in a consumer-facing video promoting the Boardroom Event, it has not provided the video or any other video in which Mr. Marshall discusses trading with any of the defendants.  The FTC also does not allege any statements Mr. Marshall made in the video, or statements he made promoting the Profit Accelerator Service or any other Raging Bull service.

And, the other images in the advertising material submitted with the FTC's Reply are clearly images taken from the lone Boardroom Event in Las Vegas and reused in multiple advertisements: in all but one image, Mr. Marshall is shown wearing the same blazer and blue shirt. (Tyndall Decl. ¶¶ 3, 4, 7). Thus, to Mr. Marshall's knowledge, photographs of him in material submitted with the FTC's Reply were all taken at the Boardroom Event. (Ex. 7, Second Marshall Decl. ¶ 14.) Far from demonstrating Mr. Marshall's involvement with the other defendants or activities in the complaint, these repurposed images prove that Raging Bull did not have photographs of Mr. Marshall at different Raging Bull events and needed to reuse photographs taken of him at a single event.

To be sure, Mr. Marshall did not know that any video footage or images of him would be used in conjunction with any advertising, marketing, or promotional material or consumer-facing service, whether the Profit Accelerator or any other Raging Bull-related service. (*Id.* ¶ 5.) Mr. Marshall also had not heard of Angel Investing Insider until after the FTC filed this case (First Marshall Decl., ECF 45-1 ¶ 29; Ex. 7, Second Marshall Decl. ¶ 10). And, before receiving the FTC's Reply on December 15, Mr. Marshall had never even seen the emails provided with the FTC's Reply. (Second Marshall Decl. ¶¶ 10, 11.) Mr. Marshall also did not create, review, modify, authorize, or even know about either of the emails, the article "What Jimmy Fallon Has To Do With Artificial Intelligence," the "video series" referenced in the Reply and accompanying declaration, or any other emails promoting Raging Bull products or services. (*Id.* ¶ 9.) And, as the FTC acknowledges, Jeff Bishop, not Mr. Marshall, was the author of the second April 21, 2020, email. (Tyndall Decl. at 6.)

Thus, the FTC provided nothing showing that MFA or Mr. Marshall authorized Raging Bull or any other defendant to use his name or image in Raging Bull advertising. Accordingly,

the FTC does not and cannot dispute that neither Mr. Marshall nor anyone at MFA approved, created, or modified advertisements, marketing or promotional materials of the other defendants, including in any of the materials in the Reply such as the "Angel Investing Insider" or any Raging Bull online article or "video series." (Tyndall Decl. ¶¶ 6, 7; Second Marshall Decl. ¶¶ 10, 12.)

Courts have refused to find liability in similar circumstances. In *FTC v. Garvey*, the court found a famous baseball player and his company were not liable for false advertising claims the football player allegedly made in advertising for a dietary supplement because neither he nor his company "ha[d] actual knowledge of any material misrepresentations" or "had control over the creation and/or dissemination of the [challenged] advertising claims." *FTC v. Garvey*, No. 00-cv-9358, 2002 WL 31744639, at **6-7 (C.D. Cal. Nov. 25, 2002), *aff'd*, 383 F.3d 891 (9th Cir. 2004).

In *Kramer v. Unitas*, the court found a celebrity football player was not liable for his involvement in a fraudulent investment scheme, even though his image, purported signature (which he disputed was authentic), and statements appeared in advertising and a video where he introduced the service and "invit[ed] the public to call [] for more information." 831 F.2d 994, 996 (11th Cir. 1987). Despite his appearance in advertising, the court found that he "had no involvement with the creation, promotion or dissemination of the brochures," and he "merely introduced himself, called first federal representatives his 'friends', and asked the audience to call First Federal for more information." *Id.* at 997-98. Further, while the football player's contract with the company "reserved the right to approve all subsequent promotional features; [] nothing in the district court's records suggests that [he] knew about the newspaper advertisements or brochures." *Id.* at 998. Accordingly, the court refused to find him liable for the false advertising.

This Court should reach the same conclusions as the courts in *Garvey* and *Unitas*. The use of Mr. Marshall's name, likeness, and biography in advertising for Raging Bull does not

demonstrate MFA's involvement or any "common enterprise" between MFA and the other defendants, or that MFA was even aware of the materials that it references in its Reply. Accordingly, nothing in the FTC's Reply demonstrates that the FTC is likely to succeed on its claims against MFA on a theory of common enterprise or joint and several liability.

The FTC also will not succeed on the merits of its claims because it does not and cannot allege much less show, as it must under Section 13(b), that MFA "is violating" or "is about to violate" the FTC Act.  The FTC's ability to obtain injunctive relief under Section 13(b) is limited to situations in which it has reason to believe that a defendant "is violating, or is about to violate," the FTC Act. 15 U.S.C. § 53(b)(1). *FTC v. Shire Viropharma, Inc.,* 917 F.3d 147, 155 (3d Cir. 2019) (finding the FTC did not have jurisdiction to proceed in court under Section 13(b) for conduct that ended before the FTC filed suit, holding that Section 13(b) only "empowers the FTC to speedily address ongoing or impending illegal conduct."); *see also FTC v. LendingClub Corp.*, No. 18-cv-02454, 2020 WL 2838827, at *24 (N.D. Cal. June 1, 2020) ("the Court's inquiry hinges on whether the FTC has established, with evidence, a cognizable danger of a recurring violation"). The FTC has not alleged specific facts that MFA "is violating" or "is about to violate" the FTC Act, and therefore it is unlikely to prevail on the merits for this additional reason.

**B.     The FTC Failed to Show that MFA Was Part of Any "Common Enterprise" with the Other Defendants.**

The FTC also failed to show that it is likely to prevail on the merits of its claim that MFA is liable as part of a "common enterprise" with the other defendants.  This is not a case where the defendants "did not operate as arm's length entities, but instead were so interrelated that no real distinction existed between them." *FTC v. AmeriDebt, Inc.*, 343 F. Supp. 2d 451, 463 (D. Md. 2004) (quotations omitted).  Rather, MFA, an entity that invests in multiple companies and was a passive investor in Raging Bull, had no input in or control over its operations.

Without support, the FTC incorrectly asserts that MFA operates as a "shell company and not as an investment [vehicle] engaged with other legitimate businesses." (Reply, at 3.)  But the FTC provided nothing contradicting MFA's evidence proving that it is an investment company that holds ownership in multiple companies other than Raging Bull. (*See* First Declaration of A. Marshall, ECF 45-1, at ¶¶ 7, 31.)  Indeed, MFA is far from a "shell company"; it invests in a diverse portfolio of companies, including an informational technology infrastructure company, an advertising technology company, a cannabis advertising company, and a company that manufactures consumer health products. (*Id*. ¶ 31.)  In fact, MFA produced comprehensive financial disclosures and the FTC presumably received bank records – both of which demonstrate that MFA engages in substantial business independent from Raging Bull and is not a "shell company."  And, these same financial disclosures – along with the discovery responses and documents MFA produced – demonstrated that MFA's business activities were and are separate and apart from Raging Bull.  Thus, the FTC's unsupported assertions concerning MFA's business are belied by the documents and information provided by MFA and that the FTC otherwise received.

Rather than refuting these facts with any evidence, the FTC argues that MFA "has not produced any financial accounting to verify any such investments or financial transactions independent of Raging Bull, and its contention that the preliminary injunction should not apply to it is based solely on the single declaration of its sole owner." (Reply, at 5.)  This argument is unavailing because it is the FTC's burden to show that the broad preliminary injunction it seeks should issue, not MFA's to show why it should not. *FTC v. Agora Fin.,* 447 F. Supp. 3d 350, 359 (D. Md. 2020) (citing *FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976)).

Additionally, a "solely-owned investment company is not necessarily a corporate shell." *U.S. v. Kline*, 61 F. App'x 987, 990 (8th Cir. 2003).

MFA's receipt of funds from Raging Bull and payments to Raging Bull do not establish common enterprise liability either. (Tyndall Decl. ¶¶ 10, 11.)  MFA does not dispute it paid Mr. Bishop and Jason Bond (or their companies) approximately $1,400,000 in exchange for a portion of each of their ownership interest in Lighthouse Media, Raging Bull's predecessor.  However, MFA did not know that the funds would be used in any trading account because MFA was not involved in and did not oversee or direct Raging Bull's day-to-day operations. (Ex. 7, Second Marshall Decl. ¶ 20.)  The FTC also does not dispute that the money MFA received from Raging Bull reflected periodic payouts pursuant to the parties' arms-length agreement, or that these payouts are consistent with routine distribution payments to an investor which cannot and do not give rise to liability under applicable law. *N.M. ex rel. Balderas*, 401 F. Supp. 3d 1229, 1308 (D.N.M. 2019); *FTC v. Kuykendall,* 371 F.3d 745, 758-59 (10th Cir. 2004); *FTC v. Vacation Prop. Servs.*, No. 8:11-cv-00595, 2012 WL 1854251, at *5 (M.D. Fla. May 21, 2012). *CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-cv-0859, 2019 WL 1295004, at *14 n.12 (N.D. Ga. Mar. 21, 2019); *FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 657 (W.D.N.Y. 2017).

Likewise, the approximately $135,000 in funds to Raging Bull referenced in the Tyndall Declaration reflect MFA's reimbursement to Raging Bull for it inadvertently paying for part of a membership MFA shared with Raging Bull in FlexJet, a program allowing members to pay for limited shared use of a plane. (First Marshall Decl., ECF 45-1, ¶ 26.)  As MFA previously demonstrated, Raging Bull in 2019 inadvertently paid the entire cost of the membership fee to FlexJet instead of only its portion. (*Id.*) After learning that Raging Bull had paid for MFA's portion of the membership fee, MFA transferred its portion of the membership fee, $135,000, to Raging

Bull as reimbursement for MFA's portion of the membership fee. (*Id*.) And, as Mr. Marshall stated in his initial declaration, Mr. Marshall subsequently instructed Raging Bull to refrain from paying for his portion of the FlexJet membership because he did not use it for Raging Bull purposes. (*Id*.)

The FTC cannot impute liability to MFA for payments to Greenberg Traurig attorneys either. These payments concerned legal services to MFA for business activities unrelated to Raging Bull. (Ex. 7, Second Marshall Decl. ¶ 17.)

The cases cited by the FTC, *Zurixx* and *Nudge,* do not change the result that the FTC is not likely to prevail on the merits of its claims. In *Zurixx*, the FTC alleged specific details of "the overlapping ownership, management structure, and business purpose among the [defendants]," demonstrating that the defendants had "transacted business through a maze of interrelated companies." *FTC v. Zurixx, LLC*, No. 19-cv-713, 2020 WL 6898341, *3 (D. Utah Nov. 24, 2020). There, the court found facts about overlapping ownership of multiple persons and companies adequate to allege an "interrelated network of entities comprising the Zurixx enterprise." *Id*.

In *Nudge*, the FTC alleged that the corporate defendants all shared a common control and ownership structure, common corporate officers, shared a principal place of business, had transferred millions of dollars between each corporate defendant's bank account, and provided services for each other related to the unlawful conduct. *FTC v. Nudge, LLC*, 430 F. Supp. 3d 1230, 1240 (D. Utah 2019).

In contrast, the FTC does not allege that MFA comprised part of a "maze of interrelated companies," and the unsupported assertion that MFA is a "shell company" is insufficient to demonstrate that "the same individuals transact business through a maze of interrelated companies" required to show common enterprise liability. *Zurixx*, 2020 WL 6898341, at *3. Nor do the FTC's assertions rise to the complex common enterprise alleged in *Nudge* where corporate

officers, office space, ownership all overlapped. 430 F. Supp. 3d at 1240-41. Instead, MFA's "only apparent relationship to the activities" of Raging Bull was "sharing some common ownership interests" with Raging Bull – facts insufficient to fine common enterprise liability. *FTC v. Kuykendall*, 371 F.3d 745, 758–59 (10th Cir. 2004); *see also FTC v. Vacation Prop. Servs.*, No. 8:11-cv-00595, 2012 WL 1854251, at *5 (M.D. Fla. May 21, 2012) (evidence insufficient to find a common enterprise where "each company [] dealt independently with its own customers," and "the record does not establish that the entities commingled corporate funds," even though one of the corporate defendants "made periodic payments to [the other corporate defendant]."). The FTC is therefore unlikely to prevail on the merits of showing a "common enterprise" between MFA and the other defendants.

### C.   The Balance of the Equities Weigh Against Entering the Injunction, Even as Modified, and The Public Interest Would Not Be Advanced by Entering Injunctive Relief As to MFA

While the FTC asserts that the harm of a preliminary injunction "is far outweighed by the public interest in preventing fraud," it does not provide any facts that MFA was involved in any fraudulent or unlawful conduct. Further, the FTC implicitly acknowledges that the public interest would not be advanced by entering an injunction against MFA given its agreement to remove MFA from the receivership and asset provisions of the TRO.

MFA, on the other hand, has been harmed by the TRO and will continue to suffer harm in the form of lost business and reputational harm and stigma if it is named in a preliminary injunction. For example, MFA intended to make an investment in a drug development company that was scheduled to close on December 31, 2020, which would have presented an opportunity for MFA for economic growth into 2021. (Ex. 7, Second Marshall Decl. ¶ 19.) However, at the last minute, the company decided against engaging in a transaction with MFA altogether due to MFA being subjected to the TRO. (*Id.*) This pattern will continue and MFA will suffer harm

through other lost investment and growth opportunities unless MFA is released from the lawsuit or, at a minimum, ongoing injunctive relief.

Moreover, the FTC argues that the public interest would be served in entering an injunction that includes MFA because, absent an injunction, MFA could "use the proceeds of Raging Bull's fraudulent scheme to further MFA's private investment interests." (Reply at 5.)  However, entering a preliminary injunction against MFA is not needed to prevent transfers of funds from Raging Bull to MFA; the same result would be achieved if an injunction omitting MFA were issued as to the remaining defendants pursuant to Sections VI, XV, and XXV of the Modified TRO, which impose obligations on asset holders and other third parties, provide for transfer of receivership property to the receiver and allow expedited discovery of third parties, respectively.  These provisions provide the FTC with the relief needed to fulfill any purported public interest goals.

Further, the FTC does not explain how the public interest would be served by an injunction against MFA because a preliminary injunction will not change any conduct, given that MFA did not engage in any activities challenged in the complaint.  Accordingly, the FTC cannot show that an injunction would further the public interest, and the balance of the equities militate against entering any preliminary injunctive relief against MFA. *FTC v. Lakhany*, No. 12-cv-03337, 2012 WL 12860115, *1 (C.D. Cal. May 2, 2012).

For any or all of the above reasons, the Court should not enter any preliminary injunctive relief against MFA.

## CONCLUSION

For the reasons stated herein, the Court should not enter the FTC's proposed preliminary injunction against Defendants, or, alternatively, modify the FTC's proposed injunction as set forth herein.

Dated: January 13, 2021
Respectfully submitted,

/s/  Matthew L. Schwartz
Matthew L. Schwartz
John T. Zach
Sabina Mariella
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York
Tel.: (212) 446-2300
E-mail: mlschwartz@bsfllp.com
jzach@bsfllp.com smariella@bsfllp.com

Jonathan Shaw (Bar No. 11328)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Tel: 202 274 1123
E-mail: jshaw@bsfllp.com

Brian Levin
Levin Law, P.A.
2665 South Bayshore Drive Penthouse 2B
Miami, Florida 33133
Tel: (305) 539-0593
E-mail: brian@levinlawpa.com

*Counsel for Defendants Kyle Dennis,
Winston Research Inc., and Winston Corp.*

/s/ Ari Nicholas Rothman
Ari Nicholas Rothman
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Tel: 202-344-4000
Email: anrothman@venable.com

*Counsel for Defendant MFA Holdings
Corporation*

/s/ David G. Barger
David G. Barger (DCB No. 469095)
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749 1300
Email: bargerd@gtlaw.com

Andrew G. Berg
Greenerg Traurig LLP
2101 L Street, N.W.
Suite 1000
Washington, DC 20037
Tel: (202) 331-3100
Email: berga@gtlaw.com

Miriam G. Bahcall
Greenberg Traurig LLP
Suite 3100
Chicago, IL 60601
Tel: (312) 476-5135
Email: bahcallm@gtlaw.com

*Counsel for Defendants RagingBull.com,
LLC ("Raging Bull"), Jeffrey M. Bishop,
Jason Bond, Sherwood Ventures, LLC, and
Jason Bond, LLC*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 13th day of January 2021 a true and accurate copy

foregoing was properly served on all parties through the ECF system.

> /s/ Matthew L. Schwartz
> Matthew L. Schwartz
> BOIES SCHILLER FLEXNER LLP
> 55 Hudson Yards
> New York, New York
> Tel.: (212) 446-2300
> E-mail: mlschwartz@bsfllp.com