Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-03538 - GLR |
| | ) | |
| RAGINGBULL.COM, LLC f/k/a | ) | |
| LIGHTHOUSE MEDIA LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Initial Expert Report of Bates Group LLC and Greg A. Kyle**

**January 13, 2021**

## <u>INITIAL EXPERT REPORT OF BATES GROUP LLC AND GREG KYLE</u>

**I.          Bates Group and Greg Kyle:  Summary of Engagement and Opinions.**

1.          In connection with the matter styled, <u>Federal Trade Commission vs. RagingBull.com, et al.</u>, Case No. 1:20-cv-03538-GLR, Bates Group LLC ("Bates Group") and I have been asked by Greenberg Traurig, LLP, counsel for RagingBull.com (f/k/a Lighthouse Media LLC), Jason Bond and Jeffrey M. Bishop (collectively, the "Defendants") to opine on the investment performance of several brokerage accounts in which Messrs. Bond and Bishop directed some or all of the securities trading activity at issue in this matter.

2.          In addition, Bates Group and I have been asked to review and respond to certain opinions of Prof. Russell R. Wermers in his Expert Report (the "Wermers Report") dated November 24, 2020, submitted by the Federal Trade Commission ("FTC") in support of its Complaint for Permanent Injunction and Other Equitable Relief and Emergency Motion for a Temporary Restraining Order with Asset Freeze ("Complaint").  Specifically, counsel requested that I review and opine in this Initial Expert Report on the Wermers Report opinion that "Raging Bull's Actual Trading Performance Shows Substantial and Persistent Losses, Even During Periods of Market Upturns."[1]

3.          I am being compensated by the Defendants for my work, through Bates Group LLC, at the rate of $500 per hour.  The rates of Bates Group employees, who conducted research and analysis under my direction and supervision, range between $105 and $400 per hour.  My compensation

---

[1] PX 26, 1777, Opinion VII.

and the compensation of Bates Group are in no way dependent on the content of my and/or Bates Group analysis, the content of this report, my opinions, or the outcome of these proceedings.

4.       The materials I have considered in forming my opinion are summarized in Appendix I.

## II.       Summary of Opinions.

5.       For the reasons described below, and as more fully set forth in this Initial Expert Report, I have reached the following opinions:

i.      The Wermers Report's "Proceeds minus Costs"[2] figure of ($56,426,361), representing Prof. Wermers's assessment of the Defendants' securities trading losses, presents an exceedingly misleading picture of performance for two reasons. One, the primary reason for this grossly distorted loss figure is that the Wermers Report utilizes a flawed methodology based on tax return information derived from select Internal Revenue Service ("IRS") Form 1099-B ("1099-B") tax records to assess performance. Because 1099-B tax records report a cost basis to the IRS that includes the cost of securities purchased **_plus_** an income tax reporting (only) adjustment,[3] without adjusting for these "artificial losses"[4] or wash sale losses disallowed, the methodology used in the Wermers Report is flawed and grossly overstates losses.

ii.      The Wermers Report opines on trading results utilizing artificial losses, not "actual trading performance"[5] using realized net gains or losses. When the Wermers Report's analysis is corrected to only include realized net gains or losses for the

---

[2] PX 26, 1779 Table 1.
[3] This adjustment used for tax reporting purposes is called wash sale losses disallowed. *See infra* para 26.
[4] Wash sale losses are considered "artificial losses" and are disallowed for tax accounting purposes. *See* Exhibit 1.
[5] PX 26, 1777.

accounts listed in Wermers Report Table 1, the actual trading performance or net loss for the period 2014 to 2018 for the selected accounts (according to the 1099-B tax records) would be ($2,308,158) and not ($56,426,361) as the Wermers Report opines (see Exhibit 3). In other words, the Wermer Report overstates the realized net loss by over 2,300 percent or approximately $54 million.

iii.    Further, a review of the monthly account statements from the securities brokerage firms establishes that the average equity value across the selected accounts listed in the Wermers Report Table 1 was only $1.98 million. Raging Bull and its principals had nowhere near $56.43 million to lose in these accounts. Simply put, it was not possible for Defendants to lose ($56 million) with an average equity or aggregate account values of less than $2 million.

iv.    The most accurate and effective method for assessing the performance of a securities trading strategy is the net out-of-pocket (or overall) profit/loss method, as described in more detail *infra* Section VII. The net out-of-pocket profit/loss method is widely accepted as the standard method for assessing performance in the investment industry and is commonly based on comprehensive monthly account statements from the brokerage firms. It appears that Prof. Wermers did not use the comprehensive monthly account statements in calculating trading performance, but instead used incomplete and selected data from 1099-B tax records.[6]

v.    The second reason the Wermers Report overstates losses is that in some of the accounts and for some of the time periods Prof. Wermers reviewed, neither Jason

---

[6] For example, in the 2014 1099-B tax records from TD Ameritrade account ending in 9075 are six pages of short-term transactions which are missing in the calculations found in the Wermers Report Table 1.

Bond nor Jeffrey Bishop implemented the trading patterns and techniques that they taught to Raging Bull subscribers.

    vi.    For example, based on the comprehensive monthly account statements, the realized and unrealized net gain in the aggregate for the TD Ameritrade, Interactive Brokers, and E*Trade securities brokerage accounts in which Jason Bond implemented the trading patterns and techniques that he taught to Raging Bull subscribers for the period 2014 to 2018 was $318,539.[7]  At or around the end of 2017, Mr. Bond had crossed the $1 million threshold in trading profits.[8]  The Wermers Report makes no mention of these profits.

    vii.    The realized net loss in the aggregate for the TD Ameritrade securities brokerage account in which Jeffrey Bishop implemented the trading patterns and techniques that he taught to Raging Bull subscribers for 2018 was ($1,158,939).[9]

6.    In the course of forming the opinions presented in this Initial Expert Report, I have relied on my own industry and consulting experience, as well as the experience of other Bates Group professionals.

7.    In arriving at the opinions expressed herein, I and other Bates Group professionals at my direction reviewed and relied on the monthly account statements for the securities brokerage accounts referenced in Appendix I.  In addition, I and other Bates Group professionals reviewed brokerage IRS 1099-B tax records referenced in Appendix I.[10]

---

[7] *See* Exhibit 7.
[8] These profits were predominantly due to trades that were realized.
[9] *See* Exhibit 8.
[10] Bates Group utilized 1099-B tax records for the purpose of comparing realized net gain or losses available in those records to the results in Table 1 of the Wermers Report.

8.      In arriving at the opinions expressed herein, I also relied on the Declarations of Jason Bond and Jeffrey Bishop for information regarding the securities brokerage accounts and specific time periods relevant to their subscriber instruction services.[11]

9.      I reserve the right to amend and supplement this Initial Expert Report if new information becomes available during the discovery process or otherwise during these proceedings, or if Bates Group is tasked with performing additional analyses and rendering additional opinions.

**III.      Greg Kyle:  Background and Qualifications.**

10.      I am a Director with the Bates Group, which is a strategic consulting and expert services firm.  In this capacity, I have provided consulting services on litigation issues related to investment management, portfolio performance analysis, investment and trading strategies including strategies based on fundamental and technical analysis, risk analysis, and securities valuation.  A copy of my resume is included in Appendix II.

11.      I have extensive experience in analyzing investment performance and trading strategies within the investment management industry and have been recognized for my professional experience and contribution in educating investment professionals.  I was elected by my peers to an industry leadership position as a member of the Board of Directors for the New York Society of Security Analysts, the largest professional member society affiliated with the Chartered Financial Analyst Institute, formerly known as the Association for Investment Management and Research.  Election to its Board of Directors is through a selection process of other professionals within the investment management, trading, and research industry.

---

[11] To remain consistent with the overall time period Prof. Wermers reviewed, I limited my review of trading accounts to the period 2014 to 2018 with the exception of the analysis regarding when Bond crossed the $1 million profit threshold (*infra* para 46) where I reviewed the time period 2013-2018.

12.     My research on equities trading, financial risk, and performance analysis has appeared extensively in numerous major financial publications including *The Wall Street Journal, Bloomberg*, *The Economist*, *BusinessWeek*, *Fortune, Capital Magizin,* and the *Swiss Handelsblatt*. In addition, my equity market research and analysis were featured in many cover stories with *Barron's,* a Dow Jones publication.  I have been a regular investment analysis and equity market trading contributor to *Bloomberg TV*, *Yahoo! Finance TV*, and *CNNfn*, among other media outlets, and provided a weekly equity market commentary distributed to and featured on many of the major financial websites in the United States and around the world.  I have also authored a weekly column for *The Wall Street Journal Interactive*.

13.     My direct experience in the investment management industry includes as a former institutional investment manager with responsibility for managing two different style funds in three different currencies.  In addition, I was head of U.S. research for a major Swiss bank in Switzerland with responsibility for formulating U.S. investment policy for more than $360 billion in assets under management.[12]  In those two roles, I had extensive experience evaluating and measuring investment performance on a daily basis.

14.     In my role as President and Chief Analyst for Pegasus Research in New York, I was actively involved in analyzing, implementing, and reporting on investment trading strategies including strategies based on fundamental and technical analysis.  That experience included providing analysis and developing research reports and commentary to short-term focused trading professionals.

---

[12] Union Bank of Switzerland, Zurich, Switzerland.

15.     Further, as briefly mentioned previously, I served on the Board of Directors of the New York Society of Security Analysts, one of the largest professional organizations for security analysts, investment managers, and market trading professionals in the United States.  My Board responsibilities included helping ensure that the organization and its members maintained a high standard of professionalism.  I was also actively involved in producing and lecturing at educational seminars and conferences related to equity market trading strategies, valuation, and risk analysis.

16.     I have testified in more than 60 securities litigation matters filed in U.S. Federal courts and arbitration forums directly related to the capital markets, including equity trading, investment performance, and market analysis.  A detailed list of these matters can be found in Appendix IV.

## IV.     Summary of Prof. Wermers's Expert Opinion VII in the Wermers Report.

17.     In its Complaint, the FTC alleges, among other things, that the Defendants present themselves as "expert stock and options traders who made millions in the stock market"[13] despite incurring "substantial and persistent losses"[14] on stock and option trading activities.

18.     In its Memorandum in Support of Plaintiff's Emergency Motion, the FTC ("Memorandum") cites the Wermers Report extensively.  With respect to the Wermers Report Opinion VII (at paragraph 86), Prof. Wermers opines that in analyzing the "actual trading performance" of Raging Bull, "***the trading records*** of Raging Bull and its co-founders show that even these consumers would have experienced persistent and substantial losses."[15]  It is worth noting that according to the Wermers Report, Prof. Wermers did not review the monthly account statements, which constitute the comprehensive trading records, from the various brokerage

---

[13] Complaint, p. 2, para 2.
[14] Ibid., p. 16, para 44 and p. 17, para 50.
[15] PX 26, 1777 (emphasis added).

firms.[16]  Instead, he appears to have simply reviewed selected IRS 1099-B records, which provide an incomplete summary of trading activity and not a comprehensive trading record.

19.     I understand that the FTC, and therefore by extension Prof. Wermers, had access to the same TD Ameritrade, Interactive Brokers, Merrill Lynch, and E*Trade monthly account statements that I and my firm, the Bates Group, reviewed in preparing this Initial Expert Report. I have been informed by counsel that the Defendants produced those records to the State of New Hampshire in its investigation, and that New Hampshire shared its investigative file with the FTC.

20.     As part of Prof. Wermers's opinion that Raging Bull and its co-founders generated "persistent and substantial losses," Prof. Wermers prepared Table 1 in the Wermers Report, which purports to show net losses of ($56,426,361) from 2014 to 2018.

21.     The Wermers Report does not identify the basis for the selected brokerage accounts and time periods Prof. Wermers chose to analyze, other than to state, "I [Prof. Wermers] have been provided with 26 copies of 1099-B tax reports associated with Raging Bull and its co-founders (Jeff Bishop and Jason Bond)."[17]  As noted above, the Wermers Report makes no reference to TD Ameritrade, Interactive Brokers, E*Trade, or other monthly account statements that represent the comprehensive trading records.

**V.      The Wermers Report's Methodology Used to Calculate "Actual Trading Performance"[18] is Inaccurate and Misleading.**

22.     The opinion expressed in the Wermers Report regarding the Defendants' securities "actual trading performance" and a net loss of ($56,426,361) is flawed for two reasons that skew the

---

[16] I found no mention of a review of the monthly statements in the Wermers Report and these monthly statements are not listed in Appendix B of the Report, Documents and Materials Considered.
[17] PX 26, 1777, footnote 128.
[18] The Wermers Report Section VII is titled, "Raging Bull's Actual Trading Performance Shows Substantial and Persistent Losses, Even During Periods of Market Upturns" (PX 26, 1777).

trading results in order to allege substantial losses. First, and critically, the Wermers Report relies on a flawed methodology to assess the Defendants' securities trading performance. Second, the Wermers Report analyzes certain accounts and time periods that are not relevant to the trading patterns and technologies Messrs. Bond and Bishop taught Raging Bull subscribers.

23.     In the Wermers Report, Prof. Wermers purports to show the net losses for Raging Bull and its co-founders was ($56,426,361), stating that he "analyze[d] the profitability of Raging Bull and its co-founders' trading activity as shown on available 1099-B records."[19] Prof. Wermers then states, "Table 1 summarizes the gains and losses of the different accounts held by Raging Bull and Raging Bull's instructors for the period from 2014 to 2018."[20]

24.     However, Table 1 of the Wermers Report does not, in fact, show the net gain or losses for the selected accounts. Instead, Prof. Wermers uses a unique and flawed methodology for opining that the selected accounts generated an "actual trading performance" was a net loss of ($56,426,361). His methodology is flawed for the reasons set forth below.

25.     First, as the basis for its flawed methodology, the Wermers Report relies on data from selected 1099-B tax records[21] the brokerage firms provided to the IRS, and not comprehensive net gains or losses as derived from the brokerage firm account statements. The 1099-B tax records provide an incomplete record of trading activity as not all trading activity or data is required to be reported to the IRS. For example, included in the TD Ameritrade 1099-B tax record for 2014 are six pages of short-term transactions[22] that are not included as part of the calculations in the Wermers Report Table 1. By not including these six pages of short-term transactions totaling

---

[19] PX 26, 1777, para 87.
[20] Ibid.
[21] Ibid.
[22] TD Ameritrade 2014 1099-B tax record, for the account ending in 9075, pp. 46-51.

$8,123,983 in proceeds, the calculation of a net loss of ($1,532,777) listed in Table 1 of the Wermers Report[23] cannot be an accurate representation of actual trading performance.  And, by not relying on the monthly account statements, which provide a comprehensive record of trading activity and therefore account performance, the Wermers Report further presents an incomplete assessment of the Defendants' securities net gains or losses in the selected accounts.

26.     Second, the Wermers Report includes an artificial adjustment, known as "wash sale loss disallowed"[24] in calculating the purported "actual trading performance" in the selected accounts. Wash sale losses disallowed is an IRS tax accounting rule under Section 1091 of the Internal Revenue Code that "prevents investors from recognizing *artificial losses* by selling a stock for a loss and then repurchasing the stock within a short period of time."[25]  A wash sale occurs when, among other things, an investor sells or trades stock or securities at a loss and within 30 days before or after the sale buys substantially similar stock.  It is those specific types of "artificial" losses that form the basis for the opinion in the Wermers Report that the Defendants lost ($56.43 million).

27.     Because much of the Defendants' securities trading were short-term transactions, those transactions frequently implicated the wash sale rule.  According to Interactive Brokers, one of the Defendants' securities brokerage firms, "The wash sales rule was implemented to defer the deduction when a taxpayer sells a security at a loss and purchases the same or an equivalent security within a short period of time. A sale of stock or securities is considered a 'wash sale' if a trader sells shares or securities at a loss and purchases the same or equivalent shares or securities within the 61-day wash sale period…"[26]

---

[23] PX 26, 1779 Table 1, row 1.
[24] *See* Exhibit 1.
[25] Ibid. (emphasis added).
[26] *See* Exhibit 2.

28.     Under the wash sale rule, the wash sale loss disallowed is added to the cost basis of subsequent purchases of the same or equivalent securities.  The result is that for tax reporting purposes, the investor's cost basis in the replacement share position is elevated.  The elevated cost basis is for tax purposes only and does not alter the actual purchase value for the replacement shares, which is the appropriate figure to utilize when assessing actual trading performance or realized net gain or losses.

29.     In other words, on 1099-B tax records, the cost basis column includes the actual cost of the purchased securities **plus** "artificial losses"[27] (wash sale loss disallowed). The Wermers Report uses that cost basis column without adjusting for the artificial losses to assess the Defendants' trading performance, and thus materially overstates actual trading losses.

30.     To illustrate, consider the following example:

31.     On a given day, a trader buys 10 shares of XYZ Corp. for a total of $100 in the morning. At noon, that trader sells those 10 shares for $90, resulting in a $10 loss.  At 1 p.m., the trader buys back 10 shares of XYZ for a total of $92 and sells those shares at the end of the day for $104.  His or her net gain or loss or actual trading performance for XYZ would be $2 as illustrated in Table 1.1 below:

**Table 1.1**

| Date | Quantity | Dollar Value of Shares Bought | Dollar Value of Shares Sold | Net Gain or Loss |
|---|---|---|---|---|
| 06/01/18 | 10 | 100 | -- | -- |
| 06/01/18 | 10 | -- | 90 | -10 |
| 06/01/18 | 10 | 92 | -- | -- |
| 06/01/18 | 10 | -- | 104 | 12 |
| **Total Net Gain or Loss:** | | **--** | **--** | **2** |

---

[27] *See* Exhibit 1.

32.     However, according to IRS tax accounting rules,[28] the investor cannot claim a $10 loss on taxes as it is an "artificial loss"[29] and classified as a wash sale loss disallowed for tax accounting purposes.  Per applicable IRS rules, the $10 loss would be added back to the cost of repurchasing the shares and would form the new cost basis of the second purchase.  Once the shares of XYZ are sold and the position closed, the net realized gain or loss or actual trading performance for XYZ would be $2 ($104 - $102).  This is illustrated in Table 1.2 below:

**Table 1.2**

| Date Acquired | Date Sold | Quantity | Proceeds (Dollar Value of Securities Sold) | Cost Basis (Dollar Value of Securities Bought + Adjustments) | Adjustment (Wash Sale Loss Disallowed) | Net Gain or Loss |
|---|---|---|---|---|---|---|
| 06/01/18 | | 10 | -- | 100 | -- | -- |
| | 06/01/18 | 10 | 90 | -- | 10 | -- |
| 06/01/18 | | 10 | -- | (92+10) 102 | -- | -- |
| | 06/01/18 | 10 | 104 | -- | -- | 2 |
| **Net Gain** | | | -- | -- | -- | **2** |

33.     On a typical 1099-B tax record, such as the ones TD Ameritrade issues, the summary trading details including net gain or loss could appear as follows (Table 1.3, see also Exhibits 4 and 5).

**Table 1.3**

XYZ Corp, / CUSIP: 1234567890 / Symbol: XYZ

| Date Sold | Quantity | Proceeds (Dollar Value of Securities Sold) | Date Acquired | Cost Basis (Dollar Value of Securities Bought + Adjustments) | Wash Sale Loss Disallowed (Adjustment) | Net Gain or Loss |
|---|---|---|---|---|---|---|
| 06/01/18 | 10 | 90 | 06/01/18 | 100 | -- | -10 |
| 06/01/18 | 10 | 104 | 06/01/18 | 102 | 10 | 12 |
| **Security Total:** | | **194** | | **202** | **10** | **2** |

---

[28] *See* IRS Section 1091, Loss from Wash Sales of Stocks or Securities.
[29] *See* Exhibit 1.

34.     As can be seen in the examples with Tables 1.1 to 1.3, the net gain or "actual trading performance" for trades would still be $2.  Using the 1099-B tax records to calculate net gain or loss by subtracting the total Cost Basis from total Proceeds ($194 − $202) without the proper adjustment, would give an inaccurate loss of ($8).  Subtracting the Cost Basis from Proceeds without this adjustment is a fundamental error that is used in the Wermers Report.

35.     To specifically illustrate how the methodology[30] used in the Wermers Report artificially skews trading performance results, I selected two transactions from the TD Ameritrade securities account (ending in 6387) found in Table 1 of the Wermers Report and analyzed them based on the net out-of-pocket ("NOOP") profit/loss methodology.  In the first such transaction, I reviewed trades in I Shares (symbol IWM) made in July and August 2018 (*see* Exhibit 4).  If Proceeds minus the Cost Basis were used to (incorrectly) show trading results, the trades would appear to generate a loss of ($6,937).[31]  However, in using the accepted NOOP methodology, the actual realized trading result for IWM was a net gain or trading profit of $9,655.  Further, the net gain of $9,655 is also listed in the second to last column of the 1099-B tax record.  In the second example, I reviewed trading in Energous Group (symbol WATT) in April to July 2018 (*see* Exhibit 5).  Instead of a loss calculation of ($9,514) that would result if Proceeds and Cost Basis[32] were incorrectly used, the actual realized trading performance based on NOOP methodology (and shown in the second to last column of the 1099-B tax record) was a net realized gain of $7,234..

36.     Third, the Wermers Report misleadingly titles the columns in Table 1 of the Report to infer or indicate that the net gains or "actual trading performance" of the selected accounts reviewed

---

[30] In the Wermer Report, Table 1 includes a column titled, "Proceeds minus Costs" which purports to show net gains or losses (*See* PX, 26, 1779).
[31] Total Proceeds – Cost Basis ($254,821 – $261,758).
[32] Total Proceeds – Cost Basis ($413,252 – $422,766).

were based on the 1099-B tax records of the selected accounts and represents the difference between the value of securities sold and the value of securities purchased.

37.     Table I in the Wermers Report titled, "Summary of Gains/Losses from Available 1099-B Records"[33] includes six columns as follows: 1. "Account Number Ending in," 2. "Account Owner," 3. "Year," 4. "Dollar Volume of Securities Sold," 5. "Dollar Volume of Securities Bought," and 6. "Proceeds minus Costs."  The Wermers Report notes as a source for the data in the columns the 1099-B tax records for five accounts.[34]

38.     Two of the columns in Table 1 of the Wermers Report are inaccurately titled to contend that Raging Bull generated substantial losses in its trading activity.  For example, column 5 ("Dollar Volume of Securities Bought") indicates that this column represents the total dollar value of securities purchased in the referenced accounts.

39.     Column 6 ("Proceeds minus Costs") purports to show net gains or losses for the referenced accounts by suggesting that the column is the difference between column 4 ("Securities Sold") and column 5 ("Securities Bought.")  The calculations, and the Total in the last row of Table 1, form the basis of Prof. Wermers's view that the net gain or loss or "actual trading performance" for the selected accounts was a substantial net loss of ($56.43 million).

40.     Columns 5 and 6 in Table 1 of the Wermers Report are inaccurate for two reasons:  One, column 5 is not the "Dollar Volume of Securities Bought," but instead the dollar value of securities bought ***plus*** an IRS (only) accounting adjustment.  As can be seen in Exhibit 6 attached to this Initial Expert Report, column 5 from the Wermers Report Table 1 matches the "Cost basis" column

---

[33] PX 26, 1779
[34] PX 26, 1779.  Interestingly, the Wermers Report mentions a review of 26 copies of 1099-B tax reports, however the data in Table 1 only include data from 16 copies of the 1099-B tax reports.

in the TD Ameritrade 1099-B tax records.  There is no mention or explanation in the notes to Wermer Report Table 1 that column 5 also includes "artificial losses" or tax adjustment that are included in the "Cost basis" column in the 1099-B tax records.  Two, column 6, ("Proceeds minus Costs,") is not the net gains or losses for the respective accounts as listed on the 1099-B tax records,[35] but an artificial total that the Wermers Report calculates by including the artificial loss that the IRS disallows for tax purposes.  A more accurate title for column 6 would be "Proceeds minus Cost Basis" as the columns are listed in the respective 1099-B tax records.  That said, even if the title were corrected to correspond with the respective columns in the 1099-B tax records, reported values in column 6 of the Wermers Report Table 1 would still not represent actual trading performance.

41.     To more fully illustrate, Exhibit 6 in this Initial Expert Report includes several tables.  The first table at the top of Exhibit 6 is Table 1 from the Wermers Report,[36] and the second table in Exhibit 6 is the Summary Table from the TD Ameritrade 1099-B tax record.[37]  Arrows are drawn to highlight where the Wermers Report Table 1 column titles and data correspond to the Summary Tables in the 1099-B tax records.  As can be seen in Exhibit 6, Wermers Report Table 1, "The Dollar Volume of Securities Sold," corresponds to the "Proceeds" column in the Summary Table from the 1099-B tax record, and the "Dollar Volume of Securities Bought" in the Wermers Report Table 1 corresponds to the "Cost Basis" column in the Summary Table from the 1099-B.

42.     The third and fourth tables in my Exhibit 6, reconcile the differences in Wermers Report Table 1 and the Summary Table in the 1099-B tax records.  The third table in Exhibit 6 provides a breakdown of the "Cost basis" total in the 1099-B tax records and shows that it includes both the

---

[35] *See* TD Ameritrade 1099-B tax records listed in Appendix 1.
[36] PX 26, 1779.
[37] *See* 2018 TD Ameritrade 1099-B tax record for account ending in 9075, p. 1.

actual cost or "Dollar Volume of Securities Bought" plus the artificial adjustment which is the "Wash sale loss disallowed."  The fourth table in Exhibit 6 shows that the net gain or loss in the Summary Table in the 1099-B tax record is the difference between "Proceeds," or the "Dollar Volume of Securities Sold," and the cost of the securities or actual "Dollar Volume of Securities Bought."  As can be seen in Exhibit 6, the trading performance or "Net gain or loss" for the account ending in 9075 according to the 1099-B tax records was a loss of ($1,009,698) in 2018 and not ($6,040,472) as Table 1 of the Wermers Report opines.

43.     If I extend the corrected analysis as detailed above to the other accounts listed in Wermers Report Table 1, the trading performance or net loss for the period 2014 to 2018 for the selected accounts (according to the 1099-B tax records) would be ($2.31 million) and not ($56.43 million) as the Wermers Report opines (see Exhibit 3).  In other words, the Wermer Report overstates the realized net loss by over 2,300 percent or $54 million.

44.     Finally, to place the Wermers Report misleading performance assessment into proper perspective, consider the comparison of the average equity of the trading accounts referenced in Table 1 of the Wermers Report to the Wermers's net loss figure of ($56.43 million).  At my request, Bates Group calculated the average equity, or amount available to invest, utilizing the brokerage account statements listed in Appendix I.  The average equity value across these selected accounts for the periods listed was only $1.98 million.   Raging Bull and its principals had nowhere near $56.43 million in equity to lose in those accounts.  Simply put, it was not possible for the Defendants to lose ($56 million) with an average equity or aggregate account values of less than

$2 million.[38]  Nonetheless, that is the figure presented in the Wermers Report to support the opinion that the trading records show "substantial losses."[39]

## VI.  The Trading Accounts and Time Periods Reviewed in the Wermers Report are Incorrect.

45.  The second flaw in the Wermers Report trading performance assessment is the scope of the accounts and time periods Prof. Wermers reviewed.  Several of the accounts and time periods Prof. Wermers reviewed do not correspond to the trading patterns and techniques Messrs. Bond and Bishop taught subscribers.[40]   By including accounts and time periods not relevant to this dispute, the Wermers Report further exaggerated its inaccurate loss figures.

46.  In a review of the relevant accounts and time periods in which Jason Bond implemented the trading patterns and techniques he taught to Raging Bull subscribers, and based on our NOOP analysis of the comprehensive monthly account statements,[41] the realized and unrealized net gain for the period 2014 to 2018 was $318,539.[42]  At or around the end of 2017, Mr. Bond had crossed the $1 million threshold in profits due to realized trades.[43]  The Wermers Report makes no mention of any of these profits.

47.  Applying the Wermers Report methodology (excluding wash sale losses disallowed), the realized net loss in the aggregate for the TD Ameritrade securities brokerage account in which

---

[38] Even if the accounts received cash inflows to make up for "substantial and persistent losses" as alleged, those inflows would show up in and inflate monthly account values. The monthly account statements do not show any material cash inflows.
[39] PX 26, 1777, para 86.
[40] *See* Declarations of Jason Bond and Jeffrey Bishop, as listed in Appendix I.
[41] For the TD Ameritrade, Interactive Brokers, and E*Trade securities brokerage accounts.
[42] *See* Exhibit 7.
[43] *See* Exhibit 9.

Jeffrey Bishop implemented the trading patterns and techniques that he taught to Raging Bull subscribers for 2018 was ($1,158,939).[44]

## VII.      Net Overall Profit/Loss Methodology.

48.      As part of the Bates Group's standard process, and under my direction and review, I had Bates Group perform an analysis of the net overall profit/loss of each relevant account (and for each relevant time period) based on inputting the deposit, withdrawal and net equity values contained on brokerage account statements into an easily reviewable format.  Once the activity was input, the data is reviewed and back-checked to the account statements by two separate individuals to ensure accuracy.  Once confirmed, this allowed for computations of the monthly, annual, and overall totals in the following categories: net deposits/withdrawals, net equity, average net equity and net overall profit/loss.  The analyzed data is then captured in our Equity Change Analysis, which is an abbreviated part of our standard procedure for preparing an account report.

49.      The standard net overall profit/loss analysis that we perform at Bates Group follows standard accepted account analysis and has been routinely accepted as accurate in thousands of litigation matters including those in various state and federal courts and in Financial Industry Regulatory Authority ("FINRA") arbitrations throughout the United States.

50.      According to an analysis of the comprehensive trading records as detailed in the monthly account statements, the actual trading performance or aggregate net loss (or net out-of-pocket) for the selected accounts and periods that are listed in the Wermers Report Table 1 is ($2,314,494). This NOOP analysis is summarized in column G in Exhibit 3.  The Wermers Report overstates the realized net loss by over 2,300 percent or approximately $54 million.

---

[44] *See* Exhibit 8.

## VIII.      Mr. Wermer's Own Research Articles Contradict the Wermers Report Methodology.

51.      In the matter, <u>Terraza v. Safeway Inc. et. al</u>, Prof. Wermers authored an expert report on behalf of Safeway[45] in which he analyzed historical performance of the defendant.  In analyzing and reporting on the historical investment performance of Safeway, Prof. Wermers used performance data from Thomson Reuters Lipper, which follows the standard industry custom and practice of evaluating investment performance.  The standard industry practice for calculating investment performance does not include using cost basis inclusive of wash sale losses disallowed. Instead, the Safeway expert report used a similar methodology to analyze portfolio net gains or losses or net returns[46] as Bates Group does in its equity trading analysis and internal rate of return ("IRR") analysis.  In contrast, when Prof. Wermers analyzed the Defendants' "gains and losses,"[47] he did not use accepted industry custom and practice for measuring "net returns" but a method that is not discussed or even mentioned in his <u>Terraza v. Safeway, Inc. et. al</u> expert report.

52.      In his article "Performance Evaluation with Portfolio Holdings Information,"[48] Prof. Wermers makes no mention of using cost basis and including wash sale losses disallowed in his investment performance evaluation as he does when analyzing the Defendants' "profitability" in the Wermer Report.

53.      Similarly, in "Portfolio Performance, and Herding: A Study of Mutual Fund Behavior"[49] (1995), Prof. Wermers again uses a different methodology[50] in evaluating performance for

---

[45] Expert Report of Russell R. Wermers, Ph.D. in <u>Terraza v. Safeway Inc., et. al</u>, U.S. District Court for the Northern District of California, May 22, 2018.
[46] Ibid., p. 19, para 42 and Exhibits 3.1 to 3.4.
[47] PX 26, 1777, para 87.
[48] Russ Wermers, "Performance Evaluation with Portfolio Holdings Information," The North American Journal of Economics and Finance, February 23, 2006.
[49] Mark Grinblatt, Sheridan Titman, and Russ Wermers, "Momentum Investment Strategies, Portfolio Performance, and Herding: A Study of Mutual Fund Behavior," The American Economic Review, December 1995.
[50] Ibid., p. 1090.

"momentum investors" than for Raging Bull. Prof. Wermers makes no mention of using cost basis and including wash sale losses disallowed in his investment performance evaluation as he does when analyzing the Defendants' "profitability" in the Wermer Report.

54.    In "Performance Measurement of Mutual Funds, Hedge Funds, and Institutional Accounts,"[51] Prof. Wermers discusses several "best practices"[52] for analyzing returns. However, none of the examples of "best practices" Prof. Wermers discusses in his article were used in analyzing investment performance of Raging Bull or its co-founders in the Wermers Report. Further, the concept of including cost basis with a tax accounting adjustment, such as wash sale losses disallowed, for performance evaluation was not even mentioned in this publication.

55.    In fact, in reviewing numerous publications and expert reports either authored or co-authored by Prof. Wermers, I could find no example of the unique methodology that he utilized in calculating and opining on Raging Bull's investment performance in the Wermers Report. Interestingly, the methodology that he used for calculating investment performance in the articles and publications is similar to the approach that Bates Group utilizes in our standard analysis and in this Initial Expert Report, and conforms with industry custom and practice including in the performance analysis of the Raging Bull accounts (see Exhibit 3).

## IX.    An Initial Review of Defendant's Statements.

56.    In the Complaint, the FTC alleges that a number of statements Defendants made to Raging Bull subscribers were "false, misleading or unsubstantiated."[53] We reviewed two of the claims the

---

[51] Russ Wermers, "Performance Measurement of Mutual Funds, Hedge Funds, and Institutional Accounts," Annual Review of Financial Economics, September 9, 2011.
[52] Ibid., p. 541.
[53] *See* Memorandum, p. 8.

FTC highlights and compared Defendant's statements with the actual trading performance as detailed in the monthly account statements.  In one example, the FTC states:

      a.   In a marketing email sent to one of Raging Bull's mailing lists in March 2020, Bond states he "made over 180% in 2015 and then in 2016 I turned a $100,000 account into $430,000! A massive 330% returns [sic]. 2017, I then made $284,000 and get this… I donated all of it to charity! … 2018 is no different because of my market-tested strategy that myself and thousands of members are using for HUGE success."[54]

57.     Under my instruction, Bates Group analyzed the returns for the account ending in 4059 and found the percentage returns, based on the monthly account statements, were largely in-line with the returns mentioned in the above marketing email. For 2015, the trading in the account generated an IRR of 168 percent, for 2016 the IRR was 777 percent, and in 2017 the IRR was 366 percent (see Exhibit 10).

58.     In the second example the FTC states:

      a.   In emails Bond sent to consumers who signed up to receive his free newsletter, he wrote, for example, "SNAP, crackle, pop! $22,000 profit for me on SNAP Wednesday, 172% on the options and another 10% on the shares. ALL from IPHONE" and "I'm avg, $2300 a day right now trading part time."[55]

59.     In analyzing the detailed trade data available in the monthly account statement, we found Mr. Bond's claim of $22,000 as accurate. When Jason Bond closed some of the trades in SNAP

---

[54] *See* Complaint, para 47.
[55] See Complaint, para 62.

on Wednesday, March 22, 2017, the total profit generated on those stock and option trades were $21,199.92 (see Exhibit 11).

60.     I affirm that the statements, opinions and conclusions set forth in Sections I.-IX. of this report are true to the best of my knowledge and belief.

Executed this 13th day of January 2021.

Greg A. Kyle

**Appendix I – Documents and Data Reviewed**

**Documents reviewed and relied upon include:**

- Federal Trade Commission v. RagingBull.com, LLC et al, Complaint for Permanent Injunction and Other Equitable Relief, December 7, 2020.

- Federal Trade Commission v. RagingBull.com, LLC et al, Memorandum in Support of Plaintiff's Emergency Motion for a Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, Other Relief, and Order to Show Cause why a Preliminary Injunction Should not Issue, December 7, 2020.

- Expert Report of Professor Russel R. Wermers, November 24, 2020.

- TD Ameritrade 1099-B tax records and monthly account statements for account ending in 9075, for the period 2014 to 2018.

- E*Trade 1099-B tax records and monthly account statements for account ending in 8701, for the period 2013 to 2018.

- E*Trade 1099-B tax records and monthly account statements for account ending in 4059, for the period 2014-2018.

- Interactive Brokers 1099-B tax records and annual account statement for account ending in 1637, for 2015.

- TD Ameritrade 1099 Information Guide, December 2020.

- Interactive Brokers, Wash Sales: Understanding the Basics.

- Expert Report of Russell R. Wermers, PH.D. in Maria Karla Terraza v. Safeway Inc, et al, U.S. District Court for the Northern District of California, May 22, 2018.

- Russ Wermers, "Performance evaluation with portfolio holdings information," The North American Journal of Economics and Finance, February 23, 2006.

- Mark Grinblatt, Sheridan Titman, and Russ Wermers, "Momentum Investment Strategies, Portfolio Performance, and Herding: A Study of Mutual Fund Behavior," The American Economic Review, December 1995.

- Russ Wermers, "Performance Measurement of Mutual Funds, Hedge Funds, and Institutional Accounts," Annual Review of Financial Economics, September 9, 2011.

- Declaration of Jason Bond, January 13, 2021.

- Declaration of Jeffrey M. Bishop, January 13, 2021.

**Appendix II – Curriculum Vitae**

**Professional Experience**

**Bates Group LLC**, 2011 to Present
Lake Oswego, OR; New York, NY

*Director*

Provide litigation consulting services and expert witness testimony on securities matters involving performance analysis, equity and fixed income valuation and financial models, sector and asset allocation analysis, portfolio management, trading strategies and market sentiment issues.

**Bates Private Capital/LECG**, 2007 to 2011
Lake Oswego, OR; New York, NY

*Director*

Provide litigation consulting services and expert witness testimony on securities matters involving performance analysis, equity and fixed income valuation and financial models, sector and asset allocation analysis, portfolio management, trading strategies and market sentiment issues.

**Pegasus Research, LLC**, 1997 to 2012
New York, NY

*Founder, President and Chief Strategist/Analyst*

Founded Pegasus Research as an independent investment research firm focused on equity valuations, financial risk and capital market strategies.  Regular contributor on capital market issues, valuation and trading strategies to *CNNfn, Bloomberg TV, The Wall Street Journal, The Economist* and *Business Week*, among other media outlets.  Authored weekly column for *The Wall Street Journal Interactive* and other global financial publications.

**Union Bank of Switzerland**, 1992 to 1996
Zurich, Switzerland

*Head of North American Research Team*

Formulated U.S. investment policy for UBS private banking in Switzerland (est. $350 billion AUM).  Managed the U.S. portion of a $7 billion global asset allocation portfolio in multiple currencies and styles. Authored studies related to international portfolio management, market correlations, volatility as well as regular U.S. strategy and equity research reports.

*Equity Analyst, Capital Markets*

Responsible for fundamental analysis of the Swiss retail sector. Developed fundamental and technical models, analyzed and produced company and sector research publications.

**Credit Suisse**, Zurich Switzerland, 1990 to 1992

*Research Editorial Assistant*

Supported senior analysts with company, sector, and market research reports.

## Education

International Portfolio Management, Swiss National Bank, Gerzensee, Switzerland, 1994

Wolfsberg Executive Management Program, Wolfsberg, Switzerland, 1994

B.S.-Finance, City University, Zurich, Switzerland, 1992

## Professional & Other Affiliations

Served 6 years on the Board of Directors, New York Society of Security Analysts (NYSSA)

Board of Governors, United Rescue, Jersey City, NJ, 2017 – Present

Emergency Medical Responder, United Rescue, Jersey City, NJ, 2017 – Present

**Appendix III – Greg Kyle's Published Materials:**

Reports and articles authored within the past ten years include:

- Bates Capital Market Insights, Bear Markets, Black Swan Events, and Volatility, June 1, 2020.

- Bates Strategy Insights, U.S. Chartbook, Economic and Capital Markets Analysis, 2019 Year in Review, February 2020.

- Bates Strategy Insights, U.S. Chartbook, Economic and Capital Markets Analysis, 2018 Year in Review, March 2019.

- Bates Research, *Markets 2016: A Look Back*, January 26, 2017.

- Bates Research, *BREXIT*, July 1, 2016.

- Bates Research, *Crowdfunding and Title III of the JOBS Act*, June 2, 2016.

- Bates Research, *All Eyes on Interest Rates*, June 5, 2015.

- Bates Research, *Mixed Signals for the U.S. Economy*, May 29, 2015.

- Bates Research, *Solid U.S. Growth but Weakness Still Present*, January 30, 2015.

- Bates Research, *Federal Reserve Raises Interest Rates for First Time Since 2006*, December 18, 2015.

- Bates Research, *U.S. Economic Growth, A Tale of Two Cities?*, September 4, 2015.

- Bates Research, *Housing Crisis? What Housing Crisis?*, June 12, 2015.

- Bates Group and Pegasus Research Strategy Insights, Economic and Capital Markets Chart book, Fourth Quarter 2014

- Bates Research, *The Jobs Recession is Finally Over*, June 30, 2014.

- Bates Research, *A Shrinking Economy in the First Quarter*, May 30, 2014.

- Bates Group and Pegasus Research Strategy Insights, Economic and Capital Markets Chart book, Fourth Quarter 2013

- Bates Research, *The "Volcker Rule,"* December 27, 2013.

- Bates Group White Paper: REITs Explained, June 7, 2013.

- Bates Group White Paper: CDOs Explained, February 20, 2013.

- Bates Group White Paper: LIBOR Explained, January 16, 2013.

- Bates Group White Paper: CDS Explained, January 11, 2013.

- Bates Group White Paper: MBS Explained, January 11, 2013.

- Pegasus Strategy Insights, Economic and Capital Market Analysis, 2009-2012.

**Appendix IV – Greg Kyle Trial, Arbitration, Deposition and Expert Report History:**

- *Bernard Grossman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, December 19, 2003. Testimony on economic, capital markets, and equity research issues.

- *Ronald Harwood v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, June 6, 2004. Testimony on economic, capital markets, and equity research issues.

- *Abdelkarim Khalil v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, July 16, 2004. Testimony on economic, capital markets, equity research, and trading issues.

- *Mohammed Azab v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, July 29, 2004. Testimony on economic, capital markets, mutual funds, equity research, and trading issues.

- *Richard McInnis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, August 2, 2004. Testimony on economic, capital markets, and equity research issues.

- *Michel Hachem v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, August 25, 2004. Testimony on economic, capital markets, equity research, and trading issues.

- *Beth Glaub v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, October 4, 2004. Testimony on economic, capital markets, and equity research issues.

- *Louis Imundo v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, October 5, 2004. Testimony on economic, capital markets, mutual funds, equity research, and trading issues.

- *Kenny Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, November 13, 2004. Testimony on economic, capital markets, equity research, and trading issues.

- *Ted Schofield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, November 16, 2004. Testimony on economic, capital markets, equity research, and trading issues.

- *Thomas Redman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, November 30, 2004. Testimony on economic, capital markets, equity research, and trading issues.

- *Kenny Wilson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, December 15, 2004. Testimony on economic, capital markets, equity research, and trading issues.

- *-Janet Baker, et al. v. KPMG LLP, et al.,* U.S. District Court, District of Massachusetts, January 18, 2005. Expert report on industry custom and practice for security analysts.

- *James Rice v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, January 27, 2005. Testimony on economic, capital markets, equity research, and trading issues.

- *Douglas Berge v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, July 28, 2005. Testimony on economic, capital markets, equity research, and trading issues.

- *Joseph Davenport v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, September 30, 2005. Testimony on economic, capital markets, equity research, and trading issues.

- *Richard Clyne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, January 26, 2006. Testimony on economic, capital markets, equity research, and trading issues.

- *Stanley Cunningham v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, February 27, 2006. Testimony on economic, capital markets, equity research, and trading issues.

- *Bo Hammerich v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, March 9, 2006. Testimony on economic, capital markets, equity research, and trading issues.

- *Regis Garcia v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, July 12, 2006. Testimony on economic, capital markets, structured products, equity research, and trading issues.

- *Tom Lester v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* NASD Arbitration Panel, May 9, 2007. Testimony on economic, capital markets, equity research, and trading issues.

- *CDX Liquidating Trust v. Venrock Associates, et al*, U.S. District Court, Eastern Division, February 2, 2008. Expert report and deposition on the capital markets, valuations, and technology sector risk factors.

- *OFHEO v. Franklin D. Raines, et al,* February 28, 2008. Expert report on the capital market view of pro forma earnings, valuation methodologies, and analyst views of FAS 133.

- *Ray Colter v. Morgan Keegan & Company, Inc.*, FINRA Arbitration Panel, October 13, 2008. Testimony on principles and procedures of investment management, capital markets, structured products, and fund risk disclosure issues.

- *Katherine Murphy v. Charles Schwab & Co., Inc.*. FINRA Arbitration Panel, April 21, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *James S. Postigo v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, April 27, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Janet Laird v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, May 18, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Thomas E. Cusack v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, May 19, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Gary L. Wilhelm v. Charles Schwab & Co., Inc.,* FINRA Arbitration Panel, May 19, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Everett C. Ross et al v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, June 16, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *D. Lee Bartell v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, June 24, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *John Frederick Archer v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, June 25, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Keith Thompson & Gwen Thompson v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, July 21, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Scott W. Doyle v. Charles Schwab & Co., Inc.,* FINRA Arbitration Panel, July 28, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Gary Brent Mayes et al v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, July 28, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Olivia E. Herman v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, August 4, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Doug H. Brown v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, August 11, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Harvey Lerman, Roberta Lerman, Sheldon Ludmerer & Josephine Ludmerer v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, August 25, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Paul Edwards v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, September 1, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *David Sigalow & Stephen Milbrath v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, September 14, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Bruce M. Eliot & Denise O. Eliot v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, September 22, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Werner Salinger & Rosa Salinger v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, October 13, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Jack Robeson v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, November 2, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Patricia M. Flanagan v. UBS Financial Services Inc*, FINRA Arbitration Panel, November 16, 2009. Testimony on capital markets. equity and credit analysis and structured products.

- *Kenneth A. & Holly Schweiterman v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, December 1, 2009. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Marc Mauney, Rogerson Revocable Living Trust v. Charles Schwab & Co., Inc.,* FINRA Arbitration Panel, December 14, 2009. Testimony on investment management, capital

markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Matthew Schoenberg v. Wells Fargo Bank*, AAA Arbitration Panel, January 4, 2010. Testimony on capital markets, investment management, asset allocation, and structured products.

- *Kwen-Jen Chang v. UBS Financial Services Inc,* FINRA Arbitration Panel, February 12, 2010. Testimony on capital markets, equity and credit analysis and structured products.

- *Laurence Frank et al v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, February 19, 2010. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *David Marcus v. UBS Financial Services Inc.,* FINRA Arbitration Panel, March 8, 2010. Testimony on capital markets, equity and credit analysis and structured products.

- *Roe Green v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, March 11, 2010. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *T. Hayes v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, March 15, 2010. Testimony on investment management, capital markets, fixed income, structured products, and fund risk disclosures.

- *Kathleen Pomeroy v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, April 30, 2010. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Deborah Hill v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, September 22, 2010. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Steven Edelson v. UBS Financial Services Inc.,* FINRA Arbitration Panel, September 24, 2010. Testimony on capital markets, equity and credit analysis and structured products.

- *Fannie Mae*, et al, U.S. District Court, District of Columbia, November 15, 2010. Expert report on valuation and impact of pro forma financial restatements on capital markets and investment community's perception towards Fannie Mae.

- *Fannie Mae*, et al, U.S. District Court, District of Columbia, May 16, 2011. Deposition on valuation and impact of pro forma financial restatements on capital markets and investment community's perception towards Fannie Mae.

- *D. Vollstedt, et al v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, April 22, 2011. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Madhok Family Trust v. Charles Schwab & Co., Inc.*, FINRA Arbitration Panel, October 6, 2011. Testimony on investment management, capital markets and cycles, fixed income, structured products, credit analysis and ratings, default rates and fund risk disclosures.

- *Michael Farah v. Wedbush Morgan Securities, Inc*., FINRA Arbitration Panel, September 3, 2013. Testimony on investment management, capital markets, CMOs and structured products. and fund risk disclosures.

- *U.S. v Eric Bloom, U.S. District Court, Eastern Division*, March 19, 2014. Testimony on credit markets and cycles, credit ratings and default rates.

- *Michael Alonso et al v. Leslie J. Weiss et al, U.S. District Court, Eastern Division, September 22, 2016*. Expert Report and deposition on the capital markets, fund manager custom and practices, trading and valuations.

- *Katrina Godshalk et al v. Tembion Capital Management LLC et al, AAA Arbitration Panel, December 19, 2018.* Testimony on capital markets, volatility and fund risk analysis.

- *Limpinbear Family Partnership v. Aveo Capital Partners, LLC et al, AAA Arbitration Panel, April 10, 2019.* Testimony on capital markets, volatility, and fund risk analysis.

# Exhibit 1



1099 Information Guide

## Detail for Sales Transactions



### A1: Short-term Proceeds reported

Shows total Proceeds from short-term transactions for which Cost basis is reported to the IRS as shown in **A2**.

Guidelines from the IRS for reporting written contracts (Sale to open) on options in the 1099-B form stipulate that brokers report the Cost basis as zero, and the proceeds as the net amount—the sales proceeds received when the options were sold, minus the cost. Therefore, if you had written options closed in the tax year, A1 would contain the net amount and not the actual proceeds received.

### A3: Market discount

Reports the Market discount.

### A4: Wash sale loss disallowed

Reports Wash sale loss disallowed for short-term transactions.

### A5: Net gain or loss

Shows net gain or loss on the short-term transactions for which Cost basis is reported to the IRS and is the difference between A1 and A2, including Market discount (subtract) and Wash sale adjustment (add).

### B1, B2, B3, B4: Total short-term Proceeds | Cost basis not reported

Shows total proceeds from short-term transactions for which Cost basis is not reported to the IRS. Proceeds, however, are reported to the IRS. Cost basis, Market discount, and Wash sale adjustment may be shown in B2, B3, and B4, respectively, for informational purposes.

### NNN: Form 1099-B not received

Shows the Proceeds, Cost basis, Market discount, and Wash sale adjustment for transactions that the broker will not report in the 1099-B form. You may need to consult a licensed tax advisor to determine if and how these transactions should be reported to the IRS.

 **Ameritrade**

**1099 Information Guide**

## Frequently Asked Questions (continued)

**Q. There is a lot of information in the details of the 1099-B. How do I determine which information is being reported to the IRS?**

A. The information that is being reported to the IRS on the Consolidated Form 1099 will have a line number next to the heading. If there is no line number next to the heading, then the information is being provided for informational purposes only.

**Q. What is the tax treatment of market discount?**

A. Market discount is always treated as ordinary income, regardless of the type of bond.

**Q: What is a wash sale?**

A: The IRS wash sale rule under Section 1091 of the Internal Revenue Code prevents investors from recognizing artificial losses by selling a stock for a loss and then repurchasing the stock within a short period of time. The wash sale window starts 30 days prior to the sale, includes the date of sale, and ends 30 days after the sale, for a total of 61 days.

**Q: When will TD Ameritrade report information related to distributions from Widely Held Fixed Investment Trusts (WHFITs)?**

A: TD Ameritrade will not receive information related to WHFITs until March 15, 2021. As a result, a corrected Consolidated Form 1099 statement may need to be issued once that information is available.

**Q: Are sales reported on a trade date or a settlement date basis?**

A: The IRS requires that we report all sales of positions held long on a trade date basis on Form 1099-B. Consequently, sale transactions with a trade date in 2020 and a settlement date in 2021 will be reported on your 2020 Consolidated Form 1099. For positions held short, the IRS requires the closing of short positions to be reported on settlement date. In this circumstance, a buy to close transaction with a trade date in 2020 and a settlement date in 2021 will be reported on your 2021 Consolidated Form 1099.

**Q: Are dividends reported by record date or payable date?**

A: Most dividends are reported by payable date. However, the IRS allows certain securities (such as mutual funds and REITs) to declare a dividend in October, November, or December with a payable date in January of the following year. These "spillover dividends" are reportable in the tax year the dividend was declared.

**Q: What is original issue discount (OID) income, and why is it included on my 1099?**

A: OID income is the excess of a debt obligation's stated redemption price at maturity over its issue price (acquisition price for a stripped bond or coupon). Whether or not you receive any cash payments during the year, TD Ameritrade is still required to report any OID income.

Additional information on OID income and the associated taxpayer reporting requirements can be found in IRS Publication 1212, "Guide to Original Issue Discount Instruments," at irs.gov, or by calling 800-TAX-FORM.

TD Ameritrade does not provide tax advice. We suggest you consult with a tax professional regarding your personal circumstances.

TD Ameritrade, Inc., member FINRA/SIPC, a subsidiary of The Charles Schwab Corporation. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2020 Charles Schwab & Co., Inc. All rights reserved.

# **Exhibit 2**

1/12/2021                                        Tax Information and Reporting



| | |
|---|---|
| Overview | Tax Residency |
| Reports and Dates | US Persons & Entities |
| CAN Persons & Entities | Non-US Persons & Entities |
| Wash Sales | FX P&L |
| FAQs | |

## Wash Sales: Understanding the Basics

The wash sales rule was implemented to defer the deduction when a taxpayer sells a security at a loss and purchases the same or an equivalent security within a short period of time. A sale of stock or securities is considered a "wash sale" if a trader sells shares or securities at a loss and purchases the same or equivalent shares or securities within the 61-day wash sale period, which includes the 30 calendar days before the sale, the day of the sale, and 30 calendar days following the sale.

When the loss on the sale is deferred, the amount of the loss is added to the cost basis of shares purchased during the wash sale period ("replacement shares"). Upon the sale of the replacement shares, the disallowed loss is incorporated into the calculations of the gain or loss on the replacement shares and recognized. Additionally, the holding period of the original shares is added to the holding period of the newly acquired shares or securities.

Wash sale rules apply to losses from short sales, securities options and securities futures. They do not apply to losses from commodity contracts or foreign currencies.

#### Wash Sales and Activity Statements

Interactive Brokers includes wash sales on daily, monthly and annual Activity Statements for all 1099-eligible accounts, as required by the IRS. Our wash sales are calculated on a granular basis, in other words as the shares actually trade through the system. This may result in multiple wash sales which at the end of a day sum to zero impact. Note however that there may be a timing difference with year-end recognition impacting the annual statement.

## Tax reporting for Wash Sales

# Exhibit 3

**PROFIT/(LOSS) COMPARISON**

RAGING BULL ACCOUNTS WITH VARIOUS BROKERAGE FIRMS (FOR TIME PERIODS INCLUDED IN PROF WERMERS' REPORT)

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| | | | | | [1] | |
| | | | | PROFESSOR | REALIZED | BATES NOOP |
| ACCOUNT | ACCOUNT HOLDER | BROKERAGE | YEAR | WERMERS' | P/(L) | PER MONTHLY |
| | | | | CALCULATIONS | PER 1099-B | STATEMENTS |
| 9075 | HAPPY MOUNTAIN HOLDINGS LLC - JEFF BISHOP | TD AMERITRADE | 2014 | (1,532,777) | (57,250) | 34,498 |
| 9075 | HAPPY MOUNTAIN HOLDINGS LLC - JEFF BISHOP | TD AMERITRADE | 2015 | (15,416,758) | (433,862) | (414,119) |
| 9075 | HAPPY MOUNTAIN HOLDINGS LLC - JEFF BISHOP | TD AMERITRADE | 2016 | (8,308,200) | [B] (153,304) | (209,481) |
| 9075 | HAPPY MOUNTAIN HOLDINGS LLC - JEFF BISHOP | TD AMERITRADE | 2017 | (16,330,001) | [B] (898,690) | (710,446) |
| 9075 | HAPPY MOUNTAIN HOLDINGS LLC - JEFF BISHOP | TD AMERITRADE | 2018 | (6,040,472) | [B] (1,158,939) | (1,118,165) |
| 6387 | JASON BOND AND PAMELA BOND | TD AMERITRADE | 2018 | (575,599) | [B] (170,220) | (336,034) |
| 8701 | JEFF BISHOP | E TRADE FINANCIAL | 2015 | (613,633) | [B] (117,947) | (100,122) |
| 8701 | JEFF BISHOP | E TRADE FINANCIAL | 2016 | (567,139) | [C] (16,511) | (34,312) |
| 8701 | JEFF BISHOP | E TRADE FINANCIAL | 2017 | 5,388 | [A, C] 12,287 | (16,280) |
| 8701 | JEFF BISHOP | E TRADE FINANCIAL | 2018 | (14,138) | [D] (14,138) | (42,891) |
| 1637 | LIGHTHOUSE MEDIA LLC | INTERACTIVE BROKERS | 2015 | (100,084) | [E] 1,531 | 1,516 |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2014 | (617,449) | (75,427) | (95,880) |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2015 | (823,617) | [B] 145,638 | 138,539 |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2016 | (2,479,067) | [C] 316,032 | 318,966 |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2017 | (1,331,936) | [C] 314,172 | 300,697 |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2018 | (1,480,877) | [B, C] (1,531) | (30,982) |
| | | | | ($56,426,361) | ($2,308,158) | ($2,314,494) |

Note [1]: Realized P/(L) per 1099-B uses Gain/Loss columns (adjusted for wash sale disallowed, where applicable).

[A] Excludes one or more of the following: short-term transactions with box B checked on form 8989, "Undetermined" with box B or E checked on form 8989, or unknown term gains or losses on gross proceeds transactions with box X checked on form 8989.

[B] Includes Realized P/(L) on closed futures contracts.

[C] Gain/Loss Amount in E*TRADE tax document does not back out Wash Sale Loss Disallowed amount, therefore Realized P/(L) represents the Gain/Loss Amount column total adjusted by the Wash Sale Disallowed column.

[D] Cost Basis amounts on the 1099 were not adjusted by the Wash Sale Loss Disallowed amount. The Wash Sale Loss Disallowed appeared to be for informational purposes only.

[E] There were no actual Gain/Loss totals on the 1099. This amount is a calculation of proceeds minus cost basis (after adjustment).

# Exhibit 4

| | | | | | | |
|---|---|---|---|---|---|---|
| **TD Ameritrade Clearing, Inc.** | | | | | Account | 865706387 |
| | | **Proceeds from Broker and Barter Exchange Transactions** | | | | |
| **2018**    **1099-B**[*]   OMB No. 1545-0715 | | | (continued) | | 01/17/2019 | |

**SHORT TERM TRANSACTIONS FOR COVERED TAX LOTS [Ordinary gains or losses are identified in the Additional information column]** *(Lines 2 & 5)*
Report on Form 8949, Part I with Box A checked. Basis is provided to the IRS. *(Line 3)*
*Gain or loss (-)* is NOT reported to the IRS.

1a- Description of property/CUSIP/Symbol

| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | 1b- Date acquired | 1e- Cost or other basis | 1f- Accrued mkt disc (D) & 1g- Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z) | Additional information |
|---|---|---|---|---|---|---|---|
| ISHARES IWM May 18 2018 153.0 Put / CUSIP:  / Symbol: IWM 05/18/18 P 153.000 | | | | | | | |
| 05/04/18 | 200.000 | 14,839.38 | 05/04/18 | 25,684.63 | ... | -10,845.25 | Option sale |
| 05/04/18 | 400.000 | 30,085.71 | 05/04/18 | 44,934.44 | 12,124.36 W | -2,724.37 | Option sale |
| | **Security total:** | **44,925.09** | | **70,619.07** | **12,124.36 W** | **-13,569.62** | |
| ISHARES IWM May 18 2018 157.0 Put / CUSIP:  / Symbol: IWM 05/18/18 P 157.000 | | | | | | | |
| 05/11/18 | 900.000 | 20,002.63 | Various | 58,538.59 | ... | -38,535.96 | Option sale |
| ISHARES IWM May 25 2018 159.0 Put / CUSIP:  / Symbol: IWM 05/25/18 P 159.000 | | | | | | | |
| 05/25/18 | 1,500.000 | 0.00 | Various | 67,485.60 | ... | -67,485.60 | Option expiration |
| ISHARES IWM Jun 08 2018 160.0 Put / CUSIP:  / Symbol: IWM 06/08/18 P 160.000 | | | | | | | |
| 05/29/18 | 100.000 | 10,016.06 | 05/29/18 | 14,580.14 | 4,564.08 W | 0.00 | Option sale |
| 05/30/18 | 500.000 | 18,108.51 | Various | 52,064.75 | ... | -33,956.24 | Option sale |
| | **Security total:** | **28,124.57** | | **66,644.89** | **4,564.08 W** | **-33,956.24** | |
| ISHARES IWM Jun 22 2018 166.0 Put / CUSIP:  / Symbol: IWM 06/22/18 P 166.000 | | | | | | | |
| 06/07/18 | 150.000 | 21,671.93 | Various | 26,128.89 | ... | -4,456.96 | Option sale |
| ISHARES IWM Aug 10 2018 165.0 Put / CUSIP:  / Symbol: IWM 08/10/18 P 165.000 | | | | | | | |
| 07/30/18 | 600.000 | 116,717.52 | Various | 106,454.23 | ... | 10,263.29 | Total of 4 transactions |
| 07/30/18 | 200.000 | 36,890.85 | 07/30/18 | 37,908.27 | 1,017.42 W | 0.00 | Option sale |
| 08/01/18 | 200.000 | 30,486.50 | Various | 32,324.71 | ... | -1,838.21 | Total of 2 transactions |
| 08/01/18 | 500.000 | 70,726.22 | Various | 85,070.98 | 15,575.32 W | 1,230.56 | Total of 3 transactions |
| | **Security total:** | **254,821.09** | | **261,758.19** | **16,592.74 W** | **9,655.64** | |
| ISHARES IWM Aug 10 2018 166.0 Put / CUSIP:  / Symbol: IWM 08/10/18 P 166.000 | | | | | | | |
| 08/01/18 | 100.000 | 21,943.16 | 08/01/18 | 20,056 | | | |
| 08/03/18 | 150.000 | 15,367.45 | 08/03/18 | 24,127 | | | |
| 08/03/18 | 750.000 | 82,092.12 | Various | 123,229 | | | |
| | **Security total:** | **119,402.73** | | **167,413** | | | |
| ISHARES IWM Aug 17 2018 167.0 Put / CUSIP:  / Symbol: IWM 08/17/18 P 167.000 | | | | | | | |
| 08/08/18 | 500.000 | 35,236.59 | 08/06/18 | 80,976 | | | |
| INTELSAT SA COM / CUSIP: L5140P101 / Symbol: I | | | | | | | |
| 04/06/18 | 7,000.000 | 35,692.93 | 04/06/18 | 33,308.05 | ... | 2,384.88 | Sale |

*Red annotation box:* By taking the difference of the Proceeds and Cost Basis (without removing the tax gross up for the $16,592.74 in wash sale losses disallowed), it results in a loss of ($6,937.10).  Whereas, in actuality, the trading performance produced a net gain of $9,655.64.

[*] This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported. Remember, taxpayers are ultimately responsible for the accuracy of their tax return(s).

# **Exhibit 5**

| TD Ameritrade Clearing, Inc. | | | | | Account   865706387 | |
|---|---|---|---|---|---|---|
| | | **Proceeds from Broker and Barter Exchange Transactions** | | | | |
| **2018     1099-B*** OMB No. 1545-0715 | | | **(continued)** | | 01/17/2019 | |

**SHORT TERM TRANSACTIONS FOR COVERED TAX LOTS [Ordinary gains or losses are identified in the Additional information column]** *(Lines 2 & 5)*
Report on Form 8949, Part I with Box A checked. Basis is provided to the IRS. *(Line 3)*
"Gain or loss (-)" is NOT reported to the IRS.

| 1a- Description of property/CUSIP/Symbol | | | | | | |
|---|---|---|---|---|---|---|
| 1c- Date sold or disposed | Quantity | 1d- Proceeds & 6- Reported (G)ross or (N)et | 1b- Date acquired | 1e- Cost or other basis | 1f- Accrued mkt disc (D) & 1g- Wash sale loss disallowed (W) | Gain or loss(-) & 7- Loss not allowed (X) also not reported (Z)   Additional information |
| DAXOR CORP COM / CUSIP: 239467103 / Symbol: DXR | | | | | | |
| 03/28/18 | 3,000.000 | 31,057.33 | 03/28/18 | 29,088.45 | ... | 1,968.88   Sale |
| 04/27/18 | 3,000.000 | 22,781.17 | Various | 22,109.75 | ... | 671.42   Total of 3 transactions |
| | Security total: | 53,838.50 | | 51,198.20 | ... | 2,640.30 |
| DIFFERENTIAL BRANDS GROUP INC N/C 11/2/18 15644G104 / CUSIP: 25374L108 / Symbol: DFBG | | | | | | |
| 07/05/18 | 2,600.000 | 13,138.10 | 07/05/18 | 14,978.08 | ... | -1,839.98   Sale |
| 07/05/18 | 4,400.000 | 22,357.23 | 07/05/18 | 24,311.71 | 631.21 W | -1,323.27   Sale |
| | Security total: | 35,495.33 | | 39,289.79 | 631.21 W | -3,163.25 |
| DOCUMENT SECURITIE COM / CUSIP: 25614T200 / Symbol: DSS | | | | | | |
| 03/23/18 | 9,800.000 | 15,606.85 | Various | 15,593.69 | ... | 13.16   Total of 3 transactions |
| 03/23/18 | 200.000 | 313.24 | 03/23/18 | 318.14 | 4.90 W | 0.00   Sale |
| | Security total: | 15,920.09 | | 15,911.83 | 4.90 W | 13.16 |
| DPW HOLDINGS INC COM / CUSIP: 26140E105 / Symbol: DPW | | | | | | |
| 04/12/18 | 10,000.000 | 12,215.49 | Various | 11,003.90 | ... | 1,211.59   Total of 3 transactions |
| 04/13/18 | 10,000.000 | 14,132.33 | Various | 10,996.05 | ... | 3,136.28   Total of 3 transactions |
| 07/18/18 | 3,301.000 | 1,947.48 | Various | 2,264.91 | ... | -317.43   Total of 2 transactions |
| 07/18/18 | 13,799.000 | 8,141.43 | Various | 8,978.67 | 309.58 W | -527.66   Total of 2 transactions |
| | Security total: | 36,436.73 | | 33,243.53 | 309.58 W | 3,502.78 |
| EKSO BIONICS HOLDINGS INC COM / CUSIP: 282644202 / Symbol: EKSO | | | | | | |
| 07/27/18 | 10,000.000 | 18,993.61 | 07/25/18 | 20,009.35 | ... | -1,015.74   Sale |
| 07/27/18 | 10,000.000 | 19,095.60 | Various | 20,004.95 | 909.35 W | 0.00   Total of 2 transactions |
| | Security total: | 38,089.21 | | 40,014.30 | 909.35 W | -1,015.74 |
| ENERGOUS CORP COM / CUSIP: 29272C103 / Symbol: WATT | | | | | | |
| 04/09/18 | 2,000.000 | 41,724.09 | Various | 30,712.10 | ... | 11,011.99   Total of 2 transactions |
| 06/05/18 | 3,000.000 | 51,029.53 | Various | 54,893.90 | 3,864.37 W | 0.00   Sale |
| 06/13/18 | 2,000.000 | 32,252.28 | Various | 35,047.26 | 2,794.98 W | 0.00   Total of 3 transactions |
| 06/20/18 | 3,000.000 | 49,173.35 | 06/19/18 | 52,137.13 | 3,015.10 W | 51.32   Sale |
| 06/21/18 | 7,000.000 | 116,393.16 | Various | 120,469.46 | 4,076.30 W | 0.00   Total of 5 transactions |
| 06/27/18 | 5,000.000 | 76,273.47 | 06/26/18 | 80,696.83 | 2,996.54 W | -1,426.82   Sale |
| 07/16/18 | 3,000.000 | 46,406.79 | 07/12/18 | 48,809.51 | ... | -2,402.72   Sale |
| | Security total: | 413,252.67 | | 422,766.19 | ==16,747.29 W== | ==7,233.77== |

<span style="color:red">By taking the difference of the Proceeds and Cost Basis (without removing the tax gross up for the $16,747.29 in wash sale losses disallowed), it results in a loss of ($9,513.52).  Whereas, in actuality, the trading performance produced a net gain of $7,233.77.</span>

* This is important tax information and is being furnished to the Internal Revenue Service. If yo[...] [...]imposed on you if this income is taxable and the IRS determines that it has not been reported. Remember, taxpay[...]

# Exhibit 6

## Table 1 From Russell R. Wermers Expert Report

**Table 1: Summary of Gains/Losses from Available 1099-B Records**

| Account Number Ending In | Account Owner | Year | Dollar Volume of Securities Sold | Dollar Volume of Securities Bought | Proceeds minus Costs |
|---|---|---|---|---|---|
| 9075 | Happy Mountain Holdings LLC - Jeff Bishop | 2014 | $39,902,793 | $41,435,570 | -$1,532,777 |
| 9075 | Happy Mountain Holdings LLC - Jeff Bishop | 2015 | $110,628,877 | $126,045,635 | -$15,416,758 |
| 9075 | Happy Mountain Holdings LLC - Jeff Bishop | 2016 | $61,893,736 | $70,201,936 | -$8,308,200 |
| 9075 | Happy Mountain Holdings LLC - Jeff Bishop | 2017 | $61,288,458 | $77,618,459 | -$16,330,001 |
| 9075 | Happy Mountain Holdings LLC - Jeff Bishop | 2018 | $54,671,724 | $60,712,196 | -$6,040,472 |
| 6387 | Jason Bond and Pamela J Bond | 2018 | $11,270,753 | $11,846,352 | -$575,599 |
| 8701 | Jeff Bishop | 2015 | $5,710,863 | $16,524,496 | -$813,633 |
| 8701 | Jeff Bishop | 2016 | $6,730,294 | $7,297,434 | -$567,139 |
| 8701 | Jeff Bishop | 2017 | $532,701 | $527,316 | $5,388 |
| 8701 | Jeff Bishop | 2018 | $64,351 | $78,489 | -$14,138 |
| 1637 | Lighthouse Media LLC | 2015 | $871,084 | $971,168 | -$100,084 |
| 4059 | Lighthouse Media LLC n/k/a RagingBull.com LLC | 2014 | $15,222,954 | $15,840,403 | -$617,449 |
| 4059 | Lighthouse Media LLC n/k/a RagingBull.com LLC | 2015 | $20,733,570 | $21,557,187 | -$823,617 |
| 4059 | Lighthouse Media LLC n/k/a RagingBull.com LLC | 2016 | $45,496,214 | $47,975,281 | -$2,479,067 |
| 4059 | RagingBull.com LLC | 2017 | $31,874,102 | $33,206,038 | -$1,331,936 |
| 4059 | RagingBull.com LLC | 2018 | $30,434,044 | $31,914,922 | -$1,480,877 |
| **Total** | | | | | **-$56,426,361** |

## Summary Table From Account Ending in 9075 TDAmeritrade 1099-B (2018)



**SUMMARY OF PROCEEDS, GAINS & LOSSES, ADJUSTMENTS AND WITHHOLDING**

Refer to the 1099-B and Proceeds not reported to the IRS pages to ensure that you consider all relevant items and to determine the correct gains and losses. The amounts shown below are for informational purposes.

| Term | Form 8949 type | Proceeds | Cost basis | Market discount | Wash sale loss disallowed | Net gain or loss(-) |
|---|---|---|---|---|---|---|
| Short | A (basis reported to the IRS) | 46,823,234.28 | 52,635,958.45 | 0.00 | 4,952,927.84 | -859,796.33 |
| Short | B (basis not reported to the IRS) | 7,344,733.45 | 7,542,049.31 | 0.00 | 77,845.71 | -119,470.15 |
| Short | C (Form 1099-B not received) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **Total Short-term** | 54,167,967.73 | 60,178,007.76 | 0.00 | 5,030,773.55 | -979,266.48 |
| Long | D (basis reported to the IRS) | 503,756.32 | 534,188.25 | 0.00 | 0.00 | -30,431.93 |
| Long | E (basis not reported to the IRS) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Long | F (Form 1099-B not received) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **Total Long-term** | 503,756.32 | 534,188.25 | 0.00 | 0.00 | -30,431.93 |
| Undetermined | B or E (basis not reported to the IRS) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Undetermined | C or F (Form 1099-B not received) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **Total Undetermined-term** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | **Grand total** | 54,671,724.05 | 60,712,196.01 | 0.00 | 5,030,773.55 | -1,009,698.41 |

| Withholding | Amount |
|---|---|
| Federal income tax withheld | 0.00 |

| Cost Basis (Cost + Adjustment) | = | Costs (Dollar Volume of Securities Bought) | + | Adjustment (Wash Sale Loss Disallowed) |
|---|---|---|---|---|
| 60,712,196.01 | | 55,681,422.46 | | 5,030,773.55 |

| Proceeds (Dollar Volume of Securities Sold) | - | Costs (Dollar Volume of Securities Bought) | = | Net Gain or Loss (-) |
|---|---|---|---|---|
| 54,671,724.05 | | 55,681,422.46 | | -1,009,698.41 |

Page 40

# Exhibit 7

**PROFIT/(LOSS) COMPARISON**

ACCOUNTS (AT VARIOUS BROKERAGE FIRMS) IN WHICH JASON BOND IMPLEMENTED HIS TRADING STRATEGIES

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| | | | | [1] | |
| ACCOUNT | ACCOUNT HOLDER | BROKERAGE | PERIOD | REALIZED P/(L) PER 1099-B | BATES NOOP PER MONTHLY STATEMENTS |
| 8701 | JEFF BISHOP | E TRADE FINANCIAL | Jan 2014 - March 2014 | [B] 84,537 | 79,265 |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2014 | (75,427) | (95,880) |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2015 | [D] 145,638 | 138,539 |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2016 | [E] 316,032 | 318,966 |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2017 | [E] 314,172 | 300,697 |
| 4059 | LIGHTHOUSE MEDIA LLC N/K/A RAGING BULL.COM LLC | E TRADE FINANCIAL | 2018 | [D, E] (1,531) | (30,982) |
| 1637 | LIGHTHOUSE MEDIA LLC | INTERACTIVE BROKERS | 2015 | [F] 1,531 | 1,516 |
| 8701 | JEFF BISHOP | E TRADE FINANCIAL | 2017 | [C, E] 12,287 | (16,280) |
| 8701 | JEFF BISHOP | E TRADE FINANCIAL | 2018 | [A] (14,138) | (42,891) |
| 6387 | JASON BOND AND PAMELA BOND | TD AMERITRADE | Nov 2017 - Dec 2017 | N/A | 1,622 |
| 6387 | JASON BOND AND PAMELA BOND | TD AMERITRADE | 2018 | [D] (170,220) | (336,034) |
| | | | | $612,882 | $318,539 |

UNREALIZED LOSS CARRIED OVER TO 2019 FOR LIQUIDMETAL TECH (SEE JASON BOND'S AFFIDAVIT) — (163,583)

ADJUSTED TOTAL EXCLUDING LIQUIDMETAL TECH — $482,121

Note [1]: Realized P/(L) per 1099-B uses Gain/Loss columns (adjusted for wash sale disallowed, where applicable).

Note [2]: Cumulative Realized P/(L) through 2017 for accounts and time periods included is $798,771.

[A] Cost Basis amounts on the 1099 were not adjusted by the Wash Sale Loss Disallowed amount. The Wash Sale Loss Disallowed appeared to be for informational purposes only.

[B] Due to partial year, Realized P/(L) calculated using transactions through 3/2014.

[C] Excludes one or more of the following: short-term transactions with box B checked on form 8989, "Undetermined" with box B or E checked on form 8989, or unknown term gains or losses on gross

proceeds transactions with box X checked on form 8989.

[D] Includes Realized P/(L) on closed futures contracts.

[E] Gain/Loss Amount in E*TRADE tax document does not back out Wash Sale Loss Disallowed amount, therefore Realized P/(L) represents the Gain/Loss Amount column total adjusted by the Wash Sale Disallowed column.

[F] There were no actual Gain/Loss totals on the 1099. This amount is a calculation of proceeds minus cost basis (after adjustment).

N/A - Not available or applicable

SOURCE: VARIOUS BROKERAGE FIRMS CLIENT STATEMENTS
& DOCUMENTS PROVIDED BY COUNSEL          PAGE 1 OF 1          DRAFT PREPARED BY BATES GROUP LLC 01/13/21 11:53 AM

# <u>Exhibit 8</u>

**PROFIT/(LOSS) COMPARISON**

ACCOUNT IN WHICH JEFF BISHOP IMPLEMENTED HIS TRADING STRATEGIES

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| ACCOUNT | ACCOUNT HOLDER | BROKERAGE | YEAR | REALIZED P/(L) PER 1099-B | BATES NOOP PER MONTHLY STATEMENTS |
| 9075 | HAPPY MOUNTAIN HOLDINGS LLC | TD AMERITRADE | 2018 | [A] (1,158,939) | (1,118,165) |

[A] Includes Profit or (loss) realized in 2018 on closed contracts

# Exhibit 9

## COMBINED EQUITY CHANGE ANALYSIS
### ACCOUNTS (AT VARIOUS BROKERAGE FIRMS) IN WHICH JASON BOND IMPLEMENTED HIS TRADING STRATEGIES

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | MONTH END | CASH OUT | CASH IN | SECURITIES OUT | SECURITIES IN | NET JOURNAL ENTRIES IN | NET IN | CUMULATIVE NET IN | EQUITY | MONTHLY P/(L) | CUMULATIVE P/(L) |
| | | | | | | * $309,441 | * BEGINNING EQUITY | | | | |
| | 01/31/13 | | | | | | 309,441 | 309,441 | 322,239 | 12,798 | 12,798 |
| | 02/28/13 | | | | | | | 309,441 | 341,305 | 19,067 | 31,865 |
| | 03/31/13 | | | | | | | 309,441 | 375,955 | 34,650 | 66,514 |
| | 04/30/13 | | | | | | | 309,441 | 389,657 | 13,702 | 80,216 |
| | 05/31/13 | | | | | | | 309,441 | 414,913 | 25,256 | 105,472 |
| | 06/30/13 | | | | | | | 309,441 | 400,359 | (14,553) | 90,918 |
| | 07/31/13 | | | | | | | 309,441 | 413,862 | 13,502 | 104,421 |
| | 08/31/13 | | | | | | | 309,441 | 433,004 | 19,142 | 123,563 |
| | 09/30/13 | | | | | | | 309,441 | 483,573 | 50,569 | 174,132 |
| | 10/31/13 | | | | | | | 309,441 | 533,915 | 50,342 | 224,474 |
| | 11/30/13 | | | | | | | 309,441 | 556,142 | 22,227 | 246,701 |
| | 12/31/13 | 200,000 | | | | | (200,000) | 109,441 | 340,095 | (16,047) | 230,654 |
| | 01/31/14 | 146,000 | | | | | (146,000) | (36,559) | 220,500 | 26,405 | 257,059 |
| | 02/28/14 | | | | | | | (36,559) | 232,108 | 11,608 | 268,667 |
| | 03/31/14 | | 250,000 | | | | 250,000 | 213,441 | 522,726 | 40,618 | 309,285 |
| | 04/30/14 | | 1,000 | | | [A] (273,360) | (272,360) | (58,919) | 242,730 | (7,636) | 301,649 |
| | 05/31/14 | | | | | | | (58,919) | 212,641 | (30,089) | 271,560 |
| | 06/30/14 | | | | | | | (58,919) | 256,546 | 43,905 | 315,465 |
| | 07/31/14 | | | | | | | (58,919) | 264,602 | 8,056 | 323,521 |
| | 08/31/14 | | | | | | | (58,919) | 247,385 | (17,218) | 306,304 |
| | 09/30/14 | | | | | | | (58,919) | 196,972 | (50,412) | 255,892 |
| | 10/31/14 | | | | | | | (58,919) | 160,016 | (36,957) | 218,935 |
| | 11/30/14 | | | | | | | (58,919) | 169,157 | 9,141 | 228,076 |
| | 12/31/14 | 60,000 | | | | | (60,000) | (118,919) | 95,120 | (14,036) | 214,039 |
| | 01/31/15 | | | | | | | (118,919) | 88,359 | (6,761) | 207,278 |
| | 02/28/15 | | | | | | | (118,919) | 108,898 | 20,539 | 227,817 |
| | 03/31/15 | | | | | | | (118,919) | 124,616 | 15,718 | 243,535 |
| | 04/30/15 | | | | | | | (118,919) | 169,317 | 44,701 | 288,237 |
| | 05/31/15 | | | | | | | (118,919) | 197,414 | 28,097 | 316,333 |
| | 06/30/15 | | | | | | | (118,919) | 214,419 | 17,004 | 333,338 |
| | 07/31/15 | | | | | | | (118,919) | 190,250 | (24,169) | 309,169 |
| | 08/31/15 | 100,000 | 105,000 | | | | 5,000 | (113,919) | 227,078 | 31,828 | 340,997 |
| | 09/30/15 | | | | | | | (113,919) | 219,674 | (7,403) | 333,594 |
| | 10/31/15 | 104,456 | 104,456 | | | | | (113,919) | 221,779 | 2,105 | 335,699 |
| | 11/30/15 | | | | | | | (113,919) | 265,176 | 43,396 | 379,095 |
| | 12/31/15 | 140,000 | | | | | (140,000) | (253,919) | 100,176 | (25,000) | 354,095 |
| | 01/31/16 | 4,379 | | | | [A] (2,060) | (6,439) | (260,358) | 119,947 | 26,210 | 380,305 |
| | 02/29/16 | | | | | | | (260,358) | 162,862 | 42,915 | 423,220 |

## COMBINED EQUITY CHANGE ANALYSIS

ACCOUNTS (AT VARIOUS BROKERAGE FIRMS) IN WHICH JASON BOND IMPLEMENTED HIS TRADING STRATEGIES

| A MONTH END | B CASH OUT | C CASH IN | D SECURITIES OUT | E SECURITIES IN | F NET JOURNAL ENTRIES IN | G NET IN | H CUMULATIVE NET IN | I EQUITY | J MONTHLY P(L) | K CUMULATIVE P(L) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | * $309,441 | * BEGINNING EQUITY | | | | |
| 03/31/16 | | | | | | | (260,358) | 197,007 | 34,144 | 457,365 |
| 04/30/16 | | | | | | | (260,358) | 225,267 | 28,260 | 485,625 |
| 05/31/16 | | | | | | | (260,358) | 271,281 | 46,014 | 531,639 |
| 06/30/16 | | | | | | | (260,358) | 354,833 | 83,552 | 615,191 |
| 07/31/16 | 280,000 | | | | | (280,000) | (540,358) | 102,817 | 27,984 | 643,175 |
| 08/31/16 | | | | | | | (540,358) | 114,446 | 11,629 | 654,804 |
| 09/30/16 | | | | | | | (540,358) | 135,550 | 21,104 | 675,908 |
| 10/31/16 | | | | | | | (540,358) | 137,795 | 2,244 | 678,153 |
| 11/30/16 | | | | | | | (540,358) | 166,761 | 28,966 | 707,119 |
| 12/31/16 | 50,047 | | | | | (50,047) | (590,405) | 82,656 | (34,058) | 673,061 |
| 01/31/17 | | | | | [B] 196,192 | 196,192 | (394,213) | 314,825 | 35,977 | 709,038 |
| 02/28/17 | | | | | | | (394,213) | 339,593 | 24,769 | 733,806 |
| 03/31/17 | | | | | | | (394,213) | 438,734 | 99,140 | 832,947 |
| 04/30/17 | | | | | | | (394,213) | 463,280 | 24,546 | 857,493 |
| 05/31/17 | | | | | | | (394,213) | 460,982 | (2,298) | 855,195 |
| 06/30/17 | | | | | | | (394,213) | 503,863 | 42,881 | 898,077 |
| 07/31/17 | | | | | | | (394,213) | 469,256 | (34,607) | 863,469 |
| 08/31/17 | | | | | | | (394,213) | 426,384 | (42,872) | 820,597 |
| 09/30/17 | | | | | | | (394,213) | 424,425 | (1,959) | 818,638 |
| 10/31/17 | | | | | | | (394,213) | 438,443 | 14,018 | 832,656 |
| 11/30/17 | | 100,000 | | | | 100,000 | (294,213) | 581,225 | 42,782 | 875,438 |
| 12/31/17 | 232,048 | | | | | (232,048) | (526,261) | 432,838 | 83,662 | 959,100 |
| 01/31/18 | | | | | | | (526,261) | 502,392 | 69,554 | 1,028,653 |
| 02/28/18 | | 200,000 | | | | 200,000 | (326,261) | 588,837 | (113,555) | 915,098 |
| 03/31/18 | 277,049 | 200,000 | | | | (77,049) | (403,310) | 531,183 | 19,395 | 934,493 |
| 04/30/18 | | 3,279 | | | | 3,279 | (400,031) | 647,104 | 112,642 | 1,047,135 |
| 05/31/18 | | | | | | | (400,031) | 534,039 | (113,065) | 934,071 |
| 06/30/18 | 5,165 | 200,000 | | | | 194,835 | (205,197) | 709,752 | (19,122) | 914,949 |
| 07/31/18 | | 100,000 | | | | 100,000 | (105,197) | 717,921 | (91,831) | 823,118 |
| 08/31/18 | 350,000 | 300,000 | | | | (50,000) | (155,197) | 499,778 | (168,143) | 654,975 |
| 09/30/18 | | | | | | | (155,197) | 513,377 | 13,599 | 668,573 |
| 10/31/18 | | 100,000 | | | | 100,000 | (55,197) | 625,553 | 12,176 | 680,749 |
| 11/30/18 | | | | | | | (55,197) | 638,529 | 12,976 | 693,725 |
| 12/31/18 | | | | | | | (55,197) | 493,996 | (144,533) | 549,193 |
| | 1,949,144 | 1,663,735 | | | 230,213 | (55,197) | | | 549,193 | |

## COMBINED EQUITY CHANGE ANALYSIS
ACCOUNTS (AT VARIOUS BROKERAGE FIRMS) IN WHICH JASON BOND IMPLEMENTED HIS TRADING STRATEGIES

| A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|
| MONTH END | CASH OUT | CASH IN | SECURITIES OUT | SECURITIES IN | NET JOURNAL ENTRIES IN | NET IN | CUMULATIVE NET IN | EQUITY | MONTHLY P/(L) | CUMULATIVE P/(L) |
| | | | | | * $309,441 | * BEGINNING EQUITY | | | | |

| | | |
|---|---|---|
| FINAL EQUITY | 493,996 | |
| LESS: NET IN FROM ABOVE | (55,197) | |
| CUMULATIVE P/(L) | $549,193 | |

| | | |
|---|---|---|
| UNREALIZED LOSS CARRIED OVER TO 2019 FOR LIQUIDMETAL TECH (SEE JASON BOND'S AFFIDAVIT) | ($163,583) | |
| ADJUSTED CUMULATIVE P/(L) EXCLUDING LIQUIDMETAL TECH | $712,776 | |

| | | |
|---|---|---|
| INTERNAL RATE OF RETURN | 65.3% | |
| ADJUSTED INTERNAL RATE OF RETURN EXCLUDING LIQUIDMETAL TECH | 68.0% | |

[A] NET JOURNAL ENTRIES REFLECTS ENTRY TO REMOVE FINAL EQUITY BALANCE FOR ACCOUNTS ENDING THE PREVIOUS MONTH.
[B] NET JOURNAL ENTRIES REFLECTS ENTRY TO ADD BEGINNING EQUITY BALANCE FOR ACCOUNT TIME PERIOD BEGINNING IN THE CURRENT MONTH.

**ACCOUNTS INCLUDED:**
FROM 1/1/13 TO 3/31/14    JEFF M. BISHOP/XXXX-8701
FROM 1/1/17 TO 12/31/18   JEFF M. BISHOP/XXXX-8701
FROM 11/16/17 TO 12/31/18    JASON & PAMELA J. BOND/XXX-XX6387
FROM 3/12/14 TO 12/31/18    LIGHTHOUSE MEDIA\RAGINGBULL.COM, LLC/XXXX-4059
FROM 8/3/15 TO 12/31/15    LIGHTHOUSE MEDIA LLC/XXXX1637

# Exhibit 10

**ANNUAL RETURNS**

LIGHTHOUSE MEDIA\RAGINGBULL.COM, LLC/XXXX-4059

| DATE | 2015 CASH OUT | CASH IN | EQUITY | MONTHLY P/(L) | 2016 CASH OUT | CASH IN | EQUITY | MONTHLY P/(L) | 2017 CASH OUT | CASH IN | EQUITY | MONTHLY P/(L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JAN 1 | | | 95,120 | | | | 98,116 | | | | 82,656 | |
| JAN 31 | | | 88,359 | (6,761) | 4,379 | | 119,947 | 26,210 | | | 120,480 | 37,824 |
| FEB 28 | | | 108,898 | 20,539 | | | 162,862 | 42,915 | | | 148,674 | 28,194 |
| MAR 31 | | | 124,616 | 15,718 | | | 197,007 | 34,144 | | | 248,957 | 100,283 |
| APR 30 | | | 169,317 | 44,701 | | | 225,267 | 28,260 | | | 267,315 | 18,357 |
| MAY 31 | | | 197,414 | 28,097 | | | 271,281 | 46,014 | | | 258,899 | (8,416) |
| JUN 30 | | | 214,419 | 17,004 | | | 354,833 | 83,552 | | | 291,401 | 32,502 |
| JUL 31 | | | 190,250 | (24,169) | 280,000 | | 102,817 | 27,984 | | | 253,473 | (37,927) |
| AUG 31 | 100,000 | | 122,078 | 31,828 | | | 114,446 | 11,629 | | | 212,603 | (40,871) |
| SEP 30 | | | 114,674 | (7,403) | | | 135,550 | 21,104 | | | 186,008 | (26,595) |
| OCT 31 | | 104,456 | 219,709 | 578 | | | 137,795 | 2,244 | | | 212,455 | 26,447 |
| NOV 30 | | | 263,116 | 43,407 | | | 166,761 | 28,966 | | | 269,819 | 57,364 |
| DEC 31 | 140,000 | | 98,116 | (25,000) | 50,047 | | 82,656 | (34,058) | 232,048 | | 151,305 | 113,534 |
| | 240,000 | 104,456 | | 138,539 | 334,426 | | | 318,966 | 232,048 | | | 300,697 |

|  | 2015 |  | 2016 |  | 2017 |
|---|---|---|---|---|---|
| TOTAL PROFIT | 138,539 | TOTAL PROFIT | 318,966 | TOTAL PROFIT | 300,697 |
| SIMPLE RETURN | 69.4% | SIMPLE RETURN | 325.1% | SIMPLE RETURN | 363.8% |
| INTERNAL RATE OF RETURN | 167.7% | INTERNAL RATE OF RETURN | 777.1% | INTERNAL RATE OF RETURN | 365.8% |

NOTE: SIMPLE RETURN = TOTAL PROFIT / (BEGINNING EQUITY + NET CASH INS)

# **Exhibit 11**

**PROFIT/(LOSS) FOR SNAP INC ON TRADE DATES FROM 3/20/17 TO 3/22/17**

LIGHTHOUSE MEDIA\RAGINGBULL.COM, LLC/XXXX-4059

**COMMON SHARES**

| TRADE DATE | SETTLE DATE | SHARES | BUY/SELL | PRICE | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| 03/20/17 | 03/23/17 | 900 | BUY | 19.8990 | 17,914.05 | |
| 03/20/17 | 03/23/17 | 2,000 | BUY | 19.8956 | 39,796.15 | |
| 03/20/17 | 03/23/17 | 2,100 | BUY | 19.8850 | 41,758.50 | |
| 03/22/17 | 03/27/17 | (5,000) | SELL | 21.7723 | | 108,854.17 |
| | | | | | 99,468.70 | 108,854.17 |
| | | | | PROFIT | | 9,385.47 |
| | | | | GAIN AGAINST PURCHASE | | 9.4% |

**OPTIONS (CALL @20 ON 3/31/17)**

| TRADE DATE | SETTLE DATE | SHARES | BUY/SELL | PRICE | DEBIT | CREDIT |
|---|---|---|---|---|---|---|
| 03/20/17 | 03/21/17 | 46 | BUY | 0.70 | 3,249.04 | |
| 03/20/17 | 03/21/17 | 54 | BUY | 0.75 | 4,078.29 | |
| 03/22/17 | 03/23/17 | (100) | SELL | 2.00 | | 19,941.78 |
| | | | | | 7,327.33 | 19,941.78 |
| | | | | PROFIT | | 12,614.45 |
| | | | | GAIN AGAINST PURCHASE | | 172.2% |
| | | | | TOTAL PROFIT | | 21,999.92 |

NOTE: THE 1099-B TAX FORM SHOWS PROFIT/(LOSS) NUMBERS WHICH ARE DIFFERENT DUE TO CALCULATIONS AGAINST OTHER POSITIONS IN THE STOCK IN ACCORDANCE WITH TAX LAW. THIS ANALYSIS HAS BOXED THE TRANSACTIONS SHOWN IN BOND'S TWEET IN ORDER TO MAINTAIN CONSISTENCY WITH THE DATA SHOWN TO BOND BY E*TRADE'S REPORTING TOOL, WHICH ALLOWS THE USER TO SELECT WHICH SHARE LOTS TO SELL.