**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

FEDERAL TRADE COMMISSION,   )
              )
    Plaintiff,     )
              )
   v.       )  Case No. 1:20-cv-03538 - GLR
              )
RAGINGBULL.COM, LLC f/k/a   )
LIGHTHOUSE MEDIA LLC, et al.,  )
              )
    Defendants.   )
              )

**DEFENDANTS RAGINGBULL.COM, LLC, JEFFREY M. BISHOP
AND JASON BOND'S COMBINED REPLY IN SUPPORT OF
<u>EMERGENCY MOTIONS (DKT. 107 AND 110)</u>**

Defendant RagingBull.com, LLC ("Raging Bull" or the "company") and Individual Defendants Jeffrey M. Bishop and Jason Bond (the "Individual Defendants," and collectively with Raging Bull, the "Defendants"), by and through undersigned counsel, submit this combined reply, whereby Defendants reply in further support of their Emergency Motion for Clarification of the Temporary Restraining Order, or in the Alternative to Increase Funds Available to Individual Defendants to Pay Defense Costs ("Defense Costs Motion"), and Individual Defendants reply in further support of their Emergency Motion for Increased Use of Individual Assets for Living Expenses ("Living Expenses Motion" and collectively with the Defense Costs Motion, the "Motions").

## I.     Response to FTC's Attack on the Merits of the Lawsuit

In its Opposition brief (Dkt. 116), the FTC unnecessarily addresses the merits of their lawsuit, which is entirely irrelevant to the Motions. The FTC claims the "GT Defendants continue to level conclusory arguments that the entry of the TRO – which the Court has found good cause to grant based on more than 3,000 pages of evidence submitted in support of the FTC's application – was somehow unjust or improper. But in support of their position, they offer not a single argument or defense relevant to the merits of the case." Opp'n at 3. Since the FTC made this comment in their January 11, 2021 filing, the following developments took place on January 13th:

Defendants responded to the FTC's motion to show cause. In this response, Defendants demonstrate that the very foundation of the FTC's allegations is a massive error, exemplified by the FTC's error, based on its purported expert's opinion, that Jason Bond had $7.5 million in trading *losses* from 2014 to 2018. In fact, as Defendants' expert demonstrates, Jason Bond had a realized trading *profit* of over $500,000 in the same accounts the FTC's expert analyzed during that period. Furthermore, Defendants' additional expert opined that empirical evidence suggests that Raging Bull subscribers received value and that the reasonable consumer in the target audience

of 18-45 year-olds simply was not deceived. Defendants' expert further pointed to multiple businesses with the same business model presently operating profitably and legally without FTC interference. The FTC had offered no expert opinion and conducted no analysis to support its conclusory allegations of deception, which is nothing more than lawyer argument.

The U.S. Supreme Court heard oral argument in *AMG Capital Management, LLC v. FTC* (No. 19-508). At issue before the U.S. Supreme Court is whether the FTC has the legal authority under Section 13(b) of the FTC Act to seek the type of relief it requests in the present case as the predicate for the TRO's asset freeze and appointment of a Temporary Receiver. The Supreme Court heard oral arguments on January 13, 2021. Much of the questioning during the arguments related to the concern with the FTC's abusive conduct under Section 13(b), in which rather than issuing a cease-and-desist order to entities the FTC contends are engaging in deceptive trade practices, the FTC goes straight to court seeking immediate and devastating injunctions and damages.

Justice Breyer expressed these concerns, drawing on the original concerns with creating an FTC that could unilaterally harm legitimate businesses:

> History matters. I think Justice Brandeis, when he started, was faced with a business community that was very suspicious of the FTC's power and thought it would be abused and a progressive community that thought it's absolutely necessary to bring bad business practices under control. So they compromised.
>
> **The compromise was you've got to do what the FTC says, but before it tells you to do something, it will find that what you're doing now is wrong. It will find that. It will be a cease-and-desist order …**
>
> So Section 5, cease-and-desist order or violation of a rule, ha, damage of some kind. [Section] Nineteen, the same thing. **And now we have right in the middle [Section] 13, no protection like that whatsoever. Do not worry, says the FTC, we will only use it in exceptional cases.**
>
> Ha! In 2012, they repeal that. And now, 10 years later, after this has been in effect for a few years, I read that 100 cases under this provision are in the courts, compared with 10 or 12 under the regular cases. **And you [the FTC] say it's just obvious, we're going to get those people who think their bad conduct is obvious….**

> People wouldn't know that it is an unfair practice that a chiropractor who was married to a wife who had some income from the company and therefore is a conclusion as to the muscle toning of the company should be discounted. **And that's the kind of case they're bringing now.**
>
> Now do you see my point? … **[I]f we interpret it your [the FTC's] way, we … say your fears, business community, were absolutely right.** It is now up to the FTC. **Before you know the thing is wrong, they hit you with bad damages.**

Sup. Ct. Hr'g Transcript (attached as Ex. 2), at 37:7 – 39:1 (emphasis added).[1]

The FTC's lawsuit against Raging Bull illustrates Justice Breyer's concern. The FTC conducted a secret investigation for at least nine months, using clandestine investigators posing as customers but without ever actually using the company's services. Rather than inform Defendants of its purported view that the company was engaging in deceptive practices, or warn the company of any perceived violations in order to prompt an immediate response by the company in the public interest, the FTC filed (before the Supreme Court argument and its ruling in *AMG Capital Management*) under Section 13(b) without any warning and obtained an *ex parte* TRO based on false evidence and lawyer argument.

The FTC's deeply flawed lawsuit here in fact belies the response the FTC provided in response to Justice Breyer's concern, in which the FTC says it only brings Section 13(b) claims in court "where it doesn't take a lot of Commission expertise to explain why a particular act is deceptive. … [that is,] when the Commission feels that it doesn't need to expound on the – the meaning and boundaries of the FTC Act, it can bring cases under Section 13." *Id*. at 36:5-18. That perhaps explains the FTC's decision to rely only a false expert opinion and flawed lawyer argument rather than actually conducting a proper investigation, which would have made clear the

---

[1] An official transcript of the oral arguments may be found at:
https://www.supremecourt.gov/oral_arguments/argument_transcripts/2020/19-508_omjp.pdf.  In addition, an audio version may be found at: https://www.supremecourt.gov/oral_arguments/audio/2020/19-508.

FTC's allegations are "not based on a conceptually sound understanding of consumer behavior and marketing nor on any generalizable empirical data on the perceptions and behavior of the Raging Bull consumers and, the FTC Complaint, in fact, ignored most of the available data that contradicts its speculative and unsupported allegations." Consolidated Resp. to Motion to Show Cause (Dkt. 123), Exhibit 2 (Wind Report) at ¶ 3.

## II.    The FTC Fails to Show that Both Company Funds and Individual Assets Must be Withheld from Defendants to Prevent Payment of Defense Costs Necessary to Defend this Case

### A.    The FTC Avoids Addressing the Temporary Receiver's Obligation Under the TRO to Pay for Defense Costs, and the Temporary Receiver Does Not Deny That He is Obligated

As Defendants demonstrated in their Defense Costs Motion, the Temporary Receiver has the authority and obligation under the TRO to make payments from the company's assets for necessary Defense Costs to avoid increasing the company's liabilities. This is unrebutted.

The Temporary Receiver does not dispute that he is obligated to pay for defense costs to protect against increased liabilities, and does not dispute that shutting down the company, and preventing Raging Bull from fulfilling its obligations to its subscribers, will increase the company's liabilities.

The FTC shrugs it off, suggesting without basis that Defendants cannot seek clarification of the TRO. The FTC, however, ignores the substance of Defendants' position. Specifically, the FTC conspicuously fails to acknowledge – and does not deny – that the TRO contemplates the need to defend the company against actions that may threaten the preservation of company assets. Under Section XIV(M) of the TRO, the Temporary Receiver is "directed and authorized" to defend "any legal action in state, federal or foreign courts" or "[i]nstitute, compromise, adjust, appear in, intervene in, defend, dispose of, or otherwise become party to any legal action in state, federal or foreign courts or arbitration proceedings as the Receiver deems necessary and advisable to

preserve or recover the Assets of the Receivership Entities, or to carry out the Receiver's mandate under this Order…." Here, the FTC seeks to increase the company's liabilities by prohibiting Raging Bull from providing services to its subscribers, depriving these subscribers of the benefit of their bargain (and subscription fees) with the company. This has and will continue to result in a flood of demands for refunds from subscribers – increasing the company's liabilities.

Defendants have substantial evidence that subscribers want and enjoy the services Raging Bull provides. Even after the FTC misled the public (and the Court) by its claims that the company is "permeated with fraud" and that Jason Bond and Raging Bull gurus lost millions of dollars trading, these subscribers continue to support the company and want their services. Even if the FTC prevailed at trial (it won't), it would not be entitled to disgorgement for subscription fees paid by satisfied subscribers. Shutting down the company harms these subscribers, who would nevertheless demand a refund because they would not have received the services in return. This needlessly increases the company's liability, which the Temporary Receiver has an obligation to avoid. The company must defend itself against the FTC's unproven claims – which requires paying for such defense – in order to avoid the unnecessary depletion of company assets.

**B.    The FTC Provides No Plausible Basis to Block the Court's Approval of the Increased Use of Individual Defendants' Assets, and the Temporary Receiver Does Not Deny Suggesting the Individual Defendants Seek the Court's Approval**

If the Court declines to clarify the TRO and order the Temporary Receiver to release company funds for the company's defense, the Court should approve an increase in the individual assets available to the Individual Defendants for their and the company's defense in the interests of due process. Indeed, the Temporary Receiver does not dispute that he directly informed Raging Bull that "[t]he owners of Raging Bull may, of course, seek relief from the preservation of assets provision of the temporary restraining order, if they believe the proposed expenses are helpful to

their legal defense." Defense Cost Mot., Trahan Decl. at ¶ 18. Indeed, courts routinely allow individual defendants facing an FTC civil suit to be given access to certain funds so they can pay their attorneys because this is necessary to enable defendants to obtain representation and ensure a defendant may defend against the FTC's charges. *FTC v. QT, Inc.*, 467 F. Supp. 2d 863, 866 (N.D. III. 2006)); *see also FTC v. Click4Support, LLC*, No. 15-5777, 2015 U.S. Dist. LEXIS 153945, at *18-23 (E.D. Pa. Nov. 10, 2015) (finding that "with regard to the corporate defendants, the public equities in this case are weighty, and when compared to the insignificant private interests of the corporate defendants, the balance of the equities in this matter favor injunctive relief. But we do not find that the public equities outweigh the private equities with regard to the freezing of the individual defendants' bank accounts. We will therefore amend the conditions of the TRO and lift the asset freeze on the personal bank accounts for the individual defendants.").

The FTC objects, despite the Temporary Receiver's endorsement. The FTC takes the position that Bishop and Bond should use other resources, such as family members, or get new jobs to pay their defense costs. First, the suggestion that Bishop and Bond can use their "other income" or perhaps get new jobs to pay their defense costs is ironic. The FTC brought an ambush lawsuit and obtained an *ex parte* TRO that immediately froze all assets and appointed a Temporary Receiver. Bishop and Bond have been prevented from running their business ever since, despite no determination by the Temporary Receiver or the Court that Raging Bull cannot be run profitably or lawfully. In the face of the FTC's actions, Bishop and Bond are working every day to keep their company on life support long enough so that there is a business to run again in the event the Court denies the FTC's preliminary injunction. The suggestion that Bishop and Bond just move on from their company is yet another way in which the FTC is working to ensure, as it told the Temporary Receiver, that Raging Bull is shut down permanently. *See FTC v. 8 Figure Dream Lifestyle*, No.

SACV 19-01165 AG, 2019 U.S. Dist. LEXIS 227542, at *7-8 (C.D. Cal. Dec. 9, 2019) (in response to FTC's position that if defendants – whose assets were frozen – want lawyers they should get jobs, the court stated: "[t]his highlights the Court's ongoing concern about access to justice and representation of counsel in cases like this.").

Second, the suggestion that they should get the money from family or friends is presumptuous. Both Bishop and Bond come from modest backgrounds. Bishop worked his way to pay for college. Jason Bond, before his time with Raging Bull, he was a school teacher who, with his wife who is also a school teacher, worked hard just to get out of over $200,000 in debt. Neither Bishop nor Bond come from wealthy or connected families who have $300,000 available to lend them. That is simply not reality for most Americans, including Bishop and Bond.

In addition, Bishop himself had accumulated $8 million before starting Raging Bull. Consolidated Resp., J. Bishop Decl. at ¶ 34. He nevertheless in good faith agreed to freeze all of his accounts, despite the fact this $8 million is now frozen as well. Bishop could have, but has not, objected to the freezing of all of his assets because it necessarily ties up the substantial monies his wife made as a college professor and the $8 million he made before starting Raging Bull. *Id*. That money will never be available to pay damages in this case, even if the FTC were to prevail on all erroneous claims (which it won't). At a minimum, Bishop should have access to the amounts requested in the Motions, which are far below the money he and his wife acquired completely separate from Raging Bull. Bishop has been very reasonable and complied with the TRO even where he could have objected. The FTC seeks to punish Bishop in particular by preventing him from using those funds to pay for the defense of himself and the company he helped to build.

### C.      The Payment of Attorneys' Fees Defendants Request is Reasonable

Although the FTC claims the Defense Costs are "exorbitant" and "extravagant," that is a red herring to the FTC's actual argument. Nothing in the FTC's argument turns on whether the

amount of attorneys' fees requested in reasonable. What the FTC is actually arguing is that Defendants should be barred from access to ***any*** funds – not even a single dollar – from either the company's assets or their own individual assets to defend themselves.

Nevertheless, the FTC contends the $300,000 in attorneys' fees sought by Defendants is too high. The FTC knows very well what is required of counsel for Defendants in defending against the FTC's action to permanently shut down the company, as the FTC has been fighting Defendants' counsel every step of the way. However – once again – the FTC keeps that from the Court. The FTC purports to wonder how Defendants' attorneys' fees could be very high at all, "[g]iven that counsel has not yet answered Plaintiff's Complaint (ECF No. 1), raised substantive defenses, issued or responded to discovery, or attended a deposition." Opp'n at 13. This curious cherry-picking of tasks notwithstanding, there have been many tasks requiring a team of attorneys that, if not undertaken, would have had serious negative consequences for Defendants. As detailed in the Declaration of Miriam Bahcall, attached as Ex. 1, from December 7, 2020 through January 15, 2021, Greenberg Traurig attorneys performed significant work on behalf of the Defendants, including the following:

- Response to the FTC's initial filing and application for a TRO;
- Attempted stay and modifications to the TRO following the *ex parte* entry of the TRO;
- Implementation and compliance with the TRO;
- Cooperation with Temporary Receiver;[2]
- Negotiation of potential settlement with the FTC;
- Preparation of the opposition to the FTC's motion to show cause why a preliminary injunction should not issue;
- Assist in the preparation of two expert reports; and
- Related tasks.

---

[2] The work to cooperate with the Temporary Receiver alone has been substantial. From December 8 to December 31, 2020, Greenberg Traurig attorneys spent over 120 hours working with the Receiver to fulfil the obligations of the TRO. Bahcall Decl. at ¶ 8.

Bahcall Decl. at ¶ 6.

As of January 15, 2020, the billings exceeded the $300,000 that Defendants are requesting to be released from the freeze for the payment of Defense Costs. Bahcall Decl. at ¶ 7.

The FTC's suggestion that Defendants can adequately defend this case with only three attorneys working 20 hours a week is baseless and inappropriate. To the contrary, it would be reasonably expected that the sum of $300,000 or more would be expended given the complex factual and legal issues involved in this matter. Indeed, the FTC has no fewer than five attorneys working (presumably full- or near full-time) on this matter, and required the use of a Temporary Receiver working full-time on this matter since for six weeks—at the company's expense. The FTC began conducting its secret investigation at least in March 2020 – eight months before filing the complaint. The amount of work and cost to U.S. taxpayers is likely substantially higher than $300,000 – not to mention the $750 per hour expert the FTC retained, who arrived at an opinion on trading performance that was strikingly wrong and misleading to the Court.

Here, given the complexity of the case, the appointment of a Temporary Receiver, the emergency and exigent basis of the litigation, and the FTC's stated desire to shut the company down permanently, this necessitated the involvement of the equivalent of four attorneys with Greenberg Traurig working essentially full time on this matter since December 7, 2020. Bahcall Decl. at ¶ 7. This is reasonable in light of the circumstances and the FTC's approach to this lawsuit.

With respect to Defendants' request for the availability of "up to" $100,000 for attorneys' fees for the possible defense of a hearing on the New Hampshire Bureau of Securities Regulation's Order to Cease and Desist, Defendants were hoping to be in a position with this Reply to withdraw that request. The basis for withdrawal would be confirmation from the New Hampshire Bureau hearing officer that the hearing will not take place before the preliminary injunction hearing in this matter. Unfortunately, despite Defendants' diligent efforts, the New Hampshire hearing officer has

not yet confirmed the hearing will not be held before the preliminary injunction hearing in this Court. As a result, Defendants cannot at this time withdraw their prior request for the use of up to $100,000 in available funds, from either the company assets or their own individual assets, to pay for any defense in the New Hampshire action.[3]

### D.    Defendants' Request for Payment of the Cost to Retain Two Experts is Reasonable

Defendants request "up to $125,000"[4] for retaining two experts to assist Defendants in defending themselves in the FTC action. The FTC asks the Court to deny this request and disallow either company funds or the individual assets of the Individual Defendants to be used to pay any experts.

The FTC objects to the payment of expert fees because "GT Defendants do not identify the experts they seek to pay or even hint at a defense they hope to assert. They do not state why they seek no less than two experts or identify the experts' respective areas of expertise. They do not state the experts' billing rates." Opp'n at 13-14. All of that has now been done, as Defendants have disclosed two experts, who provide their areas of expertise and their billings rates, and have submitted reports that are directed to the very heart of the FTC's Complaint, providing this Court with a critical response which undercuts the foundation of the FTC's allegations. Specifically, Defendants engaged two qualified experts, Greg Kyle of The Bates Group and Professor Yoram Wind, a Professor of Marketing at the Wharton School of the University of Pennsylvania. In particular, Bates was retained to analyze the economic aspects of the FTC's deeply flawed expert report. Dr. Wind was retained to respond to the allegations regarding purported false advertising

---

[3] In the event that the New Hampshire hearing officer provide confirmation before the Court rules on the Motions, Defendants will promptly inform the Court.
[4] The FTC again mischaracterizes facts to the Court by omitting the fact that Defendants request "up to" $125,000 for experts – not a lump sum payment of $125,000. If the actual cost for experts is less than $125,000, then only that lesser amount will be drawn from the company or individual assets.

by the Defendants. Each expert's extensive qualifications are set forth in Defendants' Response to the Motion to Show Cause. To date, the experts' billings collectively approach $150,000, although Defendants seek access to only $125,000 to pay these amounts at this time. Bahcall Decl. at ¶ 9. As evidenced by these experts' respective reports, they have done extensive work which is a crucial component of Defendants' response to the FTC's effort to obtain a preliminary injunction.

Given the significant impact that Defendants' experts have had on the FTC's false and thin case, it is unsurprising the FTC seeks to block their payment. And the reports submitted to the Court by Defendants' experts illustrates the importance of allowing Defendants to defend the case, rather than allowing the FTC's case to proceed unchecked.

### E. The FTC Provides No Plausible Basis to Refuse the Payment of Six Employees, Whose Knowledge and Access is the Only Way for Defendants to Retrieve Documents and Information Necessary to Defense of the Lawsuit

Defendants need to pay six specific employees to retrieve documents and information from the company's records and systems to aid Defendants in their defense. There is no alternative means for Defendants to retrieve these documents and information from the company. The FTC's refusal is tantamount to locking exculpatory evidence away, denying Defendants access to much of the information needed to prove its case. It goes beyond even the abusive conduct that concerns Justice Breyer, and which we are seeing in this case in spades.

The FTC offers no plausible or reasonable basis to block Defendants from exculpatory evidence. First, the FTC suggests the parties already negotiated and reached a consent agreement to pay a small number of employees, and Defendants' additional request undermines the integrity of those negotiations. The FTC points to the Temporary Receiver's position to suggest that the Temporary Receiver does not support paying employees to support Defendants' from the company's assets. It is darkly ironic that the FTC notes the Temporary Receiver stated it would allow the payment of Raging Bull employees "to ensure that the business can remain operational

(with no outward-facing operations)' until the preliminary injunction hearing." Opp'n at 15. The Temporary Receiver did indeed take that position, and Raging Bull and the Temporary Receiver negotiated a list of 13 employees, which include employees for that very purpose. Trahan Decl. at ¶ 17. That was, indeed, the negotiation of the parties. But the FTC rejected it and forced the Temporary Receiver to back out of its negotiated position. *Id.* at ¶ 18. Only now, in their Opposition – and only because the FTC believes it serves their argument – does the FTC purport to respect the "negotiations" of the parties. The FTC has shown little interest in the Temporary Receiver's actual view.

In fact, it was because of the FTC's refusal to allow payment to employees that Raging Bull had no choice but to take what it could get by consent, which was the payment of the employees identified in the consent motion, and expressly reserve its rights to bring this motion. But those employees were paid to serve the Temporary Receiver only; they were forbidden – pursuant to the FTC's demands – from doing work to support any company operations or assist in the defense. In any event, all of those employees are no longer employed, as the time period for their employment, as stated in the order, expired on January 15, 2021, and the Temporary Receiver did not seek to extend their employment. As of this filing, there are no Raging Bull employees, whether working for the Temporary Receiver or assisting Defendants.[5]

The FTC further objects to the three employees who are to provide "marketing evidence support." The FTC nonsensically suggests that "to the extent Defendants are now asking that frozen or preserved funds be expended to enable them to gather substantiation for their marketing claims, that's too late: they were required to have the substantiation before making the claims." Opp'n at 15.

---

[5] These employees were employed at the time of Defendants' Defense Costs Motion. Because those six employees are no longer with the company, Raging Bull reserves the right to request that all or some of them be brought back on as paid employees to assist Defendants in their defense of the FTC action or the New Hampshire action.

These employees do not need to manufacture substantiation. The substantiation already exists, as Defendants demonstrated in their Response. Consolidated Resp. to Motion to Show Cause at 28-31. But someone with the company needs to identify and retrieve the documents and information from the company. Remarkably, the FTC seeks not only to deny Defendants' counsel and experts, but also wants to keep their own exculpatory documents and evidence away from them.

The purpose behind the FTC's refusal to allow Defendants to access and retrieve their own documents and information is made manifest in the FTC's use of partial facts from the company's records to use against Defendants in the litigation. The FTC points to "some of Defendants' internal communications and other records that corroborate the already extensive evidence of Defendants' illegal conduct." Opp'n at 3. The FTC has access to these documents and is using its unlimited resources to locate and retrieve these documents. But the FTC objects to Defendants being able to locate and retrieve the documents that show the FTC mischaracterizes those partial facts. Defendants cannot adequately defend themselves – no defendant can – if they are denied the ability to retrieve and present to the Court the contrary evidence. Most problematic is that there will be no Raging Bull employees to help retrieve any documents or information from the company's records to assist Defendants in responding to the FTC's upcoming reply brief in support of its motion to show cause. This is patently unfair.

The Temporary Receiver does not dispute the necessity or reasonableness of retaining these employees to assist Defendants in defending this action. While the Temporary Receiver's stated position is that these defense costs should not be paid out of the company's assets, he suggests the Individual Defendants should ask the Court for approval to pay from their individual assets.

### F. Undersigned Counsel was Engaged Before the TRO was Entered

Greenberg Traurig was engaged by Defendants to represent them in the action ***before*** the TRO was entered and before the asset freeze was put into place.

Defendants have been clients of Greenberg Traurig since 2017 on a variety of matters. Bahcall Decl. at ¶ 4. On the morning of December 7, 2020, and immediately upon receipt of the FTC's complaint and motion for TRO, Defendants retained Greenberg Traurig to represent them in this matter. *Id*. On the afternoon of December 7, the day before the TRO was entered *ex parte*, Defendants transferred $2 million to Greenberg Traurig for previously incurred and anticipated attorneys' fees before the TRO was entered. The fact that undersigned counsel entered their appearances in this case after the *ex parte* TRO was entered is irrelevant.

The FTC also argues that Defendants' Defense Cost Motion comes too late. For this point, the FTC relies on *FTC v. LoPinto*, No. CVS-93-0561, 1994 U.S. Dist. LEXIS 21695 (D. Nev. Feb. 1, 1994). But this case shows the error of the FTC's position. In *LoPinto*, the court noted that "[Defendants'] assets have been frozen because **they appear to have been fraudulently obtained by defendants from innocent consumers**. Defendants' counsel [] was aware of this fact yet he chose to work for defendants anyway. [Counsel] assumed the risk of non-payment or at least delayed payment." *Id*. at *3 (emphasis added). Here, the undersigned counsel has been aware that the FTC's allegations are false, based on an inadequate and biased investigation and grounded on a deeply flawed and misleading expert opinion. Without competent counsel and expert analysis, the FTC's false allegations – which is the basis on which the Court entered the *ex parte* TRO – would be unrebutted.

### G.     The FTC Misleads the Court to Suggest Defendants have "Unclean Hands"

The FTC claims that Defendants have "unclean hands." Opp'n at 17-18. The FTC bases this allegation on the transfer of funds to undersigned counsel and Jason Bond's wife on the afternoon of December 7, 2020, <u>before</u> the TRO was entered. The FTC claims this was a nefarious effort to "conceal funds" before the TRO was entered. The FTC is wrong.

First, no court order was violated. There was TRO in place when the transfers occurred.

Second, the suggestion that Defendants "conceal[ed]" funds is unfounded. No money was transferred to secret bank accounts or sent overseas. There were no cash withdraws to disperse money to unknown people and places. No funds were hidden from anyone. Jason Bond transferred money to his wife. Raging Bull transferred money to its long-time counsel. There was no cloak and dagger here.

Third, Jason Bond openly disclosed to the FTC his transfer to his wife as part of his financial disclosures under the TRO. Jason Bond's wife did not use or transfer any of the funds Jason Bond transferred to her account. Bond has treated the account as subject to the asset freeze on his own volition.

Fourth, the FTC's objections to Defendants having any money to pay for competent counsel or experts, whether that money comes from the company assets or the Individual Defendants' own individual assets, is an effort to deny Defendants the effective assistance of counsel.

Fifth, the FTC does not inform the Court that immediately after the funds were transferred to Greenberg Traurig, the FTC and the Temporary Receiver asked Greenberg Traurig to hold the $2 million in escrow, which Greenberg Traurig did and so informed the FTC.

Sixth, at the time Raging Bull transferred $2 million to Greenberg Traurig, Raging Bull owed Greenberg Traurig approximately $175,000 for legal services provided before the FTC's complaint was filed. Greenberg Traurig could have chosen to apply that amount to cover the amount outstanding. But Greenberg Traurig did not do that.

Seventh, Bishop could have but did not object to a freeze over *all* of his funds. Bishop had earned over $8 million before Raging Bull began. J. Bishop Decl. at ¶ 34.  His wife earned a substantial amount of money as a professor at the University of New Hampshire. J. Bishop Decl.

at ¶ 5. Because those funds are broadly speaking commingled with funds obtained in connection with Raging Bull, Bishop took a very conservative view of his assets and agreed to freeze all of his accounts, despite the fact this $8 million is now frozen as well. This shows Bishop has complied with the TRO in good faith and does not have "unclean hands."[6]

The FTC ignores these facts because they are inconsistent with what the FTC wants the Court to believe – that Defendants have acted in "bad faith" by "conceal[ing]" money from the FTC.[7] The Court should be told the complete and accurate story, rather than the FTC's false and misleading version.

## III.   The FTC Fails to Show that the Court Should Not Approve the Increased Use of Individual Assets for Reasonable Living Expenses

The FTC relies on the fact the *ex parte* TRO was entered, which the FTC incorrectly uses to claim that the Court determined that the FTC is likely to prevail in a final determination on the merits, and therefore has a duty to ensure that assets are available to return to purportedly injured consumers. Opp'n at 5-6. But, as Defendants demonstrated in their Response to the Motion to Show Cause, the FTC obtained the TRO based on a false picture of Raging Bull's trading performance and services, and based solely on lawyer argument rather than empirical data or a sound understanding of consumer behavior and marketing.

The amount requested by Bishop and Bond is modest. Both seek access to an additional $25,000 from their individual assets to pay for ordinary and reasonable living expenses.[8] The FTC

---

[6] Bishop reserves the right, at the preliminary injunction, to request access to all funds he held before starting Raging Bull, as well as all funds from his wife's employment, regardless of where such funds are presently held.

[7] For this reason, the case relied on by the FTC is inapplicable. In *SEC v. Illarramendi*, 2014 WL 8019048 (D. Conn. Mar. 27, 2014), the court concluded plaintiffs, former officers and principals of company at issue, had unclean hands because they engaged in "undisclosed self-dealing transactions to provide for their own personal interests and without seeking approval from the Funds' directors." Here, there was no subterfuge by officers of the company or violations of corporate formalities in order to secure company assets for personal use.

[8] Jason Bond withdraws his request for access to an additional $30,000 from his individual assets to pay contractual obligations identified in the Living Expenses Motion. Bond made this request in good faith because those amounts are due for past services and he has no credit cards to pay these debts.

has already acknowledged that $25,000 is an appropriate and fair amount to allow the Individual Defendants to access during the ten-day period between the entry of the TRO and original date of December 18, 2020 for the preliminary injunction hearing. Indeed, the FTC drafted the TRO, which included access to $25,000. The FTC therefore acknowledges that a per diem of $2,500 is entirely reasonable and appropriate. And yet, now the FTC argues that an additional $25,000 to cover an additional 49 days of time – which is a per diem of $510 – has somehow become "unwarranted" and "inequitable." The FTC's goal-post moving lacks semblance of logic and fairness.

The FTC again suggests that Bishop and Bond should use their "other assets," find new jobs, use credit cards or borrow money from family or friends. Bishop has "other assets" that pre-date Raging Bull and have nothing to do with Raging Bull other than the fact those funds are in accounts which also includes money received in connection with Raging Bull. As noted above, Bishop earned over $8 million before staring Raging Bull, and his wife earned a substantial amount of money as a professor at the University of New Hampshire. Because those funds are broadly speaking commingled in bank accounts with funds obtained in connection with Raging Bull, Bishop took a very conservative view of his assets and agreed to freeze all of his accounts, despite the fact this $8 million is now frozen as well for the sole reason that those funds are not segregated into separate accounts from any amounts paid in connection with Raging Bull. That said, and as the FTC should agree given its reference to "other assets," Bishop should be allowed access to his non-Raging Bull money to cover the modest amount requested to cover living expenses. The FTC's sole basis for objecting to the use of individual assets to pay living expenses – the need to preserve assets to pay consumers – is inapplicable to this money. This Court should therefore grant Bishop the requested $25,000 increase in the individual funds he is permitted to use for living expenses.

Individual Defendants have established a compelling need for this modest increase in the available funds from their individual assets. The amount requested is substantially lower on a per diem basis than what the FTC acknowledges is reasonable. The FTC's suggestion that Bond and Bishop do not seek "necessary" living expenses is baseless, as they request living expenses including housing, food, insurance and utilities. The FTC criticizes the inclusion of connectivity technology, pointing to a 2009 case stating "cellular telephones, home phone, high-speed internet" are not necessary living expenses. Opp'n at 8. That case is irrelevant given the global pandemic, forcing people to work from home – making connectivity a necessary living expense.

## IV.   The Temporary Receiver's Claim that Raging Bull has $49 Million in Negative Net Equity is Potentially Flawed and Irrelevant

The Temporary Receiver submitted a response to the Motions which claims that Raging Bull operates with a large negative net equity position of $49 million. Receiver Resp. at 1. The reason the Temporary Receiver believes the Court may find his Response relevant is unstated and unclear. To the extent this is to suggest the company is under-capitalized, this is wrong and irrelevant.[9]

Raging Bull is a limited liability company with three members – Sherwood Ventures, LLC (of which Jeff Bishop is a member), Jason Bond LLC and MFA Holdings Corp. As a limited liability company, there are no shareholders, as mistakenly referenced by the CPA for the Temporary Receiver ("Verity").

Raging Bull carries no debt and has no outside investors. Raging Bull has always provided its services on time to its subscribers, and has always had sufficient cash on hand to pay any

---

[9] Although the Temporary Receiver is apparently focusing on the present net equity of the company, the Temporary Receiver was appointed to determine whether Raging Bull's business model of publishing newsletters and education products and services to consumers can be run "legally and profitably." This is what the Temporary Receiver is required to report to the Court on, under Section XXII.4 of the TRO.

requested refunds. At no time in Raging Bull's history has the company been unable to satisfy all current debts and obligations. Neither the FTC nor the Temporary Receiver contend otherwise.

Verity claims that "[d]uring the years 2014 through 2020, RagingBull.com, LLC made substantial distributions of unearned income" to Bond and Bishop. Verity Decl. at ¶ 17. This is demonstrably false.

Without explanation, Verity ignores the fact that Raging Bull accounted on a cash basis through tax year 2018, only changing to an accrual basis in 2020.[10]  Cash basis accounting is an accepted and appropriate method of accounting as recognized by the IRS, and Verity does not suggest otherwise. As stated in 2014 Congressional Research Service report, Cash Versus Accrual Basis of Accounting: An Introduction (available at https://fas.org/sgp/crs/misc/R43811.pdf), "[u]nder cash basis accounting, revenue and expenses are recorded when cash is actually paid or received." *See also* IRS Pub. 538 (TY2019) (Accounting Periods and Methods), at 8. The report illustrates cash basis accounting with an example involving a "two-year subscription for online content" – very much like Raging Bull's service offerings. As the report's example indicates, for a two-year subscription paid up front, the revenue is booked at the time the payment is received. This is exactly how Raging Bull accounted for its revenue during this time period. Moreover, also during this time period, distributions were made only after satisfying all current debts and obligations of the company. Simply put, at no time did Raging Bull distribute unearned income to its principals.

Although not required at the time, the company chose to change to accrual basis accounting for 2019, with the implementation occurring in calendar year 2020. In years 2019 and YTD

---

[10] Verity also incorrectly "extrapolates" Raging Bull's purported "unearned income" for years 2016 and 2017 based on data from 2018 and the following. Verity Decl., at ¶ 15. In 2018, Raging Bull began offering subscriptions of longer than one-year. Verity's analysis relies on an inaccurate understanding of Raging Bull's subscription periods for years prior to 2018, which further compounds Verity's errors.

September 2020, distributions were less than the cash generated from operations in the years 2019 and 2020, as reflected in the following table generated from the company's Quickbooks and Intact records, to which the Temporary Receiver has access:

| Year | Cash from Operations | Distributions | Net |
|---|---|---|---|
| 2014 | 1,905,486 | (1,642,397) | 263,089 |
| 2015 | 2,384,344 | (2,557,673) | (173,329) |
| 2016 | 3,805,798 | (3,224,382) | 581,416 |
| 2017 | 8,127,993 | (8,507,939) | (379,946) |
| 2018 | 9,877,987 | (6,532,293) | 3,345,694 |
| 2019* | 32,433,704 | (16,024,736) | 16,408,968 |
| YTD Sep 2020 | 28,333,660 | (19,700,394) | 8,633,266 |
| **Cumulative** | **86,868,972** | **(58,189,814)** | **28,679,158** |

*2019 Conversion from permitted cash basis to accrual basis accounting

| Year | Equity | Company's Accounting Method |
|---|---|---|
| 2014 | 521,650 | Cash |
| 2015 | 256,846 | Cash |
| 2016 | 861,411 | Cash |
| 2017 | 969,700 | Cash |
| 2018 | 4,251,781 | Cash |
| 2019* | (35,058,760) | Accrual |
| YTD Sep 2020 | (56,832,624) | Accrual |

*2019 Conversion from permitted cash basis to accrual basis accounting

The distributions made from 2014 to 2020 were appropriate and did not leave the company under-capitalized at any time.

## CONCLUSION

For the reasons stated herein, Defendant RagingBull.com, LLC and Individual Defendants Jeffrey M. Bishop and Jason Bond respectfully request the Court grant the Emergency Motion for Clarification of the Temporary Restraining Order, or in the Alternative to Increase Funds Available to Individual Defendants to Pay Defense Costs, and the Emergency Motion for Increased Use of Individual Assets for Living Expenses, and any further relief as appropriate.

Dated: January 18, 2021

Respectfully submitted,

RagingBull.com, LLC, Jeffrey M. Bishop
and Jason Bond

 By: /s/ *David G. Barger*
David G. Barger (DCB# 469095)
Greenberg Traurig, LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749-1300
Email: bargerd@gtlaw.com

Andrew G. Berg (admitted *pro hac vice*)
Greenberg Traurig, LLP
2101 L Street, N.W.
Suite 1000
Washington DC 20037
Tel: (202) 331- 3100
Email: berga@gtlaw.com

Miriam G. Bahcall (admitted *pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: (312) 476-5135
Email: bahcallm@gtlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of January 2021 a true and accurate copy foregoing Defendants RagingBull.com, LLC, Jeffrey M. Bishop and Jason Bond's Combined Reply in Support of Emergency Motions (Dkt. 107 and 110), was properly served on all parties through the ECF system.

<div style="margin-left:50%">

/s/ *David Barger*
David G. Barger (DCB# 469095)
Greenberg Traurig, LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749-1300
Email: bargerd@gtlaw.com

*Counsel for RagingBull.com, LLC,*
*Jeffrey M. Bishop and Jason Bond*

</div>

22