**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-03538 - GLR |
| | ) | |
| RAGINGBULL.COM, LLC f/k/a | ) | |
| LIGHTHOUSE MEDIA LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# RAGINGBULL.COM, LLC BUSINESS PLAN

David G. Barger (DCB# 469095)
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749-1300
Email: bargerd@gtlaw.com

Andrew G. Berg (admitted *pro hac vice*)
2101 L Street, N.W.
Suite 1000
Washington DC 20037
Tel: (202) 331- 3100
Email: berga@gtlaw.com

Miriam G. Bahcall (admitted *pro hac vice*)
Brett M. Doran (admitted *pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: (312) 476-5135
Email: bahcallm@gtlaw.com
Email: doranb@gtlaw.com

*Counsel for RagingBull.com, LLC,*
*Jeffrey M. Bishop and Jason Bond*

## I.   <u>Executive Summary</u>

RagingBull.com, LLC ("Raging Bull" or "the Company") submits this Business Plan to describe its proposal to re-start business operations. Raging Bull's business operations have been paused since December 21, 2020, when the Company was forced to halt operations as a result of the FTC's lawsuit. This plan lays out how Raging Bull will operate lawfully and profitably up to the time a trial on the merits is held in this lawsuit, or the case is otherwise resolved.

<u>Raging Bull Will Operate Lawfully</u>

Raging Bull proposes a two-phase approach to re-start its business operations. The purpose of this phased approach is to allow the Company to first reconnect with its subscriber base and build out compliant advertising practices and scalable business operations to allow for the long-term financial viability of the Company. Then, once the Company has successfully completed these foundational steps, it can move forward to expand its subscriber base and become profitable while implementing its compliance plan.

During Phase 1 (approximately 60 days), the Company will undertake the following steps:

- Focus on re-establishing the Company's relationship with its existing subscribers
- Focus on fulfilling its obligations to its existing subscribers
- Develop and refine product offerings to subscribers to ensure compliance
- Develop and refine a strong advertising and compliance structure
- Address outstanding refund requests and customer complaints
- Support a Court-appointed Compliance Monitor audit of compliance activities
- Obtain certification of compliance from the Compliance Monitor and report to the Court

Upon completing Phase 1, and with the Court's approval, the Company will proceed to Phase 2. During Phase 2, the Company will undertake the following steps:

- Advertise to prospective new subscribers and offer existing subscribers additional services
- Perform regular and ongoing reviews, audits and employee training, under the supervision of the Compliance Monitor

<u>Raging Bull Will Operate Profitably</u>

Raging Bull has always run a profitable business. Raging Bull understands that the Temporary Receiver is skeptical that the Company can operate profitably. But the Temporary Receiver's view is based primarily on a misapplication of accounting principles by the forensic accountant engaged by the Temporary Receiver, which led to the forensic accountant's erroneous conclusion that the Company has had a negative net equity balance since its inception, and that the distributions to partners were from unearned income.

This is not true. To demonstrate this for the Court, Raging Bull submits the expert report of A. Christine Davis, a Certified Public Accountant and Certified in Financial Forensics, to opine on

the Company's historical financial position. Ms. Davis concludes that the Company has always been profitable and all distributions to partners were paid from earned income. The Company has always had net positive equity. It was only in the Fall of 2020, when the Company was advised to convert based on the growth of the Company, and did convert, from the cash basis of accounting to the accrual basis of accounting, that the Company ever had a negative net equity, but this position was only brought about by the switch to accrual basis accounting, and not due to the financial performance of the Company or the cash distributions to the partners.

Raging Bull submits with this plan financial projections for the next three years. These projections are based on the assumption the Company completes Phase 1 within 60 days and proceeds to Phase 2. As these projections demonstrate, the Company will continue to operate profitably going forward and will have positive cash balances at the end of each year presented.

According to the Temporary Receiver's Initial Report, the Company has approximately $10.75 million cash on hand to fund the Company's operations at the start of Phase 1. The Company seeks the approval of the Court, the FTC and the Temporary Receiver to use a portion of these Company funds to satisfy the Company's outstanding refund requests during Phase 1.

The Company is likely to have a cash shortfall in the first few months of 2021. The Company's partners have committed to make up to $10 million of their personal assets available to the Company as needed in the first 180 days after re-start to ensure it maintains adequate liquidity, including to pay various obligations of the Company existing as of the time operations re-start. Separately, Messrs. Bishop and Bond have agreed to pay the accrued legal defenses of the Company in connection with this and related litigation from their personal funds.

This commitment from the Company's partners reflects their dedication to saving Raging Bull and operating Raging Bull going forward in a compliant and lawful manner. Raging Bull is optimistic about its future and its ability to retain many of its tens of thousands of customers, and attract new customers, who want to learn how to trade stocks.

If Raging Bull is not permitted to operate pending the resolution of this lawsuit, then there will be no additional revenues and the liabilities – in particular, the deferred revenues along with the exposure to a large demand for refunds from the Company's 80,000 subscribers – will be massive. Allowing Raging Bull to operate its business in the interim period before this lawsuit is resolved will not only allow Raging Bull to employ and re-employ a significant staff and provide a service that its consumers demand and value, but also will facilitate the preservation and generation of assets, while reducing liabilities through the earning of deferred revenues and avoiding exposure to additional demands for refunds. This revenue can be used to fund an eventual resolution of this case. As this plan demonstrates, the Company's operations will add, rather than diminish, cash available for consumers, and will substantially reduce the Company's liabilities by eliminating the demand for refunds from a majority of subscribers.

Raging Bull, operating lawfully and profitably as described in this plan, can and should be part of the solution to resolve this matter.

## II.    <u>Overview of Company</u>

Raging Bull is a stock market education publisher, which delivers training and market commentary and teaches specific stock trading strategies. Raging Bull has over 80,000 paid subscribers and over 800,000 non-paid supporters. Raging Bull considers all of these paid subscribers and non-paid supporters to be part of the Raging Bull community.

As of December 2020, Raging Bull had approximately 170 full-time employees and a few independent contractors. Raging Bull maintains an office and a majority of its employees are based in Baltimore, Maryland.

The Company sells over 20 different online products that teach people about various stock market trading techniques and strategies. This fulfills a niche in the online stock education market for people who primarily want to learn more about short-term trading techniques and ideas. Raging Bull publishes content mainly through email, a mobile app and from the Company's proprietary dashboard.

Like its competitors, Raging Bull is not a licensed broker-dealer or registered investment advisor, which Raging Bull makes known to consumers. The Company does not manage or review individual investment accounts for its subscribers, provide them with personalized investment advice or sell them securities. Raging Bull is not required to hold specific investment licenses or registrations and is not bound by rules that FINRA or the SEC imposes on brokers or investment advisors.

## III.    <u>Market for Raging Bull's Services</u>

The demand for stock market trading education is strong. As the Temporary Receiver noted, there is a "strong public interest in stock trading and, implicitly, education in trading." Receiver's Rep., at 105.

According to Devin Ryan of JMP Securities, the brokerage industry added over 10 million new retail accounts in 2020. *See* https://www.wsj.com/articles/new-army-of-individual-investors-flexes-its-muscle-11609329600. As these new traders seek to learn more about the market and find new ideas, Reddit.com, in particular, has seen a surge in interest. Notably, the subreddit r/WallStreetBets grew from 1 million users to 2 million in 2020. This growth further exploded to over 6 million so far in 2021. *See* https://www.businessinsider.com/wallstreetbets-fastest-growing-subreddit-hits-58-million-users-2021-1.  Raging Bull would fill this market demand with qualified teachers offering transparent services and monitored content.

Stock option trading, in particular, has exploded in the last few years. As Deutsche Bank recently noted, retail call option buyers accounted for less than 2 million contracts of open interest near the end of 2018 and have exploded to over 12 million by January 2021. *See* https://www.marketwatch.com/story/a-surge-in-options-trading-is-pushing-around-the-stock-market-and-bringing-back-memories-of-the-dot-com-bubble-11611618636. Many of Raging Bull's services teach option trading strategies because that is where the market demand is now.

The online stock market education sector is fragmented with hundreds of vendors of various sizes. Raging Bull competes with well-established and high-profile businesses such as Jim Cramer's TheStreet.com, Motley Fool, Timothy Sykes and Investor's Business Daily. All of these businesses have services that provide market commentary, trading recommendations, education, trade alerts, and utilize real-money trading. Raging Bull offers similar products at similar prices to their largest and most established competitors, none of which is a registered investment advisor or licensed broker-dealer.

The following are excerpted screenshots of current advertising from these competitors. These screenshots illustrate that many of the core service features offered by Raging Bull – as further described below – are common and appropriate for Raging Bull's target market.

The Motley Fool (fool.com):



**Start investing alongside Motley Fool CEO Tom Gardner and discover the one portfolio he's _personally_ going 100% "all in" on with <u>his own money</u>.**

_Although the portfolio is already up <u>712%</u>, read on to see why we believe its best days are still ahead!_

_Plus, learn how it can help you shape up YOUR portfolio in less than 30 minutes._

Jim Cramer, TheStreet (TheStreet.com):







Timothy Sykes (TimothySykes.com):



<u>Investor's Business Daily (Investors.com):</u>



## IV.   <u>Raging Bull's Products</u>

Raging Bull will continue to provide stock market education services to its subscribers. Raging Bull will provide multiple services centered around different trading strategies. These services may incorporate a Learning Management System ("LMS") approach, which is a system Raging Bull has been developing and intends to roll out to more of its services. To date, the course content has been centered around Jason Bond's products. This has been developed and overseen by an expert who is a licensed broker with over 20 years of experience in the markets and trading. He is a member of Investopedia's Financial Review Board and was managing director for the Chartered Market Technician ("CMT") program offered by the CMT Association. He also developed an online curriculum and oversaw its growth during the Thinkorswim and TD Ameritrade mergers as well as authored several books in the finance sector.

The LMS approach involves teams dedicated to the trading education for each service centered on the strategy being taught in the service. It will focus on teaching subscribers the foundation in the trading strategy through a course of written and video instruction followed by group sessions with trainers who answer FAQs and take subscribers through paper trading examples of the strategy. Raging Bull will use both live and recorded classes available to reinforce the learning which are run by former TD Ameritrade-certified instructors.

Raging Bull's services will involve some or all of the following components:

> <u>Curriculum</u>: Written and video lessons from the guru focused in detail on teaching the service's strategy, and explaining how and why the service's strategy can be successful.

Daily watch list and commentary: At regular intervals (e.g., each morning before market, each evening after market), the gurus will send communications to subscribers that may:

- List and describe the trades the guru is looking at;

- Discuss their plan for entry/exit points and how the guru views the trade potential;

- Share general lessons on trading using current real-world examples; and

- Share general lessons on risk management and portfolio allocation.

Real-time buy and sell trade alerts: Trade alerts will be made ahead of any buy or sell.

Portfolio / market analysis: At regularly scheduled times (e.g., morning, midday and after market close) gurus will provide commentary on open positions noting any adjustments to the trading plan based on what the teacher is seeing in the market.

Live training rooms: Services may use live training rooms where the community of subscribers can discuss trading and the gurus can provide additional education.

Ongoing education: Written and video ongoing education lessons are issued each week covering key points allowing the subscribers to catch up on teachable moments at their convenience.

24/7 online education: Online training materials, unique to each trading strategy, that the guru has prepared which subscribers can view at any time. These materials may include recorded training videos, written lessons, and answers to commonly asked questions.

Real money or paper money trading: Trading by gurus as part of a service to subscribers may be conducted using real money or paper money accounts.

No personalized investment advice: The Company will not operate as an investment advisor and in accordance with the publisher's exception. Gurus are prohibited from offering any personalized investment advice.

Raging Bull will also continue to offer its Start Up Camp service, which is a paid subscription service that does not involve stock or option trading and is a stand-alone service.

Start Up Camp:  Start Up Camp is a new business segment the Company launched in December of 2019 that focuses on teaching about investing in privately held companies that are available to the public under Regulation CF on crowdfunding platforms. Raging Bull anticipates this will be the fastest-growing segment of the business over the next two years. The primary product for this segment is called "The Boardroom" which shows subscribers different real-life angel investment opportunities that the Company sees as an attractive investment and teaches how to evaluate these companies. The Boardroom hosts live interviews with company CEOs to allow The Boardroom hosts and subscribers to ask direct questions. The Boardroom sometimes decides to make an investment in a

company, which it makes known to its subscribers, who have the same opportunity to invest.

The Company collects information on each company evaluated as a growing educational resource, and then provides ongoing updates on its investments so members can learn the process of how angel investing works and monitor the status.

Raging Bull also expects to offer the following free stand-alone services once it is economically feasible to do so, which the Company has already developed:

Live trading education platform: The Company previously provided and hopes to reintroduce when the financial circumstances warrant a free live trading education and entertainment platform, called the Bullpen, which provides live content at no cost to anyone in the Raging Bull community each market day. The platform will have a regular schedule of trainers who share their observations on the market and trading techniques, as well as live interviews with CEOs, traders, and notable figures from the trading community.

Options Academy:  This service will offer option trading content produced under the leadership of the same expert who is producing the Company's LMS programs. While the LMS is available only for members of paid products, Options Academy will be made available for free to anyone in the Raging Bull community who wants to further their learning of option trading concepts. Raging Bull has completed a considerable amount of work at a cost of over $1 million to develop the LMS and Options Academy programs.

## V.   **Compliance Plan – Phased Approach**

The Company's operations re-start will correspond with a phased approach to its court-mandated regulatory compliance. In Phase 1, the Company will reconnect with its existing subscribers – whose relationship with the Company has been interrupted as a result of the Temporary Restraining Order and asset freeze. In Phase 2, the Company will be able to solicit new subscribers after additional certified robust compliance mechanisms are in place to the satisfaction of the Court or its appointed representatives (*e.g.*, an independent Compliance Monitor).

The Company anticipates Phase 1 will last approximately 60 days. Phase 1 will focus on re-establishing the Company's relationship with its pre-existing subscribers (to the exclusion of marketing to any potentially new subscribers for most of Phase 1); investing in and executing on strong advertising and compliance structure enhancements and redundancies; clarifying and improving customer service, refunds, renewals and cancellation policies; and completing an independent Compliance Monitor audit.

When the parameters of Phase 1 are met and validated by the Compliance Monitor, following an audit, certification, and report satisfactory to the Court, the Company will move to Phase 2. Phase 2 will allow for outreach to prospective new subscribers and upsell to pre-existing subscribers in a manner compliant with FTC rules and case law. This compliance approach will

be supported by regular and ongoing reviews, audits, employee training, and independent approval from the Court-approved Compliance Monitor, who will remain in place until the lawsuit is resolved, or unless otherwise ordered by the Court.

## PHASE 1

### A. Operations Limited to Existing Subscribers

The Company will devote its efforts in Phase 1 to servicing existing subscribers only.

During this time, the Company will adhere to the following:

- abstention from any advertising or marketing to potentially new subscribers during Phase 1;

- all communications to pre-existing subscribers will not contain earnings claims, consumer testimonials, or any misrepresentations of any type regarding the Company's services;

- all services to pre-existing subscribers will not involve any product "upsell" or Company-initiated solicitation of renewals;

- any renewals or new subscriptions from pre-existing subscribers will be accepted only upon express written acknowledgement made to the Company by the subscriber that the renewal or upsell was not in any manner solicited or initiated by the Company; and

- all pre-existing subscriptions for products or services that marketed with a refund option will be supported by a ROSCA-compliant cancellation mechanism.

This tightly-controlled compliance approach to pre-existing subscribers will allow the Company to regain the confidence of consumers who already know and appreciate the Company, which the Company believes is essential for the Company's long-term financial viability.

### B. Investment in Advertising and Compliance Infrastructure

Concurrent with this focus on pre-existing subscribers, the Company will also concentrate directly on revamping and expanding its advertising and compliance infrastructure. This concerted focus on additional compliance redundancies will include:

- the hiring of up to 5 full-time compliance personnel, as needed, based on the Chief Compliance Officer's determination; one of these employees will be designated Chief Compliance Officer and will have sufficient knowledge and expertise in FTC Section 5 advertising and marketing law and policies and will be available to be present in the Baltimore office as needed;

- a multi-stakeholder review and revision of the Company's process for analyzing and approving sales and advertising materials before they are posted or communicated externally;

- review and targeted revision of the Company's employee code of conduct, which includes compliance procedures and policies, including disciplinary consequences for compliance violations;

- development of methods for anonymous and confidential internal reporting of employee compliance misconduct, and creation of a process for the investigation of internally reported compliance complaints, with assurance of non-retaliation;

- institution of regular reviews of guru trading activity and subscriber communications to ensure compliance with this plan;

- implementation of employee and guru compensation and evaluation structures that incentivize compliance and penalize unlawful conduct;

- elimination of all advertising and marketing content under the Company's control that is currently on the Internet that is not in compliance with the requirements of this plan;

- elimination or modification of all video and written materials for each service provided by the Company to ensure that all such materials offered to subscribers are in compliance with the requirements of this plan; and

- the construction and implementation of new internal and external auditing and monitoring functions.

The additional staff, as well as ownership of the new or updated policies and procedures, will belong to the internal Compliance Team dedicated to overseeing the Company's compliance efforts, with appropriate enforcement authority and clear reporting lines to the Company's owners.

Building on efforts already underway in 2020, the Compliance Team will also establish a formal program for the regular and consistent compliance training of Company employees, gurus and management. The training programs will be provided by the Compliance Team and may utilize outside counsel or specialists. The compliance training will be subject to review by the Compliance Monitor.

The Compliance Team will closely oversee compliance with respect to all Raging Bull advertising and marketing; language on all order forms; subscriber refunds, cancellations and customer service and response, including the resolution of complaints; trading practices of company gurus; and communications with subscribers; and all consumer-facing communications.

The Company anticipates being able to send consumer-facing communications without prior approval (subject to the Compliance Monitor's audit and internal compliance monitoring), provided the communications do not contain any sales or marketing content.

The Compliance Team will report to the Company's Legal Department and will be subject to the final decision authority of the Compliance Monitor with respect to all matters of compliance.

### C. Customer Service, Refund and Cancellation Procedures

The Company will also commit significant resources during Phase 1 and beyond to customer service. This will include immediate attention to addressing outstanding customer complaints and refund requests. The Company will also develop policies and procedure for addressing refunds, renewal cancellations and complaints. These policies and procedures will be subject to review by the Compliance Monitor.

The Company will undertake the following actions during Phase 1:

<u>Customer Complaints</u>

- The Company's will establish a Complaint Management Team under the direction of the Compliance Team which will be dedicated to addressing subscriber complaints, whether received directly (*e.g.*, phone or email complaints sent to the company) or indirectly (*e.g.*, BBB and similar sites); and

- Members of the Complaint Management Team will address all outstanding complaints made directly to the company or received from BBB and comparable sites.

<u>Refunds</u>

- The Company will address the backlog of outstanding refund requests that have not been addressed since the TRO was entered, including hiring additional customer service agents as needed to do so;

- Going forward, the Company will promptly honor all new refund requests for services that have a refund option, and promptly address on a case-by-case basis new refund requests for services without a refund option; and

- Ensure that all services have a clear statement as to whether refunds are available for the service, and for what period of time refunds are available. "No refund" services will allow transfer of credit toward another service. The relevant refund or transfer policies will be stated prominently and clearly at the point in the sales process where a potential subscriber enters payment information on an order form.

<u>Renewals and Cancellations</u>

- The Company will continue to offer services with an auto-renewal feature, and for subscriptions longer than 6 months, subscribers will be notified at least one time, including 30 days in advance of auto-renewal;

- The Company will provide a simple and easy-to-use process to terminate auto-renewal, stop any recurring charges, and/or cancel services; specifically, subscribers who wish to cancel an auto-renewal will be able to do so promptly with a simple feature provided through the Company's dashboard or by calling the Company's Customer Service team; and

- Because not all subscribers who initially seek a refund want to terminate their relationship with the Company, it will offer anyone seeking a refund an alternative resolution, including the addition of time to their subscription or the transfer to another comparable service; any subscribers seeking a refund who are members of a "no refund" service will be offered alternative resolutions in lieu of refunds.

**D. Independent Compliance Monitor Audit**

Upon completion of the above steps in relation to existing subscribers and internal compliance enhancements, and as a condition to moving into Phase 2, these efforts will be subject to an audit by the Compliance Monitor, who must first certify the satisfactory completion of these efforts and compliance with this plan in a written report filed with the Court. The certification shall be made on the basis of the Company's obligations set forth in the Court's order as well as all relevant authority under FTC law including recent case law authority, relevant rules and informal FTC guidance, and such other relevant authority as the Compliance Monitor deems appropriate based on the Compliance Monitor's expertise in the area.

For the avoidance of doubt, the Compliance Monitor will be paid by the Company but will not answer to the Company in any way. Moreover, the Compliance Monitor will have the ability to obtain or hire whatever additional resources are needed, including in the form of auditors, computers and data specialists, and all other resources required to discharge the functions of the Compliance Monitor in its sole discretion.

The Compliance Monitor will be appointed by the Court from a list of suggestions coming from both the Company and the FTC, or in any other such manner as the Court deems appropriate.

Provided the Court concurs with the progress of the steps taken and the certification of the Compliance Monitor, the Company will be permitted to move into Phase 2 operations.

# PHASE 2

### A.  Full Operations Subject to Ongoing Compliance and Oversight

During Phase 2, the Company will be permitted to engage in full operations, subject to ongoing compliance and careful oversight by the Compliance Monitor. The Company also proposes to provide annual reporting to the Court or to a recipient of the Court's choosing, providing an overview of the steps taken.

Full operations will include upselling and solicitation of renewals of pre-existing subscribers as well as the solicitation of new subscribers, but only through the use of sales and marketing materials previously approved by the Compliance Monitor. Any modification to those approved materials will be permitted only upon approval of the Company's outside counsel along with prior reasonable notice being given to the Compliance Monitor.

At any point during Phase 2, as a result of the Compliance Monitor's auditing and monitoring functions, the Compliance Monitor will be permitted, at its sole discretion, to withdraw its prior certification of the Company's compliance efforts, at which time (subject to a petition filed by the Company with the court) the Company's ability to operate on a Phase 2 basis will be suspended, and the Company would be restricted to Phase 1 activities only.

Based on the nature of such issues, the Compliance Monitor will also have the authority to petition the Court to suspend the Company's Phase 1 operations if the nature of the Company's compliance efforts do not satisfy the Compliance Monitor's interpretation of the Company's commitments to operate in a lawfully compliant manner based on any order entered by the Court.

### B.  Documentation and Oversight of Compliance Plan and Safeguards

As part of its full operations and the oversight of those activities by the Compliance Monitor, the Company will annually document in writing the content, implementation and maintenance of the Compliance Plan described herein. This will include descriptions of documented risk assessments; documented consumer safeguards (including around customer service, refunds and cancellations); descriptions of the training required for all Company employees and management; and a description of the procedures adopted for implementing and monitoring the Compliance Plan. The Company will provide the annual documentation of its Compliance Plan to the Compliance Monitor or, upon request, to the Court.

The Company will also designate a qualified employee(s) to coordinate and be responsible for implementing the Compliance Plan, one of whom will be the Chief Compliance Officer. The Company will assess and document, at least once every twelve (12) months, internal and external risks in each area of its operations (*e.g.*, sales, customer service, marketing, website operations, vendor/third-party relationships) that could result from failure to comply with the Compliance Plan.

## VI.    <u>Financial Overview of Raging Bull</u>

As a closely-held, private company, Raging Bull has always prioritized the exercise of financial discipline.

From inception, Raging Bull has funded its growing operations from strong internal positive cash flows. The Company has no outside investors, no significant debt to third parties, and no public shareholders.

As an online business, Raging Bull does not have any manufacturing facilities or costly inventory to hold. A majority of the Company's expenses are not fixed and can vary depending on the level of sales. With this structure, the Company can operate at virtually any sales level and remain profitable.

Raging Bull's biggest line-item expense has historically been marketing. Going forward, the Company will target its marketing spend to be 30 percent or less of its overall revenue. This is a flexible expense that can be adjusted to any level of monthly revenues and still remain profitable.

In accordance with the Company's operating agreement, Raging Bull has historically passed on free cash flow from operations to the partners as distributions. The Company's annual goal has historically been to operate at a 30 percent net profit margin, which Raging Bull has historically achieved.

According to the Temporary Receiver's Initial Report, the Company has approximately $10.75 million cash on hand to fund the Company's operations at the start of Phase 1.[1] In addition, the Company seeks the approval of the Court, the FTC and the Temporary Receiver to use these Company funds to satisfy the Company's outstanding refund requests.

Raging Bull assumes it will hire or re-hire approximately 50 employees when it resumes operations. The majority of these employees will be based from the Company's Baltimore office.

The Company expects there to be a meaningful decrease in its overall user base from both refunds and natural attrition. However, even in light of the reputational damage caused by the FTC's lawsuit, subscriber support has been high. According to the Temporary Receiver's review and the customers emails Raging Bull has compiled and attached to its filings with the Court, there are thousands of subscribers who want the products and services that Raging Bull provides. Conservatively, the Company expects to retain over 30,000 of its existing paid users over time. The cash flow from this subscriber base alone will be enough to profitably sustain ongoing operations when business resumes.

---

[1] The $10.75 million comprises $7,593,922 from the Company's bank accounts transferred to the Temporary Receiver, $2 million held in trust at Greenberg Traurig, and $1,151,795 held as a reserve by Eastern Bank on Raging Bull's Paycheck Protection Program loan which the Company understands will be released upon filing the appropriate documents with the Small Business Administration. *See* Receiver's Rep., at 10-15.

The partners have sufficient personal financial liquidity and will operate the Company without receiving distributions until the Company satisfies its current liabilities and obligations and resumes profitable operations once again. Moreover, the partners are prepared to personally fund the Company, up to $10 million of their personal assets as needed, during the first 180 days (by which time the Company expects to generate revenue) after the re-start of operations to ensure the Company maintains adequate liquidity, including to pay various obligations of the Company existing as of the time operations re-start, Messrs. Bond and Bishop also are prepared to pay legal fees and costs incurred to date defending the Company and themselves in this action and related matters.  Notably, Raging Bull is a Delaware company and under Delaware law the Company is responsible for these fees whether expended on their own or on the Company's behalf.

## VII.  Raging Bull Has Always Been Profitable and Operated with a Positive Equity Balance

The Temporary Receiver has expressed skepticism about Raging Bull's ability to operate profitably. This skepticism is primarily based on the opinion offered by Raymond Peroutka, Jr., a forensic accountant engaged by the Temporary Receiver to examine the Company's financial standing. According to Mr. Peroutka, "Raging Bull had negative net equity at the close of each year from 2016 through 2020." Receiver's Rep., at 93. Specifically, Mr. Peroutka concluded that the Company's revenues in 2014 through 2019 included "unearned income" and that the cash distributions to the Company's members in 2014 through 2019 were paid from unearned income. On this basis, Mr. Peroutka concluded that the Company had negative "net equity" since 2014.

Following Mr. Peroutka's conclusions, the Temporary Receiver stated that a "significant obstacle for Raging Bull is the Company's financial position." Receiver's Rep., at 107.

Mr. Peroutka, and the Temporary Receiver, are wrong. To demonstrate their error for the Court, and to support Raging Bull's position that it can operate profitably, the Company engaged A. Christine Davis, Certified Public Accountant and Certified in Financial Forensics, to examine Mr. Peroutka's conclusions and offer an expert opinion on the correct equity values of the Company from 2014 through 2019.

Raging Bull submits for the Court's review the Initial Expert Report from Ms. Davis. *See* **Attachment A**. As discussed in this Report:

- Mr. Peroutka misapplied accounting principles and either overlooked that the Company was appropriately using the cash basis of accounting or simply ignored that fact in favor of using unearned income in his analysis. Unearned income is not a valid concept in cash-basis accounting, because all cash received pertaining to the operations of the business is earned income under cash-basis accounting.

- All of the Company's cash receipts from 2014 through 2019 were properly recognized as earned income and were not unearned income.

- The cash distributions to the Company's members were paid from earned income and did not cause equity to be negative at any point in time.

- Using the correct and applicable basis of accounting (cash basis of accounting), the Company's equity balances were positive, not negative (from 2014 through June 30, 2020).

- The correct equity values for the Company as of the fiscal years ended 2014 through 2019 are as follows:

| 2019[2] | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| $2,837,962 | $4,251,781 | $969,699 | $861,405 | $256,845 | $521,650 |

In other words, Raging Bull has been profitable and maintained a positive net equity value every year since its inception. It was only in the Fall of 2020, when the Company was advised to convert, and did convert, from a cash basis of accounting to the accrual basis of accounting, that the Company ever had a negative net equity – which was only brought about by the switch to accrual basis accounting.

## VIII.   Litigation Costs

The other concern expressed by the Temporary Receiver with Raging Bull's ability to operate profitably is the potential liability from the "present and foreseeable litigation" facing the Company. Receiver's Rep., at 111. Raging Bull disagrees with the Temporary Receiver's assessment that present or contingent litigation threatens the profitability of the Company. These litigation claims are unliquidated, speculative and defensible.

First, the three pending litigation matters – the FTC action, the New Hampshire enforcement action, and the TCPA litigation in federal court in Tennessee – are defensible and the Company intends to present a defense. The Company's owners are prepared to pay legal defense costs for the three present lawsuits from personal funds, not the Company's assets.

Second, it is very likely that the U.S. Supreme Court will end the FTC's use of Section 13(b) to obtain monetary damages. *See AMG Capital Mgmt., LLC v. FTC*, No. 19-508 (cert. granted July 9, 2020)).  Raging Bull is not merely "hopeful" of this outcome, as the Temporary Receiver suggests. In fact, every commentator who has weighed in – including numerous former FTC officials and senior staffers – believes the FTC will lose in *AMG*. This will eliminate the possibility of the vast bulk of damages the FTC seeks from Raging Bull.

Third, the Temporary Receiver did not offer any analysis of possible damages in either the New Hampshire action or the TCPA litigation. At this time, there is no basis for concluding substantial damages are either estimable or probable, and any eventual judgment or settlement cannot be reasonably ascertained at this time.

---

[2] 2019 equity value is based on cash basis of accounting prior to conversation to accrual.

Fourth, the Temporary Receiver makes reference to contingent liability from possible future lawsuits from unhappy customers seeking refunds or cancellations. Of course, such future lawsuits are speculative at best. And there is no private right of action under Section 5 of the FTC Act. But more importantly, the best way to lower the risk of future lawsuits and reduce contingent liability is to allow Raging Bull to fulfil the services for which its subscribers paid. It is unsurprising that there are many subscribers demanding refunds or cancellations, as the FTC's actions forced the Company to shut down its operations. But even despite the reputational damage caused by the FTC's lawsuit and the negative press that resulted (much of which reported allegations from the FTC that have been discredited and abandoned by the FTC), most subscribers value and want to receive Raging Bull's services, as reflected in the Temporary Receiver's Initial Report. *See* Receiver's Rep., at 88. Allowing Raging Bull to re-start its operations is part of the solution, as it would generate revenue and dramatically reduce the Company's liabilities by eliminating the need for refunds or cancellations for many of its subscribers – most of whom, even according to the Temporary Receiver's review of post-FTC lawsuit customer comments (*see* Receiver's Rep., at 87-88), support Raging Bull and wish to continue as subscribers. If Raging Bull's operations are permanently shut down, the refund demand will be astronomical as all of Raging Bull's 80,000 subscribers would have paid for services they did not receive.

## IX.    **Financial Projections and Profitability of Raging Bull**

The Company has prepared and submits as **Attachment B** prospective Income Statements and Balance Sheets for the next 36 months based on the presumption that operations can resume on March 1, 2021.

Based on the partners' deep knowledge of the industry, the Company's ten years of experience, and using reasonable and conservative assumptions, the Company forecasts that it will generate a profit, or Net Income, for each of the three years listed below as follows:

| For the 12 Months Ending: | Forecast Net Income |
|---|---|
| • February 28, 2022 | $ 54.0 million |
| • February 28, 2023 | $ 19.8 million |
| • February 29, 2024 | $ 33.0 million |

The Company forecasts it will have Cash as of the end of each of the three years listed below as follows:

| As of the 12 Months Ending: | Forecast Cash |
|---|---|
| • February 28, 2022 | $ 17.0 million |
| • February 28, 2023 | $ 47.0 million |
| • February 29, 2024 | $ 88.2 million |

In arriving at the forecast Net Income amounts shown above, the Company used the following key assumptions pertaining to the following material and/or significant accounts:

<u>Net Sales</u>:  For the purposes of these projections, the Company has assumed that it will resume operations on March 1, 2021. Upon resuming operations, it will need approximately two to three months to generate new subscription revenues; however, it intends to start servicing prior clients immediately (and recognizing previously deferred revenues). For each of the twelve months ending February 28, 2022, 2023, and 2024, Net Sales are forecast to be $69.0 million, $38.1 million, and $54.2 million, respectively. The relatively higher Net Sales during the twelve months ending February 28, 2022 reflects revenues recognized in connection with the Deferred Revenue balance prior to the pause of operations in December 2020.

<u>Advertising</u>:  Based on the projection to start spending $250,000 in the first month, with an increase of 10% per month for the first fiscal year, the Company's forecasts reflect Advertising costs of $4.6 million in fiscal 2022, the first forecast year. Assuming a 20% year-over-year increase after that, the Company forecasts spending $5.6 million in fiscal 2023 and $6.7 million in fiscal 2024.

<u>Legal and professional fees</u>:  Based on estimates received from providers, the Company's forecasts reflect Legal and Professional fees of $1.2 million in fiscal 2022 and $960,000 in fiscal years 2023 and 2024.

<u>Compliance-related expenses</u>:  As discussed in this Business Plan, the Company intends to invest in a compliance infrastructure. The Company's forecasts have reflected this investment in the amount of $920,000 in compliance salaries in fiscal 2022 and $720,000 in 2023 and 2024.

<u>Payroll expense</u>:  Payroll expense is based on a smaller number of employees as discussed above.

<u>Cash Distributions</u>: The Company's forecast Balance Sheets reflect the partners' near-term plans of no cash distributions to themselves.

<u>Equity</u>:  Based on the Company's Business Plan, its Equity will turn positive within 24 months, by February 28, 2023. The forecast Equity as of fiscal 2023 is $12.4 million. The prior years' negative Equity balances were a result of the Company's conversion to accrual-basis accounting as required by the IRS due to the Company's achieving the revenue milestone that triggers accrual-basis accounting for tax purposes.

Upon completion and submission to the Court of this Business Plan, Raging Bull has asked Ms. Davis to review the Company's projections and prepare a supplemental report with her independent analysis.

Dated: February 19, 2021                    Respectfully submitted,

                                            RagingBull.com, LLC, Jeffrey M. Bishop
                                            and Jason Bond

                                            By: /s/ *David G. Barger*
                                            David G. Barger (DCB# 469095)
                                            Greenberg Traurig LLP
                                            1750 Tysons Blvd.
                                            Suite 1200
                                            McLean, VA 22102
                                            Tel: (703) 749-1300
                                            Email: bargerd@gtlaw.com

                                            Andrew G. Berg (admitted *pro hac vice*)
                                            2101 L Street, N.W.
                                            Suite 1000
                                            Washington DC 20037
                                            Tel: (202) 331- 3100
                                            Email: berga@gtlaw.com

                                            Miriam G. Bahcall (admitted *pro hac vice*)
                                            Brett M. Doran (admitted *pro hac vice*)
                                            Greenberg Traurig, LLP
                                            77 West Wacker Drive
                                            Suite 3100
                                            Chicago, IL 60601
                                            Tel: (312) 476-5135
                                            Email: bahcallm@gtlaw.com
                                            Email: doranb@gtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of February 2021 a true and accurate copy foregoing RagingBull.com, LLC Business Plan, was properly served on all parties through the ECF system.

/s/ *Brett M. Doran*
Brett M. Doran (admitted *pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: (312) 476-5135
Email: doranb@gtlaw.com

*Counsel for RagingBull.com, LLC,*
*Jeffrey M. Bishop and Jason Bond*