# ATTACHMENT A

**Initial Expert Report of**

**Bates Group LLC and A. Christine Davis, CPA/CFF, CVA, CGMA**

**February 19, 2021**

**FEDERAL TRADE COMMISSION**

**v.**

**RAGINGBULL.COM, LLC f/k/a**
**LIGHTHOUSE MEDIA, LLC, *et al*.**

**Case No. 1:20-cv-03538-GLR**

**TABLE OF CONTENTS**

I.    NATURE OF MY ASSIGNMENT..............................................................3

II.   PROFESSIONAL QUALIFICATIONS ....................................................3

III.  INFORMATION CONSIDERED ..............................................................6

IV.   SUMMARY OF OPINIONS.......................................................................7

V.    BASIS FOR OPINIONS..............................................................................8

    A. THE COMPANY'S REVENUES FROM 2014 THROUGH 2019 WERE PROPERLY
       RECOGNIZED AS EARNED INCOME AND WERE NOT UNEARNED INCOME; THEREFORE,
       THE CASH DISTRIBUTIONS TO THE COMPANY'S MEMBERS DURING THOSE YEARS
       WERE PAID FROM EARNED INCOME PERTAINING TO THOSE YEARS. ..........................8

       *i.   The Cash Basis of Accounting and the Accrual Basis of Accounting..................8*

       *ii.  Internal Revenue Service ("IRS") Instructions Informed the Company that the
           Cash Basis of Accounting was Appropriate for its Business for the Fiscal Years
           2014 through 2019.....................................................................................................9*

       *iii. The Company's Operations Were Correctly and Appropriately Accounted for
           under the Cash Basis of Accounting from Inception in 2014 through the Second
           Quarter of 2020.....................................................................................................11*

       *iv.  During Fiscal Year 2020, the Company Was Advised to Convert and Did
           Convert from the Cash Basis of Accounting to the Accrual Basis of Accounting
           Effective January 1, 2019 .....................................................................................12*

       *v.   The Cash Distributions to the Members Were Permitted Under the Company's
           Operating Agreement Consistent with the Cash Basis of Accounting...............14*

       *vi.  Under the Cash Basis of Accounting, All Cash Receipts from Customers Were
           Earned Income, and All Distributions to Members Were Paid from Earned
           Income....................................................................................................................15*

    B. USING THE CORRECT AND APPLICABLE BASIS OF ACCOUNTING, THE COMPANY'S
       EQUITY BALANCES WERE POSITIVE, NOT NEGATIVE (FROM 2014 THROUGH JUNE 30,
       2020). ....................................................................................................................17

       *i.   Mr. Peroutka Misapplied Accounting Principles by Restating the Company's
           Equity.....................................................................................................................17*

       *ii.  Mr. Peroutka Either Overlooked the Fact that the Company was Appropriately
           Applying the Cash Basis of Accounting or Ignored that Fact in Insisting on
           Using Unearned Income in his Analysis ..........................................................18*

    C. THE CORRECT EQUITY VALUES FOR THE COMPANY AS OF THE FISCAL YEARS ENDED
       2014 THROUGH 2019 UNDER THE CASH BASIS OF ACCOUNTING. .............................21

## I.  NATURE OF MY ASSIGNMENT

1.     In connection with the matter styled Federal Trade Commission vs. RagingBull.com, *et al.*, Case No. 1:20-cv-03538-GLR, I have been retained, through Bates Group LLC, by Greenberg Traurig, LLP, counsel for RagingBull.com (f/k/a Lighthouse Media LLC; "Company"), Jason Bond and Jeffrey M. Bishop (collectively, "Defendants"), to review and respond to certain statements made by Raymond J. Peroutka, Jr. in his Declaration dated January 11, 2021. Mr. Peroutka was retained by the Temporary Receiver in this matter, Peter E. Keith, Esq., "to provide certain consulting services in support of [Mr. Keith's] reporting obligations."[1]

2.     Specifically, I have been asked to render my independent and expert opinions in response to Mr. Peroutka's opinions or conclusions that:

> a) The Company's revenues in 2014 through 2019 included "unearned income"; therefore, the cash distributions to the Company's members in 2014 through 2019 were paid from unearned income pertaining to those years.
>
> b) The Company had negative "net equity" since 2014.

3.     I have also been asked to render my independent and expert opinions regarding the correct Equity values of the Company as of the years ended 2014 through 2019.

## II.  PROFESSIONAL QUALIFICATIONS

4.     I have twenty-nine years of combined professional experience in public accounting, financial accounting and reporting, management accounting, forensic accounting and investigations, financial statement auditing, preparing corporate and partnership income tax returns, and calculating and reporting on the fair market value of privately held businesses like RagingBull.com. I possess

---

[1] See Declaration of Raymond J. Peroutka, Jr. page 2.

professional credentials in public accounting, management accounting, financial forensics, and business valuation.

5.      I am a licensed Certified Public Accountant in three states - California, New York, and Oregon. I received my first CPA license in 1995, two years after graduating from college. I graduated with a Bachelor's in Accounting degree from Golden Gate University in San Francisco, California in June 1993.

6.      I hold the Certified in Financial Forensics credential issued by the American Institute of Certified Public Accountants ("AICPA"), and I was one of the earliest recipients of this credential in the nation in 2008. In addition, I am a Certified Valuation Analyst and a Chartered Global Management Accountant. I also hold a Blockchain Fundamentals for Accounting and Finance certificate issued by the AICPA, and an arbitrator certificate issued by the San Francisco Bar Association.

7.      I am an Affiliate Expert at Bates Group LLC, a provider of U.S. and global securities litigation support and regulatory consulting, financial institution compliance solutions, professional services in anti-money laundering and fraud investigations, and expert witness services in forensic accounting, valuation, and commercial damages. Prior to my position as an Affiliate Expert, I was the Managing Director of Forensic Accounting and Economic Damages at Bates Group from November 2018 through November 2020 and a Member of the firm. In November 2020, after many years in leadership positions at CPA and consulting firms, I founded and launched Financial Evidence Group, a California corporation and a registered CPA firm providing litigation support and forensic accounting services.

8.      I am retained as a consulting and testifying expert in the areas of financial accounting and reporting, management accounting, accountant malpractice, and accounting fraud. I have led and participated in a wide range of matters involving both large public corporations and privately held

companies. Other types of matters in which I have significant experience include estimating or evaluating economic damages such as lost profits or lost earnings, investigating allegations of asset misappropriation and financial improprieties, explaining an entity's ability to pay punitive damages based upon the financial condition of the entity, and estimating the fair market value of privately held businesses like RagingBull.com. In my business valuation assignments, I applied the AICPA's guidance in preparing forecasts and projections which include the evaluation and use of reasonable and supportable assumptions incorporated in prospective financial information.

9.     During my professional career, I have audited financial statements as an independent auditor, prepared financial statements as a management accountant and controller, and, in the role of independent accounting expert, reviewed and analyzed the financial statements of large and small companies that are the subject of litigation to determine whether those financial statements were prepared in accordance with the applicable accounting framework such as generally accepted accounting principles ("GAAP") and Cash-basis or Accrual-basis accounting. As an accounting expert in litigation matters, I have rendered expert opinions pertaining to the reliability of financial statements and their conformity with prevailing accounting standards. I have also rendered expert opinions pertaining to the standard of care and ethics required of accountants whose professional services were the subject of legal disputes.

10.     To maintain my professional credentials, I complete extensive continuing professional education in accounting, financial forensics, and business valuation every year. I also teach programs that qualify for continuing professional education for CPAs and continuing legal education for attorneys. Those programs, which include learning objectives in financial and forensic accounting, auditing, and economic damages, have been provided through the Practising Law Institute, Bar Association of San Francisco, Continuing Education of the Bar of California, the AICPA, and the CalCPA Education Foundation. My professional qualifications, including my trial,

deposition and arbitration testimony and publications I have authored, are summarized in my curriculum vitae attached hereto as Appendix I.[2]

11.    I am being compensated by the Defendants for my work through Bates Group LLC at the rate of $500 per hour. The rates of Bates Group employees who conducted research and analysis under my direction and supervision range from $105 to $400 per hour. The payment for services provided by Bates Group in this matter is not contingent upon the opinions herein or the outcome of this matter.

## III.    INFORMATION CONSIDERED

12.    The opinions expressed in this report constitute my present opinions. Amendments or supplements to this report may be required because of new information received after the submission of this report. I have relied upon documents and information that is of the type that is reasonably relied upon by experts in my field. In evaluating the documents and information provided to me in this assignment, I have applied my professional judgment and the technical expertise I have accumulated over my 29 years of relevant professional experience.

13.    I reviewed the following documents and information:

a)    The Company's financial statements as contained in the Company's QuickBooks files including access to files housed in QuickBooks Online;

b)    The Company's Partnership tax returns (Form 1065) for 2014 through 2019;

c)    Various spreadsheets pertaining to Deferred Revenue and related accounts;

d)    Analyses and Memos from the Company's current CPAs (CliftonLarsonAllen)[3]; and

---

[2] Numerous litigation matters for which I served as a consulting expert and for which my oral testimony was not required are not listed in my curriculum vitae. An example of such matter is one that settled between the disputing parties prior to my scheduled deposition.

[3] For tax year 2014 through 2018, the Company's Partnership tax returns were prepared by Meredith CPAs PC. In conjunction with the Company's significant growth during 2019, it retained Blum, Shapiro & Company, P.C., a top 100 CPA firm, as its tax CPAs beginning with the 2019 tax year. In December 2020, CliftonLarsonAllen acquired Blum, Shapiro & Company with an effective dated of January 1, 2021.

e) Various pleadings in this matter.

14.    In addition to reviewing the aforementioned documents and information, I interviewed representatives from the Company's CPA firm, CliftonLarsonAllen ("CLA"), one of the ten largest CPA firms in the country, including one of the firm's Principals for Advisory Services. This CLA Principal was the primary CLA professional who advised and worked with the Company during the Company's conversion to the Accrual basis of accounting (see related discussion below).

## IV.    SUMMARY OF OPINIONS

15.    It is my opinion that Mr. Peroutka's opinions or conclusions as referenced in paragraphs 2.a) and 2.b) above are materially incorrect because:

a) The Company's revenues from 2014 through 2019 were properly recognized as earned income and were not unearned income; therefore, the cash distributions to the Company's members during those years were paid from earned income pertaining to those years.

b) Using the correct and applicable basis of accounting (Cash basis of accounting), the Company's Equity balances were positive, not negative (from 2014 through June 30, 2020).

16.    The correct Equity values for the Company as of the fiscal years ended 2014 through 2019 are shown in the table below:

| 2019* | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| $ 2,837,962 | $ 4,251,781 | $ 969,699 | $ 861,405 | $ 256,845 | $ 521,650 |

* 2019 Equity value is based on Cash basis of accounting prior to conversion to Accrual.

## V.   BASIS FOR OPINIONS

### A.   The Company's Revenues from 2014 through 2019 Were Properly Recognized as Earned Income and Were Not Unearned Income; therefore, the Cash Distributions to the Company's Members During Those Years Were Paid from Earned Income Pertaining to Those Years.

#### i.   *The Cash Basis of Accounting and the Accrual Basis of Accounting*

17.   For accounting and tax reporting purposes, there are two widely accepted bases for accounting for a business - the Cash basis of accounting and the Accrual basis of accounting.

18.   The Cash basis of accounting is a method that recognizes revenues and expenses based on the timing of when cash is received and paid, respectively, without regard to whether all associated services have been performed. The AICPA explains that, under the Cash basis of accounting:

- Revenues are recognized [*i.e.,* reflected in the financial statements] only when cash is received rather than when earned, and
- Expenses are recognized only when cash is paid rather than when the obligation is incurred. [4]

19.   For example, if the Company was paid by a customer $10,000 in January 2019 in exchange for monthly services to be rendered ratably by the Company over the next 24 months (a 2-year contract), under the Cash basis of accounting, the Company recognizes the $10,000 payment as revenue during the 2019 fiscal year reporting period. The $10,000 is earned income at the time the amount is received.

20.   The Cash basis of accounting is simpler than the Accrual basis of accounting and commonly used by small businesses.

21.   From inception in 2014 through June 30, 2020 (Q2 2020), the Company operated its business and appropriately accounted for its operations under the Cash basis of accounting.

---

[4] See AICPA Practice Aid, *Accounting and Financial Reporting Guidelines for Cash- and Tax-Basis Financial Statements*, page 6

Expert Report of A. Christine Davis                                         Page **8** of **22**

22.    On the other hand, the Accrual basis of accounting is a method that recognizes revenue when the amount is earned, and the expense, incurred, without regard to whether the related cash has been exchanged. Under the Accrual basis of accounting, whether revenue is deemed "earned" is determined by specific rules that apply under the relevant accounting framework, such as GAAP.

23.    Using the same illustrative transaction in paragraph 19 above, under Accrual accounting, the Company recognizes earned income of $5,000 in fiscal year 2019, and the remaining $5,000 in fiscal year 2020, because the Company would have provided 50% of services it was obligated to provide in 2019 (the first 12 months out of 24 months). The revenue recognized in 2020 is classified as Deferred Revenue in 2019 (a liability).

ii.    *Internal Revenue Service ("IRS") Instructions Informed the Company that the Cash Basis of Accounting was Appropriate for its Business for the Fiscal Years 2014 through 2019*

24.    IRS Publication 538, *Accounting Periods and Methods* (revised January 2019), provides guidance to businesses pertaining to the appropriate determination of the accounting period and accounting method to use for tax reporting purposes.

25.    With respect to accounting methods, the IRS is consistent with the AICPA's guidance and discussion above:

> The most commonly used accounting methods are the **cash method** and the **accrual method**. **Under the cash method**, you generally report income in the tax year you receive it, and deduct expenses in the tax year in which you pay the expenses. **Under the accrual method**, you generally report income in the tax year you earn it, regardless of when payment is received. You deduct expenses in the tax year you incur them, regardless of when payment is made.[5] [Emphasis added.]

---

[5] See IRS Publication 538, Accounting Periods and Methods, page 2.

26.     Publication 538 also explains the concept of "constructive receipt" under the Cash method or basis of accounting. Constructive receipt is consistent with the AICPA's guidance referenced above which states revenue is earned when cash is received:

> **Income.** Under the cash method, you include in your gross income all items of income you actually or constructively receive during the tax year. …
>
> **Constructive receipt.** Income is constructively received when an amount is credited to your account or made available to you without restriction. You do not need to have possession of it. If you authorize someone to be your agent and receive income for you, you are considered to have received it when your agent receives it. Income is not constructively received if your control of its receipt is subject to substantial restrictions or limitations.[6]

27.     Finally, Publication 538 explains the "gross receipts test" pertaining to partnerships and corporations: businesses using the Cash basis of accounting are required to convert to Accrual accounting upon reaching a revenue milestone—when the Company's average annual gross receipts for the three preceding tax years exceed $25 million, it must convert to Accrual accounting.[7]

28.     Shown below are the Company's gross receipts for the tax years 2014 through 2020, and the corresponding average gross receipts for the three preceding tax years beginning with 2017. As the table shows, the Company was **<u>not</u>** required for tax purposes to convert to the Accrual method until the tax year 2020, when the average gross receipts for the three preceding tax years exceeded $25 million.

| | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|---|---|
| Gross Receipts* | $94,000,000 | $64,759,116 | $35,153,604 | $16,410,913 | $6,708,584 | $3,169,988 | $2,780,595 |
| Average of 3 Preceding Years | $38,774,544 | $19,424,367 | $ 8,763,162 | $ 4,219,722 | | | |

* 2014-2018 from Form 1065, Line 1a; 2019 from QuickBooks report; 2020 is estimated and provided by counsel's client

---

6 See IRS Publication 538, Accounting Periods and Methods, page 8.

7 See IRS Publication 538, Accounting Periods and Methods, page 9 (Gross receipts test).

29.    Similar to the discussion above regarding the Accrual basis of accounting, IRS Publication 538 defines the "Accrual Method" as follows:

> **Accrual Method**
> Under an accrual method of accounting, you generally report income in the year it is earned and deduct or capitalize expenses in the year incurred. The purpose of an accrual method of accounting is to match income and expenses in the correct year. [8]

### iii.    The Company's Operations Were Correctly and Appropriately Accounted for under the Cash Basis of Accounting from Inception in 2014 through the Second Quarter of 2020

30.    Since its inception in 2014 through June 30, 2020, the Company complied with the rules of Cash basis accounting and Publication 538. It correctly and appropriately accounted for its operations under the Cash basis of accounting by recognizing Gross Receipts (cash) as revenue when received, and cash disbursements as expenses in the year paid. The Company recorded its business transactions in QuickBooks using the Cash basis of accounting until June 30, 2020.

31.    The Company, from inception, retained professional tax CPAs to prepare its Partnership income tax returns. Through tax year 2018, all of the Company's tax returns correctly informed the IRS that it had used the Cash method of accounting during the tax year.[9] For example, see Row H of the Partnership tax return excerpt below, where the box for "Cash" is marked with "X" as the Company's accounting method. I also reviewed the Company's tax returns for 2014 through 2017 and observed that the box for "Cash" was similarly marked for each of those years.

---

[8] See IRS Publication 538, Accounting Periods and Methods, page 10.

[9] In September 2020, the Company, through Blum, Shapiro & Company, filed IRS Form 3115, *Application for Change in Accounting Method*. By filing Form 3115, the Company informed the IRS that it has changed its accounting method to the Accrual method of accounting effective January 1, 2019.

| Form **1065** | | **U.S. Return of Partnership Income** | | OMB No. 1545-0123 | |
|---|---|---|---|---|---|
| Department of the Treasury | | For calendar year 2018, or tax year beginning _____ , 2018, | | **2018** | |
| Internal Revenue Service | | ending _____ , 20 _____ . | | | |
| | | ► Go to *www.irs.gov/Form1065* for instructions and the latest information. | | | |
| A Principal business activity | | | | D Employer identification no. | |
| Online Mktg | Type or Print | Ragingbull.com, LLC | | 46-4420621 | |
| B Principal product or service | | 62 Calef Highway Ste 233 | | E Date business started | |
| Newsletter | | Lee, NH 03861 | | 1/06/2014 | |
| C Business code number | | | | F Total assets (see instructions) | |
| 523900 | | | | $ | 4,797,487. |

G  Check applicable boxes: (1) ☐ Initial return  (2) ☐ Final return  (3) ☐ Name change  (4) ☐ Address change  (5) ☐ Amended return
H  Check accounting method: (1) ☒ Cash  (2) ☐ Accrual  (3) ☐ Other (specify) ►
I  Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year.  ► ___3___
J  Check if Schedules C and M-3 are attached . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► ☐

**Caution:** Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

32.    As explained below, during the entire 2019 tax year and through the second quarter of 2020, the Company justifiably continued to conduct and account for its operations under the Cash method.

#### iv.  *During Fiscal Year 2020, the Company Was Advised to Convert and Did Convert from the Cash Basis of Accounting to the Accrual Basis of Accounting Effective January 1, 2019*

33.    Because of the Company's significant revenue increase in 2019, it was required to convert to Accrual accounting for tax year 2020 based the IRS' gross revenue test. During the third quarter of tax year 2020, the Company's accountants at CLA advised the Company to convert its accounting for the business from Cash basis to Accrual basis.[10]

34.    In or around Fall of 2020, and heeding the professional advice of CLA, the Company converted its 2020 financial statements to Accrual accounting. In addition, at CLA's recommendation, the Company retroactively applied Accrual accounting treatment to the results of operations for the entire fiscal year 2019.

35.    The impact of the conversion to Accrual accounting pertained to recognizing or establishing, for the first time, the deferral of revenues relating to customer payments received but

---

[10] I interviewed representatives from CLA on February 9, 2021 and obtained the information pertaining to their role in the Accrual conversion I describe herein.

for which future services were owed. In the Fall of 2020, to retroactively convert 2019 to Accrual accounting, the Company recognized for the first time the Deferred Revenue account as of December 31, 2019 with a $36.9 million balance (a liability). The Company's Equity account was decreased for the same amount. As the Company's 2019 Equity account prior to Accrual accounting conversion was a positive $2.8 million, the post-accrual Company Equity account became revalued to negative $35.1 million.[11] This was the first time the Company's Equity became negative, and this fact was not known until the Fall of 2020 in connection with the conversion to Accrual accounting.[12]

36.    The magnitude of the newly-established Deferred Revenue account was not a result of an accounting error, a misapplication of accounting principles, or fraud—it was a result of the accelerated growth the Company had experienced in the last few years leading up to 2019. As shown in the table in paragraph 42 below, Gross Receipts (cash receipts) increased from $16.4 million in 2017 to $64.9 million in 2019. Had the 2019 Gross Receipts been materially lower, the adjusting journal entry recognizing Deferred Revenue would reflect a much lower amount.

37.    It is important to note that the business operations during 2019 operated contemporaneously under the Cash basis of accounting, and the Company and its members were not aware that a conversion to Accrual accounting for 2019 was even contemplated or would be recommended by the CPAs. As shown in paragraph 28 above, the Company was not required to convert to Accrual accounting for tax reporting purposes until the 2020 tax year. Consistent with

---

[11] The 2019 Partnership tax return shows that the Company's equity as of December 31, 2019 was negative $35,133,182 (Form 1065, Schedule L, Line 21(d)). The $35.1 million in equity reflects approximately $1.0 million in other adjustments in addition to the $36.9 million of deferred revenues.

[12] It is important to note the recognition of deferred revenues arising from a conversion to Accrual-basis accounting is not unique to the Company. Any business accounted for on the Cash basis of accounting will necessarily establish a Deferred Revenue account upon conversion to Accrual-basis accounting if the business provides services under a multi-period contract and receives payment in advance of providing services.

prior years, throughout 2019, the members of the Company received cash distributions from earned income under the Cash basis of accounting and pursuant to its Operating Agreement.

**v. The Cash Distributions to the Members Were Permitted Under the Company's Operating Agreement Consistent with the Cash Basis of Accounting**

38.    The cash distributions were permitted under the Company's Operating Agreement. As set forth in the Operating Agreement, cash distributions were to be paid from "Net Operating Cash Flow," which is a concept akin to the Cash basis of accounting. The Operating Agreement makes no reference to the Accrual basis of accounting or to any calculations of unearned income from which to base the amount and timing of cash distributions.

39.    Article IV of the Operating Agreement, *Distributions*, states, in part:

Operating Distributions. After providing for the satisfaction of the current debts and obligations of the Company, the Company **shall** distribute the Net Operating Cash Flow of the Company to the Members in the manner set forth in Schedule B, which shall be confidential and shall only be accessed by the Members. Distributions shall be made monthly as expeditiously as possible after the Net Operating Cash Flow has been computed.[13] [Emphasis in bold added.]

40.    In addition, Article I of the Operating Agreement, *Definitions*, sets forth the definition of "Net Operating Cash Flow." It is defined as "Gross Operating Cash Receipts" minus "Current Operating Expenditures." Furthermore, "Gross Operating Cash Receipts" is defined as "all cash received by the Company, excluding capital contributions."[14] The aforementioned definitions and the contemplated outcome are substantively describing the Cash basis of accounting.

41.    Shown below is a table showing the cash distributions to the Company's members relative to the Company's Gross Receipts from 2014 through 2019. For example, in 2017, cash distributions

---

[13] See the Company's Operating Agreement, page 11.

[14] See the Company's Operating Agreement, page 4.

represented 52% of Gross Receipts for that year. Similarly, in 2018, cash distributions were 19% of Gross Receipts.

42.    I have noted that, during the Company's significant period of growth from 2017 to 2019, Gross Receipts increased by 295%, while distributions to the Company's members increased by 88%, a growth rate far lower than the rate of growth in Gross Receipts. As the Company's Gross Receipts increased every year, the amounts of cash distributions relatively decreased.

|  | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|---|
| Gross Receipts* | $  64,759,116 | $35,153,604 | $ 16,410,913 | $6,708,584 | $3,169,988 | $  2,780,595 |
| Distributions** | $  16,024,736 | $ 6,532,293 | $ 8,507,939 | $3,224,382 | $2,557,673 | $  1,642,397 |
| Distributions Relative to Gross Receipts | 25% | 19% | 52% | 48% | 81% | 59% |

\* 2014-2018 from Form 1065, Line 1a; 2019 from QuickBooks report
\*\*From Form 1065, Schedule M-2

### vi.    Under the Cash Basis of Accounting, All Cash Receipts from Customers Were Earned Income, and All Distributions to Members Were Paid from Earned Income

43.    Based on the discussion above, it is my opinion that the Company's revenues in 2014 through 2019 were earned income, not unearned income. It is also my opinion that, when the cash distributions were made to the Company's members for the years 2014 through 2019, the funds came only from earned income of the Company and under the prevailing and approved basis of accounting for the Company.

44.    In his report, Mr. Peroutka was materially incorrect in characterizing the Company's revenues pertaining to its subscription services as unearned income to the extent the customer payments related to future services. In the context of this matter, unearned income is the same as deferred revenue. He states: "Unearned income, for accounting purposes, is not earned at the time

of receipt from the customer because the services for which the income is paid have not yet been received."[15]

45.   Mr. Peroutka's statement about unearned income is irrelevant to an accounting analysis of the Company's operations prior to 2020 because unearned income pertains to the fundamental accounting for revenues under Accrual accounting. Accrual accounting was not applicable to the Company until after June 30, 2020.[16]

46.   Furthermore, Mr. Peroutka's erroneous application of a fundamental Accrual accounting concept contradicts the guidance set forth in IRS Publication 538 regarding advance payments. The characterization by the IRS of advance payments is consistent with the Company's subscription-related cash receipts or Gross Receipts. IRS Publication 538 states:

> **Advance Payments**
> Generally, you report an advance payment for goods, services or other items as income **in the year you receive the payment**. However, if you use an accrual method of accounting, you can elect to postpone including the advance payment in income until the next year. However, you cannot postpone including any payment beyond that tax year.[17] [Emphasis added.]

47.   The concept of unearned income has absolutely no application in Cash basis accounting. Unearned income is recognized and used only under the Accrual basis of accounting. Consequently, Mr. Peroutka's attempt to apply the concept of unearned income to the Company's operations and accounting during years when revenue was properly defined by the receipt of cash is baseless and puzzling. This invalid and flawed application, in turn, has led to his materially erroneous

---

[15] Peroutka Declaration, paragraph 13, page 6.

[16] Mr. Peroutka's statement would be clearly and accurately stated if it included the word "accrual" in the phrase "for [accrual] accounting purposes." Unearned income does not apply for Cash-basis accounting purposes.

[17] See IRS Publication 538, Accounting Periods and Methods, page 10.

recalculations and "extrapolations" of restated "net equity" amounts as shown on page 8 of his report (see related discussion below).

**B. Using the Correct and Applicable Basis of Accounting, the Company's Equity Balances Were Positive, Not Negative (from 2014 through June 30, 2020).**

   ***i.  Mr. Peroutka Misapplied Accounting Principles by Restating the Company's Equity***

48.    As explained above, the Company appropriately and correctly accounted for its operations under the Cash basis of accounting until its CPA firm, CLA, recommended a conversion to Accrual accounting in the Fall of 2020.

49.    The Company, since its inception, retained professional tax accountants to prepare its partnership tax returns, justifiably relying on the professionals to prepare its tax returns and critique its year-end financial statements as needed to properly file the tax returns. In my opinion, the Company complied with the AICPA and the IRS rules with respect to using the Cash basis of accounting, and the Company's CPAs affirmed this basis of accounting as appropriate for the Company.

50.    I have reviewed the Company's financial statements and obtained an understanding of its operations. It is my opinion that the Company was permitted to use the Cash basis of accounting through June 30, 2020, and appropriately and correctly applied this basis of accounting. The significant growth in 2019 created the need to convert to Accrual accounting in 2020 with the average annual Gross Receipts in the three years preceding 2020 exceeding $25 million. Until then, the Cash basis of accounting was appropriate, specifically in relation to IRS Publication 538.

51.    In his report, however, Mr. Peroutka, without proper basis in any accounting framework, concluded that it would be appropriate to **assume** that the Accrual basis of accounting was in place at the Company since inception. Mr. Peroutka's determination to apply Accrual accounting to the Company's Cash-basis operations cannot be reconciled to the AICPA guidance and IRS regulations.

### ii.  *Mr. Peroutka Either Overlooked the Fact that the Company was Appropriately Applying the Cash Basis of Accounting or Ignored that Fact in Insisting on Using Unearned Income in his Analysis*

52.     It is clear from my review of the Company's accounting and tax records that it was permitted to use the widely accepted Cash basis of accounting. It is therefore perplexing that, in his report, Mr. Peroutka stated that he "[r]eviewed and evaluated Defendants' accounting and tax records."[18] I have concluded that, if Mr. Peroutka did review and evaluate the Defendants' accounting and tax records, he either overlooked the very significant and relevant fact that the Company was appropriately applying the Cash basis of accounting, or he knew of that fact but chose to ignore it.

53.     Mr. Peroutka continued on a path to conflate Cash and Accrual accounting when he restated the Company's Equity ("net equity" in his terms) for purposes of extracting any unearned income to recast the Company's financial condition as if it were operating under the Accrual basis of accounting all along. Using the misguided assumption that the Company had unearned income during years it was on the Cash basis of accounting, he proceeded to restate the Company's "net equity" going back to 2016 under the hypothetical scenario that previously properly recognized revenues should have been deferred. In turn, his analysis has provided the basis for the Temporary Receiver to conclude that the cash distributions had to come from unearned income.[19] This is simply untrue as all cash received by the Company was earned income until the conversion to Accrual accounting.

54.     Furthermore, Mr. Peroutka's restated Equity values, which are negative beginning as of the end of 2016, provided the basis for him to proffer the conclusion that the Company's

---

[18] See Peroutka Declaration, page 3, paragraph 8.

[19] See Response of Temporary Receiver in this matter to Emergency Motions of Defendants on January 11, 2021, page 8, paragraph 17.

"distributions to its principals of more than $59 million, much of which reflected unearned income, have saddled the company with more than $49 million of present negative net equity."[20] This is also simply untrue, because the Company had positive Equity until the retroactive conversion to Accrual accounting occurred in the Fall of 2020. The first occurrence of negative Equity was a result of the retroactive, prior-period conversion to Accrual accounting, not by the contemporaneous cash distributions that were made pursuant to the Operating Agreement.

55.   Mr. Peroutka did not provide sufficient information or underlying data points or schedules to support his restated "net equity" amounts. He only briefly explained that he reviewed accounting records and used the Company's unearned income calculations for 2018 and later years as a basis to "extrapolate" unearned income for years 2016 and 2017. He acknowledged that he was unable to determine unearned income for 2014 and 2015 but, nevertheless, expressed he "[has] a high degree of confidence" that the Company also had negative "net equity" as of the end of 2014 and 2015. [21]

56.   It is unclear if Mr. Peroutka evaluated important facts in his "extrapolation" of the Company's "net equity" values. Mr. Peroutka did not explain whether his extrapolation included a reasonable evaluation of the rate at which deferred revenues are earned, which in turn will cause the negative Equity to reverse over the near-term. I have noted, however, that the revenue example he used pertaining to a customer subscription to be earned over 36 months (a 3-year revenue contract) is misleading because the majority of the Company's subscription revenues is earned within one year (see related discussion below).[22]

57.   With respect to Deferred Revenue and the related impact on Equity, it is important to note that Deferred Revenue is reduced and reclassified to Revenue as services are provided by the

---

[20] Peroutka Declaration, page 8, paragraph 18.

[21] Peroutka Declaration, page 7, paragraph 16.

[22] Peroutka Declaration, page 6, paragraph 13.

Company. As Deferred Revenue is reclassified to Revenue, the Equity account is correspondingly increased (towards the positive). In reviewing the underlying data supporting the accrual journal entry in the Fall of 2020, I observed that the majority of the Company's Deferred Revenue was reclassified to Revenue within the short-term; this also means the Equity improved accordingly.

58.    The table below shows that the Company had been reducing Deferred Revenues at a relatively fast pace by providing services as promised. As shown in the table, of the Deferred Revenues at 12/31/2018 in the amount of $16.5 million, **89%** of that amount was earned by the end of 2019. Similarly, of the Deferred Revenues of $35.1 million at 12/31/2019, **68%** had been earned as of June 30, 2020 (within 6 months). This means that the Company's Equity was also improving at the same rate. This conclusion is consistent with CLA's classification of the Deferred Revenues as of 12/31/2019 as a Current Liability:[23] It is also consistent with statements made by CLA in a January 15, 2021 letter to the Temporary Receiver in this matter, which states, in part:

> The major change in tax position for RagingBull.com, LLC resulted from the advance payments by subscribers. Under the accrual method of accounting, these advance payments are deferred for a period no greater than 1 year from the date of receipt…Additionally, **the change in accounting method caused the partners' capital accounts to become negative, which will also reverse over future tax periods**.[24] [Emphasis added.]

Finally, the Company's high percentages of earned revenue within the next twelve months in relation to the deferred amounts provide evidence that Mr. Peroutka's seemingly arbitrary use of a 3-year revenue contract (with revenue earned over three years) is materially misleading.

---

[23] Obligations that are expected to be relieved or paid within one year are classified as Current Liabilities.

[24] Letter from CLA to Peter E. Keith (Temporary Receiver) dated January 15, 2021.

| End of Reporting Period | Deferred Revenues as of End of Reporting Period | Earned in 2019 | Earned through 6/30/2020 | Earned after 6/30/2020 |
|---|---|---|---|---|
| 12/31/2018 | $   16,542,036 | $   14,740,147 | $   152,137 | $   1,649,752 |
| % Earned | | **89%** | 1% | 10% |
| 12/31/2019 | $   35,122,689 | | $   24,050,928 | $   11,071,761 |
| % Earned | | | **68%** | 32% |

*There is a $2.8 million reconciling difference between the Deferred Revenue as of 12/31/2019 shown above and the Deferred Revenue on the 2019 tax return.

## C.   The Correct Equity Values for the Company as of the Fiscal Years Ended 2014 through 2019 Under the Cash Basis of Accounting.

59.   I have reviewed the Company's financial statements and Partnership tax returns and have obtained an understanding of the business. Based on my review, it is my opinion that the "net equity" amounts presented by Mr. Peroutka on page 8 of his report are materially incorrect and materially understate the Company's financial condition (Equity). Mr. Peroutka's restated "net equity" amounts and related opinions or conclusions were based upon his misapplication of the Accrual accounting to Cash basis operations, limited analysis, an unexplained extrapolation, and a mere statement of "high confidence" pertaining to 2014 and 2015.

60.   The Company's correct Equity is shown in Row A in the table below. These amounts are reflected in the Company's tax returns and financial statements. For 2019, I have used the financial statements generated from QuickBooks.[25]

61.   Mr. Peroutka's restated Equity amounts are shown in Row B in the table below. He did not offer restated values for 2014 and 2015 although he expressed "high confidence" that the

_____

[25] I was informed by the Company that the fiscal year 2020 financial statements have not been finalized; therefore, no Equity for 2020 is shown in the table.

Company's Equity was also negative as of the end of those years if he could determine the unearned income for those years.

| Row | | | 2019* | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|---|---|---|
| A | Correct Equity | a | $ 2,837,962 | $ 4,251,781 | $ 969,699 | $ 861,405 | $ 256,845 | $ 521,650 |
| B | Peroutka's "Extrapolated" Equity | b | (36,968,549) | (14,611,500) | (15,694,377) | (5,578,685) | | |
| C | Difference/Swing | b - a | $ (39,806,511) | $ (18,863,281) | $ (16,664,076) | $ (6,440,090) | | |

     * 2019 Correct Equity is based on Cash basis of accounting.

62.    As shown in the table above (Row B), Mr. Peroutka's restated Equity values are all negative and materially different from and lower than the Correct Equity that was based upon the Cash basis of accounting. In contrast, the Company's Correct Equity (Row A) was positive until the conversion to Accrual.

63.    As explained above, the recognition of Deferred Revenue at the end of 2019 and 2020 and the corresponding decrease to Equity was an accounting exercise. As the Company continues to provide the services it is obligated to provide, the Deferred Revenue will convert to Revenue within the short-term while the Company's Equity increases and improves in the process.

64.    I affirm that the statements, opinions, and conclusions set forth herein are true to the best of my knowledge and belief.

Executed this 19th day of February 2021.

A. Christine Davis

A. Christine Davis, CPA/CFF, CVA CGMA

APPENDIX I

# CURRICULUM VITAE OF
# A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA

## PROFESSIONAL CREDENTIALS

1. Certified Public Accountant, State of California (#69217) - 1995

2. Certified Public Accountant, State of New York (#101228) - 2009

3. Certified Public Accountant, State of Oregon (#15510) - 2019

4. Certified in Financial Forensics, AICPA (#257) - 2008

5. Certified Valuation Analyst, National Association of Certified Valuators and Analysts (#041850) - 2008

6. Chartered Global Management Accountant, AICPA - 2014

7. Arbitrator Certificate, Bar Association of San Francisco - 2015

8. Blockchain Fundamentals for Accounting and Finance Professionals Certificate, AICPA - 2019

## EDUCATION

Golden Gate University, San Francisco, CA, *B.A. Accounting,* 1993

## PROFESSIONAL POSITIONS

1. Financial Evidence Group, San Francisco, CA, *Founder and Shareholder,* November 2020 - present

2. Bates Group LLC, San Francisco, CA, *Managing Director of Forensic Accounting, Economic Damages & Financial Crimes and Member of the Firm*, January 2020 – November 2020; *Affiliate Expert*, November 2020 - present

3. Bates Group LLC, San Francisco, CA, *Director of Forensic Accounting, Economic Damages & Financial Crimes*, November 2018 – December 2019

4. OnPoint Analytics, Inc., Emeryville, CA, *Director of Forensic and Financial Accounting,* 2016-2018

5. DZH Phillips LLP, CPAs and Advisors, San Francisco, CA, *Director and Partner in Charge of Forensic Accounting and Litigation Consulting*, 2013-2016

6. StoneTurn, San Francisco, CA, *Managing Director,* 2012

7. Hemming Morse, LLP, San Francisco, CA, *Director, Forensic Accounting and Litigation Consulting*, 1997-2011

APPENDIX I

**CURRICULUM VITAE OF**
**A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA**

8. Banner Aerospace, San Francisco Bay Area, CA, *Subsidiary Controller*, 1995-1996

9. Coopers & Lybrand LLP, San Francisco Bay Area, CA, *Auditor and Tax Accountant*, 1994-1995

10. Burr, Pilger & Mayer, San Francisco Bay Area, CA, *Auditor and Tax Accountant*, 1993-1994

**PROFESSIONAL MEMBERSHIPS & AFFILIATIONS**

1. American Institute of Certified Public Accountants (including Forensic and Valuation Services Section)
2. National Association of Certified Valuators and Analysts
3. Association of Certified Fraud Examiners
4. Practising Law Institute – Co-Chair and faculty member, Pocket MBA: Finance for Lawyers and Other Professionals; Faculty member, Accounting Basics for Lawyers
5. Continuing Education of the Bar of California – CLE Speaker

**SPEECHES & PROGRAMS**

1. *Forensic Accounting & Financial Investigations: A Primer for Litigators,* Asian Pacific American Bar Association of Silicon Valley, Live Webinar, January 28, 2021

2. *Pocket MBA 2020: Finance for Lawyers and Other Professionals,* Practising Law Institute, Live Webinar, September 21-22, 2019 (Faculty and Co-chair)

3. *Filing a Business Interruption Claim: Properly Calculating the Business Income Loss,* Canadian Institute of Actuaries, Live Webinar, August 2020

4. *Forensic Accounting in Litigation Support and Financial Investigations,* Practising Law Institute, San Francisco, California, July 2020

5. *Accounting Concepts and Financial Statements for Lawyers,* Continuing Education of the Bar of California, On-Demand CLE, June 2020

6. *Employment Claims and Commercial Damages – What to Expect in the "New Normal,"* Bates Group, San Francisco, California, June 2020

APPENDIX I

# CURRICULUM VITAE OF
## A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA

7. *Pocket MBA 2019: Finance for Lawyers and Other Professionals,* Practising Law Institute, San Francisco, California, September 2019 (Faculty and Co-chair)

8. *Basics of Fraud and Forensic Accounting in Legal Settings*, Practising Law Institute, San Francisco, California, July 2019, July 2017

9. *Guest Lecturer, Business Ethics MGT 327, Menlo College, Atherton, California,* Spring 2017, Fall 2014, Fall 2013, Spring 2013, and Fall 2012

10. *60 Minutes with a Forensic Accountant: Evaluating Damages and Financial Condition,* Marin County Bar Association, San Rafael, California, September 2016

11. *Introduction to Valuing a Business,* Bar Association of San Francisco, San Francisco, California, June 2016

12. *Introduction to Analyzing Wage-and-Hour Claims,* Bar Association of San Francisco, San Francisco, California, March 2016

13. *Forensic Accounting for Fraud and Financial Wrongdoing,* Continuing Education of the Bar of California, Oakland, California, March 2016

14. *Retaining and Using Experts, Without Breaking Ethical Rules,* Bar Association of San Francisco, San Francisco, California, December 2015

15. *Economic Damages: Numbers Tell the Story – Elements of a Damage Model for an Individual and for a Business,* Bar Association of San Francisco, San Francisco, California, October 2015

16. *The Proper Care and Feeding of a Fraudster,* AICPA Not-for-Profit Industry Conference, National Harbor, Maryland, June 2015

17. *Presenting Damages Evidence in Anticipation of an Appeal,* Consumer Attorneys of California, 53rd Annual Convention, San Francisco, California, November 2014

18. *Fraud Schemes and Business Ethics,* Guest Lecturer, Menlo College, Fall 2014, Fall 2013, Spring 2013, and Fall 2012

19. *Fraud Risk Factors, Schemes and Responses Impacting Not-for-Profits,* California Society of CPAs Education Foundation, Los Angeles and San Francisco, California, May 2014

20. *Forensic Accounting in Today's Busiest Practice Areas,* Continuing Education of the Bar of California, Oakland, California, March 2012

APPENDIX I

## CURRICULUM VITAE OF
## A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA

21. *An Act of Goodwill (A webcast discussing Accounting Standards Update No. 2011-08, Intangibles - Goodwill and Other (Topic 350): Testing Goodwill for Impairment,* California Society of CPAs, November 2011

22. *Basics of Accounting & Finance 2009: What Every Practicing Lawyer Needs to Know (Fraud and Other Issues on the Horizon),* Practising Law Institute, San Francisco, July 2009

23. *Introduction to Financial Forensic Accounting,* Guest Lecturer, Golden Gate University, Spring 2009

24. *Maximizing the Use of Financial Forensic Accountants in Commercial Litigation,* Continuing Education of the Bar of California, Oakland, California, February 2009

25. *Home At Last: FAS 162 and the GAAP Hierarchy (Webcast),* California Society of CPAs, August 2008

26. *Basics of Accounting & Finance 2008: What Every Practicing Lawyer Needs to Know (Fraud and Financial Disaster: A Forensic Accountant's Overview),* Practising Law Institute, San Francisco, July 2008 and July 2007

27. *Accounting and Financial Statements for Lawyers,* Continuing Education of the Bar (California), Irvine, June 2007; Sacramento, May 2007

28. *Accountant Professional Liability,* California Society of CPAs San Francisco, May 2006

## PUBLICATIONS

1. *3 Data Challenges in Wage and Hour Damages Analysis,* Law 360, published by Portfolio Media, Inc., March 2018

2. *How to Value Your Company (An introduction to the basics of business valuation),* www.firstrepublic.com, published by First Republic Bank, January 2016

3. *When the Story's in the Numbers (A description of a forensic accountant's various roles in civil litigation),* The Recorder, published by ALM Media Properties LLC, August 2015

4. *Forensic, CPA (Written for present and future CPAs, an overview of forensic accounting for those interested in this specialization),* California CPA, published by the California Society of Certified Public Accountants, September 2014

APPENDIX I

# CURRICULUM VITAE OF
# A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA

5. *The Opportunity to Commit Fraud Doesn't Have to Be There (A description of the fraud triangle),* California Society of CPAs - From the Corner Office, http://www.calcpa.org/Content/26385.aspx, September 2013

6. *SAS 126 Arrives (A discussion of Statement on Auditing Standards No. 126, The Auditor's Consideration of Entity's Ability to Continue as a Going Concern),* California CPA, October 2012

7. *An Act of Goodwill (A discussion of Accounting Standards Update No. 2011-08, Intangibles - Goodwill and Other (Topic 350): Testing Goodwill for Impairment),* California CPA, November 2011

8. *Fairly Aligned (A discussion of Accounting Standards Update No. 2011-04, Fair Value Measurement (Topic 820): Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS (ASU 2011-04), with a focus on U.S. GAAP),* California CPA, August 2011

9. *Extreme Makeover (An overview of proposed changes to the presentation of general financial statements and the rationale),* California CPA, December 2010

10. *Home At Last: FAS 162 and the GAAP Hierarchy (An explanation of the authoritative hierarchy for generally accepted accounting principles),* California CPA, July 2008

11. *What's Fair (A discussion of fair value accounting),* California CPA, August 2007

12. *Assessing Risk (An analysis of SASs 104-111, the "suite" of new audit risk assessment standards),* California CPA, June 2006

13. *The Future is Bright for Internal Auditors (An overview of the various roles of an internal auditor),* Candidate Connection, published by the California Society of Certified Public Accountants, Spring 2005

14. *A New Era: Using the Internal Audit to Spot Fraud (An overview of the role of internal audit in detecting or preventing financial statement fraud),* California CPA, May 2005

15. *Revisiting Review Engagements: Public and Nonpublic Companies (A discussion of SAS 100 and SSARS 10, the new standards for a review engagement),* California CPA, November 2004

16. *How the Sarbanes-Oxley Act Has Redefined Auditor Independence (An analysis of the Sarbanes-Oxley Act and its impact on auditors),* California CPA, October 2002

APPENDIX I

**CURRICULUM VITAE OF**
**A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA**

17. *When to Consolidate A Special Purpose Entity (A discussion of Pre-FIN 46 consolidation accounting for SPEs),* California CPA, June 2002

## EXPERT TESTIMONY

1. *William Bonner v. GEICO Indemnity Company et al.* (Superior Court of Alameda County, Case No. RG17879701 (2020)
   - Deposition

2. *Poodles, Inc. et al. v. Roger C. Kuhn et al.* (Superior Court of California – City and County of San Francisco, Case No. CGC-16-550634 (2019)
   - Deposition
   - Trial

3. *Joannie Reyes v. Victory Outreach of Santa Rosa, et al.* (Sonoma County Superior Court, Case No. SCV-261181 (2019)
   - Trial

4. *Chi Hoang v. Vu Nguyen, et al.* (Santa Clara Superior Court, Case No. 16CV300868 (2019)
   - Deposition
   - Trial

5. *Minoo Parsazadeh v. Hampton Health et al. and related Cross-Complaint* (San Francisco Superior Court, Case No. CGC-17-562581) (2019)
   - Deposition

6. *Riptide LLC et al. v. Great Highway Market at al.* (San Francisco Superior Court, Case No. CGC-17-557249) (2019)
   - Deposition

7. *Gilberto Molina Carranza v. N. Gonzalez Farm Labor Service, Inc., et al.* (Kern County Superior Court, Case No. BCV-17-100927) (2019)
   - Deposition
   - Trial

APPENDIX I

**CURRICULUM VITAE OF**
**A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA**

8. *Andrew Huff v. Royal Inn Hotel, et al.* (San Francisco County Superior Court, Case No. CGC-17-556945) (2018)
   - Deposition

9. *Gary Mattes, individually and dba Gary Apiaries v. George Perry and Sons, Inc, et al.* (Superior Court of California, County of San Joaquin, Case No. 39-2013-00304818-CU-PU-STK) (2017)
   - Deposition

10. *Carlos McClatchy v. Gary B. Pruitt; et al.* (Superior Court of the State of California, City and County of San Francisco, Case No. PES-11-294985) (2017)
    - Deposition
    - Trial

11. *Jo Savage et al. v. The Roman Catholic Bishop of Santa Rosa, et al. and related Cross-Complaint* (Superior Court of Sonoma, Case No. SCV-258610) (2017)
    - Deposition
    - Trial

12. *Cal Chef Foods, LLC v. Cold Storage Manufacturing, Inc., et al. and related Cross-Complaint* (Superior Court of Alameda, Case No. HG15784028) (2017)
    - Deposition
    - Arbitration

13. *Darren Wallace, Keith Hart, Mark Leeds, and other employees similarly situated v. City of San Jose* (Northern District Court of California, Case No. 5:16-cv-04914-HRL) (2017)
    - Deposition

14. *Taquerias La Alteña, Inc. v. Hawk Ling Lou, et al.* (San Francisco Superior Court, Case No. CGC-15-547412) (2017)
    - Deposition

15. *LF Centennial Limited v. Z-Line Designs, et al.* (United States District Court, Southern District of California, Case No. 3:16-cv-00929-JM-NLS) (2017)

APPENDIX I

## CURRICULUM VITAE OF
## A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA

- Deposition

16. *Jeff W. Baker v. David R. Baker (JAMS Silicon Valley Reference No. 1100085388)* (2017)
    - Arbitration

17. *California Bureau of Real Estate v. [Respondents]* (2016)
    - Administrative Hearing

18. *Old Trace Partners, L.P., et al. v. Theodore G. Sorensen, et al.* (JAMS Silicon Valley Reference No. 1110017521, Santa Clara Superior Court Case No. 114CV266849) (2016)
    - Deposition
    - Arbitration

19. *Noah Silver-Sky, et al. v. SRAC Holdings I, Inc., et al.* (American Arbitration Association, Commercial Arbitration Tribunal, Case No. 74-160-288-12) (2016)
    - Deposition

20. *Steven Rempell and Marcia Rempell v. Robert Theodore Hofmann, O.C. Jones and Sons, Inc., et al.* (Superior Court, Marin County, Case No. CIV 1302527) (2015)
    - Deposition
    - Trial

21. *Charles Stephen Sanford v. Jacy Leann Rasnick and William Rasnick* (Superior Court, Alameda County, Case No. RG13668115) (2015)
    - Deposition
    - Trial

22. *John J. McAleese, III v. Morgan, Lewis & Bockius LLP, and related Counterclaim* (2015)
    - Arbitration

23. *Yolanda Stokes as Guardian ad Litem of Latrice Captain v. Kmart Corporation, and related Cross-Complaint Kmart Corporation v. Pacific Cycle* (Superior Court, Alameda County, Case No. RG13683700) (2014)

APPENDIX I

**CURRICULUM VITAE OF**
**A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA**

- Deposition
- Trial

24. *Tower Acquisition LLC v. Grace E. Sweningsen, et al. and Related Cross-Complaint* (Superior Court, Alameda County, California, Case No. VG11565045) (2014)
   - Deposition
   - Trial

25. *Newman Flange & Fitting Company v. Fred Hawley and Stephen Bissett, et al.* (Superior Court, County of Stanislaus, Case No. 680979) (2014)
   - Deposition

26. *Tara Ganance and Justin Davis v. California Pacific Medical Center and St. Luke's Hospital, et al.* (Superior Court, County of San Francisco, Case No. GCG-12-521398) (2014)
   - Deposition

27. *7 Dawn LLC, et al. v. Groundswell Development, Inc., et al.* (Superior Court, Alameda County, California, Case No. RG 09444557) (2012)
   - Deposition

28. *Rosario Maiolino v. UnumProvident Corporation* (Superior Court, San Francisco County, California, Case No. 307568) (2006)
   - Deposition

29. *Samuel Quiroz v. Pacific Rim Transport, Inc., Joshua Gruen, et al.* (Superior Court, Alameda County, California, Case No. 2002-039303) (2002)
   - Deposition
   - Trial

30. *Marlene C. Rozett v. UnumProvident Corporation, The Paul Revere Life Insurance Company, et al.* (Superior Court, Santa Clara County, California, Case No. CV788024) (2002)
   - Deposition
   - Trial

**APPENDIX I**

## CURRICULUM VITAE OF
## A. CHRISTINE DAVIS, CPA/CFF, CVA, CGMA

31. *Joan Hangarter v. The Paul Revere Life Insurance Company, UnumProvident Corporation, et al.* (U.S. District Court, Northern District of California, Case No. C99-05286 JL) (2002)
    - Deposition
    - Trial

32. *Wesley Evans and Dr. Joseph Ellis v. Provident Life and Accident Insurance Company, Bay Brook Medical Group, Inc., et al.* (Superior Court, Alameda County, California, Case No. 815688-2) (2001)
    - Deposition