ORIGINAL COPY
(FILED UNDER TEMP SEAL)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, | Case No. 1:20-cv-3538 |
|     Plaintiff, | |
| v. | |
| **RAGINGBULL.COM, LLC**, et al., | |
|     Defendants. | |

**FTC'S RESPONSE TO DEFENDANTS' BUSINESS PLAN**

## TABLE OF CONTENTS

RESPONSE TO BUSINESS PLAN.......................................................................... 1

I.   Relevant Background ................................................................................ 2

II.  Defendants' Business Plan Does Not Address The Fact That Defendants Have
     Refused To Correct Their Unlawful Behavior Despite Years Of Warnings ......... 4

     A.  Defendants Lied to Payment Processors to Obtain Consumers' Payments ........... 4

         1.  *Raging Bull's Merchant Accounts Had High Chargebacks And Were
             Terminated Repeatedly*............................................................................. 5

         2.  *Defendants Lied On Merchant Account Applications*...................................... 7

     B.  Defendants Have Knowingly Relied on Deception To Sell Their Services For
         Years.................................................................................................... 10

     C.  Defendants Tried to Hide Negative Consumer Reviews Online to Continue to
         Perpetuate Their Scheme ......................................................................... 13

III. Defendants' Business Plan Fails to Establish They Can Run This Business
     Lawfully and Profitably ......................................................................... 16

     A.  Defendants Cannot Continue to Advertise with Earnings Claims Because They
         Lack Substantiation and They Fail to Provide an Alternative Value Proposition . 17

     B.  Defendants Provide No Evidence to Support Profit Projections ......................... 20

     C.  Defendants Fail To Provide Key Details About How Their Compliance Reforms
         Will Be Implemented .............................................................................. 23

     D.  Other Aspects of the Business Plan Raise Serious Concerns .............................. 25

     E.  Defendants Fail To Address How They Will Pay For Legal Obligations Resulting
         From Their Prior Conduct......................................................................... 28

IV.  Conclusion ........................................................................................... 31

i

## TABLE OF PLAINTIFF'S EXHIBITS

| Exhibit | Description | PX _, [Page Range] |
|---|---|---|
| PX 1 | Declaration of Abagail Zeviar (consumer) | 1 - 55 |
| PX 2 | Declaration of Alan Adelson (consumer) | 56 - 147 |
| PX 3 | Declaration of Bradley Panek (consumer) | 148 - 152 |
| PX 4 | Declaration of Bruno Roy (witness) | 153 - 288 |
| PX 5 | Declaration of Charles Buckley (consumer) | 289 - 293 |
| PX 6 | Declaration of Danielle Felts (consumer) | 294 - 307 |
| PX 7 | Declaration of Ugo Diribe (consumer) | 308 - 495 |
| PX 8 | Declaration of Dustyann Tyukody (consumer) | 496 - 652 |
| PX 9 | Declaration of George Fotion (consumer) | 653 - 655 |
| PX 10 | Declaration of Hussein Abtidon (consumer) | 656 - 666 |
| PX 11 | Declaration of Joseph Palamara (consumer) | 667 - 783 |
| PX 12 | Declaration of Joseph Webster (consumer) | 784 - 800 |
| PX 13 | Declaration of Jyothish Kaimal (consumer) | 801 - 908 |
| PX 14 | Declaration of Marie Roy (consumer) | 909 - 1224 |
| PX 15 | Declaration of Matthew Arvin (consumer) | 1225 - 1227 |
| PX 16 | Declaration of Michael Oniya (consumer) | 1228 - 1318 |
| PX 17 | Declaration of Nova Holness (consumer) | 1319 - 1346 |
| PX 18 | Declaration of Ronald Martin (consumer) | 1347 - 1351 |
| PX 19 | Declaration of Sydney Budina (consumer) | 1352 - 1457 |
| PX 20 | Declaration of Tracy Forth (consumer) | 1458 - 1461 |
| PX 21 | Declaration of Trina Larson (consumer) | 1462 – 1492 |
| PX 22 | Declaration of Robert Shompe (New Hampshire BBB) | 1493 – 1586 |
| PX 23 | Declaration of Michelle Tavares (FTC Investigator) | 1587 – 1652 |
| PX 24 | Declaration of Emil George (FTC Forensic Accountant) | 1653 – 1683 |
| PX 25 | Declaration of Olivia Pennoyer (FTC Paralegal) | 1684 – 1731 |
| PX 26 | Expert Report of Prof. Russell R. Wermers | 1732 - 1805 |
| PX 27 | Declaration of Reeve Tyndall (FTC Investigator) | 1806 – 3061 |
| PX 28 | Second Declaration of Reeve Tyndall | 3062 – 3100 |
| PX 29 | Third Declaration of Reeve Tyndall | 3101 – 3109 |
| PX 30 | Fourth Declaration of Reeve Tyndall | 3110 - 3116 |
| PX 31 | Declaration of Roshni C. Agarwal (FTC Forensic Accountant) | 3117 - 3119 |
| PX 32 | Declaration of Kenneth Babikan (consumer) | 3120 - 3135 |
| PX 33 | Declaration of Robert Biello (consumer) | 3136 |
| PX 34 | Declaration of Donnie Durham (consumer) | 3137 - 3141 |
| PX 35 | Declaration of Elise Klein (consumer) | 3142 - 3178 |
| PX 36 | Declaration of Mark Macsenti (consumer) | 3179 - 3191 |
| PX 37 | Declaration of Mike Jean Pierre (consumer) | 3192 - 3196 |
| PX 38 | Declaration of Robert Sigler (consumer) | 3197 - 3234 |
| PX 39 | Declaration of Gary Walton (consumer) | 3235 - 3240 |
| PX 40 | Declaration of E.C. Wells (consumer) | 3241 - 3246 |

| PX 41 | Declaration of David Wrape (consumer) | 3247 - 3251 |
| PX 42 | Second Declaration of Emil George | 3252 - 3292 |
| PX 43 | Second Declaration of Olivia Pennoyer | 3293 - 3320 |
| PX 44 | Fifth Declaration of Reeve Tyndall | 3321 - 4579 |
| PX 45 | Rebuttal Report of Prof. Russell R. Wermers | 4580 - 4622 |
| PX 46 | Declaration of Emil George | 4623 - 4629 |
| PX 47 | Sixth Declaration of Reeve Tyndall | 4630 - 4773 |

**Notes on exhibits:** All exhibits cited in the FTC' motions and memoranda submitted with this filing (or previously submitted to the Court in this case) are referenced above as "PX [exhibit number]." References include citations to relevant paragraphs by number, and to relevant attachments by page number. The pages of the FTC's exhibits are consecutively numbered.

<u>**TABLE OF REFERENCED FILINGS**</u>

| ECF No. | Filing |
| --- | --- |
| 2-1 | FTC's Memorandum in Support of a TRO |
| 21 | Signed TRO |
| 123 | Defendants' Opposition to the PI |
| 145 | FTC's Reply in Support of a PI |
| 145-2 | FTC's Proposed PI |
| 156 | Receiver's Report |
| 165 | Order Vacating Hearing and Requesting Briefing Schedule |
| 176 | Defendants' Notice of Filing Business Plan |
| 177 | Defendants' Business Plan |
| 177-1 | Attachment A to Defendants' Business Plan |
| 177-2 | Attachment B to Defendants' Business Plan |
| 179 | Supplemental Attachment to Defendants' Business Plan |

### RESPONSE TO BUSINESS PLAN

Per this Court's order of February 4, 2021, ECF No. 165, FTC submits this Response to RagingBull.com, LLC's Business Plan and supporting documents filed by Defendants RagingBull.com, LLC, Jason Bond and Jeff Bishop (collectively, "Defendants"), ECF Nos. 176, 177, 177-1, 177-2 and 179. RagingBull.com, LLC's Business Plan ("Plan;" ECF No. 177) is just as speculative and unsupported as the earnings claims Defendants have persisted in making for years, despite knowledge that consumers were being harmed. Defendants ask this Court to let them invest consumers' money—the money they have obtained through deception—into a new business venture that would have to be unlike any they have ever before operated. Yet they offer no credible evidence to support their assertion that such a business would be profitable, and few assurances they will not continue to violate the law in an effort to make ends meet.

As explained below, the FTC has discovered that Defendants lied to payment processors to maintain their access to the credit card networks after Defendants' merchant accounts were repeatedly terminated. Furthermore, the Temporary Receiver's investigation confirmed that Defendants have spent years making unlawful earnings claims and defrauding consumers. During the COVID-19 pandemic in particular, Defendants bilked consumers out of tens of millions of dollars before the Court entered a temporary restraining order ("TRO") in this matter, and many consumers lost sorely-needed savings when trying to follow Defendants' investment recommendations and advice. Defendants have engaged in their unlawful conduct for years, despite numerous consumer complaints, multiple law enforcement investigations, and warnings from the Better Business Bureau.

Given their refusal or inability to operate lawfully in the past, Defendants have a difficult burden to establish that they would be able to create a new business that would operate lawfully and profitably. The FTC had hoped that the Plan would also demonstrate how Defendants could make injured consumers whole in the process. As explained below, Defendants' submission does not adequately address this heavy burden, and the FTC respectfully submits that this is because

1

they would in fact be entirely unable to meet it. The FTC respectfully requests this Court enter the FTC's proposed preliminary injunction, ECF No. 145-2, which would appoint a Receiver over the Raging Bull operation in order to preserve and marshal the corporate assets for redress of consumers harmed by Defendants' deceptive practices.

## I.  Relevant Background

Substantial evidence demonstrates that, for years, Defendants have operated a deceptive scheme that used unsubstantiated and false earnings claims to sell their investment services. The evidence shows Defendants' marketing was replete with explicit and implicit representations that purchasers of their services were likely to make substantial income.[1]  Sworn consumer declarations show that consumers purchased because they believed that Defendants' services would help them make money.[2]  Defendants never had substantiation to support such claims.

As one of Raging Bull's own "gurus" described it, "Raging Bull's advertising is … designed to elicit responses from consumers who want fast money,"[3] and he was "unsure" if the company could survive without earnings claims and trade alerts.[4]  After reviewing a sample of Raging Bull's advertising on one internet platform, the Temporary Receiver found the "overwhelming majority" focused on the "gurus'" wealth and the idea that subscribers could realize similar gains with Raging Bull's services.[5]  This is consistent with the FTC's findings.[6]  The Temporary Receiver also noted that "more than 2/3 of the marketing emails the receivership

---

[1] Defendants' deceptive earnings claims designed to convince consumers to purchase their services were ubiquitous throughout their marketing, including in promotional videos for their services, email marketing, websites and sales pages. PX 43, Att. A., pp. 3299-3320.

[2] ECF No. 145 at 14 n.65; *see also* ECF No. 156 at 58 (noting "[m]any" consumers "have indicated that they decided to subscribe to Raging Bull because they believed that they could achieve profits like those described in Raging Bull's ads and that they could do so quickly and with little effort.").

[3] ECF No. 156 at 45 (recounting interview with Nathan Bear); *see, e.g.,* PX 27, ¶ 24, Att. OO, 2150 ("[Y]ou can literally look over my shoulder and pay you back [sic][piggyback] on the trades with doing nothing more than picking up that spoon and taking a bite of that sweet honey.").

[4] ECF No. 156 at 45-46.

[5] *Id.* at 53-54.

[6] PX 43, pp. 3299-3320; *see generally* PX 27.

team reviewed" made deceptive earnings claims of the types alleged by the FTC, and that such claims have been "a prominent feature of the Company's advertising."[7]

The Temporary Receiver also disagreed with Defendants' attempts to characterize their past advertising as having an educational focus, noting the ads instead "herald[ed] 'consistent profits, week after week after week,' '100% profits each week,' and breakthroughs 'poised to . . . ignite your profits into uncharted territories.'"[8]  Consistently, the "focal point" of Raging Bull's advertising has been "the real-time trade alerts, live streaming services, and weekly watch lists, which Raging Bull claims are based on strategies that [purportedly] result in 'money doubling potential.'"[9]  For some customers, what "entices" them to subscribe "is not Raging Bull's educational content," but the idea that "all they have to do is follow the trade alerts of the instructors in order to make profits."[10]  Defendant Jeff Bishop, Raging Bull's CEO, has even advertised the fact that his service, Bullseye Trades, was "not a training course,"[11] a statement representative of numerous ads that emphasize how little time and effort is required for consumers to profit using Raging Bull's services, if consumers merely follow the alerts.[12]

On the strength of the FTC's initial evidence, this Court entered a TRO on December 7, 2020, ECF No. 21, barring Defendants from using such claims, requiring Defendants to disclose their assets, and freezing or ordering the preservation of those assets for potential redress to consumers injured by Defendants' deception. After briefing on the FTC's motion for a preliminary injunction was complete, the Court directed Defendants to submit a brief describing

---

[7] ECF No. 156 at 57.

[8] *Id.* at 58.

[9] *Id.* at 46.

[10] *Id.* at 51; *see also, e.g.,* PX 1 ¶ 3; PX 3 ¶ 4; PX 5 ¶¶ 2; PX 7 ¶ 4, 6; PX 8 ¶ 3; PX 10 ¶ 2; PX 15 ¶ 3; PX 17 ¶ 3; PX 18 ¶ 2; PX 19 ¶ 4; PX 21 ¶ 4.

[11] ECF No. 156 at 58.

[12] *Id.* at 58, 45; *see also* ECF 2-1 at 14-15; PX 27, Att. OO, p. 1971 (Bishop: "[i]f you can't make money with it, then what's the point?"); *id.* p. 2148 ("JEFF BISHOP: So you're sending the actual video of how to make the trade that you're making? JASON BOND: Yeah, all of them. JEFF BISHOP: It's like spoon-feeding profits. JASON BOND: Exactly. That's what clients pay for.").

a proposed business plan, explaining how Defendants could operate legally and profitably during the pendency of this case. ECF No. 165. Defendants submitted their plan in response to the Court's order. ECF Nos. 176, 177.

For the reasons set forth below, this Court should not permit Raging Bull to restart operations. Instead the FTC respectfully requests that the Court issue the proposed preliminary injunction, ECF No. 145-2, and appoint a Permanent Receiver to preserve and marshal the limited assets remaining for consumer redress.

## II.     Defendants' Business Plan Does Not Address The Fact That Defendants Have Refused To Correct Their Unlawful Behavior Despite Years Of Warnings

In their brief describing their proposed business plan, Defendants wholly fail to grapple with their prior activities, let alone present evidence or plans about how they would undertake the massive changes needed to operative lawfully and profitably. Defendants operated deceptively for years, despite numerous consumer complaints, negative online reviews, law enforcement investigations, and warnings from payment processors and vendors. Rather than amend their practices and act lawfully, Defendants chose to continue marketing their services with false and unsubstantiated claims and failed to provide a simple mechanism for consumers to cancel. Even after their merchant accounts were repeatedly terminated, Defendants continued their unlawful practices. In the process, they bilked consumers out of over $196 million.[13]

### A.     Defendants Lied to Payment Processors to Obtain Consumers' Payments

The FTC has uncovered that, after their merchant accounts were terminated, Defendants resorted to lying on merchant account applications they submitted in order to keep accepting

---

[13] PX 46, ¶ 8. The FTC originally estimated the consumer harm resulting from Raging Bull's deceptive practices to be over $137 million. PX 24, ¶ 10; ECF No. 1 ¶ 6. This initial estimate was based on a review of Defendants' bank records from April 2017 through May 2020. *Id*. Based on a review of additional bank records obtained since the FTC first filed, the FTC now estimates consumer injury to be over $196 million, for the time period from April 2017 through November 2020. PX 46, ¶ 8. This estimate does not take into account the consumer harm that occurred prior to April 2017, as the FTC has not obtained those records at this time. Between July and November 2020—during the pandemic, and at a time of record unemployment— Defendants took $40,438,501 from consumers. *Id*. at ¶ 9. At the same time, Raging Bull took out a Paycheck Protection Program loan in April 2020. *See* ECF No. 156 at 12-13.

consumers' credit card payments. Raging Bull accepted the vast majority of consumers' payments via credit card, primarily through merchant accounts it established with banks and payment processors.[14] But Raging Bull's deceptive business model made it difficult for the company to access the credit card networks, as its merchant accounts were terminated repeatedly.

### 1. Raging Bull's Merchant Accounts Had High Chargebacks And Were Terminated Repeatedly

Many disgruntled Raging Bull consumers sought to recoup their credit card payments by filing disputes known as "chargebacks."[15] A high rate of chargebacks is a common indicator of fraud.[16] Until July of 2019, Raging Bull primarily relied on Bank of America to process consumers' credit card payments. But Bank of America and its processor, First Data Merchant Services (now known as "Fiserv"), repeatedly raised concerns with Raging Bull that consumer chargebacks were high.[17] On January 30, 2018, a First Data representative emailed Jordan Reyna[18] of Raging Bull, noting high chargeback rates and asking what the company was doing to address the problem.[19] On May 22, 2018, a First Data representative emailed Jordan Reyna regarding an upcoming call: "The main talking point of the call will be chargebacks. The levels have been extremely high for a long time. The analyst who preceded me, Rosemarie, was even

---

[14] PX 46, ¶ 8.

[15] *See* PX 47, Att. A, pp. 4710-14, PX 47, Att. A, p. 4716; PX 47, Att. A, pp. 4689-99.

[16] *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1075-76 (C.D. Cal. 2012) *aff'd in part, vacated in part, remanded*, 815 F.3d 593 (9th Cir. 2016) (high chargeback rates are an indicator of fraud); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1222 (D. Nev. 2011) *aff'd in part, vacated in part* 763 F.3d 1094 (9th Cir. 2014) (same).

[17] PX 47, Att. A, pp. 4710-14.

[18] Jordan Reyna was Raging Bull's Director of Finance and reported directly to Defendant Jeff Bishop, partial owner and CEO. Reyna was involved in the opening and maintenance of Raging Bull's merchant accounts.

[19] The representative noted: "Chargeback levels for the last few months are as follows:

- Oct 2017 – 7.18% by volume, 5.66% by count

- Nov 2017 – 4.72% by volume, 3.19% by count

- Dec 2017 – 1.64% by volume, 2.24% by count

- Jan 2018 – 3.64% by volume, 4.57% by count." PX 47, Att. A, p. 4711. Historically, chargeback rates of 1% or more triggered the fraud monitoring programs of the credit card networks. *See Commerce Planet, Inc.*, 878 F. Supp. 2d at 1075-76.

working with you guys to reduce chargebacks, but levels remain high."[20]  In early 2019, First Data informed Reyna that the credit card company Discover had terminated Raging Bull's access to the Discover network, based on Discover's own research and "cardholder complaints."[21] Ultimately, Bank of America informed Raging Bull that it would terminate Raging Bull's merchant account on a phone call with Jordan Reyna on July 2, 2019.[22]  Reyna received the Bank of America termination notice via email that day; he then forwarded the termination letter to Jeff Bishop.[23]

After Bank of America notified Raging Bull that its account would be closed, Raging Bull used Stripe, a payment processor, to continue to accept consumer's credit card payments. But Raging Bull was concerned about its ability to continue to access the credit card networks. In a March 2020 email, Raging Bull employee Jordan Reyna reported on the challenges the company faced in obtaining merchant accounts:

> Right now, I'm in talks with Balanced Processing, SMB Global and Nuvei. They have all been in process the past few months with a lot of back and forth on merchant and credit card requirements for them to do business with us.
>
> To be 100% honest with you, each of them have [sic] been challenging to work with and we haven't even started processing with them.[24]

Reyna then explained that the company was making all these efforts out of concern that their main payment processor, Stripe, would terminate Raging Bull's account.[25]

Raging Bull had good reason for its concern that Stripe might terminate it, too. On August 28, 2020, Raging Bull was notified that the company's Stripe account was placed on

---

[20] PX 47, Att. A, p. 4710.

[21] PX 47, Att. A, p. 4707.

[22] PX 47, Att. A, p. 4743.

[23] PX 47, Att. A, p. 4743-45.

[24] PX 47, Att. A, p. 4702.

[25] PX 47, Att. A, p. 4702 ("[t]his was all to have a backup processor in case Stripe decided to part ways for any reason.").

Mastercard's Excessive Chargeback Monitoring Program.[26]  Shortly thereafter, on September 11, 2020, Stripe notified the company that it would terminate Raging Bull's merchant account.[27]  On September 22, 2020, the processor Nuvei asked Raging Bull to explain a spike in chargebacks on the account it had opened for the company just six months earlier; a week later it also terminated Raging Bull's account.[28]  And on October 5, 2020, WePay—another Raging Bull payment processor—terminated a Raging Bull account that was open for only a few weeks.[29]  WePay informed Raging Bull that it did this because Raging Bull had a "high risk for chargebacks."[30]

### 2.    Defendants Lied On Merchant Account Applications

Rather than reform the deceptive practices that concerned its payment processors and the customers filing chargebacks, Raging Bull employed subterfuge in an effort to maintain access to the credit card networks and consumers' money. In December 2019, in response to the payment processor Nuvei's inquiry about whether Raging Bull's earnings claims were substantiated, Jordan Reyna falsely responded: "We collect proof from client testimonials before we utilize them as marketing materials. We aim to maintain the highest ethical standards and that has served our business well and separated us from the competition."[31]  In fact, Raging Bull has admitted in this litigation that it "does not verify the income claims of its subscribers."[32]

In that same email, Reyna also did not disclose that Bank of America had in fact terminated Raging Bull's merchant account, despite being asked about the status of that account. Nuvei posed the following question (through a sales agent): "[i]t appears that before August [2019], the merchant processing [sic] a substantial amount through their Bank of America merchant account. Please clarify the merchants [sic] current relationship with Bank of America.

---

[26] PX 47, Att. A, p. 4716.

[27] PX 47, Att. A, p. 4700.

[28] PX 47, Att. A, pp. 4689-99; 4746-48.

[29] PX 47, Att. A, pp. 4680-4681.

[30] PX 47, Att. A, p. 4679.

[31] PX 47, Att. A, p. 4703.

[32] ECF No. 123 at 37.

Will they be opening a third merchant account through Nuvei or transferring volume?" In response, Reyna did not disclose that Bank of America had sent Raging Bull a termination letter in July of 2019, requiring the company to find another processor by August. Instead, Reyna stated:

> [w]e were working with Bank of America from the launch of RagingBull through the end of last year. Their small business online features were very limited and not user friendly. We ultimately decided to move banks over to Chase and have been much more pleased with their support, feature rich small biz dashboard and timelines of implementation. Bank of America was a positive relationship, but we simply outgrew what they had to offer.[33]

Nuvei ultimately opened a merchant account for Raging Bull.

In four separate merchant applications for merchant accounts completed in September and October of 2020—at a point when Discover, Bank of America and Stripe had already terminated the company's accounts—Raging Bull falsely stated that the company had not previously had a merchant account terminated:

1) On September 23, 2020, in response to the following question on a merchant account application: "[h]as Merchant or any Principal been terminated as a Visa / MasterCard Merchant (TMF)?" Raging Bull responded "No." The application also inquired as to the reason Raging Bull left its current acquiring bank; Raging Bull responded: "[p]oor service and support, does not facilitate growth." Defendant Jeff Bishop signed the application.[34]

2) On September 24, 2020, on another merchant account application, Raging Bull stated that the company's previous processor was Stripe. When asked why they left, Raging Bull checked boxes for "service" and "rate;" but did not check the box for "terminated." Defendants Jeff Bishop and Jason Bond signed the application.[35]

3) In another application signed by Defendants Jeff Bishop and Jason Bond on October 1, 2020, in response to the following question: "[h]ave merchant or owners /

---

[33] PX 47, Att. A, p. 4703.

[34] PX 47, Att. A, p. 4684 (merchant application for Fresno First Bank; Base Commerce was the processor).

[35] PX 47, Att. A, pp. 4736-37 (merchant application for Westamerica Bank; BankCard USA Merchant Services, Inc. was the processor).

principals ever been terminated from accepting bankcards for this business or any
other businesses?"  Raging Bull checked the box for "no."[36]

4)  In response to the following question on a merchant application: "Have you ever been
    terminated from accepting bankcards?"  Raging Bull checked the box for "No."
    Bishop and Bond signed the application on October 2, 2020.[37]

Defendants also misrepresented their refund policy in applications for merchant accounts

in the fall of 2020. In six merchant applications completed between September and October

2020, the company variously stated that Raging Bull: (1) had a no refund policy, (2) had a thirty-

day refund policy, or (3) had a full refund policy:

| September 23, 2020 | In response to an application question about its return policy, Raging Bull stated: "no refunds."[38] |
| September 24, 2020 | In response to an application question about its return policy, Raging Bull checked the "full refund" box.[39] |
| September 28, 2020 | In response to an application question about its return policy, Raging Bull stated: "full refund."[40] |
| October 1, 2020 | In response to an application question about its return policy, Raging Bull stated "no refunds."[41] |
| October 2, 2020 | In response to an application question about its return policy, Raging Bull stated "no refund."[42] |
| October 20, 2020 | In response to an application question about its return policy, Raging Bull stated "Refund in 30 days or less."[43] |

---

[36] PX 47, Att. C, p. 4759 (merchant application for Avidia Bank; Maverick Bankcard, Inc. was
the processor).

[37] PX 47, Att. B, p. 4749 (merchant application for Evolve Bank & Trust; Cardflex, Inc., d/b/a
Cliq was the processor).

[38] PX 47, Att. A, p. 4685 (merchant application for Fresno First Bank; Base Commerce was the
processor). The application was signed by Defendants Bishop and Bond. *Id.* p. 4687.

[39] PX 47, Att. A, pp. 4737 (merchant application for Westamerica Bank; BankCard USA
Merchant Services, Inc. was the processor). The application was signed by Defendants Bishop
and Bond. PX 47, Att. A, pp. 4737.

[40] PX 47, Att. A, 4726 (merchant application for Synovus Bank; Priority Payment Systems was
the processor). The application was signed by Defendants Bishop and Bond. PX 47, Att. A, pp.
4729.

[41] PX 47, Att. C, p. 4759 (merchant application for Avidia Bank; Maverick Bankcard, Inc. was
the processor). The application was signed by Defendants Bishop and Bond. *Id.* p. 4760.

[42] PX 47, Att. B, p. 4749 (merchant application for Evolve Bank & Trust; Cardflex, Inc., d/b/a
Cliq was the processor). The application was signed by Defendants Bishop and Bond. *Id.* p.
4752.

In communications with the Better Business Bureau and consumers, both before and after submitting these merchant account applications, however, Raging Bull stated that it had a policy of not providing refunds to consumers.[44] An FTC investigator reviewed the terms and conditions of Raging Bull products online, and found that all provided that Raging Bull would not provide consumer refunds.[45] Raging Bull's statements to payment processors claiming otherwise were false.

### B. Defendants Have Knowingly Relied on Deception To Sell Their Services For Years

Despite knowing from the company's earliest days that customers were not getting what they paid for and were being harmed by Raging Bull's policies and practices, Defendants did little if anything to change. Defendants started operating in 2014 under the name Lighthouse Media, then changed the corporate name to RagingBull.com, LLC December 8, 2016. On December 14, 2016, an employee at Raging Bull sent an email to Bishop arguing that Defendants could work with a third party to help with "DAMAGE CONTROL on bad past pr," which had already become a problem for the company. The employee suggested they could improve transparency with clients about issues like the "refund policy/don't mirror trades, learn and develop your own style" and "not playing stockbroker by advising them."[46] Evidently, Raging Bull did not change its practices, because up until the entry of this Court's TRO, consumers continued to complain about deception in regard to these same issues.[47]

Defendants knew that their marketing relied on deceptive claims in order to convince consumers to purchase their services, and they continued to employ such practices despite

---

[43] PX 47, Att. A, p. 4718 (merchant application for Commercial Bank of California; Electronic Commerce was the processor). Defendant Bishop signed the application. *Id*. p. 4720.

[44] On September 15, 2020, Michael Bowers, Raging Bull's Director of Client Services, informed the New Hampshire Better Business Bureau that Raging Bull has "a no refund policy." PX 44, p. 3446. On December 3, 2020, Raging Bull informed a consumer: "RagingBull has a strict no refund policy" PX 47, Att. A, pp. 4714-15.

[45] PX 47 ¶¶ 2-4.

[46] PX 44, Att. P, p. 3443.

[47] *See* PX 43, Att. A, pp. 3299-3320.

internal resistance. On July 21, 2017, one of Raging Bull's contractors, Barry Bensa, reached out to Petra Hess, a Raging Bull "guru" at the time, to discuss writing a promotional sales letter on her behalf for her Raging Bull services. Petra said to the contractor, "[i]f you're going to write one of those hypey, smoke and mirrors sales letters I get all the time and immediately delete, I will not approve it." The contractor emailed Bishop about this communication and Bishop forwarded to Bond stating, "Petra giving Barry a hard time here. She doesn't feel the need to sell I guess?" After some back and forth, Bishop stated, "I'm putting Barry to work with someone else who doesn't care about hype as long as it sells."[48]

Soon after this exchange, on September 8, 2017, the Better Business Bureau ("BBB") sent Jason Bond Picks a letter seeking substantiation for Raging Bull's earnings claims and informing the company of complaints regarding consumers' difficulties cancelling and receiving refunds. This letter spelled out the BBB's Code of Advertising and set forth advertisers' responsibilities, including the requirement to possess substantiation at the time claims are made.[49] It also cited to a particular Raging Bull advertisement and asked for substantiation. Specifically, it asked "if the advertised claims are typical results of customers who use the service" and, if they were not, the BBB asked for the typical experience of customers using the service.[50] In addition, the letter pointed out that the BBB received numerous complaints about Defendants, in which consumers "allege they either call or go online to cancel their subscriptions to Jason Bond Picks. However, they are still charged for their services and refunds are declined

---

[48] PX 47, Att. A, p. 4632-35.

[49] *See* PX 44, Att. P, pp. 3439-41. Specifically, "Advertisers should be prepared to substantiate any objective claims or offers made before publication or broadcast. Upon request, they should present such substantiation promptly to the advertising medium or BBB. Misrepresentation may result not only from direct statements, but by omitting or obscuring a material fact. Additionally, the testimonials and endorsements section of the Code states in general, advertising which uses testimonials or endorsements is likely to mislead or confuse if a consumer's experience represented in an advertisement is not the typical experience of those using the product or service, unless the advertisement clearly and conspicuously discloses what the expected results will be." *Id.* p. 3439-40.

[50] *Id*. p. 3440.

to the consumers due to them not cancelling within the contracted time frame."[51]  Defendants
never bothered responding to this letter.[52]  Instead, they continued to use earnings claims they
could not substantiate,[53] and failed to provide a simple mechanism for consumers to cancel their
subscriptions up until the date the FTC filed this lawsuit.[54]

In 2018 and 2019, Defendants became aware of two separate and independent
government investigations into their advertising and investment advice activities—one by the
Securities and Exchange Commission ("SEC"), and one by the New Hampshire Department of
State's Bureau of Securities Regulation ("NHSB").[55]  These agencies alerted Raging Bull to
various concerns with its practices, including that Raging Bull made performance guarantees and
posted false advertising images that gave the impression Defendants were successful millionaire
traders. After learning of these investigations and the specific concerns raised, Defendants did
not meaningfully change any of the challenged practices and continued to aggressively sell their
services using false and unsubstantiated earnings claims.

Defendants' unlawful acts continued without pause until entry of the TRO in this matter.
From at least 2017 through 2020, Defendants received hundreds of complaints from consumers
directly, from TrustPilot, and from the BBB.[56]  These included, among other things, complaints
about consumers losing money, their inability to follow and make money from Defendants' trade
alerts, their inability to obtain a refund, their inability to cancel, and requests for substantiation.
None of these gave Defendants pause. Despite years of complaints, negative reviews, and
warnings, Defendants chose to continue in their practices; in the process, they raked in nearly
$200 million from the consumers they were harming.[57]

---

[51] *Id.* pp. 3439-3441.

[52] PX 22, Att. C, p. 1553.

[53] ECF No. 156 at 35-36, 60.

[54] ECF No. 2-1 at 25-28 & n.133.

[55] ECF No. 123 at 14.

[56] *See, e.g.*, PX 44, Att. O, pp. 3340-3407, Att. P, pp. 3408-3848; PX 47, Att. A, p. 4645.

[57] PX 46, ¶ 8.

C.   **Defendants Tried to Hide Negative Consumer Reviews Online to Continue to Perpetuate Their Scheme**

Rather than heeding the complaints they were getting from consumers and reading in negative online reviews, Defendants adopted a combative approach toward their customers and actively tried to suppress negative reviews.[58]  This allowed Defendants to continue to operate their scheme and attract new customers, despite many consumer complaints online about Raging Bull's deceptive practices.

On April 21, 2020, the online review platform TrustPilot sent Raging Bull an email pushing back on Defendants' practice of flagging and reporting negative reviews without justification in order to get them taken down. The email stated:

> If a reviewer can document a genuine buying or service experience **and/or** their review doesn't contravene our guidelines for the reason that it has been reported, we have no basis on which to remove it or ask the reviewer to edit it. While we understand that this can be frustrating for companies, we have to reinstate the review on TrustPilot.[59]

Subsequently, TrustPilot warned Defendant Jeff Bishop that Raging Bull was misusing its reporting tool and referenced complaints Raging Bull reported without justification between January 30, 2020 and April 30, 2020 for jasonbondpicks.com.[60]

Despite TrustPilot's warning, on September 6, 2020, after receiving a 1-star review, Bishop emailed Raging Bull staff, writing: "I don't know who manages RB responses, but we need to stay on top of these. If we can't get rid of them, we need to combat them with responses about why what they are claiming isn't true or makes no sense. We can't leave things like this unattended."[61]  Three days later, on September 9, after another 1-star review, Bishop again emailed Raging Bull staff, saying "[w]e need to come up with a plan to get our top members to

---

[58] ECF No. 145 at 15-18; PX 47, Att. A, pp. 4638-40, 4643-44, 4646-48.

[59] PX 47, Att. A, p. 4653.

[60] PX 47, Att. D, pp. 4772-4773.

[61] PX 44, Att. P, p. 3453.

submit some positive reviews and keep contesting the unverified ones like this."[62]  On

September 20, 2020, TrustPilot suspended Raging Bull's access to their reporting tool for

jasonbondpicks.com between September 21, 2020 through October 5, 2020, stating "[d]espite

our previous warning, you continued to misuse our reporting tool and violate our Guidelines for

Businesses."[63]

On October 5, 2020, the same day their suspension was ending, TrustPilot sent Bishop an

email telling him that they noticed his account has reported "quite a few reviews lately." The

email discussed ways to turn negative reviews into an advantage and provided links to

suggestions. The email also stated, "Be fair and don't report reviews simply because they're

negative."[64]  Yet, Raging Bull continued its practices. On October 12, 2020, the Director of

Operations at Raging Bull emailed the company's TrustPilot representative stating that "any

reviews with the word "scam" should be automatically removed from my understanding?  How

would I go about getting those down/reported."[65]  On October 23, 2020, TrustPilot again warned

Raging Bull, stating it was violating its terms of service by making invalid reports of 1-2 star

reviews between July 24, 2020 and October 24, 2020 for the domain ragingbull.com.[66]  Despite

multiple warnings, Defendants maintained their improper practices and continued to attempt to

suppress negative reviews.

Not only did Defendants attempt to suppress their customers' complaints, but they also

showed utter contempt for their customers.[67]  For example, one consumer who purchased

---

[62] *Id*. p. 3450.

[63] PX 47, Att. A, p. 4649.

[64] *Id*. p. 4645.

[65] *Id*. p. 4642. An email from July 2020 shows Defendants routinely flagged reviews with the word scam. Despite a negative review that very specifically described the programs the consumer purchased, his inability to obtain the 30 day money back guarantee, his losses—in the thousands—by following Bishop's trade alerts, and Raging Bull's aggressive email and webinar marketing, the Director of Operations exclaimed that "the word scam means it can automatically come down!"  Another employee responded with heart emojis. *Id*. p. 4651.

[66] PX 44, Att. P., p. 3444-45.

[67] *See* ECF No. 145 at 15-18.

Dennis's Fast 5 Trades service complained about the inability to reach anyone to receive the promised 30 day money back guarantee.[68]  Bishop forwarded this email to Raging Bull staff and responded by saying, "This person either needs to be deleted or totally humiliated in a response from us for their stupidity."[69]  Another consumer left a review complaining that he could not get a refund after he purchased a service with a 30 day refund guarantee. Bishop forwarded this to Raging Bull staff and responded by stating, "Take the time to break down their complaint to the point where it just looks stupid they would even be posting this."[70]

Each time Defendants were confronted with the consequences of their deceptive practices, Defendants had a choice. And, over and over again, they chose to continue making false and unsubstantiated earnings claims to consumers, and pursued a strategy of:

- lying to payment processors;

- adhering to a strict no refund policy, despite making contrary statements to payment processors and consumers;

- forcing consumers to switch services rather than refunding[71];

- failing to provide consumers a simple mechanism to cancel[72]; and then

- actively suppressing negative reviews and complaints.

---

[68] PX 47, Att. A, 4638-41. Despite promising this money back guarantee in a handful of their products, the evidence shows that Defendants made it difficult if not impossible for consumers to actually obtain their money back. *See, e.g.*, PX 9, ¶¶ 6-7; PX 12, ¶¶ 11-14; PX 40, ¶ 3PX 27, ¶¶ 56-59; PX 47, Att. A, pp. 4655-4678.

[69] PX 47, Att. A, p. 4640. Another consumer complained that the marketing videos make it appear "they have nothing but huge gains but in reality that's far from the truth," "they will constantly harass you to keep buying more and more services," and "when you contact customer service and call them out on all their bold claims they tell you this is just for educational purposes only." *Id.* pp. 4643-44. Despite many other consumers complaining about these very issues, Bishop forwarded this to Raging Bull staff and responded "This one guy keeps trolling our account. I don't know if he's getting removed all the time but it's definitely bad for us as he constantly suggests to people they turn us into the authorities. We gotta stop that." *Id.* p. 4643.

[70] *Id.* p. 4647.

[71] ECF No. 145 at 15 n.67.

[72] *Id.* at 21 n.98.

These are not the actions of business owners who will come into compliance with the law, maintain their compliance over time, and treat consumers with honesty and fairness in the future. These are the actions of people who consistently have chosen profit over truth.

### III.   Defendants' Business Plan Fails to Establish They Can Run This Business Lawfully and Profitably

Defendants' business plan is inadequate and unsupported. Broadly, the Plan proposes to reinitiate operations in two phases. ECF No. 177 at 1. During Phase 1, over the course of approximately 60 days, the company would begin to reorganize itself, invest in compliance infrastructure and customer support, and resume operations with respect to existing subscriptions. *Id*. at 1, 9-11. The Company would also support a Court-appointed Compliance Monitor in establishing audit procedures. *Id*. at 1, 12. During Phase 2, the Company proposes to begin marketing to new customers and resume full operations under supervision of the Monitor. *Id*. at 1, 13.

Little detail is provided on how Raging Bull will implement these broad plans or why Raging Bull believes it will be profitable or lawful. As described below, the Plan fails to answer the most fundamental questions facing the company: (1) how will it advertise without unlawful earnings claims?; and (2) why is this company—which has relied entirely on such claims to make sales in the past—certain it will survive that transformation?  Raging Bull seems to expect that it can continue to sell its products with earnings claims in Phase 2 as long as those claims are reviewed by a Monitor and compliance personnel. But Raging Bull fails to recognize it cannot use earnings claims at all without substantiation—it has none.

Raging Bull provides no plan for how it will develop substantiation, which if feasible would take significant time; nor does it provide an alternative plan for advertising. Without an explanation of what the company's new value proposition will be without earnings claims, Raging Bull's profit projections are baseless. The Plan also fails to explain how other key changes will be implemented, reading more like a recitation of the Temporary Receiver's recommendations rather than as a hard analysis that the Company has actually thought through

and researched. Worse yet, parts of the Plan suggest the company intends to continue operating in ways that harm consumers, and the Plan makes no mention of how Raging Bull will make whole its former customers harmed by the company's panoply of law violations.

Defendants ask the Court to earmark millions of dollars wrongfully taken from consumers through blatant deception—including the $10.75 million from frozen funds and "up to $10 million of their personal assets" that Bishop and Bond offer to invest[73]—and permit them to use it to run this speculative enterprise. The evidence strongly counsels against doing so.

### A.    Defendants Cannot Continue to Advertise with Earnings Claims Because They Lack Substantiation and They Fail to Provide an Alternative Value Proposition

Defendants' proposed business plan appears to anticipate using earnings claims, but fails to address the fact that Raging Bull lacks the substantiation necessary to make such claims. Defendants' Plan also fails to explain how they will develop the substantiation needed to make earnings claims, or to articulate an alternative value proposition that does not involve telling consumers they can make money. Defendants only propose to cease using "earnings claims, consumer testimonials, or any misrepresentations of any type regarding the Company's services" for the first sixty days of operation, during Phase 1. ECF No. 177 at 9. After that point, Defendants anticipate continuing to make earnings claims under the review of a court-appointed Monitor and new compliance personnel.[74]

No amount of review can fix the underlying problem: Defendants cannot make earnings claims without substantiation.[75]  Even claims that are literally true—for example, a truthful statement that a "guru" made a certain amount of money or that a past trade achieved certain profits—can easily be deceptive if they create a false or unsubstantiated net impression that a

---

[73] ECF No. 177 at 14-15.

[74] *See* ECF No. 177 at 9-13 (mentioning review procedures, but not promising to cease earnings claims during Phase 2).

[75] *Grant Connect*, 827 F. Supp. 2d at 1214*; Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 298 (D. Mass. 2008).

typical consumer can expect similar profits.[76]  This applies to both express and implied claims,

including testimonials that represent certain profits as typical.[77]

Raging Bull does not have substantiation to support earnings claims. When interviewed

by the Temporary Receiver, Bishop admitted "that Raging Bull has never systematically

reviewed its "gurus'" track records with the trading strategies that Raging Bull markets to the

public," much less the track record of consumers using the service, and in fact, "Mr. Bishop was

not even aware of the track record of the trade ideas pitched by his own service."[78]  Nor do

Defendants have substantiation that the (unverified) consumer testimonials they used were

representative of typical consumers' results.[79]  Yet, as Bishop admitted in internal

correspondence, these have been among Defendants' most effective advertising tactics.[80]  As

Bishop stated, "[t]his is how you sell. The proof. The testimonials. The actual email copy. It

makes it look like any child could do this and make money" and "[t]he social media testimonials

---

[76] *See FTC v. Febre*, No. No. 94-C-3625, 1996 WL 556957, *2, *6 (N.D. Ill. 1996), *aff'd* 128 F.3d 530 (7th Cir. 1997) (adopting magistrate's finding that earnings claims that exceeded amounts typically received by program participants were deceptive); *Five Star Auto*, 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (reasonable for consumers to assume the promised rewards were achieved by the typical participant); *In re Amway*, 93 F.T.C. 618, 729-32 (1979) (despite specific earnings claims and disclaimers that some would earn more or less, claims violated Section 5 because the earnings were not typical).

[77] *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 125 (D. Conn. 2008) ("[W]hen an advertisement contains a testimonial reflecting the experience of an individual with a product, there is an implicit representation that such experience reflects the typical or ordinary results anyone may anticipate from use of the product." (quotation omitted)); *see also* 16 C.F.R. § 255.1, 255.2(b) (an advertiser must have "substantiation that the endorser's experience is representative of what consumers will generally achieve," or else "the advertisement should clearly and conspicuously disclose the generally expected performance in the depicted circumstances, and the advertiser must possess and rely on adequate substantiation for that representation.").

[78] ECF No. 156 at 57.

[79] *Id*.; ECF 2-1 at 23 & n.111, 24-25.

[80] Bond and Bishop have a long history of selling their services through the use of testimonials. Jason Bond started Penny Stock Live in 2011. The webpages from 2011 show consumer testimonials and the offer of real time trade alerts. PX 27, Att. YYY, pp. 2384-2385. Penny Stock Live morphed into Jason Bond Picks in 2011. *Id.* p. 2386. This service ran from 2011-2019. PX 27, ¶ 62. The webpages show that Jason Bond Picks' website continued to use consumer testimonials, examples of winning trades, and the offer of real time trade alerts. *Id.*, Atts. YYY-ZZZ, pp. 2386-2410.

carry the most weight."[81]  If Defendants do plan to use earnings claims in the future, they would need to develop a process for obtaining substantiation that a typical customer makes the advertised magnitude of profits, and would also need to develop a process for verifying all testimonials before use.

Ads involving Defendants' trade alerts, which Raging Bull plans to continue offering,[82] are particularly problematic. Raging Bull has always advertised these alerts in ways that create a net impression consumers can copy the trades to make money.[83]  Consumers have lost tremendous sums of money trying to follow these alerts.[84]

Not only does Raging Bull lack substantiation for the claim that its alerts are profitable, Defendants also failed to contest Professor Russell Wermers's opinion that Raging Bull's trade alerts are not likely to make consumers money in general, due to market dynamics. As the expert explained, even if Raging Bull's founders were consistently profitable traders themselves, following trade alerts is not likely to work well for most consumers for the securities that Raging Bulls' "gurus" trade, or the time-sensitive trading styles they employ.[85]  Raging Bull did not contest these points in its Response to the FTC's motion for injunctive relief,[86] instead trying to

---

[81] PX 44, Att. P, pp. 3421.

[82] Defendants say the alerts will be made ahead of the "guru's" trade, ECF No. 177 at 7, but this fixes only one of the many problems Wermers identified with Raging Bull's alerts. *See* PX 26, ¶ 79-85. It is notable that Defendants do not even try to argue that their alerts are profitable for consumers, instead attempting to reframe the alerts as educational, contrary to their advertising.

[83] *See, e.g.,* ECF No. 156 at 53-59; *see also* PX 1 ¶ 3; PX 2 ¶ 15; PX 6 ¶ 3-4; PX 9 ¶ 4; PX 10 ¶ 2; PX 12 ¶¶ 6-8; PX 15 ¶ 3; PX 16 ¶ 6; PX 17 ¶ 3; PX 18 ¶ 5; PX 19 ¶ 4; PX 20 ¶ 6.

[84] *E.g.*, PX 2, ¶¶ 35 (at least $75,000 trading losses from following alerts); PX 3, ¶ 16 (over $19,000 trading losses, mostly from following alerts); PX 6, ¶ 13 (at least $50,000 trading losses from following alerts); PX 7, ¶ 32 (approximately $24,000 losses from following alerts); PX 8, ¶ 51 (about $15,000 trading losses from following trades); PX 14, ¶ 57 (at least $96,000 trading losses from following trade rec); PX 19, ¶ 53 (about $26,000 trading losses from following trades); PX 20, ¶ 10 (almost $10,000 trading losses from following a single alert); PX 21, ¶¶ 12 (approximately $10,000-$15,000 trading losses from following alerts); PX 32 ¶ 14 ($2700 subscription fees, $4000 losses); PX 33, ¶ 4($8,000 subscription fees, $30,000 losses); PX 36, ¶ 23 (approximately $50,000 losses from following trades).

[85] ECF No. 145 at 12 n.54; PX 26 ¶¶ 79-85.

[86] *See* ECF No. 145 at 12 n.54; *see generally* ECF No. 123.

repaint the alerts as merely educational.[87]  This characterization is belied by Defendants' advertising, by the Temporary Receiver's investigation, and by the numerous consumer declarations submitted by the FTC.[88]  Defendants fail to explain whether alerts will figure in their new advertising, and, if so, how they will do so without creating a deceptive net impression as they have done consistently in the past.

Defendants' Plan fails to address these challenges to their business model. They do not explain how they would develop substantiation; nor do they provide an alternative value proposition that they could use to sell their services. To be sure, Defendants cite a few example ads from other companies, ECF No. 177 at 5-6, to prove market demand exists for investment education (a point no one contests). But this tiny sampling of competitors' ads says little about how Raging Bull itself will be able to advertise. Raging Bull offers no hint of what its new approach might be, much less a reason to believe that approach would be lawful and profitable.

## B.    Defendants Provide No Evidence to Support Profit Projections

In failing to explain how they will advertise their services going forward, Defendants also fail to provide any basis for concluding they can sell their services profitably. Raging Bull's plan predicts it will continue to make a significant number of sales and will operate profitably over the next three years. ECF No. 177 at 17. Raging Bull offers little in the way of evidence or even rational argument to support these projections.

Raging Bull asserts that it bases its projections on "the partners' deep knowledge of the industry," "the Company's ten years of experience," and "reasonable and conservative assumptions."[89]  The company relies chiefly on its past experience and assertions that the

---

[87] ECF No. 123 at 5-6, 54-55; *see also* PX 44, Att. T, p. 4475 (Bishop telling customer-service staff that service is not intended for consumers to copy trades, but that "[t]his happens all the time," and acknowledging that where "stocks are pretty thinly traded … it doesn't take many new buyers in a short period of time to have an impact on the price."); *id*. p. 4480.

[88] *See supra* notes 3-12.

[89] It is unclear exactly what these assumptions are, but in the Statement of Forecast Assumptions, the Assumption Description for Net Sales says that the figures are based on subscription revenue projections based on prior subscription history. ECF No. 177-2 at 3.

company "has always been profitable," ECF No. 177 at 15, but <u>Raging Bull's past sales were based on deception</u>. The company can draw on no experience to support projections of profitability based on lawful advertising and does not explain in any detail how it came up with the sales figures it projects.

Defendants' make much ado about their past profits and defend their choice to use cash versus accrual-based accounting in the past, but this has little bearing on whether the company would be profitable in the future.[90] Whatever profits Defendants may have made in the past were derived from deceptive advertising and preventing consumers from canceling.[91]  Defendants' proposed business plan provides no explanation about how the company will profit without such practices.

Raging Bull's estimated number of customers likewise lacks any basis. Though Raging Bull admits it expects a "meaningful decrease in its overall user base from both refunds and natural attrition," it claims "subscriber support has been high" and says it "expects to retain over 30,000 of its existing paid users over time." ECF No. 177 at 14. No support for these statements is provided, and they are belied by the Temporary Receiver's report and the Defendants' own expert. Contrary to Defendants' assertion that "most" subscribers "support Raging Bull and wish to continue as subscribers," the Temporary Receiver's report states "only 37%" of the 4,464 emails received "were supportive of Raging Bull."[92]  Since 30,000 is just over 37% of Defendants' 80,000 purportedly active subscribers,[93] perhaps this is how Defendants created their estimate. But if so,

---

[90] Defendants submitted an expert report defending Defendants' use of cash accounting. ECF No. 177-1. But there is no dispute that Defendants reported a loss of over $3 million in the 11 months prior to this lawsuit, a year in which Defendants realized their highest-ever number of sales. ECF No. 156 at 97-98. Regardless, any periods of past profitability would not be probative given that Defendants would have to fundamentally change their business model in order to operate lawfully.

[91] ECF No. 156 at 53-60, 66; ECF No. 2-1 at 4-14, 25-28, 44; ECF No. 145 at 3-12, 21-24.

[92] ECF No. 156 at 88.

[93] Defendants also assert that have "over 800,000 non paid supporters" but do not explain what this means or how it factors into their projections. ECF No. 177 at 3.

the number fails to reflect that these emails were in response to requests for <u>support</u> from the company, and likely underestimate the level of dissatisfaction.[94]

Davis's Supplemental Expert Report, submitted by Raging Bull four days after the deadline its own attorneys requested, fails to fill the gaps in Defendants' plan or offer additional support for the company's projections. Instead, the report confirms that Raging Bull's projections are based on its past sales when the company was advertising deceptively,[95] and not on any understanding of how the company will advertise in the future or what its new value proposition will be. Davis explains the "[f]orecast [of] monthly Net Sales" is based on a "20% is the historical rate of renewal" applied to past sales figures.[96]  This figure further undermines Defendants' projection of how many customers they will retain, which is far more optimistic, and fails to support Raging Bull's optimistic sales projections. Many of the 20% who did renew in the past may have done so on the basis of Defendants' deceptive claims, which were also directed at existing customers to encourage renewals and upsells.[97]  The evidence also shows that consumers who tried to cancel their subscriptions were often unsuccessful and their accounts were renewed without their authorization.[98]

Additionally, a significant part of Raging Bull's projected income is from "deferred revenues," an accounting concept that refers to recognizing the company has now provided services that consumers paid for in the past. ECF No. 177 at 18 (noting that Raging Bull "intends to start servicing prior clients immediately (and recognizing previously deferred revenues)").[99] As Raging Bull admits, the "relatively higher Net Sales" in its projections for the twelve months

---

[94] The Temporary Receiver's report also notes at least two "gurus" have already left the company, ECF 156 No. at 44, 46, making the services they ran impossible to offer to subscribers, and Defendants do not affirm other "gurus" will remain with them.

[95] ECF No. 179, Att. A., ¶¶ 5, 17, 27.

[96] *Id*. at ¶ 27.

[97] *See* ECF No. 156 at 47-48 (noting that Raging Bull sent 36 marketing emails to its customers in a 24-hour period before the TRO was entered and providing examples).

[98] ECF No. 145 at 21 & n.98.

[99] *See also* ECF No. 179, Att. A., ¶¶ 19-21 (confirming that Raging Bull's projections include the recognition of past sales that were made using deception).

ending February 28, 2022 "reflects revenues recognized in connection with the Deferred Revenue balance prior to the pause of operations in December 2020." ECF No. 177 at 18. These past sales, which Raging Bull seeks to recognize now as profit, were made using deception. These are monies the company is liable to disgorge for consumer redress, and should not be used to support the company's ability to operate profitably when complying with the law.

Defendants fail to offer anything more than speculation that the new Raging Bull would be profitable. The bottom line is that, even if Raging Bull could manage to change its approach to advertising enough to become lawful, the company would look dramatically different from its past. Defendants have never run such a company, and their past profits from deception are inapposite when projecting the profitability of this novel enterprise.

### C.       Defendants Fail To Provide Key Details About How Their Compliance Reforms Will Be Implemented

Defendants' business plan must show they have a plan to operate lawfully and profitably, not just that they will hire people to tell them when they go astray. But even their plans to expand the compliance team and hire a Monitor lack substance. As detailed above, the plan is silent on how it intends to ensure that any earnings claims in the future are truthful and substantiated. As background, the Temporary Receiver found a "sea change" would be required in the company's "approach to legal compliance."[100]  Defendants' business plan provides few details about how Defendants would achieve that change.

Defendants have a history of making token compliance investments while continuing to violate the law at full speed. Defendants formed their compliance team in the summer of 2019 when they hired Susan Trahan, and later hired an additional lawyer, Martin Saunders, in the summer of 2020.[101]  Defendants had been violating the law for years at this point, and were under active investigation by the New Hampshire Securities Bureau.[102]  But Mrs. Trahan and Mr.

---

[100] ECF No. 156 at 105.

[101] *Id*. at 25.

[102] ECF No. 123 at 14.

Saunders were given various duties apart from compliance and, as the Temporary Receiver found, they were "not able to dedicate significant time or attention to advertising compliance."[103] In fact, consistent with what appeared to be Defendants' priority as described above, one of Mr. Saunders' duties was to "reduce negative statements about Raging Bull made to the BBB and other similar bodies."[104]  Despite Defendants' stated "efforts" in compliance (introducing a compliance manual in October 2019; hiring a compliance analyst in January 2020; retaining Greenburg Traurig for compliance training in April 2020; auditing of support phone calls in June and September 2020; and compliance training), Defendants continued to use unsubstantiated earnings claims in their advertising for each of their services up until the date the FTC filed this case on December 7, 2020.[105]

Defendants' proposed plan includes high-level promises, such as hiring "up to" 5 new compliance personnel, reviewing and revising the company's employee code of conduct, developing methods for internal reporting, instituting regular reviews of "guru" trading activity, changing compensation and evaluation structures to incentivize compliance, and eliminating deceptive advertising.[106]  But the Business Plan provides no explanation of how any of these operational components would change. How would the new compliance team actually operate to ensure legal compliance occurs and how will it differ from the compliance team Raging Bull created in the past, which utterly failed to stop deceptive practices?  What changes do Defendants actually contemplate making to the code of conduct or to Raging Bull's

---

[103] ECF No. 156 at 26.

[104] *Id*.

[105] Notably, Raging Bull's marketing and advertising personnel did not report to the compliance or legal department and "they received little guidance on legal compliance." *Id*. at 30. Despite having hired Ms. Trahan in summer 2019, as of December 7, 2020—18 months later—Defendants "did not yet have a process in place requiring compliance review of all advertisements and marketing materials before they were published to the public on the internet." *Id*. at 61. The "Temporary Receiver has not found any evidence to date of any meaningful efforts by Raging Bull to review advertising or marketing materials to prevent publication of false or unsubstantiated earnings claims that violate Section 5 of the FTC Act." *Id*. at 60. The Temporary Receiver also found that "although the Company was placing some effort and resources in compliance, revenue growth and profits were a much higher priority." *Id*. at 63.

[106] ECF 177 at 9-10.

compensation and evaluation structures, and why does the company believe they will improve compliance?  And, critically, how do Defendants envision advertising lawfully once they eliminate all claims that are false or unsubstantiated?  Raging Bull's promises lack content, and, based on their history, credibility.[107]

Defendants' Business Plan also fails to include the cost of a compliance monitor though it states the Monitor would be "paid for by the company." ECF No. 177 at 12. This would be a significant expense, especially if the Monitor "will have the ability to obtain or hire whatever additional resources are needed including in the form of auditors, computers and data specialists, and all other resources required to discharge the functions of the Compliance Monitor in its sole discretion," ECF No. 177 at 12. The absence of a line item for this significant expense is glaring.

### D.   Other Aspects of the Business Plan Raise Serious Concerns

In many respects, Defendants' Business Plan appears to condone and perpetuate the same or similar troubling practices that Raging Bull engaged in before this Court's TRO, including their cancellation and refund policies. Defendants took a hard line stance on refunds and cancellations prior to the TRO and continued this despite a payment processor suggesting they do otherwise, and despite consumer complaints.[108]

Defendants state that in Phase 1, they will focus on "clarifying and improving customer service, refunds, renewals and cancellation policies." ECF No. 177 at 8-9. Defendants further state that they will commit significant resources to address outstanding customer complaints and refund requests. ECF No. 177 at 11. None of these commitments is persuasively explained.

---

[107] Additionally, Defendants note in passing that they plan to downsize from approximately 160 employees, ECF No. 123 at 9, to approximately 50 employees, ECF No. 177 at 14. Defendants provide no explanation regarding who would be retained, how this would affect compliance, or how they would navigate such a monumental change in operations.

[108] PX 44, Att. P, pp. 3467-3472 (In August 2019, a Raging Bull employee summarized Stripe's suggestion as "If someone requests a refund within a day or two of getting the subscription, they really need to be refunded. The card issuers view this as unreasonable." The Stripe employee also suggested Raging Bull look at their current processes and ensure it is very easy to understand their refund terms, to ask for a refund, and connect with support); PX 44, Att. P, pp. 3340-3407 (text of over 400 consumer complaints).

As long as Defendants continue to offer services with an auto-renewal feature (which they will, *see* ECF No. 177 at 12), Defendants must comply with the Restore Online Shoppers Confidence Act ("ROSCA"), including by providing a simple mechanism to cancel. Defendants do not provide guidance as to how their new policies under the business plan will differ from the practices they engaged in prior to the TRO, and do not explain whether the same customer service employees will be brought back to carry them out.

Defendants' business plan states that customers will be able to cancel through a "simple feature provided through the Company's dashboard *or* by calling the Company's Customer Service Team." ECF No. 177 at 12 (emphasis added). It is thus not clear if all services will have an online cancellation option, and this does not explain how they will improve their cancellation practices relative to their conduct prior to the TRO and come into compliance under ROSCA. Despite assuring its payment processors in 2019 that they would send renewal reminders and "make it easier for their customers to cancel their account,"[109] Defendants made it difficult for consumers to cancel many of their subscriptions before Defendants charged them again up until the time the FTC filed this lawsuit.[110]  Some of Defendants' services had a dashboard mechanism that purportedly allowed consumers to cancel online; some services did not have such a feature. For those services that provided an online cancellation mechanism, Raging Bull did not provide confirmation that the cancellations went through and some consumers complained the cancellation did not work or they were still charged even though they believed they had cancelled.[111]  For those services that lacked an online mechanism, consumers complained about their inability to reach customer service to cancel, despite multiple attempts, and this experience was confirmed by an FTC investigator.[112]

---

[109] ECF No. 2-1 at 28 n.132.

[110] ECF No. 2-1 at 26 n.119.

[111] ECF No. 2-1 at 27 & n.127; PX 34, ¶ 15; ECF No. 145 at 22 n.104.

[112] ECF No. 2-1, pp. 25-28.

Nothing in Raging Bull's business plan explains how the new Customer Service Team will act any differently from the one they already had in place, which actively suppressed negative reviews,[113] denied refunds,[114] denied cancellations,[115] and pushed upsells.[116] Defendants' plan does not address how or whether they will change these existing practices and whether these same individuals will be part of the fifty returning employees. And Defendants' assertions that they will fundamentally change everything about their interactions with customers are simply not credible given the company's history.

Defendants' description of their updated refund policy is no better. Prior to the TRO, Defendants routinely responded to consumers who asked for a refund with, "Raging Bull has a strict no refund policy which you may view on the Terms and Conditions."[117]  Defendants denied refunds to consumers who asked for a refund within days of purchasing, consumers who discovered an unintended auto-renewal of the service, and also consumers who stated they were misled by Raging Bull's advertising.[118]  When pondering whether to change this policy to reduce chargebacks, and because "folks don't like not being able to recover a refund," Defendants records show they chose to just "[k]eep as-is since clients are going to make up reasons to try to obtain an unjust refund."[119]

Defendants state they will "address the backlog of outstanding refund requests" since entry of the TRO, that they will "honor all new refund requests for services that have a refund option," and that "no refund services will allow transfer of credit toward another service."[120]

---

[113] ECF No. 145 at 15-18; *see, e.g.*, PX 47, Att. A, pp. 4638-4653.

[114] ECF No. 145 at 15 n.67.

[115] ECF No. 2-1 at 25-28.

[116] ECF No. 145 at 15 n.67.

[117] PX 47, Att. A, p. 4636.

[118] ECF No. 145 at 15 nn.67, 102-105; *see, e.g.,* PX 44, Att. P, pp. 3408-3848.

[119] PX 44, Att. P, pp. 3442.

[120] Defendants also state that "all pre-existing subscriptions for products or services that [are] marketed with a refund option will be supported by a ROSCA-compliant cancellation mechanism." ECF No. 177 at 9. ROSCA applies to *all* online transactions that include an auto-

ECF No. 177 at 11. This new plan does not state that their services *will* provide a refund and perpetuates Defendants' policy of switching consumers to different programs rather than providing refunds; a policy consumers complained about. Historically, this no refund policy and "credit" for a different service effectively allowed Defendants to take more money from consumers[121] and this is likely to continue; particularly because Defendants have not explained how they will sell their services without deceptive earnings claims.[122]

Defendants also emphasize their plans to bring online a new Learning Management System ("LMS") that will supposedly benefit consumers. But the LMS was actually developed to make it harder for consumers to request their money back when signing up for products with purported guarantees. Internal records and consumer experiences show that the goal was to be able to deny refund requests if consumers did not complete the LMS and pass a test within the limited timeframe of the guarantee.[123]

Nothing in Defendants' proposed plan provides any indication that Raging Bull is capable of transforming into a law-abiding company that maintains profitability. The plan fails to demonstrate Raging Bull will comply with its obligations under ROSCA and the FTC Act, and shows no sympathy for the consumers harmed by this company's past deception.

### E. Defendants Fail To Address How They Will Pay For Legal Obligations Resulting From Their Prior Conduct

As the Temporary Receiver recognized in his Initial Status Report, a critical question is where the money will come from to comply with a preliminary injunction, to pay for judgments

---

renewal feature and requires a simple mechanism to cancel for all auto-renewal programs, not just those that include a refund option. ECF No. 2-1 at 43.

[121] ECF No. 145 at 15 n.67.

[122] Defendants understand the importance of a refund policy that actually provides for refunds, because they lied about this very issue multiple times to payment processors. *See supra* section II.A.2. If they intended to change their practice, they would have done so already so as to avoid lying to obtain merchant accounts.

[123] PX 47, Att. A., p. 4654 ("When we talked on the phone a few weeks back, I mentioned that we are attempting to implement something similar with our suite of products and use an LMS as refund tool (i.e. clients must complete the LMS within 30 days to qualify for a refund)"); *id*. p. 4655-4677 (denying refund to consumer who failed to complete LMS); *e.g.,* PX 12, ¶ 13; PX 40 ¶ 3.

obtained against the company, and to make all the changes that would be necessary to turn the company around.[124]  Defendants' business plan does not adequately address the significant liabilities Defendants face.

Raging Bull has been sued by the FTC and the NHSB and is facing a Telephone Consumer Protection Act ("TCPA") class action lawsuit in Tennessee federal court.[125] Defendants' cursory dismissal of these cases as "unliquidated," "speculative," and "defensible," ECF No. 177 at 16, does not make the harm from Defendants' past practices—and the liability for that harm—disappear. Whether Raging Bull manages to settle some of these claims or not, it is facing tremendous liability for its past deception.

Defendants' potential liability for violating Section 5 of the FTC Act is $196 million.[126] Raging Bull tries to brush aside its legal liabilities from the FTC's case by predicting the Supreme Court will decide *AMG Capital Mgmt., LLC v. FTC* in a way that makes Defendants immune to monetary liability in this case, but that is simply speculation at this point. And, even if the Supreme Court rules the FTC cannot obtain monetary relief under Section 13(b), this does not preclude the FTC from obtaining a monetary judgment for Defendants' violations of ROSCA. Given that the vast majority of services sold by Defendants were auto-renewals, Defendants' potential monetary liability under ROSCA is significant. Separately, Defendants are potentially liable for injury caused by their actions in the NHSB and TCPA lawsuits.

Defendants have not said anything about how they will refund current consumers who have complained, or past consumers who have been harmed. Defendants tell the court that they expect to use the frozen receivership funds ($10.75 million) to "fund the Company's operations at the start of Phase 1. The Company seeks approval of the Court, the FTC and the Temporary Receiver to use a portion of these Company funds to satisfy the Company's outstanding refund requests during Phase 1." ECF No. 177 at 2.

---

[124] ECF No. 156 at 108.

[125] *See id.* at 101-104; *Broyles v. Ragingbull.com, LLC*, No. 20-cv-245 (E.D. Tenn. Nov. 19, 2020.

[126] PX 46, ¶ 8.

To be clear, Defendants plan to first use frozen or preserved funds—money that consumers paid to Defendants based on deceptive earnings claims—to restart a company that caused $196 million in consumer injury.[127]  Then they expect to use a portion of the remaining funds to provide refunds to an unspecified portion of consumers who were harmed overall. The Temporary Receiver stated in his report that two-thirds of the thousands of consumers who responded to him were dissatisfied with Defendants' services and wanted a refund. Defendants claim they have 80,000 current customers. Using Defendants' customer figure, they will have to refund approximately 52,000 customers.[128]  Multiplying 52,000 by $1,573, a conservative figure that loosely estimates the average cost of Defendant's front-line services (not upsells) reviewed by the FTC,[129] Defendants would have to pay nearly $82 million ($81,796,000) just to refund those consumers. This figure does not include funds needed to refund past consumers who have been harmed.[130]  This is far more than what is frozen or preserved at this time under the asset freeze.

Defendants do not have a line item in their balance sheet for refunds, chargebacks, or monetary redress. Their plan contains no indication as to how they will refund customers who ask during these next three years, when they project to be rebuilding the business and turning a profit, much less all past customers who have been harmed by their deceptive earnings claims. And, given that they have not provided any marketing strategy or explanation of how they will

---

[127] Consumer injury is based on the amount consumers paid to Defendants for subscription fees. *See FTC v. Ross*, 897 F. Supp. 2d 369, 387-88 (D. Md, 2012) (proper measure of consumer redress is the amount paid by consumers for Defendants' products, minus refunds; not Defendants' profit). Consumers lost far more than $196 million, though, by following Defendants' trade alerts and "strategies." Consumers reported trading losses in the thousands; some losing everything. ECF No. 145 at 9 n.38.

[128] This number of consumers is very close to Defendants' own optimistic projection that they will retain about 30,000 of an alleged 80,000 subscribers, and therefore lose 50,000. ECF No. 177 at 14.

[129] Defendants' order pages for 16 of their services contain prices for these services, including a pre-checked box next to the "best offer." Adding the pre-checked price for each of those 16 services and calculating the average equals $1573. *See* PX 27, Atts. PP-GGG, pp. 2155-2259.

[130] The average loss of the FTC's consumer declarants for subscription fees is $7264 because consumers are routinely pushed into purchasing multiple products. ECF No. 145 at 9 n.38.

advertise their services to consumers and persuade them that Raging Bull's services are valuable without relying on earnings claims, they should not be allowed to gamble with consumers' money.

## IV.    Conclusion

The Defendants are asking this Court to allow them to use money obtained through deception to continue their business. Defendants failed to transform into a lawful business in the past, despite years of warnings, and they provide no credible plan here for how they will operate lawfully and profitably in the future. For this reason, and the reasons set forth in the FTC's motion for a TRO, ECF No. 2-1, and reply brief, ECF No. 145, the FTC respectfully submits that this Court should not permit Raging Bull to restart its operation and should instead enter the FTC's proposed preliminary injunction, ECF No. 145-2.

Respectfully submitted,

March 2, 2021                         */s/  Gordon E. Sommers*
                                      Colleen Robbins (D. Md. Temp Bar No. 92567)
                                      Sung W. Kim (D. Md. Temp Bar No. 814609)
                                      Gordon E. Sommers (D. Md. Temp. Bar No. 814431)
                                      Laura C. Basford (D. Md. Temp. Bar No. 814888)
                                      Federal Trade Commission
                                      600 Pennsylvania Ave., NW
                                      Mailstop CC-8528
                                      Washington, DC 20580
                                      (202) 326-2548; crobbins@ftc.gov
                                      (202) 326-2211; skim6@ftc.gov
                                      (202) 326-2504; gsommers@ftc.gov
                                      (202) 326-2343; lbasford@ftc.gov
                                      (202) 326-3395 (Facsimile)

                                      *Attorneys for Plaintiff*
                                      *Federal Trade Commission*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2021, I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to counsel of record for Defendants and the Temporary Receiver.


_/s/ Gordon E. Sommers_
Gordon E. Sommers