**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RAGINGBULL.COM, LLC f/k/a LIGHTHOUSE MEDIA LLC, et al.,<br><br>Defendants. | ) | Case No. 1:20-cv-03538 - GLR |

# RAGINGBULL.COM, LLC'S REPLY
# <u>IN SUPPORT OF ITS BUSINESS PLAN</u>

David G. Barger (DCB# 469095)
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749-1300
Email: bargerd@gtlaw.com

Andrew G. Berg (admitted *pro hac vice*)
2101 L Street, N.W.
Suite 1000
Washington DC 20037
Tel: (202) 331- 3100
Email: berga@gtlaw.com

Miriam G. Bahcall (admitted *pro hac vice*)
Brett M. Doran (admitted *pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: (312) 476-5135
Email: bahcallm@gtlaw.com
Email: doranb@gtlaw.com

*Counsel for RagingBull.com, LLC, Jeffrey M. Bishop and Jason Bond*

## TABLE OF CONTENTS

**INTRODUCTION** ..... **1**

**BACKGROUND** ..... **9**

I. The Temporary Receiver's Conduct Before the Court's Request for a Business Plan ..... 9

II. The Temporary Receiver Declines to Work Cooperatively with Raging Bull to Develop its Business Plan ..... 11

III. In His Response to the Business Plan, the Temporary Receiver Offers Conclusions for Which He Has No Qualification or Expertise, but which Supports the FTC's Litigation Position ..... 14

IV. The Temporary Receiver's Continued Support of the FTC's Litigation Position ..... 15

**ARGUMENT** ..... **16**

I. The Temporary Receiver is Not a Marketing Expert and Cannot Serve as One for the FTC ..... 16

II. The FTC's focus on Allegations of Raging Bull's Prior Conduct is Irrelevant and False 18

A. The FTC Failed to Demonstrate that Raging Bull Deceived Consumers with False Statements ..... 19

B. The FTC Wrongly Suggests Raging Bull was "Alerted" that Its Advertising was Deceptive Before the FTC's Lawsuit, Despite the FTC *Never Once* Informing Raging Bull the FTC Believes Its Advertising Was Deceptive ..... 19

C. The FTC Continues to Misstate and Mischaracterize Facts that are Not Relevant to the Business Plan ..... 24

III. Raging Bull's Compliance Plan Ensures the Company Will Operate Its Business Lawfully ..... 26

A. The FTC and Temporary Receiver Ignore the Role of the Independent Compliance Monitor, Which Ensures the Company Will Operate Lawfully Before Any New Consumer Advertising Can Occur ..... 26

B. The Few Details Identified by the Temporary Receiver as "Missing" are Minor and Do Not Justify the Temporary Receiver's Rejection of the Business Plan ..... 28

C. Raging Bull's Compliance Plan is Consistent with Other FTC Matters ..... 30

D. For the Court's Consideration, Raging Bull Recommends Affiliated Monitors, Inc. to Serve as Compliance Monitor ..... 33

E. The Compliance Monitor Will Ensure Raging Bull's Customer Service, Refund and Cancellation Policies and Practices are Lawful ........ 34

IV. Raging Bull's business can and is expected to be profitable pending resolution of this case ........ 36

A. Raging Bull Offers a Valued Service – Stock Market Trading Education – to Consumers to Meet what the FTC and Temporary Receiver Admit is a Strong Market Demand ........ 36

B. The Temporary Receiver Inexplicably Ignores the Large Number of Competitor Advertising Examples, Similar to Raging Bull's Own, that Raging Bull Provided to Temporary Receiver Before He Submitted His Initial Status Report ........ 41

C. The Recent Change in Accounting Methodology Does Not Change the Fact that Raging Bull Has Always Been Profitable ........ 46

D. Raging Bull's Expectation on Retaining Paid Subscribers Over Time is Reasonable .. 48

E. The Temporary Receiver's Position on Contingent Liabilities is Biased and Incorrect 51

F. The Temporary Receiver Grossly Overstates the Impact of Honoring Outstanding Refund Requests on Raging Bull's Profitability ........ 52

G. Raging Bull's Business Plan is Reliable ........ 55

**CONCLUSION ........ 57**

Defendant RagingBull.com, LLC ("Raging Bull" or the "Company") and Individual Defendants Jeffrey M. Bishop and Jason Bond (the "Individual Defendants" and collectively with Raging Bull, the "Defendants"), by and through undersigned counsel, submit this Reply in further support of Raging Bull's Business Plan.

## INTRODUCTION

After reviewing the parties' submissions ahead of the preliminary injunction hearing, the Court during a hearing on February 4, 2021 asked Raging Bull to submit a Business Plan for operating lawfully and profitably during what could be protracted litigation leading up to a trial on the merits in this matter. The Court directed the parties to work collaboratively on a business plan that would allow Raging Bull to continue operating its business in a lawful and profitable manner pending the resolution of this matter. In doing so, the Court stated that it was not interested in seeing "a one hundred page business plan" from Raging Bull. In its Order, the Court also noted that it would refer the matter to a Magistrate Judge to assist the effort to develop the business plan should any party make such a request.

From the start, however, both the FTC and the Temporary Receiver have refused to engage in any type meaningful dialogue on these issues. On February 8, 10 days before Raging Bull submitted its Business Plan, Raging Bull asked the FTC and the Temporary Receiver to consent to its request for referral to a Magistrate to assist in developing the plan. Neither the FTC nor the Receiver would agree, and the FTC for its part expressly stated that it would oppose any business plan proposed by Raging Bull and that in their view it would be a waste of time to discuss one.

Despite this, Raging Bull timely submitted a succinct but comprehensive Business Plan detailing a two-phase process that utilizes a Court-appointed, independent Compliance Monitor

that would ensure Raging Bull would operate lawfully in order to allay the concerns of the FTC and the Temporary Receiver. In fact, under that Business Plan, unless and until the Compliance Monitor determines – and certifies to the Court – that Raging Bull will operate lawfully in all respects, Raging Bull cannot send a single piece of advertising or any other marketing materials to solicit new subscribers. Furthermore, Raging Bull's Business Plan lays out a reasonable and plausible plan for operating profitably. This Business Plan is conservative, and accounts for Raging Bull's present circumstances, its compliance plan and the industry experience of the Individual Defendants.

The Business Plan is a blueprint for profitability. Raging Bull provides online stock market trading education. The FTC and the Temporary Receiver both acknowledge there is a strong market for these services. Despite the FTC and Temporary Receiver's cherry-picking and overstatement of a relatively small number of customer complaints, even now most subscribers support the Company and value its trading education services.

The FTC opposes the Business Plan. But that is no surprise, as the FTC told Raging Bull ***before*** it submitted the Business Plan that the FTC would oppose ***any*** business plan from Raging Bull. True to its exhibited lack of interest and disregard in the actual Business Plan, the FTC dedicates most of its Response to re-hashing its claims and presenting new (and false) allegations that have nothing to do with what the Court asked the FTC to do – to respond to the Business Plan. And the few substantive objections that the FTC raises to the Business Plan itself, however, are based on the FTC's misunderstanding of the Business Plan or otherwise simply lack any substantive merit.

In point of fact, the FTC's Response is simply a continuation of its well-publicized – and thinly disguised – mission to entirely shut down Raging Bull. The FTC is so focused on this

desired outcome that it has misled the Court multiple times. This case began with a Complaint and Motion for TRO that made at least two attention-grabbing misstatements – both of which were later proved to be completely false.

First, the FTC told the Court that Raging Bull was "permeated with fraud," based on the FTC's purported expert, Russell Wermers' finding that Raging Bull had trading losses of over $56 million from 2014 to 2018, which purportedly included Raging Bull's lead guru Jason Bond suffering $7.5 million in trading losses. This was false – and massively so. The purported $56 million trading loss never happened. And Jason Bond did not have $7.5 million in trading losses from 2014 to 2018. Rather, Jason Bond had a realized trading ***profit*** of over $500,000 in the accounts Wermers reviewed during the time period of his review. After Raging Bull demonstrated Wermers' error, the FTC and Wermers misled the Court again – this time claiming Wermers did not actually analyze trading gains and losses. Dkt. 145, at 10. That was false. He did, as the title of his analysis in his report made that quite clear: "RAGING BULL'S ACTUAL TRADING PERFORMANCE SHOWS SUBSTANTIAL AND PERSISTENT LOSSES, EVEN DURING PERIODS OF MARKET UPTURNS." PX26, 1777; *see also id.* at 1779 ("Table 1: Summary of Gains/Losses from Available 1099-B Records"). This is the foundation of the FTC's case against Raging Bull – the alleged false and deceptive earnings claims.

Second, the FTC told the Court that Defendants "prey" on the elderly and immigrants. The FTC provided no support – the FTC simply said it and expects the Court to take it as gospel. This was false, as Raging Bull has demonstrated. Dkt. 123, at 9, 18. The FTC then pivoted by trying to minimize their baseless claim, saying it was only "one line from the FTC's complaint." Again, not true. This false statement was in fact the ***second sentence*** in the FTC's Motion for TRO (Dkt. 2-1 at 1 ("Defendants prey on consumers, including older individuals…")) and it was

featured prominently in the FTC's self-serving, intentionally headline-grabbing press releases and case summaries to the public.[1]

Now, rather than seriously respond to the Business Plan, as it appears the Court directed the FTC to do, the FTC instead focuses on false new allegations and telling the Court that Raging Bull cannot be trusted to run its business. The FTC's case is fundamentally about advertising that was allegedly in violation of Section 5. Unlike the FTC, which offers only lawyer argument, Raging Bull submitted an extensive analysis of Raging Bull's advertising practices from an independent expert, Dr. Yoram Wind, who concluded that the evidence cited by the FTC in support of the FTC's Complaint could not support a conclusion that Raging Bull's target audience was deceived. The FTC has not disputed Dr. Wind and does not even mention Dr. Wind in its Response, nor has the FTC offered any qualified expert testimony in rebuttal to Dr. Wind – a world renowned expert in consumer perception and behavior with impeccable expert and academic credentials.

The FTC has no plausible basis for its insistence on shutting down Raging Bull. In fact, many businesses charged with or even found liable for unlawful advertising practices have been allowed to continue in business provided they comply fully with the relevant requirements under the FTC Act. Indeed, the FTC's Complaint does not even include in its prayer for relief a demand to shut the Company down, only that Raging Bull be required to operate in compliance with the FTC Act going forward. Dkt. 1. The FTC Staff certainly knows how to ask for a bar when it wants to and is able to obtain approval from the FTC Commissioners when the case was presented to them for their consideration. Presumably, and it is reasonable to infer that, the FTC

[1] *See, e.g.*, https://www.ftc.gov/news-events/press-releases/2020/12/scammers-leverage-pandemic-fears-ftc-law-enforcement-partners; https://www.ftc.gov/enforcement/cases-proceedings/2023073/ragingbullcom.

did not get Commission approval here to do so. Thus, the TRO the FTC submitted to, and which was entered by this Court, also did not order the shutdown of Raging Bull.

So how did we end up here? The FTC, with the aid of the Temporary Receiver, simply made it impossible for Raging Bull to continue to operate before the preliminary injunction hearing by refusing to allow any of Raging Bull's 160 employees to be paid – no matter what function they served for the Company. Simply stated, the FTC's goal was to "suffocate" Raging Bull – which they did with the active aid of the Temporary Receiver. This left Raging Bull with no choice but to furlough its employees over the December holiday season. Without employees to service its business, Raging Bull was compelled to suspend operations pending the preliminary injunction hearing. The FTC and the Temporary Receiver now want to preserve Raging Bull's temporary demise – and accomplish more than the FTC's Complaint even seeks – by blocking any possibility of Raging Bull's re-starting its business while it operates in full compliance with all regulatory requirements. Permanently shutting the Company down will indisputably increase the Company's liabilities, dissipate the Company's assets, prevent customers from enjoying the services they contracted for and put almost two hundred employees out of work during a pandemic. Sadly, this is the FTC's desired end.

The Temporary Receiver also submitted a Response to the Business Plan. Rather than providing the Court with a neutral, <u>unbiased</u> assessment of the Business Plan, which was his mandate, the Temporary Receiver – who was hand-picked by the FTC – advocates for the FTC. And despite having no known or identifiable experience or qualification to assess the lawfulness of advertising practices or the details of a compliance plan, the Temporary Receiver claims Raging Bull's compliance plan "lacks specificity" sufficient for him to assess the Business Plan. But the Temporary Receiver (apparently) misunderstands the plan and the critical role of the

Compliance Monitor and the Court. Consistent with how Raging Bull understood the Court's direction in requesting a business plan – which told Raging Bull it was not looking for "a hundred page business plan"--the Business Plan provides the working blue print for how the Company will re-start operations and move forward in a wholly compliant and profitable manner pending the outcome of this case. [2] If the Court – or the Temporary Receiver – wants more detail on the proposed Business Plan, Raging Bull is fully prepared to provide that detail in whatever granularity is needed. But the reality is the Temporary Receiver does not want it – the Temporary Receiver simply wants to say "not enough – I can't really say – so shut Raging Bull down." That is not what we believe the Court intended in its Order to the parties and to the Temporary Receiver.

The Business Plan, as directed by the Court, responds to the issues put forward by the Temporary Receiver in his Initial Report, establishes a two-phase process whereby Raging Bull can engage in no advertising or marketing whatsoever until the independent Compliance Monitor approves the policies and certifies their lawfulness, processes and details of the compliance plan and the Court agrees, and then only after approval in phase two will the Company be permitted to begin to advertise its services pursuant to the specific protocols approved by the Compliance Monitor and by the Court. And if at any time subsequent to that the Company fails to comply with those procedure, the Compliance Monitor can then "de-certify" the Company's practices and thereby suspend the Company's Phase 2 advertising and marketing activities. If the Temporary Receiver were willing to work with Raging Bull (as directed by the Court) to identify whatever additional detail he deems necessary beyond that in his Initial Report where he

[2] Of note, the pleadings and corresponding attachments submitted in response to Raging Bull's Business Plan was 187 pages for the FTC (Dkt. 188) and 58 pages for the Temporary Receiver (Dkt. 189), for a total of 245 pages.

concluded it was possible for Raging Bull to operate in the future in a compliant and profitable manner, the Temporary Receiver could have either asked for those details (which he did not) or agreed to either of Raging Bull's requests for the assistance of a Magistrate (which he refused to do when asked on three separate occasions); something the Receiver's counsel had himself suggested once before.

In this Reply, Raging Bull attempts to address most of the Temporary Receiver's questions, but if the Court or the Temporary Receiver requires more details in the Business Plan at this time that are not addressed, Raging Bull would be more than willing and able to provide them. And if there is any lingering concern about the commitment of Messrs. Bishop and Bond to the lawful operations of the Company, the owners of Raging Bull have agreed to make up to $10 million of their own funds available to cover any shortfalls while the Company re-starts operations.

The Temporary Receiver's conclusion that Raging Bull cannot operate profitably is also flawed and incorrect. The Temporary Receiver and his expert, Mr. Peroutka, continue to base their conclusion mostly on the false premise that the Company is not, and has never been, profitable because it temporarily finds itself in a short-term "negative equity" situation from an accrual accounting standpoint. To be clear, Raging Bull has always been a highly profitable company. It has no outside shareholders or debt financing, pays its bills and required refunds and employees on time (at least prior to the Temporary Receivership refusing to pay employee payroll) and still managed to make handsome distributions to its partners. Even the FTC does not suggest otherwise in its Response to the Business Plan.

The Temporary Receiver's attempts to attack the projected subscription revenues are misguided as they are based on the purported number of "complaints" the Temporary Receiver

has allegedly received – which is highly overstated. In fact, an examination of what the Temporary Receiver has produced demonstrates that the revenue numbers are clearly conservative. And, contrary to the Temporary Receiver's claims, the revenue projections can be met with the services of Messrs. Bond and Bishop alone, even if no other gurus returned (which is highly unlikely).

Likewise, the Receiver's criticisms of the "cost" side of the ledger are unwarranted. A significant portion of the liabilities again stem from an inflated view of the "refunds" that would be required to be paid. As explained below, both the number of refunds and the average amount of the refunds is simply wrong.

Finally, the Temporary Receiver's view of certain "contingent liabilities" is flawed as well, and overly (and inappropriately) solicitous of the FTC's claims. The Business Plan is a plan for the Company to operate lawfully and profitably up to the time this litigation is resolved, which – as the Court notes – could involve "protracted litigation leading up to a trial on the merits some time in the distant future." Dkt. 165. The Temporary Receiver and the FTC suggest the Company should be permitted to operate during this time period only if it could absorb the losses from a complete eventual FTC victory and still be profitable. But the Temporary Receiver points to no basis for this view, which is found nowhere in the TRO. It also makes no sense because if found liable those past liabilities will exist regardless. And if Raging Bull makes money – lawfully, while in full compliance with the law – during this interim time period, that will provide for a bigger pool of assets to meet those liabilities. The question before the Court is whether Raging Bull can operate profitably during the interim time period before this case is resolved. And the answer to that question is, yes, it can, as the Business Plan demonstrates.

## BACKGROUND

The Temporary Receiver is a go-to receiver for the FTC, having been brought in by the FTC on at least two other recent matters.[3] In this matter alone, the Temporary Receiver, his law firm, and accountants have incurred over $850,000 in fees and expenses as of March 1, 2021.[4] In this case, the Temporary Receiver has acted as an advocate for the FTC, not as the neutral agent in assistance of the Court.

### I. THE TEMPORARY RECEIVER'S CONDUCT BEFORE THE COURT'S REQUEST FOR A BUSINESS PLAN

To better understand the current situation, it is helpful to briefly consider an overview of some of the critical decisions and rationales made by the Temporary Receiver in relation to Raging Bull. When viewed alongside the FTC's consistent unwillingness to meaningfully collaborate with Raging Bull, a clear pattern emerges. It is thus not surprising that the Temporary Receiver informed Raging Bull in one of his very first conversations with undersigned counsel that it was his intention to shut down the Company. Dkt. 28, at 17.

The Temporary Receiver claims he does not have the authority to make any payments from the Company's assets without the FTC's consent. This position is contrary to the TRO, under which "the Receiver is directed and authorized," without requiring the FTC's consent, to "[m]ake payments and disbursements from the receivership estate that are necessary or

---

[3] According to the FTC, "Mr. Keith has extensive experience with federal and state receiverships and has previously served as receiver or as counsel for the receiver in cases filed by the FTC […]. In this District Court, Mr. Keith served as receiver in the matter *FTC v. Midway Industries, LLC*, Case No. JKB-14-CV-2312 (D. Md.) and also in *FTC v. Residential Relief Foundation, Inc.*, Case No. JFM-10-CV-3214 (D. Md.)" Plaintiff's Notice of Candidate for Appointment as Receiver, Dkt. 3 at 1.

[4] The Temporary Receiver, Peter Keith, is a partner at the law firm Gallagher Evelius & Jones, which is the law firm that represents him as Temporary Receiver. Gallagher Evelius & Jones has approximately 55 attorneys. It is likely that $850,000 in billed fees over a three month time period represent a significant matter for the firm.

advisable" to "[c]onserve, hold, manage, and prevent the loss of all Assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those Assets." TRO, Section XIV(D) and (G).

The Temporary Receiver's refusal to pay ***any*** Raging Bull employees without the consent of the FTC (which was not provided) left Raging Bull with no choice but to furlough employees and shut down all operations on December 21, 2020.

The Temporary Receiver objected to the Raging Bull Defendants' motion for use of funds to pay defense costs and living expenses on the basis that Raging Bull allegedly had a massive negative net equity every year of its existence, dating back to 2014, and paid $59 million in unearned income in distributions to the Company's partners and Kyle Dennis. Dkt. 117, at 7-8; Dkt. 117-1, at ¶¶ 16-18. This same claim was a centerpiece of the Temporary Receiver's February 2, 2021 Initial Report. Dkt. 156, at 92-96, 108-109. This position was based on the expert report submitted by Mr. Peroutka, the Temporary Receiver's CPA. Mr. Peroutka was wrong. Just like Mr. Wermers' massive and critically important error in misstating Mr. Bond's and Raging Bull's trading performance, Mr. Peroutka was wrong by a huge margin. The error was easily avoidable, as Mr. Peroutka had unconstrained access Raging Bull's financial records. And his error was critically important because, in reality and under the actual accounting method (cash-basis) that the Company properly employed, Raging Bull's distributions were not from unearned income and the Company has always been profitable.

Whatever the reason for Mr. Peroutka's mistake, what occurred ***after*** this mistake was exposed by Raging Bull's expert on February 19, 2021 (*see* Dkt. 177-1), and reveals the bias of the Temporary Receiver. Rather than acknowledge, correct and explain how the mistake occurred, which a neutral officer of the Court would certainly be expected to do, the Temporary

Receiver, and his expert Mr. Peroutka, instead tried to sweep the mistake under the rug. Neither the Temporary Receiver nor Mr. Peroutka mention the mistake in the Temporary Receiver's Response to the Business Plan, and instead they tried to pivot to a new (and equally erroneous) position (discussed below at 56). This is the same move that the FTC made in ignoring and downplaying Mr. Wermers' error. This is the move of an advocate, not the actions of a neutral officer of the Court.

## II. THE TEMPORARY RECEIVER DECLINES TO WORK COOPERATIVELY WITH RAGING BULL TO DEVELOP ITS BUSINESS PLAN

In his Initial Status Report, the Temporary Receiver spends the bulk of the report evaluating and supporting the FTC's allegations, before concluding that it may be possible for Raging Bull to operate its business if it is "truly committed to the task and willing to devote the necessary time, attention and resources." Dkt. 156, at 107. Taking note of and specifically citing this conclusion, the Court in the February 4th hearing asked Raging Bull to submit a business plan, and also directed the parties to work on the plan together and, if requested, along with the assistance of a Magistrate.

But the Temporary Receiver has refused to work collaboratively with Raging Bull. On February 8th, 10 days before Raging Bull submitted its Business Plan, Raging Bull asked the parties to agree to request a referral to a Magistrate to assist in developing the plan. The FTC stated it would oppose any business plan so, in the FTC's view, it would be a waste of time to discuss one. During that call, the Temporary Receiver parroted the FTC by not agreeing to request a Magistrate, despite the Court's direction that the parties were to "work together collaboratively regarding whether and how Raging Bull can lawfully and profitably operate the business" up to trial, and the Court's stated willingness "to refer this matter to a U.S. Magistrate Judge to assist in these efforts upon request by either side." Dkt. 165, 167.

After Raging Bull submitted its Business Plan, the Temporary Receiver vaguely requested additional "[m]issing … information" which he considered "necessary to ascertain the basis for RagingBull's stated and unstated assertions and conclusions" in the Business Plan. *See* Exhibit 1 hereto (2/25/21 email fr. M. Saudek). Hoping that the Temporary Receiver was finally willing to engage in dialogue with Raging Bull about the Business Plan, on February 26th – one day after Raging Bull's counsel received the request and four days before the Temporary Receiver's response to the Business plan was due – Raging Bull responded by asking the Temporary Receiver for clarification as to what details and materials he needed so he could evaluate Raging Bull's Business Plan. *See id*. (2/26/21 email fr. B. Doran) (asking the Temporary Receiver for "more specificity on what you're looking for" because "[i]t's not clear to us what assertions you're referring to here"). Unfortunately, rather than engaging in any dialogue to provide clarification about what the Temporary Receiver believed to be missing from the Business Plan, the Temporary Receiver ***never even responded*** to Raging Bull's email. It seems clear from these facts that the Temporary Receiver really was not interested in getting any details that he claimed he needed in order to more substantively evaluate Raging Bull's Business Plan. That conclusion is inescapable from the Temporary Receiver's lack of any response.

On March 1st, the Temporary Receiver submitted his Response to the Business Plan. In his Response, the Temporary Receiver reaches a different conclusion, now "urg[ing] the Court to reject implementation of the Business Plan," and concluding the Business Plan "lacks the specificity necessary for the Temporary Receiver or the Court to evaluate its potential to create a culture of compliance." Dkt. 189, at 1, 24. Again, this is the specificity that Raging Bull was happy to provide, but that the Temporary Receiver pretty clearly did not actually want to get.

Because the Temporary Receiver criticized the Business Plan as lacking the specificity needed for his evaluation, Raging Bull again asked the Temporary Receiver if he would agree to request a referral to a Magistrate to assist Raging Bull and the Temporary Receiver in working together to identify and address the specificity that the Temporary Receiver believes is needed for an acceptable plan. *See* Exhibit 1 hereto (3/3/21 email fr. B. Doran) ("[N]ow that the Temporary Receiver has reviewed and responded to Raging Bull's business plan, and has objected that it lacks specificity, we believe a Magistrate could be very helpful at this time to assist Raging Bull and the Temporary Receiver to work through the specificity that the Temporary Receiver believes is needed for an acceptable plan."). Raging Bull understands that a Magistrate is needed to facilitate any productive discussion between Raging Bull and the Temporary Receiver because (a) based on the many tens of hours spent by Raging Bull and counsel in negotiations with the Receiver over the payment of expenses to maintain the operations of the business it is clear (*see* Dkt. 107, 107-1) that the Temporary Receiver consistently looks to the FTC for "consent" to the Temporary Receiver's decisions, and the FTC expressly stated it would oppose ***any*** business plan; and (b) when Raging Bull tried to engage the Temporary Receiver in a dialogue about the details of the Business Plan, the Temporary Receiver completely ignored Raging Bull.

Unfortunately, the Temporary Receiver again rejected Raging Bull's request. The reason provided for this rejection reveals the Temporary Receiver's view that his real function is to support the FTC and its case. Counsel for the Temporary Receiver stated the Temporary Receiver was uninterested in a dialogue about the Business Plan "to potentially learn more about Raging Bull's efforts to devise a proposed compliance plan, ***the express purpose of which is to avoid a resolution of the FTC's claims***." *See* Exhibit 1 (3/4/21 email fr. M. Saudek) (emphasis

added). Of course, the Business Plan is not an impediment to the FTC's claims; rather, the Business Plan was submitted at the Court's request to assist the Court in determining whether Raging Bull could operate lawfully and profitably while the litigation proceeds. Moreover, the precise relief sought by the FTC in its Complaint and Motion to Show Cause is that Raging Bull be ordered to operate going forward in compliance with Section 5 with the FTC Act. This is an attempt to ***resolve*** that claim for relief.

## III. IN HIS RESPONSE TO THE BUSINESS PLAN, THE TEMPORARY RECEIVER OFFERS CONCLUSIONS FOR WHICH HE HAS NO QUALIFICATION OR EXPERTISE, BUT WHICH SUPPORTS THE FTC'S LITIGATION POSITION

The Temporary Receiver's Response to the Business Plan further reveals his assumed role as advocate for the FTC, rather than as a neutral officer of the Court. As noted below, despite having no expertise or qualification in the subject matter at issue, and despite going well beyond his charge in the TRO, the Temporary Receiver advocates for the FTC's claims, going so far as to declare that the FTC's claim against Raging Bull is "liquidated" – stating that the FTC's claim "***is not 'speculative' because it has been filed and supported with many pages of evidence in this lawsuit***." Dkt. 189, at 16 (emphasis added). Apparently, as far as the Temporary Receiver is concerned, this case is over — and Raging Bull is guilty as charged.

The Temporary Receiver also concludes, again without any expertise or qualification to do so, that Raging Bull makes "earnings claims that are not substantiated or leave a false impression, which appears to be the core of Raging Bull's sales and marketing practices." Dkt. 189, at 7. In supporting the FTC's arguments, the Temporary Receiver parrots the FTC in ignoring Dr. Wind, who concluded that Raging Bull's advertising did not leave a false impression with the typical member of the Raging Bull target audience, which is the relevant test under FTC Act Section 5 in a case like this. The Temporary Receiver further ignores the

evidence that "earnings" claims cited by the FTC in support were in fact substantiated and true. *Infra* at 19.

## IV. THE TEMPORARY RECEIVER'S CONTINUED SUPPORT OF THE FTC'S LITIGATION POSITION

The Temporary Receiver has on several occasions made requests of Raging Bull or its former employees for documents and information for the purpose of supporting the FTC's case against Raging Bull, without any apparent purpose for the Temporary Receiver. For example, on February 11th – after the Temporary Receiver had submitted his Initial Report and before Raging Bull submitted its Business Plan – counsel for the Temporary Receiver made a direct request for a large amount of information from a former Raging Bull employee who still had access to Raging Bull's records. The Temporary Receiver's request was for detailed information on all Raging Bull customers (including contact information, products purchased, cancellation requests) and all of Raging Bull's products and services (including dates each was offered, the subscription terms, gross revenue, number of subscribers, total number and dollar value of refunds per year). At this time, the Temporary Receiver had no need for this detailed information as he had already filed his Initial Report. When Raging Bull learned of this request, it asked why the Temporary Receiver needed it and whether the request came from the FTC. Counsel for the Temporary Receiver would not answer this question, instead saying only that the information requested was of interest to both the Temporary Receiver and the FTC and that he would share it with the FTC. *See* Exhibit 2 hereto (2/16/21 email string between M. Saudek and D. Barger).

Most recently, the Temporary Receiver's advocacy for the FTC was again demonstrated during the March 5th deposition of Defendant Kyle Dennis. During every break in the deposition, counsel for the Temporary Receiver caucused and conferred in private with the FTC counsel. *See*

Exhibit 3 hereto (D. Repking Declaration). Counsel for the Temporary Receiver did not ask any questions of Mr. Dennis in the deposition. *Id.*

## ARGUMENT

### I. THE TEMPORARY RECEIVER IS NOT A MARKETING EXPERT AND CANNOT SERVE AS ONE FOR THE FTC

The Temporary Receiver oversteps his experience and qualifications, as well as his responsibility as temporary receiver, in reaching ultimate conclusions about Raging Bull's advertising and marketing practices. For example, the Temporary Receiver concludes that Raging Bull makes "earnings claims that are not substantiated or leave a false impression, which appears to be the core of Raging Bull's sales and marketing practices." Dkt. 189, at 7. In supporting the FTC's arguments, the Temporary Receiver blindly follows the FTC in ignoring Dr. Wind, who concluded that the allegations made by the FTC in its Complaint about Raging Bull's advertising are unfounded.

The Temporary Receiver is no doubt an experienced and capable lawyer whose career has spanned numerous substantive areas, including matters involving health care, estates and trusts, education, constitutional and civil rights, employment, environmental and professional malpractice, investigations of nonprofit institutions and for governmental clients, and serving as a receiver on multiple occasions for the FTC. Dkt. 3 at Attachment 1. Absent, however, is any advertising and marketing practice experience of any type relevant to the issues presented in this case. He also has no accounting expertise.

This lack of experience or qualification notwithstanding, the FTC holds out the Temporary Receiver's findings and conclusions on Raging Bull's marketing practices as evidence to support its case and, in effect, tries to use those findings and conclusions in an empty attempt to rebut the expert opinions of Dr. Wind. Indeed, noticeably absent from the FTC's

pleadings is any consumer study or report from an actual advertising and marketing expert to quantify or substantiate its allegations or to address Dr. Wind's expert report. Dr. Wind evaluated empirical evidence on whether consumers were in fact deceived by Raging Bull and suffered compensable injury. He found that the "FTC's conclusions are based mostly on speculation, through a few affidavits from customers, and from selective reference to a few ads and marketing materials (without regard to whether they are fairly representative of Raging Bull's overall program or how much of the alleged consumer injury is attributable to these specific ads)." Dkt. 126-2, at ¶ 25. Dr. Wind further concluded that the Company's actual advertising target audience and existing customer base would not materially rely on the alleged historical misrepresentations in purchasing or upgrading Raging Bull subscriptions. *Id.* at ¶ 34.

The FTC's lack of any expert to offer an independent and reliable response to Dr. Wind's opinions leaves a substantial gap in the FTC's case – a gap that the FTC could try to address by offering up their own consumer perception expert, which the FTC does in many of its other advertising and marketing cases – but in a telling manner has not done so here. The FTC attempts to address this significant gap by instead relying on the Temporary Receiver's own non-expert analysis. For example, the FTC characterizes the Temporary Receiver's conclusions in the following manner:

- "[T]he Temporary Receiver's investigation confirmed that Defendants have spent years making unlawful earnings claims and defrauding consumers." Dkt. 188-1, at 1.
- "The Temporary Receiver also noted that "more than 2/3 of the marketing emails the receivership team reviewed" made deceptive earnings claims of the types alleged by the FTC." *Id.* at 2 (citing Dkt. 156, at 53).
- "As background, the Temporary Receiver found a "sea change" would be required in the company's 'approach to legal compliance.'" *Id.* at 23 (citing Dkt. 156, at 105).
- "The 'Temporary Receiver has not found any evidence to date of any meaningful efforts by Raging Bull to review advertising or marketing materials to prevent publication of

false or unsubstantiated earnings claims that violate Section 5 of the FTC Act.'" *Id.* at 24 not 105 (citing Dkt. 156, at 60).

- The Temporary Receiver also found that "although the Company was placing some effort and resources in compliance, revenue growth and profits were a much higher priority." *Id.* at 24 n.105 (citing Dkt. 156, at 63).

The FTC's reliance on the Temporary Receiver in this fashion is misplaced and without basis. The Temporary Receiver has not acted as an independent neutral and is certainly not qualified to offer conclusions as to the validity of the FTC's allegations of deceptive advertising. Moreover, the Temporary Receiver has not been appointed as a "special master" by the Court but is a Temporary Receiver whose main assignment was to identify and preserve assets. Defendants respectfully submit that the ultimate decision on liability and damages is for the Court to decide, not the Temporary Receiver.

## II. THE FTC'S FOCUS ON ALLEGATIONS OF RAGING BULL'S PRIOR CONDUCT IS IRRELEVANT AND FALSE

The FTC dedicates more than half of its Response to attacking Raging Bull and the Individual Defendants in an effort to distract from the actual issues at hand. Not only does the FTC repeat prior allegations, it also adds many new alleged facts to make up for the allegations that the FTC abandoned after Raging Bull exposed them as factually baseless and without merit. But these allegations have absolutely nothing to do with what the Court explicitly directed the FTC to do– to consider and to respond to the Business Plan proposed by Raging Bull. Indeed, Raging Bull does not believe the Court meant that by granting the FTC an opportunity to respond to Raging Bull's Business Plan, the FTC was to instead use that opportunity to get in new baseless evidence and posit new meritless allegations wholly unrelated to the task of addressing Raging Bull's Business Plan.

### A. The FTC Failed to Demonstrate that Raging Bull Deceived Consumers with False Statements

Despite the voluminous filings and arguments by the FTC in this matter, the FTC has not pointed to ***any*** instance in which Raging Bull made any earnings claims that were false or actually misrepresented a guru's or a subscriber's trading performance. The FTC, of course, ***began*** this case claiming that Raging Bull misrepresented its gurus' trading profits. This claim was based on ***solely*** Wermers' error in analyzing trading profits.[5] Raging Bull's expert, Greg A. Kyle, demonstrated that Wermers was wrong – specifically, that there was no purported $56 million trading loss, and Jason Bond had a trading ***profit*** of over $500,000, not a loss of $7.5 million, from 2014 to 2018. Mr. Kyle also analyzed a sampling of the specific guru earnings claims attacked by the FTC in its Motion to Show Cause, and concluded that those claims were correct. Dkt. 126-1. Because the Temporary Receiver continues to claim Raging Bull sold its products and services based on false earnings claims as alleged by the FTC, Raging Bull asked Mr. Kyle to supplement his analysis to review additional guru earnings claims in the FTC's Motion to Show Cause. Mr. Kyle's Supplemental Expert Report is attached as Exhibit 4 hereto.

### B. The FTC Wrongly Suggests Raging Bull was "Alerted" that Its Advertising was Deceptive Before the FTC's Lawsuit, Despite the FTC *Never Once* Informing Raging Bull the FTC Believes Its Advertising Was Deceptive

The FTC suggests – and wants the Court to believe – that Raging Bull was previously "alerted" to problems with its advertising by prior investigations and customer complaints. Not only is the FTC wrong, but the opposite is actually true.

---

[5] In its Motion to Show Cause, the FTC argued Jason Bond's earnings claims must be false because such earnings would not be consistent with Wermers' opinion that Mr. Bond "failed to generate profits and incurred substantial losses over several years." *See, e.g.*, Dkt. 123, at 28-29 (citing Dkt. 2, at 9 n.38 (citing to ¶¶ 92 and 93 of Wermers' report)).

On June 25, 2018, the SEC served voluntary document requests on Raging Bull and Mr. Bond in connection with an informal, confidential SEC investigation. The SEC requested, among other things, materials relating to advertising and certain earnings statements. Over a period of months, Raging Bull and Mr. Bond voluntarily cooperated with the SEC and produced responsive materials. In the two and a half years since Raging Bull and Mr. Bond produced these materials to the SEC, including substantiation for earnings claims, the SEC never followed up, never interviewed Mr. Bond, never asked for additional documents, never questioned the substantiation of Mr. Bond's earning claims, and never issued a testimonial or documentary or a Wells notice. The FTC suggests the SEC's investigation put Raging Bull on "alert." In fact, because the SEC never took any additional action after receiving extensive documentation and numerous communications with counsel, the SEC plainly signaled that Raging Bull's conduct was ***not*** problematic.[6]

The FTC also claims that the New Hampshire Bureau investigation "alerted" Raging Bull about its allegedly problematic advertising practices. But, again, the FTC mischaracterizes plain facts. The New Hampshire Bureau's investigation focused on whether Raging Bull was acting within the publisher's exemption of the state investment advisors act – an allegation not relevant or at issue here. In March and April of 2020, Raging Bull had been negotiating a settlement with the New Hampshire Bureau for the Company to continue operating as a non-registered business, and which largely would not have impacted Raging Bull's advertising practices, when the New Hampshire Bureau surprisingly stopped settlement discussions in the spring of 2020. The New

---

[6] Among the materials produced to the SEC were Mr. Bond's trading account statements, which demonstrated that Mr. Bond was a profitable trader. Mr. Wermers did not review these account statements, and did not recognize Mr. Bond's trading profits, in his flawed expert report. *See* Dkt. 123, at 13-16.

Hampshire Bureau then brought its enforcement action on the same December 7, 2020 morning as the FTC brought its complaint, strongly indicating that the FTC in the interim had put an end to the New Hampshire Bureau's open settlement discussions with Raging Bull.

Furthermore, the FTC wrongly suggests that Raging Bull was "warned" by the Better Business Bureau ("BBB"). The BBB, a private organization with no affiliation with the FTC or any governmental organization, does not verify the accuracy of any information or complaints that users submit. *See* https://www.bbb.org/terms-of-use. The FTC points to a 2017 letter from the BBB, which asks for information from Raging Bull regarding fewer than a handful of statements on the Company's website to assess whether the statements conformed to the BBB's "Code of Advertising." But this "Code" has no authority and "is provided solely to assist users in exercising their own best judgment…." *Id.*

The FTC also claims the 2017 BBB letter "pointed out that the BBB received numerous complaints" about Raging Bull. But, according to the President and CEO of BBB New Hampshire, Robert Shomphe, Raging Bull received 3 complaints in 2014, 1 complaint in 2015, 5 complaints in 2016, and only 6 complaints in 2017 – the year the FTC says the BBB "received numerous complaints" about Raging Bull. *See* PX 22, 1494. The number of complaints increased to 143 in 2020, which – as Raging Bull has demonstrated and the FTC has not rebutted – was largely due to a COVID-related influx of complaints. *See* Dkt. 123, at 44.

Further undermining the FTC's argument is Mr. Shomphe's acknowledgement that Raging Bull's BBB rating was a "B" in November 2019. *See id*. at 1496. The FTC points to Raging Bull's "F" rating from February 2018 to November 2019, but Mr. Shomphe explained that this was because Raging Bull had been miscategorized by the BBB. *See id*. (stating that on "November 5, 2019 [Raging Bull's] rating changed from an "F" to a "B" and that "[t]his change

was based on Raging Bull LLC providing BBB with updated and verifiable Gross Annual Sales data in the form of their 2018 tax return, which placed them in a larger size category and lowered the weight of the unanswered and unresolved complaints that were factored into their BBB rating"). Indeed, according to Mr. Shomphe, Raging Bull's rating was an "A-" at the time it was downgraded in February 2018 to an "F", and the downgrade occurred because Raging Bull was miscategorized and had merely failed to respond to "at least one" customer complaint. *Id.*[7]

Despite the FTC's spurious allegations, the fact is that Messrs. Bishop and Bond have operated Raging Bull (and its predecessor company) for ten years. And all during that time they have never once been sued and the Company has had essentially no consumer litigation (until a recent TCPA matter) and never had a judgment entered against it. Neither the owners nor the Company have ever filed for bankruptcy. There were no investigations of the company until 2018, with the SEC's informal investigation and voluntary document requests. And the SEC did not even pursue their investigation after the Company voluntarily cooperated and demonstrated the substantiation and accuracy of its earning claims and advertisements. The only other investigation of the Company was by the New Hampshire Bureau, and that investigation looked into whether Raging Bull should be registered as an investment adviser.

And yet, without any demand or warning from any governmental or regulatory agency to do so, Raging Bull had been taking numerous significant steps on its own initiative to strengthen its regulatory compliance practices. Dkt. 123, at 8-9. Both the FTC and the Temporary Receiver

---

[7] BBB's rating system has long been of dubious value. *See Terror Group Gets 'A' Rating From Better Business Bureau? Consumer watchdog accused of running "pay to play" scheme with grading system*, Nov. 11, 2010 (https://abcnews.go.com/Blotter/business-bureau-best-ratings-money-buy/story?id=12123843) (20/20 Investigative Report quoting Connecticut attorney general Richard Blumenthal as saying the BBB rating system is "really unworthy of consumer trust or confidence"). Indeed, many reputable companies have received "D" and "F" ratings by the BBB (*e.g.*, E*Trade, PlanetFitness, My Pillow, JetBlue, AMC Theaters, Fox Channels).

try to hold this against Raging Bull, suggesting that Raging Bull's efforts were not good enough and serve to demonstrate that Raging Bull was not serious about compliance. But the FTC acknowledges that Raging Bull was in fact taking serious steps to strengthen it compliance, including "introducing a compliance manual in October 2019; hiring a compliance analyst in January 2020; retaining Greenburg Traurig for compliance training in April 2020; auditing of support phone calls in June and September 2020; and compliance training." Dkt. 188-1, at 24. And Raging Bull was taking all of these steps despite no "warning" that its compliance was insufficient or that it was engaged in unlawful advertising.

Indeed, Messrs. Bishop and Bond were ***never*** warned – not a single time – about its advertising practices by the ***FTC***, the federal government agency empowered to protect consumers from deceptive advertising. There was not a single communication of any type between the FTC and either the Company or the Company's counsel relating to the FTC's apparently year-long investigation – a dramatic departure from the FTC's longstanding practice where FTC investigations commence through the issuance of a Civil Investigative Demand, a voluntary request for production of information, or an informal inquiry. The absence of that is meaningful because it gives the FTC – and a company under investigation – the opportunity to "get the facts right," which the FTC has meaningfully failed to do here. Instead, the FTC ambushed Raging Bull with an enforcement filing on December 7th, without even properly characterizing it, to either the Company or to counsel, as an *ex parte* action. Had the FTC simply come to Raging Bull a year ago, when the FTC's secret investigation appears to have begun, Raging Bull, and Messrs. Bishop and Bond, would have done everything they could to ensure that the Company assisted the FTC in its investigation and corrected, as needed, any shortcoming in its regulatory compliance. And the FTC would have seen that the Company was already

working on its compliance program – highly relevant because FTC Act Section 13(b) provides a basis for injunctive relief only where a defendant "is violating, or is about to violate" a law enforced by the FTC. But the FTC never gave Raging Bull that opportunity.[8]

Indeed, it is painfully clear that the FTC's plan all along – despite the apparent lack of approval by the Commissioners themselves in approving the filing of the Complaint here – has been to shut down Raging Bull's operations. The best way for the FTC to do that was to ambush the Company, using the FTC's enormous power under FTC Act Section 13(b) (a power which is under significant scrutiny by the U.S. Supreme Court and which Supreme Court Justice Breyer critically focused on in the January 13th hearing in the *AMG Capital* case) to choke the life out of Raging Bull. Being permitted to implement the Business Plan that was requested by this Court, and to operate lawfully as part of that, is now the Company's last and best hope.

### C. The FTC Continues to Misstate and Mischaracterize Facts that are Not Relevant to the Business Plan

The FTC also puts forward new and irrelevant allegations in its Response to the Business Plan relating to the company's payment processors and online consumer reviews.

[8] The Temporary Receiver draws the conclusion that "Raging Bull's approach to consumer issues in the first decade seems to be combative rather than cooperative." Dkt. 189, at 11. This is not so. As explained above, Raging Bull has had very little litigation in its first decade. But, where presented with litigation or potential litigation it has tried to resolve that litigation where possible. As shown above, Defendants voluntarily submitted to an informal inquiry from the SEC. It could have but did not require SEC staff to seek permission from the Commission to open a formal investigation and obtain subpoena power before responding (and perhaps it never would have needed to). When the company received notice of an investigation by the New Hampshire Bureau, Raging Bull immediately tried to settle and work with the Bureau on a framework to move forward. Most telling is that when Raging Bull's new accountants made them aware that because of the passage of a new tax law on internet providers they might have sales taxes owing, the company quickly started a process to ***voluntarily*** pay the taxes. Raging Bull had arguments to suggest taxes were not owing, and perhaps the taxing authorities would have never approached the company, but they company acted proactively to pay the tax. And the company has cooperated with the Temporary Receiver here and tried to reach common ground with the FTC on this Business Plan and before, only to be treated combatively by the FTC.

The FTC contends that several payment processors dropped Raging Bull because of excessive chargebacks. This is yet another false allegation by the FTC. Indeed, the FTC presents no evidence that any payment processor terminated the relationship with Raging Bull due to chargebacks. The FTC ignores the fact that Raging Bull had the same payment processor, Bank of America, for nearly a decade. Raging Bull understands that Bank of America only terminated this relationship in 2019 as part of a general purge of all accounts – which included Mr. Bishop, holding an interest in a company, which was under SEC investigation. [9] One of the subsequent payment processors, Stripe, terminated its relationship with Raging Bull in late 2020, likely because of its contact with the FTC during the FTC's secret investigation and the possible fear created by the FTC that it could be sued by the FTC as an aider and abettor to the allegations made by the FTC here against Raging Bull or as a relief defendant.[10]

Contrary to the FTC's new allegations, Raging Bull did not lie to payment processors. The FTC pores over payment processor applications and suggests it caught Raging Bull in lies to obtain a new processing bank. But that is not what they found. For instance, the first instance cited by the FTC is the following: "On September 23, 2020, in response to the following question on a merchant account application: '[h]as Merchant or any Principal been terminated as a Visa / MasterCard Merchant (TMF)?' Raging Bull responded "No." Dkt. 188-1, at 8. This was accurate, and not a lie. As the FTC notes (*id*., at 6-7, n.26), Raging Bull learned it has been placed on MasterCard's temporary monitoring program for having 1.5% chargebacks. This was not a termination and therefore Raging Bull correctly answered "no" to whether it had been

---

[9] For the avoidance of doubt, Mr. Bishop was in no way under investigation himself. To the best of Raging Bull's knowledge, no formal actions or proceedings ensued as a result of the investigation.

[10] Raging Bull cannot confirm this, because it is not permitted under the TRO to take any discovery before the hearing on preliminary injunction.

"terminated as a Visa / MasterCard Merchant. And the fact this was a correct answer is plain from the FTC's own description of the materials it reviewed.

The FTC also repeats its allegation that Raging Bull engaged in poor conduct in connection with online consumer reviews on the TrustPilot website. The FTC grossly mischaracterizes the facts, however. Indeed, as shown in Dr. Wind's expert report and unrebutted by the FTC or Temporary Receiver, there are thousands of ***positive*** unpaid testimonials and customer reviews of Raging Bull on TrustPilot. Dkt. 126-2, at 68-71. Dr. Wind also noted that TrustPilot employs a rigorous customer verification system that accurately verifies actual customers and allowed Raging Bull to flag reviews that are not from verified subscribers. In a highly competitive industry, with unscrupulous enemies – such as Emmett Moore, the securities fraudster seeking "revenge" on Raging Bull and who is a dubious source for the FTC's case (Dkt. 46, at 2-4) –TrustPilot allows Raging Bull to weed out unverified reviewers. Raging Bull denies the FTC's allegation that it sought to remove knowingly verified reviews, but even if that had occurred on some occasion this does not change the fact that TrustPilot overwhelmingly demonstrates that Raging Bull's subscribers value the Company and its services.

## III. RAGING BULL'S COMPLIANCE PLAN ENSURES THE COMPANY WILL OPERATE ITS BUSINESS LAWFULLY

### A. The FTC and Temporary Receiver Ignore the Role of the Independent Compliance Monitor, Which Ensures the Company Will Operate Lawfully Before Any New Consumer Advertising Can Occur

Both the FTC and the Temporary Receiver fail to understand or appreciate the role of the independent Compliance Monitor in Raging Bull's proposed Business Plan. This is surprising, as the FTC has frequently approved the use of compliance monitors for the same purpose as Raging Bull lays out in its Business Plan, as noted below.

The Compliance Monitor will be appointed by the Court. Raging Bull will establish and staff a Compliance Team, who will be subject to the final decision authority of the Compliance Monitor with respect to all matters of compliance. Dkt. 177, at 11. The Compliance Monitor will oversee Raging Bull's work during Phase 1 to revamp and expand its advertising and compliance infrastructure. This will include addressing the specific concerns the Temporary Receiver raised in his Initial Report. *Id.*, at 9-10.

During Phase 1, while working with the Compliance Monitor to establish the policies, procedures and practices for full operations, Raging Bull cannot engage in any advertising or marketing to potentially new subscribers, and its communications with current subscribers will contain no earnings claims, no consumer testimonials, no misrepresentations of any type regarding Raging Bull's services, and no solicitations of renewals or additional services. There will be no activities during Phase 1 that could even possibly violate Section 5.

The purpose for the significantly restricted operation during Phase 1 is to allow Raging Bull the time to re-connect with its many thousands of loyal subscribers and to work under the supervision of the Compliance Monitor to put its detailed compliance plan into place. Raging Bull will not – indeed, cannot – move to Phase 2 until the Compliance Monitor and the Court approve it. Specifically, when Raging Bull completes all Phase 1 steps, the Compliance Monitor will conduct an audit of Raging Bull's readiness to fully operate. Only if the Compliance Monitor is satisfied that the compliance plan is comprehensive, compliant and sufficiently detailed will the Compliance Monitor certify the satisfactory completion of Phase 1. At that time, the Compliance Monitor will submit a written report to the Court, which will then determine whether to approve the report. At that time – and no sooner – will Raging Bull be permitted to

move to Phase 2. And if the Company moves to Phase 2, the Compliance Monitor will remain in the same position until this litigation is resolved.[11]

### B. The Few Details Identified by the Temporary Receiver as "Missing" are Minor and Do Not Justify the Temporary Receiver's Rejection of the Business Plan

The Temporary Receiver contends the compliance plan is not sufficiently detailed to allow him to evaluate whether Raging Bull will operate lawfully. This position ignores the purpose of Phase 1 and the role of the Compliance Monitor, who will oversee the development of all of the necessary details for the plan in Phase 1 and has the sole authority to recommend to the Court that Raging Bull be allowed to continue to Phase 2. Indeed, the very purpose of the Compliance Monitor and his/her involvement and authority is to dispel any legitimate concerns the FTC and Temporary Receiver might have.

Because the Temporary Receiver fails to understand Raging Bull's two-phase approach and the role of the Compliance Monitor, he criticizes minor details of the compliance plan that are not germane to the task of determining whether Raging Bull can operate lawfully, or says there are missing details that are, in fact, not missing.

For example, the Temporary Receiver objects to the Business Plan having only the "vague requirement" that the Chief Compliance Officer be available to work in the Baltimore office, and not establishing a clear minimum number of compliance staff employees. Dkt. 189, at 5-6. Raging Bull doubts this level of detail is necessary or desired by the Court to be listed out in

---

[11] Contrary to the Temporary Receiver's assertion, the Compliance Monitor would not literally need to review every piece of advertising that was sent to consumers. Note, for comparison, that on December 22, 2020, the Securities and Exchange Commission adopted amendments to Rule 206(4)-1—the "Advertising Rule") under the Investment Advisers Act of 1940, creating a new "Marketing Rule." Although not directly applicable to Raging Bull, for reference, this Marketing Rule permits testimonials, endorsements, and third-party ratings, subject to certain restrictions and conditions.

the Business Plan. Indeed, Raging Bull would expect that if it needs, for example, five rather than four compliance staff employees, or if its Chief Compliance Officer should be physically present in the Baltimore office at least four days a week, that is a detail that Raging Bull can work out and run by the Compliance Monitor for approval in Phase 1. In any event, had the Temporary Receiver simply asked, Raging Bull would have answered that the company anticipates five compliance employees (including the Chief Compliance Officer) who report to the Company's general counsel. And the reason for leaving open the possibility of the Chief Compliance Officer working at least some of the time remotely is to help the Company attract the best candidate, including someone with extensive FTC experience, and perhaps from the pool of legal candidates outside Washington, D.C. Although Raging Bull does not understand the Court to be looking for this level of granularity, had the Temporary Receiver simply asked rather than apparently seeking pretexts to oppose whatever the Company put forward as the FTC does, Raging Bull would have provided these additional details.

The Temporary Receiver also suggests the Business Plan is missing various details about its future advertising. For example, the Temporary Receiver suggests an explanation is needed about how Raging Bull's "litigation posture" that it did not engage in deceptive advertising will not undermine its compliance efforts. In fact, the Temporary Receiver, again simply parroting the FTC, claims that he has "substantial concerns about the seriousness of commitment and effectiveness of Raging Bull's efforts." Dkt. 189, at 5. But the lesson here is the opposite. Raging Bull not only believes its pre-FTC lawsuit advertising practices were lawful, but submitted a powerful, and unrebutted, expert report from Dr. Wind, who demonstrated that Raging Bull's target audience was not deceived by its advertising. The fact that, despite its strong defense on the merits of this case, Raging Bull is willing to take all of the steps outlined in the Business

Plan, willing to submit to the appointment of an independent Compliance Monitor who, with the Court, alone holds the key to Raging Bull proceeding to Phase 2, and the fact that Messers. Bishop and Bond will make $10 million of their own funds available to cover any shortfalls, demonstrates to any unbiased observer just how serious their commitment is.

To take one more example, the Temporary Receiver also claims that Raging Bull fails to explain "whether its prohibition on misrepresentations concerns only the Company's services or whether the prohibition extends to gurus' performance or subscribers' purported performance." Dkt. 189, at 5 ("These mandates would be critical to understanding Raging Bull's compliance proposal."). As the Temporary Receiver should know, Raging Bull has always had a clear and definitive policy prohibiting misrepresentations. And, as demonstrated in Mr. Kyle's Supplemental Expert Report, all of the guru earnings claims attacked by the FTC in its Motion to Show Cause were actually correct.

If there is any remaining doubt, Raging Bull understands that any earnings claims made in its advertising require substantiation and Raging Bull agrees to comply with this requirement and all applicable rules going forward. Indeed, if it did not agree, the Compliance Monitor would not certify Raging Bull's completion of Phase 1 and the Company cannot engage in any advertising or marketing activities of any type.

### C. Raging Bull's Compliance Plan is Consistent with Other FTC Matters

The use of an independent monitor to evaluate, assess and report on the implementation of a compliance plan has been frequently used by the FTC in other matters, so the FTC can take no serious issue with a monitor being used here. In OTA, for example, the Court ordered a monitor to review marketing materials and report to the Court on OTA's compliance with a Preliminary Injunction Order. *FTC v. OTA Franchise Corporation, et al.*, No. 8:20-CV-00287

JVS (C.D. Cal.), Preliminary Injunction (Apr. 2, 2020), Dkt. 130, at 18-19. In that case for instance, the Monitor was tasked with, among other things:

> Identifying and reviewing the Monitored Entities' marketing materials and other Documents that reflect the Monitored Entities' marketing, advertising, promotion, offer for sale, or sale of their trading or investing training programs, including, but not limited to, radio ads, television ads, direct mail, email, search engine advertising, Internet banner advertisements, websites, online videos, webinars, social media, live sales events, recordings of live sales events, including recordings of franchisee-owned training centers' events, handouts, slide decks, workbooks, telephone calls (both live and recorded), call logs, call detail records, and reports. The Monitor will determine the number of live sales events, recordings of live sales events, and calls to review. *Id.* at 18.

Raging Bull understands this to be in line with what an independent monitor and the Court would expect, and the Company would willingly submit to this type of oversight—in line with precedent and with whatever else the Court deems necessary based on the facts—as part of its compliance plan to restore full operations. Raging Bull is confident that, in keeping with its Business Plan, its consumer advertising and marketing practices will be deemed legal and compliant by an independent Compliance Monitor, as a precondition to being approved by the Court.

It is also the case that the FTC must recognize that that the scope of the preliminary injunction, and the surrounding measures that support it such as the imposition of a Compliance Monitor, must be narrow and reasonable. In an appeal before the federal Ninth Circuit as to whether the First Amendment precluded the issuance of a preliminary injunction against OTA (where the court enjoined only deceptive or unsubstantiated advertising and marketing claims), the FTC directly concedes this point. The FTC in that matter articulated that in order to regulate commercial speech under the landmark *Central Hudson* case, it understood that the constitutionality of its restrictions must satisfy a three-prong test evaluating: whether (1) "the asserted governmental interest is substantial"; (2) "the regulation directly advances the

governmental interest asserted"; and (3) "it is not more extensive than is necessary to serve that interest." *FTC v. OTA Franchise Corp.*, Case 20-55356 (May 29, 2020), Answering Br. for the FTC at 46-47 (citing 447 U.S. 557, at 566 (1980)).

In defending the imposition of a compliance monitor, the FTC observed "[u]nder the terms of his appointment, the monitor reviews appellants' practices to ensure that they are consistent with the district court's order, and reports purported violations to the court. His focus is on appellants' sales and marketing materials, not their instructional activities." *Id.* at 50 (citations omitted). Having established this, the FTC concluded "The monitor thus firmly satisfies the Central Hudson factors because his role is **directly related and reasonably tailored** to advance the substantial government interest in keeping appellants' advertising honest and consistent with the court's restrictions." *Id.* (emphasis added). Significantly for the present matter, whereas OTA *opposed* the imposition of a Compliance Monitor on First Amendment grounds in its FTC case, Raging Bull is willingly *offering* to submit to the use of a Compliance Monitor as part of a Court-approved phased approach to restoring full operations. Raging Bull respectfully submits that its Business Plan, in addition to being firmly in line with precedent, demonstrates the Company's clear desire to voluntarily submit its consumer advertising and marketing practices to oversight—the oversight that other companies have flatly opposed.

Independent monitors have been used in many other FTC cases as well. *See, e.g.*, *FTC v. Western Union Co.*, No. 1:17-CV-0110 (M.D. Pa.), Dkt. 12 (Jan. 20, 2017), at 27-28 (appointing an independent compliance auditor to review, assess, evaluate and report on Defendant's with the stipulated order for permanent injunction); *FTC v. Herbalife Int'l of Am.*, No. CV16-05217 BRO(GJXx) (C.D. Cal.), Stipulated Order for Permanent Injunction, Dkt. 17 (July 25, 2016) (same); *FTC v. Telestar Consulting, Inc. et al.*, No. 2:16-cv-00555-SJO-SS (C.D. Cal.), Dkt. 38

(Mar. 24, 2016) at 19 (directing and authorizing the Monitor to "Monitor the Defendants' compliance with this Order by: (1) identifying and reviewing the Defendants' marketing materials, time sheets…reports and other documents that reflect the Defendants' business activities"). The FTC did not shut those companies down, but rather allowed them to operate with an independent monitor, just as is described in Raging Bull's Business Plan. The only apparent difference is that here the FTC has no interest in any business plan that would allow Raging Bull to operate.

Strangely, the FTC seems to be arguing out of both sides of its mouth, saying whatever seems to be convenient to suit its immediate purposes. Here, the FTC and the Temporary Receiver criticize the Raging Bull Business Plan because it "lacks specificity" sufficient to commit Raging Bull to lawfully operate and assure the Court of doing so. Yet in the *OTA* case, where OTA made the same "lack of specificity" criticism of the FTC's proposed Preliminary Injunction language in that case, the FTC stated in its Opposition Brief that the FTC's proposed Preliminary Injunction provides "'flexibility and reasonable breadth, rather than meticulous specificity' which is consistent with the law." FTC OTA Opposition Brief in OTA at page 69 (case citations omitted) (notably, the FTC's Opposition Brief in OTA was authored by one of the FTC counsel in this case). Well, which is it? The FTC cannot have it both ways — changing its views when convenient to fit the facts. We submit that the Raging Bull Business Plan has sufficient specificity for the Court's purpose here — and the company is happy to provide more specificity as needed.

### D. For the Court's Consideration, Raging Bull Recommends Affiliated Monitors, Inc. to Serve as Compliance Monitor

To further assist the Court in evaluating the Business Plan, Raging Bull has identified and recommends Affiliated Monitors, Inc. ("AMI") to act as the independent Compliance Monitor.

Monitors from AMI have served as independent compliance monitors in numerous state and federal matters, including matters involving the Federal Trade Commission. AMI has the expertise and experience to act in this capacity. Raging Bull submits for the Court's consideration a representative list of recent federal cases for which AMI has served as an independent monitor. *See* Exhibit 5. For context, AMI was jointly selected by the FTC and the Defendant in the *Herbalife* case following a highly rigorous and public selection process.[12] Twenty-six organizations submitted applications to the FTC for consideration as the compliance monitor, including a number of prominent national law firms, and AMI was selected for the role.[13] *FTC v. Herbalife Int'l of Am., Inc*., Case. No. 16-cv-05217-BRO-GJSx (C.D. Cal), Dkt. No. 18, Joint Notice of Selection of Independent Compliance Auditor, at 2. Given the stature and experience that AMI possesses, and the fact that it has acted as a compliance monitor in FTC matters before, Raging Bull respectfully submits that AMI could faithfully execute the compliance oversight duties set forth in the Business Plan and in line with the Court's expectations and approval. Raging Bull proposes AMI based on past approval by federal district courts and the FTC, or by selection of the Court based on recommendations by the FTC and the Company.

**E. The Compliance Monitor Will Ensure Raging Bull's Customer Service, Refund and Cancellation Policies and Practices are Lawful**

Both the FTC and the Temporary Receiver also fail to understand or appreciate the role of the Compliance Monitor concerning Raging Bull's customer service, refund and cancellation

[12] *See* FTC Press Release, "FTC Seeks Applicants for Independent Compliance Auditor to Assess Herbalife's Compliance with Court Order," Aug. 9, 2016, *available at* https://www.ftc.gov/news-events/press-releases/2016/08/ftc-seeks-applicants-independent-compliance-auditor-assess-0.
[13] *See* FTC Press Release, "Applications for Herbalife Independent Compliance Auditor," Aug. 31, 2016, *available at* https://www.ftc.gov/public-statements/2016/08/applications-herbalife-independent-compliance-auditor.

policies and practices. The FTC once against suggests the Business Plan does not provide sufficient details of exactly how Raging Bull will structure its refund and cancellation process. Raging Bull again does not believe this granular level of detail is necessary in the plan requested by the Court. More importantly, as stated in the Business Plan, all policies and procedures for addressing refunds, renewal cancellations and complaints, which will be updated and developed during Phase 1, will be subject to review and approval by the Compliance Monitor. Dkt. 177, at 11-12. If these policies and procedures are not sufficient for compliance, then the Compliance Monitor will not certify that Raging Bull has completed Phase 1 and Raging Bull will never get to Phase 2.

Instead of acknowledging this structural protection, both the FTC and Temporary Receiver criticize Raging Bull's plan for not committing to certain practices that ***are not even required by ROSCA***. The FTC rejects Raging Bull's plan because it would allow subscribers to cancel by calling the Company's customer service team. The FTC does not – and cannot – contend this is anything but entirely consistent with ROSCA. The FTC's position, instead, rests entirely on its belief that Raging Bull cannot be trusted to comply. But whatever level of distrust the FTC purports to have, the Compliance Monitor defuses this by having the expertise and authority to ensure Raging Bull fully complies with ROSCA.

Both the FTC and the Temporary Receiver also object to Raging Bull's plan to honor new refund requests only for those services that have a refund option. Dkt. 188-1, at 27; Dkt. 189, at 10. If ROSCA actually required all of Raging Bull's services to have a refund option, then the FTC and Temporary Receiver would have a reasonable criticism. But ROSCA does not (*see* 15 U.S.C. § 8403(3) (requiring "simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other

financial account")), and neither the FTC nor the Temporary Receiver provide any support for their objection.

## IV. RAGING BULL'S BUSINESS CAN AND IS EXPECTED TO BE PROFITABLE PENDING RESOLUTION OF THIS CASE

### A. Raging Bull Offers a Valued Service – Stock Market Trading Education – to Consumers to Meet what the FTC and Temporary Receiver Admit is a Strong Market Demand

In claiming that Raging Bull has nothing of value to sell, the FTC shrugs off what has always been the core business of Raging Bull – trading education. Raging Bull teaches consumers how to trade stocks and options, focusing primarily on swing trading. This is what Raging Bull's advertising will focus on, because this is what Raging Bull will continue to do.

Both the FTC and the Temporary Receiver acknowledge there is a market for what Raging Bull offers. In its Initial Report, the Temporary Receiver noted there is a "strong public interest in stock trading and, implicitly, education in trading." Dkt. 156, at 105. The FTC admits this as well, saying "no one contests" that a market demand exists for investment education. Dkt. 188-1, at 20. Raging Bull offers and will continue to offer products and services, and advertise those products and services, to meet this market.

This is why Raging Bull's subscribers support Raging Bull, as illustrated by numerous recent subscribers statements:

> Email #1: I am a Raging Bull Subscriber. I have been a subscriber on and off for several years. I cannot say enough about the training and knowledge I have received from them. They work hard at training their customers. I have loved their program. I have a subscription where you can live trade with Nathan Bear and others. They are always telling customers that you need to have a strategy and exit plan. What works for some may not work for others. They give us the tools and then we have to have common since when using them. Since my subscription has been suspended, because of the FTC, I have joined a couple of other services. One service I belong to is not much different than Raging Bull except I made more money at Raging Bull. They have live training, rhetoric like Raging Bull, and enthusiasm. I cannot understand why Raging Bull is shut down if these others are still open.

> Email #2: I first discovered Jeff Bishop and Raging Bull via an ad on YouTube. I was watching an educational video explaining some of the terminology used for trading options in the stock market. I was looking for additional education about the market and, more specifically, about trading/buying/selling options. I was immediately attracted to Raging Bull's services because I was looking for more education. I don't remember which marketing event I was taken to, but I signed up for the newsletter and marketing materials. … I clearly understood that they were providing an education service and NOT investment advice; which is exactly what I looking for. I wanted to learn more about the stock market so that I could make investment decisions that I wanted to make.
>
> Email #3: The service is designed around education. They offer multiple platforms for teaching stock market education. For most, this is the reason we choose to invest in their company. It is an individual choice to invest our own money into a company of our choice. There has been no false information provided by Raging Bull. Clearly, the information is presented by their members that they are not a financial advisor, and their stock recommendations come with risk.
>
> Email #4: I signed up with RagingBull around mid August 2020. In just a few short months I gained an incredible amount of knowledge that I continue to use to trade the market. There is a huge amount of high quality training material available that I took full advantage of. I was watching at least 3-4 hours of training everyday for about 2 months. I went from knowing nothing to having enough knowledge to confidently find my own trades. I can honestly say that the education I received through Raging Bull was of higher quality than many of the college courses I took to obtain my BA degree.
>
> Email #5: I would like to offer my observations on this action. I am a former CFP, educator and investment professional. In that capacity I have been a part of and have reviewed a vast number of trading plans and programs and I find Raging Bull to be legitimate. They are, primarily, an education service and as such serves their customers well. They breakdown technical analysis and charting into an understandable format.

*See* Group Exhibit 6 hereto.

Both the FTC and the Temporary Receiver argue that Raging Bull relies entirely on its trade alerts and earnings claims to sell its products, and both express doubt that Raging Bull can succeed without them. For this point, the FTC relies on the Temporary Receiver's stated

recollection from his interview with Nathan Bear in which Mr. Bear purportedly said he was unsure if Raging Bull could be successful without earnings claims and trade alerts. Dkt. 188-1, at 2. But this vague recollection is entirely devoid of details or context, including what question(s) Mr. Bear was asked, what his actual answer was, whether he was specifically asked about unsubstantiated earnings claim and trade alerts made before or after trades, and what other related statements may have been made by Mr. Bear. The Temporary Receiver provided no transcript or notes from his interview. And Raging Bull was not invited to and was not present at the interview.

In fact, the FTC and Temporary Receiver both overshoot the mark by suggesting that earnings claims and trade alerts are inherently problematic and cannot be part of Raging Bull's Business Plan going forward. This position, however, is belied by the fact that advertising products that include trade alerts and include earnings claims ***are not unlawful*** and are central to how Raging Bull's competitors operate every day. The real issue is rather that earnings claims made in advertising need to be substantiated.

To the extent the Temporary Receiver and FTC raise concern with unsubstantiated earning claims, Raging Bull has agreed that it will not use unsubstantiated earnings claims in any of its advertising, and will do no consumer-facing advertising of any kind until Phase 2. The FTC and Temporary Receiver's concern that Raging Bull will not be able to sell its products without using earnings claims is demonstrably false, as any earnings claims made in Raging Bull's advertising will be substantiated. This is consistent with the trading education market, and is used by Raging Bull's competitors every day.

Furthermore, as indicated in the Business Plan, Raging Bull will modify its trade alert practice such that all trade alerts will be made ahead of any buy or sell. Dkt. 177, at 7. This change will address the concerns raised by the FTC and the Temporary Receiver.

For instance, the FTC claims that by alerting trades after the guru buys or sells the stock, the guru "front runs" trading activity to the guru's benefit and the subscribers' detriment. While Defendants deny this actually constitutes "front running", however, by alerting trades only before the trade is made, there isn't even a hint of "front running." The FTC acknowledges this. And although the FTC appears to suggest that even alerting trades before they are made remains a "problem," the FTC does not identify what exactly the "problem" is. Dkt. 188-1, at 19.

The FTC (and Wermers) ignores the fact that real time trade alerts (whether made ahead or after trades) are common in the trading education industry for the purpose of providing education to subscribers. Raging Bull, like many of its competitors, teaches trading in part by executing a trading strategy in real time, under real market conditions and without bias from hindsight. Dkt. 123, at 5 (citing declarations of J. Bishop and K. Dennis). Thus, Raging Bull's gurus educate subscribers through a "teach by doing" method, providing real-time trading examples. *Id.* (citing Bishop Decl. at ¶ 15. Dennis Decl. at ¶ 23). As Raging Bull pointed to in its Business Plan, Jim Cramer of TheStreet.com – perhaps the market's highest profile trading educator – provides real time trade alerts made ahead of his trades. Dkt. 177, at 4-5. There is nothing unlawful or wrong about trade alerts, despite the FTC's and Temporary Receiver's stated, but unsupported, skepticism.

And almost every one of the ads provided to the Temporary Receiver on January 29, 2021 promote real time trade alerts. *Infra* at 42. In other words, it is extremely common among

competitors in the online trading education market. This is difficult to square with the Temporary Receiver's stated concern:

> Many subscribers have informed the Temporary Receiver that they bought Raging Bull subscriptions to receive the real-time trade alerts, so they can follow them. Raging Bull management and ownership have conceded that mirroring occurs. Offering real time trading alerts creates a risk of future legal exposure to claims and seems at odds with Raging Bull's stated reliance on a learning management system.

Dkt. 189, at 7-8.

The FTC also claims (joined by the Temporary Receiver) that Raging Bull deceives consumers in its marketing by claiming or implying consumers will make money mirroring their trades through trade alerts. Similar to their unfounded concerns about trade alerts, there is also nothing unlawful about having subscribers who mirror trades. In fact, there are pure stock pick companies operating that do nothing more than pick stocks and alert trades for subscribers to follow. This is, of course, not what Raging Bull does, as it provides trading education services. But the point is there is nothing inherently problematic or concerning about having subscribers (or anyone else) mirror trades.[14]

Rather, the issue under FTC Act Section 5 is that trade alerts and the possibility of trade mirroring cannot be deceptively marketed. As the Business Plan makes clear, Raging Bull will not engage in any deceptive advertising. And Raging Bull will use prominently-placed "clear and conspicuous" disclaimers to counter any possible misimpression. Moreover, this is fully addressed in the Business Plan with the role of the Compliance Monitor, who will not allow unlawful advertising to be sent to consumers. This is the safeguard in the Business Plan to ensure consumers are not misled or deceived.

---

[14] It is of course common for investors to mirror the trades of other investors or pundits. Warren Buffett knows his trades are followed by investors, and that this parallel trading might influence the price of stock he trades. But Warren Buffett, of course, is not defrauding investors.

### B. The Temporary Receiver Inexplicably Ignores the Large Number of Competitor Advertising Examples, Similar to Raging Bull's Own, that Raging Bull Provided to Temporary Receiver Before He Submitted His Initial Status Report

In its Business Plan, Raging Bull provided a sampling of the types of products and advertising of Raging Bull's competitors. Dkt. 177, at 3-6. These materials demonstrate that Raging Bull's competitors advertise using earnings claims, feature real time trade alerts and claim their services help subscribers make money in the market. *Id.* Again, there is nothing unlawful or problematic about this advertising, which the FTC allows in the marketplace every day.

The Temporary Receiver concedes that online trading education companies operate and advertise in compliance with Section 5. Dkt. 189, at 7. However, the Temporary Receiver downplays the advertising examples provided in the Business Plan by saying it only consists of a "single statement" in a Motley Food ad "about a portfolio being 'up 712%.'" *Id.* The Temporary Receivers says this ad is distinguishable because it includes an earnings claim about "overall performance of a portfolio, rather than any specific trade, and so actually establishes a record of earnings success that can be substantiated." *Id*. On this basis alone, the Temporary Receiver concludes that Raging Bull failed to establish that its competitors' marketing bears similarity to its own.

What is remarkable about this dismissiveness of the samples provided in the Business Plan is that the Temporary Receiver knows full well there is no shortage of comparable ads made by competitors in the market. The Temporary Receiver knows this because on January 29, 2021, Raging Bull sent to counsel for the Temporary Receiver a 47-page document full of competitor advertisements, featuring: earnings claims, including earnings claims on single trades; promotion of real time trade alerts; stock and options trading educational materials; both short-term stock

recommendations; stock pick services; ads saying "we do the research for you" "simple strategies that could more than double your returns", "learn how I turned $12,415 into $6,56,287 trading stocks", "It doesn't matter where you live, it doesn't matter your schedule … You don't even have to be that smart, or that great at math, it doesn't matter if you have a lot of money, or a little, it doesn't matter if you know anything about the stock market", "you don't need a large account to start"; use of disclaimers; live trading communities; etc.

For the convenience of the Court in reviewing the competitor advertising materials that the Temporary Receiver has had since January 29, the 47-page document is attached as Exhibit 7 hereto. More recently, Raging Bull has compiled additional competitor advertisements that further demonstrate that the company's competitors utilized advertising similar to Raging Bull. A group exhibit of these additional advertisements is attached as Exhibit 8 hereto. This group exhibit also includes a handful of Raging Bull advertisements highlighting the company's focus on trading education. To illustrate the types of advertisement in this group exhibit, below are a few examples:



7:25

Trading Roadmap Leading To Pr...

MarketWatch

The Number One

**How 'the single best trade of all time' netted one investor a $2.6 billion profit**

Published: May 2, 2020 at 9:31 a.m. ET

That's a return of 100,000%.

No, that's not a typo... I said a 100,000% return.

**That's enough to turn $1,000 into an easy million.**

Now, in an exclusive one-hour training event, you can learn how to unlock this powerful roadmap...

And discover how to start using it in your own trading to consistently bag winning trades worth up to THOUSANDS of percent in profits.

**Discover The Secrets Of This Life-Changing Roadmap... And Learn How To Leverage It In Your Own Trading Starting Today!**

See, not only can this roadmap show you precisely where to get in and set your profit targets...

**But it can also help you structure your trades in an optimal way that can amplify your returns by a factor of up to 1,000X.**

It's all being revealed in a very special in-depth training event...

**Which you can view right now by clicking right here!**

**Day 7: These 3 tech stocks could dominate the $12.5 trillion 5G sector**

**Money Morning** <moneymorning@e.moneymorning.com> Mon, Nov 23, 2020 at 9:33 AM
Reply-To: moneymorning@e.moneymorning.com
To: mmills@ragingbull.com

You are receiving this as a part of your subscription to *Money Morning*. To remove your email from this list, unsubscribe here.

WE MAKE INVESTING PROFITABLE

Dear New *Money Morning* Member,

We're right on the edge of a *massive* turning point in tech.



**Bob Keppel**
**Publisher**

In a few weeks - maybe even days - there will be no turning back.

I'm talking about 5G high-speed cellular networks.

I expect this single 5G event to unleash millions - even billions - in new wealth for investors that latch on now.

How do I know?

Because our very own tech specialist Michael Robinson has been following the 5G story for more than five years.

And when Michael gets excited about something, our readers tend to see huge profits...

Like 143% gains in under two years...

289% gains in under three years...

And 258% gains in just 15 months.

Now, he believes 5G could blow all of those gains out of the water.





Here's Michael...

• • •

In all my time researching 5G, I *NEVER* could have anticipated what happened this year.



**Michael Robinson**
**Defense + Tech Specialist**

Due to the stay-at-home orders in the United States and across the globe, the internet has gone from a household staple to an essential part of our day-to-day life.

Since the crisis began in March, there's been...

- A 60% increase in data usage...
- A 300% surge in teleconferencing...
- And an 850% rise in the number of people working from home.

This extra traffic has put the internet under tremendous stress. Internet speeds are tumbling.

And 5G is the answer.

At the end of 2019, 5G was going to be a brilliant technological innovation.

Now it's an absolute necessity to our way of life.

The first major roll out of 5G is going to happen any day now, and I expect that to bring a HUGE payday for three little-known companies.

**Just click here to see them**, and as an added bonus, I'll automatically add you to my ***Strategic Tech Investor*** mailing list, so you can get updates and new recommendations from me at no cost.

Sincerely,






Don't miss out. Get these recommended stock picks before the next market close.

05 : 24 : 15 : 22
UNTIL MARKET CLOSE

Join Now

188 Stock Recommendations with 100%+ Returns

*Stock Advisor* members gain unlimited access to our library of expert stock recommendations inside the service, each carefully aimed at multiplying your net worth.

Members also receive new stock picks – each and every month – from legendary investors and Motley Fool Co-Founders, Tom and David Gardner.

| Recommendation Return | S&P Return | Vs. S&P Return |
|---|---|---|
| +29,061% | +338% | +28,723% |
| +23,079% | +364% | +22,715% |
| +21,173% | +509% | +20,664% |
| +19,194% | +226% | +18,878% |
| +16,560% | +284% | +16,276% |
| +13,857% | +306% | +13,551% |
| +10,982% | +226% | +10,756% |
| +9,928% | +432% | +9,495% |
| +9,294% | +383% | +8,911% |

Returns as of January 4, 2021

amazon
Amazon
up 21,014%

Average *Stock Advisor* Recommendations Have Returned Over 564%




### C. The Recent Change in Accounting Methodology Does Not Change the Fact that Raging Bull Has Always Been Profitable

The Temporary Receiver and his expert argue that Raging Bull will not be profitable in part because they claim that Raging Bull has never been profitable, based on their use of an inapplicable accounting method. In his initial report, Mr. Peroutka opined that Raging Bull was ***never*** profitable from 2016 to 2020, has always been burdened with a huge negative net equity, and paid its partners and Mr. Dennis $59 million in distributions from "unearned income." However, Raging Bull's expert, A. Christine Davis, demonstrated conclusively that Mr. Peroutka was wrong.

Based on her analysis of the Company's financials and the application of the actual accounting methodology used by Raging Bull up to the second quarter of 2020, Ms. Davis concluded that Raging Bull has always been profitable and all distributions were paid from earned income.

From the inception of the Company, Raging Bull has funded its growing operations from strong internal positive cash flows. Raging Bull has no outside investors, no debt to third parties, and no public shareholders. And yet, it had the cash available to appropriately pay all distributions from earned income throughout the Company's history. This is a profitable company. Indeed, the FTC does not even dispute this. Dkt. 188-1, at 21.

Mr. Peroutka's initial report was deeply flawed because he applied the wrong accounting methodology, accrual-basis accounting, despite the fact he had access to Raging Bull records that made it clear he was wrong because the Company used cash-basis accounting. In his second report, Mr. Peroutka tacitly acknowledges his mistake by no longer claiming the Company used accrual-basis accounting. In its place, however, Mr. Peroutka now claims that Raging Bull used "modified cash-basis" accounting before 2020, but did so incorrectly in how it handled distributions. In essence, Mr. Peroutka continues to claim the Company has never truly been profitable because it paid those distributions. However, Mr. Peroutka is wrong again; the Company did not use "modified cash-basis" accounting, as Ms. Davis demonstrates. Exhibit 10 at 6-11.

In his Response to the Business Plan, the Temporary Receiver discusses at length the fact that Raging Bull presently has a large negative net equity position. Dkt. 189, at 12-15. While the Temporary Receiver emphasizes how "huge," "massive" and "severe" this negative equity position is, he nonetheless recognizes, as he must, that this negative equity position matters only from "an accounting standpoint." *Id.* at 13.

The Temporary Receiver and Mr. Peroutka both pin their arguments that Raging Bull will not be profitable going forward on the payment distributions. The fact that Messrs. Bishop and Bond have committed not to take any distributions until the Company satisfies its current

liabilities and obligations and resumes profitable operations once again should allay these concerns.

### D. Raging Bull's Expectation on Retaining Paid Subscribers Over Time is Reasonable

In its Business Plan, Raging Bull projects that it will retain approximately 30,000 paid subscribers over time. Both the FTC and the Temporary Receiver incorrectly suggest that Raging Bull arrived at this number based on the percentage of "supportive" emails Raging Bull and the Temporary Receiver have received since the lawsuit. This is not so. Raging Bull knows its subscribers and knows its business. And just like any other business would do, Raging Bull drew on its knowledge and experience to project its expected subscriber base going forward.

Furthermore, the Temporary Receiver's contention that only 37% of subscribers who emailed the Company or Temporary Receiver are supportive of Raging Bull is wrong and plainly designed to mislead the Court. The Temporary Receiver arrives at this percentage by baselessly claiming that all subscribers who requested a refund or cancellation after the FTC's lawsuit were not supportive of Raging Bull and "have had their fill of the Company." Dkt. 156, at 88.

In his Response to the Business Plan, the Temporary Receiver reported that he and the company received 1,493 refund requests after the FTC lawsuit was filed. Dkt. 189, at 18. On March 3, 2021, Raging Bull requested the Temporary Receiver immediately produce these 1,493 refund requests. Exhibit 1 (3/3/21 email fr. B. Doran). At first, counsel for the Temporary Receiver agreed to produce the 1,493 documents. *Id.* (3/4/21 email fr. M. Saudek). Subsequently, counsel for the Temporary Receiver said he would only provide the refund requests that were sent directly to the Temporary Receiver, telling Raging Bull to go find the requests sent to Raging Bull itself despite the fact that the Temporary Receiver has full access to the emails and, presumably, segregated the refund requests to arrive at his specific count of 1,493. *Id.* (3/6/21

email fr. M. Saudek). Raging Bull finally received only approximately 1,150 emails in total from the Temporary Receiver. Based on undersigned counsel's review, the breakdown of these emails (in approximate numbers) is as follows:

> 310 emails – refund/cancellation requests, w/ negative comments re RB
> 305 emails – refund/cancellation requests, neutral or no comments re RB
> 30 emails – refund/cancellation requests, positive re RB
> 175 emails – no refund/cancellation request, positive re RB

As this demonstrates, the Temporary Receiver sent only approximately 640 emails with a refund or cancellation request.[15] And more than half were not negative.

These emails make clear, however, that the Temporary Receiver's presumption that all subscribers who requested refunds or cancellation are unhappy with Raging Bull and "have had their fill of the Company" is flatly untrue. Most refund requests, so far as Raging Bull can discern from the small sample the Temporary Receiver provided, simply ask for the refund or cancellation without saying anything negative about the Company:

> Email #6: I am only concerned about my subscriptions with Raging Bull. I'd only like to know at this point when and how I will be receiving my refund for services not rendered.

> Email #7: How do we ensure that we aren't charged again for the next subscription payment? This is an automatic payment and obviously whilst the company isn't operating, I want to ensure that customers aren't being charged for upcoming subscriptions.

> Email #8: I am a fairly recent subscriber to the Raging Bull services. As I don't have a lot of history with the company, I do have some recent credit card charges for services that appear will not continue to be provided. Would I be wrong to challenge those credit card charges with my credit card company since the services were interrupted due to the lawsuit?

---

[15] The Temporary Receiver produced additional documents at 9:13 p.m. ET on March 9, 2021, mere hours before this Reply brief was due to be filed. Raging Bull does not have time to review the materials that have been produced and reserved the right to supplement this Reply as necessary based on any materials just produced.

*See* Group Exhibit 6.

The Temporary Receiver's own numbers show that twice as many subscribers were happy with Raging Bull than were unhappy. Dkt. 156, at 88 (1650 positive emails; 888 negative emails). And while the Temporary Receiver tries to explain away the significance of this by saying these emails were in response to two solicitations for positive reviews by the Company, the Temporary Receiver is wrong. In fact, the second email sent to subscribers did not solicit positive reviews. *See* Exhibit 9 hereto (second email sent by company to subscribers after the FTC lawsuit). In addition, the Temporary Receiver fails to account for the fact that all of these subscribers emailed the company shortly after the FTC brought its highly publicized lawsuit claiming Raging Bull is "permeated with fraud" and bilked its subscribers out of $137 million. Getting positive reviews from subscribers after the federal government made those accusations gives those positive reviews even more weight.

In addition, many subscribers who enjoyed Raging Bull's services nevertheless asked for a refund, unsurprisingly, simply because the Company was compelled to shut its services down. This is not surprising, as even the happiest subscribers may reasonably want their money back knowing that Raging Bull may never operate again. There are examples of this, which the Temporary Receiver ignored:

> <u>Email #9</u>: I am a happy client of Raging Bull. I do not believe that I was defrauded. I paid things and began to receive value, but the simple fact is that I paid $15,194 in total for a lifetime elite membership. If the business is not able to provide that beginning one month after I finished my payment plan, then I believe that I am entitled to a full reimbursement from the assets of the business.

> <u>Email #10</u>: I was satisfied with my very short subscription to the service. Now because of government action my expensive subscription lasted only six weeks - I want my money back. The service organization is not bankrupt, it has simply been

> accused of acting badly. If the service is being forced to discontinue operations, subscribers should be refunded the prorated amount of their subscriptions.
>
> Email #11: I am a recent subscriber of 2 lifetime services, in which I am fairly satisfied with and would like to continue. If they do not continue, I should be entitled to that money back. I imagine there are plenty of others just like me who the courts would be stealing from if Raging Bull is forced to cease their services without full compensation to the subscribers.

*See* Group Exhibit 6.

All of this supports Raging Bull's reasonable and conservative projection that approximately 30,000 of its paid subscribers will continue with Raging Bull over time.

### E. The Temporary Receiver's Position on Contingent Liabilities is Biased and Incorrect

As noted above (*supra* at 14), the Temporary Receiver views the FTC's claims as "liquidated" and "not speculative." He reaches this conclusion because he believes the FTC's claims are "supported with many pages of evidence in this lawsuit." Dkt. 189, at 16. Of course, in his advocacy for the FTC, the Temporary Receiver ignores the "pages of evidence" that Raging Bull has already discredited. It is simply untrue and inappropriate for the Temporary Receiver to view the FTC's claim for $137 million, or more, in damages as "liquidated."

The Temporary Receiver's pro-FTC view sullies his analysis of contingent liabilities. In particular, the Temporary Receiver continues to claim that Raging Bull's Business Plan must show the company will be profitable ***even if*** it is liable for $137 million in damages to the FTC. But the Court asked Raging Bull for a business plan to lay out how Raging Bull can operate lawfully and profitably ***up to the resolution of the case***. Considerations of the ultimate outcome of this matter are irrelevant. Indeed, there is nothing in the Complaint or TRO suggesting that Raging Bull will be allowed to operate only if its profitability is so high as to cover the full redress for all present and past subscribers as if the FTC's claims have been proven. Such a view

would make it impossible in almost all cases, and certainly this case, for a defendant to operate at all. That cannot be, and is not, the rule.

The Temporary Receiver asks the wrong question. Whether or not Raging Bull is permitted to re-start operations, the case will be resolved and the FTC's claim will be adjudicated or settled. The right question, and the question posed by the Court, is whether Raging Bull and operate profitably in the time period before the case is resolved. As Raging Bull has already demonstrated, ***allowing the company to re-start its operations is part of the solution***, as it would generate revenue and dramatically reduce the Company's potential liabilities by eliminating the need or desire for refunds or cancellations for many of its subscribers, most of whom support Raging Bull and wish to continue as subscribers. Dkt. 177, at 17. Killing the company permanently will decrease assets and increase liabilities.[16] The Temporary Receiver's only response to this is to suggest assets could be lost if the company operates but fails to be profitable. Raging Bull's Business Plan, which reasonably forecasts profitability by the end of each of the next three years, responds to that concern.

### F. The Temporary Receiver Grossly Overstates the Impact of Honoring Outstanding Refund Requests on Raging Bull's Profitability

In the Business Plan, Raging Bull states that, during Phase 1, it will "address the backlog of outstanding refund requests that have not been addressed since the TRO was entered [and g]oing forward, the Company will promptly honor all new refund requests for services that have a refund option and promptly address on a case by case basis new refund requests for services without a refund option." Dkt. 177, at 11.

---

[16] Permanently shuttering the company will also harm the thousands of subscribers who value and want Raging Bull's services. The Temporary Receiver makes no mention of their interests.

In his Response to the Business Plan, the Temporary Receiver misunderstands this and grossly overstates the amount of refunds that would need to be paid. The Temporary Receiver makes a series of baseless assumptions and significant errors, culminating in his conclusion that the refund liabilities of the company will prevent Raging Bull from operating profitably because those liabilities will far exceed the cash on hand.

First, the Temporary Receiver assumes that every one of the 1,493 subscribers seeking refunds will continue to seek a refunds after the company re-starts operations. But, as noted above, many subscribers who have contacted the company or the Temporary Receiver for refunds have asked only because the service was shut down following the TRO. A fair analysis would account for the number of refund requests that would be rescinded if the services are permitted to continue.

Second, the Temporary Receiver claims that the average refund requested is $4,826 for the 1,493 customers seeking refunds. The Temporary Receiver provides no evidence for this number. And the Temporary Receiver either could not or would not provide to Raging Bull all of the emails seeking these refunds. *Supra* at 48.

Third, the Temporary Receiver assumes that every subscriber who seeks a refund is entitled to a refund. It is on this assumption that he calculates a $7.2 million refund liability immediately upon re-start (1,493 x $4,826). But most of Raging Bull's services do not have a refund option. And many of those services that do have a refund option allow for a refund only within the first 30 days. Of the 1,493 subscribers who have asked for refunds, only a small fraction of those would be entitled to a refund.

Fourth, the Temporary Receiver knows that most services, by their clear terms, do not allow for a refund. But the Temporary Receiver conflates the business reality of implementing a

clear and lawful refund policy (in which only those subscribers who are entitled to a refund on the service terms would receive a refund) with his assumption that the FTC's claims are "liquidated." The Temporary Receiver says the following:

> The Company contends that subscribers are eligible for refunds only if a refund was made available as part of the specific serv ice purchased by the consumer. If consumers were deceived into entering into a subscription, though, those consumers should be entitled to refunds, regardless of whether the subscription service they purchased expressly provided for a refund.

Dkt. 189, at 18. This is the completely wrong analysis. Raging Bull's Business Plan is a plan to operate the business pending the outcome of the litigation – exactly as the Court requested. This means refund requests are treated according to their terms, and not under the assumption that the FTC claims will be proven and those refunds must be accounted for as part of preliminary injunctive relief. The Temporary Receiver is viewing refund requests as liquidated claims for recovery of amounts subscribers were deceived into paying. This is the same error the Temporary Receiver makes with respect to the "liquidated" $137 million contingent liability based on the FTC's claims. This is buy-in on the FTC's claims.

Fifth, the Temporary Receiver misunderstands Raging Bull's Business Plan and assumes the company expects to lose 50,000 present subscribers who will be in a position to demand a refund. The Temporary Receiver uses this number to estimate how many additional subscribers, on top of the 1,493 already identified, will demand refunds. But, as noted above, the Temporary Receiver misunderstands the Business Plan, which projects the company will retain approximately 30,000 paid subscribers who will buy new services over time. Raging Bull did not and does not expect 50,000 subscribers to decline to continue the services they have already paid for once the company re-starts. In fact, most of these subscribers are more likely to complete their present subscription and simply not purchase any new subscriptions.

Sixth, to make its point more dramatically, the Temporary Receiver extrapolates out to what the refund liability would be based on his assumptions that all refund requests must be paid. The Temporary Receiver concludes that Raging Bull's refund liability could be as high as $100,000,000 if just 20,000 subscribers requested refunds. Dkt. 189, at 19. But under this analysis, and given his understanding that there are potentially 200,000 current and former subscribers who could seek refunds,[17] if all 200,000 subscribers sought refunds then Raging Bull's refund liability would be as high as ***$1 billion***.[18] But according to the FTC's own allegations, Raging Bull's subscription-based revenues comes nowhere close to that amount. The only conclusion can be that the Temporary Receiver's assumptions and calculations are unsupported, massively overstated and, therefore, worthless.

**G. Raging Bull's Business Plan is Reliable**

The Temporary Receiver presents two arguments attacking the reliability of the Business Plan. Both arguments fail.

First, the Temporary Receiver misunderstands the basis for Raging Bull's anticipated revenues. In the Business Plan, Raging Bull conservatively projects that approximately 30,000 of its present subscribers would continue with the company over time and renew their memberships when they come due or purchase new and additional services. Dkt. 177, at 14. The Temporary Receiver argues this number is overstated, but his reasoning is flawed. He relies on his mistaken calculation that only 37% of subscribers who emailed the company or the Temporary Receiver since the FTC lawsuit was filed viewed Raging Bull favorably. But, as detailed above, the

[17] This number is the combination of the company's 80,000 present subscribers plus the 120,000 former subscribers who the Temporary Receiver believes could seek refunds that would need to be paid. Dkt. 189, at 19-20.

[18] 200,000 subscribers x $5,000 average refund amount.

Temporary Receiver's calculation is false and misleading. In fact, there are twice as many positive emails than negative emails, according to the Temporary Receiver's own assessment.

The Temporary Receiver also definitively states that gurus Kyle Dennis, Nathan Bear, and Ben Sturgill "do not intend to continue employment with the Company if operations are allowed to continue." Dkt. 189, at 22. Even if none of them were to return, this would have no impact because the company's projections were made under the conservative assumption that none of Messrs. Dennis, Bear or Sturgill would return. However, since the time of the Receiver's Response, all three have informed Raging Bull that they have not foreclosed the possibility of rejoining Raging Bull under the appropriate circumstances should the Court permit Raging bull to re-start operations. Mr. Dennis confirmed this on the record in his March 5, 2021 deposition. *See* Exhibit 3. If all or any of these three gurus chooses to return to the company, this would only stand to increase the profit forecasts. And if Mr. Dennis elects not to return, his service would still be able to continue because Mr. Bond would provide fulfilment for that service. Mr. Bond, of course, taught Mr. Dennis how to trade and Mr. Dennis has affirmed that his strategy is based off of what he learned from Mr. Bond. Dkt. 124 at ¶ 4.

Second, Mr. Peroutka says Raging Bull significantly understated the projected expenses. But his projection of an $18.5 million negative cash flow in the first year is flawed. Based on her careful analysis, Ms. Davis concluded Mr. Peroutka materially overstating the adjusted "cash costs" relating to payroll, advertising and costs of goods sold (including credit card fees) due to his fundamental lack of understanding the business or the Business Plan. Second Supplemental Expert Report of Bates Group LLC and A. Christine Davis as Exhibit 10 hereto, at 18-25. In particular, Mr. Peroutka bases his estimation of advertising and payroll costs on prior years and fails to take into account how and to what extent the company will move forward as a scaled

back operation. Ms. Davis concludes that Raging Bull will likely generate a positive cash flow of approximately $11.8 million during the first year after operations re-start, including $1.8 million of cash receipts in the first month, $2.4 million in the second month and $3 million in the third month. *Id.* at 12-25. These projected profits are carried through into the second and third years of the Business Plan. As this demonstrates, if permitted by the Court to operate, Raging Bull will be profitable during and up to the time of trial or resolution of matter.

## CONCLUSION

For the reasons stated herein, Defendant RagingBull.com, LLC and Individual Defendants Jeffrey M. Bishop and Jason Bond respectfully submit this Reply in further support of the RagingBull.com, LLC Business Plan. Defendants greatly appreciate the opportunity to prepare and submit this Business Plan and supporting reply brief for the Court's consideration.

Dated: March 9, 2021

Respectfully submitted,

RagingBull.com, LLC, Jeffrey M. Bishop
and Jason Bond

By: /s/ *Brett M. Doran*
David G. Barger (DCB# 469095)
Greenberg Traurig LLP
1750 Tysons Blvd.
Suite 1200
McLean, VA 22102
Tel: (703) 749-1300
Email: bargerd@gtlaw.com

Andrew G. Berg (admitted *pro hac vice*)
2101 L Street, N.W.
Suite 1000
Washington DC 20037
Tel: (202) 331- 3100
Email: berga@gtlaw.com

Miriam G. Bahcall (admitted *pro hac vice*)
Brett M. Doran (admitted *pro hac vice*)

Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: (312) 476-5135
Email: bahcallm@gtlaw.com
Email: doranb@gtlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of March 2021 a true and accurate copy foregoing RagingBull.com, LLC Reply in Support of Its Business Plan, was properly served on all parties through the ECF system.

/s/ *Brett M. Doran*
Brett M. Doran (admitted *pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Tel: (312) 476-5135
Email: doranb@gtlaw.com

*Counsel for RagingBull.com, LLC, Jeffrey M. Bishop and Jason Bond*