**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | * | |
| Plaintiff, | * | |
| v. | * | Case No. GLR-20-3538 |
| RAGINGBULL.COM, LLC, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**INITIAL STATUS REPORT OF
TEMPORARY RECEIVER**

**GALLAGHER EVELIUS & JONES LLP**
Mark S. Saudek (Fed. Bar #23963)
Meghan K. Casey (Fed. Bar #28958)
218 North Charles Street, Suite 400
Baltimore MD 21201
phone (410) 727-7702
fax (410) 468-2786
msaudek@gejlaw.com
mcasey@gejlaw.com

*Counsel to Court-appointed Temporary
Receiver Peter E. Keith*

Date:  February 1, 2021

729396

TABLE OF CONTENTS

I.     Introduction ...................................................................................1

II.    The Temporary Receiver took immediate measures to implement
       the Temporary Restraining Order ...............................................2

       A. Assumed control over receivership entities...........................2

       B. Entered agreement with Raging Bull to cease sales, furlough
          employees, and cease services, marketing, "fulfillment," &
          customer service ....................................................................3

       C. Secured the Premises..............................................................5

       D. Took possession of documents & IT system ...........................8

       E. Took possession of assets .....................................................10

       F. Diverted mail.........................................................................15

       G. No pre-receivership debts paid without Court approval ....16

       H. Secured website.....................................................................17

       I.  Investigated investments...................................................18

       J.  Created receivership bank account .....................................19

       K. Provided all parties have access to IT & information.........20

       L.  Cooperated with law enforcement .......................................21

       M. Posted bond............................................................................22

III.   Defendant Raging Bull largely has cooperated with the Temporary
       Receiver's efforts ........................................................................23

IV.    Corporate structure & business of the Receivership Entities ................24

       A. Summary description of entities..........................................24

       B. Overview of Raging Bull's business......................................25

   1. Employees/Divisions .......................................................25

   2. Significance of IT/data management...........................30

   3. The Raging Bull gurus ................................................32

   4. Sales & Subscriber base..............................................46

   5. Marketing ....................................................................53

   6. Compliance efforts ......................................................60

   7. Cancellation Policies ...................................................66

   8. Customer satisfaction ..................................................67

V. Value of assets, sum of liabilities, & financial analysis of the
Receivership Entities...............................................................89

 A. Structure of Receivership Entities .....................................91

 B. Summary of conclusions.....................................................91

   1. Value of all assets and sum of all liabilities .............91

   2. Trading performance ..................................................99

VI. Litigation & regulatory enforcement actions .........................101

 A. New Hampshire Bureau of Securities Regulation cease &
desist order ......................................................................101

 B. *Broyles v. RagingBull.com* – Tennessee purported class action.......103

VII. Whether Raging Bull can be operated legally & profitably ..................104

VIII. Conclusion...............................................................................113

Temporary Receiver Peter E. Keith respectfully submits this status report pursuant to the Court's December 8, 2020 Temporary Restraining Order [ECF 21], as modified by Order dated December 17, 2020 [ECF 64] and as extended by the Court.  By agreement of the parties, the Temporary Restraining Order remains in effect through at least February 5, 2021, until further Order of the Court.

## I.    Introduction

Following entry of the December 8, 2020 Temporary Restraining Order, on December 9, 2020, the Temporary Receiver initiated his immediate access to the primary business premises of the RagingBull.com, LLC ("Raging Bull") located in Hunt Valley, Maryland.  Raging Bull informed the Temporary Receiver it operates a lawful business that complies with all applicable laws and regulations. The Temporary Receiver immediately conducted a number of interviews of executive management, and shortly thereafter reached agreement with Raging Bull to cease outward-facing business operations and to discontinue subscriber communications. To the Temporary Receiver's knowledge, few outward-facing business operations have occurred since.  The Temporary Receiver is not aware of any ongoing sales, marketing, or collection efforts.

The Temporary Receiver is in the process of carrying out the duties required under the Temporary Restraining Order.  The Receivership Entities have provided substantial, if not entirely uniform, cooperation with the receivership and have submitted financial statements and access to certain accounting and financial records.

The Temporary Receiver respectfully submits this initial report in advance of the Court's February 5, 2021 hearing on the Federal Trade Commission's motion for preliminary injunction.

## II.   The Temporary Receiver took immediate measures to implement the Temporary Restraining Order.

### A.      Assumed control over receivership entities

As directed in Section XIV.A of the Temporary Restraining Order, [ECF 64] at 17, the Temporary Receiver assumed full control of the Receivership Entities. Following the issuance and service of the TRO, the Temporary Receiver sought and obtained the cooperation of Raging Bull's management and employees.  Early in the Temporary Receiver's investigation, the Receivership Entities advised the Temporary Receiver that no new sales, advertising or marketing would be pursued, a decision that was consistent with the Temporary Receiver's views concerning Raging Bull's operations.  Within a few days thereafter, Raging Bull's management determined to cease active operations, including all customer service activities, and furloughed most of the workforce.  Given the Court's findings set forth in the TRO at 2-4, this decision was also consistent with the Temporary Receiver's views of the Company's operations.

The Temporary Receiver determined that certain key vendors should be paid during the course of the receivership to ensure that the Company's premises remained available, that its IT system was preserved and remained operational for all parties to access data for purposes of the lawsuit, and that data was preserved. No pre-receivership debts or obligations have been paid.

With regard to the remaining Receivership Entities as defined in the TRO, the Temporary Receiver has been advised by its forensic accounting team and by counsel for defendant Dennis that corporate defendant Winston Corp. was dissolved in 2017 and currently has no assets or liabilities.  Counsel for Mr. Dennis also confirmed that corporate defendant Winston Research, Inc. currently has no assets or liabilities.  Corporate defendant MFA Holdings Corp. has been released from the receivership.  TRO [ECF 64] at 6 and 10.  The remaining Receivership Entities (Sherwood Ventures, LLC and Jason Bond, LLC) are essentially personal investment vehicles for defendants Bishop and Bond.  These defendants have cooperated with the Temporary Receiver in providing information concerning those entities, and the assets have been frozen pursuant to Section V of the TRO.

## B. Entered agreement with Raging Bull to cease sales, furlough employees, and cease services, marketing, "fulfillment," & customer service

Immediately upon commencing his investigation, the Temporary Receiver entered into discussions with Raging Bull's principals, through counsel, regarding continued operations of the business.  By December 17, 2020, Raging Bull agreed to cease all outward-facing operations, including marketing and advertising; its product fulfillment services, including chat rooms, updates to subscribers, market analyses, and all other communications with subscribers; and all customer service operations.   Thereafter, the Company's operations were largely limited to (1) providing subscribers with notice of the Company's view of the lawsuit and invitation to subscribers to make positive comments about the Company, which was reviewed and approved by the Temporary Receiver; (2) occasional posting of

messages on the Company's website generally involving broad market commentary or trading strategy, without earnings claims or other forward-looking marketing of the Company; (3) cooperation with the Temporary Receiver in providing information as required by the TRO; and (4) allowance for Receivership Entities to engage in activities to support their defense of the case.   These limited operations were deemed the bare minimum necessary to preserve the Company's business, should the Court permit business operations in the future.

The Temporary Receiver has concluded that Raging Bull largely complied with these restrictions, with the exception of certain limited activities that were soon remedied.  While a number of subscribers continued to receive Raging Bull service auto renewal notices, these auto renewals were not in fact made.  The Temporary Receiver has worked with Raging Bull's Information Technology staff to ensure that future auto renewal notices will not be sent.  Raging Bull has provided assurances that future auto renewal notices will not be sent, and no auto renewals will be processed, until further notice. The Temporary Receiver is not aware of any material Raging Bull customer-facing or marketing and advertising operations that continued past December 17, 2020.

On December 16, 2020, Raging Bull's counsel informed the Temporary Receiver that the Company had made the determination to furlough all employees, effective immediately, with the exception of certain employees it deemed critical and necessary to ongoing operations.  The Temporary Receiver worked cooperatively with Raging Bull to determine the staff members that the Temporary

Receiver determined were critical and necessary to continue necessary operations to support the Temporary Receiver. All other employees of Raging Bull remained furloughed. Subsequently, upon motion of the Temporary Receiver, the Court issued an order permitting the release of receivership funds to provide compensation to these employees. January 4, 2021 Order [ECF 106]. The Court also has approved the release of frozen funds of certain defendants to continue the employment of personnel Raging Bull deems critical and necessary to its operations. January 21, 2021 Order [ECF 138].

### C. Secured the Premises

On December 9, 2020, the Temporary Receiver assumed control of Raging Bull's Hunt Valley, Maryland office. The office is fairly generic Class B+ office space on the second floor of an office park across Shawan Road from the Hunt Valley Mall. The physical space consists of the following:

- an entry foyer with a meeting or collaboration space for employees;

- four private executive offices with doors;

- four shared office spaces with multiple desks and monitors;

- four conference room areas;

- two open call center-type rooms with multiple desks, monitors, equipment for making and receiving calls (all of which were handled through the computer system), and golf putting and other game equipment for relaxation;

- an Information Technology center, containing three desks with monitors, for Jason Pell and two IT assistants;

- a production room, used for producing marketing and other materials;

- an unfinished kitchen area still under construction;

- a kitchen nook; and

- two pantry areas, where supplies were maintained.

The office contained a bookshelf with multiple copies of motivational books on investing, advertising, life management, and *Series 7 Exam for Dummies*.  Copies of photos of the Hunt Valley office space are attached to the February 2, 2021 Declaration of Temporary Receiver Peter Keith, Esq. ("Temporary Receiver Decl."), as Exhibit 1.

The walls contain framed art depicting the following:

- bulls of various types;

- art with motivational statements like "Money never sleeps / verb / If you don't find a way to make money while you sleep, you will work until you die" and "Everyone wants to eat but few are willing to HUNT," in the jaws of a snarling lion;

- various oversized art prints depicting such scenes as Gordon Gecko from the film "Wall Street," a woman's lips with $100 bills printed on them, and pop art images of the Mona Lisa, with messages in graffiti print; and

- generic photos of Wall Street and other black and white scenes;

and the following, unframed, as decoration:

- the actual hoods of two race cars, with the words "RagingBull.com" and the Raging Bull logo on one, and the other bearing a large photo of Jason Bond, with graphics referring to his Wall Street Bookie service and WallStBookie.com; and

- a cartoon meme of fire completely surrounding a dog in a hat, with the caption "This is fine."

Copies of photos of this art are attached.  Temporary Receiver Decl., Exhibit 1.

Several rooms also contain white boards or comparable surfaces, with writing on them.

The Temporary Receiver has changed the locks to the office and retained all copies of the keys.  In accordance with applicable COVID-19 protocols, the Temporary Receiver has required that no personnel access the facility unless he or she certifies that he or she has not been exposed to others with COVID-19, has not been diagnosed with COVID-19, and exhibits no COVID-19 symptoms; all personnel accessing the office must represent that they presently are not suffering any COVID-19 symptoms; and no more than five representatives have been present at a single time.  The Temporary Receiver also had the entire office space professionally cleaned and disinfected, following COVID-19 protocols.

The office was largely deserted when the Temporary Receiver assumed control of the premises because COVID-19 restrictions required personnel to work remotely.  Nonetheless, several executive-level personnel were present and continued to seek and be granted access to the office, including Gavin Harrison, Director of Telesales; Bret Holmes, Chief Operating Officer; Jason Pell, Chief Technology Officer; Martin Saunders, Associate Compliance Counsel; Kayla Smith, Director of Operations; and Michael Bowers, Director of Support, Client Experience. The Temporary Receiver has permitted these executives to access the office at all times, by request and as necessary, consistent with COVID-19 restrictions.  The Temporary Receiver is aware of no time that a Raging Bull representative has accessed the office without a representative of the Temporary Receiver also present.

Over the past several weeks, a number of staff members have accessed the premises to collect personal belongings.  The Temporary Receiver has allowed these

furloughed employees to collect their belongings, under supervision and consistent with COVID-19 protocols.

On December 9, 2020, representatives of Raging Bull first informed the Temporary Receiver that the entity has an office in Utah.  The Temporary Receiver subsequently took control of that office as soon as practicable.  The Temporary Receiver effectively shut down all operations in the office within 24 hours of learning of its existence.  The Temporary Receiver has changed the locks and restricted all access to the Utah facility.  To preserve assets, the Temporary Receiver has eliminated all unnecessary costs related to the Utah facility, although he continues to pay the rent and heating costs, as he deems these necessary.  No Raging Bull personnel have had access to the Utah facility at any point since the Temporary Receiver assumed control of it.

**D.      Took possession of documents & IT system**

The Temporary Receiver worked cooperatively with Raging Bull and its counsel to reach agreement on terms relating to the copying of the hard drives of all laptop and desktop computers used by the following people to conduct Raging Bull business (listed in alphabetical order):

- Nathan Bear (guru)

- Jeff Bishop (principal)

- Jason Bond (principal)

- Michael Bowers (executive)

- Taylor Conway (trader)

- Kyle Dennis (guru)

- Bret Holmes (chief operating officer)

- David Lukas (trader)

- Allan Marshall (principal)

- Nathan Stavseth (president of operations)

- Jeff Williams (guru)

The Temporary Receiver believed the data from these computers was required for his investigation, and their turnover is covered by Section XIV of the December 8, 2020 Temporary Restraining Order.  As agreed between the parties, the FTC conducted the hard drive mirroring and instituted agreed protections to preserve the attorney-client privilege of Defendants and avoid the FTC's review of attorney-client communications.  The Temporary Receiver has not at any time sought a waiver of Receivership Entities' attorney-client privilege.  Following mirroring of the hard drives, the computers were returned to their respective custodians.

In addition, the Temporary Receiver sought and received administrator-level access to the following Information Technology systems used by Raging Bull:

- Google Suite, which includes Gmail and other platforms;

- InfusionSoft, Raging Bull's primary customer management system;

- Dash, Raging Bull's custom interface to manage its customer data;

- Sendgrid, Raging Bull's customer email management system;

- Slack, Raging Bull's platform for communicating internally among team members; and

- Rackspace, Raging Bull's Amazon-hosted cloud data storage system.

Following discussions with the Temporary Receiver regarding access levels required and protections of confidential and potentially attorney-client privileged information, Raging Bull provided the Temporary Receiver the requested access to Information Technology systems.  Jason Pell, Raging Bull's Chief Director of Technology, provided material assistance to the Temporary Receiver in facilitating this access.

The Temporary Receiver accordingly presently has maintained access to all disclosed Raging Bull electronic systems.  With the knowledge of Defendants, the Temporary Receiver has provided the Federal Trade Commission access to all electronic systems.

### E.  Took possession of assets

The Temporary Receiver has pursued the Receivership Entities' financial assets and issues associated with the asset freeze.  The Temporary Receiver has conducted several interviews with persons familiar with the Receivership Entities' assets and/or business operations, including but not limited to general counsel and chief operating officer (Susan Trahan), associate compliance counsel (Martin Saunders), chief operating officer (Brett Holmes), director of operations (Kayla Smith), director of support and client experience (Michael Bowers), director of telesales (Gavin Harrison), chief director of technology (Jason Pell), director of finance and human resources (Jordan Rayna), financial and administrative specialist (Matthew Watabe) and administrative personnel. The Temporary Receiver has also reviewed a significant volume of the Receivership Entities' documents and business records, discovery produced by the FTC regarding the

Receivership Entities' business operations and asset holdings, and financial disclosures produced by defendants.

Based on the review of these materials to date, the Temporary Receiver believes that he has taken exclusive custody, control, and possession of a significant portion of the Receivership Entities' disclosed "assets associated with credits, debits, or charges made on behalf of any Receivership Entities, wherever situated, including reserve funds held by payment processors, credit card processors, merchant banks, acquiring banks, independent sales organizations, third parties processors, insurance companies, or other entities," pursuant to the TRO and as described further herein.  TRO [ECF 64] § XIV.B.  To date, asset holders have transferred $7,593,921.66 into the account established by the Temporary Receiver. Details regarding these transfers are provided in the following table.

| Institution | Account Number[1] | Receivership Entity | Balance as of 12/8/2020[2] | Amount of Transfer to Receiver |
|---|---|---|---|---|
| Bank of the West | X6821 | Raging Bull | $ 24,748.55 | $ 24,748.55 |
| Cardflex | Unknown | Unknown | Unknown | $ 271,921.30 |
| Commercial Merchant Solutions, LLC | X2347 | Raging Bull | $ 687,333.40 | $ 723,022.40 |
| E*TRADE Securities, LLC | X4059 | Raging Bull | $ 50,157.51 | $ 50,157.93 |
| Eastern Bank | X1438 | Jason Bond | $ 193,106.70 | $ 193,106.70 |
| Eastern Bank | X4217 | Raging Bull | $ 3,655,378.40 | $2,503,583.49 |
| Eastern Bank | X4715 | Sherwood Ventures | $ 602.80 | $ 602.80 |
| Electronic Commerce, LLC | X8502 | Raging Bull | $ 435,776.39 | $ 435,776.39 |

| Electronic Commerce, LLC | X8726 | Raging Bull | $    327,111.30 | $ 327,111.30 |
|---|---|---|---|---|
| Esquire Bank | X5750 | Raging Bull | $1,663,774.412[3] | $1,602,280.51 |
| Fiserv | X2880 | Raging Bull | $    47,847.12 | $    47,847.12 |
| JPMorgan Chase Bank, N.A. | X91455 | Sherwood Ventures | $        101.99 | $        101.99 |
| Maverick BankCard Inc. | Unknown | Raging Bull | Unknown | $ 392,354.21 |
| Stripe, Inc. | Unknown | Raging Bull | $ 1,176,944.09 | $ 861,698.50 |
| TD Bank, N.A. | X7815 | Sherwood Ventures | Unknown | $ 159,608.47 |
| TD Bank, N.A. | X6651 | Sherwood Ventures | Unknown | N/A |
| **Total Assets Recovered by Receiver to Date:** | | | | **$7,593,921.66** |

Note 1: Accounts for which financial institutions or other account holders reported no balance or no active account are not included in this table.  TriSource, LLC, TSYS Acquiring Solutions, LLC, Visa, Inc., and SMB Global LLC each indicated that they did not have any account funds of the Receivership Entities in their possession.  The Temporary Receiver will conduct further review to confirm the accuracy of these responses.

Note 2: For some institutions this balance is self-reported.  The Temporary Receiver continues to review and confirm this information and will seek any additional funds that may be available, if any.

Note 3: Esquire Bank reported this balance on December 14, 2020.  It is unclear from the correspondence whether this balance had changed from December 8, 2020.  The Temporary Receiver has reached out to Esquire Bank for clarification and records.

Three of the institutions identified above transferred less than the full

account balance of the Receivership Entity account to the Temporary Receiver:

Eastern Bank, Stripe, Inc., and Esquire Bank.  For one Eastern Bank account, the

bank transferred an amount that represents $1,151,794.91 less than the full

account balance as of December 8, 2020.  Eastern Bank has held this amount as

claimed security for Raging Bull's Paycheck Protection Program loan based on

Eastern Bank's perceived conflict between the requirements of the TRO and its obligations to the United States Small Business Association.   The Temporary Receiver understands from Eastern Bank's representations that Eastern Bank has sought guidance from both the FTC and the Small Business Association regarding this matter and continues to believe it has conflicting obligations.   On January 29, 2021, counsel for the Temporary Receiver, Eastern Bank, the FTC, and the Small Business Association discussed this matter and agreed that Eastern Bank would continue to hold these funds in the short term and will not release or otherwise dissipate them without notice to the Temporary Receiver and an opportunity to seek relief.  The Temporary Receiver agreed to continue his inquiry into whether Raging Bull may qualify for complete or partial loan forgiveness, and to update Eastern Bank on the status of the receivership following the February 5, 2021 hearing scheduled in this matter and any resulting order.  After those updates, the stakeholders will again meet and confer regarding the assets.  The Temporary Receiver interprets the TRO as requiring Eastern Bank to immediately transfer the funds to the Temporary Receiver, but under the circumstances, and given Eastern Bank's cooperation and communication to date, is satisfied that the assets are protected in the short term and that the agreed upon plan is an appropriate and cost effective means of resolving this dispute at present.

Stripe, Inc. a merchant processor, transferred an amount that represents $315,245.59 less than the full account balance as of December 8, 2020, based on expenses Stripe, Inc. purports to have incurred as a result of refunds and

chargebacks processed after December 8, 2020.  The Temporary Receiver interprets the Temporary Restraining Order as requiring Stripe to immediately transfer these funds to the Temporary Receiver, and does not believe Stripe may properly recoup expenses from receivership assets.  The FTC has indicated that it shares this position.  Should the receivership continue, the Temporary Receiver and/or the FTC may seek relief related to this issue and brief it more fully at that time.

Esquire Bank transferred an amount that represents $61,493.90 less than the full account balance as of December 14, 2020.  The Temporary Receiver has sought additional information from Esquire Bank regarding the account balance as of December 8, 2020 and requested the transfer any remainder of that balance.

Should the receivership continue, the Temporary Receiver will continue discussions with any institutions that have transferred less than the full account balance of a Receivership Entity as of December 8, 2020.  The Temporary Receiver will also continue to follow up on requests for documents to all institutions described above, and will review the documents produced to confirm compliance with the Temporary Restraining Order.  The Temporary Receiver will also continue to investigate whether the institutions identified above hold any additional receivership assets.

In addition to assets held or previously held by financial institutions or merchant service providers. Greenberg Traurig, counsel for the Raging Bull Defendants, holds $2,000,000 of Raging Bull assets in its trust account.  Raging Bull wired $2,000,000 to Greenberg Traurig on December 7, 2020, the day the FTC

filed this action and the day prior to the Court's entering the Temporary Restraining Order.  Raging Bull et al. Reply in Support of Emergency Mot. [ECF 132] at 14-15. Defendants represent that Raging Bull owed Greenberg Traurig approximately $175,000 for legal services provided before the FTC's complaint was filed. *Id.*  After communications among counsel for Raging Bull, the Temporary Receiver, and the FTC regarding this transfer, Greenberg Traurig provided a sworn affidavit stating that the $2,000,000 is being held in the firm's trust account.  The Temporary Receiver interprets the Temporary Restraining Order as requiring the immediate transfer of these assets to the Temporary Receiver.  However, based on the affidavit provided and the role of Greenberg Traurig attorneys as officers of the court, the Temporary Receiver deems these assets sufficiently secured at present and has not demanded their transfer.

As of Friday, January 29, 2021, the receivership account has a balance of $7,432,382.99.  The Temporary Receiver has used the funds transferred into the receivership account for various expenses approved by the Court, as discussed in Section II.G of this report.  The Temporary Receiver continues to investigate whether any other entities hold assets of the Receivership Entities subject to the Temporary Restarting Order.

### F.     Diverted mail

Section XIV.E of the Temporary Restraining Order instructs the Temporary Receiver to divert mail.  TRO [ECF 64] at 18.  The Temporary Receiver has complied with this instruction.  The Company's mail was previously directed to New Hampshire (a P.O. box), Utah and the Hunt Valley office.  The Temporary Receiver

has directed the U.S. Postal Service to forward all mail to the Temporary Receiver at his business office address in Baltimore.  Raging Bull employees have also cooperated with the Temporary Receiver in forwarding critical mail, and in boxing and sending mail at times when the Postal Service had not yet acted on the request that mail be forwarded to the Temporary Receiver.

> **G.      No pre-receivership debts paid without Court approval**

Section XIV.G of the Temporary Restraining Order [ECF 64] requires that the Temporary Receiver apply to the Court for prior approval of the payment of any debts incurred by the Receivership Entities prior to the entry of the Temporary Restraining Order.  The Temporary Receiver has sought approval of the Court only once to use receivership assets to pay pre-receivership debts of Raging Bull.  On December 31, 2020, the Temporary Receiver filed a motion [ECF 105] seeking the Court's leave to pay invoices for vendor services, as well as wages and benefits for six Raging Bull employees, covering a period that partly predated the entry of the Temporary Restraining Order.  The Temporary Receiver requested payment for only those critical vendors and employees who assisted the Temporary Receiver in fulfilling his duties under the Temporary Restraining Order.  Specifically, the Temporary Receiver sought to pay the vendors that supported the preservation of Raging Bull's critical information systems and the employees who were assisting the Temporary Receiver in accessing those systems.

Since the entry of the Temporary Restraining Order, the Temporary Receiver has received directly or been made aware of hundreds of requests for refunds by Raging Bull subscribers for payments made to Raging Bull prior to the entry of the

Temporary Restraining Order.  Until such time as the Court decides whether Raging Bull should continue as an ongoing business, the Temporary Receiver will not seek the Court's approval to pay those pre-receivership debts.

### H.     Secured website

The Temporary Receiver reached agreement with Raging Bull to take the following steps with respect to RagingBull.com, the business's primary web site domain:

- Raging Bull has ceased actively posting new content to the RagingBull.com web site; certain content, generated at earlier times, autopopulated the site for a certain period, but the Temporary Receiver worked with Raging Bull to ensure that these processes did not continue;

- Raging Bull has placed the following banner across the top of the RagingBull.com website:

   NOTICE – PLEASE READ:  On December 7, 2020, the Federal Trade Commission filed Federal Trade Commission v. RagingBull.com, et al., Case No. 20:cv-3538, in the United States District Court for the District of Maryland against RagingBull.com, Jeffrey M. Bishop, Jason Bond f/k/a Jason P. Kowalik, Jason Bond, LLC, Kyle W. Dennis, MFA Holdings, Corp. Sherwood Ventures, LLC, Winston Corp., and Winston Research Inc.

   On December 8, 2020, United States District Judge George L. Russell, III issued a temporary restraining order against Raging Bull and the other Defendants in the case.  For more information, visit the Temporary Receiver's web site here [link provided].

- Raging Bull has provided an active link on its RagingBull.com website to the Temporary Receiver's website, which links to the FTC's site, as well.

Jason Pell, Raging Bull's Chief Director of Information Technology, has provided substantial assistance to the Temporary Receiver in carrying out these duties.

The Temporary Receiver created a website to provide neutral information and updates to the public and consumers regarding the pending action, the role of the Temporary Receiver, and significant court filings. That website is available at https://receiver-ragingbull.com. The website provides contact information for the FTC, Raging Bull, and the Temporary Receiver.

## I.       Investigated investments

The Receivership Entities hold interests in a number of entities, as described below in Section V, which provides an accounting analysis. Among these investments is InterActive Offers, LLC ("InterActive"), in which Raging Bull owns a 20% membership interest and Sherwood Ventures owns a 15% membership interest.   The Receivership Entities purchased their shares representing 40% of the interest in InterActive for a combined $700,000, premised upon a company value of $2,000,000. MFA Holdings Corp. also owns a 15% interest independently of its indirect interest as a Raging Bull member. This separate interest is not a receivership asset.

On December 17, 2020, counsel for InterActive wrote to the Temporary Receiver to assert InterActive's right to repurchase Raging Bull and Sherwood Ventures' interests in InterActive, pursuant to Section 6 of the Buy-Sell Agreement governing Raging Bull and Sherwood Ventures' investment. That section defines an event of default to include the assignment of a receiver to manage a member's

property, and permits other members the option to repurchase the affected member's membership interests.  The Temporary Receiver interviewed InterActive's principals to gather information concerning the Receivership Entities' investment in InterActive, as well as the services InterActive provides to Raging Bull as a vendor.  On January 12, 2021, InterActive provided a valuation of the company.

The valuation provided by InterActive concludes that the fair market value of the company as of January 11, 2021 is $1,450,000.  A purchase of the Receivership Entities' shares in InterActive based upon this valuation would result in a payment of $507,500, for an overall loss on the investment of $192,500.   The Temporary Receiver provided the valuation to the Receivership Entities.  Sherwood Ventures and the members of Raging Bull – Jeff Bishop, Jason Bond, and MFA Holdings Corp., have no objection to the valuation.  InterActive had requested that the purchase be completed by about February 7, 2021. Recently, InterActive offered to extend that date.  The Temporary Receiver has agreed to extend the time to complete the sale so that the parties have clarity regarding the Temporary Receiver's role moving forward.  Should the receivership continue, and barring any new objections, the Temporary Receiver will take appropriate steps to complete the repurchase of the Receivership Entitles' interests by InterActive, subject to approval by the Court.

### J.    Created receivership bank account

Section XIV.O of the Temporary Restraining Order directs the Temporary Receiver to open one or more bank accounts for funds of the Receivership Entities,

and to use that account to make all payments from the receivership estate.  TRO [ECF 64] at 20.  The Temporary Receiver has complied with this instruction.  A business checking account in the name of the receivership has been opened at M&T Bank, Account No. X8881.  The TRO also directs the Temporary Receiver to serve copies of monthly account statements on all parties.  The Temporary Receiver has not yet received the initial monthly account statement from M&T Bank, but once received will serve the account statement on all parties.  Unfortunately, M&T Bank advised the Temporary Receiver that due to the bank's internal compliance rules and the fiduciary nature of the account, the bank could not provide online access to the account.  Accordingly, there may be delays in receiving monthly statements due to mailing, and in the Temporary Receiver's ability to monitor the account on a daily basis.

### K.      Provided all parties access to IT & information

The Temporary Receiver has ensured at all times that all parties, including all Defendants and the FTC, have had equal and unfettered access to all electronic systems of Raging Bull.  The parties reached agreement on protocols to protect Raging Bull's assertion of its attorney-client privilege and the attorney work product doctrine.  The Temporary Receiver is not aware of any party being denied access by the Temporary Receiver to any Raging Bull information technology system or any data obtained by the Temporary Receiver, including from mirroring of individual computer and laptop hard drives.

The Temporary Receiver similarly has provided all parties unfettered access to the offices and hard copy materials of Raging Bull, upon request and consistent

with COVID-19 protocols and maintenance of protections of materials over which Defendants assert or may assert the attorney-client privilege or attorney work product doctrine protection. The Federal Trade Commission has elected not to enter Raging Bull premises, as a result of its own internal agency COVID-19 safety protocols.

The Temporary Receiver is not aware of any requested access that has been denied to any party, subject to agreed restrictions.

## L.   Cooperated with law enforcement

The Temporary Receiver has cooperated with regulatory and law enforcement agencies as requested. Specifically, the Temporary Receiver has received communications from and provided responsive information to the Federal Trade Commission, the New Hampshire Bureau of Securities Regulation, and the Securities & Exchange Commission, as follows:

- The Temporary Receiver provided the Federal Trade Commission access to Raging Bull information upon request, including the opportunity to: (i) mirror a number of Raging Bull computers and laptop computers; (ii) access Raging Bull electronic information systems and email with "super admin" access rights; (iii) access copies of hard copy materials collected at the Hunt Valley, Maryland office; (iv) access materials received from RagingBull.com principals in New Hampshire and the Raging Bull facility in Utah; (v) access limited information relating to accounting documents of Raging Bull; and (vi) access limited information relating to interviews of Raging Bull executives.

- The Temporary Receiver has communicated with representatives of the New Hampshire Bureau of Securities Regulation regarding its investigation, and the Temporary Receiver has received and intends to respond to information relating to Mr. Marshall and entities he controls. The Temporary Receiver also requested a postponement of any hearing on the New Hampshire Bureau of Securities Regulation's

enforcement action, and the Temporary Receiver has participated in a video conference with the hearing officer.

- The Temporary Receiver has communicated with the Securities and Exchange Commission regarding an investigation it has undertaken into the conduct and activities of Raging Bull and its principals.

In addition, the Temporary Receiver has responded to inquiries from State Attorneys General seeking informal resolution of consumer complaints filed with those Offices by Raging Bull subscribers.  To date, the Temporary Receiver has responded to seven such inquiries, received from the Offices of the Attorney General for the States of Indiana, New Hampshire, Pennsylvania, and Washington.  As a general matter, the consumers who filed complaints with those Offices seek a refund and make one or more of the following allegations:

(1) The consumer lost thousands of dollars after purchasing stocks based on recommendations made by Raging Bull personnel;

(2) Raging Bull billed the consumer even though the consumer indicated that they did not want to continue their subscription;

(3) Raging Bull refused to issue a refund to the consumer when requested; and/or

(4) The consumer was no longer able to access services that they paid for after Raging Bull's operations were suspended following the entry of the Temporary Restraining Order.

## M.   Posted bond

Section XXI of the Temporary Restraining Order directs the Temporary Receiver to file with the Clerk a bond in the sum of $20,000.  TRO [ECF 21] at 28. The Temporary Receiver has complied with the Court's instructions.  A receiver bond in the amount of $20,000 was procured through RCM&D and was filed with the Clerk on December 23, 2020.

### III.    Defendant Raging Bull largely has cooperated with the Temporary Receiver's efforts.

Raging Bull and its representatives have substantially complied with their obligation under the Temporary Restraining Order to cooperate with the Temporary Receiver.  Raging Bull's in-house counsel, Susan Trahan and Martin Saunders, have been the primary contact points for the Temporary Receiver in its interactions with Raging Bull.  Ms. Trahan and Mr. Saunders have responded to the Temporary Receiver's requests for information and facilitated the Temporary Receiver's access to Raging Bull information and personnel, upon request.  In addition, members of Raging Bull's accounting staff, notably Matthew Watabe and Jordan Reyna, provided the Temporary Receiver and his accountants access to accounting information, upon request.  The principals of Raging Bull, Messrs. Bishop and Bond, made themselves available for interviews, at the request of the Temporary Receiver, as did gurus Nathan Bear and Ben Sturgill.

Outside counsel to Raging Bull have on occasion delayed but not materially hampered the Temporary Receiver's access to information.  On one occasion, a representative of Raging Bull informed the Temporary Receiver that Greenberg Traurig lawyers told him that he need not provide cooperation or meet with the Temporary Receiver because the Temporary Receiver was not paying him.   The representative of Raging Bull nonetheless provided the information.  The Temporary Receiver considers this direction to be materially inconsistent with parties' obligations under the Temporary Restraining Order.  In addition, Greenberg Traurig has misstated the Temporary Receiver's statements and conduct

in its papers filed with the Court.  The Temporary Receiver, for the most part, has deemed those misrepresentations to be insufficiently material to require correction.

The Temporary Receiver and his accountants have encountered material difficulties gathering information from Raging Bull systems because Raging Bull personnel have not been readily available; Raging Bull's company records are scattered, unclear, incomplete, and diffused over numerous electronic platforms with complex user access and data download capabilities; and Raging Bull changed its accounting professional within the past two years, rendering historic information more challenging to obtain.

## IV.   Corporate structure & business of the Receivership Entities

### A.      Summary description of entities

Ragingbull.com, LLC is owned by Sherwood Ventures, LLC (65%), Jason Bond, LLC (25%), and MFA Holdings Corporation (10%).

Each of the three corporate owners of Raging Bull appears to function as an investment vehicle for its human owner.  Sherwood Ventures, LLC receives distributions from Raging Bull, which it then passes on to Jeff and Melissa Bishop. Jason Bond, LLC likewise distributes the funds it receives from Raging Bull to Jason Bond, and MFA Holdings Corporation passes on its Raging Bull distributions to Allan Marshall.  The Temporary Receiver has no information to suggest that any of Sherwood Ventures, LLC, Jason Bond, LLC, or MFA Holdings Corporation provides services to Raging Bull subscribers.

The other two corporate entities named in the complaint—Winston Research Inc. and Winston Corp.—appear to play no role in Raging Bull's operations.  The

Temporary Receiver has found no evidence of their direct involvement in Raging Bull's business.  Instead, it appears that all of Raging Bull's operations and the services that it provides to consumers are run through the Ragingbull.com, LLC entity.

That entity has recently undergone a period of rapid growth.  Raging Bull provided the Temporary Receiver with an employee census reflecting 167 employees, all but 16 of whom were hired in 2019 or later.  Raging Bull brought on 55 new employees in 2019 and an additional 19 in the first three months of 2020.  Another 78 employees were added over the remaining months of 2020.

The 2020 hires included additions to the following departments:  thirteen Marketing, seven "Editorial," four Sales Representatives, two Advertising, and one Business Development.  Also included were 18 additions to the Production Department, among them a Social Media Director, a Visual Marketing Producer, and a Live Stream Producer.  Only one employee brought on during this period was hired to work in the Compliance Department.

### B.   Overview of Raging Bull's business

#### 1.   Employees/Divisions

The primary divisions of Raging Bull's operations are as follows:

**Legal/Compliance.**  Raging Bull employed a small legal and compliance staff, comprising Susan Trahan, Martin Saunders, and one non-lawyer.  Ms. Trahan joined Raging Bull in summer 2019, and Mr. Saunders joined in summer 2020.  Before that, Raging Bull had no separate in-house legal or compliance department or staff.  Ms. Trahan and Mr. Saunders are lawyers and each has a background

working in regulated industries, although neither professed to have particular experience with the Federal Trade Commission Act or FTC regulations. Ms. Trahan told the Temporary Receiver that Raging Bull had internally discussed adding another junior staff member to this department but had not taken concrete steps to do so.

The legal and compliance department is responsible for overseeing all legal and compliance matters.  This is a daunting task in most organizations, and it was particularly so at Raging Bull.  Ms. Trahan and Mr. Saunders informed the Temporary Receiver that compliance was only a part of their job responsibilities. Ms. Trahan served in a general counsel-type role, handling a broad range of legal matters, issues, and concerns.  Raging Bull charged Mr. Saunders with reducing negative statements about Raging Bull made to the Better Business Bureau and other similar bodies.  Ms. Trahan and Mr. Saunders had the resources and capacity to review for legal compliance only a portion of the advertising and marketing materials generated by Raging Bull.  Given their other duties, they were not able to dedicate significant time or attention to advertising compliance.  Ms. Trahan and Mr. Saunders told the Temporary Receiver nonetheless that they believed Raging Bull was making a serious commitment to compliance.

**Gurus & product managers.**  Raging Bull's primary subscriber service providers are its "gurus": Defendants Bishop, Bond, and Dennis, as well as non-Defendants Nate Bear, Dave Lukas, Ben Sturgill, and Jeff Williams.  Each guru ran

one or more trading services.  The services have varied over time, but have included at least the following:

- Bishop:  Bullseye Trades, Total Alpha

- Bond:  Jason Bond Picks, Monday Movers, Weekly Windfalls

- Dennis:  Biotech Breakouts, Dollar Ace, Option Rocket, FDA Insiders, Sniper Report, Fast Five

- Bear:  Weekly Money Multiplier

- Sturgill:  Daily Profit Machine, Dark Pools, IPO Pay Day

- Lukas:  Options Profit Planner

- Williams:  Penny Pro, SuperNova/Boost

Each guru was responsible for running several services for subscribers, and Raging Bull had been moving toward a model by which each guru offered an inexpensive entry-level "front end" service and one or more "back end" services which were substantially more expensive and involved.  Each guru purports to operate independently and to provide his own market trading strategy.  The gurus were responsible for conducting their own trades, informing their subscribers of those trades, and providing any other subscriber fulfillment required, such as periodic email communications or chat room sessions.  The gurus appear to have conducted their own market research and analysis, independent of one another and without guidance or supervision by Raging Bull.  Each Raging Bull guru developed his own trading strategies.

The Federal Trade Commission's expert, Russell Wermers, whose report focuses on the services offered by Defendants Bishop, Bond, and Dennis, has observed "overlap in the types of securities (stocks or options) being traded and the

purported trading approach of the instructors."  Expert Report of Russell R. Wermers, PX26 [ECF 12-9] at 1742-43.  In Wermers's opinion, Raging Bull's strategies consist of "a collection of generic trading concepts and technical trading indicators."  *Id.* at 1738-39.  The Temporary Receiver has not conducted any analysis on the differences among the strategies promoted by Raging Bull's gurus and whether, for instance, each is based on a "momentum trading" model.

Although Raging Bull made representations about the gurus to the effect that their programs "consistently make money," (*see* https://RagingBull.com/experts/), Raging Bull made no efforts to monitor the financial performance of the trading conducted by the gurus over time, with the sole exception of requiring the gurus to be truthful when presenting any individual trade the guru asserted he had made. The Temporary Receiver interviewed four of the gurus—Bishop, Bond, Bear, and Sturgill—and each represented that he did not track his own gains and losses over time.

Working in support of each guru was one or more "product managers," who were responsible for assisting the guru in all aspects of his services.  Gurus assert that they and their product managers operated largely independent of Raging Bull's marketing and advertising teams.

The gurus are compensated based on a flat monthly amount and a commission based on sales of their services.  Mr. Bear, for instance, received a compensation package consisting of a monthly payment of $10,000 and a commission of 15% of all Raging Bull net revenue on his services, accounting for all

costs attributable to those services.  Mr. Bear said that his monthly commissions ranged from lows of $5,000 to $15,000, to a high of $150,000.  This mixed salary/commission compensation structure appears to have been in place for most of the gurus.

Each guru was either a self-taught trader or a trader who learned to trade through Raging Bull.  The gurus received little direction or supervision from Raging Bull, including only minimal, at most, training in compliance with applicable statutes and regulations.  Each guru we interviewed represented that Raging Bull instructed him to "be truthful," by which Raging Bull explained that it expected its gurus to accurately describe individual trades and not to affirmatively advise subscribers to invest in particular stocks.  Each guru with whom we spoke acknowledged that subscribers on occasion attempt to mirror their trades.

**Marketing & Advertising.**  Raging Bull employed a substantial staff to conduct its marketing and advertising operations.  Roughly one-third of Raging Bull's total business expenses were spent on marketing and advertising.  The marketing staff prepared text and copy for advertisements; prepared other materials for advertisements; prepared marketing strategies; reviewed the effectiveness of the Raging Bull marketing; and interacted with the gurus and their product managers to learn of "winning" trades which Raging Bull could then advertise.

Raging Bull's marketing and advertising personnel did not report to the compliance or legal department, and they received little guidance on legal compliance.

**Production.**  The production department was charged with preparing certain marketing materials, particularly those that involved video.  Employees in Maryland, Utah, and New Hampshire participated in the production of videos.

**Customer Service.**  Raging Bull's customer service department at the time of the Temporary Receiver's appointment comprised approximately 30 staff members.  The customer service department did not conduct affirmative outreach but instead responded to customer inquiries or complaints.  In practice, the customer service department's job duties appear to have included upselling subscribers to other Raging Bull products, if possible.  As described in Section IV.B.7, Raging Bull as a matter of policy and practice rarely provided refunds to subscribers.

**Information Technology/Data Analysis.**  This department, comprising Jason Pell and several other employees, oversaw all information technology for Raging Bull.

### 2.    Significance of IT/data management

Raging Bull's operations exist nearly entirely online.  In many respects, Raging Bull's operations depend entirely on its electronic platforms.  Similarly, its principals' decisions relating to Raging Bull depend on the analysis of electronic data.  To say that Raging Bull can operate only through its electronic systems is not an exaggeration.

Nearly all of Raging Bull's internal and external-facing operations depend on electronic systems:

- Advertising, marketing, fulfillment, customer service, and other services are provided online;

- Raging Bull's customer management operations are run entirely through online electronic systems, primarily through a program named "InfusionSoft";

- All credit card processing, revenue receipts, customer complaint and customer service functions, data analysis, human resources, accounting processes, and data retention are operated through electronic platforms;

- Raging Bull's electronic chat rooms exist entirely online;

- Raging Bull's document retention systems are hosted by Amazon's Rackspace electronic data hosting service; and

- Raging Bull's primary means of internal communication are through Gmail emails and Slack, an online instant messaging service.

Raging Bull uses each of these electronic services on a near-daily basis. The Temporary Receiver identified an extremely small amount of hard-copy information or paper documents of any kind in Raging Bull's primary office, in Hunt Valley, Maryland.

Raging Bull's principals and executives monitor the company's overall financial performance closely through evaluation of multiple metrics. These performance measures range from chargebacks by credit card processors to such data as measures of daily subscription levels to each service, customer engagement, service revenue, advertising and marketing effectiveness, expenses, and complaint response time. Data to inform Raging Bull of each of these metrics was obtained from one or more electronic systems. It is the Temporary Receiver's understanding

that trading performance of Raging Bull's gurus was not one of the metrics monitored.

Raging Bull executives Jason Pell and Kayla Smith are well versed in the use of Raging Bull's electronic systems, and each provided regular reports to Raging Bull principals and executives.

In addition, Raging Bull developed an app to facilitate communication with its subscribers. The app replaced earlier Raging Bull subscriber communications platforms, based largely on email and other forms of communication that provide less instantaneous notification to consumers.

Raging Bull's Information Technology system is robust, as it must be to satisfy the business's immediate and ongoing needs. Mr. Pell and Ms. Smith have substantial knowledge regarding organizing, accessing, and analyzing the data in this system and mining it for useful, meaningful information. Other Raging Bull representatives undoubtedly have substantial experience with its electronic systems.

### 3. The Raging Bull gurus

As of the date of the filing of this lawsuit, Raging Bull had seven stock trading experts, identified both internally and to the public as "gurus," who provided services to consumers who subscribed to Raging Bull services. To date, the Temporary Receiver has interviewed four of the gurus, each of whom provided information regarding his background, his role at Raging Bull, and his views of the company's business practices. As of this date, the Temporary Receiver has not yet interviewed Defendant Kyle Dennis, but hopes that an interview can be conducted

prior to the February 5 hearing.  Information about Mr. Dennis learned from other sources has been included below.

### a.  Jeffrey M. Bishop

Mr. Bishop is CEO and founder of Raging Bull.  He is promoted on the Company website as "one of the best traders anywhere," and has degrees in finance and economics.  He has devoted 100% of his time to Raging Bull in recent years and is effectively 65% owner of the Company, with about one-third of his time recently devoted to instruction through services where he is the trading "guru," and two-thirds of his time managing the Company.  In the past five years, Mr. Bishop has received a combined $36,445,552 from Raging Bull, through distributions to Sherwood Ventures, LLC, of which he and his wife Melissa Bishop are the sole owners. Declaration of Raymond J. Peroutka, Jr. dated January 11, 2021 [ECF 117-1] at 3-4.

Mr. Bishop began stock trading in 1999 and has regularly traded for more than 20 years.  Prior to founding Raging Bull, he worked in the online marketing industry, wrote articles on trading, and founded a financial research company.  He advised the Temporary Receiver that during the period 2005-2010 he made well over $1 million in trading, and had a personal net worth of at least $8 million at the time he started Raging Bull.

As Raging Bull's CEO, Mr. Bishop feels that the Company was doing "pretty well" prior to the filing of this lawsuit.  He said in his interview that he planned for continued growth of the Company, and that the Company was in the process of

searching for an outside investor to provide additional capital with a plan of acquiring financial websites to generate data for stock trading subscribers at the time the lawsuit was filed.

Mr. Bishop indicated that the Company's goal was to create a base of long-term, dedicated subscribers.  He indicated that as of the date of the lawsuit, the Company's total, historical customer list was 230,000 consumers, with 84,000 active subscribers, meaning that roughly two-thirds of subscribers were no longer active. The Company had both "front-end" services that are less expensive, sometimes include money-back guarantees, and are designed to get consumers "in the door," familiar with a particular guru, and hopefully sufficiently interested in the services provided to purchase a higher-end subscription.  Mr. Bishop indicated that the Company does not know how many of its subscribers are novices at stock trading, as opposed to experienced traders who may also subscribe to competitor services.  He advised that the Company's target audience includes both inexperienced and experienced consumers, and the stated hope is to sign up sophisticated consumers with a six-figure income and at least a bachelor's degree.

With regard to Raging Bull's advertising, Mr. Bishop stated that as CEO he is aware of "most" of the advertising that is published, but that as the Company has grown he no longer reviews all advertising content.  He said that Raging Bull initially modeled its advertising on what competitors were doing.  With regard to the FTC's allegations of earnings claims, Mr. Bishop stated that everyone who is interested in stock trading is hoping to make money.  He believes that the

Company's ads do not make promises or guarantees, and that the ads are always literally true, based upon specific individual trades. However, with regard to the question of substantiation, Mr. Bishop indicated that the Company keeps no data on what percentage of trades are successful, or whether or how much profit is made by a guru or in a particular service over a period of time. Accordingly, the Company is unable to provide a "track record" of the batting average or profit/loss of a particular guru or service.

By way of example, Mr. Bishop was questioned about a promotional video for a service called Bullseye Trades, in which Mr. Bishop provides a single "best" idea each week, in which Mr. Bishop stated:

> I'm aiming to make over 100% profit each and every week with these ideas and I'm really good at it. I have made literally hundreds of trades where I've made well over 100% on it. Some of these I used to think were unreal profits, I mean I'm talking $50,000, 60, even $100,000 in a matter of days.

In response to questioning about this marketing comment, Mr. Bishop stated that it was literally true, in the sense that his goal each week for the service was to make 100% profit on the idea he passed on to subscribers; that he has in fact made hundreds of trades where he made over 100%; and that he has made trades generating $50,000-$100,000 in profits over the years. However, Mr. Bishop also conceded that he did not know how often his Bullseye Trade ideas in fact made 100% profit, or what the track record of his trade ideas in the Bullseye Trade service has been. He noted that there are some weeks when he does not actually trade on the idea he has advertised to his subscribers. He indicated the Company

has never analyzed the Bullseye Trade weekly picks—either in their entirety or even the smaller subset of those on which he actually traded—to determine how frequently his pick was successful, whether over time the trades actually made or lost money, or the magnitude of any profit/loss over any time period.

Mr. Bishop noted that because consumers wish to learn stock and options trading to make money, the Company's ads feature the ability of the gurus to make money.  Mr. Bishop indicated that the Company distinguished itself through its advertising, looking for something that would stand out and give the viewer the notion that they too could be successful in making money.  However Mr. Bishop believes that most consumers will realize that they cannot replicate the results of the gurus, but instead expect to learn the mechanics of trading.  Mr. Bishop acknowledged that some of his ads may not have been reviewed by compliance personnel, but that the Company mandate for all advertising was "be truthful."

### b.    Jason Bond

Mr. Bond was an elementary school teacher from 2001-2011 or 2012, and also began a master's degree program to become a school principal.  He indicated that he began stock trading about 15 years ago, and has been a full-time trader and trading educator since 2011-2012.  He viewed himself as a part-time trader and a full-time teacher of stock trading.  Mr. Bond met Mr. Bishop roughly a decade ago, he learned trading in part from him, they began doing business together, and in 2014, they co-founded Lighthouse Media, which became RagingBull.com in 2016.  Mr. Bond owns 25% of Raging Bull through his entity Jason Bond, LLC.  According to Mr. Bishop,

as of late 2020, Mr. Bond's trading services accounted for 25-30% of Raging Bull's overall revenue, second only to Kyle Dennis.  In the past five years, Mr. Bond has received $12,973,737 from Raging Bull, through distributions to Jason Bond, LLC, of which he is the sole owner.  Declaration of Raymond J. Peroutka, Jr. dated January 11, 2021 [ECF 117-1] at 4.

As of the filing of the lawsuit, Mr. Bond served as the "guru" in four of the Company's services.  His "Jason Bond's Picks" is the "flagship" service with approximately 9,000 subscribers as of the date of the lawsuit.  This service focuses on trades in small and mid-cap U.S. stocks.  His other services include programs involving week-long swing-trading, and what he characterized as "high probability" options trades.

Mr. Bond indicated that he helped initiate ideas for advertisements for his services.  He indicated that if a subscriber sends a message with positive comments, that is fair game for advertising and the company could use it, without verifying whether the message contained accurate information.  Also, if he had a highly successful individual trade, he would take a screen shot of the brokerage account statement to verify the successful trade if that specific trade were to be used in marketing.  He indicated that company "success stories"—summaries of successful experiences of individual consumers posted on the Raging Bull website—have been used by the Company.  It appears that prior to late 2019, no archive was kept verifying the accuracy of these "success stories."  To date, the Temporary Receiver has not seen any such archives at all, though some may exist.

Mr. Bond provided the following summary of his profits/losses in trading, by year:

| Year | Profit/Loss |
|------|-------------|
| 2020 | (609,000) loss |
| 2019 | 200,000 profit |
| 2018 | (170,000) loss |
| 2017 | 300,000 profit |
| 2016 | 30,000 profit |
| 2015 | 150,000 profit |
| 2014 | (50,000) loss |
| 2013 | 200,000 profit |

Based upon the figures provided by Mr. Bond during his interview, over the eight-year period 2013-2020, Mr. Bond made a total profit of $51,000 through trading. Mr. Bond indicated that he did "poorly" in 2020, trading in an account with greater than $1 million, in contrast to prior years where his account size was much smaller. He also stated that he passed the $1 million mark in trading in 2017.

Mr. Bond indicated that he monitored the performance of the other gurus "only on a case-to-case basis," and did not systematically or regularly review performance of individual gurus or their services to see if they were profitable or not. He indicated that he had a general awareness of how Nathan Bear, Jeff Williams, and Ben Sturgill were doing with their services. According to Mr. Bond, neither Kyle Dennis nor Nathan Bear has ever had a losing year since becoming a

guru.  Mr. Bond indicated that he didn't know Jeff Williams's performance but that

his strategies were very successful, and that he did not know Ben Sturgill's overall

performance but that he had a high winning percentage.

Mr. Bond contends that it was "always" his vision to be fully transparent

with the public in advertising, including telling about losses as well as gains, with

the goal to be "truthful at all times."  He contends that every claim the Company

makes has substantiation, and that the Company has never promised to anyone

that they will make money.  Mr. Bond is "110%" confident that the Company would

be successful, even if the Court were to prohibit any type of earnings claims in

advertisements or stock picking advice in Company services.

### c.      Kyle Dennis

Unlike Messrs. Bishop and Bond, Mr. Dennis does not have an ownership

interest in Raging Bull.  However, he is a highly-compensated employee of the

Company.  In the past five years, Mr. Dennis has received $13,615,214 in gross

compensation from Raging Bull (including total W-2 wages, and payments to two of

Mr. Dennis's corporate entities: Winston Corp and Winston Research, Inc.).

Declaration of Raymond J. Peroutka, Jr. dated January 11, 2021 [ECF 117-1] at 5.

The most recent employment agreement between the Company and Mr. Dennis is

dated June 1, 2019, and is attached to the Temporary Receiver's Declaration as

Exhibit 2.  That employment contract states that Mr. Dennis's duties included

providing content to customers and responding to customer emails for any Company

website featuring Mr. Dennis.  Temporary Receiver Decl., Exhibit 2 at 2.  Under the

contract, the Company reserved the right to review, modify or edit website content. *Id*. Mr. Dennis's compensation under the employment contract is largely commission-based. He was guaranteed a minimum annual base salary of only $23,660, with the remainder of his compensation based upon a monthly formula calculated using a commission percentage of 37%-39% (during 2019-2020), the percentage of his services' revenue as a portion of the Company's total revenue multiplied by the Company's monthly marketing budget, and the net income derived from the services run by Mr. Dennis. *Id*.

Mr. Dennis's employment contract also contains a "Publicity Waiver and Release," pursuant to which Mr. Dennis expressly permitted and authorized the Company to use his name, images and personal information in marketing materials. Temporary Receiver Decl., Exhibit 2 at 3. Along with that authorization, the contract states that Mr. Dennis "has no right to review or approve materials before they are used by the Company," but also, further (and ambiguously in the view of the Temporary Receiver) states that Mr. Dennis "shall have the right to review and approve any materials."

Prior to the June 2019 contract, Mr. Dennis executed a December 14, 2018 employment offer letter, in which he was to be paid a base salary of $100,000 per year to serve as the guru for Biotech Breakouts, reporting to Jeff Bishop. Earlier, in June 2016, Mr. Dennis executed an agreement with Raging Bull's predecessor, Lighthouse Media, LLC, under which Mr. Dennis agreed to produce a video detailing his strategy using Jason Bond Picks Millionaire Roadmap (a Jason Bond

service) that grew $15,000 into $1.1 million, and to produce six webinars concerning his strategy, in return for a one-time payment of $53,087.  In September 2016, Mr. Dennis also executed an agreement with Lighthouse Media through his personal entity, Winston Corp, in which he agreed to serve as guru for his new service, Biotech Breakouts, to be paid on commission.  The Temporary Receiver hopes to conduct an interview of Mr. Dennis prior to the February 5 hearing.

### d.    Ben Sturgill

Ben Sturgill is a former guru for the Company who resides in Florida.  Prior to his employment with Raging Bull, he was a professional basketball player, an entrepreneur running a small business, and involved in Christian ministry. Mr. Sturgill indicated that he has been a stock investor since his early 20s on a long-term basis, and only in 2019 did he begin short-term trading.

In August 2017, Mr. Sturgill was attending the same church as Mr. Bishop, and Mr. Bishop approached him about running a new service (Startup Camp) that would teach people the basics of how to start and run a small business.  Thereafter in 2019, Mr. Sturgill transferred to Raging Bull.

Initially he assisted Messrs. Bishop and Bond in various tasks, with Mr. Bond supervising sales and services and Mr. Bishop handling operations.  From March or April 2019 through August 2019 he served as a production manager, coding production materials so they could be posted and emailed.

Mr. Sturgill indicated that as a production manager he would see earnings claims that would show the specific performance of a concept or strategy in a

particular trade, and that could include screenshots of results.  To his knowledge, at that time no one was reviewing the content for purposes of legality or compliance. He does recall that once or twice his supervisor, Bret Holmes, commented to the writers regarding the content of materials, advising what couldn't be said, but this was random and only happened once or twice.

In August 2019, Mr. Sturgill approached Mr. Bishop and Mr. Bond about launching a new service focused on trading in IPOs (initial public offerings). Mr. Sturgill had thought about, researched, and invested in a number of IPOs, including Facebook.  He had concluded that there were four key moments associated with an IPO, and that an educational service focusing on IPO trading could be a useful service.  He stated that he viewed himself as an educator, and produced daily video content about ongoing IPOs and whether, in his view, the IPO was worthy of a red, green, or yellow light from an investor/trader standpoint at that point in time.  Mr. Sturgill indicated that his IPO subscriber list included about 1,300 people, but he is unsure how many of those subscribers had signed up for all Raging Bull services as opposed to being his members.  He advised that he was never asked to create or review marketing for his service.

Mr. Sturgill also ran two other services—Daily Profit Machine and Dark Pools.  He advised that Daily Profit Machine involved technical analysis and charting of patterns, focused on day trading the SPY (an exchange-traded fund based upon the S&P 500).  Mr. Sturgill would give a morning alert to subscribers at the start of each day with a trading plan, and if the market was not moving in the

expected direction, would send an "audible," or another (different) plan, later in the day as the market unfolded.  Mr. Sturgill would send alerts if he followed the plan, or if he acted on his "audible" and entered a different trade.  At the end of the day Mr. Sturgill would send subscribers a "recap," evaluating what had occurred during the day.  Although he encouraged people to have their own plans, Mr. Sturgill acknowledged that some subscribers simply mirrored his trades, following exactly what he did.

Mr. Sturgill informed us that he tried to be conservative with his Daily Profit trades, shooting for a low gain (i.e. 10%), with stop losses and a plan around a $1 option that would limit customer losses.  Mr. Sturgill estimates that at least 8 out of 10 of his trades were winners, although he does not have a sense of how much he gained or lost over time and did not track the financial performance of the Daily Profit service.

Mr. Sturgill was compensated with a base salary of $8,000/month, plus commissions of 15% of net revenue after costs such as marketing and overhead.  His average monthly commission exceeded his base salary, and averaged $20,000 per month, with the amount ranging from $10,000 to $60,000 each month.

He indicated that Raging Bull management never seemed interested in gathering his trading account results or determining whether his trades in his services were successful, although he believes each of his services would have been profitable overall.

Mr. Sturgill resigned from Raging Bull in mid-December 2020.  He indicated that he does not envision himself going forward with Raging Bull, and was uncomfortable with the Company's marketing and advertising.  He believes that one has to "work hard" at trading.  He plans to continue trading on his own.

### e.    Nathan Bear

Mr. Bear resides in Georgia, and is a 2005 college graduate who worked in construction management after college and then started his own company involved in expediting construction permits.  He started stock trading in 2008 and lost money for three years.  In 2012 he became a subscriber of Jason Bond Picks, moving from investing in stocks to becoming a short-term trader.  Mr. Bear noted that short-term technical trading is "hard," and "takes years" and "many hours" of study and practice to become proficient.  He started having success in 2015, his first year of profitable trading after seven years of losses.  Mr. Bear indicated that he has been profitable in trading each year since 2015.

In 2017 or 2018, Jason Bond recognized that Mr. Bear was having success in trading, and invited Mr. Bear to serve as a chat room moderator on an independent contractor basis.  At one point Mr. Bond was not available to teach, and Mr. Bear was asked to share his screen.  He became a full-time employed Trading Guru on January 1, 2019 at a salary of $120,000.  Thereafter, the Company agreed to pay him a monthly commission based upon his service's subscriber revenues, after advertising and other expenses.  Mr. Bear indicated his Commission was usually $5,000-$15,000 per month, but was very high (up to $150,000) on three occasions.

Mr. Bear indicated that he was a successful trader, estimating that he generated profits totaling $3.2 million during 2015-2020, using an account size of roughly $150,000-$200,000. However, Mr. Bear indicated that neither he nor Raging Bull kept track of his profits. He reported that at one point, he tracked his trades for about a three-month period and observed that he was "hitting about 60-70%" over that time. He asked Raging Bull if the Company could build a formula that would show his success over time, since nothing like that existed, but Raging Bull never built the formula, and Mr. Bear stopped tracking his trades.

With regard to advertising, Mr. Bear indicated that he would provide screen shots of successful individual trades and commentary concerning the strategy behind the individual trades. He said he had no ability to change advertising and no control over advertising. Mr. Bear indicated that he was not interested in having his image or profitability placed on the internet, and that he never saw anything about him that was inaccurate. However, he noted that in his view Raging Bull's advertising is "all positive," "silly," and designed to elicit responses from consumers who want fast money. Mr. Bear was critical of certain aspects of the Company's advertising, disagreeing with ads indicating that consumers don't need money, experience, dedication, or time to become successful traders.

Mr. Bear was also critical of the Company's use of live trade "alerts" through text messages and the Raging Bull app. In his view, he was teaching subscribers "how to fish," and the trade alerts to him appeared to be "like a sales gimmick" that was "almost counterintuitive to what I'm trying to do." Instead of the use of "trade

alerts" that might lead subscribers to mimic his trades, Mr. Bear indicated that he was trying to teach people to make their own decisions.

Mr. Bear told the Temporary Receiver that he has resigned from Raging Bull and does not want to be involved with the Company in the future.  He indicated that unlike others at the Company, he derives the majority of his income from his own trading.  He indicated that he was unsure whether the Company could be successful going forward, if no earnings claims were permitted in advertising and if live trades were not allowed.

### 4.     Sales & Subscriber Base

### a.     Focus of Sales

Raging Bull characterizes itself as a subscription-based publisher that "provides subscribers with training and educational materials to learn trading strategies for their own investing activity."  Defs.' Mot. to Stay Enforcement or Modify Temporary Restraining Order [ECF 28] at 4.  After a review of marketing materials disseminated by Raging Bull, the Temporary Receiver can confirm that Raging Bull offers the following services through its subscriptions:  instructional videos, live chat rooms, stock watch lists, email communications, articles, books, live streaming of stock portfolios, and real-time trade alerts.  However, the focal point of Raging Bull's advertising efforts appear to be the real-time trade alerts, live streaming services, and weekly watch lists, which Raging Bull claims are based on strategies that result in "money doubling potential."  Temporary Receiver Decl., Exhibit 3.

Following the entry of the Temporary Restraining Order, the receivership team reviewed emails received by Kayla Smith, Raging Bull Director of Operations, and the "support@ragingbull.com" email account for emails containing subscriber feedback.  In the course of that review, the receivership team also identified marketing emails sent to those accounts by Raging Bull and its gurus.  The receivership team identified more than 200 such emails dated from December 1 to December 7, 2020—the one-week period preceding the entry of the Temporary Restraining Order.  On the day before the Temporary Restraining Order was signed by the Court, December 7, 2020, Raging Bull sent 36 such emails in a 24-hour period.

The two examples provided below and attached to the Temporary Receiver's Declaration as Exhibit 3 illustrate the emphasis placed by Raging Bull on its trade alerts as recently as the day the Federal Trade Commission filed this action:

- Sent:  December 7, 2020 08:14
  From:  "Jeff Bishop" Jeff@totalalphatrading.com to kaylas@ragingbull.com
  Subject:  1-Trade-Per-Week Alert Service

  Now this is what I'm talking about…

  "*Jeff you are a saint! … I acted on your AAPL alert Monday morning, made 2 separate trades on the 119 contract, sold one for a whopping 115% gain while the other rides out until next week currently sitting at 87% return!*" - David W.

  What you might not know is that David had nearly no knowledge of the market, and had never traded an option in his life.

  Until he stumbled upon my 1-Trade-Per-Week alert service… Bullseye Trades.

He executed on my AAPL trade alert last week and came out with a 115% gain on his very FIRST trade.

*Does it get much better than that?*

Guys like David are living proof that there's never been a more streamlined, easy to execute alert service than this one.

ANYONE can get into the game.

This is your chance.

And right now, the clock is ticking…My next trade drops this morning before the market opens.

And as always… **I'm settling for nothing less than a trade with money doubling potential.**

**→ Click here right now to get your hands on it.**

(Italicized emphasis in original, bolded emphasis added).

- Sent:  December 7, 2020 09:12
  From:  "Ben Sturgill" ben@dailyprofitmachine.com to kaylas@ragingbull.com
  Subject:  December 8th → My Trade of the Day

  **175.**
  That's how many times this year I've traded this one stock.
  *How am I doing?*
  Well, I've won 159 of them.
  That's a 91% win rate, but who's counting?
  These aren't measly 2% or 4% winners either.
  Recently, I net 23%, 169% and 64% on three of my trades.
  That's not enough for you?
  Ok… let me put it this way.
  Say you started trading with me on January 1st, with a $1,000 account.
  Now, as I mentioned earlier, we're only trading ONE stock…
  …every single day…
  …at the same time.
  Just as I've been doing since January 1st, 2020.
  In fact, my next alert hits in less than two hours… and you could secure it.
  But I'll get to that in a second.
  Say you put just 10% of your account in every single trade (LOSERS INCLUDED!) that  I've made since January 1st.

As of this morning… your account would be sitting at: **$267,707**
I'm not joking.
I did the math, and it checks out.

Now, the fact remains that in two hours, **I'm releasing my next trade alert.**

Don't ignore this.

Next year at this time, you could be $267,707 richer.

It starts by saying "YES" to today's trade alert.

Give yourself a chance

(emphasis in original).

In these emails, Raging Bull appears to promote the idea that if consumers subscribe to the advertised Raging Bull service, they will gain an immediate advantage in the market that will turn into massive profits. Specifically, the emails create the impression that even subscribers with very little knowledge of the market can follow Raging Bull's trade alerts and turn a profit, possibly even on their first trade. Similarly, Raging Bull creates the impression that subscribers can sit back and relax, while Raging Bull's instructors do all of the hard work, leveraging their skill, and knowledge of the market to identify successful trades for subscribers to follow.

The Federal Trade Commission alleges that a number of Raging Bull subscribers have explained that the primary reason they purchased Raging Bull's services was because they believed they would have the ability to copy the trades from the trade alerts and make money like Raging Bull instructors. Mem. in Supp. of Pl.'s Emergency Mot. for Temporary Restraining Order ("Pl.'s Mem.") [ECF 2-1]

at 14.  The receivership team has reviewed thousands of communications from

Raging Bull subscribers addressed to Raging Bull and/or the Temporary Receiver,

and in that review, the Temporary Receiver has found support for the FTC's claim

that some customers do, in fact, subscribe to Raging Bull primarily for the trade

alert services.[1]  The following examples, extracted from emails sent either to Raging

Bull's support email address (support@ragingbull.com) or the Temporary Receiver's

email addresses (Receiver@gejlaw.com and/or pkeith@gejlaw.com), are

representative:

- **Luke M. stated:**
  When I signed up for Bullseye Trades, Fast 5 Trades, and Jason Bond
  Picks, I was led to believe it that following the trade recommendations of
  Jeff, Jason and Kyle was going to make me at least one 100% trade return
  and that I could build incremental wealth by simply following their
  recommendations.

- **Naveen K. stated:**
  I enrolled in Ragingbull in 2019 after going through one of the webinars
  by Jeff Bishop, the marketing is in such a way it gives the impression that
  you can make more money and just follow their trades.

- **Josh C. stated:**
  The promise of Fast Five Trades seemed too tantalizing to pass up, and
  $97 seemed like a bargain considering all the money I was about to make.
  The promise was this: Kyle does all the research – leveraging his
  experience, skills and wisdom – and all I had to do was buy the stock, wait
  a couple days and then ring the register.

- **Bec F. stated:**
  Yes they have an educational section but that is not what you sign
  up for, you sign up for their live trade alerts so you know when to
  buy and when to sell. Everything else you can learn on the internet
  for free anyway.

---

[1]      The Temporary Receiver has not independently verified that these emails, or any
emails discussed herein, do in fact come from the person stated or that the person is in fact
a subscriber.

These emails are attached to the Temporary Receiver's Declaration as Exhibit 4.

These emails illustrate that what entices a portion of consumers to subscribe to Raging Bull is not Raging Bull's educational content, but its live-trade alert services. Customers seem to value the idea that once subscribed, all they have to do is follow the trade alerts of the instructors in order to make profits. Furthermore, some subscribers have reported that the educational content provided by Raging Bull is nothing different than what can be found for free on search engines such as Google.

### b.   Raging Bull's Subscriber Base

Defendants (and their expert, Dr. Wind) acknowledge that Raging Bull targets both first-time investors and more experienced traders. Defs.' Consolidated Response to Order to Show Cause Why Preliminary Injunction Should Not Issue ("Defs.' Consolidated Response") [ECF 123] at 18. But Defendants generally describe Raging Bull's target audience and customer base as a "relatively sophisticated group interested in trading and financial news." *Id.* They assert that Raging Bull primarily targets 35-54 year-olds, and that the majority of the visitors to Raging Bull's website have an income over $100,000. *Id.* at 18, 20. The FTC has argued that Raging Bull's customer base is more diverse than suggested by Defendants, including a number of older adults, retirees, and/or immigrants. FTC's Reply Mem. in Further Support of Its Mot. for Preliminary Injunction ("Pl.'s Reply") [ECF 145] at 5.

The Temporary Receiver has not been presented with any evidence to refute the FTC's position regarding Raging Bull's customer base. Since the commencement of the receivership, the receivership team has reviewed emails from many Raging Bull subscribers who self-identify as a being older adults or retirees. A number of these emails are attached to the Temporary Receiver's Declaration as Exhibit 5. For example:

- **Sean B. stated:**
  I am one of those disabled, retirees taken advantage of by this Company, Raging Bull…. I am a Retired Physician on Disability due to severe Bipolar disorder, Ischemic Heart Disease, hypertension and Diabetes. I am 60 years of age. I am as vulnerable as they come, Sir!!

- **Walter R. stated:**
  I am 66 and just retired from the State of NC and retired from the Marine Corps in 93 and this treatment and false sales pitches using only the good one is terrible service.

- **Vince O. stated:**
  I am a 69 yr old retiree with less than 20,000 to my name.

- **Sheila K. stated:**
  I am a 70 year old that fell for their video and felt they would help me learn a little about market.

- **Paul L. stated:**
  As I have already mentioned I am 80 year old and both me and my partner battle with the Corona Virus and the last thing we need is your useless to us advice and marketing emails.

The receivership team has also reviewed emails from many Raging Bull subscribers who self-identify as living outside of the United States. Specifically, the Temporary Receiver has reviewed emails from Raging Bull subscribers living in Australia, Europe, Canada, New Zealand and Qatar. These emails are attached to the Temporary Receiver's Declaration as Exhibit 6.

### 5.    Marketing

The receivership team has reviewed marketing materials disseminated by Raging Bull in the days and weeks before the Temporary Restraining Order was entered.  These include ads posted by Raging Bull on a web-based platform that connects advertisers and third-party publishers called Interactive Offers,[2] and marketing emails sent by Raging Bull and its gurus.  A large volume of the materials reviewed by the receivership team make claims that are inconsistent with the law, as stated by the FTC its memorandum, specifically:  (1) claims regarding the gurus' wealth and trading success; (2) claims that subscribers can make market-beating returns by using Raging Bull's services; and (3) claims that those returns can be achieved with only a negligible investment of time, effort, or money.  Pl.'s Mem. [ECF 2-1] at 4-21.

Attached to the Temporary Receiver's Declaration as Exhibit 7 are several .html ads that Raging Bull ran on Interactive Offers' platform since November 1, 2020.[3]  The overwhelming majority of the 47 unique .html ads reviewed by the

---

[2]      As described in Interactive Offers Advertiser Terms and Conditions, "The 'Interactive Offers Network' comprises a group of third-party publishers ('Publishers') authorized by Interactive Offers to post Advertiser-furnished content on or through email communications, websites, text messages, or other digital resources the Publishers control and as may be approved by Interactive Offers from time to time. Interactive Offers provides you, as Advertiser, with the ability to post content for advertising purposes ('Creative,' as further defined below) for distribution through the Interactive Offers Network subject to your compliance with the terms and conditions of this Agreement."

[3]      Counsel for InterActive Offers provided these materials to the Temporary Receiver on January 5, 2021, and indicated that he was providing "all ads that RagingBull ran on InteractiveOffers' platform since November 1, 2020."

receivership team highlight the wealth the gurus have amassed through trading

and insist that subscribers can realize similar gains with just a modicum of effort.

To offer a few examples:

- One ad features Jason Bond reporting, "This year alone I've earned well over $450,000 trading stocks, and this number is skyrocketing as I repeatedly take down win after win in the options market as well.  My system is easy to learn (no, really!), easy to implement, and easy to remember.  Believe me, you CAN do this.  As a teacher by profession I'm *sure* of it."  The ad goes on to encourage the reader to, "Take a moment to see how thousands of others have earned millions of dollars using my simple, time-tested system for taking consistent profits out of the stock and options market, week after week after week just like these . . ."

- An ad for the Monday Movers service announces that "Jason Bond is identifying and trading stocks that are moving up 33%, 47%, 69%, and 101% OVER THE WEEKEND."  The ad urges, "Don't miss stocks poised to gap up THIS WEEKEND!  Don't compete with the wall street fat cats.  Profit over the weekend while they're out of the office.  DON'T MISS THIS FRIDAY'S MONDAY MOVER TRADES!!!!"

- Another ad featuring "27-year-old, millionaire trader Kyle Dennis," claims that in five years Dennis has "amassed over $4,021,304 in trading profits simply trading stocks."  According to the ad, Dennis has made "what could be the biggest breakthrough of his career"—an option-related breakthrough that is "poised to change your life and ignite your profits into uncharted territories."

- In an ad for Dennis's "Fast Five" service, Dennis states, "I believe anyone can do this, regardless of what they're experience level is. . . . You just have to focus on one trade idea a week."  The ad screen shots messages from "Fast 5 clients" who are "using my [Dennis's] trade ideas to their advantage," and who report profits of 80% and 98%.

- In an ad for Bullseye Trades, Jeff Bishop insists, "It's so easy that anyone who can follow simple instructions can win making these Bullseye Trades… Whether you want more money to take care of family, buy that dream car or pay for your kid's tuition, you can achieve this easily with Bullseye."

- In another ad marketing Bullseye Trades, Jeff Bishop says, "*Each week I hunt down one trade that I think has the best chance to make me 100% in profits, and I share this exact idea every Monday morning before the market*

*opens*." The ad continues, "**100% profits each week.  At home.**  That sound like music to *your* ears?"  (emphasis in original)

- Yet another Bullseye Trades ad asks, "What if, after this pandemic is over, you didn't have to put on a suit and tie and sit in traffic again?  What if you could stay home in your sweats and slippers and make a six-figure income?  Jeff Bishop has been doing that and much more for over 20 years – For him, life just keeps getting better and better, no matter what goes on in the news."  The ad goes on to explain that "**<u>BullsEye Trades is not a training course</u>**, it's a simple, proven opportunity to equip you to start taking in huge profits.  In BullsEye Trades, Jeff will even share with you his single best high-conviction trade each week."  (emphasis added).

Only one of the ads quoted above includes any kind of disclaimer.

Similar messaging was deployed in emails sent by Raging Bull and its gurus as recently as the week before the FTC filed for a temporary restraining order against the Defendants.  As described in Section IV.B.4, as part of its review of emails received by Kayla Smith, Raging Bull Director of Operations, and the "support@ragingbull.com" email account, the receivership team identified marketing emails sent to those accounts by Raging Bull and its gurus.  The receivership team reviewed more than 200 such emails dated from December 1 to December 7, 2020—the one-week period preceding the entry of the Temporary Restraining Order.  Some of the emails do not contain earnings claims and primarily provide information about market trends or stock movements.  However, a large number of the emails include one or more of the types of claims described by the FTC as deceptive.  Several of those emails are attached to the Temporary Receiver's Declaration as Exhibit 8.  For example:

- A December 1, 2020 email signed by Jeff Bishop announces that Bishop has identified "the one stock that's the lynchpin of a new revolution," and insists that if the reader would "get in right now," she "could be looking at life-changing gains."

- Another December 1, 2020 email from Jeff Bishop states, "Last week you could have had a combined return of 379% with just two trades, in a matter of days."  The email includes quotes that appear to be from satisfied subscribers, sharing that they made 185%, 175%, 130%, and 118% on trading calls using one of Raging Bull's services.  It then asks the reader, "Knowing what you know now . . . Are you really going to turn your nose to tomorrow's alert?  Get your hands on it right here."

Some of the emails use these claims with the apparent goal of upselling current subscribers on even pricier services.  For example:

- A December 4, 2020 email from Kyle Dennis appears to be directed to current subscribers to the Fast Five Trades service, and encourages the recipients to upgrade to "forever access to Fast Five Trades."  The email insists that "anyone can execute these, regardless of their trading experience."  It points to a subscriber named Mario, who is "sitting pretty on $3,386 from LK, he recouped his permanent membership fee and THEN Some!  ***On ONE TRADE.***"  Dennis asks, "Who doesn't want an extra $1,500 or $3,386 every week?  It's become a reality for traders like Edgar, Mario, and myself..  And it can be for you."

Each of the emails quoted above includes a link to Raging Bull's "full disclaimer" on the Raging Bull website.  Several paragraphs of additional disclaimer language can also be found in small, gray print at the bottom of each email.  One of the paragraphs states:

> **RESULTS PRESENTED NOT TYPICAL OR VERIFIED**. RagingBull Services may contain information regarding the historical trading performance of RagingBull owners or employees, and/or testimonials of non-employees depicting profitability that are believed to be true based on the representations of the persons voluntarily providing the testimonial. **However, subscribers' trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL**. Actual results will vary widely given a variety of factors such as experience, skill, risk mitigation practices, market dynamics and the amount of capital deployed. **Investing in securities is speculative and carries a high degree of risk; you may lose some, all, or possibly more than your original investment.**

(emphasis in original).

Following the review of these emails, the Temporary Receiver cannot agree that the examples of Raging Bull's ads and marketing materials cited by the FTC as non-compliant with the law are "cherry-picked," as the Defendants maintain. *See* Defs.' Consolidated Response [ECF 123] at 1, 24.  To the contrary, more than 2/3 of the marketing emails reviewed by the receivership team make claims similar to those quoted above.  It is the Temporary Receiver's impression that such claims are a prominent feature of the Company's advertising.

Raging Bull made these claims despite having never attempted to substantiate the performance of either its gurus or its subscribers.  In an interview with the Temporary Receiver, Mr. Bishop acknowledged that Raging Bull has never systematically reviewed its gurus' track records with the trading strategies that Raging Bull markets to the public.  In fact, Mr. Bishop was not even aware of the track record of the trade ideas pitched by his own service, Bullseye Trades.  Raging Bull has further acknowledged that it does not attempt to verify profits that subscribers claim to have achieved using Raging Bull's strategies.  As the Defendants admit in their opposition, "Raging Bull does not verify the income claims of its subscribers," despite using their testimonials in its marketing, including in the examples quoted above.  Defs.' Consolidated Response [ECF 123] at 37.

The Defendants assert that "Raging Bull does not tell or imply to consumers that using Raging Bull's services means they *will* or *likely will* make profits on a given trade," but that "Raging Bull's service . . . is intended to arm traders with

knowledge to make their own informed trading decisions." *Id.* at 34 (emphasis in original).  The examples quoted above seem to tell a different story, heralding "consistent profits, week after week after week," "**100% profits each week**," and breakthroughs "poised to . . . ignite your profits into uncharted territories."

The Defendants also argue that Raging Bull stresses to its subscribers that "nothing comes easy" and "skill and practice" are required to learn its trading strategies.  Defs.' Consolidated Response [ECF 123] at 36.  Yet the materials quoted above do not caution that practice and training are needed to achieve results. Instead, they advertise a quick and easy profit, announcing that "anyone who can follow simple instructions can win."  Temporary Receiver's Decl., Exhibit 8.  In fact, they expressly disclaim the need for education and training.  As one ad states, "BullsEye Trades is not a training course, it's a simple, proven opportunity to equip you to start taking in huge profits."  *Id.* (emphasis added).

The materials reviewed by the Temporary Receiver show that subscribers were enticed by these claims.  As discussed further in Section IV.B.8, the receivership team has reviewed thousands of emails from Raging Bull subscribers providing feedback about the Company, both those sent to Raging Bull and those sent to the Temporary Receiver directly.  Many have indicated that they decided to subscribe to Raging Bull because they believed that they could achieve profits like those described in Raging Bull's ads and that they could do so quickly and with little effort.  A few representative emails are attached to the Temporary Receiver's Declaration as Exhibit 9, and provided here:

- **Sandy R. emailed support@ragingbull.com and stated:**
  In a genuine matter I truly believed that my investments would mask me a significant amount of money as they portrayed in their videos and their training tutorials they basically specifically with Jason bond , Kyle Dennis, just Bishop as I truly believed I could in seven trades to 15 trades create more than $175,000 worth of wealth it appeared of time that would be something around three months there are several videos I've downloaded them I have it from Kyle Dennis about the apple option a day to triple quadruple and grow my options with Apple to more than $175,000 in less than 3060 days[.]

- **Bec F. emailed pkeith@gejlaw.com and stated:**
  I saw the advertisement for Trade with Kyle and how much money they are making during Covid while everyone else was losing money and registered and signed up to watch it. He said he invested in Biotech, the industry directly impacted by Covid and used the news and medical information to make his trades. He showed how he invested $15,000 in trading and lost half of it. Then he did his research and learned how to trade successfully and turned the remaining $8,000 into the multi-millionaire he is now. He said that he would give us his exact trades with real time alerts as and when he made them so that we could copy his trades and make the same money as him. Obviously from his previous statement that meant that we would be millionaires too if we just did what he did. So I signed up with Trade with Kyle. When I got to the payment page there was an upgrade that told me if I pay more I would be signed up for a lifetime and pay only $1 a year to keep getting his alerts. I saw this as an investment into our future and paid the extra to sign up.

- **Josh C. emailed receiver@gejlaw.com and stated:**
  Still, in the age of social media, I've had this nagging feeling of "missing out" on the truly life-changing gains in the stock market that you hear about. Younger investors/traders frequently take to Twitter and Reddit to brag about the massive profits they've made, with a screenshot of their gargantuan account balances as proof. It was in this environment that I clicked on a Raging Bull ad while scrolling through my Facebook feed. The ad featured Kyle Dennis, and it pulled me in with his rags-to-riches story. According to the ad, Kyle was just a regular guy who purportedly has made millions upon millions of dollars in the stock market – by studying the markets, learning as much as he could and becoming an expert in technical analysis. What really pulled me in was the exact dollar figures he claimed to have made. I don't remember the exact numbers off the top of my head, but he claimed that he made $900,000 one year, $1.2 million the next, $1.8 million the year after that, $2.3 million after that, etc. And this was all from

stock trading. And one of the thoughts I had was, "If this guy can do it, maybe I can too."

**6.    Compliance Efforts**

In their Consolidated Response, Defendants discuss their efforts at compliance prior to the filing of this lawsuit.  Defs.' Consolidated Response [ECF 123] at 8-9.  The Temporary Receiver has examined Raging Bull's compliance efforts.

As of the date of this Report, the Temporary Receiver has found little evidence of significant compliance efforts undertaken by the Company prior to the hiring of Susan Trahan as General Counsel and Chief Compliance Officer in the summer of 2019.  Prior to Ms. Trahan's hiring, it appears Raging Bull did not have an in-house legal or compliance officer, and the Temporary Receiver has not found any evidence to date of any meaningful efforts by Raging Bull to review advertising or marketing materials to prevent publication of false or unsubstantiated earnings claims that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Ms. Trahan advised the Temporary Receiver that prior to joining Raging Bull, she had significant experience in compliance through serving as corporate counsel at Sprague Operating Resources, LLC, one of the largest independent suppliers of energy products in the Northeast U.S., and at Bostonia Global Securities, LLC (now Waterway Capital), a FINRA/SEC-registered broker-dealer and investment bank based in Boston that provides financial and real estate services.

Ms. Trahan told the Temporary Receiver that prior to her arrival, the Company was developing a compliance manual.  As the Company's first Chief Compliance Officer, one of her key tasks was to create a compliance department, which Raging Bull's CEO (Jeff Bishop) told her was an "important" goal.  Following her hiring, Ms. Trahan's compliance efforts included completion and launching of the Company's Compliance Manual (October 2019), which prohibits misrepresentations in marketing; the hiring of a compliance analyst (January 2020); retention of Greenburg Traurig to conduct compliance training for marketing, customer support and telesales (April 2020); audits of marketing emails and telesales and customer support phone calls in an effort to ensure compliance (June 2020 and September 2020); the hiring of Martin Saunders as Associate Compliance Counsel (August 2020); and Company-wide "Phase 2" compliance training from Greenburg Traurig.

In an interview with the Temporary Receiver, Ms. Trahan described the Company's compliance program as "nascent," and conceded that "we are only at the 35-40 yard line."  Both Ms. Trahan and Mr. Saunders noted in interviews that as of December 7, 2020, the date of the filing of the FTC's lawsuit, Raging Bull did not yet have a process in place requiring compliance review of all advertisements and marketing materials before they were published to the public on the internet. According to Mr. Saunders, after he was hired in August 2020, from time to time he would find ads that he felt were improper earnings claims appearing on the internet, and he would then instruct company employees to take down the ads.

Mr. Saunders also indicated that certain traders or "gurus" had marketing production teams that completely bypassed any compliance screening and created ads that were published without his knowledge, review or approval.  As noted above in Section IV.B.5, the Temporary Receiver found recent advertisements/marketing materials that contained questionable earnings claims, either recently published or in process for publication at the time the Court entered the TRO.

On December 8, 2020, the day the TRO was issued and prior to the Temporary Receiver's initial access to the Company's premises, the Company's compliance team generated an "Additional Marketing Requirements" document, based on the FTC's complaint, that stated in part as follows:

**RagingBull.com, LLC**
**Additional Marketing Requirements**
**12/08/2020**

I.    **PROHIBITED BUSINESS/MARKETING ACTIVITIES**
The following activities are prohibited:

A.   **Earnings Claim**:  At this time, Raging Bull is prohibited from making any Earnings Claim, defined as any representation to consumers (specific or general/directly or by implication) about **income, financial gains, percentage gains, profit, net profit, gross profit, or return on investment**.
Earnings Claims include, but are not limited to:
1)   the details of specific profitable trades, whether **actual or hypothetical;**
2)   references to quitting one's job, not having to work, or living off of income from trading;
3)   references to increased purchases or savings, including a home, vacations, or travel;
4)   claims that consumers will not lose money if they use a particular trading strategy;
5)   claims that profits are likely, probable, or the "mathematical" result of applying a particular trading strategy; and

6) any <u>representation, even hypothetical, of how much money a consumer could or would earn</u>.

**B.    Get Rich/Trade/Income Quick & No Experience/Big Money Required:**
Raging Bull cannot make any claim, expressly or by implication, about
1) the level of <u>experience</u> required for consumers to effectively use Raging Bull's services,
2) the <u>time or effort</u> required for consumers to effectively use Raging Bull's services, or
3) the <u>amount of capital</u> required for consumers to effectively use Raging Bull's services.

(underlining and bold emphasis in original document).

In opposing the entry of a preliminary injunction, Defendants acknowledge that "[t]he growth of the business in some respects outpaced the company's ability to keep up with the implementation of processes and controls for compliance and customer service."  Defs.' Consolidated Response [ECF 123] at 8.  It appears that although the Company was placing some effort and resources in compliance, revenue growth and profits were a much higher priority.  Ms. Trahan was based in New Hampshire, and until Mr. Saunders was hired in August 2020 there appears to have been no one focused on compliance physically present at the Hunt Valley, Maryland operations center.  The disparate nature of the Company's workforce – many employees operated remotely from different parts of the country – and COVID restrictions and quarantines undoubtedly made compliance more challenging.  But the Company could have long-ago issued a company-wide mandate that the compliance team must review and approve all marketing materials before they were published, to prevent unlawful earnings claims from being disseminated to the public.  Nor does there appear to be any good reason why the "Prohibited

Business/Marketing Activities" set forth in the Company's December 8, 2020 document could not have been ordered and applied by the Company months or years earlier.

Defendants assert that "[t]he company's tightening of compliance oversight and its establishment of renewed standards and procedures in relation to advertising materials moots past alleged violations and makes the likelihood of their recurrence much lower." Defs.' Consolidated Response [ECF 123] at 9. The Temporary Receiver respectfully disagrees with this contention, for three reasons. First, although Ms. Trahan and Mr. Saunders appear to be sincere in their desire to see the Company operate lawfully, the Company's compliance oversight as of the date of the TRO was far from "tight" or thorough. There were certainly far greater compliance efforts in 2020 than in prior years, when little (if any) compliance efforts appear to have been pursued. But compliance as of December 2020 was filled with holes. Without any requirement that advertising or marketing materials or statements be reviewed by a well-staffed compliance team, earnings claims could continue to be produced and viewed by the public.

Second, the Temporary Receiver questions whether past earnings claims violations are "mooted" by the fact that the Company was in the process of creating a compliance program that was still "nascent" and only at the "35 to 40 yard line" at the date of the TRO. The Temporary Receiver has reviewed a large volume of negative reviews from consumers who feel they have been deceived and damaged.

Are those disgruntled consumers and their claims to be ignored, simply because the Company belatedly placed more resources and effort at compliance?

Third, the Defendants' view of "mootness" does not appear to be consistent with case law in this District.  Judge Gallagher of this Court recently addressed the issue of mootness in the context of violations of the FTC Act in *FTC v. Agora Financial, LLC*, 447 F. Supp. 3d 350 (D. Md. 2020).[4]  Judge Gallagher noted that even if a defendant voluntarily ceases a challenged practice, the Court retains its power to address the practice – "[o]therwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, [and] then pick up where he left off. . . ."  *Id.* at 370, *quoting Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  Judge Gallagher held that "[t]he standard for determining whether a defendant's voluntary conduct has mooted a case is 'stringent': the defendant's conduct must make it 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"  *Id.* (citations omitted).  In *FTC v. Agora*, Judge Gallagher found that the defendants' voluntary cessation of marketing practices did not moot the FTC's claim of deceptive marketing, and entered a preliminary injunction.  *Id.* at 370, 372.

Defendants contend that "many of the alleged violative practices the FTC references have already been addressed and are moot," such that the likelihood of recurrence "is very low and unlikely to happen."  Defs.' Consolidated Response [ECF 123] at 25.  But the Temporary Receiver does not have the same level of confidence,

---

[4]  Both the FTC and the Defendants cited *FTC v. Agora* in their briefing, but neither addressed the Court's holding on mootness.

given the nature of ads appearing on the internet and being produced and disseminated at the time of the filing of this lawsuit, and the obvious holes in the Company's compliance process that existed as of the date the Court entered the TRO, as acknowledged by Ms. Trahan and Mr. Saunders in their interviews.

### 7.   Cancellation Policies

Raging Bull appears to have made cancellation difficult for subscribers.  They failed to provide a simple, straightforward mechanism for subscribers to cancel their subscriptions.  Subscribers reported to regulators and the Temporary Receiver that when they called Raging Bull to attempt to cancel their subscription, they were not able to do so, either because they could not reach a customer service agent or the customer service agent proceeded to upsell them to another product.  This practice appears to have been sufficiently consistent that the Temporary Receiver cannot say it is an outlier among Raging Bull customer service employees.

As one example of Raging Bull's efforts to prevent subscribers from cancelling, on January 6, 2020, Raging Bull circulated an internal memorandum to address the stated "Key outcome[]" of "Reduce rate of cancellations."  *See* Exhibit 10.  Rather than address any substantive issues with services or customer service, Raging Bull sought to reduce cancellations by "remov[ing] functionality from the dashboard" that allowed subscribers to cancel their subscriptions.  The "Objective" was to "Require BE product customers to call in or email to cancel their subscription."  As described above, Raging Bull customer service employees were also trained to attempt to upsell subscribers rather than permit them to cancel their subscriptions.

### 8.    Customer Satisfaction

Since the entry of the Temporary Restraining Order, the Temporary Receiver has reviewed emails submitted by thousands of Raging Bull's purported subscribers between December 7, 2020 and January 29, 2021.   During the course of the receivership, the receivership team reviewed emails sent to Raging Bull employee, Kayla Smith (kaylas@ragingbull.com), and Raging Bull's support email address (support@ragingbull.com) for certain time periods.  The receivership team also reviewed hundreds of emails submitted directly to the Temporary Receiver via the Temporary Receiver's email addresses (Receiver@gejlaw.com and/or pkeith@gejlaw.com).

The receivership team conducted a comprehensive review, after applying filters for spam and duplication with the advice of eDiscovery consultants, of emails sent to kaylas@ragingbull.com and support@ragingbull.com in two different time periods.  The first time-period consists of emails sent to Kayla Smith and Support between December 7, 2020 and December 17, 2020.  The second time-period consists of emails sent to Kayla Smith and Support between December 18, 2020 and December 28, 2020.  Regardless of the time-period, consumer emails appear to fall into three distinct categories:

- Category (1): Unhappy customers who have negative comments about Raging Bull and the services provided or who state they lost money because of Raging Bull and the services provided;

- Category (2): Customers requesting refunds or that their subscriptions be cancelled (for reasons ranging from anger because the services have been shut down or because they were unhappy with the services provided); and

- <u>Category (3):</u> Happy customers who have positive comments about Raging Bull and would like their services to continue.

***Kayla Smith & Support Emails from December 7, 2020 – December 17, 2020***

The Temporary Receiver selected emails from this period of time because Raging Bull began sending out emails to its subscribers on December 7, 2020, requesting testimonials from customers sharing their experiences with Raging Bull. Examples of Raging Bull's email requests with the subject lines "Help for Jeff Williams" and "Urgent personal favor" (from Jason Bond) are attached to the Temporary Receiver's Declaration as Exhibit 11. Presumably, Raging Bull sought positive feedback to report such responses to the Court. During this time period, Raging Bull received approximately 312 emails from subscribers in Category 1 (unhappy customers who have negative comments about Raging Bull and the services provided or who state they lost money because of Raging Bull and the services provided), 847 emails from subscribers in Category 2 (customers requesting refunds or cancellations, for reasons ranging from anger because the services have been shut down or because they were unhappy with the services provided) and 702 emails from subscribers in Category 3 (happy customers who hope Raging Bull's services continue). Examples from each of these categories are attached as Exhibit 12 to the Temporary Receiver's Declaration.[5]  The Temporary Receiver has not

---

[5]      These numbers are approximations due to the application of spam and other filters applied in consult with an eDiscovery vendor.

independently verified that these emails, or any emails discussed herein, do in fact come from the person stated or that the person is in fact a subscriber.

Representative statements from subscribers in <u>Category 1</u> (unhappy customers) are as follows:

- **On 12/14/2020 Gozde C. wrote:**
  The educational materials provided by Raging Bull are only scratching the surface, which is not enough to teach a beginner to learn this type of trading. And this can lead a beginner to have a false confidence in their trading skills and might cause them losing a lot of money in real trading.  The 2-3 hr training enabling one to learn momentum trading is mis-leading information and the context of the educational videos provided by Raging Bull are also fragmented with no logical order and contains repetitive information which are not helpful.  There was also a false information in one of the videos where Jason Bond says the tool he used Finviz is free. Finviz has a basic screening tool which is free. However, the version Jason Bond teaching and using has additional screening filter function and available if one has FinViz Elite. Finviz elite is again subscription based and one has to pay for it to have access. It is not a free tool.

  In the marketing video that I subscribed for Jason Bond Picks, it was noted that subscribers receive live alerts while Jason trades live on daily basis. The live alerts that I receive are often delayed and I receive them after the fact that the stock price already went up because of Jason's position in the stock since he had already bought it. Small cap swing trading often plays around small fluctuations in a volatile stock. Therefore, even if I am buying the stock slightly higher than he did, I have a higher risk of losing money than him because of the fact that I bought it after him with a higher price. If I were to buy it then, I could only buy it at a higher price than he did, and likely will boost his win while exposing me to a higher risk. When I called Raging Bull that I don't receive text alerts, but only app alerts and they are delayed; the Raging Bull rep said there is a problem with the text alerts, so there is only app alerts being sent. There is no point is receiving an alert if it is not on-time and I cannot utilize the information properly.

- **On 12/16/2020 Barbara P. wrote:**
  I have lost over $26,400 (Subtracting my gains from the majority of losses incurred from the gurus' (as you call them) recommendations.
  …...

729396                                    69

[Y]ou need to know that you are causing a lot of serious harm to very well-meaning people who naively believed your selling speeches hoping they would make money as you do as you made it sound so easy, 'We tell you ahead of the market exactly which stock we will trade and at what price, we will send you an announcement once the trade has been taken, and then an alert when we exist the trade. Can't get easier than that!'

- **On 12/16/2020 Scottie E. wrote:**
  I have spent almost $10 thousand dollars on your services and have lost $5 thousand dollars in trading from your 'learning' platform. I had such high hope when I joined this service and it has done nothing but make my life so much more stressful and has ultimately led to me having to get a second job.

Representative statements from subscribers in <u>Category 2</u> (refund or cancellation requests) are as follows:

- **On 12/7/2020 Kathleen B. wrote:**
  I want all of my subscriptions taken off the auto renewals. You were to sent notifications before Jason bond subscription was renewed, but sadly this did not happen and even though I sent an email to you saying I did NOT want this renewed, you did it anyway.

  Now I can't get anyone to understand that i want that money refunded I am ignored. I have gotten a couple of emails from raging Bull with crazy stuff about taking his classes to get a refund. This is not the original subscription but a RENEWAL that I did not want. It's not like you guys need the money or anything. Why would you ignore me over a $300 subscription.

  As I have explained before, I have multiple subscriptions with Raging Bull and cannot handle all the emails and alerts from so many traders. I am a new trader with a $7000 account and can't handle all of this. Please just give me the money back for this renewal I did not want.

- **On 12/7/2020 Robert E. wrote:**
  Hello
  This is my 2nd request.
  1. Turn OFF my Auto Renew for the Raging Bull
  2. Cancel my Raging Bull Subscription
  3. I do NOT use the service
  4. REFUND the $799 ASAP to Visa Card ending in 5298
  5. I will NOT be calling you as I did NOT have to call you to sign up

6. If the refund is NOT received in 48 hours, I will file A CHARGEBACK WITH MY BANK IMMEDIATELY

- **On 12/17/2020 Michael S. wrote:**
  I would like a full refund of my Raging Bull purchases. Considering your current legal issues and the fact that the livestreams are no longer functional. Trade alerts are also not being made or posted daily. This is failing to deliver on what was advertised and what has been delivered in the past few weeks. Plain and simple this service is not delivering as promised.

Representative statements from subscribers in <u>Category 3</u> (happy customers)

are as follows:

- **On 12/8/2020 Scott F. wrote:**
  I am 64 years old. I have been a traditional investor since I was in my 30's, investing in typical, middle class-type investments (mutual funds in and out of 401k and IRAs). This Spring, my wife and I determined that we wanted to venture into more active trading. I did a lot of research into various trading services, and evaluated many of them. In addition to Raging Bull, I signed up for a few other services/newsletters. My research led me to the conclusion that Raging Bull had the most to offer for the best value.

  I initially signed up for a trial of Monday Movers. I was very pleased with the results, and then signed up for a trial of Fast 5 and Weekend Wiretaps. I started using the services with smaller (under $1000) trades. I did not take every trade, but every single trade I did make based upon the recommendations in those 3 services proved to be successful, unless I was not able to follow the trade plan due to my own inability to follow the plans. I was so pleased with the results, I signed up for the 14 month Elite Program. Based upon my research, the prices I paid for Raging Bull services are comparable to other services. Based on my research and my own experiences, the trade ideas provided by Raging Bull are significantly better than the other services I looked at.

- **On 12/9/2020 Eric G. wrote**:
  My name is Eric G[.], I am a verified subscriber of multiple services with Raging Bull. I have traded the financial markets for over 30 years and during this time I have subscribed to a number of educational services.

Raging Bull is the finest such service. The instructors are competent, considerate and highly knowledgeable. They provide top line education and provide individuals with the tools to become better investors/traders.

They are totally transparent with their own trades and trading history, gains and losses. They advise each student to make their own decisions based upon their own risk tolerance and they encourage that everyone paper trade before using/risking any of their own money.

- **On 12/9/2020 Shannon B. wrote:**
  As a new trader Raging Bull, their educational services, and various types of stock alert services have been paramount in my success.  I would stand to lose access to a ton of educational materials and market profits should they no longer be able to put out their stock alerts for any reason.  Their mentors have been entirely professional and honest with me the entire time.  In no way have I ever felt like what they were offering was not worth the money I have invested in their services.  Please do not shut them down.  It would be very unfair to all of the happy clients who benefit both educationally and financially from their services.

  Kyle Dennis and Jeff Williams in particular have been great trading mentors for me personally.

### *Kayla Smith & Support Emails from December 18, 2020 – December 28, 2020*

The Temporary Receiver selected emails from this period of time because Raging Bull sent out an email to consumers on December 18, 2020, informing consumers that it would be temporarily suspending its services to defend this matter.  In this email, attached as Exhibit 13 to the Temporary Receiver's Declaration, Raging Bull again invited consumers to "voice [their] support for RagingBull" by emailing support@ragingbull.com to "share their experiences and how much RagingBull means to them."  During this time period, Raging Bull received approximately 366 emails from subscribers in Category 1 (unhappy customers who have negative comments about Raging Bull and the services

provided or who state they lost money because of Raging Bull and the services provided), 818 emails from subscribers in Category 2 (customers requesting refunds or cancellations, for reasons ranging from anger because the services have been shut down or because they were unhappy with the services provided) and 844 emails from subscribers in Category 3 (happy customers who hope Raging Bull's services continue). Examples from each of these categories are attached as Exhibit 14 to the Temporary Receiver's Declaration.[6]

Representative statements from subscribers in <u>Category 1</u> (unhappy customers) are as follows:

- **On 12/18/2020 Dave D. wrote:**
  Your company provides wonderful warnings about the pitfalls of trading and does a great job of covering yourselves on that end, but your company also paints a picture of the capabilities, skills and achievements of your "mentors" which is incongruous with reality, and is in no way representative of the expected trading results on a day-to-day basis. This constitutes gross false advertising to lure people in, and then only after the fact do the "mentors" try to live up to those expectations once people are hooked. If the bottom falls out of the trades and advice given by the "mentors", well, apologies are sent all around..... but they already have our subscription money, so "oh well".

  I started my entry into RagingBull with Jason Bond, as the marketing material couldn't be passed up. Within 6 months Jason's trades had nearly completely wiped out my trading account of over $8,000. However, I persevered, added funds and switched over to Kyle Dennis because the marketing material was conclusive and couldn't be argued with. With Kyle, while there were some small victories, they were always quickly wiped out by major losses. The third strike came with Nathan Bear. Again, nobody could argue with the marketing material and somehow RagingBull knew exactly what I was looking for in a trading service, and presented this winning selection. Well, after a couple days it became obvious that Nathan's approach wouldn't work with a small account, nor

---

[6]     These numbers are approximations due to the application of spam and other filters applied in consult with an eDiscovery vendor.

could it work with anything except a cash account as his trades were in and out within a day, most of which were losers.

- **On 12/19/2020 Cynthia B. wrote:**
  Sorry I won't be one of your supporters rallying around you. I have felt swindled by Raging Bull multiple times... Got suckered into Jason Bond's Smoke Signals and my son and I lost a bunch of money. What a bait and switch that was. And Jeez... for the trading God he purports himself to be, I haven't had a winning trade from Jeff Bishop's Bullseye Trade service in I don't know how long. Kyle Dennis sends out reports too late. Nate just went MIA this week. How do I get in on getting a refund for all of this?!?!? And no matter how many times I ask to have the SPAM advertising emails turned off, they still keep pouring into my email box.

- **On 12/20/2020 Vincent P. wrote:**
  Unfortunately, I cannot give you words of encouragement (though I am saddened to hear that staff has been laid off before the Holidays).   I found your advertising deceptive.  When I tried to cancel my order – and get a refund – I was put through such a "paper chase" (and multiple calls, multiple emails, multiple excuses by your staff as to why I could not get my money back after 1 day of subscription) that I just gave up and let you have my money – but vowed never to do that again.    I subsequently advised your company to NOT automatically renew my subscription.   If the FTC or SEC sets up a claim procedure, I will be the first in line.   What your company did was NOT fair and NOT truthfully advertised.

Representative statements from subscribers in <u>Category 2</u> (refund or cancellation requests) are as follows:

- **On 12/18/2020 John L. wrote:**
  I have a number of outstanding subscriptions with Raging Bull - Energy Trader, Double Down, LottoX, Weekend Wiretaps, Stock Profit Pro. It's sad and unfortunate that Raging Bull has run into problems with the FTC but that is not my fault. Therefore because no emails or alerts are being issued as per the terms of my subscriptions I would request a refund for these outstanding subscriptions.

- **On 12/18/2020 Karl K. wrote:**
  Please cancel all subscriptions immediately. I have not received satisfactory service. I continue to utilize other companies such as efx plus for $1000 annually as they operate polar opposite to RagingBull. I would

suggest you folks model your business more transparently and allow the consumer to decide when and how to upgrade rather than locking us in a vice grip and squeezing for as much as you can before we catch on.

- **On 12/27/2020 William C. wrote:**
  Hello again I am asking for my refund for both stock profit pro and bullseye trades. You have paused you services and I am unable to use them which is a breach of contract. I know about the legal matter but I am clearly not getting the services I paid for.

  As my previous email states I'd like a refund and before I go to the FTC to complain I've already left the BBB a review stating there's been no reponse from your end About any of the legal matters or what will happen.

Representative statements from subscribers in <u>Category 3</u> (happy customers) are as follows:

- **On 12/23/2020 Kresimir S. wrote:**
  I've been a member of RB family for 2 years now.
  Honestly, the first year trading with RB was pretty hard for me and I have lost money on the market.
  By the end of 2019, I was even thinking about quitting trading. At that moment I told myself:
  "If they can do it, I can do it also".
  I have put my trading on pause for a few months and went again through all trading videos I had access to... Started again step by step.. This year, 2020, I can proudly say that I have made huge progress in my trading and will be closing this year green.
  Now when I look back at 2019 mistakes I have done then, are exactly things the RB team was teaching us to avoid. I was taking oversized positions, didn't know which strategy fits me best, didn't know when to take profits, copying the trades without knowing the reason I'm taking the trade, etc...
  Even Though I had a rough 2019, not in one moment I have thought things like: "RB is a scam" or "they are cheating me", etc... I knew that all trades I take are my responsibility and I manage my own account.
  I'm thankful for all your time and knowledge you have shared with us because I can now confidently take trades and manage them successfully. I really hope this lawsuit will be resolved soon so we can go back to trading as a team.

- **On 12/24/2020 Larry S. wrote:**

My experience with the RagingBull is the exact opposite of a scam or fraud. Although I might not always agree with their stock selections and sometimes don't understand the pricing structure for membership, I have never been displeased with the services provided by their corporation. I can assure you that I have made money the well beyond what my subscription fees were by following their recommendations. For the most part, I trust the information I received from the corporation and typically follow through with stock purchases. My personal lack of appropriate timing has cost me thousands of dollars because I choose to not sell when I should have and have hung onto positions they recommend that I should sell. That is my fault, not the fault of RagingBull.

I've never experienced another stock support group that performs any better than the RagingBull. I am pleased with them and plan to continue my subscription for years after your investigation proves them to be a legitimate firm.

- **On 12/28/2020 Rosa R. wrote:**
  After seeing many ads on You-Tube, of kids talking about their investments, and how they had turned investing into a career,  I decided that may be a good avenue for me to pursue. That said, investing in the stock market and the many forms that takes, requires a great deal of education.  I looked at many training opportunities as I made my decision to pursue this course of action and I ultimately decided on Raging Bull.  This company has not only provided as much content as I needed to begin my education in investing but also was quick to address any concerns I had along the way.  I am truly pleased with their service and happy to say that my modest portfolio is thriving to this day.

  I plan to keep Raging Bull as a provider for my ongoing education into investing in the stock market because the team of educators are excellent investors themselves as well as exceptional teachers.  Please take my words of support for Raging Bull into consideration as you pursue your investigation.  This company is providing REAL value to ordinary people like myself.

### *Emails Sent to Temporary Receiver*

In addition to reviewing emails sent to Kayla Smith and Support, the

receivership team reviewed emails sent directly to the Temporary Receiver via

[Receiver@gejlaw.com](mailto:Receiver@gejlaw.com) or the Temporary Receiver's personal work email address,

pkeith@gejlaw.com.  The first communication received to his personal work email

account, pkeith@gejlaw.com, was on December 14, 2020.  The first communication

received to Receiver@gejlaw.com was on January 12, 2021.  At 8:00 a.m. on January

23, 2021 and January 25, 2021, Raging Bull sent an email to its subscribers from

the Temporary Receiver addressing Frequently Asked Questions regarding the

receivership.   This email invited subscribers to submit any comments, positive or

negative, to the Temporary Receiver at Receiver@gejlaw.com, Raging Bull at

support@ragingbull.com, or the FTC at Ragingbulllitigation@ftc.gov.  A copy of the

email is attached as Exhibit 15 to the Temporary Receiver's Declaration.  As

expected, this email resulted in a noticeable uptick in emails to the Temporary

Receiver's email address (Receiver@gejlaw.com).  As of January 29, 2021 at 5:00

p.m., the receivership team has received and reviewed 523 emails sent to

Receiver@gejlaw.com as well as a handful of emails sent directly to the Temporary

Receiver at pkeith@gejlaw.com.

Similar to the emails sent to kaylas@ragingbull.com and

support@ragingbull.com, the emails sent to the Temporary Receiver fall into three

general categories:

- Category (1): Unhappy customers who have negative comments about Raging Bull and the services provided or who state they lost money because of Raging Bull and the services provided;

- Category (2): Customers requesting refunds or that their subscriptions be cancelled (for reasons ranging from anger because the services have been shut down or because they were unhappy with the services provided); and

- Category (3): Happy customers who have positive comments about Raging Bull and would like their services to continue.

The Temporary Receiver received approximately 210 emails from subscribers in Category 1 (unhappy customers who have negative comments about Raging Bull and the services provided or who state they lost money because of Raging Bull and the services provided), 261 emails from subscribers in Category 2 (customers requesting refunds or cancellations, for reasons ranging from anger because the services have been shut down or because they were unhappy with the services provided) and 104 emails from subscribers in Category 3 (happy customers who hope Raging Bull's services continue).  Examples from each of these categories are attached as Exhibit 16 to the Temporary Receiver's Declaration.[7]

Representative statements from subscribers in <u>Category 1</u> (unhappy customers) are as follows:

- **On 1/23/2021, Alex T. emailed <u>Receiver@gejlaw.com</u> and stated:**
  I am not a naive investor, however, it turns out that the way they present their program and the promises they make based on you following what they say you will make so much money in such a little time with a very simple " technical strategy" and with minimal time...According to them, it takes no more than 5 minutes a day and you can even quit your day job and dedicate yourself full time to those programs as you will make 10 times more than what you earn by doing this simple investment

  My first subscription was " Bullseye" which was based on the fact that every Monday morning they would send instructions on any stock option that they would choose and announced. You are supposed to make so much money with this program however most of the time those gains were not realized as by the time you wanted to buy that option the price was already too high to get into ... I could say that I lost money with this subscription

---

[7]    These numbers are not mutually exclusive, some consumers who submitted complaints also submitted refund requests and vice versa.

Giving it a second try, I enrolled in the Lotto X subscription which I liked a bit more because at some point you would have the feeling that maybe you can make the money however you would lose 3 trades and you would gain one trade. It was definitely not as easy as advertised.. Once again the timing of the transactions were too quick and most of the time it only generated losses.

My third subscription was Dollar Ace and my fourth was High Octane Options. Once again all those investment programs never made any money for me as promised on their infomercials

My investment was about $28,000usd and my account lost so much money with their programs (in the range of $25.0000) that at some point I stopped using their services when I was well below $5,000usd account value

When I called by phone to request a refund for whatever time was left on my subscription plans they refused to reimburse and as a matter of fact when I requested to change from one program to another subscription they refused as well

I personally think that it was a scam, that there was overwhelming misleading information that you would make so much money in such a short time. They promised and made it look like a very simple process however it was definitely neither as simple as they have advertised on the infomercials nor it was such a secure investment and easy money-making as they announced

My intention is to be able to join if there is ever a class action suit in order for them to refund the subscription plans that I have paid + all funds that I have lost due to their misleading information + compensation for all the time that I have lost with them while I could have been making more decent return on other investment opportunities at that time.

This scam has created a lot of stress and discomfort during the pandemic and I was misled that it was a good way to be able to live off the income, pay credit cards and loans that I have with the proceeds that I could have generated according to their investment strategy however it turned out to be completely false

- **On 1/25/2021, Diana S. emailed Receiver@gejlaw.com and stated:**
  The advice and trades of this company were shameless.  Much information about their trades were not revealed.  It was advertised that they would give us day trades with text to buy and sell.  I

729396                                    79

followed this advice and lost money 95% of the time.  Raging Bull would email and text subscribers their trade results, revealing they made $5000 to $8000 on most of their trades. That would be impossible unless they were trading sums of $100,000.000 or more on trades that barely moved.  And if they were using that kind of money, it should have been transparent to subscribers.  Raging Bull advertised they could help you make millions even if you only had $2000 to start.  There was a lot of smoke and mirrors.

- **On 1/27/2021, Rainey T. emailed Receiver@gejlaw.com and stated:** This is EMN3 Rainey, T[.] (United States Navy) and I just wanted to email you and put forth my two cents on this situation. This all started when I joined the lifetime raging bull program mobile closer back in September of 2020, during the initial livestream seminar introducing the "Mobile Closer" program their were multiple instances of media showcasing the potential gains of the program and how you could turn 500 dollars into multiple thousands to pay off the initial investment in just a week of using the program, also there were heavy amounts of emphasis being placed on the fact that after a very short amount of time they would close membership and never open it up again, unfortunately this was not the case because very soon after that live seminar introducing mobile closer Jeff bishop sent out an email pretending to be going behind Kyle Dennis's back to allow more people to join the program and this went on for almost a week. This was the start of the "fall from grace" that raging bull was initially sitting at inside of my mind because they were being really money hungry and manipulative going back on their word in the live seminar to close the membership after a day or two, but I didn't pay it too much mind because I had already payed the money and I just wanted to start making the money that was basically promised during the first live seminar for the mobile closer program, but after losing basically all the money inside of my robinhood brokerage account because of the defendant Kyle Dennis's option picks I had no choice but to withdraw the last couple dollars I had left inside of my brokerage account and ended up falling deep in debt with the credit card I used to purchase the premium membership. Upon request for a refund I was denied due to "company policy" even though I was a lifetime member and wasn't limited by a time limit request in my eyes due to me not having to pay annually for my subscription, and I was told the best they can do is give me a "credit" on my Raging Bull account to use towards a different subscription which would have done literally nothing for my predicament due to me not even having enough money to stock trade anymore nor would it have helped me to pay off the 2500 dollars I had used on my credit card to purchase the initial lifetime mobile closer subscription. Unfortunately due to the debt I incurred on my credit card I was forced to get a debt consolidation loan

putting me even further in debt to prevent myself from falling into the brutal cycle plaguing so many Americans of only making enough to pay off the interest on my credit card and not the actual principle that is on the card. This company has changed my perspective and ruined my foreseeable futures financial prospects either because of the bad or late picks from Kyle Dennis or because of the multiple malfunctions that happened on the website and to the trade alert system they were using, either or it was their fault and it has basically ruined me. A full refund and a very generous amount of restitution for emotional and financial distress would go a long way to fixing the wrongs that these people have done because of this evil and fraudulent scheme. Thank you for your time and I look forward to justice and relief being brought down from on high onto this company and these defendants have a great day.

Representative statements from subscribers in <u>Category 2</u> (refund/ or cancellation requests) are as follows:

- **On 1/23/2021 Larry M. emailed Receiver@gejlaw.com and stated:**
  I subscribed to Raging Bull service in August 2020, under the assumption that they would refund me if I am not satisfied with their service within a month. This was clearly said in their promotion video. Three weeks later, I requested to unsubscribe and refund. And I followed up for twice more. The Raging Bull simply ignored all my requests. In November 2020, they charged my credit card again for another $299 for another 3-month service without my consent. As usual, they ignored my complaint again.

  This is clearly scam and fraudulent activity. I am asking for my money (a total of $598) back.

- **On 1/25/2021 Rodolfo H. emailed Receiver@gejlaw.com and stated:**
  My name is Rodolfo H[.] and I am a subscriber of RB.com services which I am totally unsatisfied.

  I want a full refund of the money paid.
  email used in subscription is this : ██████████████████
  paid via credit card

- **On 1/25/2021 Michael F. emailed Receiver@gejlaw.com and stated:**
  I am a new investor. I signed up and paid for several Raging Bull programs. I was extremely dissatisfied with EVERY one. I don't think they were totally honest with me about anything I understood I would receive. A refund of those would be great.

Representative statements from subscribers in <u>Category 3</u> (happy customers)

are as follows:

- **On 1/26/2021 Rodger G., new-trader who subscribes to various Raging Bull services emailed [Receiver@gejlaw.com](mailto:Receiver@gejlaw.com) and stated:** I discovered raging bull last year a few months after the pandemic had come into full swing.  I was at home laid off I was always curious about the stock market/trading but never really had time to learn about it or even knew where to start.  I decided to take a leap of faith and sign up for a membership (I believe it was called total alpha) that was run by Jeff Bishop and he would be the one that was doing the training.  I would like to say that the training/videos/information provided by Jeff was amazing in explaining how stocks and options worked.  It was simple yet in depth, now I'm not saying I'm an amazing trader because of that (far from it).  In fact I'm in the red when it comes to my training career, but that's mainly on my myself because I didn't educate myself enough before jumping in the market with real money.

  Now a year later and I had signed up for an additional service with Jason Bond and with the training he also provided (recommended literature to read, video training etc.) I feel like I'm finally starting to get a better grip on the market and am hopefully gonna be confident enough to jump into the market again.

  From the beginning everyone at raging bull has always said "YOUR trading with YOUR money so trade with what you feel comfortable with and if you don't feel comfortable use a paper account", "signing up for this service doesn't guarantee you're anything, being a successful trader takes time dedication and education". Also when I did purchase a subscription that I didn't benefit me I was able to call them up and as long as it was with in the refund policy time frame my money was refunded promptly.

   In closing I really hope raging bull can get back to business as usual as I was really starting to gain some knowledge in a field I had 0 experience in and I wouldn't think twice about recommending their service to a friend that wanted to gain some knowledge in this field too.

- **On 1/23/2021 Julius H., former business analyst and Raging Bull subscriber emailed [Receiver@gejlaw.com](mailto:Receiver@gejlaw.com) and stated:** I just wanted to say that I found the RagingBull service to be amazing. Right now I'm reading that there is a bit of uncertainty and a refund may or may not be available and I can tell you with 100% confidence that I have no concern because that service has paid for itself. Not only have

they delivered some really profitable ideas, but I have also learned quite a bit from them that I have been able to apply to other traders throughout the year. In 2020 I had a 61.4% rate of return. No kidding. Here is a snippet from my brokerage account. Just this week I used a lesson I learned on RagingBull. It's a pattern called a fish hook where a stock rebounds partially after making a large drop. I saw this happen with the IPO of AbCellera (symbol ABCL).I bought on January 5th at $38.52 and sold on Jan 21 at $50.10. That's a 30% pop in two weeks.

- **On 1/25/2021 D. Michael E., 64 year-old attorney with twenty-five years of trading experience emailed <u>Receiver@gejlaw.com</u> and stated:**
  The bottom line is that I feel that I have received good value for the services that I have purchased from Raging Bull.  I do not feel that I have been misled by their marketing and, in fact, I was so pleased that I opted for lifetime memberships in some services.  Have I won every trade that any of the Raging Bull gurus have mentioned, no, and I have never expected to.  Anyone who expects to win on every trade is either a total novice or has unrealistic expectations.  I feel certain that in most every long video presentation the guru will remind viewers that there will be some losses.  If anyone chooses to ignore such statements, that's on them, not the presenter.
  I have not subscribed to any services offered by Jason Bond, partially because his services seemed more geared to small cap trading or selling options in one service. I personally find his voice and over the top style ("I will work my balls off for you!, he said in one video), irritating but that is just a matter of my own personal preference and has nothing to do with the quality or usefulness of his own services and certainly not a reason to shut down the company.

  In summary, I find the FTC's actions to be entirely unjustified and hope that my own comments as a satisfied customer will be taken into account in whatever further actions are taken with regard to the complaints filed against Raging Bull.

### *Satisfied Customers who Identify Flaws with Raging Bull*

The receivership team also reviewed a handful of emails from purported subscribers that fit into Category 3 (happy customers who have positive things to say about Raging Bull and would like their services to continue), but were quick to

identify a number of flaws with Raging Bull's services and marketing tactics.  For

example, the receivership team reviewed the following emails:

- **On 12/18/2020, Adam R. responded to [support@ragingbull.com](mailto:support@ragingbull.com) and stated:**
  Here are my overall impressions:
  - I think Jason is a genuine guy.
  - I think the ads about Raging Bull are incredibly misleading. It takes work to be a good trader and you can't use other people's picks.
  - I think Jeff Bishop is NOT a genuine guy. If I have to hear about how he's a "Mensa certified genius" one more time, I might go insane.
  - Their webinars are filled with fake people commenting. This is super obvious and really shady.
  - I think nearly all of Raging Bull's products are outrageously over priced. $5000+ for anything related to stock education better give you a degree or a guaranteed return.
  - I think they use questionable marketing tactics to lure in "suckers" (Like the bots in the webinars, hosts telling you what you could do with all the money they won, etc)
  - Thankfully, I have a degree in finance so my base level of understanding allowed me to use JBP to learn about technical analysis from a new POV and filter through the b/s. And I did learn.
  - There is no chance that people who don't have that foundation would be able to make money using these services.
  - The educational videos I had access to were nice. I did feel like Jason spent WAY too much time going over prior wins instead of actually explaining his method. I concluded that he really doesn't have one, but there was some good knowledge mixed in there. He'd have a 50 min video that would show maybe 3 minutes of worthwhile stuff. Basically, he talks a lot without saying anything.
  - Spending the money I did on JBP forced me to get serious about trading. This "serious" attitude has ironically lead me away from Raging Bull and now I'm making good money in the markets while working full time and occasionally using other services
  - In a strange, round-about way, I owe some of my stock market success to Raging Bull.
  - Having said that, I would NEVER recommend it to a friend. In fact, I'd be curious to see what their Net Promoter Score is if they have one. It has to be super negative.
  Thank you for reading this much.

  I hope Raging Bull gets back on its feet and is required to be more honest in their marketing and set more reasonable prices. There is good content

on the site - it's just very over priced and very shady with how they get customers and take advantage of beginners with money. (Other than that, how was the play Mrs. Lincoln?)

- **On 12/20/2020 James C. responded to support@ragingbull.com and stated:**
  After reading the FTC claims, if I was asked to talk to their points, I would have to honestly agree. I signed up and then I was bombarded with 10's of emails a day trying to upsell me and sell me different services all telling me how they were going to help me and after actually signing up with them they did not provide what they claimed. So many of the services are overlapping which makes it hard to make a proper decision, which again, once you make you are fucked and can not change to something better suited for you. I do not think, I hope, that anyone at RagingBull did anything with evil intent. But a lot of money is going into the pockets of RagingBull for these confusing classes which most give you enough information to be dangerious and then lead you to follow with a lot of pump and dumps.

  I am not party to the FTC filings, but you all asked for honest feedback. I do like RaginBull, even after giving you my feedback. I think the company has a place and a future, but I think these valid claims of the FTC need to be addressed by the leadership of RB so they can move on. I believe they have caused harm. I am not rick, I spend $4000 out of trust and hope, in the economy that I would learn to be better..... I am still hoping that can happen. With that, I am also sad that this had to happen during the pandemic, and that families of RB are suffering and not sure what is going to happen moving forward. I do wish you all the best of luck and hope things can be worked out. If things come back, I still want to continue on with Jeff, but would like to address my other issues with the other services as stated.

- **On 12/20/2020 Chris L. emailed support@ragingbull.com and stated:**
  Yes, I say that a few people are really complaining; because, they were too stupid and chose to ignore the 100 pages of warnings anyone signing up for an broker account is suppose to read. (I found the whole case online Federal Trade Commission v. RagingBull.com, LLC, 1:20-cv-03538 – CourtListener.com)

  Wow, an old person 60 year old is complaining he didn't know he could lose money in the markers... Wow that is sad. Where was he all this time. A 20 year leman bro lost $100,000 trading option... Hello, Leman was a clearing house for options... One bad employee.

My bad news is

Your advertising is Very overstated and probably did get you into this mess.
How you may ask?
1 You don't mention you are using the riskiest method of trading! Options less then a week to expiration.
2 You don't put a big warning about account sizing!!! Come on, tell a novice they can double their money guarantee and they aren't going to buy too much?!? Come on.
3 Advertised walk away from computer alerts when your edge is being there for that 10 min buying window… And then discourage GTC orders. You know the profit reward is tight if you miss that momentary price dip.
4 This is the BIGGEST. You know, know that a person using good account management can't make serious money as advertised. There are outliers who get it right the first time taking too much risk but so are the people who get it wrong the first time and are there really more people benefiting from the service then quickly crashing? Telling people that they only need $300 dollar to double down on their first trade… You know there are people who use $300 and lose and then lose and there account is toast.
5 Promo videos even mention that your own gurus can't find success in some of the other 'guarranteed' money making services.

 It does anger me that the government can walk into a business seize every form of assets without a conviction, leaving the defendant on the hook. And the gov will hurt all the people who payed for the service realize the flaws and move on and enjoy what they can.

 My brother spent thousands on you guys upgrading to lifetime service and now the gov hurts him. But as a responsible adult, he knew that life time is risk.

It's all risk.

Though, I think my big find from you guys was Tastytrade. I got so tired of overstated penny pro wins… Sure, put $1,000 on a trade that could implode 20% in one walk to fill a coffee cup…

6 you don't advertise you EXPECT to lose 40% of the time but hope to be right 60% of the time and that all the time in-between times need to keep using the same amount of capital!!!

And another thing. Always saying this is the last SALE and next week there is a lower price…. You guy asked for some of this. Though much of the world of advertising to stretch the facts till it brakes.

 I signed up for Luke energy trader. I never knew that the "secret" script wasn't included. I never knew that he was risking $1,000 to make $100 and you need a $100,000 to properly account manage that 1% defined risk trade.

So yes I can see how you got problems. But I didn't go complaining to the FTC. Many users see the flaws of RagingBull and live with them or move on.

These emails are attached as Exhibit 17 to the Temporary Receiver's Declaration.

These emails indicate that even some subscribers who claim to like Raging Bull's services believe that Raging Bull uses questionable marketing tactics and overstates the types of earnings subscribers can make using Raging Bull's services.

### *Summary of email review*

The following table provides a summary of the categories of emails described in this section.

| | Negative Feedback (may include refund requests) | Refund & Cancellation Requests (may include negative feedback) | Positive Feedback |
|---|---|---|---|
| ***December 7-December 17*** Customer Responses to Raging Bull's email seeking positive customer experiences. | 312 | 847 | 702 |
| ***December 18- December 28*** Customer Responses to Raging Bull's email seeking positive customer experiences. | 366 | 818 | 844 |

| | | | |
|---|---|---|---|
| **Emails sent to Temporary Receiver** (Receiver@gejlaw.com) Customers reaching out to Temporary Receiver as a result of the receivership and/or in response to Raging Bull's email from Temporary Receiver. | 210 | 261 | 104 |
| | 888 | 1926 | 1650 |

In total, the receivership team has reviewed 4,464 emails providing feedback from purported subscribers. Of those, only 37% were supportive of Raging Bull. The rest were either critical or seeking a refund or cancellation of their subscription to Raging Bull's services, indicating that roughly 2/3 of Raging Bull's subscriber base who responded have had their fill of the Company. Contrary to the Raging Bull Defendants' position that negative consumer comments are cherry-picked from a multitude of largely happy customers, it appears that a significant portion of Raging Bull's subscribers are either unhappy with the services provided or, at the very least, are no longer interested in receiving them.

### Initial Conclusions re Customer Satisfaction

Based on the customer emails the receivership team has reviewed, it appears that Raging Bull's customer base is highly polarized. Subscribers range from angry customers who feel victimized by Raging Bull, to happy customers thanking Raging Bull for taking their trading to the next level. The receivership team also reviewed a number of emails from happy customers who feel that Raging Bull uses deceptive advertising that likely results in harm to a number of its subscribers. Notable, however, is that Raging Bull sent out two batches of emails seeking positive

customer testimonials, and in response received not only positive emails, but also a large number of negative responses, refund requests, and cancellation requests.

While the Temporary Receiver can confirm that Raging Bull does have a number of happy subscribers, the receivership team did review a significant number of emails from consumers who feel they were deceived and taken advantage of by Raging Bull.[8]  The Temporary Receiver concludes that these emails, if authenticated as communications from customers, directly refute the contentions of Defendants' expert Dr. Wind that "it is unlikely that consumers were either deceived or injured by Raging Bull's alleged misrepresentations" and that "based on scientific analysis, that it is also unlikely that the FTC will be able to establish that Raging Bull customers were in fact deceived and injured."  Defs.' Consolidated Response [ECF 123] at 19.  Rather, the receivership team has reviewed many customer communications that support the conclusion that some Raging Bull customers were in fact, deceived, as the FTC argues.  Pl.'s Reply [ECF 145] at 5.

## V.   Value of assets, sum of liabilities, & financial analysis of the Receivership Entities

In Section XIV.L of the Temporary Restraining Order, the Court directed the Temporary Receiver to "Make an accounting, as soon as practicable, of the Assets and financial condition of the receivership and file the accounting with the Court and deliver copies thereof to all parties."  TRO [ECF 64] at 20.  The Court further ordered the Receiver to report the value of all assets and sum of all liabilities of the

---

[8]     *See* Exhibit 20 to the Temporary Receiver's Declaration for examples of purported subscribers referring to themselves as the following:  "bamboozled victim," "one of the people who got duped," "deceived," and "taken advantage of."

Receivership Entities, and whether the business of the Receivership Entities can be operated legally and profitably. *Id.* at 27. To complete these tasks, the Temporary Receiver engaged Verity, LLC, which is managed by Raymond J. Peroutka, Jr., who personally oversaw all accounting services in this matter. Verity, LLC provides services including forensic accounting, financial analysis, valuation, fraud and related business investigations, and associated accounting, economic, financial and regulatory consulting services. Verity, LLC regularly provides services related to restructuring and insolvency matters, as well as litigation support. Mr. Peroutka has decades of experience with financial investigations, including numerous appointments as receiver and forensic accountant to court-appointed receivers. A copy of Mr. Peroutka's c.v. is attached as Exhibit 18 to the Temporary Receiver's Declaration.

Given constraints of time and availability of corporate records and personnel to assist in interpreting them, Verity has done its best to report on the assets and liabilities of the Receivership Entities. The Temporary Receiver, working with Verity and his financial advisors, has been able to evaluate the financial and accounting records of the Receivership Entities provided to him by those entities. Verity has inspected this information to confirm the circumstances of the assets' acquisition, including the acquisition date, cost, use, and earnings record. From this information, the Temporary Receiver and his financial advisors have developed and present the cost of acquisition and whether that cost reasonably approximates its present value.

## A.      Structure of Receivership Entities

The following is a depiction of the Receivership Entities provided to the

Temporary Receiver by Raging Bull's corporate accountants and tax advisors Blum

Shapiro.



## B.      Summary of conclusions

### 1.      Value of all assets and sum of all liabilities

Verity has evaluated the financial information submitted by each of the

Corporate Defendants as of December 15, 2020.  Verity chose this date for analysis

because it represented the most current date for which financial information could

be obtained when the Court instructed the Temporary Receiver to perform his

analysis of assets and liabilities.  Some of the Corporate Defendants were not able

to provide the requested information.

Net equity value represents the total fair market value of a business's assets less the total of its liabilities.  Net equity thus represents the funds that would be left and available to shareholders if all liabilities and debts of the entity were paid off.  Net equity value is used to determine an entity's net worth.  An entity that has a positive net equity value has total assets greater than its total liabilities.  Conversely, an entity that has a negative net equity has total assets less than its total liabilities.

Raging Bull's business model involves primarily prepayment by subscribers for future services to be provided by Raging Bull and, possibly, related entities.  Accounting principles provide that these prepayments by customers are "unearned income," sometimes referred to as "unearned revenue" or "deferred revenue."  Unearned income, for accounting purposes, is not earned at the time of receipt from the customer because the services for which the income is paid have not yet been provided.  Because subscribers' payments reflect cash received as payment for goods or services not yet provided, the business may not recognize the income as earned when received.  Unearned income remains a liability until delivery of the good or service is made.  Each time delivery of the good or service is made, a corresponding amount of unearned income is converted into revenue.  For instance, a subscriber may pay $3,600 for Raging Bull to provide services at an even rate over a period of 36 months.  In this example, $100 of services are provided each month, so $100 of the unearned income may be recognized as revenue each month.  Unearned income

would start at $3,600 and decrease by $100 for each month in which services are provided.

The cash associated with unearned income is offset by a liability until the associated service is delivered. Therefore, it does not result in an increase in equity available to the owners of the company.

An understanding of Raging Bull's financial condition necessarily involves determination of its unearned income. For the year ending December 31, 2019, management of Raging Bull, in consultation with the company's accountants Blum Shapiro, acknowledged that the liability associated with unearned income should be included in the company's balance sheet. Accordingly, they recorded this liability for service contract obligations the company entered into beginning in 2018. Since its inception, Raging Bull received payments from its customers in advance of its delivery of services consistent with the recognition of unearned income. Verity extrapolated Raging Bull's unearned income for years 2016 and 2017, based on the calculations performed by Raging Bull for the years 2018 and following. Given the state of Raging Bull's records, Verity was unable to adjust its financials for years 2014 and 2015.

When unearned income is considered, as it should be to reach a complete and accurate understanding of Raging Bull's financial standing, Raging Bull had negative net equity at the close of each year from 2016 through 2020. After applying the adjustments, which Verity has analyzed in detail, Verity developed the following values of assets and totals of liabilities for each of the Corporate

Defendants at December 15, 2020, except MFA Holdings Corp., which is valued at December 31, 2019:

| Assets & Liabilities of All Corporate Defendants (Values as adjusted, as of 12/15/20) | |
| --- | --- |
| **Total Assets with Adjustments:** | |
| RagingBull.com, LLC | $6,141,798 |
| Sherwood Ventures, LLC | $2,992,115 |
| Jason Bond, LLC | $195,087 |
| MFA Holdings Corp. (as of 12/31/19) | $4,139,425 |
| Winston Corp | 0 |
| Winston Research, Inc. | 0 |
| **Total Assets – All Corporate Defendants** | **$13,468,425** |
| **Total Liabilities with Adjustments:** | |
| RagingBull.com, LLC | $59,541,057 |
| Sherwood Ventures, LLC | $(580,918) |
| Jason Bond, LLC | $161 |
| MFA Holdings Corp. (as of 12/31/19) | $178,188 |
| Winston Corp | 0 |
| Winston Research, Inc. | 0 |
| **Total Liabilities – All Corporate Defendants** | **$59,138,488** |
| **Total Net Assets (Assets - Liabilities)** | ($45,670,063) |

During the years 2014 through 2020, Raging Bull made substantial distributions of unearned income to Mr. Bishop and Mr. Bond through their corporate entities Sherwood Ventures, LLC and Jason Bond, LLC. In addition,

Raging Bull distributed $6,504,387 to its principal MFA Holdings Corporation. The records of Defendants that Verity has reviewed establish that Defendant Jeffrey M. Bishop received from Raging Bull through distributions to Sherwood Ventures, LLC, of which he and his wife Melissa Bishop are the sole owners, the following amounts:

| Year | Distributions to Sherwood Ventures, LLC |
|---|---|
| 2014 | $906,659 |
| 2015 | $1,258,001 |
| 2016 | $1,813,058 |
| 2017 | $5,364,232 |
| 2018 | $5,759,375 |
| 2019 | $10,094,136 |
| 2020 | $13,414,751 |
| **Total** | **$38,610,212** |

The records of Defendants that Verity has reviewed establish that Defendant Jason Bond received from RagingBull.com, LLC through distributions to Jason Bond, LLC, of which he is the sole owner, the following amounts:

| Year | Distributions to Jason Bond, LLC |
|---|---|
| 2014 | $360,762 |
| 2015 | $748,665 |
| 2016 | $939,521 |
| 2017 | $2,395,766 |

| Year | Distributions to Jason Bond, LLC |
|---|---|
| 2018 | $0 |
| 2019 | $4,322,655 |
| 2020 | $5,315,795 |
| **Total** | **$14,073,164** |

The records of Defendants that Verity has reviewed establish that Defendant Kyle Dennis received from Raging Bull compensation in the following amounts (gross compensation reflects total W-2 wages, and payments to two of Mr. Dennis's corporate entities: Winston Corp and Winston Research Inc.):

| Year | Gross Compensation to Kyle Dennis |
|---|---|
| 2016 | $339,139 |
| 2017 | $1,707,692 |
| 2018 | $2,896,109 |
| 2019 | $2,736,516 |
| 2020 | $5,935,758 |
| **Total** | **$13,615,214.00** |

The question of the Receivership Entities' ability to operate legally is inherently complex.  It requires a consideration of legal business practices for this entity, a question currently before the Court.  It also requires a projection of revenues and expenses, both potentially constrained by any restrictions on future business practices, as may be required by the Court.

In an effort to assist the Court on this question, the Temporary Receiver offers the following snapshot of Raging Bull's Profits and Losses extracted from the Defendant's Sage Intacct accounting system. This Profit and Loss statement covers the period January 1, 2020 through November 30, 2020. This is a period after the massive expense associated with the retrospective recognition of Deferred Revenue that affected 2019 reported results, and before the Temporary Restraining Order was entered on December 8, 2020. During this time, Raging Bull appears to have been recording revenues and expenses, including expenses associated with deferred revenue for the current period, in the ordinary course of business. Verity has confidence that the results reflected are consistent with Raging Bull's contemporaneous accounting records.

| Raging Bull Profit & Loss (All services, 2020) | |
| --- | --- |
| **Revenue** | |
| Total Service Revenue | $74,969,521 |
| Total Advertising Revenue | $33,286 |
| Total Refunds – Allowances | ($7,941,224) |
| Total Refunds – Chargebacks | ($1,257,154) |
| **Total Revenue** | **$65,804,429** |
| **Expenses** | |
| Total Cost of Sales | $4,489,810 |
| Total Payroll Related Expense | $25,742,002 |
| Total Operating Related Expenses | $38,897,450 |

| | |
|---|---|
| Total Facility Related Expense | $12,340 |
| Total Other Income/Other Expense/Taxes | ($8,362) |
| **Total Expenses** | **$69,133,240** |
| **Total Profit and (Loss)** | **($3,328,811)** |

The expenses associated with refunds, both allowances and chargebacks, are related to the Defendant's business practices as well as customers' perception of the value of services and products provided to them. These may change if business practices change in the future. Of course, revenues might change, as well. Predicting the exact relationship between these is beyond the Temporary Receiver's ability at present. What is known is that Raging Bull recorded a net loss of $3,328,811 during the 11-month period prior to the entry of the Temporary Restraining Order, when it was not facing restrictions.

### 2. Trading performance

Verity was also able to make a limited analysis of trading activity in the Raging Bull E*Trade account ending in 4059. Like the rest of the financial and accounting data, the Temporary Receiver requested a three-year history of account statements.

On January 1, 2018, the E*Trade account held a balance of $151,304. During that month and subsequent months ending on September 30, 2020, the account statements showed all trading activity. During this period, stocks valued at $53,946,999 were purchased and stocks valued at $54,355,153 were sold. The account statements reflected that the value of the account was affected by

additional funds deposited and funds withdrawn.  This is shown in the Net Cash (in)/out column in the following table.  Not including these funds contributed and withdrawn, the account grew by $725,283 over the 33-month period of the summary.  This result is not normalized to take into consideration any return expected from a portfolio of stocks with a similar investment risk profile over this time period nor does it consider the cost associated with managing a portfolio with more than $100 million in trades.  But it does show a marginally positive return on trading activity.

The following table reflects this analysis:

| RagingBull.com, LLC E*Trade Investment Account (Account # XXXX-4059) | | | | |
|---|---|---|---|---|
| Stmt. Date | Account Value | Net Cash (in) / Out | Net Change | Change Net of In/Out |
| 12/31/2017 | $151,304.60 | | | |
| 1/31/2018 | $223,007.94 | $777.82 | $71,703.34 | $72,481.16 |
| 2/28/2018 | $310,002.53 | $199,968.01 | $86,994.59 | $286,962.60 |
| 3/31/2018 | $1,913.77 | $277,058.50 | $(308,088.76) | $(31,030.26) |
| 4/30/2018 | $5,165.01 | $(3,251.22) | $3,251.24 | $0.02 |
| 5/31/2018 | $5,165.05 | - | $0.04 | $0.04 |
| 6/30/2018 | $0.15 | $5,165.05 | $(5,164.90) | $0.15 |
| 8/31/2018 | $111,335.47 | $(100,000.00) | $111,335.32 | $11,335.32 |
| 9/30/2018 | $138,312.16 | | $26,976.69 | $26,976.69 |
| 10/31/2018 | $197,813.07 | $369.09 | $59,500.91 | $59,870.00 |
| 11/30/2018 | $244,852.06 | - | $47,038.99 | $47,038.99 |

| | | | | |
|---|---|---|---|---|
| 12/31/2018 | $141,387.05 | $307.53 | $(103,465.01) | $(103,157.48) |
| 1/31/2019 | $388,046.82 | $(64,925.38) | $246,659.77 | $181,734.39 |
| 2/28/2019 | $489,241.37 | - | $101,194.55 | $101,194.55 |
| 3/31/2019 | $17.70 | $475,696.38 | $(489,223.67) | $(13,527.29) |
| 5/31/2019 | $97,884.29 | $(100,000.00) | $97,866.59 | $(2,133.41) |
| 6/30/2019 | $133,442.01 | - | $35,557.72 | $35,557.72 |
| 7/31/2019 | $85,383.68 | $100,046.17 | $(48,058.33) | $51,987.84 |
| 8/31/2019 | $1,956.37 | $85,219.27 | $(83,427.31) | $1,791.96 |
| 9/30/2019 | $50,578.33 | $(50,000.00) | $48,621.96 | $(1,378.04) |
| 10/31/2019 | $49,941.44 | - | $(636.89) | $(636.89) |
| 11/30/2019 | $54,143.13 | - | $4,201.69 | $4,201.69 |
| 12/31/2019 | $57,341.19 | - | $3,198.06 | $3,198.06 |
| 1/31/2020 | $48,811.92 | - | $(8,529.27) | $(8,529.27) |
| 2/29/2020 | $48,230.83 | - | $(581.09) | $(581.09) |
| 3/31/2020 | $53,139.34 | - | $4,908.51 | $4,908.51 |
| 4/30/2020 | $47,454.97 | - | $(5,684.37) | $(5,684.37) |
| 5/31/2020 | $49,776.08 | - | $2,321.11 | $2,321.11 |
| 6/30/2020 | $47,739.96 | - | $(2,036.12) | $(2,036.12) |
| 7/31/2020 | $48,745.22 | - | $1,005.26 | $1,005.26 |
| 8/31/2020 | $50,948.96 | - | $2,203.74 | $2,203.74 |
| 9/30/2020 | $50,156.66 | | $(792.30) | $(792.30) |
| **Totals** | | **$826,431.22** | **$(101,147.94)** | **$725,283.28** |

## VI.   Litigation & regulatory enforcement actions

### A.   New Hampshire Bureau of Securities Regulation cease & desist order

On December 7, 2020, the New Hampshire Bureau of Securities Regulation, as designee of the New Hampshire Secretary of State, issued an order directing Raging Bull, Jason Bond, Sherwood Ventures LLC, Jeffrey Bishop, and MFA Holdings Corp. to cease and desist from committing violations of the New Hampshire's Uniform Securities Act (the "NH Act"), RSA 421-B:1-101 *et seq.* Temporary Receiver Decl., Exhibit 19. The Bureau's Order is based upon the allegations in a Staff Petition of the New Hampshire Bureau of Securities Regulation, and upon the finding that, if the allegations contained therein are proven true, they form the legal basis for relief under the New Hampshire Act.

The Bureau's Staff Petition, attached to the order, alleges, based on an investigation that appears to have commenced more than a year ago, that the defendants are in violation of the NH Act.  As to Raging Bull, the petition alleges that it is transacting business in NH as an unlicensed "investment advisor" within the meaning of the Act. NH Act, B:1-102(26) (defining "investment advisor"); *id.*, B:4-403 (registration requirement for investment advisor).  As to Raging Bull, Jason Bond, and Bishop, the petition alleges they are committing fraud in providing investment advice in violation of the NH Act, B:5-502(a), by (i) providing advisement advisor services without seeking state or federal licensure; (ii) failing to disclose that it would be difficult or impossible to match the trades they were making; and (iii) publishing false advertising images and statements in connection

with offering investment advisor services, indicating that they are successful millionaire traders.  The Bureau also alleges as to Jason Bond and Jeffrey Bishop that they are transacting business in New Hampshire as unlicensed "investment advisor representatives" within the meaning of the Act.  NH Act, B:1-102(27) (defining "investment advisor representative") and B:-40 (registration requirement for investment advisor representative).  As to Sherwood Ventures, LLC, the Petition defines Bishop (in the Petition, "JB") collectively as his name individually and Sherwood Ventures and does not separately address the entity's alleged wrongdoing.  Temporary Receiver Decl., Exhibit 19.

The Temporary Receiver has not undertaken an independent analysis of the merits of this matter or the allegations at this stage.  In addition, the Temporary Receiver notes that on April 3, 2020, and in response to a demand by the Bureau to Raging Bull to resolve potential claims, Raging Bull denied that it had engaged in any wrongdoing.

The order and the NH Act provided the defendants 30 days from receipt of the order to avoid default judgment and administrative penalties.  In order to preserve all rights of the Receivership Entitles at this stage, the Temporary Receiver requested a hearing.  The Receivership Entities separately requested a hearing through their own counsel.  On January 28, 2021, a scheduling conference was held in the matter.  Presiding Officer Kevin Moquin determined, based on the request or consent of all parties, to defer entering a scheduling order at this time, pending the upcoming preliminary injunction hearing in this matter.  Presiding

Officer Moquin will hold another scheduling conference shortly after receiving notice of this Court's order following the preliminary injunction hearing.

**B.** ***Broyles v. RagingBull.com*** **- Tennessee purported class action**

On November 19, 2020, a class action complaint was filed against Raging Bull in the United States District Court for the Eastern District of Tennessee.  The complaint, captioned *Broyles v. Ragingbull.com, LLC*, No. 20-cv-245, alleges that Raging Bull violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, by sending repeated, unsolicited text messages to consumers, including those who, like the plaintiff, have terminated their membership with Raging Bull and opted out of Raging Bull's services.  Compl. [ECF 1] ¶¶ 18, 22-23.  Ragingbull.com, LLC is the only party named as a defendant in the action.

Section XIX of the Temporary Restraining Order [ECF 64] entered by this Court orders that, "except by leave of this Court, during the pendency of the receivership ordered herein, . . . all . . . customers and other persons seeking to establish or enforce any claim, right, or interest against or on behalf of Defendants, and all others acting for or on behalf of such persons, are hereby enjoined from taking action that would interfere with the exclusive jurisdiction of this Court over the Assets or Documents of the Receivership Entities, including, but not limited to: . . . [c]ommencing, prosecuting, or continuing a judicial . . . action or proceeding against the Receivership Entities," one of which is Ragingbull.com, LLC.  On January 8, 2021, the Temporary Receiver moved to intervene in the action and to stay all proceedings pending further order of this Court or termination of the receivership.  The Temporary Receiver attached as exhibits to his motion the

Temporary Restraining Order [ECF 21] and the Modified Temporary Restraining Order [ECF 64] entered by this Court.  To date, no opposition to the motion has been filed, and no ruling on the motion has been entered.

Because there has been no ruling on the Temporary Receiver's motion and the deadline for Raging Bull to answer the complaint was January 15, 2021, Raging Bull has answered the complaint [ECF 26] and filed its certificate of corporate interest [ECF 30].  No motions other than the Temporary Receiver's motion to intervene and stay proceedings are currently pending before the court.

## VII.   Whether Raging Bull can be operated legally & profitably

The Temporary Restraining Order directs the Temporary Receiver to report to this Court "whether the business of the Receivership Entities can be operated legally and profitably."  TRO [ECF 64] at 27.

Defendants are of the view that the answer to this question is "yes."  In interviews, both Mr. Bishop and Mr. Bond expressed the willingness to operate the business lawfully going forward.  They have expressed great confidence that whatever the Court's ruling might be, the Company could adjust its marketing and business practices accordingly and thereafter proceed to provide services lawfully and profitably.  It appears from Defendants' pleadings that they have represented to the Court that they are willing to do so, as at least the Raging Bull Defendants (Raging Bull, Sherwood Ventures, LLC, Jason Bond, LLC, Mr. Bond, and Mr. Bishop) are "prepared to stipulate going forward to Sections I and II" of the TRO.  Defs.' Consolidated Response [ECF 123] at 51.

One positive force going forward is that there appears to be strong public interest in stock trading and, implicitly, education in trading.  Raging Bull experienced a doubling of revenue and subscribers in the past year, at least in part due to the COVID pandemic.  The pandemic and quarantines have continued and may be ongoing for many months.  In addition, the recent publicity surrounding Robinhood, GameStop, short-selling, and the possibility of profits associated with stock and options trading may lead to even greater public interest in trading.  The Temporary Receiver has observed the public interest in stock trading wax and wane over the past three decades, depending on market conditions and the economy.  But, arguably, the demand for services that educate on stock and options trading may remain strong.  Much information concerning trading is available for free on the internet, of course, as well as through services that compete against Raging Bull.

However, the Temporary Receiver has significant doubts about the Company's ability to operate profitably and legally going forward, for several reasons.

First, with regard to operations, in order to comply with applicable law as the Temporary Receiver understands it, Raging Bull would need to effect a sea change in its approach to legal compliance.  The Company would need to consider measures such as implementing the following hallmarks of an effective compliance program (this is intended to be an illustrative but not necessarily comprehensive list):

- Implement a clear, unequivocal, and well-publicized policy in favor of compliance, including a commitment from senior management;

- Establish and implement a code of conduct, with appropriate compliance procedures and policies;

- Conduct regular risk assessments to gain a clear understanding of relative levels of compliance risk in different aspects of the company's operations;

- Review and scrub all marketing materials for compliance with the ruling;

- Eliminate all advertising currently on the internet that would violate applicable law or orders of a court or regulatory body;

- Scrub all video and written materials for each trading service to comply with legal requirements;

- Educate its workforce and establish a systematic program to effectively, repeatedly, and consistently train the workforce on applicable law to ensure compliance going forward;

- Implement employee compensation and evaluation structures that incentivize compliance and penalize unlawful conduct, with respect to gurus and all other employees;

- Commit to appropriate discipline of employees who engage in any future violations of compliance policies;

- Provide for methods of anonymous, confidential internal reporting and subsequent appropriate investigation, with non-retaliation assurances;

- Staff, fund, and empower an appropriate compliance team dedicated to overseeing compliance efforts;

- Grant the compliance team appropriate enforcement authority and clear reporting lines to Raging Bull's owners;

- Address consumer communications and complaints, and incorporate them in future compliance efforts; and

- Conduct regular reviews of the efficacy of compliance measures and systematically report to an internal source with appropriate authority.

Raging Bull's approach to date, to allow its marketing and other staff to "own their own compliance," as one member of the department characterized current efforts, with sporadic guidance and evaluation, does not meet these standards and has not, by Raging Bull's own admission, led to consistent compliance. This is so

despite Raging Bull's knowledge of multiple government investigations of Raging Bull, as well as regulatory enforcement actions against other market participants. Establishment of a compliance program would involve considerable expense and attention from the Company.  Whether it is achievable would depend on a new level of dedication from Raging Bull and its ownership.

To date, the Company has not demonstrated an ability to accomplish this task.  Greater resources would need to be devoted to compliance and training of the workforce if such an order were to be entered, and Company mandates and processes would need to be put in place to ensure that any injunction the Court may enter is not violated while the case is pending prior to trial.  A monitor may be necessary to ensure compliance, through close oversight and reporting to the Court. If a company is truly committed to the task and willing to devote the necessary time, attention and resources, the Temporary Receiver believes it may be possible for a company in this market space to accomplish such changes imposed by a court.

A significant obstacle for Raging Bull is the Company's financial position.  As noted by the Temporary Receiver's forensic accounting analyses, during the period January 1, 2020 through November 30, 2020, a period of enormous revenue growth for the Company, Raging Bull actually lost $3.3 million, on revenue of $69 million. This loss did not include an additional $20.7 million that was distributed out of the Company to its owners in 2020.  The Temporary Receiver wonders how the Company could operate profitably going forward, when in its most active year ever,

the Company lost $3.3 million before taking into account any distributions to owners, and without the costs and restrictions of a robust compliance program.

It is also important to note that currently, the Company does not appear to have sufficient assets to operate profitably going forward.  Simply put, the owners have made distributions to themselves, with substantial frequency and in significant amounts, totaling $20.7 million in 2020 and a total of $59 million since the Company's inception.  Where will the money come from to comply with a preliminary injunction order?  To pay for any changes in Company operations required by the order?  To pay for any judgment that might be obtained by the FTC?  To pay for the defense of any litigation that might be pursued by consumers (individually or class actions) or State Attorneys General, and any judgments that might be imposed on such claims even if the Supreme Court rules, as Defendants contend it will, that the FTC cannot obtain money damages?

As the accounting analysis notes, the Company's current accrued liabilities far exceed the Company's assets, because of the deferred revenue issue—*i.e.*, the Company has treated subscriber payments as cash revenue and has distributed much of it already to its owners, without recognizing that subscribers have not yet received the promised services in full, leaving the Company with substantial obligations to its subscribers for years to come, and potential claims by subscribers against the Company if those services are not delivered.  In one way, the Company already is clearly insolvent—its balance sheet as of December 15, 2020 shows assets

of $9.7 million, with liabilities of $66 million, $65 million of which is a deferred revenue liability.

The financial disclosures provided by Raging Bull's owners indicate that the owners have significant assets that were in large measure obtained through distributions from Raging Bull, and that could be returned to Raging Bull to address expenses if the Company were to be allowed to operate going forward.  To date, the Temporary Receiver has seen no material commitment by any of the Defendants to return income they received from Raging Bull should the Company be allowed to operate going forward.  The owners apparently agree not to pay any future disbursements to themselves while this litigation is pending.  Defs.' Consolidated Response [ECF 123] at 51.  But will the owners commit to return any past distributions to the Company as needed to operate the business lawfully and profitably and to pay any claims or settlements?  And even if the Defendants still had and were willing to return every dollar they ever received from Raging Bull as a condition of operating the Company going forward, the Temporary Receiver questions whether that would be enough to address the cost of all the obstacles recited above.

Much will depend, as a practical matter, upon the Court's ruling on the pending motion for preliminary injunction.  If the Court grants the FTC's motion, concludes that the Company has likely violated the FTC Act, and prohibits any earnings claims of any kind that might lead consumers to believe that they will

successfully make money by purchasing Raging Bull's services, that ruling alone will have significant impact on the Company's operations and financial prospects.

Another obstacle facing the Company is, of course, this lawsuit itself.  If the Court determines that the Company appears to have violated the FTC Act and grants a preliminary injunction holding there is a likelihood of success on the merits, any future operations would be taking place under a cloud of contingent liability that would far exceed the Company's resources.  The FTC is claiming the right to damages in the amount of roughly $137 million on behalf of injured consumers.  That figure far exceeds both the Company's current ability to pay such a judgment, as well as the combined net worth of all the Defendants (both individual and corporate).  Under current Fourth Circuit precedent the FTC would be entitled to money damages in an amount equal to the Company's revenues, for purposes of consumer redress.  *F.T.C. v. Ross*, 743 F.3d 886 (4th Cir. 2014). Defendants argue that the FTC's ability to recover money damages may be blocked by a potential ruling of the U.S. Supreme Court in *AMG Capital Mgmt., LLC v. F.T.C.*, No. 19-508 (cert. granted July 9, 2020).  It is unclear how the Supreme Court might rule, when that ruling might be issued, and whether the decision will completely reverse *Ross* and prevent the FTC from recovering any money damages at all in this case.

Even if the Supreme Court rules exactly as Defendants hope and have argued, however, the Temporary Receiver seriously doubts that the cloud of contingent liability will simply go away.  The Temporary Receiver is now aware of

nearly 3,000 customers who have expressed unhappiness with the Company and/or are seeking refunds or cancellations, as well as several customers who have submitted complaints to State Attorney General consumer protection divisions.  At least one attorney (a California lawyer who purports to have been contacted by at least 15 consumers to assist with claims against Raging Bull) is already contemplating a class action.  If the FTC is barred from recovering money damages, that would not prohibit individual consumers, a class of consumers, or State Attorneys General from proceeding with claims against Raging Bull and the other Defendants based upon common law theories of fraud and misrepresentation, as well as violations of State consumer protection laws that may include rights to recover attorneys' fees or multiple damages.  To succeed going forward and successfully operate the business profitably and lawfully, the Company and its owners will have to address not only the FTC, but if the agency is barred from recovery of damages, also the claims of consumers who allege they have been deceived and injured.  Some of these consumers are not only claiming losses in the amount they paid to Raging Bull for subscription services, but also alleging that they suffered losses (some into six-figures) by trading as instructed by the Company's gurus, and that they would not have done business with Raging Bull at all but for the deceptive advertising.

In short, the Temporary Receiver does not foresee present and foreseeable litigation going away quickly and cheaply for the Company.  Instead, there would be protracted proceedings—discovery in this case following entry of a preliminary

injunction if the Court should so order, uncertainty regarding the Supreme Court decision, and a pool of many hundreds if not thousands of disgruntled customers who will seek relief, if not through the FTC's current right to obtain damages for purposes of consumer redress, then through individual claims/lawsuits, class actions, and possible actions by State consumer protection divisions.

Another major hurdle for the Company to overcome if it were to attempt to operate going forward is the cease and desist order issued by the New Hampshire Bureau of Securities Regulations and challenged by Raging Bull, described in Section II.L. *supra*.  To operate lawfully, the Company would need either to litigate those proceedings to a conclusion, or reach a settlement with the governmental agency that may include a sizeable monetary payment and a change in the Company's operational practices.

A final significant obstacle is whether the public will have any interest at all in paying for Raging Bull's services, if there is a finding that the FTC is likely to succeed on the merits, that the Company has likely broken the law, and that the Company has been enjoined from certain prior activities by a federal court.  There may be some subscribers who have enjoyed, appreciated and/or profited from the Company's services to date, and these subscribers may want to continue paying Raging Bull notwithstanding entry of a preliminary injunction.  But the Temporary Receiver believes that many existing customers and potential new customers may be distrustful of the Company and would not wish to do business with Raging Bull, if the Court determines that a preliminary injunction is appropriate.  A consumer

may look elsewhere rather than learn stock trading, at significant cost, from a Company that may have broken the law in its advertising claims.

In conclusion, the Temporary Receiver believes that if the Court enters a preliminary injunction, it is conceivable that the Company could make the necessary adjustments to comply with the Court Order, and then also take steps to address the New Hampshire regulatory action, this lawsuit, and the claims of disgruntled consumers, but to do so would require the owners to infuse the Company with large amounts of additional capital to pay for all of these expenses, and even then, that might not be enough.  However, the Temporary Receiver believes that it is more likely that the Company cannot be profitable going forward, for the reasons described above.

If the Court rules in Defendants' favor at this stage of the case, declines to issue a preliminary injunction, and terminates the Temporary Receivership, the Temporary Receiver would still have serious concerns about the Company's ability to operate profitably and lawfully on a long-term basis, for the reasons cited above, particularly the Company's existing compliance standards and financial position and the pending lawsuit by the FTC and potential claims of disgruntled consumers.

## VIII.  Conclusion

The Temporary Receiver remains available to Your Honor to address any issues relating to the receivership or to provide any services the Court may find appropriate.

Respectfully submitted,

**GALLAGHER EVELIUS & JONES LLP**

_____*/s/ Mark S. Saudek*_____
Mark S. Saudek (Fed. Bar #23963)
Meghan K. Casey (Fed. Bar #28958)
218 North Charles Street, Suite 400
Baltimore MD 21201
phone (410) 727-7702
fax (410) 468-2786
msaudek@gejlaw.com
mcasey@gejlaw.com

*Counsel to Court-appointed Temporary
Receiver Peter E. Keith*

Date:  February 1, 2021