# EXHIBIT 2

RAGINGBULL.COM, LLC
62 Calef Hwy #233
Lee, NH 03861

Kyle Dennis   [ADDRESS LINE 2]
June 1, 2019

Dear Kyle:

This letter agreement (this "**Agreement**") sets forth the terms and conditions whereby you ("you" or "**Employee**") agree to be employed by RagingBull.Com (the "**Company**") as further described below. Company and Employee shall be collectively referred to herein as the "**Parties**" and each, individually, as a "**Party**").

DUTIES.

Employee hereby agrees to perform the duties detailed below to the Company on the terms and conditions set forth in this Agreement:

- Employee agrees to provide the daily content, including commentary, stock pick ideas, video lessons, and periodic webinars for customers (and prospective customers), and to promptly answer customer emails (all such content, information and emails collectively "**Website Content**") for any Company website that features Employee, currently or in the future, including, without limitation, "Biotechbreakouts.com" (collectively, the "**Website**"). For the avoidance of doubt the term "**Website**" as used herein means only Biotechbreakouts and any other website that features Employee and the Deliverables (as defined below) of Employee and is agreed to in writing and listed on Schedule I.
- Employee agrees that "time is of the essence" with regard to its obligations to provide new and original content hereunder and that prompt and timely performance of all obligations in accordance with all time tables and other deadlines as mutually agreed between Employee and the Company is strictly required.

Employee agrees that the Company has the right at its sole discretion to review, edit, alter, modify or remove the Website Content.

TERM OF EMPLOYMENT. Employee shall be employed on an at-will basis, meaning that either Employee or the Company is free to terminate the employment relationship at any time, with or without prior notice.

COMPENSATION.

<u>Definitions</u>.

"**Commission Percentage**" shall initially be 37% and shall increase by one percentage point (1%) each year on October 1, until a maximum Commission Percentage of 41% is achieved (for example, on October 1, 2019 the Commission Percentage shall be adjusted to 38%, and October 1, 2020, the Commission Percentage shall be adjusted to 39%, etc. until a maximum of 41% has been reached on October 21, 2022 at which point the Commission Percentage shall remain at 41% for each subsequent year).

"**Marketing Apportionment**" means that percentage of the Website's revenue as a portion of the Company's total revenue for all products and services sold by the Company multiplied by the Company's marketing budget for that month. (For example only with respect to Website, if the revenue from the Website is 50% of the Company's total revenue and the monthly marketing budget is $10,000 then the Marketing Apportionment for the Website would be $5,000).

"**Website Net Income**" means the total revenue from subscriptions for the Website less any direct expenses incurred by the Company specifically for the Website, including, without limitation, (i) any bank charges related to the Website, (ii) affiliate commissions for sales of subscriptions to the Website, and (iii) the Marketing Apportionment for the Website. For the avoidance of doubt the "Website" means only Biotechbreakouts and any other website that features Employee and the Deliverables of Employee and is agreed to in writing on Schedule I.

<u>Compensation</u>. Employee will receive an annual base salary of $23,660 (the "**Base Salary**"). In addition to the Base Salary, Employee shall receive a commission equal to the applicable Commission Percentage of all Website Net Income minus the pro-rata Base Salary amount each month. This commission shall be earned and calculated on a full monthly basis and any commission earned shall be paid monthly in arrears. The Marketing Apportionment for each month shall be set monthly in arrears and Employee shall receive a monthly statement, simultaneous with each payment, outlining the commission calculation formula.

<u>Additional Payments</u>. The Company will also reimburse Employee for all reasonable travel and other expenses in connection his employment that have been pre- approved by the Company in writing.

<u>Payment Upon Termination</u>. Upon termination of Employee's employment for any reason, Employee shall receive all accrued but unpaid Base Salary through the date of termination and any earned but unpaid commission due as of the date of termination

<u>Benefits</u>. Employee shall be entitled to any fringe benefits offered by the Company, in accordance with the eligibility requirements of such Plans, as well as all statutorily required benefits.

PUBLICITY WAIVER AND RELEASE

Employee, in consideration for the offer of employment and any compensation paid to Employee hereunder, hereby irrevocably permits, authorizes, and licenses the Company and its affiliates, successors, and assigns, and their respective licensees, advertising agencies, promotion agencies, and fulfillment agencies, and the employees, officers, directors, and agents of each and all of them ("**Authorized Persons**"), to display, publicly perform, exhibit, transmit, broadcast, reproduce, record, photograph, digitize, modify, alter, edit, adapt, create derivative works, exploit, sell, rent, license, otherwise use, and permit others to use Employee's name, image, likeness, and appearance, voice, professional and personal biographical information, and other personal characteristics and private information ("**Personal Characteristics**"), and all materials created by Employee for the Company, or created for or on behalf of the Company, that incorporate any of the foregoing (collectively, "**Materials**"), including, but not limited to, the Website Content, on a perpetual basis throughout the world and in any medium or format whatsoever now existing or hereafter created, including but not limited to, in and on magazines, brochures and other print publications, electronic, magnetic, and optical media, television broadcasts, radio broadcasts, display, point-of-sale, and other advertising and promotional materials, press releases, and the internet for any purpose, including but not limited to advertising, public relations, publicity, packaging, and promotion of the Company and its affiliates and their businesses, programs, products, and services, without further consent from or royalty, payment, or other compensation to Employee except as otherwise expressly provided in this Agreement.

Employee acknowledges and agrees that, subject to the approval rights set forth in this paragraph 4.2, he has no right to review or approve Materials before they are used by the Company, and that the Company has no liability to Employee for any editing, alteration, or modification of the Materials or for any distortion or other effects resulting from the Company's editing, alteration, modification, or use of the Materials. The Company has no obligation to use the Materials or to exercise any rights given by this Agreement. Notwithstanding the foregoing, Employee shall have the right to review and approve any Materials that contain Personal Characteristics created by the Company or created for or on behalf of the Company by any third party (other than Employee); provided that if Employee does not respond within three days after his consent has been requested, he shall be deemed to have consented to such Materials containing his Personal Characteristics.

To the fullest extent permitted by applicable law, and provided that the Company is not in breach of this Agreement, Employee hereby: (i) irrevocably waives all legal and equitable rights relating to all liabilities, claims, demands, actions, suits, damages, and expenses, including but not limited to claims for copyright or trademark infringement, infringement of moral rights, defamation, invasion of rights of privacy, rights of publicity, intrusion, false light, public disclosure of private facts, physical or emotional injury or distress, or any similar claim or cause of action in tort, contract, or any other legal theory, now known or hereafter known in any jurisdiction throughout the world (collectively, "**Claims**") arising directly or indirectly from the Authorized Persons' exercise of their rights under this Agreement and the use and exploitation of the Materials; (ii) covenants not to make or bring any such Claim against any Authorized Persons; and (iii) forever releases and discharges the Authorized Persons from liability

under such Claims.
INTELLECTUAL PROPERTY RIGHTS.

The Company is and shall be, the sole and exclusive owner of all right, title, and interest throughout the world in and to all the results and proceeds of the Employee's services performed under this Agreement, including but not limited to the Materials, and the Website Content (collectively, the "`Deliverables`"), including all patents, copyrights, trademarks, trade secrets, and other intellectual property rights (collectively "`Intellectual Property Rights`") therein. Employee agrees that the Deliverables are hereby deemed a "work made for hire" as defined in 17 U.S.C. § 101 for the Company. If, for any reason, any of the Deliverables do not constitute a "work made for hire," Employee hereby irrevocably assigns to the Company, without additional consideration, all right, title, and interest throughout the world in and to the Deliverables, including all Intellectual Property Rights therein.

Any assignment of copyrights under this Agreement includes all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" (collectively, "`Moral Rights`"). Employee hereby irrevocably waives, to the extent permitted by applicable law, any and all claims Employee may now or hereafter have in any jurisdiction to any Moral Rights with respect to the Deliverables.

Upon the request of the Company, Employee shall promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist the Company to prosecute, register, perfect, record, or enforce its rights in any Deliverables. In the event the Company is unable, after reasonable effort, to obtain Employee's signature on any such documents necessary for the Company to prosecute, register, perfect, record, or enforce its rights in any Deliverables, Employee hereby irrevocably designates and appoints the Company as his agent and attorney-in-fact, to act for and on his behalf solely to execute and file any such application or other document and do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, or other intellectual property protection `related to the Deliverables` with the same legal force and effect as if he had executed them. Employee agrees that this power of attorney is coupled with an interest.

Employee has no right or license to use, publish, reproduce, prepare derivative works based upon, distribute, perform, or display any Deliverables. Employee has no right or license to use the Company's trademarks, service marks, trade names, trade names, logos, symbols, or brand names.

CHANGE OF CONTROL BONUS
Definitions. As used herein, the following terms have the meanings provided.
  "`Affiliate`" means any person or entity that directly or indirectly through one or

more intermediaries controls, is controlled by or is under common control with, the Company, including any officer or director of the Company, in each case as of the date on which, or at any time during the period for which, the determination of affiliation is being made. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract or otherwise.

"**Applicable Percentage**" means during the trailing twelve months immediately prior to the date of the Change of Control, the percentage of revenue from Website of the total revenue from sales of all products and services by the Company. For example if the Company had revenues of $50 Million in the trailing twelve months prior the Change of Control and, the revenues from the Website in such period were $10 Million, the Applicable Percentage would be 20%.

"**Change in Control**" means the occurrence of any of the following events, taking into account Treasury Regulation § 1.409A-3(i)(5)(iii):

Any person or group of persons, other than an Affiliate of the Company, becomes the owner, by way of merger, consolidation, reorganization, business combination or otherwise, of more than fifty percent (50%) of the combined voting power of the then-outstanding voting equity interests of the Company; or

the sale or other disposition by the Company of all or substantially all of its assets in one or more transactions over a 12-month period to any person or group of persons which is not a "related person" as defined in Treasury Regulation § 1.409A-3(i)(5)(vii)(B).

- Persons will be considered to be acting as a group if they are owners of an entity that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the Company. Notwithstanding the foregoing, to the extent that any amount constituting deferred compensation (as defined in Section 409A of the Code) would become payable under this Agreement by reason of a Change in Control, such amount shall become payable only if the event constituting a Change in Control would also qualify as a change in ownership of the Company or a change in the ownership of a substantial portion of the assets of the Company, each as defined within the meaning of Code Section 409A and any proposed or final Treasury Regulations and IRS guidance that has been promulgated or may be promulgated thereunder from time to time. The Company shall have full and final authority to determine conclusively whether a Change in Control of the Company has occurred under the terms of the above definition, the date of the occurrence of such Change in Control and any incidental matters relating thereto.

"**Net Income**" means (i) the total revenue from subscriptions for the Website for the trailing twelve months immediately prior to the Change of Control **less** (ii) the Applicable Percentage of all the Company's expenses listed on the Company's profit and loss statement for the same 12 month period of time. The calculation of Net Income shall be determined by the Company in good faith. For the purpose of clarity, the calculation of Net Income for the Website for the purposes of this Section 6 shall be calculated on a fully burdened basis and the Company's expenses shall include the Applicable Percentage of all expenses of the Company, not just those expenses included

in the calculation of Website Net Income for the purposes of determining Employee's commission pursuant to Section 3.1(c).

<u>Change of Control Payment</u>.  Upon a Change of Control, Employee shall be entitled to receive a payment (the "**Change of Control Payment**") equal to three times the Net Income as defined in Section 6.1(d) above.  The Change of Control Payment shall be payable by the Company (or an agent of the Company or entity formed by the Company for the purpose of fulfilling the Company's obligations under this Agreement)  under the same limitations and restrictions on the receipt of the consideration from the Change of Control transaction that affect the Company  or the selling members (as the case may be) and shall be paid if, and only if, the Employee has executed any documentation required of him pursuant to the Change of Control, including any employment agreement.  The Change of Control payment shall be paid within five business days after the Company or the selling members (as the case may be) receives the consideration from the sale and shall be paid proportionally based on the percentage of the consideration received by the Company or the selling members, as the case may be, of the total consideration due, but in any case the payment of any amounts due shall be made not later than five (5) years after the occurrence of the Change in Control event, in accordance with  § 409A of the Internal Revenue Code of 1986.  (For example, if ten percent of the compensation to be received by the Company or the selling members, as the case may be, as a result of the Change of Control has been escrowed, then 10% of the Change of Control Payment shall not be paid until such time, if any, as the escrowed funds are released.)

<u>Limitations and Conditions on Benefits</u>

<u>Termination of Company's Obligations</u>.  Notwithstanding any provisions in this Agreement to the contrary, the Company's obligations, and Employee's rights pursuant to Section 6  of this Agreement, shall terminate and be immediately rendered null and void and of no further force or effect if Employee's employment is terminated for any reason (whether voluntarily or involuntarily by the Employee, including, without limitation, due to death or disability, or by the Company, with or without cause) prior to a Change of Control.

<u>Non-Duplication of Benefits</u>.  Employee is not eligible to  receive benefits under this Agreement more than one time.

<u>Tax Limitations</u>.  Notwithstanding any provisions in this Agreement to the contrary, any payment or benefit due to Employee may be amended, altered or delayed if necessary to comply with state or federal tax laws or to avoid punitive taxes or penalties thereunder.

CONFIDENTIALITY.

Employee acknowledges that he will have access to information that is treated as confidential and proprietary by the Company, including, without limitation, the existence and terms of this Agreement, trade secrets, and information pertaining to business operations and strategies, customers, pricing, marketing, finances, personnel, or operations of the Company, its affiliates, or their suppliers or customers, in each case whether spoken, written, printed, electronic, or in any other form or medium (collectively, the "**Confidential Information**"). Any Confidential Information that Employee develops in connection with his employment, including but not limited to any Deliverables, shall be subject to the terms and conditions of this clause. Employee agrees to treat all Confidential Information as strictly confidential, not to disclose

Confidential Information or permit it to be disclosed, in whole or part, to any third party without the prior written consent of the Company in each instance, and not to use any Confidential Information for any purpose except as required in the performance his employment. This obligation shall survive the expiration or termination of this Agreement indefinitely.  Employee shall notify the Company immediately in the event he becomes aware of any loss or disclosure of any Confidential Information.

Confidential Information shall not include information that:

is or becomes generally available to the public other than through breach of this Agreement; or

is communicated to Employee by a third party that had no confidentiality obligations with respect to such information.

Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Employee agrees to provide written notice of any such order to an authorized officer of the Company within two days of receiving such order, but in any event sufficiently in advance of making any disclosure to permit the Company to contest the order or seek confidentiality protections, as determined in the Company's sole discretion.

Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA"). Notwithstanding any other provision of this Agreement:

Employee will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

is made: (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or

is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

If  Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, he may disclose the Company's trade secrets to such party's attorney and use the trade secret information in the court proceeding if such party:

files any document containing the trade secret under seal; and

does not disclose the trade secret, except pursuant to court order.


REPRESENTATIONS AND WARRANTIES.

Employee represents and warrants to the Company that:

Employee has the legal capacity to enter into this Agreement, to grant the rights granted herein and to perform fully all of its obligations in this Agreement;

Employee's entering into this Agreement with the Company and performance of his duties hereunder does not and will not conflict with or result in any breach or default under any other agreement to which he is subject; and

all Deliverables are and shall be Employee's original work (except for material in the public domain or provided by the Company) and, as provided by Employee, does not and will not violate or infringe upon the intellectual property right or any other right whatsoever of any person, firm, corporation, or other entity.

The Company hereby represents and warrants to Employee that:

it has the full right, power, and authority to enter into this Agreement and to perform its obligations hereunder; and

the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary limited liability company action.

INDEMNIFICATION.

Each party shall defend, indemnify, and hold harmless the other party and its affiliates and their officers, directors, employees, agents, successors, and assigns from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind (including reasonable attorneys' fees) arising out of or resulting from any breach of any representation, warranty, or obligation under this Agreement.  Company may satisfy such indemnity (in whole or in part) by way of deduction from any payment due to Employee.

EFFECT OF TERMINATION.

Upon termination of employee's employment for any reason, or at any other time upon the Company's written request, Employee shall within five (5) days after such expiration or termination:

deliver to the Company all Deliverables (whether complete or incomplete);

deliver to the Company all tangible documents and materials (and any copies) containing, reflecting, incorporating, or based on the Confidential Information;

permanently erase all of the Confidential Information from Employee's computer systems; and

certify in writing to the Company that Employee has complied with the requirements of this clause.

The terms and conditions of this Section 10 and **Section 4**, **Section 5**, **Section 7**, **Section 9**, **Section 11**, Section 12, **Section 13**, and **Section 15** shall survive the expiration or termination of this Agreement.

COVENANT NOT TO COMPETE.
In consideration for the offer of employment and the compensation paid to Employee hereunder, during Employee's employment, and for a period of twenty-four months after the termination of his employment for any reason (the "**Restricted Period**"), except when acting on behalf of the Company as an employee, consultant, or service provider, Employee shall not, alone or together or in association with others, whether as owner, shareholder, director, partner, manager, member, lender, investor, or co-venturer, consultant, independent contractor or employee, directly or indirectly, invest in, own an equity interest in or have any other financial interest in, or be employed, engaged by or retained by or render services for, any person, firm, enterprise or other business (a "**Third Party**") that is "in competition with the Company" (as defined below) in the "Restricted Territory" (as defined below).

Definitions.  For purposes of this Agreement:

- The phrase "**in competition with the Company**" shall mean to be engaged in the publishing or distribution via the internet of e-Websites, webinar programs, DVD's, websites, software applications, or emails on the topics of investment opportunities; stock picks; trade orders; investment research, opinions or analysis; stock, bond or options trading (including instructional materials, or tutorials), or other topics that are the same as or similar to those provided by the Company (including, without limitation on the Website), its subsidiaries and affiliates or their respective successors and assigns from time to time during the term of Employee's employment.
- The term "**Restricted Territory**" shall mean the world wide web.

NON-DISPARAGEMENT.  Neither party shall, at any time during or subsequent to Employee's employment with the Company, disparage the other party or any of its members, shareholders, directors, officers, employees, agents or affiliates, as applicable, provided, however, that either party may make truthful statements in conjunction with any arbitration, proceeding, or litigation matter commenced by the Company, Employee, or any other third party related to this Agreement.

NON-SOLICITATION. Employee agrees that during his employment with the Company and for a period of twelve (12) months following the termination of his employment, Employee shall not, directly or indirectly, for such party or on behalf of, or in conjunction with, any Third Party, solicit, induce, engage, or hire or attempt to solicit, induce, engage

or hire any employee or independent contractor of the Company to terminate such employment or engagement or otherwise interfere with the business of the Company. For purposes of this paragraph, any employee or independent contractor who has performed services for the Company in the twelve (12) months prior to Employee's termination shall be covered.

ASSIGNMENT. Neither party shall assign any rights, or delegate or subcontract any obligations, under this Agreement without the other party's prior written consent. Any assignment in violation of the foregoing shall be deemed null and void. Subject to the limits on assignment stated above, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the parties hereto and their respective successors and assigns.

MISCELLANEOUS.

This Agreement constitutes the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto, and any of the terms thereof may be waived, only by a written document signed by each party to this Agreement or, in the case of waiver, by the party or parties waiving compliance.

This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Hampshire without giving effect to any choice or conflict of law provision or rule. Each party irrevocably submits to the exclusive jurisdiction and venue of the federal and state courts located in the State of New Hampshire in any legal suit, action, or proceeding arising out of or based upon this Agreement.

If any provision of this Agreement shall be held invalid or unenforceable by competent authority, such provision shall be construed so as to be limited or reduced to be enforceable to the maximum extent compatible with the law as it shall then appear. The total invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

No right or remedy conferred upon the Company or Employee by this Agreement is

DocuSign Envelope ID: D9741C62-4C99-4AF5-BF26-363D7757E70B

intended to be exclusive of any other right or remedy, and each and every such right or remedy shall be cumulative and shall be in addition to any other right or remedy given hereunder or now or hereafter existing at law or in equity. The services to be performed by Employee are special and unique; it is agreed that any breach of this Agreement by Employee shall entitle Company (or any successor or assigns of the Company), in addition to any other legal remedies available to it, to apply to any court of competent jurisdiction to enjoin such breach.

This Agreement may be executed in multiple counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

- [SIGNATURE PAGE FOLLOWS]

If this letter accurately sets forth our understanding, kindly execute the enclosed copy of this letter and return it to the Company.

Very truly yours,

RAGINGBULL.COM, LLC

By: *Jeff Bishop* (DocuSigned, 49778BD5343C4A4)     6/25/2019
Name: Jeffrey Bishop
Title: President

ACCEPTED AND AGREED:

By: *Kyle Dennis* (DocuSigned, F1DB457745F8482)     6/22/2019
Name: Kyle Dennis

**Schedule I**

**Website**

Biotechbreakouts.com

## Exhibit A
### Sample Hypothetical Calculation of Applicable Percentage of the Company's expenses

(For the purpose of clarity, other expenses may apply at the time of calculation, example provided for illustrative purposes only)