```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3    FEDERAL TRADE COMMISSION,)
           Plaintiff,        )
 4                           )
           vs.               )   CIVIL CASE NO. 20-cv-3538-GLR
 5                           )
      RAGINGBULL.COM, LLC,    )
 6    et al.,                )
           Defendants.       )
 7    _____)

 8                    Friday, March 19, 2021
                     Virtual Hearing via Zoom
 9                     Baltimore, Maryland

10        Hearing on Motion for Preliminary Injunction

11    BEFORE:  THE HONORABLE GEORGE LEVI RUSSELL, III, Judge

12

13    For the Plaintiff, Federal Trade Commission:
               Colleen Robbins, Esquire
               Sung Kim, Esquire

14

15    For the Defendant,  RagingBull.com
           Greenberg, Traurig, LLP
16               Steven Malina, Esquire
               Miriam Bahcall, Esquire
17               Brett Doran, Esquire
               Andrew Berg, Esquire
18               David Barger, Esquire

19    For the Defendant, Kyle Dennis and the Winston Corp. entities:
           Boies Schiller Flexner LLP
20               Matthew Schwartz, Esquire
               John Zach, Esquire
21               Sabina Mariella, Esquire
               Jonathan Shaw, Esquire
      (Appearances continued on following page)
22    _____
                         Reported by:
23                Nadine M. Gazic, RMR, CRR
                 Federal Official Court Reporter
24               101 W. Lombard Street, 4th Floor
                  Baltimore, Maryland  21201
25                      410-962-4753
```

(Appearances continued on following page)

```
 1                A P P E A R A N C E S (Continued)

 2    For the Temporary Receiver, Peter Keith,
           Gallagher Evelius and Jones LLP
 3                Mark Saudek, Esquire
                  Meghan Casey, Esquire
 4
      Also Present:
 5         Defendant, Jason Bond, Jeffrey M. Bishop
           Temporary Receiver, Peter Keith
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          P R O C E E D I N G S
 2              THE COURT:  All right, everyone. All right, good
 3     morning. Why don't we go ahead and have the case called.
 4              THE CLERK:  The matter now pending before this Court
 5     is Civil Number GLR-20-3538, Federal Trade Commission versus
 6     RagingBull.com, LLC; Jeffrey M. Bishop; Kyle B. Dennis; Jason
 7     Bond; Jason Bond, LLC; Winston Corporation; Winston Research,
 8     Inc.; and Sherwood Ventures, LLC. This matter now comes before
 9     the Court for the purpose of a Preliminary Injunction.
10              Counsel, please identify yourselves for the record,
11     beginning with Ms. Robbins.
12              MR. ROBBINS:  Your Honor, Colleen Robbins with the
13     Federal Trade Commission. Good morning.
14              THE COURT:  Good morning.
15              MR. KIM:  Good morning, Your Honor.  Sung Kim with
16     the Federal Trade Commission.
17              THE COURT:  Good morning, Mr. Kim.
18              MR. MALINA:  Steve Malina, Your Honor, with
19     Greenberg Traurig on behalf of the RagingBull defendants.
20              MS. BAHCALL: Miriam Bahcall with Greenberg Traurig
21     on behalf of the RagingBull defendants.
22              MR. DORAN:  Good morning, Your Honor.
23              THE COURT:  Good morning.
24              MR. DORAN:  Brett Doran on behalf of the RagingBull
25     defendants as well.
```

 1            **MR. BERG:**  Good morning, Your Honor.  Andrew Berg

 2    from Greenberg Traurig on behalf of the RagingBull defendants

 3    as well.

 4            **THE COURT:**  Good morning.

 5            **MR. BARGER:**  Your Honor, David Barger on behalf of

 6    the RagingBull defendants as well. Good morning.

 7            **THE COURT:**  All right. I want to thank everyone for

 8    getting together for this.

 9            **MR. SCHWARTZ:**  One more.

10            **THE COURT:**  I didn't mean to miss you, Mr. Schwartz.

11            **MR. SCHWARTZ:**  That's all right.  I take it as a

12    good sign that they were forgetting about me.  On behalf of

13    Kyle Dennis and the Winston entities you have Matthew

14    Schwartz, John Zach, Sabina Mariella and Jonathan Shaw from

15    Boies Schiller Flexner; and Brian Levin from Levin Law and we

16    are joined by our client, Kyle Dennis.  Good morning.

17            **THE COURT:**  All right. Mr. Saudek, you're on mute.

18    We cannot hear you.

19            **MR. MALINA:**  Your Honor, also Defendants Bond and

20    Bishop are also present this morning.

21            **THE COURT:**  Very good. Mr. Saudek, we still can't

22    hear you.

23            **MR. SAUDEK:**  Thank you very much, Your Honor.  Mark

24    Saudek on behalf of Temporary Receiver Peter Keith.  With me

25    is Mr. Keith. We are on one audio feed and so my audio feed is

1   also linked to Mr. Keith. We thought that would be easier for

2   the Court. It turns out it was a little more complicated at

3   the outset. We can mute from our end, Ms. Moyé, so we're happy

4   to do that and keep ourselves muted and unmuted as we move

5   forward ourselves to make it easier for the Court.

6           **THE CLERK:** That's fine, thank you.

7           **THE COURT:**  That makes sense, all right.

8           **MR. SAUDEK:**   Thank you.

9           **MS. CASEY:**  Good morning, Your Honor.  Meghan Casey

10   also on behalf of Temporary Receiver Peter Keith. Good

11   morning.

12           **THE COURT:**  Okay.  Did I miss anyone?  All right,

13   very good. As indicated from the docket, we are here for the

14   purposes of a hearing on a Motion for Preliminary Injunctive

15   Relief that is sought by the Federal Trade Commission. As I

16   indicated in our previous teleconference, I'd like to give a

17   general overview of where we are as far as the litigation is

18   concerned and a procedural history of the case. Subsequent to

19   that I will hear from the FTC regarding a presentation related

20   to the balance of the equities.

21           I've had the opportunity to digest much of the

22   material related to the likelihood of success on the merits

23   and so my primary focus today will be on the balance of the

24   equities.

25           Subsequent to our hearing, I will hold the matter

1  over for a formal ruling on the Motion for Preliminary

2  Injunctive Relief that will be set this Friday or the

3  following Friday, a week from today. The full force and effect

4  of the Temporary Restraining Order will remain until such time

5  as I issue a ruling on the Motion for Preliminary Injunctive

6  Relief.

7        This case arises out of a complaint that was filed

8  on December 7th of 2020. In addition, a three-count complaint

9  in essence alleging two counts of violation of the Federal

10 Trade Commission Act, as well as one count related to the

11 Restore Online Shoppers' Confidence Act which is Count Three.

12 Concurrent with that filing, the FTC sought a Motion for a

13 Temporary Restraining Order with an asset freeze and

14 appointment of a Temporary Receiver in addition to seeking

15 other relief, as well as an order to show cause why the

16 preliminary injunction should not be issued.

17        The next day, the Court entered into an ex parte

18 order resulting in a TRO being imposed and an asset freeze on

19 personal bank accounts with Defendants Bond, Bishop and

20 Dennis, and I also appointed a Temporary Receiver to take

21 control of RagingBull's current day-to-day operations. We

22 certainly enjoined, that order enjoined the Defendants from

23 engaging in certain advertising practices. This Court modified

24 on December 17th of 2020 the Temporary Restraining Order to

25 release Defendant, MFA Holdings Corporation from the TRO asset

1    freeze and allowed the FTC to file an amended complaint

2    dropping MFA Holdings as a defendant in its entirety.

3              The parties fully briefed the Motion for Preliminary

4    Injunction and attempted to reschedule the Preliminary

5    Injunction hearing for February 5 of 2021. As indicated, the

6    defense filed a consolidated response to the Motion for PI on

7    January 13. The FTC filed a reply on January 27 in further

8    support and, of course, the Temporary Receiver filed an

9    initial status report on February 1 of 2021. On February 3 I

10   convened a teleconference after review of the pleadings to

11   discuss the upcoming Preliminary Injunction hearing and

12   expressed my interest in an additional briefing regarding

13   RagingBull's business operation. At the conclusion of the

14   call, the parties agreed to set in a briefing schedule and

15   RagingBull, in fact, submitted a proposed business plan and

16   the FTC, as well as the Temporary Receiver, filed a response

17   and RagingBull indeed filed a reply to the responses that were

18   submitted. We had this hearing set for this morning, March 19

19   of 2020.

20             FTC's complaint arises out of -- the first two

21   counts arise out of misrepresentations regarding RagingBull's

22   potential earnings by its gurus, Bishop, Bond, and arguably

23   Dennis. The second, Count Two deals with misrepresentations of

24   the consumers' ability to deploy the RagingBull's strategies,

25   namely mirroring of trades, et cetera.

1            Finally, the Restoration Online Shoppers' Confidence

2    Act which is contained in Count Three has as its genesis the

3    business transaction of offering or imposing a negative option

4    feature that would require the seller to opt out of the

5    services that are offered by RagingBull instead of having a

6    positive option feature.  In other words, if the consumer did

7    no action, it would automatically renew instead of an option

8    where the consumer could in essence automatically cancel the

9    services that they ended up ordering.

10            There are a number of documents.  In fact, I've got

11    boxes and boxes of documents in my chambers supporting both

12    the FTC's position regarding their claims and I've got boxes

13    of documents and evidence from RagingBull attempting to refute

14    the claims that were made by the FTC.

15            Section 13(b) of the FTC Act as codified in Title 18

16    United States Code Section 53(a) grants this Court the

17    authority to issue preliminary injunctive relief to enjoin

18    practices that violate any law enforced by the FTC. In order

19    for the Court to grant a preliminary injunction, the FTC must

20    demonstrate a likelihood of success on the merits of its

21    claims and that the equities weigh in favor of a preliminary

22    injunction.

23            Regarding likelihood of success on the merits, the

24    FTC must show preliminarily by affidavits or other proof that

25    it has a fair and tenable chance of ultimately success on the

```
 1    merits.
 2              The balancing of the equities element of this case
 3    is one that the Court reached out to the parties on to focus
 4    their attention and argument on today. The RagingBull has made
 5    a number of concessions that they have memorialized in a most
 6    recent proposed preliminary injunction order that has been
 7    presented to the Court for its consideration. This proposed
 8    injunctive relief related to RagingBull involves numerous --
 9    well, at least two phases of operation, both of which would be
10    overseen by a compliance monitor that would be chosen by the
11    Court.
12              RagingBull has proposed a compliance monitor,
13    Affiliated Monitors as the suggested monitor overseeing
14    RagingBull's reconstitution of its operation. Affiliated
15    Monitors has been chosen or used by the Federal Trade
16    Commission in the past.
17              There are a number of precautions that have been put
18    in place as well by RagingBull to ensure not only lawful
19    compliance, but also ensuring that certain customers who
20    believed that they are entitled to refunds get them,
21    specifically some of the 31 affiants, some or all of the 31
22    affiants that are the subject in the fulcrum of this
23    litigation, as well as present customers of RagingBull or past
24    customers of RagingBull who have sought to have these refunds.
25    And to ensure this, both Bishop and Bond have agreed to place
```

1     into escrow the sum of $10 million to ensure compliance with

2     both Phase I and Phase II in conjunction with the monitor.

3                The question that I have and I posed to I guess the

4     FTC and Ms. Robbins is here and I think she's speaking on

5     behalf of the FTC, initially and at the outset was in light of

6     these concessions which would be memorialized in a court order

7     that would have the strength and authority authorized by

8     federal statutes, as well as the Federal Rules of Civil and

9     Criminal procedure as far as enforcement which would include

10    both contempt mechanisms as well as arguably complete rollback

11    of the phasing system and arguably the reimposition of a

12    temporary asset freeze, why with those precautions, the

13    balancing of the equities would tip in favor of the asset

14    freeze and the continued receivership.

15                I would ask at the outset, Ms. Robbins, to address

16    these issues, or if Mr. Kim is there, or anyone else to

17    provide me an understanding of how it is that a current asset

18    freeze would not completely kill the business. In light of the

19    Court's backlog due to the coronavirus and just general

20    caseload in general, a trial on the merits of this case before

21    me may not take place until 2023 or 2024. There is protracted

22    litigation involved with numerous attorneys. The Receiver, the

23    latest costs by the Receiver is close to $500,000. Those

24    assets are going to dwindle RagingBull's assets as well.  The

25    Receiver monitoring RagingBull's activities over the course of

1    the protracted litigation, participation in depositions,

2    otherwise investigating things, it could be an astronomical

3    amount of money that has to be expended with no money coming

4    in whatsoever. And there appear to be some pretty significant

5    safeguards as to the viability of the company to ensure that

6    the company will be operating in a lawful manner. And

7    certainly while I understand that there may be some skepticism

8    both on the Receiver's part, as well as the FTC's part as to

9    RagingBull's ability to operate lawfully and profitably during

10   the two or three-year pendency of this litigation, it seems to

11   make sense under some circumstances for me to give them a

12   shot. And instead of having 160-plus employees remain

13   unemployed, to have past customers who are awaiting refund and

14   demanding a refund for their services, having them wait

15   three years until the final disposition on the merits to get

16   refunds, you have present customers who will now demand

17   refunds because the services that they paid for were not

18   provided. In addition to that, I would note that there are

19   approximately 30,000 at least according to RagingBull, current

20   customers that are willing to despite the knowledge of this

21   particular lawsuit, willing to stick with RagingBull because

22   they value RagingBull's services. This seems to undercut the

23   revenue based damage stream of $137 million fairly

24   significantly.

25          While I don't have before me the exact amount of

1    services that were offered or the price of those services,

2    given that we've got 31 affiants and potentially 30,000

3    present customers that are willing to reengage RagingBull, it

4    seems to weigh heavily in the one thing, in blunting or

5    reducing the damage claim, the ultimate damage claim that is

6    sought. But the reality is is that there appears to be an

7    opportunity for RagingBull to continue to earn money during

8    the years pendency of this litigation. And so that's why in

9    weighing this and in considering these arguments, that's why I

10   wanted to have the parties focus primarily this morning and

11   today, on that particular element which, of course, must be

12   met.

13        I note that in RagingBull's proposed preliminary

14   injunction order which seems to address the motion that was

15   submitted by the FTC, it seems to me that this order would be

16   a standalone order and if I believed that FTC could not meet

17   its burden, the Motion for Preliminary Injunction as filed

18   would be denied and this particular order would be instituted

19   separate from the preliminary injunction that was sought by

20   RagingBull, again, with the full force and effect of

21   enforcement through federal statutes or the Federal Rules of

22   Criminal or Civil Procedure.

23        So with that, those preliminary comments, you know,

24   I will sort of go round-robin in a really short form and just

25   ask whether or not I've sort of got it.  And then I will ask

1    Ms. Robbins to address the issues that I raised in my

2    preliminary remarks, as well as further develop the second

3    prong of that preliminary injunctive relief.

4         So I hope that I've sort of put forth a procedure or

5    methodology for moving forward.  But Ms. Robbins, I can either

6    start with you for a relatively short comment to point out the

7    flaws in my -- not necessarily the flaws in my analysis, but

8    where from a factual procedural standpoint I am incorrect.

9         **MR. ROBBINS:**  Your Honor, we don't -- everything you

10   said does sound correct of the procedural history of this

11   case. The FTC feels strongly about an asset freeze and

12   preservation order and a Receiver should remain in place and

13   we would like to argue the balance of the equities as to that.

14        We are also able to address if the Court does feel

15   that a monitor is appropriate in this case, we would also like

16   to address the Defendants' proposed order.  And so we would

17   like that opportunity. But everything you have said so far is

18   correct.

19        **THE COURT:**  Okay, that's good. All right,

20   RagingBull, I'll just hear from one by one whoever is going to

21   speak on behalf of the attorneys for the Defendants.

22        **MR. BARGER:**  Yes, Your Honor, good morning.  This is

23   David Barger.  Just very briefly from my standpoint and I

24   appreciate the opportunity from other counsel to make sure I

25   don't overstep. Without conceding the factual premises, I

think the Court's summary is absolutely accurate. Thank you.

            THE COURT:  Okay, thank you very much.

            MR. SCHWARTZ:  With respect to Mr. Dennis, Your
Honor, we also agree that everything you said is accurate. We
would add that there's a further sort of second set of
inequities that apply uniquely to Mr. Dennis and we'll be
prepared to address those.

            THE COURT:  Okay, thank you.

            MR. SAUDEK:  Your Honor, this is Mark Saudek.  Can
you hear me?

            THE COURT:  I can, thank you.

            MR. SAUDEK:  Your Honor, just very briefly,
two points I think worth raising the facts that you described.
One is the number of refund requests. While there are 31
affiants, I know that Your Honor has seen that we have
received approximately 1,500 requests for refund without
soliciting any requests for refund. We think that is the
current number that we are aware of.  And I believe that the
current proposed preliminary injunction does not, in fact,
provide for any payment to any of those who have requested
refunds other than the 31 that Your Honor described.

            And the only other point, Your Honor, is that I
believe the 30,000 customers figure is one that the Temporary
Receiver has not in any way attempted to validate or I think
at this point could validate. That is a number that RagingBull

1    has proposed that they believe is reasonable and we do not

2    have any position, Your Honor, on whether that is accurate or

3    not.

4         **THE COURT:**  Okay. And all of that -- thank you for

5    that, Mr. Saudek, and I will await Mr. Barger or another

6    attorney for RagingBull to address the issue of the proposed

7    1,500 and whether or not there's a methodology to properly

8    vett the 1,500 to determine whether or not they are entitled

9    to that relief that they are requesting. But I would note of

10   those 1,500 requests for refund, I believe, I believe that

11   there was somewhere in the pleadings that not all of those

12   requested refunds were from disgruntled customers. That some

13   of those refunds were, indeed, from individuals who for

14   whatever reason just no longer needed the services. Is that

15   accurate, Mr. Saudek?

16        **MR. SAUDEK:**  Your Honor, there are some who have

17   said that they are no longer receiving services and therefore

18   would like a refund.  And then there are as you character

19   them, disgruntled consumers. We have not done a statistical

20   analysis of how much are in each group, but certainly those

21   are the two primary groups.  So we have not seen a market

22   number of customers who just say they would like a refund

23   without a reason.  People have either told us that they would

24   like a refund because they no longer have been receiving

25   services for the past four months, or that they were

 1    dissatisfied with the services that they did receive.

 2         **THE COURT:**   And let me ask you, Mr. Saudek, did the

 3    Receiver anticipate providing those refunds -- oh, okay, I

 4    note that I believe in page 15 of the proposed preliminary

 5    injunction, all refund requests would be handled before the

 6    end of Phase I. So I think -- I could be wrong and I'll wait

 7    for Mr. Barger to comment on that, but it may be that those

 8    individual requests for refunds are addressed there.

 9         I also have another question for -- whether or not

10    Mr. Saudek you knew this and I know it's fluid.  And I haven't

11    had the opportunity to talk to you about this, but is it

12    anticipated that none of the refunds for those 1,500 that are

13    possibly eligible or the 31 affiants or anyone else will be

14    processed until there's an actual final judgment in this

15    litigation?  So in other words, there's an actual finding via

16    jury as to whether or not the FTC is entitled to the relief it

17    requests?

18         **MR. SAUDEK:**   At this point, Your Honor, your point

19    is well taken that these are what we deem to be liquidated

20    claims in the sense that the amount of the claim is

21    determinable. The validity of the claim would have to be

22    determined. I don't believe that the mechanism that's provided

23    in the current proposed order does that.  But Your Honor, I

24    think that the short answer to your question is that there

25    would need to be a mechanism in this litigation or in some

```
 1    other resolution to this litigation to determine which

 2    claimants have valid claims and then what amounts of those

 3    claims would be recognized. Whether that's through the

 4    litigation process that the FTC manages, whether individuals

 5    would make claims against the Defendant entities, whether

 6    there would be a class action lawsuit filed by a private

 7    attorney, I think we would have to see how those claims are

 8    made and pursued, prosecuted during the litigation.

 9          We have in the past, of course, if there is a

10    resolution between the parties, instituted a claims

11    adjudication process that's far less formal than that in which

12    the Receiver adjudicates individual claims both for their

13    validity and their amount.  That would only occur I believe in

14    this instance if there were a settlement, a resolution agreed

15    to between the parties. Otherwise it would have to happen

16    through the normal litigation process with either the FTC

17    driving that on behalf of consumers that does, or with

18    consumers bringing claims themselves either individual or

19    collectively.

20          THE COURT:  And so in essence while reading this

21    case and given the current state of affairs and how protracted

22    this litigation is going to be, it appears as though this

23    particular -- oh, well let me ask you this, Mr. Saudek:  If

24    this current TRO asset freeze and Receivership remains in

25    place, do you agree that that's going to basically terminate
```

1    RagingBull?  They're going to go out of business by the time--

2    in two years, three years when this goes to the merits?

3            **MR. SAUDEK:**  I think that two to three years of

4    activity by a Temporary Receiver or by a Permanent Receiver

5    through litigation would likely consume the assets of the

6    estate or most of the assets that are currently in the estate

7    and the company would not have additional revenues. I don't

8    see how the company would continue. Of course part of the

9    process of gathering -- of pursuing the Receivership is to

10   gather more assets into the Receivership. We believe that

11   would be possible. But in terms of the ongoing business of the

12   entity, I think that would be very difficult. It's hard to

13   imagine, Your Honor, that that could continue if the

14   Receivership continues and assets remain frozen.

15           **THE COURT:**  Right, okay. All right. Thank you very

16   much, Mr. Saudek.  Oh, by the way, with regard to the plan, I

17   know that Ms. Robbins indicated that she is going to raise

18   some issues regarding the proposed preliminary injunction in

19   this case.  And I note that in RagingBull's papers that they

20   reached out to the Receiver -- the Receiver reached out to

21   RagingBull with regard to the business plan and then

22   RagingBull reached back out to the Receiver regarding the

23   business plan, but then there was no communication whatsoever

24   related to a vetting of the practicality of the business model

25   that has been proposed by RagingBull. And I'm wondering why

 1    that was. Because initially I was hoping that I expressed, if

 2    not implied, that I really wanted the nuts and bolts of this

 3    to be vetted a little bit more thoroughly than that.  And I

 4    know the FTC had issues -- is now saying that they have issues

 5    with this and the Respondent.  But I would have hoped that

 6    those responses would have been used to a magistrate instead

 7    of an outright opposition prior to even a business plan being

 8    put forth.  So I want to know why it is that there was not a

 9    more robust engagement with RagingBull subsequent to their

10    business plan being filed.

11         **MR. SAUDEK:**  The magistrate engagement was that that

12    was an engagement that all of the parties would need to

13    participate in.  And it was our understanding that the FTC was

14    not willing to participate in an engagement with the

15    magistrate judge to try to resolve claims or to settle the

16    entire lawsuit. So our view was that without the participation

17    of the FTC, it did not seem appropriate for us to move forward

18    to try to resolve claims with the magistrate judge.  We're

19    frankly not in a position to do that.

20         As to the business plan, we have worked closely with

21    our financial expert and our accounting experts to try to

22    understand the business plan, and then to express to

23    RagingBull where we viewed the business plan to be

24    insufficient. I think, Your Honor, that the differences that

25    we have as to the business plan -- and the business plan is

1     devised I think neatly into two sections, one is compliance,

2     the other is the financial aspect of it.  As to the financial

3     aspect of it which I think is what Your Honor is referring to

4     now, although I'm happy to address the compliance as well, our

5     view of the business aspect is that we -- just based on our

6     financial experts' views -- have different assumptions that we

7     bring to the business plan. And so given the different basic

8     assumptions on costs that the entity is facing currently and

9     the projected revenues, we do not think -- and our financial

10    expert, Your Honor, advised us that he did not see that this

11    was a business plan that was anywhere close to viable and that

12    the assumptions were so different and so far off from one

13    another that we did not see that there was a possibility to

14    try to reach a resolution on a business plan that would be

15    viable moving forward for this entity that would lead us to

16    profitability in the near term.

17           Of course, if the assumptions that RagingBull has

18    made are correct, then the business plan will work. And so,

19    Your Honor, we're not of the view that if RagingBull's

20    assumptions moving forward are accurate, that this company

21    cannot operate profitably. In fact, if RagingBull's

22    assumptions as stated in its business plan are, in fact,

23    accurate and we're attempting to predict the future here, if

24    their predictions of the future are correct based on their own

25    personal experience and the opinions of their expert, then,

1    Your Honor, we believe that the business plan itself is not

2    flawed structurally in any way. It's just a difference I

3    believe, Your Honor, in the assumptions that go into it.

4         So we do not take issue with the structure of the

5    business plan, the finances of the business plan itself.  If

6    RagingBull is correct that it can operate with 15 employees,

7    that the marketing that is compliant with all FTC rules and

8    regulations will generate the types of revenues that it

9    predicts it will generate and that it can, in fact, operate

10   with the compliance staff as it says it can in a way that's

11   compliant that satisfies the Court moving forward, then we are

12   not of the view, Your Honor, that its business plan is

13   structurally in some other way flawed. Does that address Your

14   Honor's question as to that?

15        **THE COURT:**  It does. Also, but is it safe to say

16   that you have agreed that the one future predictor that the

17   Receiver can make is that all of the assets will likely be

18   consumed within the two-year or even three-year period of time

19   before this case will go to the merits -- when this case would

20   go to the merits?  So in other words, we can't predict whether

21   or not RagingBull can survive under the circumstances that

22   they are proposing and under those assumptions, but what we

23   can predict is that if the current status quo remains in

24   place, it's fairly likely that there are not going to be any

25   assets left to pay anybody.

1    **MR. SAUDEK:**  Your Honor, in the current estate there

2    is by our estimation, approximately $7 million. There are

3    costs that have been presented to the Receiver that are costs

4    of the company that could reduce that by as much as

5    approximately $4 million. So that would leave roughly

6    $3 million in the estate. And I have more specific numbers,

7    but let's call it roughly $3 million. The question is whether

8    that $3 million would be consumed over the course of

9    litigation over the next two to three years. Your Honor --

10    **THE COURT:**  Also there's one -- Mr. Saudek, there's

11    one other factor too, the costs and fees of the Receiver.

12    Because right now we're at $500,000. Three years from now that

13    could be more than that.

14    **MR. MALINA:**  We're more than $500,000 into the

15    Receiver, Your Honor, well in excess of that.

16    **THE COURT:**  I just threw out $500,000 just for the

17    realistic figure that if this were to continue to go forward

18    for much longer, according to the monitored projections of the

19    Receiver itself, and of course RagingBull disputes those

20    monetary projections, but according to those monetary

21    projections, the company could be insolvent in a year. So

22    another balancing of the equities aspect of this which means

23    no claimant gets paid and the present customer -- the

24    liabilities increase because the present consumers of the

25    products and services are disgruntled and they rightfully

```
1    deserve -- they rightfully deserve refunds because the
2    products that they're paying for upfront they're not
3    receiving.  And so the harm that is being caused is
4    significant.  It's unfortunate, because this TRO has basically
5    put handcuffs behind RagingBull's back and allowed FTC to step
6    on their throat for two years until this litigation is
7    proceeded to the merits.
8              So those are the issues that I'm sort of grappling
9    with, as opposed to a compliance monitor which is overseeing
10   an operation of RagingBull and as opposed to a Receiver that
11   is not engaging and assisting in the operation of RagingBull
12   whatsoever.
13             So those are sort of my preliminary thoughts on
14   that. I don't know whether or not you want to address the last
15   point, but to my point that, you know, the costs of the
16   Receiver, the legitimate costs of the Receiver are there. You
17   submitted a motion for fees and costs. They're extraordinary.
18   I didn't call them unreasonable, I haven't ruled on it yet,
19   and I'm not suggesting that they are. But if we continue down
20   the line of, you know, $500,000 and $600,000 every
21   three months for compliance, those are monies that could have
22   gone to claimants right now, putting money in the pockets of
23   consumers right now that believe that they're disgruntled,
24   that 1,500. Do you know an approximate amount speaking to the
25   Receiver of the value or the amount of money that those 1,500
```

1    claimants are requesting?  Even if it were approximate and I'm

2    not going to hold you to it, Mr. Saudek, because that's

3    digging in the details of those claims.  But I did not know

4    whether or not you investigated whether or not the -- assuming

5    that all 1,500 claims were paid and entitled to the payment of

6    refund, whether or not that would amount to a million dollars

7    worth of claims or what. And I don't know whether or not -- I

8    see Mr. Keith taking off his mask, so he might have something

9    to say about it. I'm not putting him under oath at this point

10   because I'm not taking testimony, but what I'm just trying to

11   receive is information for me to digest as I navigate the

12   merits of this particular case.

13           So Mr. Saudek, can you give me any insight as to

14   that?  Because I'm wondering to use a slogan by my law clerk,

15   whether or not the juice is worth the squeeze so-to-speak.

16           **MR. SAUDEK:**  Yes, Your Honor.

17           **THE COURT:**  Go ahead.

18           **MR. SAUDEK:**  I'll address both those points and I do

19   think Mr. Keith would appreciate addressing the Court briefly

20   if the Court will hear from him.

21           As to the two points that you've raised, one the

22   1,500 claims, we have not calculated the exact amount. We have

23   calculated an approximate amount of between 4 and $5,000 per

24   claim. We don't know whether that is a valid amount or not. We

25   have not pursued whether that is, in fact, what people have

1  paid and what they would be entitled to. The simple math of

2  that is 1,500 times 4,000 is 6 million. Again, we have not

3  evaluated individual claims to see whether there's merit to

4  them, but this is what people have presented to us.

5  And then, Your Honor, just more globally and then I

6  will allow if Your Honor will allow Mr. Keith to speak for a

7  moment, the question that we have attempted to answer is

8  whether, in fact, there will be more money or less money in

9  the estate if RagingBull is permitted to operate. That is the

10  question that we attempted to answer to serve the Court.

11  That's what our response to the business plan was driving at.

12  But Your Honor, if Your Honor would hear from Mr. Keith, he

13  would be glad to address these points.

14  **THE COURT:**  By the way, I have one other comment,

15  Mr. Keith, before you get started. And I'm sorry, this is just

16  the way I conduct these hearing because I read all of your

17  papers and I've got some questions. For the most part I know

18  that there was some -- early on in this litigation, there was

19  an assertion that one of the attorneys from RagingBull told

20  one of the employees not to necessarily provide some

21  information or documents to Mr. Keith. I recall reading

22  something like that. But for the most part, Mr. Saudek, would

23  you characterize the cooperation from RagingBull and its

24  attorneys, the principals as being full and complete?

25  **MR. SAUDEK:**  Your Honor, the issue that Your Honor

1   has raised we have seen and heard from more than one employee.

2   So that remains an issue, one that we have concerns about.

3   That would be the primary driver that would prevent me from

4   saying it has been full and complete.  But other than that,

5   Your Honor, we have received cooperation. We have received

6   information as requested for the most part from RagingBull and

7   we have certainly had access to all electronic systems that

8   RagingBull operates to the best of our knowledge.

9           **THE COURT:**  And by the way, there's been complete

10  and utter financial undress and transparency regarding

11  RagingBull and its principals. In other words, you haven't

12  found any secret bank accounts or anything like that that have

13  been discovered subsequent to the Court's order of the TRO and

14  the appointment of the Receiver?

15          **MR. SAUDEK:**  We have not, Your Honor, and we have

16  coordinated closely with primarily outside accountants to

17  RagingBull.  And the outside accountants to RagingBull have

18  been cooperative and have provided us the financial

19  information that our financial experts have sought. We have

20  not found hidden bank accounts or other evidence of attempts

21  to hide assets.

22          **THE COURT:**  All right. And would the proposing of a

23  $10 million in escrow account in your mind or -- again, I

24  don't want to speak for Mr. Keith, but you're representing Mr.

25  Keith -- but in your mind that seems to be a pretty good, good

1  faith deposit where you're not taking money out of a company,

2  you're putting it in to safeguard and ensure that disgruntled

3  consumers or customers and those entitled to refunds are

4  entitled to them and paying for monitors. That's not a

5  pittance worth of money that's being proposed by the

6  RagingBull principals; is that correct?

7       **MR. SAUDEK:**  $10 million is certainly not a

8  pittance, Your Honor. Would you like me to address it any

9  further?

10      **THE COURT:**  No. Mr. Keith, if there's something that

11  you wish to add, I thank you very much.

12      **MR. KEITH:**  Good morning, Your Honor. Yes, I just

13  would like us all to be on the same page with regard to the

14  facts of what money is available.  So we currently hold

15  slightly in excess of $7 million in the Receivership account.

16  We have employees who have not been paid wages and that number

17  is roughly $425,000. So they are creditors of the business. We

18  have 37 business creditors who have not been paid and they are

19  owed approximately $325,000. We have payment processors.

20  These are the organizations that basically handle the credit

21  cards and there are five of those entities and that amount is

22  about $1.8 million that they are claiming. We have Government

23  entities that are claiming taxes owed. Those include

24  pre-Receivership taxes for the company, as well as internet

25  sales taxes.  And those numbers are a total of about

1    $2.8 million. And then there's a Paycheck Protection Program

2    loan for the Government that hopefully will be forgiven, but

3    that's unclear. And that's another $1.2 million roughly.

4            So currently, if you factor in all of the creditors,

5    all of the obligations that the company has, if you take into

6    account the PPP loan, you're roughly about four-and-a-half

7    million dollars left in cash for the company.

8            And then our concern under the TRO, you've directed

9    us to protect the interest of consumers in the TRO and so Mr.

10   Saudek has indicated we have 1,500 consumers that have

11   contacted either the company or us or the FTC about a refund.

12   And the average refund that we've calculated given the

13   documentation that customers have given us thus far is between

14   4 and $5,000. So if you multiply that out, that is between 6

15   and $7 million just on current refund claims. So that's just

16   the raw data there. We haven't requested that all consumers

17   who want refunds, we haven't asked them. We haven't initiated

18   a claims process at all.  But if you add up all those numbers

19   you're correct, Your Honor, that the current cash available

20   within the Receivership estate is not going to be able to

21   satisfy all of those liabilities. And then the question is

22   whether the infusion of $10 million by the principals will be

23   enough to operate the business forward and the speculative

24   gamble if you will of can they make a profit?  Or at the end

25   of the day as of the date of trial would they have lost money

 1    so that that $10 million is no longer available to satisfy

 2    either consumer redress as claimed by the FTC or the business

 3    creditors or the consumers who might want refunds. And I think

 4    that that's uncertain and you've seen conflicting expert

 5    presentation on that.

 6         So that's where things stand if we were in a

 7    liquidation mode based upon the asset freeze.  And based upon

 8    the declarations that were filed by the Defendants which

 9    appear to be accurate based upon what we know, it does appear

10    that the Defendants had not spent the many millions of dollars

11    in distributions that they've received over the past few

12    years. And so my estimate is that there's currently 25 to

13    $30 million, perhaps more in very recoverable assets that are

14    currently available just from the principals based upon the

15    distributions that were paid to them as profits from this

16    company.  And it's my understanding that Mr. Bond and Mr.

17    Bishop are willing to take 10 million of what they currently

18    hold that they took from the company in profits and put that

19    in to try to fund operations going forward.

20         So that's just the raw data, Your Honor, with regard

21    to the numbers.

22         **THE COURT:**  Let me ask you, Mr. Keith, would you

23    agree that -- you may not know the exact figure -- but would

24    you agree that there are -- with any portion of RagingBull's

25    argument -- that there indeed are thousands of customers that

 1    apparently valued RagingBull's services when they were

 2    operational, or whether or not you've received any information

 3    corroborating the positive testimonials?  And as Receiver,

 4    have you made -- I note that there was an estimate of

 5    disgruntled employees -- maybe not disgruntled, but employees

 6    -- customers seeking a refund. I'm not going to call them

 7    disgruntled because they're a subset of those 1,500. Have you

 8    determined that there very well could be thousands, if not

 9    tens of thousands of perfectly satisfied customers of

10    RagingBull that are willing to engage RagingBull in the

11    future?  And indeed, since this litigation was put into the

12    public fray, I don't know whether or not there's been a

13    significant uptick in the tens of thousands of individuals

14    seeking refunds because, of course, their client base,

15    RagingBull's client base was very large. And so in the event

16    that there was a bandwagon to be jumped on because the

17    services were of no value, you would suspect that there would

18    be tens of thousands of RagingBull customers that would be

19    seeking to have a refund, especially given the fact that the

20    viability of RagingBull is essentially in a precarious

21    position.

22            So I guess my question is have you seen a run on

23    additional customer requests for refunds other than the 1,500

24    and 2, can you verify to any degree of accuracy the

25    representations of RagingBull that their customer base,

1    current customer base exceeded let's say 20,000 customers when

2    it was up and operating or 30,000 when it was up and

3    operating?

4              **MR. KEITH:**  So Your Honor asked a very good

5    question. We tried to analyze that issue in our initial status

6    report. After the lawsuit was filed, RagingBull sent out an

7    e-mail to its entire customer base asking for positive

8    comments about the company. They wanted support for what they

9    call the RagingBull family. And I'm sure that was an effort to

10   try to generate evidence for purposes of this case and it

11   allowed them to do that. And what we found in reviewing both

12   those e-mails that came to the company, as well as negative

13   e-mails that came in response to that request, as well as on

14   our website, and we set up an e-mail account so we got a large

15   volume, many thousands of e-mails.  And it basically broke

16   down like this, Your Honor:  About 37 percent had favorable

17   comments about the company. And as you point out, some of

18   those people might want refunds just because the service was

19   over, the company had gone dark and they weren't getting their

20   money's worth.

21              So my sense of the e-mails and our analysis of it

22   and reading them one by one was roughly 37 percent were

23   positive, and then the rest either wanted refunds or were

24   critical. And we have a large number of e-mails saying, I've

25   been deceived. They kept moving me into different services. I

1   asked for my money back, I couldn't get it.  I followed the

2   gurus, I lost money trading.  I want my money back, can you

3   help me?

4         And so then the question becomes and I think it's

5   speculative, if the company were to start operations in

6   two months under the business plan, how many of their 80,000

7   customers would actually want to continue to do services with

8   them?  Is that number 30,000?  I don't know. Is it 20?  Is it

9   50?  I don't know. But from what we could tell of the e-mail

10   traffic that we received, both positive and negative, there

11   was a significant group.  And Your Honor is correct, it was

12   37 percent of the e-mails that we saw that were positive and

13   37 percent -- if that percentage continued throughout, that's

14   basically 30,000 subscribers.

15         On the other hand, there was a large number as well

16   who were highly critical of the company.  Felt like they had

17   either been deceived or felt like they hadn't gotten their

18   money's worth and wanted their money back.  So I think the

19   customer base is highly polarized, Your Honor, and I think

20   it's difficult to predict what it will look like going

21   forward.

22       **THE COURT:**  Right, and that may end up undercutting

23   the argument that the company is permeated with fraud because

24   if you've got a third of people who are coming to you, a third

25   of your base that's coming to you saying hey, I like

```
1     RagingBull. I'm willing to pay money for their services, but I
2     got -- that's just an aside. All right, thank you very much,
3     Mr. Keith. Very much.
4            MR. KEITH:   Thank you, Your Honor.
5            THE COURT:   Who is next?
6            MR. BARGER:   Your Honor, this is David Barger.   If I
7     could just ask the Court, there are a number of points raised
8     both by Mr. Saudek and by Mr. Keith that we would like to
9     address and it went on at some length, so I want to just ask
10    the Court's indulgence if we could address a couple of those
11    points.  And I know Mr. Malina --
12           THE COURT:   Well, if you don't mind, Mr. Barger, I
13    promise you, I'm going to hear everybody. If you could table
14    your points unless someone else had something additional to
15    add from the preliminary standpoint, I was going to just start
16    with Ms. Robbins and then Mr. Barger, I'm going to go right to
17    you and then I'm going to go to Mr. Schwartz to make the
18    various presentations.  And then I'll add in, I'll ask Mr.
19    Saudek whether or not he wishes anything else to add and then
20    I'll go back to Ms. Robbins again for a rebuttal. And then I
21    will probably be in a really good position to be able to
22    decide this case and figure out which way I want to go. And
23    I've got two very capable people off screen that are
24    designated from my chambers to assist me in this.
25           MR. BARGE:   Yes, Your Honor.
```

1          **THE COURT:**  All right, very good.  Ms. Robbins,

2     there's a lot to address, but I'll be more than happy to hear

3     from you as you make it through this.

4          **MR. ROBBINS:**  Thank you, Your Honor. And I am going

5     to -- I promise I will address all of your points, but I also

6     would like to give some context too while I'm addressing those

7     points and try to refocus right now. Because, Your Honor, the

8     focus so far has been on the harm to RagingBull. And really,

9     the reason why the FTC brought this case was on behalf of

10    consumers. Because consumers have been harmed. And since 2017,

11    the Defendants have made $200 million using deceptive

12    advertising. And the law is clear that it is the fraud in the

13    selling, not in the value of what's being sold. And these

14    consumers, we're not talking 1,500 or 30,000. They said they

15    have 200,000 customers. They have always used deceptive

16    earnings claims since the very beginning.

17          And I'd like to -- I know Your Honor has said that

18    you really want to address the equities, but I would like to

19    just address briefly the likelihood to succeed because I think

20    it's really important in the context of the equities that --

21          **THE COURT:**  Why don't you hit your highlights -- why

22    don't you hit your highlights on those, but this case was very

23    well briefed and I want to compliment the lawyers on that. And

24    I'm fairly confident I won't miss any of your points, but if

25    you want to put it forward to me, I promise you I will indulge

1   you with regard to those three points.

2           **MR. ROBBINS:**  Okay.  Thank you, Your Honor.

3           **THE COURT:**  All right.

4           **MR. ROBBINS:**  So the earnings claims in this case

5   were ubiquitous throughout all of their marketing. And the

6   Defendants do not have substantiation for those claims.

7   Regardless, you know, you cannot just substantiate a handful

8   of claims and say that you have substantiation. They must show

9   that their earnings are typical. They are typical earnings for

10  their consumers.  They can't show that. They've never been

11  able to show that. They don't have that evidence. And the net

12  impression that consumers get is that they are likely to make

13  money using Defendants' services. Therefore, these claims are

14  likely to mislead. And in fact, they did mislead consumers.

15  And consumers purchased 196 million dollars worth of services.

16  And the Defendants have not provided a single sworn consumer

17  declaration to show anything else. And the FTC has submitted

18  30 sworn declarations to the Court. And these sworn

19  declarations show a glimpse of the irreparable harm that some

20  of these consumers have faced.

21          And if the Court will indulge me, I just want to go

22  through just a few.  Gary Walton, in PX 39, he spent $1,499 on

23  subscription fees. He lost $20,000 trading using Dennis's

24  services. He is currently unemployed. He has no income. He has

25  no prospect of income and he pulled $10,000 out of his IRA

1   because Dennis told him and he believed that Dennis was

2   successful and that if he followed him, he could make that

3   money too.

4   　　　　　Kenneth Babikan, he lost $6,000 trying to follow

5   Defendants' alert and he is a retiree. That's a lot of money

6   for him.

7   　　　　　Robert Biello, he's another retiree.  He lost

8   $30,000 trying to follow Defendants' trade and spent another

9   $2,700 in subscriptions.

10   　　　　　Robert Sigler had $110,000 in his IRA. It is now

11   down to $3,500. These are clear harms that consumers have from

12   the Defendants, from following the Defendants. And David

13   Wrape, he went from $184,000 in his investment account to over

14   $1,000. He is frustrated, he's mostly broke and he says that

15   the Defendants are masters at manipulating the investors'

16   emotions into believing that merely following their expert

17   will make them wealthy.

18   　　　　　Abigail Zeviar was furloughed because of the

19   pandemic. She wasn't receiving a paycheck. She bought their

20   services for $2,499.  She tried to cancel the first day she

21   used it. RagingBull would refuse to give her a refund and then

22   when she charged back, they fought the chargeback the first

23   day she tried to use their services.

24   　　　　　Danielle Felts, she owns a small business that's

25   been struggling in the pandemic. She's also in a wheelchair.

```
 1        She suffers from chronic pain and she does not receive
 2        disability. She lost $50,000 trying to follow the Defendants'
 3        trades and $5,000 in subscription fees. In just the 30 sworn
 4        declarations that the FTC has submitted to the Court,
 5        consumers lost $965,000 in trading losses and $140,000 in
 6        subscription fees. That's just 30 consumers. They have over
 7        200,000 customers. And the law is clear that the public
 8        interest in preventing further consumer harm and providing
 9        redress to consumers must be accorded greater weight than the
10        Defendants' private interest in continuing their business. And
11        the Fourth Circuit was clear in Foodtown Stores that the
12        public interest should be given greater weight in 13(b)
13        proceedings and that private injuries to Defendants from
14        injunction are not proper consideration for granting or
15        withholding injunctive relief.  And in that case there was an
16        issue about losing personnel and personnel being laid off
17        because of a merger.  And the Court still said, that is not a
18        proper consideration.
19             The equities strongly weigh against allowing these
20        Defendants to operate even under a monitor. And the equities
21        weigh in favor of redressing consumers and preserving these
22        assets for redress.
23             The Defendants were violating the FTC Act up until
24        the day that we filed. And Your Honor, this isn't just a
25        company that strayed over the line once. This isn't a company
```

```
 1      that can easily come back into compliance with a monitor.
 2      These Defendants are not starting with a blank slate and we
 3      cannot avert our eyes from the way that they have operated
 4      over the past seven years and take on faith that they're going
 5      to comply with the PI even with a monitor and be profitable.
 6      And I want to explain why.  Because I think it's very
 7      important for the Court to understand it's not just an N/A
 8      situation. We have very specific facts, very specific
 9      Defendants.
10              In July 2017, Bishop learned that one of his gurus
11      did not want to send out, quote, hypey smoke and mirror sales
12      letters I get all the time.  And his response was well, we're
13      just going to have that contractor work with someone else who
14      doesn't care about hype, as long as it sells.
15              Soon after this in September 2017, the BBB sent the
16      Defendants a letter and the letter showed an ad that was
17      currently running, currently running for Jason Bond picks, and
18      told them that they need to possess substantiation at the time
19      the claim was made, they must be able to produce that
20      substantiation, and that testimonials are likely to mislead
21      consumers if what is represented is not the typical
22      experience. The letter also informed them that consumers were
23      complaining that they tried to cancel, they went online or
24      they called, thought they cancelled, then they were charged.
25      They asked for a refund and were told, We don't give refunds.
```

1    *You should have cancelled*. Defendants never responded to that

2    letter.  That was in 2017 and Defendants were doing the exact

3    same practices up until the date that we filed, four years

4    later.

5            Between 2017 and 2020 -- and this is all in our

6    filings and the Court has Attachment P to Exhibit 44, the

7    Defendant -- sorry, and all the exhibits -- the Defendants

8    received numerous complaints directly from consumers. They

9    received complaints that consumers were losing money hand over

10   fist in trying to follow their strategies. Strategies by the

11   way, strategies and alerts that our expert opined would

12   uncontested, that those strategies and alerts that they're

13   selling are likely -- consumers are likely to lose money

14   following them. And that's uncontested.

15           They received complaints also that consumers could

16   not follow their trade alerts. They couldn't get in and out at

17   the time that they alerted in their trade alert.  Also not

18   being able to get a refund. Consumers complained over and over

19   again that they were not able to get a refund and that they

20   were not able to cancel. None of these gave Defendants pause.

21   None of them made them change.

22           And in 2018 and 2019, they became aware of two

23   separate Government investigations, from the FTC and the New

24   Hampshire Securities Bureau.  And the New Hampshire Securities

25   Bureau informed them that they were concerned about their

1    advertising practices, that they were using images and giving

2    consumers the impression that these were millionaire traders.

3    And after learning of these investigations and these very

4    specific concerns raised, Defendants did not change anything.

5            In 2019 and 2020 Defendants hired two compliance

6    lawyers. But in fact, one of the attorneys in part was

7    actually hired to help reduce the negative statements about

8    RagingBull that remained to the BBB. And the Temporary

9    Receiver pointed out in his report that he has not found any

10   evidence to date of any meaningful efforts by RagingBull

11   employees -- I'm sorry, to review advertising or marketing to

12   comply with Section 5 and to prevent publication of

13   unsubstantiated earnings claims.  And this is corroborated by

14   the marketing that we presented to the Court up until the time

15   that we filed.

16           But in 2020, the Defendants engaged in particularly

17   egregious behavior that shows these Defendants' true colors.

18   First, the Defendants engaged in active suppression of

19   negative reviews.  They hired a company called Trustpilot and

20   it was a third-party review site.  And Trustpilot warned them

21   that they were flagging negative reviews and finally suspended

22   them because they kept flagging negative reviews even though

23   they were warned. And in fact, after the suspension, one of

24   their employees wrote in an e-mail, *I know we're suspended*

25   *from recording Jason on Pick Reviews for a couple of weeks,*

1    *but we're really not. I have something worked out with our*

2    *rep.*

3            Second and extremely telling about how these

4    Defendants operate is the Defendants lied on multiple merchant

5    account applications regarding prior payment processing

6    termination. Laura, could you pull up those slides, please?

7    Sorry, I just have our paralegal.

8            Your Honor, in January of 2019, Discover Card

9    Network terminated the Defendants due to consumer complaints.

10   In July 2019, Bank of America terminated Defendants' merchant

11   account. In September 2019, Stripe terminated Defendants'

12   merchant account.  Yet in September 2020, Defendants submitted

13   two merchant account applications that falsely state that the

14   company has never had a merchant account terminated. Then in

15   September 2020, Nuvei terminated Defendants' merchant account.

16   In October 2020, Defendant submitted another two merchant

17   applications, falsely stating the company had never had a

18   merchant account terminated. Finally, on October 5th 2020,

19   WePay terminated Defendants' merchant account for a high risk

20   of charge back.

21           Also, on six merchant account applications

22   Defendants gave three different answers about their refund

23   policy. These lies to payment processors, they were not made

24   years ago and they were not run off. These were months before

25   we filed this lawsuit, back to back. And why did they lie?  To

1    get what they wanted. They need payment processors to process

2    consumer payments, regardless of their behavior.

3            Despite all of these warnings and notices,

4    Defendants chose to continue to make unsubstantiated earnings

5    claims and profit off of consumers. And throughout all this

6    time, they're engaged in actively suppressing reviews,

7    aggressively fighting chargebacks, adhering to strict no

8    refund policies, forcing consumers to switch services,

9    upselling them.  That's why some of these consumers that

10   you'll read in their declaration, they spent $8,000, $10,000

11   on subscriptions that kept getting upsold because they

12   couldn't get refunds and failing to provide a simple mechanism

13   to cancel. And reading the internal complaints from consumers

14   to Defendants and Defendants' reactions to the negative

15   reviews is very telling and provides the Court a window into

16   how these Defendants interact with their customers.

17           For example, Bishop responded to a negative review

18   by saying, *Get this removed or tear his argument apart.  We*

19   *can't let stuff like this stand without making him look*

20   *stupid*.  And Jordan Rayna, at one point head of customer

21   support frequently told consumers who left negative reviews,

22   filed complaints with the BBB or attempted to chargeback that

23   RagingBull would do nothing to assist them now.

24           Rather than trying to address consumer complaints

25   year after year, rather than trying to address the high

```
1   chargebacks, rather than trying to address the fact that why

2   are merchants terminating or payment processors terminating

3   our merchant accounts, why are they doing this?  They never

4   addressed those problems. They always chose to stay the

5   course. And they chose to deflect the press over let's try to

6   make this better.

7           THE COURT:  Ms. Robbins, you're not suggesting, are

8   you, that RagingBull, they were snake oil salesmen?  In other

9   words, they never provided any service of any value?  Because

10  that even appears to be refuted by Mr. Keith who is the

11  Receiver who received verified or verifiable reviews related

12  to RagingBull that were quite favorable, indeed 37 percent.

13          MR. ROBBINS:  Your Honor, value does not -- is not a

14  defense -- providing some value to customers is not a defense

15  to the FTC Act. It's not a defense to selling something with

16  deception. As I said earlier, it's a fraud --

17          THE COURT:  But it goes to net impression. I mean,

18  doesn't it go to net impression that you're going to have to

19  establish?

20          MR. ROBBINS:  Your Honor, if you would indulge me

21  I'd like to play a video clip that I think highlights the net

22  impression that consumers received from these Defendants.

23          THE COURT:  No, I'd like you to answer my question

24  which is, do those 37 percent favorable e-mails that were

25  received by Mr. Keith out of the e-mails of individuals that
```

 1   are seeking refunds negate the negative impression that the

 2   FTC is trying to establish?

 3              **MR. ROBBINS:**  Your Honor --

 4              **THE COURT:**  I mean, I'm not suggesting you can't

 5   win, you know, I'm saying that this is isn't a slam dunk. They

 6   weren't reviled by every single person whom they contracted

 7   services for and I'm asking you to at least concede that there

 8   were a portion of individuals that are out there that praised

 9   RagingBull for what they did.

10              **MR. ROBBINS:**  There are, there are clearly customers

11   who enjoyed Defendants' services or who enjoyed the bullpen,

12   enjoyed the chatrooms. But there's two things with that,

13   though. Number one is that in this kind of situation,

14   consumers don't always know that they've been deceived.

15   Because what's happened is consumers get this net impression

16   that they're likely to make money if they buy these services.

17   That's the whole reason to buy these services is so they can

18   make money in the stock market. And they don't -- consumers

19   don't always know that that's not true. They don't always know

20   that the Defendants don't have substantiation to make those

21   claims, right?  Consumers don't understand that these products

22   may not work for them and if they're not working for them,

23   they don't necessarily understand why.  And so yes, consumers

24   could be happy, but that --

25              **THE COURT:**  But these are 37 percent of individuals

1  who knew about the lawsuit. So if they didn't believe that

2  they were being deceived before or they didn't know they were

3  being deceived before, they didn't know about the scam

4  so-to-speak, these are the folks that wrote in after they were

5  aware of the allegations of fraud against RagingBull and still

6  wrote in to support them.

7      **MR. ROBBINS:**  So Your Honor, like I said, there are

8  going to be customers who enjoy their services. But it isn't a

9  defense though to the fact that they just -- they used

10  deception to get them in the first place. I understand that

11  there are going to be consumers that enjoy their services, but

12  we can't -- it doesn't -- satisfied customers just isn't a

13  defense though, to the FTC Act.

14      **THE COURT:**  No, it's a defense to the extent that it

15  changes the net impression. You know, when this case goes to

16  trial, undoubtedly they will have Dr. Winn or the expert Winn

17  who is going to talk about the demographics. They are probably

18  going to -- and you are going to in turn get your folks,

19  including the 31 affiants.  And I don't know whether or not

20  it's going to be done by statistical sample or what, but

21  that's years down the line. And that's why -- I mean, I

22  understand the power of your evidence, Ms. Robbins. I really

23  do. I mean, I get it. And if indeed that's true, you know,

24  then the Defendants did, indeed, engage in some really

25  deceptive activity that caused a lot of harm to others.  And

```
1    that's why I didn't -- I wasn't really going to the issue of

2    the likelihood of success on the merits. I've read all of the

3    tales and the claims that have been made and, you know, I

4    understand the significance of at least according to the FTC,

5    the material and real misrepresentations and according to the

6    FTC, the real damage that this has caused. And so, I mean, I

7    understand that, but there's a counterpoint to this as well

8    which there are not a small percentage of favorable reviews

9    that were received by the Receiver related to the company's

10   operation.

11          So I interrupted you. I interrupted you, but I don't

12   want you to spend the majority of your time arguing the

13   likelihood of success on the merits. I mean, I get it. It's a

14   real battle of the experts so-to-speak sometimes too. I'm not

15   suggesting that you're going to win on that, I'm not

16   suggesting that you're going to lose, but I'm troubled by the

17   second prong.

18          MR. ROBBINS:  So Your Honor, I think the reason why

19   I wanted to give you that background was because I think that

20   is the lens through which the Court should evaluate their

21   business plan and their business plan going forward. So that

22   is why I wanted to give the Court that background. Because

23   it's not just about any Defendant trying to restart this

24   business. It's about these Defendants, their history, their

25   facts.
```

```
1              THE COURT:  They can't be trusted.
2              MR. ROBBINS:  Well Your Honor, one thing I want to
3     say just about --
4              THE COURT:  No, I'm asking you. From your standpoint
5     your argument is they can't be trusted, Judge.  You know, they
6     can't be trusted to do the right thing under any set of
7     circumstances. Now I presume it would be okay if the FTC or
8     the Government had resources that they could stick an FTC
9     attorney inside RagingBull 24 hours a day, 7 days a week and
10    have real-time monitoring or mirroring of their economic
11    activity. I'm pretty sure that would satisfy the FTC. But the
12    reality is is that the current business model that they put
13    forth even with an independent compliance monitor, RagingBull
14    is going to figure out a way to loop the company. It's going
15    to figure out a way to rip off consumers. Even if they were to
16    begin the process of attempting to make those 1,500 people
17    whole, even if they were to begin the process of paying those
18    31 claimants and affiants who are by the way, not going to get
19    paid for years to come with no guarantee that they're going to
20    get paid now, get paid at all with a fairly strong guarantee
21    that they're going to be receiving refunds and assets within
22    60 days. That's a big contrast between three years and
23    60 days. Especially when Mr. Keith's optimism regarding the
24    financial viability of RagingBull is so dim.
25             MR. ROBBINS:  So Your Honor, before I move into that
```

1    I just want to just point out one thing with the testimonials

2    is that those testimonials were solicited by the Defendants

3    and as we presented in our evidence, some of those were paid.

4    So I think that that, you know, it's just something that I

5    would like to point out to the Court.

6         **THE COURT:**  You're going to sort that out in

7    deposition.  I can't imagine the litigation expenses that are

8    going to be incurred over the course of the next six months to

9    a year. I can't imagine. They're going to want to depose every

10   single one of your affiants. You're going to want to depose as

11   many of the testimonial folks as you can, not to mention the

12   expert witnesses.  I mean, the litigation expenses right now

13   we're probably looking at $10,000 an hour just on the screen

14   alone. That's going to be -- that bill is going to have to be

15   footed by somebody.

16        Okay, go ahead, Ms. Robbins.

17        **MR. ROBBINS:**  But even giving them the benefit of

18   the doubt that they could change, that they could

19   fundamentally change their entire business model, that they

20   could fundamentally change the culture of their company and

21   that they could stop using earnings claims, the Defendants

22   haven't provided any evidence to the Court of a profitable

23   path forward. Because either they use earnings claims which

24   they actually say in their reply that they're going to be

25   using earnings claims, but they fundamentally don't understand

 1    their obligations under the law because they think that

 2    substantiating a handful of trades is substantiation. That's

 3    not. So they think they're going to be going ahead and using

 4    earnings claims in Phase II, but they don't have

 5    substantiation that a typical consumer can make those

 6    earnings. So the path forward is either we go ahead and use

 7    earnings claims and that's what they base their profitability

 8    on, based on historic profits which was all based on deceptive

 9    earnings claims, and their -- the principals' tenure at the

10    company.  And if they can't use deceptive -- so those two

11    metrics.  Their past profitability and their experience are

12    irrelevant to an analysis in a world in which they can't use

13    earnings claims. And they have not provided to the Court what

14    value proposition are they going to give to consumers that are

15    going to convince consumers to spend thousands of dollars on

16    their services.  Services that uncontested our expert has said

17    are not likely to make consumers money. What value proposition

18    have they put forward?  None.  So why --

19              **THE COURT:**  Well, there are consumers, there are

20    customers out there that are willing to pay for their

21    services. I don't think that there's any dispute about that.

22              **MR. ROBBINS:**  But Your Honor, they have only ever

23    sold their services by telling consumers they're going to make

24    a lot of money.

25              **THE COURT:**  Right, but again, these same consumers

1   and customers know about this lawsuit.  They know about the

2   lawsuit and they're still promoting and praising the services

3   that they're receiving. You seem to think that the customer is

4   duped. I'm saying this 37 percent that Mr. Keith discovered

5   are not duped at all. They're going in eyes wide open and they

6   continue to pay for the services.

7           **MR. ROBBINS:**  Well Your Honor, first of all we don't

8   know from that 37 percent how many customers are even active

9   customers or do they just get automatically renewed and not

10  know that their service has been renewed?  That number is not

11  saying -- is not indicative that there are 30,000 people who

12  are happy. They submitted 200 solicited testimonials, but we

13  don't have 30,000 e-mails from customers who said we are

14  happy, we want to stay.

15          And Your Honor, if the Defendants don't

16  fundamentally understand their obligations regarding using

17  earnings claims, then how can we expect them to move forward

18  and do this lawfully?  And if they're not using earnings

19  claims, then, you know, maybe they keep -- maybe they keep

20  30,000 consumers. But what happens when they move into Phase

21  II and they can't use earnings claims?  Then what about those

22  profits after Phase II after the 60 days?  They haven't --

23  they haven't put forth any evidence to show that they will be

24  profitable. Their business plan is based on their past

25  profits, their historic profits which was based on deceptive

1    earnings claims. They have not shown what other value

2    proposition they're going to put forward and why are consumers

3    going to in the future, not the existing, but in the future,

4    why are they going to purchase these services?

5              **THE COURT:**  What is the fear in allowing them to

6    try?

7              **MR. ROBBINS:**  Well Your Honor, if the Court would

8    like them to try, then --

9              **THE COURT:**  Yes, the Court would like them to try.

10             **MR. ROBBINS:**  It is the FTC --

11             **THE COURT:**  Yes, I don't -- go ahead.

12             **MR. ROBBINS:**  Your Honor, then none of the money

13   that is preserved should be used to fund this business. The

14   Defendants -- in OTA, the Court did allow a monitor, but still

15   kept an asset freeze and preservation order in place. And in

16   that instance and in this instance too, the Defendants can

17   turn to MFA -- they're not a part of this case anymore -- for

18   money.  They can turn to Alan Marshall.  They can turn to

19   their spouses.  They can turn to other investors.  They can

20   get a loan.  They can get jobs. They can do things to fund

21   their restart.  They do not have to use money that should be

22   preserved for consumer redress.

23             **THE COURT:**  But Ms. Robbins, those monies are going

24   to be consumed anyway. Those monies are going to be gone

25   because the Receiver -- and this is no criticism of Mr. Keith

1       or Mr. Saudek, but they're clipping at half a million dollars

2       a clip. So for the Receiver to be in place for three years,

3       we're talking about millions of dollars.

4               **MR. ROBBINS:**  Well Your Honor, the Receiver has

5       access to the corporate funds. But the Defendants have taken

6       $55 million out of this company and are sitting on tens of

7       millions of dollars. So they don't need to use the

8       Receivership funds to pay for the restart of this business.

9               **THE COURT:**  And there will not be any Receivership

10      funds in three years from now if this freeze in Receivership

11      stays in place. The way money is being spent right now with no

12      money coming in, there won't be any corporate assets to pay

13      any of the claims. But if they're able to operate in some

14      fashion, they're going to be -- your affiants will get paid.

15      You know, there may be some other folks that are going to get

16      paid sooner rather than waiting three years for a 4 or $5,000

17      payout.

18              **MR. ROBBINS:**  Well, to be clear though, the

19      Defendants have not in the order that they proposed to the

20      Court, they have put in that order that the $10 million isn't

21      supposed to be used for consumer redress. It's supposed to be

22      used for compliance.  And there is no mechanism in that order

23      as it stands for a redress to consumers. In fact, they say

24      that they're going to refund consumers only on services that

25      have a refund option. None of their services have refund

1     options. So they're effectively putting in an order that they

2     don't have to give refunds to anybody.  That's not equitable

3     for consumers.

4           So in this case, we have 196 million dollars of

5     harm. They want to redress 31 consumers.  That's not

6     equitable. And the public equities outweigh the private ones.

7     And so there has to be a way to preserve assets for consumers

8     in this case. If the Court is going to find that we are likely

9     to succeed on the merits because we have proven our case that

10    we have a fair and tenable chance of success then there has to

11    be a mechanism by which consumers are redressed. And in this

12    situation, like I said, the Defendants have access.  MFA is an

13    owner of the company. They're not under order. Alan Marshall,

14    their spouses. They can get a private investor. There are

15    other ways that they can get money into this company to try to

16    move forward and see if they can be profitable. The FTC is

17    doubtful that they will be able to be profitable because if

18    they use earnings claims, they're not going to have

19    substantiation and if they don't use earnings claims, it's

20    unclear that they have a path forward.

21          But in any event, the Defendants' money should be

22    preserved and the Defendants should have to use money

23    elsewhere to restart their company.

24          **THE COURT:**  Okay.

25          **MR. ROBBINS:**  A couple points just about their

```
 1      order.  I just want to point out to the Court that we think
 2      that the monitor should at least be familiar with advertising
 3      law and we don't believe that the one that they have put
 4      forward does have that type of expertise. The FTC case that
 5      that monitor was involved in they were not tasked with
 6      reviewing ads and earnings claims.  So we think it would be
 7      certainly equitable or efficient to have the Temporary
 8      Receiver be appointed as monitor, but also we are willing to
 9      work with the Court if the Court wants a third-party to be
10      selected. But the monitor also needs to have full power to
11      engage in undercover purchases, to subpoena documents and
12      otherwise engage in discovery. The monitor needs the ability
13      to monitor the financial stability of the company going
14      forward to determine whether or not the company is profitable
15      going forward. And then also the FTC should have access to and
16      ability to consult with the Monitor regarding their compliance
17      review.
18               THE COURT:  Wouldn't that be part of the compliance
19      monitor's -- first, wouldn't that be part of the compliance
20      monitor's report to the Court that would be subject to
21      approval before they even went into Phase I?  So in other
22      words, it's my understanding it's broken into two phases,
23      Phase I and Phase II. They don't get to advertise at all until
24      they get out of Phase I.  And they don't get out of Phase I
25      until the compliance monitor submits to me a compliance report
```

1    detailing what they have done and how they are going to

2    maintain a lawful business and advertising practices.  And

3    then if I'm individually satisfied -- and I presume that the

4    FTC at some point in time is going to be a recipient of the

5    monitor's report and be able to sort of weigh in .  You know,

6    I don't want to have little mini-trials every 60 days, but the

7    FTC is not going to be left alone and the monitor is not the

8    sole decider. I am the sole gatekeeper on whether or not they

9    move to Phase II. And I'm the sole keeper on whether or not

10   they go back to Phase I.

11           **MR. ROBBINS:**  Your Honor, I was just merely pointing

12   out that in their order they did not provide for that because

13   they do have specific provisions of the monitor's duties. But

14   I agree with Your Honor.

15           The other point I wanted to make about the order is

16   that Sherwood Ventures and Bond, LLC are left out of the order

17   and those are part of the common enterprise.  And they have

18   not argued that they are not part of the common enterprise.

19   That hasn't been part of their briefing.  So the FTC believes

20   that they should be routed back into that.

21           **THE COURT:**  All right, I'll have the Defendants

22   address that collectively to the extent that Sherwood should

23   be a part of the court order, as well as Bond Enterprises. It

24   seems to me that that might be appropriate and would go a long

25   way into continuing to bolster the Court's confidence that all

```
 1    parties right now that are subject to this are free and that
 2    may end up avoiding any sort of potential shenanigans that the
 3    FTC may be concerned about.
 4            MR. ROBBINS:  Your Honor, my colleague, Mr. Kim, if
 5    you could just allow him to just address the Kyle Dennis
 6    Defendant.
 7            THE COURT:  Okay, sure.
 8            MR. ROBBINS:  We haven't talked about him at all,
 9    but if we could have him just address briefly points regarding
10    the equity for him.
11            THE COURT:  Okay.
12            MR. ROBBINS:  Thank you.
13            MR. KIM:  Good morning, Your Honor. Can you hear me
14    okay?
15            THE COURT:  Where are you?  I can hear you.
16            MR. KIM:  I'm sitting down, but I can easily get up
17    to the podium if you'd like.
18            THE COURT:  No, that's all right.
19            MR. KIM:  Okay, thank you.  So just quickly, Your
20    Honor, I'd like to address the FTC's claims against the
21    Defendant, Kyle Dennis, and why the entry of the preliminary
22    injunction is necessary and proper as to Mr. Dennis.
23            I don't believe the order that you received last
24    night from RagingBull takes into account Mr. Dennis in the
25    order.  So I'm not sure if there is going to be an order
```

1    coming from Mr. Dennis's counsel.  But addressing the balance

2    of the equities as to Mr. Dennis, I think it's also important

3    not to lose sight of Mr. Dennis's role that he played in

4    perpetuating the RagingBull scheme and his unclean hands in

5    this matter. Here are the facts that cannot be disputed.

6         Mr. Dennis ran the BioTech Breakouts services. His

7    name and face are featured on all the marketing to this brand.

8    Mr. Dennis narrated his own sales videos. In the videos, Mr.

9    Dennis claims consumers can make substantial income from

10   trading, consistently make 100 percent or more in profits

11   following his services and that they can just sit back and let

12   the profits roll in.

13        Mr. Dennis reviewed and provided content for their

14   sales presentations that he personally delivered in his sales

15   webinars. I'd like to show you one of his screen captures a

16   consumer of ours took at one of his sales seminars. Laura, can

17   you pull up OX-1, please?  Sorry, Your Honor.

18        **THE COURT:**  That's all right.

19        **MR. KIM:**  So here are -- this is a screen capture

20   from Mortal Lock.  In the first slide you'll see in the second

21   bullet -- and this is Mr. Dennis's face in the lower right

22   corner.  So he's sitting there showcasing this slide and

23   talking at the same time to consumers.  And there are

24   thousands that are attending these webinars.  I guarantee

25   you'll make more than $1,999[sic] with this one trade. I think

 1     that's in the second bullet.

 2             If you'll go to the second slide, these are trade

 3     examples that Mr. Dennis provided for his own presentations.

 4     You'll see that these are what appear to be his supposed wins

 5     on certain trades that he made for this particular service.

 6             Laura, if you can go to OX-2. Let me just add --

 7     show the entire document. Thank you.  Can you scroll down to

 8     the bottom?  I'm sorry, the second page of this document. So

 9     this is Mr. Dennis in an e-mail -- this is in the record, Your

10     Honor. And he's writing to Strikepoint Media which is an

11     outside marketing agency and he's telling them how to design

12     these slides that he's going to be using for his presentations

13     that he's going to deliver to consumers.  And Mr. Dennis says,

14     *I want the focus to be on what I made, that I made a killing*

15     *in stocks and now options which could bring even more in*

16     *profits. I'd like to break down the ignite formula in separate*

17     *slides*. So here he's giving creative selection in one of his

18     many slides that he uses in his presentations.

19             I think you'll hear later from counsel for Mr.

20     Dennis that he didn't have any role in the marketing or the

21     advertising of his product, but I think the evidence that

22     you'll see shows exactly the opposite.

23             If you go to the first page, Laura, Mr. Dennis

24     writes again to Strikepoint and to others at RagingBull, the

25     marketing folks, he reminds them, *this launch for us is going*

1    *to be really important so just want to make sure we kill it on*

2    *the presentation.*

3              Laura, can we play the Dollar Ace sales video?  It's

4    a short clip. It's at PX 44, Attachment C.

5              **(Whereupon the video was played.)**

6              **MR. KIM:**  Thank you, Laura. So we took Mr. Dennis's

7    deposition two weeks ago, Your Honor, and nothing he said in

8    his deposition controverts any of the critical evidence

9    demonstrating his unclean hands. The deposition did confirm

10   that Mr. Dennis, like all the others at RagingBull, lack

11   complete substantiation for his earnings claims. And Mr.

12   Dennis's reckless and unsubstantiated earnings claims have

13   cost substantial harm to consumers.

14             Just a couple of examples from the record.  Ugo

15   Diribe, he's at PX 7 said in his declaration, *Carl Dennis said*

16   *that his Option Rocket service comes with what he called*

17   *Mortal Lock trade alerts and he guaranteed a 400 percent*

18   *return on his Mortal Lock options trade. He said that for that*

19   *night only, the services would be discounted to $1,997.* Later

20   on he says in his declaration*, I lost approximately $24,000*

21   *trying to follow Jeff Bishop and Carl Dennis's alerts.*

22             E.C. Wells, PX 40.  *Dennis claimed that his service*

23   *would find momentum stocks at biotech companies doing*

24   *pandemic-related drug development.  I think he called these*

25   *coronavirus picks. I have incurred trading losses of at least*

1    *$10,000 following Raging Bull's stock picks, trade alerts, and*

2    *watch lists.*

3         Gary Walton, he was mentioned earlier during my

4    colleague's presentation. *During the webinar, Carl showed us*

5    *that he made 1000 percent returns on trades and he showed*

6    *clips of tweets and messages he said he received from other*

7    *subscribers who were successful using his service. I lost*

8    *approximately $20,000 trading using Kyle's services.*

9         Donnie Durham:  *Kyle hyped up another service called*

10   *Mobile Closer.* And this is a service that Mr. Dennis had I

11   believe launched in August of 2020.  It was a couple months

12   before our case was filed.  *Kyle said he won every day in*

13   *August 2020 and started this service in September of 2020.  I*

14   *bought this service as well.  I spent approximately $20,000 on*

15   *RagingBull's subscriptions and I lost approximately $50,000*

16   *using RagingBull's services' alerts and strategies.*

17        And these consumer experiences, Your Honor, are not

18   anomalies. When consumers tried to seek Mr. Dennis's -- when

19   consumers follow these alerts, they end up losing money and

20   when consumers try to seek Mr. Dennis to get out of the hole

21   that he's put them in, he's nowhere to be found. He's very

22   difficult to even track down for a consumer.  He doesn't even

23   answer e-mails if consumers are writing to him, for the most

24   part. And Mr. Dennis's deceptive marketing of the services

25   have caused over 45 million in consumer harm, just from the

 1    BioTech brand of services that he runs.

 2        **THE COURT:**  Let me ask you, Mr. Kim, is there

 3    anything during the course of your discovery with Mr. Dennis

 4    that revealed that he is a principal?  I know Mr. Dennis has

 5    indicated through his pleadings that he's just an employee of

 6    RagingBull. Is there anything that has been revealed in your

 7    discovery that contradicts that particular assertion?

 8        **MR. KIM:**  So Your Honor, there was a brief period of

 9    time where Mr. Dennis was earning profits not just on his own

10    products that he was selling, but also on other products --

11    other newsletters that RagingBull was offering. We believe

12    that he discontinued that arrangement because he was able to

13    make more money from his own services. That was in late 2019

14    to early 2020.

15        In terms of his formal title, he doesn't hold a

16    formal title except when he first started with the company he

17    held himself out as the co-founder and director of BioTech

18    Breakouts. Later on he's I believe changed his title to or had

19    an employment agreement with the company and the employment

20    agreement also does give him the right to review and approve

21    the marketing materials that bear his image and his name,

22    which indicates that he has the ability to control the

23    marketing from withholding consent or disapproving of any

24    marketing materials that uses his name or his image that

25    contain deceptive claims. In terms of --

```
 1              THE COURT:  I don't know, I'm just trying to -- is
 2      it the FTC's position that he is now an employee or a
 3      principal?  Or I don't --
 4              MR. KIM:  I'm not sure exactly.
 5              THE COURT:  Does he get a salary?
 6              MR. KIM:  He's not paid a salary, he's paid
 7      commissions based on his sales of his products.
 8              THE COURT:  Okay. And who pays his commissions?
 9              MR. KIM:  RagingBull does, Your Honor.
10              THE COURT:  And does he pay himself or does
11      RagingBull pay him?  He gets a check from RagingBull and he
12      deposits that check in the account?
13              MR. KIM:  That's correct, Your Honor.
14              THE COURT:  He can't sign his own check to himself
15      for a commission?
16              MR. KIM:  I don't believe he can.
17              THE COURT:  Okay, because if he can sign his own
18      check off of RagingBull, then that indicates that he might be
19      a principal. If somebody else has to sign that check that he
20      cashes, then that is more suggestive that he might be an
21      independent contractor or an employee.
22              MR. KIM:  Okay. The law does say that whether you're
23      a principal or an owner or an executive or an employee, you're
24      still held liable if you directly participated in the illegal
25      acts and also --
```

```
 1          THE COURT:  I'm not contesting that.  I need to know
 2   what his sort of station in life is in the pecking order over
 3   at RagingBull. And it's been suggested that it may, indeed,
 4   make a difference that he is an employee as opposed to a
 5   principal. I know that you're putting forth the legal context
 6   which would be addressed probably at some point in time when
 7   we deal with the merits in this case in the event that we go
 8   to trial or, quite frankly, in a Motion for Summary Judgment
 9   which will be at some portion of time at the conclusion of
10   discovery when I imagine Mr. Schwartz is satisfied that he is
11   going to be prepared to try to move for judgment in this case.
12   Just like FTC let out MFA, presumably because MFA demonstrated
13   satisfactorily to FTC that they should not be a party to this
14   litigation and that FTC doing the right thing said, you're
15   right.
16          So I presume at some point in time Mr. Schwartz is
17   going to attempt to use his powers of persuasion, whether or
18   not it's in the middle or at the end of discovery, through
19   oral presentation to you or through pleadings that I will end
20   up deciding, to get his client removed from this litigation
21   prior to trial.
22          But I cut you off, Mr. Kim, because I had a
23   question. So feel free to proceed.
24          MR. KIM:  Well, I was just wrapping up the
25   presentation. I think I just wanted to address that point
```

1    because it has been raised by Mr. Dennis's counsel that his

2    status as an employee as a non-principal matters. I doesn't

3    matter under the law and it shouldn't matter also under the

4    balance of equities, Your Honor. Mr. Dennis made over

5    $13 million and the money he made was based purely on the

6    effectiveness of his deceptive marketing. It's not based on

7    the trading performance or success of his students.

8           Now the preliminary injunction order which we

9    haven't seen as to Mr. Dennis, we believe it's necessary in

10   order to ensure that Mr. Dennis during the pendency of this

11   litigation does not continue to make the same unsubstantiated

12   earnings claims and cause further harm. We also believe that

13   the asset preservation order is necessary to ensure that some

14   of the money that Mr. -- or the money that Mr. Dennis has

15   received, his ill-gotten profits, are secured so that there's

16   some meaningful redress that could be provided to consumers at

17   the conclusion of this litigation.

18           **THE COURT:**  I think, Mr. Kim, and Mr. Barger is

19   probably going to address this.  He's probably got a 15-page

20   list of things that he's going to end up addressing, but I'm

21   going to add to that because, Mr. Kim, it's my understanding

22   at least that the Court will have the ability to roll back the

23   entire preliminary injunction, if necessary, if the monitor

24   comes up and says well A) they can't advertise but in the

25   event that there's any illegal advertisement by Mr. Dennis,

1  that to the extent that he remains with RagingBull, that that

2  will be brought to my attention by the compliance monitor who

3  will then in turn -- who will then in turn either recommend

4  that I allow them to go to Phase II or not recommend.  And I'm

5  afforded the discretion either way.  And I imagine I'm going

6  to get a whole series of pleadings from individual parties.

7  I'll probably have to put a page limit on you folks, you know,

8  as to whether or not I should or should not approve going into

9  Phase II. But I think that there may be some safeguards in the

10  proposal that's made by RagingBull to address some of those

11  issues, Mr. Kim. What do you think?

12        **MR. KIM:**  Well, Your Honor, Mr. Dennis is curiously

13  absent from the proposed order that counsel for RagingBull has

14  submitted. Now if Mr. Dennis decides to leave RagingBull but

15  join another outfit but continue to make the same

16  unsubstantiated earnings claims that he has been making with

17  RagingBull, that's a problem for us and that's why we think --

18        **THE COURT:**  I am certain you will take that up.  And

19  I believe that it probably wouldn't be in Mr. Dennis's best

20  interest to do that given the torment of litigation that

21  has gone on over the course of the last 90 days.  Basically

22  the FTC came in and rocked everyone's world.  And I'm not

23  saying they did it inappropriately, but that would be

24  extraordinarily foolish for an individual to come in not once,

25  but twice, and then have a related case with me.  Because

1    you're going to put down a related case notation in the event

2    that that ends up occurring.  And that case will come directly

3    to me and rightfully so.

4         **MR. KIM:**  Well one other thing, Your Honor, is that

5    the injunctive -- the conduct release provisions, Section 1

6    and 2 of the proposed order that we've submitted or that

7    RagingBull has submitted just requires nothing more than the

8    person to comply with what's already the law.  It doesn't

9    require anything more than that.  So we don't think that it

10   should add any additional burden to Mr. Dennis to just have to

11   comply with that, Your Honor, for the remainder of this

12   litigation, especially if his intentions are not to make the

13   substantiated earnings claims.

14        **THE COURT:**  We'll see whether or not, Mr. Dennis,

15   Mr. Schwartz, is going to say no, he doesn't want to be added

16   to any court order.  But nevertheless, I will certainly make

17   that inquiry and make a determination as I end up seeing fit.

18   You know, of course the downside is that -- well, never mind.

19   I'll reserve on that.

20        Go ahead, Mr. Kim.  Have you finished?

21        **MR. KIM:**  Yes, Your Honor.  I'd like to if there's

22   any time for rebuttal later, I'd like to be able to address

23   that based on what counsel for Mr. Dennis raises.

24        **THE COURT:**  We're going to do a brief period of time

25   for rebuttal as well for the FTC, but it is going to be brief

 1    because I know that you guys have presented a fulsome case

 2    both on paper and today.

 3            So all right, Mr. Barger goes first and then I'll

 4    hear from Mr. Dennis's counsel.

 5            **MR. BARGER:**  Yes, Your Honor, thank you. Your Honor,

 6    at the risk of being presumptuous, could we have a small sort

 7    of courtesy break?

 8            **THE COURT:**  Absolutely not.  I'm ready to go. No, we

 9    could do -- why don't we do this?  Can everyone stay on the

10    line?  Just keep the lines open.  Understand that I will

11    forewarn counsel these are hot mics during the course of the

12    break.  So we will take ten minutes and come on back.

13            Mr. Barger, I'm going to give you about -- we'll

14    take about ten minutes.  Mr. Barger, I'll give you until about

15    12:30.  Then the FTC will have until about 12:45.  I keep

16    forgetting Mr. Schwartz. I just keep forgetting him.  I'll

17    give Mr. Schwartz about ten minutes after you, Mr. Barger. I

18    don't think there's a whole lot that you need to add, Mr.

19    Schwartz. And then I will give FTC another 15 minutes and then

20    we'll wrap this up, all right?  Okay.

21            **MR. MALINA:**  Your Honor, just one question.  This is

22    Steve Malina for the RagingBull Defendants.  A lot of matters

23    have been addressed so far and the Court has asked certain

24    questions. Just for our focusing on what it is that you might

25    want to hear from specifically from the RagingBull Defendants'

1   counsel, maybe you could give me -- you know, you've spoken

2   about the balance of equities and we'll certainly address

3   that, but there's a whole host of other matters that have been

4   addressed so far. Is there anything specific that the Court

5   would like us to address?

6          **THE COURT:**  Correct. I want to -- I'd like to get a

7   little bit more granular on the details of compliance to

8   provide assurances that the company is not going to be lewded.

9   I'd like to make sure that we shore up the $10 million in

10  escrow that will be provided. I'd like additional proposed

11  recommendations about who the monitor will be, including

12  whether or not Affiliated Monitors can fulfill the expertise

13  required, because I think Ms. Robbins makes a very good point.

14  And I'm not certain at this point in time given where we are

15  that Mr. Keith -- and it's no lack of respect to Mr. Keith,

16  but I think right now we need to get to a point where we move

17  to another monitor because of sort of -- we need to get to a

18  point where there seems to be in reading the pleadings, not a

19  lack of trust, but it appears to be that Mr. Keith was

20  proposed by the FTC.  And so I'm not quite sure whether or not

21  we may end up wanting to have somebody a little bit more from

22  the parties from a compliance standpoint as opposed to coming

23  in as a Receiver standpoint.  Because there are a lot of --

24  I'd like to -- if I'm going to rule in RagingBull's favor, but

25  tax them with a fairly significant order that they're agreeing

1    to that's subject to the clause and enforcement of federal law

2    and the rules, I'd like to give them a clean look from a

3    monitor, but I need a monitor with experience.  And ideally,

4    I'd like both sides to agree to somebody in the short term.

5            So those are the things that I'd like to see

6    addressed and we'll take our ten minutes and so why don't we

7    say we'll come back here at 11:45, all right?  Thank you.

8            **(Recess was taken.)**

9            **THE CLERK:** This Honorable Court now resumes in

10   session.

11           **THE COURT:**  Okay, all right. Mr. Barger, are you

12   prepared to proceed, sir?

13           **MR. BARGER:**  Yes, Your Honor, I am.  And I say we

14   are because it is a group effort. I'm sure all of us who are

15   litigators, we like this because we like to talk, but I'm

16   going to save some of my time for my subject matter expertise

17   or subject matter expert colleagues.

18           If I could just make two observations and then I'd

19   like with the Court's permission for Mr. Berg to start off

20   with the discussion of the compliance plan and all the bells

21   and whistles that go with that that will hopefully address

22   some of the concerns raised by the FTC and the Receiver and

23   especially the Court.

24           But my two observations are one, the proposed

25   monitor and the proposed preliminary injunction order that

1    we've submitted provides for extraordinary transparency and

2    insight and overview by the monitor. We believe the one we

3    proposed is competent and Mr. Berg can address that.  And the

4    only second point I wanted to address is while there are many

5    factual representations and arguments that we made which we

6    disagree, we're trying to focus our efforts on those matters

7    that I think the Court seems to be most interested in today.

8         And I was struck by one of the questions the Court

9    asked earlier of I believe the FTC.  And that was, if you

10   would ask any person who really wants and truly wants a refund

11   whether they want it now or within 60 days or wait for

12   three years to see if there's possibly any money leftover with

13   a company that's shut down and involved in litigation, I have

14   no doubt that those people wanting refunds would prefer an

15   option that involves the business legally operating and

16   hopefully generating significant income to help redress those

17   who truly deserve redress.

18        So that is I think our focus and I hope I haven't

19   stolen anyone else's thunder.  And so with the Court's

20   permission, if Mr. Berg could proceed.

21        **THE COURT:**  Mr. Berg, during the break and I'm going

22   to jump on you right away because I'm just really interested

23   in figuring this out. With regard to the compliance monitor,

24   there's a provision in the proposed injunction that RagingBull

25   is agreeing to that the compliance monitor has the ability to

1    evaluate refund requests and make a determination on whether

2    or not they are fully or partially reimbursable. However, I

3    didn't see any language in there, but of course RagingBull has

4    the right to deny refunds to individuals whose contract did

5    not call for refunds. I did not know whether or not the

6    compliance monitor would have the ability to recommend and/or

7    give refunds to a compliance monitor -- to a consumer who

8    sought a refund, but the contract may call for no refunds.

9    But nevertheless, the monitor thought that there was some

10   circumstances which required a refund, whether or not

11   RagingBull would be obligated to turn that over according to

12   the current proposed order.

13          And then with that, Mr. Berg, I'll let you do your

14   thing and put it in whatever package you want to put it in.

15          **MR. BERG:**  Thank you, Your Honor.  And in fact, the

16   refund request is going to be addressed by one of our

17   colleagues in a subsequent presentation, but I do want to take

18   the opportunity to go through the operation of the proposed

19   order and the proposed business plan as it relates to the

20   compliance issues.

21          Your Honor, the essential issue before the Court is

22   whether there can be a mechanism to ensure that the Defendants

23   will operate in a lawful manner pending resolution of this

24   case on the merits, that preserves or enhances the

25   availability of redress funds if the FTC were to ultimately

1    prevail, or whether the Defendant should be compelled by

2    operation of the Receivership and the asset freeze currently

3    under the TRO to suspend its business operations. We think the

4    clear answer to the first question is yes, and that the

5    balancing of the equities in this case strongly weighs in

6    favor of that.  The compliance portion of the proposed

7    business plan and the proposed order have been carefully

8    crafted to achieve that objective.

9           Without rehashing everything that's been set forth

10   in the papers and our briefs that have been submitted to Your

11   Honor, I'd like to address two issues that we believe are

12   particularly relevant to Your Honor's consideration today.

13          First, I want to highlight the several aspects of

14   the operation of the compliance portion of the proposed

15   business plan which provides the assurances and certainty that

16   the Defendants will operate in a lawful manner going forward.

17          And second, I want to explain to the Court the

18   structure of the proposed order that we submitted yesterday

19   and how it implements a compliance portion of the proposed

20   business plan.

21          We heard this morning the criticism coming from the

22   FTC on the proposed business plan and proposed order. The FTC

23   criticizes the Defendants' business plan because it claims,

24   simply stated, the Defendants aren't trustworthy. We disagree

25   strongly with that position.  But having said that, this need

 1    not simply be a matter of trust because the Defendants'

 2    compliance with the law going forward will be verified and

 3    certified by a court-appointed monitor who has established

 4    expertise in the relevant regulatory compliance areas.  And

 5    the Receiver criticizes the business plan because it claims it

 6    lacks sufficient specificity, but we're happy to provide

 7    whatever additional specificity the Receiver needs, which in

 8    fact, we offered repeatedly to do with the Receiver, but

 9    frankly he wasn't interested in hearing from us -- or whatever

10    additional specificity that Your Honor may require.

11          Our submission was not a 100-page business plan that

12    Your Honor cautioned us against filing, but we do believe it

13    has sufficient specificity and detail to both implement and to

14    provide a high level of confidence to the Court and to the FTC

15    that the Defendants will operate in a lawful manner going

16    forward. But in a sense, that specificity shouldn't matter

17    much because unless the Defendants are in compliance and

18    remain in compliance with the Court's order as we have

19    proposed, the compliance monitor has absolute veto authority

20    over both the restarting and the continuation of any of the

21    Defendants' revenue-generating operations.

22          Notably, the compliance proposal that we made goes

23    well beyond what the FTC has previously approved and put in

24    place in numerous cases in terms of compliance monitoring,

25    auditing, and certification. Here, the compliance monitor will

1    have absolute veto authority in terms of the Defendants'

2    regulatory compliance and the Defendants' ability to continue

3    operating through the PI compliance period which will remain

4    in effect until trial on the merits. No prior FTC order gives

5    a compliance monitor the ability to control the regulatory

6    compliance conduct of the company under order that the

7    proposed order and the compliance portion of the business plan

8    does here.

9        There are four relevant features of the compliance

10    portion of the proposed business plan and proposed order that

11    I'd like to highlight for Your Honor's attention and

12    consideration. First, no consumer facing communications of any

13    type, in particular advertising and marketing materials, can

14    be used at any time by the Defendants that have not been

15    previously reviewed, assessed, and approved by the

16    Court-appointed compliance monitor.  In fact, every aspect of

17    Defendants' consumer facing activities. Its refund practices,

18    its complaint receipt and resolution activities, its sales

19    activities must have the prior express approval by the

20    compliance monitor before being put in place.

21        The compliance monitor has broad discretion to

22    determine what is required based on the monitor's established

23    expertise in advertising and marketing law.

24        Second, that the Defendants cannot engage in any

25    revenue-generating activities unless and until their

1    regulatory compliance is certified by the monitor to this

2    Court. And after restarting their revenue-generating

3    operations following the certification of their regulatory

4    compliance, the Defendants' continued operations are subject

5    to ongoing certification by the compliance monitor.

6            Moreover, the compliance monitor at any time can

7    suspend the Defendants' revenue-generating operations by

8    decertifying their regulatory compliance without the need for

9    the Court's intervention. As stated previously, the compliance

10   monitor has a functional veto power over the continuation of

11   revenue-generating activities by the Defendants.

12           Third, the operation of the compliance monitor and

13   by extension, the revenue-generating operations of the

14   Defendants is subject to ongoing and regular oversight by the

15   Court through reporting and as needed, consultation with the

16   Court. The compliance monitor is an agent of the Court and is

17   not subject to either the control or any influence by the

18   Defendants.

19           **THE COURT:**  Let me ask you, Mr. Berg, I just want to

20   cut you off real quick on this.  This presentation that you're

21   giving me is a sort of for lack of a better term, a client

22   intent regarding the interpretation of the document. So in

23   other words, if somehow, some way this document which was

24   created by RagingBull and its principals were to somehow have

25   some sort of vague meaning or interpretation in some

```
 1       litigation, we would rely upon the representations of counsel
 2       today in the interpretation of any particular term or
 3       condition. Is that accurate?
 4             MR. BERG:  Your Honor, I think the details that are
 5       relevant to the compliance by the Defendants, their regulatory
 6       obligations, are pretty clearly and pretty specifically set
 7       forth in both the business plan and the proposed order. The
 8       two work hand in hand.
 9             THE COURT:  Fair enough.
10             MR. BERG:  And I don't think -- you know, with all
11       due respect, I don't think it turns on interpretation, I think
12       it turns on an understanding of how the proposed order works
13       in conjunction with the business plan as we proposed for the
14       Court's consideration.
15             THE COURT:  All right, very well. It was just a
16       question of, you know, if in the event that I was to agree
17       with you, I don't want any misinterpretation about well, we
18       really didn't mean that and we really meant this. And so that
19       is why I only raised that.  And I raised that because there
20       appears to be a fairly significant error of suspicion on
21       behalf of the other side in this case that I'm just doing the
22       best I can to try and clear up. And by the way, this is
23       precisely what I wanted to have happen before the hearing.
24             MR. BERG:  Your Honor, that point is very well taken
25       and we were actually very anxious to have the opportunity to
```

```
 1        sit down with the FTC and sit down with the Receiver to put

 2        forth a business plan with a proposed order that we could then

 3        respond to the issues and the requests made by the FTC and the

 4        Receiver.

 5                  THE COURT:  Understood.

 6                  MR. BERG:  Specifically if there was a need for

 7        greater specificity.  And there may yet be need for additional

 8        specificity notwithstanding the fact that there is significant

 9        detail in both the business plan and the proposed order.  But

10        we were happy --

11                  THE COURT:  Very good.

12                  MR. BERG:  --to have that discussion, but that

13        discussion unfortunately didn't happen.

14                  THE COURT:  Understood.

15                  MR. BERG:  The fourth point I wanted to make with

16        regard to the business plan and the proposed order is that

17        they require the Defendants to establish and implement

18        significantly enhanced compliant structures and mechanisms to

19        satisfy their regulatory compliance obligations. This

20        encompasses every asset of their consumer facing activities.

21        It also imposes self-monitoring, self-auditing,

22        self-reporting, and internal assessments of compliance risk as

23        a part of its ongoing regulatory compliance and to assist the

24        compliance monitor in assessing and certifying the Defendants'

25        regulatory compliance.
```

1          In addition, the proposed order requires the

2     Defendants to fully cooperate with the compliance monitor in

3     discharging his or her review, assessment, approval and

4     certification responsibilities. Including providing unfettered

5     access to all relevant documents, data, materials and

6     personnel both within the Defendants' operations and outside

7     relevant service providers and associated entities.

8          Now if I can turn to the actual proposed order in

9     terms of its structure and content. The proposed order is

10    based on several recently adopted commission and court orders

11    in the relevant area. As reflected in previous submissions,

12    there's ample authority in the OTA, in the Herbalife, in the

13    Western Union, in Telestar FTC cases for this type of

14    compliance monitoring and structure. We did this because we

15    believe that it was important for Your Honor to know that

16    there is well-established precedent supporting the proposals

17    we've made and details that we have provided.

18         As previously noted, our proposed compliance monitor

19    is the same one that the FTC selected in the Herbalife case.

20    That compliance monitor having been selected by the FTC after

21    reviewing the applications of more than two dozen applicants,

22    including a number of prominent national law firms. If, in

23    fact, it's not acceptable to the FTC and to the Court, we have

24    in the proposed order a mechanism whereby mutual agreement of

25    the parties, again with the approval of the Court, that an

1    alternative monitor could be selected. We respectfully suggest

2    to Your Honor that Affiliated Monitors Incorporated does have

3    very adequate expertise not only in the area of advertising

4    and marketing law both at the FTC level and in the state level

5    in terms of state cases where baby FTC acts are adopted at the

6    state law level and case law follows the FTC law as well.  But

7    in the event that Affiliated Monitors is for some reason not

8    acceptable, we're amenable to a process where with the mutual

9    consent of the parties, an alternative monitor could be

10   selected. We do feel strongly, however, that the Receiver,

11   although highly competent in terms of its responsibilities

12   over the Receivership entities does not have adequate

13   expertise in the area of advertising and marketing law

14   sufficient to warrant being selected as the monitor.

15            Turning further to the proposed order and the

16   structure and the content, significantly, the compliance

17   portions of the proposed business plan and the proposed order

18   go well beyond the requirements of any of those auditors that

19   we previously mentioned.  The OTA order, the Herbalife order,

20   the Western Union and the Telestar FTC cases go well beyond

21   the requirements in those orders in terms of the mandated

22   regulatory compliance efforts by the Defendants in those cases

23   and the operations and functioning of the compliance monitor

24   to assure the Court and the Defendants will operate in a

25   lawful manner going forward. These compliance provisions are

```
1   far more rigorous and far more demanding than what the

2   auditors in those cases require.

3           In summary, Your Honor, we believe that the

4   compliance portion of the proposed business plan and the

5   corresponding portions of the proposed order provide a very

6   high level of assurance that the Defendants can and will

7   operate in a lawful manner going forward pending resolution of

8   the trial on the merits of this case.

9           THE COURT:  Mr. Berg, did you finish your

10  presentation?

11          MR. BERG:  Yes.  I am happy to entertain any

12  questions Your Honor has with regard to --

13          THE COURT:  Yes, I do.  With regard to this

14  particular order, there seems to be some dispute regarding

15  Affiliated Monitors having appropriate expertise. So as a

16  result, it seems to me that it may be best in the event that I

17  do rule -- if I rule in favor of the FTC and there's an asset

18  freeze in the continued Receivership, then the appointment of

19  the monitor is moot. However, if I agree with RagingBull that

20  the balancing of the equities dictate to denial of the

21  preliminary injunction motion and an adoption of this

22  preliminary injunction that has been proposed, I'll need an

23  opportunity to vett and I don't want to vett 12 monitors and

24  12 law firms. You know, I'd like each side to pick one or two

25  to be put forward along with the appropriate credentials. The
```

 1     question of it is whether or not it's timing. I don't know

 2     whether or not Ms. Robbins -- and I don't believe Mr. Keith

 3     with no offense to him, would be an appropriate person to

 4     monitor this case over the protracted litigation period of

 5     time. So I don't know whether or not Ms. Robbins, I know that

 6     she believed Affiliated Monitors might not be -- might not

 7     have an expertise. You know, quite frankly I'm not familiar

 8     with them, but it may be that maybe the parties could work

 9     collaboratively together to come up with one.  I'm optimistic,

10     but it could be that the parties could agree on a monitor in

11     the event that I disagreed with the FTC in this case. I'm

12     hopeful that that's the case.

13          Ms. Robbins, is there any -- I take it you have some

14     familiarity with Affiliated Monitors; is that correct?

15          **MR. ROBBINS:**  Your Honor, my understanding from the

16     person from Affiliated Monitors that they referenced that had

17     worked on Herbalife was not focused on the specific ads. So it

18     was focused more on the structure of the company.  And so we

19     don't think that that person necessarily would have the

20     expertise in this case, but we are happy to provide and work

21     with defense counsel to come up with a suitable monitor.

22          **THE COURT:**  I would really like to have some

23     consensus on it in the event that I disagree. I would really

24     like that.  Because you are the experts in this particular

25     field, I am not. I'm not an expert in advertising. And it

1    seems to me that you should be able to come up with an

2    objective person that both of you can trust to have the

3    expertise necessary to oversee this case for the next two or

4    three years. So that would be my expectation. Otherwise,

5    you're both going to get what you get when I scrutinize the

6    submissions.  And so don't complain if I pick somebody that

7    you didn't like.

8              But I may end up making that request very shortly

9    after I -- if I rule in RagingBull's favor or rule against

10   FTC, I may put in a very short time table or window of maybe a

11   week for that kind of turnaround. If we conclude today, there

12   will be a week ahead of time before my Court ruling. As a

13   prophylactic matter that shouldn't waste too much time, in the

14   event that I rule in FTC's favor and there's no need for a

15   monitor, I would request that the parties sort of work

16   together over the next week to see whether or not you can

17   throw around some agencies or some names that have the

18   capability of handling that.

19             Is that okay, Ms. Robbins?

20             **MR. ROBBINS:**  Yes, that's fine.

21             **THE COURT:**  Is that okay with you, Mr. Berg?

22             **MR. BERG:**  Yes, Your Honor.  I'm quite confident

23   that we can putting our heads together, come up with a

24   mutually agreeable recommendation in terms of the monitor. I

25   should note that there was no one individual in Affiliated

 1      Monitors, Inc. who we had suggested or recommended. It's

 2      actually the equivalent of a small law firm that

 3      specializes --

 4              THE COURT:  Right.

 5              MR. BERG:  --exclusively in monitorships like this

 6      and they do have several individuals within their organization

 7      that do have extensive expertise in both advertising and

 8      marketing law. Frankly, we suggested Affiliated Monitors

 9      because they were the monitors that had been selected

10      previously in the FTC's case in Herbalife.  And we thought by

11      doing so, that removed one area of discord and disagreement

12      between us and the FTC.  But I'm quite confident that putting

13      our heads together we can come up with a joint recommendation.

14              It is, of course, Your Honor, in our best interest

15      to make sure that there's someone selected as a monitor who

16      does have sufficient expertise in the area of advertising and

17      marketing law in order to make sure that this works as

18      smoothly as possible going forward.

19              THE COURT:  Thank you.  Who is next?

20              MR. BARGER:  Your Honor, I'm sorry.  This is David

21      Barger again.  I was on mute. My understanding is Mimi Bahcall

22      was going to go next for RagingBull.  And Mimi if I'm wrong,

23      if it was Mr. Malina or Mr. Doran that needed to address a

24      couple of factual issues then I apologize, but I think Ms.

25      Bahcall was going to go next, Judge, with the Court's

1    permission.

2              **THE COURT:**  Thank you very much.

3              **MS. BAHCALL:**  Good afternoon, Your Honor.  This is

4    Mimi Bahcall.  And the first thing I would like to address is

5    your question on refunds and how they're going to be handled

6    under the order.  I think what's clear is the 31 that supplied

7    affidavits that have made complaints that we can see what the

8    complaints are. We've agreed that those will be refunded, to

9    the extent they haven't already been.

10             It's interesting to note that when we did some

11   research on them, it turns out about almost half of them had

12   already been refunded in whole or in part, because that has

13   been the company's practice where people do raise claims if

14   they can be verified.

15             Then that leaves us with the 1,400 and where we

16   stand on those.  As I think you heard the Receiver's counsel

17   represent, they weren't sure how these broke down, most of

18   those refund requests whether they were complaints, et cetera.

19   And when we look at the 1,400 and we did ask for the backup

20   for the number and we asked about four times and we weren't

21   able to get the exact how they came up with the 1,400.  But

22   what we did get was we were given 1,150, 1,150 e-mails and

23   then we did break them down. And what we found was of that

24   number that we actually received, 310 were cancellation

25   requests with negative comments. The rest, including 305 made

1    the request but with no comment and there were 30 that made

2    positive comments about RagingBull.  And 175 didn't even make

3    a refund or cancellation request.

4          So the problem with saying we're just going to give

5    them their money back is we don't even know what they are.

6    And some of them, the vast majority don't even make requests.

7    However, what we have in the order is that the ultimate

8    responsibility -- and we will work out the process for going

9    through those with the monitor and we see it there.  It does

10   say in paragraph 2 which might cause the ambiguity, that as a

11   general rule, only subscribers who seek a refund based on

12   their terms will get it.

13         And to answer the FTC, we have different types of

14   products. And the -- I'll call them the front-end products I

15   think you've heard about which are most of the products that

16   we actually sell, are the subject of ads.  They, in fact, do

17   have refund parameters. People can request refunds.

18         So there are products with those terms. We will look

19   through them. We'll make, you know, we'll work with the

20   monitor, but ultimately it's his decision. And those decisions

21   will be made and presumably people will be paid in Phase I.

22   That's what it provides for.

23         **THE COURT:**  Of course I will know in Phase I through

24   the monitoring status submission, the extent to which that

25   RagingBull has been compliant with the refund obligations and

```
 1        precisely how many of these customers who sought refunds have

 2        now been made whole.

 3                 MS. BAHCALL:  Correct.

 4                 THE COURT:  And I will be able to make a

 5        determination on whether RagingBull has put its best foot

 6        forward in an effort to be able to provide refunds to

 7        individual customers who have sought them out and who no

 8        longer want the services, but for whatever reason was not able

 9        to cancel the services whether or not it is because FTC

10        expressly -- because RagingBull expressly prevented them from

11        -- and deceitfully prevented them from initialing the

12        cancellation of services so RagingBull could bill them for an

13        additional month's worth of credit card payments for which

14        they didn't want to incur, or for whatever reason the

15        cancellation that they put forward didn't go through; is that

16        correct?

17                 MS. BAHCALL:  That is absolutely correct.

18                 THE COURT:  Okay.

19                 MS. BAHCALL:  So the next topic I'd like to address

20        is the balancing of the equities. And it is RagingBull's

21        position that the balancing of the equities does not favor

22        further injunctive relief against RagingBull and its owners.

23        They've agreed -- RagingBull has agreed from the outset as you

24        notice and we're agreeing in the proposed order, to be

25        enjoined from making any misleading claims in its advertising
```

```
1    and going forward. And they put in a compliance plan that will
2    ensure that in the future. And again, we are not conceding and
3    do not believe that you've seen from what we've submitted so
4    far that there has been issues in the past. We think we're
5    going to be able to defend this case and we have. But I guess
6    that the FTC has said they don't trust us. And, you know,
7    there may have been issues however with, you know, some of the
8    ads, but you're not depending on us as you've heard.  We're
9    putting--
10          THE COURT:  Did you say there may have been issues
11   with some of the ads?
12          MS. BAHCALL: What I'm saying is --
13          THE COURT:  That's more than fair.
14          MS. BAHCALL:  Okay.  So all I'm saying is going
15   forward, they don't trust us and we are putting in a plan and
16   somebody is going to review before we send out any ads and
17   they are going to be compliant. And if we don't have a plan
18   for it, we're not going to move forward. We get that.
19          THE COURT:  Maybe the balancing of the equities are
20   not really about RagingBull and the company itself, but to
21   make sure that the individual customers and consumers that are
22   trying to get refunds and cancel their service contracts and
23   be made whole or made whole sooner rather than three years or
24   four years from now in the event that FTC is successful in the
25   litigation.
```

1          **MS. BAHCALL:**  Yeah, I do think that the balancing of

2     the equities is about balancing the public interest.

3          **THE COURT:**  Correct.

4          **MS. BAHCALL:**  And what we do think, I think we've

5     put it in our papers is a couple of things.  One, I think

6     allowing this business to go forward does two things. It

7     allows consumers who like this product to continue using it.

8     You've heard the number of 37 percent from the Receiver who

9     has said based on what he has received after frankly the

10    lawsuit, still 37 people still like it, which is pretty

11    remarkable -- 37 percent, not people -- 37 percent still enjoy

12    the product, are still supporting us even though they're not

13    even getting it. I find that pretty remarkable because

14    frankly, I would have thought everybody would want a refund.

15    And hearing what you heard, they would be inclined, you know,

16    to see us negatively.

17          Our numbers based on looking at what they're looking

18    at actually and you've seen our papers, are more like

19    50 percent are satisfied. So the deal is that it will allow

20    consumers to continue enjoying a product they like if we are

21    allowed to continue in business.

22          In addition, what we also know and it's not

23    disputed, that the product teaching people how to trade which

24    is at bottom what this product is and what we're selling, it's

25    something consumers want. The FTC in fact acknowledges in

```
 1      their papers that there's a strong market for trading

 2      education. We regularly see in the news, retail consumers want

 3      to trade in the markets. And they want to have as much

 4      knowledge as they can, probably a good bit about how to do

 5      that.

 6              And what we also see is RagingBull has competitors

 7      who operate similar businesses in the space, demonstrating

 8      there's a need for the services and presumably can be done and

 9      we've showed you we believe RagingBull can as well in a

10      compliant and profitable manner.

11              We presented numerous examples of this with a

12      business plan.  If you look at Exhibit 7 and 8, RagingBull at

13      the time of the shutdown had 80,000 customers. RagingBull's

14      clients as we've said, overwhelmingly enjoyed them over time.

15      And even when this happened, you know, we still had a good

16      number supporting us, a good percentage. And we presented

17      evidence.  You've heard the FTC go through, you know, a number

18      of e-mails and people that were dissatisfied. But we

19      represented evidence of the support we have from customer

20      e-mails, positive reviews, and repeat customers, part of Dr.

21      Winn's report in opining in terms of whether or not clients

22      were actually deceived. But if we shut down, not only will

23      current customers not be able to enjoy the services, but also

24      the public at large, other people who may want to -- who

25      obviously are interested -- we've seen the need, everyone
```

1    admits it -- in learning about trading won't be able to learn

2    from us either.

3           And then to answer your question, isn't it also

4    about being in a position to provide more redress?  We do

5    think based on the business plan we've provided not only will

6    it allow us going forward to service our clients who have

7    contracted for it and also ones who will want it in the

8    future, but in this time period, as we've shown in our

9    business plan, we believe we will be in a positive economic

10   situation. We will make money in the business based upon the

11   assumptions you've seen and assuming only the 37 percent keeps

12   going, et cetera.

13          So we do believe that it's part of the solution.

14   Because as Your Honor pointed out, what we know is if we shut

15   -- first of all, we are shut down because the way the Receiver

16   and the asset freezes work, we couldn't pay employees. We

17   couldn't pay to have --our ability to pay the people who take

18   in the credit card processing, it was impossible to move

19   forward.  We had no choice but to furlough.

20          **THE COURT:**  By the way, even if -- by the way, I

21   didn't mean to cut you off, but by the way, even if Mr. Bishop

22   or Mr. Bond were to borrow or use their own funds to restart

23   the business, the freeze puts that in place anyway. You can't

24   restart a business that's effectively shut down unless you

25   open the business up.

```
 1            MS. BAHCALL:   Well, that's exactly it. That's
 2    exactly it. So you know, I do think it will be part of the
 3    solution. What we do know is if we can't restart because of --
 4    and that's why I said the equities are whether we shut down or
 5    not because it's a given. If we don't eliminate the Receivers
 6    and the freezes, we're gone. And I think the Receiver -- and
 7    we won't ever be able to restart. So that's why I phrased it
 8    that way, but I do think it becomes we know what it looks like
 9    if we aren't relieved from these burdens and we know that
10    everybody is going to want a refund, et cetera, and there's
11    going to be so more demand to get repaid even if they love the
12    service. And otherwise they wouldn't even have paid us more
13    money.  And we're going to have less to pay it with. So I
14    agree with you that ultimately the consumers, past, future,
15    present. And we'll be able to have more in the kitty to pay
16    them should a judgment come down and we'll be able to provide
17    the service.
18            So the negatives we hear from them are again, that
19    somehow we're adding to the problem by staying in business.
20    And the only way that would be is if people were deceived in
21    the future.  And again, that's what the plan and the monitor
22    are for.  And you, Your Honor, you're going to make sure that
23    we have a process in place so it doesn't happen.
24            They admit that the product is good. At least today
25    they admit that. Maybe not when we started. So then their
```

```
 1    answer is well, less available if we use the money to pay

 2    past. I think we've all shown that, you know, it will actually

 3    be the opposite.

 4            And then we hear that, you know, we can't be trusted

 5    and the business, you know, there were complaints and

 6    complaints we ignored to begin with. Well, let me give you

 7    some numbers on that. And again, this has been our pleadings

 8    and it's based on their filings as well.

 9            So over time, we had 200,000 subscribers. And again,

10    this business goes back for like a decade.  And in the FTC's

11    filing they identify we had 240 complaints before they filed.

12    And that's with the FTC, the Better Business Bureau, State's

13    Attorney, all in in a decade. I'm not diminishing any one

14    individual complaint. I wouldn't do that. However, when you

15    look at the numbers for a business in this space and this

16    large, it's pretty small.

17            THE COURT:  Indeed I think I read something where

18    the number of Better Business Bureau complaints was a

19    relatively very small amount until about 2019, and then 2020

20    and there was a representation that there was an exponential

21    growth within the company which caused growing pains related

22    to the cancellation. And that's I think put forth by

23    RagingBull. And then of course 2020 with the pandemic.

24            But what I thought which stood out was that the

25    Better Business Bureau, it was a relatively good rating early
```

1    on. It went to a rating of F, but then I think as of 2020 or

2    even 2021 it's now at a B; is that correct?

3              **MS. BAHCALL:**  It is.  And in fact, I think we were

4    told that it would have been an A before this happened.

5              **THE COURT:**  Okay.  And of course the Better Business

6    Bureau complaints were the basis, one of the bases, one, not

7    the sole one and certainly not the majority one, but a basis

8    for determining the customer dissatisfaction and the fraud

9    especially with regard to the cancellations.

10             **MS. BAHCALL:**  Right. And I think what we've said and

11   the reason we've gotten it back up is we had two things

12   happening.  And I'm sure we're not the only business, although

13   unexpectedly we had an increase in people wanting our service

14   during the furlough. And again, we thought it would be the

15   exact opposite, that people wouldn't want to. So we had that.

16   And then at the same time, we sent people home because people

17   had to work remotely. So admittedly -- and we put in our

18   papers that when it came to, you know, customer service and

19   being able to handle the refunds and just talk to people --

20   and a lot of times people just had questions. We didn't do a

21   very good job of doing that. And again, we make no excuses,

22   but those are the facts on how that happened.

23             So again, that's sort of the negative that we see

24   from them is, you know, we've had these issues in the past.

25   And I will say this too, so you'd have a relatively I would

1    say, most major broker dealers or other people in the

2    financial industry would kind of be thrilled with those

3    percentages.  But again, not saying it's a good thing.  We'd

4    rather have no complaints.  But it is what happens with

5    business.

6         But up until, again, for a decade, up until maybe

7    the New Hampshire claim and whatever in 2019 -- maybe I'm

8    getting my dates mixed up -- for almost a decade, this company

9    had virtually -- well, it had no -- it had involuntary inquiry

10   from the FTC in 2018 that we never heard about again. It

11   wasn't a subpoena, not even a formal order.  And then New

12   Hampshire in 2019. Prior to that, nothing in terms of any

13   litigation. We've never had a judgment. Nobody has filed for

14   bankruptcy. And it's been a pretty steady business.

15        So again, I hear the don't trust us and again, we're

16   not relying on trust. We have a third-party, but those are the

17   facts.

18        So as you pointed out, if we don't stay in business

19   and we continue with the Receiver and the freezes which make

20   it impossible, I don't need -- you already touched on this,

21   but as it stands now, if we have a Receiver as he stands, his

22   fees are up to -- he's running at a clip of about $400,000 a

23   month. I mean, the last we saw was 850 before even now.  And

24   again, I'm not questioning, you know, those are the fees, but

25   it's expensive.

1          So, you know, we don't think any order going forward

2     should have a Receiver that the company can't go forward. It's

3     not necessary if we have a compliance manager and it adds to

4     the expense.

5          And again, in terms of the freezes that you said, I

6     mean, what we've committed to do -- I mean, the company needs

7     to be able to manage itself. And again, there's no evidence

8     out there to suggest the Receiver didn't say they haven't been

9     able to, you know, that they've been sending, you know, money

10    has been disappearing or they can't run a profitable business.

11    And they've agreed.

12         So you have the money in the business and we've also

13    agreed to put -- and you said you wanted to hear about this --

14    $10 million into an escrow account that can be used for any

15    shortfall.  Because the way it works with the two prongs, in

16    the beginning, Phase I, we are going to be -- we are not going

17    to be doing any advertising. We're going to work on the

18    compliance plan. We're going to service the business we have,

19    but we're not going to generate new income and we know we're

20    going to make a big investment in compliance, et cetera. So

21    although the business plan doesn't suggest that the monies in

22    the business already that the Receiver has collected won't be

23    sufficient during this phase to pay the expenses, the owners

24    offered -- agreed to put up 10 million of their own money in

25    order to make sure that the business is sustained during this

 1    period.

 2              You've asked, suggested we might want to put that in

 3    an escrow account that can be drawn upon and that's what we're

 4    going to do. And it can be used to make up for any shortfall

 5    in the business. So the monies will be there for the business

 6    to continue.  And if, for example, it's decided that well, for

 7    whatever period of time, 60 days before we go to Phase II that

 8    we need to pay the refund request including the 31, the 10

 9    million is available for that.

10              **THE COURT:**  Right, that's precisely what my inquiry

11    was.

12              **MS. BAHCALL:**  I thought it might be.

13              **THE COURT:**  That was exactly what I was saying

14    because that goes directly to addressing consumer harm and

15    serving the public interest. Thank you.

16              **MS. BAHCALL:**  So at the end of the day, we do

17    believe that the equities favor allowing RagingBull to

18    continue in business with a compliance monitor and an approved

19    plan as set forth in our orders and to eliminate the freezes

20    and the Receivers so that we can do that effectively.

21              **THE COURT:**  All right.

22              **MS. BAHCALL:**  Any questions?

23              **THE COURT:**  No. You know, I think I've asked a lot

24    of questions. Okay, well thank you.  And believe me, if I've

25    got some more questions, I will not hesitate to ask them.

```
 1              MS. BAHCALL:  And I will try to answer them.

 2              THE COURT:  Okay, very good. All right, who is next?

 3    Who wants to speak on behalf --

 4              MR. BARGER:  Your Honor, this is David Barger again.

 5    I think that concludes our RagingBull presentation, subject to

 6    Court questions.  And I will note that Mimi actually finished

 7    ahead of the Court's schedule, so we will -- I forget the word

 8    now -- we'll donate our time to Mr. Schwartz who I think is

 9    next.

10              THE COURT:  You don't need to donate anything to Mr.

11    Schwartz.  I keep overlooking him.

12              MR. BARGER:  He might be even more succinct.

13              THE COURT:  All right, Mr. Schwartz, I'll hear from

14    you, sir.

15              MR. SCHWARTZ:  I suspect we will be more succinct.

16    I'm mindful of the fact that the discussion thus far has been

17    about a business plan and, you know, in many respects Mr.

18    Dennis is the tail on the dog here, but I'd be remiss if I

19    didn't make a few comments about him, given how differently

20    situated he is from everyone else.  But I will endeavor to hit

21    the under on the 10 minutes that have been allotted to us.

22              I want to respond to a few things that the FTC said

23    and then with Your Honor's permission, I'd like to allow my

24    associate, Ms. Mariella, to respond to some of the specific

25    evidence that the FTC put forward.
```

```
 1              But the FTC began its presentation this morning with
 2    what I presume they believe is the most powerful evidence of
 3    liability that they have. They talked about the New Hampshire
 4    Consumer Protection Bureau, they talked about letters from the
 5    Better Business Bureau. So let me be clear about one thing
 6    because in the FTC's presentation, there was a lot of talk
 7    about the Defendants. Mr. Dennis did not receive any letter
 8    from the Better Business Bureau. Mr. Dennis was not involved
 9    in any New Hampshire Consumer Protection Bureau investigation.
10    Mr. Dennis was not involved in hiring Trustpilot, whatever
11    that was and he was not warned by them and he did not know
12    that they were suspended.  They accused to quote "the
13    Defendants" of lying on multiple merchant account
14    applications. Mr. Dennis had nothing to do with merchant
15    account applications. He had nothing to do with fighting
16    chargebacks or refunds which are the things the FTC accused,
17    quote, "the Defendants" of doing. And that's because it is
18    ultimately undisputed.  I think you got an equivocal response
19    from the FTC, but ultimately it's undisputed that Mr. Dennis
20    was only an employee of RagingBull. He was not an officer.  He
21    was not an owner.  He was not an executive and he was not even
22    an employee that had managerial responsibility. He is the only
23    employee that's been sued here, even though numerous other
24    so-called gurus had effectively the same job.  And the FTC has
25    never explained what makes Kyle Dennis different from anyone
```

 1    else or why Mr. Dennis alone among the company's 160 employees

 2    was sued. Nor have they explained why they didn't sue any of

 3    those other people, including the people that were actually

 4    responsible for the ads that they allege are deceptive. That's

 5    not to say that they should sue those people. Like all of the

 6    other employees, Mr. Dennis relied upon the policies and

 7    procedures that the company had in place, including the review

 8    by compliance personnel of the advertising. And he was

 9    entitled to rely on it. And that fact --

10         **THE COURT:**  Let me ask you -- let me stop you, Mr.

11    Schwartz.  I do have a question for you. To the extent that

12    the Federal Trade Commission -- to the extent that the Federal

13    Trade Commission Act was violated by Mr. Dennis during the

14    course of his employment with RagingBull, it would be your

15    contention that RagingBull was Mr. Dennis's employer and not

16    Mr. Dennis himself individually would be responsible for the

17    damages caused by the violation of RagingBull's employees; is

18    that correct?

19         **MR. SCHWARTZ:**  Well, that's correct. And that's

20    especially true in the facts here where the FTC is attempting

21    to hold Mr. Dennis responsible for every single allegedly

22    deceptive act that occurred at the company, including things

23    that had nothing to do even arguably with the BioTech Breakout

24    brand that Mr. Dennis was providing content for to paid

25    subscribers, to people who had already purchased the service.

```
1   And that's why this question of whether Mr. Dennis is an

2   employee or not is a material one. The FTC sort of waves their

3   hands at it, but it's actually deeply relevant both to the

4   law, to the likelihood of success on the merits, because to

5   hold him individually liable they must show that he

6   participated directly in the conduct or had the ability to

7   control the conduct and that he knew that it was deceptive,

8   that he knew about the deceptive practices. And they cannot

9   provide this as best to have sort of cherry picked, taken out

10  of context examples where they don't show the disclaimers. Ms.

11  Mariella can talk about that.

12          And, of course, it's also really relevant to the

13  balance of the equities because it is grossly inequitable to

14  hold Mr. Dennis who never had an ownership in this company,

15  never had the ability to control this company, liable for what

16  they say is $137 million when, you know, he was paid salary.

17  I mean, it was a commission-based salary, but it was salary, a

18  paycheck from RagingBull for the work that he performed.  And

19  it was, of course, much, much, much less than the amount of

20  money that you're talking about. And that has both equitable

21  aspects to it and legal aspects.

22          And I won't go back over the briefing, but of course

23  the Supreme Court in the SEC versus Liu case held even where

24  you can hold someone liable under principles of equity, they

25  can only be held liable for their individual ill-gotten
```

1    profits. And that's not what the FTC is doing here and they

2    haven't even attempted to isolate what the ill-gotten profits

3    are. I mean, Mr. Kim made a remark saying every dollar that

4    Mr. Dennis earned was based on deception. There's no evidence

5    of that in the record. And in fact, I think what you have is

6    evidence that a lot of RagingBull's customers were quite

7    happy. Mr. Dennis was by all accounts the most successful guru

8    and that's because he was the most successful trader,

9    presumably because his advice and educational content was the

10   most valuable of all the gurus. And so it would be truly

11   inequitable to hold him, an unquestionably great trader who

12   was providing a real service to the company's customers,

13   liable for every penny that the company received from

14   consumers.

15         And look, you have a rich factual record.  You have

16   a declaration from Mr. Dennis on these points. The FTC took

17   his deposition for three hours. They did not evidence any

18   indicia of ownership or control. The best they could do is

19   show you a stray e-mail where he may have commented on

20   something. Mr. Kim said there was a period where Mr. Dennis's

21   commissions were based on not just the profits of BioTech

22   Breakouts, but other brands. That's true.  There was a

23   three-month period in late '19, early '20, but it was still

24   commission.  It was just a different way that his commissions

25   were calculated.  Whereas before his commission was based

 1    entirely on a percentage of BioTech Breakouts, they tried on a

 2    trial basis to make it a half BioTech Breakouts and half

 3    profits across all of the product that the company had. That

 4    didn't work out for anyone and they want back to commissions

 5    based purely on Mr. Dennis's content. But he never had an

 6    ownership interest, he never had a profit participation in the

 7    business.

 8            And look, we asked for an opportunity for Mr. Dennis

 9    to testify here. I'm not sure that that's necessary, but if

10    Your Honor has any questions on the facts, he is more than

11    happy to answer them.  Because Mr. Dennis is an accomplished

12    trader who was focused on providing educational content to

13    RagingBull's customers. That's what he likes doing. He likes

14    to be a trader and it would not be right to hold him liable

15    for marketing that he had nothing to do with.

16            **THE COURT:**  I was going to only comment that Mr.

17    Dennis, the presence of Mr. Dennis in this litigation I know

18    it's always been his position, the FTC's position regarding

19    Mr. Dennis's involvement is different.  If investigation

20    reveals and maybe the investigation has revealed, I don't

21    know. I don't have his testimony in front of me, but the

22    disposition of the case with regard to Mr. Dennis would

23    probably be most appropriate and the proper vehicle would be

24    either a dismissal by the FTC or favorable resolution by me in

25    a Summary Judgment stage. And if indeed there were some

 1    genuine disputes in the material facts that needed to be

 2    vetted by a finder of fact, then this case would be held over

 3    with Mr. Dennis for a jury to determine the extent of Mr.

 4    Dennis's involvement.

 5         So it seems like there are three avenues for Mr.

 6    Dennis:  The short run, the medium run and the long run. And

 7    right now I don't know where Mr. Dennis stands because I'm not

 8    privy to any of that information.  But I'm not certain at

 9    least at this juncture that Mr. Dennis should be the specific

10    subject of the proposed preliminary injunction until such time

11    as it's pretty conclusively demonstrated that he is something

12    other than an employee of RagingBull, which of course are

13    locked into the proposed order to begin with. So thank you,

14    Mr. Schwartz.

15         **MR. SCHWARTZ:**  Thank you, Your Honor.  And this may

16    be a case where it's appropriate if the FTC does not see the

17    light to move for early Summary Judgment and if that becomes

18    something that's tenable, we'll certainly let Your Honor know.

19         **THE COURT:**  All right.  Well, you know, I appreciate

20    you not shooting off the bow too early because that just gives

21    me more things to look through just to tell you no. So I would

22    prefer that you shoot when you think you're ready and then I

23    will address the motion in due course.

24         All right, thank you.  All right, Ms. Robbins, I

25    think you're up for the last word, right?

1          **MR. ROBBINS:**  Yes, Your Honor, thank you.  Your

2     Honor, I want to just address a few things that Ms. Bahcall

3     said just for the record, that the BBB received numerous

4     complaints about the Defendants.  And, in fact, from

5     December 2017 to October 2020, they had an F rating for 27 of

6     those 34 months. So it's not a case where oh, they had an F

7     rating for a month and then they're bumped up. 27 of 34 months

8     they had an F rating for a large number of unanswered

9     complaints.

10          **THE COURT:**  And how much weight should I give that

11     rating, Ms. Robbins?

12          **MR. ROBBINS:**  Well --

13          **THE COURT:**  Is it just one small factor that I

14     consider or is it something that the FTC believes to be pretty

15     significant?

16          **MR. ROBBINS:**  Well, I think -- so it's significant

17     for two reasons:  One is that the Defendants had that F rating

18     so they didn't bother to answer those complaints. And again,

19     it shows their callousness toward their consumers and that

20     they don't care about trying to rectify the problem.

21          The second thing that it shows is that -- so that

22     number of complaints, in the FTC's experience that is the tip

23     of the iceberg. So what happens is consumers don't always know

24     to complain to us and they don't always complain, right?  And

25     it's not just the BBB complaints we have, it's the complaints

1    to the FTC and it's their very high rated chargebacks that

2    they had over and over again to the point where they even

3    passed the 1 percent mark, which is indicative to credit card

4    companies of fraud.  And Discover Card Network in fact

5    terminated them.

6            THE COURT:  So yeah, I didn't want you to -- so

7    given the weight that I'm to give the F rating for the

8    27 months, do I give the B rating the same amount of weight?

9    In other words, do I say all right, well they did improve.

10   They actually did change their act and their attitude because

11   their rating went up. Their rating didn't remain an F. So how

12   much weight do I give the B rating?

13           MR. ROBBINS:  Your Honor, I think you would give it

14   the weight that -- you need to look at it as a whole. It's not

15   just -- we're not asking you to just look at the F rating or

16   just look at the B rating.

17           THE COURT:  Right, but the B rating was after the F

18   rating.  So that means that they improved according to the

19   Better Business Bureau, pretty significantly. Like kids in

20   school, he gets an F the first quarter, but then he gets a B

21   the second quarter, I'm patting him on the back like way to

22   go, you really buckled down.  You did what you're supposed to

23   do. Isn't the same analogy applicable here?

24           MR. ROBBINS:  Your Honor, you know, they did make an

25   effort to answer consumer complaints, yes. But did they --

1          **THE COURT:**  But then you're condemning them.  You

2   condemn them to say oh my God, they're horrible.  They don't

3   care about their customers, but now you're saying they got a B

4   rating from the Better Business Bureau after an F grade.

5   That's pretty good, right?  It's okay, you can say yeah,

6   that's pretty good.

7          **MR. ROBBINS:**  Yes, it is. I mean, it's good that

8   they increased their rating.

9          Your Honor, I want to just address the point -- I

10   want to bring back to the 37 percent that we keep talking

11   about. Because there's a flip side to that. There's the

12   two-thirds that were not happy.

13          And one thing struck me when Ms. Bahcall just spoke

14   about how they don't even think that their ads were deceptive

15   to begin with. And if they don't understand what their

16   obligations are under the law, then it is very difficult to

17   conceive that they will be able to move forward. But we

18   understand that the Court is mindful and wants them to be able

19   to have a second try. And we think that it's very critical in

20   the public interest in preserving money for consumer redress.

21          And I want to make this distinction that right now

22   there's an asset freeze in asset preservation. And the asset

23   freeze, if the asset freeze is lifted, they can use that money

24   to run the business. The asset preservation only counts --

25   covers the Defendants' individual assets, Bond, Bishop and

```
1    Dennis. And they have tens of millions of dollars.  And that

2    money should be preserved for consumer redress at the end of

3    the day.

4         THE COURT:  Where is it going to go?  Where is it

5    going to go?  They're not going to eat it. You know, that's so

6    much money that they're going to -- the assets that are out

7    there.  I mean, you know, are you suggesting that they're

8    going to be sent overseas someplace, or hidden, or Bond and

9    Bishop aren't going to be around?

10        MR. ROBBINS:  They're going to use it to fund the

11   business.  And if the business fails, then that money is gone

12   for consumers. So what we're asking is for the Court to

13   preserve that money.

14        THE COURT:  Go ahead.

15        MR. ROBBINS:  So Your Honor, what we're asking is

16   that if the Court lifts the asset freeze and appoints a

17   monitor, that at the very least, that the Defendants' assets

18   are preserved for final consumer redress.

19        THE COURT:  Okay, all right.  Thank you very much.

20        All right, Mr. Saudek, is there anything that the

21   monitor would like to add?  You're on mute again.

22        MR. ROBBINS:  Your Honor, if I may, Mr. Kim would

23   like to also address just --

24        THE COURT:  I'm sorry, Mr. Kim, I apologize. Mr.

25   Saudek, you can get your audio fixed and the Court's going to
```

1       hear from Mr. Kim. I apologize, Mr. Kim. I didn't know that

2       you wanted to speak up.

3               **MR. KIM:**  Thank you, Your Honor. And this will be

4       just very quick, just to address a couple of points Mr.

5       Schwartz had raised in his arguments.  We're only trying to

6       hold or seeking to hold Mr. Dennis liable for the direct

7       participation in the deceptive marketing here. Under Mr.

8       Schwartz's theory, it seems that there can be no individual

9       liability or personal liability at all for any individuals and

10      that that just would go against decades of case law. It's not

11      that there's a violation of the FTC Act, only that companies

12      can be held liable. Individuals who directly participated or

13      who had authority to control those activities can also be held

14      liable and that's very clear from the law.

15              The other question he asked was what makes Mr.

16      Dennis different from the other employees. Well, Mr. Dennis

17      runs the BioTech Breakouts services. He said so in his

18      deposition.

19              **THE COURT:**  Is that like a -- I mean, that strikes

20      me as just like a department within RagingBull. So in other

21      words, I can be the head of the IT department of some company

22      and the company is still paying me as an employee, but I'm

23      just running that department. I mean, the best example is like

24      maybe the Department of Justice. I mean, there are all sorts

25      of branches in the Department of Justice, but all are

1    employees and all get a paycheck that is signed by the

2    treasurer. None of them are operating independently.

3         **MR. KIM:**  Well, he's not just a figure, he's also

4    the one that helps pulling himself out as the one delivering

5    these services.  He's the one that's in the best position to

6    know whether the claims he's making in these videos that you

7    saw, Your Honor, and in the marketing materials are true and

8    accurate. So that's the point about his involvement. And why

9    his connection with the BioTech Breakouts services which

10   attributes for about a third of the company's overall income

11   in the last four years is significant.

12        **THE COURT:**  Okay. All right, well thank you. There's

13   quite a bit to digest. The authority vested in the monitor and

14   the oversight by the monitor and reporting exclusively to me

15   is something that's very critical. I look forward to receiving

16   a joint submission for a monitor. Certainly I'd like the

17   parties to get together.

18        Oh, Mr. Saudek, you had something that you wished to

19   say or wished to add?  I didn't know, it looked like you were

20   saying Your Honor, I have nothing further to say.  So I read

21   your lips and that's what you were saying.

22        **MR. SAUDEK:**  Your Honor, if I may indulge you for

23   one minute, Your Honor.

24        **THE COURT:**  Absolutely. Go ahead, Mr. Saudek.

25   That's fine.

1          **MR. SAUDEK:**   Section 14(k) of the Temporary

2    Restraining Order requires that the Temporary Receiver protect

3    the interest of consumers. What we would propose is that if it

4    is helpful to the Court and to the parties, we would certainly

5    endeavor to prepare a list of the 1,500 consumers whom we have

6    logged as having contact with the company and the monitor to

7    request a refund so that the company and any monitor, if that

8    is where we are headed, could make a determination on the

9    validity of those claims and the amount of those claims. So we

10   are happy to work with the parties to provide that list to

11   them if that is helpful to the Court and to the parties.

12          **THE COURT:**   Well, I think that anything to assist in

13   getting funds in the hands of individual consumers who

14   potentially would like to have refunds meets the goals of the

15   Court. But that is certainly duly noted. We've got to figure

16   out who the monitor is first if I decide to go down that path

17   and hopefully that won't resolve in another mini-litigation.

18   But if the parties submit to me something that they would -- a

19   proposal, I'll be more than happy to consider it as part of

20   the package related to my ruling. And that's assuming that I

21   rule against the FTC at least on their proposed request for

22   preliminary injunctive relief and side in favor of the consent

23   preliminary injunction that is before me that that has been

24   proposed.

25          So all right. Well, I want to thank you all very

1    much. Let's see.

2         **MR. ROBBINS:**  Your Honor, may I just ask one thing

3    of the Court?

4         **THE COURT:**  Right, the hearing -- also just for your

5    information, it's going to be a ruling. I'm not going to

6    entertain any argument. I'm going to issue my ruling on

7    Friday, March 26th at 9:30 a.m.  We don't need all of the

8    lawyers present.  If there was a representative from each one

9    of the parties that would be present, that's fine with me and

10   then I will issue a subsequent order related to the case as

11   well.  But I wanted to give everyone a heads up that that will

12   be March 26th at 9:30. Hopefully by maybe next Wednesday I can

13   get a consensus on who a potential monitor would be in the

14   event that I sided with RagingBull or didn't agree with FTC.

15   So I wanted to advise you of that.  And there will be the same

16   call-in instructions that you ended up receiving prior to this

17   particular hearing. Okay?

18        **MR. ROBBINS:**  Your Honor, if I may, would the Court

19   be amenable if the FTC submitted and working with the other

20   side a proposed PI that met some of the requirements that I

21   discussed earlier that were left out, like Sherwood Ventures

22   and Bond, LLC or some other provisions for the monitor?  If we

23   worked with the other side, we'd like to present a post PI to

24   the Court.

25        **THE COURT:**  Well, I think that that ship has already

1    sailed. I asked you to engage regarding the business plan. You

2    didn't want it. You opposed it and so right now I've taken the

3    argument that I need. I've received the submissions that I

4    have and I'm going to end up issuing a ruling with what I

5    have. All right?

6                    All right, is there anything else?  Thank you.

7                    **THE CLERK:** This Honorable Court now stands

8    adjourned.

9                    **(Proceeding concluded at 1:02 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5              I, Nadine M. Gazic, Certified Realtime Reporter and

 6       Registered Merit Reporter, in and for the United States

 7       District Court for the District of Maryland, do hereby

 8       certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

 9       true and correct transcript of the stenographically-reported

10       proceedings held in the above-entitled matter and that the

11       transcript page format is in conformance with the regulations

12       of the Judicial Conference of the United States.

13

14                             Dated this 5th day of April, 2021.

15

16                             -S-

17                             _____
                               NADINE M. GAZIC, CRR, RMR
18                             FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```

**$**

**$1,000** [1] - 36:14
**$1,499** [1] - 35:22
**$1,997** [1] - 59:19
**$10** [8] - 10:1, 26:23, 27:7, 28:22, 29:1, 52:20, 68:9, 95:14
**$10,000** [4] - 35:25, 42:10, 48:13, 60:1
**$110,000** [1] - 36:10
**$13** [1] - 64:5
**$137** [2] - 11:23, 100:16
**$140,000** [1] - 37:5
**$184,000** [1] - 36:13
**$2,499** [1] - 36:20
**$2,700** [1] - 36:9
**$20,000** [3] - 35:23, 60:8, 60:14
**$200** [1] - 34:11
**$24,000** [1] - 59:20
**$3,500** [1] - 36:11
**$30** [1] - 29:13
**$30,000** [1] - 36:8
**$325,000** [1] - 27:19
**$400,000** [1] - 94:22
**$425,000** [1] - 27:17
**$5,000** [4] - 24:23, 28:14, 37:3, 52:16
**$50,000** [2] - 37:2, 60:15
**$500,000** [5] - 10:23, 22:12, 22:14, 22:16, 23:20
**$55** [1] - 52:6
**$6,000** [1] - 36:4
**$600,000** [1] - 23:20
**$8,000** [1] - 42:10
**$965,000** [1] - 37:5

**'**

**'19** [1] - 101:23
**'20** [1] - 101:23

**1**

**1** [3] - 7:9, 66:5, 105:3
**1,150** [2] - 84:22
**1,400** [3] - 84:15, 84:19, 84:21
**1,500** [16] - 14:16, 15:7, 15:8, 15:10, 16:12, 23:24, 23:25, 24:5, 24:22, 25:2, 28:10, 30:7, 30:23, 34:14, 47:16, 110:5
**1,999[sic** [1] - 57:25
**1.2** [1] - 28:3
**1.8** [1] - 27:22
**10** [4] - 29:17, 95:24, 96:8, 97:21
**100** [1] - 57:10
**100-page** [1] - 73:11
**1000** [1] - 60:5
**101** [1] - 1:24
**11:45** [1] - 69:7
**12** [2] - 80:23, 80:24
**12:30** [1] - 67:15
**12:45** [1] - 67:15
**13** [1] - 7:7
**13(b** [2] - 8:15, 37:12
**14(k** [1] - 110:1
**15** [3] - 16:4, 21:6, 67:19
**15-page** [1] - 64:19
**160** [1] - 99:1
**160-plus** [1] - 11:12
**175** [1] - 85:2
**17th** [1] - 6:24
**18** [1] - 8:15
**19** [2] - 1:8, 7:18
**196** [2] - 35:15, 53:4
**1:02** [1] - 112:9

**2**

**2** [3] - 30:24, 66:6, 85:10
**2.8** [1] - 28:1
**20** [1] - 32:8
**20,000** [1] - 31:1
**20-cv-3538-GLR** [1] - 1:4
**200** [1] - 50:12
**200,000** [3] - 34:15, 37:7, 92:9
**2017** [6] - 34:10, 38:10, 38:15, 39:2, 39:5, 104:5
**2018** [2] - 39:22, 94:10
**2019** [9] - 39:22, 40:5, 41:8, 41:10, 41:11, 61:13, 92:19, 94:7, 94:12
**2020** [18] - 6:8, 6:24, 7:19, 39:5, 40:5, 40:16, 41:12, 41:15, 41:16, 41:18, 60:11, 60:13, 61:14, 92:19, 92:23, 93:1, 104:5
**2021** [5] - 1:8, 7:5, 7:9, 93:2, 113:14
**2023** [1] - 10:21
**2024** [1] - 10:21
**21201** [1] - 1:24
**24** [1] - 47:9
**240** [1] - 92:11
**25** [1] - 29:12

**26th** [2] - 111:7, 111:12
**27** [4] - 7:7, 104:5, 104:7, 105:8
**28** [1] - 113:8

**3**

**3** [4] - 7:9, 22:6, 22:7, 22:8
**30** [4] - 35:18, 37:3, 37:6, 85:1
**30,000** [10] - 11:19, 12:2, 14:23, 31:2, 32:8, 32:14, 34:14, 50:11, 50:13, 50:20
**305** [1] - 84:25
**31** [11] - 9:21, 12:2, 14:14, 14:21, 16:13, 45:19, 47:18, 53:5, 84:6, 96:8
**310** [1] - 84:24
**34** [2] - 104:6, 104:7
**37** [16] - 27:18, 31:16, 31:22, 32:12, 32:13, 43:12, 43:24, 44:25, 50:4, 50:8, 88:8, 88:10, 88:11, 90:11, 106:10
**39** [1] - 35:22

**4**

**4** [4] - 22:5, 24:23, 28:14, 52:16
**4,000** [1] - 25:2
**40** [1] - 59:22
**400** [1] - 59:17
**410-962-4753** [1] - 1:25
**44** [2] - 39:6, 59:4
**45** [1] - 60:25
**4th** [1] - 1:24

**5**

**5** [2] - 7:5, 40:12
**50** [2] - 32:9, 88:19
**53(a** [1] - 8:16
**5th** [2] - 41:18, 113:14

**6**

**6** [2] - 25:2, 28:14
**60** [6] - 47:22, 47:23, 50:22, 55:6, 70:11, 96:7

**7**

**7** [6] - 22:2, 27:15, 28:15, 47:9, 59:15, 89:12
**753** [1] - 113:8
**7th** [1] - 6:8

**8**

**8** [1] - 89:12
**80,000** [2] - 32:6, 89:13
**850** [1] - 94:23

**9**

**90** [1] - 65:21
**9:30** [2] - 111:7, 111:12

**A**

**a.m** [1] - 111:7
**Abigail** [1] - 36:18
**ability** [13] - 7:24, 11:9, 54:12, 54:16, 61:22, 64:22, 70:25, 71:6, 74:2, 74:5, 90:17, 100:6, 100:15
**able** [29] - 13:14, 28:20, 33:21, 35:11, 38:19, 39:18, 39:19, 39:20, 52:13, 53:17, 55:5, 61:12, 66:22, 82:1, 84:21, 86:4, 86:6, 86:8, 87:5, 89:23, 90:1, 91:7, 91:15, 91:16, 93:19, 95:7, 95:9, 106:17, 106:18
**above-entitled** [1] - 113:10
**absent** [1] - 65:13
**absolute** [2] - 73:19, 74:1
**absolutely** [4] - 14:1, 67:8, 86:17, 109:24
**acceptable** [2] - 78:23, 79:8
**access** [5] - 26:7, 52:5, 53:12, 54:15, 78:5
**accomplished** [1] - 102:11
**accorded** [1] - 37:9
**according** [7] - 11:19, 22:18, 22:20, 46:4, 46:5, 71:11, 105:18
**account** [20] - 26:23,

**27**:15, 28:6, 31:14, 36:13, 41:5, 41:11, 41:12, 41:13, 41:14, 41:15, 41:18, 41:19, 41:21, 56:24, 62:12, 95:14, 96:3, 98:13, 98:15
**accountants** [2] - 26:16, 26:17
**accounting** [1] - 19:21
**accounts** [5] - 6:19, 26:12, 26:20, 43:3, 101:7
**accuracy** [1] - 30:24
**accurate** [9] - 14:1, 14:4, 15:2, 15:15, 20:20, 20:23, 29:9, 76:3, 109:8
**accused** [2] - 98:12, 98:16
**Ace** [1] - 59:3
**achieve** [1] - 72:8
**acknowledges** [1] - 88:25
**act** [2] - 99:22, 105:10
**Act** [9] - 6:10, 6:11, 8:2, 8:15, 37:23, 43:15, 45:13, 99:13, 108:11
**action** [2] - 8:7, 17:6
**active** [2] - 40:18, 50:8
**actively** [1] - 42:6
**activities** [8] - 10:25, 74:17, 74:18, 74:19, 74:25, 75:11, 77:20, 108:13
**activity** [3] - 18:4, 45:25, 47:11
**acts** [2] - 62:25, 79:5
**actual** [3] - 16:14, 16:15, 78:8
**ad** [1] - 38:16
**add** [12] - 14:5, 27:11, 28:18, 33:15, 33:18, 33:19, 58:6, 64:21, 66:10, 67:18, 107:21, 109:19
**added** [1] - 66:15
**adding** [1] - 91:19
**addition** [5] - 6:8, 6:14, 11:18, 78:1, 88:22
**additional** [10] - 7:12, 18:7, 30:23, 33:14, 66:10, 68:10, 73:7, 73:10, 77:7, 86:13
**address** [44] - 10:15, 12:14, 13:1, 13:14, 13:16, 14:7, 15:6, 20:4, 21:13, 23:14,

24:18, 25:13, 27:8,
33:9, 33:10, 34:2,
34:5, 34:18, 34:19,
42:24, 42:25, 43:1,
55:22, 56:5, 56:9,
56:20, 63:25, 64:19,
65:10, 66:22, 68:2,
68:5, 69:21, 70:3,
70:4, 72:11, 83:23,
84:4, 86:19, 103:23,
104:2, 106:9,
107:23, 108:4
**addressed** [7] - 16:8,
43:4, 63:6, 67:23,
68:4, 69:6, 71:16
**addressing** [5] -
24:19, 34:6, 57:1,
64:20, 96:14
**adds** [1] - 95:3
**adequate** [2] - 79:3,
79:12
**adhering** [1] - 42:7
**adjourned** [1] - 112:8
**adjudicates** [1] -
17:12
**adjudication** [1] -
17:11
**admit** [2] - 91:24,
91:25
**admits** [1] - 90:1
**admittedly** [1] - 93:17
**adopted** [2] - 78:10,
79:5
**adoption** [1] - 80:21
**ads** [8] - 54:6, 81:17,
85:16, 87:8, 87:11,
87:16, 99:4, 106:14
**advertise** [2] - 54:24,
64:24
**advertisement** [1] -
64:25
**advertising** [17] -
6:23, 34:12, 40:1,
40:11, 54:2, 55:2,
58:21, 74:13, 74:23,
79:3, 79:13, 81:25,
83:7, 83:16, 86:25,
95:17, 99:8
**advice** [1] - 101:9
**advise** [1] - 111:15
**advised** [1] - 20:10
**affairs** [1] - 17:21
**affiants** [9] - 9:21,
9:22, 12:2, 14:15,
16:13, 45:19, 47:18,
48:10, 52:14
**affidavits** [2] - 8:24,
84:7
**Affiliated** [11] - 9:13,
9:14, 68:12, 79:2,

79:7, 80:15, 81:6,
81:14, 81:16, 82:25,
83:8
**afforded** [1] - 65:5
**afternoon** [1] - 84:3
**agencies** [1] - 82:17
**agency** [1] - 58:11
**agent** [1] - 75:16
**aggressively** [1] -
42:7
**ago** [2] - 41:24, 59:7
**agree** [11] - 14:4,
17:25, 29:23, 29:24,
55:14, 69:4, 76:16,
80:19, 81:10, 91:14,
111:14
**agreeable** [1] - 82:24
**agreed** [10] - 7:14,
9:25, 17:14, 21:16,
84:8, 86:23, 95:11,
95:13, 95:24
**agreeing** [3] - 68:25,
70:25, 86:24
**agreement** [3] - 61:19,
61:20, 78:24
**ahead** [1] - 3:3,
24:17, 48:16, 49:3,
49:6, 51:11, 66:20,
82:12, 97:7, 107:14,
109:24
**al** [1] - 1:6
**Alan** [2] - 51:18, 53:13
**alert** [2] - 36:5, 39:17
**alerted** [1] - 39:17
**alerts** [8] - 39:11,
39:12, 39:16, 59:17,
59:21, 60:1, 60:16,
60:19
**allegations** [1] - 45:5
**allege** [1] - 99:4
**allegedly** [1] - 99:21
**alleging** [1] - 6:9
**allotted** [1] - 97:21
**allow** [8] - 25:6, 51:14,
56:5, 65:4, 88:19,
90:6, 97:23
**allowed** [4] - 7:1, 23:5,
31:11, 88:21
**allowing** [4] - 37:19,
51:5, 88:6, 96:17
**allows** [1] - 88:7
**almost** [2] - 84:11,
94:8
**alone** [3] - 48:14, 55:7,
99:1
**alternative** [2] - 79:1,
79:9
**ambiguity** [1] - 85:10
**amenable** [2] - 79:8,
111:19

**amended** [1] - 7:1
**America** [1] - 41:10
**amount** [15] - 11:3,
11:25, 16:20, 17:13,
23:24, 23:25, 24:6,
24:22, 24:23, 24:24,
27:21, 92:19,
100:19, 105:8, 110:9
**amounts** [1] - 17:2
**ample** [1] - 78:12
**analogy** [1] - 105:23
**analysis** [4] - 13:7,
15:20, 31:21, 49:12
**analyze** [1] - 31:5
**Andrew** [2] - 1:17, 4:1
**anomalies** [1] - 60:18
**answer** [13] - 16:24,
25:7, 25:10, 43:23,
60:23, 72:4, 85:13,
90:3, 92:1, 97:1,
102:11, 104:18,
105:25
**answers** [1] - 41:22
**anticipate** [1] - 16:3
**anticipated** [1] - 16:12
**anxious** [1] - 76:25
**anyway** [2] - 51:24,
90:23
**apart** [1] - 42:18
**apologize** [3] - 83:24,
107:24, 108:1
**appear** [4] - 11:4,
29:9, 58:4
**Appearances** [1] -
1:21
**applicable** [1] -
105:23
**applicants** [1] - 78:21
**applications** [7] -
41:5, 41:13, 41:17,
41:21, 78:21, 98:14,
98:15
**apply** [1] - 14:6
**appointed** [4] - 6:20,
54:8, 73:3, 74:16
**appointment** [3] -
6:14, 26:14, 80:18
**appoints** [1] - 107:16
**appreciate** [3] - 13:24,
24:19, 103:19
**appropriate** [8] -
13:15, 19:17, 55:24,
80:15, 80:25, 81:3,
102:23, 103:16
**approval** [4] - 54:21,
74:19, 78:3, 78:25
**approve** [2] - 61:20,
65:8
**approved** [3] - 73:23,
74:15, 96:18

**approximate** [3] -
23:24, 24:1, 24:23
**April** [1] - 113:14
**area** [5] - 78:11, 79:3,
79:13, 83:11, 83:16
**areas** [1] - 73:4
**arguably** [4] - 7:22,
10:10, 10:11, 99:23
**argue** [1] - 13:13
**argued** [1] - 55:18
**arguing** [1] - 46:12
**argument** [7] - 9:4,
29:25, 32:23, 42:18,
47:5, 111:6, 112:3
**arguments** [3] - 12:9,
70:5, 108:5
**arise** [1] - 7:21
**arises** [2] - 6:7, 7:20
**arrangement** [1] -
61:12
**aside** [1] - 33:2
**aspect** [5] - 20:2, 20:3,
20:5, 22:22, 74:16
**aspects** [2] - 72:13,
100:21
**assertion** [2] - 25:19,
61:7
**assessed** [1] - 74:15
**assessing** [1] - 77:24
**assessment** [1] - 78:3
**assessments** [1] -
77:22
**asset** [21] - 6:13, 6:18,
6:25, 10:12, 10:13,
10:17, 13:11, 17:24,
29:7, 51:15, 64:13,
72:2, 77:20, 80:17,
90:16, 106:22,
106:23, 106:24,
107:16
**assets** [17] - 10:24,
18:5, 18:6, 18:10,
18:14, 21:17, 21:25,
26:21, 29:13, 37:22,
47:21, 52:12, 53:7,
106:25, 107:6,
107:17
**assist** [4] - 33:24,
42:23, 77:23, 110:12
**assisting** [1] - 23:11
**associate** [1] - 97:24
**associated** [1] - 78:7
**assuming** [3] - 24:4,
90:11, 110:20
**assumptions** [9] -
20:6, 20:8, 20:12,
20:17, 20:20, 20:22,
21:3, 21:22, 90:11
**assurance** [1] - 80:6
**assurances** [2] - 68:8,

72:15
**assure** [1] - 79:24
**astronomical** [1] -
11:2
**Attachment** [2] - 39:6,
59:4
**attempt** [1] - 63:17
**attempted** [6] - 7:4,
14:24, 25:7, 25:10,
42:22, 101:2
**attempting** [4] - 8:13,
20:23, 47:16, 99:20
**attempts** [1] - 26:20
**attending** [1] - 57:24
**attention** [3] - 9:4,
65:2, 74:11
**attitude** [1] - 105:10
**Attorney** [1] - 92:13
**attorney** [3] - 15:6,
17:7, 47:9
**attorneys** [5] - 10:22,
13:21, 25:19, 25:24,
40:6
**attributes** [1] - 109:10
**audio** [3] - 4:25,
107:25
**auditing** [2] - 73:25,
77:21
**auditors** [2] - 79:18,
80:2
**August** [2] - 60:11,
60:13
**authority** [8] - 8:17,
10:7, 73:19, 74:1,
78:12, 108:13,
109:13
**authorized** [1] - 10:7
**automatically** [2] -
8:7, 8:8, 50:9
**availability** [1] - 71:25
**available** [6] - 27:14,
28:19, 29:1, 29:14,
92:1, 96:9
**avenues** [1] - 103:5
**average** [1] - 28:12
**avert** [1] - 38:3
**avoiding** [1] - 56:2
**await** [1] - 15:5
**awaiting** [1] - 11:13
**aware** [3] - 14:18,
39:22, 45:5

## B

**Babikan** [1] - 36:4
**baby** [1] - 79:5
**background** [2] -
46:19, 46:22
**backlog** [1] - 10:19
**backup** [1] - 84:19

**BAHCALL** [16] - 3:20, 84:3, 86:3, 86:17, 86:19, 87:12, 87:14, 88:1, 88:4, 91:1, 93:3, 93:10, 96:12, 96:16, 96:22, 97:1
**Bahcall** [7] - 1:16, 3:20, 83:21, 83:25, 84:4, 104:2, 106:13
**balance** [7] - 5:20, 5:23, 13:13, 57:1, 64:4, 68:2, 100:13
**balancing** [10] - 9:2, 10:13, 22:22, 72:5, 80:20, 86:20, 86:21, 87:19, 88:1, 88:2
**Baltimore** [2] - 1:9, 1:24
**bandwagon** [1] - 30:16
**bank** [3] - 6:19, 26:12, 26:20
**Bank** [1] - 41:10
**bankruptcy** [1] - 94:14
**BARGE** [1] - 33:25
**BARGER** [8] - 4:5, 13:22, 33:6, 67:5, 69:13, 83:20, 97:4, 97:12
**barger** [1] - 67:14
**Barger** [15] - 1:17, 4:5, 13:23, 15:5, 16:7, 33:6, 33:12, 33:16, 64:18, 67:3, 67:13, 67:17, 69:11, 83:21, 97:4
**base** [8] - 30:14, 30:15, 30:25, 31:1, 31:7, 32:19, 32:25, 49:7
**based** [28] - 11:23, 20:5, 20:24, 29:7, 29:9, 29:14, 49:8, 50:24, 50:25, 62:7, 64:5, 64:6, 66:23, 74:22, 78:10, 85:11, 88:9, 88:17, 90:5, 90:10, 92:8, 100:17, 101:4, 101:21, 101:25, 102:5
**bases** [1] - 93:6
**basic** [1] - 20:7
**basis** [3] - 93:6, 93:7, 102:2
**battle** [1] - 46:14
**BBB** [5] - 38:15, 40:8, 42:22, 104:3, 104:25
**bear** [1] - 61:21
**became** [1] - 39:22
**becomes** [3] - 32:4,

91:8, 103:17
**BEFORE** [1] - 1:11
**began** [1] - 98:1
**begin** [5] - 47:16, 47:17, 92:6, 103:13, 106:15
**beginning** [3] - 3:11, 34:16, 95:16
**behalf** [14] - 3:19, 3:21, 3:24, 4:2, 4:5, 4:12, 4:24, 5:10, 10:5, 13:21, 17:17, 34:9, 76:21, 97:3
**behavior** [2] - 40:17, 42:2
**behind** [1] - 23:5
**believes** [2] - 55:19, 104:14
**bells** [1] - 69:20
**benefit** [1] - 48:17
**Berg** [10] - 1:17, 4:1, 69:19, 70:3, 70:20, 70:21, 71:13, 75:19, 80:9, 82:21
**BERG** [11] - 4:1, 71:15, 76:4, 76:10, 76:24, 77:6, 77:12, 77:15, 80:11, 82:22, 83:5
**best** [10] - 26:8, 65:19, 76:22, 80:16, 83:14, 86:5, 100:9, 101:18, 108:23, 109:5
**better** [2] - 43:6, 75:21
**Better** [8] - 92:12, 92:18, 92:25, 93:5, 98:5, 98:8, 105:19, 106:4
**between** [8] - 17:10, 17:15, 24:23, 28:13, 28:14, 39:5, 47:22, 83:12
**beyond** [3] - 73:23, 79:18, 79:20
**Biello** [1] - 36:7
**big** [2] - 47:22, 95:20
**bill** [2] - 48:14, 86:12
**biotech** [1] - 59:23
**BioTech** [9] - 57:6, 61:1, 61:17, 99:23, 101:21, 102:1, 102:2, 108:17, 109:9
**Bishop** [13] - 2:5, 3:6, 4:20, 6:19, 7:22, 9:25, 29:17, 38:10, 42:17, 59:21, 90:21, 106:25, 107:9
**bit** [5] - 19:3, 68:7, 68:21, 89:4, 109:13
**blank** [1] - 38:2

**blunting** [1] - 12:4
**Boies** [2] - 1:19, 4:15
**bolster** [1] - 55:25
**bolts** [1] - 19:2
**bond** [2] - 29:16, 90:22
**Bond** [13] - 2:5, 3:7, 4:19, 6:19, 7:22, 9:25, 38:17, 55:16, 55:23, 106:25, 107:8, 111:22
**borrow** [1] - 90:22
**bother** [1] - 104:18
**bottom** [2] - 58:8, 88:24
**bought** [2] - 36:19, 60:14
**bow** [1] - 103:20
**boxes** [3] - 8:11, 8:12
**branches** [1] - 108:25
**brand** [2] - 57:7, 61:1, 99:24
**brands** [1] - 101:22
**break** [5] - 58:16, 67:7, 67:12, 70:21, 84:23
**Breakout** [1] - 99:23
**Breakouts** [7] - 57:6, 61:18, 101:22, 102:1, 102:2, 108:17, 109:9
**Brett** [2] - 1:16, 3:24
**Brian** [1] - 4:15
**brief** [3] - 61:8, 66:24, 66:25
**briefed** [2] - 7:3, 34:23
**briefing** [4] - 7:12, 7:14, 55:19, 100:22
**briefly** [5] - 13:23, 14:12, 24:19, 34:19, 56:9
**briefs** [1] - 72:10
**bring** [3] - 20:7, 58:15, 106:10
**bringing** [1] - 17:18
**broad** [1] - 74:21
**broke** [3] - 31:15, 36:14, 84:17
**broken** [1] - 54:22
**broker** [1] - 94:1
**brought** [2] - 34:9, 65:2
**buckled** [1] - 105:22
**Bull's** [1] - 60:1
**bullet** [2] - 57:21, 58:1
**bullpen** [1] - 44:11
**bumped** [1] - 104:7
**burden** [2] - 12:17, 66:10
**burdens** [1] - 91:9

**Bureau** [2] - 39:24, 39:25, 92:12, 92:18, 92:25, 93:6, 98:4, 98:5, 98:8, 98:9, 105:19, 106:4
**business** [94] - 7:13, 7:15, 8:3, 10:18, 18:1, 18:11, 18:21, 18:23, 18:24, 19:7, 19:10, 19:20, 19:22, 19:23, 19:25, 20:5, 20:7, 20:11, 20:14, 20:18, 20:22, 21:1, 21:5, 21:12, 25:11, 27:17, 27:18, 28:23, 29:2, 32:6, 36:24, 37:10, 46:21, 46:24, 47:12, 48:19, 50:24, 51:13, 52:8, 55:2, 70:15, 71:19, 72:3, 72:7, 72:15, 72:20, 72:22, 72:23, 73:5, 73:11, 74:7, 74:10, 76:7, 76:13, 77:2, 77:9, 77:16, 79:17, 80:4, 88:6, 88:21, 89:12, 90:5, 90:9, 90:10, 90:23, 90:24, 90:25, 91:19, 92:5, 92:10, 92:15, 93:12, 94:5, 94:14, 94:18, 95:10, 95:12, 95:18, 95:21, 95:22, 95:25, 96:5, 96:18, 97:17, 102:7, 106:24, 107:11, 112:1
**Business** [8] - 92:12, 92:18, 92:25, 93:5, 98:5, 98:8, 105:19, 106:4
**businesses** [1] - 89:7
**buy** [2] - 44:16, 44:17

## C

**calculated** [4] - 24:22, 24:23, 28:12, 101:25
**call-in** [1] - 111:16
**callousness** [1] - 104:19
**cancel** [7] - 8:8, 36:20, 38:23, 39:20, 42:13, 86:9, 87:22
**cancellation** [5] - 84:24, 85:3, 86:12, 86:15, 92:22
**cancellations** [1] - 93:9
**cancelled** [2] - 38:24, 39:1

**cannot** [7] - 4:18, 20:21, 35:7, 38:3, 57:5, 74:24, 100:8
**capability** [1] - 82:18
**capable** [1] - 33:23
**capture** [1] - 57:19
**captures** [1] - 57:15
**Card** [2] - 41:8, 105:4
**card** [3] - 86:13, 90:18, 105:3
**cards** [1] - 27:21
**care** [3] - 38:14, 104:20, 106:3
**carefully** [1] - 72:7
**Carl** [3] - 59:15, 59:21, 60:4
**CASE** [1] - 1:4
**case** [51] - 3:3, 5:18, 6:7, 9:2, 10:20, 13:11, 13:15, 17:21, 18:19, 21:19, 24:12, 31:10, 33:22, 34:9, 34:22, 35:4, 37:15, 45:15, 51:17, 53:4, 53:8, 53:9, 54:4, 60:12, 63:7, 63:11, 65:25, 66:1, 66:2, 67:1, 71:24, 72:5, 76:21, 78:19, 79:6, 80:8, 81:4, 81:11, 81:12, 81:20, 82:3, 83:10, 87:5, 100:23, 102:22, 103:2, 103:16, 104:6, 108:10, 111:10
**caseload** [1] - 10:20
**cases** [6] - 73:24, 78:13, 79:5, 79:20, 79:22, 80:2
**CASEY** [1] - 5:9
**Casey** [2] - 2:3, 5:9
**cash** [2] - 28:7, 28:19
**cashes** [1] - 62:20
**caused** [6] - 23:3, 45:25, 46:6, 60:25, 92:21, 99:17
**cautioned** [1] - 73:12
**certain** [7] - 6:23, 9:19, 58:5, 65:18, 67:23, 68:14, 103:8
**certainly** [13] - 6:22, 11:7, 15:20, 26:7, 27:7, 54:7, 66:16, 68:2, 93:7, 103:18, 109:16, 110:4, 110:15
**certainty** [1] - 72:15
**CERTIFICATE** [1] - 113:1
**certification** [4] -

73:25, 75:3, 75:5,
78:4
**Certified** [1] - 113:5
**certified** [2] - 73:3,
75:1
**certify** [1] - 113:8
**certifying** [1] - 77:24
**cetera** [5] - 7:25,
84:18, 90:12, 91:10,
95:20
**chambers** [2] - 8:11,
33:24
**chance** [2] - 8:25,
53:10
**change** [6] - 39:21,
40:4, 48:18, 48:19,
48:20, 105:10
**changed** [1] - 61:18
**changes** [1] - 45:15
**character** [1] - 15:18
**characterize** [1] -
25:23
**charge** [1] - 41:20
**chargeback** [2] -
36:22, 42:22
**chargebacks** [4] -
42:7, 43:1, 98:16,
105:1
**charged** [2] - 36:22,
38:24
**chatrooms** [1] - 44:12
**check** [5] - 62:11,
62:12, 62:14, 62:18,
62:19
**cherry** [1] - 100:9
**choice** [1] - 90:19
**chose** [3] - 42:4, 43:4,
43:5
**chosen** [2] - 9:10,
9:15
**chronic** [1] - 37:1
**Circuit** [1] - 37:11
**circumstances** [4] -
11:11, 21:21, 47:7,
71:10
**Civil** [3] - 3:5, 10:8,
12:22
**CIVIL** [1] - 1:4
**claim** [7] - 12:5, 16:20,
16:21, 24:24, 38:19,
94:7
**claimant** [1] - 22:23
**claimants** [4] - 17:2,
23:22, 24:1, 47:18
**claimed** [2] - 29:2,
59:22
**claiming** [2] - 27:22,
27:23
**claims** [59] - 8:12,
8:14, 8:21, 16:20,

17:2, 17:3, 17:5,
17:7, 17:10, 17:12,
17:18, 19:15, 19:18,
24:3, 24:5, 24:7,
24:22, 25:3, 28:15,
28:18, 34:16, 35:4,
35:6, 35:8, 35:13,
40:13, 42:5, 44:21,
46:3, 48:21, 48:23,
48:25, 49:4, 49:7,
49:9, 49:13, 50:17,
50:19, 50:21, 51:1,
52:13, 53:18, 53:19,
54:6, 56:20, 57:9,
59:11, 59:12, 61:25,
64:12, 65:16, 66:13,
72:23, 73:5, 84:13,
86:25, 109:6, 110:9
**class** [1] - 17:6
**clause** [1] - 69:1
**clean** [1] - 69:2
**clear** [10] - 34:12,
36:11, 37:7, 37:11,
52:18, 72:4, 76:22,
84:6, 98:5, 108:14
**clearly** [2] - 44:10,
76:6
**CLERK** [4] - 3:4, 5:6,
69:9, 112:7
**clerk** [1] - 24:14
**client** [5] - 4:16, 30:14,
30:15, 63:20, 75:21
**clients** [3] - 89:14,
89:21, 90:6
**clip** [4] - 43:21, 52:2,
59:4, 94:22
**clipping** [1] - 52:1
**clips** [1] - 60:6
**close** [2] - 10:23,
20:11
**closely** [2] - 19:20,
26:16
**Closer** [1] - 60:10
**co** [1] - 61:17
**co-founder** [1] - 61:17
**Code** [1] - 8:16
**codified** [1] - 8:15
**collaboratively** [1] -
81:9
**colleague** [1] - 56:4
**colleague's** [1] - 60:4
**colleagues** [2] -
69:17, 71:17
**collected** [1] - 95:22
**collectively** [2] -
17:19, 55:22
**Colleen** [2] - 1:13,
3:12
**colors** [1] - 40:17
**coming** [7] - 11:3,

32:24, 32:25, 52:12,
57:1, 68:22, 72:21
**comment** [5] - 13:6,
16:7, 25:14, 85:1,
102:16
**commented** [1] -
101:19
**comments** [6] - 12:23,
31:8, 31:17, 84:25,
85:2, 97:19
**COMMISSION** [1] -
1:3
**commission** [5] -
62:15, 78:10,
100:17, 101:24,
101:25
**Commission** [9] -
1:12, 3:5, 3:13, 3:16,
5:15, 6:10, 9:16,
99:12, 99:13
**commission-based**
[1] - 100:17
**commissions** [5] -
62:7, 62:8, 101:21,
101:24, 102:4
**committed** [1] - 95:6
**common** [2] - 55:17,
55:18
**communication** [1] -
18:23
**communications** [1] -
74:12
**companies** [3] -
59:23, 105:4, 108:11
**company** [56] - 11:5,
11:6, 18:7, 18:8,
20:20, 22:4, 22:21,
27:1, 27:24, 28:5,
28:7, 28:11, 29:16,
29:18, 31:8, 31:12,
31:17, 31:19, 32:5,
32:16, 32:23, 37:25,
40:19, 41:14, 41:17,
47:14, 48:20, 49:10,
52:6, 53:13, 53:15,
53:23, 54:13, 54:14,
61:16, 61:19, 68:8,
70:13, 74:6, 81:18,
87:20, 92:21, 94:8,
95:2, 95:6, 99:7,
99:22, 100:14,
100:15, 101:13,
102:3, 108:21,
108:22, 110:6, 110:7
**company's** [5] - 46:9,
84:13, 99:1, 101:12,
109:10
**compelled** [1] - 72:1
**competent** [2] - 70:3,
79:11

**competitors** [1] - 89:6
**complain** [3] - 82:6,
104:24
**complained** [1] -
39:18
**complaining** [1] -
38:23
**complaint** [6] - 6:7,
6:8, 7:1, 7:20, 74:18,
92:14
**complaints** [23] - 39:8,
39:9, 39:15, 41:9,
42:13, 42:22, 42:24,
84:7, 84:8, 84:18,
92:5, 92:6, 92:11,
92:18, 93:6, 94:4,
104:4, 104:9,
104:18, 104:22,
104:25, 105:25
**complete** [5] - 10:10,
25:24, 26:4, 26:9,
59:11
**completely** [1] - 10:18
**compliance** [76] -
9:10, 9:12, 9:19,
10:1, 20:1, 20:4,
21:10, 23:9, 23:21,
38:1, 40:5, 47:13,
52:22, 54:16, 54:18,
54:19, 54:25, 65:2,
68:7, 68:22, 69:20,
70:23, 70:25, 71:6,
71:7, 71:20, 72:6,
72:14, 72:19, 73:2,
73:4, 73:17, 73:18,
73:19, 73:22, 73:24,
73:25, 74:2, 74:3,
74:5, 74:6, 74:7,
74:9, 74:16, 74:20,
74:21, 75:1, 75:4,
75:5, 75:6, 75:8,
75:9, 75:12, 75:16,
76:5, 77:19, 77:22,
77:23, 77:24, 77:25,
78:2, 78:14, 78:18,
78:20, 79:16, 79:22,
79:23, 79:25, 80:4,
87:1, 95:3, 95:18,
95:20, 96:18, 99:8
**compliant** [6] - 21:7,
21:11, 77:18, 85:25,
87:17, 89:10
**complicated** [1] - 5:2
**compliment** [1] -
34:23
**comply** [4] - 38:5,
40:12, 66:8, 66:11
**concede** [1] - 44:7
**conceding** [2] - 13:25,
87:2

**conceive** [1] - 106:17
**concern** [1] - 28:8
**concerned** [3] - 5:18,
39:25, 56:3
**concerns** [3] - 26:2,
40:4, 69:22
**concessions** [2] - 9:5,
10:6
**conclude** [1] - 82:11
**concluded** [1] - 112:9
**concludes** [1] - 97:5
**conclusion** [3] - 7:13,
63:9, 64:17
**conclusively** [1] -
103:11
**concurrent** [1] - 6:12
**condemn** [1] - 106:2
**condemning** [1] -
106:1
**condition** [1] - 76:3
**conduct** [5] - 25:16,
66:5, 74:6, 100:6,
100:7
**Conference** [1] -
113:12
**confidence** [2] -
55:25, 73:14
**Confidence** [2] - 6:11,
8:1
**confident** [3] - 34:24,
82:22, 83:12
**confirm** [1] - 59:9
**conflicting** [1] - 29:4
**conformance** [1] -
113:11
**conjunction** [2] - 10:2,
76:13
**connection** [1] - 109:9
**consensus** [2] -
81:23, 111:13
**consent** [3] - 61:23,
79:9, 110:22
**consider** [2] - 104:14,
110:19
**consideration** [6] -
9:7, 37:14, 37:18,
72:12, 74:12, 76:14
**considering** [1] - 12:9
**consistently** [1] -
57:10
**consolidated** [1] - 7:6
**consult** [1] - 54:16
**consultation** [1] -
75:15
**consume** [1] - 18:5
**consumed** [3] - 21:18,
22:8, 51:24
**Consumer** [2] - 98:4,
98:9
**consumer** [24] - 8:6,

8:8, 29:2, 35:16,
37:8, 41:9, 42:2,
42:24, 49:5, 51:22,
52:21, 57:16, 60:17,
60:22, 60:25, 71:7,
74:12, 74:17, 77:20,
96:14, 105:25,
106:20, 107:2,
107:18
**consumers** [80] -
15:19, 17:17, 17:18,
22:24, 23:23, 27:3,
28:9, 28:10, 28:16,
29:3, 34:10, 34:14,
35:10, 35:12, 35:14,
35:15, 35:20, 36:11,
37:5, 37:6, 37:9,
37:21, 38:21, 38:22,
39:8, 39:9, 39:13,
39:15, 39:18, 40:2,
42:5, 42:8, 42:9,
42:13, 42:21, 43:22,
44:14, 44:15, 44:18,
44:21, 44:23, 45:11,
47:15, 49:14, 49:15,
49:17, 49:19, 49:23,
49:25, 50:20, 51:2,
52:23, 52:24, 53:3,
53:5, 53:7, 53:11,
57:9, 57:23, 58:13,
59:13, 60:18, 60:19,
60:20, 60:23, 64:16,
87:21, 88:7, 88:20,
88:25, 89:2, 91:14,
101:14, 104:19,
104:23, 107:12,
110:3, 110:5, 110:13
**consumers'** [1] - 7:24
**contact** [1] - 110:6
**contacted** [1] - 28:11
**contain** [1] - 61:25
**contained** [1] - 8:2
**contempt** [1] - 10:10
**content** [7] - 57:13,
78:9, 79:16, 99:24,
101:9, 102:5, 102:12
**contention** [1] - 99:15
**contesting** [1] - 63:1
**context** [4] - 34:6,
34:20, 63:5, 100:10
**continuation** [2] -
73:20, 75:10
**continue** [17] - 12:7,
18:8, 18:13, 22:17,
23:19, 32:7, 42:4,
50:6, 64:11, 65:15,
74:2, 88:7, 88:20,
88:21, 94:19, 96:6,
96:18
**continued** [5] - 1:21,

10:14, 32:13, 75:4,
80:18
**Continued** [1] - 2:1
**continues** [1] - 18:14
**continuing** [2] - 37:10,
55:25
**contract** [2] - 71:4,
71:8
**contracted** [2] - 44:6,
90:7
**contractor** [2] - 38:13,
62:21
**contracts** [1] - 87:22
**contradicts** [1] - 61:7
**contrast** [1] - 47:22
**control** [8] - 6:21,
61:22, 74:5, 75:17,
100:7, 100:15,
101:18, 108:13
**controverts** [1] - 59:8
**convened** [1] - 7:10
**convince** [1] - 49:15
**cooperate** [1] - 78:2
**cooperation** [2] -
25:23, 26:5
**cooperative** [1] -
26:18
**coordinated** [1] -
26:16
**corner** [1] - 57:22
**coronavirus** [2] -
10:19, 59:25
**Corp** [1] - 1:18
**corporate** [2] - 52:5,
52:12
**Corporation** [2] - 3:7,
6:25
**correct** [19] - 13:10,
13:18, 20:18, 20:24,
21:6, 27:6, 28:19,
32:11, 62:13, 68:6,
81:14, 86:3, 86:16,
86:17, 88:3, 93:2,
99:18, 99:19, 113:9
**corresponding** [1] -
80:5
**corroborated** [1] -
40:13
**corroborating** [1] -
30:3
**cost** [1] - 59:13
**costs** [8] - 10:23, 20:8,
22:3, 22:11, 23:15,
23:16, 23:17
**counsel** [13] - 3:10,
13:24, 57:1, 58:19,
64:1, 65:13, 66:23,
67:4, 67:11, 68:1,
76:1, 81:21, 84:16
**Count** [3] - 6:11, 7:23,

8:2
**count** [2] - 6:8, 6:10
**counterpoint** [1] -
46:7
**counts** [3] - 6:9, 7:21,
106:24
**couple** [8] - 33:10,
40:25, 53:25, 59:14,
60:11, 83:24, 88:5,
108:4
**course** [26] - 7:8,
10:25, 12:11, 17:9,
18:8, 20:17, 22:8,
22:19, 30:14, 43:5,
48:8, 61:3, 65:21,
66:18, 67:11, 71:3,
83:14, 85:23, 92:23,
93:5, 99:14, 100:12,
100:19, 100:22,
103:12, 103:23
**COURT** [124] - 1:1,
3:2, 3:14, 3:17, 3:23,
4:4, 4:7, 4:10, 4:17,
4:21, 5:7, 5:12,
13:19, 14:2, 14:8,
14:11, 15:4, 16:2,
17:20, 18:15, 21:15,
22:10, 22:16, 24:17,
25:14, 26:9, 26:22,
27:10, 29:22, 32:22,
33:5, 33:12, 34:1,
34:21, 35:3, 43:7,
43:17, 43:23, 44:4,
44:25, 45:14, 47:1,
47:4, 48:6, 49:19,
49:25, 51:5, 51:9,
51:11, 51:23, 52:9,
53:24, 54:18, 55:21,
56:7, 56:11, 56:15,
56:18, 57:18, 61:2,
62:1, 62:5, 62:8,
62:10, 62:14, 62:17,
63:1, 64:18, 65:18,
66:14, 66:24, 67:8,
68:6, 69:11, 70:21,
75:19, 76:9, 76:15,
77:5, 77:11, 77:14,
80:9, 80:13, 81:22,
82:21, 83:4, 83:19,
84:2, 85:23, 86:4,
86:18, 87:10, 87:13,
87:19, 88:3, 90:20,
92:17, 93:5, 96:10,
96:13, 96:21, 96:23,
97:2, 97:10, 97:13,
99:10, 102:16,
103:19, 104:10,
104:13, 105:6,
105:17, 106:1,
107:4, 107:14,

107:19, 107:24,
108:19, 109:12,
109:24, 110:12,
111:4, 111:25,
113:17
**Court** [72] - 1:23, 3:4,
3:9, 5:2, 5:5, 6:17,
6:23, 8:16, 8:19, 9:3,
9:7, 9:11, 13:14,
21:11, 24:19, 24:20,
25:10, 33:7, 35:18,
35:21, 37:4, 37:17,
38:7, 39:6, 40:14,
42:15, 46:20, 46:22,
48:5, 48:22, 49:13,
51:7, 51:9, 51:14,
52:20, 53:8, 54:1,
54:9, 54:20, 64:22,
67:23, 68:4, 69:9,
69:23, 70:7, 70:8,
71:21, 72:17, 73:14,
74:16, 75:2, 75:15,
75:16, 78:23, 78:25,
79:24, 82:12, 97:6,
100:23, 106:18,
107:12, 107:16,
110:4, 110:11,
110:15, 111:3,
111:18, 111:24,
112:7, 113:7
**court** [5] - 10:6, 55:23,
66:16, 73:3, 78:10
**Court's** [13] - 10:19,
14:1, 26:13, 33:10,
55:25, 69:19, 70:19,
73:18, 75:9, 76:14,
83:25, 97:7, 107:25
**court-appointed** [1] -
73:3
**Court-appointed** [1] -
74:16
**courtesy** [1] - 67:7
**covers** [1] - 106:25
**crafted** [1] - 72:8
**created** [1] - 75:24
**creative** [1] - 58:17
**credentials** [1] - 80:25
**credit** [4] - 27:20,
86:13, 90:18, 105:3
**creditors** [4] - 27:17,
27:18, 28:4, 29:3
**Criminal** [2] - 10:9,
12:22
**critical** [5] - 31:24,
32:16, 59:8, 106:19,
109:15
**criticism** [1] - 51:25,
72:21
**criticizes** [2] - 72:23,
73:5

**CRR** [2] - 1:23, 113:17
**culture** [1] - 48:20
**curiously** [1] - 65:12
**current** [16] - 6:21,
10:17, 11:19, 14:18,
14:19, 16:23, 17:21,
17:24, 21:23, 22:1,
28:15, 28:19, 31:1,
47:12, 71:12, 89:23
**customer** [11] - 22:23,
30:23, 30:25, 31:1,
31:7, 32:19, 42:20,
50:3, 89:19, 93:8,
93:18
**customers** [40] - 9:19,
9:23, 9:24, 11:13,
11:16, 11:20, 12:3,
14:23, 15:12, 15:22,
27:3, 28:13, 29:25,
30:6, 30:9, 30:18,
31:1, 32:7, 34:15,
37:7, 42:16, 43:14,
44:10, 45:8, 45:12,
49:20, 50:1, 50:8,
50:9, 50:13, 86:1,
86:7, 87:21, 89:13,
89:20, 89:23, 101:6,
101:12, 102:13,
106:3
**cut** [3] - 63:22, 75:20,
90:21

**D**

**damage** [4] - 11:23,
12:5, 46:6
**damages** [1] - 99:17
**Danielle** [1] - 36:24
**dark** [1] - 31:19
**data** [3] - 28:16, 29:20,
78:5
**date** [3] - 28:25, 39:3,
40:10
**Dated** [1] - 113:14
**dates** [1] - 94:8
**David** [7] - 1:17, 4:5,
13:23, 33:6, 36:12,
83:20, 97:4
**day-to-day** [1] - 6:21
**days** [8] - 47:9, 47:22,
47:23, 50:22, 55:6,
65:21, 70:11, 96:7
**deal** [2] - 63:7, 88:19
**dealers** [1] - 94:1
**deals** [1] - 7:23
**decade** [4] - 92:10,
92:13, 94:6, 94:8
**decades** [1] - 108:10
**deceitfully** [1] - 86:11
**deceived** [7] - 31:25,

32:17, 44:14, 45:2, 45:3, 89:22, 91:20
**December** [3] - 6:8, 6:24, 104:5
**deception** [3] - 43:16, 45:10, 101:4
**deceptive** [15] - 34:11, 34:15, 45:25, 49:8, 49:10, 50:25, 60:24, 61:25, 64:6, 99:4, 99:22, 100:7, 100:8, 106:14, 108:7
**decertifying** [1] - 75:8
**decide** [2] - 33:22, 110:16
**decided** [1] - 96:6
**decider** [1] - 55:8
**decides** [1] - 65:14
**deciding** [1] - 63:20
**decision** [1] - 85:20
**decisions** [1] - 85:20
**declaration** [5] - 35:17, 42:10, 59:15, 59:20, 101:16
**declarations** [4] - 29:8, 35:18, 35:19, 37:4
**deem** [1] - 16:19
**deeply** [1] - 100:3
**defend** [1] - 87:5
**defendant** [1] - 7:2
**Defendant** [11] - 1:14, 1:18, 2:5, 6:25, 17:5, 39:7, 41:16, 46:23, 56:6, 56:21, 72:1
**defendants** [5] - 3:19, 3:21, 3:25, 4:2, 4:6
**Defendants** [71] - 1:6, 4:19, 6:19, 6:22, 13:21, 29:8, 29:10, 34:11, 35:6, 35:16, 36:12, 36:15, 37:13, 37:20, 37:23, 38:2, 38:9, 38:16, 39:1, 39:2, 39:7, 39:20, 40:4, 40:5, 40:16, 40:18, 41:4, 41:9, 41:12, 41:22, 42:4, 42:14, 42:16, 43:22, 44:20, 45:24, 46:24, 48:2, 48:21, 50:15, 51:14, 51:16, 52:5, 52:19, 53:12, 53:22, 55:21, 67:22, 71:22, 72:16, 72:24, 73:15, 73:17, 74:14, 74:24, 75:11, 75:14, 75:18, 76:5, 77:17, 78:2, 79:22, 79:24, 80:6, 98:7, 98:13, 98:17,

104:4, 104:17
**Defendants'** [27] - 13:16, 35:13, 36:5, 36:8, 37:2, 37:10, 40:17, 41:10, 41:11, 41:15, 41:19, 42:14, 44:11, 53:21, 67:25, 72:23, 73:1, 73:21, 74:1, 74:2, 74:17, 75:4, 75:7, 77:24, 78:6, 106:25, 107:17
**defense** [8] - 7:6, 43:14, 43:15, 45:9, 45:13, 45:14, 81:21
**deflect** [1] - 43:5
**degree** [1] - 30:24
**deliver** [1] - 58:13
**delivered** [1] - 57:14
**delivering** [1] - 109:4
**demand** [2] - 11:16, 91:11
**demanding** [2] - 11:14, 80:1
**demographics** [1] - 45:17
**demonstrate** [1] - 8:20
**demonstrated** [2] - 63:12, 103:11
**demonstrating** [2] - 59:9, 89:7
**denial** [1] - 80:20
**denied** [1] - 12:18
**dennis** [6] - 14:6, 58:3, 60:10, 60:20, 64:4, 99:16
**Dennis** [67] - 1:18, 3:6, 4:13, 4:16, 6:20, 7:23, 14:3, 36:1, 56:5, 56:21, 56:22, 56:24, 57:2, 57:6, 57:8, 57:9, 57:13, 58:9, 58:13, 58:20, 58:23, 59:10, 59:15, 59:22, 61:3, 61:4, 61:9, 64:9, 64:10, 64:14, 64:25, 65:12, 65:14, 66:10, 66:14, 66:23, 97:18, 98:7, 98:8, 98:10, 98:14, 98:19, 98:25, 99:1, 99:6, 99:13, 99:21, 99:24, 100:1, 100:14, 101:4, 101:7, 101:16, 102:8, 102:11, 102:17, 102:22, 103:3, 103:6, 103:7, 103:9, 107:1, 108:6, 108:16
**Dennis's** [5] - 35:23,

59:21, 60:18, 67:4, 99:15
**dennis's** [12] - 57:1, 57:3, 57:21, 59:6, 59:12, 60:24, 64:1, 65:19, 101:20, 102:5, 102:19, 103:4
**deny** [1] - 71:4
**department** [3] - 108:20, 108:21, 108:23
**Department** [2] - 108:24, 108:25
**deploy** [1] - 7:24
**depose** [2] - 48:9, 48:10
**deposit** [1] - 27:1
**deposition** [6] - 48:7, 59:7, 59:8, 59:9, 101:17, 108:18
**depositions** [1] - 11:1
**deposits** [1] - 62:12
**described** [2] - 14:13, 14:21
**deserve** [3] - 23:1, 70:17
**design** [1] - 58:11
**designated** [1] - 33:24
**despite** [2] - 11:20, 42:3
**detail** [2] - 73:13, 77:9
**detailing** [1] - 55:1
**details** [4] - 24:3, 68:7, 76:4, 78:17
**determinable** [1] - 16:21
**determination** [4] - 66:17, 71:1, 86:5, 110:8
**determine** [5] - 15:8, 17:1, 54:14, 74:22, 103:3
**determined** [2] - 16:22, 30:8
**determining** [1] - 93:8
**develop** [1] - 13:2
**development** [1] - 59:24
**devised** [1] - 20:1
**dictate** [1] - 80:20
**difference** [2] - 21:2, 63:4
**differences** [1] - 19:24
**different** [10] - 20:6, 20:7, 20:12, 31:25, 41:22, 85:13, 98:25, 101:24, 102:19, 108:16
**differently** [1] - 97:19
**difficult** [4] - 18:12,

32:20, 60:22, 106:16
**digest** [3] - 5:21, 24:11, 109:13
**digging** [1] - 24:3
**dim** [1] - 47:24
**diminishing** [1] - 92:13
**direct** [1] - 108:6
**directed** [1] - 28:8
**directly** [6] - 39:8, 62:24, 66:2, 96:14, 100:6, 108:12
**director** [1] - 61:17
**Diribe** [1] - 59:15
**disability** [1] - 37:2
**disagree** [3] - 70:6, 72:24, 81:23
**disagreed** [1] - 81:11
**disagreement** [1] - 83:11
**disappearing** [1] - 95:10
**disapproving** [1] - 61:23
**discharging** [1] - 78:3
**disclaimers** [1] - 100:10
**discontinued** [1] - 61:12
**discord** [1] - 83:11
**discounted** [1] - 59:19
**Discover** [2] - 41:8, 105:4
**discovered** [2] - 26:13, 50:4
**discovery** [5] - 54:12, 61:3, 61:7, 63:10, 63:18
**discretion** [2] - 65:5, 74:21
**discuss** [1] - 7:11
**discussed** [1] - 111:21
**discussion** [4] - 69:20, 77:12, 77:13, 97:16
**disgruntled** [8] - 15:12, 15:19, 22:25, 23:23, 27:2, 30:5, 30:7
**dismissal** [1] - 102:24
**disposition** [2] - 11:15, 102:22
**dispute** [2] - 49:21, 80:14
**disputed** [2] - 57:5, 88:23
**disputes** [2] - 22:19, 103:1
**dissatisfaction** [1] -

93:8
**dissatisfied** [2] - 16:1, 89:18
**distinction** [1] - 106:21
**distributions** [2] - 29:11, 29:15
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 113:7
**DIVISION** [1] - 1:2
**docket** [1] - 5:13
**document** [4] - 58:7, 58:8, 75:22, 75:23
**documentation** [1] - 28:13
**documents** [6] - 8:10, 8:11, 8:13, 25:21, 54:11, 78:5
**dog** [1] - 97:18
**Dollar** [1] - 59:3
**dollar** [1] - 101:3
**dollars** [10] - 24:6, 28:7, 29:10, 35:15, 49:15, 52:1, 52:3, 52:7, 53:4, 107:1
**donate** [2] - 97:8, 97:10
**done** [4] - 15:19, 45:20, 55:1, 89:8
**Donnie** [1] - 60:9
**Doran** [3] - 1:16, 3:24, 83:23
**DORAN** [2] - 3:22, 3:24
**doubt** [2] - 48:18, 70:14
**doubtful** [1] - 53:17
**down** [21] - 23:19, 31:16, 36:11, 45:21, 56:16, 58:7, 58:16, 60:22, 66:1, 70:13, 77:1, 84:17, 84:23, 89:22, 90:15, 90:24, 91:4, 91:16, 105:22, 110:16
**downside** [1] - 66:18
**dozen** [1] - 78:21
**Dr** [2] - 45:16, 89:20
**drawn** [1] - 96:3
**driver** [1] - 26:3
**driving** [2] - 17:17, 25:11
**dropping** [1] - 7:2
**drug** [1] - 59:24
**due** [4] - 10:19, 41:9, 76:11, 103:23
**duly** [1] - 110:15
**dunk** [1] - 44:5
**duped** [2] - 50:4, 50:5
**Durham** [1] - 60:9

**during** [13] - 11:9, 12:7, 17:8, 60:3, 60:4, 61:3, 64:10, 67:11, 70:21, 93:14, 95:23, 95:25, 99:13
**duties** [1] - 55:13
**dwindle** [1] - 10:24

## E

**e-mail** [6] - 31:7, 31:14, 32:9, 40:24, 58:9, 101:19
**e-mails** [13] - 31:12, 31:13, 31:15, 31:21, 31:24, 32:12, 43:24, 43:25, 50:13, 60:23, 84:22, 89:18, 89:20
**E.C** [1] - 59:22
**early** [6] - 25:18, 61:14, 92:25, 101:23, 103:17, 103:20
**earn** [1] - 12:7
**earned** [1] - 101:4
**earning** [1] - 61:9
**earnings** [27] - 7:22, 34:16, 35:4, 35:9, 40:13, 42:4, 48:21, 48:23, 48:25, 49:4, 49:6, 49:7, 49:9, 49:13, 50:17, 50:18, 50:21, 51:1, 53:18, 53:19, 54:6, 59:11, 59:12, 64:12, 65:16, 66:13
**easier** [2] - 5:1, 5:5
**easily** [2] - 38:1, 56:16
**eat** [1] - 107:5
**economic** [2] - 47:10, 90:9
**education** [1] - 89:2
**educational** [2] - 101:9, 102:12
**effect** [3] - 6:3, 12:20, 74:4
**effectively** [4] - 53:1, 90:24, 96:20, 98:24
**effectiveness** [1] - 64:6
**efficient** [1] - 54:7
**effort** [4] - 31:9, 69:14, 86:6, 105:25
**efforts** [3] - 40:10, 70:6, 79:22
**egregious** [1] - 40:17
**either** [15] - 13:5, 15:23, 17:16, 17:18, 28:11, 29:2, 31:23, 32:17, 48:23, 49:6,

65:3, 65:5, 75:17, 90:2, 102:24
**electronic** [1] - 26:7
**element** [2] - 9:2, 12:11
**eligible** [1] - 16:13
**eliminate** [2] - 91:5, 96:19
**elsewhere** [1] - 53:23
**emotions** [1] - 36:16
**employee** [21] - 61:5, 62:2, 62:21, 62:23, 63:4, 64:2, 98:20, 98:22, 98:23, 100:2, 103:12, 108:22
**employees** [14] - 11:12, 21:6, 25:20, 27:16, 30:5, 40:11, 40:24, 90:16, 99:1, 99:6, 99:17, 108:16, 109:1
**employer** [1] - 99:15
**employment** [3] - 61:19, 99:14
**encompasses** [1] - 77:20
**end** [16] - 5:3, 16:6, 28:24, 32:22, 56:2, 60:19, 63:18, 63:19, 64:20, 66:17, 68:21, 82:8, 85:14, 96:16, 107:2, 112:4
**endeavor** [2] - 97:20, 110:5
**ended** [2] - 8:9, 111:16
**ends** [1] - 66:2
**enforced** [1] - 8:18
**enforcement** [3] - 10:9, 12:21, 69:1
**engage** [6] - 30:10, 45:24, 54:11, 54:12, 74:24, 112:1
**engaged** [3] - 40:16, 40:18, 42:6
**engagement** [4] - 19:9, 19:11, 19:12, 19:14
**engaging** [2] - 6:23, 23:11
**enhanced** [1] - 77:18
**enhances** [1] - 71:24
**enjoin** [1] - 8:17
**enjoined** [3] - 6:22, 86:25
**enjoy** [4] - 45:8, 45:11, 88:11, 89:23
**enjoyed** [4] - 44:11, 44:12, 89:14

**enjoying** [1] - 88:20
**ensure** [9] - 9:18, 9:25, 10:1, 11:5, 27:2, 64:10, 64:13, 71:22, 87:2
**ensuring** [1] - 9:19
**entered** [1] - 6:17
**enterprise** [2] - 55:17, 55:18
**Enterprises** [1] - 55:23
**entertain** [2] - 80:11, 111:6
**entire** [5] - 19:16, 31:7, 48:19, 58:7, 64:23
**entirely** [1] - 102:1
**entirety** [1] - 7:2
**entities** [7] - 1:18, 4:13, 17:5, 27:21, 27:23, 78:7, 79:12
**entitled** [9] - 9:20, 15:8, 16:16, 24:5, 25:1, 27:3, 27:4, 99:9, 113:10
**entity** [3] - 18:12, 20:8, 20:15
**entry** [1] - 56:21
**equitable** [4] - 53:2, 53:6, 54:7, 100:20
**equities** [24] - 5:20, 5:24, 8:21, 9:2, 10:13, 13:13, 22:22, 34:18, 34:20, 37:19, 37:20, 53:6, 57:2, 64:4, 68:2, 72:5, 80:20, 86:20, 86:21, 87:19, 88:2, 91:4, 96:17, 100:13
**equity** [2] - 56:10, 100:24
**equivalent** [1] - 83:2
**equivocal** [1] - 98:18
**error** [1] - 76:20
**escrow** [5] - 10:1, 26:23, 68:10, 95:14, 96:3
**especially** [6] - 30:19, 47:23, 66:12, 69:23, 93:9, 99:20
**Esquire** [13] - 1:13, 1:13, 1:15, 1:16, 1:16, 1:17, 1:17, 1:19, 1:20, 1:20, 1:21, 2:3, 2:3
**essence** [3] - 6:9, 8:8, 17:20
**essential** [1] - 71:21
**essentially** [1] - 30:20
**establish** [3] - 43:19,

44:2, 77:17
**established** [3] - 73:3, 74:22, 78:16
**estate** [6] - 18:6, 22:1, 22:6, 25:9, 28:20
**estimate** [2] - 29:12, 30:4
**estimation** [1] - 22:2
**et** [6] - 1:6, 7:25, 84:18, 90:12, 91:10, 95:20
**evaluate** [2] - 46:20, 71:1
**evaluated** [1] - 25:3
**Evelius** [1] - 2:2
**event** [13] - 30:15, 53:21, 63:7, 64:25, 66:1, 76:16, 79:7, 80:16, 81:11, 81:23, 82:14, 87:24, 111:14
**evidence** [19] - 8:13, 26:20, 31:10, 35:11, 40:10, 45:22, 48:3, 48:22, 50:23, 58:21, 59:8, 89:17, 89:19, 95:7, 97:25, 98:2, 101:4, 101:6, 101:17
**ex** [1] - 6:17
**exact** [6] - 11:25, 24:22, 29:23, 39:2, 84:21, 93:15
**exactly** [5] - 58:22, 62:4, 91:1, 91:2, 96:13
**example** [3] - 42:17, 96:6, 108:23
**examples** [4] - 58:3, 59:14, 89:11, 100:10
**exceeded** [1] - 31:1
**except** [1] - 61:16
**excess** [2] - 22:15, 27:15
**exclusively** [2] - 83:5, 109:14
**excuses** [1] - 93:21
**executive** [2] - 62:23, 98:21
**Exhibit** [2] - 39:6, 89:12
**exhibits** [1] - 39:7
**existing** [1] - 51:3
**expect** [1] - 50:17
**expectation** [1] - 82:4
**expended** [1] - 11:3
**expense** [1] - 95:4
**expenses** [3] - 48:7, 48:12, 95:23
**expensive** [1] - 94:25
**experience** [5] - 20:25, 38:22, 49:11,

69:3, 104:22
**experiences** [1] - 60:17
**expert** [11] - 19:21, 20:10, 20:25, 29:4, 36:16, 39:11, 45:16, 48:12, 49:16, 69:17, 81:25
**expertise** [13] - 54:4, 68:12, 69:16, 73:4, 74:23, 79:3, 79:13, 80:15, 81:7, 81:20, 82:3, 83:7, 83:16
**experts** [4] - 19:21, 26:19, 46:14, 81:24
**experts'** [1] - 20:6
**explain** [2] - 38:6, 72:17
**explained** [2] - 98:25, 99:2
**exponential** [1] - 92:20
**express** [2] - 19:22, 74:19
**expressed** [2] - 7:12, 19:1
**expressly** [2] - 86:10
**extension** [1] - 75:13
**extensive** [1] - 83:7
**extent** [8] - 45:14, 55:22, 65:1, 84:9, 85:24, 99:11, 99:12, 103:3
**extraordinarily** [1] - 65:24
**extraordinary** [2] - 23:17, 70:1
**extremely** [1] - 41:3
**eyes** [2] - 38:3, 50:5

## F

**face** [2] - 57:7, 57:21
**faced** [1] - 35:20
**facing** [4] - 20:8, 74:12, 74:17, 77:20
**fact** [29] - 7:15, 8:10, 14:19, 20:21, 20:22, 21:9, 24:25, 25:8, 30:19, 35:14, 40:6, 40:23, 43:1, 45:9, 52:23, 71:15, 73:8, 74:16, 77:8, 78:23, 85:16, 88:25, 93:3, 97:16, 99:9, 101:5, 103:2, 104:4, 105:4
**factor** [3] - 22:11, 28:4, 104:13
**facts** [10] - 14:13, 27:14, 38:8, 46:25,

57:5, 93:22, 94:17, 99:20, 102:10, 103:1
**factual** [5] - 13:8, 13:25, 70:5, 83:24, 101:15
**failing** [1] - 42:12
**fails** [1] - 107:11
**fair** [4] - 8:25, 53:10, 76:9, 87:13
**fairly** [6] - 11:23, 21:24, 34:24, 47:20, 68:25, 76:20
**faith** [2] - 27:1, 38:4
**falsely** [2] - 41:13, 41:17
**familiar** [2] - 54:2, 81:7
**familiarity** [1] - 81:14
**family** [1] - 31:9
**far** [13] - 5:17, 10:9, 13:17, 17:11, 20:12, 28:13, 34:8, 67:23, 68:4, 80:1, 87:4, 97:16
**fashion** [1] - 52:14
**favor** [11] - 8:21, 10:13, 37:21, 68:24, 72:6, 80:17, 82:9, 82:14, 86:21, 96:17, 110:22
**favorable** [5] - 31:16, 43:12, 43:24, 46:8, 102:24
**fear** [1] - 51:5
**feature** [2] - 8:4, 8:6
**featured** [1] - 57:7
**features** [1] - 74:9
**February** [3] - 7:5, 7:9
**federal** [3] - 10:8, 12:21, 69:1
**FEDERAL** [2] - 1:3, 113:17
**Federal** [12] - 1:12, 1:23, 3:5, 3:13, 3:16, 5:15, 6:9, 9:15, 10:8, 12:21, 99:12
**feed** [2] - 4:25
**fees** [7] - 22:11, 23:17, 35:23, 37:3, 37:6, 94:22, 94:24
**felt** [2] - 32:16, 32:17
**Felts** [1] - 36:24
**few** [5] - 29:11, 35:22, 97:19, 97:22, 104:2
**field** [1] - 81:25
**fighting** [2] - 42:7, 98:15
**figure** [8] - 14:23, 22:17, 29:23, 33:22, 47:14, 47:15, 109:3,

110:15
**figuring** [1] - 70:23
**file** [1] - 7:1
**filed** [19] - 6:7, 7:6, 7:7, 7:8, 7:16, 7:17, 12:17, 17:6, 19:10, 29:8, 31:6, 37:24, 39:3, 40:15, 41:25, 42:22, 60:12, 92:11, 94:13
**filing** [3] - 6:12, 73:12, 92:11
**filings** [2] - 39:6, 92:8
**final** [3] - 11:15, 16:14, 107:18
**finally** [3] - 8:1, 40:21, 41:18
**finances** [1] - 21:5
**financial** [11] - 19:21, 20:2, 20:6, 20:9, 26:10, 26:18, 26:19, 47:24, 54:13, 94:2
**finder** [1] - 103:2
**fine** [4] - 5:6, 82:20, 109:25, 111:9
**finish** [1] - 80:9
**finished** [2] - 66:20, 97:6
**firm** [1] - 83:2
**firms** [2] - 78:22, 80:24
**first** [18] - 7:20, 36:20, 36:22, 40:18, 45:10, 50:7, 54:19, 57:20, 58:23, 61:16, 67:3, 72:4, 72:13, 74:12, 84:4, 90:15, 105:20, 110:16
**fist** [1] - 39:10
**fit** [1] - 66:17
**five** [1] - 27:21
**fixed** [1] - 107:25
**flagging** [2] - 40:21, 40:22
**flawed** [2] - 21:2, 21:13
**flaws** [2] - 13:7
**Flexner** [2] - 1:19, 4:15
**flip** [1] - 106:11
**Floor** [1] - 1:24
**fluid** [1] - 16:10
**focus** [5] - 5:23, 9:3, 12:10, 34:8, 58:14, 70:6, 70:18
**focused** [3] - 81:17, 81:18, 102:12
**focusing** [1] - 67:24
**folks** [6] - 45:4, 45:18, 48:11, 52:15, 58:25,

65:7
**follow** [7] - 36:4, 36:8, 37:2, 39:10, 39:16, 59:21, 60:19
**followed** [2] - 32:1, 36:2
**following** [8] - 1:21, 6:3, 36:12, 36:16, 39:14, 57:11, 60:1, 75:3
**follows** [1] - 79:6
**Foodtown** [1] - 37:11
**foolish** [1] - 65:24
**foot** [1] - 86:5
**footed** [1] - 48:15
**FOR** [1] - 1:1
**force** [2] - 6:3, 12:20
**forcing** [1] - 42:8
**foregoing** [1] - 113:8
**forewarn** [1] - 67:11
**forget** [1] - 97:7
**forgetting** [3] - 4:12, 67:16
**forgiven** [1] - 28:2
**form** [1] - 12:24
**formal** [5] - 6:1, 17:11, 61:15, 61:16, 94:11
**format** [1] - 113:11
**formula** [1] - 58:16
**forth** [10] - 13:4, 19:8, 47:13, 50:23, 63:5, 72:9, 76:7, 77:2, 92:22, 96:19
**forward** [42] - 5:5, 13:5, 19:17, 20:15, 20:20, 21:11, 22:17, 28:23, 29:19, 32:21, 34:25, 46:21, 48:23, 49:6, 49:18, 50:17, 51:2, 53:16, 53:20, 54:4, 54:14, 54:15, 72:16, 73:2, 73:16, 79:25, 80:7, 80:25, 83:18, 86:6, 86:15, 87:1, 87:15, 87:18, 88:6, 90:6, 90:19, 95:1, 95:2, 97:25, 106:17, 109:15
**fought** [1] - 36:22
**founder** [1] - 61:17
**four** [7] - 15:25, 28:6, 39:3, 74:9, 84:20, 87:24, 109:11
**four-and-a-half** [1] - 28:6
**Fourth** [1] - 37:11
**fourth** [1] - 77:15
**frankly** [7] - 19:19, 63:8, 73:9, 81:7, 83:8, 88:9, 88:14

**fraud** [6] - 32:23, 34:12, 43:16, 45:5, 93:8, 105:4
**fray** [1] - 30:12
**free** [2] - 56:1, 63:23
**freeze** [18] - 6:13, 6:18, 7:1, 10:12, 10:14, 10:18, 13:11, 17:24, 29:7, 51:15, 52:10, 72:2, 80:18, 90:23, 106:22, 106:23, 107:16
**freezes** [5] - 90:16, 91:6, 94:19, 95:5, 96:19
**frequently** [1] - 42:21
**Friday** [4] - 1:8, 6:2, 6:3, 111:7
**front** [2] - 85:14, 102:21
**front-end** [1] - 85:14
**frozen** [1] - 18:14
**frustrated** [1] - 36:14
**FTC** [102] - 5:19, 6:12, 7:1, 7:7, 7:16, 8:14, 8:15, 8:18, 8:19, 8:24, 10:4, 10:5, 12:15, 12:16, 13:11, 16:16, 17:4, 17:16, 19:4, 19:13, 19:17, 21:7, 23:5, 28:11, 29:2, 34:9, 35:17, 37:4, 37:23, 39:23, 43:15, 44:2, 45:13, 46:4, 46:6, 47:7, 47:8, 47:11, 51:10, 53:16, 54:4, 54:15, 55:4, 55:7, 55:19, 56:3, 63:12, 63:13, 63:14, 65:22, 66:25, 67:15, 67:19, 68:20, 69:22, 70:9, 71:25, 72:22, 73:14, 73:23, 74:4, 77:1, 77:3, 78:13, 78:19, 78:20, 78:23, 79:4, 79:5, 79:6, 79:20, 80:17, 81:11, 82:10, 83:12, 85:13, 86:9, 87:6, 87:24, 88:25, 89:17, 92:12, 94:10, 97:22, 97:25, 98:1, 98:16, 98:19, 98:24, 99:20, 100:2, 101:1, 101:16, 102:24, 103:16, 104:14, 105:1, 108:11, 110:21, 111:14, 111:19
**FTC's** [11] - 7:20, 8:12,

11:8, 56:20, 62:2, 82:14, 83:10, 92:10, 98:6, 102:18, 104:22
**fulcrum** [1] - 9:22
**fulfill** [1] - 68:12
**full** [5] - 6:3, 12:20, 25:24, 26:4, 54:10
**fully** [3] - 7:3, 71:2, 78:2
**fulsome** [1] - 67:1
**functional** [1] - 75:10
**functioning** [1] - 79:23
**fund** [4] - 29:19, 51:13, 51:20, 107:10
**fundamentally** [4] - 48:19, 48:20, 48:25, 50:16
**funds** [6] - 52:5, 52:8, 52:10, 71:25, 90:22, 110:13
**furlough** [2] - 90:19, 93:14
**furloughed** [1] - 36:18
**future** [10] - 20:23, 20:24, 21:16, 30:11, 51:3, 87:2, 90:8, 91:14, 91:21

### G

**Gallagher** [1] - 2:2
**gamble** [1] - 28:24
**Gary** [2] - 35:22, 60:3
**gatekeeper** [1] - 55:8
**gather** [1] - 18:10
**gathering** [1] - 18:9
**GAZIC** [1] - 113:17
**Gazic** [2] - 1:23, 113:5
**general** [4] - 5:17, 10:19, 10:20, 85:11
**generate** [4] - 21:8, 21:9, 31:10, 95:19
**generating** [7] - 70:16, 73:21, 74:25, 75:2, 75:7, 75:11, 75:13
**genesis** [1] - 8:2
**genuine** [1] - 103:1
**GEORGE** [1] - 1:11
**given** [13] - 12:2, 17:21, 20:7, 28:12, 28:13, 30:19, 37:12, 65:20, 68:14, 84:22, 91:5, 97:19, 105:7
**glad** [1] - 25:13
**glimpse** [1] - 35:19
**globally** [1] - 25:5
**GLR-20-3538** [1] - 3:5
**goals** [1] - 110:14
**God** [1] - 106:2

**Government** [4] -
27:22, 28:2, 39:23,
47:8
**grade** [1] - 106:4
**grant** [1] - 8:19
**granting** [1] - 37:14
**grants** [1] - 8:16
**granular** [1] - 68:7
**grappling** [1] - 23:8
**great** [1] - 101:11
**greater** [3] - 37:9,
37:12, 77:7
**Greenberg** [4] - 1:15,
3:19, 3:20, 4:2
**grossly** [1] - 100:13
**group** [3] - 15:20,
32:11, 69:14
**groups** [1] - 15:21
**growing** [1] - 92:21
**growth** [1] - 92:21
**guarantee** [3] - 47:19,
47:20, 57:24
**guaranteed** [1] - 59:17
**guess** [3] - 10:3,
30:22, 87:5
**guru** [1] - 101:7
**gurus** [5] - 7:22, 32:2,
38:10, 98:24, 101:10
**guys** [1] - 67:1

## H

**half** [5] - 28:6, 52:1,
84:11, 102:2
**Hampshire** [6] -
39:24, 94:7, 94:12,
98:3, 98:9
**hand** [4] - 32:15, 39:9,
76:8
**handcuffs** [1] - 23:5
**handful** [2] - 35:7,
49:2
**handle** [1] - 27:20,
93:19
**handled** [2] - 16:5,
84:5
**handling** [1] - 82:18
**hands** [4] - 57:4, 59:9,
100:3, 110:13
**happy** [15] - 5:3, 20:4,
34:2, 44:24, 50:12,
50:14, 73:6, 77:10,
80:11, 81:20, 101:7,
102:11, 106:12,
110:10, 110:19
**hard** [1] - 18:12
**harm** [10] - 23:3, 34:8,
35:19, 37:8, 45:25,
53:5, 59:13, 60:25,
64:12, 96:14

**harmed** [1] - 34:10
**harms** [1] - 36:11
**head** [2] - 42:20,
108:21
**headed** [1] - 110:8
**heads** [3] - 82:23,
83:13, 111:11
**hear** [20] - 4:18, 4:22,
5:19, 13:20, 14:10,
24:20, 25:12, 33:13,
34:2, 56:13, 56:15,
58:19, 67:4, 67:25,
91:18, 92:4, 94:15,
95:13, 97:13, 108:1
**heard** [9] - 26:1,
72:21, 84:16, 85:15,
87:8, 88:8, 88:15,
89:17, 94:10
**hearing** [11] - 5:14,
5:25, 7:5, 7:11, 7:18,
22:16, 73:9, 76:23,
88:15, 111:4, 111:17
**Hearing** [2] - 1:8, 1:10
**heavily** [1] - 12:4
**held** [8] - 61:17, 62:24,
100:23, 100:25,
103:2, 108:12,
108:13, 113:10
**help** [3] - 32:3, 40:7,
70:16
**helpful** [2] - 110:4,
110:11
**helps** [1] - 109:4
**Herbalife** [5] - 78:12,
78:19, 79:19, 81:17,
83:10
**hereby** [1] - 113:7
**hesitate** [1] - 96:25
**hidden** [2] - 26:20,
107:8
**hide** [1] - 26:21
**high** [5] - 41:19,
42:25, 73:14, 80:6,
105:1
**highlight** [2] - 72:13,
74:11
**highlights** [3] - 34:21,
34:22, 43:21
**highly** [3] - 32:16,
32:19, 79:11
**himself** [5] - 61:17,
62:10, 62:14, 99:16,
109:4
**hired** [3] - 40:5, 40:7,
40:19
**hiring** [1] - 98:10
**historic** [2] - 49:8,
50:25
**history** [3] - 5:18,
13:10, 46:24

**hit** [3] - 34:21, 34:22,
97:20
**hold** [13] - 5:25, 24:2,
27:14, 29:18, 61:15,
99:21, 100:5,
100:14, 100:24,
101:11, 102:14,
108:6
**Holdings** [2] - 6:25,
7:2
**hole** [1] - 60:20
**home** [1] - 93:16
**Honor** [128] - 3:12,
3:15, 3:18, 3:22, 4:1,
4:5, 4:19, 4:23, 5:9,
13:9, 13:22, 14:4,
14:9, 14:12, 14:15,
14:21, 14:22, 15:2,
15:16, 16:18, 16:23,
18:13, 19:24, 20:3,
20:10, 20:19, 21:1,
21:3, 21:12, 22:1,
22:9, 22:15, 24:16,
25:5, 25:6, 25:12,
25:25, 26:5, 26:15,
27:8, 27:12, 28:19,
29:20, 31:4, 31:16,
32:11, 32:19, 33:4,
33:6, 33:25, 34:4,
34:7, 34:17, 35:2,
37:24, 41:8, 43:13,
43:20, 44:3, 45:7,
46:18, 47:2, 47:25,
49:22, 50:7, 50:15,
51:7, 51:12, 52:4,
55:11, 55:14, 56:4,
56:13, 56:20, 57:17,
58:10, 59:7, 60:17,
61:8, 62:9, 62:13,
64:4, 65:12, 66:4,
66:11, 66:21, 67:5,
67:21, 69:13, 71:15,
71:21, 72:11, 73:10,
73:12, 76:4, 76:24,
78:15, 79:2, 80:3,
80:12, 81:15, 82:22,
83:14, 83:20, 84:3,
90:14, 91:22, 97:4,
102:10, 103:15,
103:18, 104:1,
104:2, 105:13,
105:24, 106:9,
107:15, 107:22,
108:3, 109:7,
109:20, 109:22,
109:23, 111:2,
111:18
**Honor's** [4] - 21:14,
72:12, 74:11, 97:23
**HONORABLE** [1] -

1:11
**Honorable** [2] - 69:9,
112:7
**hope** [2] - 13:4, 70:18
**hoped** [1] - 19:5
**hopeful** [1] - 81:12
**hopefully** [5] - 28:2,
69:21, 70:16,
110:17, 111:12
**hoping** [1] - 19:1
**horrible** [1] - 106:2
**host** [1] - 68:3
**hot** [1] - 67:11
**hour** [1] - 48:13
**hours** [2] - 47:9,
101:17
**hype** [1] - 38:14
**hyped** [1] - 60:9
**hypey** [1] - 38:11

## I

**iceberg** [1] - 104:23
**ideally** [1] - 69:3
**identify** [2] - 3:10,
92:11
**ignite** [1] - 58:16
**ignored** [1] - 92:6
**II** [9] - 10:2, 49:4,
50:21, 50:22, 54:23,
55:9, 65:4, 65:9,
96:7
**III** [1] - 1:11
**ill** [3] - 64:15, 100:25,
101:2
**ill-gotten** [3] - 64:15,
100:25, 101:2
**illegal** [2] - 62:24,
64:25
**image** [2] - 61:21,
61:24
**images** [1] - 40:1
**imagine** [5] - 18:13,
48:7, 48:9, 63:10,
65:5
**implement** [2] - 73:13,
77:17
**implements** [1] -
72:19
**implied** [1] - 19:2
**important** [5] - 34:20,
38:7, 57:2, 59:1,
78:15
**imposed** [1] - 6:18
**imposes** [1] - 77:21
**imposing** [1] - 8:3
**impossible** [2] -
90:18, 94:20
**impression** [8] -
35:12, 40:2, 43:17,

43:18, 43:22, 44:1,
44:15, 45:15
**improve** [1] - 105:9
**improved** [1] - 105:18
**IN** [1] - 1:1
**inappropriately** [1] -
65:23
**Inc** [2] - 3:8, 83:1
**inclined** [1] - 88:15
**include** [2] - 10:9,
27:23
**including** [9] - 45:19,
68:11, 78:4, 78:22,
84:25, 96:8, 99:3,
99:7, 99:22
**income** [5] - 35:24,
35:25, 57:9, 70:16,
95:19, 109:10
**Incorporated** [1] -
79:2
**incorrect** [1] - 13:8
**increase** [2] - 22:24,
93:13
**increased** [1] - 106:8
**incur** [1] - 86:14
**incurred** [2] - 48:8,
59:25
**indeed** [6] - 7:17,
15:13, 29:25, 30:11,
43:12, 45:23, 45:24,
63:3, 92:17, 102:25
**independent** [2] -
47:13, 62:21
**independently** [1] -
109:2
**indicated** [6] - 5:13,
5:16, 7:5, 18:17,
28:10, 61:5
**indicates** [2] - 61:22,
62:18
**indicative** [2] - 50:11,
105:3
**indicia** [1] - 101:18
**individual** [14] - 16:8,
17:12, 17:18, 25:3,
65:6, 65:24, 82:25,
86:7, 87:21, 92:14,
100:25, 106:25,
108:8, 110:13
**individually** [3] - 55:3,
99:16, 100:5
**individuals** [10] -
15:13, 17:4, 30:13,
43:25, 44:8, 44:25,
71:4, 83:6, 108:9,
108:12
**indulge** [4] - 34:25,
35:21, 43:20, 109:22
**indulgence** [1] - 33:10
**industry** [1] - 94:2

**inequitable** [2] - 100:13, 101:11
**inequities** [1] - 14:6
**influence** [1] - 75:17
**information** [7] - 24:11, 25:21, 26:6, 26:19, 30:2, 103:8, 111:5
**informed** [2] - 38:22, 39:25
**infusion** [1] - 28:22
**initial** [2] - 7:9, 31:5
**initialing** [1] - 86:11
**initiated** [1] - 28:17
**Injunction** [6] - 1:10, 3:9, 7:4, 7:5, 7:11, 12:17
**injunction** [12] - 6:16, 8:19, 8:22, 9:6, 12:14, 12:19, 14:19, 16:5, 18:18, 37:14, 56:22, 64:8, 64:23, 69:25, 70:24, 80:21, 80:22, 103:10, 110:23
**Injunctive** [3] - 5:14, 6:2, 6:5
**injunctive** [7] - 8:17, 9:8, 13:3, 37:15, 66:5, 86:22, 110:22
**injuries** [1] - 37:13
**inquiry** [1] - 66:17, 94:9, 96:10
**inside** [1] - 47:9
**insight** [2] - 24:13, 70:2
**insolvent** [1] - 22:21
**instance** [3] - 17:14, 51:16
**instead** [4] - 8:5, 8:7, 11:12, 19:6
**instituted** [2] - 12:18, 17:10
**instructions** [1] - 111:16
**insufficient** [1] - 19:24
**intent** [1] - 75:22
**intentions** [1] - 66:12
**interact** [1] - 42:16
**interest** [12] - 7:12, 28:9, 37:8, 37:10, 37:12, 65:20, 83:14, 88:2, 96:15, 102:6, 106:20, 110:3
**interested** [4] - 70:7, 70:22, 73:9, 89:25
**interesting** [1] - 84:10
**internal** [2] - 42:13, 77:22
**internet** [1] - 27:24

**interpretation** [4] - 75:22, 75:25, 76:2, 76:11
**interrupted** [2] - 46:11
**intervention** [1] - 75:9
**investigated** [1] - 24:4
**investigating** [1] - 11:2
**investigation** [3] - 98:9, 102:19, 102:20
**investigations** [2] - 39:23, 40:3
**investment** [2] - 36:13, 95:20
**investor** [1] - 53:14
**investors** [1] - 51:19
**investors'** [1] - 36:15
**involuntary** [1] - 94:9
**involved** [5] - 10:22, 54:5, 70:13, 98:8, 98:10
**involvement** [3] - 102:19, 103:4, 109:8
**involves** [2] - 9:8, 70:15
**IRA** [2] - 35:25, 36:10
**irrelevant** [1] - 49:12
**irreparable** [1] - 35:19
**isolate** [1] - 101:2
**issue** [12] - 6:5, 8:17, 15:6, 21:4, 25:25, 26:2, 31:5, 37:16, 46:1, 71:21, 111:6, 111:10
**issued** [1] - 6:16
**issues** [10] - 10:16, 13:1, 18:18, 19:4, 23:8, 65:11, 71:20, 72:11, 77:3, 83:24, 87:4, 87:7, 87:10, 93:24
**issuing** [1] - 112:4
**IT** [1] - 108:21
**itself** [5] - 21:1, 21:5, 22:19, 87:20, 95:7

**J**

**January** [3] - 7:7, 41:8
**Jason** [5] - 2:5, 3:6, 3:7, 38:17, 40:25
**Jeff** [1] - 59:21
**Jeffrey** [2] - 2:5, 3:6
**job** [2] - 93:21, 98:24
**jobs** [1] - 51:20
**John** [2] - 1:20, 4:14
**join** [1] - 65:15
**joined** [1] - 4:16
**joint** [2] - 83:13, 109:16

**Jonathan** [2] - 1:21, 4:14
**Jones** [1] - 2:2
**Jordan** [1] - 42:20
**Judge** [3] - 1:11, 47:5, 83:25
**judge** [2] - 19:15, 19:18
**judgment** [4] - 16:14, 63:11, 91:16, 94:13
**Judgment** [3] - 63:8, 102:25, 103:17
**Judicial** [1] - 113:12
**juice** [1] - 24:15
**July** [2] - 38:10, 41:10
**jump** [1] - 70:22
**jumped** [1] - 30:16
**juncture** [1] - 103:9
**jury** [2] - 16:16, 103:3
**Justice** [2] - 108:24, 108:25

**K**

**keep** [8] - 5:4, 50:19, 67:10, 67:15, 67:16, 97:11, 106:10
**keeper** [1] - 58:25
**keeps** [1] - 90:11
**KEITH** [3] - 27:12, 31:4, 33:4
**Keith** [26] - 2:2, 2:5, 4:24, 4:25, 5:1, 5:10, 24:8, 24:19, 25:6, 25:12, 25:15, 25:21, 26:24, 26:25, 27:10, 29:22, 33:3, 33:8, 43:10, 43:25, 50:4, 51:25, 68:15, 68:19, 81:2
**Keith's** [1] - 47:23
**Kenneth** [1] - 36:4
**kept** [4] - 31:25, 40:22, 42:11, 51:15
**kids** [1] - 105:19
**kill** [2] - 10:18, 59:1
**killing** [1] - 58:14
**Kim** [17] - 1:13, 3:15, 3:17, 10:16, 56:4, 61:2, 63:22, 64:18, 64:21, 65:11, 66:20, 101:3, 101:20, 107:22, 107:24, 108:1
**KIM** [19] - 3:15, 56:13, 56:16, 56:19, 57:19, 59:6, 61:8, 62:4, 62:6, 62:9, 62:13, 62:16, 62:22, 63:24, 65:12, 66:4, 66:21,

108:3, 109:3
**kind** [3] - 44:13, 82:11, 94:2
**kitty** [1] - 91:15
**knowledge** [3] - 11:20, 26:8, 89:4
**Kyle** [9] - 1:18, 3:6, 4:13, 4:16, 56:5, 56:21, 60:9, 60:12, 98:25
**Kyle's** [1] - 60:8

**L**

**lack** [4] - 59:10, 68:15, 68:19, 75:21
**lacks** [1] - 73:6
**laid** [1] - 37:16
**language** [1] - 71:3
**large** [7] - 30:15, 31:14, 31:24, 32:15, 89:24, 92:16, 104:8
**last** [6] - 23:14, 56:23, 65:21, 94:23, 103:25, 109:11
**late** [2] - 61:13, 101:23
**latest** [1] - 10:23
**launch** [1] - 58:25
**launched** [1] - 60:11
**Laura** [6] - 41:6, 57:16, 58:6, 58:23, 59:3, 59:6
**Law** [1] - 4:15
**law** [26] - 8:18, 24:14, 34:12, 37:7, 49:1, 54:3, 62:22, 64:3, 66:8, 69:1, 73:2, 74:23, 78:22, 79:4, 79:6, 79:13, 80:24, 83:2, 83:8, 83:17, 100:4, 106:16, 108:10, 108:14
**lawful** [6] - 9:18, 11:6, 55:2, 71:23, 72:16, 73:15, 79:25, 80:7
**lawfully** [2] - 11:9, 50:18
**lawsuit** [11] - 11:21, 17:6, 19:16, 31:6, 41:25, 45:1, 50:1, 50:2, 88:10
**lawyers** [3] - 34:23, 40:6, 111:8
**lead** [1] - 20:15
**learn** [1] - 90:1
**learned** [1] - 38:10
**learning** [2] - 40:3, 90:1
**least** [11] - 9:9, 11:19, 44:7, 46:4, 54:2,

59:25, 64:22, 91:24, 103:9, 107:17, 110:21
**leave** [2] - 22:5, 65:14
**leaves** [1] - 84:15
**left** [6] - 21:25, 28:7, 42:21, 55:7, 55:16, 111:21
**leftover** [1] - 70:12
**legal** [2] - 63:5, 100:21
**legally** [1] - 70:15
**legitimate** [1] - 23:16
**length** [1] - 33:9
**lens** [1] - 46:20
**less** [5] - 17:11, 25:8, 91:13, 92:1, 100:19
**letter** [5] - 38:16, 38:22, 39:2, 98:7
**letters** [2] - 38:12, 98:4
**level** [5] - 73:14, 79:4, 79:6, 80:6
**LEVI** [1] - 1:11
**Levin** [2] - 4:15
**lewded** [1] - 68:8
**liabilities** [2] - 22:24, 28:21
**liability** [2] - 98:3, 108:9
**liable** [10] - 62:24, 100:5, 100:15, 100:24, 100:25, 101:13, 102:14, 108:6, 108:12, 108:14
**lie** [1] - 41:25
**lied** [1] - 41:4
**lies** [1] - 41:23
**life** [1] - 63:2
**lifted** [1] - 106:23
**lifts** [1] - 107:16
**light** [3] - 10:5, 10:18, 103:17
**likelihood** [7] - 5:22, 8:20, 8:23, 34:19, 46:2, 46:13, 100:4
**likely** [11] - 18:5, 21:17, 21:24, 35:12, 35:14, 38:20, 39:13, 44:16, 49:17, 53:8
**limit** [1] - 65:7
**line** [4] - 23:20, 37:25, 45:21, 67:10
**lines** [1] - 67:10
**linked** [1] - 5:1
**lips** [1] - 109:21
**liquidated** [1] - 16:19
**liquidation** [1] - 29:7
**list** [3] - 64:20, 110:5, 110:10

**lists** [1] - 60:2
**litigation** [33] - 5:17,
9:23, 10:22, 11:1,
11:10, 12:8, 16:15,
16:25, 17:1, 17:4,
17:8, 17:16, 17:22,
18:5, 22:9, 23:6,
25:18, 30:11, 48:7,
48:12, 63:14, 63:20,
64:11, 64:17, 65:20,
66:12, 70:13, 76:1,
81:4, 87:25, 94:13,
102:17, 110:17
**litigators** [1] - 69:15
**Liu** [1] - 100:23
**LLC** [6] - 1:5, 3:6, 3:7,
3:8, 55:16, 111:22
**LLP** [3] - 1:15, 1:19,
2:2
**loan** [3] - 28:2, 28:6,
51:20
**Lock** [3] - 57:20,
59:17, 59:18
**locked** [1] - 103:13
**logged** [1] - 110:6
**Lombard** [1] - 1:24
**look** [14] - 32:20,
42:19, 69:2, 84:19,
85:18, 89:12, 92:15,
101:15, 102:8,
103:21, 105:14,
105:15, 105:16,
109:15
**looked** [1] - 109:19
**looking** [3] - 48:13,
88:17
**looks** [1] - 91:8
**loop** [1] - 47:14
**lose** [3] - 39:13, 46:16,
57:3
**losing** [3] - 37:16,
39:9, 60:19
**losses** [2] - 37:5,
59:25
**lost** [10] - 28:25, 32:2,
35:23, 36:4, 36:7,
37:2, 37:5, 59:20,
60:7, 60:15
**love** [1] - 91:11
**lower** [1] - 57:21
**lying** [1] - 98:13

## M

**magistrate** [4] - 19:6,
19:11, 19:15, 19:18
**mail** [6] - 31:7, 31:14,
32:9, 40:24, 58:9,
101:19
**mails** [13] - 31:12,

31:13, 31:15, 31:21,
31:24, 32:12, 43:24,
43:25, 50:13, 60:23,
84:22, 89:18, 89:20
**maintain** [1] - 55:2
**major** [1] - 94:1
**majority** [3] - 46:12,
85:6, 93:7
**Malina** [1] - 1:15, 3:18,
33:11, 67:22, 83:23
**MALINA** [4] - 3:18,
4:19, 22:14, 67:21
**manage** [1] - 95:7
**manager** [1] - 95:3
**managerial** [1] - 98:22
**manages** [1] - 17:4
**mandated** [1] - 79:21
**manipulating** [1] -
36:15
**manner** [7] - 11:6,
71:23, 72:16, 73:15,
79:25, 80:7, 89:10
**March** [4] - 1:8, 7:18,
111:7, 111:12
**Mariella** [3] - 1:20,
4:14, 100:11
**mariella** [1] - 97:24
**mark** [1] - 105:3
**Mark** [3] - 2:3, 4:23,
14:9
**market** [3] - 15:21,
44:18, 89:1
**marketing** [22] - 21:7,
35:5, 40:11, 40:14,
57:7, 58:11, 58:20,
58:25, 60:24, 61:21,
61:23, 61:24, 64:6,
74:13, 74:23, 79:4,
79:13, 83:8, 83:17,
102:15, 108:7, 109:7
**markets** [1] - 89:3
**Marshall** [2] - 51:18,
53:13
**MARYLAND** [1] - 1:1
**Maryland** [3] - 1:9,
1:24, 113:7
**mask** [1] - 24:8
**masters** [1] - 36:15
**material** [4] - 5:22,
46:5, 100:2, 103:1
**materials** [5] - 61:21,
61:24, 74:13, 78:5,
109:7
**math** [1] - 25:1
**matter** [12] - 3:4, 3:8,
5:25, 57:5, 64:3,
69:16, 69:17, 73:1,
73:16, 82:13, 113:10
**matters** [4] - 64:2,
67:22, 68:3, 70:6

**Matthew** [2] - 1:19,
4:13
**mean** [20] - 4:10,
43:17, 44:4, 45:21,
45:23, 46:6, 46:13,
48:12, 76:18, 90:21,
94:23, 95:6, 100:17,
101:3, 106:7, 107:7,
108:19, 108:23,
108:24
**meaning** [1] - 75:25
**meaningful** [2] -
40:10, 64:16
**means** [2] - 22:22,
105:18
**meant** [1] - 76:18
**mechanism** [7] -
16:22, 16:25, 42:12,
52:22, 53:11, 71:22,
78:24
**mechanisms** [2] -
10:10, 77:18
**Media** [1] - 58:10
**medium** [1] - 103:6
**meet** [1] - 12:16
**meets** [1] - 110:14
**Meghan** [2] - 2:3, 5:9
**memorialized** [2] -
9:5, 10:6
**mention** [1] - 48:11
**mentioned** [2] - 60:3,
79:19
**merchant** [13] - 41:4,
41:10, 41:12, 41:13,
41:14, 41:15, 41:16,
41:18, 41:19, 41:21,
43:3, 98:13, 98:14
**merchants** [1] - 43:2
**merely** [2] - 36:16,
55:11
**merger** [1] - 37:17
**Merit** [1] - 113:6
**merit** [1] - 25:3
**merits** [19] - 5:22,
8:20, 8:23, 9:1,
10:20, 11:15, 18:2,
21:19, 21:20, 23:7,
24:12, 46:2, 46:13,
53:9, 63:7, 71:24,
74:4, 80:8, 100:4
**messages** [1] - 60:6
**met** [2] - 12:12, 111:20
**methodology** [2] -
13:5, 15:7
**metrics** [1] - 49:11
**MFA** [6] - 6:25, 7:2,
51:17, 53:12, 63:12
**mics** [1] - 67:11
**middle** [1] - 63:18
**might** [13] - 24:8, 29:3,

31:18, 55:24, 62:18,
62:20, 67:24, 81:6,
85:10, 96:2, 96:12,
97:12
**million** [34] - 10:1,
11:23, 22:2, 22:5,
22:6, 22:7, 22:8,
24:6, 25:2, 26:23,
27:7, 27:15, 27:22,
28:1, 28:3, 28:7,
28:15, 28:22, 29:1,
29:13, 29:17, 34:11,
35:15, 52:1, 52:6,
52:20, 53:4, 60:25,
64:5, 68:9, 95:14,
95:24, 96:9, 100:16
**millionaire** [1] - 40:2
**millions** [4] - 29:10,
52:3, 52:7, 107:1
**Mimi** [4] - 83:21,
83:22, 84:4, 97:6
**mind** [4] - 26:23,
26:25, 33:12, 66:18
**mindful** [2] - 97:16,
106:18
**mini** [2] - 55:6, 110:17
**mini-litigation** [1] -
110:17
**mini-trials** [1] - 55:6
**minute** [1] - 109:23
**minutes** [6] - 67:12,
67:14, 67:17, 67:19,
69:6, 97:21
**Miriam** [2] - 1:16, 3:20
**mirror** [1] - 38:11
**mirroring** [2] - 7:25,
47:10
**misinterpretation** [1] -
76:17
**mislead** [3] - 35:14,
38:20
**misleading** [1] - 86:25
**misrepresentations**
[3] - 7:21, 7:23, 46:5
**miss** [3] - 4:10, 5:12,
34:24
**mixed** [1] - 94:8
**Mobile** [1] - 60:10
**mode** [1] - 29:7
**model** [3] - 18:24,
47:12, 48:19
**modified** [1] - 6:23
**moment** [1] - 25:7
**momentum** [1] - 59:23
**monetary** [1] - 22:20
**money** [53] - 11:3,
12:7, 23:22, 23:25,
25:8, 27:1, 27:5,
27:14, 28:25, 32:1,
32:2, 32:18, 33:1,

35:13, 36:3, 36:5,
39:9, 39:13, 44:16,
44:18, 49:17, 49:24,
51:12, 51:18, 51:21,
52:11, 52:12, 53:15,
53:21, 53:22, 60:19,
61:13, 64:5, 64:14,
70:12, 85:5, 90:10,
91:13, 92:1, 95:9,
95:12, 95:24,
100:20, 106:20,
106:23, 107:2,
107:6, 107:11,
107:13
**money's** [2] - 31:20,
32:18
**monies** [5] - 23:21,
51:23, 51:24, 95:21,
96:5
**Monitor** [1] - 54:16
**monitor** [74] - 9:10,
9:12, 9:13, 10:2,
13:15, 23:9, 37:20,
38:1, 38:5, 47:13,
51:14, 54:2, 54:5,
54:8, 54:10, 54:12,
54:13, 54:25, 55:7,
64:23, 65:2, 68:11,
68:17, 69:3, 69:25,
70:2, 70:23, 70:25,
71:6, 71:7, 71:9,
73:3, 73:19, 73:25,
74:5, 74:16, 74:20,
74:21, 75:1, 75:5,
75:6, 75:10, 75:12,
75:16, 77:24, 78:2,
78:18, 78:20, 79:1,
79:9, 79:14, 79:23,
80:19, 81:4, 81:10,
81:21, 82:15, 82:24,
83:15, 85:9, 85:20,
91:21, 96:18,
107:17, 107:21,
109:13, 109:14,
109:16, 110:6,
110:7, 110:16,
111:13, 111:22
**monitor's** [5] - 54:19,
54:20, 55:5, 55:13,
74:22
**monitored** [1] - 22:18
**monitoring** [6] -
10:25, 47:10, 73:24,
77:21, 78:14, 85:24
**monitors** [3] - 27:4,
80:23, 83:9
**Monitors** [11] - 9:13,
9:15, 68:12, 79:2,
79:7, 80:15, 81:6,
81:14, 81:16, 83:1,

83:8
**monitorships** [1] -
83:5
**month** [3] - 94:23,
101:23, 104:7
**month's** [1] - 86:13
**months** [9] - 15:25,
23:21, 32:6, 41:24,
48:8, 60:11, 104:6,
104:7, 105:8
**moot** [1] - 80:19
**moreover** [1] - 75:6
**morning** [21] - 3:3,
3:13, 3:14, 3:15,
3:17, 3:22, 3:23, 4:1,
4:4, 4:6, 4:16, 4:20,
5:9, 5:11, 7:18,
12:10, 13:22, 27:12,
56:13, 72:21, 98:1
**Mortal** [3] - 57:20,
59:17, 59:18
**most** [15] - 9:5, 18:6,
25:17, 25:22, 26:6,
60:23, 70:7, 84:17,
85:15, 94:1, 98:2,
101:7, 101:8,
101:10, 102:23
**mostly** [1] - 36:14
**motion** [4] - 12:14,
23:17, 80:21, 103:23
**Motion** [9] - 1:10,
5:14, 6:1, 6:5, 6:12,
7:3, 7:6, 12:17, 63:8
**move** [13] - 5:4, 19:17,
47:25, 50:17, 50:20,
53:16, 55:9, 63:11,
68:16, 87:18, 90:18,
103:17, 106:17
**moving** [5] - 13:5,
20:15, 20:20, 21:11,
31:25
**Moyé** [1] - 5:3
**MR** [109] - 3:12, 3:15,
3:18, 3:22, 3:24, 4:1,
4:5, 4:9, 4:11, 4:19,
4:23, 5:8, 13:9,
13:22, 14:3, 14:9,
14:12, 15:16, 16:18,
18:3, 19:11, 22:1,
22:14, 24:16, 24:18,
25:25, 26:15, 27:7,
27:12, 31:4, 33:4,
33:6, 33:25, 34:4,
35:2, 35:4, 43:13,
43:20, 44:3, 44:10,
45:7, 46:18, 47:2,
47:25, 48:17, 49:22,
50:7, 51:7, 51:10,
51:12, 52:4, 52:18,
53:25, 55:11, 56:4,

56:8, 56:12, 56:13,
56:16, 56:19, 57:19,
59:6, 61:8, 62:4,
62:6, 62:9, 62:13,
62:16, 62:22, 63:24,
65:12, 66:4, 66:21,
67:5, 67:21, 69:13,
71:15, 76:4, 76:10,
76:24, 77:6, 77:12,
77:15, 80:11, 81:15,
82:20, 82:22, 83:5,
83:20, 97:4, 97:12,
97:15, 99:19,
103:15, 104:1,
104:12, 104:16,
105:13, 105:24,
106:7, 107:10,
107:15, 107:22,
108:3, 109:3,
109:22, 110:1,
111:2, 111:18
**MS** [17] - 3:20, 5:9,
84:3, 86:3, 86:17,
86:19, 87:12, 87:14,
88:1, 88:4, 91:1,
93:3, 93:10, 96:12,
96:16, 96:22, 97:1
**multiple** [2] - 41:4,
98:13
**multiply** [1] - 28:14
**must** [8] - 8:19, 8:24,
12:11, 35:8, 37:9,
38:19, 74:19, 100:5
**mute** [4] - 4:17, 5:3,
83:21, 107:21
**muted** [1] - 5:4
**mutual** [2] - 78:24,
79:8
**mutually** [1] - 82:24

## N

**N/A** [1] - 38:7
**NADINE** [1] - 113:17
**Nadine** [2] - 1:23,
113:5
**name** [3] - 57:7, 61:21,
61:24
**namely** [1] - 7:25
**names** [1] - 82:17
**narrated** [1] - 57:8
**national** [1] - 78:22
**navigate** [1] - 24:11
**near** [1] - 20:16
**neatly** [1] - 20:1
**necessarily** [4] - 13:7,
25:20, 44:23, 81:19
**necessary** [5] - 56:22,
64:9, 64:13, 64:23,
82:3, 95:3, 102:9

**need** [24] - 16:25,
19:12, 38:18, 42:1,
52:7, 63:1, 67:18,
68:16, 68:17, 69:3,
72:25, 75:8, 77:6,
77:7, 80:22, 82:14,
89:8, 89:25, 94:20,
96:8, 97:10, 105:14,
111:7, 112:3
**needed** [4] - 15:14,
75:15, 83:23, 103:1
**needs** [4] - 54:10,
54:12, 73:7, 95:6
**negate** [1] - 44:1
**negative** [13] - 8:3,
31:12, 32:10, 40:7,
40:19, 40:21, 40:22,
42:14, 42:17, 42:21,
44:1, 84:25, 93:23
**negatively** [1] - 88:16
**negatives** [1] - 91:18
**net** [6] - 35:11, 43:17,
43:18, 43:21, 44:15,
45:15
**Network** [2] - 41:9,
105:4
**never** [14] - 35:10,
39:1, 41:14, 41:17,
43:3, 43:9, 66:18,
94:10, 94:13, 98:25,
100:14, 100:15,
102:5, 102:6
**nevertheless** [2] -
66:16, 71:9
**New** [6] - 39:23, 39:24,
94:7, 94:11, 98:3,
98:9
**new** [1] - 95:19
**news** [1] - 89:2
**newsletters** [1] -
61:11
**next** [13] - 6:17, 22:9,
33:5, 48:8, 82:3,
82:16, 83:19, 83:22,
83:25, 86:19, 97:2,
97:9, 111:12
**night** [2] - 56:24,
59:19
**NO** [1] - 1:4
**nobody** [1] - 94:13
**non** [1] - 64:2
**non-principal** [1] -
64:2
**none** [7] - 16:12,
39:20, 39:21, 49:18,
51:12, 52:25, 109:2
**normal** [1] - 17:16
**NORTHERN** [1] - 1:2
**notably** [1] - 73:22
**notation** [1] - 66:1

**note** [9] - 11:18,
12:13, 15:9, 16:4,
18:19, 30:4, 82:25,
84:10, 97:6
**noted** [2] - 78:18,
110:15
**nothing** [9] - 42:23,
59:7, 66:7, 94:12,
98:14, 98:15, 99:23,
102:15, 109:20
**notice** [1] - 66:9
**notices** [1] - 42:3
**notwithstanding** [1] -
77:8
**nowhere** [1] - 60:21
**Number** [1] - 3:5
**number** [23] - 8:10,
9:5, 9:17, 14:14,
14:18, 14:25, 15:22,
27:16, 31:24, 32:8,
32:15, 33:7, 44:13,
50:10, 78:22, 84:20,
84:24, 88:8, 89:16,
89:17, 92:18, 104:8,
104:22
**numbers** [7] - 22:6,
27:25, 28:18, 29:21,
88:17, 92:7, 92:15
**numerous** [7] - 9:8,
10:22, 39:8, 73:24,
89:11, 98:23, 104:3
**nuts** [1] - 19:2
**Nuvei** [1] - 41:15

## O

**oath** [1] - 24:9
**objective** [2] - 72:8,
82:2
**obligated** [1] - 71:11
**obligations** [7] - 28:5,
49:1, 50:16, 76:6,
77:19, 85:25, 106:16
**observations** [2] -
69:18, 69:24
**obviously** [1] - 89:25
**occur** [1] - 17:13
**occurred** [1] - 99:22
**occurring** [1] - 66:2
**October** [3] - 41:16,
41:18, 104:5
**OF** [2] - 1:1, 113:1
**offense** [1] - 81:3
**offered** [4] - 8:5, 12:1,
73:8, 95:24
**offering** [2] - 8:3,
61:11
**officer** [1] - 98:20
**Official** [1] - 1:23
**OFFICIAL** [2] - 113:1,

113:17
**oil** [1] - 43:8
**once** [2] - 37:25, 65:24
**one** [63] - 4:9, 4:25,
6:10, 9:3, 12:4,
13:20, 14:14, 14:23,
20:1, 20:12, 21:16,
22:10, 22:11, 24:21,
25:14, 25:19, 25:20,
26:1, 26:2, 31:22,
38:10, 40:6, 40:23,
42:20, 44:13, 47:2,
48:1, 48:10, 54:3,
57:15, 57:16, 57:25,
58:17, 66:4, 67:21,
69:24, 70:2, 70:8,
71:16, 78:19, 80:24,
81:9, 82:25, 83:11,
88:5, 92:13, 93:6,
93:7, 98:5, 100:2,
104:13, 104:17,
106:13, 109:4,
109:5, 109:23,
111:2, 111:8
**ones** [2] - 53:6, 90:7
**ongoing** [4] - 18:11,
75:5, 75:14, 77:23
**Online** [2] - 6:11, 8:1
**online** [1] - 38:23
**open** [3] - 50:5, 67:10,
90:25
**operate** [15] - 11:9,
20:21, 21:6, 21:9,
25:9, 28:23, 37:20,
41:4, 52:13, 71:23,
72:16, 73:15, 79:24,
80:7, 89:7
**operated** [1] - 38:3
**operates** [1] - 26:8
**operating** [6] - 11:6,
31:2, 31:3, 70:15,
74:3, 109:2
**operation** [10] - 7:13,
9:9, 9:14, 23:10,
23:11, 46:10, 71:18,
72:2, 72:14, 75:12
**operational** [1] - 30:2
**operations** [11] - 6:21,
29:19, 32:5, 72:3,
73:21, 75:3, 75:4,
75:7, 75:13, 78:6,
79:23
**opined** [1] - 39:11
**opining** [1] - 89:21
**opinions** [1] - 20:25
**opportunity** [9] - 5:21,
12:7, 13:17, 13:24,
16:11, 71:18, 76:25,
80:23, 102:8
**opposed** [5] - 23:9,

23:10, 63:4, 68:22,
112:2
**opposite** [3] - 58:22,
92:3, 93:15
**opposition** [1] - 19:7
**opt** [1] - 8:4
**optimism** [1] - 47:23
**optimistic** [1] - 81:9
**Option** [1] - 59:16
**option** [5] - 8:3, 8:6,
8:7, 52:25, 70:15
**options** [3] - 53:1,
58:15, 59:18
**oral** [1] - 63:19
**order** [71] - 6:15, 6:18,
6:22, 8:18, 9:6, 10:6,
12:14, 12:15, 12:16,
12:18, 13:12, 13:16,
16:23, 26:13, 51:15,
52:19, 52:20, 52:22,
53:1, 53:13, 54:1,
55:12, 55:15, 55:16,
55:23, 56:23, 56:25,
63:2, 64:8, 64:10,
64:13, 65:13, 66:6,
66:16, 68:25, 69:25,
71:12, 71:19, 72:7,
72:18, 72:22, 73:18,
74:4, 74:6, 74:7,
74:10, 76:7, 76:12,
77:2, 77:9, 77:16,
78:1, 78:8, 78:9,
78:24, 79:15, 79:17,
79:19, 80:5, 80:14,
83:17, 84:6, 85:7,
86:24, 94:11, 95:1,
95:25, 103:13,
111:10
**Order** [4] - 6:4, 6:13,
6:24, 110:2
**ordering** [1] - 8:9
**orders** [3] - 78:10,
79:21, 96:19
**organization** [1] - 83:6
**organizations** [1] -
27:20
**OTA** [3] - 51:14, 78:12,
79:19
**otherwise** [5] - 11:2,
17:15, 54:12, 82:4,
91:12
**ourselves** [2] - 5:4,
5:5
**outfit** [1] - 65:15
**outright** [1] - 19:7
**outset** [4] - 5:3, 10:5,
10:15, 86:23
**outside** [4] - 26:16,
26:17, 58:11, 78:6
**outweigh** [1] - 53:6

**overall** [1] - 109:10
**overlooking** [1] -
97:11
**overseas** [1] - 107:8
**oversee** [1] - 82:3
**overseeing** [2] - 9:13,
23:9
**overseen** [1] - 9:10
**oversight** [2] - 75:14,
109:14
**overstep** [1] - 13:25
**overview** [2] - 5:17,
70:2
**overwhelmingly** [1] -
89:14
**owed** [2] - 27:19,
27:23
**own** [9] - 20:24, 57:8,
58:3, 61:9, 61:13,
62:14, 62:17, 90:22,
95:24
**owner** [3] - 53:13,
62:23, 98:21
**owners** [2] - 86:22,
95:23
**ownership** [3] -
100:14, 101:18,
102:6
**owns** [1] - 36:24
**OX-1** [1] - 57:17
**OX-2** [1] - 58:6

# P

**p.m** [1] - 112:9
**package** [2] - 71:14,
110:20
**page** [7] - 1:21, 16:4,
27:13, 58:8, 58:23,
65:7, 113:11
**paid** [19] - 11:17,
22:23, 24:5, 25:1,
27:16, 27:18, 29:15,
47:19, 47:20, 48:3,
52:14, 52:16, 62:6,
85:21, 91:12, 99:24,
100:16
**pain** [1] - 37:1
**pains** [1] - 92:21
**pandemic** [4] - 36:19,
36:25, 59:24, 92:23
**pandemic-related** [1]
- 59:24
**paper** [1] - 67:2
**papers** [7] - 18:19,
25:17, 72:10, 88:5,
88:18, 89:1, 93:18
**paragraph** [1] - 85:10
**paralegal** [1] - 41:7
**parameters** [1] - 85:17

**part** [21] - 11:8, 18:8,
25:17, 25:22, 26:6,
40:6, 51:17, 54:18,
54:19, 55:17, 55:18,
55:19, 55:23, 60:24,
77:23, 84:12, 89:20,
90:13, 91:2, 110:19
**parte** [1] - 6:17
**partially** [1] - 71:2
**participate** [2] - 19:13,
19:14
**participated** [3] -
62:24, 100:6, 108:12
**participation** [4] -
11:1, 19:16, 102:6,
108:7
**particular** [12] - 11:21,
12:11, 12:18, 17:23,
24:12, 58:5, 61:7,
74:13, 76:2, 80:14,
81:24, 111:17
**particularly** [2] -
40:16, 72:12
**parties** [21] - 7:3, 7:14,
9:3, 12:10, 17:10,
17:15, 19:12, 56:1,
65:6, 68:22, 78:25,
79:9, 81:8, 81:10,
82:15, 109:17,
110:4, 110:10,
110:11, 110:18,
111:9
**party** [4] - 40:20, 54:9,
63:13, 94:16
**passed** [1] - 105:3
**past** [13] - 9:16, 9:23,
11:13, 15:25, 17:9,
29:11, 38:4, 49:11,
50:24, 87:4, 91:14,
92:2, 93:24
**path** [4] - 48:23, 49:6,
53:20, 110:16
**patting** [1] - 105:21
**pause** [1] - 39:20
**pay** [16] - 21:25, 33:1,
49:20, 50:6, 52:8,
52:12, 62:10, 62:11,
90:16, 90:17, 91:13,
91:15, 92:1, 95:23,
96:8
**paycheck** [3] - 36:19,
100:18, 109:1
**Paycheck** [1] - 28:1
**paying** [4] - 23:2,
27:4, 47:17, 108:22
**payment** [7] - 14:20,
24:5, 27:19, 41:5,
41:23, 42:1, 43:2
**payments** [2] - 42:2,
86:13

**payout** [1] - 52:17
**pays** [1] - 62:8
**pecking** [1] - 63:2
**pendency** [3] - 11:10,
12:8, 64:10
**pending** [3] - 3:4,
71:23, 80:7
**penny** [1] - 101:13
**people** [30] - 15:23,
24:25, 25:4, 31:18,
32:24, 33:23, 47:16,
50:11, 70:14, 84:13,
85:17, 85:21, 88:10,
88:11, 88:23, 89:18,
89:24, 90:17, 91:20,
93:13, 93:15, 93:16,
93:19, 93:20, 94:1,
99:3, 99:5, 99:25
**per** - 24:23
**percent** [19] - 31:16,
31:22, 32:12, 32:13,
43:12, 43:24, 44:25,
50:4, 50:8, 57:10,
59:17, 60:5, 88:8,
88:11, 88:19, 90:11,
105:3, 106:10
**percentage** [4] -
32:13, 46:8, 89:16,
102:1
**percentages** [1] - 94:3
**perfectly** [1] - 30:9
**performance** [1] -
64:7
**performed** [1] -
100:18
**perhaps** [1] - 29:13
**period** [10] - 21:18,
61:8, 66:24, 74:3,
81:4, 90:8, 96:1,
96:7, 101:20, 101:23
**Permanent** [1] - 18:4
**permeated** [1] - 32:23
**permission** [4] -
69:19, 70:20, 84:1,
97:23
**permitted** [1] - 25:9
**perpetuating** [1] -
57:4
**person** [7] - 44:6,
66:8, 70:10, 81:3,
81:16, 81:19, 82:2
**personal** [3] - 6:19,
20:25, 108:9
**personally** [1] - 57:14
**personnel** [4] - 37:16,
78:6, 99:8
**persuasion** [1] - 63:17
**Peter** [4] - 2:2, 2:5,
4:24, 5:10
**phase** [1] - 95:23

**Phase** [19] - 10:2,
16:6, 49:4, 50:20,
50:22, 54:21, 54:23,
54:24, 55:9, 55:10,
65:4, 65:9, 85:21,
85:23, 95:16, 96:7
**phases** [2] - 9:9, 54:22
**phasing** [1] - 10:11
**phrased** [1] - 91:7
**PI** [5] - 7:6, 38:5, 74:3,
111:20, 111:23
**pick** [2] - 80:24, 82:6
**Pick** [1] - 40:25
**picked** [1] - 100:9
**picks** [3] - 38:17,
59:25, 60:1
**pittance** [2] - 27:5,
27:8
**place** [15] - 9:18, 9:25,
10:21, 13:12, 17:25,
21:24, 45:10, 51:15,
52:2, 52:11, 73:24,
74:20, 90:23, 91:23,
99:7
**Plaintiff** [2] - 1:3, 1:12
**plan** [55] - 7:15, 18:16,
18:21, 18:23, 19:7,
19:10, 19:20, 19:22,
19:23, 19:25, 20:7,
20:11, 20:14, 20:18,
20:22, 21:1, 21:5,
21:12, 25:11, 32:6,
46:21, 50:24, 69:20,
71:19, 72:7, 72:15,
72:20, 72:22, 72:23,
73:5, 73:11, 74:7,
74:10, 76:7, 76:13,
77:2, 77:9, 77:16,
79:17, 80:4, 87:1,
87:15, 87:17, 89:12,
90:5, 90:9, 91:21,
95:18, 95:21, 96:19,
97:17, 112:1
**play** [2] - 43:21, 59:3
**played** [2] - 57:3, 59:5
**pleadings** [7] - 7:10,
15:11, 61:5, 63:19,
65:6, 68:18, 92:7
**pockets** [1] - 23:22
**podium** [1] - 56:17
**point** [28] - 13:6,
14:22, 14:25, 16:18,
23:15, 24:9, 31:17,
42:20, 48:1, 48:5,
54:1, 55:4, 55:15,
63:6, 63:16, 63:25,
68:13, 68:14, 68:16,
68:18, 70:4, 76:24,
77:15, 105:2, 106:9,
109:8

**pointed** [3] - 40:9, 90:14, 94:18
**pointing** [1] - 55:11
**points** [15] - 14:13, 24:18, 24:21, 25:13, 33:7, 33:11, 33:14, 34:5, 34:7, 34:24, 35:1, 53:25, 56:9, 101:16, 108:4
**polarized** [1] - 32:19
**policies** [2] - 42:8, 99:6
**policy** [1] - 41:23
**portion** [9] - 29:24, 44:8, 63:9, 72:6, 72:14, 72:19, 74:7, 74:10, 80:4
**portions** [2] - 79:17, 80:5
**posed** [1] - 10:3
**position** [12] - 8:12, 15:2, 19:19, 30:21, 33:21, 62:2, 72:25, 86:21, 90:4, 102:18, 109:5
**positive** [9] - 8:6, 30:3, 31:7, 31:23, 32:10, 32:12, 85:2, 89:20, 90:9
**possess** [1] - 38:18
**possibility** [1] - 20:13
**possible** [2] - 18:11, 83:18
**possibly** [2] - 16:13, 70:12
**post** [1] - 111:23
**potential** [3] - 7:22, 56:2, 111:13
**potentially** [2] - 12:2, 110:14
**power** [3] - 45:22, 54:10, 75:10
**powerful** [1] - 98:2
**powers** [1] - 63:17
**PPP** [1] - 28:6
**practicality** [1] - 18:24
**practice** [1] - 84:13
**practices** [7] - 6:23, 8:18, 39:3, 40:1, 55:2, 74:17, 100:8
**praised** [1] - 44:8
**praising** [1] - 50:2
**pre** [1] - 27:24
**pre-Receivership** [1] - 27:24
**precarious** [1] - 30:20
**precautions** [2] - 9:17, 10:12
**precedent** [1] - 78:16
**precisely** [3] - 76:23,

86:1, 96:10
**predict** [4] - 20:23, 21:20, 21:23, 32:20
**predictions** [1] - 20:24
**predictor** [1] - 21:16
**predicts** [1] - 21:9
**prefer** [2] - 70:14, 103:22
**preliminarily** [1] - 8:24
**Preliminary** [9] - 1:10, 3:9, 5:14, 6:1, 6:5, 7:3, 7:4, 7:11, 12:17
**preliminary** [24] - 6:16, 8:17, 8:19, 8:21, 9:6, 12:13, 12:19, 12:23, 13:2, 13:3, 14:19, 16:4, 18:18, 23:13, 33:15, 56:21, 64:8, 64:23, 69:25, 80:21, 80:22, 103:10, 110:22, 110:23
**premises** [1] - 13:25
**prepare** [1] - 110:5
**prepared** [3] - 14:7, 63:11, 69:12
**presence** [1] - 102:17
**present** [10] - 4:20, 9:23, 11:16, 12:3, 22:23, 22:24, 91:15, 111:8, 111:9, 111:23
**Present** [1] - 2:4
**presentation** [12] - 5:19, 29:5, 59:2, 60:4, 63:19, 63:25, 71:17, 75:20, 80:10, 97:5, 98:1, 98:6
**presentations** [5] - 33:18, 57:14, 58:3, 58:12, 58:18
**presented** [8] - 9:7, 22:3, 25:4, 40:14, 48:3, 67:1, 89:11, 89:16
**preservation** [5] - 13:12, 51:15, 64:13, 106:22, 106:24
**preserve** [2] - 53:7, 107:13
**preserved** [5] - 51:13, 51:22, 53:22, 107:2, 107:18
**preserves** [1] - 71:24
**preserving** [2] - 37:21, 106:20
**press** [1] - 43:5
**presumably** [4] - 63:12, 85:21, 89:8, 101:9
**presume** [4] - 47:7,

55:3, 63:16, 98:2
**presumptuous** [1] - 67:6
**pretty** [14] - 11:4, 26:25, 47:11, 76:6, 88:10, 88:13, 92:16, 94:14, 103:11, 104:14, 105:19, 106:5, 106:6
**prevail** [1] - 72:1
**prevent** [2] - 26:3, 40:12
**prevented** [2] - 86:10, 86:11
**preventing** [1] - 37:8
**previous** [2] - 5:16, 78:11
**previously** [6] - 73:23, 74:15, 75:9, 78:18, 79:19, 83:10
**price** [1] - 12:1
**primarily** [2] - 12:10, 26:16
**primary** [3] - 5:23, 15:21, 26:3
**principal** [6] - 61:4, 62:3, 62:19, 62:23, 63:5, 64:2
**principals** [6] - 25:24, 26:11, 27:6, 28:22, 29:14, 75:24
**principals'** [1] - 49:9
**principles** [1] - 100:24
**private** [5] - 17:6, 37:10, 37:13, 53:6, 53:14
**privy** [1] - 103:8
**problem** [4] - 65:17, 85:4, 91:19, 104:20
**problems** [1] - 43:4
**procedural** [3] - 5:18, 13:8, 13:10
**Procedure** [1] - 12:22
**procedure** [2] - 10:9, 13:4
**procedures** [1] - 99:7
**proceed** [3] - 63:23, 69:12, 70:20
**proceeded** [1] - 23:7
**Proceeding** [1] - 112:9
**proceedings** [2] - 37:13, 113:10
**process** [11] - 17:4, 17:11, 17:16, 18:9, 28:18, 42:1, 47:16, 47:17, 79:8, 85:8, 91:23
**processed** [1] - 16:14
**processing** [2] - 41:5,

90:18
**processors** [4] - 27:19, 41:23, 42:1, 43:2
**produce** [1] - 38:19
**product** [8] - 58:21, 88:7, 88:12, 88:20, 88:23, 88:24, 91:24, 102:3
**products** [10] - 22:25, 23:2, 44:21, 61:10, 62:7, 85:14, 85:15, 85:18
**profit** [3] - 28:24, 42:5, 102:6
**profitability** [3] - 20:16, 49:7, 49:11
**profitable** [8] - 38:5, 48:22, 50:24, 53:16, 53:17, 54:14, 89:10, 95:10
**profitably** [2] - 11:9, 20:21
**profits** [15] - 29:15, 29:18, 49:8, 50:22, 50:25, 57:10, 57:12, 58:16, 61:9, 64:15, 101:1, 101:2, 101:21, 102:3
**Program** [1] - 28:1
**projected** [1] - 20:9
**projections** [3] - 22:18, 22:20, 22:21
**prominent** [1] - 78:22
**promise** [3] - 33:13, 34:5, 34:25
**promoting** [1] - 50:2
**prong** [2] - 13:3, 46:17
**prongs** [1] - 95:15
**proof** [1] - 8:24
**proper** [4] - 37:14, 37:18, 56:22, 102:23
**properly** [1] - 15:7
**prophylactic** [1] - 82:13
**proposal** [3] - 65:10, 73:22, 110:19
**proposals** [1] - 78:16
**propose** [1] - 110:3
**proposed** [60] - 7:15, 9:6, 9:7, 9:12, 12:13, 13:16, 14:19, 15:1, 15:6, 16:4, 16:23, 18:18, 18:25, 27:5, 52:19, 65:13, 66:6, 68:10, 68:20, 69:24, 69:25, 70:3, 70:24, 71:12, 71:18, 71:19, 72:6, 72:7, 72:14, 72:18, 72:19, 72:22,

73:19, 74:7, 74:10, 76:7, 76:12, 76:13, 77:2, 77:9, 77:16, 78:1, 78:8, 78:9, 78:18, 78:24, 79:15, 79:17, 80:4, 80:5, 80:22, 86:24, 103:10, 103:13, 110:21, 110:24, 111:20
**proposing** [2] - 21:22, 26:22
**proposition** [3] - 49:14, 49:17, 51:2
**prosecuted** [1] - 17:8
**prospect** [1] - 35:25
**protect** [2] - 28:9, 110:2
**Protection** [3] - 28:1, 98:4, 98:9
**protracted** [4] - 10:21, 11:1, 17:21, 81:4
**proven** [1] - 53:9
**provide** [15] - 10:17, 14:20, 25:20, 42:12, 55:12, 68:8, 73:6, 73:14, 80:5, 81:20, 86:6, 90:4, 91:16, 100:9, 110:10
**provided** [13] - 11:18, 16:22, 26:18, 35:16, 43:9, 48:22, 49:13, 57:13, 58:3, 64:16, 68:10, 78:17, 90:5
**providers** [1] - 78:7
**provides** [4] - 42:15, 70:1, 72:15, 85:22
**providing** [7] - 16:3, 37:8, 43:14, 78:4, 99:24, 101:12, 102:12
**provision** [1] - 70:24
**provisions** [4] - 55:13, 66:5, 79:25, 111:22
**public** [8] - 30:12, 37:7, 37:12, 53:6, 88:2, 89:24, 96:15, 106:20
**publication** [1] - 40:12
**pull** [2] - 41:6, 57:17
**pulled** [1] - 35:25
**pulling** [1] - 109:4
**purchase** [1] - 51:4
**purchased** [2] - 35:15, 99:25
**purchases** [1] - 54:11
**purely** [2] - 64:5, 102:5
**purpose** [1] - 3:9
**purposes** [2] - 5:14,

31:10
**pursuant** [1] - 113:8
**pursued** [2] - 17:8, 24:25
**pursuing** [1] - 18:9
**put** [33] - 9:17, 13:4, 19:8, 23:5, 29:18, 30:11, 34:25, 47:12, 49:18, 50:23, 51:2, 52:20, 54:3, 60:21, 65:7, 66:1, 71:14, 73:23, 74:20, 77:1, 80:25, 82:10, 86:5, 86:15, 87:1, 88:5, 92:22, 93:17, 95:13, 95:24, 96:2, 97:25
**puts** [1] - 90:23
**putting** [9] - 23:22, 24:9, 27:2, 53:1, 63:5, 82:23, 83:12, 87:9, 87:15
**PX** [4] - 35:22, 59:4, 59:15, 59:22

## Q

**quarter** [2] - 105:20, 105:21
**questioning** [1] - 94:24
**questions** [10] - 25:17, 67:24, 70:8, 80:12, 93:20, 96:22, 96:24, 96:25, 97:6, 102:10
**quick** [2] - 75:20, 108:4
**quickly** [1] - 56:19
**quite** [8] - 43:12, 63:8, 68:20, 81:7, 82:22, 83:12, 101:6, 109:13
**quo** [1] - 21:23
**quote** [3] - 38:11, 98:12, 98:17

## R

**Raging** [1] - 60:1
**RagingBull** [110] - 3:19, 3:21, 3:24, 4:2, 4:6, 7:15, 7:17, 8:5, 8:13, 9:4, 9:8, 9:12, 9:18, 9:23, 9:24, 11:19, 11:21, 12:3, 12:7, 12:20, 13:20, 14:25, 15:6, 18:1, 18:21, 18:22, 18:25, 19:9, 19:23, 20:17, 21:6, 21:21, 22:19, 23:10, 23:11, 25:9, 25:19, 25:23, 26:6,

26:8, 26:11, 26:17, 27:6, 30:10, 30:18, 30:20, 30:25, 31:6, 31:9, 33:1, 34:8, 36:21, 40:8, 40:10, 42:23, 43:8, 43:12, 44:9, 45:5, 47:9, 47:13, 47:24, 56:24, 57:4, 58:24, 59:10, 61:6, 61:11, 62:9, 62:11, 62:18, 63:3, 65:1, 65:10, 65:13, 65:14, 65:17, 66:7, 67:22, 67:25, 70:24, 71:3, 71:11, 75:24, 80:19, 83:22, 85:2, 85:25, 86:5, 86:10, 86:12, 86:22, 86:23, 87:20, 89:6, 89:9, 89:12, 92:23, 96:17, 97:5, 98:20, 99:14, 99:15, 100:18, 103:12, 108:20, 111:14
**RagingBull's** [26] - 6:21, 7:13, 7:21, 7:24, 9:14, 10:24, 10:25, 11:9, 11:22, 12:13, 18:19, 20:19, 20:21, 23:5, 29:24, 30:1, 30:15, 60:15, 60:16, 68:24, 82:9, 86:20, 89:13, 99:17, 101:6, 102:13
**RAGINGBULL.COM** [1] - 1:5
**RagingBull.com** [2] - 1:14, 3:6
**raise** [2] - 18:17, 84:13
**raised** [10] - 13:1, 24:21, 26:1, 33:7, 40:4, 64:1, 69:22, 76:19, 108:5
**raises** [1] - 66:23
**raising** [1] - 14:13
**ran** [1] - 57:6
**rated** [1] - 105:1
**rather** [6] - 42:24, 42:25, 43:1, 52:16, 87:23, 94:4
**rating** [18] - 92:25, 93:1, 104:5, 104:7, 104:8, 104:11, 104:17, 105:7, 105:8, 105:11, 105:12, 105:15, 105:16, 105:17, 105:18, 106:4, 106:8
**raw** [2] - 28:16, 29:20
**Rayna** [1] - 42:20

**reach** [1] - 20:14
**reached** [4] - 9:3, 18:20, 18:22
**reactions** [1] - 42:14
**read** [5] - 25:16, 42:10, 46:2, 92:17, 109:20
**reading** [5] - 17:20, 25:21, 31:22, 42:13, 68:18
**ready** [2] - 67:8, 103:22
**real** [6] - 46:5, 46:6, 46:14, 47:10, 75:20, 101:12
**real-time** [1] - 47:10
**realistic** [1] - 22:17
**reality** [2] - 12:6, 47:12
**really** [20] - 12:24, 19:2, 33:21, 34:8, 34:18, 34:20, 41:1, 45:22, 45:24, 46:1, 59:1, 70:10, 70:22, 76:18, 81:22, 81:23, 87:20, 100:12, 105:22
**Realtime** [1] - 113:5
**reason** [9] - 15:14, 15:23, 34:9, 44:17, 46:18, 79:7, 86:8, 86:14, 93:11
**reasonable** [1] - 15:1
**reasons** [1] - 104:17
**rebuttal** [3] - 33:20, 66:22, 66:25
**receipt** [1] - 74:18
**receive** [4] - 16:1, 24:11, 37:1, 98:7
**received** [14] - 14:16, 26:5, 29:11, 30:2, 32:10, 39:8, 39:9, 39:15, 43:11, 43:22, 43:25, 46:9, 56:23, 60:6, 64:15, 84:24, 88:9, 101:13, 104:3, 112:3
**Receiver** [55] - 2:2, 2:5, 4:24, 5:10, 6:14, 6:20, 7:8, 7:16, 10:22, 10:23, 10:25, 13:12, 14:24, 16:3, 17:12, 18:4, 18:20, 18:22, 21:17, 22:3, 22:11, 22:15, 22:19, 23:10, 23:16, 23:25, 26:14, 30:3, 40:9, 43:11, 46:9, 51:25, 52:2, 52:4, 54:8, 68:23, 69:22, 73:5, 73:7, 73:8, 77:1,

77:4, 79:10, 88:8, 90:15, 91:6, 94:19, 94:21, 95:2, 95:8, 95:22, 110:2
**Receiver's** [2] - 11:8, 84:16
**Receivers** [2] - 91:5, 96:20
**receivership** [1] - 10:14
**Receivership** [13] - 17:24, 18:9, 18:10, 18:14, 27:15, 27:24, 28:20, 52:8, 52:9, 52:10, 72:2, 79:12, 80:18
**receiving** [8] - 15:17, 15:24, 23:3, 36:19, 47:21, 50:3, 109:15, 111:16
**recent** [1] - 9:6
**recently** [1] - 78:10
**Recess** [1] - 69:8
**recipient** [1] - 55:4
**reckless** [1] - 59:12
**recognized** [1] - 17:3
**recommend** [3] - 65:3, 65:4, 71:6
**recommendation** [2] - 82:24, 83:13
**recommendations** [1] - 68:11
**recommended** [1] - 83:1
**reconstitution** [1] - 9:14
**record** [6] - 3:10, 58:9, 59:14, 101:5, 101:15, 104:3
**recording** [1] - 40:25
**recoverable** [1] - 29:13
**rectify** [1] - 104:20
**redress** [15] - 29:2, 37:9, 37:22, 51:22, 52:21, 52:23, 53:5, 64:16, 70:16, 70:17, 71:25, 90:4, 106:20, 107:2, 107:18
**redressed** [1] - 53:11
**redressing** [1] - 37:21
**reduce** [2] - 22:4, 40:7
**reducing** [1] - 12:5
**reengage** [1] - 12:3
**referenced** [1] - 81:16
**referring** [1] - 20:3
**reflected** [1] - 78:11
**refocus** [1] - 34:7
**refund** [40] - 11:13, 11:14, 14:14, 14:16,

14:17, 15:10, 15:18, 15:22, 15:24, 16:5, 24:6, 28:11, 28:12, 28:15, 30:6, 30:19, 36:21, 38:25, 39:18, 39:19, 41:22, 42:8, 52:24, 52:25, 70:10, 71:1, 71:8, 71:10, 71:16, 74:17, 84:18, 85:3, 85:11, 85:17, 85:25, 88:14, 91:10, 96:8, 110:7
**refunded** [2] - 84:8, 84:12
**refunds** [36] - 9:20, 9:24, 11:16, 11:17, 14:21, 15:12, 15:13, 16:3, 16:8, 16:12, 23:1, 27:3, 28:17, 29:3, 30:14, 30:23, 31:18, 31:23, 38:25, 42:12, 44:1, 47:21, 53:2, 70:14, 71:4, 71:5, 71:7, 71:8, 84:5, 85:17, 86:1, 86:6, 87:22, 93:19, 98:16, 110:14
**refuse** [1] - 36:21
**refute** [1] - 8:13
**refuted** [1] - 43:10
**regard** [18] - 18:16, 18:21, 27:13, 29:20, 35:1, 70:23, 77:16, 80:12, 80:13, 93:9, 102:22
**regarding** [17] - 5:19, 7:12, 7:21, 8:12, 8:23, 18:18, 18:22, 26:10, 41:5, 47:23, 50:16, 54:16, 56:9, 75:22, 80:14, 102:18, 112:1
**regardless** [2] - 35:7, 42:2
**Registered** [1] - 113:6
**regular** [1] - 75:14
**regularly** [1] - 89:2
**regulations** [2] - 21:8, 113:11
**regulatory** [11] - 73:4, 74:2, 74:5, 75:1, 75:3, 75:8, 76:5, 77:19, 77:23, 77:25, 79:22
**rehashing** [1] - 72:9
**reimbursable** [1] - 71:2
**reimposition** [1] - 10:11
**related** [13] - 5:19,

5:22, 6:10, 9:8, 18:24, 43:11, 46:9, 59:24, 65:25, 66:1, 92:21, 110:20, 111:10
**relates** [1] - 71:19
**relatively** [4] - 13:6, 92:19, 92:25, 93:25
**release** [2] - 6:25, 66:5
**relevant** [9] - 72:12, 73:4, 74:9, 76:5, 78:5, 78:7, 78:11, 100:3, 100:12
**relied** [1] - 99:6
**relief** [9] - 6:15, 8:17, 9:8, 13:3, 15:9, 16:16, 37:15, 86:22, 110:22
**Relief** [3] - 5:15, 6:2, 6:6
**relieved** [1] - 91:9
**rely** [2] - 76:1, 99:9
**relying** [1] - 94:16
**remain** [7] - 6:4, 11:12, 13:12, 18:14, 73:18, 74:3, 105:11
**remainder** [1] - 66:11
**remained** [1] - 6:23
**remains** [4] - 17:24, 21:23, 26:2, 65:1
**remark** [1] - 101:3
**remarkable** [2] - 88:11, 88:13
**remarks** [1] - 13:2
**reminds** [1] - 58:25
**remiss** [1] - 97:18
**remotely** [1] - 93:17
**removed** [3] - 42:18, 63:20, 83:11
**renew** [1] - 8:7
**renewed** [2] - 50:9, 50:10
**rep** [1] - 41:2
**repaid** [1] - 91:11
**repeat** [1] - 89:20
**repeatedly** [1] - 73:8
**reply** [3] - 7:7, 7:17, 48:24
**report** [7] - 7:9, 31:6, 40:9, 54:20, 54:25, 55:5, 89:21
**reported** [1] - 113:9
**Reported** [1] - 1:22
**REPORTER** [2] - 113:1, 113:17
**Reporter** [3] - 1:23, 113:5, 113:6
**reporting** [3] - 75:15, 77:22, 109:14
**represent** [1] - 84:17

**representation** [1] - 92:20
**representations** [3] - 30:25, 70:5, 76:1
**representative** [1] - 111:8
**represented** [2] - 38:21, 89:19
**representing** [1] - 26:24
**request** [10] - 31:13, 71:16, 82:8, 82:15, 85:1, 85:3, 85:17, 96:8, 110:7, 110:21
**requested** [4] - 14:20, 15:12, 26:6, 28:16
**requesting** [2] - 15:9, 24:1
**requests** [13] - 14:14, 14:16, 14:17, 15:10, 16:5, 16:8, 16:17, 30:23, 71:1, 77:3, 84:18, 84:25, 85:6
**require** [5] - 8:4, 66:9, 73:10, 77:17, 80:2
**required** [3] - 68:13, 71:10, 74:22
**requirements** [3] - 79:18, 79:21, 111:20
**requires** [3] - 66:7, 78:1, 110:2
**reschedule** [1] - 7:4
**Research** [1] - 3:7
**research** [1] - 84:11
**reserve** [1] - 66:19
**resolution** [8] - 17:1, 17:10, 17:14, 20:14, 71:23, 74:18, 80:7, 102:24
**resolve** [3] - 19:15, 19:18, 110:17
**resources** [1] - 47:8
**respect** [3] - 14:3, 68:15, 76:11
**respectfully** [1] - 79:1
**respects** [1] - 97:17
**respond** [2] - 77:3, 97:22, 97:24
**responded** [2] - 39:1, 42:17
**Respondent** [1] - 19:5
**response** [6] - 7:6, 7:16, 25:11, 31:13, 38:12, 98:18
**responses** [2] - 7:17, 19:6
**responsibilities** [2] - 78:4, 79:11
**responsibility** [2] - 85:8, 98:22

**responsible** [3] - 99:4, 99:16, 99:21
**rest** [2] - 31:23, 84:25
**restart** [8] - 46:23, 51:21, 52:8, 53:23, 90:22, 90:24, 91:3, 91:7
**restarting** [2] - 73:20, 75:2
**Restoration** [1] - 8:1
**Restore** [1] - 6:11
**Restraining** [4] - 6:4, 6:13, 6:24, 110:2
**result** [1] - 80:16
**resulting** [1] - 6:18
**resumes** [1] - 69:9
**retail** [1] - 89:2
**retiree** [2] - 36:5, 36:7
**return** [1] - 59:18
**returns** [1] - 60:5
**revealed** [2] - 61:4, 61:6, 102:20
**reveals** [1] - 102:20
**revenue** [7] - 11:23, 73:21, 74:25, 75:2, 75:7, 75:11, 75:13
**revenue-generating** [6] - 73:21, 74:25, 75:2, 75:7, 75:11, 75:13
**revenues** [3] - 18:7, 20:9, 21:8
**review** [9] - 7:10, 40:11, 40:20, 42:17, 54:17, 61:20, 78:3, 87:16, 99:7
**reviewed** [2] - 57:13, 74:15
**reviewing** [3] - 31:11, 54:6, 78:21
**reviews** [9] - 40:19, 40:21, 40:22, 42:6, 42:15, 42:21, 43:11, 46:8, 89:20
**Reviews** [1] - 40:25
**reviled** [1] - 44:6
**rich** [1] - 101:15
**rightfully** [3] - 22:25, 23:1, 66:3
**rigorous** [1] - 80:1
**rip** [1] - 47:15
**risk** [3] - 41:19, 67:6, 77:22
**RMR** [2] - 1:23, 113:17
**Robbins** [1] - 1:13, 3:12
**robbins** [20] - 3:11, 10:4, 10:15, 13:1, 13:5, 18:17, 33:16, 33:20, 34:1, 43:7,

45:22, 48:16, 51:23, 68:13, 81:2, 81:5, 81:13, 82:19, 103:24, 104:11
**ROBBINS** [39] - 3:12, 13:9, 34:4, 35:2, 35:4, 43:13, 43:20, 44:3, 44:10, 45:7, 46:18, 47:2, 47:25, 48:17, 49:22, 50:7, 51:7, 51:10, 51:12, 52:4, 52:18, 53:25, 55:11, 56:4, 56:8, 56:12, 81:15, 82:20, 104:1, 104:12, 104:16, 105:13, 105:24, 106:7, 107:10, 107:15, 107:22, 111:2, 111:18
**robert** [1] - 36:7
**Robert** [1] - 36:10
**robin** [1] - 12:24
**robust** [1] - 19:9
**rocked** [1] - 65:22
**Rocket** [1] - 59:16
**role** [2] - 57:3, 58:20
**roll** [2] - 57:12, 64:22
**rollback** [1] - 10:10
**roughly** [6] - 22:5, 22:7, 27:17, 28:3, 28:6, 31:22
**round** [1] - 12:24
**round-robin** [1] - 12:24
**routed** [1] - 55:20
**rule** [6] - 68:24, 80:17, 82:9, 82:14, 85:11, 110:21
**ruled** [1] - 23:18
**rules** [2] - 21:7, 69:2
**Rules** [2] - 10:8, 12:21
**ruling** [7] - 6:1, 6:5, 82:12, 110:20, 111:5, 111:6, 112:4
**run** [7] - 30:22, 41:24, 95:10, 103:6, 106:24
**running** [4] - 38:17, 94:22, 108:23
**runs** [2] - 61:1, 108:17
**RUSSELL** [1] - 1:11

**S**

**Sabina** [2] - 1:20, 4:14
**safe** [1] - 21:15
**safeguard** [1] - 27:2
**safeguards** [2] - 11:5, 65:9
**sailed** [1] - 112:1

**salary** [5] - 62:5, 62:6, 100:16, 100:17
**sales** [7] - 27:25, 38:11, 57:8, 57:14, 57:16, 59:3, 62:7, 74:18
**salesmen** [1] - 43:8
**sample** [1] - 45:20
**satisfactorily** [1] - 63:13
**satisfied** [5] - 30:9, 45:12, 55:3, 63:10, 88:19
**satisfies** [1] - 21:11
**satisfy** [4] - 28:21, 29:1, 47:11, 77:19
**SAUDEK** [15] - 4:23, 5:8, 14:9, 14:12, 15:16, 16:18, 18:3, 19:11, 22:1, 24:16, 24:18, 25:25, 26:15, 27:7, 109:22
**Saudek** [23] - 2:3, 4:17, 4:21, 4:24, 14:9, 15:5, 15:15, 16:2, 16:10, 17:23, 18:16, 22:10, 24:2, 24:13, 25:22, 28:10, 33:8, 33:19, 52:1, 107:20, 107:25, 109:18, 109:24
**sAUDEK** [1] - 110:1
**save** [1] - 69:16
**saw** [3] - 32:12, 94:23, 109:7
**scam** [1] - 45:3
**schedule** [2] - 7:14, 97:7
**scheme** [1] - 57:4
**Schiller** [2] - 1:19, 4:15
**school** [1] - 105:20
**SCHWARTZ** [6] - 4:9, 4:11, 14:3, 97:15, 99:19, 103:15
**Schwartz** [16] - 1:19, 4:10, 4:14, 33:17, 63:10, 63:16, 66:15, 67:16, 67:17, 67:19, 97:8, 97:11, 97:13, 99:11, 103:14, 108:5
**Schwartz's** [1] - 108:8
**screen** [4] - 33:23, 48:13, 57:15, 57:19
**scroll** [1] - 58:7
**scrutinize** [1] - 82:5
**SEC** [1] - 100:23
**second** [15] - 7:23, 13:2, 14:5, 41:3, 46:17, 57:20, 58:1,

58:2, 58:8, 70:4,
72:17, 74:24,
104:21, 105:21,
106:19
**secret** [1] - 26:12
**Section** [5] - 8:15,
8:16, 40:12, 66:5,
110:1
**sections** [1] - 20:1
**secured** [1] - 64:15
**Securities** [2] - 39:24
**see** [23] - 17:7, 18:8,
20:10, 20:13, 24:8,
25:3, 53:16, 57:20,
58:4, 58:22, 66:14,
69:5, 70:12, 71:3,
82:16, 84:7, 85:9,
88:16, 89:2, 89:6,
93:23, 103:16, 111:1
**seeing** [1] - 66:17
**seek** [3] - 60:18,
60:20, 85:11
**seeking** [6] - 6:14,
30:6, 30:14, 30:19,
44:1, 108:6
**seem** [2] - 19:17, 50:3
**selected** [8] - 54:10,
78:19, 78:20, 79:1,
79:10, 79:14, 83:9,
83:15
**selection** [1] - 58:17
**self** [3] - 77:21, 77:22
**self-auditing** [1] -
77:21
**self-monitoring** [1] -
77:21
**self-reporting** [1] -
77:22
**sell** [1] - 85:16
**seller** [1] - 8:4
**selling** [5] - 34:13,
39:13, 43:15, 61:10,
88:24
**sells** [1] - 38:14
**seminars** [1] - 57:16
**send** [2] - 38:11, 87:16
**sending** [1] - 95:9
**sense** [5] - 5:7, 11:11,
16:20, 31:21, 73:16
**sent** [4] - 31:6, 38:15,
93:16, 107:8
**separate** [2] - 12:19,
39:23, 58:16
**September** [5] - 38:15,
41:11, 41:12, 41:15,
60:13
**series** [1] - 65:6
**serve** [1] - 25:10
**service** [21] - 31:18,
43:9, 50:10, 58:5,

59:16, 59:22, 60:7,
60:9, 60:10, 60:13,
60:14, 78:7, 87:22,
90:6, 91:12, 91:17,
93:13, 93:18, 95:18,
99:25, 101:12
**services** [53] - 8:5,
8:9, 11:14, 11:17,
11:22, 12:1, 15:14,
15:17, 15:25, 16:1,
22:25, 30:1, 30:17,
31:25, 32:7, 33:1,
35:13, 35:15, 35:24,
36:20, 36:23, 42:8,
44:7, 44:11, 44:16,
44:17, 45:8, 45:11,
49:16, 49:21, 49:23,
50:2, 50:6, 51:4,
52:24, 52:25, 57:6,
57:11, 59:19, 60:8,
60:24, 61:1, 61:13,
86:8, 86:9, 86:12,
89:8, 89:23, 108:17,
109:5, 109:9
**services'** [1] - 60:16
**serving** [1] - 96:15
**session** [1] - 69:10
**set** [9] - 6:2, 7:14,
7:18, 14:5, 31:14,
47:6, 72:9, 76:6,
96:19
**settle** [1] - 19:15
**settlement** [1] - 17:14
**seven** [1] - 38:4
**several** [3] - 72:13,
78:10, 83:6
**Shaw** [2] - 1:21, 4:14
**shenanigans** [1] -
56:2
**Sherwood** [4] - 3:8,
55:16, 55:22, 111:21
**ship** [1] - 111:25
**shoot** [1] - 103:22
**shooting** [1] - 103:20
**Shoppers'** [2] - 6:11,
8:1
**shore** [1] - 68:9
**short** [7] - 12:24, 13:6,
16:24, 59:4, 69:4,
82:10, 103:6
**shortfall** [2] - 95:15,
96:4
**shortly** [1] - 82:8
**shot** [1] - 11:12
**show** [13] - 6:15, 8:24,
35:8, 35:10, 35:11,
35:17, 35:19, 50:23,
57:15, 58:7, 100:5,
100:10, 101:19
**showcasing** [1] -

57:22
**showed** [4] - 38:16,
60:4, 60:5, 89:9
**shown** [3] - 51:1, 90:8,
92:2
**shows** [4] - 40:17,
58:22, 104:19,
104:21
**shut** [6] - 70:13,
89:22, 90:14, 90:15,
90:24, 91:4
**shutdown** [1] - 89:13
**side** [6] - 76:21, 80:24,
106:11, 110:22,
111:20, 111:23
**sided** [1] - 111:14
**sides** [1] - 69:4
**sight** [1] - 57:3
**Sigler** [1] - 36:10
**sign** [4] - 4:12, 62:14,
62:17, 62:19
**signed** [1] - 109:1
**significance** [1] - 46:4
**significant** [11] - 11:4,
23:4, 30:13, 32:11,
68:25, 70:16, 76:20,
77:8, 104:15,
104:16, 109:11
**significantly** [4] -
11:24, 77:18, 79:16,
105:19
**similar** [1] - 89:7
**simple** [2] - 25:1,
42:12
**simply** [2] - 72:24,
73:1
**single** [4] - 35:16,
44:6, 48:10, 99:21
**sit** [3] - 57:11, 77:1
**site** [1] - 40:20
**sitting** [2] - 52:6,
56:16, 57:22
**situated** [1] - 97:20
**situation** [4] - 38:8,
44:13, 53:12, 90:10
**six** [2] - 41:21, 48:8
**skepticism** [1] - 11:7
**slam** [1] - 44:5
**slate** [1] - 38:2
**slide** [3] - 57:20,
57:22, 58:2
**slides** [4] - 41:6,
58:12, 58:17, 58:18
**slightly** [1] - 27:15
**slogan** [1] - 24:14
**small** [7] - 36:24, 46:8,
67:6, 83:2, 92:16,
92:19, 104:13
**smoke** [1] - 38:11
**smoothly** [1] - 83:18

**snake** [1] - 43:8
**so-called** [1] - 98:24
**so-to-speak** [3] -
24:15, 45:4, 46:14
**sold** [2] - 34:13, 49:23
**sole** [4] - 55:8, 55:9,
93:7
**solicited** [2] - 48:2,
50:12
**soliciting** [1] - 14:17
**solution** [2] - 90:13,
91:3
**someone** [4] - 33:14,
38:13, 83:15, 100:24
**someplace** [1] - 107:8
**sometimes** [1] - 46:14
**somewhere** [1] -
15:11
**soon** [1] - 38:15
**sooner** [2] - 52:16,
87:23
**sorry** [8] - 25:15, 39:7,
40:11, 41:7, 57:17,
58:8, 83:20, 107:24
**sort** [18] - 12:24,
12:25, 13:4, 14:5,
23:8, 23:13, 48:6,
55:5, 56:2, 63:2,
67:6, 68:17, 75:21,
75:25, 82:15, 93:23,
100:2, 100:9
**sorts** [1] - 108:24
**sought** [9] - 5:15,
6:12, 9:24, 12:6,
12:19, 26:19, 71:8,
86:1, 86:7
**sound** [1] - 13:10
**space** [2] - 89:7, 92:15
**speaking** [2] - 10:4,
23:24
**specializes** [1] - 83:3
**specific** [9] - 22:6,
38:8, 40:4, 55:13,
68:4, 81:17, 97:24,
103:9
**specifically** [4] - 9:21,
67:25, 76:6, 77:6
**specificity** [7] - 73:6,
73:7, 73:10, 73:13,
73:16, 77:7, 77:8
**speculative** [2] -
28:23, 32:5
**spend** [2] - 46:12,
49:15
**spent** [6] - 29:10,
35:22, 36:8, 42:10,
52:11, 60:14
**spoken** [1] - 68:1
**spouses** [2] - 51:19,
53:14

**squeeze** [1] - 24:15
**stability** [1] - 54:13
**staff** [1] - 21:10
**stage** [1] - 102:25
**stand** [3] - 29:6,
42:19, 84:16
**standalone** [1] - 12:16
**standpoint** [6] - 13:8,
13:23, 33:15, 47:4,
68:22, 68:23
**stands** [5] - 52:23,
94:21, 103:7, 112:7
**start** [4] - 13:6, 32:5,
33:15, 69:19
**started** [4] - 25:15,
60:13, 61:16, 91:25
**starting** [1] - 38:2
**state** [5] - 17:21,
41:13, 79:4, 79:5,
79:6
**State's** [1] - 92:12
**statements** [1] - 40:7
**States** [3] - 8:16,
113:6, 113:12
**STATES** [1] - 1:1
**stating** [1] - 41:17
**station** [1] - 63:2
**statistical** [2] - 15:19,
45:20
**status** [5] - 7:9, 21:23,
31:5, 64:2, 85:24
**statutes** [2] - 10:8,
12:21
**stay** [4] - 43:4, 50:14,
67:9, 94:18
**staying** [1] - 91:19
**stays** [1] - 52:11
**steady** [1] - 94:14
**stenographically** [1] -
113:9
**stenographically-
reported** [1] - 113:9
**step** [1] - 23:5
**Steve** [2] - 3:18, 67:22
**Steven** [1] - 1:15
**stick** [2] - 11:21, 47:8
**still** [13] - 4:21, 37:17,
45:5, 50:2, 51:14,
62:24, 88:10, 88:11,
88:12, 89:15,
101:23, 108:22
**stock** [2] - 44:18, 60:1
**stocks** [2] - 58:15,
59:23
**stolen** [1] - 70:19
**stood** [1] - 92:24
**stop** [2] - 48:21, 99:10
**Stores** [1] - 37:11
**strategies** [6] - 7:24,
39:10, 39:11, 39:12,

60:16
**stray** [1] - 101:19
**strayed** [1] - 37:25
**stream** [1] - 11:23
**Street** [1] - 1:24
**strength** [1] - 10:7
**strict** [1] - 42:7
**Strikepoint** [2] -
  58:10, 58:24
**strikes** [1] - 108:19
**Stripe** [1] - 41:11
**strong** [2] - 47:20,
  89:1
**strongly** [5] - 13:11,
  37:19, 72:5, 72:25,
  79:10
**struck** [2] - 70:8,
  106:13
**structurally** [2] - 21:2,
  21:13
**structure** [6] - 21:4,
  72:18, 78:9, 78:14,
  79:16, 81:18
**structures** [1] - 77:18
**struggling** [1] - 36:25
**students** [1] - 64:7
**stuff** [1] - 42:19
**stupid** [1] - 42:20
**subject** [12] - 9:22,
  54:20, 56:1, 69:1,
  69:16, 69:17, 75:4,
  75:14, 75:17, 85:16,
  97:5, 103:10
**submission** [3] -
  73:11, 85:24, 109:16
**submissions** [3] -
  78:11, 82:6, 112:3
**submit** [1] - 110:18
**submits** [1] - 54:25
**submitted** [17] - 7:15,
  7:18, 12:15, 23:17,
  35:17, 37:4, 41:12,
  41:16, 50:12, 65:14,
  66:6, 66:7, 70:1,
  72:10, 72:18, 87:3,
  111:19
**subpoena** [2] - 54:11,
  94:11
**subscribers** [5] -
  32:14, 60:7, 85:11,
  92:9, 99:25
**subscription** [3] -
  35:23, 37:3, 37:6
**subscriptions** [3] -
  36:9, 42:11, 60:15
**subsequent** [6] - 5:18,
  5:25, 19:9, 26:13,
  71:17, 111:10
**subset** [1] - 30:7
**substantial** [2] - 57:9,

59:13
**substantiate** [1] - 35:7
**substantiated** [1] -
  66:13
**substantiating** [1] -
  49:2
**substantiation** [9] -
  35:6, 35:8, 38:18,
  38:20, 44:20, 49:2,
  49:5, 53:19, 59:11
**succeed** [2] - 34:19,
  53:9
**success** [9] - 5:22,
  8:20, 8:23, 8:25,
  46:2, 46:13, 53:10,
  64:7, 100:4
**successful** [5] - 36:2,
  60:7, 87:24, 101:7,
  101:8
**succinct** [2] - 97:12,
  97:15
**sue** [2] - 99:2, 99:5
**sued** [2] - 98:23, 99:2
**suffers** [1] - 37:1
**sufficient** [5] - 73:6,
  73:13, 79:14, 83:16,
  95:23
**suggest** [3] - 79:1,
  95:8, 95:21
**suggested** [5] - 9:13,
  63:3, 83:1, 83:8,
  96:2
**suggesting** [6] -
  23:19, 43:7, 44:4,
  46:15, 46:16, 107:7
**suggestive** [1] - 62:20
**suitable** [1] - 81:21
**sum** [1] - 10:1
**Summary** [3] - 63:8,
  102:25, 103:17
**summary** [2] - 14:1,
  80:3
**Sung** [2] - 1:13, 3:15
**supplied** [1] - 84:6
**support** [5] - 7:8, 31:8,
  42:21, 45:6, 89:19
**supporting** [4] - 8:11,
  78:16, 88:12, 89:16
**supposed** [4] - 52:21,
  58:4, 105:22
**suppressing** [1] - 42:6
**suppression** [1] -
  40:18
**Supreme** [1] - 100:23
**survive** [1] - 21:21
**suspect** [2] - 30:17,
  97:15
**suspend** [2] - 72:3,
  75:7
**suspended** [3] -

40:21, 40:24, 98:12
**suspension** [1] -
  40:23
**suspicion** [1] - 76:20
**sustained** [1] - 95:25
**switch** [1] - 42:8
**sworn** [4] - 35:16,
  35:18, 37:3
**system** [1] - 10:11
**systems** [1] - 26:7

## T

**table** [2] - 33:13, 82:10
**tail** [1] - 97:18
**tales** [1] - 46:3
**tasked** [1] - 54:5
**tax** [1] - 68:25
**taxes** [3] - 27:23,
  27:24, 27:25
**teaching** [1] - 88:23
**tear** [1] - 42:18
**teleconference** [2] -
  5:16, 7:10
**Telestar** [2] - 78:13,
  79:20
**temporary** [1] - 10:12
**Temporary** [17] - 2:2,
  2:5, 4:24, 5:10, 6:4,
  6:13, 6:14, 6:20,
  6:24, 7:8, 7:16,
  14:23, 18:4, 40:8,
  54:7, 110:1, 110:2
**ten** [4] - 67:12, 67:14,
  67:17, 69:6
**tenable** [3] - 8:25,
  53:10, 103:18
**tens** [5] - 30:9, 30:13,
  30:18, 52:6, 107:1
**tenure** [1] - 49:9
**term** [4] - 20:16, 69:4,
  75:21, 76:2
**terminate** [1] - 17:25
**terminated** [8] - 41:9,
  41:10, 41:11, 41:14,
  41:15, 41:18, 41:19,
  105:5
**terminating** [2] - 43:2
**termination** [1] - 41:6
**terms** [15] - 18:11,
  61:15, 61:25, 73:24,
  74:1, 78:9, 79:5,
  79:11, 79:21, 82:24,
  85:12, 85:18, 89:21,
  94:12, 95:5
**testify** [1] - 102:9
**testimonial** [1] - 48:11
**testimonials** [5] -
  30:3, 38:20, 48:1,
  48:2, 50:12

**testimony** [2] - 24:10,
  102:21
**THE** [129] - 1:1, 1:1,
  1:11, 3:2, 3:4, 3:14,
  3:17, 3:23, 4:4, 4:7,
  4:10, 4:17, 4:21, 5:6,
  5:7, 5:12, 13:19,
  14:2, 14:8, 14:11,
  15:4, 16:2, 17:20,
  18:15, 21:15, 22:10,
  22:16, 24:17, 25:14,
  26:9, 26:22, 27:10,
  29:22, 32:22, 33:5,
  33:12, 34:1, 34:21,
  35:3, 43:7, 43:17,
  43:23, 44:4, 44:25,
  45:14, 47:1, 47:4,
  48:6, 49:19, 49:25,
  51:5, 51:9, 51:11,
  51:23, 52:9, 53:24,
  54:18, 55:21, 56:7,
  56:11, 56:15, 56:18,
  57:18, 61:2, 62:1,
  62:5, 62:8, 62:10,
  62:14, 62:17, 63:1,
  64:18, 65:18, 66:14,
  66:24, 67:8, 68:6,
  69:9, 69:11, 70:21,
  75:19, 76:9, 76:15,
  77:5, 77:11, 77:14,
  80:9, 80:13, 81:22,
  82:21, 83:4, 83:19,
  84:2, 85:23, 86:4,
  86:18, 87:10, 87:13,
  87:19, 88:3, 90:20,
  92:17, 93:5, 96:10,
  96:13, 96:21, 96:23,
  97:2, 97:10, 97:13,
  99:10, 102:16,
  103:19, 104:10,
  104:13, 105:6,
  105:17, 106:1,
  107:4, 107:14,
  107:19, 107:24,
  108:19, 109:12,
  109:24, 110:12,
  111:4, 111:25, 112:7
**themselves** [1] - 17:18
**theory** [1] - 108:8
**therefore** [2] - 15:17,
  35:13
**they've** [6] - 29:11,
  35:10, 44:14, 86:23,
  95:9, 95:11
**third** [7] - 32:24,
  40:20, 54:9, 75:12,
  94:16, 109:10
**third-party** [3] - 40:20,
  54:9, 94:16
**thirds** [1] - 106:12

**thoroughly** [1] - 19:3
**thoughts** [1] - 23:13
**thousands** [8] - 29:25,
  30:8, 30:9, 30:13,
  30:18, 31:15, 49:15,
  57:24
**three** [21] - 6:8, 11:10,
  11:15, 18:2, 18:3,
  21:18, 22:9, 22:12,
  23:21, 35:1, 41:22,
  47:22, 52:2, 52:10,
  52:16, 70:12, 82:4,
  87:23, 101:17,
  101:23, 103:5
**Three** [2] - 6:11, 8:2
**three-count** [1] - 6:8
**three-month** [1] -
  101:23
**three-year** [2] - 11:10,
  21:18
**threw** [1] - 22:16
**thrilled** [1] - 94:2
**throat** [1] - 23:6
**throughout** [3] -
  32:13, 35:5, 42:5
**throw** [1] - 82:17
**thunder** [1] - 70:19
**timing** [1] - 81:1
**tip** [2] - 10:13, 104:22
**Title** [1] - 8:15
**title** [3] - 61:15, 61:16,
  61:18
**today** [10] - 5:23, 6:3,
  9:4, 12:11, 67:2,
  70:7, 72:12, 76:2,
  82:11, 91:24
**together** [6] - 4:8,
  81:9, 82:16, 82:23,
  83:13, 109:17
**took** [4] - 29:18,
  57:16, 59:6, 101:16
**topic** [1] - 86:19
**torment** [1] - 65:20
**total** [1] - 27:25
**touched** [1] - 94:20
**toward** [1] - 104:19
**track** [1] - 60:22
**TRADE** [1] - 1:3
**trade** [10] - 36:8,
  39:16, 39:17, 57:25,
  58:2, 59:17, 59:18,
  60:1, 88:23, 89:3
**Trade** [9] - 1:12, 3:5,
  3:13, 3:16, 5:15,
  6:10, 9:15, 99:12,
  99:13
**trader** [4] - 101:8,
  101:11, 102:12,
  102:14
**traders** [1] - 40:2

**trades** [5] - 7:25, 37:3, 49:2, 58:5, 60:5
**trading** [9] - 32:2, 35:23, 37:5, 57:10, 59:25, 60:8, 64:7, 89:1, 90:1
**traffic** [1] - 32:10
**transaction** [1] - 8:3
**transcript** [2] - 113:9, 113:11
**transparency** [2] - 26:10, 70:1
**Traurig** [4] - 1:15, 3:19, 3:20, 4:2
**treasurer** [1] - 109:2
**trial** [8] - 10:20, 28:25, 45:16, 63:8, 63:21, 74:4, 80:8, 102:2
**trials** [1] - 55:6
**tried** [6] - 31:5, 36:20, 36:23, 38:23, 60:18, 102:1
**TRO** [8] - 6:18, 6:25, 17:24, 23:4, 26:13, 28:8, 28:9, 72:3
**troubled** [1] - 46:16
**true** [7] - 40:17, 44:19, 45:23, 99:20, 101:22, 109:7, 113:9
**truly** [3] - 70:10, 70:17, 101:10
**trust** [7] - 68:19, 73:1, 82:2, 87:6, 87:15, 94:15, 94:16
**trusted** [4] - 47:1, 47:5, 47:6, 92:4
**Trustpilot** [3] - 40:19, 40:20, 98:10
**trustworthy** [1] - 72:24
**try** [17] - 19:15, 19:18, 19:21, 20:14, 29:19, 31:10, 34:7, 43:5, 51:6, 51:8, 51:9, 53:15, 60:20, 63:11, 76:22, 97:1, 106:19
**trying** [16] - 24:10, 36:4, 36:8, 37:2, 39:10, 42:24, 42:25, 43:1, 44:2, 46:23, 59:21, 62:1, 70:6, 87:22, 104:20, 108:5
**turn** [9] - 45:18, 51:17, 51:18, 51:19, 65:3, 71:11, 78:8
**turnaround** [1] - 82:11
**turning** [1] - 79:15
**turns** [4] - 5:2, 76:11, 76:12, 84:11
**tweets** [1] - 60:6

**twice** [1] - 65:25
**Two** [1] - 7:23
**two** [35] - 6:9, 7:20, 9:9, 11:10, 14:13, 15:21, 18:2, 18:3, 20:1, 21:18, 22:9, 23:6, 24:21, 32:6, 33:23, 39:22, 40:5, 41:13, 41:16, 44:12, 49:10, 54:22, 59:7, 69:18, 69:24, 72:11, 76:8, 78:21, 80:24, 82:3, 88:6, 93:11, 95:15, 104:17, 106:12
**two-thirds** [1] - 106:12
**two-year** [1] - 21:18
**type** [3] - 54:4, 74:13, 78:13
**types** [2] - 21:8, 85:13
**typical** [4] - 35:9, 38:21, 49:5

## U

**U.S.C** [1] - 113:8
**ubiquitous** [1] - 35:5
**Ugo** [1] - 59:14
**ultimate** [2] - 12:5, 85:7
**ultimately** [6] - 8:25, 71:25, 85:20, 91:14, 98:18, 98:19
**unanswered** [1] - 104:8
**uncertain** [1] - 29:4
**unclean** [2] - 57:4, 59:9
**unclear** [2] - 28:3, 53:20
**uncontested** [3] - 39:12, 39:14, 49:16
**under** [19] - 11:11, 21:21, 21:22, 24:9, 28:8, 32:6, 37:20, 47:6, 49:1, 53:13, 64:3, 72:3, 74:6, 84:6, 97:21, 100:24, 106:16, 108:7
**undercover** [1] - 54:11
**undercut** [1] - 11:22
**undercutting** [1] - 32:22
**understood** [2] - 77:5, 77:14
**undisputed** [2] - 98:18, 98:19
**undoubtedly** [1] - 45:16
**undress** [1] - 26:10

**unemployed** [2] - 11:13, 35:24
**unexpectedly** [1] - 93:13
**unfettered** [1] - 78:4
**unfortunate** [1] - 23:4
**unfortunately** [1] - 77:13
**Union** [2] - 78:13, 79:20
**uniquely** [1] - 14:6
**UNITED** [1] - 1:1
**United** [3] - 8:16, 113:6, 113:12
**unless** [4] - 33:14, 73:17, 74:25, 90:24
**unmuted** [1] - 5:4
**unquestionably** [1] - 101:11
**unreasonable** [1] - 23:18
**unsubstantiated** [5] - 40:13, 42:4, 59:12, 64:11, 65:16
**up** [48] - 8:9, 28:18, 31:2, 31:14, 32:22, 37:23, 39:3, 40:14, 41:6, 56:2, 56:16, 57:17, 60:9, 60:19, 63:20, 63:24, 64:20, 64:24, 65:18, 66:2, 66:17, 67:20, 68:9, 68:21, 76:22, 81:9, 81:21, 82:1, 82:8, 82:23, 83:13, 84:21, 90:25, 93:11, 94:6, 94:8, 94:22, 95:24, 96:4, 103:25, 104:7, 105:11, 108:2, 111:11, 111:16, 112:4
**upcoming** [1] - 7:11
**upfront** [1] - 23:2
**upselling** [1] - 42:9
**upsold** [1] - 42:11
**uptick** [1] - 30:13
**uses** [2] - 58:18, 61:24
**utter** [1] - 26:10

## V

**vague** [1] - 75:25
**valid** [2] - 17:2, 24:24
**validate** [2] - 14:24, 14:25
**validity** [3] - 16:21, 17:13, 110:9
**valuable** [1] - 101:10
**value** [10] - 11:22, 23:25, 30:17, 34:13,

43:9, 43:13, 43:14, 49:14, 49:17, 51:1
**valued** [1] - 30:1
**various** [1] - 33:18
**vast** [1] - 85:6
**vehicle** [1] - 102:23
**Ventures** [3] - 3:8, 55:16, 111:21
**verifiable** [1] - 43:11
**verified** [3] - 43:11, 73:2, 84:14
**verify** [1] - 30:24
**versus** [2] - 3:5, 100:23
**vested** [1] - 109:13
**veto** [2] - 73:19, 74:1, 75:10
**vett** [3] - 15:8, 80:23
**vetted** [2] - 19:3, 103:2
**vetting** [1] - 18:24
**via** [2] - 1:8, 16:15
**viability** [3] - 11:5, 30:20, 47:24
**viable** [2] - 20:11, 20:15
**video** [3] - 43:21, 59:3, 59:5
**videos** [2] - 57:8, 109:6
**view** [4] - 19:16, 20:5, 20:19, 21:12
**viewed** [1] - 19:23
**views** [1] - 20:6
**violate** [1] - 8:18
**violated** [1] - 99:13
**violating** [1] - 37:23
**violation** [2] - 6:9, 99:17, 108:11
**Virtual** [1] - 1:8
**virtually** [1] - 94:9
**volume** [1] - 31:15
**vs** [1] - 1:4

## W

**wages** [1] - 27:16
**wait** [3] - 11:14, 16:6, 70:11
**waiting** [1] - 52:16
**Walton** [2] - 35:22, 60:3
**wants** [5] - 54:9, 70:10, 97:3, 106:18
**warned** [3] - 40:20, 40:23, 98:11
**warnings** [1] - 42:3
**warrant** [1] - 79:14
**waste** [1] - 82:13
**watch** [1] - 60:2
**waves** [1] - 100:2

**ways** [1] - 53:15
**wealthy** [1] - 36:17
**webinar** [1] - 60:4
**webinars** [2] - 57:15, 57:24
**website** [1] - 31:14
**Wednesday** [1] - 111:12
**week** [5] - 6:3, 47:9, 82:11, 82:12, 82:16
**weeks** [2] - 40:25, 59:7
**weigh** [5] - 8:21, 12:4, 37:19, 37:21, 55:5
**weighing** [1] - 12:9
**weighs** [1] - 72:5
**weight** [7] - 37:9, 37:12, 104:10, 105:7, 105:8, 105:12, 105:14
**well-established** [1] - 78:16
**Wells** [1] - 59:22
**WePay** [1] - 41:19
**Western** [2] - 78:13, 79:20
**whatsoever** [3] - 11:4, 18:23, 23:12
**wheelchair** [1] - 36:25
**whereas** [1] - 101:25
**whereby** [1] - 78:24
**whistles** [1] - 69:21
**whole** [10] - 44:17, 47:17, 65:6, 67:18, 68:3, 84:12, 86:2, 87:23, 105:14
**wide** [1] - 50:5
**willing** [9] - 11:20, 11:21, 12:3, 19:14, 29:17, 30:10, 33:1, 49:20, 54:8
**win** [2] - 44:5, 46:15
**window** [2] - 42:15, 82:10
**Winn** [2] - 45:16
**Winn's** [1] - 89:21
**wins** [1] - 58:4
**Winston** [4] - 1:18, 3:7, 4:13
**wish** [1] - 27:11
**wished** [2] - 109:18, 109:19
**wishes** [1] - 33:19
**withholding** [2] - 37:15, 61:23
**witnesses** [1] - 48:12
**won** [1] - 60:12
**wondering** [2] - 18:25, 24:14
**word** [2] - 97:7,

103:25

**words** [9] - 8:6, 16:15,
21:20, 26:11, 43:9,
54:22, 75:23, 105:9,
108:21
**works** [3] - 76:12,
83:17, 95:15
**world** [2] - 49:12,
65:22
**worth** [8] - 14:13,
24:7, 24:15, 27:5,
31:20, 32:18, 35:15,
86:13
**wrap** [1] - 67:20
**Wrape** [1] - 36:13
**wrapping** [1] - 63:24
**writes** [1] - 58:24
**writing** [2] - 58:10,
60:23
**wrote** [3] - 40:24,
45:4, 45:6

## Y

**year** [7] - 11:10, 21:18,
22:21, 42:25, 48:9
**years** [23] - 11:15,
12:8, 18:2, 18:3,
22:9, 22:12, 23:6,
29:12, 38:4, 39:3,
41:24, 45:21, 47:19,
47:22, 52:2, 52:10,
52:16, 70:12, 82:4,
87:23, 87:24, 109:11
**yesterday** [1] - 72:18
**yourselves** [1] - 3:10

## Z

**Zach** [2] - 1:20, 4:14
**Zeviar** [1] - 36:18
**Zoom** [1] - 1:8

## §

**§** [1] - 113:8