## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FEDERAL TRADE COMMISSION,     )
                                       )
         Plaintiff,          )
                                       )
        v.              )     Case No. 1:20-cv-03538 - GLR
                                       )
RAGINGBULL.COM, LLC f/k/a     )
LIGHTHOUSE MEDIA LLC, et al.,     )
                                       )
        Defendants.        )
                                       )

## ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANTS RAGINGBULL.COM, LLC, JEFFREY M. BISHOP, AND JASON BOND TO AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Defendants RagingBull.com, LLC ("Raging Bull"), Jeffrey M. Bishop ("Bishop"), and Jason Bond ("Bond") (collectively, "Defendants"), through undersigned counsel, hereby submit their Answer and Affirmative Defenses ("Answer") to the Amended Complaint for Permanent Injunction and Other Equitable Relief ("Amended Complaint") of the Federal Trade Commission ("FTC"). This Answer is not made for or on behalf of Defendants Sherwood Ventures, LLC, Jason Bond LLC, Kyle W. Dennis, Winston Research Inc., or Winston Corp. Defendants are responding to the allegations in the Amended Complaint concerning the operations of Raging Bull as of the date of the original Complaint.

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and under Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of Section 4 of ROSCA, 15 U.S.C. § 8403, in connection with the sale and marketing of Defendants' goods and services.

**ANSWER**:     Defendants admit that the FTC purports to bring this action under Section 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and

under Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404.

Defendants state that the remaining allegations in this Paragraph state legal conclusions and no

response thereto is required. To the extent a response is required, Defendants deny the remaining

allegations in this Paragraph.

## SUMMARY OF THE CASE

2.      Defendants operate a company called Raging Bull, which sells online services related to stock and options trading. Raging Bull is directed by Jeff Bishop and Jason Bond, who present themselves as a pair of expert stock and options traders who made millions in the stock market and now teach their techniques to the public. Additional "self-made millionaire" instructors have been added over time, including Kyle Dennis. Raging Bull advertises that consumers who sign up for their programs will learn from Bishop, Bond, Dennis, and the other instructors' simple-to-follow strategies for beating the market or will be able to copy these millionaires' trades using real-time alerts.

**ANSWER**:    Defendants admit the allegations in the first sentence in this Paragraph.

Defendants admit that Raging Bull is directed by Jeff Bishop and Jason Bond. Defendants admit

that Raging Bull has hired additional instructors over time including Kyle Dennis. Defendants

deny the remaining allegations in this Paragraph.

3.      Defendants' advertising is replete with claims that Bishop, Bond, Dennis, and other instructors have made substantial money with these strategies and on trades to which they alerted consumers as part of their programs. Defendants also make extensive use of testimonials where their customers claim to have made substantial profits using Raging Bull's services, often citing particular trades.

**ANSWER**:    Denied.

4.      Buried in fine print at the bottom of their websites, Defendants admit they do not verify the testimonials they use in advertising and do not track whether consumers who purchase their services make any money at all, much less the kinds of returns advertised. Numerous consumers have purchased Defendants' programs and found Defendants' claims to be false.

**ANSWER**:    Denied.

5.      The majority of consumers do not beat the market or make the kinds of returns advertised. Many consumers have lost substantial sums of money in the stock market following Defendant's strategy or trade recommendations; some consumers have even lost tens of thousands of dollars on just a few trades. When consumers try to cancel their subscriptions, many find they cannot do so easily.

**ANSWER**:   Denied.

6.     Amid one of the most volatile stock markets in history and the economic crisis brought on by the COVID-19 pandemic, Defendants are aggressively marketing their products while touting the success of their so-called COVID-19 and pandemic "plays" in a market they say is "creating more money making opportunities than we've seen in over a decade." Recent account statements show Defendants are causing millions of dollars of consumer injury per month. In the past three years, Defendants have defrauded consumers of more than $137 million dollars.

**ANSWER**:   Denied.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

**ANSWER**:   Admitted.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2)–(3), (c)(2), and (d), and 15 U.S.C. § 53(b).

**ANSWER**:   Admitted.

## PLAINTIFF

9.     The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401 *et seq.*, which prohibits certain methods of negative option marketing on the internet.

**ANSWER**:   Defendants state that the allegations in this Paragraph state legal

conclusions and no response thereto is required. To the extent a response is required, Defendants

deny the allegations in this Paragraph.

10.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and ROSCA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57b, and 8404.

**ANSWER**:   Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

## DEFENDANTS

11.    Defendant RagingBull.com, LLC ("Raging Bull") is a Delaware Corporation. Raging Bull's principal place of business is listed as 62 Calef Hwy. Ste. 233, Lee, New Hampshire 03861; but Raging Bull also maintains an office at 1311 McCormick Rd., Suite 200, Hunt Valley, Maryland 21031. Raging Bull transacts or has transacted business in this district and throughout the United States. Raging Bull was formed in or around 2014 as Lighthouse Media, LLC and changed its name to Raging Bull in December of 2016.

**ANSWER**:   Defendants deny that Raging Bull is a Delaware Corporation. Defendants admit the remaining allegations in this Paragraph.

12.    Defendant Jeffrey M. Bishop ("Bishop") is co-founder and CEO of Raging Bull, appears in the company's advertising, narrates a number of Raging Bull's marketing and training videos, and leads a number of its trading services, as described further below. Bishop owns and controls Sherwood Ventures, LLC ("Sherwood Ventures"). Sherwood Ventures owns 65% of Raging Bull, and Bishop signs Raging Bull business documents on behalf of Sherwood Ventures. Bishop receives money from Raging Bull either directly or through Sherwood Ventures. Bishop resides in New Hampshire. At all times material to this Complaint, acting alone or in concert with others, Bishop has formulated, directed, controlled, had authority to control, or participated in the acts and practices set forth in this Complaint. Bishop, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**ANSWER**:   Bishop admits the allegations in the first, second, third, fourth, and sixth sentences in this Paragraph. Bishop denies the remaining allegations in this Paragraph. Raging Bull and Bond admit the allegations in the first sentence in this Paragraph. Raging Bull and Bond lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and therefore deny said allegations.

13.    Defendant Jason Bond ("Bond"), formerly known as Jason P. Kowalik, is President and co-founder of Raging Bull and appears in the company's advertising. Bond leads many of Raging Bull's "educational" and stock alert programs. Bond owns and controls Jason Bond, LLC. At all times material to this Complaint, either Bond or Jason Bond, LLC has been listed as a 25% owner of Raging Bull, and Bond signs Raging Bull business documents on behalf of Jason Bond, LLC. At times Bond has been paid directly by Raging Bull, and at times he receives money through his LLC. Bond resides in New Hampshire. At all times material to this Complaint, acting alone or

in concert with others, Bond has formulated, directed, controlled, had authority to control, or participated in the acts and practices set forth in this Complaint. Bond, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**ANSWER**:   Bond admits the allegations in the first, third, fourth, fifth, and seventh sentences in this Paragraph. Bond denies the remaining allegations in this Paragraph. Raging Bull and Bishop admit the allegations in the first sentence in this Paragraph. Raging Bull and Bishop lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and therefore deny said allegations.

14.   Defendant Kyle W. Dennis ("Dennis") is a trading instructor who offers and promotes a number of widely advertised services through Raging Bull. In doing so, Dennis claims to be one of Jason Bond's most successful students and a self-made millionaire who made his fortune trading in the stock market. Dennis is also a principal and owner of Winston Corp. and of Winston Research Inc. and does business under these names. Dennis resides in Tennessee.  At all times material to this Complaint, acting alone or in concert with others, Dennis has formulated, directed, controlled, had authority to control, or participated in the acts and practices set forth in this Complaint. Dennis, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**ANSWER**:   Defendants deny the allegations in the first sentence in this Paragraph. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and therefore deny said allegations.

15.   Defendant Sherwood Ventures, LLC ("Sherwood Ventures") is a Texas corporation with its principal place of business listed at the same address as Raging Bull. Sherwood Ventures holds assets for Bishop and owns 65% of Raging Bull. Raging Bull's internet domain, ragingbull.com, was originally registered under Sherwood's name; the registration was changed to list Ragingbull.com, LLC as the registrant in January 2017. Sherwood Ventures transacts or has transacted business in this district and throughout the United States.

**ANSWER**:   Defendants admit Sherwood Ventures owns 65% of Raging Bull and previously owned the internet domain ragingbull.com before ownership was changed to Ragingbull.com, LLC in or around January 2017. Bishop denies the remaining allegations of this Paragraph. Raging Bull and Bond lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in this Paragraph and therefore deny said allegations.

16.     Defendant Jason Bond, LLC is a Delaware corporation. Jason Bond, LLC's principal place of business is the same as Bond's home address. Jason Bond, LLC transacts or has transacted business in this district and throughout the United States.

**ANSWER**:     Bond denies the allegations in this Paragraph. Raging Bull and Bishop lack

knowledge or information sufficient to form a belief about the truth of the allegations in this

Paragraph and therefore deny said allegations.

17.     Defendant Winston Research Inc. is a Delaware corporation. Winston Research Inc.'s principal place of business is Dennis' home address in Kingsport, Tennessee. Winston Research Inc. transacts or has transacted business in this district and throughout the United States. Winston Research Inc. is owned and controlled by Dennis and receives funds from Raging Bull.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in this Paragraph and therefore deny said allegations.

18.     Defendant Winston Corp. is a California corporation. Winston Corp. shares the same business address as Winston Research Inc., which is Dennis's home address in Kingsport, Tennessee. Winston Corp. transacts or has transacted business in this district and throughout the United States. Winston Corp. is owned and controlled by Dennis and has received funds from Raging Bull.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in this Paragraph and therefore deny said allegations.

### Common Enterprise

19.     Defendants Raging Bull, Sherwood Ventures, Jason Bond, LLC, Winston Corp., and Winston Research, Inc. (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices alleged below. Corporate Defendants concerted and coordinated to design, organize, manage, market, and sell Raging Bull's fraudulent enterprise, as well as to derive revenue and profit from it. Working together, Corporate Defendants have conducted the business practices described below through an interrelated network of companies, which share owners, officers, managers, employees, and office locations. Consumer money comes into Raging Bull as a result of Defendants' deceptive acts and is quickly transferred out to the other corporate entities, sometimes multiple times per month, as profit distributions, commissions, or wages. Because Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below. Individual Defendants Bishop, Bond, and Dennis formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

**ANSWER**:   Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

## COMMERCE

20.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**ANSWER**:   Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

## DEFENDANTS' BUSINESS ACTIVITIES

21.    Defendants have operated and continue to operate a company called Raging Bull, which sells online services related to stock and options trading to consumers across the United States and abroad.

**ANSWER**:   Admitted.

22.    Defendants Bishop and Bond formed Raging Bull in 2014, own 65% and 25% of the company, respectively, and are its principals. Dennis joined the company in 2016. He serves as an instructor and is also actively involved in Raging Bull's marketing and operations. Defendants claim to have thousands of subscribers, and bank records show they are bilking consumers out of millions of dollars on a monthly basis. A number of these consumers are older adults, retirees, and/or immigrants.

**ANSWER**:   Defendants admit that Raging Bull hired Kyle Dennis in 2016. Defendants admit that Raging Bull has thousands of subscribers. Defendants deny the remaining allegations in this Paragraph.

23.    Defendants offer or have offered over 30 services to date, as well as packages that include access to all or a set of their services. Defendants frequently add new services and change or remove existing ones. Each service purportedly shares with consumers a given instructor's strategies for making money in the stock market through educational materials or trade recommendations, and frequently both. Trade recommendations are advertised to come in the form of specific, real-time alerts that the instructor has bought or sold a particular stock or option; some services also offer live-streaming of the instructor's trading activity during the day, so that consumers can follow along. Defendants market these services by touting examples of the

instructors' purported success as traders, by sharing consumer testimonials that boast big wins, and by claiming consumers can make consistent and substantial profits regardless of the consumer's experience, wealth, or available time.

**ANSWER**:   Defendants admit that Raging Bull offers and markets a variety of services

with various features related to stock market trading education. Defendants deny the remaining

allegations in this Paragraph.

24.   Consumers purchase these services based on Defendants' claims that they will be able to make substantial, market-beating returns in the stock market – either by studying the materials Defendants provide or by following specific trade recommendations that Defendants offer as part of their services.

**ANSWER**:   Denied.

25.   In numerous instances, however, consumers have instead lost substantial sums of money when investing based on Defendants' advice and alerts, not counting the millions of dollars consumers collectively pay each month for access to these services.

**ANSWER**:   Denied.

26.   Buried in a purported disclaimer on their websites, described further below, Defendants admit they have no substantiation for their claims that consumers are likely to make the advertised profits or income. Defendants admit they have not independently verified the claims made by consumer testimonials and have not determined whether those testimonials are typical of consumers using their services.

**ANSWER**:   Denied.

27.   Numerous consumers have realized Defendants' services do not work as claimed. Consumers who request refunds are routinely denied. When attempting to cancel the services to avoid recurring charges, many consumers encounter difficulties, including an inability to cancel certain services online, challenges reaching customer service, and confusing instructions about how to request cancellations.

**ANSWER**:   Denied.

### Defendants' Advertising

#### *Defendants' Marketing Practices*

28.   While Defendants offer numerous paid subscription stock and option trading services and frequently change their lineup, Defendants' services are all marketed in similar ways. Defendants make parallel claims across all services about the possibility of making consistent, substantial profits and about who can use their services effectively.

**ANSWER**:     Denied.

29.     Defendants pay millions of dollars to promote their products with search engine advertisements, social media posts and videos, and individual websites for each service they offer. Defendants also use an affiliate marketing program, paying other companies and individuals to direct potential customers to their site, and they engage in mass email marketing. Defendants' advertisements and websites are replete with purported testimonials from customers claiming to have made substantial returns on individual trades using Defendants' services.

**ANSWER**:     Denied.

30.     Consumers typically first encounter Defendants' marketing after searching on the internet for information about the stock market or visiting websites related to the stock market or options trading.  Utilizing the advertising services of sites such as Google, Facebook, Instagram, and YouTube, defendants show ads to customers who have been identified as potentially interested in such topics.  One such ad is depicted below in Figure 1.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief about

the  truth  of  the  allegations  in  the  first  sentence  in  this  Paragraph  and  therefore  deny  said

allegations. Defendants admit that Figure 1 purports to be a Raging Bull advertisement, which

speaks for itself. To the extent the allegations in this Paragraph mischaracterize, are inconsistent

with or misstate, directly or indirectly, the context of Figure 1, Defendants deny such allegations

as  inconsistent  with  the  source  material.  Defendants  deny  the  remaining  allegations  in  this

Paragraph.



**Figure 1:** Screenshot of Raging Bull ad featuring Jeff Bishop, running on Facebook's platforms (from Facebook Ad Library).

31.    Many Raging Bull ads emphasize the purported success of the instructors, including Defendants Bishop, Bond, and Dennis.  The ads often feature Raging Bull's instructors, talking about highly successful trades or claiming they have made millions in the stock market. A number of ads feature instructors with private jets or in expensive-looking hotels.

**ANSWER**:    Denied.

32.     Raging Bull markets its services as opportunities to learn from these purported millionaires. The services include purported educational materials that claim to teach consumers these traders' secrets to success and are often paired with trade alerts that will purportedly let consumers copy the instructors' trades and share in the wealth.

**ANSWER**:     Denied.

33.     Raging Bull touts its trading strategies as simple and easy to use. For example, advertisements for Defendants' service Bullseye Trades describe that program as "the simplest, most consistent strategy on Wall Street. Hands down," and assert "Bullseye Trades can work for everyone" and "has worked for tons of people."

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from Raging Bull advertisements, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

34.     Raging Bull markets its trade alerts as easy opportunities to copy the instructors' trades and make similar returns. For example, advertisements for Bishop's service Total Alpha assert consumers can "leave the heavy lifting to Jeff!" when using the service's alerts and that consumers can "look right over Jeff's shoulder and see the moves he is making in real time." Likewise, ads for Bond's "Jason Bond Picks" service state "I do the work, find, and reveal up to 10 simple trades each week that make me a killing. Learn my system. Trade my system. Keep all the profits." Marketing materials often include selective examples of past alerts that went out on trades that earned large returns for the instructor, despite such returns being highly atypical for the instructors.

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from Raging Bull advertisements, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

35.     Many Raging Bull ads and advertising campaigns feature testimonials by individuals who claim to have made significant money with the services, often boasting about returns of several thousand dollars or over 100% profit from a single trade. Raging Bull ads claim the company has "helped thousands of people to become empowered, self-directed traders who know how to take control in any market condition."

11

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from Raging Bull advertisements, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

36.     After consumers click one of these ads, they are typically taken to the website for a specific product. Most of these sites have a similar design and feature further advertising for the specific product. In many cases, the site will pitch some introductory content such as a webinar or e-book, as illustrated below in Figure 2 (stating "Learn how you could DOUBLE or TRIPLE your account in One Week!"). These webinars and e-books provide some basic educational content but serve primarily to advertise Raging Bull' s products.

**ANSWER**:     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence in this Paragraph and therefore deny said allegations. Defendants admit that Figure 2 purports to be a screenshot of a webinar offered on one of Raging Bull's websites, which speaks for itself. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of Figure 2, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.



**Figure 2**: Screenshot of webinar offered on one of Defendants' marketing websites, arrived at by clicking the ad shown in **Figure 1**, *supra*.

37.     Consumers who enter an email address, for example to obtain a free e-book or register for a webinar, are added to marketing email lists. Consumers on such email lists receive frequent emails marketing Defendants' services, sometimes highlighting purported limited-time deals, and directing consumers to product-specific websites for additional services.

**ANSWER**:     Defendants admit that Raging Bull communicates and markets to consumers through email. Defendants deny the remaining allegations in this Paragraph.

38.     The free webinar videos typically begin with the instructor for the service discussing his background and purported success as a millionaire trader. The instructor then provides an overview of the purported strategy behind the product, often while sharing consumer testimonials or touting successful trades. The videos typically discuss details about the particular Raging Bull service and how to purchase it. In many cases, the free webinar videos end by describing a purported limited-time offer to get the advertised product at a discount, as illustrated below in Figure 3. Many of the products' web pages also assert limited-time deals.

**ANSWER**:     Defendants admit that Raging Bull offers free webinar videos that may include information about the instructor and the instructor's trading strategies. Defendants admit that Figure 3 purports to be a screenshot from Jason Bond Unchained promotional webinar, which speaks for itself. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of Figure 3, Defendants deny such allegations

as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.



**Figure 3**: Screenshot from Jason Bond Unchained promotional webinar.

39.     If a consumer proceeds to purchase a product, he or she is typically taken to a checkout page on ragingbull.com. Most of the checkout pages have a similar format, featuring additional earnings claims, consumer testimonials that claim substantial profits, or examples of highly-profitable trades made by the instructors, along with a payment form.

**ANSWER**:   Defendants admit that consumers can purchase Raging Bull products

through checkout pages on Raging Bull websites. Defendants deny the remaining allegations in

this Paragraph.

40.     Once consumers purchase a product from Defendants, they are often bombarded with more marketing. This includes further emails advertising special deals on new products or access to other promotional webinars. Consumers may also receive offers from Raging Bull customer service staff to try out new or different services.

**ANSWER**:   Defendants admit that Raging Bull sometimes markets to its current

subscribers. Defendants deny the remaining allegations in this Paragraph.

*Marketing Based on the Founders and Instructors*

41.     Much of the advertising for Raging Bull's products centers on the purported success of the instructors that lead each service. Consumers are led to believe they can also make significant money by using the instructor's methods, copying their trades, or both.

**ANSWER**:     Denied.

### Defendant Bishop

42.     Many ads for Bishop's services begin by touting his success as one of Wall Street's top options traders, and as a "genius trader who has made millions in the stock market." Defendants also refer to Bishop as "one of the most widely followed stock market commentators and traders out there." Many Raging Bull ads claim Bishop taught Bond, and that together they taught most of the other instructors at the company.

**ANSWER**:     Denied.



**Figure 4:** Screenshot of promotional video for Weekly Money Multiplier (Bishop on the right).

43.     When touting Bishop's purported success, Defendants do not tell consumers Bishop's income is primarily derived from subscription fees consumers pay to Raging Bull and not from stock and options trading. Bishop has incurred substantial and persistent losses as a result of his own stock and options trading activities.

**ANSWER**:     Denied.

**Defendant Bond**

44.     As the leader of many of Raging Bull's services and one of the company's founders, Bond's success as a securities trader is also a central feature of many of Defendants' advertisements.

**ANSWER**:     Defendants admit that Bond is one of the company's founders and certain of Raging Bull's advertisements contain information regarding Bond's success as a trader. Defendants deny the remaining allegations in this Paragraph.

45.     Raging Bull's website and product pages tell the story that Bond is a former gym teacher who was $250,000 in debt, found a mentor in Jeff Bishop, became a "stock trading millionaire," and is now "sharing the wealth" with his clients. Defendants frequently describe Jason Bond as a trading phenomenon, and claim, for example, that his training is "second to none because he started as a physical education teacher making a modest salary and grew his net worth to become a multi-millionaire."

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from Raging Bull advertisements, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

46.     In a marketing email sent to one of Raging Bull's mailing lists in March 2020, Bond states he "made over 180% in 2015 and then in 2016 I turned a $100,000 account into $430,000! A massive 330% returns [sic]. 2017, I then made $284,000 and get this… I donated all of it to charity! … 2018 is no different because of my market-tested strategy that myself and thousands of members are using for HUGE success." Bond later told the New Hampshire Bureau of Securities Regulation that he lost money in 2018.

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from a Raging Bull advertisement, which speaks for itself. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Bond admits he told the New Hampshire Bureau of Securities Regulation that he lost money in 2018 but denies that the language quoted in this Paragraph is inaccurate or misleading. To the extent the allegations

in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of Bond's statements, Defendants deny such allegations. Defendants deny the remaining allegations in this Paragraph.

47.     Other Raging Bull advertisements tout Bond's and Bishop's purported success by claiming they have been recognized for their success by the media or by well-known institutions. For example, one advertisement claimed "[b]ecause of our crazy story, we've been all over the media—including Times Square!" Other ads have claimed Bond was invited to speak at Harvard Business School or feature a video of him supposedly doing so. A screenshot of a recording of Bond's purported Harvard speech is shown below in Figure 5.

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from Raging Bull advertisements, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants admit that Figure 5 purports to be a screenshot of a recording of Bond, which speaks for itself. Defendants deny the remaining allegations in this Paragraph.



**Figure 5**: Screenshot from recording of Bond's purported Harvard Business School speech.

48.     The events referred to in such marketing are mostly paid-for promotional events. For example, the image that appeared on a Times Square Billboard was a paid advertisement. Similarly, Defendants paid for Bond to speak on or near Harvard's campus for promotional purposes; Bond was never invited by the school or any of its affiliates.

**ANSWER**:    Defendants admit that Raging Bull has paid for advertisements in Times Square. Defendants admit that Bond was led to believe and understood that he had been invited to speak by Harvard University and only learned afterward that he had been misled in that belief. Defendants deny the remaining allegations in this Paragraph.

49.    When touting Bond's purported success, Defendants do not tell consumers Bond's income is primarily derived from subscription fees consumers pay to Raging Bull and not from stock and options trading. Bond has incurred substantial and persistent losses as a result of his own stock and options trading activities.

**ANSWER**:    Denied.

### Defendant Dennis/Other Instructors

50.    Ads for services offered by instructors other than Bond and Bishop feature similar· claims. In most cases, Raging Bull advertises that other instructors, including Defendant Dennis, are former students of Bond and Bishop who made their own millions trading stocks and then joined Raging Bull as instructors to teach their methods. Defendants make the success of these instructors central to their advertising as well.

**ANSWER**:    Denied.

51.    Defendants' ads portray their instructors as able to generate market-beating returns through their trades and able to pick "winning" stocks on a week-after-week basis. As discussed further below, many of Defendants' marketing materials involve their instructors highlighting selected winning trades that earned huge percentages, often over 100% per trade and as high as 1600%. Such trades are atypical, and neither Raging Bull's instructors nor their consumers make market-beating returns on a week-after-week basis. Many consumers have complained of losing money when trying to follow Defendants' trade recommendations.

**ANSWER**:    Defendants admit that some of Raging Bull's subscribers have reported losing money in the market. Defendants deny the remaining allegations in this Paragraph.

52.    Ads for services offered by Kyle Dennis feature, for example, Dennis saying he made "about $9,100 per day" in 2019, which the image shown in **Figure 6**, below, displays.

**ANSWER**:    Defendants admit that Figure 6 purports to be a screenshot from a promotional video for Kyle Dennis' service Fast Five Trades, which speaks for itself. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or

indirectly, the context of Figure 6, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.



**Figure 6**: Screenshot of promotional video for Dennis's service Fast Five Trades.

### Misrepresentations about Income Potential

53.     Defendants advertise that consumers can make substantial, market-beating returns by following Defendants' purported trade strategies or by following Defendants' specific trade recommendations and alerts. Defendants make three main types of income claims: (1) general claims about the kinds of profits consumers can make, which include statements like "consistent money," "big money," "double your money," and various profit percentages; (2) examples of specific, winning trades the instructors themselves claim to have made using their strategies, which purport to illustrate the income potential of the programs; and (3) testimonials that purport to illustrate the kinds of profits Raging Bull customers make.

**ANSWER**:    Defendants admit that certain of Raging Bull advertisements contain information regarding the trading successes of its instructors. Defendants deny the remaining allegation in this Paragraph.

<u>General Income Claims</u>

54.     All of Defendants' services are marketed with substantially similar income claims, boasting the success of the instructor and claiming subscribers will be able to make consistent,

substantial income too if they purchase the service and learn the instructor's method.

**ANSWER**:   Denied.

55.   For example, typical of Defendants' services is one called Bullseye Trades, led by Defendant Jeff Bishop. Bullseye Trades offers consumers access to purported educational materials plus alerts for "one trade," "once a week," with "one hundred percent profit targets." Advertising materials for Bullseye Trades state "I'm aiming to make over 100% profit each and every week with these ideas and I'm really good at it."

**ANSWER**:   Defendants admit that this Paragraph purports to include quotations from

Raging Bull advertisements, which speak for themselves. To the extent the allegations in this

Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of

the alleged quotations, Defendants deny such allegations as inconsistent with the source material.

Defendants deny the remaining allegations in this Paragraph.

56.   Likewise, Defendants describe Total Alpha as teaching consumers "the options trading strategies that Jeff Bishop has used to make a fortune in the stock market." Defendants market Jason Bond Picks with statements like "Don't Just Beat the Market… Crush It." Defendants describe Weekly Windfalls as "Jason Bond's unique options strategy that could DOUBLE your income (in as little as a few minutes per week)." Defendants also call Weekly Windfalls a "new $10,000 per week trading strategy." Defendants market Sniper Report as a newsletter by Kyle Dennis "strategically developed to only deliver high probable [sic] trades with the power to make 100%, 200% 300% return [sic] on each trade."

**ANSWER**:   Defendants admit that this Paragraph purports to include quotations from

Raging Bull advertisements, which speak for themselves. To the extent the allegations in this

Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of

the alleged quotations, Defendants deny such allegations as inconsistent with the source material.

Defendants deny the remaining allegations in this Paragraph.

57.   Since approximately March 2020, during the COVID-19 pandemic, Defendants have employed additional marketing tactics based on the nationwide economic uncertainty. For example, marketing emails in April 2020 claimed Dennis "was able to rack up nearly $500K in profits by trading stocks related to the COVID-19 pandemic" and had found a "hidden bull market." In May 2020, Defendants advertised a webinar in which Kyle Dennis purported to explain the effects of the pandemic on the stock market and "why he believes this may be the **most exciting opportunity in decades!**" (emphasis original). The video was an advertisement for one of Kyle Dennis's Raging Bull subscription services called Trade With Kyle. Many of Defendants'

instructors have sent marketing emails touting their ability to make money during the pandemic.

**ANSWER**:   Defendants admit that this Paragraph purports to include quotations from Raging Bull advertisements, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

58.    Defendants do not, in fact, provide effective strategies that consumers can reasonably use to make market-beating profits. Nor can consumers make market-beating returns by using Defendants' trade alerts.

**ANSWER**:   Denied.

59.    Consumers do not typically make returns like those advertised. A substantial number of consumers have lost money attempting to invest based on the "education" provided by Defendants or attempting to follow the instructors' trade alerts.

**ANSWER**:   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and therefore deny said allegations.

<u>Example Instructor Trades</u>

60.    Defendants also frequently tout examples of the instructors' winning trades in their advertising.

**ANSWER**:   Defendants admit that certain of Raging Bull's advertisements contain examples of its instructors' successful trades. Defendants deny the remaining allegations in this Paragraph.

61.    For example, a promotional video for Weekly Money Multiplier includes numerous examples of highly profitable trades that a Raging Bull instructor named Nathan Bear claims he shared as alerts with his subscribers, boasting profits like 140%, 267%, or as high as 1600%. Similarly, in a promotional webinar for Bullseye Trades, Bishop states, "I have made literally hundreds of trades where I've made well over 100% on [sic]," and "[s]ome of these I used to think were unreal profits, I mean, I'm talking $50,000, $60,000, even $100,000 in a matter of days." Dennis, in a video for his service Trade With Kyle, shares examples of options or stocks where the price jumped several hundred percent for each, which his strategy would purportedly have identified, and claims his own trading returned tens of thousands of dollars of profit on these. In emails Bond sent to consumers who signed up to receive his free newsletter, he wrote, for example,

"SNAP, crackle, pop! $22,000 profit for me on SNAP Wednesday, 172% on the options and another 10% on the shares. ALL from IPHONE" and "I'm avg, $2300 a day right now trading part time."

**ANSWER**:    Defendants admit that this Paragraph purports to include quotations from Raging Bull advertisements, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

62.    The instructor trades mentioned in Defendants' advertising are not representative of consumers' experience using Defendants' services.

**ANSWER**:    Defendants state that the allegations of this Paragraph are overbroad and vague, and no response thereto is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and therefore deny said allegations.

63.    Defendants do not provide effective strategies that consumers can reasonably use to make market-beating profits of the type illustrated by these example trades. Nor can consumers make such returns by using Defendants' trade alerts.

**ANSWER**:    Denied.

Consumer Testimonials

64.    Defendants make heavy use of consumer testimonials in their videos and other promotional materials.

**ANSWER**:    Denied.

65.    For example, advertising for Fast 5 Trades features many testimonials, including quotes from three individuals who stated they made over $1,000 in three weeks, made $500 in two days, and made nearly 20% on their first trade with the service, respectively. Advertisements for Bullseye Trades also feature quotes from purported customers, asserting wins of 25%, 70%, or 115%, or claiming, "all of the Bullseye Trades have been profitable for me." Total Alpha ads feature testimonials from purported customers claiming to have made "[$]6500.00 in 20 MINUTES," "$500 in 15 min[utes]," "roughly 90% in 24 hours," and "92%" wins.

**ANSWER**:    Defendants admit that this Paragraph purports to include quotations from Raging Bull advertisements, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

66.    As described below, the trades described in these testimonials are not typical or representative of Raging Bull customer experiences overall. Customers do not make market-beating returns overall from their trading with Defendants' programs, much less returns like those advertised. Numerous customers lose money.

**ANSWER**: Defendants state that the allegations of this Paragraph are overbroad and vague, and no response thereto is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and therefore deny said allegations.

67.    Defendants do not provide effective strategies that consumers can reasonably use to make consistent, market-beating profits such as those suggested by the consumer testimonials they use in advertising. Nor can consumers make such returns by using Defendants' trade alerts.

**ANSWER**:    Denied.

### *Misrepresentations About Who Can Use Defendants' Services Successfully*

68.    Defendants claim their services can be used successfully by people with little or no stock or options trading experience.

**ANSWER**:    Denied.

69.    Defendants claim consumers can make substantial profits regardless of the balance in consumers' accounts. For example, Defendants advertise that their High Octane service can be used with as little as $500. As illustrated in **Figure 7**, below, Defendants advertise that consumers can turn a $1,000 account into a $10,000 account with their Profit Prism service.

**ANSWER**:    Defendants admit that Figure 7 purports to be a screenshot of a promotional video for Profit Prism, which speaks for itself. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of Figure 7,

Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.



**Figure 7**: Screenshot of promotional video for Defendants' service Profit Prism.

70.     Defendants claim their services can be used profitably by people who only trade part-time. For many services, Defendants claim people can make money using the service in as little as 10 to 30 minutes per day or by just following a single trade alert per week. For example, Defendants claim their service Total Alpha is designed for people with busy schedules and that Freedom Trader is for "busy professionals."

**ANSWER**:     Defendants admit the allegations in the third sentence in this Paragraph.

Defendants deny the remaining allegations in this Paragraph.

71.     In general, Defendants advertise that anyone can use their services profitably because it is easy to follow the instructors' alerts and recommendations.

**ANSWER**:     Denied.

72.     Numerous consumers have found Defendants' claims about the level of experience, account size, and time investment needed to be inconsistent with their experiences.

**ANSWER**:     Defendants state that the allegations of this paragraph are overbroad and, vague and no response thereto is required. To the extent a response is required, Defendants lack

knowledge or information sufficient to form a belief about the truth of the allegations in this

Paragraph and therefore deny said allegations.

73.    While Defendants routinely market their services as simple and easy to use, their purported educational materials and alerts consist of generic trading concepts and technical indicators that are not sufficiently concrete to be implemented. Defendants do not provide any strategy that consumers can follow, much less a strategy capable of achieving market-beating returns.

**ANSWER**:    Denied.

74.    Contrary to Defendants' claims that consumers with small balances in their accounts can grow their accounts into a source of substantial income as Raging Bull traders claim to have done, these consumers are especially unlikely to realize the kind of income advertised.

**ANSWER**:    Denied.

75.    Consumers are also likely to have a hard time using Defendants' services without spending significantly more time than advertised, and even then, they struggle to make positive investment returns. Consumers are unable to reliably execute Defendants' trade alerts without dedicating significant time and making themselves available throughout the day during market hours. The stocks and options Defendants trade tend to be low-volume securities with prices that move rapidly and with great volatility, particularly when Defendants issue trade alerts.

**ANSWER**:    Denied.

**Defendants' Purported Disclaimers Do Not Cure Their Misrepresentations**

76.    Defendants' purported disclaimers are not clear or conspicuous, and do not cure their misrepresentations. Rather, in many instances, the disclaimers actually confirm the misleading nature of Defendants' advertising.

**ANSWER**:    Denied.

77.    Defendants frequently include disclaimers on their services' purchase pages in a small "Terms & Conditions" text box that appears below the purchase button. The text box contains several pages worth of text and requires several minutes to scroll through. A screenshot of such a disclaimer box appears in **Figure 8**, below, in the bottom right corner. As can be seen in the image, the actual disclaimers are not visible at first and require significant scrolling to find.

**ANSWER**:    Defendants admit that Figure 8 purports to be a screenshot of a purchase

page for Bullseye Trades, which speaks for itself. To the extent the allegations in this Paragraph

mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of Figure 8,

Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

78.     Defendants also typically include a pair of links at the bottom of their web pages that take consumers to two separate pages, titled "Disclaimer" and "Terms and Conditions," which contain similar text.

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from Raging Bull's disclaimers, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.



**Figure 8:** Screenshot of purchase page for Bullseye Trades. The text box where Defendants put disclaimers appears in the bottom right corner, below the purchase button. The actual disclaimers are not visible without scrolling down through the box's several pages of text.

79.     These website disclaimers acknowledge that Defendants have not collected any data to substantiate whether the earnings claims they make, or the example trades or consumer testimonials they use in advertising, are typical and representative. In pertinent part, they state that "facts stated in testimonials have not been independently audited or verified," and that there has not been "any attempt to determine whether any testimonials are representative of the experiences of all persons using the methods described herein or to compare the experiences of the persons giving the testimonials after the testimonials were given."

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from

Raging Bull's disclaimers, which speak for themselves. To the extent the allegations in this

Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of

the alleged quotations, Defendants deny such allegations as inconsistent with the source material.

Defendants deny the remaining allegations in this Paragraph.

80.     The website disclaimers also contradict Defendants' advertising that consumers can make money by simply following the instructors' trades. For example, while Bullseye Trades is marketed with statements such as "I do all the homework and research during the week ahead and you get to piggyback off my single best idea for the week," the disclaimers on other pages of the website or in the small text box below the purchase button contradict that. In a complete about-face, the disclaimers say instead that consumers "should never invest in the securities of any of the companies mentioned based solely on information contained on our website" and should assume "all information provided regarding companies is not trustworthy unless verified by their own independent research."

**ANSWER**:     Defendants admit that this Paragraph purports to include quotations from

Raging Bull's disclaimers, which speak for themselves. To the extent the allegations in this

Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of

the alleged quotations, Defendants deny such allegations as inconsistent with the source material.

Defendants deny the remaining allegations in this Paragraph.

81.     Defendants additionally include purported disclaimers buried in small-print font at the end of many marketing emails. In recent emails, for example, these disclaimers admit that "subscribers' trading results have NOT been tracked or verified" and that "the results presented in this communication are NOT TYPICAL." These recent email disclaimers also acknowledge that "[a]ctual results will vary widely given a variety of factors such as experience, skill, risk mitigation

practices, market dynamics and the amount of capital deployed."

**ANSWER**:   Defendants admit that this Paragraph purports to include quotations from Raging Bull's disclaimers, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

82.   Defendants sometimes, but not always, include disclaimers at the beginning of their promotional videos. Such disclaimers appear only for a brief period of time, in a large block of text, while the instructor speaks to the viewer.

**ANSWER**:   Defendants admit that certain of Raging Bull's promotional videos have displayed disclaimers. Defendants deny the remaining allegations in this Paragraph.

83.   For example, as shown below in **Figure 9**, Defendants' webinar advertising the Trade With Kyle service that was released as a COVID-19 "state of the market" webinar includes a brief disclaimer at the beginning of the video for approximately 30 seconds, about 15 minutes prior to Dennis sharing his example wins and consumer testimonials.



**Figure 9**: Screenshot of disclaimer text displaying at the beginning of a Trade With Kyle promotional video.

While the disclaimer displays on the screen, Dennis continues to speak and tells consumers:

> Now, really really quickly right, especially right now, this is really super super-duper important Disclaimer here. Trading is risky. I think we've all understood and found that out in the last month here, right? Heck, going outside is risky nowadays, right? So, make sure you're smart, you're the one pushing the buttons, you're the one taking responsibility for your wins and your losses. I always like to hear about both because I have wins and losses as well and I take responsibility for my decisions, as you should take responsibility as well.

**ANSWER**:    Defendants admit that Figure 9 purports to be a screenshot of disclaimer text displaying at the beginning of a Trade With Kyle promotional video, which speaks for itself. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of Figure 9, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

84.    Contrary to Defendants' marketing claims, the fleeting video disclaimer states that Dennis's "results are very atypical and you should not expect to replicate them."

**ANSWER**:    Defendants admit that this Paragraph purports to include quotations from Raging Bull's disclaimers, which speak for themselves. To the extent the allegations in this Paragraph mischaracterize, are inconsistent with or misstate, directly or indirectly, the context of the alleged quotations, Defendants deny such allegations as inconsistent with the source material. Defendants deny the remaining allegations in this Paragraph.

### Consumer Complaints

85.    Numerous consumers have concluded their own experience is not consistent with the impressions created by Defendants' marketing about consumers' ability to generate substantial income using Raging Bull's services.

**ANSWER**:    Denied.

86.    The training materials to which consumers are given access after signing up consist of one or more series of videos and some written materials that purport to describe the instructors' strategies. Many of the videos are just recordings of past webinars or live chat sessions. Overall, these materials are a collection of generic trading concepts and technical trading indicators lacking

the structure, concreteness, consistency, and clarity required for Raging Bull's subscribers to use them to generate substantial income through trading.

**ANSWER**:   Denied.

87.   Consumers also encounter numerous problems with Defendants' trade alerts. Numerous consumers have incurred substantial losses following Defendants' trade recommendations.  Further, many consumers have found that alerts arrive too late or do not arrive at all in some cases. For example, consumers may receive a buy alert but not a sell alert or may only realize the instructor sold the security when he later claims he made substantial profit on the trade, at which point the security's price has dropped significantly.

**ANSWER**:   Denied.

88.   Many consumers have requested refunds after concluding the service does not work for them as advertised.

**ANSWER**:   Denied.

89.   Defendants routinely deny refund requests, often stating it is against company policy. In many cases, consumers are instead encouraged to try a different Raging Bull service or even to purchase an upgrade to get the results they want.

**ANSWER**:   Defendants admit that Raging Bull would deny refund requests when consumers are not entitled to refunds and, in some circumstances, would offer those subscribers the opportunity to try a different Raging Bull service. Defendants deny the remaining allegations in this Paragraph.

90.   When consumers are denied a refund, some file complaints online with agencies such as the Federal Trade Commission or with organizations such as the Better Business Bureau.

**ANSWER**:   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and therefore deny said allegations.

91.   Some consumers have been able to obtain refunds after they filed complaints with the Better Business Bureau, despite initially being told it was against company policy, but were told they could only receive a refund if they took down their complaints or marked them as resolved.

**ANSWER**:   Denied.

92.   All of the Individual Defendants are aware of consumer complaints. Consumers have complained to Raging Bull customer service and to Raging Bull instructors, including the

Individual Defendants, by way of email, chat rooms, social media, and messaging services. Consumers have also filed complaints and negative reviews online, including complaints that consumers could not make money using the materials or alerts provided by Raging Bull, that consumers were losing money, that consumers could not understand or implement strategies from the purported educational materials, and that alerts were not working for consumers. Bishop, Bond, and Dennis all have seen or received such complaints from consumers.

**ANSWER**:    Bishop and Bond admit that they are aware of certain consumer complaints

and negative reviews online, some of which purport to being unsuccessful or to have lost money,

but deny that they are aware of all consumer complaints made to other Raging Bull instructors or

Raging Bull customer support personnel or posted in or on chat rooms, social media, and

messaging services. Defendants lack knowledge or information sufficient to form a belief about

whether Dennis has seen or received complaints from consumers and therefore deny said

allegations. Defendants deny the remaining allegations in this Paragraph.

93.    For example, in or around December 2019, Bond shared a video with members of Raging Bull's services called Nucleus, Black Optics, Millionaire Roadmap, and Most Wanted wherein he apologized to them for significant changes in the services that "did not sit right" with him. Bond admitted he, Bishop, and Dennis had overestimated their ability to mentor so many people and had failed to deliver the services as promised. Raging Bull offered these consumers limited access to their Elite service instead but refused to give consumers even partial refunds for the services they had discontinued.

**ANSWER**:    Defendants admit that in or around December 2019, Bond shared a video

with members of Raging Bull's services called Nucleus, Black Optics, Millionaire Roadmap, and

Most Wanted. To the extent the allegations in this Paragraph seek to paraphrase or characterize

the contents of the video, the video speaks for itself and Defendants deny the allegations to the

extent that they are inconsistent with the video. Defendants deny the remaining allegations in this

Paragraph.

<u>Consumers' Difficulties Cancelling Defendants' Services to Stop Recurring Charges</u>

94.    Raging Bull sells and has sold its services as recurring subscriptions that are billed quarterly or annually, with prices that range from several hundred dollars to several thousand dollars per year, per service. Some customers pay additional amounts to obtain so- called "lifetime" access to services.

**ANSWER**:   Defendants admit that Raging Bull sold certain services as recurring subscriptions, some of which were billed quarterly or annually. Defendants admit that Raging Bull offered a lifetime subscription option for certain services. Defendants deny the remaining allegations in this Paragraph.

95.   In numerous instances, consumers have had a difficult time cancelling Raging Bull's recurring billing of their credit cards. Defendants have made it difficult to cancel in numerous ways, including: (1) limiting the means consumers could use to submit cancellation requests; (2) having different cancellation requirements for different services; (3) substantially and chronically understaffing the customer service phone line to which many consumers are directed for cancellation purposes; and (4) providing consumers with inconsistent and confusing instructions regarding the way to cancel their services.

**ANSWER**:   Denied.

96.   While Raging Bull offers a few services that consumers appear able to cancel online, many of their services cannot be cancelled online. Many consumers are directed to call or email a Raging Bull customer support representative instead.

**ANSWER**:   Defendants admit that certain services could be cancelled online, and certain other services could be cancelled through telephone or email. Defendants deny the remaining allegations in this Paragraph.

97.   In some cases, cancellation instructions are unclear. For example, some services cannot be cancelled from the subscriptions page on Raging Bull's website. Those services instead direct consumers to a Frequently Asked Questions ("FAQ") webpage. If consumers wish to cancel immediately, that document directs consumers back to the subscriptions page and directs them to write to customer service.

**ANSWER**:   Defendants admit that certain services could be cancelled online, and certain other services could be cancelled through telephone or email. Defendants deny the remaining allegations in this Paragraph.

98.   Consumers who email customer support experience delays or problems getting in touch with a representative and then often are told they need to call instead to discuss cancellation.

**ANSWER**:   Denied.

99.   Consumers who try to contact customer support by phone often have had to wait significant amounts of time before speaking to someone, have been disconnected, never received

a call back if they left messages, or received a voicemail recording instructing them to send an email.

**ANSWER**:    Denied.

100.    These delays sometimes result in Raging Bull charging consumers for a renewal, despite those consumers' attempts to cancel in advance of the renewal date.

**ANSWER**:    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in this Paragraph and therefore deny said allegations.

<u>Defendants Continue to Violate the Law</u>

101.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

**ANSWER**:    Denied.

<u>VIOLATIONS OF THE FTC ACT</u>

102.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

**ANSWER**:    Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

103.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**ANSWER**:    Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

<u>Count I – False or Unsubstantiated Earnings Claims</u>

104.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Raging Bull's services, including through the means described in Paragraphs 41 to 67, Defendants represent, directly or indirectly, expressly or by implication, that consumers who purchase Raging Bull's services will earn or are likely to earn substantial income.

**ANSWER**:     Defendants incorporate their answers to Paragraphs 41 to 67 as if stated

fully herein. Defendants deny the remaining allegations in this Paragraph.

105.    The representations set forth in Paragraph 104 are false, misleading, or were not substantiated at the time the representations were made.

**ANSWER**:     Denied.

106.    Therefore, Defendants' representations as set forth in Paragraph 104 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**ANSWER**:     Defendants state that the allegations in this Paragraph state a legal

conclusion and no response thereto is required. To the extent a response is required, Defendants

deny the allegations in this Paragraph.

### Count II – Other Misrepresentations Regarding Raging Bull's Services

107.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Raging Bull's services, including through the means described in Paragraphs 68 to 75, Defendants represent, directly or indirectly, expressly or by implication, that:

    a.   Consumers will or are likely to earn substantial income using Raging Bull's services even if they have little to no experience in securities trading.

    b.   Consumers will or are likely to earn substantial income using Raging Bull's services even if they spend only a short amount of time each day using the service, for example if they are trading while also working full time.

    c.   Consumers will or are likely to earn substantial income using Raging Bull's services even if they start with a very small balance in their brokerage account.

**ANSWER**:     Defendants incorporate their answers to Paragraphs 68 to 75 as if stated

fully herein. Defendants deny the remaining allegations in this Paragraph.

108.    The representations set forth in Paragraph 107 are false or misleading or were not substantiated at the time the representations were made.

**ANSWER**:     Denied.

109.    Therefore, Defendants' representations as set forth in Paragraph 107 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).

**ANSWER**:   Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

## VIOLATIONS OF THE RESTOREONLINE SHOPPERS' CONFIDENCE ACT

110.   In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010. Congress passed ROSCA because: "Consumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." 15 U.S.C. § 8401.

**ANSWER**:   Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

111.   Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(u), unless the seller: (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains the consumer's express informed consent before making the charge; and (3) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403.

**ANSWER**:   Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

112.   The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u).

**ANSWER**:   Defendants state that the allegations in this Paragraph state legal conclusions and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

113.   As described in Paragraph 94, Defendants advertise and sell Defendants' services

to consumers through a negative option feature as defined by the TSR. *See* 16 C.F.R. § 310.2(u).

**ANSWER**:   Defendants state that the allegations in this Paragraph state a legal conclusion and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

114.   Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

**ANSWER**:   Defendants state that the allegations in this Paragraph state a legal conclusion and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

### Count III – Failure to Provide a Simple Cancellation Method

115.   In numerous instances, as described in Paragraphs 94 to 100, Defendants charge or attempt to charge consumers for Defendants' services through a negative option feature while failing to provide simple mechanisms for consumers to stop recurring charges from being placed on their credit card, debit card, bank account, or other financial account.

**ANSWER**:   Denied.

116.   Defendants' acts or practices set forth in Paragraph 115 constitute a violation of Section 4(3) of ROSCA, 15 U.S.C. § 8403(3), and are therefore treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

**ANSWER**:   Defendants state that the allegations in this Paragraph state a legal conclusion and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

### CONSUMER INJURY

117.   Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and ROSCA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**ANSWER**:   Denied.

## THE COURT'S POWER TO GRANT RELIEF

118.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

**ANSWER**:    Defendants state that the allegations in this Paragraph state a legal conclusion and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

119.    Section 19 of the FTC Act, 15 U.S.C. §57b, and ROSCA, 15 U.S.C. § 8404, authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of ROSCA, including the rescission or reformation of contracts, the refund of monies paid, the disgorgement of ill-gotten monies, and prejudgment interest.

**ANSWER**:    Defendants state that the allegations in this Paragraph state a legal conclusion and no response thereto is required. To the extent a response is required, Defendants deny the allegations in this Paragraph.

## JURY DEMAND

Defendants demand a trial by jury on all issues so triable.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants hereby allege and assert the following affirmative and other defenses to the FTC's Amended Complaint. Defendants do not assume the burden of proof on such defenses that would otherwise rest with the FTC. Defendants reserve the right to supplement or amend these defenses as discovery proceeds. Defendants do not knowingly or intentionally waive any applicable defense. In support of their defenses, Defendants allege as follows:

### First Defense

The Amended Complaint fails to state a claim on which relief can be granted under Section 5 of the FTC Act, 15 U.S.C. 45.

### Second Defense

The FTC's claims are barred, in whole or in part, because the alleged misrepresentations are not material to the purchasing decisions of Raging Bull subscribers.

### Third Defense

The FTC's claims for consumer redress are barred, in whole or in part, because the FTC cannot show that any consumer has suffered or will suffer harm from Defendants' actions.

### Fourth Defense

The FTC's claims are barred, in whole or in part, against Defendants by the applicable statute of limitations.

### Fifth Defense

Defendants have acted in good faith in all aspects of their marketing and advertising practices, which prohibits Plaintiff from obtaining any injunctive relief.

### Sixth Defense

The consumers referenced in the FTC's Amended Complaint received and, in the future will continue to receive, all or substantially all of the benefits from Raging Bull's services, including the value of the education and other benefits, which said consumers expected and intended they would receive when they purchased the services. If the FTC is able to prove any of its claims, any damages awarded for consumer redress must be reduced by the benefits received.

### Seventh Defense

The FTC's claims are barred, in whole or in part, by its failure to satisfy statutory conditions precedent prior to filing suit. In particular, the FTC improperly seeks to assert claims against Defendants for conduct that was voluntarily ceased and/or for which the FTC has no reasonable basis to believe will be resumed.

### Eighth Defense

The requested relief, if granted, would not be in the public interest because Defendant Raging Bull's customers obtain value and benefit from Raging Bull's services and wish its services to continue.

### Ninth Defense

The FTC's claims brought under Section 5(a) of the FTC Act, 15 U.S.C. §45(a) are barred, in whole or in part, because the FTC does not have the authority, under that statute or other governing law, to obtain monetary relief from Defendants.

### Tenth Defense

The Complaint is a violation of Defendants' due process rights. Defendants lack notice as to what constitutes unfair or deceptive trade practices because the statute is impermissibly vague, and the FTC acted in violation of its own procedures by failing to provide prior notice.

### Eleventh Defense

The FTC's claims are barred, in whole or in part, because Defendants provided appropriate disclaimers and other informational disclosures to consumers regarding the products that consumers purchased.

## Twelfth Defense

The FTC's claims are barred, in whole or in part, because the injuries alleged in the Amended Complaint, none being admitted, were not caused by any allegedly wrongful conduct by Defendants.

## Thirteenth Defense

To the extent the FTC seeks monetary or other relief with respect to Defendant Raging Bull's subscribers who were not misled by the advertisements or other materials the FTC asserts were false or misleading, such relief would be barred against Defendants by the United States Constitution, including, but not limited to, the First and Fifth Amendments thereto.

## Fourteenth Defense

To the extent the FTC seeks monetary relief that is not proportional to the actual injury, if any, suffered by Defendant Raging Bull's subscribers, such relief would be barred against Defendants by the United States Constitution, including, but not limited to, the First and Fifth Amendments thereto.

## RELIEF REQUESTED

Defendants respectfully request that this Court:

1. Enter Judgment in favor of Defendants and against the FTC on all counts and claims;

2. Deny the FTC any relief whatsoever by way of its Amended Complaint;

3. Deny the FTC all forms of injunctive relief;

4. Deny the FTC's request for rescission, reformation, restitution, refund and/or disgorgement of any monies or amounts;

5. Deny the FTC's request for costs;

6.      Award Defendants their reasonable attorneys' fees and costs;

7.      Award Defendants their damages for having been wrongly injured by the Temporary Restraining Order; and

8.      Award Defendants any further relief the Court deems just and proper.

Dated: April 16, 2021                           Respectfully submitted,


                                                RagingBull.com, LLC, Jeffrey M. Bishop,
                                                and Jason Bond

                                                By: /s/ Brett M. Doran
                                                David G. Barger (DCB# 469095)
                                                Greenberg Traurig LLP
                                                1750 Tysons Blvd, Suite 1200
                                                McLean, VA 22102
                                                Tel: (703) 749-1300
                                                Email: bargerd@gtlaw.com


                                                Andrew G. Berg (*admitted pro hac vice*)
                                                2101 L Street, N.W.
                                                Suite 1000
                                                Washington DC 20037
                                                Tel: (202) 331- 3100
                                                Email: berga@gtlaw.com


                                                Miriam G. Bahcall (*admitted pro hac vice*)
                                                Brett M. Doran (admitted *pro hac vice*)
                                                Greenberg Traurig, LLP
                                                77 West Wacker Drive
                                                Suite 3100
                                                Chicago, IL 60601
                                                Tel: (312) 476-5135
                                                Email: bahcallm@gtlaw.com
                                                Email: doranb@gtlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of April 2021 a true and accurate copy of the

foregoing Answer and Affirmative Defenses to Amended Complaint for Permanent Injunction and

Other Equitable Relief, was properly served on all parties through the ECF system.

/s/ *Brett M. Doran*