# Exhibit B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Federal Trade Commission,**<br>600 Pennsylvania Ave., NW<br>Mailstop CC-8528<br>Washington, DC 20580<br><br>**Plaintiff,**<br><br>vs.<br><br>**RagingBull.com, LLC f/k/a Lighthouse Media LLC**, a Delaware ~~corporation~~<u>limited liability company</u>, 62 Calef Hwy., Ste. 233, Lee, New Hampshire 03861 and 1311 McCormick Rd., Suite 200, Hunt Valley, Maryland 21031, Baltimore County,<br><br>**Jeffrey M. Bishop**, individually and as an officer and/or member of RagingBull.com, LLC, and Sherwood Ventures, LLC, 18 Sackett Rd., Lee, New Hampshire 03861,<br><br>**Jason Bond, f/k/a Jason P. Kowalik**, individually and as an officer and/or member of RagingBull.com, LLC and Jason Bond, LLC, 22 Foss Farm Rd., Durham, New Hampshire 03824,<br><br>**Kyle W. Dennis**, individually ~~and as an officer and/or member of Winston Research Inc. and Winston Corp.~~<u>,</u> 857 Indian Trail Dr., Apt. E36, Kingsport, Tennessee 37660,<br><br>**Sherwood Ventures, LLC**, a Texas ~~corporation~~<u>limited liability company</u>, 62 Calef Hwy., Ste. 233, Lee, New Hampshire 03861,<br><br>**Jason Bond, LLC**, a Delaware ~~corporation~~<u>limited liability company</u>, 22 Foss Farm Rd., Durham, New Hampshire 03824, | **Case No.** 1:20-cv-3538<br><br><br><br><br><br><br><br><u>**SECOND**</u> **AMENDED COMPLAINT FOR PERMANENT INJUNCTION**<u>**,**</u> <u>**MONETARY RELIEF,**</u> **AND OTHER** ~~**EQUITABLE**~~ **RELIEF** |

~~Winston Research Inc.~~, ~~a Delaware~~
~~corporation, 857 Indian Trail Dr, Apt E36,~~
~~Kingsport, Tennessee 37660, and~~

~~Winston Corp.~~, ~~a California corporation,~~
~~857 Indian Trail Dr, Apt E36, Kingsport,~~
~~Tennessee 37660,~~

**Defendants.**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and under Section 5 of the Restore

Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, to obtain ~~temporary,~~

~~preliminary, and~~ permanent injunctive relief, ~~rescission or reformation of contracts,~~

~~restitution~~monetary relief, the refund of monies paid, ~~disgorgement of ill-gotten monies,~~ and

other ~~equitable~~ relief for Defendants' acts or practices in violation of Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a), and in violation of Section 4 of ROSCA, 15 U.S.C. § 8403, in connection

with the sale and marketing of Defendants' goods and services.

## SUMMARY OF THE CASE

2.      Defendants operate a company called Raging Bull, which ~~sells online services~~

~~related to stock and options trading.~~ promotes and sells stock and options trading services online

that Defendants claim provide strategies that generate substantial profits.  The problem is

Defendants have no proof that their trading strategies generate such profits for consumers, and in

fact the typical consumer does not make substantial income when attempting to deploy them.

Misrepresenting the attributes of a product that you are selling is deceptive and violates the FTC

Act.

2.3.    Raging Bull is directed by Jeff Bishop and Jason Bond, who present themselves as a pair of expert stock and options traders who made millions in the stock market and now teach their techniques to the public.  Additional "self-made millionaire" so-called trading "gurus" and "instructors "—in reality, Raging Bull salespeople—have been added over time, including Kyle Dennis.  Raging Bull advertises that consumers who sign up for their programs will learn from Bishop, Bond, Dennis, and the other instructors' simple-to-follow strategies for beating the market or will be able to copy these millionaires' trades using real-time alerts.

3.4.    Defendants' advertising is replete with claims that Bishop, Bond, Dennis, and other instructors have made substantial money with these strategies and on trades to which they alerted consumers as part of their programs.  Defendants also make extensive use of testimonials where their customers claim to have made substantial profits using Raging Bull's services, often citing particular trades.

4.5.    Buried in fine print at the bottom of their websites, Defendants admit they do not verify the testimonials they use in advertising and.  And they admit they do not track whether consumers who purchase their services make any money at all, much less the kinds of returns advertised.  Numerous consumers have purchased Defendants' Defendants' programs and found Defendants' earnings claims to be false.

5.6.    The majority of consumers do not beat the market or make the kinds of returns advertised.  Many consumers have lost substantial sums of money in the stock market following Defendant's Defendants' strategy or trade recommendations; some consumers have even lost tens of thousands of dollars on just a few trades.  When consumers try to cancel their subscriptions, many find they cannot do so easily.

6.7.    Amid one of the most volatile stock markets in history and the economic crisis brought on by the COVID-19 pandemic, Defendants are aggressively marketing their products while touting the success of their so-called COVID-19 and pandemic "plays" in a market they say is "creating more money making opportunities than we've seen in over a decade."  Recent account statements show Defendants are causing millions of dollars of consumer injury per month.  In the past three years, Defendants have defrauded consumers out of more than $137197 million dollars.

## JURISDICTION AND VENUE

7.8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.9.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2)–(3), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

9.10.    The FTC is an independent agency of the United States Government created by statute.the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401 et seq., which prohibits certain methods of negative option marketing on the internet.

10.    The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and ROSCA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the

refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57b, and

8404.

**DEFENDANTS**

11.     Defendant RagingBull.com, LLC ("Raging Bull") is a Delaware

Corporationlimited liability company.  Raging Bull's principal place of business is listed as 62

Calef Hwy. Ste. 233, Lee, New Hampshire 03861; but Raging Bull also maintains an office at

1311 McCormick Rd., Suite 200, Hunt Valley, Maryland 21031.  Raging Bull transacts or has

transacted business in this district and throughout the United States.  Raging Bull was formed in

or around 2014 as Lighthouse Media, LLC and changed its name to Raging Bull in December of

2016.

12.     Defendant Jeffrey M. Bishop ("Bishop") is co-founder and CEO of Raging Bull,

appears in the company's advertising, narrates a number of Raging Bull's marketing and training

videos, and leads a number of its trading services, as described further below.  Bishop, along

with his wife, owns and controls Sherwood Ventures, LLC ("Sherwood Ventures").  Bishop is

Sherwood Ventures' sole officer and controls the company.  Sherwood Ventures owns 65% of

Raging Bull, and Bishop signs Raging Bull business documents on behalf of Sherwood

Ventures.  Bishop receives money from Raging Bull either directly or through Sherwood

Ventures.  Bishop resides in New Hampshire.  At all times material to this Complaint, acting

alone or in concert with others, Bishop has formulated, directed, controlled, had authority to

control, or participated in the acts and practices set forth in this Complaint.  Bishop, in

connection with the matters alleged herein, transacts or has transacted business in this district

and throughout the United States.

13.     Defendant Jason Bond ("Bond"), formerly known as Jason P. Kowalik, is President and co-founder of Raging Bull and appears in the company's advertising.  Bond leads many of Raging Bull's "educational" and stock alert programs.  Bond ~~owns~~is an owner and controls Jason Bond, LLC.  At all times material to this Complaint, either Bond or Jason Bond, LLC has been listed as a 25% owner of Raging Bull, and Bond signs Raging Bull business documents on behalf of Jason Bond, LLC.  At times Bond has been paid directly by Raging Bull, and at times he receives money through his LLC.  Bond resides in New Hampshire.  At all times material to this Complaint, acting alone or in concert with others, Bond has formulated, directed, controlled, had authority to control, or participated in the acts and practices set forth in this Complaint.  Bond, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

14.     Defendant Kyle W. Dennis ("Dennis") is a salesman and trading instructor who offers and promotes a number of widely advertised services through Raging Bull.  In doing so, Dennis claims to be one of Jason Bond's most successful students and a self-made millionaire who made his fortune trading in the stock market.  ~~Dennis is also a principal and owner of Winston Corp. and of Winston Research Inc. and does business under these names.~~  Dennis is also the lone "guru" or purported trading expert featured on the Biotech Breakouts brand of services at Raging Bull, which has bilked over $40 million from consumers in the past three years.  Dennis appears on all of the sales and marketing materials that promote the Biotech Breakouts brand.  Dennis purportedly created and developed the Biotech Breakouts trading system or methods that purport to generate substantial and consistent trading profits for its subscribers.  At various times, Dennis has held himself out as the "Director and Co-Founder of Biotech Breakouts" and as the "Biotech Breakouts Guru."  Dennis has personally reaped over

$13.6 million in profits from Defendants' sales and auto-renewals of the Biotech Breakouts services, all of which are sold and billed as negative options.  As set forth in detail below, Dennis has repeatedly made false and unsubstantiated earnings claims in connection with the sale and marketing of Biotech Breakouts subscriptions, including during online sales presentations attended by thousands of consumers, in widely disseminated sales videos, and in his communications with consumers.  Dennis resides in Tennessee.  At all times material to this Complaint, acting alone or in concert with others, Dennis has formulated, directed, controlled, had authority to control, or participated in the acts and practices set forth in this Complaint. Dennis, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

15.     Defendant Sherwood Ventures, LLC ("Sherwood Ventures") is a Texas corporation limited liability company with its principal place of business listed at as the same address as Raging Bull.  Bishop and his wife are the sole owners of Sherwood Ventures holds assets for Bishop and, and Bishop is the sole officer and controls the company.  Sherwood Ventures owns 65% of Raging Bull.  Raging Bull's internet domain, ragingbull.com, was originally registered under Sherwood's name; the registration was changed to list Ragingbull.com, LLC as the registrant in January 2017.  In the past five years, Sherwood Ventures has received more than $36 million from Raging Bull.  At least three Raging Bull employees also work for Sherwood.  Sherwood Ventures, along with the other two owners of Raging Bull, opened a Raging Bull depository account used to collect consumers' payments to Raging Bull.  Sherwood Ventures transacts or has transacted business in this district and throughout the United States.

16.     Defendant Jason Bond, LLC is a Delaware ~~corporation.  Jason Bond, LLC's~~

~~principal place of business is the same as Bond's home address.~~ limited liability company.  Jason

Bond, LLC's principal place of business is the same as Bond's home address.  Bond owns and

controls Jason Bond, LLC.  Jason Bond, LLC owns 25% of Raging Bull.  In the past five years,

Jason Bond, LLC has received more than $12 million from Raging Bull.  A Raging Bull

employee is a signatory on the Jason Bond LLC bank account.  Jason Bond, LLC, along with the

other two owners of Raging Bull, opened a Raging Bull depository account used to collect

consumers' payments to Raging Bull.  Bond is an officer of Raging Bull and a member of Jason

Bond, LLC.  Jason Bond, LLC transacts or has transacted business in this district and throughout

the United States.

~~17.     Defendant Winston Research Inc. is a Delaware corporation.  Winston Research~~

~~Inc.'s principal place of business is Dennis' home address in Kingsport, Tennessee.  Winston~~

~~Research Inc. transacts or has transacted business in this district and throughout the United~~

~~States.  Winston Research Inc. is owned and controlled by Dennis and receives funds from~~

~~Raging Bull.~~

~~18.     Defendant Winston Corp. is a California corporation.  Winston Corp. shares the~~

~~same business address as Winston Research Inc., which is Dennis's home address in Kingsport,~~

~~Tennessee.  Winston Corp. transacts or has transacted business in this district and throughout the~~

~~United States.  Winston Corp. is owned and controlled by Dennis and has received funds from~~

~~Raging Bull.~~

**Common Enterprise**

~~19.~~17.  Defendants Raging Bull, Sherwood Ventures, and Jason Bond, LLC, ~~Winston~~

~~Corp., and Winston Research, Inc.~~ (collectively, "Corporate Defendants") have operated as a

common enterprise while engaging in the deceptive acts and practices alleged below.  Corporate Defendants concerted and coordinated to design, organize, manage, market, and sell Raging Bull's fraudulent enterprise, as well as to derive revenue and profit from it.  Working together, Corporate Defendants have conducted the business practices described below through an interrelated network of companies, which share owners, officers, managers, employees, and office locations.  Consumer money comes into Raging Bull as a result of Defendants' deceptive acts and practices and is quickly transferred out to the other corporate entities, sometimes multiple times per month, as profit distributions, commissions, or wages.  Because Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices alleged below.  Individual Defendants Bishop, Bond, and Dennis formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

20.18.  At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

21.19.  Defendants have operated and continue to operate a company called Raging Bull, which sells online services related to stock and options trading services online to consumers across the United States and abroad.  Defendants claim their services provide strategies that generate substantial profits.

22.20.  Defendants Bishop and Bond formed Raging Bull in 2014, and are its principals. Through Sherwood Ventures and Jason Bond, LLC, Bishop and Bond own 65% and 25% of the

company, respectively, and are its principals. .  Dennis joined the company in 2016.  He serves as an instructoris the featured "guru" for the Biotech Breakouts brand at Raging Bull and is also actively involved in Raging Bull's marketing and sales operations.  Defendants claim to have thousands of subscribers, and bank records show they are bilking consumers out of millions of dollars on a monthly basis.  A number of these consumers are older adults, retirees, and/or immigrants.

23.21.  Defendants offer or have offered over 30 services to date, as well as packages that include access to all or a set of their services.  Defendants frequently add new services and change or remove existing ones.  Each service purportedly shares with consumers a given instructor's strategies for making money in the stock market through educational materials or trade recommendations, and frequently both.  Trade recommendations are advertised to come in the form of specific, real-time alerts that the instructor has bought or sold a particular stock or option; some services also offer live-streaming of the instructor's trading activity during the day, so that consumers can follow along.  Defendants market these services by touting examples of the instructors' purported success as traders, by sharing consumer testimonials that boast big wins, and by claiming consumers can make consistent and substantial profits regardless of the consumer's experience, wealth, or available time.

24.22.  Consumers purchase these services based on Defendants' claims that they will be able to make substantial, market-beating returns in the stock market – either by studying the materials Defendants provide or by following specific trade recommendations that Defendants offer as part of their services.

25.23.  In numerous instances, however, consumers have instead lost substantial sums of money when investing based on Defendants' advice and alerts, not counting the millions of dollars consumers collectively pay each month for access to these services.

26.24.  Buried in a purported disclaimer on their websites, described further below, Defendants admit they have no substantiation for their claims that consumers are likely to make the advertised profits or income.  Defendants admit they have not independently verified the claims made by consumer testimonials and have not determined whether those testimonials are typical of consumers using their services.

27.25.  Numerous consumers have realized Defendants' services do not work as claimed. Consumers who request refunds are routinely denied.  When attempting to cancel the services to avoid recurring charges, many consumers encounter difficulties, including an inability to cancel certain services online, challenges reaching customer service, and confusing instructions about how to request cancellations.

**Defendants' Advertising**

***Defendants' Marketing Practices***

28.26.  While Defendants offer numerous paid subscription stock and option trading services and frequently change their lineup, Defendants' services are all marketed in similar ways.  Defendants make parallel claims across all services about the possibility of making consistent, substantial profits and about who can use their services effectively.

29.27.  Defendants pay millions of dollars to promote their products with search engine advertisements, social media posts and videos, and individual websites for each service they offer.  Defendants also use an affiliate marketing program, paying other companies and individuals to direct potential customers to their site, and they engage in mass email marketing.

Defendants' advertisements and websites are replete with purported testimonials from customers claiming to have made substantial returns on individual trades using Defendants' services.

30.28.  Consumers typically first encounter Defendants' marketing after searching on the internet for information about the stock market or visiting websites related to the stock market or options trading.  Utilizing the advertising services of sites such as Google, Facebook, Instagram, and YouTube, defendants show ads to customers who have been identified as potentially interested in such topics.  One such ad is depicted below in **Figure 1**.



**Figure 1:** Screenshot of Raging Bull ad featuring Jeff Bishop, running on Facebook's platforms (from Facebook Ad Library).

31.29.   Many Raging Bull ads emphasize the purported success of the instructors,

including Defendants Bishop, Bond, and Dennis.  The ads often feature Raging Bull's

instructors, talking about highly successful trades or claiming they have made millions in the

stock market.  A number of ads feature instructors with private jets or in expensive-looking hotels.

32.30.  Raging Bull markets its services as opportunities to learn from these purported millionaires.  The services include purported educational materials that claim to teach consumers these traders' secrets to success and are often paired with trade alerts that will purportedly let consumers copy the instructors' trades and share in the wealth.

33.31.  Raging Bull touts its trading strategies as simple and easy to use.  For example, advertisements for Defendants' service Bullseye Trades describe that program as "the simplest, most consistent strategy on Wall Street.  Hands down," and assert "Bullseye Trades can work for everyone" and "has worked for tons of people."

34.32.  Raging Bull markets its trade alerts as easy opportunities to copy the instructors' trades and make similar returns.  For example, advertisements for Bishop's service Total Alpha assert consumers can "leave the heavy lifting to Jeff!" when using the service's alerts and that consumers can "look right over Jeff's shoulder and see the moves he is making in real time." Likewise, ads for Bond's "Jason Bond Picks" service state "I do the work, find, and reveal up to 10 simple trades each week that make me a killing.  Learn my system.  Trade my system.  Keep all the profits."  Marketing materials often include selective examples of past alerts that went out on trades that earned large returns for the instructor, despite such returns being highly atypical for the instructors.

35.33.  Many Raging Bull ads and advertising campaigns feature testimonials by individuals who claim to have made significant money with the services, often boasting about returns of several thousand dollars or over 100% profit from a single trade.  Raging Bull ads

claim the company has "helped thousands of people to become empowered, self-directed traders who know how to take control in any market condition."

~~36.~~34.  After consumers click one of these ads, they are typically taken to the website for a specific product.  Most of these sites have a similar design and feature further advertising for the specific product.  In many cases, the site will pitch some introductory content such as a webinar or e-book, as illustrated below in **Figure 2** (stating "Learn how you could DOUBLE or TRIPLE your account in One Week!").  These webinars and e-books provide some basic educational content but serve primarily to advertise Raging Bull's products.



**Figure 2:** Screenshot of webinar offered on one of Defendants' marketing websites, arrived at by clicking the ad shown in **Figure 1**, *supra*.

~~37.~~35.  Consumers who enter an email address, for example to obtain a free e-book or register for a webinar, are added to marketing email lists.  Consumers on such email lists receive frequent emails marketing Defendants' services, sometimes highlighting purported limited-time deals, and directing consumers to product-specific websites for additional services.

~~38.~~36.  The free webinar videos typically begin with the instructor for the service discussing his background and purported success as a millionaire trader.  The instructor then

provides an overview of the purported strategy behind the product, often while sharing consumer testimonials or touting successful trades.  The videos typically discuss details about the particular Raging Bull service and how to purchase it.  In many cases, the free webinar videos end by describing a purported limited-time offer to get the advertised product at a discount, as illustrated below in **Figure 3**.  Many of the products' web pages also assert limited-time deals.



**Figure 3**: Screenshot from Jason Bond Unchained promotional webinar.

39.37.  If a consumer proceeds to purchase a product, he or she is typically taken to a checkout page on ragingbull.com.  Most of the checkout pages have a similar format, featuring additional earnings claims, consumer testimonials that claim substantial profits, or examples of highly-profitable trades made by the instructors, along with a payment form.

40.38.  Once consumers purchase a product from Defendants, they are often bombarded with more marketing.  This includes further emails advertising special deals on new products or access to other promotional webinars.  Consumers may also receive offers from Raging Bull customer service staff to try out new or different services.

*Marketing Based on the Founders and Instructors*

41.39.  Much of the advertising for Raging Bull's products centers on the purported

success of the instructors that lead each service.  Consumers are led to believe they can also

make significant money by using the instructor's methods, copying their trades, or both.

<u>Defendant Bishop</u>

42.40.  Many ads for Bishop's services begin by touting his success as one of Wall

Street's top options traders, and as a "genius trader who has made millions in the stock market."

Defendants also refer to Bishop as "one of the most widely followed stock market commentators

and traders out there."  Many Raging Bull ads claim Bishop taught Bond, and that together they

taught most of the other instructors at the company.



**Figure 4:** Screenshot of promotional video for Weekly Money Multiplier (Bishop on the right).

43.41.  When touting Bishop's purported success, Defendants do not tell consumers

Bishop's income is primarily derived from subscription fees consumers pay to Raging Bull and

not from stock and options trading.  Bishop has incurred substantial and persistent losses as a result of his own stock and options trading activities.

<u>Defendant Bond</u>

44.42.  As the leader of many of Raging Bull's services and one of the company's founders, Bond's success as a securities trader is also a central feature of many of Defendants' advertisements.

45.43.  Raging Bull's website and product pages tell the story that Bond is a former gym teacher who was $250,000 in debt, found a mentor in Jeff Bishop, became a "stock trading millionaire," and is now "sharing the wealth" with his clients.  Defendants frequently describe Jason Bond as a trading phenomenon, and claim, for example, that his training is "second to none because he started as a physical education teacher making a modest salary and grew his net worth to become a multi-millionaire."

46.44.  In a marketing email sent to one of Raging Bull's mailing lists in March 2020, Bond states he "made over 180% in 2015 and then in 2016 I turned a $100,000 account into $430,000! A massive 330% returns [sic].  2017, I then made $284,000 and get this… I donated all of it to charity! … 2018 is no different because of my market-tested strategy that myself and thousands of members are using for HUGE success."  Bond later told the New Hampshire Bureau of Securities Regulation that he lost money in 2018.

47.45.  Other Raging Bull advertisements tout Bond's and Bishop's purported success by claiming they have been recognized for their success by the media or by well-known institutions. For example, one advertisement claimed "[b]ecause of our crazy story, we've been all over the media—including Times Square!"  Other ads have claimed Bond was invited to speak at Harvard

Business School or feature a video of him supposedly doing so.  A screenshot of a recording of Bond's purported Harvard speech is shown below in **Figure 5**.



**Figure 5**: Screenshot from recording of Bond's purported Harvard Business School speech.

48.46.  The events referred to in such marketing are mostly paid-for promotional events. For example, the image that appeared on a Times Square Billboard was a paid advertisement. Similarly, Defendants paid for Bond to speak on or near Harvard's campus for promotional purposes; Bond was never invited by the school or any of its affiliates.

49.47.  When touting Bond's purported success, Defendants do not tell consumers Bond's income is primarily derived from subscription fees consumers pay to Raging Bull and not from stock and options trading.  Bond has incurred substantial and persistent losses as a result of his own stock and options trading activities.

<u>Defendant Dennis/Other Instructors</u>

50.48.  Ads for services offered by instructors other than Bond and Bishop feature similar claims.  In most cases, Raging Bull advertises that other instructors, including Defendant Dennis, are former students of Bond and Bishop who made their own millions trading stocks and then

joined Raging Bull as instructors to teach their methods.  Defendants make the success of these instructors central to their advertising as well.

51.49.  Defendants' ads portray their instructors as able to generate market-beating returns through their trades and able to pick "winning" stocks on a week-after-week basis.  As discussed further below, many of Defendants' marketing materials involve their instructors highlighting selected winning trades that earned huge percentages, often over 100% per trade and as high as 1600%.  Such trades are atypical, and neither Raging Bull's instructors nor their consumers make market-beating returns on a week-after-week basis.  Many consumers have complained of losing money when trying to follow Defendants' trade recommendations.

52.50.  Ads for services offered by Kyle Dennis feature, for example, Dennis saying he made "about $9,100 per day" in 2019, which the image shown in **Figure 6**, below, displays.



**Figure 6:A:** Screenshot of promotional video for Dennis's service Fast Five Trades.

51.      Dennis appears in and narrates numerous sales videos with false or unsubstantiated earnings claims used to induce consumers to enroll in one or more of the Biotech

Breakouts services.  These sales videos were disseminated to consumers through emails, posted on the BiotechBreakouts.com website, and broadcast on Defendants' YouTube channels.  Dennis has admitted in a sworn deposition that he does not track his subscribers' results and lacks data showing what a typical consumer earns in trading profits using Defendants' services.  For example, Dennis narrates the sales video for "Fast Five Trades," a negative option product sold under the Biotech Breakouts brand.  In this video, Dennis tells the viewer that he intends to "show people how they can hit the ground running and begin to add an extra 250, 500, even 2,000 dollars or more to their account each and every week" and enable consumers to generate "fast profits" in "five days" or less.  Defendants, including Dennis, lack substantiation for these earnings claims.

52.     Dennis also narrates the sales video for "Dollar Ace," another negative option product sold under the Biotech Breakouts brand.  In this video, Dennis tells the viewer that Dennis has developed a simple and easy to use system that will enable consumers to grow their small accounts from "1,000 to 5,000 to 10,000 to 25,000 in a matter of months; something medium-sized accounts of 25,000 or more could apply to make an extra 1,000 or 4,000 per week; and something that large accounts, 100 grand or more could supplement into their trading as another low maintenance cash generator."  Dennis claims that "Dollar Ace" subscribers will receive access to trades that will generate 100% or more in trading profits in just "one to three days."  Defendants, including Dennis, lack substantiation for these claims.  In fact, many subscribers of Biotech Breakouts services have incurred substantial losses as a result of following the trades that Dennis provided to them in trade alerts.

53.     In the sales video – "Kyle Dennis presents the $100K Heist!" – Dennis tells the viewer:  "So what I'm planning to do here is to take a small $10,000 account and show you how

to systematically build that up to a $100,000.  Because that is everyone's goal at the end of the day, right?  You're trying to work that 9-to-5, you're trying to make that six-figure salary."  Defendants, including Dennis, lack substantiation for the claim that consumers are likely to grow their trading account from $10,000 to $100,000 by enrolling in the services offered in this video.

54.     In the sales video for "Black Optics," a marketing campaign Defendants devised to enroll consumers in various Biotech Breakouts negative option products, Dennis claims that he has generated millions in trade profits over the past year, that Black Optics will "provide you with everything you need to experience results like my own," and that Dennis will "show you how to 10X your account by mastering my simple system and then introducing new profit buckets so that the cash flow never dries up."  Defendants, including Dennis, lack substantiation for the claim that consumers are likely to grow their trading accounts by ten times the initial value if they enroll in the services offered in this video.

55.     Dennis also conducted numerous live webinar presentations attended by thousands of consumers.  In these webinars, Dennis repeatedly made claims that consumers enrolling in one or more of his Biotech Breakouts services are likely to generate substantial income and consistent trading profits.  Defendants record these webinars and provide them to visitors of the BiotechBreakouts.com website and Dennis' Facebook page so they can be replayed and viewed by consumers who did not attend the live events.

56.     In an hour long webinar called "Mortal Lock," a promotional campaign Defendants devised to enroll consumers in a negative option service called "Option Rocket," Dennis claims that consumers will generate consistent trading profits of 100% or more using his "C.A.S.H. system," and that there is a 95% likelihood of doubling a consumer's investment using his C.A.S.H. system:

So this system can be a – can be a nice foundation. That's why I like it so much for anybody who wants to scale up their profits or anybody who is struggling. It requires very little maintenance. As the time has gone on, I've had less time to, you know, have ten different strategies and have them all be, you know, really lucrative and little maintenance strategies. These are intra-week trades that required very little maintenance. A lot of times you can get in on Monday and be out on Friday. And the target is always 100 percent. Double or nothing. Put your money on black, spin it. (Making noise). Black. Boom, 100 percent, right? Just like -- just like the casino, but this isn't 50/50, this is more like 95/5, right? 95 percent, 5 percent, right? It's really a nice strategy ….

57.     Dennis then claims that consumers who sign up now for this service will get access to his "Mortal Lock" trade alerts, which have the potential to generate "500, 600, 1,000, 2,000 percent" returns, and that Dennis has "hundreds" of trade alerts with the potential to generate 1000% or more in trading profits.  Dennis also "guarantees" that his Mortal Lock trades will generate at least $1997 in trading profits on a single trade (approximately a 400% return on a $500 investment), as illustrated in **Figure 6B** below:



**Figure 6B:** Screenshot from the Mortal Lock sales webinar

58.     Defendants, including Dennis, lack substantiation for the claim that consumers are likely to generate returns of 100% or more using the "C.A.S.H. system" or from the "Mortal Lock trades."  Many consumers have incurred substantial losses as a result of following the Mortal Lock trades and other trades that Dennis alerted to Option Rocket subscribers.  Dennis does not have a system or strategy that consistently generates 100% or more in trading profits, and Dennis himself does not consistently make 100% or more from his own trades.

59.     Dennis also presented a webinar called "Fortune Forecaster, the 9-to-5 Killer," which is another sales campaign that Dennis and Raging Bull devised to enroll consumers in several Biotech Breakouts offers.  In this webinar, Dennis claims to have a system or strategy that consumers can easily copy or mirror to make "reliable," "repeatable" and "reproducible" trading profits.  Dennis claims that his annual goal for the Fortune Forecaster portfolio is at least 100% growth, that the strategy is simple and that anybody can use this strategy to quickly generate trading profits like Dennis.  Dennis also claims that he will do the research necessary and find profitable trading opportunities for his subscribers.  Defendants, including Dennis, lack substantiation for the claim that consumers are likely to grow their account by 100% from the services offered in this webinar.

60.     Dennis also conducted a webinar called "The Resolution," another campaign that Dennis and Raging Bull launched to promote Biotech Breakouts services.  In the webinar, Dennis tells the viewer that he is doing one last "5K challenge," where he will grow a $5,000 trading account into $50,000 account and his subscribers can similarly grow their accounts by following Dennis' trading accounts and his trades.  Defendants, including Dennis, lack substantiation for the claim that consumers are likely to grow their accounts from $5,000 to $50,000 using the services offered in this webinar.

61.     In connection with his sale and marketing of the Biotech Breakouts services, Dennis uses various high pressure tactics to induce consumers to purchase the products, including offering limited time "guarantees," "free" services, "discounted" pricing, using timers that count down and warning consumers not to miss out on his purportedly "risk-free" trade recommendations or alerts.  To complete the sale, Dennis urges consumers to click on online order forms and complete their purchase or to call his telesales team (the "VIP Team") who will dispel any doubts about joining the service.  Dennis also communicates directly with consumers in chatrooms and through emails, further using deception to sell Raging Bull services.

62.     Dennis is also involved in the review and development of the sales scripts and presentation slides used to promote the various Biotech Breakouts services.  Dennis has decision-making authority on the rebranding and launch of new services under the Biotech Breakouts brand.  Dennis works closely with the lead advertising copywriter for the Biotech Breakouts brand, who Dennis referred to as "my right hand man."  Dennis has the ability to approve or reject any advertisement or marketing material bearing his name, image or likeness, which includes all the marketing materials used to promote the Biotech Breakouts brand.

63.     Dennis has a lucrative compensation arrangement with Raging Bull, where Dennis receives over one-third of the net revenues or profits generated from the sale and auto-renewals of the Biotech Breakouts subscription services.  Dennis also stands to receive a substantial lump-sum payment in the event Bishop and Bond transfer their controlling interest in Raging Bull to an outside party.  In 2018, when Dennis was re-negotiating his compensation terms, Dennis told Bishop: "Glad to be on board for the next 5+ years and have a great path of incentives.  And I'm ready to crank these sales as much as we can in anyway [sic] we can!"

Dennis' agreement with the Raging Bull owners has not been terminated and is operative for several more years.

53.64.  Dennis continues to offer and sell the same Raging Bull trading services that he promoted prior to the FTC's lawsuit in December 2020, such as Mobile Closer.  On May 5, 2021, Raging Bull sent an email to its subscribers promising that Dennis would appear at a Raging Bull program.

*Misrepresentations about Income Potential*

54.65.  Defendants advertise that consumers can make substantial, market-beating returns by following Defendants' purported trade strategies or by following Defendants' specific trade recommendations and alerts.  Defendants make three main types of income claims: (1) general claims about the kinds of profits consumers can make, which include statements like "consistent money," "big money," "double your money," and various profit percentages; (2) examples of specific, winning trades the instructors themselves claim to have made using their strategies, which purport to illustrate the income potential of the programs; and (3) testimonials that purport to illustrate the kinds of profits Raging Bull customers make.

General Income Claims

55.66.  All of Defendants' services are marketed with substantially similar income claims, boasting the success of the instructor and claiming subscribers will be able to make consistent, substantial income too if they purchase the service and learn the instructor's method.

67.    Defendants lack substantiation for their claims that consumers are likely to earn substantial income using their services.

56.68.  For example, typical of Defendants' services is one called Bullseye Trades, led by Defendant Jeff Bishop.  Bullseye Trades offers consumers access to purported educational materials plus alerts for "one trade," "once a week," with "one hundred percent profit targets." Advertising materials for Bullseye Trades state "I'm aiming to make over 100% profit each and every week with these ideas and I'm really good at it."

57.69.  Likewise, Defendants describe Total Alpha as teaching consumers "the options trading strategies that Jeff Bishop has used to make a fortune in the stock market."  Defendants market Jason Bond Picks with statements like "Don't Just Beat the Market… Crush It." Defendants describe Weekly Windfalls as "Jason Bond's unique options strategy that could DOUBLE your income (in as little as a few minutes per week)."  Defendants also call Weekly Windfalls a "new $10,000 per week trading strategy."  Defendants market Sniper Report as a newsletter by Kyle Dennis "strategically developed to only deliver high probable [sic] trades with the power to make 100%, 200% 300% return [sic] on each trade."  Defendants lack substantiation for their claims that consumers are likely to earn substantial income using the Weekly Windfalls service.

58.70.  Since approximately March 2020, during the COVID-19 pandemic, Defendants have employed additional marketing tactics based on the nationwide economic uncertainty.  For example, marketing emails in April 2020 claimed Dennis "was able to rack up nearly $500K in profits by trading stocks related to the COVID-19 pandemic" and had found a "hidden bull market."  In May 2020, Defendants advertised a webinar in which Kyle Dennis purported to explain the effects of the pandemic on the stock market and "why he believes this may be the **most exciting opportunity in decades!**" (emphasis original).  The video was an advertisement for one of Kyle Dennis's Raging Bull subscription services called Trade With Kyle.  Many of

Defendants' instructors have sent marketing emails touting their ability to make money during the pandemic.

59.71.  Defendants do not, in fact, provide effective strategies that consumers can reasonably use to make market-beating profits.  Nor can consumers make market-beating returns by using Defendants' trade alerts.

72.      Defendant Jeff Bishop has stated that, at the time Defendants made their income claims, Defendants kept no data on what percentage of their trades are successful, or whether or how much profit was made by a "guru" or in a particular Raging Bull service over a period of time.  Accordingly, Raging Bull is unable to provide a "track record" of the profit or loss of a particular "guru" or service.

60.73.  Consumers do not typically make returns like those advertised.  A substantial number of consumers have lost money attempting to invest based on the "education" provided by Defendants or attempting to follow the instructors' trade alerts.

<u>Example Instructor Trades</u>

61.74.  Defendants also frequently tout examples of the instructors' winning trades in their advertising.

62.75.  For example, a promotional video for Weekly Money Multiplier includes numerous examples of highly profitable trades that a Raging Bull instructor named Nathan Bear claims he shared as alerts with his subscribers, boasting profits like 140%, 267%, or as high as 1600%.  Similarly, in a promotional webinar for Bullseye Trades, Bishop states, "I have made literally hundreds of trades where I've made well over 100% on [sic]," and "[s]ome of these I used to think were unreal profits, I mean, I'm talking $50,000, $60,000, even $100,000 in a matter of days."  Dennis, in a video for his service Trade With Kyle, shares examples of options

or stocks where the price jumped several hundred percent for each, which his strategy would purportedly have identified, and claims his own trading returned tens of thousands of dollars of profit on these.  In emails Bond sent to consumers who signed up to receive his free newsletter, he wrote, for example, "SNAP, crackle, pop! $22,000 profit for me on SNAP Wednesday, 172% on the options and another 10% on the shares.  ALL from IPHONE" and "I'm avg, $2300 a day right now trading part time."

63.76.  The instructor trades mentioned in Defendants' advertising are not representative of consumers' experience using Defendants' services.

64.77.  Defendants do not provide effective strategies that consumers can reasonably use to make market-beating profits of the type illustrated by these example trades.  Nor can consumers make such returns by using Defendants' trade alerts.

<u>Consumer Testimonials</u>

65.78.  Defendants make heavy use of consumer testimonials in their videos and other promotional materials.

66.79.  For example, advertising for Fast 5 Trades features many testimonials, including quotes from three individuals who stated they made over $1,000 in three weeks, made $500 in two days, and made nearly 20% on their first trade with the service, respectively. Advertisements for Bullseye Trades also feature quotes from purported customers, asserting wins of 25%, 70%, or 115%, or claiming, "all of the Bullseye Trades have been profitable for me." Total Alpha ads feature testimonials from purported customers claiming to have made "[$]6500.00 in 20 MINUTES," "$500 in 15 min[utes]," "roughly 90% in 24 hours," and "92%" wins.

67.80.  As described below, the trades described in these testimonials are not typical or representative of Raging Bull customer experiences overall.  Customers do not make market-beating returns overall from their trading with Defendants' programs, much less returns like those advertised.  Numerous customers lose money.

68.81.  Defendants do not provide effective strategies that consumers can reasonably use to make consistent, market-beating profits such as those suggested by the consumer testimonials they use in advertising.  Nor can consumers make such returns by using Defendants' trade alerts.

### *Misrepresentations About Who Can Use Defendants' Services Successfully*

69.82.  Defendants claim their services can be used successfully by people with little or no stock or options trading experience.  For example, Defendants tell consumers when advertising the Total Alpha service, "it's even better if you're brand new because there's no bad habits to break" and "so, yes if you're new to options, perfect."

70.83.  Defendants claim consumers can make substantial profits regardless of the balance in consumers' accounts.  For example, Defendants advertise that their High Octane service can be used with as little as $500.  As illustrated in **Figure 7**, below, Defendants advertise that consumers can turn a $1,000 account into a $10,000 account with their Profit Prism service.



**Figure 7:** Screenshot of promotional video for Defendants' service Profit Prism.

71.84.  Defendants claim their services can be used profitably by people who only trade part-time.  For many services, Defendants claim people can make money using the service in as little as 10 to 30 minutes per day or by just following a single trade alert per week.  For example, Defendants claim their service Total Alpha is designed for people with busy schedules and that Freedom Trader is for "busy professionals."

85.     In the Fast Five Trades sales video, Dennis claims that most of his subscribers are "brand new to trading and don't have a lot of funds to allocate to the market" and that he will be "spoon feeding" his subscribers the information to make consistent and weekly trading profits: "I call these my fast five trades.  In on Monday, out by Friday, five days, fast profits.  Just like that."

86.     In the Dollar Ace sales video, Dennis claims that the Dollar Ace system is "easy to follow" and use, even for beginners and consumers with small accounts, and requires just "minutes per day" to implement:  "It finds those big returns in a one to three-day period so you can grow and it works in no matter what market condition is thrown at us….  whether you're

31

new, you're a beginner, maybe you're really experienced, maybe you have a big account, maybe you have a small account, it doesn't matter."

87.     In the Mortal Lock sales webinar, Dennis claims that his Mortal Lock system and options trade alerts will enable consumers to generate consistent trading profits even if they are inexperienced traders, have little time to devote to trading, or have small accounts:  "So how are people with no trading experience doing this? Because I make it easy….  Schedule your paycheck. Collect your cash….  There's little time commitment on this. I don't have a lot of time myself and I've developed a system utilizing options that doesn't require too much time….  With this strategy, it doesn't matter if you have the smallest account in the world and it doesn't matter if you have the largest account in the world.  You can make money doing this."  Dennis claims that Mortal Lock provides a "simplified way to supplement [consumers'] income without having to spend too much time."

~~72.~~88.  In general, Defendants advertise that anyone can use their services profitably because it is easy to follow the instructors' alerts and recommendations.

~~73.~~89.  Numerous consumers have found Defendants' claims about the level of experience, account size, and time investment needed to be inconsistent with their experiences.

90.     While Defendants sell subscription services that require consumers to be sophisticated traders who have clearance with brokerage firms, Defendants describe these services in their advertising as designed for beginners.  For example, when advertising Total Alpha, Defendants tell consumers that experience is not necessary.  But Total Alpha is a product for sophisticated traders and requires them to have clearance with brokerage firms.

~~74.~~91.  While Defendants routinely market their services as simple and easy to use, their purported educational materials and alerts consist of generic trading concepts and technical

indicators that are not sufficiently concrete to be implemented.  Defendants do not provide any strategy that consumers can follow, much less a strategy capable of achieving market-beating returns.

75.92.  Contrary to Defendants' claims that consumers with small balances in their accounts can grow their accounts into a source of substantial income as Raging Bull traders claim to have done, these consumers are especially unlikely to realize the kind of income advertised.

76.93.  Consumers are also likely to have a hard time using Defendants' services without spending significantly more time than advertised, and even then, they struggle to make positive investment returns.  Consumers are unable to reliably execute Defendants' trade alerts without dedicating significant time and making themselves available throughout the day during market hours.  The stocks and options Defendants trade tend to be low-volume securities with prices that move rapidly and with great volatility, particularly when Defendants issue trade alerts.

### Defendants' Purported Disclaimers Do Not Cure Their Misrepresentations

77.94.  Defendants' purported disclaimers are not clear or conspicuous, and do not cure their misrepresentations.  Rather, in many instances, the disclaimers actually confirm the misleading nature of Defendants' advertising.

78.95.  Defendants frequently include disclaimers on their services' purchase pages in a small "Terms & Conditions" text box that appears below the purchase button.  The text box contains several pages worth of text and requires several minutes to scroll through.  A screenshot of such a disclaimer box appears in **Figure 8**, below, in the bottom right corner.  As can be seen in the image, the actual disclaimers are not visible at first and require significant scrolling to find.

79.96.  Defendants also typically include a pair of links at the bottom of their web pages that take consumers to two separate pages, titled "Disclaimer" and "Terms and Conditions," which contain similar text.



**Figure 8:** Screenshot of purchase page for Bullseye Trades.  The text box where Defendants put disclaimers appears in the bottom right corner, below the purchase button.  The actual disclaimers are not visible without scrolling down through the box's several pages of text.

80.97.  These website disclaimers acknowledge that Defendants have not collected any data to substantiate whether the earnings claims they make, or the example trades or consumer testimonials they use in advertising, are typical and representative.  In pertinent part, they state that "facts stated in testimonials have not been independently audited or verified," and that there has not been "any attempt to determine whether any testimonials are representative of the

experiences of all persons using the methods described herein or to compare the experiences of the persons giving the testimonials after the testimonials were given."

~~81.~~98.   The website disclaimers also contradict Defendants' advertising that consumers can make money by simply following the instructors' trades.  For example, while Bullseye Trades is marketed with statements such as "I do all the homework and research during the week ahead and you get to piggyback off my single best idea for the week," the disclaimers on other pages of the website or in the small text box below the purchase button contradict that.  In a complete about-face, the disclaimers say instead that consumers "should never invest in the securities of any of the companies mentioned based solely on information contained on our website" and should assume "all information provided regarding companies is not trustworthy unless verified by their own independent research."

~~82.~~99.   Defendants additionally include purported disclaimers buried in small-print font at the end of many marketing emails.  In recent emails, for example, these disclaimers admit that "~~subscribers'~~subscribers' trading results have NOT been tracked or verified" and that "the results presented in this communication are NOT TYPICAL."  These recent email disclaimers also acknowledge that "[a]ctual results will vary widely given a variety of factors such as experience, skill, risk mitigation practices, market dynamics and the amount of capital deployed."

~~83.~~100.      Defendants sometimes, but not always, include disclaimers at the beginning of their promotional videos.  Such disclaimers appear only for a brief period of time, in a large block of text, while the instructor speaks to the viewer.

~~84.~~101.      For example, as shown below in Figure **9**, Defendants' webinar advertising the Trade With Kyle service that was released as a COVID-19 "state of the market"

webinar includes a brief disclaimer at the beginning of the video for approximately 30 seconds,

about 15 minutes prior to Dennis sharing his example wins and consumer testimonials.



**Figure 9**: Screenshot of disclaimer text displaying at the beginning of a Trade With Kyle promotional video.

While the disclaimer displays on the screen, Dennis continues to speak and tells consumers:

> Now, really really quickly right, especially right now, this is really super super-duper important. Disclaimer here. Trading is risky. I think we've all understood and found that out in the last month here, right? Heck, going outside is risky nowadays, right? So, make sure you're smart, you're the one pushing the buttons, you're the one taking responsibility for your wins and your losses. I always like to hear about both because I have wins and losses as well and I take responsibility for my decisions, as you should take responsibility as well.

85.102.    Contrary to Defendants' marketing claims, the fleeting video disclaimer

states that Dennis's "results are very atypical and you should not expect to replicate them."

103.    In the sales webinar for "The Resolution," Dennis momentarily displays on the

screen a similar, boilerplate disclaimer while telling the consumer:  "I've taken a lot of risks in

my life and I've been rewarded for that.  And I expect nothing less of you.  If you want reward, you have to take risk.  That's what this disclaimer is all about."

**Consumer Complaints**

86.104.        Numerous consumers have concluded their own experience is not consistent with the impressions created by Defendants' marketing about consumers' ability to generate substantial income using Raging Bull's services.

87.105.        The training materials to which consumers are given access after signing up consist of one or more series of videos and some written materials that purport to describe the instructors' strategies.  Many of the videos are just recordings of past webinars or live chat sessions.  Overall, these materials are a collection of generic trading concepts and technical trading indicators lacking the structure, concreteness, consistency, and clarity required for Raging Bull's subscribers to use them to generate substantial income through trading.

88.106.        Consumers also encounter numerous problems with Defendants' trade alerts.  Numerous consumers have incurred substantial losses following Defendants' trade recommendations.  Further, many consumers have found that alerts arrive too late or do not arrive at all in some cases.  For example, consumers may receive a buy alert but not a sell alert or may only realize the instructor sold the security when he later claims he made substantial profit on the trade, at which point the security's price has dropped significantly.

89.107.        Many consumers have requested refunds after concluding the service does not work for them as advertised.

90.108.        Defendants routinely deny refund requests, often stating it is against company policy.  In many cases, consumers are instead encouraged to try a different Raging Bull service or even to purchase an upgrade to get the results they want.

37

91.109.	When consumers are denied a refund, some file complaints online with agencies such as the Federal Trade Commission or with organizations such as the Better Business Bureau.

92.110.	Some consumers have been able to obtain refunds after they filed complaints with the Better Business Bureau, despite initially being told it was against company policy, but were told they could only receive a refund if they took down their complaints or marked them as resolved.

93.111.	All of the Individual Defendants are aware of consumer complaints. Consumers have complained to Raging Bull customer service and to Raging Bull instructors, including the Individual Defendants, by way of email, chat rooms, social media, and messaging services.  Consumers have also filed complaints and negative reviews online, including complaints that consumers could not make money using the materials or alerts provided by Raging Bull, that consumers were losing money, that consumers could not understand or implement strategies from the purported educational materials, and that alerts were not working for consumers.  Bishop, Bond, and Dennis all have seen or received such complaints from consumers.  Dennis has received complaints from consumers who have incurred substantial losses following trade alerts that Dennis guaranteed would generate 400% to 800% returns.

94.112.	For example, in or around December 2019, Bond shared a video with members of Raging Bull's services called Nucleus, Black Optics, Millionaire Roadmap, and Most Wanted wherein he apologized to them for significant changes in the services that "did not sit right" with him.  Bond admitted he, Bishop, and Dennis had overestimated their ability to mentor so many people and had failed to deliver the services as promised.  Raging Bull offered

these consumers limited access to their Elite service instead but refused to give consumers even partial refunds for the services they had discontinued.

### Consumers' Difficulties Cancelling Defendants' Services to Stop Recurring Charges

95.113.      Raging Bull sells and has sold its services as recurring subscriptions that are billed quarterly or annually, with prices that range from several hundred dollars to several thousand dollars per year, per service.  Some customers pay additional amounts to obtain so-called "lifetime" access to services.

96.114.      In numerous instances, consumers have had a difficult time cancelling Raging Bull's recurring billing of their credit cards.  Defendants have made it difficult to cancel in numerous ways, including: (1) limiting the means consumers could use to submit cancellation requests; (2) having different cancellation requirements for different services; (3) substantially and chronically understaffing the customer service phone line to which many consumers are directed for cancellation purposes; and (4) providing consumers with inconsistent and confusing instructions regarding the way to cancel their services.

97.115.      While Raging Bull offers a few services that consumers appear able to cancel online, many of their services cannot be cancelled online.  Many consumers are directed to call or email a Raging Bull customer support representative instead.

98.116.      In some cases, cancellation instructions are unclear.  For example, some services cannot be cancelled from the subscriptions page on Raging Bull's website.  Those services instead direct consumers to a Frequently Asked Questions ("FAQ") webpage.  If consumers wish to cancel immediately, that document directs consumers back to the subscriptions page and directs them to write to customer service.

99.117.    Consumers who email customer support experience delays or problems getting in touch with a representative and then often are told they need to call instead to discuss cancellation.

100.118.    Consumers who try to contact customer support by phone often have had to wait significant amounts of time before speaking to someone, have been disconnected, never received a call back if they left messages, or received a voicemail recording instructing them to send an email.

101.119.    These delays sometimes result in Raging Bull charging consumers for a renewal, despite those consumers' attempts to cancel in advance of the renewal date.

**Defendants Continue to Violate the Law**

102.120.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

**VIOLATIONS OF THE FTC ACT**

103.121.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

104.122.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

**Count I – False or Unsubstantiated Earnings Claims**

*(Against All Defendants)*

105.123.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Raging Bull's services, including through the means

described in Paragraphs 41~~19~~ to ~~67~~81, Defendants represent, directly or indirectly, expressly or by implication, that consumers who purchase Raging Bull's services will earn or are likely to earn substantial income.

~~106.~~124.    The representations set forth in Paragraph ~~104~~123 are false, misleading, or were not substantiated at the time the representations were made.

~~107.~~125.    Therefore, Defendants' representations as set forth in Paragraph ~~104~~123 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### Count II – Other Misrepresentations Regarding Raging Bull's Services

*(Against All Defendants)*

~~108.~~126.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Raging Bull's services, including through the means described in Paragraphs 68~~82~~ to ~~75~~93, Defendants represent, directly or indirectly, expressly or by implication, that:

    a.  Consumers will or are likely to earn substantial income using Raging Bull's services even if they have little to no experience in securities trading.

    b.  Consumers will or are likely to earn substantial income using Raging Bull's services even if they spend only a short amount of time each day using the service, for example if they are trading while also working full time.

    c.  Consumers will or are likely to earn substantial income using Raging Bull's services even if they start with a very small balance in their brokerage account.

~~109.~~127.    The representations set forth in Paragraph ~~107~~126 are false or misleading or were not substantiated at the time the representations were made.

110.128.        Therefore, Defendants' representations as set forth in Paragraph 107126 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

111.129.        In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010. Congress passed ROSCA because: "Consumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." 15 U.S.C. § 8401.

112.130.        Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(u), unless the seller: (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains the consumer's express informed consent before making the charge; and (3) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403.

113.131.        The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(u).

~~114.~~   As described in Paragraph ~~94~~113, Defendants advertise and sell Defendants' services to consumers through a negative option feature as defined by the TSR.  *See* 16 C.F.R. § 310.2(u).

~~115.~~132.      Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

### Count III – Failure to Provide a Simple Cancellation Method

*(Against Raging Bull, Bishop, Bond, Sherwood Ventures, and Jason Bond LLC)*

~~116.~~133.      In numerous instances, as described in Paragraphs ~~94~~113 to ~~100~~119, Defendants Raging Bull, Bishop, Bond, Sherwood Ventures and Jason Bull LLC ("Raging Bull Defendants") charge or attempt to charge consumers for ~~Defendants'~~Raging Bull's services through a negative option feature while failing to provide simple mechanisms for consumers to stop recurring charges from being placed on their credit card, debit card, bank account, or other financial account.

~~117.~~134.      The Raging Bull Defendants' acts or practices set forth in Paragraph ~~115~~133 constitute a violation of Section 4(3) of ROSCA, 15 U.S.C. § 8403(3), and are therefore treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

### CONSUMER INJURY

~~118.~~135.      Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and ROSCA. ~~In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.~~ Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, ~~reap unjust enrichment,~~ and harm the public interest.

**THE COURT'S POWER TO GRANT RELIEF**

~~119.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.~~

~~120.    Section 19 of the FTC Act, 15 U.S.C. §57b, and ROSCA, 15 U.S.C. § 8404, authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of ROSCA, including the rescission or reformation of contracts, the refund of monies paid, the disgorgement of ill-gotten monies, and prejudgment interest.~~

**PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC requests ~~pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404, and the Court's own equitable powers,~~ that the Court:

~~A.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, an order freezing assets, immediate access, and appointment of a receiver;~~

~~B.~~A.    Enter a permanent injunction to prevent future violations of the FTC Act ~~and ROSCA~~ by Defendants~~;~~ and of ROSCA by the Raging Bull Defendants;

B.    Award monetary and other relief as provided by law; and

C.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and ROSCA, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.C.    Award Plaintiff the costs of bringing this action, as well as suchany other and additional relief as the Court may determinedetermines to be just and proper.

Dated: February 4June 11, 2021                    Respectfully submitted,

                                                  JAMES REILLY DOLAN
                                                  Acting General Counsel


                                                  /s/ Gordon E. Sommers
                                                  /s/ Laura C. Basford
                                                  Colleen Robbins (D. Md. Temp. Bar No. 92567)
                                                  Sung W. Kim (D. Md. Temp. Bar No. 814609)
                                                  Gordon E. Sommers (D. Md. Temp. Bar No.
                                                  814431)
                                                  Laura C. Basford (D. Md. Temp. Bar No. 814888)
                                                  Federal Trade Commission
                                                  600 Pennsylvania Ave., NW
                                                  Mailstop CC-8528
                                                  Washington, DC 20580
                                                  (202) 326-2548; crobbins@ftc.gov
                                                  (202) 326-2211; skim6@ftc.gov
                                                  (202) 326-2504; gsommers@ftc.gov
                                                  (202) 326-2343; lbasford@ftc.gov
                                                  (202) 326-3395 (Facsimile)
                                                  *Attorneys for Plaintiff*
                                                  *Federal Trade Commission*