**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | * | |
| Plaintiff, | * | |
| v. | * | Case No. GLR-20-3538 |
| RAGINGBULL.COM, LLC, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**SECOND AND FINAL APPLICATION FOR FEES & EXPENSES**

Peter E. Keith, previously the Temporary Receiver for the Corporate Defendants RagingBull.com, LLC f/k/a Lighthouse Media, Sherwood Ventures LLC, and Jason Bond LLC (collectively, the "Receivership Entities"),[1] respectfully moves the Court for an Order requiring the Receivership Entities to pay the fees and expenses of the Court-appointed Temporary Receiver, his counsel, and its financial consultants.

**INTRODUCTION**

The Temporary Receiver made an initial application for fees and expenses for the first six weeks of the receivership, for the time period December 8, 2020 through January 15, 2021 (the "First Interim Application") [ECF 183].[2]  The Temporary

---

[1]    Peter Keith was also the Temporary Receiver for Winston Research Inc. and Winston Corp. during the time period relevant to this application.  These entities were dismissed from this matter on May 18, 2020. May 18, 2021 Order [ECF 235].

[2]    On May 18, 2021, the Court found the First Interim Application "meritorious and well-founded."  May 18, 2021 Order [ECF 233].  On June 4, 2021, the Receivership Entities filed an unopposed motion to vacate that Order and requested leave to file a response to the First Application within one week of the Court's ruling on the motion, based on a prior

Receiver now requests fees for the period from January 16, 2021.  The Temporary Receiver represents that, even if he performs additional services in this matter to assist the Court, the parties or the Monitor, he will incur those costs himself and not seek further reimbursement in connection with this matter.

By temporary restraining order dated December 8, 2020 [ECF 21], the Court appointed the Temporary Receiver for the Receivership Entities.  The Court subsequently modified and extended the temporary restraining order several times: on December 17, 2020 [ECF 64], the Court extended the preliminary injunction hearing to January 13, 2021; on December 30, 2020 [ECF 104], the Court extended the preliminary injunction hearing to February 5, 2021; on February 4, 2021 [ECF 165], the Court extended the preliminary injunction hearing to follow briefing on a business plan submitted by Raging Bull; and on March 19, 2021 [ECF 211], the Court extended the temporary restraining order through the date of issuance of the Court's ruling on the Federal Trade Commission's motion for preliminary injunction, which occurred on March 26, 2021 [ECF 218] (collectively, the "Temporary Restraining Order" or 'TRO").  In addition to establishing the Temporary Receivership and appointing the Temporary Receiver, the Temporary Restraining Order froze the assets of the Receivership Entities and imposed on the Temporary Receiver substantial obligations.

---

agreement with the Temporary Receiver and Order of the Court.  June 4, 2021 Motion to Vacate [ECF 238].  The Court granted that motion on June 17, 2021 [ECF 244].  On June 24, 2021, the Receivership Entities filed an unopposed motion to extend the time to respond to the First Application by an additional week.  July 24, 2021 Motion [ECF 245].  The Court granted that motion.  June 24, 2021 Order [ECF 246].  A response is now due July 1, 2021.

The Court directed the Temporary Receiver through the Temporary Restraining Order to, among other responsibilities, assume control of the Receivership Entities and their assets and documents, secure the business premises, inventory assets, preserve assets, obtain, manage, and prevent the loss of documents, protect the interests of and prevent possible injury to consumers, and manage and administer the business on an interim basis as the Temporary Receiver saw fit.  TRO § XIV at ¶¶ A-E, H, and K.  The Temporary Restraining Order further authorized and compelled the Temporary Receiver to undertake significant tasks to carry out the objectives of the Temporary Restraining Order, including the following:

- Select and engage attorneys, accountants, and other consultants as he the Temporary Receiver deemed advisable or necessary in to carry out the tasks of the receivership.  TRO § XIV at ¶ F.

- Make payments from the receivership estate as advisable or necessary to carry out the Temporary Restraining Order. TRO § XIV at ¶ G.

- Enter into contracts as advisable or necessary to carry out the Temporary Restraining Order.  TRO § XIV at ¶ J.

- Make an accounting of the assets and financial condition of the Receivership Entities and file the accounting with the Court. TRO § XIV at ¶ L.

- Appear in and defend any legal action as advisable or necessary to carry out the duties of the receivership, and cooperate with government regulatory and law enforcement agencies.  TRO § XIV at ¶¶ M, S.

- Conduct discovery in this action, obtain documents and records of Receivership Entities, open bank accounts as repositories for funds of the Receivership entities, maintain accurate records of receipts and expenditures, and provide reasonable access to Plaintiffs and Defendants to documents, books, records, and other possessions of the Receivership entities. TRO § XIV at ¶¶ N-R.

The Temporary Receiver undertook each of these tasks and continued to satisfy in full these responsibilities, from December 8, 2020 through March 26, 2021.  The Initial Report of Temporary Receiver, filed under seal on February 1, 2021 [ECF 156], and filed with limited redactions on March 18, 2021 [ECF 208] (the Temporary Receiver's "Initial Report") and the Status Report regarding Implementation of March 26, 2021 Order [ECF 221] each summarizes actions taken by the Temporary Receiver.

The Temporary Restraining Order and subsequent Orders of the Court also required the Temporary Receiver to investigate and make reports concerning material, critical issues presented in the underlying litigation.  The Temporary Restraining Order required the Temporary Receiver to report to the Court "regarding: (1) the steps taken by the Receiver to implement the terms of the Order; (2) the value of all assets and sum of all liabilities of the Receivership Entities; (3) the steps the Receiver intends to take in the future to protect receivership assets, recover receivership assets from third parties, and adjust receivership liabilities; (4) whether the business of the Receivership Entities can be operated legally and profitably; and (5) any other matters which the Receiver believes should be brought to the Court's attention."  TRO § XXII.  The Temporary Receiver made an extensive report in compliance with the Order.  *See* Temporary Receiver's Initial Report [ECF 156 & 208].  In addition, the Court ordered Raging Bull to file a proposed Business Plan and set a briefing schedule for the Temporary Receiver and Federal Trade Commission to respond.  [ECF 165 & 169].

In addition to the investigation and summary of his findings included in the Temporary Receiver's Initial Report and his response to Raging Bull's proposed Business Plan, the Temporary Receiver was required to prepare for and appear at the preliminary injunction hearing in this matter, and to review and in some cases respond to extensive and numerous filings of the parties, including a complaint and amended complaint attaching voluminous exhibits, substantive responses on the merits of the preliminary injunction filed by defendants and the Federal Trade Commission's reply, and numerous requests for extensions of time, including extensions that prolonged the pendency of the Temporary Receivership pending a preliminary injunction hearing.  The docket in this matter contains 221 entries through April 10, 2021, the date on which Temporary Receiver filed a status report on his progress in effecting the termination of the Temporary Receivership.  The majority of these 221 entries are filings of the parties or related to teleconferences held by the Court and resulting orders.

The Temporary Receiver does not seek his fees for preparing this or any other fee application.  The Temporary Restraining Order required the Temporary Receiver to file requests for compensation, including this application. TRO § XX. The Temporary Receiver and his counsel have devoted significant time to and incurred substantial fees in preparing these applications, including additional review and privilege-related redactions of detailed counsel invoices at Defendants' request.  Although the preparation of these applications is expressly required by the Temporary Restraining Order, which provides for the payment of fees necessary to

accomplish its directives, the Temporary Receiver has not included the substantial work and related fees incurred in this process in his applications.

On March 26, 2021, the Court entered an Order terminating the appointment of the Temporary Receiver and providing that within seven days, the Temporary Receiver "shall take all necessary steps" to terminate the Temporary Receivership and "relinquish, return and/or transfer all power, access, authority, responsibility and obligation that were granted to the Temporary Receiver by the TRO to Raging Bull Defendants." March 26, 2021 Order [ECF 214] § XIV. As set forth in the Temporary Receiver's April 10, 2021 Status Report, the Temporary Receiver took all steps necessary and advisable to carry out the requirements of the Order as expeditiously as possible. April 10, 2021 Status Report [ECF 221]. The Temporary Receiver worked cooperatively with Defendants, the Monitor, and the Federal Trade Commission to effect the Court's Order immediately. The Temporary Receiver undertook additional work following the filing of the Status Report, including work to resolve open matters addressed in the Status Report, work performed at the request of the Defendants and Plaintiff, and the preparation of the Fee Application.

The Temporary Receiver's work has been necessary throughout this time, extended by consent of the parties repeatedly. The Temporary Receivership was at first intended to last 10 days, through the preliminary injunction hearing initially scheduled for December 18, 2020. The Receivership Defendants sought or consented to multiple extensions of the Temporary Receivership, and while the Temporary Receiver consented to those requests, he took a neutral position and

deferred to the parties' agreements.  Ultimately, the preliminary injunction hearing went forward on March 19, 2021.  The parties' agreements extended the duration of the temporary receivership by more than three months beyond the Temporary Restraining Order's contemplated 10-day period.  The Temporary Receiver's performance of his duties necessarily required significantly more work over this time than would have been required had the matter proceeded to a hearing sooner.

Over the course of the Temporary Receivership from January 16, 2021 through its termination and winding down, the Temporary Receiver, his counsel, and his financial consultants completed considerable work to carry out the obligations of the Temporary Restraining Order.  The Temporary Receiver's work has included:

- maintaining the premises and certain corporate operations of the Receivership Entities and their affiliates in Maryland, New Hampshire, and Utah;

- maintaining assets and communication with financial institutions, merchant account providers and independent sales organizations;

- investigating and collection information regarding the Receivership Entities' business, performance, customer service, marketing, and operations;

- continuing the review and assessment of the Receivership Entities' accounting records and records of financial and investment performance;

- negotiating and reviewing a draft purchase and sale agreement regarding interests held by Raging Bull and Sherwood Ventures in InterActive Offers, LLC, and engaging in initial document requests and review concerning a proposed termination agreement of a lease interest of Raging Bull in FlexJet;

- conferring with counsel to the Federal Trade Commission and Defendants;

- conferring with state and federal government regulatory and law enforcement agencies;

- responding to consumer and employee claims filed with state law enforcement agencies;

- interviewing four executives and employees of the Receivership Entities and preparing for and representing the Temporary Receiver at the deposition of Defendant Kyle Dennis;

- providing access to documents and facilitating discovery by the Federal Trade Commission and the Receivership Entities;

- monitoring the Receivership Entities' communications with subscribers and employees;

- providing updates to consumers via the maintenance of a Temporary Receivership website and email address;

- reporting to the Court on the status of the Receivership Entities and the receivership, and the Temporary Receiver's assessment of the Raging Bull Business plan;

- preparing for and appearing before the Court for the March 19, 2021 hearing on the Plaintiff's motion for preliminary injunction; and

- implementing the March 26, 2021 Order terminating the receivership.

The Temporary Receiver submits that his work, as well as that of his counsel and consultants, benefited the Court and the receivership estate significantly. Based on the extensive nature of the duties required by the Temporary Restraining Order, the fees and expenses incurred in this matter are reasonable under the applicable lodestar analysis and factors set forth by the United States Court of Appeals for the Fourth Circuit and Maryland Rule of Professional Conduct 1.5.

Based upon his regular hourly rates for comparable services, and those of his counsel and his paraprofessionals at Gallagher Evelius & Jones LLP, the Temporary Receiver applies for compensation in the amount of $524,059.50 and

reimbursement of expenses in the amount of $30,392.76,[3] comprised of a total of $144,085.50 for his services in the administration of the Temporary Receivership; and $379,974.00 for his counsel at Gallagher Evelius & Jones LLP.

The Temporary Receiver has written off and does not seek to recover $93,026.00 in fees for time incurred by the Temporary Receiver and his counsel. These fees include work related to preparation of the fee applications and the review of counsel invoices for privilege and related concerns at the request of Raging Bull's attorneys. These fees also include discretionary write-off of some fees to further the efficiency of the Temporary Receiver's use of assets of the Receivership Entities.

The declarations of the Temporary Receiver and of Mark S. Saudek identify each Gallagher professional who worked on this case and for whose time the Temporary Receiver seeks compensation. *See* June 24, 2021 Declarations of Peter E. Keith ("Keith Decl."), attached as Exhibit 1 & Mark S. Saudek ("Saudek Decl."), attached as Exhibit 2. The declarations of the Temporary Receiver and Mr. Saudek detail the total number of hours expended by each person, his or her hourly rate, a summary of the work performed, and the total compensation requested. Attached to the declaration of the Temporary Receiver is a detailed invoice, including time entries for all time. The individual time entries of counsel to the Temporary Receiver are not included in this filing, to protect the attorney-client privilege. This

---

[3]     The expenses include a May 4, 2021 charge of $1,459 to the Temporary Receiver's credit card for a monthly subscription of Raging Bull, billed as a recurring charge, which Raging Bull did not transfer to its own credit card. The Temporary Receiver requested that Raging Bull reimburse Gallagher for this expense. Raging Bull declined.

is consistent with the Temporary Receiver's practice with respect to fee petitions submitted in other receivership matters.  The Temporary Receiver will provide a copy of the detailed time entries to counsel for the Receivership Entities, for their review, without waiver of assertion of privilege, shortly after this filing.  Should the Court wish to review detailed time entries *in camera*, the Temporary Receiver will be glad to provide the detailed invoices to the Court.

In addition to his staff at Gallagher, and as described in his First Interim Fee Application and in the Interim Report, the Temporary Receiver has engaged accounting professionals, led by Raymond Peroutka of Verity, LLC to provide accounting and related services.  Verity is an accounting, economic analysis, financial consulting, and forensic examination firm that specializes in receiverships, complex financial fraud investigations, and providing financial analyses related to complex financial transactions.  Verity continued its work on this matter beyond the time period for which compensation was sought in the First Fee Application.

The declaration of Raymond J. Peroutka, Jr. identifies each accounting professional who worked on this case and for whose time the Temporary Receiver seeks compensation.  *See* June 22, 2021, Declaration of Raymond J. Peroutka, Jr. ("Peroutka Decl."), attached as Exhibit 3.  The declaration of Mr. Peroutka details the total number of hours expended by each person, his or her hourly rate, a summary of the work performed, and the total compensation requested for the period from January 16, 2021 to March 15, 2021.  The declarations also detail the expenses incurred by each accounting firm on behalf of the Temporary Receiver

10

during this period.  The Temporary Receiver applies for compensation of these

accounting professionals for fees in the amount of $43,685.96.

The total of the Temporary Receiver's fees and expenses, including those of

all legal and accounting professionals, for the current period is $598,138.16,

consisting of $567,745.40, in fees and $30,392.76, in expenses, as summarized in the

following table:

**Fees & Expenses Incurred January 16, 2021 through Present**

| Description | Amount Incurred / Requested |
|---|---|
| Expenses incurred in administration of Receivership Estate and Temporary Receivership | $   30,392.76 |
| Professional fees incurred in administration of Temporary Receivership | $ 144,085.50 |
| Professional fees of counsel to Temporary Receiver | $ 379,974.00 |
| Professional fees of accounting and related financial services | $   43,685.90 |
| **Total Request** | **$ 598,138.16** |

These fees and costs are reasonable, when measured by the applicable

lodestar analysis and the factors in Maryland Rule of Professional Conduct 1.5,

which the Court has adopted by Local Rule 704.

Section XX of the Modified Temporary Restraining Order provides that "the

Receiver and all personnel hired by the Receiver as herein authorized, including

counsel to the Receiver and accountants, are entitled to reasonable compensation

for the performance of duties pursuant to this Order and for the cost of actual out-

of-pocket expenses incurred by them, from the Assets now held by, in the possession

or control of, or, which may be received by the Receivership Entities." Temporary

Restraining Order, 26-27.

The Temporary Receiver seeks allowance for reasonable fees and actual out-

of-pocket expenses incurred for the period January 16, 2021 through present.  No

further applications will be necessary.

## LEGAL STANDARD

In the Fourth Circuit, the lodestar analysis generally is the appropriate

method for determining the reasonableness of attorneys' fees.  *Grissom v. The Mills

Corp.*, 549 F.3d 313, 320-21 (4th Cir. 2008); *Brodziak v. Runyon*, 145 F.3d 194, 196

(4th Cir. 1998).  The lodestar approach calculates reasonable attorneys' fees by

determining the number of hours reasonably expended and multiplying those hours

by a reasonable hourly rate.  *Id.*  The United States Supreme Court recognizes that

when "the applicant for a fee has carried his burden of showing that the claimed

rate and number of hours are reasonable, the resulting product is presumed to be

the reasonable fee" to which a prevailing plaintiff is entitled.  *Blum v. Stenson*, 465

U.S. 886, 897 (1984).

The Fourth Circuit considers the following factors in calculating the lodestar

figure:

    (1)    the time and labor expended;

    (2)    the novelty and difficulty of the questions raised;

    (3)    the skill required to properly perform the legal services rendered;

    (4)    the attorneys' opportunity costs in pressing the instant litigation;

    (5)    the customary fee for like work;

(6)     the attorneys' expectations at the outset of the litigation;

(7)     the time limitations imposed by the client or circumstances;

(8)     the amount in controversy and the results obtained;

(9)     the experience, reputation and ability of the attorney;

(10)    the undesirability of the case within the legal community in which the suit arose;

(11)    the nature and length of the professional relationship between attorney and client; and

(12)    attorneys' fees awards in similar cases.

*See Brodziak*, 145 F.3d at 196 (quoting *EEOC v. Service News Co.*, 898 F.2d 958, 965 (4th Cir. 1990)).  These factors often are referred to as the "Johnson factors" because they were adopted from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *see Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978); *Anderson v. Morris*, 658 F.2d 246 (4th Cir. 1978); *Harman v. Levin*, 772 F.2d 1150 (4th Cir. 1985).

In determining the reasonableness of a fee request, the Court may also employ the similar factors set forth in Maryland Rule of Professional Conduct 1.5:

(1)     the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2)     the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the employer;

(3)     the fee customarily charged in the locality for similar legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers
        performing the services; and

(8)     whether the fee is fixed or contingent.

*See Friolo v. Frankel*, 373 Md. 501, 527-28 (2003).

## ANALYSIS

The requested fees of the Temporary Receiver, including Verity, LLC, and his counsel are reasonable when analyzed using applicable factors set forth in the lodestar case law and Maryland Rule of Professional Conduct 1.5.

## I.    The time and labor expended.

The Receivership Entities were engaged in a business of substantial complexity and scope.  At the time of the Temporary Restraining Order, the Receivership Entities employed more than 160 people and were engaged in business throughout most of the country, as well as selling products to overseas subscribers. They solicited thousands of potential new customers each month and communicated with thousands of consumers.  As of the date of the TRO, the Receivership Entities had approximately eighty thousand active subscribers, with substantial annual receipts of subscriber funds.  By December 17, 2020, Raging Bull agreed to cease all outward-facing operations and had determined to furlough the majority of its employees

The administration of the Temporary Receivership after January 16, 2021 required a significant investment of time and resources.  At all times, the Temporary Receiver has strived to work closely and cooperatively with the Federal Trade Commission and Defendants, in an effort to most effectively carry out the

14

mandate of the Temporary Restraining Order, while, to the fullest extent possible, preserving the interests of all litigants. To accomplish this with a corporate structure of this complexity and operation of this magnitude, the Temporary Receiver continued to maintain communication with Defendants and the Federal Trade Commission, as well as many consumers, vendors, creditors, employees, merchant accounts and financial institutions. The Temporary Receiver also worked to prepare a thorough Initial Report, reflecting his initial summary of his actions, findings, and conclusions, and a detailed review and consideration of Raging Bull's proposed Business Plan. The Temporary Receiver also reviewed the proposed preliminary injunction [ECF 209] and prepared for the preliminary injunction hearing to be in a position to report to the parties and the Court regarding his investigation to date and findings. The Temporary Receiver's work to prepare was substantial, as he had neither founded and operated the business like Defendants nor investigated it for a substantial period like the Federal Trade Commission. After the Court's Order terminating the Temporary Receivership, the Temporary Receiver worked diligently to transfer the business and its assets back to the Receivership Defendants.

The Temporary Receiver's counsel assisted in myriad legal issues relating to the Temporary Receiver's obligations and how most effectively to administer the receivership. Counsel also assisted Verity, LLC and the Temporary Receiver with the continued investigation of the Temporary Receivership entities. Counsel and Verity, LLC reviewed corporate organizational documents and financial records of

the Receivership Entities and correspondence and contracts with creditors of the

Receivership Entities, and continued to conduct interviews with employees of the

Receivership Entities.  Counsel consulted with the Temporary Receiver and

Verity, LLC regarding the financial and legal analysis of the Receivership Entities'

business activities and the investigation of receivership assets.  Counsel and

Verity, LLC assisted the Temporary Receiver in preparing the Temporary

Receiver's Initial Report, reviewing and analyzing Raging Bull's Business Plan, and

preparing for the March 26, 2021 hearing.  Counsel also worked with the

Temporary Receiver in completing the many measures required to wind up the

Temporary Receivership and transfer control back to the Receivership Entities.

     The following summarizes significant actions the Temporary Receiver and his

team took between January 16, 2021 and present.  Should the Court seek additional

information, the Temporary Receiver will be glad to provide any information that

could be of assistance to the Court.

###     A.    The Temporary Receiver maintained control over the Receivership Entities and the premises.

     As directed in the Temporary Restraining Order, § XIV.A, the Temporary

Receiver maintained control of the Receivership Entities and their business

premises between January 16, 2021 and April 2, 2021, including maintenance of the

corporate operations of the Receivership Entities and their affiliates in Maryland,

New Hampshire, and Utah.  The Temporary Receiver continued to maintain the

Hunt Valley, Maryland, premises and to permit access to the office by executives at

all times, by request and as necessary, and as consistent with COVID-19

restrictions.  The Temporary Receiver is aware of no time that a Raging Bull representative accessed the office during the Temporary Receiver's control of it without a representative of the Temporary Receiver also present.

The Temporary Receiver did not permit any Raging Bull personnel to have access to the Utah facility at any point during the period of the Temporary Receiver's control of it.  The Temporary Receiver continued to pay the rent and heating costs, as he deemed these necessary.

**B.    The Temporary Receiver maintained documents and IT systems.**

As directed in the Temporary Restraining Order, § XIV.B, C, and E, the Temporary Receiver maintained control of and preserved documents of the Receivership Entities.  The Temporary Receiver determined that certain key vendors should be paid during the course of the Temporary Receivership to ensure that the Company's premises remained available, that its IT system was preserved and remained operational for all parties to access data for purposes of the lawsuit, and that data was preserved, and continued to pay those key vendors.

In addition, the Temporary Receiver maintained administrator-level access to Information Technology systems used by Raging Bull and maintained access to all disclosed Raging Bull electronic systems.  The Temporary Receiver paid outstanding invoices as necessary to maintain these systems.

The Temporary Receiver ensured at all times that all parties, including all Defendants and the Federal Trade Commission, had equal and unfettered access to all electronic systems of Raging Bull.  Defendants retained full administrator access

17

to these systems, subject to the terms of the Temporary Restraining Order.  Despite this access, the Temporary Receiver investigated and responded to requests from the Raging Bull defendants for information from these systems.  The Temporary Receiver is not aware of any party's being denied access by the Temporary Receiver to any Raging Bull information technology system or any data obtained by the Temporary Receiver, including from mirroring of individual computer and laptop hard drives.

The Temporary Receiver continued to receive mail of the Receivership Entities as diverted to him in the beginning of the Temporary Receivership, and reviewed, catalogued, and forwarded mail, totaling 11 bankers' boxes and/or large mailing envelopes and approximately 9,753 pages of mail.

### C. The Temporary Receiver maintained and preserved assets of the Receivership Entities.

Pursuant to Sections XIV.C and D of the Temporary Restraining Order, the Temporary Receiver managed the Receivership Entities' financial assets and issues associated with the asset freeze, a total of $7,593,921.66 transferred into the account established by the Temporary Receiver.  The Temporary Receiver also reviewed a significant volume of the Receivership Entities' documents and business records, discovery produced by the Federal Trade Commission regarding the Receivership Entities' business operations and asset holdings, and financial disclosures produced by Defendants.  In the interest of conserving receivership assets, the Temporary Receiver did not initiate any affirmative discovery directed to any party.  The Temporary Receiver continued to review and assess the

Receivership Entities' accounting records and records of financial and investment performance in order to aid in his Initial Report and his response to Raging Bull's proposed Business Plan.  The Temporary Receiver did not pay any pre-receivership debts without Court approval, as required by Section XIV.G of the Temporary Restraining Order.[4]

The Temporary Receiver continued to be in contact with dozens of asserted creditors regarding the Company's payment obligations.

### D.    The Temporary Receiver reviewed potential transactions to preserve assets.

The Temporary Receiver investigated and reviewed potential transactions regarding two substantial assets held by Raging Bull in compliance with his duty to preserve and maintain assets and to enter into contracts as advisable or necessary. TRO § XIV at ¶ C, D, and J.  The Temporary Receiver was approached by InterActive Offers, LLC, with a demand to repurchase the interests of Raging Bull and Sherwood Ventures, LLC, in InterActive, pursuant to the agreement among the parties and an alleged default of the Buy-Sell agreement based on the entities being placed into receivership. InterActive asserted that Section 9(b) of the Buy-Sell Agreement "indicates that the repurchase price of Raging Bull's and Sherwood's IAO stakes shall be at a 50% discount of the appraised value under these circumstances [the appointment of a temporary receiver]."  To preserve receivership assets, the Temporary Receiver responded that Section 9(b) did not apply and that

---

[4]      The Temporary Receiver did pay $43,000 to Zenefits to issue W-2s to employees. This process required the Temporary Receiver to include taxes owed on employee wages, including taxes on wages paid prior to December 8, 2021.

no discount was appropriate.  InterActive acquiesced, and the Temporary Receiver moved forward with a negotiation over the terms of the repurchase.

The Temporary Receiver negotiated on behalf of the Receivership Entities for a repurchase of the InterActive shares that would provide for an immediate, lump-sum payment to the Receivership Entities upon closing of the transaction, more favorable terms than those of the Buy-Sell agreement, which provide for the purchase price to be paid in five equal installments annually over five years beginning one year after the closing.  Based on communications with counsel for Raging Bull, the Temporary Receiver engaged a transactions attorney to review the proposed agreement and also reviewed the agreement for terms related to the Temporary Receivership.

The Temporary Receiver also was approached by counsel for MFA Holdings Corp. to negotiate a termination of Raging Bull's LLC's interest in a joint FlexJet share held by MFA Holdings Corp. and Raging Bull.  The Temporary Receiver requested, received, and reviewed documents from FlexJet in order to more fully evaluate the proposed arrangement offered by FlexJet and MFA Holdings Corp.

After a March 17th teleconference with the Court indicating the likely duration of the Temporary Receivership, the Temporary Receiver paused any further work on potential transactions with InterActive Offers and FlexJet, and turned the matters over to Raging Bull as described more fully *infra* in the discussion of steps taken to comply with the March 26, 2021 Order.

### E.     The Temporary Receiver appeared in and defended legal actions, and cooperated with law enforcement.

The Temporary Receiver appeared in and defended legal actions and cooperated with government regulatory and law enforcement agencies as directed by the Temporary Restraining Order.  TRO § XIV at ¶¶ M, S.  Specifically, the Temporary Receiver received communications from and provided responsive information to the Federal Trade Commission and the New Hampshire Bureau of Securities Regulation as follows:

- The Temporary Receiver provided the Federal Trade Commission access to Raging Bull information upon request and consistent with both the Temporary Restraining Order and as a representative of Raging Bull and pursuant to its discovery obligations in this matter.

- The Temporary Receiver appeared through counsel as a representative of the Receivership Entities at a January 28, 2021 status conference held in connection with the New Hampshire Bureau of Securities Regulation's Cease and Desist Order to Raging Bull and related investigation, and continued to monitor any communications in that mater.

In addition, the Temporary Receiver continued to respond to inquiries from State Attorneys General seeking informal resolution of consumer complaints filed with those Offices by Raging Bull subscribers, including providing responses after January 15, 2021 to three governmental consumer complaint inquiries, received from the Offices of the Attorney General for the States of Indiana, Minnesota, and New Hampshire.  The Temporary Receiver also responded in March 2021 to inquiries from the State of Illinois and the State of Utah Labor Commission regarding claims filed with those entities by former employees of Raging Bull.

In addition, the Temporary Receiver entered an appearance in and continued to monitor the status of the litigation and engagement of Tennessee counsel in the

putative class action case filed against Raging Bull in the United States District Court for the Eastern District of Tennessee, *Broyles v. Ragingbull.com, LLC*, No. 20-cv-245.

### F.     The Temporary Receiver communicated with consumers and kept them apprised of the status of the pending litigation.

The Temporary Receiver continued to maintain a website to provide neutral information and updates to the public and consumers regarding the pending action, the role of the Temporary Receiver, and significant court filings.  The website provided contact information for the Federal Trade Commission, Raging Bull, and the Temporary Receiver.  The Temporary Receiver reviewed hundreds of communications sent by consumers directly to the Temporary Receiver, returned emails and phone calls to consumers who made direct contact, and monitored the Receivership Entities' communications with subscribers and employees.

In addition, the Temporary Receiver negotiated with Defendants and reached agreement regarding receivership information to be posted on the RagingBull.com site.  The Temporary Receiver worked with Defendants' Information Technology staff to implement this agreement and ensure prominent public reference to the receivership on the RagingBull.com website home page.

### G.     The Temporary Receiver made reports to the Court and the parties and participated as a party in the pending litigation.

The Temporary Restraining Order obligated the Temporary Receiver to make an accounting of the assets and financial condition of the Temporary Receivership

and file the accounting with the Court.  TRO § XIV at ¶ L.  It further required the

Temporary Receiver to report to the Court regarding:

> (1) the steps taken by the Receiver to implement the terms of the
> Order; (2) the value of all assets and sum of all liabilities of the
> Receivership Entities; (3) the steps the Receiver intends to take in the
> future to protect receivership assets, recover receivership assets from
> third parties, and adjust receivership liabilities; (4) whether the
> business of the Receivership Entities can be operated legally and
> profitably; and (5) any other matters which the Receiver believes
> should be brought to the Court's attention.

TRO § XXII.  In addition, the Court ordered Raging Bull to file a proposed Business

Plan and set a briefing schedule for the Temporary Receiver and Federal Trade

Commission to respond.  February 4, 2021 Order [ECF 165]; February 12, 2021

Order [ECF 169].

In order to effectively serve the Court, fulfill his duty, and make these

reports, the Temporary Receiver continued his interviews of four Raging Bull

owners and senior executives conducted after January 15, 2021; collected

information regarding the Receivership Entities' business, performance, customer

service, marketing, and operations; and analyzed and assessed the information he

obtained himself and through counsel and other consultants engaged pursuant to

the Temporary Restraining Order.  This required an appropriate review and

analysis of the pleadings filed by all parties and the exhibits thereto, the Raging

Bull website and marketing materials, financial information of Raging Bull and its

principals, and a significant volume of consumer communications, including those

sent directly to the Temporary Receiver by consumers and communications sent to

Raging Bull email accounts monitored by the Temporary Receiver.

23

To further assist in his investigation, the Temporary Receiver and his counsel imported over 400,000 documents into a database based in part on targeted selections of Raging Bull email user mailboxes. The Temporary Receiver's team performed keyword and date searches to identify communications of interest, and reviewed thousands of emails, identifying representative examples of customers (both satisfied and dissatisfied). The Temporary Receiver sorted communications into categories based on the nature of complaint or review provided. Ultimately, the Temporary Receiver specifically identified over 1,500 consumers who had requested a refund from Raging Bull after December 8, 2020, the date of the Temporary Restraining Order.

As a result of this investigation, the Temporary Receiver was able to prepare and submit the Temporary Receiver's Initial Report [ECF 156], a lengthy report discussing in substantial detail the Temporary Receiver's investigation and efforts to date, as well as a response to Raging Bull's proposed Business Plan [ECF 189].

In addition to reporting to the Court, the Temporary Receiver participated in this case in other ways requiring substantial effort, including reviewing discovery responses, responding to requests for information and documents, preparing for and representing the Temporary Receiver at the deposition of Kyle Dennis, and frequently communicating with counsel for the Defendants and the Federal Trade Commission on issues relating to the Federal Trade Commission's claims, Defendants' defenses, operations of the business, consumer inquiries, and myriad other maters. The Temporary Receiver also reviewed and analyzed, and, as

appropriate, responded to extensive and numerous filings of the parties, including a

complaint and amended complaint attaching voluminous exhibits, substantive

responses on the merits of the motion for preliminary injunction filed by Defendants

and the Federal Trade Commission's reply, and numerous requests for extensions of

time, including extensions that prolonged the pendency of the Temporary

Receivership pending a preliminary injunction hearing.  The Temporary Receiver

participated in several telephonic hearings with the Court, and prepared for and

attended the preliminary injunction hearing.

### H. The Temporary Receiver implemented the March 26, 2021 Order terminating the Temporary Receivership.

The Court's March 26, 2021 Order terminated the appointment of the

Temporary Receiver and provided that within seven days, the Temporary Receiver

"shall take all necessary steps" to terminate the receivership and "relinquish,

return and/or transfer all power, access, authority, responsibility and obligation

that were granted to the Temporary Receiver by the TRO to Raging Bull

Defendants."  March 26, 2021 Order [ECF 214] § XIV.  The Temporary Receiver

took all steps necessary and advisable to carry out the requirements of the Order as

expeditiously as possible.

Within one hour of the Order's issuance, the Temporary Receiver had

initiated the return to Raging Bull of the company premises in Utah and Maryland,

and the Temporary Receiver had requested wire instructions to transfer to Raging

Bull funds held by the Temporary Receiver.  The Temporary Receiver subsequently

provided to all parties a comprehensive memorandum that detailed the measures

he would take to implement the Order.  The Temporary Receiver worked cooperatively with Raging Bull to effectively carry out the terms of the Order as set forth in his Status Report [ECF 221] in the time provided by the Court.  The Temporary Receiver's April 10, 2021 Status Report, attached at Exhibit 4, sets forth in detail the measures the Temporary Receiver undertook.  The following summarizes some of those measures the Temporary Receiver and his team undertook, to effectuate the March 26, 2021 Order:

- The Temporary Receiver turned over the Hunt Valley, Maryland and Utah premises to Raging Bull;

- The Temporary Receiver transferred certain funds collected by the Temporary Receiver to the Receivership Entities, and held other funds in escrow for a period of time at Raging Bull's request;

- The Temporary Receiver communicated with financial institutions and merchant processors regarding the March 26, 2021 Order and the transfer of funds;

- On April 2, 2021, counsel for Raging Bull requested that the Temporary Receiver forward all communications between the Temporary Receiver and entities that had transferred assets to the Receivership Account; the Temporary Receiver and his counsel complied with this request over the next several days by identifying, organizing, and rendering into a transmissible format letter and electronic correspondence with these entities;

- The Temporary Receiver paid remaining vendors approved by the Court except as noted in the April 10, 2021 Status Report;

- The Temporary Receiver provided information to Raging Bull to have accurate and complete tax and accounting records for the period of the Temporary Receivership;

- The Temporary Receiver terminated all mail forwarding and provided all mail received to Raging Bull;

- The Temporary Receiver filed appropriate motions to withdraw appearances in pending court and regulatory proceedings and

investigations, and terminated engagement of local counsel in the putative class action pending in the United States District Court for the Eastern District of Tennessee captioned as *Broyles v. Ragingbull.com, LLC*, No. 20-cv-245.

- The Temporary Receiver returned all hard copy documents to Raging Bull;

- The Temporary Receiver made all emails and other electronic material received and reviewed by the Temporary Receiver in evaluating consumer responses and requests for refund or service cancellation, available to Raging Bull, including a production of 423,939 documents through Relativity and additional productions of emails received to the receiver@gejlaw.com email address;

- The Temporary Receiver terminated the website and email address established by the Temporary Receiver;

- The Temporary Receiver organized, finalized, and provided a list to the parties of certain consumers seeking refunds, at the request of Raging Bull;

- The Temporary Receiver delivered a draft purchase and sale agreement regarding the interests of Raging Bull and Sherwood Ventures in InterActive Offers, LLC together with summaries of the status of his review of the transaction;

- The Temporary Receiver delivered materials gathered regarding FlexJet and communications regarding a proposed repurchase of Raging Bull's interest;

- The Temporary Receiver drafted a proposed final communication to Raging Bull subscribers from the Temporary Receiver and provided it to Raging Bull;

- The Temporary Receiver communicated with Defendants and the Federal Trade Commission regarding the actions he was taking to terminate the Temporary Receivership and transfer control back to the Receivership Entities, and invited, incorporated, and responded to feedback from the Receivership Entitles in that process; and

- The Temporary Receiver prepared a Status Report regarding his actions to terminate the Temporary Receivership, circulated drafts to Defendants and the Federal Trade Commission, invited and incorporated edits, and filed a final, agreed-upon Status Report with the Court [ECF 221].

I.     **The Temporary Receiver took additional, limited actions following his filing of the April 10, 2021 Status Report.**

The Temporary Receiver performed additional, limited actions following his filing of the April 10, 2021 Status Report on his efforts to terminate the Temporary Receivership, as appropriate and necessary, including the following:

- Pursuant to direction from Raging Bull, the Temporary Receiver initiated transfers to two additional merchant processers to return funds collected by the Temporary Receiver; the Temporary Receiver continues to hold $861,698.50 in escrow pending direction from Raging Bull as to the resolution of any claim of Stripe, Inc. to those funds;

- In addition, the Temporary Receiver responded to communications from the court-appointed Monitor and spoke with the Monitor at his request regarding the Temporary Receivership and the Temporary Receiver's investigation;

- The Temporary Receiver received, processed, and provided to Raging Bull mail received by the Temporary Receiver after the termination of the Temporary Receivership;

- The Temporary Receiver and his counsel attended a telephone conference with the Court and parties on April 13, 2021;

- The Temporary Receiver received consumer communications and forwarded them to counsel for Raging Bull.

II.    **The skill required to properly perform the legal and other professional services rendered.**

This Temporary Receivership, which involved complex financial transactions and many inter-related entities, required extensive skill, knowledge, and time to gather evidence and link entities, find and freeze assets, and successfully preserve the receivership estate for the benefit of all interested parties. The Temporary Receiver previously served in the United States District Court for the District of Maryland as Court-appointed Temporary Receiver and Receiver in multiple cases,

including the federal law enforcement receiverships styled, *Federal Trade Commission v. Midway Industries, LLC, et al.*, Case No. Case No. JDB-14-2312, and *Federal Trade Commission v. Residential Relief Foundation, Inc. et al.*, JFM-10-03214.  Those cases involved a similarly complex set of corporate entities, statutory and common law legal regimes, creditors, multistate business operations, and adversarial legal proceedings.

In addition, the Temporary Receiver has served as receiver in other substantial cases and served as Monitor pursuant to a deferred prosecution agreement effective September 12, 2011 between a national healthcare provider and the United States Department of Justice, through the United States Attorney's Office for the District of New Jersey.  Counsel to the Temporary Receiver has served as counsel to the receiver and monitor in each of the above-referenced matters and has served as counsel to receivers in numerous other matters, such as *Lubin v. Williams*, *et al.*, Case No. CAE07-28453, pending in the Circuit Court of Maryland for Prince George's County.

## III.   The customary fee for like work.

Gallagher Evelius & Jones, LLP, has performed legal services and services as Temporary Receiver in this case on an hourly basis.  The rates sought by the Temporary Receiver and the Temporary Receiver's counsel are the same rates that Gallagher regularly bills to its clients who pay on an hourly basis, including a court-

appointed receivership and monitorship.[5]  *See* Saudek Decl. (Ex. 2).  Unlike many law firms, Gallagher Evelius & Jones does not routinely discount its rates.  Instead, it sets its rates based on the expectation that its clients will pay those rates.  *See* Saudek Decl. (Ex. 2).  These rates are therefore presumed reasonable.  "[M]arket rates may be proved by the rate which clients normally and willingly pay the petitioning attorneys."  *Rum Creek Coal Sales v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994).  Fees under fee-shifting statutes should be calculated "according to the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. at 895.

Gallagher's rates are consistent with, if not lower than, the prevailing market rates charged by other law firms in the Baltimore area for attorneys of comparable experience, expertise, and qualifications who litigate comparable matters.  *See* Saudek Decl. (Ex. 2).

Similarly, Verity, LLC's hourly billing is reasonable for the work performed on this case.  The hourly rates are the standard hourly rates actually charged to, and paid by, clients of Verity, LLC.  *See* Peroutka Decl. (Ex. 3).

## IV.   The novelty and difficulty of the questions involved.

This case involves a complex business enterprise that operates in a field heavily regulated by the federal government.  The Receivership Entities' operations are set forth in detail in the Initial Report at pages 25-89.   This area of the law and

---

[5]     One exception is that, as described in the Declaration of Peter E. Keith, Exhibit 1, the Temporary Receiver has agreed to reduce his hourly rate by 25% as a courtesy to the Court and given the public service nature of the appointment as Temporary Receiver. This reduced hourly rate

regulation has undergone significant transformation as a result of the recent increase in unlawful sales practices nationwide.  The novelty and difficulty of the questions involved is borne out by the Temporary Receiver's Initial Report and the parties' comprehensive briefing.  The Temporary Receiver has been faced with a number of complex issues, including reviewing consumer account issues and analyzing the lawfulness of marketing, advertising, and forms of cancellation and refunds for consumers, and assessing the ability of Raging Bull to operate lawfully and profitably.

Gallagher has been paid its then-current hourly rates for all work performed in other federal law enforcement receiverships before the Court, including *Federal Trade Commission v. Midway Industries, LLC, et al.*, Case No. Case No. JDB-14-2312, and *Federal Trade Commission v. Residential Relief Foundation, Inc. et al.*, JFM-10-03214.

## V.   The amount in controversy and the results obtained.

The Federal Trade Commission's claims exceeded $130 million and requested significant additional injunctive relief.  At the time of entry of the Temporary Restraining Order, Raging Bull employed than 160 people had substantial annual receipts of subscriber funds.  The Temporary Receiver, with assistance from his counsel and Verity, LLC, successfully established and maintained the Temporary Receivership, and successfully implemented the considerable duties set forth in the Temporary Restraining Order, § XIV ¶¶ A-V for a period of more than three

is reflected on the detailed invoice attached to the Temporary Receiver's declaration as Exhibit A and in the amount of the request described in this Application.

months.  The Temporary Receiver maintained the business of the Receivership Entities, including their premises, documents, and information technology systems, such that the Temporary Receiver was able to effectively and quickly transfer control of the business, and enable Raging Bull to resume operations and control, following termination of the Temporary Receivership.

The Temporary Receiver prepared thorough reports for the Court on the assets and business of the Receivership Entities, and an assessment of the proposed Business Plan, to inform the Court of issues and information pertinent to the question of whether Raging Bull could operate legally and profitably, as directed by the Temporary Restraining Order, and in an effort to aid in the Court's consideration of issues resolved by the Court's March 26, 2021 Order.

The Temporary Receiver also preserved the Receivership Entities' rights in several ongoing regulatory and state investigations and claims.

## VI.    Time limitations imposed by the client or the circumstances.

The dissipation of assets from the Temporary Receivership has been of concern to the Temporary Receiver throughout this case.  The Temporary Receiver, Verity, LLC, and Receiver's counsel were required to rapidly analyze and undertake various actions designed to secure, protect and retrieve assets of the receivership estate.  The Temporary Receiver took all of these actions in the context of carrying out the duties set forth in the Temporary Restraining Order, while being cognizant of any diminishment of the finite estate assets.

The fees incurred by the Temporary Receiver were significant, due in part to the pendency of the Temporary Receivership, which was lengthier than initially

anticipated by the Court and the parties.  The Court initially scheduled a preliminary injunction hearing to occur ten days after the Temporary Restraining Order was entered, for December 18, 2020.  December 8, 2020 Temporary Restraining Order, § XXVIII.  The hearing was rescheduled and duties of the Temporary Receiver as set forth in the Temporary Restraining Order continued through multiple consent agreements by the parties, in which the Temporary Receiver consented but took only a neutral role.  The Temporary Receiver made no request for extension of the hearing and did not otherwise advocate for any extension.  To the contrary, the Temporary Receiver encouraged both Defendants and the Federal Trade Commission to move forward to a preliminary injunction hearing as promptly as possible, noting that such an approach would, among other advantages, provide for the appropriate conservation of assets of the Receivership Entities by minimizing the double-tracking of litigation and receivership activities and, if appropriate, limit the time and potential disruption of the receivership.  Ultimately, the preliminary injunction hearing was held on March 19, 2021, three months and 11 days after entry of the Temporary Restraining Order.

**VII.   The nature and length of the professional relationship with the client.**

Gallagher has represented the Temporary Receiver in two significant prior United States District Court for the District of Maryland receiverships and a substantial monitorship, in each of which the Temporary Receiver, Gallagher, and its supporting accountants have been awarded all fees that they have requested. That the Temporary Receiver is highly familiar with and confident in the skill and

work of Verity, LLC and the Gallagher attorneys and paraprofessionals working on this case increases the efficiency of the administration of the Temporary Receivership estate.

## VIII.  The experience, reputation and ability of the attorneys and other professionals.

Gallagher is a well-regarded law firm in the Baltimore region.  Saudek Decl. (Ex. 2).  Gallagher lawyers have significant trial and appellate experience and have successfully represented parties in a broad range of subject matters in state and federal courts throughout the country.  *Id.*  Gallagher and its attorneys have been recognized for a commitment to outstanding legal work and public service.  *Id.*  Gallagher has successfully represented receivers in other cases.  Gallagher lawyers have been recognized with some of the highest honors available to litigators, including membership in the American College of Trial Lawyers and the Fourth Circuit Judicial Conference.

In this case, Gallagher designated Mark S. Saudek as lead counsel for the Temporary Receiver.  Mr. Saudek is lawyer with 25 years' experience in high-stakes internal investigations and litigation.  He has significant experience in complex commercial litigation and has extensive trial experience.  Mr. Saudek also has particular experience in representing court-appointed receivers in State and Federal courts, and in investigating alleged fraudulent schemes.  Mr. Saudek graduated from Wesleyan University, with honors, and the University of Maryland School of Law, with honors.  Following a clerkship with the Honorable Catherine C. Blake of the United States District Court for the District of Maryland, Mr. Saudek

practiced complex litigation and internal investigations for a decade at a prominent Washington, D.C. law firm.  Mr. Saudek joined Gallagher 15 years ago.  He has served as a Director and President of the Federal Bar Association—Maryland Chapter and is a life fellow of the Fellows of the American Bar Foundation and the Fellows of the Federal Bar Association, as well as a permanent member of the Fourth Circuit Judicial Conference.

Mr. Saudek has a history of dedication to the Court and its mission to serve the community.  He serves as a member of the Court's Bench-Bar Liaison Committee and has chaired the Court's committee on *pro bono* service.  Mr. Saudek has represented *pro bono* indigent clients before the Court on a number of occasions, including accepting multiple Court appointments as counsel.  Mr. Saudek presently represents *pro bono* a former inmate who asserts constitutional claims against the Maryland State Police, following an appointment by the Honorable Ellen L. Hollander.  For fourteen years, Mr. Saudek has, in conjunction with the Honorable Susan L. Gauvey and the Honorable Stephanie A. Gallagher, led the Court's *Open Doors to the Federal Courts* program, in which the Court presents employment counseling and federal court trials to Baltimore City high schools students.

Meghan Casey has practiced law for thirteen years, including more than ten years as a litigator in complex business and financial matters.  She earned her bachelor's degree from Yale University, where she was inducted into Phi Beta Kappa, and her law degree from the University of Virginia School of Law, from which she graduated Order of the Coif.  Ms. Casey served as a law clerk to the

Honorable J. Frederick Motz of the United States District Court for the District of Maryland and the Honorable Norman H. Stahl, of the United States Court of Appeals for the First Circuit.  Ms. Casey then worked at a prominent Washington, D.C. firm before joining the Office of the Attorney General of Maryland.  Following four years with the Office of the Attorney General, Ms. Casey has been a partner at Gallagher since 2020, focusing on complex litigation and internal investigations. Before attending law school, Ms. Casey taught in a public school as part of the Teach for America program.

Ella Aiken graduated from Columbia University School of Law where she earned her J.D. in 2011 and was a Harlan Fiske Stone Scholar.  Also in 2011, she received her LL.M. in International Criminal Law, cum laude, from the University of Amsterdam Law School.  Ms. Aiken earned her undergraduate degree from Columbia University in 2007.  Prior to joining Gallagher, Ms. Aiken practiced civil litigation and intellectual property law in New York City.

Samantha Burgess earned her bachelor's degree from the University of Florida, with honors, in 2017, and her J.D. from the University of Maryland School of Law, with honors, in 2020.  She has practiced in the Gallagher litigation group since graduation, during which time she has overseen complex litigation discovery matters.

Verity, LLC's initial predecessor entity was founded in 1986 as Maryland First Financial Services Corp.  Since that time, Verity's principal has become one of Maryland's most highly regarded financial consulting experts specializing in

receiverships, complex financial fraud investigations and providing financial analyses related to complex financial transactions.  Peroutka Decl. (Ex. 3). Raymond J. Peroutka, Jr. is the Managing Partner of Verity, LLC.  *Id.*  Mr. Peroutka recently served as receiver (with Gallagher as receiver's counsel) in a case under the jurisdiction of the Circuit Court for Prince George's County, Maryland, in which Mr. Peroutka and his counsel shut down a $130 million nationwide mortgage loan Ponzi scheme and recovered assets for 1,200 victimized investors. He has particular experience and knowledge in the field of complex financial fraud investigations.  He is a member of the Association of Certified Fraud Examiners, the American Institute of Certified Public Accountants, the Maryland Association of Certified Public Accountants, the Licensing Executives Society, and the Maryland State Bar Association.

The Temporary Receiver has significant experience in civil litigation and in special investigations, and is a Fellow of the American College of Trial Lawyers. Keith Decl. (Ex. 1). He has served as receiver in other cases brought by the Federal Trade Commission and in a case brought by the Maryland Securities Commissioner. Keith Decl. (Ex. 1). In 2019, Ms. Casey and the Temporary Receiver were selected by the Maryland Commission to Restore Trust in Policing, chaired by retired U.S. District Judge Alexander Williams, Jr. of this Court, to serve as counsel to the Commission.  The Commission was given subpoena powers by the legislature, conducted an investigation of corruption within the Gun Trace Task Force of the Baltimore City Police Department, and made recommendations to the Governor and

General Assembly for changes within BPD and for statewide police reform to help restore public trust in policing.

The Temporary Receiver, Temporary Receiver's counsel, and Verity, LLC have accepted this case on an hourly fee basis.  As stated above, market rates normally billed and paid by clients are presumed reasonable and in fact are comparable to or lower than those charge by lawyers of comparable skill and qualifications.  *See Rum Creek Coal Sales*, 31 F.3d at 175.

## CONCLUSION

The Temporary Receiver appreciates the opportunity to have served the Court in this case.  In this motion, as directed by the Temporary Restraining Order, the Temporary Receiver requests an award of fees for work incurred from January 16, 2021 to date.  The Temporary Receiver will not present any further fee applications to the Court with respect to this matter.  For all of the reasons stated above, the factors set forth in decisions of the United States Court of Appeals for the Fourth Circuit and in Maryland Rule of Professional Conduct 1.5 weigh in favor of awarding the fees requested by the Temporary Receiver, on behalf of himself, Verity, LLC, and his counsel.

WHEREFORE, the Temporary Receiver respectfully requests an Order requiring the Receivership Entities to cause the payment of fees and expenses of the Temporary Receiver in the total amount of $598138.16, which amount accounts for fees and expenses incurred from January 16, 2021 through present.

Respectfully submitted,

**GALLAGHER EVELIUS & JONES LLP**

*/s/ Mark S. Saudek*

Mark S. Saudek (Fed. Bar #23963)
Meghan K. Casey (Fed. Bar #28958)
218 North Charles Street, Suite 400
Baltimore MD 21201
phone (410) 727-7702
fax (410) 468-2786
msaudek@gejlaw.com
mcasey@gejlaw.com

Date:  June 25, 2021

*Counsel to Court-appointed Temporary Receiver, Peter E. Keith*

**EXHIBIT LIST TO**
**SECOND AND FINAL APPLICATION**
**FOR FEES & EXPENSES**

1.    June 24, 2021 Declaration of Peter E. Keith

2.    June 24, 2021 Declaration of Mark S. Saudek

3.    June 22, 2021 Declaration of Raymond J. Peroutka, Jr.

4.    April 10, 2021 Status Report regarding Implementation of March 26, 2021 Order [ECF 221]