# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-03538 – GLR |
| | ) | |
| RAGINGBULL.COM, LLC f/k/a | ) | |
| LIGHTHOUSE MEDIA LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NOTICE OF FILING OF MONITOR'S SECOND REPORT

Pursuant to this Court's Order dated March 16, 2021, the independent Monitor, Affiliated Monitors, Inc., by and though its undersigned counsel, files the Monitor's Second Report, which is attached hereto as **Exhibit A.**

Dated:  June 25, 2021

Respectfully submitted,

Affiliated Monitors Inc.

By: /s/ *David C. Shonka*

David C. Shonka (Bar ID# 21871)
Redgrave LLP
601 Pennsylvania Ave., NW
Washington, DC  20004
Tel: (202) 384-6348
Email: dshonka@redgravellp.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of June 2021 I have served a true and accurate copy of the foregoing Notice of Filing of Monitor's Second Report on all parties through the ECF System.


*/s/ David C. Shonka*

Exhibit A



*Federal Trade Commission v. RagingBull.com, et al.*

**Case No. 1:20-cv-03538-GLR (D. MD)**

**MONITOR'S SECOND REPORT**

June 25, 2021

## TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................................................1

II.  BACKGROUND ...........................................................................................................2

III. MONITOR'S ACTIVITIES SINCE THE FIRST REPORT ........................................3

IV.  CONDITIONS SUBJECT TO MONITORING UNDER THE ORDER.......................5

    A.  Prohibited Business Activities ...........................................................................5

    B.  Simple Mechanism to Cancel Negative Option Feature ..................................12

    C.  Compliance Monitoring Over Defendants........................................................14

    D.  Raging Bull Business Plan ...............................................................................17

    E.  Provision of Information to the Monitor ..........................................................17

    F.  Cooperation and Non-Interference with the Monitor ......................................19

    G.  Escrow Account................................................................................................20

    H.  Refund and Cancellation Requests ..................................................................23

V.   CONDITIONS SUBJECT TO MONITORING UNDER THE BUSINESS PLAN –
    PHASE 1 OBLIGATIONS..........................................................................................35

    A.  Operations Limited to Existing Subscribers....................................................35

    B.  No Advertising or Marketing to Potentially New Subscribers.........................35

    C.  No Earnings Claims, Consumer Testimonials, Etc. ........................................35

    D.  No Upselling and No Renewals or New Subscriptions from Existing Subscribers .35

    E.  All Pre-Existing Subscriptions Supported by ROSCA-Compliant Cancellation
       Mechanism .......................................................................................................36

    F.  Investment in Advertising and Compliance Infrastructure .............................36

    G.  Customer Service, Refund and Cancellation Procedures ................................42

VI.  INDEPENDENT COMPLIANCE MONITOR AUDIT AND CERTIFICATION .......50

    A.  Audit................................................................................................................50

    B.  Certification .....................................................................................................51

    C.  Court's Concurrence and Permission for Raging Bull to Move into Phase 2
       Operations ........................................................................................................52

VII. CONCLUSION............................................................................................................53

Raging Bull
Monitor's Second Report
Page 1



## I.     INTRODUCTION

By its Order entered March 26, 2021 ("Order"), the Court appointed Affiliated Monitors, Inc. as the compliance monitor ("Monitor") in *Federal Trade Commission v. RagingBull.com, et. al.,* Case No. 1:20-cv-03538-GLR (D. MD).  The Monitor is an agent of the Court and is directly accountable to the Court.  The Monitor's duties and authority include those described in the Order and in the Raging Bull Business Plan ("Business Plan") (which is incorporated into the Order) and require the Monitor to monitor Raging Bull Defendants'[1] compliance with the Order and Business Plan.  (Order Sections V and VI).

In its Order, the Court also terminated the appointment of the Temporary Receiver and the asset freeze, previously put in place under the December 8, 2020 and December 17, 2020 Temporary Restraining Orders ("TRO"), effectively returning control over RagingBull.com ("Raging Bull" or "Company") business operations back to the Company and its principals.  (Order Section XIV).

This submission serves as the Monitor's Second Report, describing Raging Bull Defendants' compliance activities and the Monitor's monitoring activities since the Monitor's First Report filed on April 26, 2021 (Order Section VI.E.).

This submission also serves as the Monitor's audit of Raging Bull's Phase 1 activities and, subject to certain caveats and exceptions, the Monitor's certification of the satisfactory completion of Phase 1 and the Company's compliance with the Order, as provided in Section V.D. of the Raging Bull Business Plan (Business Plan p. 12).  As described in greater detail in this Second Report, the Monitor certifies that, with the exception of condition "XI. Escrow Account" of the

---

[1]   Raging Bull Defendants are RagingBull.com, LLC f/k/a Lighthouse Media, Jeffrey M. Bishop and Jason Bond f/k/a Jason P. Kowalik.

Raging Bull
Monitor's Second Report
Page 2



Order, Raging Bull Defendants have substantially complied with the Order and completed the Phase 1 requirements under the Business Plan.

The Business Plan states that "[p]rovided the Court concurs with the progress of the steps taken and the certification of the Compliance Monitor, the Company will be permitted to move into Phase 2 operations." (Business Plan at p. 12). The Monitor does not have the authority to permit Raging Bull to move into Phase 2 operations. Should the Court on its own motion, or upon motion of Raging Bull, permit the Company to move into Phase 2 operations, the Monitor is prepared to continue to monitor, audit and assess the Company's continued compliance with Phase 2, the Order and applicable laws and regulations, and to continue to report to the Court as contemplated under the Order and the Business Plan.

II.    BACKGROUND

On December 7, 2020, the FTC brought an action against Raging Bull Defendants alleging violations of the FTC Act and the Restore Online Shoppers' Confidence Act ("ROSCA"). On December 8, 2020, the Court granted the FTC's *ex parte* motion for a TRO, asset freeze, and appointment of a Temporary Receiver, and on December 17, 2020, the Court entered a modified TRO. On March 26, 2020, the Court declined the FTC's requested preliminary injunction, but instead entered the Order (consented to by Raging Bull Defendants) which, among other things, sets forth specific activities that Raging Bull Defendants are either prohibited from or required to comply with, incorporates the Company's representations and obligations under the Business Plan, terminates the Temporary Receivership and asset freeze, and appoints Affiliated Monitors, Inc. to monitor Raging Bull Defendants' compliance with the Order. Under the Order, the Monitor shall report to the Court initially within 30 days of the entry of the Order, and subsequently every 60 days for the duration of the Order. The Monitor may apply to the Court for any relief necessary



or appropriate to ensure the Monitor can carry out its duties, and should the Monitor determine Raging Bull Defendants are not in substantial compliance with the Order, the Monitor shall notify the Court immediately, and may take any additional action as further described in the Business Plan.

Further, Section V.D. of the Raging Bull Business Plan provides that "[u]pon completion of the above steps [Phase 1 activities] in relation to existing subscribers and internal compliance enhancements, and as a condition to moving into Phase 2, these efforts will be subject to an audit by the Compliance Monitor, who must first certify the satisfactory completion of these efforts and compliance with this plan in a written report filed with the Court.  The certification shall be made on the basis of the Company's obligations set forth in the Court's order as well as all relevant authority under FTC law including recent case law authority, relevant rules and informal FTC guidance, and such other relevant authority as the Compliance Monitor deems appropriate based on the Compliance Monitor's expertise in the area."

Finally, the Business Plan provides that "[d]uring Phase 2, the Company will be permitted to engage in full operations, subject to ongoing compliance and careful oversight by the Compliance Monitor" (Business Plan at p. 13).

## III.   MONITOR'S ACTIVITIES SINCE THE FIRST REPORT

The Monitor's First Report summarized the monitoring activities during the first 30-day period after the Court's March 26, 2021 Order.  Those activities included meetings with counsel for Raging Bull Defendants, Defendants Bishop and Bond, the FTC and the Temporary Receiver. They further included establishing a RagingBull.com Monitorship webpage and dedicated email address and telephone number for customers to contact the Monitor, and responding to the customer contacts that followed.  They also included testing the Company's customer support



email and telephone number, issuing an Initial Request for Information and a Second Request for Information, and reviewing the Company's initial proposed email communications to existing subscribers.  In the First Report, the Monitor reported on Raging Bull Defendant's compliance during the first 30 days with its obligations under both the Order and the Business Plan.

Since submission of the First Report, the Monitor has engaged in additional multi-faceted activities in monitoring and auditing Raging Bull Defendants' obligations.  These have included:

(i)      Weekly scheduled meetings[2] with the Company's outside counsel;

(ii)     Additional meetings with outside and in-house counsel as needed;

(iii)    Five separate letter requests for information relating to the Company's compliance obligations under the Order and Business Plan;

(iv)     Additional email requests for information relating to specific questions or concerns;

(v)      Interviews with Company owners and key Company personnel, including legal, operational, customer support, sales and compliance leadership[3];

(vi)     Interview with representatives of consumer review website, TrustPilot;

(vii)    Weekly scheduled calls with the FTC;

(viii)   Verification of the Company's obligations relating to prohibitions on prohibited content, and of sales, marketing and promotion activities, through persistent monitoring of Company-affiliated websites and social media accounts, of Company emails and subscription services, and of other public websites and social media platforms;

---

[2]   All meetings described in this Report are virtual meetings.
[3]   The Monitor originally planned a site visit to Raging Bull's offices in Baltimore, MD, but was informed that because of COVID-19 restrictions and concerns, very few staff were working on-site.  Therefore, the Monitor has postponed an on-site visit until a later date.

Raging Bull
Monitor's Second Report
Page 5



(ix)     Verification of the Company's handling of refund and cancellation requests
pending as of the date of the Order through auditing of the Company's and the
Temporary Receiver's files for a significant portion of applicable customers;

(x)     Accepting, responding to and tracking customer emails and phone calls to the
Monitor through several channels, including the dedicated Raging.Bull.com
Monitorship webpage, dedicated email address, and dedicated phone number; and

(xi)     Review of scores of documents constituting hundreds of pages relating to Raging
Bull Defendants' obligations under the Order and Business Plan.

The Monitor's specific monitoring and auditing activities and findings related to each of
the Conditions under the Order and the Business Plan are detailed below.

On June 23, 2021, the Monitor sent a draft of this Report to both counsel for Raging Bull
Defendants and the FTC, and received comments and/or information from the FTC.

## IV.     CONDITIONS SUBJECT TO MONITORING UNDER THE ORDER

### A.     Prohibited Business Activities

Section I of the Order prohibits Raging Bull Defendants from making Earnings Claims, or
claims about the experience, time or effort, or capital required for consumers to effectively use the
Defendants' Covered Goods or Services, without an appropriate basis for, or substantiation of such
claims.  It also prohibits any misrepresentation of any other fact material to consumers concerning
any Covered Goods or Services.  Similarly, the Business Plan provides that under Phase 1, the
Company will abstain "from any advertising or marketing to potentially new subscribers"; "all
communications with pre-existing subscribers will not contain earnings claims, consumer
testimonials, or any misrepresentation of any type regarding the Company's services"; and "all



services to pre-existing subscribers will not involve any product 'upsell' or Company-initiated solicitation of renewals." (Business Plan p. 9).

     1.    <u>Removal of Prohibited Legacy Content from the Company's Website and Public-Facing Digital Media</u>

Shortly after the Monitor submitted its First Report, through their counsel, Raging Bull Defendants indicated to the Monitor that they were reviewing every piece of "legacy," or previously existing, content on their website and on all public-facing digital media (*e.g*., Facebook, LinkedIn, YouTube) and "scrubbing" to remove any content that contained Earnings Claims or other content prohibited by either the Order or the Business Plan.  In weekly reports beginning on May 2, 2021 the Company's counsel provided general updates regarding the removal of such content.  In order to confirm the representations with respect to this review and removal, and to obtain detail about the process the Company was using to "scrub" the content, the Monitor submitted its Fifth Request for Information to  Raging Bull Defendants on May 14, 2021 requesting ". . . a written explanation of the internal review process [the Company] is conducting with respect to legacy content that is taken down or removed from its website, or from any digital media outlet."

On May 24, 2021 the Raging Bull Defendants provided a written response, indicating that Defendant Jason Bond was directing a team of sixteen individuals conducting the review and removal of content from Raging Bull's website and digital media outlets; that the process was complete; that the Company had conducted checks to confirm that potentially offending content within its control had been removed or hidden; and that the Company is keeping digital copies of all removed content and storing digital copies of all removed content in its databases.

Raging Bull
Monitor's Second Report
Page 7



2. <u>Communications with Existing Subscribers, Including New Content for Subscription Services</u>

The Company resumed its communications with existing subscribers via email on April 27, 2021. On or about May 5, 2021, the Company began offering fulfillment of subscription services to pre-existing customers, including new content in an "open house" period during which the Company has made additional products available free of charge, absent any solicitation of or upselling to these existing customers.[4]  In order to understand the process the Company was utilizing with respect to newly deployed content and confirm compliance with the Order and Business Plan, the Monitor included in its Fifth Request for Information to the Raging Bull Defendants on May 14, 2021 a request for "a written explanation of the internal review process [the Company] is conducting with respect to any new content that is either added to its website or to any digital media outlet, or disseminated to existing subscribers," including:

a.  Who specifically (by name and title) at the Company is conducting the review, and for each individual and role, please provide:

i.   His or her qualifications for the role, preferably in the form of a resume or CV;
ii.  Job description; and
iii. The component of the review process in which the individual is involved.

b.  How the review is conducted, including what guidelines the reviewer is using to determine what he or she is flagging or editing;

c.  When the review is taking place, and whether all content is reviewed before it is distributed or deployed;

d.  What records the Company is keeping of this review;

---

[4]   Nor will these customers be charged for the services at the conclusion of the "open house" period.



    e.      What is being reviewed, *i.e.* fulfillment emails, videos, trade alerts, webinars, livestream, etc. and what is the flow from generators/authors of the content to reviewers; and

    f.      Whether the process is being audited to confirm that all content is properly vetted before deployment.

The Raging Bull Defendants, through their counsel, responded as follows:

    a.      Raging Bull has a team of 4 people who are currently reviewing fulfillment content for existing subscribers.  This team includes Martin Saunders, General Counsel and Acting Chief Compliance Officer; Steven Hinkes, Compliance Analyst; Michael Mills, Compliance Analyst; and Cory Andrews, Compliance Manager.  We have previously uploaded their CVs to the Monitor's SharePoint site.  The team members are all involved in the process of reviewing content and providing any edits before [the Company's counsel] conducts its review;

    b.      The Raging Bull review team reviews each piece of proposed content from the Raging Bull instructors and their writers and then provides suggested edits to ensure compliance with the March 26th Order and the Raging Bull business plan. The review team uses the following documents/training as guidelines for its review: March 26th Order; Raging Bull Business Plan; Guidance for Conducting Raging Bull Business Under the Order During Phase I; Standard Operating Procedure for Compliance Communications Review; and Training conducted by [the Company's counsel] on April 30, 2021[5];

---

[5]   Section IV. A. 3 below describes in detail the process the Monitor used for verifying that the Company's review team is complying with the requirements contained in these documents.



c.      The Raging Bull review team analyzes proposed content when Raging Bull instructors and their writing teams forward that content to the review team.[6] All proposed content is being reviewed before dissemination to current subscribers;

d.      The review process is done through email, and Raging Bull keeps all email exchanges in connection with the review process, including all emails reflecting proposed edits from the review team;

e.      All prepared content is reviewed. Authors/generators of the content send all content for review to the Raging Bull review team via email; and

f.      After the Raging Bull review team completes its review of all content, the review team forwards the content to [the Company's counsel]. [The Company's counsel] then conducts a separate review of all content, including any proposed edits made by the Raging Bull review team, and makes any additional revisions or poses follow up questions or comments to the Raging Bull review team. This process continues until [the Company's counsel] has approved the content, at which time [the Company's counsel] notifies the Raging Bull review team of such approval by email. No content is disseminated to subscribers without [the Company's counsel] approval.

3.      <u>Monitoring of Raging Bull Content for Prohibited Business Activities</u>

The Monitor began proactively monitoring the Raging Bull Defendants' communications with existing subscribers on May 6, 2021, by obtaining a full-access Raging Bull Membership for the members of the Monitoring team.  The membership provided access to all the materials on the

---

[6]   The Compliance Modules discussed in Section V.F.2 below address what content instructors are required to forward to the internal compliance review team.



Raging Bull website, as well as signed up the members of the Monitoring team to receive all email communications sent by the Company to its subscribers.  The Monitor divided all the Company's subscription content – constituting over thirty different subscription services, over twenty different publications, and over a dozen different courses -- among four team members, who each spent approximately five hours per week reviewing a sampling of content to which they were assigned, inclusive of emails sent by the Company to subscribers, written and video content posted on the Company website, and chat rooms.   Further, two additional team members each spent approximately five hours per week reviewing a sampling of all public-facing digital media outlets on which the Monitor found the Raging Bull Defendants to have a presence, including Facebook, Instagram Twitter, LinkedIn, YouTube, and Reddit.  These team members included in their review the individual social media accounts of the Company "gurus", third-party complaint websites such as TrustPilot and the Better Business Bureau, and conducted google searches for key words such as "RagingBull Scam," "RagingBull Lawsuit," and "RagingBull Make Money."

In total, the team spent over 100 hours reviewing emails, publications, videos, chat room chats, comment threads on social media, webinars and livestreams. This robust effort revealed that the Company had, in fact, undertaken a review of all pre-existing content on its website, and with limited exceptions, had successfully removed prohibited content.[7] Similarly, the Monitor's review of communications with existing subscribers, including emails and new content for fulfillment of

---

[7]   The Monitor created Monitoring Reports for each of the pieces of content reviewed.  Each Report indicates whether the content reviewed contained any Earnings Claims or other Prohibited Business Activities. The Monitor found several instances of "Yes" findings, and shared the corresponding Reports with the Company's counsel, citing content that in the Monitor's view was prohibited and should be removed.  As of this writing, the Company has removed all such content.

Raging Bull
Monitor's Second Report
Page 11



the Company's subscription services, determined that the Company was successful in preventing prohibited content from distribution.[8]

In addition to these monitoring activities, the Monitor interviewed Jeff Bishop, CEO, Jason Bond, VP, Martin Saunders, General Counsel and Interim Chief Compliance Officer, and Kayla Smith, Director of Operations.  These interviews covered a range of topics and included specific questioning on the Company's internal review process to prevent access to, or dissemination of, prohibited content by or to existing subscribers.  Each confirmed that the Company was following the internal review process as outlined in the written response from counsel.

    4.    <u>Advertising or Marketing to Potentially New Subscribers</u>

Both through their counsel and in interviews, Raging Bull Defendants have repeatedly represented that they are not advertising or marketing to potentially new subscribers as they are prohibited from doing under the Order or during Phase 1 of the Business Plan.  The Monitor has not found any evidence, including in its proactive monitoring of the Company subscription services and public facing digital media, of the Company engaging in this activity.  Consistent with their commitment to compliance with this provision, the Company's counsel sent the Monitor for advance review two separate emails that the Company proposed to deploy to customers who had requested refunds from the Company, and whom the Company had determined were either eligible or not eligible for a refund.  The Monitor found that the emails contained content that could be

---

[8]    The Company's counsel proactively brought to the Monitor's attention the one exception to this finding, which was an email sent to existing subscribers containing language that could be construed as an Earnings Claim.  See May 13, 2021 email from <u>jeffwilliams@pennypro.com</u>, Exhibit 1, attached hereto. According to the Company's counsel, compliance edits to the email were inadvertently missed and the email was deployed in its original form, without the compliance revisions, due to an administrative mistake on the part of a production employee when sending out the communication.  The email was removed from the subscriber dashboard, and Martin Saunders, General Counsel and Interim Chief Compliance Officer, interviewed the employee to determine where the process failed and educated him or her on the appropriate protocols in an effort to avoid a repeat error.  He also gave the employee a warning that compliance violations can lead to discipline.  The Company's counsel further indicated that the Company would continue to monitor the situation.



construed as marketing or upselling of products or service. When alerted by the Monitor, the Company revised the emails accordingly, resulting in compliant communications.

In summary, the Monitor finds that the Raging Bull Defendants have, for the last 60 days, complied with Section I of the Order and the related Phase 1 requirements in the Business Plan.

### B.     Simple Mechanism to Cancel Negative Option Feature

Section II of the Order requires the Company to provide a simple mechanism for consumers to avoid being charged, or charged an increased amount, and to stop any recurring charges for Covered Goods or Services promoted or offered using a Negative Option Feature. This mechanism must be accessible on the same Internet website or web-based application used by consumers purchasing services over the Internet, and through a phone number and postal address for consumers purchasing through an oral offer and acceptance.

During Phase 1, the Company has not been accepting new or extended services from current customers, or auto-renewing any subscriptions. Going forward, Raging Bull offers a simple on-line mechanism to cancel an auto-renewal for all its products. As of June 14, 2021, and as shown in the FAQ section of Raging Bull's website (which all paid subscribers can access, including subscribers who signed up through the internet or by telephone), subscribers can stop an auto-renewal at any time before the renewal by following the instructions or by clicking on the "Update Subscription" button on their Subscriptions page. A screenshot of the FAQ with images of the notification option for auto-renewals and "Update Subscription" button is below.

Raging Bull
Monitor's Second Report
Page 13





Moreover, once Raging Bull is authorized to restart charging customers for services, Raging Bull subscribers will have access to a button on their Subscriptions page to cancel the auto-renewal feature of their subscription.[9]  A screenshot of this button is below:



---

[9]   The Monitor recognizes that there is value in deploying the "Cancel Subscription" button before Raging Bull is authorized to restart charging customers for services, and will address the timing of this functionality with the Company in short order if the Company is permitted to move into Phase 2 operations.  At that time, the Monitor will additionally consider whether the cancellation-related FAQs should be revised accordingly.

Raging Bull
Monitor's Second Report
Page 14



Raging Bull has represented that it will also continue to send auto-renewal notice emails to customers on a 30-day, 7-day and 2-day schedule.[10]  Raging Bull has revised its template notice email, to include a telephone number and a mailing address for customers to contact to terminate an auto-renewal.  The Company provided a template auto-renewal notice email that is consistent with this representation.

In summary, the Monitor finds that the Raging Bull Defendants are in compliance with Section II of the Order and the related Phase 1 requirements in the Business Plan.

### C. Compliance Monitoring Over Defendants

Section III of the Order requires the Company to take all reasonable steps necessary to monitor and ensure that Raging Bull Defendants and their agents, representatives, employees, and independent contractors act in compliance with the Court's Order, and to record all live sales events in conjunction with the offering for sale of any of the Defendants' Covered Goods and Services.

To assess compliance with this condition, the Monitor requested, as part of the Monitors' comprehensive assessment of the Company's entire compliance program, a written explanation of the steps taken by the Company "to monitor and ensure that Raging Bull Defendants and their agents, representatives, employees, and independent contractors act in compliance with this Order."  In its written responses, the Company provided specific compliance policies, procedures and modules addressing the various components of the Company's compliance program, which is

---

[10]  Raging Bull represented, through counsel, that prior to the FTC lawsuit, Raging Bull's practice was to send notice emails to customers whose services were scheduled to auto-renew to notify them that their services will be auto-renewing on a specific date and providing the customer with the simple mechanism to terminate the auto-renewal or discuss transfer to a different service by emailing or calling Raging Bull. Raging Bull sent this email to customers on three separate occasions – 30 days before service auto-renewal, 7 days before auto-renewal and then 2 days before auto-renewal.

Raging Bull
Monitor's Second Report
Page 15



discussed in greater detail below in Section V of this Report. More specifically, the Company stated that, "Even prior to the FTC's Complaint . . . the Company had started to engage in Employee training on topics such as FTC 'truth-in-advertising' best practices and telemarketing compliance," and "the Company can confirm that all of the trainings, policies, and auditing that it has done prior to and during Phase 1, which is provided to the Company's Employees and contractors, is designed to ensure compliance with the Order and Business Plan and to ensure Raging Bulls' workforce's awareness of their obligations under the Order."

To verify these representations, the Monitor interviewed Company leadership, including Jeff Bishop, CEO, Jason Bond, VP, Martin Saunders, General Counsel and Interim Chief Compliance Officer, Kayla Smith, Director of Operations, and Mustafa Hersi, the newly hired Chief Compliance Officer. They confirmed that staff have been trained on the conditions in the Order and Business Plan specifically related to the prohibitions on Earnings Claims, consumer testimonials, or any misrepresentation of any type regarding the Company's services.

As described in more detail in Section IV.A. above (Prohibited Business Activities), content to be used for existing subscribers is reviewed by the legal/compliance team and outside counsel before being deployed, and in some instances monitored once presented. This includes monitoring of subscription service chat rooms by the compliance team. Customer support agents have been trained and provided with "macros" or scripts on what can be said to subscribers. Compliance team members are assigned to work with and oversee compliance obligations of different departments, including with the "gurus" and their teams who supply content to subscribers, and the customer support team that interacts with subscribers who contact the Company.

Raging Bull
Monitor's Second Report
Page 16



At the time of the Monitor's appointment, the position of Chief Compliance Officer was vacant, but was being handled by the General Counsel, Martin Saunders, on an interim basis.  On approximately May 20, 2021, Mustafa Hersi was hired as Raging Bull's Chief Compliance Officer (*see* Hersi Résumé, attached at Exhibit 2).  Mr. Hersi's official start date with Raging Bull was June 7, 2021.

In addition to Mr. Saunders and Mr. Hersi, there are currently three employees assigned to compliance duties at Raging Bull.  One current compliance staff member focuses on the Company's systems, since he has been with the Company for several years and worked in a variety of roles.  A second member of the compliance staff focuses on fulfillment and reviewing "front end content."  His current focus has been on communications to and from the Company, and on monitoring the content of chat rooms.  The third member of the compliance staff focuses on marketing.  The new Chief Compliance Officer may adjust those assignments, although the duties being performed by each will need to continue, regardless of which staff member performs them.

The General Counsel and new Chief Compliance Officer described a current environment in which compliance is a primary focus of the Company.  They estimated that they speak with the Company's executive leadership several times each day, and are involved in the key business decisions facing the Company.  The General Counsel stated that the compliance program is adequately staffed, "for now," but foresees the need to increase staff, particularly if marketing expands.  The new Chief Compliance Officer stated that he is currently evaluating the compliance team and determining whether he needs additional resources.  The Company's compliance efforts have also been enhanced by the critical support of outside counsel.



In interviews with the Company's executive leadership, both Jeff Bishop and Jason Bond expressed strong commitments to compliance generally, and to a strong compliance program in particular.

Section III of the Order also requires Raging Bull to record the Company's "live sales events in conjunction with the offering for sale of any of Defendant's Covered Goods or Services." Because the Company has not been authorized to solicit new subscribers during this initial phase of the Monitorship, no live sales events have occurred.  However, the Company represented that these events, which are "educational training session[s] with the purpose of marketing a related product or service," are all recorded.

In summary, the Monitor finds that the Raging Bull Defendants are in compliance with Section III of the Order and the related Phase 1 requirements in the Business Plan.

### D.      Raging Bull Business Plan

Section IV of the Order incorporates the Raging Bull Business Plan.  The Business Plan includes specific representations and obligations that the Company has committed to meeting under Phase 1 and Phase 2, subject to monitoring by, and in some instances the approval of, the Monitor.  The Monitor's specific findings with respect to the Company's compliance with its representations and obligation under the Business Plan are detailed in Section V. Conditions Subject to Monitoring Under the Business Plan – Phase 1 Obligations, below.

### E.      Provision of Information to the Monitor

Section VII of the Order requires Raging Bull Defendants provide the Monitor, immediately upon request, certain information relating to Defendants' Earning Claims and other representations, locations where documents are located, and individuals who have been associated

Raging Bull
Monitor's Second Report
Page 18



or done business with Defendants since December 7, 2017, in connection with the marketing, advertising, promotion, offer for sale or sale of the Company's Covered Goods and Services.

As described in the First Report, the Monitor sent an initial Request for Information, dated April 13, 2021, requesting the specific information and documents covered by this section of the Order, and a Second Request for Information, dated April 18, 2021, requesting information relating to Prohibited Business Activities and the escrow account.

Since the First Report, the Monitor has sent the following additional Requests for Information to the Raging Bull Defendants covering multiple conditions in the Order and Business Plan:

1)      Monitor's Third Request for Information, dated May 7, 2021, requesting, *inter alia*, materials regarding refunds and the escrow account;

2)      Monitor's Fourth Request for Information, dated May 12, 2021, requesting materials related to the Company's Compliance Program;

3)      Monitor's Fifth Request for Information, dated May 14, 2021, requesting information related to the Company's process for review and vetting of old and new content for compliance with the Order and Business Plan; and

4)      Monitor's Sixth Request for Information, dated May 24, 2021 requesting certain back-up data related to customer refund requests.

5)      A letter, dated June 4, 2021, requesting outstanding materials needed for certification of satisfactory completion of Phase 1 requirements.

Further, the Monitor sent the Company's counsel numerous email communications regarding specific points of data and information. Raging Bull Defendants have provided

Raging Bull
Monitor's Second Report
Page 19

responses, through counsel, to these requests that the Monitor deems to be consistent with their

obligations under Section VII of the Order.

### F. Cooperation and Non-Interference with the Monitor

Section VIII of the Order requires the Raging Bull Defendants and their officers, agents,

employees, and attorneys to "fully cooperate with and assist the Monitor."  The Order further states

that this cooperation and assistance shall specifically include "providing information to the

Monitor that the Monitor deems necessary or appropriate to exercise the authority and discharge

the responsibilities of the Monitor under this Order."

As detailed above under "Provision of Information to the Monitor," the Monitor has made

multiple Requests for Information, by formal letter, by email, and in discussions with the Company

and its counsel.  While at times the Company struggled with providing some of the information

requested by the Monitor on a timely basis, neither Raging Bull Defendants nor their counsel ever

declined to produce any information requested.

Shortly after appointment of the Monitor, a weekly meeting was scheduled each Monday

afternoon between the Monitors, members of the monitoring team, and Raging Bull's counsel.

These meetings provided a valuable forum for the exchange of information, and for the frank

discussion of issues relevant to the monitorship.  In addition, these meetings helped ensure

accountability over the status of responses to requests for information.  In addition to the regularly

scheduled weekly meetings, numerous additional meetings between the Monitor and the

Company's counsel were also conducted.

At the request of the Monitor, interviews were conducted with the following executives

and key leadership of Raging Bull, along with Raging Bull counsel:

1.      Jeff Bishop, CEO



2.     Jason Bond, VP
3.     Martin Saunders, General Counsel and interim Chief Compliance Officer
4.     Kayla Smith, Director of Operations
5.     Mustafa Hersi, newly hired Chief Compliance Officer

The Company was cooperative with the Monitor regarding these interviews, and made the individuals, including Defendants Bishop and Bond, available at the time and date the Monitor requested. The Company permitted the Monitor full access to employees for interviews, and made every individual available whom the Monitor requested.  The Monitor will be conducting additional interviews in the coming weeks.  Accordingly, Raging Bull Defendants have provided the Monitor access to individuals for interviews in a manner that the Monitor deems to be consistent with their obligations under Section VIII of the Order.

Based upon the foregoing, the Monitor believes that Raging Bull has cooperated with the Monitor as required by Section VIII of the Order.

Section IX of the Order holds that the Raging Bull Defendants and their officers, agents, employees, and attorneys are preliminarily restrained and enjoined from directly or indirectly interfering with the Monitor's efforts to carry out its duties under the Order; destroying or otherwise altering or disposing of any documents; and refusing to cooperate with the Monitor in the exercise of the Monitor's duties or authority under any order of the Court.  The Monitor has no reason to believe that Raging Bull Defendants or anyone working at their behest has interfered with the Monitor's efforts to carry out its duties under the Order, and believes that Raging Bull has been cooperative with the Monitor in the exercise of those duties.

G.     **Escrow Account**

Section XI of the Order requires the owners of Raging Bull to create and fund from their personal assets the Escrow Account in the amount of $10 million by no later than ten days after



the entry of the Order.  In the Monitor's First Report, the Monitor detailed the efforts made by the owners as of the date of that Report, as represented by the owners and their counsel, to establish the Escrow Account.  The Monitor reported:

> *In its April 21, 2021 response, the Defendants represented that Messrs. Bishop and Bond have made $10 million of their personal assets available to Raging Bull, did so within 10 days of the Order, and have since used approximately $4 million of their personal funds to cover Raging Bull's costs and expenses. However, they have "been unable to create the $10 million escrow account, despite their efforts to do so." The explanation given was "the substantial and unexpected difficulty Raging Bull encountered in re-establishing its banking relationship with [its former bank] or establishing a new banking relationship."*

The Monitor also reported that counsel for Defendants had been advised that if they are unsuccessful in these efforts and intend to seek a modification to the requirement that they create and fund an Escrow Account, that modification request must be made to the Court, and unless other action is ordered by the Court, the Monitor would continue to assess and monitor this condition, and to report to the Court on the Company's compliance with this condition, in the Monitor's next scheduled report or earlier.

Since the First Report, the Monitor has continued to request from the Company and its owners information and documentation on the status and establishment of the Escrow Account, and explanation and documentation evidencing their representations that, in lieu of some or all of the $10 million required in the Escrow Account, they have otherwise made their personal assets available to "Raging Bull only on an as-needed basis solely for the purpose of covering any shortfalls during the first 180 days after commencement of Phase 1 operations," consistent with the Escrow Account requirements.

Between the First Report and mid-May 2021, the Raging Bull Defendants provided the Monitor with updates and documentation demonstrating their efforts and challenges in establishing

Raging Bull
Monitor's Second Report
Page 22



an Escrow Account.   Subsequently, the Raging Bull Defendants provided documentation demonstrating that on or about May 12, 2021, an Escrow Express Master Account and Sub-Account were established for the benefit of RagingBull.com, LLC, and that these accounts were funded on May 17, 2021 by Jason Bond in the amount of $1 million, and on May 18, 2021 by Jeff Bishop in the amount of $5 million, for a total between the two accounts of $6 million.   They also provided bank statements showing that as of May 31, 2021, the combined accounts had a balance totaling $6 million, and that as of June 17, 2021, the combined accounts had a balance totaling $3 million.   With respect to the $3 million withdrawn from the Escrow Accounts, the Raging Bull Defendants represented through counsel that those funds were requested and received by Raging Bull on June 4, 2021, and provided documentation that the $3 million was deposited into a RagingBull.com, LLC checking account.

The Raging Bull Defendants have not represented that they have deposited into the Escrow Accounts any amounts in addition to the initial $6 million in funding, to meet the $10 million funding requirement in the Order.   Instead, the Defendants, through counsel, have represented, as they did in the First Report, that they have used over $4 million of their personal assets to help fund the Company's operations.   In support of this representation, the Defendants provided the Monitor with a chart showing 15 different transactions between March 12, 2021 and May 13,



2021[11], from accounts owned and/or controlled by Jeff Bishop to pay amounts due on RagingBull.com credit cards, invoices, tax obligations and for other apparent RagingBull.com operational purposes in an amount totaling $4,051,524.  At the Monitor's request, the Defendants also provided documentation evidencing these transactions.

Based on the Defendants' representations and supporting documentation, the Monitor is satisfied that the owners have funded the Escrow Account in the amount of $6 million, and have used personal assets totaling $4 million to otherwise assist in the funding of RagingBull.com operations.  Nevertheless, the Order specifically requires that the Escrow Account be funded in the amount of $10 million from the personal assets of the owners of Raging Bull, and that condition has not been met.  The Monitor does not believe it has the authority to waive that condition, and as stated above, the Monitor has advised Defendants' counsel that if they intend to seek a modification from this requirement, they must make that modification request to the Court.

### H.    Refund and Cancellation Requests

Section XII of the Order requires the Company to follow a specific process for handling all requests pending as of the date of the Order from subscribers seeking a refund of amounts paid for services and/or a cancellation of any auto-renewal for services.  That process calls for the

---

[11]  The Monitor requested further explanation for the transactions that occurred prior to the March 26, 2021 Order, and the reasons why those transactions were made although the Company was still under temporary receivership. With respect to the first transaction – a $750,000 transfer from Jeff Bishop's line of credit to Raging Bull's Capital One credit card account, Defendants' counsel explained that "Raging Bull's Capital One * * * credit card account required a $750,000 line of credit which Mr. Bishop had in place from his brokerage account with UBS bank. Because the Temporary Receiver did not pay even the minimum payments on the outstanding balance in the Capital One account, the account went into default. After repeated attempts by Capital One to collect payment, they exercised the line of credit and pulled the $750,000 from Mr. Bishop's personal UBS brokerage account to satisfy the balance owed."  With respect to a $28,148 transfer on March 22, 2021, Defendants' counsel explained that the "$28,148 payment made to Capital One on March 22 was from Mr. Bishop's personal account at TD Bank. The purpose of this March 22 payment was because Capital One was demanding full payment on the account balance in order to reinstate the card, which was the only credit card Raging Bull had at that time and was critical for Raging Bull to promptly begin to turn its critical systems back on. This payment was made on March 22, which was three days after the March 19 hearing on the TRO, where the Judge strongly indicated he would rule in Raging Bull's favor on March 26."



Company to provide full refunds to the thirty-one Declarants who submitted declarations in support of the FTC's Motion to Show Cause.  All other requests pending as of the date of the Order are to be handled before the completion of Phase 1 as specifically set forth in the Order.  Under the Order, "[a]s a general rule, only subscribers who seek a refund for a service that, by its terms, provide for a refund are eligible for a refund," and "subscribers who seek a refund for a service that, by its terms, does not provide for a refund, or does not provide for a refund in the time period the request was made, will not be provided a refund . . .."  Under the Order, "[t]he Monitor has the authority * * * to determine, given the particular circumstances of each particular subscriber seeking a refund, whether any refund should be made and, if so, whether such refund should be full or partial."

Therefore, the Monitor does not have the authority to require that a refund be paid to any subscriber whose request and particular circumstances do not otherwise entitle the subscriber to a refund under the limitations in the Order.  Subscribers who are not eligible for a refund under the Order, but who believe they should be entitled to a refund or other restitution based on Raging Bull Defendants' alleged unfair and deceptive acts and practices that precipitated the FTC lawsuit, or for any other reasons, must seek those refunds or other relief through other avenues, *i.e.,* through the FTC's continuing litigation in this enforcement action, through other legal action, or through appeals directly with the Company.

1.      31 Declarants

As detailed in the Monitors first report, Defendants provided the Monitor with information describing the refunds to be paid to each of the 31 Declarants, and the communication that the Company intended to send to each Declarant in connection with the refund.  After several meetings and communications between the Monitor and the Company's counsel, the Company has

Raging Bull
Monitor's Second Report
Page 25



demonstrated to the Monitor that it sent to each of the 31 Declarants on April 26, 2021, an email stating that the Declarant will be receiving a check in the amount of the *greater* of (i) the amount the Declarant actually paid the Company for all subscription services (as calculated by the Company) or (ii) the amount the Declarant claims to have paid for all subscription services, less any prior refund amount, and also demonstrated that on April 26, 2021 or shortly thereafter the Company sent each of these 31 Declarants a refund check by FedEx.  These refunds do not require or request any release from any of the Declarants.   Furthermore, each of the Declarants' email addresses will be deleted from all of the Company's subscriber lists so these individuals will not be receiving any other communications from the Company going forward (except in connection with the refunds).

In an effort to verify the refunds provided to the 31 Declarants, the Monitor selected a sample of five refunds to review.  The Monitor concluded that four of the five Declarants' refund amounts were accurate.  The fifth Declarant's refund was for the amount the customer stated that they believed they were owed from Raging Bull, however, after a review of the Declarant's payment history the Monitor determined that the Declarant was actually due a larger amount.  Once this was brought to Raging Bull's attention, the Declarant was mailed a second check for the additional amount.  The Monitor contacted the fifth Declarant and confirmed that they received both checks from Raging Bull, for the correct amounts.

In addition to the audit of the five Declarants, the Monitor corresponded with four additional Declarants who contacted the Monitor indicating that they had not received their refunds. One of the Declarants subsequently informed the Monitor that they had received their refund.  For the other three Declarants, it was determined that Raging Bull did not have their correct mailing address.  The Monitor notified Raging Bull, and Raging Bull reissued refund

Raging Bull
Monitor's Second Report
Page 26



checks to each.  The Monitor followed up with each Declarant to confirm that they received their check and to verify the amount.

The Monitor finds that Raging Bulls' obligations with respect to the 31 Declarants has been satisfactorily completed.

> 2.    Remaining Refund and Cancellation Requests Pending as of the March 26 Order

As described above, under the Order, all remaining requests for refunds or cancellations pending as of the date of the Order are to be handled before the completion of Phase 1 as specifically set forth in the Order.  Under the Order, "[a]s a general rule, only subscribers who seek a refund for a service that, by its terms, provides for a refund are eligible for a refund," and "subscribers who seek a refund for a service that, by its terms, does not provide for a refund, or does not provide for a refund in the time period the request was made, will not be provided a refund . . .."  Under the Order, "[t]he Monitor has the authority * * * to determine, given the particular circumstances of each particular subscriber seeking a refund, whether any refund should be made and, if so, whether such refund should be full or partial."

The Monitor does not have the authority to require that a refund be paid to any subscriber whose request and particular circumstances do not otherwise entitle the subscriber to a refund under the limitations in the Order.  Instead, the Monitor's responsibility and authority focuses on determining whether the Company's decisions as to which of these subscribers are eligible for a refund or not, and if so the amount of the refund they are eligible for, are accurate under the terms of the Order and the specific products or services they purchased.

In order to determine the accuracy of the Company's refund eligibility decisions and refund amounts, the Monitor conducted a comprehensive audit of the Company's refund eligibility decisions and refund amount calculations, using Raging Bull's published refund policies for each

Raging Bull
Monitor's Second Report
Page 27



product or service, other criteria applied by Raging Bull in favor of refund eligibility, Raging Bull's customer files, the Temporary Receiver's files provided to the Company, and in some cases the correspondence between the subscriber and Raging Bull and/or the Temporary Receiver. For reasons described below, this audit proved very challenging and time consuming. However, as of this Second Report, the Monitor has determined that the Company has substantially complied with its obligation to handle all remaining refund and cancellation requests pending as of the date of the Order consistent with the specific parameters and limitations set forth in Section XII of the Order.

For a number or reasons, it was not until May 14, 2021 that the Company was able to provide to the Monitor a partial list of the subscribers who had refund or cancellation requests pending as of the date of the Order. That original list included a total of 1,156 individuals, of whom Raging Bull initially identified 233 subscribers who they determined were eligible for refunds. It was not until May 25, 2021 that the remaining list of 576 customers were provided to the Monitor, and of those Raging Bull initially determined that 93 customers were eligible for a refund, 8 were still under review, and for 25, Raging Bull could not find an account. Overall, of the 1,732 customers Raging Bull reviewed, 334 customers were initially determined by Raging Bull to be eligible for a refund.

The Monitor began the audit by reviewing all available files for the 334 subscribers whom Raging Bull determined were eligible for refunds. However, the Monitor was only able to verify the accuracy of the refund eligibility and amounts for a subset of those subscribers. For a number of reasons, not all of the backup files for each subscriber were complete, accurate or, in some cases, available at all. In addition, the information provided by Raging Bull to the Monitor evidencing the applicable refund policies for each product or service purchased was not entirely accurate, which resulted in some products and services being identified by the Company as "not refund

Raging Bull
Monitor's Second Report
Page 28



eligible" when they were, and others being identified as "refund eligible" when they were not.

There were other subscribers for whom the Company could not determine whether they were

refund eligible or not.

On June 8, 2021 the Monitor emailed Raging Bull's counsel that:

While we have been able to verify that most of those 300+ refund decisions appear consistent with the Order (which requires refunds only for those services that were subject to a refund policy and where the request was timely made), we found a significant portion of the decisions did not appear to be consistent with the Order, or with RB's refund policies, or with the process that RB has indicated it is using to make these refund decisions, or with the paperwork provided by RB.  Further, there are a significant number of customers who fall within a group who may have purchased products without a refund policy, but who may have legitimate arguments as to why they should be entitled to a refund based on the date they purchased the product (i.e., shortly before the TRO was ordered suspending all RB services), and/or what happened to the product shortly after it was purchased (i.e., the product was discontinued or the educators did not return to RB after the TRO was lifted).

In that email, the Monitor provided specific examples of inconsistencies, insufficient backup, and

apparently erroneous refund determinations.

On June 11, 2021, the Monitor provided the Company's counsel with the list of 252

subscribers who the Monitor was able to verify that the Company's refund determinations and

calculations appeared to be accurate.  On June 14, 2021, Raging Bull's counsel represented to the


[CONTINUED ON NEXT PAGE]

Raging Bull
Monitor's Second Report
Page 29



Monitor that a previously approved email communication was being sent to all 252 Monitor-verified refund-eligible subscribers on that day.[12]

On June 15, 2021, Raging Bull provided the Monitor with an updated list of pending subscriber refund requests, purportedly addressing the concerns that the Monitor had raised in the Monitor's June 8, 2021 email.  This list included all  the subscribers who were not included in the

---

[12] Under the Order, "subscribers who have made a pending refund request as of the date of this Order may be offered to continue their service(s) in lieu of a refund.  Except as otherwise approved by the Monitor, Raging Bull shall initiate only a single, pressure-free offer to continue services for each subscriber with a pending refund request."  The template email to refund-eligible subscribers that the Monitor reviewed, commented on, and ultimately approved after being revised, reads as follows:

**Subject line:** Re: Your refund request

Hello {NAME},

We've been catching up on emails from when operations were paused and have taken a look at your refund request. After reviewing your account, you do in fact meet the terms and are eligible for a refund totaling $____ for your subscription[s] to [LIST SERVICES ELIGIBLE FOR REFUND]. You may have other services for which you are not eligible for a refund under the terms of those services.

We wanted to express our sincere apologies for the inconvenience you experienced during the pause. We are about to process your refund. Once we make the refund, your subscription to [LIST SERVICES ELIGIBLE FOR REFUND] will immediately be cancelled. Any additional, non-refundable services you have will of course continue according to their terms – only the services for which you are provided a refund will end.

However, you also have the option to decline this refund and, instead, continue your services for the time you had remaining on those services as of December 8, 2020. Your remaining time would not start counting until after the currently ongoing open house and the four months continuation of your services free of charge to make up for the time we weren't able provide services to our subscribers. The ongoing open house is expected to run through the end of June (though it might be pushed back into July). So, for example, if you had two months left on your service as of December 8, 2020, the two months of remaining service would not start to run until the end of October 2021, after the completion of the ongoing open house and the four months of free service you'll receive.

If you choose to continue your services rather than take the refund, your services will not be auto-renewed. The service will expire with no payment unless you contact us to renew it.

Please contact our customer service team at (800) 380-7072 or support@ragingbull.com within seven days to let us know if you would like to decline the refund and continue the services. If we do not hear from you within seven days, we will process your refund and cancel those services.

We look forward to hearing from you!

Sincerely,

Jeff Bishop & Jason Bond



list of 252 refund-eligible subscribers previously verified by the Monitor. This updated list included approximately 226 entries that were revised from Raging Bull's initial determinations whether to pay a refund or not, or the amount of the refund due, based on the issues raised by the Monitor and/or revised refund criteria being applied. Most of these resulted in customers receiving refunds (when initially they were deemed not eligible) or receiving larger refunds than initially determined. On June 16, 2021, the Monitor provided Raging Bull with a list of the remaining subscribers who the Company had initially determined were "refund eligible," indicating which ones the Monitor was able to verify the accuracy of the Company's determination and calculations, and which ones required additional research and review by the Company.

On June 16, 2021, the Monitor began reviewing the remaining 1,315 entries on the updated list of pending subscriber refund requests, the vast majority of which Raging Bull had determined were not eligible for a refund. This review consisted of a random audit of 10% of the 1,315 entries (a total of 133 subscriber refund determinations), again applying the Company's refund policies[13] and updated refund criteria[14], and all available information in the Company's and the Temporary Receiver's backup files. As a result of this audit, the Monitor found a significant number of the

---

[13] A document listing Raging Bull's Services Refund Policies for each of its services for purposes of refund eligibility determinations is attached as Exhibit 3.

[14] Raging Bull is applying the following criteria to determine whether a subscriber with a pending refund request as of the date of the Order is eligible for a refund:

- If the subscriber purchased a product or service with a refund policy of up to 30 days, and that purchase was made up to 30 days prior to the TRO on December 8, 2020, then the subscriber is eligible for a refund for that product or service, regardless of when the subscriber made their pending refund request.
- If a subscriber purchased a product or service with a longer refund policy (*i.e.*, 365-day refund policy), and that purchase was made within that time period before the TRO, then the subscriber is eligible for a refund, regardless of when the subscriber made their pending refund request.
- If the subscriber purchased ANY product or service during the period December 1 – December 8, 2020 (the week prior to the TRO), then they are eligible for a refund for those products or services, regardless of when the subscriber made their pending refund request.

Raging Bull
Monitor's Second Report
Page 31



Company's "not refund eligible" determinations either inaccurate, or not supported by sufficient

(or any) backup documentation.  On June 17, 2021, the Monitor emailed the Company's counsel:

> We audited 133 (or 10%) of the entries in the "2021.06.14 - Combined and Updated Pending Refund Request Tracker (Corrected)" that we received on the afternoon of 6/15, related to the 1315 customers who were originally listed by Raging Bull as NOT refund eligible (column N).  We have found that 12 were either missing a backup file or the documentation we needed to verify, and 15 appear to be entitled to refunds based on the RB criteria.  Altogether, that is an error rate of 20% total, or 11% just on the customers who appear to be entitled to refunds.  If our audit is accurate, this is a problem that likely prevents us from being to certify that refund requests pending as of the Order have been handled correctly.

> Attached are the spreadsheets with our findings.  The first spreadsheet has our audit results for entries 1-660, and the second for entries 661-1315.  If you go to the last column – "AMI COMMENTS" – you will see our audit findings.  Wherever there is a "V" – that means that entry was verified and we do not dispute it.  The other entries in that column describe the audit concern.

> We request that you review these spreadsheets as soon as possible and provide a response and proposal for addressing these discrepancies.  We are available tomorrow (Friday) to discuss.

The Monitor met with the Company's counsel on June 18, 2021, and in that meeting

counsel represented that Raging Bull would be re-reviewing all entries in the updated tracker over

the weekend, would "quality assure" what they find, and would provide the Monitor an updated

tracker by the end of the day on Monday, June 21.

Late on Monday, June 21, 2021, or early on Tuesday, June 22, 2021, Raging Bull provided

the Monitor with the further updated list of pending subscriber refund requests, and an additional

133 subscriber backup files.  The Monitor immediately began reviewing this list, which consisted

of a random audit of 10% of the 1,212 entries (a total of 120 subscriber refund determinations),

again applying the Company's refund policies and updated refund criteria, and all available

information in the Company's and the Temporary Receiver's backup files.  As a result of this

audit, and after sharing the audit results to Raging Bull and receiving their response on June 23,

Raging Bull
Monitor's Second Report
Page 32



2021, the Monitor determined that there were two entries (or 1.7% of those audited) where subscribers were eligible for a refund, and one entry (or 0.8%) where Raging Bull unable to locate an account for the individual which would otherwise verify that the "not refund eligible" determination was accurate.[15]

[CONTINUED ON NEXT PAGE]

---

[15]  The Monitor understands that in June a Raging Bull customer submitted a refund request directly to the Court, and that this customer's request was added to the publicly available court documents in this matter.  The Monitor understands that this customer was eligible for a refund, and that Raging Bull emailed the customer on June 14, 2021 so indicating.

Raging Bull
Monitor's Second Report
Page 33



Raging Bull represents that it is prepared to immediately send the previously approved emails to these remaining individuals notifying them whether they are eligible or not eligible for a refund.[16]

In total, the Monitor has audited Raging Bull's "refund" and "no refund" determinations and the backup documentation supporting those determinations of approximately 587 of the 1,732 subscribers who were identified by Raging Bull as having pending refund or cancellation requests

---

[16]   The template email to "not refund eligible" customers with refund requests pending as of the date of the Order reads as follow:

Subject line: Re: Your refund request

Hello {NAME},

We've been catching up on emails from when operations were paused and have taken a look at your refund request.

Based on our review of your account, you did not meet the refund eligibility requirements because your subscription(s) either had a strict "no refund" policy or the time period to request a refund for any service with a refund policy had already expired by December 8, 2020, the date we were forced to pause our services.

We want to express our sincere apologies for the inconvenience you experienced during the pause in our services.

As you know, since the beginning of May you've had full access to every service RagingBull offers as part of our open house. The ongoing open house is expected to run through the end of June (though it might be pushed back into July).

When the open house ends, all Raging Bull members, including you, will receive four months continuation of your services free of charge to make up for the time we weren't able provide services to our subscribers. Once those four months end, which we anticipate will be around the end of October 2021, the time you had remaining on your services as of December 8, 2020 will begin to run. So, for example, if you had two months left on your service as of December 8, 2020, the two months of remaining service would not start to run until the end of October 2021.

You do not need to contact us or do anything to receive this. All of this is automatic and you will not be charged anything for it. And your continued services will not be auto-renewed. The services will expire when the time remaining ends with no payment unless you contact us to renew it.

Although you are not eligible for a refund for your services, we can offer you the option to switch to another service of similar value at no additional cost. If you would like to switch to another service, at no additional cost, please reply to this email or contact our customer service team at (800) 380-7072 or support@ragingbull.com.

The bottom line is that we understand you have been inconvenienced during this whole process. We want you to know how much your business means to us.

Sincerely,

Jeff Bishop & Jason Bond



as of the date of the Order, or approximately 34% of all such subscribers.  As a result of the Monitor's audits, and the Monitor's communications and instructions to the Company, Raging Bull invested additional time and resources, and refined its criteria, in connection with its process for determining which subscribers within this group were entitled to refunds, and the amounts of those refunds.  The Monitor does not believe that an audit of every single one of the 1,732 pending refund requests is necessary under the Order.  While the Monitor recognizes that there may be subscribers within this group whose pending refund requests may not have been accurately determined by Raging Bull, given that the most recent audit found that just 2 out of 120 subscriber "not refund eligible" determinations (or 1.7%) appeared to be inaccurate, it is likely that number will be very low.  As such, the Monitor has determined that the Company has substantially complied with its obligation to handle all remaining refund and cancellation requests pending as of the date of the Order consistent with the specific parameters and limitations set forth in Section XII of the Order.

However, because there may be individuals who do not believe that Raging Bull has properly determined their eligibility for a refund, and because the Monitor's audits found that some of these eligibility determinations may have been made in error, the Monitor intends to require Raging Bull to continue to provide the Monitor with regular reports on communications they receive from any of the subscribers, and how they have been handled and/or resolved by the Company, and where appropriate, the Monitor will also continue to review individual cases.

Raging Bull
Monitor's Second Report
Page 35



## V. CONDITIONS SUBJECT TO MONITORING UNDER THE BUSINESS PLAN – PHASE 1 OBLIGATIONS

### A. Operations Limited to Existing Subscribers

In the Business Plan, Raging Bull represented that it "will devote its efforts in Phase 1 to servicing existing subscribers only," and that it would adhere to certain restrictions and conditions (see Business Plan p. 9).  The Monitor's assessment of Raging Bull's compliance with these restrictions and conditions are described below.

### B. No Advertising or Marketing to Potentially New Subscribers

As discussed in detail in Section I.A.4. above, the Monitor has not found evidence, including in its proactive monitoring of the Company subscription services and public facing digital media, of the Company engaging in advertising or marketing to potentially new subscribers.

### C. No Earnings Claims, Consumer Testimonials, Etc.

As discussed in detail in Section I.A. above, the Monitor finds that the Company has satisfactorily removed "legacy" content containing Earnings Claims, Consumer Testimonials, and other content that constitutes Prohibited Business Activities from its subscription services and public facing digital media.  In addition, the Monitor finds that the Company has properly vetted new content deployed to existing subscribers and has functionally abstained from making Earnings Claims, using Consumer Testimonials, or deploying content that otherwise violates the Order or Business Plan.

### D. No Upselling and No Renewals or New Subscriptions from Existing Subscribers

As discussed in Section I.A.3 above, the Monitor engaged in a robust monitoring effort of Raging Bull Defendants' subscription services, including content such as webinars, chat rooms, videos, and livestreams on the Company website, and of communications sent to existing

Raging Bull
Monitor's Second Report
Page 36



subscribers, as well as public-facing digital media, to determine whether any of said content contained prohibited material.  Over the course of this review, the Monitor has not found any instances of the Company upselling, renewing subscriptions, or soliciting new subscriptions from existing subscribers.

### E.      All Pre-Existing Subscriptions Supported by ROSCA-Compliant Cancellation Mechanism

As discussed in Section IV.B. above, Raging Bull has developed a simple mechanism to cancel an auto-renewal for all its products.

### F.      Investment in Advertising and Compliance Infrastructure

During Phase 1, Raging Bull committed in its Business Plan to "revamping and expanding its advertising and compliance infrastructure" through what the Plan calls a "concerted focus on additional compliance redundancies."  (Business Plan at p. 9). In order to assess Raging Bull's compliance with these commitments and the viability of the Company's compliance program, we requested extensive documentation from the Company, which the Company provided.  In addition, we interviewed both the General Counsel and the new Chief Compliance Officer.

It is important to stress that the Monitor's present review of Raging Bull's commitments in connection with its advertising and compliance program is a snapshot in time.  As contemplated by the Order and the Business Plan, our review at this juncture is predominantly a paper review, and is largely prospective, as the revamped program is nascent.  Although a compliance program has existed at the Company in some form, implementation of this revamped and expanded program will largely be the responsibility of the newly hired Chief Compliance Officer, who only recently joined the Company.  Future Monitor reports will continue to review the developing state of the Program, and assess whether it is real and effective.  To that end, the Monitor intends to provide

Raging Bull
Monitor's Second Report
Page 37



Raging Bull with an assessment and recommendations to potentially improve the Compliance Program as currently designed and written.

Raging Bull, in its Business Plan, committed to the following investments in its Advertising and Compliance Infrastructure:

1.  The hiring of up to 5 full-time compliance personnel, as needed, based on the Chief Compliance Officer's determination; one of these employees will be designated Chief Compliance Officer and will have sufficient knowledge and expertise in FTC Section 5 advertising and marketing law and policies and will be available to be present in the Baltimore office as needed.

Mustafa Hersi joined Raging Bull as its Chief Compliance Officer on June 7, 2021.  Mr. Hersi is an experienced attorney and compliance professional, having served, among other positions, as an Assistant United States Attorney, as an Associate General Counsel and Regulatory Counsel for an educational organization where, among other responsibilities he managed all FTC and state consumer protection marketing and advertising compliance, and as a Chief Compliance Officer for a University and its affiliated health system.  Mr. Hersi is located in the Washington, DC area, and has committed to being present in the Company's Baltimore office as needed.  Mr. Hersi currently has a staff of three compliance professionals, and indicates that he has the authority to hire additional staff as he deems necessary.

2.  A multi-stakeholder review and revision of the Company's process for analyzing and approving sales and advertising materials before they are posted or communicated externally.

Raging Bull's new Compliance Manual provides that "[a]ll potential advertisements and/or marketing materials designed to be widely disseminated must be composed in compliance with Raging Bull's Customer Communications & Advertising Policy, Module 7 ("Raging Bull Compliance Communications Review Policy"), Module 8 ("Raging Bull Compliance Marketing Review Policy"), and Module 10 ("Raging Bull Advertising Claim Standards"). The [Chief



Compliance Officer ("CCO")] will periodically sample and review communication and advertising materials to ensure compliance with the Company's compliance polices and maintain appropriate documentary evidence of such reviews." Module 7 provides a specific process for the review of sales and advertising materials that requires, among other things, that employees share with the compliance department the communication copy; that a compliance department employee will review the copy and make edits and suggestions; that when the compliance department has completed their review of the proposed copy they will forward the communication to outside counsel for their review; and that the copy will be returned to the employee and can be used only once it is deemed satisfactory by outside counsel and the compliance department. Module 8 similarly provides that "No Advertisements can be disseminated to the public without approval from the compliance team, [outside counsel], ***and the Monitor***"[17] (emphasis added).

3.      <u>Review and targeted revision of the Company's employee code of conduct, which includes compliance procedures and policies, including disciplinary consequences for compliance violations.</u>

Raging Bull has developed a revised Code of Ethics and Business Conduct that includes compliance procedures and policies. The Code specifically provides that "Violations of this Code, or the other policies and procedures set forth in the Manual, may warrant sanctions including, without limitation, requiring that personal trades be reversed, requiring the disgorgement of profits or gifts, issuing a letter of caution or warning, suspending personal trading rights, imposing a fine, suspending employment (with or without compensation), making a referral to a regulatory

---

[17] Raging Bull Defendants have recently provided the Monitor with advertising and marketing materials the Company proposes to utilize in Phase 2. The Monitor has deferred review of these materials in order to prioritize our audit of the Company's Phase 1 obligations. The Monitor intends to verify that the Company has followed the rigorous process for compliance review set forth in these Modules, including approval of these materials by the internal compliance department, outside counsel, and the Monitor, before deployment of any advertising, marketing or promotional content.

Raging Bull
Monitor's Second Report
Page 39



authority (including the SEC), terminating employment (including for cause), and/or a combination of the foregoing."

> 4.  <u>Development of methods for anonymous and confidential internal reporting of employee compliance misconduct, and creation of a process for the investigation of internally reported compliance complaints, with assurance of non-retaliation</u>.

The Code of Conduct provides that "Employees must promptly report any improper or suspicious activities, including any suspected violations of the Code of Ethics, to the CCO. Issues can be reported to the CCO in person, or by telephone, email, or written letter. Reports of potential issues may be made anonymously," and the Compliance Manual includes a Whistleblower Policy that prohibits retaliation against employees who report compliance concerns in good faith. The Whistleblower Policy also requires the Chief Compliance Officer to develop investigation procedures and to conduct investigations of internally reported compliance complaints.

> 5.  <u>Institution of regular reviews of "guru" trading activity and subscriber communications to ensure compliance with this plan</u>.

Raging Bull's Compliance Module 7 – Compliance Communications Review – provides the procedure for reviewing, among other activities, "guru" trading activity and subscriber communications, as follows: "To provide oversight and suggestions for all company generated non-marketing email, texts, videos, and mobile application communications to existing subscribers, including watch lists, educational information, and trading activity for educational purposes."[18]

---

[18]   As part of any Phase 2 monitoring, we intend to audit whether in fact the Company is conducting regular review of "guru" trading activity.

Raging Bull
Monitor's Second Report
Page 40



6. Implementation of employee and "guru" compensation and evaluation structures that incentivize compliance and penalize unlawful conduct.

Raging Bull's Compliance Manual has a specific provision addressing "Employee Compliance Compensation Incentives" that provides:

> Employees with demonstrated adherence to the Company's compliance program will be eligible for a bonus. Employees will not be considered for a bonus if there are significant compliance concerns with their work product or overall respect for the Company's compliance objectives. The decision to deem an employee's actions as a significant compliance concern is at the discretion of the [Chief Compliance Officer]. By way of example, repeated failures to attend compliance trainings without giving notice to the Compliance department and being responsible for reviewing the session's content will be considered a significant compliance concern.

7. Elimination of all advertising and marketing content under the Company's control that is currently on the Internet that is not in compliance with the requirements of this plan; elimination or modification of all video and written materials for each service provided by the Company to ensure that all such materials offered to subscribers are in compliance with the requirements of this plan.

As discussed in greater detail in Section IV.A. above, and as referenced in Compliance Modules 7, 8 and 10, Raging Bull has implemented a process to identify and remove all non-compliant advertising and marketing content, as well as video and written materials offered to subscribers, and has been largely successful in meeting this requirement.

8. The construction and implementation of new internal and external auditing and monitoring functions.

Module 1 of the Compliance Program requires both regular internal and external compliance audits overseen by the Chief Compliance Officer. As discussed in Section IV.A.3. above, the Company has also implemented an internal monitoring program to prevent violations of both the law and the Court's Order.



9. <u>The Compliance Team will also establish a formal program for the regular and consistent compliance training of Company employees, "gurus" and management</u>.

Raging Bull's Compliance Module 2 describes the Company's training approach and schedule, and provides for regular trainings for staff as follows:

> Trainings are led by outside counsel, team leads, senior management and other experts, depending on the session. Some trainings are recorded and all materials/slides/handouts are made available to Employees after the training, for their continued review and ease of access. Training topics planned for 2021 include sessions involving earnings claims, substantiation, ethics, SEC rules and testimonials.

Compliance Module 2 also includes a training schedule for 2021 which identifies different training sessions scheduled for each week as well as monthly compliance training programs. The topics for 2021 seem appropriate for the organization's risks.

In his interview, the Chief Compliance Officer confirmed the training schedule, and reported that he had led his first monthly compliance training program for all Company staff in June 2021.

10. <u>The Compliance Team will closely oversee compliance with respect to all Raging Bull advertising and marketing; language on all order forms; subscriber refunds, cancellations and customer service and response, including the resolution of complaints; trading practices of company "gurus"; and communications with subscribers; and all consumer facing communications</u>.

Raging Bull's Compliance Manual and Compliance Modules include specific policies and procedures addressing compliance oversight of advertising and marketing materials and content (Module 7 - Raging Bull Compliance Communications Review Policy; Module 8 - Raging Bull Compliance Marketing Review Policy; and Module 10 - Raging Bull Advertising Claim Standards), language in subscriber order forms (Module 1 - Raging Bull Audit Policy), addressing subscriber requests for refunds, cancellations and other customer service complaints (Module 6 -

Raging Bull
Monitor's Second Report
Page 42



Raging Bull Complaint Response Team; Module 9 - Raging Bull Refund And Complaint

Procedure; Module 11- Raging Bull Telesales And Marketing Compliance Policy; and Module 13

- Raging Bull Refund & Cancellation Policy), trading practices of company "gurus" (Code of

Conduct - Personal Trading Policy and Procedures; Module 1 and Module 18 - Guidance For

Conducting Raging Bull Business Under The Publisher's Exclusion And The March 26, 2021

Order During Phase 1), and other communications with both subscribers and other consumers

(Compliance Manual Appendix B (Raging Bull.com LLC Customer Communications &

Advertising Policy) and Appendix C (RagingBull.com, LLC Customer Relations Policy).

In summary, Raging Bull has hired a qualified Chief Compliance Officer, has developed a

written Compliance Program that includes each element of the revised Compliance Program as set

forth in the Business Plan, and has begun implementing that Program, consistent with its

representation in the Business Plan to "revamp and expand its advertising and compliance

infrastructure."

### G.        Customer Service, Refund and Cancellation Procedures

1.        <u>Complaints, Refund and Cancellation Requests to Raging Bull</u>

In its Business Plan, Raging Bull stated that it would "commit significant resources during

Phase 1 and beyond to customer service," that it would "develop policies and procedures for

addressing refunds, renewal cancellations and complaints," and that it would, among other things,

"address the backlog of outstanding refund requests that have not been addressed since the TRO

was entered."

To monitor compliance with these commitments, the Monitor requested specific

information addressing the customer service resources, policies and procedures and status of the

handling of customer inquiries.  On June 14, 2021, the Company's counsel provided the Monitor

Raging Bull
Monitor's Second Report
Page 43



with the names and titles of twelve employees constituting the Complaint Management Team,

which includes eight Customer Support staff, a Chargeback Specialist, the Support and Telesales

Manager, Director of Operations, and a member of the Compliance Department.  The Company

also provided the Monitor with its Updated Refund Process memo, as well as its Module 13 -

Raging Bull Refund & Cancellation Policy. With respect to the handling of both the backlog and

current state of outstanding refund requests and other customer inquiries, the Company's counsel

stated the following on June 21, 2021:

> Each time a customer contacts Raging Bull with a question, complaint or request, a
> customer ticket is generated. Since Raging Bull re-started services again on May 5, 2021,
> Raging Bull has addressed approximately 7,000 customer tickets. At this time, Raging Bull
> has approximately 2,000 open tickets, most of which are from the customers who made
> refund requests prior to March 26, 2021 and are on the Combined and Updated Pending
> Request Tracker spreadsheet, which was provided to the Monitor on June 14, 2021. Raging
> Bull estimates there presently are approximately 250 remaining refund requests made after
> March 26, and Raging Bull expects to address all of these in the next few days in
> accordance with its Refund and Complaint Procedure (Module 9). Raging Bull will confirm
> with the Monitor when it has substantially addressed all of these requests.

On June 24, 2021 Raging Bull's counsel provided the Monitor with the following update on

outstanding refund requests: "Raging Bull has addressed all post-March 26 refund requests it was

aware of as of June 18. Raging Bull has received approximately 400 post-March 26 refund

requests, approximately 170 of which it has deemed to be eligible for a refund and notified.  We

are handling any new refund requests in accordance with our refund consideration procedures."

On April 12, 2021, Raging Bull established its dedicated customer support email address

at support@ragingbull.com and subsequently established a customer support phone number (800-

380-7072) which were both tested by the Monitor.  Based on the Monitor's testing, and customer

complaints, it appears that the Company's customer support phone number is not always directed

to a live customer support representative. Raging Bull has indicated that the volume of customers

Raging Bull
Monitor's Second Report
Page 44



calling the support number at a given period will affect whether a call is answered by a live customer support representative.

The Monitor finds that Raging Bull has committed resources and developed policies and procedures to address refund and cancellation requests, and customer complaints, substantially consistent with its commitments under the Business Plan.

However, the Monitor has received, directly to the Monitor's dedicated email address, telephone number, and in some cases individual Monitor's personal cell phone numbers, over 350 inquiries and complaints from Raging Bull customers since the date of the Order (most seeking refunds or cancellations). The Monitor's handling of these inquiries is discussed in more detail below. Further, the Monitor has been tracking customer complaints made to review sites such as the BBB and TrustPilot, and other social media platforms. Based upon these sources, it is clear that many customers have had difficulty getting through to Raging Bull customer service, have not received timely or substantive responses to their inquiries, and remain dissatisfied with how Raging Bull has handled their requests or complaints.

Given the continued level of frustration by many Raging Bull customers relating to Customer Service, while the Monitor believes that Raging Bull has made good faith efforts to meet its commitments in the Business Plan as described above, and that those efforts are continuing and improving, the Monitor views these shortcomings as significant; this is an area that the Monitor will continue to monitor, assess and report on during the monitoring period.

2.    <u>Complaints to the Raging Bull Monitor Email and Telephone Accounts</u>

As described in the first report, the Monitor has taken steps to make sure that current subscribers who are seeking refunds or cancellations, who want to raise complaints, or who are seeking more information about the status of the Company's operations, are able to contact the

Raging Bull
Monitor's Second Report
Page 45



Monitor and/or the Company and have their communications acknowledged and addressed.  On April 9, 2021, the Monitor established its RagingBull.com Monitorship webpage at https://www.affiliatedmonitors.com/raging-bull-monitorship/, which provides Raging Bull customers with information about the Order, and a dedicated email address.  On April 13, 2021, a dedicated telephone number (617-807-1161) was added whereby customers can leave a message for the Monitor. Customers are asked to leave their email and contact information so the Monitor can get back to them.  The Monitor's webpage also included Raging Bull's dedicated customer support email address and customer support phone number.

On May 13, 2021, the FTC sent an email to all Raging Bull customers who had previously contacted the Temporary Receiver. The email included a copy of the Order, Business Plan, and Notice from Raging Bull. The email stated that the Order provides a refund process for some Raging Bull consumers and provided the contact information for Raging Bull and the Monitor. The Monitor notes that the email generated a large volume of customer outreach to the Monitor and Raging Bull, which resulted in delays in the Monitor responding to each customer.  As of June 7, 2021, the Monitor had received emails or telephone calls from 351 Raging Bull customers.  Prior to May 28, 2021, the monitor responded with an acknowledgment and available relevant information to each customer.   The information provided by the Monitor stated that RagingBull.com will be addressing customer refund requests and complaints during the first 60 days of the Monitorship; Affiliated Monitors, Inc. will be monitoring that process; that  customers should contact Raging Bull at support@ragingbull.com;and if the customer does not receive a resolution from RagingBull.com by May 25, 2021, the customer should email the Monitor at RagingBullMonitor@affiliatedmonitors.com.

Raging Bull
Monitor's Second Report
Page 46



As of May 28, 2021the Monitor initiated a revised automatic email response, which states that "Raging Bull continues to examine each refund claim to determine whether Raging Bull believes the claim is eligible for a refund, based on the terms of the purchase agreement that was in place at the time of sale.  This is the process Raging Bull is required to follow under the Court Order. As monitor, it is our role to oversee this process and ensure it is carried out in accordance with the Court Order." The message directs customers to contact Raging Bull for their refund request, provides customers with Raging Bull's customer support contact information, and explains that refund requests will be placed in a queue for evaluation by Raging Bull.   The Monitor's website was likewise updated on June 7, 2021, with this new message.

The Monitor has provided Raging Bull with a list of customers who have contacted the Monitor. Raging Bull was provided with a total customer list, including customer contact information, on April 23, 2021 (85 Customers) and on June 7, 2021 (351 Customers). On both occasions, AMI requested that the Company report on the status of all refund requests. The Monitor received Raging Bulls status update on the 85 customers on May 5, 2021. The update only indicated whether the customer was eligible for a refund and whether a refund was provided. The Monitor received Raging Bull's status update on the 351 (total) customers on June 24, 2021. The Monitor has not yet had the opportunity to review that update[19]

---

[19]  In the communication from Raging Bull's counsel transmitting the status update on the 351 customers who had contacted the Monitor, counsel stated:

The list of 351 names includes the following:
16 who were among the 31 Declarants
192 who were on the list provided to Raging Bull by the Temporary Receiver
2 duplicate entries
221 who were listed in the June 14 pending request (pre-march 26) spreadsheet
24 who made post-March 26 refund requests who are eligible for refunds (all of whom have been notified of eligibility)

Raging Bull
Monitor's Second Report
Page 47



AFFILIATED
MONITORS, INC.™
INTEGRITY THROUGH COMPLIANCE

3.   <u>Scams Targeting Raging Bull Customers by Third-Party Imposters on Social Media</u>

In reviewing customer refund and cancellation requests, the Monitor has found at least four and potentially five instances where customers appear to have been scammed by third parties pretending to be Raging Bull employees, asking the customer to send money to them directly, often in cryptocurrency or a similar format that is not readily traceable. Some of the scams were detailed and convincing, and included fake social media accounts utilizing the names of Raging Bull "gurus" and leadership.  Some of the third parties used nearly identical names, "guru" photos and even family photos in the "profile" they created posing as one of the Raging Bull "gurus". These issues have surfaced both from customers contacting the Monitor through the RagingBull Monitor email and in the Monitor's review of the back-up documentation from the Receiver.

The Monitor conducted an investigation of the first customer it identified as a potential victim of a scam to confirm that Raging Bull employees or "gurus" were not contacting customers outside of normal business channels and were not soliciting direct payments from customers.  The Monitor requested and received supporting documentation from the customer including social media (WhatsApp and Twitter) chat discussions; deposit receipts for two checks, totaling $1,750, the customer wrote believing he was paying for "one-on-one" training from Raging Bull "guru", Ben Sturgill[20]; bank account information for the accounts into which he deposited the checks, including bank name, name of account holder, and account number; and phone numbers provided to the customer by the scammer(s).  Additionally, the Monitor conducted two interviews with the customer, who, although he was a relatively experienced trader, did not understand that he had been the victim of a scam until the Monitor's questions alerted him to the suspicious nature of the

---

[20]   At the direction of the third-party via a WhatsApp chat, the customer went in-person to his local Wells Fargo branch and deposited a check into a Wells Fargo bank account for $1,000 on January 19, 2021, and another check for $750 on January 27, 2021.



contact and the payments.  Ultimately, the Monitor concluded that the individual(s) to whom the customer sent the $1,750 was not Ben Sturgill, or any other Raging Bull employee or "guru", but rather a scammer pretending to be Ben Sturgill.

The most compelling support for this finding is the Twitter handle used by the individual who contacted the customer through a DM (or "direct message") on Twitter, presumably after the customer had commented on a tweet posted by the real Ben Sturgill.  The contact used the Twitter handle "@bensturgilllrb" (sic), while the real Ben Sturgill's Twitter handle is "@bensturgill".  The customer's recollection during the Monitor's interviews was that at some point during the direct message conversation on Twitter, the individual asked him for his cell phone number, which he provided.  He then received a message via WhatsApp from the individual (claiming to be same Ben Sturgill who had DM'd him on Twitter), and texted with the person, as well as someone identified as the person's assistant, in a conversation that eventually led to the request for, and his deposit of, the $1,750.  When contact ceased after he deposited the money, the customer repeatedly asked when his services would be forthcoming, and when he received no response, requested a refund. [21]

As of the Monitor's last contact with the customer, on June 2, 2021, the scammer(s) had resumed contacting the customer, trying new approaches to convince him to deposit more funds via cryptocurrency.  The Monitor provided the customer with the contact information of an individual at his local law enforcement agency, a Special Agent of the North Carolina Bureau of Investigation's Financial Crimes Unit, and advised him of the option of reporting the scam to that authority, as well as to the FTC.[22]

---

[21] The Monitor likewise found no connection between any of the information provided by the scammer(s) and the real Ben Sturgill.

[22] The Monitor is unaware whether the customer pursued either of these options.

Raging Bull
Monitor's Second Report
Page 49



Shortly after discovering the issue, the Monitor notified Raging Bull's counsel of the investigation, its findings, and conducted a meeting with Defendants Jeff Bishop and Jason Bond, along with their counsel, to discuss the scam issue.[23]  The Defendants and their counsel indicated that this type of scam is unfortunately common in the online service industry, and alerted the Monitor to the FTC's own warning to customers on its website regarding these types of scams. Bishop and Bond explained that they had been aware of similar scenarios occurring in the past, and described to the Monitor the steps they took to combat scam artists dating back prior to the TRO.  These efforts included hiring an outside vendor whose sole purpose is to search for fake accounts and shut them down before they can target and take advantage of Raging Bull customers, and assigning Customer Service representatives to similarly monitor social media. In addition, Bishop and Bond indicated that the Company typically provides relief to customer victims, most often in the form of providing the services the customer thought he/she was buying from the Company to the customer at no charge.

To further protect its customers, the Monitor recommended that Raging Bull provide a specific and conspicuous warning, alerting customers to the prevalence of these scams, and stating clearly that the Company would never ask them to make a payment via social media. In response, the Company added the below disclaimer to its customer account page:

> **Social Media Scam Warning:** There are RagingBull and RagingBull trader imposters on the Internet. These fakers cannot prove who they are, but they try hard to convince you that they're the real deal. They will try to set up fake social media profiles, create fake websites, use real pictures of RagingBull's traders (and their families!), use fake IDs, ask you to send them money via social media, and generally try to pass themselves off as the real thing. RagingBull and RagingBull traders will NEVER ask you to send them money through social media private messages, and you should report anyone who does.

---

[23]  The Monitor has been informed that Raging Bull will be crediting the impacted customer $2,500 for a legitimate Raging Bull service to which the customer had earlier subscribed.

Raging Bull
Monitor's Second Report
Page 50



The Monitor confirmed that this disclaimer appears when a subscriber accesses his or her account.

## VI. INDEPENDENT COMPLIANCE MONITOR AUDIT AND CERTIFICATION

The Business Plan provides that:

Upon completion of the above steps in relation to existing subscribers and internal compliance enhancements, and as a condition to moving into Phase 2, these efforts will be subject to an audit by the Compliance Monitor, who must first certify the satisfactory completion of these efforts and compliance with this plan in a written report filed with the Court. The certification shall be made on the basis of the Company's obligations set forth in the Court's order as well as all relevant authority under FTC law including recent case law authority, relevant rules and informal FTC guidance, and such other relevant authority as the Compliance Monitor deems appropriate based on the Compliance Monitor's expertise in the area.

### A. Audit

Consistent with this provision, the Monitor has both monitored and audited Raging Bull Defendants' completion of its commitments under Phase 1 of the Business Plan, as well as their compliance with the Order, as described in this Second Report.

Consistent with its obligations, the Monitor has also conducted an initial assessment of the design of the "revamped" and "expanded" Raging Bull compliance program. In doing so the Monitor has relied on applicable federal rules, regulations and guidance, including:

- United States Sentencing Guidelines ("USSG") for Effective Compliance and Ethics Programs,[24]
- U.S. Department of Justice Criminal Division, Evaluation of Corporate Compliance Programs Guidance Document ("DOJ Guidance"),[25]
- Applicable FTC Regulations and Guidance, including FTC Regulations re Endorsements and Testimonials,[26] and FTC Guidance re Advertising and Marketing,[27] and
- ROSCA.[28]

---

[24] USSG §8B2.1: https://www.ussc.gov/guidelines/2015-guidelines-manual/2015-chapter-8

[25] U.S. Department of Justice Criminal Division, Fraud Section -- Evaluation of Corporate Compliance Programs (updated April 2019): https://www.justice.gov/criminal-fraud/page/file/937501/download

[26] https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-publishes-final-guides-governing-endorsements-testimonials/091005revisedendorsementguides.pdf

[27] https://www.ftc.gov/tips-advice/business-center/advertising-and-marketing

[28] https://www.ftc.gov/enforcement/statutes/restore-online-shoppers-confidence-act

Raging Bull
Monitor's Second Report
Page 51



While again highlighting the caveats above regarding the "on paper only" nature of our review to date, the Monitor finds that the design of Raging Bull's Compliance Program, as written, is generally consistent with applicable guidance and should, if implemented appropriately, be largely effective in identifying, preventing and remediating violations of applicable laws and regulations.  However, it is premature to assess whether the Compliance Program is, or will be, properly implemented, and whether it is effective in practice.  To address the current uncertainty over the effectiveness of Raging Bull's revamped Compliance Program, the Monitor intends to engage in the following as part of its continuing monitoring duties:

- Complete an assessment of the design and structure of the Compliance Program and provide recommendations to the Company on areas for possible improvement or modification; and
- Assess the implementation and effectiveness of the Compliance Program for the duration of the monitoring period.

The Monitor anticipates reporting to the Court in future reports the Company's progress in implementing the written Compliance Program, and an assessment of the effectiveness of that implementation and of the Program in practice.

### B. Certification

Based on the monitoring and auditing described in this Second Report, the Monitor certifies that, with the exception of condition XI. Escrow Account of the Order, and with the acknowledgement of the significant shortcomings related to customer service responsiveness, Raging Bull Defendants have substantially complied with the Order and completed the Phase 1 requirements under the Business Plan.  The Monitor makes this certification with the knowledge that under both the Order and the Business Plan, continued monitoring of the Company is mandated.  That continuing monitoring will include, *inter alia*, the Monitor's review and advance

Raging Bull
Monitor's Second Report
Page 52



approval of all sales and marketing materials to be used in Phase 2, continued review of subscriber and public facing content, continued monitoring of the handling of refund and cancellation requests and consumer complaints, and continued monitoring and assessment of the revamped Raging Bull Compliance Program.  Further, this certification is made with the knowledge that the Monitor will continue to report to the Court at least every sixty days, that the Monitor "may apply to the Court for any relief necessary or appropriate to ensure the Monitor can carry out his duties," and that "[i]f, at any time, the Monitor determines that Defendants are not in substantial compliance with this Order, the Monitor shall notify the Court immediately, and may take any such additional action, in the Monitor's discretion, as further described in the compliance monitoring description in the Business Plan."  (Order at Section VI.E-G.)

### C.      Court's Concurrence and Permission for Raging Bull to Move into Phase 2 Operations

The Business Plan states that "[p]rovided the Court concurs with the progress of the steps taken and the certification of the Compliance Monitor, the Company will be permitted to move into Phase 2 operations."  (Business Plan at p. 12).  The Monitor does not have the authority to permit Raging Bull to move into Phase 2 operations.  Should the Court on its own motion, or upon motion of Raging Bull, permit the Company to move into Phase 2 operations, the Monitor is prepared to continue to monitor, audit and assess the Company's continued compliance with Phase 2, the Order and applicable laws and regulations, and to continue to report to the Court as contemplated under the Order and the Business Plan.

Raging Bull
Monitor's Second Report
Page 53



## VII.   CONCLUSION

The Monitor submits this Monitor's Second Report for the Court's consideration, and is

available for a conference or hearing, at the Court's discretion, to present its finding and to answer

any questions.  The Monitor will submit its next Report within sixty days, or sooner if necessary.

**Respectfully submitted,**


Jesse M. Caplan
Monitor

Gerald J. Coyne
Monitor


Attachments:   Exhibit 1 – May 13, 2021 email from jeffwilliams@pennypro.com
                       Exhibit 2 – Hersi Résumé
                       Exhibit 3 – Raging Bull's Services Refund Policies

Exhibit 1 – May 13, 2021 email from jeffwilliams@pennypro.com

Case 1:20-cv-03538-GLR   Document 248   Filed 06/25/21   Page 59 of 67

 **RagingBull**

**Martin Saunders <martin.saunders@ragingbull.com>**

---

## Why doing nothing can still have value
1 message

---

**Jeff Williams** <jeff@pennypro.com>                       Thu, May 13, 2021 at 12:00 PM
Reply-To: jeff@pennypro.com
To: martin.saunders@ragingbull.com



Hey Gang,

As I mentioned briefly in yesterday's recap, I wound up not taking any trades in *Profit Prism*.

It was just one of those days where the market was hit badly, and the opportunities seemed scarce.

And that's okay, because I'm still going to learn from days like these.

A lot of traders might just wave their hand and say, "All right, better luck next time." But  I think there's still an opportunity here to look at yesterday.

Let's start with EEGI.

### Lesson #1: No trading strategy is perfect

I liked EEGI's setup yesterday. I was looking for it to break through $.002 and then peak around the next line of resistance, which would have been $.0028 or so.

Now, it *did* break through $.002:



EEGI only made it up to $.0024 before dropping way down and never recovering.

Suppose I had jumped into this trade. If I had set my sell limit at $.0026, my shares wouldn't have sold at a profit, and I would've eventually lost money on this trade.

It happens, of course.

But this is a good chance for me to remind myself that no indicator is perfect, and all the homework in the world can't always protect you from a loss. It would've been extremely important for me to set a stop-loss here just to get out without losing all of my money.

Missing the trade here protected me.

And it reinforced in me a valuable lesson without the sting of losing money.

Now, let's look at HTZGQ.

### Lesson #2: My strategy does still work, even if not as expected

About midday yesterday, HTZGQ broke through the $5 price point, which would be where I start paying attention.

I saw resistance between $6 and $6.20, and would've set my stop-loss around $4.50.

Check out what happened:



Again, this stock broke through.

But suppose I set my exit price at $6.10 to conservatively stay under the potential $6.20 resistance point. The stock peaked at $6.09 and then flattened out.

And with my stop-loss at $4.50, I'd still be hanging onto these shares as I write this.

Now, I could have gotten out at $5.80 or so, pocketed around 16% and walked away with a nice little win.

This is a chance for me to recognize that my estimates were off, but they still would have led me to profit. That's good reassurance as I head into this trading day and beyond.

A lot of times, learning lessons while trading involves losing money. "Learning the hard way."

Some days, it's nice to take a time out to learn… even if you didn't make or lose a dime.

If you'd like to learn more about how I trade scenarios like these, then hop on over to the **Stock Profit Pro room.**

*Jeff Williams*

**Jeff Williams**



**RagingBull, LLC**

62 Calef Hwy. #233, Lee, NH 03861

Manage Email Preferences | Unsubscribe All*

* Unsubscribe All will block our premium
alert service from sending you any e-mails
in the future, you will need to contact
support to give us permission to e-mail you
again.

This e-mail was sent to the following lists:
Profit Prism Exclusive

© Copyright 2020, RagingBull

DISCLAIMER: To more fully understand any Ragingbull.com, LLC ("RagingBull") subscription, website, application or other service
("Services"), please review our full disclaimer located at https://ragingbull.com/disclaimer.

FOR EDUCATIONAL AND INFORMATION PURPOSES ONLY; NOT INVESTMENT ADVICE. Any RagingBull Service offered is
for educational and informational purposes only and should NOT be construed as a securities-related offer or solicitation, or
be relied upon as personalized investment advice. RagingBull strongly recommends you consult a licensed or registered
professional before making any investment decision.

**RESULTS PRESENTED NOT TYPICAL OR VERIFIED.** RagingBull Services may contain information regarding the historical trading performance of RagingBull owners or employees, and/or testimonials of non-employees depicting profitability that are believed to be true based on the representations of the persons voluntarily providing the testimonial. **However, subscribers' trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL.** Actual results will vary widely given a variety of factors such as experience, skill, risk mitigation practices, market dynamics and the amount of capital deployed. **Investing in securities is speculative and carries a high degree of risk; you may lose some, all, or possibly more than your original investment.**

**RAGINGBULL IS NOT AN INVESTMENT ADVISOR OR REGISTERED BROKER.** Neither RagingBull nor any of its owners or employees is registered as a securities broker-dealer, broker, investment advisor (IA), or IA representative with the U.S. Securities and Exchange Commission, any state securities regulatory authority, or any self-regulatory organization. Employees, owners, and other service providers of RagingBull.com, LLC are paid in whole or in part by commission based on their sales of Services to subscribers.

**WE MAY HOLD SECURITIES DISCUSSED.** RagingBull has not been paid directly or indirectly by the issuer of any security mentioned in the Services. However, Ragingbull.com, LLC, its owners, and its employees may purchase, sell, or hold long or short positions in securities of the companies mentioned in this communication.

# MUSTAFA A. HERSI

hersi.mustafa.a@gmail.com   |   571-289-0256

## EXPERIENCE

**FELDMAN TUCKER LEIFER FIDELL LLP**, Washington, DC

**Partner, Jan. 2021 – Present**

Recruited to create and lead regulatory compliance for colleges, educational technology and healthcare online businesses, including matters related to consumer protection.

**NATIONAL COMMUNITY PHARMACISTS ASSOCIATION**, Alexandria, VA

**Vice President and General Counsel, Nov. 2019 – Dec. 2020**

- Reviewed marketing and advertising initiatives for compliance with FTC mandates and provided legal guidance on regulatory matters involving antitrust activity and consumer protection concerns before the FTC and DOJ
- Coordinated and managed drafting of *amicus* brief in support of successful Supreme Court petition in *Rutledge v. PCMA* involving challenge to state law relating to marketing of pharmaceutical prices
- Managed all legal matters pending before federal agencies, including the Food and Drug Administration (FDA), Centers for Medicare and Medicaid Services (CMS), National Science Foundation (NSF), and Centers for Disease Control and Prevention (CDC)
- Led all legal, regulatory, transactional, compliance and related activities of the organization, and worked closely with senior management, company personnel, the Board of Directors and outside counsel
- Developed and executed legal strategy including litigation and risk management
- Advised on corporate governance, tax, real estate, employment, and privacy matters

**HOWARD UNIVERSITY HOSPITAL/HOWARD UNIVERSITY**, Washington, DC

**Chief Compliance Officer, Jan. 2018 – Nov. 2019**

- Led, implemented, and managed compliance and legal initiatives for Howard University Hospital and Howard University Faculty Practice plan
- Served as an expert on the laws, regulations, and policies applicable to healthcare compliance, including the Stark Law, Anti-Kickback statute, and False Claims Act
- Independently investigated legal and compliance matters, including a large-scale criminal investigation of a fraud/embezzlement scandal that resulted in former employees being sentenced to federal prison
- Partnered with senior leadership to provide advice and guidance on a variety of legal and regulatory compliance issues including healthcare fraud and abuse, tax exemption, D.C. Department of Health, Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), tax exemption, and Accreditation Association for Ambulatory Health Care ("AAAHC") standards
- Provided legal and compliance oversight in the preparation of annual IRS non-profit tax-exemption filings; managed higher education compliance and reporting by the Board of Trustees; managed compliance budget and staff to ensure effective implementation of programming

**DELTA CAREER EDUCATION CORP./SEI**, Alexandria, VA

**Associate General Counsel and Regulatory Counsel, Aug. 2014 – Jan. 2018**

- Recruited while at Hogan Lovells to go in-house for firm client to oversee day-to-day legal operations for this large educational organization, including managing all litigation, contractual, and regulatory matters (e.g., U.S. Department of Education mandates, accreditor requirements, state higher education regulatory mandates, and all FTC and state consumer protection marketing and advertising compliance)
- Managed educational foundation focused on career and technical education
- Managed compliance with federal and state higher education regulatory mandates
- Managed and led marketing review compliance team that ensured compliance with FTC Act, CAN-SPAM, TCPA, and other consumer protection laws related to marketing and advertising
- Managed compliance with ROSCA requirements for educational technology products offered for online sale
- Responded to grievances, inquiries, and investigations by state regulatory, consumers, and accrediting bodies
- Conducted and directed internal investigations on matters that pose enterprise risk
- Managed a multimillion-dollar litigation portfolio, including TCPA class actions and hired and oversaw outside counsel

**HOGAN LOVELLS, LLP**, Washington, DC *(recruited by firm client to serve as AGC and Regulatory Counsel)*

**Senior Associate, Healthcare and Litigation Department, Nov. 2013 – Aug. 2014**

- Counseled national and regional health insurers, pharmacy benefit managers, care coordination organizations, and other specialty health care service providers and trade associations on complex regulatory issues
- Conducted internal investigations and represented corporate and non-profit clients in federal court on issues involving the False Claims Act; the Stark law; the Anti-Kickback statute; Foreign Corrupt Practices Act; the Food, Drug & Cosmetic Act; HIPAA; and the Privacy Act
- Provided legal counseling to medical schools and healthcare trade associations on non-profit legal obligations
- Counseled educational institutions on compliance with U.S. Department of Education regulations, including negotiating and implementing consent decrees with U.S. Department of Justice for educational institutions found to have compliance findings

**U.S. DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE OF U.S. ATTORNEYS**, Denver, CO

**Assistant United States Attorney, Sept. 2010 – Nov. 2013**

- Represented the United States in bench and jury trials in federal court in civil and criminal matters, with a focus on healthcare fraud and abuse.  Served as regional subject-matter expert on issues involving HIPAA, Stark law, and the Anti-Kickback Statute
- Co-investigated violations of securities laws along with the SEC, including the Investment Act of 1940 and the Securities Exchange Act of 1934 and the Securities Act of 1933
- Co-investigated with the FTC on deceptive consumer marketing practices of an online retailer that resulted in more than a $50 million settlement
- Affirmatively represented the United States in fraud litigation involving hospitals, private healthcare providers, insurance companies, pharmaceutical companies, pharmacies, and private-party federal contractors
- Prosecuted individuals and corporate entities for civil and criminal violations of the False Claims Act; Anti-Kickback statute; Stark law; Food, Drug & Cosmetic Act; and HIPAA
- Chief attorney responsible for managing the Financial Litigation Unit, which is tasked with post-judgment litigation on behalf of victims of federal crime and enforcing civil and criminal judgments
- Lead trial attorney in diverse federal court litigation involving the Privacy Act, torts, and commercial litigation on behalf of the United States and its federal agencies

**U.S. DISTRICT COURT, EASTERN DISTRICT OF TENNESSEE**, Chattanooga, TN

**Federal Judicial Clerk to the Hon. Harry S. Mattice, Jr., Aug. 2008 – Sept. 2010**

**WINSTON & STRAWN, LLP,** Chicago, IL

**Associate, Sept. 2005 – June 2008**

- Member of team that drafted successful motion for summary judgment in securities class action involving major investment company and major retailer
- Represented multi-city health systems in False Claims Act investigations and negotiated consent decree settlements with U.S Department of Justice

## EDUCATION

**THE UNIVERSITY OF CHICAGO: THE LAW SCHOOL**, Chicago, IL

**Doctor of Law, June 2005**

- The Ann Watson Barber Outstanding Service Award, Merit Scholarship
- *Mandel Legal Aid Clinic*, Student Attorney for the Mental Health Advocacy Project
- *Black Law Students Association*, First-Year Student Liaison

**THE UNIVERSITY OF TENNESSEE**, Knoxville, TN

**Bachelor of Arts, *magna cum laude,* in College Scholars, May 2002**

Alvin Neilson Scholarship Recipient

## PUBLICATIONS AND PRESENTATIONS

- New England Pharmacists Association Annual Meeting, *Supreme Court Update: Regulatory Implications of Rutledge v. PCMA* (2020)
- Co-author, *"Whistleblowers and Qualified Relators: Is One Always the Other?"* American Bar Association Healthcare Section white paper, (2014)
- Co-Author, *"Expansion of Financial Institutions Reform, Recovery, and Enforcement Act Activity: Payment Processer Liability Risk,"* Hogan Lovells Client Advisory (2014)

## BAR ADMISSIONS

Admitted in the District of Columbia, Illinois

Exhibit 3 – Raging Bull's Services Refund Policies

**RagingBull.com**
**Services and Refund Policies**

**Revised June 17, 2021**

Services with a "No Refund" policy, and service code:

- Boardroom (BDM or BDV)
- Dark Pool Profits (STR)
- Data Driver (DDR)
- Dollar Ace (DAC)
- Double Down (DBD)
- Energy Trades (ENG)
- High Octane (HOO)
- IPO Payday (IPO)
- Jeff's 20k Bets (J2K)
- LottoX (LTX)
- Millionaire Roadmap (MRM)
- Mobile Closer (OPR)
- Options Profit Planner (OPP)
- Portfolio Accelerator (JFA)
- Profit Prism (PPR)
- Supernova Penny Pro (PPP)
- Total Alpha (TAL)
- Trade with Kyle (TWK)
- Triple Threat (TTT)
- Weekly Money Multiplier (WMM)
- Weekly Windfalls (WWF)

Service with a "No Refund" policy but which allowed for a $100 refund that we are applying for any purchase at or above that amount:

- Weekend Wiretaps (WWT)

Services with a "30 Day" refund policy, and service code:

- Angels Investing Insider (AII)
- Bullseye (BUL)
- Daily Deposits (DPM)
- Fast 5 (FFV)
- Jason Bond Picks (JBP)
- Monday Movers (MM)
- Profit Bridge (PBR)
- Rooster Report (RST)
- Sniper Report (SNR)
- Stock Profit Pro (PPR)

Services with a "365 Day" refund policy, and service code:

- Jeff's Portfolio Creator (JFC)
- Jeff's Portfolio Manager (JFM)