**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-03538 – GLR |
| | ) | |
| RAGINGBULL.COM, LLC f/k/a | ) | |
| LIGHTHOUSE MEDIA LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NOTICE OF FILING OF MONITOR'S FOURTH REPORT**

Pursuant to this Court's Order dated March 26, 2021, the independent Monitor, Affiliated

Monitors, Inc., by and though its undersigned counsel, files the Monitor's Fourth Report, which

is attached hereto as **Exhibit A.**

Dated:  November 1, 2021

Respectfully submitted,

Affiliated Monitors Inc.

By: /s/ *David C. Shonka*
David C. Shonka (Bar ID# 21871)
Redgrave LLP
601 Pennsylvania Ave., NW
Washington, DC 20004
Tel: (202) 384-6348
Email: dshonka@redgravellp.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of November 2021 I have served a true and

accurate copy of the foregoing Notice of Filing of Monitor's Fourth Report on all parties through

the ECF System and will send on the 2nd day of November by overnight mail a paper copy to:

Clerk's Office,
Attn: Judge Russell
United States District Court
101 W. Lombard St., 4th Floor
Baltimore, MD 21201

                                        */s/ David C. Shonka*

# EXHIBIT A



*Federal Trade Commission v. RagingBull.com, et al.*

**Case No. 1:20-cv-03538-GLR (D. MD)**

**MONITOR'S FOURTH REPORT**

November 1, 2021

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................1

II. BACKGROUND ................................................................................................5

III. MONITOR'S ACTIVITIES SINCE THE THIRD REPORT ...........................7

IV. CONDITIONS SUBJECT TO MONITORING UNDER THE ORDER .........9

    A. Prohibited Business Activities ................................................................9

    B. Simple Mechanism to Cancel Negative Option Feature .................34

    C. Compliance Monitoring Over Defendants ......................................37

    D. Raging Bull Business Plan ................................................................39

    E. Provision of Information to the Monitor .........................................39

    F. Cooperation and Non-Interference with the Monitor.................40

    G. Escrow Account ................................................................................41

    H. Refund and Cancellation Requests ................................................41

V. CONDITIONS SUBJECT TO CONTINUED MONITORING UNDER THE BUSINESS
PLAN – PHASE 1 AND NEW MONITORING UNDER THE BUSINESS PLAN –
PHASE 2 ........................................................................................................44

    A. Operations Limited to Existing Subscribers ................................44

    B. No Advertising or Marketing to Potentially New Subscribers ...............44

    C. No Earnings Claims, Consumer Testimonials, Etc.....................44

    D. No Upselling and No Renewals or New Subscriptions from Existing Subscribers ...45

    E. All Pre-Existing Subscriptions Supported by ROSCA-Compliant Cancellation
Mechanism ................................................................................................45

    F. Investment in Advertising and Compliance Infrastructure....................45

    G. Customer Service, Refund and Cancellation Procedures...........................54

VI. INDEPENDENT COMPLIANCE MONITOR AUDIT AND CERTIFICATION ........61

VII. CONCLUSION ................................................................................................62

EXHIBIT A – October 22, 2021 FTC Letter to Raging Bull Counsel
EXHIBIT B – October 26, 2021 Raging Bull Counsel Letter to FTC

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 1



## I.   INTRODUCTION

By its Order entered March 26, 2021 ("Order"), the Court appointed Affiliated Monitors, Inc. as the compliance monitor ("Monitor") in *Federal Trade Commission v. RagingBull.com, et. al.,* Case No. 1:20-cv-03538-GLR (D. MD).   The Monitor is an agent of the Court and is directly accountable to the Court.   The Monitor's duties and authority include those described in the Order and in the Raging Bull Business Plan ("Business Plan") (which is incorporated into the Order) and require the Monitor to monitor Raging Bull Defendants'[1] compliance with the Order and Business Plan.   (Order Sections V and VI).

This submission serves as the Monitor's Fourth Report, describing Raging Bull Defendants' compliance activities and the Monitor's monitoring activities since the Monitor's Third Report filed on August 24, 2021.

Up until October 19, 2021, the Monitor was prepared to report on October 25, 2021 that Raging Bull Defendants were in substantial compliance with the Order and Business plan during this most recent reporting period.   However, on October 19, 2021, and subsequently, the Monitor became aware of several very recent communications that raised compliance concerns.   Because the Monitor wanted to further investigate these concerns before reporting to the Court, the Monitor sought from the Court, and received, an extension to file this Fourth Report until November 1, 2021.

Based on further investigation of these recent communications of Raging Bull Defendants, the Monitor has determined that Raging Bull Defendants are not currently in substantial compliance with the Order.   As more fully described below, since October 19, 2021 (but potentially

---

[1]   Raging Bull Defendants are RagingBull.com, LLC f/k/a Lighthouse Media ("Raging Bull" or "Company"), Jeffrey M. Bishop and Jason Bond f/k/a Jason P. Kowalik.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 2

earlier), the Company has engaged in several instances of marketing and other communications that the Monitor has determined violate the Order.  These communications represent a small fraction of the marketing materials and other communications that the Company has used, and that the Monitor is aware of.

It is important to note that these violations have been the subject of recent communications between the Federal Trade Commission ("FTC") and Raging Bull's counsel, as well as between the Monitor and separately with the FTC and Raging Bull's counsel.  Two of the communications between the FTC and Raging Bull, which the Monitor was copied on, are attached to this Fourth Report as Exhibit A (October 22, 2021 FTC Letter to Raging Bull Counsel) and Exhibit B (October 26, 2021 Raging Bull Counsel Letter to FTC), and are at times referenced in this Report.  In addition, on October 28, 2021, the Monitor sent a draft of this Report to both Raging Bull counsel and the FTC for their review and comment.  Raging Bull's counsel sent their comments to the Monitor on October 29, 2021; in lieu of specific comments to the draft Report, the FTC sent a letter to Raging Bull's counsel on October 29, 2021, which they shared with the Monitor.  Certain Raging Bull counsel's comments to the draft Report, and certain FTC statements in their October 29, 2021 letter are referenced in this Report.  The Monitor chose not to attach a copy of the FTC's October 29, 2021 letter to this Report because, as of the filing of this Report, the Monitor has not yet received Raging Bull's response to that letter.

The specific violations of the Order that the Monitor has identified are as follows:

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 3



1.      Using marketing materials that have not gone through outside counsel's review, and to the Monitor for review and approval, as required by the Order and Business Plan.[2]

2.      Making at least one "Earnings Claim" in a marketing communication to subscribers that does not appear to meet the requirements of the Order, is misleading, and would not have been approved by the Monitor if the Claim had been provided to the Monitor for review and approval.

3.      Using language in at least one marketing communication that was previously objected to by the Monitor and which language the Company had represented to the Monitor would be changed, and was changed in one component of the marketing campaign, but that was then used without change in a separate component of the same marketing campaign.

Most of these violations are very recent, and constitute just a fraction of all the marketing, fulfillment content and other communications that the Company has disseminated since the date of the Order, or since the submission of the Monitor's last Report.  Nevertheless, these violations are material.[3]  The Monitor will be conducting further investigation into these violations to determine whether they are outliers, indicate a breakdown in the Company's internal monitoring, or intentional abrogation of the Company's compliance obligations.  In recent communications to the Monitor and the FTC, the Company proposes to address these issues by "continu[ing] to

---

[2]   The Company's counsel has represented that the Company did not consider these communications at issue to be marketing materials, but instead what they call subscriber "fulfillment" material, and as such did not believe these communications needed to go through the process of outside counsel review, and Monitor review and approval, set out in the Order and Business Plan.  As explained below, the Monitor believes these communications were marketing materials.

[3]   In their comments to the Monitor's draft Report, Raging Bull's counsel stated the following: "The Company's position is that these few violations were not intentional and were potentially due to possible misunderstandings and an absence of specificity as to guiding principles, and at this time the Monitor has to [*sic*] no reason to conclude that this is not the case."  In addition, on November 1, 2021, Raging Bull's counsel represented to the Monitor "that the principals of the company followed the compliance processes set up for fulfillment and marketing materials, including submitting the materials at issue to internal compliance for review and followed the directions received from compliance, and that there was no intent or knowledge by the principals that any of these materials did not follow all compliance processes or contain any language or claims not consistent with the Order."  The Monitor has not independently substantiated these representations from the Company's counsel.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 4



follow" certain compliance protocols (as further described below).  These suggested approaches are sound.  The Company and its counsel have also agreed to work with the Monitor to identify ways to better address the circumstances that led to the Monitor's determination that these communications constitute material violations of the Order and Business Plan.  However, the Monitor feels additional actions need to be taken immediately to both address these recent violations and provide the Monitor, and the Court, with confidence that the Company has both the intention and capacity to continue to meet its compliance obligations under the Order, Business Plan, and its own Compliance Program.  Therefore, based on the Monitor's determination that Raging Bull is not in substantial compliance with the Order, the Monitor intends to take the following actions, which Raging Bull's counsel indicated that "Raging Bull Defendants have indicated they would accept," unless otherwise ordered by the Court:

1.      Instruct the Company to refrain from any communications with subscribers or non-subscribers that include any "Earnings Claim" as that term is defined in the Order, until and unless the Company demonstrates to the Monitor's satisfaction that (a) all communications "advertising, marketing, promoting, or offering for sale of any Covered Goods or Services" are going through the prior review and approval process required under the Order, Business Plan and Company Compliance Program, and (b) for each "Earnings Claim" made "in connection advertising, marketing, promoting, or offering for sale of any Covered Goods or Services" is "non-misleading, and, at the time such claim is made, Defendants: (1) have a reasonable basis for the claim; [and] (2) have in their possession written materials that substantiate that the claimed earnings are typical for consumers similarly situated to those to whom the claim is made."  (Order Section I.A.).

2.      Instruct the Company to refrain from any communications with subscribers or non-subscribers that include any offer or link to upgrade, purchase or order any Covered Goods or

Services (what the Monitor deems "marketing" materials) until and unless each such communication goes through the Company's internal review process, outside counsel review process, and is submitted for review and approval by the Monitor; and the Company can demonstrate, to the Monitor's satisfaction, that it has processes to ensure no such communications are used before the communication goes through the internal, outside counsel and Monitor's review and approval process required by the Order, Business Plan, and the Company's Compliance Program.

3.      Instruct the Company to report and certify to the Monitor's satisfaction, whether any communications with subscribers or non-subscribers since October 1, 2021 included language or representations previously objected to or rejected by the Monitor, and the Company's processes going forward to ensure that language or representations previously objected to or rejected by the Monitor are not used in any communications going forward.

## II.    BACKGROUND

On December 7, 2020, the FTC brought an action against Raging Bull Defendants alleging violations of the FTC Act and the Restore Online Shoppers' Confidence Act ("ROSCA").   On December 8, 2020, the Court granted the FTC's *ex parte* motion for a Temporary Restraining Order ("TRO"), asset freeze, and appointment of a Temporary Receiver, and on December 17, 2020, the Court entered a modified TRO.

On March 26, 2020, the Court declined the FTC's requested preliminary injunction, but instead entered the Order (consented to by Raging Bull Defendants) which, among other things, sets forth specific activities that Raging Bull Defendants are either prohibited from or required to comply with, incorporates the Company's representations and obligations under the Business Plan, terminates the Temporary Receivership and asset freeze, and appoints Affiliated Monitors, Inc. to



monitor Raging Bull Defendants' compliance with the Order.  The Order effectively returns control over Raging Bull business operations back to the Company and its principals.  (Order Section XIV).  Under the Order, the Monitor shall report to the Court initially within thirty days of the entry of the Order, and subsequently every sixty days for the duration of the Order.  The Monitor may apply to the Court for any relief necessary or appropriate to ensure the Monitor can carry out its duties, and should the Monitor determine Raging Bull Defendants are not in substantial compliance with the Order, the Monitor shall notify the Court immediately, and may take any additional action as further described in the Business Plan.

Further, Section V.D. of the Raging Bull Business Plan provides that "[u]pon completion of the above steps [Phase 1 activities] in relation to existing subscribers and internal compliance enhancements, and as a condition to moving into Phase 2, these efforts will be subject to an audit by the Compliance Monitor, who must first certify the satisfactory completion of these efforts and compliance with this plan in a written report filed with the Court.  The certification shall be made on the basis of the Company's obligations set forth in the Court's order as well as all relevant authority under FTC law including recent case law authority, relevant rules and informal FTC guidance, and such other relevant authority as the Compliance Monitor deems appropriate based on the Compliance Monitor's expertise in the area."

Finally, the Business Plan provides that "[d]uring Phase 2, the Company will be permitted to engage in full operations, subject to ongoing compliance and careful oversight by the Compliance Monitor" (Business Plan at p. 13).

On June 25, 2021, the Monitor filed the Second Report under the Order and certified Raging Bull Defendants' substantial compliance with their Phase 1 obligations.  On June 30, 2021,

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 7



the Court granted Raging Bull's Unopposed Motion to Move into Phase 2 Operations Under the

Business Plan and March 26, 2021 Order.

### III.    MONITOR'S ACTIVITIES SINCE THE THIRD REPORT

Since submission of the Third Report the Monitor has engaged in additional multi-faceted

activities in monitoring and auditing Raging Bull Defendants' obligations.  These have included:

(i)      Continued weekly scheduled meetings[4] with the Company's outside counsel and

Chief Compliance Officer;

(ii)     Additional meetings with counsel as needed;

(iii)    A visit to the Company's headquarters and offices in Hunt Valley, Maryland,

including a tour of the on-site operations, and meetings with Jeff Bishop, Jason

Bond, Martin Saunders (General Counsel), Mustafa Hersi (Chief Compliance

Officer), and outside counsel.

(iv)     An Eighth Request for Information relating to the Company's continuing

obligations under the Order and Business Plan;

(v)      Additional email requests for information relating to specific questions or concerns;

(vi)     Scheduled calls with the FTC;

(vii)    Continued verification of the Company's compliance with its obligations under the

Order including: obligations relating to prohibitions on prohibited content; the

requirement of a simple mechanism for consumers to avoid new or recurring

charges; the requirement that the Company monitor its own compliance with the

Court's Orders, including recording all live sales events; the status of the Escrow

---

[4]    All meetings described in this Report are virtual meetings unless otherwise indicated.

Account funding; and verification of the Company's handling of refund and cancellation requests pending as of the date of the Order;

(viii)    Verification of the Company's continuing obligations under the Business Plan, including the Company's investment and actions in advertising and compliance infrastructure, and its handling of customer service, refund and cancellation requests;

(ix)    Monitoring of the Company's activities and obligations under Phase 2 of the Business Plan, with particular focus on the Company's sales, marketing and promotion activities and materials, including: verifying the Company's compliance with its procedural obligations to vet all sales, marketing and promotion activities and materials both internally and through outside counsel; and the Monitor's independent review of all of the Company's sales, marketing and promotion activities and materials to assess compliance under the Order, Business Plan, and applicable law, rules and regulations;

(x)    Accepting, responding to and tracking customer emails and phone calls to the Monitor through several channels, including the dedicated Raging.Bull.com Monitorship webpage, dedicated email address, and dedicated phone number;

(xi)    Monitoring of public facing websites, including platforms for customers to post reviews of and complaints against the Company; and

(xii)    Review of scores of documents constituting hundreds of pages relating to Raging Bull Defendants' obligations under the Order and Business Plan.

The Monitor's specific monitoring and auditing activities and findings related to each of the Conditions under the Order and the Business Plan are detailed below.



## IV.   CONDITIONS SUBJECT TO MONITORING UNDER THE ORDER

### A.   Prohibited Business Activities

Section I of the Order prohibits Raging Bull Defendants from making Earnings Claims, or claims about the experience, time or effort, or capital required for consumers to effectively use the Company's Covered Goods or Services, without an appropriate basis for, or substantiation of such claims.  It also prohibits any misrepresentation of any other fact material to consumers concerning any Covered Goods or Services.

> 1.   <u>Proactive Monitoring of Raging Bull's Fulfillment Content, Communications to Subscribers and Non-Subscribers, and Public-Facing Digital Media for Prohibited Business Activities</u>

As set forth in the Second and Third Reports, the Monitor began proactively monitoring Raging Bull Defendants' business activities in May 2021.  This effort has continued throughout the sixty days since the Third Report, and includes review of the channels we have been reviewing since May 2021: communications with existing subscribers through an all-access Raging Bull Membership that allows the monitoring team to review all materials on the Raging Bull website, as well as all email communications sent by the Company to its subscribers -- constituting over thirty different subscription services, over twenty different publications, and over a dozen different courses; all public-facing digital media outlets on which the Raging Bull Defendants have a presence, including Facebook, Instagram, Twitter, LinkedIn, YouTube, and Reddit; the individual social media accounts of the Company "gurus"; third-party complaint websites "TrustPilot", the Better Business Bureau, and "tradingschools.org"; and results of Google searches for key words such as "RagingBull Scam," "RagingBull Lawsuit," and "RagingBull Make Money."

Significantly, in a change from previous reporting periods, in the past sixty days Raging Bull has begun soliciting new subscribers through sales and marketing outreach.  The Company



has pursued this effort through the channels listed above, as well as the live sales events discussed below. The monitoring team has expanded its proactive monitoring to include such materials.

The methodology of the proactive monitoring described in the Second Report, and maintained in the Third Report, has remained consistent in the past sixty days. On a weekly basis, members of the monitoring team reviewed a sampling of what the Company refers to as "fulfillment" content, inclusive of emails sent by the Company to subscribers, written and video content posted on the Company website, and chat rooms. In addition, team members reviewed a sampling of the relevant public-facing digital media outlets listed above. In total, the monitoring team spent dozens of hours reviewing emails, publications, videos, chat room chats, comment threads on social media, webinars and livestreams.

Since the last Report, the monitoring team found several instances of communications that contained material prohibited by the Order.

a.      Misleading Earnings Claims in Marketing Emails

On October 20, 2021, the FTC notified the Monitor of an October 19, 2021 email from "Raging Bull Insider with Jeff Bishop and Jason Bond" sent to subscribers (and possibly non-subscribers) titled "7-figure month?," and that this email raised concerns with the FTC. The FTC subsequently notified Raging Bull's counsel about concerns with this email and others in a letter dated October 22, 2021 (attached as Exhibit A). At about the same time the Monitor's team identified a similar email as potentially a violation of the Order and Business Plan.[5]   In these emails Bond and Bishop indicate that from October 1 – October 19, 2021, Jason Bond had an adjusted gain on his trading activity of $883,686.31. Included is a statement that "results include

---

[5]   The Monitor identified another email with the same earnings claim and offer to purchase additional services, like *JasonBondPicks*, *i.e.*, "Connect the Dots Live: Record-Breaking Month" email on October 19, 2021.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 11



options, small-cap swing trades, and long-term holds" and that "October is shaping up to be a

record month for me…"  In addition, the emails state "Want real-time Pre-alerts on these stocks

and more? Upgrade to *JasonBondPicks* and I'll re-alert you before I BUY."  The emails then

provide a link for recipients to click that takes them to an order page.

The following is a screen shot of the October 19th "7-figure month?" email:


[CONTINUED ON NEXT PAGE]

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 12





**7-figure month?**
1 message

**Raging Bull** <support@ragingbull.com>                                                         Tue, Oct 19, 2021 at 6:14 PM
T▮▮▮▮▮▮▮



Hey Guys and Gals,

They say those who can't—TEACH

I beg to differ…



*results include options, small-cap swing trades, and long-term holds.

October is shaping up to be a record month for me…

However, it's when you start to think you're invincible and that you've
got this game figured out—when the market comes and smacks you
right in the face.

So instead of this…



Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 13



I'll be coming to you live at **7 PM ET to Connect The Dots.**

Not only does teaching keep me sharp, but it also keeps me grounded, and focused on my trading plan.

Tonight we'll be talking about:

- My favorite setups in small-caps
- Stocks I'm in or looking to get in
- Why I'm bullish small-caps for the rest of the year
- The latest pumps in the market, and how I like to play them

**It all goes down at 7 PM ET**

Guys and gals, this market is hot right now, and I want to show you how I'm finding opportunities and the strategies I'm utilizing to take advantage of them.

You don't want to miss this!

*Jason Bond*

**Jason Bond**

**P.S.** Want real-time Pre-alerts on these stocks and more? Upgrade to *JasonBondPicks* and I'll pre-alert you before I BUY. Click here for my $7 trial w/30-day money-back guarantee.

**DISCLAIMER:** To more fully understand any Ragingbull.com, LLC ("RagingBull") subscription, website, application or other service ("Services"), please review our full disclaimer located at https://ragingbull.com/disclaimer

**FOR EDUCATIONAL AND INFORMATION PURPOSES ONLY: NOT INVESTMENT ADVICE.** Any RagingBull Service offered is for educational and informational purposes only and **should NOT be construed as a securities-related offer or solicitation, or be relied upon as personalized investment advice.** RagingBull strongly recommends you consult a licensed or registered professional before making any investment decision.

**RESULTS PRESENTED NOT TYPICAL OR VERIFIED.** RagingBull Services may contain information regarding the historical trading performance of RagingBull owners or employees, and/or testimonials of non-employees depicting profitability that are believed to be true based on the representations of the persons voluntarily providing the testimonial. **However, subscribers' trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL.** Actual results will vary widely given a variety of factors such as experience, skill, risk mitigation practices, market dynamics and the amount of capital deployed. **Investing in securities is speculative and carries a high degree of risk; you may lose some, all, or possibly more than your original investment.**

**RAGINGBULL IS NOT AN INVESTMENT ADVISOR OR REGISTERED BROKER.**

**RESULTS PRESENTED NOT TYPICAL OR VERIFIED.** RagingBull Services may contain information regarding the historical trading performance of RagingBull owners or employees, and/or testimonials of non-employees depicting profitability that are believed to be true based on the representations of the persons voluntarily providing the testimonial. **However, subscribers' trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL.** Actual results will vary widely given a variety of factors such as experience, skill, risk mitigation practices, market dynamics and the amount of capital deployed. **Investing in securities is speculative and carries a high degree of risk; you may lose some, all, or possibly more than your original investment.**

RagingBull nor any of its owners or employees is registered as a securities broker-dealer, broker, investment advisor (IA), or IA representative with the U.S. Securities and Exchange Commission, any state securities regulatory authority, or any self-regulatory organization. Employees, owners, and other service providers of Ragingbull.com, LLC are paid in whole or in part by commission based on their sales of Services to subscribers.

**WE MAY HOLD SECURITIES DISCUSSED.** RagingBull has not been paid directly or indirectly by the issuer of any security mentioned in the Services. However, Ragingbull.com, LLC, its owners, and its employees may purchase, sell, or hold long or short positions in securities of the companies mentioned in this communication.



In addition to the Earnings Claims made in these emails, both these emails were meant to tout Jason Bond's success and to encourage recipients of the email to upgrade to or purchase another Covered Good or Service (as defined in the Order), namely the *JasonBondPicks* service. These are clearly marketing materials that were required to go through the process set out in the Order, Business Plan and in Raging Bull Compliance Program documents for all marketing materials. Had that occurred these emails should have been reviewed by the Company's outside counsel, and then provided to the Monitor for review and approval, in addition to any internal vetting by the Company's compliance team. However, the Company did not treat this as marketing material, and apparently did not subject these emails to its processes for outside counsel review, and did not provide the emails to the Monitor for advance review and approval.[6]

On October 20, 2021, the Monitor (and subsequently the FTC) flagged the October 19 "7-figure month" email for the Company and the Monitor asked for substantiation of the Earnings Claim. The Company, through counsel, provided the Monitor with a link to Jason Bond's "Trading Journal." The Monitor analyzed the October 1 – October 19, 2021 entries in this "Trading Journal" link, and did not find that the entries supported the earnings claim. Instead, the trade journal at best appeared to reflect gains and losses totaling substantially less – by hundreds of thousands of dollars – than the gains indicated in the email.

Subsequently, the Monitor identified a similar email dated October 17, 2021 from "Bond's Beat" and titled "CTD Live w/Jay at 7: Brand New Watchlist" that also included an "Earnings

---

[6]   In Raging Bull counsel's comments to the draft Fourth Report, they represented that because the Company did not consider these emails "marketing" material, "instead it was subject only to the review and approval by internal compliance review and to a random one third review by outside counsel. The review and advance approval of these emails was done by internal compliance and they were not selected for review by outside counsel."

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 15



Claim." This Earnings Claim, reported just two days prior to the October 19, 2021 Claim, indicated that Jason Bond had adjusted gains from October 1 – October 14, 2021 of $204,164.04.

The following is a screen shot of the beginning of the October 17th "CTD Live w/Jay" email:



Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 16





If you've been attending the **Connect The Dots Livestreams** then you already know...

**I Have Owned
The Month Of October**

On October 26, 2021 the Monitor shared this second email with the Company and asked for substantiation of this Earnings Claim and an explanation addressing the large discrepancy between the Earnings Claim made on October 17 versus the Earnings Claim made on October 19. In response, the Company, through counsel, provided the Monitor with two spreadsheets purportedly listing all of Jason Bond's trades for the periods October 1 – 13, 2021, and October 1 – 19, 2021.  The Monitor analyzed the spreadsheet for the longer period, which is 10 pages long and includes 388 separate trades.  This spreadsheet does appear to reflect total adjusted gains of $883,586.31 as represented in the October 19 email.  However in analyzing the difference between the adjusted gains for October as of October 14, 2021 (Bond's representation that he made $204,164.04 during that period) and the adjusted gains for October as of October 19, 2021 (Bond's representation that he made $883,586.31 during that period), the spreadsheet shows approximately $600,000 in adjusted gains for the period  October 14 – 19, 2021 came from Bond apparently



making 57 sales of stock on October 14, 2021, **stock that he had held from at least as early as April 2019, and possibly longer**.[7]

The October 19, 2021 "7-figure month?" email, which indicates October trading earnings of over $883,000 and states "October is shaping up to be a record month for me" appears to the Monitor as misleading on its face when the vast majority of those gains were made by selling stocks on one day that had been held for over two years.  This is particularly true in the context that Raging Bull markets itself as an educational company that focuses on short-term trading strategies like "swing" trading.[8]  It is unlikely that recipients of this email would have understood that the vast majority of the gains were made by selling stocks held for over two years, and it is questionable whether they would have been able to figure that out even if they had painstakingly analyzed Bond's on-line trading journal.[9]  The language in the emails that include, with an asterisk, "results include options, small-cap swing trades, and long-term holds" does not alter this finding.  Furthermore, it is difficult to imagine this Earnings Claim would have met the standard for "typicality" set forth in the Order, as it is unlikely that the typical Raging Bull consumer, or even

---

[7]   The FTC in its October 29, 2021 letter to Raging Bull Counsel states with regard to these stock sales (which statement has not been independently verified by the Monitor): "Based on those trading records, over 70% of the overall net gains (approximately $644,000 out of $889,337) that Bond purportedly earned during that time frame were derived from Bond's sale of Grove, Inc. ("Grove") stock. According to Raging Bull's records, Bond obtained these Grove shares in April 2019, before its IPO in June 2021, when these shares first became available to the public and thus to the typical Raging Bull subscriber. See https://ragingbull.com/grvi-ipo. We also note that the CEO of Grove is Allan Marshall, who is a Raging Bull minority owner. Raging Bull touted Bond's seemingly impressive trading success without disclosing that much of the profit was not from savvy trading on the stock market, but instead derived from an advantageous private arrangement with a Raging Bull insider."

[8]   "Swing trading is a style of trading that attempts to capture short- to medium-term gains in a stock (or any financial instrument) over a period of a few days to several weeks." Investopedia https://www.investopedia.com/terms/s/swingtrading.asp.

[9]   As indicated above, the Monitor's analysis of Jason Bond's Trade Journal (as opposed to the subsequently provided spreadsheets) did not substantiate the Earnings Claims.



Raging Bull "guru," would have the opportunity, resources or time to make these or similar trades between October 1 and October 19, 2021, or during any 19-calendar day period.[10]

In any event, the two October 19, 2021 emails were "marketing" materials and would have been rejected by the Monitor if they had gone through the review and approval process required by the Order and Business Plan.

  b. <u>Using Language Rejected by the Monitor</u>

On October 19, 2021, the FTC provided the Monitor with another Raging Bull marketing communication that went to subscribers (and possibly non-subscribers) that included language that had previously been rejected by the Monitor.   This communication touted Jeff Bishop's "Sniper Report" in which Bishop provides to subscribers on a particular date and time the names of three "zombie" stocks that he intends to purchase.   In this marketing communication, the Company states that "Jeff reveals 3 zombie stocks ***poised for a breakout***," and "there's a whole new batch [of zombie stocks] ***ready to pop off***" (emphasis added).   However, on October 4 and 6, 2021, as part of the Monitor's review and approval of all marketing materials, the Monitor had objected to the same and similar language in other "Sniper Report" marketing material, and the Company agreed to change that language (and did so in those previous marketing materials).   Specifically, the Monitor rejected any language that suggested that any stocks were likely or certain to increase in price (*i.e.,* "poised for a breakout" and "ready to pop off"), and required that such language could only indicate that the stocks had the potential to increase in price.

On October 20, 2021, the Monitor (and subsequently the FTC) provided this marketing material to the Company and requested an explanation as to how and why this language had been

---

[10] Raging Bull has not provided the Monitor with any argument or documentation to address the "typicality" requirement in the Order.



used after the same and similar language had been rejected by the Monitor.  The Company's initial response, through counsel, concedes that the Monitor had rejected the same and similar language in other "Sniper Report" marketing materials, but contended that the Monitor had not rejected this specific marketing piece, and the Company therefore understood that this marketing piece – even with the language previously rejected by the Monitor – was approved for use.[11]  In subsequent communications to the Monitor, including Raging Bull counsel's comments to the draft Report, and in the Company's October 26, 2021 response to the FTC's October 22, 2021 letter, the Company's counsel state that "[t]he Company's counsel denies that there was an intent to provide language previously rejected and has indicated that there was at worst a misunderstanding," that "the failure to make the change in the other component was inadvertent," and that "[i]n the future, we will take responsibility to ensure that any agreed-upon changes flow through all of the components of a marketing campaign."

       c.    <u>Marketing Embedded in "Fulfillment" Communications</u>

The Company takes the position that "fulfillment" communications, which are undefined, that also include an embedded marketing component that was previously approved by the Monitor, are not "marketing" for purposes of the advance review and approval requirements of all marketing materials under the Order and Business Plan.  *See* Raging Bull counsel's October 26, 2021 letter responding to the FTC's October 22, 2021 letter (attached as Exhibit B).

---

[11] To be clear, the Monitor never approved the marketing piece at issue.  The Monitor reviewed the other "Sniper Report" marketing materials and in phone calls with the Company's counsel on October 4 and 6 verbally reviewed the language in those materials that were objectionable, and on October 8 the Company, through counsel, sent the Monitor redlined revised materials that addressed the Monitor's concerns, and the Monitor approved those materials.  At that time the Company did not send to the Monitor the marketing piece at issue, and therefore that piece had not been approved.



The Monitor has consistently taken the position that any communications or material that advertises, markets, promotes or offers for sale the Company's good or services, including communications to existing subscribers that seeks to have subscribers renew or upgrade a subscription, constitutes sales and marketing material requiring the Monitor's review and approval. The Monitor made that clear in its "Monitor's Protocol for Reviewing and Approving Raging Bull Defendants' Sales and Marketing Materials," provided to the Company on July 22, 2021. That Protocol defines sales and marketing materials to include, inter alia, "[t]he content of subscription services."

To address this issue, the Company represented in emails to the Monitor on October 26, 2021, in its October 26, 2021 letter response to the FTC, and in counsel's comments to the draft Report that "Raging Bull will discontinue using any marketing inserts in product fulfillment emails," and "[t]his prohibition will apply regardless of whether the marketing materials were previously approved by the Monitor." We believe that this response is appropriate. However, the next day, on October 27, 2021, the Company sent at least one email to subscribers that included an embedded marketing insert in an otherwise fulfillment email. This email is titled "C-t-D On-Demand, Trade Alert Feedback & Hump Day w/Jay," and includes an embedded link to "visit JasonBondPicks.com." A screenshot of that embedded link is below:

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 21



> To learn more about my trading curriculum Trade with Jason, visit
> JasonBondPicks.com
>
> The diary of a retail trader,
>
> *Jason Bond*
>
> **Jason Bond**

When a recipient clicks the "visit JasonBondPicks.com" link, a marketing page appears where

subscribers (or anyone with the link) can subscribe to new or upgraded services, as follows:



Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 22





Some strategies Jason Bond teaches require up to level 3 options clearance

The Monitor forwarded this email to the Company's counsel on October 27, 2021. In their comments to the draft Report, Company's counsel stated:

> [T]here was no intention to violate or skirt the new process that was put into place mere hours earlier. The compliance team's good faith and reasonable understanding of the commitment to 'discontinue using any marketing inserts in product fulfillment emails' was that no marketing language can be included in fulfillment. The team also understood that a link to a page describing the curriculum of the services would be appropriate. However, upon our [Company counsel's] review we note that the landing page is a piece that was reviewed and approved by the Monitor as marketing, and that the curriculum also includes the pricing and buttons to join. We therefore understand the Monitor's position." Company counsel further responded that "[b]ased on this, we have directed the compliance team not to include in fulfillment emails links to marketing materials, which includes order forms and landing pages providing pricing and buttons to join. Furthermore, because this is a new



process, we have decided that GT will review 100% of the fulfillment emails at this time so we can better ensure there is a consistent application with the intent of this new process. GT will bring to the Monitor's attention any issues that are unclear or we believe may warrant discussion."

       d.     <u>Earning Claims in Non-Marketing Communications</u>

Raging Bull's Compliance Manual at Appendix B (Raging Bull.Com LLC Customer Communications & Advertising Policy) provides that "[i]n light of our commitment to provide quality educational materials and services and publish stock picks and investment ideas with a goal of maintaining transactional transparency, our Employees are prohibited from creating, disseminating or otherwise transferring or publishing any advertisement or other public statements that are false and misleading or that contain any untrue statement of material fact." Raging Bull's Module 7: Raging Bull Compliance Communications Review Policy, also provides that the purposed of the Module is "[t]o provide oversight and suggestions for all company generated non-marketing email, texts, videos, and mobile application communications to existing subscribers, including watch lists, educational information, and trading activity for educational purposes" and "[t]o efficiently communicate what is and is not acceptable in outbound communications."

As such, while the Prohibited Business Activities in Section I of the Order, and specifically the requirements and prohibitions relating to Earnings Claims, apply "in connection with the advertising, marketing, promoting, or offering for sale of any Covered Goods or Services," the requirements and prohibitions relating to Earnings Claims set forth the Company's Compliance Manual and Modules apply to all communications, whether marketing or otherwise. As such, the Monitor engaged in proactive monitoring of communications to identify whether Earnings Claims were being used, and whether they complied with the Company's own policies.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 24



A forty-five minute video posted to the Raging Bull website and hosted by one of Raging Bull's guest "gurus," Michael Parks, entitled "Buying Pullbacks with Michael Parks," included two Earnings Claims.[12]  On September 13, 2021, the Monitor alerted the Company's counsel to this video and requested substantiation for the Earnings Claims.  Counsel for the Company indicated that the Company had removed the video in response to the Monitor's concern.  The Monitor confirmed that the video had been removed from the website, and in addition, requested the following in its Eighth Request for Information:

> *Please describe the process for educating non-employees (i.e., guest speakers or contributors) on the Company's Compliance Program, and the Company's review and approval of communications by guest speakers or contributors to ensure compliance with the Order, Business Plan and the Company's Compliance Program.*

In response, counsel for the Company stated:

> *Notwithstanding Raging Bull's previous responses to AMI's Request for Information that are applicable to this topic that are incorporated by reference, Raging Bull provides the following response: Guest speakers and Contributors are provided, expected to review, sign and abide by the terms of the Raging Bull Compliance Manual as a condition of his or her contracting with Raging Bull. Any fulfillment and marketing communications involving guest speakers or contributors are held to the same review and approval process set forth in the Raging Bull Compliance Manual and Raging Bull Compliance modules. The Raging Bull Compliance Department also conducts monthly live training on compliance topics, which all employees and contractors are expected to attend and are provided access to recordings of the training sessions afterward. Individuals who miss the live training sessions are expected to review those materials as a condition of their employment. The Raging Bull Compliance Department applies a sampling methodology to conduct random assessments and audits of on-camera experts, which includes guest speakers and contributors. This activity is conducted as part of the regular course of the Compliance Department's activities.*

The Monitor further requested that Raging Bull provide records relating to the education and training of Michael Parks on the Company's Compliance Program including any certification

---

[12]  The Earning Claims Mr. Parks made were as follows: "So when I bailed, I bailed around 200% profit. Often you can get up to 400-500% profit, it just depends, it depends a little bit on that, right?"; and "We made about 200% on this trade."

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 25



or acknowledgement completed by Mr. Parks, and the vetting and approval of Mr. Parks'
fulfillment content. Counsel for the company responded by stating that Mr. Parks has viewed all
training videos available since June 2021, and that he has reviewed and agreed to abide by the
Raging Bull compliance manual. In support of this response, the Company provided a copy of Mr.
Parks' attestation that he received the training materials from the Company on September 23, 2021
and completed the training on October 5, 2021.

The monitoring teams' review of fulfillment content has detected several instances of
Raging Bull making Earnings Claims in the form of a description of specific stock transactions
made by an individual "guru" and the gain realized therefrom.  The following screenshot is an
example of one such Earnings Claim:







In reviewing these types of Earnings Claims[13], the Monitor requested from counsel an explanation as to whether, and how, this was reviewed and approved by the Company's internal compliance team, according to the Company Compliance Manual Appendix B, and Module 7 of the Compliance Program:

1.  Compliance Manual App. B – RagingBull.com Customer Communications and Advertising Policy: "B. Earning Claims An "Earnings Claim" means any representation to consumers, specific or general about income, financial gains, percentage gains, profit, net profit, gross profit, or return on investment. No Employee may make any earnings claim, expressly or by implication, unless the earnings claim is non-misleading, and at the time such claim is made there is a (1) reasonable basis for the claim and (2) the company has documented, written materials that substantiate that the claimed earnings are typical for consumers similarly situated to those to whom the claim is made; and (3) make the written substantiation available, upon request to the consumer, potential purchaser, and the FTC."

2.  Module 7 – RB Communications Review Policy: "PURPOSE 1.1. To provide oversight and suggestions for all company generated non-marketing email, texts, videos, and mobile application communications to existing subscribers, including watch lists, educational information, and trading activity for educational purposes. 1.2. To efficiently communicate what is and is not acceptable in outbound communications. * * * 3. RESPONSIBILITIES 3.1. The CCO, or an appointed designee within the compliance department, is responsible for implementing procedures for providing communication review, edits and corrections. 3.2. Employees are responsible for providing the CCO, or compliance department, copy that will be disseminated outbound for existing subscribers. What materials must be reviewed by compliance is subject to change at the discretion of the CCO."

With respect to these pieces of fulfillment content, the Monitor has requested, but has not yet received substantiation from the Company. The Monitor will continue to closely monitor Raging Bull's activity in this regard and will report on this issue in our next report.

The Monitor's ongoing proactive monitoring effort has yielded a finding that the Company has disseminated marketing, fulfillment content and/or other communications that violate the

---

[13]  The Monitor detected five pieces of fulfillment content in the past sixty days that contain Earnings Claims of this type.  Two of these pieces referenced the same trade.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 27



Order, Business Plan and the Company's Compliance Program.  Most of these violations are very recent, and constitute just a fraction of all the marketing, fulfillment content and other communications that the Company has disseminated since the date of the Order, or since the submission of the Monitor's last Report.  Nevertheless, these violations are material.  The Monitor will be conducting further investigation into these violations to determine whether they are outliers, indicate a breakdown in the Company's internal compliance processes, or an intentional abrogation of the Company's compliance obligations.  In recent communications to the Monitor and the FTC, the Company proposes to address these issues by "continu[ing] to follow the following compliance protocols, at the Monitor's approval:

1.      All fulfillment materials will continue to be reviewed by Raging Bull['s internal compliance team], with approximately one-third reviewed by [Greenberg Traurig ("GT")].

2.      All previously unapproved marketing materials will continue to be reviewed by Raging Bull['s internal compliance team] and GT, followed by submission to the Monitor for review and approval.

3.      Raging Bull will continue to make and publish non-substantive revisions to previously approved marketing materials, provided that GT provide notice to the Monitor of the non-substantive revisions before publishing such revised materials.

4.      Raging Bull will discontinue using any marketing inserts in product fulfillment emails. This prohibition will apply regardless of whether the marketing materials were previously approved by the Monitor."

These suggested approaches are sound.  However, the Monitor feels additional actions need to be taken immediately to both address these recent violations and provide the Monitor, and the Court, with confidence that the Company has both the intention and capacity to continue to meet its compliance obligations under the Order, Business Plan, and its own Compliance Program. Therefore, the Monitor intends to take the following actions, unless otherwise ordered by the Court:

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 28

i.      Instruct the Company to refrain from any communications with subscribers or non-subscribers that include any "Earnings Claim" as that term is defined in the Order, until and unless the Company demonstrates to the Monitor's satisfaction that such Earnings Claims: (a) are going through the review and approval processes required under the Order, Business Plan and Company Compliance Program, and (b) that each "Earnings Claim" is "non-misleading, and, at the time such claim is made, Defendants: (1) have a reasonable basis for the claim; [and] (2) have in their possession written materials that substantiate that the claimed earnings are typical for consumers similarly situated to those to whom the claim is made."   (Order Section I; Business Plan; Compliance Manual Appendix B; Compliance Module 7).

ii.     Instruct the Company to refrain from any communications with subscribers or non-subscribers that include any offer or link to upgrade, purchase or order any Covered Goods or Services (what the Monitor deems "marketing" materials) until and unless each such communication goes through the Company's internal review process, outside counsel review process, and is submitted for review and approval by the Monitor, and the Company can demonstrate, to the Monitor's satisfaction, that it has processes to ensure no such communications are used before the communication goes through the internal, outside counsel and Monitor's review and approval process required by the Order, Business Plan, and the Company's Compliance Program.

iii.    Instruct the Company to report and certify to the Monitor's satisfaction whether any communications with subscribers or non-subscribers since October 1, 2021 included language or representations previously objected to or rejected by the Monitor, and the Company's processes going forward to ensure that language or representations previously objected to or rejected by the Monitor are not used in any communications going forward.



2. <u>Review and Approval of Raging Bull's Sales, Marketing and Promotional Material</u>

The Court's June 30, 2021 Order permits the Company to engage in full operations under its Business Plan, subject to ongoing compliance and careful oversight by the Monitor. Under the Business Plan, "[f]ull operations will include upselling and solicitation of renewals of pre-existing subscribers as well as the solicitation of new subscribers, but only through the use of sales and marketing materials previously approved by the Compliance Monitor.  Any modification to those approved materials will be permitted only upon approval of the Company's outside counsel along with prior reasonable notice being given to the Compliance Monitor."  (Business Plan at p. 13).

Immediately upon commencing Phase 2 activities, the Company sought to resume its sales, marketing and promotional activities to existing customers.  To meet the Business Plan requirements that the Company can only use "sales and marketing materials previously approved by the Monitor," the Monitor created a "Protocol for Reviewing and Approving Raging Bull Defendants' Sales and Marketing Materials" for the Company to follow.  This Protocol defines the materials subject to review and approval[14], and sets forth the required documentation and explanations describing the sales campaigns and materials; the process the Company must follow in providing both the materials subject to review; and the necessary documentation and

---

[14] Under the Protocol, sales and marketing materials include, but are not limited to:
- Radio and television ads;
- Direct mail and emails;
- Search engine advertising, Internet banners advertisements, websites;
- Online videos, webinars, social media;
- Live sales events, recordings of live sales events, including recordings of franchise-owned training centers' events;
- Handouts, slide decks, workbooks;
- Telephone calls (both live and recorded), call logs, call detail records, and reports;
- The content of subscription services;
- Chat room or other related content;
- Scripts or related materials used by customer service, sales, educational or other staff or agents; and
- Modifications to such sales and marketing materials previously approved by the Monitor.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 30

explanations. The purpose of the Protocol is to facilitate the Monitor's review of not only the content of all sales, marketing and promotional materials, but also to determine whether the Company is following its own policies and procedures for vetting such materials both internally and through their outside counsel, before they are submitted to the Monitor for review and approval.

In reviewing and ultimately approving sales, marketing and promotional material, the Monitor assesses whether the materials comply with the Order, the Business Plan, and applicable law, rules, and regulations. More specifically, the Monitor's review looks at whether the materials include any representations that could be deemed "Earnings Claims," "Testimonials," or claims about the experience, time or effort, or capital required for consumers to effectively use the Company's Covered Goods or Services, without an appropriate basis for, or substantiation of such claims. The Monitor also assesses whether the sales and marketing materials include any misrepresentation of any other fact material to consumers concerning any Covered Goods or Services.

As of October 27, 2021, the Monitor has reviewed and ultimately approved materials in connection with 40 sales and marketing campaigns and/or single marketing communications. The Monitor returned 10 of the initial versions of these proposals to Raging Bull, seeking either clarification of the copy, or requesting that content be modified. In each case, Raging Bull either provided requested clarification, or modified the proposed copy as requested.

As described above, until recently the process appeared to have been effective. However, the Company recently engaged in marketing using materials that were not provided to the Monitor for review and approval, or used language specifically rejected by the Monitor. As discussed in detail above, marketing emails that were not reviewed or approved by the Monitor – the October



19, 2021 "7-figure month?" and "Connect the Dots Live: Record-Breaking Month" emails -- included Earnings Claims that the Monitor determined violate the Order, and would not have been approved by the Monitor.  Another marketing piece used on October 19, 2021 for Jeff Bishop's "Sniper Report" contained language specifically rejected by the Monitor.  As described above, to address these issues the Company has proposed to continue the compliance activities that should have already been in place, and to take additional actions, including to "discontinue using any marketing inserts in product fulfillment emails in product fulfillment emails" and that the Company's outside counsel "will take responsibility to ensure that any agreed-upon changes [to marketing language] flow through all of the components of a marketing campaign."  Nevertheless, the Monitor feels that additional actions need to be taken as described above, including instructing the Company to refrain from using Earning Claims or marketing in any communications until certain conditions have been met to the satisfaction of the Monitor.

Because an element of marketing is present in virtually all company communications, the Company has implemented an interpretation of pre-approved marketing under Phase 2 of the Business Plan, (i.e., "full operations will include upselling and solicitation of renewals of pre-existing subscribers as well as the solicitation of new subscribers, but only through the use of sales and marketing materials previously approved by the Compliance Monitor") that allows them the opportunity to market, in any form, material and language previously approved by the Monitor. For example, the Company markets services from the "Retail Revolution" campaign in two of their live complementary "After Hours" training sessions: "Jeff's 3 Favorite Trading Ideas in this Unpredictable Market" and Jason Bond's "How to Catch the Top of the Market." The following is a screenshot of a banner linked to live complimentary training sessions and located on the Raging Bull homepage for non-subscribers.





In addition to providing live complimentary trainings on a weekly basis, the Company maintains a catalogue of recorded live complementary training videos under a section titled "Previous Sessions". The "Previous Sessions" section contains the two aforementioned videos marketing services under the "Retail Revolution" campaign, as well as an additional 25 training videos featuring instructors Ben Sturgill, Michael Parks, Dennis Moffatt, and Jeff Williams. The two videos, featuring Jeff Bishop and Jason Bond, respectively, market the campaign during complementary live sessions and were added to the "After Hours" section near the end of the "Retail Revolution" campaign. Although the "Retail Revolution" campaign has since ended, neither of the videos have been removed and the Company remains firm in their interpretation of the Business Plan.

However, the Company has committed to the Monitor that they will provide advance notice to the Monitor whenever they intend to use pre-approved marketing material in another marketing campaign, so that the Monitor can assess whether the context of the language remains consistent and does not violate the requirements of the Order or Business Plan.



3.      Removal of Prohibited Legacy Content from the Company's Website and Public-
        Facing Digital Media

As reported in the Third Report, Raging Bull engaged in an effort to remove all "legacy,"
or previously existing, content on its website and on all public-facing digital media (e.g., Facebook,
LinkedIn, YouTube) that contained Earnings Claims or other content prohibited by either the
Order or Business Plan. On May 24, 2021, the Company reported through its counsel that the effort
was complete.

The Monitor's proactive monitoring activities in the past sixty days have confirmed the
success of this endeavor.  Since the date of the Third Report, the Monitor has not identified any
legacy content on the Company's website that would violate the Order or Business Plan.

4.      Monitoring of Recorded Telesales Calls

Raging Bull has engaged in telesales during this reporting period.  Raging Bull's telesales
campaign includes inbound and outbound calls to existing and potential subscribers, and each of
these calls is recorded. To monitor the content of these calls, in the Eighth Request for Information
the Monitor requested all the recorded telesales calls for each of the following weeks:

•       September 5-11, 2021

•       September 19-25, 2021

Raging Bull, through its counsel, provided the Monitor with a total of forty-nine (49)
telesales recordings for these periods including both inbound and outbound calls. The Monitor
reviewed a sampling of seventeen (17) of the recordings and found that the Company's sales
representatives appropriately handled all consumer questions, complaints, and concerns, and did
not make any representations about Raging Bull's services which the Monitor considers to be

misleading or in violation of the Order or Business Plan. The Monitor will continue to review

Raging Bull's telesales activity going forward.

### B.    Simple Mechanism to Cancel Negative Option Feature

Section II of the Order requires the Company to provide a simple mechanism for consumers

to avoid being charged, or charged an increased amount, and to stop any recurring charges for

Covered Goods or Services promoted or offered using a Negative Option Feature.  This mechanism

must be accessible on the same Internet website or web-based application used by consumers

purchasing services over the Internet, and through a phone number and postal address for

consumers purchasing through an oral offer and acceptance.

During Phase 1, the Company did not accept new or extended services from current

customers and did not auto-renew any subscriptions.  Through its counsel, Raging Bull has

represented that it made a decision to permanently deactivate the auto-renewal function on all

subscriptions that were in place prior to March 26, 2021, and that any renewal of such subscriptions

will require the customer to take affirmative action.  As such, the Company's position is that for

these pre-March 26, 2021 subscriptions, there is no need for any mechanism for consumers to stop

any new or recurring charges.

As described in the Monitor's Third Report, while the Company has eliminated auto-

renewal of subscriptions in place as of March 26, 2021, the Company does continue to offer and

enroll current subscribers, and intends to offer and enroll new subscribers, into services that do

include the auto-renewal function.  For these subscriptions, Raging Bull has represented that the

Company does have and will continue to have a button available on the subscriber's Raging Bull

subscription page that allows the subscribers to cancel the auto-renewal.   The Monitor has

reviewed a number of individual customer account pages, and has confirmed that the Company

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 35



has posted the following notice to subscribers when they log-in to their subscription services under

"Refund & Cancellation Policy," as well as in their "Terms of Service" (both last updated July 6,

2021):

> To cancel your auto-renewal for your subscription-based service, you can click the "Cancel Subscription" button on your member dashboard. You can also cancel your auto-renewal by contacting the Company by telephone at (800) 380-7072 or via email at Support@RagingBull.com. We must receive your request to cancel your subscription-based service at least forty-eight (48) hours before the next subscription term to avoid further charges. Before each renewal, we will send a reminder with the term and rate then in effect to the email account associated with your account no later than five (5) business days before your subscription expires. If you do nothing, we will charge the payment method you selected. Unless you cancel auto-renewal for your subscription, the subscription-based service will be automatically extended for successive renewal period of the same duration as the subscription term originally selected, at the then-current non-promotional rate.

The following is a screen shot provided by the Company of the "Cancel Subscription" button that

appears on the member's subscription page for those subscriptions with an auto-renewal function:

[CONTINUED ON NEXT PAGE]

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 36





The following is the pop-up text that comes up after clicking "Cancel Subscription":



As indicated in the Monitor's previous Reports, Raging Bull has represented that it will also continue to send auto-renewal notice emails to customers on a 30-day, 7-day and 2-day schedule.



In summary, the Monitor finds that Raging Bull Defendants are in compliance with Section II of the Order and the related requirements in the Business Plan.  However, the Monitor intends to continue to monitor this condition and report on clarifications, as necessary, going forward.

### C.      Compliance Monitoring Over Defendants

Section III of the Order requires the Company to take all reasonable steps necessary to monitor and ensure that Raging Bull Defendants and their agents, representatives, employees, and independent contractors act in compliance with the Court's Order, and to record all live sales events in conjunction with the offering for sale of any of the Defendants' Covered Goods and Services.

#### 1.   Live Sales Events

With respect to the requirement that Raging Bull record the Company's "live sales events in conjunction with the offering for sale of any of Defendant's Covered Goods or Services,"[15]  the Company represented that it has conducted two live sales events since the date of the Monitor's last report, on September 9, 2021 and September 15, 2021; the monitoring team listened to both. The September 9, 2021 event was a livestream video approximately one hour, nine minutes in length, conducted through an open house session of Jason Bond's "Wall Street Octagon" service. Raging Bull opened the event to non-subscribers, to enable them to sample the "Wall Street Octagon" and offered them the opportunity to subscribe to the service. During the event, Defendant Bond described the components of his Wall Street Octagon service, which included access to his

---

[15]  "Live sales events" are "educational training session[s] with the purpose of marketing a related product or service."

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 38

"pioneer service, JasonBondPicks," and offered viewers monthly and yearly subscription options to the Wall Street Octagon.

The September 15, 2021 live sales event was approximately one hour, twenty-two minutes in length, and featured Defendant Bishop marketing yearly and platinum access options to his "Total Alpha" service and providing viewers with the opportunity to subscribe during the event. Based on our review, neither of the two videos contained any Earnings Claims, Consumer Testimonials, or any other content that violated the Order or Business Plan.

2.   Company's Internal Monitoring of Defendants

With respect to the requirement that "the Company to take all reasonable steps necessary to monitor and ensure that Raging Bull Defendants and their agents, representatives, employees, and independent contractors act in compliance with the Court's Order," the Monitor has initiated a comprehensive assessment of the Company's internal monitoring program.  This started with the two lead Monitors, Gerald Coyne and Jesse Caplan, visiting the Company's corporate offices on September 23, 2021, and interviewing, among others, the Company's Chief Compliance Officer and General Counsel.  The Monitor followed up this visit with its Eighth Request for Information submitted to the Company on October 6, 2021, that requested, among other information and documents, specific information addressing the Company's investment in advertising and compliance infrastructure.  While the Monitor is continuing to analyze the information provided in response to the Eighth Request for Information, given recent concerns, as described above, of material violations of the Order, Business Plan and the Company's own Compliance Program, the Monitor has concerns that the Company's internal monitoring has significant deficiencies.  As



such, the Monitor intends to complete its assessment of the Compliance Program during the next reporting period and to Report on that assessment in the Monitor's next Report.

**D.      Raging Bull Business Plan**

Section IV of the Order incorporates the Raging Bull Business Plan.  The Business Plan includes specific representations and obligations that the Company has committed to meeting under Phase 1 and Phase 2, subject to monitoring by, and in some instances the approval of, the Monitor.  The Monitor's specific findings with respect to the Company's compliance with its representations and obligation under the Business Plan are detailed in other sections within this Report, including Section IV.A. Prohibited Business Activities above, and Section V. Conditions Subject to Continued Monitoring Under the Business Plan – Phase 1, and New Monitoring Under the Business Plan – Phase 2, below.

**E.      Provision of Information to the Monitor**

Section VII of the Order requires Raging Bull Defendants provide the Monitor, immediately upon request, certain information.  The Monitor's previous Reports described the information requested by, and provided to, the Monitor since the start of the monitorship.  During this reporting period, the Monitor has continued to request information covering multiple conditions in the Order and Business Plan.  These requests have included documentation to assess and approve the Company's processes and materials relating to sales, marketing and promotions permitted under Phase 2, an Eighth Request for Information, dated October 6, 2021, requesting, *inter alia*, explanations and materials regarding the Company's continuing and new obligations under the Order and Business Plan, and numerous email communications regarding specific points of data and information. With certain exceptions, the Raging Bull Defendants have provided responses, through counsel, to these requests that the Monitor deems to be consistent with their



obligations under Section VII of the Order.  If the exceptions are not adequately addressed during the next reporting period, the Monitor will report on those in the next Report.

### F.        Cooperation and Non-Interference with the Monitor

Section VIII of the Order requires the Raging Bull Defendants and their officers, agents, employees, and attorneys to "fully cooperate with and assist the Monitor."  The Order further states that this cooperation and assistance shall specifically include "providing information to the Monitor that the Monitor deems necessary or appropriate to exercise the authority and discharge the responsibilities of the Monitor under this Order."

As detailed above under "Provision of Information to the Monitor," the Monitor has made multiple Requests for Information, by formal letter, by email, and in discussions with the Company and its counsel.  With certain exceptions as described above, neither Raging Bull Defendants nor their counsel have declined to produce any information requested.  In response to the Monitor's Eighth Request for Information, Raging Bull, through counsel, declined to produce materials in response to one request because responsive memos "were prepared at the direction of internal counsel and are privileged and attorney work product."  We believe this assertion of privilege was made in good faith, and as such, Raging Bull has cooperated with the Monitor as required by Section VIII of the Order.

Section IX of the Order holds that the Raging Bull Defendants and their officers, agents, employees, and attorneys are preliminarily restrained and enjoined from directly or indirectly interfering with the Monitor's efforts to carry out its duties under the Order; destroying or otherwise altering or disposing of any documents; and refusing to cooperate with the Monitor in the exercise of the Monitor's duties or authority under any order of the Court.  The Monitor has no reason to believe that Raging Bull Defendants or anyone working at their behest has interfered

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 41



with the Monitor's efforts to carry out its duties under the Order, and believes that Raging Bull has

continued to be cooperative with the Monitor in the exercise of those duties.

G.      **Escrow Account**

Section XI of the Order requires the owners of Raging Bull to create and fund from their

personal assets the Escrow Account in the amount of $10 million by no later than ten days after

the entry of the Order.

In the Second Report, the Monitor reported that the Company had established two separate

escrow accounts (combined, the "Escrow Account") and that based on the Defendants'

representations and supporting documentation, the Monitor was satisfied that the owners had

funded the Escrow Account in the amount of $6 million, and had used personal assets totaling $4

million to otherwise assist in the funding of RagingBull.com operations.  The Monitor reported in

the Third Report that as August 17, 2021 the Escrow Account had a balance totaling $1.5 million.

For this Third Report the Monitor requested statements showing funds on deposit in the Escrow

Account and transactions as of October 15, 2021.  The documentation provided by the Company

shows two transfers from the Escrow Account on September 1, 2021 totaling $1,500,082.25 to the

RagingBull.com LLC checking account, representing the total funds available as of that date from

the Escrow Account.  The Company represented that these funds were used to fund Company

operations.  As such, it appears that there are no longer any funds in the Escrow Account.

H.      **Refund and Cancellation Requests**

Section XII of the Order required the Company to follow a specific process for handling

all requests pending as of the date of the Order from subscribers seeking a refund of amounts paid

for services and/or a cancellation of any auto-renewal for services.  That process called for the

Company to provide full refunds to the thirty-one Declarants who submitted declarations in



support of the FTC's Motion to Show Cause.  All other requests pending as of the date of the Order were to be handled before the completion of Phase 1 as specifically set forth in the Order.  Under the Order, "[a]s a general rule, only subscribers who seek a refund for a service that, by its terms, provides for a refund are eligible for a refund," and "subscribers who seek a refund for a service that, by its terms, does not provide for a refund, or does not provide for a refund in the time period the request was made, will not be provided a refund . . .."  Under the Order, "[t]he Monitor has the authority * * * to determine, given the particular circumstances of each particular subscriber seeking a refund, whether any refund should be made and, if so, whether such refund should be full or partial."

Therefore, the Monitor does not have the authority to require that a refund be paid to any subscriber whose request and particular circumstances do not otherwise entitle the subscriber to a refund under the limitations in the Order.  Subscribers who are not eligible for a refund under the Order, but who believe they should be entitled to a refund or other restitution based on Raging Bull Defendants' alleged unfair and deceptive acts and practices that precipitated the FTC lawsuit, or for any other reasons, must seek those refunds or other relief through other avenues, i.e., through the FTC's continuing litigation in this enforcement action, through other legal action, or through appeals directly with the Company.

- <u>31 Declarants</u>

As detailed in the Monitor's Second Report, the Company has demonstrated to the Monitor that it sent each of the 31 Declarants a refund check for the proper amount.  As such, the Monitor does not intend to continue to report on this requirement in future reports.



- <u>Remaining Refund and Cancellation Requests Pending as of the March 26 Order</u>

As described above, under the Order, all remaining requests for refunds or cancellations pending as of the date of the Order were to be handled before the completion of Phase 1 as specifically set forth in the Order.  The Monitor does not have the authority to require that a refund be paid to any subscriber whose request and particular circumstances do not otherwise entitle the subscriber to a refund under the limitations in the Order.  Instead, the Monitor's responsibility and authority focused on determining whether the Company's decisions as to which of these subscribers were eligible for a refund or not, and if so the amount of the refund they were eligible for, were accurate under the terms of the Order and the specific products or services they purchased.

In order to determine the accuracy of the Company's refund eligibility decisions and refund amounts, as detailed in the previous report, the Monitor conducted several audits of the Company's refund eligibility decisions and refund amount calculations and determined that the Company had substantially complied with its obligation to handle all remaining refund and cancellation requests pending as of the date of the Order consistent with the specific parameters and limitations set forth in Section XII of the Order.

However, since the Second and Third Reports, the Monitor has learned of several more subscribers who had requests for refunds or cancellations pending as of the date of the Order who should have been determined eligible to receive a refund, or who were told they were eligible for a refund but did not receive the refund or the correct amount of the refund.  In each of these instances the Monitor provided the pertinent information to Raging Bull and our understanding is, based on information from the Company and confirmations received from those subscribers who responded to the Monitor, that each of these have been properly rectified.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 44



## V.   CONDITIONS SUBJECT TO CONTINUED MONITORING UNDER THE BUSINESS PLAN – PHASE 1 AND NEW MONITORING UNDER THE BUSINESS PLAN – PHASE 2

On June 30, 2021, the Court granted Raging Bull's motion to move into Phase 2, which permits the Company to engage in full operations, subject to ongoing compliance and oversight by the Monitor.  As a result, certain Phase 1 obligations and restrictions no longer apply.  In this section the Monitor reports on Raging Bull's compliance with those continuing Phase 1 obligations and the Company's new obligations under Phase 2.

### A.   Operations Limited to Existing Subscribers

As described above, under Phase 2 Raging Bull may engage in full operations, including sales, marketing and promotional activities targeting potentially new subscribers, and as such the restriction to existing subscribers under Phase 1 no longer applies.

### B.   No Advertising or Marketing to Potentially New Subscribers

As described above, under Phase 2 Raging Bull may engage in full operations, including sales, marketing and promotional activities targeting potentially new subscribers, and as such the restriction to existing subscribers under Phase 1 no longer applies.

### C.   No Earnings Claims, Consumer Testimonials, Etc.

As discussed in detail in Section IV.A. above, the Monitor finds that recently the Company has used Earnings Claims prohibited by the Order, and marketing language specifically rejected by the Monitor.  Also as discussed above, the Monitor proposes to require the Company to refrain from using Earning Claims or marketing in any communications until certain conditions have been met to the satisfaction of the Monitor.



### D.     No Upselling and No Renewals or New Subscriptions from Existing Subscribers

As described above, under Phase 2 Raging Bull may engage in full operations, including upselling, renewals and new subscription from both existing and potentially new subscribers, and as such the restriction under Phase 1 no longer applies.

### E.     All Pre-Existing Subscriptions Supported by ROSCA-Compliant Cancellation Mechanism

As discussed in Section IV.B. above, Raging Bull has eliminated the auto-renewal function on all subscriptions existing as of the Order, and has developed and implemented simple mechanisms to cancel an auto-renewal for new subscriptions for all its products.  These mechanisms provide multiple options, including a button on the member's dashboard, telephone number, and email address.

### F.     Investment in Advertising and Compliance Infrastructure

During Phase 1, Raging Bull committed in its Business Plan to "revamping and expanding its advertising and compliance infrastructure" through what the Plan calls a "concerted focus on additional compliance redundancies."  (Business Plan at p. 9). The Monitor's Second and Third Reports describe the Monitor's assessment of Raging Bull's compliance with these commitments and the viability of the Company's compliance program as of the dates of those Reports.  During this reporting period, the Monitor has initiated a comprehensive assessment of the Company's internal Compliance Program.  This started with the two lead Monitors, Gerald Coyne and Jesse Caplan, visiting the Company's corporate offices on September 23, 2021, and interviewing, among others, the Company's Chief Compliance Officer and General Counsel.  The Monitor followed up this visit with its Eighth Request for Information submitted to the Company on October 6, 2021, that requested, among other information and documents, specific information addressing the



Company's investment in advertising and compliance infrastructure. While the Monitor is continuing to analyze the information provided in response to the Eighth Request for Information, given recent violations of the Order, Business Plan and the Company's own Compliance Program, the Monitor has concerns relating to the implementation and effectiveness of the Company's internal Compliance Program.  As such, the Monitor intends to complete its assessment of the Compliance Program during the next reporting period and to Report on that assessment in the Monitor's next Report.

In addition to this commitment, Raging Bull, in its Business Plan, committed to make certain investments in its Advertising and Compliance Infrastructure.  Below is a summary of those investments, and any developments since the Second Report:

1. <u>The hiring of up to 5 full-time compliance personnel, as needed, based on the Chief Compliance Officer's determination; one of these employees will be designated Chief Compliance Officer and will have sufficient knowledge and expertise in FTC Section 5 advertising and marketing law and policies and will be available to be present in the Baltimore office as needed.</u>

As described in the Monitor's Second Report, Mustafa Hersi joined Raging Bull as its Chief Compliance Officer on June 7, 2021.  The Company represents that there are three additional compliance staff (which includes the General Counsel), that a fourth compliance specialist is starting on November 1, 2021, and that the Company has authorized the hiring of one more compliance professional.

2. <u>A multi-stakeholder review and revision of the Company's process for analyzing and approving sales and advertising materials before they are posted or communicated externally.</u>

The Monitor's Second Report described the policies and procedures, including Compliance Manual and Compliance Modules, addressing the Company's process for analyzing and approving sales and advertising materials.  For purposes of this Fourth Report, the process for review and



revision of sales and advertising materials for the Monitor's review and approval should have remained consistent.  However, as described above, because of recent violations of the Order and Business Plan involving sales and marketing materials, the Monitor proposes to require the Company to refrain from using Earning Claims or marketing in any communications until certain conditions have been met to the satisfaction of the Monitor.

3. <u>Review and targeted revision of the Company's employee code of conduct, which includes compliance procedures and policies, including disciplinary consequences for compliance violations.</u>

The Monitor's Second Report incorrectly described Raging Bull's revised Compliance Modules 7, 8, and 18, as no longer requiring outside counsel to review all marketing materials before they are provided to the Monitor or used by the Company.   The actual modifications permit Raging Bull to forward an unspecified percentage of non-marketing communications to their outside counsel for review but continues to require outside counsel and Monitor approval of all marketing communications.

4. <u>Development of methods for anonymous and confidential internal reporting of employee compliance misconduct, and creation of a process for the investigation of internally reported compliance complaints, with assurance of non-retaliation.</u>

The Monitor's Second and Third Reports describe the Company's methods for anonymous and confidential reporting, the process for investigating complaints, and non-retaliation policy. For this Fourth Report, the Company provided the following chart indicating the methods of reporting a compliance violation:

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 48



| Method | Anonymous? | Who does it go to? | Internal or External Reporting? |
|---|---|---|---|
| Mail | Yes | General Counsel | Internal |
| Email (reporting@ragingbull.com) | This could be anonymous if the sender chose to use a non-identifying email address. | CCO | Internal |
| Webform (linked here) | Yes | CCO | Internal |
| Phone - (603) 518-6514 - a dedicated Raging Bull phone line that goes to a voicemail box that will be reviewed by the Chief Compliance Officer | Yes | General Counsel | Internal |

The Monitor also asked the Company to "describe all compliance related investigations and remediation, and provide any investigation and/or remediation reports, since the Monitor's Third Report. In response, the Company stated: "Any compliance remediation memos were prepared at the direction of internal counsel and are privileged and attorney work product. Because the company remains in litigation with the FTC, the company will withhold these privileged materials." As of this date the Monitor has not challenged that assertion of privilege.

     5.    <u>Institution of regular reviews of "guru" trading activity and subscriber communications to ensure compliance with this plan</u>.

The Monitor's Second Report describes the Company's policies and procedures for reviewing "guru" trading activity and subscriber communications. Raging Bull's Compliance Module 7 – "Compliance Communications Review" – provides the procedure for reviewing, among other activities, "guru" trading activity and subscriber communications, as follows: "To provide oversight and suggestions for all company generated non-marketing email, texts, videos,

and mobile application communications to existing subscribers, including watch lists, educational

information, and trading activity for educational purposes.

For its Third Report, the Monitor requested specific confirmation that Raging Bull is

monitoring the trading activities of its "gurus" as required by the Business Plan.  In response, the

Company represented that "Raging Bull Compliance is monitoring guru trading activity in real

time, but guru trading activity will also be subject to an internal auditing protocol."

Based upon these responses, the Monitor's Eighth Request for Information sought a

description of "the process for reviewing 'guru' presentations and subscriber communications"

and asked the Company "to provide a copy of the schedule for monitoring 'guru' live activity."  In

response, the Company stated, "Guru trading activity is reviewed in marketing and fulfillment

materials, including trading activity discussed in public facing sales materials in accordance with

Raging Bull's Compliance Manual and Compliance Modules.  Raging Bull's Compliance

Department is working with its business partners develop a platform to share Guru trading journals

with the public.  Once implemented, Guru trading data will be randomly sampled."

In addition, the Monitor's Eighth Request for Information asked the Company to "describe

how Raging Bull Compliance is monitoring 'guru' trading activity in real time."  Based upon the

Company's response to the Monitor's Seventh Request for Information, the Eighth Request for

Information also sought information regarding the internal auditing protocol the Company had

noted, and as well as a sample of such monitoring reports.

In response, the Company stated: "As part of reviewing fulfillment, marketing, and

advertising, the Raging Bull Compliance Department monitors and reviews guru trading activity

to ensure compliance with [the] company's compliance standards as set forth in the Raging Bull

Compliance Manual and Raging Bull Compliance Modules. The Raging Bull Compliance

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 50

Department has not conducted a randomly sampled internal audit, but it is working with the business to develop a protocol to automate monitoring of a Guru's trade journal activity and intends to implement assessments once the process for automating trade journal reporting for all Gurus is completed."

Based upon the foregoing responses from Raging Bull, it does not appear that the Company has yet implemented a comprehensive system to monitor the trading activity of "gurus", nor has it yet developed a protocol to monitor guru's trade journal activity.  These areas will continue to be a specific focus of our Compliance Program assessment and monitoring efforts.

During the Monitors' visit to Raging Bull corporate headquarters on September 23, 2021 we also had the opportunity to examine the oversight exercised by the Company over the substantive on-air comments made by "gurus."   We were informed by the Chief Compliance Officer that the current "guru oversight" does not involve having a member of the compliance team continuously monitoring every "guru" in real time.  Rather, members of the compliance team concentrate upon a smaller number of "gurus" who are subject to a more focused review by the team.

In addition, members of the compliance team spot check "guru" presentations pursuant to an established schedule.  The Chief Compliance Officer stated that the compliance team has established internal processes to deal with compliance issues, including issues involving "gurus", and if a violation is deemed "egregious" a remediation report is prepared.

6.    <u>Implementation of employee and "guru" compensation and evaluation structures that incentivize compliance and penalize unlawful conduct</u>.

The Monitor's Second Report described the provisions of the Company's Compliance Manual that address compliance-related incentives. During the Monitors' visit to Raging Bull

corporate headquarters on September 23, 2021 we discussed whether "guru" compensation incentivized compliance and penalized unlawful conduct. We were informed that Raging Bull shares the goal of linking compensation to compliance, and that the Company is currently exploring effective ways to achieve that. The Company recognizes that the most effective way to implement this goal would be through inclusion of specific language in individual's employment contracts, but that doing so starts with the drafting of effective job descriptions for each "guru", and inherently involves a process of negotiation.

In the Eighth Request for Information, Raging Bull was asked to "describe what the Company has implemented with respect to employee and 'guru' compensation and evaluation structures to incentivize compliance and penalize unlawful conduct, consistent with the Company's Compliance Manual." The Company responded that, "Raging Bull will implement this process as outlined in the Compliance manual when it is in a better financial position to offer bonuses" in a manner consistent with [Section] 12 of the Compliance Manual.

Section 12B of the Compliance Manual addresses "Employee Compliance Compensation Incentives," and states, "Employees with demonstrated adherence to the Company's compliance program will be eligible for a bonus. Employees will not be considered for a bonus if there are significant compliance concerns with their work product or overall respect for the Company's compliance objectives."

The Monitor intends to continue to assess the Company's implementation of these provisions during future monitoring periods.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 52



7.      Elimination of all advertising and marketing content under the Company's control
        that is currently on the Internet that is not in compliance with the requirements of
        this plan; elimination or modification of all video and written materials for each
        service provided by the Company to ensure that all such materials offered to
        subscribers are in compliance with the requirements of this plan.

As discussed in Section IV.A. above, Raging Bull implemented a process to identify and remove all non-compliant legacy advertising and marketing content.   However, also as described above, because of recent violations of the Order and Business Plan involving both fulfillment and sales and marketing materials, the Monitor proposes to require the Company to refrain from using Earning Claims or marketing in any communications until certain conditions have been met to the satisfaction of the Monitor.

8.      The construction and implementation of new internal and external auditing and
        monitoring functions.

Module 1 of the Company's Compliance Program requires both regular internal and external compliance audits overseen by the Chief Compliance Officer.  In the Third Report the Monitor reported that the Company represented that "[i]n August 2021, the Compliance Department will be conducting an audit into the following activities: Customer Service, Telesales and Chatrooms. The Compliance Department will also be conducting secret shopping activities to assess compliance with online and telephonic sales mandates."  In the Eighth Request for Information, the Monitor asked the Company to provide documentation supporting this representation.  The Company provided the Monitor with a number of documents and other information in response to this request, which the Monitor continues to analyze, and intends to report on in the next Report.



9.    <u>The Compliance Team will also establish a formal program for the regular and consistent compliance training of Company employees, "gurus" and management</u>.

The Monitor's Second and Third Reports describe the Company's training approach and schedule, primarily outlined in Compliance Module 2.

In the Eighth Request for Information the Monitor requested updated information on the Company's Compliance Plan and Training, including written materials and slide decks for recent Compliance Trainings, and attendance documentation.  The Company provided information in response to this request, which the Monitor continues to analyze, and intends to report on in the next Report.

10.   <u>The Compliance Team will closely oversee compliance with respect to all Raging Bull advertising and marketing; language on all order forms; subscriber refunds, cancellations and customer service and response, including the resolution of complaints; trading practices of company "gurus"; and communications with subscribers; and all consumer facing communications</u>.

The Monitor's previous reports describe Raging Bull's policies and procedures addressing these compliance program responsibilities.  The Monitor has also required the Company to provide internal review and tracking documentation of sales and marketing material as part of the Monitor's Protocol for reviewing and approving all marketing materials.  A compliance tracking sheet has been submitted with each sales and marketing review, evidencing the active review of each proposal by the compliance team.

During this reporting period the Monitors had the opportunity to meet with the Company's executive leadership, the Chief Compliance Officer and members of the compliance team at the Company's headquarters, and had the opportunity to discuss the role of the compliance program within the Company.  The Monitors were told that Company now has a "rigorous compliance process" and that "Compliance is now part of the daily culture at the company."  The Company's

leadership expressed their support for the Compliance program, and the Chief Compliance Officer stated that he has been provided adequate resources to design and implement a compliance program.

In the Eighth Request for Information, the Company was asked to "describe any changes or updates to the Compliance Program, Code of Conduct, Compliance Manual and/or Compliance Modules since the Monitor's Third Report." In response, the Company stated, "At this early juncture of the tenure of its Chief Compliance Officer, the Raging Bull Compliance Department …has not prepared any internal reporting on the implementation and current state of the Compliance Department. The Raging Bull Compliance Department is reviewing and analyzing potential updates to the Compliance Manual, Compliance Modules, Code of Conduct, and internal operating procedures to assess effectiveness. After assessing the first six months of implementation, the Compliance Department anticipates providing management any proposed updates during early 2022."

However, as described above, because of recent violations of the Order and Business Plan involving both fulfillment and sales and marketing materials, the Monitor has concerns about the effectiveness of the Compliance Team's oversight, and proposes to require the Company to refrain from using Earning Claims or marketing in any communications until certain conditions have been met to the satisfaction of the Monitor. In addition, the Monitor will continue to assess the Company's Compliance Program and intends to report on that assessment in the next Report.

### G.   Customer Service, Refund and Cancellation Procedures

1.   Complaints, Refund and Cancellation Requests to Raging Bull

In its Business Plan, Raging Bull stated that it would "commit significant resources during Phase 1 and beyond to customer service," that it would "develop policies and procedures for

addressing refunds, renewal cancellations and complaints," and that it would, among other things, "address the backlog of outstanding refund requests that have not been addressed since the TRO was entered."

In the Second and Third Reports, the Monitor described in detail the efforts made to monitor the Company's compliance with these commitments. The Monitor found that Raging Bull maintained resources and further developed policies and procedures to address refund and cancellation requests, and customer complaints, substantially consistent with its commitments under the Business Plan.

However, the Monitor also reported that it had received, directly to the Monitor's dedicated email address, telephone number, and in some cases individual Monitor's personal cell phone numbers, over 460 inquiries and complaints from Raging Bull customers since the date of the March 25, 2021 Order (most seeking refunds or cancellations). Further, the Monitor had been tracking customer complaints made to review sites such as the BBB and TrustPilot, and other social media platforms. The Monitor reported that, based upon these sources, it was clear that many customers had difficulty getting through to Raging Bull customer service, had not received timely or substantive responses to their inquiries, and remained dissatisfied with how Raging Bull had handled their requests or complaints.

Since August 24, 2021 and as of October 28, 2021, the Monitor has received complaints from 16 customers, some of whom have filed repeated complaints dating back to Phase 1 and/or the initial stages of Phase 2. Also, during this period, there have been 7 complaints submitted by Raging Bull customers to the Better Business Bureau ("BBB"), TrustPilot, or tradingschools.org. These complaints generally fall into the following categories:



- The service, product or "guru" that the customer had originally subscribed to is no longer being provided by Raging Bull, but the Company refuses to cancel their subscription or refund all or a portion of their subscription price. Some of these subscriptions run into the thousands of dollars. Many of these customers feel that although their subscription may have a "no-refund" policy, or the refund period has expired, they should be entitled to a refund based on "breach of contract". The majority of customers who have complained to the Monitor fall within this category.

- Customers are unable to get in contact with Raging Bull, or unable to get a timely response or resolution to their customer complaint. In some cases, the customers have complained that they could not get a live customer service agent on the phone, or did not receive a call back or substantiative email response.

- Customers are experiencing trouble receiving a previously promised refund via check and/or internet payment services. Whether it be the wrong refund amount, a check without proper accounting and routing numbers, or a delayed check due to internal issues with the postal service, some customers have waited over two months to receive their refund. However, in several cases the Company has waited additional months for the customer to send an appropriate mailing address, delaying the arrival of their promised refund.

With respect to customers who feel that they are entitled to a refund based on "breach of contract," the Monitor has no authority to provide any relief. With respect to all customer complaints, including those customers who claim they are unable to get in contact with the Company, or those who claim they had yet to receive their promised refund, the Monitor has consistently raised the issue of customer service with the Company, and the Company has consistently responded appropriately and in a timely manner to both the customer and the Monitor.

For purposes of this Fourth Report, and in line with requests for information indicated in the Third Report, the Monitor requested specific information relating to the Company's handling of customer service complaints and requests for refunds or cancellations. In response, the Company has provided the following representations:

- Raging Bull presently has 13 customer service employees, 2 of whom are part time, and 2 who act as supervisors. Within the next 90 days, and dependent upon the



nature and volume of customer complaints, Raging Bull plans to transition some or all part-time employees to full-time customer service agents.

- Raging Bull customer service has received 1,020 inbound calls and 3,405 inbound emails from September 1, 2021 to October 13, 2021.  683 out of the 1,020 inbound calls, or 67%, were answered by a customer service agent. The average hold time for these calls is 3 minutes and 51 seconds.  All 1,020 inbound calls were eventually responded to by a customer service agent.   The average turnaround time for returning calls is less than 24 hours, and the average turn around time for returning customer service emails is less than 48 hours.

- Raging Bull maintains a "Complaint Management Team", as mandated by the Business Plan (p. 11, Phase 1, Section C), consisting of 25 members, including the Company's General Council, Martin Saunders, and Chief Compliance Officer, Mustafa Hersi.

- Raging Bull's "Complaint Management Team" escalation process consists of three "Levels." At "Level One," individual complaints are reviewed for evidence indicating whether the complaint can be resolved by means of an email. If the complaint requires further effort outside of a standard email, the complaint is sent to "Level Two" of the escalation process. "Level Two" of the escalation process involves the handling of the complaint via phone call by a more experienced customer service agent. According to the Company, this allows for the customer service agent to more readily identify the complaint and remedy the issue, whether it be through a refund or a special offer. If, however, the phone call from an experienced customer service agent does not assuage the complainant, the complaint is escalated to "Level Three" where the complaint is handled by a senior member of the "Complaint Management Team." Complaints escalated to "Level Three" should meet one of four requirements as listed by Raging Bull on their "Customer Support Escalation Process" poster, i.e., "FTC Threats," "Legal threats," "BBB threats," and "any complaints that cannot be resolved by Level 1 or Level 2."

Raging Bull provided the Monitor with customer service reports handled and logged from September 19, 2021 to September 25, 2021. The following is a short sampling of the customer service reports:

- September 20, 2021: "Started with ben way back - said trade ideas in the past before legal trouble were better but likes educational aspect now - nice guy and will keep in touch - JKLINE".



- September 21, 2021: "just bought TA- asked what he can get in replace of his energy trader (supposed to get TA but didnt mention that to him - let him know we can extend his JBP out for an additional year and is happy with that -".

- September 21, 2021: "Explained to him how his WWT work. He wants more out of the service, and I explained to him he can get that with Jeff's Trading Floor. Offered to get him in contact with a Specialist that can go over it. Doesnt want to at this time and is going to go over what he has right now. Gave him email to keep in touch".

- September 22, 2021: "Was happy for the call and wanted to know how his alerts and emails work. Got him set up and should be good to go. will email me if they have further questions. – SA".

- September 22, 2021: "Customer is getting everything and has no questions. Appreciated the call- SA".

Raging Bull submitted recordings of customer service calls for the following dates: September 1, 2021; September 15, 2021; October 1, 2021. The Monitor conducted an audit sampling 14 of the provided customer service calls and found that the Company appropriately handled all questions, complaints, and in some instances transferred customers to a sales representative.

While the Monitor does not have the authority to require Raging Bull to provide refunds, cancellations, or other relief to customers (other than those who had submitted requests as of March 26, 2021, as discussed in Section IV.H., above), the Monitor believes it has an obligation to respond to consumers who have contacted the Monitor with objective, pertinent information. As such, the Monitor sends the following email communication to every Raging Bull customer who will and has contacted the Monitor since June 25, 2021:



Dear Raging Bull Customer:

Thank you for contacting the Monitor about your efforts to get a refund from Raging Bull.

Unfortunately, our ability to help you is limited by the Court's Order.  On March 26, 2021, the Court appointed us only to monitor Raging Bull's compliance with the Court's Order and the Raging Bull Business Plan.  As the Court-appointed Monitor in the case, we have no authority to do anything the Court does not allow us to do.  With respect to refunds, the Court's Order requires Raging Bull to provide refunds only in two circumstances:

1. To the 31 subscribers who gave affidavits to the Federal Trade Commission in support of its case; or
2. For all other subscribers, only if the product or service, by its terms, provided for a refund.

We have assessed Raging Bull's compliance and determined that as of the end of June 2021, Raging Bull had provided the appropriate refunds under the terms outlined above.

However, that may not mean that you are not entitled to any relief at all.  If you believe you are entitled to a refund or restitution based on Raging Bull's actions that led to the Federal Trade Commission's court case, or for any other reason, you should consider consulting a private attorney.  If you have not already done so, you may also report your complaint with the FTC at reportfraud.ftc.gov.

Also, you may reach out to Raging Bull directly if you have additional information that you have not previously provided showing that you are entitled to a refund under the terms of the March 26, 2021 Order.  Raging Bull can be contacted at support@ragingbull.com or at (800) 380-7072.  If you do not immediately get in touch with a Raging Bull customer support member, please make sure you leave a message, or send an email, with your contact information.

Sincerely,

Jesse Caplan          Gerald Coyne
Monitor               Monitor


    In addition, the Monitor has audited Raging Bull's response to the list of customers who

contacted the monitor since June 2021. The response to the Monitor included descriptions of

Raging Bull's interactions with each customer, how and when each customer complaint was

resolved, and, if the customer complaint remained unresolved, how the company intended to

resolve outstanding complaints.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 60



Upon initial review, the Company listed 8 of the 107 customer complaints as being unresolved and indicated that the customer service department was in the process of handling the unresolved complaints. The Monitor asked the Company to provide a list of formerly unresolved complaints, and to detail the ways in which the company resolved the complaints, or how they intend to resolve the complaints. As of this report, the Company notified the Monitor of actions taken for 7 of the 8 unresolved complaints by the following means: sending the customer a check, declaring the service non-refundable, or waiting for the customer to send Raging Bull an appropriate mailing address. The Company did not send the Monitor the eighth unresolved complaint, and the Monitor intends to follow-up on the matter.

Notwithstanding the continued level of frustration by many Raging Bull customers relating to the Company's customer service and handling of refund and cancellation requests, the Monitor believes that Raging Bull has made good faith efforts to meet its commitments in the Business Plan as described above, and that those efforts are continuing and improving.  Nonetheless, the Monitor views these shortcomings as significant and in need of further improvement.  This is an area that the Monitor will continue to monitor, assess, and report on during the monitoring period.

The monitoring teams' proactive monitoring efforts did not identify any potential "scams" involving non-Company personnel posing as Raging Bull "gurus" in an attempt to extract money from unwitting Raging Bull customers.[16]  To confirm these findings, the Monitor requested the following in its Eighth Request for Information:

> *Please provide any updated information the Company has relating to potential social media scams targeting its customers, including the efforts RB has undertaken to identify, prevent and mitigate such scams, the number of RB customers who the Company has reason to believe were impacted by such scams, and how such incidents were addressed by the Company.*

---

[16]  The Monitor provided a detailed description of these "scams" in its Second Report, as well as the results of an investigation the Monitor conducted into one such "scam" involving a Raging Bull customer. The Monitor further referenced these "scams" in the Third Report.



In response, counsel for the Company stated:

> *Customer service has not encountered any scams upon reopening. Raging Bull continues to affirmatively work to prevent these incidents using its vendor, ZeroFox.*

In support of this response, the Company provided the Monitor with a recent report from ZeroFox, containing a summary of its activities to detect, analyze and remove potential "scams" found on the internet relating to the Company and its "gurus."

## VI.    INDEPENDENT COMPLIANCE MONITOR AUDIT AND CERTIFICATION

The Business Plan provides that:

> Upon completion of the above steps in relation to existing subscribers and internal compliance enhancements, and as a condition to moving into Phase 2, these efforts will be subject to an audit by the Compliance Monitor, who must first certify the satisfactory completion of these efforts and compliance with this plan in a written report filed with the Court. The certification shall be made on the basis of the Company's obligations set forth in the Court's order as well as all relevant authority under FTC law including recent case law authority, relevant rules and informal FTC guidance, and such other relevant authority as the Compliance Monitor deems appropriate based on the Compliance Monitor's expertise in the area.

In the Second Report, the Monitor described how Raging Bull Defendants' completion of its commitments under Phase 1 of the Business Plan were audited, and the Monitor's decision to certify that, with the exception of condition XI. Escrow Account of the Order, and with the acknowledgement of the significant shortcomings related to customer service responsiveness, Raging Bull Defendants had "substantially complied" with the Order and completed the Phase 1 requirements under the Business Plan.

Nevertheless, the Monitor acknowledged that it was premature to assess whether the Company's Compliance Program is, or will be, properly implemented, and whether it is effective in practice. To address the uncertainty over the effectiveness of Raging Bull's revamped Compliance Program, the Monitor has initiated: (i) an assessment of the design and structure of

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 62

the Compliance Program and intends to provide recommendations to the Company on areas for possible improvement or modification; and (ii) an assessment of the implementation and effectiveness of the Compliance Program.

The Monitor anticipates reporting to the Court in future reports the Company's progress in implementing the written Compliance Program, and an assessment of the effectiveness of that implementation and of the Program in practice.

## VII.  CONCLUSION

Up until October 19, 2021, the Monitor was prepared to report on October 25, 2021 that Raging Bull Defendants were in substantial compliance with the Order and Business plan during this most recent reporting period.  However, on October 19, 2021, and subsequently, the Monitor became aware of several very recent communications that raised compliance concerns.

Based on these recent communications, the Monitor has determined that Raging Bull Defendants are not currently in substantial compliance with the Order.  Since October 19, 2021 (but potentially earlier), the Company has engaged in activities that the Monitor has determined violate the Order, specifically:

1.      Using marketing materials that have not gone through  outside counsel's review, and to the Monitor for review and approval, as required by the Order and Business Plan.

2.      Making at least one "Earnings Claim" in a marketing communication to subscribers that does not appear to meet the requirements of the Order, is misleading, and would not have been approved by the Monitor if the Claim had been provided to the Monitor for review and approval.

3.      Using language in at least one marketing communication that was previously objected to by the Monitor and which language the Company had represented to the Monitor would

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 63



be changed, and was changed for one component of the marketing campaign, but that was then used without change in a separate component of the same marketing campaign.

Most of these violations are very recent, and constitute just a fraction of all the marketing, fulfillment content and other communications that the Company has disseminated since the date of the Order, or since the submission of the Monitor's last Report.  Nevertheless, these violations are material.  The Monitor will be conducting further investigation into these violations to determine whether they are outliers, indicate a breakdown in the Company's internal monitoring, or an intentional abrogation of the Company's compliance obligations.  In recent communications to the Monitor and the FTC, the Company proposes to address these issues by "continu[ing] to follow" certain compliance protocols (as further described below).  These suggested approaches are sound.  The Company and its counsel have also agreed to work with the Monitor to identify ways to better address the circumstances that led to the Monitor's determination that these communications constitute material violations of the Order and Business Plan.  However, the Monitor feels additional actions need to be taken immediately to both address these recent violations and provide the Monitor, and the Court, with confidence that the Company has both the intention and capacity to continue to meet its compliance obligations under the Order, Business Plan, and its own Compliance Program.  Therefore, the Monitor intends to take the following actions, which Raging Bull's counsel indicated that "Raging Bull Defendants have indicated they would accept," unless otherwise ordered by the Court:

1.      Instruct the Company to refrain from any communications with subscribers or non-subscribers that include any "Earnings Claim" as that term is defined in the Order, until and unless the Company demonstrates to the Monitor's satisfaction that (a) all communications "advertising, marketing, promoting, or offering for sale of any Covered Goods or Services" are going through

the prior review and approval process required under the Order, Business Plan and Company Compliance Program, and (b) for each "Earnings Claim" made "in connection advertising, marketing, promoting, or offering for sale of any Covered Goods or Services" is "non-misleading, and, at the time such claim is made, Defendants: (1) have a reasonable basis for the claim; [and] (2) have in their possession written materials that substantiate that the claimed earnings are typical for consumers similarly situated to those to whom the claim is made."  (Order Section I.A.).

2.      Instruct the Company to refrain from any communications with subscribers or non-subscribers that include any offer or link to upgrade, purchase or order any Covered Goods or Services (what the Monitor deems "marketing" materials) until and unless each such communication goes through the Company's internal review process, outside counsel review process, and is submitted for review and approval by the Monitor, and the Company can demonstrate, to the Monitor's satisfaction, that it has processes to ensure no such communications are used before the communication goes through the internal, outside counsel and Monitor's review and approval process required by the Order, Business Plan, and the Company's Compliance Program.

3.      Instruct the Company to report and certify to the Monitor's satisfaction whether any communications with subscribers or non-subscribers since October 1, 2021 included language or representations previously objected to or rejected by the Monitor, and the Company's processes going forward to ensure that language or representations previously objected to or rejected by the Monitor are not used in any communications going forward.

Raging Bull - Monitor's Fourth Report
November 1, 2021
Page 65



The Monitor submits this Monitor's Fourth Report for the Court's consideration, and is available for a conference or hearing, at the Court's discretion, to present its finding and to answer any questions.  The Monitor will submit its next Report within sixty days, or sooner if necessary.

**Respectfully submitted,**

Jesse M. Caplan
Monitor

Gerald J. Coyne
Monitor

Attachments:          Exhibit A – October 22, 2021 FTC Letter to Raging Bull Counsel
                      Exhibit B – October 26, 2021 Raging Bull Counsel Letter to FTC



UNITED STATES OF AMERICA
## Federal Trade Commission
WASHINGTON, D.C. 20580

Laura C. Basford
Division of Marketing Practices
Phone: (202) 766-5868
Email: lbasford@ftc.gov

**Via Email**

October 22, 2021

Miriam G. Bahcall (bahcallm@gtlaw.com)
Andrew G. Berg (berga@gtlaw.com)
Greenberg Traurig, LLP

     **RE:**    *FTC v. RagingBull.com, LLC, et. al.*, **Case No. 20-cv-03538-GLR**

Dear Counsel:

     We recently became aware that your clients in this matter are engaging in marketing that appears to violate the terms of the March 26, 2021 Order (the "Order"). In particular, the Raging Bull Defendants (collectively "Raging Bull") appear to be making deceptive earnings claims in their advertising of investment training or trading services.

     For example, Raging Bull sent a marketing email on October 19, 2021 to former Raging Bull subscribers. A copy of the marketing email is attached to this letter as Attachment A. The communication begins with the subject line "7-figure month?" and includes a header that reads "Raging Bull Insider with Jeff Bishop & Jason Bond." The email contains what appears to be a screenshot of Jason Bond's brokerage statement or earnings report showing $883,686.31 in investment gains for the period October 1-19, 2021. The email also includes a picture of Jason Bond in a hot tub, smoking a cigar. After touting Jason Bond's trading profits and extravagant lifestyle, the email invites consumers to attend a webinar with Bond where he will share "[s]tocks I'm in or looking to get in." The email ends with a postscript asking consumers to pay for "JasonBondPicks" to get "real-time Pre-alerts" on stocks Jason Bond plans to purchase, before he buys them. In short, the email conveys the overall net impression that subscribers to

Raging Bull's services can easily achieve similar advertised results by following Jason Bond's trade alerts.[1]

The webpage for "Sniper Report with Jeff Bishop," another Raging Bull offering, also appears to be violating the Order's prohibition on deceptive earnings claims.  A screen capture of the Sniper Report order page as of October 19, 2021 is attached to this letter as Attachment B.  That order page represents that Jeff Bishop will reveal "3 zombie stocks poised for a breakout" and then goes on to list five stocks that experienced enormous increases (between 265% and 1,654%) in value.  Later, the webpage refers to Bishop as an "elite" and "world-renowned" trader.  Like above, the email conveys the net impression that subscribers to the Sniper Report are likely to capture similar profits by subscribing to the service and following the same trade alerts.[2]

The Order provides that defendants are prohibited, "in connection with the … marketing … of any Covered Goods and Services[3]," from: "[m]aking any Earnings Claim[4], expressly or by implication, unless the Earnings Claim is non-misleading, and, at the time such claim is made, Defendants: (1) have a reasonable basis for the claim; (2) have in their possession written materials that substantiate that the claimed earnings are typical for consumers similarly situated to those to whom the claim is made; and (3) make the written substantiation available upon request to the consumer, potential purchaser, and the FTC."  Order at Section I(A).

As required under the Order, please provide us with all written substantiation for the representations contained in Attachments A and B, including without limitation: 1) data showing that Jason Bond in fact earned the claimed profits; and 2) data showing what past subscribers of Jason Bond Picks and the Sniper Report have generated using these services, or any other data that would show that the trading results advertised in these emails are typical for consumers.  We

---

[1] *See*, *e.g.*, *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 125 (D. Conn. 2008) ("[W]hen an advertisement contains a testimonial reflecting the experience of an individual with a product, there is an implicit representation that such experience reflects the typical or ordinary results anyone may anticipate from use of the product." (quotation omitted)).

[2] *See* additional authority located in Attachment C (Notice of Penalty Offenses Concerning Deceptive or Unfair Conduct around Endorsements and Testimonials, October 13, 2021) also located at https://www.ftc.gov/enforcement/penalty-offenses/endorsements.

[3] The Order defines Covered Goods or Services as "Defendants' investment training or trading services, or functionally similar such goods or services."

[4] The Order defines Earnings Claim as "any representation to consumers, specific or general, about income, financial gains, percentage gains, profit, net profit, gross profit, or return on investment. Earnings Claims include, but are not limited to: (a) the details of specific profitable trades, whether actual or hypothetical; (b) references to quitting one's job, not having to work, or living off of income from trading; (c) references to increased purchases or savings, including a home, vacations, or travel; ( d) claims that consumers will not lose money if they use a particular trading strategy; (e) claims that profits are likely, probable, or the "mathematical" result of applying a particular trading strategy; and (f) any representation, even hypothetical, of how much money a consumer could or would earn."

ask that you provide that substantiation to us as soon as possible, and in no event no later than close of business on **Tuesday, October 26**.

We also note that your clients appear to be violating the Order's requirement that "Defendants' advertising, marketing, promoting, or offering for sale of any Covered Goods or Services shall be subject to the prior compliance review and approval by the Monitor." Order at Section I. When we provided the Monitor with copies of the attached marketing materials, the Monitor informed us that Raging Bull had not provided them with the "7-figure month?" email for review before it was disseminated to consumers. The Monitor also told us that they had seen a different version of the Sniper Report order page and had raised concerns with the language on that page previously. Raging Bull proceeded to publish the order page with the language flagged by the Monitor.

Please advise how you will rectify these apparent failures to comply with the Order and what processes Raging Bull will put into place to prevent such violations in the future.


Best regards,

Laura C. Basford


cc:     Jesse Caplan
        Gerald Coyne

Attachments

 Gmail

**7-figure month?**
1 message

**Raging Bull** <support@ragingbull.com>                                             Tue, Oct 19, 2021 at 6:14 PM
T ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Hey Guys and Gals,

They say those who can't—TEACH

I beg to differ…



*results include options, small-cap swing trades, and long-term holds.*

October is shaping up to be a record month for me…

However, it's when you start to think you're invincible and that you've got this game figured out—when the market comes and smacks you right in the face.

So instead of this…



I'll be coming to you live at **7 PM ET to Connect The Dots.**

Not only does teaching keep me sharp, but it also keeps me grounded, and focused on my trading plan.

Tonight we'll be talking about:

- My favorite setups in small-caps
- Stocks I'm in or looking to get in
- Why I'm bullish small-caps for the rest of the year
- The latest pumps in the market, and how I like to play them

**It all goes down at 7 PM ET**

Guys and gals, this market is hot right now, and I want to show you how I'm finding opportunities and the strategies I'm utilizing to take advantage of them.

You don't want to miss this!

*Jason Bond*

**Jason Bond**

**P.S.** Want real-time Pre-alerts on these stocks and more? Upgrade to *JasonBondPicks* and I'll pre-alert you before I BUY. Click here for my $7 trial w/30-day money-back guarantee.

**DISCLAIMER:** To more fully understand any Ragingbull.com, LLC ("RagingBull") subscription, website, application or other service ("Services"), please review our full disclaimer located at https://ragingbull.com/disclaimer/

**FOR EDUCATIONAL AND INFORMATION PURPOSES ONLY: NOT INVESTMENT ADVICE.** Any RagingBull Service offered is for educational and informational purposes only and **should NOT be construed as a securities-related offer or solicitation, or be relied upon as personalized investment advice.** RagingBull strongly recommends you consult a licensed or registered professional before making any investment decision.

**RESULTS PRESENTED NOT TYPICAL OR VERIFIED.** RagingBull Services may contain information regarding the historical trading performance of RagingBull owners or employees, and/or testimonials of non-employees depicting profitability that are believed to be true based on the representations of the persons voluntarily providing the testimonial. **However, subscribers' trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL.** Actual results will vary widely given a variety of factors such as experience, skill, risk mitigation practices, market dynamics and the amount of capital deployed. **Investing in securities is speculative and carries a high degree of risk; you may lose some, all, or possibly more than your original investment.**

**RAGINGBULL IS NOT AN INVESTMENT ADVISOR OR REGISTERED BROKER.**

**RESULTS PRESENTED NOT TYPICAL OR VERIFIED.** RagingBull Services may contain information regarding the historical trading performance of RagingBull owners or employees, and/or testimonials of non-employees depicting profitability that are believed to be true based on the representations of the persons voluntarily providing the testimonial. **However, subscribers' trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL.** Actual results will vary widely given a variety of factors such as experience, skill, risk mitigation practices, market dynamics and the amount of capital deployed. **Investing in securities is speculative and carries a high degree of risk; you may lose some, all, or possibly more than your original investment.**

RagingBull nor any of its owners or employees is registered as a securities broker-dealer, broker, investment advisor (IA), or IA representative with the U.S. Securities and Exchange Commission, any state securities regulatory authority, or any self-regulatory organization. Employees, owners, and other service providers of Ragingbull.com, LLC are paid in whole or in part by commission based on their sales of Services to subscribers.

**WE MAY HOLD SECURITIES DISCUSSED.** RagingBull has not been paid directly or indirectly by the issuer of any security mentioned in the Services. However, Ragingbull.com, LLC, its owners, and its employees may purchase, sell, or hold long or short positions in securities of the companies mentioned in this communication.

Attachment A

Click to Unsubscribe

Click Unsubscribe

RagingBull.com, LLC 62 Calef Hwy #233 Lee, New Hampshire 03861 United States (410) 775-6138

Attachment A



JOIN SNIPER REPORT

JEFF BISHOP'S SNIPER REPORT IS THE ULTIMATE RESOURCE FOR CONTRARIAN, OFF-THE-RADAR, AND CATALYST-DRIVEN TRADE IDEAS.

AND IT ALL STARTS ON <u>THURSDAY, OCTOBER 21ST AT 11 AM EDT</u>, WHEN JEFF REVEALS 3 ZOMBIE STOCKS POISED FOR A BREAKOUT.

ONCE "LEFT FOR DEAD" STOCKS HAVE PULLED OFF SOME *WILD COMEBACKS...*

**YOU MIGHT HAVE NOTICED SOME OF THEM...**

Attachment B



*Gains reflect closing prices on 10/11 vs. prices to open the year.*

JEFF BELIEVES THERE'S A WHOLE NEW BATCH *READY TO POP OFF...*
AND HE'LL BE SHARING HIS 3 FAVORITES ON <u>THURSDAY, OCTOBER 21ST AT 11</u>
<u>AM EDT.</u>

IN ADDITION TO GAINING ACCESS TO THIS MEMBERS-ONLY LIVESTREAM, YOUR
SUBSCRIPTION TO THE SNIPER REPORT GETS YOU:

✓ 12 MONTHS OF JEFF'S SNIPER REPORT ALERTS. EXPECT TO RECEIVE 1-4 SPECIAL
SITUATION, OFF-THE-RADAR, AND CATALYST-DRIVEN REPORTS EACH MONTH. EACH
REPORT EXPLAINS JEFF'S TRADE THESIS, THE MECHANICS BEHIND THE SETUP, HOW HE
INTENDS TO TRADE IT, ALONG WITH HIS SPECIFIC TRADE PLAN.

✓ UPDATES ON JEFF'S SNIPER PORTFOLIO. 100% TRANSPARENCY HERE. NO WONDERING
WHAT JEFF IS IN, MEMBERS WILL GET A REGULAR LOOK AT JEFF'S SNIPER PORTFOLIO
POSITIONS.

✓ REAL-TIME TRADE ALERTS. JEFF WILL ALERT YOU BEFORE HE MAKES HIS ENTRIES AND
EXITS. MEMBERS WILL RECEIVE ALERTS IN REAL-TIME VIA THE RAGINGBULL APP AND/OR
EMAIL.

✓ ON-DEMAND TRAINING VIDEOS. IMPROVE YOUR TRADING SKILLS AND LEARN AT YOUR
OWN PACE. JEFF'S LIBRARY OF VIDEO CONTENT IS THE STUFF OF LEGEND. YOU'LL
DISCOVER HOW JEFF VIEWS THE MARKET AND TRADING, THE STRATEGIES AND SETUPS
HE LIKES THE BEST, AND THE PSYCHOLOGY NEEDED TO BE A TOP TRADER.

✓ STATE OF THE MARKET EVENTS. EACH MONTH JEFF WILL INVITE MEMBERS TO A SPECIAL
LIVESTREAM WHERE HE DISCUSSES HIS LATEST VIEWS ON THE ECONOMY, TRADING,
CATALYST EVENTS, AND HOW HE'S LOOKING TO POSITION.

JOIN SNIPER REPORT

Attachment B



*"CONFESSIONS OF AN ELITE TRADER"*



JEFF'S ALL-NEW GUIDE, WHERE HE REVEALS THE MISSTEPS, FUMBLES, CHALLENGES AND TRAPS HE'S ENCOUNTERED THROUGHOUT HIS MORE THAN 20 YEARS OF TRADING.  THIS 16-PAGE GUIDE, WHICH CONVEYS A WORLD-RENOWNED OPTIONS TRADER'S MOST VALUABLE (AND OFTEN PAINFUL) LESSONS THROUGHOUT HIS TRADING CAREER, IS SET TO BECOME AN INSTANT CLASSIC, AND IS AVAILABLE FIRST TO NEW SNIPER REPORT MEMBERS!



OPTIONS ACADEMY

IT TOOK OVER TWO YEARS TO DEVELOP, BUT IT'S FINALLY HERE! WE'VE SEEN A RECORD AMOUNT OF OPTIONS TRADING VOLUME IN 2021.  WE BELIEVE OPTIONS ACADEMY WILL QUICKLY BECOME THE NUMBER ONE DESTINATION FOR FOLKS WHO WANT TO LEARN ABOUT OPTIONS. YOU'LL GAIN ACCESS TO EXCLUSIVE ARTICLES AND VIDEO LESSONS ON OPTIONS THEORY, STRATEGIES, AND BEST PRACTICES.

Attachment B





## JASON BOND'S CONNECT THE DOTS

JASON BOND'S BRAND-NEW LIVE TRAINING SERIES CONNECT THE DOTS IS AIMED AT TEACHING FOLKS HOW TO TRADE THE MARKET'S FASTEST-MOVING STOCKS. CONNECT THE DOTS COMPLEMENTS THE SNIPER REPORT BECAUSE THE FOCUS IS ON SHORT-TERM CATALYST EVENTS, WHILE SNIPER IS LASERED IN ON SWING-TRADING IDEAS. EACH WEEK (SUNDAY, TUESDAY, AND THURSDAY) YOU'LL BE INVITED TO JASON'S LIVESTREAM WHERE HE GOES

Attachment B

OVER HIS DYNAMIC WATCHLIST, AND BREAKS DOWN THE LATEST ACTION IN THE MARKET.



### CREATE YOUR PASSWORD

Enter Your Password Here



**1** BILLING INFORMATION

**2** PAYMENT INFO

| 🔒 Credit Card Number | Month | Year | CVC |
| --- | --- | --- | --- |

Charge my credit card the amount stated above for the next 1 year of my RagingBull.com subscription. Thereafter, service will automatically continue and my credit card will be charged $299 every 1 year for the annual fee only. I understand that I can cancel my subscription and avoid a recurring charge, by simply following these instructions (https://www.ragingbull.com/tos/cancellation.html) no later than 48 hours prior to the renewal date. Cancelling within 48 hours of the renewal date or on/after the renewal date is considered a late cancellation and does not constitute a refund. By submitting my payment information, I also agree to all the Terms & Conditions (https://ragingbull.com/terms-conditions/) listed on this website.

**Refund Policy**: Since your membership provides you with immediate access to RagingBull alerts, scanners, chatrooms and / or educational content, this product is not eligible for a cash refund. However, if you decide this service isn't for you, simply give our VIP Concierge team a call within the first 30 days, and a friendly member of our team will assist you in applying a credit, equal to the full value of your purchase, towards other RagingBull Service(s).

Questions? Call our VIP Concierge Team (mailto:support@ragingbull.com) on standby: 1 (410)-775-8565

### ORDER SUMMARY

**Sniper Report**                                                   $299.00

Receive 1-3 Trade Ideas per month for 1 year. Each trade alert comes with entry/exit points and Jeff's research notes. Signals are delivered real-time to your inbox and/or text message.

$299.00 / year
Renew at $299 each year (until canceled)

Subtotal                                                            $299.00

DUE TODAY   $299

🔒 All payments are secured by 256-bit encryption

**DISCLAIMER**: To more fully understand any Ragingbull.com, LLC ("RagingBull") subscription, website, application or other service ("Services"), please review our full disclaimer located at https://ragingbull.com/disclaimer.

By agreeing to the Terms and Conditions, I understand my credit card details will be stored for future renewals of my subscription; I will be charged at the auto-renewal rate of $299 yearly, until I cancel; I understand

Attachment B

how I can cancel the \$299 yearly auto-renewal charge in order to either
prevent or stop such auto-renewal; and in order to cancel the \$299 auto-
renewal recurring maintenance fee I understand that I must cancel my
subscription no later than 48 hours prior to the anniversary date of this
order authorization. I understand that the charge will appear on my credit
card as a charge from RagingBull.com (https://ragingbull.com/).
☐ I agree to the terms and conditions (https://ragingbull.com/terms-
conditions/https://ragingbull.com/terms-conditions/) and conditions and the
refund policy (https://ragingbull.com/refund-policy/)



Copyright © Raging Bull (http://ragingbull.com/). All Rights Reserved. Disclaimer (https://ragingbull.com/disclaimer/) | Terms & Conditions
(https://ragingbull.com/terms-conditions/) | Refund Policy (https://ragingbull.com/refund-policy/) | Privacy Policy (https://ragingbull.com/privacy-
policy/)
Address: 62 Calef Hwy. #233 Lee, NH 03861 - VIP Team: 1 (410)-775-8565 (tel:4107758565)

Copyright © 2021 RagingBull.com. All Rights Reserved
Terms, Privacy, & Disclaimers (https://ragingbull.com/terms-conditions/)

Attachment B

## Notice of Penalty Offenses Concerning Deceptive or Unfair Conduct around Endorsements and Testimonials

The Federal Trade Commission has determined that the following acts or practices in the use of endorsements and testimonials are deceptive or unfair and are unlawful under Section 5 of the Federal Trade Commission Act.

- It is an unfair or deceptive trade practice to make claims which represent, expressly or by implication, that a third party has endorsed a product or its performance when such third party has not in fact endorsed such product or its performance.[1]

- It is an unfair or deceptive trade practice for an advertiser to misrepresent that an endorsement represents the experience, views, or opinions of users or purported users of the product.[2]

- It is an unfair or deceptive trade practice to misrepresent an endorser as an actual user, a current user, or a recent user of a product or service.[3]

- It is an unfair or deceptive trade practice for an advertiser to continue to advertise an endorsement unless the advertiser has good reason to believe that the endorser continues to subscribe to the views presented in the endorsement.[4]

- It is an unfair or deceptive trade practice for an advertiser to use testimonials to make unsubstantiated or otherwise deceptive performance claims even if such testimonials are genuine.[5]

- It is an unfair or deceptive trade practice to fail to disclose a connection between an endorser and the seller of an advertised product or service, if such a connection might materially affect the weight or credibility of the endorsement and if the connection would not be reasonably expected by consumers.[6]

- It is an unfair or deceptive trade practice to misrepresent explicitly or implicitly through the use of testimonials that the experience described by endorsers of a product or service represents the typical or ordinary experience of users of the product or service.[7]

[1] *Mytinger & Casselberry, Inc.*, 57 F.T.C. 717 (1960); *Ar-Ex Cosms., Inc.*, 48 F.T.C. 800 (1952); *A. P. W. Paper Co., Inc.*, 38 F.T.C. 1 (1944); *Wilbert W. Haase Co., Inc.*, 33 F.T.C. 662 (1941).
[2] *R. J. Reynolds Tobacco Co.*, 46 F.T.C. 706 (1950).
[3] *Id.*; *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984).
[4] *Nat'l Dynamics Corp.*, 82 F.T.C. 488 (1973).
[5] *Cliffdale Assocs., Inc.*, 103 F.T.C. 110; *Macmillan, Inc.*, 96 F.T.C. 208 (1980); *Porter & Dietsch, Inc.*, 90 F.T.C. 770 (1977), *aff'd*, 605 F.2d 294 (7th Cir. 1979).
[6] *Cliffdale Assocs., Inc.*, 103 F.T.C. 110.
[7] *Id.; Porter & Dietsch, Inc.*, 90 F.T.C. 770; *Nat'l Dynamics Corp.*, 82 F.T.C. 488 (1973), *modified at* 85 F.T.C. 1052 (1975).

Attachment C

**GT** GreenbergTraurig

Andrew G. Berg
Tel 202.331.2181
Fax 202.331.3101
berga@gtlaw.com

October 26, 2021

**VIA EMAIL**

Laura C. Basford
Division of Marketing Practices
Federal Trade Commission
Washington, D.C. 20580

Re:      *FTC v. RagingBull.com, LLC*, Case No. 20-cv-03538-GLR

Dear Ms. Basford:

We are in receipt of your October 22, 2021 letter ("Letter") which we believe inaccurately
suggests that Raging Bull has recently engaged in marketing in violation of the Court's March
26, 2021 Order ("Order"). For the reasons stated below, Raging Bull has not violated the Order.

Your Letter addresses two documents that were published last week. As an initial matter, Raging
Bull has published over a thousand product fulfillment emails since re-starting its operations on
May 5, 2021. Raging Bull has also disseminated hundreds of marketing communications since
early July 2021 to current and prospective subscribers. The pieces at issue represent only a
miniscule fraction of the many thousands of fulfillment and marketing pieces that Raging Bull
has issued over nearly the past 6 months.

Your Letter is the *first* instance in which the FTC has alleged that any of this fulfillment and
marketing material may be in violation of the Order.

With respect to the two documents addressed in your Letter, the FTC's suggestions that these
documents contain deceptive earnings claims in violation of the Order are unfounded, as
explained below.

As you are aware, the Monitor has raised questions about these same two documents. We have
previously responded to those questions. We believe the compliance review and approval
process that is currently in place, and that has been in place for several months, is sufficient and
working as intended, as evidenced by the fact it is only now that the FTC has made any
suggestion that Raging Bull published materials not in compliance with the Order in connection

**Greenberg Traurig, LLP | Attorneys at Law**

77 West Wacker Drive | Suite 3100 | Chicago, Illinois 60601 | T +1 312.456.8400 | F +1 312.456.8435

Albany. Amsterdam. Atlanta. Austin. Berlin˙ Boston. Chicago. Dallas. Delaware. Denver. Fort Lauderdale. Houston. Las Vegas. London˙ Los Angeles. Mexico City˙
Miami. Milan˙ Minneapolis. New Jersey. New York. Northern Virginia. Orange County. Orlando. Philadelphia. Phoenix. Sacramento. Salt Lake City. San Francisco.
Seoul˙ Shanghai. Silicon Valley. Tallahassee. Tampa. Tel Aviv˙ Tokyo˙ Warsaw˙ Washington, D.C. West Palm Beach. Westchester County.

Operates as ˙Greenberg Traurig Germany  LLP ˙a separate UK registered legal entity ˙Greenberg Traurig  S.C. ˙Greenberg Traurig Santa Maria ˙˙Greenberg Traurig LLP Foreign Legal Consultant Office ˙A branch of Greenberg Traurig  P.A  Florida  USA  ˙GT Tokyo Horitsu Jimusho and Greenberg Traurig Gaikokuhojimubengoshi
Jimusho  ˙Greenberg Traurig Grzesiak sp.k.

www.gtlaw.com

Laura C. Basford
October 26, 2021
Page 2

with any of its fulfillment or marketing materials. Nevertheless, we also understand that the questions raised by the Monitor with regard to the two documents suggest that certain improvements to the compliance review and approval process may make sense in order to avoid the possibility of any misunderstandings.  As such, we offer a proposal below for Raging Bull to discontinue its practice of incorporating pre-approved marketing inserts in product fulfillment communications and materials. Raging Bull is willing to undertake this modification to its current protocols, despite our belief the current protocols are sufficient, to address the FTC's stated concerns. We have discussed this proposed modification with the Monitor, which indicated that this made sense.

**Document 1 – Raging Bull Insider Email**

**A.      The Email Does Not Contain Deceptive Earnings Claims**

Your Letter contends that the October 19, 2021 Raging Bull Insider email ("Email") conveys an "overall net impression" that subscribers "can easily achieve similar advertised results by following Jason Bond's trade alerts." This contention misreads and misrepresents the Email.

First, the Email includes only a single express claim – the statement that Mr. Bond had an adjusted gain of $883,686.31 in trading from October 1, 2021 to October 19, 2021. This claim was accurate and substantiated in the Email itself with a contemporaneous screenshot of the TD Ameritrade account showing the adjusted gain amount. We are also providing additional substantiation, at Attachment A, showing each trade made during this time period.[1] Not only does Raging Bull have written substantiation for these trades, but Mr. Bond's full and regularly updated and sourced trading results, dating back to March 29, 2021, are *publicly* available at all times at https://app.tradersync.com/#/jasonbond. Mr. Bond is fully transparent with his trading.

Second, all other claims made in the Email, other than the single express claim regarding Mr. Bond's adjusted gain from October 1-19, are at most implied claims which must be examined in light of the net consumer takeaway. The Email is overwhelmingly a product fulfillment communication and it was sent only to current Raging Bull subscribers. The only marketing content in this Email is the very short, two-line "postscript" statement at the end of the piece, which references and offers to subscribers to "upgrade" their services to include JasonBondPicks. The recipients of the Email are current Raging Bull subscribers who generally trade in the market and are very familiar with Raging Bull's services including Mr. Bond's and Raging Bull's use of trade pre-alerts. In claiming that the target audience for the Email would believe they "can easily achieve similar advertised results by following Jason Bond's trade alerts," the FTC mistakenly assumes the recipients of the Email are unfamiliar with the Raging Bull services and may be an unrepresentative audience of unsophisticated and naïve consumers. But the actual target audience – current Raging Bull subscribers – largely comprises sophisticated, investor-focused consumers, and they are quite familiar with Raging Bull's

---

[1]  Because trades do not settle on the day of the trade, the adjusted gain will change very slightly after the trades have settled. Here, once the trades settled, the adjusted gain for this time period of October 1 to 19 has increased by approximately $6,000.

Laura C. Basford
October 26, 2021
Page 3

services. These current Raging Bull subscribers are the reasonable consumers "acting reasonably in the circumstances" that the FTC acknowledges are the appropriate consumers from whose perspective marketing must be examined. *See* FTC.gov, "FTC Policy Statement on Deception," appended to *Cliffdale Associates, Inc.*., 103 F.T.C. 110, 174 (1984), *available at*: https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf. Under this standard, there is no reasonable basis for your claim that the "overall net impression" of this target audience would believe be that they "can easily achieve similar advertised results by following Jason Bond's trade alerts." *See* Defs' Consolidated Resp. to Order to Show Cause (Dkt. 113), at 21-22 (citing Dr. Wind's expert report).

Third, the Email makes clear that Mr. Bond's trading results over this nearly three-week time period in October are not typical for him and in fact could end up as a "record month."

Fourth, the Email emphasizes the difficulty in trading and likelihood of losses: "However, it's when you start to think you're invincible and that you've got this game figured out – when the market comes and smacks you right in the face."

Fifth, your suggestion that a picture of Mr. Bond in an unadorned hot tub and smoking a cigar is somehow indicative of an "extravagant lifestyle" is plainly overstated and unsupported.

Sixth, the Email includes prominent and clear disclaimers, including the following disclaimer, with emphasis in the original:

> RESULTS PRESENTED NOT TYPICAL OR VERIFIED. RagingBull Services may contain information regarding the historical trading performance of RagingBull owners or employees, and/or testimonials of nonemployees depicting profitability that are believed to be true based on the representations of the persons voluntarily providing the testimonial. **However, subscribers 'trading results have NOT been tracked or verified** and past performance is not necessarily indicative of future results, **and the results presented in this communication are NOT TYPICAL**. Actual results will vary widely given a variety of factors such as experience, skill, risk mitigation practices, market dynamics and the amount of capital deployed. **Investing in securities is speculative and carries a high degree of risk; you may lose some, all, or possibly more than your original investment.**

As you know, according to the FTC, a disclaimer is sufficient if it is clearly and conspicuously disclosed. *See* FTC's Advertising FAQ's: A Guide for Small Business, FTC.gov, https://www.ftc.gov/tips-advice/business-center/guidance/advertising-faqs-guide-small-business. Here, the disclaimers are clearly and conspicuously displayed less than an inch below the "postscript" statement.

Laura C. Basford
October 26, 2021
Page 4

Finally, Raging Bull sold only approximately two upgrade subscriptions, for an approximate total of $14, in response to the Email. This further demonstrates that the FTC has misread and mischaracterized the Email, as consumers were not "deceived" into believing they can "easily achieve" the same trading gains as Mr. Bond references for a short period in October if they simply sign up and follow Mr. Bond's trade alerts.

In sum, there is no support for your suggestion that the Email contains deceptive earnings claims.

### B. The Email Was Approved by Raging Bull Compliance in Accordance with the Process Approved by the Monitor and Consistent with Raging Bull's Protocols

The Email was a communication in fulfillment of Raging Bull's services. Specifically, the Email is a "Raging Bull Insider" email that is published on a regular basis to current Raging Bull subscribers. The Email closes with a "postscript" statement which includes general marketing language that was substantively, and previously, approved by the Monitor.

The Email went through the appropriate internal compliance processes at Raging Bull. Pursuant to the compliance protocols previously presented to and discussed with the Monitor, all fulfillment materials, including fulfillment materials that include approved marketing materials, are reviewed by Raging Bull compliance and a significant portion of those (one-third) are also reviewed by GT on a random basis prior to release. This is consistent with Raging Bull's protocols which were provided to and approved by the Monitor. Raging Bull compliance understood the "postscript" statement to be pre-approved marketing and therefore approved the Email. Because GT does not review all fulfillment materials and this particular Email was not randomly selected for GT review, the Email was not sent to or reviewed by GT prior to publication.

### Document 2 – Sniper Report Order Form

### A. The Order Form Does Not Contain Deceptive Earnings Claims

Although your Letter claims the Sniper Report Order Form ("Order Form") "violat[es] the Order's prohibition on deceptive earnings claims," the Order Form does not include any earnings claims.

The Order Form does not reference any trades made by Raging Bull. The Order Form relates to the Sniper Report product, and provides information on an event scheduled for October 21, 2021. As noted, the event will involve Jeff Bishop (who runs the Sniper Report service) discussing "zombie stocks" which are described in the Order Form as stocks that stocks that were "left for dead" but may experience a resurgence. The Order Form identifies five recent examples of

Laura C. Basford
October 26, 2021
Page 5

stocks fitting this description. There is no statement, express or implied, in the Order Form that Mr. Bishop or anyone on behalf of the Sniper Report service traded these five stocks.

Your Letter vaguely and conclusively says the "net impression" from the Order Form is that "subscribers to the Sniper Report are likely to capture similar profits by subscribing to the service and following the same trade alerts." Your Letter conspicuously fails to identify what statements in the Order Form constitute an improper earnings claims or would suggest subscribers would capture "similar profits" (despite no profits being referenced in the Order Form) by following the "same trade alerts" (despite the Order Form not referencing trade alerts in connection with the five recent examples).

As with the Raging Bull Insider email, this Sniper Report Order Form was used in connection with materials sent only to current Raging Bull subscribers, and any claims purportedly made in the Order Form must be evaluated from the perspective of those customers acting reasonably given the circumstances. The Order Form does not make any statement —either in the form or express or implied claims —that subscribers are going to make profits. The Order Form simply notes that Mr. Bishop will discuss "his 3 favorite[]" stocks which he "believes" are "poised for a breakout." Reasonable consumers who trade the market and are familiar with Raging Bull's services would not have the "overall impression" from this Order Form that they "are likely to capture similar profits by subscribing to the service and following the same trade alerts."

The Order Form also incorporates Raging Bull's disclaimers. The disclaimers, and the use and placement of disclaimers on Raging Bull product order forms, has been approved by the Monitor on multiple occasions in order forms for other Raging Bull products.

**B.      Raging Bull Did Not Disseminate an Order Form that was Rejected by the Monitor**

Your Letter also indicates that the Monitor informed the FTC that the Monitor "had seen a different version of the Sniper Report order page" and had raised concerns with Order Form. Your Letter suggests, in essence, that the Monitor rejected the Order Form, but Raging Bull proceeded to publish it anyway. That is incorrect.

On Thursday, October 21, the Monitor informed Raging Bull counsel of its concern that Raging Bull used an Order Form that was rejected by the Monitor. Later that day, Raging Bull counsel responded to the Monitor as follows:

> Regarding the Sniper Report order form, there may have been a disconnect between GT and the Monitor. GT understood the Sniper Report order form was approved. We informed RB that it was approved, and RB used the order form we told them was approved. The issue raised by the Monitor, which we discussed in our phone conversation, was with the sales emails for Sniper Report. After we discussed the

Laura C. Basford
October 26, 2021
Page 6

> sales email[s] in our October 6 call, we provided a revised draft of the sales emails to the Monitor on the morning of October 8. The Monitor approved the materials later on October 8 and said we could move forward with the campaign. Because there was no discussion about the order form, we did not go back and re-review that and the Monitor didn't raise any issues with it. So as of October 8, when we were told the revised materials were approved and could move forward with the campaign, we understood that to mean the order form and the revised sales emails were approved. If that was not your intention, then there was an apparent disconnect between GT and the Monitor. But this was not an instance of RB sending out material "rejected" by the Monitor.

It is important to note that the Monitor did not request any changes be made to the Order Form, and did not request or review a revised draft of the Order Form.

Based on our subsequent correspondence with the Monitor, we have learned that there may have been a miscommunication between GT and the Monitor regarding the Order Form. In effect, the Monitor has indicated they did not approve the Order Form. GT, however, understood from what the Monitor communicated with GT that the Order Form had in fact been approved.

GT has been discussing this miscommunication with the Monitor, including any changes to the review and approval process to ensure that such miscommunication does not occur again. We have revised the Order form to include conforming language.  In the future, we will take responsibility to ensure that any agreed-upon changes flow through all of the components of a marketing campaign.

**<u>Proposed Modification to Process Going Forward</u>**

As noted above, these two recently published documents are to our knowledge the first and only instances in which the FTC has raised any suggestion that Raging Bull may have violated the Court's Order. Raging Bull has published over a thousand fulfillment communications and has been actively marketing since early July 2021. Raging Bull has also sometimes included, upon Raging Bull compliance review and approval, pre-approved marketing language with certain product fulfillment materials, a practice of which the Monitor has been aware. This demonstrates that, even from the FTC's perspective (and, again, we disagree that Raging Bull has violated the Order in connection with these two documents), the process in place for compliance and Monitor review and approval has been working.

Nevertheless, we recognize that the FTC has raised questions about the two documents and the process for generating, reviewing and approving marketing materials, including marketing language in fulfillment materials, as illustrated by the Raging Bull Insider Email.

Laura C. Basford
October 26, 2021
Page 7

Raging Bull has considered what modifications might address the heart of FTC's concern that the Raging Bull Insider Email was not reviewed by the Monitor prior to publication. As noted above, this Email is a product fulfillment communication with what Raging Bull understood to be a short pre-approved marketing insert at the close of the Email. Since Raging Bull entered Phase 2 and began marketing with materials approved by the Monitor, Raging Bull has on occasion included short pre-approved marketing inserts in product fulfillment emails provided the context did not alert the consumer takeaway. The Monitor has been aware of this practice. Furthermore, although all fulfillment emails, whether including any marketing inserts or not, are reviewed by Raging Bull compliance, GT reviews, with the Monitor's approval, approximately one-third of fulfillment materials.

Raging Bull also already has in place and will continue to follow the following compliance protocols, at the Monitor's approval:

- All fulfillment materials will continue to be reviewed by Raging Bull compliance, with approximately one-third reviewed by GT.
- All previously unapproved marketing materials will continue to be reviewed by Raging Bull compliance and GT, followed by submission to the Monitor for review and approval.
- Raging Bull will continue to make and publish non-substantive revisions to previously approved marketing materials, provided that GT provide notice to the Monitor of the non-substantive revisions before publishing such revised materials.

However, in light of the concerns raised by the FTC and the Monitor and to avoid any additional miscommunications or ambiguity, we propose to modify the process as follows:

- Raging Bull will discontinue using any marketing inserts in product fulfillment emails. This prohibition will apply regardless of whether the marketing materials were previously approved by the Monitor.

It is our strong belief that this modification will fully address the concerns of the FTC and the Monitor with respect to the compliance process to ensure there is not a circumstance going forward in which the Monitor may believe that any marketing materials have been disseminated without Monitor review.

**Notice of Possible Improper Discovery by the FTC**

Finally, we have received several informal reports that some of Raging Bull's business partners have recently received inquiries from the FTC. We do not know if these are formal or informal inquiries. However, if the FTC has made any such inquiries of Raging Bull's business partners, this would create significant concern for the company and its counsel.

Laura C. Basford
October 26, 2021
Page 8


If the FTC is in fact undertaking such inquiries, we believe that it would be in violation of the Federal Rules of Civil Procedure and the Court's orders, as the Court has not permitted discovery to proceed and the parties have not conducted a Rule 26(a) conference. The FTC's pre-litigation investigative powers cannot apply once the matter is in litigation.

In addition, if the FTC is making such inquiries, we believe that would constitute potential interference with Raging Bull's business relationship's ability to do business. This would negatively impact the company's ability to re-establish its business operations and continue to comply with the Court's Order, in contravention of the Court's denial of the FTC's request for preliminary injunction.

Because of the potential seriousness of this matter, we ask that the FTC advise us in writing whether it has requested, formally or informally, any information or documents from any source, including Raging Bull's payment processors or other business relationships, concerning Raging Bull at any time since March 19, 2021 to the present.

We look forward to hearing from you.

Sincerely,

/s/ Andrew G. Berg

Andrew G. Berg

Cc:    Jesse Caplan
       Gerald Coyne

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Sell.FIFO | 10,000. | 10/14/2021 | 19,500.00 | 10/18/2021 | 19,498.71 | | (1.29) | (0.01) | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Sell.FIFO | 8,000. | 10/14/2021 | 16,000.00 | 10/18/2021 | 15,598.97 | | (401.03) | (2.51) | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Sell.FIFO | 1,800. | 10/14/2021 | 3,582.00 | 10/18/2021 | 3,509.77 | | (72.23) | (2.02) | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Sell.FIFO | 100. | 10/14/2021 | 198.90 | 10/18/2021 | 194.98 | | (3.92) | (1.97) | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Sell.FIFO | 100. | 10/14/2021 | 198.80 | 10/18/2021 | 194.99 | | (3.81) | (1.92) | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Wash Sale Adj | 10,000. | 10/19/2021 | (1.29) | 10/18/2021 | | | 1.29 | | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Wash Sale Adj | 8,000. | 10/19/2021 | (401.03) | 10/18/2021 | | | 401.03 | | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Wash Sale Adj | 1,800. | 10/19/2021 | (72.23) | 10/18/2021 | | | 72.23 | | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Wash Sale Adj | 100. | 10/19/2021 | (3.92) | 10/18/2021 | | | 3.92 | | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Wash Sale Adj | 100. | 10/19/2021 | (3.81) | 10/18/2021 | | | 3.81 | | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Sell.FIFO | 100. | 10/14/2021 | 200.01 | 10/18/2021 | 197.99 | | (2.02) | (1.01) | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Wash Sale Adj | 100. | 10/21/2021 | (2.02) | 10/18/2021 | | | 2.02 | | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Sell.FIFO | 9,900. | 10/14/2021 | 19,801.28 | 10/18/2021 | 19,304.71 | | (496.57) | (2.51) | Short-term |
| AGRIFORCE GROWING SYSTEMS L (AGRI) | Wash Sale Adj | 9,900. | 10/21/2021 | (496.57) | 10/18/2021 | | | 496.57 | | Short-term |
| AMC Dec 17 2021 38.0 Put | Sell to Close.FIFO | 7,800. | 10/5/2021 | 65,150.81 | 10/6/2021 | 67,063.09 | | 1,912.28 | 2.94 | Short-term |
| AMC Dec 17 2021 38.0 Put | Sell to Close.FIFO | 2,200. | 10/5/2021 | 18,348.23 | 10/6/2021 | 18,915.23 | | 567.00 | 3.09 | Short-term |
| AMC Jan 21 2022 43.0 Put | Sell to Close.FIFO | 9,900. | 10/19/2021 | 97,041.03 | 10/19/2021 | 100,958.46 | | 3,917.43 | 4.04 | Short-term |
| AMC Jan 21 2022 43.0 Put | Sell to Close.FIFO | 100. | 10/19/2021 | 970.01 | 10/19/2021 | 1,019.78 | | 49.77 | 5.13 | Short-term |
| AMC Oct 01 2021 39.0 Call | Sell to Close.FIFO | 2,000. | 10/1/2021 | 1,664.21 | 10/1/2021 | 55.76 | | (1,608.45) | (96.65) | Short-term |
| AMC Oct 01 2021 40.0 Call | Sell to Close.FIFO | 800. | 9/30/2021 | 961.69 | 10/1/2021 | 955.90 | | (5.79) | (0.60) | Short-term |
| AMC Oct 01 2021 40.0 Call | Sell to Close.FIFO | 9,200. | 9/30/2021 | 11,059.44 | 10/1/2021 | 11,130.80 | | 71.36 | 0.65 | Short-term |
| AMC Oct 15 2021 41.0 Call | Sell to Close.FIFO | 2,000. | 10/15/2021 | 1,544.21 | 10/15/2021 | 75.74 | | (1,468.47) | (95.10) | Short-term |
| AMZN Dec 17 2021 3200.0 Call | Sell to Close.FIFO | 200. | 10/5/2021 | 36,600.42 | 10/6/2021 | 38,367.78 | | 1,767.36 | 4.83 | Short-term |
| AMZN Dec 17 2021 3200.0 Call | Sell to Close.FIFO | 800. | 10/5/2021 | 146,401.68 | 10/6/2021 | 150,719.13 | | 4,317.45 | 2.95 | Short-term |
| AMZN Oct 08 2021 3200.0 Put | Sell to Close.FIFO | 1,000. | 10/5/2021 | 14,852.10 | 10/6/2021 | 8,547.84 | | (6,304.26) | (42.45) | Short-term |
| AMZN Oct 08 2021 3250.0 Put | Buy to Close.FIFO | 1,000. | 10/5/2021 | 22,652.10 | 10/6/2021 | 31,877.72 | | 9,225.62 | 40.73 | Short-term |
| AMZN Oct 15 2021 3225.0 Put | Sell to Close.FIFO | 1,000. | 10/11/2021 | 15,632.10 | 10/13/2021 | 9,017.83 | | (6,614.27) | (42.31) | Short-term |
| AMZN Oct 15 2021 3275.0 Put | Buy to Close.FIFO | 1,000. | 10/11/2021 | 24,472.10 | 10/13/2021 | 32,627.71 | | 8,155.61 | 33.33 | Short-term |
| APRN Nov 19 2021 7.0 Put | Sell to Close.FIFO | 5,000. | 10/5/2021 | 4,510.52 | 10/11/2021 | 5,239.35 | | 728.83 | 16.16 | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Sell.FIFO | 4,400. | 10/4/2021 | 10,736.00 | 10/5/2021 | 8,535.44 | | (2,200.56) | (20.50) | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Sell.FIFO | 2,100. | 10/4/2021 | 5,103.00 | 10/5/2021 | 4,073.73 | | (1,029.27) | (20.17) | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Sell.FIFO | 3,500. | 10/4/2021 | 8,487.50 | 10/5/2021 | 6,789.55 | | (1,697.95) | (20.01) | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Wash Sale Adj | 4,400. | 10/4/2021 | (2,200.56) | 10/5/2021 | | | 2,200.56 | | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Wash Sale Adj | 2,100. | 10/4/2021 | (1,029.27) | 10/5/2021 | | | 1,029.27 | | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Wash Sale Adj | 3,500. | 10/4/2021 | (1,697.95) | 10/5/2021 | | | 1,697.95 | | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Sell.FIFO | 169. | 10/4/2021 | 447.82 | 10/5/2021 | 327.84 | | (119.98) | (26.79) | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Sell.FIFO | 1,661. | 10/4/2021 | 4,401.36 | 10/5/2021 | 3,205.54 | | (1,195.82) | (27.17) | Short-term |
| AMERICAN RESOURCES CORPORAT (AREC) | Sell.FIFO | 8,170. | 10/4/2021 | 21,575.60 | 10/5/2021 | 15,685.35 | | (5,890.25) | (27.30) | Short-term |
| VINCO VENTURES INC (BBIG) | Sell.FIFO | 2,000. | 9/27/2021 | 14,358.90 | 10/5/2021 | 11,199.90 | | (3,158.90) | (22.00) | Short-term |
| VINCO VENTURES INC (BBIG) | Sell.FIFO | 3,000. | 9/30/2021 | 18,585.00 | 10/5/2021 | 16,799.86 | | (1,785.14) | (9.61) | Short-term |
| CAMBER ENERGY INC (CEI) | Sell.FIFO | 10,000. | 10/19/2021 | 16,900.00 | 10/19/2021 | 17,698.72 | | 798.72 | 4.73 | Short-term |
| CEMTREX INC (CETX) | Sell.FIFO | 10,000. | 10/14/2021 | 13,000.00 | 10/14/2021 | 12,498.75 | | (501.25) | (3.86) | Short-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| COIN Oct 08 2021 225.0 Put | Sell to Close.FIFO | 5,000. | 9/27/2021 | 27,460.56 | 10/4/2021 | 13,389.31 | | (14,071.25) | (51.24) | Short-term |
| COIN Oct 08 2021 230.0 Put | Buy to Close.FIFO | 5,000. | 9/27/2021 | 21,860.52 | 10/4/2021 | 38,589.14 | | 16,728.62 | 76.52 | Short-term |
| COIN Oct 15 2021 220.0 Put | Sell to Close.FIFO | 10,000. | 9/30/2021 | 54,721.13 | 10/1/2021 | 39,078.56 | | (15,642.57) | (28.59) | Short-term |
| COIN Oct 15 2021 230.0 Put | Buy to Close.FIFO | 10,000. | 9/30/2021 | 73,321.04 | 10/1/2021 | 94,678.19 | | 21,357.15 | 29.13 | Short-term |
| DIDI GLOBAL INC SP ADR (DIDI) | Sell.FIFO | 10,000. | 9/27/2021 | 82,696.00 | 10/8/2021 | 81,798.39 | | (897.61) | (1.09) | Short-term |
| DIDI GLOBAL INC SP ADR (DIDI) | Wash Sale Adj | 10,000. | 10/20/2021 | (897.61) | 10/8/2021 | | | 897.61 | | Short-term |
| DIDI Jan 21 2022 7.5 Call | Sell to Close.FIFO | 30,000. | 10/7/2021 | 45,963.13 | 10/8/2021 | 50,936.01 | | 4,972.88 | 10.82 | Short-term |
| ELITE EDUCATION GROUP INTER (EEIQ) | Sell.FIFO | 2,472. | 10/5/2021 | 12,038.64 | 10/7/2021 | 10,259.45 | | (1,779.19) | (14.78) | Short-term |
| ELITE EDUCATION GROUP INTER (EEIQ) | Wash Sale Adj | 2,472. | 10/5/2021 | (1,779.19) | 10/7/2021 | | | 1,779.19 | | Short-term |
| ELITE EDUCATION GROUP INTER (EEIQ) | Sell.FIFO | 528. | 10/5/2021 | 2,571.36 | 10/7/2021 | 2,180.57 | | (390.79) | (15.20) | Short-term |
| ELITE EDUCATION GROUP INTER (EEIQ) | Sell.FIFO | 3,831. | 10/5/2021 | 20,359.16 | 10/7/2021 | 15,821.48 | | (4,537.68) | (22.29) | Short-term |
| ELITE EDUCATION GROUP INTER (EEIQ) | Sell.FIFO | 169. | 10/5/2021 | 819.48 | 10/7/2021 | 697.95 | | (121.53) | (14.83) | Short-term |
| FACEBOOK INC CL A (FB) | Exercise Sell.FIFO | 10,000. | 10/15/2021 | 3,297,321.51 | 10/15/2021 | 3,266,260.94 | | (31,060.57) | (0.94) | Short-term |
| FB Dec 17 2021 320.0 Call | Sell to Close.FIFO | 3,000. | 10/4/2021 | 69,006.31 | 10/5/2021 | 78,563.23 | | 9,556.92 | 13.85 | Short-term |
| FB Dec 17 2021 330.0 Call | Sell to Close.FIFO | 3,000. | 10/6/2021 | 63,606.31 | 10/6/2021 | 63,893.30 | | 286.99 | 0.45 | Short-term |
| FB Dec 17 2021 330.0 Call | Sell to Close.FIFO | 3,000. | 10/6/2021 | 53,406.31 | 10/6/2021 | 63,893.30 | | 10,486.99 | 19.64 | Short-term |
| FB Dec 17 2021 330.0 Call | Sell to Close.FIFO | 1,300. | 10/18/2021 | 21,712.74 | 10/18/2021 | 23,587.72 | | 1,874.98 | 8.64 | Short-term |
| FB Dec 17 2021 330.0 Call | Sell to Close.FIFO | 8,700. | 10/18/2021 | 145,308.30 | 10/18/2021 | 157,903.10 | | 12,594.80 | 8.67 | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 2,400. | 10/7/2021 | 60,725.05 | 10/18/2021 | 50,179.45 | | (10,545.60) | (17.37) | Short-term |
| FB Jan 21 2022 330.0 Call | Wash Sale Adj | 2,400. | 10/15/2021 | (10,545.60) | 10/18/2021 | | | 10,545.60 | | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 2,600. | 10/7/2021 | 65,785.47 | 10/18/2021 | 54,339.40 | | (11,446.07) | (17.40) | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 5,000. | 10/8/2021 | 125,106.12 | 10/18/2021 | 104,498.86 | | (20,607.26) | (16.47) | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 5,000. | 10/11/2021 | 106,510.52 | 10/18/2021 | 104,498.85 | | (2,011.67) | (1.89) | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 5,000. | 10/11/2021 | 103,760.52 | 10/18/2021 | 104,498.85 | | 738.33 | 0.71 | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 5,000. | 10/13/2021 | 92,510.52 | 10/18/2021 | 104,498.85 | | 11,988.33 | 12.96 | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 3,200. | 10/15/2021 | 54,406.73 | 10/18/2021 | 66,879.27 | | 12,472.54 | 22.92 | Short-term |
| FB Jan 21 2022 330.0 Call | Wash Sale Adj | 2,600. | 10/15/2021 | (11,446.07) | 10/18/2021 | | | 11,446.07 | | Short-term |
| FB Jan 21 2022 330.0 Call | Wash Sale Adj | 5,000. | 10/15/2021 | (20,607.26) | 10/18/2021 | | | 20,607.26 | | Short-term |
| FB Jan 21 2022 330.0 Call | Wash Sale Adj | 5,000. | 10/15/2021 | (2,011.67) | 10/18/2021 | | | 2,011.67 | | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 1,800. | 10/15/2021 | 38,527.99 | 10/18/2021 | 37,529.59 | | (998.40) | (2.59) | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 3,900. | 10/15/2021 | 69,038.21 | 10/18/2021 | 81,314.11 | | 12,275.90 | 17.78 | Short-term |
| FB Jan 21 2022 330.0 Call | Wash Sale Adj | 1,800. | 10/15/2021 | (998.40) | 10/18/2021 | | | 998.40 | | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 500. | 10/15/2021 | 8,851.06 | 10/18/2021 | 10,354.89 | | 1,503.83 | 16.99 | Short-term |
| FB Jan 21 2022 330.0 Call | Sell to Close.FIFO | 15,600. | 10/15/2021 | 303,292.02 | 10/18/2021 | 322,916.42 | | 19,624.40 | 6.47 | Short-term |
| FB Nov 12 2021 315.0 Put | Sell to Close.FIFO | 10,000. | 10/11/2021 | 91,221.04 | 10/18/2021 | 50,278.50 | | (40,942.54) | (44.88) | Short-term |
| FB Nov 12 2021 315.0 Put | Sell to Close.FIFO | 10,000. | 10/15/2021 | 88,021.04 | 10/18/2021 | 50,278.50 | | (37,742.54) | (42.88) | Short-term |
| FB Nov 12 2021 320.0 Put | Sell to Close.FIFO | 10,000. | 10/8/2021 | 101,721.04 | 10/18/2021 | 63,678.44 | | (38,042.60) | (37.40) | Short-term |
| FB Nov 12 2021 325.0 Put | Buy to Close.FIFO | 10,000. | 10/11/2021 | 81,121.05 | 10/18/2021 | 130,278.10 | | 49,157.05 | 60.60 | Short-term |
| FB Nov 12 2021 325.0 Put | Buy to Close.FIFO | 10,000. | 10/15/2021 | 81,121.04 | 10/18/2021 | 131,078.09 | | 49,957.05 | 61.58 | Short-term |
| FB Nov 12 2021 330.0 Put | Buy to Close.FIFO | 10,000. | 10/8/2021 | 100,221.04 | 10/18/2021 | 142,678.03 | | 42,456.99 | 42.36 | Short-term |
| FB Oct 08 2021 320.0 Put | Sell to Close.FIFO | 3,600. | 10/4/2021 | 16,639.57 | 10/5/2021 | 4,309.53 | | (12,330.04) | (74.10) | Short-term |
| FB Oct 08 2021 320.0 Put | Sell to Close.FIFO | 1,400. | 10/4/2021 | 6,470.95 | 10/5/2021 | 1,665.81 | | (4,805.14) | (74.26) | Short-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| FB Oct 08 2021 325.0 Put | Buy to Close.FIFO | 3,600. | 10/4/2021 | 7,462.38 | 10/5/2021 | 23,860.23 | | 16,397.85 | 219.74 | Short-term |
| FB Oct 08 2021 325.0 Put | Buy to Close.FIFO | 1,400. | 10/4/2021 | 2,884.15 | 10/5/2021 | 9,278.98 | | 6,394.83 | 221.72 | Short-term |
| FB Oct 15 2021 310.0 Put | Sell to Close.FIFO | 900. | 10/12/2021 | 1,135.09 | 10/12/2021 | 619.08 | | (516.01) | (45.46) | Short-term |
| FB Oct 15 2021 310.0 Put | Sell to Close.FIFO | 2,900. | 10/12/2021 | 3,596.30 | 10/12/2021 | 1,994.83 | | (1,601.47) | (44.53) | Short-term |
| FB Oct 15 2021 310.0 Put | Sell to Close.FIFO | 1,200. | 10/12/2021 | 1,476.13 | 10/12/2021 | 825.45 | | (650.68) | (44.08) | Short-term |
| FB Oct 15 2021 315.0 Put | Sell to Close.FIFO | 5,000. | 10/4/2021 | 27,510.52 | 10/5/2021 | 11,889.32 | | (15,621.20) | (56.78) | Short-term |
| FB Oct 15 2021 320.0 Put | Buy to Close.FIFO | 900. | 10/12/2021 | 2,269.89 | 10/12/2021 | 3,814.87 | | 1,544.98 | 68.06 | Short-term |
| FB Oct 15 2021 320.0 Put | Buy to Close.FIFO | 4,100. | 10/12/2021 | 10,340.63 | 10/12/2021 | 17,383.40 | | 7,042.77 | 68.11 | Short-term |
| FB Oct 15 2021 322.5 Put | Sell to Close.FIFO | 7,300. | 10/12/2021 | 32,504.01 | 10/6/2021 | 19,542.99 | | (12,961.02) | (39.88) | Short-term |
| FB Oct 15 2021 322.5 Put | Wash Sale Adj | 2,000. | 10/6/2021 | (3,550.96) | 10/6/2021 | | | 3,550.96 | | Short-term |
| FB Oct 15 2021 322.5 Put | Wash Sale Adj | 5,300. | 10/11/2021 | (9,410.06) | 10/6/2021 | | | 9,410.06 | | Short-term |
| FB Oct 15 2021 322.5 Put | Sell to Close.FIFO | 700. | 10/6/2021 | 3,116.82 | 10/6/2021 | 1,868.90 | | (1,247.92) | (40.04) | Short-term |
| FB Oct 15 2021 322.5 Put | Sell to Close.FIFO | 2,000. | 10/6/2021 | 12,411.17 | 10/6/2021 | 5,339.73 | | (7,071.44) | (56.98) | Short-term |
| FB Oct 15 2021 322.5 Put | Wash Sale Adj | 700. | 10/11/2021 | (1,247.92) | 10/6/2021 | | | 1,247.92 | | Short-term |
| FB Oct 15 2021 322.5 Put | Sell to Close.FIFO | 100. | 10/11/2021 | 493.13 | 10/11/2021 | 170.99 | | (322.14) | (65.33) | Short-term |
| FB Oct 15 2021 322.5 Put | Sell to Close.FIFO | 2,000. | 10/11/2021 | 9,862.61 | 10/11/2021 | 3,619.74 | | (6,242.87) | (63.30) | Short-term |
| FB Oct 15 2021 322.5 Put | Sell to Close.FIFO | 2,000. | 10/11/2021 | 9,811.17 | 10/11/2021 | 3,619.73 | | (6,191.44) | (63.11) | Short-term |
| FB Oct 15 2021 322.5 Put | Sell to Close.FIFO | 1,900. | 10/11/2021 | 9,268.70 | 10/11/2021 | 3,438.75 | | (5,829.95) | (62.90) | Short-term |
| FB Oct 15 2021 325.0 Put | Buy to Close.FIFO | 5,000. | 10/4/2021 | 23,060.52 | 10/5/2021 | 46,239.14 | | 23,178.62 | 100.51 | Short-term |
| FB Oct 15 2021 327.5 Put | Buy to Close.FIFO | 7,300. | 10/6/2021 | 28,271.76 | 10/6/2021 | 45,970.61 | | 17,698.85 | 62.60 | Short-term |
| FB Oct 15 2021 327.5 Put | Buy to Close.FIFO | 700. | 10/6/2021 | 2,702.07 | 10/6/2021 | 4,408.14 | | 1,706.07 | 63.14 | Short-term |
| FB Oct 15 2021 327.5 Put | Buy to Close.FIFO | 2,000. | 10/6/2021 | 7,720.21 | 10/6/2021 | 12,559.69 | | 4,839.48 | 62.69 | Short-term |
| FB Oct 15 2021 327.5 Put | Buy to Close.FIFO | 100. | 10/11/2021 | 353.01 | 10/11/2021 | 514.41 | | 161.40 | 45.72 | Short-term |
| FB Oct 15 2021 327.5 Put | Buy to Close.FIFO | 2,000. | 10/11/2021 | 6,780.21 | 10/11/2021 | 10,288.27 | | 3,508.06 | 51.74 | Short-term |
| FB Oct 15 2021 327.5 Put | Buy to Close.FIFO | 2,000. | 10/11/2021 | 6,780.21 | 10/11/2021 | 10,259.70 | | 3,479.49 | 51.32 | Short-term |
| FB Oct 15 2021 327.5 Put | Buy to Close.FIFO | 1,900. | 10/11/2021 | 6,441.20 | 10/11/2021 | 9,689.71 | | 3,248.51 | 50.43 | Short-term |
| FB Oct 22 2021 315.0 Put | Sell to Close.FIFO | 10,000. | 10/6/2021 | 47,221.04 | 10/6/2021 | 29,778.61 | | (17,442.43) | (36.94) | Short-term |
| FB Oct 22 2021 320.0 Put | Sell to Close.FIFO | 10,000. | 10/7/2021 | 39,221.04 | 10/18/2021 | 12,078.70 | | (27,142.34) | (69.20) | Short-term |
| FB Oct 22 2021 325.0 Put | Buy to Close.FIFO | 10,000. | 10/6/2021 | 52,021.04 | 10/6/2021 | 79,278.36 | | 27,257.32 | 52.40 | Short-term |
| FB Oct 22 2021 330.0 Put | Buy to Close.FIFO | 10,000. | 10/7/2021 | 39,921.04 | 10/18/2021 | 72,178.39 | | 32,257.35 | 80.80 | Short-term |
| FB Oct 29 2021 320.0 Put | Sell to Close.FIFO | 2,000. | 10/7/2021 | 18,060.21 | 10/18/2021 | 9,195.71 | | (8,864.50) | (49.08) | Short-term |
| FB Oct 29 2021 320.0 Put | Sell to Close.FIFO | 8,000. | 10/7/2021 | 72,080.83 | 10/18/2021 | 36,782.82 | | (35,298.01) | (48.97) | Short-term |
| FB Oct 29 2021 330.0 Put | Buy to Close.FIFO | 8,000. | 10/7/2021 | 66,336.83 | 10/18/2021 | 104,378.48 | | 38,041.65 | 57.35 | Short-term |
| FB Oct 29 2021 330.0 Put | Buy to Close.FIFO | 2,000. | 10/7/2021 | 16,584.21 | 10/18/2021 | 26,079.62 | | 9,495.41 | 57.26 | Short-term |
| FUELCELL ENERGY INC (FCEL) | Sell.FIFO | 10,000. | 10/18/2021 | 88,800.00 | 10/18/2021 | 87,802.36 | | (997.64) | (1.12) | Short-term |
| GEVO INC (GEVO) | Sell.FIFO | 1,000. | 10/7/2021 | 6,579.40 | 10/8/2021 | 6,719.87 | | 140.47 | 2.13 | Short-term |
| GEVO INC (GEVO) | Sell.FIFO | 4,000. | 10/7/2021 | 26,317.60 | 10/8/2021 | 26,839.38 | | 521.78 | 1.98 | Short-term |
| GOOGL Dec 17 2021 2700.0 Call | Sell to Close.FIFO | 1,000. | 9/29/2021 | 137,002.11 | 10/1/2021 | 152,997.10 | | 15,994.99 | 11.67 | Short-term |
| GOOGL Dec 17 2021 2700.0 Call | Sell to Close.FIFO | 1,000. | 10/4/2021 | 122,902.10 | 10/5/2021 | 136,997.18 | | 14,095.08 | 11.47 | Short-term |
| GOOGL Jan 21 2022 2750.0 Call | Sell to Close.FIFO | 500. | 10/6/2021 | 76,001.05 | 10/7/2021 | 86,498.50 | | 10,497.45 | 13.81 | Short-term |
| GOOGL Oct 08 2021 2680.0 Put | Sell to Close.FIFO | 1,000. | 9/28/2021 | 29,282.11 | 10/5/2021 | 16,697.79 | | (12,584.32) | (42.98) | Short-term |
| GOOGL Oct 08 2021 2730.0 Put | Buy to Close.FIFO | 1,000. | 9/28/2021 | 37,002.10 | 10/5/2021 | 45,777.64 | | 8,775.54 | 23.72 | Short-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| GOOGL Oct 15 2021 2630.0 Put | Sell to Close.FIFO | 1,000. | 10/4/2021 | 36,602.10 | 10/5/2021 | 22,297.77 | | (14,304.33) | (39.08) | Short-term |
| GOOGL Oct 15 2021 2650.0 Put | Sell to Close.FIFO | 1,000. | 10/6/2021 | 27,802.10 | 10/7/2021 | 6,887.85 | | (20,914.25) | (75.23) | Short-term |
| GOOGL Oct 15 2021 2680.0 Put | Buy to Close.FIFO | 1,000. | 10/4/2021 | 36,152.10 | 10/5/2021 | 55,597.60 | | 19,445.50 | 53.79 | Short-term |
| GOOGL Oct 15 2021 2690.0 Put | Sell to Close.FIFO | 1,000. | 9/28/2021 | 50,702.11 | 10/1/2021 | 37,897.69 | | (12,804.42) | (25.25) | Short-term |
| GOOGL Oct 15 2021 2700.0 Put | Buy to Close.FIFO | 400. | 10/6/2021 | 4,758.04 | 10/7/2021 | 17,919.06 | | 13,161.02 | 276.62 | Short-term |
| GOOGL Oct 15 2021 2700.0 Put | Buy to Close.FIFO | 200. | 10/6/2021 | 2,376.02 | 10/7/2021 | 8,959.53 | | 6,583.51 | 277.08 | Short-term |
| GOOGL Oct 15 2021 2700.0 Put | Buy to Close.FIFO | 400. | 10/6/2021 | 4,748.04 | 10/7/2021 | 17,919.06 | | 13,171.02 | 277.40 | Short-term |
| GOOGL Oct 15 2021 2740.0 Put | Buy to Close.FIFO | 1,000. | 9/28/2021 | 57,302.10 | 10/1/2021 | 70,687.51 | | 13,385.41 | 23.36 | Short-term |
| GOOGL Oct 15 2021 2750.0 Put | Sell to Close.FIFO | 1,000. | 10/8/2021 | 14,702.10 | 10/11/2021 | 7,417.84 | | (7,284.26) | (49.55) | Short-term |
| GOOGL Oct 15 2021 2750.0 Put | Wash Sale Adj | 1,000. | 10/11/2021 | (7,284.26) | 10/11/2021 | | | 7,284.26 | | Short-term |
| GOOGL Oct 15 2021 2750.0 Put | Sell to Close.FIFO | 100. | 10/11/2021 | 1,564.64 | 10/14/2021 | 187.99 | | (1,376.65) | (87.99) | Short-term |
| GOOGL Oct 15 2021 2750.0 Put | Sell to Close.FIFO | 900. | 10/11/2021 | 14,081.72 | 10/14/2021 | 1,619.88 | | (12,461.84) | (88.50) | Short-term |
| GOOGL Oct 15 2021 2800.0 Put | Buy to Close.FIFO | 1,000. | 10/8/2021 | 19,222.10 | 10/11/2021 | 32,197.72 | | 12,975.62 | 67.50 | Short-term |
| GOOGL Oct 15 2021 2800.0 Put | Buy to Close.FIFO | 100. | 10/11/2021 | 1,557.01 | 10/14/2021 | 2,194.78 | | 637.77 | 40.96 | Short-term |
| GOOGL Oct 15 2021 2800.0 Put | Buy to Close.FIFO | 900. | 10/11/2021 | 13,896.09 | 10/14/2021 | 19,752.99 | | 5,856.90 | 42.15 | Short-term |
| GOOGL Oct 22 2021 2530.0 Put | Sell to Close.FIFO | 1,000. | 10/4/2021 | 37,482.10 | 10/5/2021 | 17,597.79 | | (19,884.31) | (53.05) | Short-term |
| GOOGL Oct 22 2021 2600.0 Put | Sell to Close.FIFO | 1,000. | 9/29/2021 | 44,432.11 | 10/1/2021 | 25,097.75 | | (19,334.36) | (43.51) | Short-term |
| GOOGL Oct 22 2021 2630.0 Put | Buy to Close.FIFO | 1,000. | 10/4/2021 | 36,302.10 | 10/5/2021 | 70,477.52 | | 34,175.42 | 94.14 | Short-term |
| GOOGL Oct 22 2021 2700.0 Put | Buy to Close.FIFO | 1,000. | 9/29/2021 | 50,502.10 | 10/1/2021 | 78,427.47 | | 27,925.37 | 55.30 | Short-term |
| GOOGL Oct 22 2021 2750.0 Put | Sell to Close.FIFO | 800. | 10/11/2021 | 20,594.08 | 10/14/2021 | 12,118.24 | | (8,475.84) | (41.16) | Short-term |
| GOOGL Oct 22 2021 2750.0 Put | Sell to Close.FIFO | 200. | 10/11/2021 | 5,146.02 | 10/14/2021 | 3,029.56 | | (2,116.46) | (41.13) | Short-term |
| GOOGL Oct 22 2021 2800.0 Put | Buy to Close.FIFO | 1,000. | 10/11/2021 | 31,102.10 | 10/14/2021 | 44,577.65 | | 13,475.55 | 43.33 | Short-term |
| GREENPRO CAPITAL CORP (GRNQ) | Sell.FIFO | 3,954. | 10/15/2021 | 3,795.05 | 10/18/2021 | 4,072.92 | | 277.87 | 7.32 | Short-term |
| GREENPRO CAPITAL CORP (GRNQ) | Sell.FIFO | 4,200. | 10/15/2021 | 4,027.80 | 10/18/2021 | 4,326.32 | | 298.52 | 7.41 | Short-term |
| GREENPRO CAPITAL CORP (GRNQ) | Sell.FIFO | 1,846. | 10/15/2021 | 1,762.93 | 10/18/2021 | 1,901.52 | | 138.59 | 7.86 | Short-term |
| GREENPRO CAPITAL CORP (GRNQ) | Sell.FIFO | 3,154. | 10/15/2021 | 3,012.07 | 10/18/2021 | 3,406.56 | | 394.49 | 13.10 | Short-term |
| GREENPRO CAPITAL CORP (GRNQ) | Sell.FIFO | 6,846. | 10/15/2021 | 6,531.08 | 10/18/2021 | 7,394.19 | | 863.11 | 13.22 | Short-term |
| GROM SOCIAL ENTERPRISES INC (GROM) | Sell.FIFO | 291. | 10/8/2021 | 1,488.47 | 10/8/2021 | 1,559.75 | | 71.28 | 4.79 | Short-term |
| GROM SOCIAL ENTERPRISES INC (GROM) | Sell.FIFO | 1,382. | 10/8/2021 | 7,068.93 | 10/8/2021 | 7,407.33 | | 338.40 | 4.79 | Short-term |
| GROM SOCIAL ENTERPRISES INC (GROM) | Sell.FIFO | 3,327. | 10/8/2021 | 17,017.60 | 10/8/2021 | 17,798.96 | | 781.36 | 4.59 | Short-term |
| GROM SOCIAL ENTERPRISES INC (GROM) | Sell.FIFO | 5,000. | 10/18/2021 | 18,799.50 | 10/18/2021 | 18,751.30 | | (48.20) | (0.26) | Short-term |
| GROVE INC (GRVI) | Sell.FIFO | 5,000. | 4/26/2019 | 7,650.03 | 10/14/2021 | 38,499.21 | | 30,849.18 | 403.26 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 3,110. | 4/26/2019 | 4,758.33 | 10/14/2021 | 23,884.31 | | 19,125.98 | 401.95 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 880. | 4/26/2019 | 1,346.40 | 10/14/2021 | 6,749.46 | | 5,403.06 | 401.30 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 870. | 4/26/2019 | 1,331.11 | 10/14/2021 | 6,664.06 | | 5,332.95 | 400.64 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 140. | 4/26/2019 | 214.20 | 10/14/2021 | 1,070.97 | | 856.77 | 399.99 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,317. | 4/26/2019 | 2,015.02 | 10/14/2021 | 10,733.34 | | 8,718.32 | 432.67 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,721. | 4/26/2019 | 2,633.14 | 10/14/2021 | 14,008.67 | | 11,375.53 | 432.01 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,537. | 4/26/2019 | 2,351.62 | 10/14/2021 | 12,495.57 | | 10,143.95 | 431.36 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 425. | 4/26/2019 | 650.25 | 10/14/2021 | 3,450.93 | | 2,800.68 | 430.71 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 200. | 4/26/2019 | 306.00 | 10/14/2021 | 1,614.17 | | 1,308.17 | 427.51 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 700. | 4/26/2019 | 1,071.01 | 10/14/2021 | 5,648.89 | | 4,577.88 | 427.44 | Long-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| GROVE INC (GRVI) | Sell.FIFO | 4,100. | 4/26/2019 | 6,273.02 | 10/14/2021 | 33,045.34 | | 26,772.32 | 426.79 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 546. | 4/26/2019 | 835.39 | 10/14/2021 | 4,264.18 | | 3,428.79 | 410.44 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,211. | 4/26/2019 | 1,852.83 | 10/14/2021 | 9,445.62 | | 7,592.79 | 409.79 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,393. | 4/26/2019 | 2,131.30 | 10/14/2021 | 10,851.25 | | 8,719.95 | 409.14 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,850. | 4/26/2019 | 2,830.51 | 10/14/2021 | 14,392.71 | | 11,562.20 | 408.48 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 5,000. | 4/26/2019 | 7,650.04 | 10/14/2021 | 38,549.21 | | 30,899.17 | 403.91 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 3,050. | 4/26/2019 | 4,666.52 | 10/14/2021 | 23,332.03 | | 18,665.51 | 399.99 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,950. | 4/26/2019 | 2,983.51 | 10/14/2021 | 14,897.70 | | 11,914.19 | 399.33 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 60. | 4/26/2019 | 91.80 | 10/14/2021 | 463.19 | | 371.39 | 404.56 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 2,465. | 4/26/2019 | 3,771.47 | 10/14/2021 | 19,004.75 | | 15,233.28 | 403.91 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,883. | 4/26/2019 | 2,881.00 | 10/14/2021 | 14,498.81 | | 11,617.81 | 403.26 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 5. | 4/26/2019 | 7.65 | 10/14/2021 | 38.40 | | 30.75 | 401.96 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 587. | 4/26/2019 | 898.11 | 10/14/2021 | 4,502.20 | | 3,604.09 | 401.30 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 200. | 4/26/2019 | 306.00 | 10/14/2021 | 1,576.17 | | 1,270.17 | 415.09 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 4,800. | 4/26/2019 | 7,344.03 | 10/14/2021 | 37,823.25 | | 30,479.22 | 415.02 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 47. | 4/26/2019 | 71.91 | 10/14/2021 | 370.82 | | 298.91 | 415.67 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 327. | 4/26/2019 | 500.32 | 10/14/2021 | 2,573.44 | | 2,073.12 | 414.36 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 200. | 4/26/2019 | 306.00 | 10/14/2021 | 1,572.17 | | 1,266.17 | 413.78 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 4,426. | 4/26/2019 | 6,771.81 | 10/14/2021 | 34,787.67 | | 28,015.86 | 413.71 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 5,000. | 4/26/2019 | 7,650.03 | 10/14/2021 | 38,999.20 | | 31,349.17 | 409.79 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 200. | 4/26/2019 | 306.00 | 10/14/2021 | 1,566.17 | | 1,260.17 | 411.82 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 750. | 4/26/2019 | 1,147.51 | 10/14/2021 | 5,872.38 | | 4,724.87 | 411.75 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 969. | 4/26/2019 | 1,482.57 | 10/14/2021 | 7,567.74 | | 6,085.17 | 410.45 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 200. | 4/26/2019 | 306.00 | 10/14/2021 | 1,560.17 | | 1,254.17 | 409.86 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 2,881. | 4/26/2019 | 4,407.95 | 10/14/2021 | 22,471.35 | | 18,063.40 | 409.79 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 5,000. | 4/26/2019 | 7,650.03 | 10/14/2021 | 38,999.21 | | 31,349.18 | 409.79 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 5,000. | 4/26/2019 | 7,650.04 | 10/14/2021 | 41,499.18 | | 33,849.14 | 442.47 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 953. | 4/26/2019 | 1,458.09 | 10/14/2021 | 8,071.77 | | 6,613.68 | 453.59 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 2,222. | 4/26/2019 | 3,399.68 | 10/14/2021 | 18,797.79 | | 15,398.11 | 452.93 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 100. | 4/26/2019 | 153.00 | 10/14/2021 | 845.09 | | 692.09 | 452.35 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,725. | 4/26/2019 | 2,639.26 | 10/14/2021 | 14,575.98 | | 11,936.72 | 452.28 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,500. | 4/26/2019 | 2,295.01 | 10/14/2021 | 12,809.78 | | 10,514.77 | 458.16 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 435. | 4/26/2019 | 665.55 | 10/14/2021 | 3,710.49 | | 3,044.94 | 457.51 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 200. | 4/26/2019 | 306.00 | 10/14/2021 | 1,704.17 | | 1,398.17 | 456.92 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 2,865. | 4/26/2019 | 4,383.47 | 10/14/2021 | 24,409.34 | | 20,025.87 | 456.85 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,173. | 4/26/2019 | 1,794.70 | 10/14/2021 | 9,817.82 | | 8,023.12 | 447.05 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 103. | 4/26/2019 | 157.59 | 10/14/2021 | 861.07 | | 703.48 | 446.40 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,033. | 4/26/2019 | 1,580.50 | 10/14/2021 | 8,625.37 | | 7,044.87 | 445.74 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 541. | 4/26/2019 | 827.73 | 10/14/2021 | 4,511.86 | | 3,684.13 | 445.09 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 2,150. | 4/26/2019 | 3,289.51 | 10/14/2021 | 17,909.16 | | 14,619.65 | 444.43 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 1,366. | 4/26/2019 | 2,089.99 | 10/14/2021 | 11,146.35 | | 9,056.36 | 433.32 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 3,634. | 4/26/2019 | 5,560.05 | 10/14/2021 | 29,616.54 | | 24,056.49 | 432.67 | Long-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| GROVE INC (GRVI) | Sell.FIFO | 767. | 4/26/2019 | 1,173.51 | 10/14/2021 | 6,296.94 | | 5,123.43 | 436.59 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 4,233. | 4/26/2019 | 6,476.52 | 10/14/2021 | 34,709.93 | | 28,233.41 | 435.93 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 2,400. | 4/26/2019 | 3,672.01 | 10/14/2021 | 18,983.61 | | 15,311.60 | 416.98 | Long-term |
| GROVE INC (GRVI) | Sell.FIFO | 2,600. | 4/26/2019 | 3,978.02 | 10/14/2021 | 20,539.59 | | 16,561.57 | 416.33 | Long-term |
| ESS TECH INC (GWH) | Sell.FIFO | 100. | 10/12/2021 | 2,350.00 | 10/15/2021 | 1,741.98 | | (608.02) | (25.87) | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 290. | 10/12/2021 | 6,814.97 | 10/15/2021 | 5,051.75 | | (1,763.22) | (25.87) | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 100. | 10/12/2021 | (608.02) | 10/15/2021 | | | 608.02 | | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 290. | 10/14/2021 | (1,763.22) | 10/15/2021 | | | 1,763.22 | | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 1,610. | 10/12/2021 | 38,442.86 | 10/15/2021 | 28,029.79 | | (10,413.07) | (27.09) | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 71. | 10/14/2021 | 1,398.76 | 10/15/2021 | 1,236.10 | | (162.66) | (11.63) | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 1,610. | 10/14/2021 | (10,413.07) | 10/15/2021 | | | 10,413.07 | | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 71. | 10/14/2021 | (162.66) | 10/15/2021 | | | 162.66 | | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 525. | 10/14/2021 | 13,537.31 | 10/15/2021 | 9,134.89 | | (4,402.42) | (32.52) | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 775. | 10/14/2021 | 19,987.32 | 10/15/2021 | 13,484.84 | | (6,502.48) | (32.53) | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 500. | 10/14/2021 | 12,887.55 | 10/15/2021 | 8,699.90 | | (4,187.65) | (32.49) | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 48. | 10/14/2021 | 1,527.37 | 10/15/2021 | 835.19 | | (692.18) | (45.32) | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 81. | 10/14/2021 | 2,289.33 | 10/15/2021 | 1,409.38 | | (879.95) | (38.44) | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 525. | 10/14/2021 | (4,402.42) | 10/15/2021 | | | 4,402.42 | | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 775. | 10/14/2021 | (6,502.48) | 10/15/2021 | | | 6,502.48 | | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 500. | 10/14/2021 | (4,187.65) | 10/15/2021 | | | 4,187.65 | | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 48. | 10/14/2021 | (692.18) | 10/15/2021 | | | 692.18 | | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 81. | 10/14/2021 | (879.95) | 10/15/2021 | | | 879.95 | | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 2,000. | 10/14/2021 | 50,640.70 | 10/18/2021 | 37,339.78 | | (13,300.92) | (26.27) | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 625. | 10/15/2021 | 10,971.88 | 10/18/2021 | 11,668.68 | | 696.80 | 6.35 | Short-term |
| ESS TECH INC (GWH) | Wash Sale Adj | 1,375. | 10/15/2021 | (8,898.78) | 10/18/2021 | | | 8,898.78 | | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 1. | 10/15/2021 | 18.11 | 10/18/2021 | 18.63 | | 0.52 | 2.87 | Short-term |
| ESS TECH INC (GWH) | Sell.FIFO | 1,374. | 10/15/2021 | 33,018.79 | 10/18/2021 | 25,583.60 | | (7,435.19) | (22.52) | Short-term |
| D-MARKET ELEKTRONIK HIZMETL (HEPS) | Sell.FIFO | 984. | 10/14/2021 | 5,461.20 | 10/14/2021 | 5,687.37 | | 226.17 | 4.14 | Short-term |
| D-MARKET ELEKTRONIK HIZMETL (HEPS) | Sell.FIFO | 4,316. | 10/14/2021 | 23,953.80 | 10/14/2021 | 24,902.70 | | 948.90 | 3.96 | Short-term |
| D-MARKET ELEKTRONIK HIZMETL (HEPS) | Sell.FIFO | 1,160. | 10/14/2021 | 6,426.40 | 10/14/2021 | 6,693.03 | | 266.63 | 4.15 | Short-term |
| D-MARKET ELEKTRONIK HIZMETL (HEPS) | Sell.FIFO | 1,140. | 10/14/2021 | 6,315.60 | 10/14/2021 | 6,566.23 | | 250.63 | 3.97 | Short-term |
| D-MARKET ELEKTRONIK HIZMETL (HEPS) | Sell.FIFO | 2,400. | 10/14/2021 | 13,284.00 | 10/14/2021 | 13,823.65 | | 539.65 | 4.06 | Short-term |
| ION GEOPHYSICAL (IO) | Sell.FIFO | 300. | 10/18/2021 | 660.00 | 10/18/2021 | 640.47 | | (19.53) | (2.96) | Short-term |
| ION GEOPHYSICAL (IO) | Sell.FIFO | 3,287. | 10/18/2021 | 7,231.40 | 10/18/2021 | 7,000.91 | | (230.49) | (3.19) | Short-term |
| ION GEOPHYSICAL (IO) | Sell.FIFO | 6,413. | 10/18/2021 | 14,108.60 | 10/18/2021 | 13,594.73 | | (513.87) | (3.64) | Short-term |
| IQ Jan 21 2022 7.5 Call | Sell to Close.FIFO | 20,000. | 10/5/2021 | 25,042.09 | 10/7/2021 | 29,957.36 | | 4,915.27 | 19.63 | Short-term |
| IWM Nov 19 2021 217.0 Call | Sell to Close.FIFO | 10,000. | 10/6/2021 | 79,821.04 | 10/6/2021 | 90,078.30 | | 10,257.26 | 12.85 | Short-term |
| IWM Nov 19 2021 220.0 Call | Sell to Close.FIFO | 5,000. | 10/4/2021 | 43,260.52 | 10/5/2021 | 43,839.16 | | 578.64 | 1.34 | Short-term |
| IWM Nov 19 2021 220.0 Call | Sell to Close.FIFO | 5,000. | 10/4/2021 | 40,910.52 | 10/5/2021 | 43,839.15 | | 2,928.63 | 7.16 | Short-term |
| IWM Nov 19 2021 220.0 Call | Sell to Close.FIFO | 5,000. | 10/5/2021 | 38,260.52 | 10/5/2021 | 40,139.18 | | 1,878.66 | 4.91 | Short-term |
| IWM Nov 19 2021 220.0 Call | Sell to Close.FIFO | 10,000. | 10/6/2021 | 70,321.04 | 10/7/2021 | 80,478.35 | | 10,157.31 | 14.44 | Short-term |
| IWM Oct 29 2021 221.0 Call | Sell to Close.FIFO | 5,000. | 9/28/2021 | 37,360.56 | 10/1/2021 | 32,139.22 | | (5,221.34) | (13.98) | Short-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| IWM Oct 29 2021 221.0 Call | Sell to Close.FIFO | 5,000. | 9/28/2021 | 36,410.56 | 10/1/2021 | 32,139.21 | | (4,271.35) | (11.73) | Short-term |
| IWM Oct 29 2021 221.0 Call | Sell to Close.FIFO | 10,000. | 9/28/2021 | 67,721.13 | 10/1/2021 | 64,278.43 | | (3,442.70) | (5.08) | Short-term |
| IWM Oct 29 2021 221.0 Call | Wash Sale Adj | 5,000. | 9/28/2021 | (5,221.34) | 10/1/2021 | | | 5,221.34 | | Short-term |
| IWM Oct 29 2021 221.0 Call | Wash Sale Adj | 5,000. | 9/28/2021 | (4,271.35) | 10/1/2021 | | | 4,271.35 | | Short-term |
| IWM Oct 29 2021 221.0 Call | Wash Sale Adj | 10,000. | 9/29/2021 | (3,442.70) | 10/1/2021 | | | 3,442.70 | | Short-term |
| IWM Oct 29 2021 221.0 Call | Sell to Close.FIFO | 9,000. | 9/28/2021 | 66,079.43 | 10/1/2021 | 58,210.58 | | (7,868.85) | (11.91) | Short-term |
| IWM Oct 29 2021 221.0 Call | Sell to Close.FIFO | 1,000. | 9/28/2021 | 7,224.38 | 10/1/2021 | 6,467.85 | | (756.53) | (10.47) | Short-term |
| IWM Oct 29 2021 221.0 Call | Sell to Close.FIFO | 10,000. | 9/29/2021 | 68,163.83 | 10/1/2021 | 64,678.42 | | (3,485.41) | (5.11) | Short-term |
| IWM Oct 29 2021 221.0 Call | Wash Sale Adj | 9,000. | 9/30/2021 | (7,868.85) | 10/1/2021 | | | 7,868.85 | | Short-term |
| IWM Oct 29 2021 221.0 Call | Wash Sale Adj | 1,000. | 9/30/2021 | (756.53) | 10/1/2021 | | | 756.53 | | Short-term |
| IWM Oct 29 2021 221.0 Call | Wash Sale Adj | 10,000. | 9/30/2021 | (3,485.41) | 10/1/2021 | | | 3,485.41 | | Short-term |
| IWM Oct 29 2021 221.0 Call | Sell to Close.FIFO | 10,000. | 9/30/2021 | 65,646.51 | 10/1/2021 | 65,978.42 | | 331.91 | 0.51 | Short-term |
| IWM Oct 29 2021 221.0 Call | Sell to Close.FIFO | 10,000. | 9/30/2021 | 62,306.54 | 10/1/2021 | 65,978.42 | | 3,671.88 | 5.89 | Short-term |
| LION GROUP HOLDINGS LIMITED (LGHL) | Sell.FIFO | 639. | 10/4/2021 | 1,207.71 | 10/5/2021 | 1,226.79 | | 19.08 | 1.58 | Short-term |
| LION GROUP HOLDINGS LIMITED (LGHL) | Sell.FIFO | 338. | 10/4/2021 | 638.82 | 10/5/2021 | 645.54 | | 6.72 | 1.05 | Short-term |
| LION GROUP HOLDINGS LIMITED (LGHL) | Sell.FIFO | 100. | 10/4/2021 | 188.90 | 10/5/2021 | 190.98 | | 2.08 | 1.10 | Short-term |
| LION GROUP HOLDINGS LIMITED (LGHL) | Sell.FIFO | 100. | 10/4/2021 | 188.50 | 10/5/2021 | 190.99 | | 2.49 | 1.32 | Short-term |
| LION GROUP HOLDINGS LIMITED (LGHL) | Sell.FIFO | 400. | 10/4/2021 | 751.96 | 10/5/2021 | 763.95 | | 11.99 | 1.59 | Short-term |
| LION GROUP HOLDINGS LIMITED (LGHL) | Sell.FIFO | 3,123. | 10/4/2021 | 5,933.08 | 10/5/2021 | 5,964.53 | | 31.45 | 0.53 | Short-term |
| LION GROUP HOLDINGS LIMITED (LGHL) | Sell.FIFO | 300. | 10/4/2021 | 568.50 | 10/5/2021 | 572.96 | | 4.46 | 0.78 | Short-term |
| LION GROUP HOLDINGS LIMITED (LGHL) | Sell.FIFO | 5,000. | 10/8/2021 | 11,349.50 | 10/11/2021 | 10,899.84 | | (449.66) | (3.96) | Short-term |
| LULULEMON ATHLETICA INC (LULU) | Exercise Sell.FIFO | 5,000. | 10/15/2021 | 2,025,060.91 | 10/15/2021 | 2,010,528.38 | | (14,532.53) | (0.72) | Short-term |
| LULU Oct 08 2021 410.0 Put | Sell to Close.FIFO | 5,000. | 9/28/2021 | 27,260.56 | 10/8/2021 | 64,339.05 | | 37,078.49 | 136.02 | Short-term |
| LULU Oct 08 2021 415.0 Put | Buy to Close.FIFO | 5,000. | 9/28/2021 | 89,360.52 | 10/8/2021 | 37,239.15 | | (52,121.37) | (58.33) | Short-term |
| NKE Oct 15 2021 150.0 Put | Sell to Close.FIFO | 2,000. | 10/7/2021 | 2,040.21 | 10/8/2021 | 1,635.75 | | (404.46) | (19.82) | Short-term |
| NKE Oct 15 2021 150.0 Put | Sell to Close.FIFO | 4,000. | 10/7/2021 | 4,000.42 | 10/8/2021 | 3,271.50 | | (728.92) | (18.22) | Short-term |
| NKE Oct 15 2021 150.0 Put | Sell to Close.FIFO | 2,000. | 10/7/2021 | 1,980.21 | 10/8/2021 | 1,635.75 | | (344.46) | (17.40) | Short-term |
| NKE Oct 15 2021 150.0 Put | Sell to Close.FIFO | 2,000. | 10/7/2021 | 1,960.21 | 10/8/2021 | 1,635.75 | | (324.46) | (16.55) | Short-term |
| NKE Oct 15 2021 152.5 Put | Buy to Close.FIFO | 2,000. | 10/7/2021 | 3,445.21 | 10/8/2021 | 3,799.73 | | 354.52 | 10.29 | Short-term |
| NKE Oct 15 2021 152.5 Put | Buy to Close.FIFO | 4,000. | 10/7/2021 | 6,890.41 | 10/8/2021 | 7,599.46 | | 709.05 | 10.29 | Short-term |
| NKE Oct 15 2021 152.5 Put | Buy to Close.FIFO | 2,000. | 10/7/2021 | 3,445.21 | 10/8/2021 | 3,779.73 | | 334.52 | 9.71 | Short-term |
| NKE Oct 15 2021 152.5 Put | Buy to Close.FIFO | 2,000. | 10/7/2021 | 3,420.21 | 10/8/2021 | 3,759.73 | | 339.52 | 9.93 | Short-term |
| NANO DIMENSION LTD ADR (NNDM) | Sell.FIFO | 5,000. | 10/7/2021 | 28,445.50 | 10/8/2021 | 28,699.75 | | 254.25 | 0.89 | Short-term |
| NANO DIMENSION LTD ADR (NNDM) | Sell.FIFO | 275. | 10/7/2021 | 1,564.50 | 10/8/2021 | 1,570.21 | | 5.71 | 0.36 | Short-term |
| NANO DIMENSION LTD ADR (NNDM) | Sell.FIFO | 4,725. | 10/7/2021 | 26,881.00 | 10/8/2021 | 26,931.80 | | 50.80 | 0.19 | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 500. | 10/6/2021 | 199.40 | 10/7/2021 | 182.22 | | (17.18) | (8.62) | Short-term |
| NXT-ID INC (NXTD) | Wash Sale Adj | 500. | 10/6/2021 | (17.18) | 10/7/2021 | | | 17.18 | | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 1,510. | 10/6/2021 | 602.19 | 10/7/2021 | 550.23 | | (51.96) | (8.63) | Short-term |
| NXT-ID INC (NXTD) | Wash Sale Adj | 1,510. | 10/6/2021 | (51.96) | 10/7/2021 | | | 51.96 | | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 100. | 10/6/2021 | 39.88 | 10/7/2021 | 36.43 | | (3.45) | (8.65) | Short-term |
| NXT-ID INC (NXTD) | Wash Sale Adj | 100. | 10/6/2021 | (3.45) | 10/7/2021 | | | 3.45 | | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 140. | 10/6/2021 | 55.83 | 10/7/2021 | 50.95 | | (4.88) | (8.74) | Short-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| NXT-ID INC (NXTD) | Wash Sale Adj | 140. | 10/6/2021 | (4.88) | 10/7/2021 | | | 4.88 | | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 16,650. | 10/6/2021 | 6,640.02 | 10/7/2021 | 6,051.93 | | (588.09) | (8.86) | Short-term |
| NXT-ID INC (NXTD) | Wash Sale Adj | 2,500. | 10/6/2021 | (88.30) | 10/7/2021 | | | 88.30 | | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 6,350. | 10/6/2021 | 2,532.38 | 10/7/2021 | 2,307.46 | | (224.92) | (8.88) | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 15. | 10/6/2021 | 6.49 | 10/7/2021 | 5.45 | | (1.04) | (16.02) | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 135. | 10/6/2021 | 58.31 | 10/7/2021 | 49.06 | | (9.25) | (15.86) | Short-term |
| NXT-ID INC (NXTD) | Sell.FIFO | 4,600. | 10/6/2021 | 1,989.12 | 10/7/2021 | 1,671.54 | | (317.58) | (15.97) | Short-term |
| PEDEVCO CORP (PED) | Sell.FIFO | 5,000. | 10/7/2021 | 9,800.00 | 10/8/2021 | 10,399.35 | | 599.35 | 6.12 | Short-term |
| PEDEVCO CORP (PED) | Sell.FIFO | 5,000. | 10/7/2021 | 9,800.00 | 10/8/2021 | 10,599.36 | | 799.36 | 8.16 | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 100. | 10/5/2021 | 2,347.00 | 10/12/2021 | 2,313.98 | | (33.02) | (1.41) | Short-term |
| PLBY GROUP INC (PLBY) | Wash Sale Adj | 100. | 10/5/2021 | (33.02) | 10/12/2021 | | | 33.02 | | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 200. | 10/5/2021 | 4,694.00 | 10/12/2021 | 4,625.96 | | (68.04) | (1.45) | Short-term |
| PLBY GROUP INC (PLBY) | Wash Sale Adj | 200. | 10/5/2021 | (68.04) | 10/12/2021 | | | 68.04 | | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 300. | 10/5/2021 | 7,041.00 | 10/12/2021 | 6,935.93 | | (105.07) | (1.49) | Short-term |
| PLBY GROUP INC (PLBY) | Wash Sale Adj | 208. | 10/5/2021 | (72.85) | 10/12/2021 | | | 72.85 | | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 791. | 10/5/2021 | 18,564.77 | 10/12/2021 | 18,279.92 | | (284.85) | (1.53) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 100. | 10/5/2021 | 2,347.00 | 10/12/2021 | 2,308.98 | | (38.02) | (1.62) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 101. | 10/5/2021 | 2,370.47 | 10/12/2021 | 2,331.06 | | (39.41) | (1.66) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 100. | 10/5/2021 | 2,347.00 | 10/12/2021 | 2,306.98 | | (40.02) | (1.71) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 2,658. | 10/5/2021 | 62,383.26 | 10/12/2021 | 61,292.86 | | (1,090.40) | (1.75) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 142. | 10/5/2021 | 3,332.74 | 10/12/2021 | 3,274.21 | | (58.53) | (1.76) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 58. | 10/5/2021 | 1,376.34 | 10/12/2021 | 1,337.35 | | (38.99) | (2.83) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 250. | 10/5/2021 | 5,934.69 | 10/12/2021 | 5,762.44 | | (172.25) | (2.90) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 100. | 10/5/2021 | 2,374.03 | 10/12/2021 | 2,304.98 | | (69.05) | (2.91) | Short-term |
| PLBY GROUP INC (PLBY) | Sell.FIFO | 100. | 10/5/2021 | 2,372.52 | 10/12/2021 | 2,304.98 | | (67.54) | (2.85) | Short-term |
| PLBY Jan 21 2022 20.0 Put | Sell to Close.FIFO | 10,000. | 10/5/2021 | 22,221.04 | 10/13/2021 | 18,878.66 | | (3,342.38) | (15.04) | Short-term |
| PLBY Jan 21 2022 25.0 Call | Sell to Close.FIFO | 10,000. | 10/5/2021 | 37,021.04 | 10/18/2021 | 33,478.59 | | (3,542.45) | (9.57) | Short-term |
| PLBY Jan 21 2022 25.0 Put | Buy to Close.FIFO | 10,000. | 10/5/2021 | 45,321.04 | 10/13/2021 | 48,678.51 | | 3,357.47 | 7.41 | Short-term |
| PROGENITY INC (PROG) | Sell.FIFO | 6,900. | 10/1/2021 | 14,007.00 | 10/1/2021 | 11,319.95 | | (2,687.05) | (19.18) | Short-term |
| PROGENITY INC (PROG) | Sell.FIFO | 3,100. | 10/1/2021 | 6,291.76 | 10/1/2021 | 5,085.78 | | (1,205.98) | (19.17) | Short-term |
| PIXELWORKS INC (PXLW) | Sell.FIFO | 4,200. | 10/11/2021 | 19,781.58 | 10/13/2021 | 19,151.82 | | (629.76) | (3.18) | Short-term |
| PIXELWORKS INC (PXLW) | Sell.FIFO | 800. | 10/11/2021 | 3,767.84 | 10/13/2021 | 3,647.96 | | (119.88) | (3.18) | Short-term |
| QQQ Dec 17 2021 375.0 Put | Sell to Close.FIFO | 10,000. | 10/19/2021 | 104,521.04 | 10/19/2021 | 104,578.23 | | 57.19 | 0.05 | Short-term |
| QQQ Dec 17 2021 375.0 Put | Sell to Close.FIFO | 700. | 10/19/2021 | 7,300.07 | 10/19/2021 | 7,201.48 | | (98.59) | (1.35) | Short-term |
| QQQ Dec 17 2021 375.0 Put | Sell to Close.FIFO | 9,300. | 10/19/2021 | 96,627.97 | 10/19/2021 | 95,676.76 | | (951.21) | (0.98) | Short-term |
| QQQ Nov 12 2021 358.0 Call | Sell to Close.FIFO | 1,000. | 10/1/2021 | 11,272.10 | 10/1/2021 | 11,697.82 | | 425.72 | 3.78 | Short-term |
| QQQ Nov 12 2021 358.0 Call | Sell to Close.FIFO | 4,000. | 10/1/2021 | 45,088.42 | 10/1/2021 | 46,791.26 | | 1,702.84 | 3.78 | Short-term |
| REGIS CORP MINN (RGS) | Sell.FIFO | 184. | 10/5/2021 | 570.03 | 10/6/2021 | 566.70 | | (3.33) | (0.58) | Short-term |
| REGIS CORP MINN (RGS) | Sell.FIFO | 9,516. | 10/5/2021 | 29,404.44 | 10/6/2021 | 29,307.99 | | (96.45) | (0.33) | Short-term |
| REGIS CORP MINN (RGS) | Sell.FIFO | 300. | 10/5/2021 | 925.50 | 10/6/2021 | 923.96 | | (1.54) | (0.17) | Short-term |
| SAM Nov 19 2021 520.0 Call | Sell to Close.FIFO | 2,000. | 10/6/2021 | 92,004.21 | 10/7/2021 | 101,995.24 | | 9,991.03 | 10.86 | Short-term |
| SAM Oct 15 2021 520.0 Put | Sell to Close.FIFO | 5,000. | 9/27/2021 | 71,760.56 | 10/7/2021 | 19,989.28 | | (51,771.28) | (72.14) | Short-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| SAM Oct 15 2021 530.0 Put | Buy to Close.FIFO | 5,000. | 9/27/2021 | 31,510.52 | 10/7/2021 | 94,238.86 | | 62,728.34 | 199.07 | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 3,700. | 10/7/2021 | 21,904.00 | 10/8/2021 | 21,829.50 | | (74.50) | (0.34) | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 800. | 10/7/2021 | 4,680.00 | 10/8/2021 | 4,719.89 | | 39.89 | 0.85 | Short-term |
| SIENTRA INC (SIEN) | Wash Sale Adj | 3,700. | 10/7/2021 | (74.50) | 10/8/2021 | | | 74.50 | | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 173. | 10/7/2021 | 1,015.53 | 10/8/2021 | 1,020.07 | | 4.54 | 0.45 | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 200. | 10/7/2021 | 1,173.03 | 10/8/2021 | 1,179.26 | | 6.23 | 0.53 | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 127. | 10/7/2021 | 744.24 | 10/8/2021 | 748.84 | | 4.60 | 0.62 | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 373. | 10/7/2021 | 2,185.83 | 10/11/2021 | 2,070.13 | | (115.70) | (5.29) | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 100. | 10/7/2021 | 585.51 | 10/11/2021 | 555.00 | | (30.51) | (5.21) | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 805. | 10/7/2021 | 4,709.36 | 10/11/2021 | 4,467.71 | | (241.65) | (5.13) | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 3,322. | 10/7/2021 | 19,372.74 | 10/11/2021 | 18,436.95 | | (935.79) | (4.83) | Short-term |
| SIENTRA INC (SIEN) | Sell.FIFO | 400. | 10/7/2021 | 2,326.00 | 10/11/2021 | 2,219.98 | | (106.02) | (4.56) | Short-term |
| SENTAGE HOLDINGS INC (SNTG) | Sell.FIFO | 2,453. | 10/14/2021 | 6,206.09 | 10/18/2021 | 5,666.11 | | (539.98) | (8.70) | Short-term |
| SENTAGE HOLDINGS INC (SNTG) | Sell.FIFO | 7,201. | 10/14/2021 | 18,146.52 | 10/18/2021 | 16,633.37 | | (1,513.15) | (8.34) | Short-term |
| SENTAGE HOLDINGS INC (SNTG) | Sell.FIFO | 346. | 10/14/2021 | 871.57 | 10/18/2021 | 799.21 | | (72.36) | (8.30) | Short-term |
| SONIM TECHNOLOGIES INC (SONM) | Sell.FIFO | 10,000. | 10/14/2021 | 20,393.00 | 10/18/2021 | 20,098.71 | | (294.29) | (1.44) | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 1,000. | 10/5/2021 | 6,150.00 | 10/5/2021 | 5,069.95 | | (1,080.05) | (17.56) | Short-term |
| US ENERGY CORP WYO (USEG) | Wash Sale Adj | 1,000. | 10/5/2021 | (1,080.05) | 10/5/2021 | | | 1,080.05 | | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 1,242. | 10/5/2021 | 7,638.30 | 10/5/2021 | 6,296.76 | | (1,341.54) | (17.56) | Short-term |
| US ENERGY CORP WYO (USEG) | Wash Sale Adj | 1,242. | 10/5/2021 | (1,341.54) | 10/5/2021 | | | 1,341.54 | | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 100. | 10/5/2021 | 615.00 | 10/5/2021 | 506.09 | | (108.91) | (17.71) | Short-term |
| US ENERGY CORP WYO (USEG) | Wash Sale Adj | 100. | 10/5/2021 | (108.91) | 10/5/2021 | | | 108.91 | | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 658. | 10/5/2021 | 4,046.70 | 10/5/2021 | 3,329.38 | | (717.32) | (17.73) | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 1,735. | 10/5/2021 | 10,965.36 | 10/5/2021 | 8,778.85 | | (2,186.51) | (19.94) | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 100. | 10/5/2021 | 631.91 | 10/5/2021 | 505.99 | | (125.92) | (19.93) | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 114. | 10/5/2021 | 719.36 | 10/5/2021 | 576.82 | | (142.54) | (19.81) | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 100. | 10/5/2021 | 630.91 | 10/5/2021 | 505.99 | | (124.92) | (19.80) | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 100. | 10/5/2021 | 630.52 | 10/5/2021 | 505.98 | | (124.54) | (19.75) | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 200. | 10/5/2021 | 1,253.36 | 10/5/2021 | 1,011.97 | | (241.39) | (19.26) | Short-term |
| US ENERGY CORP WYO (USEG) | Sell.FIFO | 651. | 10/5/2021 | 3,398.15 | 10/5/2021 | 3,293.97 | | (104.18) | (3.07) | Short-term |
| UVXY Oct 01 2021 24.5 Put* | Sell to Close.FIFO | 2,000. | 10/1/2021 | 1,264.21 | 10/1/2021 | 2,595.74 | | 1,331.53 | 105.33 | Multiple |
| UVXY Oct 01 2021 25.0 Put* | Sell to Close.FIFO | 10,000. | 9/30/2021 | 12,521.13 | 10/1/2021 | 16,978.67 | | 4,457.54 | 35.60 | Multiple |
| UVXY Oct 08 2021 25.0 Put* | Sell to Close.FIFO | 500. | 10/6/2021 | 726.05 | 10/6/2021 | 1,262.93 | | 536.88 | 73.95 | Multiple |
| UVXY Oct 08 2021 25.0 Put* | Sell to Close.FIFO | 500. | 10/6/2021 | 726.05 | 10/6/2021 | 1,259.93 | | 533.88 | 73.53 | Multiple |
| UVXY Oct 15 2021 18.0 Put* | Sell to Close.FIFO | 100. | 10/15/2021 | 24.21 | 10/15/2021 | 2.79 | | (21.42) | (88.48) | Multiple |
| UVXY Oct 15 2021 18.0 Put* | Sell to Close.FIFO | 4,900. | 10/15/2021 | 1,186.31 | 10/15/2021 | 87.59 | | (1,098.72) | (92.62) | Multiple |
| VOYAGER THERAPEUTICS INC (VYGR) | Sell.FIFO | 3,000. | 10/6/2021 | 10,320.00 | 10/6/2021 | 11,699.59 | | 1,379.59 | 13.37 | Short-term |
| YUNJI INC SP ADR (YJ) | Sell.FIFO | 10,000. | 10/15/2021 | 7,300.00 | 10/18/2021 | 7,298.77 | | (1.23) | (0.02) | Short-term |
| YUNJI INC SP ADR (YJ) | Wash Sale Adj | 8,119. | 10/15/2021 | (1.00) | 10/18/2021 | | | 1.00 | | Short-term |
| YUNJI INC SP ADR (YJ) | Sell.FIFO | 10,000. | 10/15/2021 | 7,300.00 | 10/18/2021 | 7,299.77 | | (0.23) | | Short-term |
| YUNJI INC SP ADR (YJ) | Sell.FIFO | 400. | 10/15/2021 | 292.00 | 10/18/2021 | 293.56 | | 1.56 | 0.53 | Short-term |
| YUNJI INC SP ADR (YJ) | Sell.FIFO | 1,481. | 10/15/2021 | 1,081.13 | 10/18/2021 | 1,080.95 | | (0.18) | (0.02) | Short-term |

| Security | Trans type | Qty | Open date | Adj cost | Close date | Adj proceeds | Gain adj | Adj gain($) | Adj gain(%) | Term |
|---|---|---|---|---|---|---|---|---|---|---|
| YUNJI INC SP ADR (YJ) | Sell.FIFO | 3,490. | 10/15/2021 | 2,513.23 | 10/18/2021 | 2,547.27 | | 34.04 | 1.35 | Short-term |
| YUNJI INC SP ADR (YJ) | Sell.FIFO | 717. | 10/15/2021 | 511.24 | 10/18/2021 | 523.33 | | 12.09 | 2.36 | Short-term |
| YUNJI INC SP ADR (YJ) | Sell.FIFO | 2,952. | 10/15/2021 | 2,104.25 | 10/18/2021 | 2,154.60 | | 50.35 | 2.39 | Short-term |
| YUNJI INC SP ADR (YJ) | Sell.FIFO | 960. | 10/15/2021 | 682.58 | 10/18/2021 | 700.68 | | 18.10 | 2.65 | Short-term |
| YATRA ONLINE INC (YTRA) | Sell.FIFO | 6,328. | 10/15/2021 | 12,782.56 | 10/18/2021 | 12,402.70 | | (379.86) | (2.97) | Short-term |
| YATRA ONLINE INC (YTRA) | Wash Sale Adj | 5,183. | 10/15/2021 | (311.13) | 10/18/2021 | | | 311.13 | | Short-term |
| YATRA ONLINE INC (YTRA) | Sell.FIFO | 2,729. | 10/15/2021 | 5,512.58 | 10/18/2021 | 5,430.36 | | (82.22) | (1.49) | Short-term |
| YATRA ONLINE INC (YTRA) | Sell.FIFO | 5,760. | 10/15/2021 | 11,635.20 | 10/18/2021 | 11,288.86 | | (346.34) | (2.98) | Short-term |
| YATRA ONLINE INC (YTRA) | Sell.FIFO | 1,511. | 10/15/2021 | 3,112.70 | 10/18/2021 | 2,961.36 | | (151.34) | (4.86) | Short-term |
| YATRA ONLINE INC (YTRA) | Sell.FIFO | 300. | 10/15/2021 | 618.01 | 10/18/2021 | 604.46 | | (13.55) | (2.19) | Short-term |
| YATRA ONLINE INC (YTRA) | Sell.FIFO | 200. | 10/15/2021 | 412.01 | 10/18/2021 | 402.18 | | (9.83) | (2.39) | Short-term |
| YATRA ONLINE INC (YTRA) | Sell.FIFO | 3,072. | 10/15/2021 | 6,328.40 | 10/18/2021 | 6,174.32 | | (154.08) | (2.43) | Short-term |
| YATRA ONLINE INC (YTRA) | Sell.FIFO | 100. | 10/15/2021 | 205.51 | 10/18/2021 | 200.99 | | (4.52) | (2.20) | Short-term |
| ZIVO BIOSCIENCE INC (ZIVO) | Sell.FIFO | 410. | 10/18/2021 | 1,783.25 | 10/18/2021 | 1,668.65 | | (114.60) | (6.43) | Short-term |
| ZIVO BIOSCIENCE INC (ZIVO) | Sell.FIFO | 25. | 10/18/2021 | 108.74 | 10/18/2021 | 101.50 | | (7.24) | (6.66) | Short-term |
| ZIVO BIOSCIENCE INC (ZIVO) | Sell.FIFO | 845. | 10/18/2021 | 3,675.24 | 10/18/2021 | 3,422.20 | | (253.04) | (6.88) | Short-term |
| ZIVO BIOSCIENCE INC (ZIVO) | Sell.FIFO | 470. | 10/18/2021 | 2,044.22 | 10/18/2021 | 1,894.03 | | (150.19) | (7.35) | Short-term |
| ZIVO BIOSCIENCE INC (ZIVO) | Sell.FIFO | 450. | 10/18/2021 | 1,957.23 | 10/18/2021 | 1,808.94 | | (148.29) | (7.58) | Short-term |
| ZIVO BIOSCIENCE INC (ZIVO) | Sell.FIFO | 2,800. | 10/18/2021 | 12,178.32 | 10/18/2021 | 11,227.61 | | (950.71) | (7.81) | Short-term |
| ZM Oct 22 2021 252.5 Put | Sell to Close.FIFO | 600. | 10/11/2021 | 2,810.06 | 10/13/2021 | 1,528.72 | | (1,281.34) | (45.60) | Short-term |
| ZM Oct 22 2021 252.5 Put | Sell to Close.FIFO | 9,400. | 10/11/2021 | 42,770.98 | 10/13/2021 | 23,949.91 | | (18,821.07) | (44.00) | Short-term |
| ZM Oct 22 2021 257.5 Put | Buy to Close.FIFO | 600. | 10/11/2021 | 2,311.26 | 10/13/2021 | 3,969.90 | | 1,658.64 | 71.76 | Short-term |
| ZM Oct 22 2021 257.5 Put | Buy to Close.FIFO | 9,400. | 10/11/2021 | 36,209.78 | 10/13/2021 | 61,568.52 | | 25,358.74 | 70.03 | Short-term |
| Total: | | | | 12,249,817.39 | | 13,139,154.20 | | 889,336.81 | 7.26 | |